ROBBINS GELLER RUDMAN
  & DOWD LLP
DARREN J. ROBBINS (168593)
DARRYL J. ALVARADO (253213)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
darrenr@rgrdlaw.com
dalvarado@rgrdlaw.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| YORK COUNTY ON BEHALF OF THE COUNTY OF YORK RETIREMENT FUND, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> HP INC., DION J. WEISLER and CATHERINE A. LESJAK, <br><br> Defendants. | Case No. <br><br> <u>CLASS ACTION</u> <br><br> COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS <br><br><br><br><br> <u>DEMAND FOR JURY TRIAL</u> |

1    Plaintiff York County on behalf of the County of York Retirement Fund ("plaintiff"),

2  individually and on behalf of all others similarly situated, by plaintiff's undersigned counsel,

3  alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts and

4  upon investigation as to all other matters conducted by and through plaintiff's counsel, which

5  included, among other things, a review of Securities and Exchange Commission ("SEC") filings

6  by HP Inc. ("HP" or the "Company"), as well as media and analyst reports about the Company.

7  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set

8  forth herein after a reasonable opportunity for discovery.

9                    **BACKGROUND AND OVERVIEW**

10    1.    This is a securities fraud class action on behalf of all purchasers of HP common

11  stock between November 6, 2015 and June 21, 2016, inclusive (the "Class Period").  This action

12  is brought against HP, its former Chief Executive Officer ("CEO"), Dion J. Weisler ("Weisler"),

13  and its former Chief Financial Officer ("CFO"), Catherine A. Lesjak ("Lesjak"), for violations of

14  the Securities Exchange Act of 1934 ("1934 Act") and SEC Rule 10b-5, promulgated thereunder.

15    2.    HP provides personal computers, printers, and related supplies, solutions, and

16  services.  The Company conducts business primarily through two segments: Printing and Personal

17  Systems.  The Printing segment provides consumer and commercial printer hardware, supplies,

18  solutions, and services.   The Personal Systems segment provides commercial and consumer

19  computers and related software, support, and services.

20    3.    HP began operations after spinning off from Hewlett Packard Enterprise Company

21  ("HPE") on or about November 1, 2015.  Following the spinoff, HP operated the Printing and

22  Personal Systems businesses, while HPE retained the enterprise technology infrastructure,

23  software, services, and financing businesses.

24    4.    Within HP's Printing segment is the Supplies division.  The Supplies division

25  consists of printing and computing supplies, such as toner, ink cartridges, and related printing

26  supplies. During the Class Period, the Supplies division of the Printing business was HP's primary

27  driver of revenues and profits.  As HP put it, "it's all about supplies."  HP also explained that

28  nearly 80% of its operating profit stemmed from the Printing business, "driven largely by

1  supplies."  As one analyst put it, "I'll say it – . . . supplies are 100% of the profits of HP Inc."

2  Thus, the Printing business, and the Supplies division in particular, were critical to HP's success

3  during the Class Period.

4       5.     During the Class Period, HP, Weisler, and Lesjak misrepresented the Company's

5  business and financial condition by issuing false and misleading statements regarding the

6  Company's financial performance, and particularly the Company's revenue, profit margin, and

7  earnings.  Specifically, the Company provided positive financial results, but misrepresented and

8  omitted to state that its Supplies channel inventory management and sales practices had resulted

9  in increased channel inventory and decreased revenues and profits.

10       6.     On November 5, 2015, following its spinoff from HPE, the Company announced

11  its financial results, including revenues, profit margins, and earnings.  *See* ¶26, *infra*.  The

12  Company blamed slightly reduced revenues and profit margins on "competitive pricing pressures."

13  *Id.*

14       7.     On November 24, 2015, the Company announced marginal decreased Supplies

15  revenue but reassured the market that Supplies revenue was "stabiliz[ing]."  *See* ¶29, *infra*.

16  Following this announcement, the price of HP stock declined 14% to a closing price of $12.64 per

17  share on November 25, 2015, on trading volume of 72 million shares.  *See* ¶30, *infra*.

18       8.     On December 16, 2015, the Company announced reductions in Printing revenue

19  and margin but blamed the declines on "unfavorable currency impacts" and "competitive pricing,"

20  respectively.  *See* ¶31, *infra*.

21       9.     On January 7, 2016, Wells Fargo downgraded HP stock, noting "near-term

22  challenges in the core businesses – currency, soft PC/printer demand . . . lower supplies demand

23  with stabilization only coming in H2 17."  *See* ¶33, *infra*.  Following this announcement, the price

24  of HP stock declined 4.6% to a closing price of $10.77 per share on January 7, 2016, on trading

25  volume of 25.5 million shares.  *See* ¶34, *infra*.

26       10.    On February 24, 2016, HP announced disappointing first quarter 2016 financial

27  results.  On the accompanying earnings call, defendant Weisler attributed the results to "channel

28  inventory adjustments" and defendant Lesjak noted that "[s]upplies channel inventory was slightly

1    above the range."  *See* ¶¶36-37, *infra*.  Following this announcement, the price of HP stock

2    declined 4.4% to a closing price of $10.34 per share on February 25, 2016, on trading volume of

3    35.6 million shares.  *See* ¶38, *infra*.

4    　　　　　11.    On March 1, 2016, defendant Lesjak spoke at the Morgan Stanley Technology,

5    Media & Telecom Conference.  During the conference, defendant Lesjak referred to prior Supplies

6    channel inventory corrections, but stated that the Company does "not expect [those] to repeat in

7    the second half" of 2016.  *See* ¶39, *infra*.

8    　　　　　12.    On March 3, 2016, the Company announced reduced Printing revenue but blamed

9    the decline on "unfavorable currency impacts and competitive pricing pressures in part due to[]

10   weak market demand and economic slowdown."  *See* ¶40, *infra*.

11   　　　　　13.    On May 25, 2016, the Company announced second quarter 2016 financial results.

12   On the accompanying earnings call, defendant Lesjak noted a reduction in Supplies revenue, but

13   stated "the supplies revenue trajectory has improved," and defendant Weisler stated that channel

14   inventory "is now back within the ranges globally, and that's obviously, where we want it to be."

15   *See* ¶¶42-43, *infra*.

16   　　　　　14.    On June 3, 2016, the Company announced decreased Printing revenue due to "weak

17   demand, unfavorable currency impacts and competitive pricing pressures" and decreased Supplies

18   revenue due to a "reduction in channel inventory, unfavorable currency impacts combined with

19   weak market demand and a competitive pricing environment."  *See* ¶44, *infra*.

20   　　　　　15.    Defendants' representations about HP's revenues, profits, and prospects were each

21   false and misleading when made.  The true facts, which were then known to or recklessly

22   disregarded by defendants HP, Weisler, and Lesjak, included:

23   　　　　　　　　　(a)    HP's channel inventory management and sales practices resulted in the sale

24   of supplies to customers that did not need or want the product in order to artificially increase

25   revenues and profits;

26   　　　　　　　　　(b)    HP's channel inventory management and sales practices resulted in the sale

27   of supplies to customers outside of designated regions at unsustainable discounts in order to

28   artificially increase revenues and profits;

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                                           - 3 -

(c) HP's channel inventory management and sales practices resulted in the sale of supplies at steep discounts to customers to encourage those customers to sell the supplies further down the supply channel, out of HP's inventory management metrics; and

(d) as a result of (a)-(c) above, defendants' statements about HP's business condition and prospects were materially false and misleading when made.

16. On June 21, 2016, the Company announced an overhaul to its Printing sales model and revealed that it would reduce Supplies channel inventory by $450 million, resulting in a corresponding reduction of $450 million in Supplies revenue over the remainder of 2016. *See* ¶46, *infra*. Following this announcement, the price of HP stock declined 5.4% to a closing price of $12.61 per share on June 22, 2016, on trading volume of 18.3 million shares. *See* ¶50, *infra*.

## JURISDICTION AND VENUE

17. The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

18. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act.

19. Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and §27 of the 1934 Act. Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this District. In addition, the Company's principal executive offices are located in this District.

20. In connection with the acts, transactions, and conduct alleged herein, defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the U.S. mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

21. Plaintiff York County on behalf of the County of York Retirement Fund purchased HP common stock during the Class Period, as described in the certification attached hereto and incorporated herein, and suffered damages as a result of the violations of the federal securities laws alleged herein.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                          - 4 -

1   22.   Defendant HP Inc. is a Delaware corporation with its principal executive offices

2   located in Palo Alto, California.  HP common stock trades on the New York Stock Exchange

3   ("NYSE") under the symbol "HPQ."

4   23.   Defendant Dion J. Weisler ("Weisler") served as CEO of HP during the Class

5   Period.

6   24.   Defendant Catherine A. Lesjak ("Lesjak") served as CFO of HP during the Class

7   Period.

8   25.   Defendants Weisler and Lesjak (collectively, the "Individual Defendants"),

9   because of their positions with the Company, possessed the power and authority to control the

10   contents of the Company's reports to the SEC, press releases, and presentations to securities

11   analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.   The

12   Individual Defendants were provided with copies of the Company's reports and press releases

13   alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and

14   opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and

15   access to material non-public information available to them, the Individual Defendants knew that

16   the adverse facts specified herein had not been disclosed to, and were being concealed from, the

17   public, and that the positive representations that were being made were then materially false and/or

18   misleading.  The Individual Defendants are liable for the false statements pleaded herein.

19   **SUBSTANTIVE ALLEGATIONS**

20   26.   On November 5, 2015, after the market closed, HP filed a Form 8-K with the SEC

21   that included pro forma consolidated financial statements reflecting HP's revenue, gross margin,

22   and profit following the Company's spinoff from HPE.  The November 5, 2015 Form 8-K

23   incorporated by reference the consolidated financial statements, accompanying notes, and

24   Management's Discussion and Analysis of Financial Condition and Results of Operations

25   ("MD&A") from the Form 10-Q for the third quarter of fiscal 2015 ("Q3 2015"), ended July 31,

26   2015.  The Form 8-K and incorporated financial statements, accompanying notes, and MD&A

27   included the following financial results and disclosures:

28

- For the nine months ended July 31, 2015, HP reported Pro Forma Product revenue of $37.8 billion, gross margin of 19.3%, and operating profit of $36 billion.

- Printing Supplies net revenue of $3.5 billion for Q3 2015 and $10.7 billion for the nine months ended July 31, 2015.

- Gross margin of 23.8% for Q3 2015 and 23.7% for the nine months ended July 31, 2015, "due primarily to competitive pricing pressures in Printing."

- Printing net revenue of $5.1 billion for Q3 2015 and $16.1 billion for the nine months ended July 31, 2015, impacted by competitive pricing pressures.

- Printing earnings from operations of $910 million for Q3 2015 and $3 billion for the nine months ended July 31, 2015.

- Printing earnings from operations as a percentage of net revenue of 17.8% for Q3 2015 and 18.5% for the nine months ended July 31, 2015.

27.    The November 5, 2015 Form 8-K and incorporated financial statements, accompanying notes, and MD&A also stated:

- In Printing, we are experiencing the impact of the growth in mobility and demand challenges in consumer and commercial markets.  We are also experiencing an overall competitive pricing environment due to aggressive pricing from our Japanese competitors, given the weakness of the Japanese Yen. . . .  In the consumer market, our Ink in the Office products are driving unit volume due to demand for our OfficeJet Pro product lines, particularly our OfficeJet Pro X printers which leverage our Page-Wide Array technology.  The Ink in the Office initiative targets shifting ink into SMBs more profitably.  In the commercial market, our focus is on placing higher value printer units which also offers a positive annuity of toner and ink and accelerating growth in graphics.  We are accomplishing this in several growth areas: in multi-function and Enterprise Ink printers with recently introduced products that are increasing demand, in managed print services, which presents a strong after-market supplies opportunity, and in graphics with product innovation in our Indigo product line.

                        *         *         *

    We use a variety of distribution methods to sell our products and services, including third-party resellers and distributors and both direct and indirect sales to enterprise accounts and consumers.  Successfully managing the interaction of our direct and indirect channel efforts to reach various potential customer segments for our products and services is a complex process.  Moreover, since each distribution method has distinct risks and gross margins, our failure to implement the most advantageous balance in the delivery model for our products and services could adversely affect our revenue and gross margins and therefore our profitability.

28.    On November 24, 2015,  HP issued a release announcing its financial results for the fourth quarter of fiscal 2015 ("Q4 2015") and fiscal year 2015 ("FY 2015") ended October 31,

2015.  The Company reported the following financial results: Printing segment net revenue of $5 billion for Q4 2015 and $21.2 billion for FY 2015; Supplies net revenue of $3.2 billion for Q4 2015 and $14 billion for FY 2015; and operating profit margin of 17.4% for Q4 2015.

29.     On the accompanying earnings call on November 24, 2015, defendant Weisler stated that the Company "expect[s] the stabilization in ink supplies revenue to be delayed towards the end of 2017."  During the same call, defendant Lesjak discussed channel inventory, stating that "[f]rom a channel inventory perspective, we've reduced both hardware and supplies levels year-over-year and sequentially, but we are still slightly above target weeks of supply range for supplies."

30.     Following the release of the Q4 2015 and FY 2015 results, HP's stock price declined 14% to a closing price of $12.64 per share on November 25, 2015, on trading volume of 72 million shares.  However, defendants' positive statements about the Supplies business and their failure to disclose the improper channel inventory management and sales practices kept the stock from dropping further.  For example, defendant Lesjak represented on the conference call that HP had reduced Supplies channel inventory "year-over-year and sequentially."  In addition, defendant Weisler reassured investors that the Company would "improve the supplies revenue trajectory" by "driving programs to increase ink usage and to increase after-market supply share."

31.     On December 16, 2015, HP filed its annual report on Form 10-K with the SEC for the fiscal year ended October 31, 2015.  The Form 10-K reported Printing net revenue of $21.2 billion and included the following financial results and disclosures relating to the Printing business:

- Printing gross margin decreased due primarily to a competitive pricing environment in hardware and unfavorable currency impacts . . . .

                    *       *       *

   Printing net revenue decreased 8.5% (decreased 5.1% on a constant currency basis) for fiscal 2015.  The decline in net revenue was due primarily to unfavorable currency impacts, decline in Supplies, weak market demand and competitive pricing pressures, the effects of which were partially offset by growth in graphics products.

32.     The December 16, 2015 Form 10-K also reported Supplies net revenue of $14 billion and included the following financial results and disclosures relating to the Printing business and its Supplies segment:

> Net revenue for Supplies decreased 6% due primarily to unfavorable currency impacts and demand weakness in toner and ink, partially offset by growth in graphics supplies. . . .

> Printing earnings from operations as a percentage of net revenue remained flat for fiscal 2015 due to a decline in gross margin, offset by lower operating expenses as a percentage of net revenue.  The decline in gross margin was due primarily to a competitive pricing environment in hardware and unfavorable currency impacts, the effects of which were partially offset by a favorable mix of ink and graphics supplies and favorable currency impacts from the Japanese yen.

33.     On January 7, 2016, Wells Fargo downgraded HP stock.  The Wells Fargo analyst report stated, in relevant part:

> • **We are downgrading HPQ to Market Perform from Outperform** . . . . [W]e believe more material growth is unlikely until FY17 while pressures in the traditional PC and printer segments are likely to continue in FY16.  While FY16 guidance of $1.59-$1.69 may still be achievable, we believe there is higher execution risk given fewer top line tailwinds then when it originally gave the guidance at its analyst day.
>
> *          *          *
>
> Following our meetings with HP Inc.'s management at CES, we believe the company has the right long-term strategy to focus on the higher margin adjacent businesses . . . .
>
> That said, we see near-term challenges in the core businesses – currency, soft PC/printer demand (outside of graphics), lower supplies demand with stabilization only coming in H2 17 . . . .

34.     Following the release of the Wells Fargo analyst report, the price of HP stock declined 4.6% to close of $10.77 per share on January 7, 2016, on trading volume of 25.5 million shares.

35.     On February 24, 2016, HP issued a release announcing its financial results for the first quarter of fiscal 2016 ("Q1 2016"), ended January 31, 2016.  On the same day, the Company held a conference call for analysts, media representatives, and investors, hosted by defendants Weisler and Lesjak.  The Company reported Printing net revenue of $4.6 billion; Supplies net revenue of $3.1 billion; and operating profit margin of 17%.

36.     During the earnings call on February 24, 2016, defendant Weisler  stated:

Shifting to supplies, the year over year revenue was down 8% in constant currency. The factors driving the decline that were expected going into the quarter were install-base erosion from declining hardware sales and channel inventory adjustments. The factors that varied from our plan were pricing and after-market share.

Supplies pricing was up, given adjustments we made to offset some of the unfavorable currency, but not as much as planned, given necessary discounting in the quarter to combat after-market alternatives. Our after-market share was more pressured than expected for toner.

37.     On the same call, defendant Lesjak stated:

Supplies channel inventory was slightly above the range . . . .

*        *        *

Our reported supplies revenue is expected to decline double digits year over year, which is incorporated in our outlook of the stabilization in constant currency by the end of 2017.

*        *        *

[F]rom a channel inventory perspective on the hardware side, we are in a very healthy position. And so there shouldn't be any more channel inventory hardware units adjusted, that need to be adjusted. On the supplies side, we are still slightly above our targeted range, and so we do need some additional channel inventory correction in Q2, but we will be through that in – by the end of the first half.

*        *        *

On the printing side, really the margin – so we delivered a margin of 17%, down 1.8 points. And the pressure there was really around very competitive pricing environment related to currency.

38.     Following the February 24, 2016 announcements, HP's stock price declined 4.4% to close at $10.34 per share on February 25, 2016, on trading volume of 35.6 million shares. However, defendants' positive statements about the outlook for the Supplies business and their failure to disclose the full extent of the improper channel inventory management and sales practices kept the stock from dropping further. For example, defendant Lesjak represented on the conference call that HP had reduced the Supplies channel inventory "both year over year and sequentially" and that correction in channel inventory would be completed "by the end of the first half." Defendant Lesjak also stated that, "[a]lthough the [Supplies] business remained challenged, we made solid progress on our core and growth initiatives."

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                        - 9 -

1    39.    On March 1, 2016, defendant Lesjak spoke at the Morgan Stanley Technology,

2    Media & Telecom Conference.  Defendant Lesjak addressed HP's earnings per share and free cash

3    flow guidance for fiscal year 2016 and stated, in relevant part, that "[t]he other assumption

4    [incorporated in the guidance] is that from a print perspective, specifically around supplies in the

5    first half, we are taking fairly significant channel inventory correction.  And those we do not expect

6    to repeat in the second half, which changes the constant currency kind of revenue growth trajectory

7    of supplies in the back half as well."

8    40.    On March 3, 2016, HP filed a Form 10-Q with the SEC for Q1 2016, ended January

9    31, 2016.  The Form 10-Q reported Printing net revenue of $4.6 billion and Supplies net revenue

10   of $3.1 billion.  The Form 10-Q also stated:

11   • In Printing, we are experiencing the impact of demand challenges in
     consumer and commercial markets.  We are also experiencing an overall
12   competitive pricing environment due to aggressive pricing from our
     Japanese competitors, given the weakness of the Japanese yen.

13                           *       *       *

14   Printing net revenue decreased 17.0% (decreased 10.7% on a constant
15   currency basis) for the three months ended January 31, 2016 as compared to the
     prior-year period.  The decline in net revenue was primarily driven by unfavorable
16   currency impacts and competitive pricing pressures in part due to[] weak market
     demand and economic slowdown. . . .  Net revenue for Supplies decreased 14% due
17   primarily to unfavorable currency impacts, demand weakness and a competitive
     pricing environment.

18                           *       *       *

19
20   Printing earnings from operations as a percentage of net revenue decreased
     by 1.8 percentage points for the three months ended January 31, 2016 as compared
21   to the prior-year period due to a decline in gross margin and an increase in operating
     expenses as a percentage of net revenue.  The gross margin decline was due
22   primarily to unfavorable currency impacts and competitive pricing across LaserJet
     and Inkjet businesses, partially offset by a higher proportion of ink and graphics
23   supplies sales.

24   41.    On May 25, 2016, HP issued a release announcing its financial results for the

25   second fiscal quarter of 2016 ("Q2 2016"), ended April 30, 2016.  On the same day, the Company

26   held a conference call for analysts, media representatives, and investors, hosted by defendants

27   Weisler and Lesjak.  The Company reported Printing net revenue of $4.6 billion; Supplies net

28   revenue of $3.1 billion; and operating profit margin of 17.3%.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                    - 10 -

42.     On the accompanying earnings call on May 25, 2016, defendant Weisler stated, in relevant part:

> Let me also highlight that we made this progress [in supply share], while reducing hardware and supplies channel inventory globally.  We are now within our targeted ranges.  And given our progress, we still expect our supplies revenue trajectory in constant currency to stabilize by the end of 2017.
>
> *        *        *
>
> Our supply trajectory improved, but it was somewhat masked by the channel inventory reductions that we had.  Supplies inventory is now back within the ranges globally, and that's obviously, where we want it to be.

43.     On the same call, defendant Lesjak stated, in relevant part:

> Supplies revenue was down 16% year over year as reported, or down 10% in constant currency.  Considering currency and the channel inventory position, the supplies revenue trajectory has improved.
>
> *        *        *
>
> And then, we also – we took our channel, our supplies channel and inventory levels down even a bit further than what we had originally intended, because we believed that managing, having a tight handle on the channel inventory levels is good for our business.
>
> *        *        *
>
> On the supplies, I think the right way to think about it is, a 16% decline in supplies revenue.  The fact that there was 6 points of currency.  So you're down to – down 10% constant currency, but you've got 7 points of channel inventory correction that our belief is, you don't continue to correct channel inventory on a go forward basis. So really, when you are looking at, what I guess, we sometimes refer to as real supplies growth or decline, right about minus 3.  And we obviously, as we go through 2017, we would expect that will continue to improve, so it stabilizes by the end of 2017.

44.     On June 3, 2016, HP filed a Form 10-Q with the SEC for Q2 2016, ended April 30, 2016.  The Form 10-Q reported Printing net revenue of $4.6 billion and Supplies net revenue of $3.1 billion.  The Form 10-Q also stated:

> •   In Printing, we are experiencing the impact of demand challenges in consumer and commercial markets.  We are also experiencing an overall competitive pricing environment due to aggressive pricing from our Japanese competitors.
>
> *        *        *
>
> Printing net revenue decreased 15.8% (decreased 10.3% on a constant currency basis) for the three months ended April 30, 2016 as compared to the prior-year period.  The decline in net revenue was primarily driven by weak demand,

unfavorable currency impacts and competitive pricing pressures. These factors resulted in a net revenue decline across Supplies and Commercial and Consumer printers. Net revenue for Supplies decreased 16% due primarily to reduction in channel inventory, unfavorable currency impacts combined with weak market demand and a competitive pricing environment.

\*   \*   \*

Printing earnings from operations as a percentage of net revenue decreased by 0.5 percentage points for the three months ended April 30, 2016 as compared to the prior-year period due to a decline in gross margin and an increase in operating expenses as a percentage of net revenue. The gross margin decline was due primarily to net unfavorable currency impacts and a competitive pricing environment, the effects of which were partially offset by operational improvements, higher proportion of graphics supplies and favorable mix of Inkjet printers.

45. Defendants' representations about HP's revenues, profits, and prospects were each false and misleading when made. The true facts, which were then known to or recklessly disregarded by defendants HP, Weisler, and Lesjak, included:

(a) HP's channel inventory management and sales practices resulted in the sale of supplies to customers that did not need or want the product in order to artificially increase revenues and profits;

(b) HP's channel inventory management and sales practices resulted in the sale of supplies to customers outside of designated regions at unsustainable discounts in order to artificially increase revenues and profits;

(c) HP's channel inventory management and sales practices resulted in the sale of supplies at steep discounts to customers to encourage those customers to sell the supplies further down the supply channel, out of HP's inventory management metrics; and

(d) as a result of (a)-(c) above, defendants' statements about HP's business condition and prospects were materially false and misleading when made.

46. Then, after the market closed on June 21, 2016, HP held a conference call for analysts and investors to announce a change to its Printing sales model. On the conference call, HP revealed that it would reduce Supplies channel inventory by $450 million and, as a result, Supplies revenue would be reduced by $450 million over the second half of fiscal 2016. During the call, defendant Weisler stated:

[W]e are going to make a one-time investment to reduce the level of supplies inventory across the channels.  Our goal is to achieve substantially all of the reduction over two quarters.  This will support our strategy of maintaining a more consistent value proposition by shifting from today's push model to a pull model driven by market demand. . . .  We will focus more on selling through the value of our branded supplies products and less through promotions and pricing.

47.   On  the same call, defendant Lesjak stated:

I'll turn now to the supplies update.  As I said on the Q2 earnings call, we exited the quarter within our targeted ranges for supplies channel inventory.  However, we have spent significant time evaluating what we believe those levels need to be to mitigate the market challenges Dion mentioned.  I am also convinced an operational change is required to manage the business differently going forward, which includes one-time investment to reduce the supplies channel inventory levels globally over the second half of fiscal 2016, as well as incremental marketing investments.  As a result of the channel inventory reduction, the supplies net revenue in reported currency is expected to be reduced by approximately $225 million in each of Q3 and Q4.

48.   On the same call, Enrique Lores ("Lores"), then the President of Imaging & Printing, explained:

We are taking four actions.  First, we will reduce Tier 1 and Tier 2 supplies channel inventory levels during Q3 and Q4. Following these one-time reductions of inventory, we will reduce and tighten the desired ranges for ink and toner in each region.  It will be critical, as it is today, for me to hold the sales teams accountable to remain within the ranges going forward.  You can expect us to report on this during the quarterly earnings calls, as we have done in the past.

Second, towards further control, we will align channel compensation and programs to a market demand selling motion and will shift from compensating on sell-in to a combination of sell-through and sell-out volumes.

Third, as Dion discussed, we are changing our pricing policy to achieve better consistency of pricing globally.  The pricing and promotion decisions on HP supplies will now be managed centrally at the global and regional levels to align timing and to maintain our value position.  We will reduce the frequency and discount levels of inducive promotions and eliminate low-value and channel promotions. . . .

Finally, by shifting some investment dollars from price promotions to inducive marketing we will be able to demonstrate the value of HP Original Supplies, creating loyalty and supplies share.  Taking these actions now is critical to effectively respond to the changes we are experiencing in the global market and to drive the long-term health of the printing business.

49.   In response to analysts' questions on the call, defendants Weisler and Lesjak also stated, in relevant part:

[Wamsi Mohan – Bank of America Merrill Lynch – Analyst:]  Yes, thank you.  Dion, can you help us then through the magnitude of this reduction to your

overall supplies inventory and how did you determine that this is the right level of inventory? . . .

[Defendant Weisler:]  So we've done a significant amount of analysis through the collection of big data.  We've spoken at length to our channel partners.  We've analyzed all areas of the business to determine what generates – both at a Tier 1 level and a Tier 2 level, what generates market demand so that we move from this push model to a pull model.  So we're fairly confident that the sums that we've talked about in the prepared remarks are the right amount of inventory to reduce in order to effect that pivoting model

\*      \*      \*

[Wamsi Mohan – Bank of America Merrill Lynch – Analyst:]  And the magnitude of the reduction relative to your overall supplies inventory out there?

[Defendant Lesjak:]  I would say it's fairly material because as I mentioned, it's about $450 million over a couple of quarters here, $225 million each quarter in terms of revenue.  So it's a fairly substantial change to channel inventory.

\*      \*      \*

[Toni Sacconaghi – Bernstein – Analyst:]  And then secondly, we had an earnings call less than four weeks ago and you said you were comfortable with supplies inventory levels.  Given all the analysis that you have done on this, I'm surprised you said that statement so unequivocally, given that you are now basically coming back to us and saying that's not the right supplies channel inventory level for the new economic reality of what supplies is today.  So did you have an inkling, in which case why didn't you share that with us?  Or has the market changed at all in the last four weeks that has changed your perception of where inventory levels need to be?

\*      \*      \*

[Defendant Weisler:]  On the second question, Toni, I would say that we've said that the separation would provide opportunities to optimize our business as we balance focus on short- and long-term operational decisions.  We believe this is the right thing to do now for the long-term stability and profitability of the printing business.  An operational shift towards a market-driven demand model is going to deliver lower inventories and increased efficiencies across the system, ultimately resulting in greater stability and predictability in the supplies revenue.

\*      \*      \*

[Maynard Um – Wells Fargo – Analyst:]  Can you just talk about the confidence you have in the increased marketing driving sales, maybe dive a little bit deeper into that?  Then the three-year payback period on the investment is probably a little bit longer than I would have anticipated.  Can you just maybe walk us through what we should be expecting over those three years and how the benefits flow through?

\*      \*      \*

[Defendant Lesjak:]  The first [benefit] is that with the incremental marketing and really driving sales on the basis of the value, we do expect that over time our share,

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                                          - 14 -

our HP branded aftermarket supply share will go up and that of course will contribute incremental margins. But it's not an immediate effect. So it will take some time for that to ramp.

Then the second benefit is just the fact that we will not be paying as many discount dollars to get the product into the channel and then to move it out of the channel. So in total, we will have lower discounts and that also contributes to the payback.

50. Following the June 21, 2016 call, the price of HP stock declined 5.4% to close at $12.61 per share on June 22, 2016, on trading volume of 18.3 million shares.

51. Although defendants attributed the channel inventory issues and revenue and margin reductions to unfavorable currency impacts, competitive pricing pressure, and a change in inventory modeling, on September 30, 2020, the SEC issued a cease and desist order that revealed the Company's improper Class Period channel inventory management and sales practices.

**LOSS CAUSATION/ECONOMIC LOSS**

52. During the Class Period, as detailed herein, defendants made false and misleading statements and/or engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of HP stock and operated as a fraud or deceit on Class Period purchasers of HP stock. As defendants' misrepresentations and fraudulent conduct became apparent to the market, the price of HP stock fell precipitously, as the prior artificial inflation came out of the price. As a result of their purchases of HP stock during the Class Period, plaintiff and other members of the Class (as defined below) suffered economic loss, *i.e.*, damages, under the federal securities laws.

**CLASS ACTION ALLEGATIONS**

53. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of HP common stock during the Class Period who were damaged thereby (the "Class"). Excluded from the Class are defendants' and their immediate families, the officers and directors of the Company, at all relevant times, and members of their immediate families, the legal representatives, heirs, successors, or assigns of any of the foregoing, and any entity in which defendants have or had a controlling interest.

54.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, HP stock was actively traded on the NYSE.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Millions of shares of HP common stock were traded publicly during the Class Period on the NYSE.  Record owners and other members of the Class may be identified from records maintained by HP or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

55.     Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law as complained of herein.

56.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

57.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     whether statements made by defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of HP; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

58.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden

1   of individual litigation make it impossible for members of the Class to individually redress the

2   wrongs done to them.  There will be no difficulty in the management of this action as a class action.

3   **APPLICABILITY OF FRAUD-ON-THE-MARKET PRESUMPTION**

4       59.    The market for HP stock was open, well-developed and efficient at all relevant

5   times.  As a result of the materially false and/or misleading statements and/or failures to disclose,

6   HP stock traded at artificially inflated prices during the Class Period.  Plaintiff and other members

7   of the Class purchased the Company's stock relying upon the integrity of the market price of HP

8   stock and market information relating to HP, and have been damaged thereby.

9       60.    During the Class Period, the artificial inflation in the price of HP stock was caused

10  by the material misrepresentations and/or omissions particularized in this complaint, which caused

11  the damages sustained by plaintiff and other members of the Class.  As described herein, during

12  the Class Period, defendants made or caused to be made a series of materially false and/or

13  misleading statements about HP's business, prospects, and operations.   These material

14  misstatements and/or omissions created an unrealistically positive assessment of HP and its

15  business, operations, and prospects, thus causing the price of the Company's stock to be artificially

16  inflated at all relevant times, and, when the truth was disclosed, the value of the Company's stock

17  was negatively affected.  Defendants' materially false and/or misleading statements during the

18  Class Period resulted in plaintiff and other members of the Class purchasing HP stock at artificially

19  inflated prices, and each of them has been damaged as a result.

20      61.    At all relevant times, the market for HP stock was an efficient market for the

21  following reasons, among others:

22      (a)    HP stock met the requirements for listing and was listed and actively traded

23  on the NYSE, a highly efficient and automated market;

24      (b)    As a regulated issuer, HP filed periodic public reports with the SEC and/or

25  the NYSE;

26      (c)    HP regularly communicated with public investors via established market

27  communication mechanisms, including through the regular dissemination of press releases on

28

national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)     HP was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

62.     As a result of the foregoing, the market for HP stock promptly digested current information regarding HP from all publicly available sources and reflected such information in HP's stock price.  Under these circumstances, all purchasers of HP stock during the Class Period suffered similar injury through their purchase of HP stock at artificially inflated prices and a presumption of reliance applies.

63.     A class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on defendants' material misstatements and/or omissions.  Because this action involves defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects – information that defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the material misstatements and omissions set forth above, that requirement is satisfied here.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

64.     Plaintiff incorporates herein each and every allegation contained above.

65.     During the Class Period, defendants engaged in a scheme and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including plaintiff and other Class members, as alleged herein; and (ii) cause plaintiff and other

1    members of the Class to purchase HP stock at artificially inflated prices.  In furtherance of this

2    unlawful scheme, plan, and course of conduct, defendants, and each of them, took the actions set

3    forth herein.

4        66.     Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made

5    untrue statements of material fact and/or omitted to state material facts necessary to make the

6    statements made not misleading; and (iii) engaged in acts, practices, and a course of business that

7    operated as a fraud and deceit upon the purchasers of the Company's stock in an effort to maintain

8    artificially high market prices for HP stock in violation of §10(b) of the 1934 Act and Rule 10b-5.

9    All defendants are sued either as primary participants in the wrongful and illegal conduct charged

10    herein or as controlling persons as alleged below.

11        67.     Defendants, individually and together, directly and indirectly, by the use, means or

12    instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

13    continuous course of conduct to conceal adverse material information about HP's financial well-

14    being and prospects, as specified herein.

15        68.     Defendants employed devices, schemes and artifices to defraud, while in

16    possession of material adverse non-public information and engaged in acts, practices, and a course

17    of conduct as alleged herein in an effort to assure investors of HP's value and performance and

18    continued substantial growth, which included the making of, or the participation in the making of,

19    untrue statements of material fact and/or omitting to state material facts necessary in order to make

20    the statements made about HP and its business operations and future prospects in light of the

21    circumstances under which they were made, not misleading, as set forth more particularly herein,

22    and engaged in transactions, practices and a course of business that operated as a fraud and deceit

23    upon the purchasers of the Company's stock during the Class Period.

24        69.     Each of the Individual Defendants' primary liability and controlling person liability

25    arises from the following facts: (i) the Individual Defendants were high-level executives and/or

26    directors at the Company during the Class Period and members of the Company's management

27    team or had control thereof; (ii) each of the Individual Defendants, by virtue of their

28    responsibilities and activities as a senior officer and/or director of the Company, was privy to and

1    participated in the creation, development and reporting of the Company's internal budgets, plans,

2    projections and/or reports; (iii) each of the Individual Defendants enjoyed significant personal

3    contact and familiarity with the other defendants and was advised of, and had access to, other

4    members of the Company's management team, internal reports and other data and information

5    about the Company's finances, operations, and sales at all relevant times; and (iv) each of these

6    defendants was aware of the Company's dissemination of information to the investing public,

7    which they knew and/or deliberately disregarded was materially false and misleading.

8         70.    Defendants had actual knowledge of the misrepresentations and/or omissions of

9    material facts set forth herein, or acted with deliberate disregard for the truth in that they failed to

10   ascertain and to disclose such facts, even though such facts were available to them.   Such

11   defendants' material misrepresentations and/or omissions were done knowingly or recklessly and

12   for the purpose and effect of concealing HP's financial well-being and prospects from the investing

13   public and supporting the artificially inflated price of its stock.   As demonstrated by defendants'

14   overstatements and/or misstatements of the Company's business, operations, financial well-being,

15   and prospects throughout the Class Period, defendants, if they did not have actual knowledge of

16   the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge

17   by deliberately refraining from taking those steps necessary to discover whether those statements

18   were false or misleading.

19        71.    As a result of the dissemination of the materially false and/or misleading

20   information and/or failure to disclose material facts, as set forth above, the market price of HP

21   stock was artificially inflated during the Class Period.   In ignorance of the fact that the market

22   price of the Company's stock was artificially inflated, and relying directly or indirectly on the

23   false and misleading statements made by defendants, or upon the integrity of the markets in which

24   the securities trade, and/or in the absence of material adverse information that was known to or

25   recklessly disregarded by defendants, but not disclosed in public statements by defendants during

26   the Class Period, plaintiff and the other members of the Class acquired HP stock during the Class

27   Period at artificially high prices and were damaged thereby.

28

72.     At the time of said misrepresentations and/or omissions, plaintiff and other members of the Class were ignorant of their falsity and believed them to be true.  Had plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that HP was experiencing, which were not disclosed by defendants, plaintiff and other members of the Class would not have purchased their HP stock, or, if they had purchased such stock during the Class Period, they would not have done so at the artificially inflated prices they paid.

73.     By virtue of the foregoing, defendants violated §10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder.

74.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's stock during the Class Period.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against the Individual Defendants

75.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

76.     The Individual Defendants acted as controlling persons of HP within the meaning of §20(a) of the 1934 Act as alleged herein.  By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content  and dissemination of the various statements plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

1    77.    In particular, the Individual Defendants had direct and supervisory involvement in
2  the day-to-day operations of the Company and, therefore, had the power to control or influence
3  the particular transactions giving rise to the securities violations as alleged herein, and exercised
4  the same.

5    78.    As set forth above, HP and Individual Defendants each violated §10(b) and Rule
6  10b-5 by their acts and omissions as alleged in this complaint.  By virtue of their positions as
7  controlling persons, the Individual Defendants are liable pursuant to §20(a) of the 1934 Act.  As a
8  direct and proximate result of defendants' wrongful conduct, plaintiff and other members of the
9  Class suffered damages in connection with their purchases of the Company's stock during the
10  Class Period.

11                              **PRAYER FOR RELIEF**

12    WHEREFORE, plaintiff prays for relief and judgment, as follows:

13    A.    Determining that this action is a proper class action, designating plaintiff as Lead
14  Plaintiff, and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of
15  Civil Procedure and plaintiff's counsel as Lead Counsel;

16    B.    Awarding compensatory damages in favor of plaintiff and the other Class members
17  against all defendants, jointly and severally, for all damages sustained as a result of defendants'
18  wrongdoing, in an amount to be proven at trial, including interest thereon;

19    C.    Awarding plaintiff and the Class their reasonable costs and expenses incurred in
20  this action, including counsel fees and expert fees; and

21    D.    Such other and further relief as the Court may deem just and proper.

22                               **JURY DEMAND**

23    Plaintiff hereby demands a trial by jury.

24  DATED:  November 5, 2020              ROBBINS GELLER RUDMAN
                                            & DOWD LLP
25                                        DARREN J. ROBBINS
                                          DARRYL J. ALVARADO
26

27                                          _____
                                              s/ Darren J. Robbins
28                                          DARREN J. ROBBINS

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
darrenr@rgrdlaw.com
dalvarado@rgrdlaw.com

Attorneys for Plaintiff

CERTIFICATION OF NAMED PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

York County on behalf of the County of York Retirement Fund ("Plaintiff")
declares:

1.      Plaintiff has reviewed a complaint and authorized its filing.

2.      Plaintiff did not acquire the security that is the subject of this action at the
direction of plaintiff's counsel or in order to participate in this private action or any other
litigation under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of the class,
including providing testimony at deposition and trial, if necessary.

4.      Plaintiff has made the following transaction(s) during the Class Period in
the securities that are the subject of this action:

| Security | Transaction | Price Per Share |
| --- | --- | --- |

*See* attached Schedule A.

5.      Plaintiff has not sought to serve or served as a representative party in a
class action that was filed under the federal securities laws within the three-year period
prior to the date of this Certification except as detailed below:

*In re PG&E Corp. Sec. Litig.*, No. 3:18-cv-03509 (N.D. Cal.)

6.      Plaintiff will not accept any payment for serving as a representative party
on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such
reasonable costs and expenses (including lost wages) directly relating to the
representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed
this ___4th___ day of November, 2020.

York County on behalf of the County of York
Retirement Fund

By:  _____
      Gregory F. Bower, Secretary

HP

## SCHEDULE A

### SECURITIES TRANSACTIONS

Stock

| Date<br>Acquired | Amount of<br>Shares Acquired | Price |
|---|---|---|
| 11/09/2015 | 1,850 | $13.89 |

| Date<br>Sold | Amount of<br>Shares Sold | Price |
|---|---|---|
| 12/08/2015 | 7,000 | $12.16 |

Prices listed are rounded to two decimal places.

*Opening position of 5,150 shares.