ROBBINS GELLER RUDMAN
  & DOWD LLP
DARRYL J. ALVARADO (253213)
RACHEL A. COCALIS (312376)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
dalvarado@rgrdlaw.com
rcocalis@rgrdlaw.com

Lead Counsel for Lead Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| YORK COUNTY ON BEHALF OF THE COUNTY OF YORK RETIREMENT FUND, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> HP INC., DION J. WEISLER, CATHERINE A. LESJAK, ENRIQUE LORES, AND RICHARD BAILEY, <br><br> Defendants. | Case No. 4:20-cv-07835-JSW <br><br> <u>CLASS ACTION</u> <br><br> CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS <br><br><br><br><br> <u>DEMAND FOR JURY TRIAL</u> |

4816-1772-1318.v1

1

**TABLE OF CONTENTS**

2

**Page**

3

I.      INTRODUCTION AND SUMMARY OF THE FRAUD .................................................1

4

II.     NATURE OF THE ACTION .......................................................................................5

5

III.    JURISDICTION AND VENUE ...................................................................................5

6

IV.     THE PARTIES...........................................................................................................6

7

V.      SUBSTANTIVE ALLEGATIONS .............................................................................8

8

        A.      For the Newly Spun-Off HP, the Printing Supplies Business Was
9               Everything.......................................................................................................8

10      B.      HP's Key Supplies Metrics ............................................................................9

11      C.      Leading Up to the Class Period, Investors Probed About Declining
                Supplies Revenue and Channel Inventory ....................................................10
12
        D.      Before the Class Period, Defendants Reassured the Market that HP Was
13              "All About Supplies" at HP's Inaugural Security Analyst Meeting..................10

14      E.      During the Class Period, Defendants Continued Their Refrain: the Printing
                Supplies Business Was the Key Driver of Profits ..........................................13
15
        F.      Defendants Engaged in a Pull-in Scheme that Rendered Their Statements
16              About the Supplies Business Misleading.......................................................14

17      G.      Defendants Misrepresented Channel Inventory..............................................18

18      H.      Defendants Knew or Were Reckless in Not Knowing of the Pull-in
                Scheme and the Falsity of Their Class Period Statements.............................18
19
        I.      At the End of the Class Period, Defendants Revealed the Full Extent of the
20              Adverse Impacts of the Scheme, Causing the Price of HP Stock to Decline
                Precipitously ................................................................................................20
21
VI.     THE SEC CEASE-AND-DESIST ORDER AND SETTLEMENT ................................21
22
        A.      The SEC Found that HP Engaged in Prohibited Gray Marketing that
23              Eroded Supplies' Gross Margins and Cannibalized Sales, Causing Its
                Public Statements to Be Misleading .............................................................22
24
        B.      The SEC Order Found that HP Used "Accelerations" to Meet Supplies
25              Sales Targets, Causing Its Public Statements to Be Misleading......................23

26      C.      The SEC Order Found that HP's Reported Channel Inventory Metrics
                "Only Told Part of [HP's Channel Inventory] Story" ..................................25
27
VII.    DEFENDANTS' MISLEADING STATEMENTS AND OMISSIONS ...........................26
28

|  |  |  | Page |
|---|---|---|---|
| | A. | The Context in Which Defendants' Misleading Statements and Omissions Were Made | 26 |
| | B. | Materially Misleading Statements and Omissions Regarding Supplies Pricing, Gross Margins, and Operating Profit Margins | 27 |
| | C. | Materially Misleading Statements and Omissions Regarding Supplies Channel Inventory | 37 |
| | D. | Materially Misleading Statements and Omissions Regarding Supplies Revenue | 44 |
| VIII. | | DEFENDANTS ACTED WITH SCIENTER | 50 |
| | A. | Defendants' Admissions of Their Detailed Involvement in and Hands-On Management of the Supplies Business Supports Scienter | 50 |
| | | 1. Defendants Acknowledged Repeatedly that It's " All About Supplies" | 50 |
| | | 2. Defendants Were Laser Focused on Supplies Pricing and Discounts | 51 |
| | | 3. Defendants Performed Detailed Operational Reviews of the Supplies Business | 53 |
| | | 4. Defendants Set and Monitored Specific Forecasts for Supplies Channel Inventory | 54 |
| | | 5. The Four Box Model: Defendants Used It "Extensively" and Updated It with New Data "Every Week" | 56 |
| | | 6. Defendants Were Highly Experienced in Monitoring HP's Channel Inventory Levels | 58 |
| | B. | The Newly Formed and Supplies-Focused Nature of HP Supports Scienter | 62 |
| | C. | Defendants' Conscious Omission of Tier 2 Inventory from Their Public Statements Supports Scienter | 63 |
| | D. | Defendants Weisler's and Lesjak's SOX Certifications and Signing of SEC Filings Support Scienter | 65 |
| | E. | The Magnitude of the Scheme Supports Scienter | 65 |
| IX. | | LOSS CAUSATION | 68 |
| X. | | APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND THE FRAUD-ON-THE-MARKET DOCTRINE | 71 |

1

2                                                                                                    **Page**

3

XI.      THE STATUTORY SAFE HARBOR DOES NOT APPLY TO DEFENDANTS'
         MISLEADING STATEMENTS AND MATERIAL OMISSIONS ...................................72

XII.     CLASS ACTION ALLEGATIONS ......................................................................72

COUNT I For Violation of §10(b) of the 1934 Act and Rule 10b-5 Against All
         Defendants ...............................................................................................................73

COUNT II For Violation of §20(a) of the 1934 Act Against All Defendants ...............................74

XIII.    PRAYER FOR RELIEF ...................................................................................74

XIV.     JURY DEMAND .............................................................................................75

1       1.      Lead Plaintiff Maryland Electrical Industry Pension Fund ("Lead Plaintiff" or the

2 "Pension Fund"), individually and on behalf of all others similarly situated, by Lead Plaintiff's

3 undersigned counsel, allege the following based upon personal knowledge as to Lead Plaintiff and

4 Lead Plaintiff's own acts and upon investigation as to all other matters conducted by and through its

5 counsel, which included, among other things, a review of Securities and Exchange Commission

6 ("SEC") filings by HP Inc. ("HP" or the "Company"), transcripts of HP's public conference calls

7 and meetings, press releases issued by the Company, media reports about the Company, and

8 interviews with third parties conducted by attorneys and/or investigators retained by attorneys. Lead

9 Plaintiff's investigation of the facts underlying this action continues, and Lead Plaintiff believes that

10 substantial additional evidentiary support will exist for the allegations set forth herein after a

11 reasonable opportunity for discovery.

12 **I.**     **INTRODUCTION AND SUMMARY OF THE FRAUD**

13       2.      This case concerns a straightforward fraudulent scheme – HP and its chief executive

14 officer ("CEO"), Dion J. Weisler ("Defendant Weisler"); chief financial officer ("CFO"), Catherine

15 A. Lesjak ("Defendant Lesjak"); President Enrique Lores ("Defendant Lores"); and President

16 Richard Bailey ("Defendant Bailey") (collectively, the "Defendants") engaged in a concealed pull-in

17 scheme whereby Defendants – in violation of HP policy – accelerated, or pulled-in, sales to

18 artificially inflate the results of HP's most important business segment. Defendants' undisclosed

19 scheme rendered their Class Period (November 6, 2015 through June 21, 2016) statements regarding

20 profit margins, channel inventory levels, and revenues materially misleading.

21       3.      Days before the Class Period, Hewlett-Packard Company ("HPC") split into two

22 separate public companies, with HP maintaining the Printing and Personal Systems businesses.

23 Within the Printing segment was the Supplies business, which was HP's most important business

24 unit and which provided almost all of HP's profits. As Defendant Weisler declared, "[o]ur business

25 as a whole generates the ***vast majority*** of its profit from our Printing segment," particularly through

26 the sale of supplies such as toner and other printing supplies. One HP analyst "estimate[d] supplies

27 account for ***110%***" of HP's operating profit, concluding that "supplies growth is the ***most important***

28 ***driver of profit growth for HP***." Thus, truthful information regarding the Supplies business was

1  critical given the segment's fundamental and, indeed singular, importance to HP's profitability and

2  growth.  In particular, analysts and investors were keenly focused on Supplies profit margins,

3  channel inventory levels, and revenue trends – the most critical metrics to evaluating HP's financial

4  health.

5        4.     In the months leading up the Class Period, Printing and Supplies revenues had

6  declined for multiple quarters in a row and Supplies channel inventory levels were elevated.

7  Analysts took note and probed frequently about these concerning metrics.  After all, increasing

8  channel inventory was understood by investors as a risk to future revenues and a sign of weak

9  demand.  So Defendant Lesjak told investors exactly what they wanted to hear, assuring investors

10  that "[w]e expect to **reduce [Supplies] channel inventory levels** in the second half" of 2015 and that

11  "[w]e are going to **bring channel inventory levels back down**."  To further bolster investor

12  confidence, Defendants held an inaugural Security Analyst Meeting just prior to the Class Period

13  during which they repeatedly and adamantly assured the market that "[e]very action that . . . we're

14  launching [has] one common objective.  Improve our supplies business."  Defendants also assured

15  investors that "***[w]e're always focused on the channel inventory***."  Defendants emphasized no fewer

16  than 10 times during the inaugural meeting that the new HP was "**all about supplies**," leading

17  investors to believe that the Supplies business would generate strong, reliable growth for the new

18  HP.

19        5.     During the Class Period, Defendants continued their assurances about the health and

20  prospects of the Supplies business while concealing the pull-in scheme and its dire impacts on HP's

21  most important financial metrics.  The pull-in scheme, albeit devastating to the Company, was

22  actually quite simple.  First, it involved the use of "**gray marketing**" – the practice of selling supplies

23  to channel partners at steep discounts who then sold those supplies outside of their assigned

24  territories and further down the inventory channel.  Gray marketing was strictly forbidden by HP

25  policy because it erodes profit margins, cannibalizes sales in other regions, and leads to channel

26  inventory build-up.  Indeed, engaging in the practice was a fireable offense under HP policy.

27  Second, the pull-in scheme involved **accelerating, or pulling-in, sales** that would have occurred, if

28  at all, in later periods by offering extraordinary discounts to induce channel partners to purchase

supplies that they did not want or need.  As one internal HP presentation explained, accelerations amount to "pay[ing] the channel to take additional shipments within a given quarter" in order to hit sales quotas.  An internal e-mail from during the Class Period confirmed that HP knew its distribution partners "*d[id] not want to carry the level of toner that we push into their warehouses. . . . [b]ut we push more toner in to help deliver on our financial plans*."  The widespread use of gray marketing and accelerated sales had the effect of lowering profit margins, cannibalizing future revenues, and increasing channel inventory levels.

6.      Although the ongoing pull-in scheme had a negative impact on profit margins, channel inventory levels, and future revenues throughout the Class Period, Defendants falsely blamed the disappointing results on external factors outside of their control.  ***First***, when operating profit margins and gross margins continued to disappoint, Defendants told investors that this was due to "currency movements" and "aggressive pricing" by competitors.  ***Second***, Defendants assured investors repeatedly that channel inventories were "declining" and that Weeks of Supply ("WOS") – the metric used by the market to assess HP's channel inventory health – was "within [HP's] target ranges."  ***Third***, Defendants assured investors throughout the Class Period that Supplies revenue was "on track" and "[s]tabilizing," when the opposite was true.  In reality, as a result of the pull-in scheme, Supplies margins and profits eroded, channel inventories ballooned, and HP's efforts to stabilize revenues fell woefully "off track."  Additionally, Defendants' channel inventory statements were incomplete and misleading because, unbeknownst to investors, HP's references to channel inventory included only its "Tier 1" channel inventory, not the inventory held by "Tier 2" channel partners further down the distribution chain.

7.      Defendants knew or recklessly disregarded that the pull-in scheme rendered their Class Period statements misleading.  By their own admission, the Supplies business was Defendants' primary focus – as they intoned repeatedly, "*it's all about supplies*."  Further, Defendant Weisler led Quarterly Business Reviews ("QBRs") for HP's Printing segment during which Defendants "dove deep" into the minutiae of the Supplies business and its performance.  In addition, Defendant Lesjak, as the head of the Finance Department, set channel inventory ceilings and conducted detailed operational reviews of the Supplies business during which she would "drill down" on Supplies'

1   pricing, operating profits, and margins.  Defendants were equally immersed in channel inventory

2   levels.  As Defendant Weisler stated in no uncertain terms: "[W]e are on it.  We're on it every single

3   day by country.  *We know exactly how much inventory we have*."  And Defendant Lesjak's Finance

4   Department monitored WOS inventory targets using weekly "flash" reports that compared quarterly

5   inventory metrics against HP's budget based on the actual performance of past weeks and the

6   anticipated performance for future weeks.

7         8.      As the Class Period progressed, Defendants ramped up their efforts to hide the true

8   state of HP's Supplies business and the adverse impacts of the pull-in scheme.  Indeed, as HP

9   exceeded its WOS ceilings, which only included Tier 1 inventory, HP's worldwide executives

10  commanded their region heads to stay within their publicly disclosed WOS ranges, yet still meet

11  sales quotas.  Accordingly, regional heads engaged in "simultaneous sell-in/sell-through deals"

12  whereby supplies sold to Tier 1 distributors immediately passed through to Tier 2 distributors and

13  therefore out of the inventory metrics communicated to the market, despite the fact that the supplies

14  remained in the channel.  Through these deals, Defendants inflated Supplies sales without any

15  visible channel inventory implications to the market, thereby creating an incomplete picture of HP's

16  channel inventory health.  Indeed, although these deals allowed Defendants to cover-up their

17  scheme, they only increased inventory build-up because the sales were not based on end-user

18  demand.

19        9.      When the effects of the pull-in scheme and the true extent of the channel inventory

20  problems could no longer be concealed, investors were blindsided with a series of negative

21  disclosures proximately caused by the pull-in scheme.  Beginning in November 2015 and continuing

22  through the end of the Class Period, Defendants announced disappointing margins and revenue and

23  recognized the need to clear out *$700 million* in excess Supplies channel inventory, resulting in a

24  corresponding reduction of $700 million in Supplies revenue.  Through these partial disclosures, the

25  truth was slowly revealed regarding the dire impact of the pull-in scheme on HP's most important

26  metrics, causing HP's stock price to decline and investors to suffer significant monetary damage.

27        10.     Notably, Defendants' scheme was confirmed by the SEC.  Specifically, on September

28  30, 2020, the SEC issued a cease and desist order finding that HP violated the federal securities laws,

1   including provisions of the Securities Exchange Act of 1934 ("1934 Act") prohibiting misleading

2   statements, inaccurate SEC filings, and the employment of a "course of business which operates or

3   would operate as a fraud or deceit upon the purchaser, in the offer or sales of securities."   Order

4   Instituting Cease-and-Desist Proceedings Pursuant to §8A of the Securities Act of 1933 and §21C of

5   the Securities Exchange Act of 1934, Making Findings, and Imposing Remedial Sanctions and a

6   Cease-and-Desist Order (Ex. A) (the "SEC Order"), ¶¶50-51.  The SEC Order found that, during the

7   Class Period, HP engaged in the pull-in scheme – employing gray marketing and accelerated sales

8   based on unsustainable discounts – which rendered its Class Period statements concerning profit

9   margins, inventory, and revenues materially misleading.  The SEC Order also imposed a $6,000,000

10   sanction against HP.

## II.   NATURE OF THE ACTION

11

12          11.     This is a federal securities class action on behalf of all purchasers of HP common

13   stock (the "Class") between the Class Period (November 6, 2015 and June 21, 2016, inclusive),

14   seeking to pursue remedies under §§10(b) and 20(a) of the 1934 Act, as amended by the Private

15   Securities Litigation Reform Act of 1995 ("PSLRA") and Rule l0b-5 promulgated thereunder (17

16   C.F.R. §240.10b-5).

## III.   JURISDICTION AND VENUE

17

18          12.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934

19   Act (15 U.S.C. §§78j(b) and 78t(a)), and SEC Rule 10b-5(a)-(c) promulgated thereunder (17 C.F.R.

20   §240.10b-5).  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C.

21   §1331 and §27 of the 1934 Act.

22          13.     Venue is proper in this district pursuant to 28 U.S.C. §1391(b) and §27 of the 1934

23   Act.  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in

24   this district.  Many of the acts charged herein, including the dissemination of materially false and/or

25   misleading information, occurred in substantial part in this district.  In addition, the Company's

26   principal executive offices are located in this district.

27

28

14.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the U.S. mail, interstate telephone communications, and the facilities of a national securities exchange.

## IV.     THE PARTIES

15.     Lead Plaintiff, which is a multiemployer non-contributory defined-benefit pension fund, has provided pension and related benefits to over 3,000 participants and their beneficiaries for 40 years.  As detailed in Lead Plaintiff's previously-filed certification (*see* ECF Nos. 19 at 5, 20-2, 20-3), the Pension Fund purchased HP common stock at artificially inflated prices during the Class Period and suffered damages as a result of Defendants' alleged misconduct.

16.     Defendant HP is a Delaware corporation with its principal executive offices located in Palo Alto, California.  HP common stock trades on the New York Stock Exchange ("NYSE") under the symbol "HPQ."[1]

17.     Defendant Weisler served as CEO of HP during the Class Period.  In addition, Weisler served as a member of HP's Board of Directors throughout the Class Period.  Prior to HP's spin-off from the Hewlett-Packard Company, Weisler was the Executive Vice President of the Printing and Personal Systems Group of HPC from June 2013 until the spin-off in November 2015, and the Senior Vice President and Managing Director, Printing and Personal Systems, Asia Pacific and Japan ("APJ"), from January 2012 to June 2013.  Weisler stepped down as CEO effective November 1, 2019.

18.     Defendant Lesjak served as CFO of HP during the Class Period.  In the eight years prior to HP's spin-off, Lesjak was the CFO for HPC.  Lesjak reported directly to Defendant Weisler during the Class Period.  Lesjak regularly attended HP Board of Directors meetings during the Class Period.  Lesjak retired as CFO effective February 28, 2019.

19.     Defendant Lores served as the President of HP's Imaging & Printing business during the Class Period.  Lores was appointed to that role by Defendant Weisler immediately prior to the

---

[1]     HP's fiscal year ("FY") 2016 began November 1, 2015 and ended on October 31, 2016.  As such, HP' fiscal quarters during the Class Period are as follows: November 1, 2015 to January 31, 2016 ("Q1 2016"); February 1, 2016 to April 30, 2016 ("Q2 2016"); and May 1, 2016 to July 31, 2016 ("Q3 2016").

start of the Class Period, coinciding with HP's spin-off.  Lores reported directly to Defendant Weisler during the Class Period.  Prior to that role, Lores held various senior executive positions at HPC since 2000, including President of HPC's Europe, Middle East, and Africa ("EMEA") region in 2015.  Lores is the current President and CEO of HP.

20.     Defendant Bailey was the President of HP's APJ region during the Class Period. Bailey was appointed to that that role by Defendant Weisler immediately prior to the start of the Class Period, coinciding with HP's spin-off.  According to Bailey's HP executive biography: "[d]uring his tenure [as the President of APJ], Richard and his team transformed the business and consistently delivered strong results in HP's fastest growing region."  Bailey reported directly to Defendant Weisler during the Class Period.  Prior to that role, Bailey held various senior executive positions at HPC since 2006, including Vice President of HPC's Imaging & Printing Group in the South Pacific division (Australia and New Zealand).  From May 2013 to July 2020 when Bailey left HP, he spent the vast majority of his career working in Palo Alto, California.

21.     Defendants Weisler, Lesjak, Lores, and Bailey (collectively, the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.

22.     The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the representations that were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein.

23.     Each Defendant is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of HP common stock by engaging in the violative conduct alleged herein, which caused HP common stock to trade at artificially inflated prices during the Class Period.

V.     **SUBSTANTIVE ALLEGATIONS**

A.     **For the Newly Spun-Off HP, the Printing Supplies Business Was Everything**

24.     On or about November 1, 2015, HPC split into two separate public companies. Following the split, HP maintained HPC's legacy Printing and Personal Systems businesses.[2]  As Defendant Lores made clear during HP's inaugural Security Analyst Meeting, held on September 15, 2015 – just weeks before the split was finalized – the new HP's "business is ***all about printing***." Indeed, Defendant Lesjak highlighted during the meeting that nearly 80% of the new Company's total operating profit stemmed from its Printing business.

25.     HP's Printing business provides consumer and commercial printer hardware, supplies, solutions, and services.  HP's Personal Systems segment provides commercial and consumer computers and related software, support, and services.  Within HP's Printing segment is the Supplies business.  The Supplies business consists of printing supplies, such as toner, ink cartridges, and related printing supplies.

26.     The Supplies business was vital to HP's success.  As one analyst noted, "Supplies are obviously where the profits are in the printing business . . . ."  As the *Wall Street Journal* explained, this is because "HP historically sold printers at a loss and then made money selling ink cartridges for them."[3]  Defendant Lores put it simply: "We lose money on printers. We make money on supplies." Likewise, in response to an analyst question about HP's "core business," Defendant Weisler explained, "***our business as a whole generates the vast majority of its profit from our Printing segment*** . . . .  We lose money, generally speaking, when we place a unit" and make back money over time as supplies go into those units.

27.     Ink cartridges, and other similar supplies, are so profitable for HP because, as explained in an analyst report, "the materials required to make printer cartridges are relatively

---

[2]     The other company that spun-off from HPC was Hewlett Packard Enterprise Company ("HPE"), which retained HPC's enterprise technology infrastructure, software, services, and financing businesses.  HP and HPE now operate and trade as two separate companies.

[3]     Cara Lombardo, *Xerox Considers Takeover Offer for HP*, Wall Street Journal (Nov. 5, 2019), https://www.wsj.com/articles/xerox-considers-takeover-offer-for-hp-11573012201.

inexpensive" and, thus, the "[g]ross margins on supplies are high for printer companies, in the 50-70% range." As Defendant Lesjak similarly explained during an analyst meeting, "printing has a very different dynamic given the annuity nature of high margin supplies and the low-to-negative margins on placing hardware units." An analyst further "estimate[d] supplies account for *110%*" of HP's profit, concluding that "***supplies growth is the most important driver of profit growth for HP***."

28. In fact, Defendant Lores explained during an analyst meeting that the Supplies business was so fundamental to the new HP that "ink" was even reflected in the Company's new name: "***In HP, we bleed ink; in HP, we bleed toner; and we like this company so much, we love this business so much that we decided to change the name of the Company, and this is why we've called now HP Inc.***"

29. Given the fundamental importance of the Printing segment to HP, information regarding the segment, and especially the Supplies business, provided critical insight for analysts and investors to evaluate the Company's financial condition and growth.

**B.     HP's Key Supplies Metrics**

30. HP utilized a "push" go-to-market model for its Printing Supplies business in its three regions – APJ, EMEA, and the Americas ("AMS"). The push model utilized a multi-tier channel, but would generally only sell products directly to its "Tier 1" distributors. The Tier 1 distributors would then sell the products through to "Tier 2" resellers, which would either sell to end users or to resellers further down the distribution chain.

31. HP measured its channel inventory levels using Weeks of Supply ("WOS"). HP's Finance Department, led by Defendant Lesjak, set the target WOS levels (*i.e.*, channel inventory ceilings) annually. The HP finance team monitored WOS targets using weekly "'flash'" reports. These "'flash'" reports compared quarterly metrics, including WOS, against HP's budget based on the actual performance of past weeks and the anticipated performance for future weeks.

32. WOS was understood by the market as a proxy for channel health. As such, Defendants disclosed to the public whether it was above or within its WOS ranges during the Class

Period.  Critically, although HP generally tracked Tier 2 inventory internally, HP's WOS calculation *excluded* Tier 2 and only included its Tier 1 inventory.

**C.  Leading Up to the Class Period, Investors Probed About Declining Supplies Revenue and Channel Inventory**

33.    Immediately prior to the split, Printing and Supplies revenues had been declining for multiple quarters in a row, and analysts understood that this ongoing decline in revenue posed a real risk to the smaller, Supplies-focused HP.  Further, analysts paid particular attention to Supplies channel inventories – an indicator of demand and future revenue.

34.    For example, on October 4, 2015 – just weeks before the Class Period – Deutsche Bank hosted an investor meeting with Defendant Weisler.  Following the meeting, Deutsche Bank reported on October 8, 2015 that "[w]hile management agrees that segments of the printer market remain in secular decline, it sees opportunities for growth.  The annuity supplies business remains the key profit driver . . . .  Based on new initiatives, . . . HP believes its ink supplies business will stabilize . . . ."  Similarly, on September 11, 2015, the first "Key Issue[] for HP, Inc." identified by analysts at Jefferies was "When Will Supplies Stabilize?  . . .  Supplies [are] a huge driver of profitability for HPI . . . ."

35.    Consequently, leading into the Class Period, Defendants recognized that they had to convince the market that it was turning around HP's Printing business, and particularly the Supplies business.

**D.  Before the Class Period, Defendants Reassured the Market that HP Was "All About Supplies" at HP's Inaugural Security Analyst Meeting**

36.    HP held its first annual Security Analyst Meeting on September 15, 2015.  Because analysts recognized that Supplies revenue had been decreasing and "supplies are 100% of the profits of HP Inc.," HP executives assured the market that Supplies would be the singular driver of profits going forward.  In fact, throughout the inaugural Security Analyst Meeting, HP executives – including Defendants Weisler, Lores, and Lesjak – repeated the catchphrase "it's all about supplies" no fewer than ten times:

- "[M]ost importantly, ***it's all about supplies***";

- "[W]e love it, because ***this business is all about supplies***";

- "***[T]his business is all about supplies***";

- "***[W]e love barrels of ink because this business is all about supplies***";

- "We want our customers to print what is most important for them to help them to print more of it because ***this business is all about supplies***";

- "[W]e have seen that they print more, which means we love the program because ***this business is all about supplies***";

- "I understand it and I know that ***this business is all about supplies***";

- "[A]s you heard Enrique say several times, ***it's all about supplies***";

- "And as you heard, ***this business is all about supplies***"; and

- "And as we have been saying, ***it's all about supplies***."

37.    Throughout the September 15, 2015 Security Analyst Meeting, Defendants also highlighted the importance of Supplies to HP's financial condition and growth.  For example, Defendant Lesjak stated that "revenue streams from supplies" was the "[f]irst" of "three key elements" supporting HP's balance sheet.  Similarly, Defendant Weisler advised analysts that "profit streams" from the Supplies business "will produce reliable returns and cash flows while having the opportunity for long-term growth."  And Defendant Lores explained, "at HP, printing is important because of its scale, because of its profitability and because of continuous opportunities to grow that it offers."

38.    During the meeting, Defendants emphasized that "sell[ing] supplies" was HP's top priority.  Indeed, Defendant Lores assured investors:

> *I know that this business is all about supplies.  Every action that we've – I have been describing, the improvements in the product portfolio, the new programs that we are launching, the new services we're launching have one common objective. Improve our supplies business*.

39.    Further, Defendants were able to dedicate significantly more time and investments to the Supplies business due to the new HP's streamlined structure.  As Meg Whitman, HPC's former CEO, explained at the September 15, 2015 Security Analyst Meeting, Defendants' QBRs – multi-

day deep dives into the business segments involving detailed PowerPoint presentations – were now singularly focused on HP's core businesses such as Printing:

> *Last week, we did our QBRs, our quarterly business reviews and for the first time, I did not do the printing and PC business, Dion [Weisler] did. We get to the end of three days where we dove deeply into these three businesses* and I'm thinking, wow I have two extra days here, because I would have rolled . . .right into printing for a day. *If you think about the organic investments, we now have a smaller arena of investments that we're considering and you'll hear from Dion later on this afternoon the ability to invest in printing in a way that we have not invested in printing because of the demands of the Company* . . . .

40.     And, critically, in response to a question from a Morgan Stanley analyst regarding inventory channel levels for Supplies, Defendants Lores and Weisler provided the following reassurances:

> [Lores:] [W]e are working through Q4 and through Q1, our goal is to restore the regular levels that we want to have, but *we're not going to do that forcing anything, it will be done in a what I would call a natural way*.

> [Weisler:] However, *we are on it.  We're on it every single day by country.  We know exactly how much inventory we have* . . . . Now the beauty about supplies is it has a few preservatives built into it, right.  So that's a little better.  So we're really focused on both businesses.  *We're always focused on the channel inventory*.

41.     Not surprisingly, nearly every analyst reporting on HP's inaugural Security Analyst Meeting highlighted the Company's assurance that HP was "all about supplies" and that Supplies would be the key driver of profits and growth:

- **"HP Inc. (HPI) told a story of reliable returns, strong cash flow and the opportunity to accelerate long-term growth**.  The most interesting takeaways include: 1. *It's all about Supplies which accounts for the majority of profits*." Morgan Stanley (Sept. 16, 2015).

- **"Printing, All About Supplies**: *We think that HPI is focused on driving supply growth within the printing segment*.  HPI has taken a number of initiatives over the past couple of years to drive high-value hardware growth, which will reap future benefits in supplies."  BMO Capital Markets (Sept. 16, 2015).

- **"HP Inc. management makes a good first impression**; . . .  This event acted as a good dry run for the HP executive team ahead of the upcoming split, and we liked management's enthusiasm (*'it's all about supplies,' the key tagline*) . . .  *The clear takeaway from the presentation was that, 'it's all about supplies*.'  Once HP has its print hardware installed, the resulting revenue stream is generally long and relatively predictable."  Morningstar (Oct. 8, 2015).

**E.     During the Class Period, Defendants Continued Their Refrain: the Printing Supplies Business Was the Key Driver of Profits**

42.     Because "supplies [we]re 100% of the profits of HP Inc.," Defendants worked during the Class Period to convince HP investors that the Supplies business would drive operating profit for the newly streamlined HP.

43.     Indeed, despite the downward trend of operating profits, margins, and pricing in the Supplies business at the beginning of the Class Period, Defendants assured that this was due to factors out of HP's control, such as pricing and currency issues. *See* §VII.B., *infra*. For example, early in the Class Period, Defendants assured investors on a November 24, 2015 earnings call that disappointing operating profit and margins resulted from currency and pricing issues: "*[t]he most significant factor [since the inaugural Security Analyst Meeting] was the continued effects of currency movements that have accelerated pricing pressures*."

44.     Moreover, during that same November 24, 2015 earnings call, Defendants assured investors that channel inventories for Supplies were "declining" and "within [their WOS] ranges." *See* §VII.C., *infra*. For example, on the November 24, 2015 earnings call, Defendant Lesjak stated:

> *From a channel inventory perspective, we have reduced both hardware and supplies levels year-over-year and sequentially, but we are still slightly above target weeks of supply range for supplies*.

45.     Following the call, analysts interpreted Defendants' representations regarding decreasing channel inventory positively and saw the channel reductions as a sign of future revenue growth. For example, a November 25, 2015 Trefis analyst report highlighted: "*[C]hannel inventory for supplies decreased during the quarter. This also suggests that demand will increase in the future*." In addition, a November 25, 2015 FBN Securities analyst report repeated Defendants' reassurances regarding the disappointing margins: "printing . . . and supplies growth were weak due to three key reasons: . . . 3.) pricing became worse as HPQ felt compelled to match competitors who were benefiting from a strong dollar."

46.     And as the Class Period progressed, Defendants assured the market that a turnaround of the Supplies business was imminent, emphasizing that the Supplies revenue was "on track" to "stabilize" by the end of FY 2017. *See* §VII.D., *infra*. On March 1, 2016, while speaking at the

Morgan Stanley Technology, Media & Telecom Conference, Defendant Lesjak assured investors that "*revenue in supplies will stabilize by the end of 2017*" and "*our channel inventory in supplies came down year-over-year and quarter-over-quarter*."

47.     Analysts reported on these developments positively.  For example, a March 20, 2016 Deutsche Bank analyst report noted:

> Line of sight on stabilization in printer supplies
>
> . . . With print supplies driving the vast majority of the profitability of the print segment as well as overall HPQ operating profit, the stabilization and recovery of supplies sales will be a key metric to track over the next two years, in our view.

48.     Thereafter, Defendants' presentation accompanying the May 25, 2016 earnings call represented that "Supplies revenue trajectory still *on track* to stabilize by end of FY17" and that "[c]hannel inventory for . . . supplies within targeted ranges."  And, consistent with Defendants' earlier assurances, as the operating profits and margins continued to disappoint, Defendant Lesjak explained to analysts on the May 25, 2016 earnings call that the results were "*really driven by currency and the very competitive pricing environment we saw*."

F.     **Defendants Engaged in a Pull-in Scheme that Rendered Their Statements About the Supplies Business Misleading**

49.     As Defendants assured analysts and investors that the new HP was "all about supplies," in truth, Defendants engaged in an undisclosed course of conduct to accelerate or "pull-in" Supplies sales that otherwise would have occurred, if at all, in future periods.  Defendants' pull-in scheme included: (i) the Company-prohibited sales practice known as "gray marketing"; and (ii) offering distributors excessive discounts in order to induce them to purchase more supplies that they wanted or needed.  By concealing this course of conduct and misrepresenting profit margins and channel inventory levels, Defendants misled investors about the true state of HP's critical Supplies business.

50.     Gray marketing, also known as "A-Business," was the practice of selling supplies to a distributor that sells those supplies outside of their assigned territory.  Gray marketing erodes a product's margins, and cannibalizes sales in other regions, and increases channel inventory.  As

such, during the Class Period, HP had a policy specifically prohibiting gray marketing.[4]  The violation of HP's gray marketing policy was a fireable offense.  Further, HP's contracts with its distributors explicitly prohibited the sale of supplies outside of distributors' authorized territory.  But unbeknownst to investors, HP engaged in this prohibited course of business throughout the Class Period, particularly in APJ – HP's fastest growing region and the only region to report sales growth during the Class Period.

51.     While HP executives recognized that it was "all about supplies" for the newly-formed HP, they pressured sales personnel to meet Supplies revenue quotas during the Class Period despite weakening demand.  As such, the APJ region resorted to offering enormous discounts – known as "eclipse" discounts – to distributors that it knew participated in gray marketing in order to push unwanted product into the channel, in violation of HP policy.

52.     Discounts that were greater than customary discount levels were approved by the region heads.  For example, during the Class Period, sales personnel in the APJ region obtained approval from Defendant Bailey for eclipse discounts for sales to HP's distributors, such as Ingram Micro.[5]  The eclipse discount would explicitly state that the distributor would sell HP's products to a "sub-distributor," such SupplyLink, which was a known exporter of printing supplies.  Indeed, the eclipse discount applied ***only*** if a sub-distributor was specifically named as the recipient of the product.  As such, Defendant Bailey knew or recklessly disregarded that HP's discounted supplies to distributors would be shipped out of the region.

53.     Further, rather than abide by its policies prohibiting gray marketing and put a stop to this course of business, HP actually accelerated this scheme during the Class Period.  This is because HP's distributors did not need or want any additional product as the scheme progressed, forcing HP to offer even higher discounts.  In fact, during the Class Period, the APJ region began offering its distributors engaging in A-Business discounts ***in excess of 40%***.  In contrast, during that same time

---

[4]     The Company's Standards of Business Conduct, which all employees and members of the Board of Directors are required to follow, required HP employees and the Board of Directors to "[u]se due diligence in preventing situations that may lead to the gray marketing of HP products."  *Hewlett-Packard Co.*, 2013 WL 6057088, at *10, *18 (Dec. 18, 2013).

[5]     Eclipse discounts had to identify a purchaser.

1  period, HP's maximum discount to APJ distributors that did not engage in A-business was in the

2  teens.

3  54.   Gray marketing in APJ had a snowball effect on gray marketing in HP's other

4  regions.  For example, EMEA was compelled to increase its eclipse discounts and engage in gray

5  marketing to compete with the gray market goods that APJ dumped in EMEA.  Unsurprisingly,

6  EMEA's gray marketing disrupted margins and sales in its region as well as in the AMS region, in

7  which EMEA's gray market distributors dumped their supplies.  The snowball effect of HP's gray

8  marketing practices negatively impacted Supplies profit margins worldwide.

9  55.   Although A-business was strictly prohibited, it was no secret internally that it was

10  occurring during the Class Period.  That is because HP's regional leaders, such as Defendant Bailey,

11  had to approve these policy-violating discounts.  In addition, HP's QBR presentations, which were

12  reviewed and analyzed by the Defendants, differentiated between A-business and HP's legitimate

13  business.  Further, internal HP documents confirmed during the Class Period that sales discounts

14  offered as part of the gray marketing practices were ***three to four times*** HP's normal discount levels,

15  and in some areas gray marketing sales actually outweighed legitimate sales.[6]

16  56.   In addition to gray marketing, Defendants also accelerated sales by offering

17  exorbitant discounts to compel distributors to make purchases that would have, in the normal course

18  of business and but for action by Defendants, been completed in a subsequent quarter.  As one

19  internal HP presentation explained, accelerations (also known as "pull-ins") amount to "'***pay[ing]***

20  ***the channel to take additional shipments*** within a given quarter.'"  SEC Order, ¶18.  This practice

21  created a misleading picture of the Supplies business because the discounted sales were based on

22  meeting HP's quotas and not on end-user demand.  This practice also resulted in low-margin sales

23  and increased channel inventory.

24

25  ───────────────
[6]  Because sales pursuant to eclipse discounts resulted in: (i) lower profit margins than if the sales
26  had materialized organically in line with demand; (ii) increased channel inventory; and (iii)
     adversely impacted future revenues, HP's Finance Department set inventory "ceilings" at the onset
27  of the fiscal year that were meant to serve as a "control over sales managers' incentives to push
     excess inventory into the channel."  SEC Order, ¶14.  Indeed, these ceilings were known internally
28  as a "'***do not exceed metric***.'"  *Id.*

57.     This practice accelerated at the beginning of the Class Period and HP begun offering steeper and steeper discounts on its printing supplies in order to meet quarterly sales targets.  These increasing discounts were necessary because, by the start of the Class Period, HP's distributors did not want or need any more printing supplies.  Indeed, emails from during the Class Period confirm that HP knew that its partners "'*d[id] not want to carry the level of toner that we push into their warehouses. . . . [b]ut we push more toner in to help deliver on our financial plans*.'"  *Id.*, ¶22. Similarly, another Supplies business unit manager complained in an email during the Class Period that it was "'*becoming increasingly difficult to get partners to place orders at any price*'" because HP was "'*at historical highs with [its] accelerations*.'"  *Id.*, ¶23.

58.     But the pull-in scheme caused channel inventories to balloon beyond HP's inventory ceilings (known internally as the "'do not exceed metric'").  Knowing that investors would be concerned with escalating Supplies channel inventory, "*HP's worldwide executives demanded that regional managers remain within their WOS ranges while still delivering sales and operating profit targets*."  *Id.*, ¶30.  Consequently, HP offered even steeper discounts to encourage distributors to move product from Tier 1 to Tier 2 sub-distributors and beyond.  This allowed HP to pull-in sales to increase revenue, while simultaneously provide the market with the false impression that it was within its WOS "'do not exceed'" range because Tier 2 inventory was not included in WOS.  As one Printing segment manager explained, "'*we needed the Supplies Revenue & we used significant amounts of contra to push in Supplies at T1 to > 2 weeks above their optimal levels*.'"[7]  *Id.*, ¶21. Because Tier 2 partners already had what they viewed as sufficient inventory, they demanded steeper discounts on top of the previously-applied steep discounts to offset the cost of holding additional inventory.

59.     HP also engaged in "'simultaneous sell-in/sell-through deals.'"  *Id.*, ¶33.  This refers to the practice of selling supplies to Tier 1 distributors that immediately pass through to Tier 2.  *Id.* Thus, HP inflated sales without any visible WOS implications to the market – the inventory sold into Tier 1 was immediately passed through to Tier 2 and, therefore, not reflected in WOS.  *Id.*  In reality,

---

[7]   "Contra" or "contra budget" were terms used internally to describe the amount of money that was foregone when HP offered steep discounts.

however, because the sales were not based on actual demand, but solely on meeting HP's unrealistic sales targets, they further increased HP's channel inventory and rendered HP's channel inventory statements misleading. *Id.*

### G. Defendants Misrepresented Channel Inventory

60. In addition to concealing the pull-in scheme, Defendants made misleading statements regarding Supplies channel inventory. For example, Defendants repeatedly stated that channel inventory was declining and made disclosures regarding the level of HP's channel inventory relative to its "'target weeks of supply range.'" However, unbeknownst to investors, channel inventory was significantly increasing during the Class Period and Defendants' references to HP's internal WOS metric included **only** Tier 1 channel inventory, **not** the inventory held by Tier 2 channel partners further down the distribution chain. Defendants' failure to accurately describe HP's overall channel inventory provided investors with only a partial and misleading picture of HP's channel health and caused HP's channel inventory disclosures to be materially misleading.

### H. Defendants Knew or Were Reckless in Not Knowing of the Pull-in Scheme and the Falsity of Their Class Period Statements

61. Defendants Weisler, Lesjak, and Lores repeatedly emphasized that the success of HP hinged on the Supplies business, stating in no uncertain terms that it was "all about supplies." Indeed, Defendant Lores not only advised that every action HP took was to "[i]mprove our supplies business," but also boasted that the Company's new name included a nod to the importance of Supplies.

62. Second, Defendants were deeply involved in the pricing of HP Supplies. For example, during the Class Period, Defendant Bailey personally signed off on discounts that exceeded customary discount levels. Moreover, Defendant Weisler reassured analysts that Supplies pricing was "track[ed] very closely" by him and the Company. Further, Defendant Lesjak, as the head of the Finance Department, conducted detailed operational reviews of the Supplies business, during which she would "drill down" on Supplies' pricing, operating profits, and margins.

63. Third, leading up to and throughout the Class Period, Defendants led multi-day QBRs during which they "dove deeply" into the Supplies business. Defendants' deep dives included the

review of presentations that differentiated between prohibited A-business sales and HP's legitimate sales. And, internal HP documents confirmed that sales discounts offered as part of the gray marketing practices were *three to four times* HP's normal discount levels, and in some areas gray marketing sales actually outweighed legitimate sales. Internal HP documents also explained that these excessive discounts were required because channel partners did not want or need the supplies, yet HP pushed those supplies into the channel using excessive discounts in order to meet sales quotas.

64.   Fourth, Defendants were significantly involved in setting and monitoring channel inventory ceilings, or WOS. For example, Defendant Lesjak, as the head of the Finance Department, was ultimately responsible for setting WOS. The Finance Department also consistently monitored inventory levels using weekly "'flash'" reports during the Class Period. Moreover, Defendant Lores admitted that it was his responsibility to monitor Tier 1 *and Tier 2* channel inventory levels. In addition, Defendants Weisler and Lesjak had substantial experience in monitoring HP's channel inventory for signs of unhealthy, excess levels.

65.   Fifth, Defendants admitted that they were laser focused on HP's "Four Box Model," which was a predictive tool based on real-time data regarding the use of supplies on a weekly basis during the Class Period.

66.   Sixth, the magnitude of the pull-in scheme further evidences scienter. Defendants were ultimately required to clear out *$700 million* in excess Supplies channel inventory, resulting in a corresponding reduction of $700 million in Supplies revenue. Analyses of Defendants' inventory and revenue reductions confirm the pull-in scheme's devastating, material impact on HP's reported revenues and profit margins in each of the quarterly results presented during the Class Period.

67.   Accordingly, Defendants were aware or reckless in not becoming aware that as a result of the pull-in scheme, operating profit and margins for Supplies were eroding, Supplies sales were being cannibalized, channel inventories were ballooning, and the Supplies business was not on-track to turnaround or stabilize by FY 2017.

68.   With respect to the misleading channel inventory statements, Defendants were aware or reckless in not knowing that their statements were incomplete because they excluded Tier 2

inventory.  As described above, Defendant Lesjak was ultimately responsible for setting WOS.  It was Defendant Lores's responsibility to monitor Tier 1 and Tier 2 channel inventory levels.  Defendant Weisler promised that he and the Company were "always focused on the channel inventory."  Finally, Defendants had substantial experience in monitoring HP's channel inventory and spoke repeatedly about the topic on earnings calls with analysts and investors, knowing that their inventory statements excluded vast amounts of inventory that remained in the channel.

I.      **At the End of the Class Period, Defendants Revealed the Full Extent of the Adverse Impacts of the Scheme, Causing the Price of HP Stock to Decline Precipitously**

69.      Beginning on November 24, 2015, the truth regarding the adverse impacts of Defendants' scheme began to leak out to the market through a series of partial disclosures.  And on June 21, 2016, Defendants revealed the full extent of the adverse impacts, announcing that HP would reduce Supplies channel inventory by $450 million, resulting in a corresponding reduction of $450 million in Supplies revenue over the remainder of FY 2016.  The $450 million reduction was in addition to the $250 million reduction in revenue Defendants took in Q2 2016, for a total of $700 million in revenue reduction during the Class Period.  Defendants also announced an overhaul to HP's sales model.[8]

70.      Comments during the June 21, 2016 investor call revealed what Defendants had been misrepresenting and concealing during the Class Period.  For instance, during the call, Defendant Weisler acknowledged that HP would "focus more on selling through the value of our branded supplies products and *less through promotions and pricing*."  Defendant Lores further explained,

> First, we *will reduce Tier 1 and Tier 2 supplies channel inventory levels . . . we will reduce and tighten the desired ranges for ink and toner in each region.  It will be critical, as it is today, for me to hold the sales teams accountable to remain within the ranges going forward*. . . .

---

[8]   Defendant Weisler admitted on the June 21, 2016 call that the model change was designed to "eliminat[e] grey marketing activity" and Defendant Lesjak admitted that, following the model shift, "we will have higher revenue as a result of not having to discount as much as we've been discounting."  During an October 13, 2016 analyst meeting, Defendant Lores stated that, pursuant to the sales model overhaul, Defendants were "shifting our focus from selling . . . with aggressive prices and aggressive discounts into the channel."  And during an October 12, 2017 analyst meeting, Defendant Lores acknowledged that the change to the sales model was instituted to "prevent gray marketing . . . around the globe" and "reduce the discounts . . . offered to channel partners."

Second, towards further control, we will align channel compensation . . . and will shift from compensating on sell-in . . . .

Third, as Dion discussed, . . . *[w]e will reduce the frequency and discount levels of inducive promotions and eliminate low-value and channel promotions*.

71.    Critically, during the call, Defendant Lesjak acknowledged in response to an analyst question regarding the "magnitude of the reduction relative to [HP's] overall supplies inventory" that "*it's fairly material* because as I mentioned, it's about $450 million over a couple of quarters here, *$225 million each quarter in terms of revenue. So it's a fairly substantial change to channel inventory*."

72.    A UBS Securities analyst summarized the news from HP's call on June 21, 2016, as follows: "Channel correction could signal weakness. . . . Last earnings call management noted it was satisfied with channel inventory levels, so the sudden shift could be a signal of continued weakness."

## VI.    THE SEC CEASE-AND-DESIST ORDER AND SETTLEMENT

73.    On September 30, 2020, the SEC issued the SEC Order. The SEC Order found that HP violated the federal securities laws, including provisions of the 1934 Act prohibiting misleading statements, inaccurate SEC filings, and a Company's use of a "course of business which operates or would operate as a fraud or deceit upon the purchaser, in the offer or sales of securities." SEC Order, ¶¶50-51. As a result, the SEC imposed a $6,000,000 sanction against HP. *Id.*, §IV.B.

74.    According to the SEC Order, "HP executives recognized the need to improve revenue and profitability in the Printing segment . . . and emphasized the importance of meeting their Supplies budgets." *Id.*, ¶10. As a result of the executives' "[f]ocus on [s]upplies [r]evenue," (*id.* at 3) the SEC Order found that HP engaged in an undisclosed course of business designed to artificially inflate the performance of HP's Supplies business during the Class Period. Specifically, the SEC found that beginning in mid-2015,

HP used a variety of incentives to accelerate, or "pull-in," sales that they otherwise expected to materialize in later quarters. In addition to the pull-ins, management in [APJ] sold printing supplies to distributors known to be involved in selling the HP printing supplies outside of their territory (internally described as "gray marketing," and known in the region as "A-Business") . . . .

*Id.*, ¶2.

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 4:20-cv-07835-JSW
4816-1772-1318.v1

- 21 -

75.     Unbeknownst to investors, however, this scheme "negatively impact[ed] operating profit in future quarters" and was "causing significant margin erosion and cannibalization of HP sales in other regions." *Id.*, ¶¶2-3.

76.     Although the scheme was deleterious to HP, the SEC Order determined that HP "did not disclose to the market during the relevant time period that its use of the pull-ins and A-Business were causing decreased margins and increased channel inventory." *Id.*, ¶3.  Thus, the SEC Order concluded that "between November 2015 and June 2016, HP's disclosures regarding channel inventory and gross margin [in its SEC filings and quarterly earnings calls] *omitted material information regarding the impact of the above-mentioned practices on these metrics, causing HP's disclosures to be incomplete and misleading*." *Id.*, ¶39.

A.     **The SEC Found that HP Engaged in Prohibited Gray Marketing that Eroded Supplies' Gross Margins and Cannibalized Sales, Causing Its Public Statements to Be Misleading**

77.     The SEC Order found that in 2015 through the end of the Class Period in June 2016, HP's APJ region "sold [supplies] to resellers or brokers *known* to sell HP supplies outside of their territory, described internally as 'gray marketing' and known in APJ as 'A-Business.'" *Id.*, ¶24.  To do so, "APJ provided HP product to resellers and brokers within their region at higher than normal discounts, *knowing* they would sell the goods through a network of firms into the Middle East." *Id.*, ¶25.  Further, to convince distributors to take on these unneeded products, HP was forced to "offer[] discounts in some instances in *excess of forty percent* for A-Business sales, while discounts for local distributors were in the teens." *Id.*, ¶26.

78.     The SEC Order stated that "*[i]nternal company documents described the A-Business in 2015 and the first half of 2016 being conducted at contra levels three to four times HP's normal contra rates.*" *Id.*[9]  In fact, in some APJ countries "the amount of A-Business surpass[ed] the amount of their local business," and "the size of the discounts granted to encourage A-Business climbed, as distributors demanded larger discounts to accept the increased inventory." *Id.*, ¶27.

---

[9]     "Contra" is another term used internally to describe discounts. *Id.*, ¶11.

79.     The SEC determined that HP itself "***recognized that the A-Business was 'cannibalizing' sales . . . and reducing HP's margins***" in other regions, particularly in EMEA. *Id.*, ¶28.   HP's EMEA region was forced to "combat gray marketing from the APJ region" by discounting its goods.  *Id.*  Exacerbating the impacts of the scheme, the "discount[ed] goods from EMEA . . . made their way into certain markets in the AMS region, causing further sales cannibalization and pressuring margins in the AMS region as well." *Id.*, ¶29.

80.     Accordingly, as a result of the gray marketing conduct described above, the SEC concluded:

> ***Between November 2015 and June 2016, HP's disclosures regarding channel inventory and gross margin omitted material information regarding the impact of the above mentioned practices on these metrics, causing HP's disclosures to be incomplete and misleading***.  As a result of the conduct described above, Respondent omitted material information in: (1) its annual report on Form 10-K for fiscal year 2015; (2) its quarterly reports on Form 10-Qs for the first and second quarters of 2016; and (3) on quarterly earnings calls during that time period.
>
> *                    *                    *
>
> ***[I]n periodic securities filings between November 2015 and June 2016, HP repeatedly disclosed decreases in its operating profits caused by declines in HP's gross margin***.  In each instance, ***HP provided various reasons for the decline in gross margin but omitted the material impact that pull-ins and the A-Business were having on HP's gross margins***.  Specifically, in its quarterly securities filings for the first two quarters of 2016, HP disclosed that its decreasing gross margins were the result of "competitive pricing environment" and "unfavorable currency impacts," but omitted from its description the impact that its use of pull-ins and A-Business was having on its gross margins.
>
> *                    *                    *
>
> In addition, in several instances where HP's channel inventory was above its target range, HP omitted from the [channel inventory] disclosure [on quarterly earnings calls between November 2015 and June 2016] the material impact that pull-ins and A-Business  were having on HP's channel inventory.  Specifically, on its quarterly earnings calls in November 2015 and February 2016, HP omitted from its channel inventory disclosure the impact that pull-ins and A-business had in causing channel inventory to increase above the target range.

*Id.*, ¶¶39, 43, 45.

**B.     The SEC Order Found that HP Used "Accelerations" to Meet Supplies Sales Targets, Causing Its Public Statements to Be Misleading**

81.     The SEC Order detailed that, "[b]eginning in early 2015 and undisclosed to the market, HP sales managers began offering increased discounts at the end of quarters to meet sales

targets." *Id.*, ¶16.  HP's engaged in this sales practice to "accelerate sales into the channel to increase quarterly revenue." *Id.*, ¶18.  In early 2015, "HP began to see regular gaps, near the ends of the quarters between the flash [reports used to manage revenue, operating profit and WOS numbers] and budget." *Id.*, ¶17.  Despite HP's knowledge of these gaps, it actually "***accelerated*** [the practice] in late 2015 and early 2016." *Id.*, ¶19.  And, according to the SEC Order, "***[t]his pattern led to a known trend of increasing channel inventory and lower margin sales that continued over multiple quarters***." *Id.*, ¶20.

82.  The SEC Order's findings were supported by contemporaneous emails.  For example, one Printing segment manager described "'unhealthy levels of stock'" in Tier 1 and Tier 2, saying that "'we needed the Supplies Revenue & we used significant amounts of contra to push in Supplies at T1 to > 2 weeks above their optimal levels.'"  *Id.*, ¶21.  Another Printing segment manager warned that "'***partners do not want to carry the level of toner that we push into their warehouses . . . . [b]ut we push more toner in to help deliver on our financial plans***.'"  *Id.*, ¶22.

83.  What is more, the SEC Order found that "***in late 2015 and early 2016, as WOS in each of HP's three regions approached or exceeded their ceilings, HP's worldwide executives demanded that regional managers . . . still deliver[] sales and operating profit targets***." *Id.*, ¶30.  As a result of pressure from HP executives, HP managers offered even more discounts to "encourage sales from Tier 1 to Tier 2," which allowed HP "to sell into Tier 1 to increase revenue without exceeding the WOS ceilings," which would have alerted investors.  *Id.*, ¶31.  Exacerbating the impacts of HP's scheme, "Tier 2 partners [who then] already had what they viewed to be sufficient inventory . . . demanded steeper discounts." *Id.*, ¶32.

84.  Worse still, the SEC Order found that HP:

> [E]ngaged in "simultaneous sell-in/sell-through deals," also called "in-and-out sales," described by one HP regional sales manager as "***indent supplies that sells-in [to Tier 1] and through [to Tier 2] immediately***" which had "***no WOS implications and helps with our profit status***."  Nevertheless, because the sales were based on meeting HP's budgeted numbers and not on specific end-user demand, ***they further increased HP's Tier 2 channel inventory***.  [And] [b]ecause HP's disclosures only described its Tier 1 channel inventory, this additional inventory was not part of HP's channel inventory disclosures.

*Id.*, ¶33.

85.     As a result, the SEC Order concluded:

Between **November 2015 and June 2016, HP's disclosures regarding channel inventory and gross margin omitted material information regarding the impact of the above-mentioned practices on these metrics, causing HP's disclosures to be incomplete and misleading**.  As a result of the conduct described above, Respondent omitted material information in: (1) its annual report on Form 10-K for fiscal year 2015; (2) its quarterly reports on Form 10-Qs for the first and second quarters of 2016; and (3) on quarterly earnings calls during that time period.

\*       \*       \*

In its 2015 Form 10-K, HP failed to disclose **the known trend of increased quarter-end discounting leading to margin erosion and an increase in channel inventory, and the unfavorable impact that the trend would have on HP's sales and income from continuing operations, causing HP's reported results to not necessarily be indicative of its future operating results.  The failure to disclose that material trend caused HP's 2015 Form 10-K to be materially misleading**.

\*       \*       \*

In addition, in several instances where HP's channel inventory was above its target range, HP omitted from the [channel inventory] disclosure [on quarterly earnings calls between November 2015 and June 2016] the material impact that pull-ins and A-Business were having on HP's channel inventory.  Specifically, on its quarterly earnings calls in November 2015 and February 2016, HP omitted from its channel inventory disclosure the impact that pull-ins and A-business had in causing channel inventory to increase above the target range.

*Id.*, ¶¶39, 42, 45.

**C.      The SEC Order Found that HP's Reported Channel Inventory Metrics "Only Told Part of [HP's Channel Inventory] Story"**

86.     "HP operated its push model through a multi-tiered channel . . . HP would generally sell products directly to 'Tier 1' distributors, which would then sell the products through to 'Tier 2' resellers, which would either sell to end users or to resellers further down the distribution chain." *Id.*, ¶12.  "HP measured its channel inventory levels using Weeks of Supply (WOS) . . . ."[10] *Id.*, ¶13.

87.     During "quarterly earnings calls HP would disclose whether it was within or above its internal targeted WOS range as a proxy for its channel health."  *Id.*  But the SEC found that "[u]ndisclosed to the market, HP only included its Tier 1 channel partners' inventory in its WOS

---

[10]   Notably, WOS was supposed to act as a "control" by HP to ensure that sales managers did not "push excess inventory into the channel."  SEC Order, ¶14.  "Internally, HP referred to the upper end of its WOS range as a ceiling, and regional managers were expected to maintain their channel inventory below the WOS ceiling."  *Id.*, ¶13.  In fact, HP's Finance Department, led by Defendant Lesjak, established the WOS ceilings and referred to them as a "'do not exceed metric.'"  *Id.*, ¶14.

calculation . . . ***meaning that disclosures about the company's position relative to its channel inventory ceiling only told part of the story regarding HP's channel health***." *Id.*, ¶15.

88.     As a result of these findings, the SEC concluded:

[O]n quarterly earnings calls between November 2015 and June 2016, HP repeatedly made disclosures regarding the level of its channel inventory relative to the company's "target weeks of supply range." . . . ***However, . . . HP's failure to describe its overall channel inventory provided the market with only a partial and misleading picture of HP's channel health and caused HP's channel inventory disclosures to be materially misleading***.

*Id.*, ¶44.

89.     As a result of the scheme and Defendants' false statements, the SEC Order found that HP violated §17(a)(2) and (3) of the Securities Act of 1933,[11] §13(a) of the 1934 Act and Rules 12b-20, 13a-1 and 13a-13 thereunder[12] and Section Rule 13a-15(a) of the 1934 Act.[13]  Further, HP was sanctioned $6,000,000 million and ordered to cease violating the federal securities laws.

## VII.     DEFENDANTS' MISLEADING STATEMENTS AND OMISSIONS

### A.     The Context in Which Defendants' Misleading Statements and Omissions Were Made

90.     Leading up to and following HP's spin-off, Defendants emphasized that the Supplies business was the key driver of HP's results going forward.  As detailed above, Defendants repeatedly emphasized during the September 15, 2015 Security Analyst Meeting that for the new HP, it's "all about supplies." *See* §V.D., *supra*.  As a result, analysts and investors were keenly focused on the Supplies business during the Class Period, with particular emphasis on profit margins, channel inventory levels, and revenue trends.  Analysts routinely asked Defendants pointed questions about

---

[11]   These provisions prohibit any person from directly or indirectly obtaining money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or engaging in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser, in the offer or sales of securities.

[12]   These provisions require issuers to file accurate annual, current, and quarterly reports, which include such further information as may be necessary to make the required statements not misleading.

[13]   This provision requires issuers file reports pursuant to §13(a) or 15(d) of the 1934 Act to maintain disclosure controls.

these metrics during earnings calls and investor presentations and highlighted the Supplies business in analyst reports.

91.    For example, on November 5, 2015 – the first day of the Class Period – Deutsche Bank issued an analyst report that included a "Buy" rating on HP's stock and stated, in relevant part:

> ***Remain positive on HPQ post split; adjusting ests and PT to $17, maintain Buy***
>
> *. . . The company has a strong recurring revenue and profit base from its supplies business*, which we expect to drive healthy free cash flow and support returns to investors through dividends and share buybacks.  We also see opportunities to outperform in core markets through growth initiatives.  Given HP Inc.'s attractive, stable business with a healthy 3% dividend yield, we view current valuation as attractive and *rate HPQ a Buy*.
>
> ***Printer business is the key driver of profitability growth***
>
> *The vast majority of HP's profitability comes from its printer supplies business*.  As a percent of the company's operating profit, we estimate[] supplies account for 110%, as negative printer hardware profit more than offsets only modest PC profit.  *Stabilizing the supplies business and driving further growth in this segment is the company's most important strategic priority*.  We think management's initiatives to drive future supplies growth (Instant Ink, Ink in the Office, move into A3 market) offer potential upside to our expectations.  *In our view, the strong recurring revenue and profit stream from supplies creates a stable and reliable cash flow stream to support returns to investors*.

92.    In this context – with the market intensely focused and reliant upon the Supplies business – Defendants made materially misleading statements regarding the Supplies business and/or omitted material information regarding HP's sales practices that caused the statements made to be materially misleading.

**B.     Materially Misleading Statements and Omissions Regarding Supplies Pricing, Gross Margins, and Operating Profit Margins**

93.    As detailed herein, Defendants employed the pull-in scheme to artificially inflate HP's Class Period Supplies revenue by pulling in revenues that would have materialized, if at all, in future periods.  Defendants failed to disclose the pull-in scheme or the impact of the scheme on HP's reported profit margins during the Class Period.  Instead, as set forth below, Defendants blamed deteriorating gross profit margins and operating profit margins on other factors, such as competitors' pricing or foreign currency fluctuations – in other words, Defendants blamed the deterioration on factors that were outside of their control.  As the SEC Order determined, "HP's disclosures regarding

1    . . . gross margin omitted material information regarding the impact of the [pull-in scheme] on these

2    metrics, causing HP's disclosures to be incomplete and misleading."  SEC Order, ¶39.

3         94.    Defendants' misleading statements and omissions regarding Supplies pricing, gross

4    margins, and operating profit margins are set forth below.

5         95.    On November 5, 2015, after the market closed, HP filed a Form 8-K with the SEC

6    that included pro forma consolidated financial statements reflecting HP's revenue, gross margin, and

7    profit following the Company's spinoff from HPC.  The November 5, 2015 Form 8-K incorporated

8    by reference the consolidated financial statements, accompanying notes, and Management's

9    Discussion and Analysis of Financial Condition and Results of Operations from the Form 10-Q for

10   the third quarter of fiscal 2015 ("Q3 2015"), ended July 31, 2015.  The November 5, 2015 Form 8-K

11   and incorporated financial statements reported pro forma gross margin of 19.3% and operating profit

12   margin of 8.2% for the nine months ended July 31, 2015, Printing segment operating profit margin

13   of 17.8% for Q3 2015, and stated, in relevant part:

14        *Gross margin was 23.8%* ($6.0 billion) and 24.0% ($6.6 billion) for the three months
          ended July 31, 2015 and 2014, respectively.  *The 0.2 percentage points decrease in*
15        *gross margin was due primarily to competitive pricing pressures in Printing*, EG
          and Personal Systems and a higher mix of ISS products in EG.
16
                            *        *        *
17
          •    In Printing, we are experiencing the impact of the growth in mobility and
18             demand challenges in consumer and commercial markets.  *We are also*
               *experiencing an overall competitive pricing environment due to aggressive*
19             *pricing from our Japanese competitors, given the weakness of the Japanese*
               *Yen*.
20
                            *        *        *
21
          For the three months ended July 31, 2015, total gross margin decreased 0.2
22        percentage points.  From a segment perspective, *the primary factors impacting gross*
          *margin performance are summarized as follows*:
23
          •    *Printing gross margin decreased due primarily to a competitive pricing*
24             *environment* in hardware.

25                          *        *        *

26        *Printing earnings from operations* as a percentage of net revenue *decreased*
          *by 0.6 percentage points* for the three months ended July 31, 2015 due to a decline in
27        gross margin . . . .

28

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 4:20-
cv-07835-JSW                                                                                  - 28 -
4816-1772-1318.v1

96.     On November 24, 2015, HP issued an earnings release announcing its financial results for the fourth quarter of fiscal 2015 ("Q4 2015") and FY 2015.  The same day, HP held a conference call for analysts, media representatives, and investors during which Defendants Weisler and Lesjak discussed the quarterly results.  As set forth below, Defendants made materially misleading statements in the earnings release and on the earnings call regarding Supplies pricing, gross margins, and operating profits and/or omitted material information regarding the pull-in scheme, which caused the statements made to be materially misleading.

97.     In the November 24, 2015 earnings release, Defendants reported gross margins of 24.7% for Q4 2015 (compared to 24.6% for fourth quarter fiscal 2014 ("Q4 2014")) and 24.0% for FY 2015 (compared to 23.9% for FY 2014) and Printing segment operating profit margin of 17.4% for Q4 2015 (compared to 17.8% for Q3 2015 and 18.2% for Q4 2014).

98.     On the November 24, 2015 earnings call, Defendant Weisler blamed HP's performance on "currency movements":

> Turning to Printing, we saw accelerated revenue declines across hardware and supplies and there have been a couple of factors that have changed since the Security Analyst Meeting. ***The most significant factor was the continued effects of currency movements that have accelerated pricing pressures even more than we expected in certain profitable segments of the printing markets***.

99.     With respect to Supplies pricing, Defendant Weisler assured investors on the call that HP did not rely on discounting prices to stay competitive: "[W]e can't compete on price alone.  So we are balancing our pricing actions with increased marketing and sales activity to stimulate demand."  Likewise, Defendant Lesjak stated that Defendants would be "careful about what we do from a supplies pricing perspective."

100.    On the same earnings call, Defendant Lesjak stated:

> ***From an operating profit perspective, we delivered 17.4%, down 0.8 points year-over-year.  Currency headwinds and competitive pricing*** were only partially offset by strong supplies mix.

101.    Following the November 24, 2015 earnings release and earnings call, analysts highlighted Defendants' assurances that the disappointing Printing results, including pricing and margins, were due to pricing pressures caused by competitors and foreign currency movements – factors that Defendants claimed were outside of their control.  For example:

- "Printing's outlook remains weak, with . . . **Yen-based competitors continuing to price aggressively**." Sterne Agee CRT (Nov. 25, 2015)

- "Printing weakness continues: . . . **HPQ said that Japanese competitors have gotten even more aggressive on pricing recently."** JP Morgan (Nov. 25, 2015).

- "HPI facing near-term headwinds as **currency and price aggressiveness weigh on growth and margins** . . . ." Morgan Stanley (Nov. 25, 2015).

- "In printing, hardware and supplies growth were weak due to three key reasons: . . . 3.) pricing became worse as **HPQ felt compelled to match competitors who were benefiting from a strong dollar**." FBN Securities (Nov. 25, 2015).

- "**[A]ggressive pricing from Japanese competitors in the printing business, primarily due to the weakness of the Yen, continued to challenge HP's market share.**" Trefis (Nov. 25, 2015).

- "[W]ith **continued pricing pressure from Japanese peers capitalizing on the lower Yen** and weakening hardware placements, management now sees printing declines not abating until the end of F17." UBS Securities (Nov. 24, 2015).

- "HPI facing near-term headwinds as **currency and price aggressiveness weigh on growth and margins** . . . ." Morgan Stanley (Nov. 25, 2015).

102.    On December 16, 2015, HP issued its Form 10-K for FY 2015, which was signed by Defendants Weisler and Lesjak.  The 10-K included the following false and misleading statements about Supplies pricing, gross margins, and operating profits, but continued to conceal the pull-in scheme and its effect on pricing, gross margin, and operating profits:

- **In Printing**, we are experiencing the impact of the growth in mobility and demand challenges in consumer and commercial markets.  **We are also experiencing an overall competitive pricing environment due to aggressive pricing from our Japanese competitors, given the weakness of the Japanese yen**.

\*        \*        \*

From a segment perspective, **the primary factors impacting gross margin performance are summarized as follows**:

\*        \*        \*

- **Printing gross margin decreased due primarily to a competitive pricing environment in hardware and unfavorable currency impacts**[.]

\*        \*        \*

Printing earnings from operations as a percentage of net revenue remained flat for fiscal 2015 due to a decline in gross margin, offset by lower operating

expenses as a percentage of net revenue. ***The decline in gross margin was due primarily to a competitive pricing environment in hardware and unfavorable currency impacts***, the effects of which were partially offset by a favorable mix of ink and graphics supplies and favorable currency impacts from the Japanese yen.

103.    On February 24, 2016, HP issued an earnings release announcing its financial results for Q1 2016, ended January 31, 2016.  The same day, HP held a conference call for analysts, media representatives, and investors during which Defendants Weisler and Lesjak discussed the quarterly results.  Defendants made materially false and misleading statements in the earnings release and on the call regarding Supplies pricing, gross margins, and operating profits and/or omitted material information regarding the pull-in scheme, which caused the statements made to be materially misleading.

104.    In the February 24, 2016 earnings release, Defendants reported gross margin of 18.7% for Q1 2016 (compared to 19.2% for Q4 2015 and 19.4% for Q1 2015) and Printing segment operating profit margin of 17.0% for Q1 2016 (compared to 18.8% for Q1 2015).

105.    On the February 24, 2016 earnings call, Defendant Weisler stated:

Turning to printing, in quarter one, many of the challenges we discussed on the Q4 earnings call continued as expected. ***Let me remind you of the competitive advantage the Japanese printing vendors have associated with the weakness of the yen, which allowed them to price more aggressively***.

*        *        *

And of course as you know and as we've explained the Four Box Model, Supplies is also a function of units that we place into the system.  And so as we mentioned on the Q4 earnings call, ***we recognize that the challenging environment at the moment with the double-edge sword of the Japanese competitors leveraging a weaker yen, putting pressure on pricing was something that we needed to indeed respond to*** by taking costs out of the system, recognizing that this is indeed the new normal.  And so, we went to work, we've developed very robust plans to take non-revenue-generating costs out of the system so that we can place those marginal units, which, of course, impacts Supplies positively in the future.

106.    On the same earnings call, Defendant Lesjak stated:

***Gross margin of 18.7% was down 0.7 points year-over-year, due to the unfavorable mix in competitive pricing in Print***, partially offset by benign commodity costs and favorable mix in Personal Systems. ***Gross margin was down 0.6 points sequentially, due to weak currencies in Print mix combined with continued competitive pricing***.

*        *        *

*On the Printing side, really the margin, so we delivered a margin of 17%, down 1.8 points.  And the pressure there was really around very competitive pricing environments related to currency* . . . .

107.    Defendant Lesjak also stated, "[t]urning to Supplies . . . [a]lthough the business remained challenged, *we made solid progress on our core and growth initiatives*."

108.    Following the February 24, 2016 earnings release and earnings call, analysts reiterated Defendants' assurances that the disappointing results, including pricing and margins, were due to pricing pressures caused by competitors and foreign currency movements – factors that Defendants claimed were outside of their control.  For example:

- "Printer operating margin fell 1.8 points Y/Y on currency related *price competition*." Morgan Stanley (Feb. 25, 2016).

- "The weakness came from both *supplies* and hardware, which *management attributed to competitive pricing dynamics, currency* and weak end-markets." Credit Suisse (Feb. 25, 2016).

109.    On March 3, 2016, HP issued its Form 10-Q for Q1 2016, which was signed by Defendants Weisler and Lesjak.  The 10-Q included the following misleading statements and omissions about Supplies pricing, gross margins, and operating profits, but continued to conceal the pull-in scheme and its effect on pricing, gross margin, and operating profit:

- *In Printing*, we are experiencing the impact of demand challenges in consumer and commercial markets.  We are also experiencing an overall *competitive pricing environment due to aggressive pricing from our Japanese competitors*, given the weakness of the Japanese yen.

\*       \*       \*

HP gross margin decreased by 0.7 percentage points for the three months ended January 31, 2016 as compared to the prior-year period.  *The primary factors impacting gross margin performance were unfavorable currency impacts and a competitive pricing environment* across LaserJet and Inkjet businesses, partially offset by favorable commodity costs, pricing and mix in Personal Systems and a higher proportion of ink and graphics supplies sales in Printing.

\*       \*       \*

*Printing earnings from operations as a percentage of net revenue decreased by 1.8 percentage points* for the three months ended January 31, 2016 as compared to the prior-year period *due to a decline in gross margin* and an increase in operating expenses as a percentage of net revenue.  *The gross margin decline was due primarily to unfavorable currency impacts and competitive pricing* across LaserJet and Inkjet businesses, partially offset by a higher proportion of ink and graphics supplies sales.

110.    On May 25, 2016, HP issued an earnings release announcing its financial results for Q2 2016, ended April 30, 2016.  That same day, HP held a conference call for analysts, media representatives, and investors during which Defendants Weisler and Lesjak discussed the quarterly results.  As set forth below, Defendants made materially misleading statements and omissions in the earnings release and on the earnings call regarding Supplies pricing, gross margins, and operating profits and/or omitted material information regarding the pull-in scheme and its effect on pricing, gross margins, and operating profit, which caused the statements made to be materially misleading.

111.    In the May 25, 2016 earnings release, Defendants reported gross margin of 19.4% for Q2 2016 (compared to 19.7% for second quarter fiscal 2015 ("Q2 2015")) and Printing segment operating profit margin of 17.3% for Q2 2016 (compared to 17.8% for Q2 2016).

112.    On the May 25, 2016 earnings call, Defendant Lesjak stated:

Gross margin of 19.4% was down 0.3 points year-over-year, ***driven by unfavorable currency and competitive pricing*** . . . .

\*        \*        \*

***Operating profit for printing was 17.3%, down 0.5 points year over year, driven by currency and competitive pricing***, partially offset by operational improvements, favorable hardware mix, and divestiture gains.

113.    During the May 25, 2016 call, Lesjak responded to an analyst question regarding Printing operating profit margins, and again blamed "currency" and "competitive pricing" for the disappointing results:

Operating losses for Printing were down 50 basis points, as you mentioned, and ***that's really driven by currency and the very competitive pricing environment we saw***.

114.    Following the earnings release and earnings call, analysts reiterated Defendants' assurances that the decline in Supplies profit margin was due to pricing pressures caused by competitors and foreign currency movements.  For example:

- ***Segment operating margin of 17.3%*** improved from Jan Q level of 17.0% but remains lower than prior-year quarter of 18.1% as ***foreign competitors pricing pressure and FX Y/Y impact has not fully recovered***.  Brean Capital, LLC (May 26, 2016).

- ***Printing margin*** of 17.3% was -100bps Y/Y on ***currency and competitive pricing*** . . . .  Sterne Agee (May 26, 2016).

115.   On June 3, 2016, HP issued its Form 10-Q for Q2 2016, which was signed by Defendants Weisler and Lesjak.  The 10-Q included the following misleading statements and omissions about Supplies pricing, gross margins, and operating profit, but continued to conceal the pull-in scheme and its effect on pricing, gross margins, and operating profit:

- ***In Printing***, we are experiencing the impact of demand challenges in consumer and commercial markets.  We are also experiencing an overall ***competitive pricing environment due to aggressive pricing from our Japanese competitors***.

\*     \*     \*

For the three and six months ended April 30, 2016, ***our gross margin decreased 0.3 percentage points and 0.6 percentage points***, respectively as compared to the prior-year periods.  ***The primary factors impacting gross margin performance were unfavorable currency impacts and a competitive pricing environment in Printing***, the effects of which were partially offset by favorable commodity costs, product mix and pricing in Personal Systems.

\*     \*     \*

***Printing earnings from operations as a percentage of net revenue decreased by 0.5 percentage points*** for the three months ended April 30, 2016 as compared to the prior-year period due to a decline in gross margin and an increase in operating expenses as a percentage of net revenue.  ***The gross margin decline was due primarily to net unfavorable currency impacts and a competitive pricing environment***, the effects of which were partially offset by operational improvements, higher proportion of graphics supplies and favorable mix of Inkjet printers.

\*     \*     \*

***Printing earnings from operations as a percentage of net revenue decreased by 1.2 percentage points*** for the six months ended April 30, 2016 as compared to the prior-year period ***due to a decline in gross margin*** and an increase in operating expenses as a percentage of net revenue.  ***The gross margin decline was due primarily to net unfavorable currency impacts and competitive pricing pressure***, partially offset by operational improvements, favorable mix of Inkjet printers and a higher proportion of graphics and ink supplies.

116.   Defendants' Class Period statements regarding Supplies pricing, gross margins, and operating profits, set forth above at ¶¶95-100, 102-107, 109-113, 115, were materially misleading and/or omitted material information, which caused the statements made to be materially misleading for the following reasons:

(a)   The decline in Supplies pricing, gross margins, and operating profits was primarily due to HP's undisclosed pull-in scheme, not currency or competitive pricing issues.  As part of the scheme, HP steeply discounted Supplies prices in order to induce unsustainable and

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 4:20-cv-07835-JSW
4816-1772-1318.v1
- 34 -

artificial Supplies sales that would have occurred, if at all, in future periods absent the scheme.  As determined in the SEC Order:

> [T]o entice distributors to take additional product, sales managers offered discounts, in some instances in excess of forty percent for A-Business sales, while discounts for local distributors were in the teens. . . .  Internal company documents described the A-Business in 2015 and the first half of 2016 being conducted at contra levels three to four times HP's normal contra rates.

SEC Order, ¶26.  The steep discounts had a direct, undisclosed impact on HP's reported gross margins and operating profits.

  (b) The following graphic demonstrates how decreasing profit margins, which Defendants blamed on external factors such as currency issues, actually coincided with Defendants' steadily increasing use of low-margin sales as part of the pull-in scheme:



  (c) As the SEC concluded, HP's failure to disclose the exorbitant discounting associated with the pull-in scheme rendered Defendants' statements misleading: "Between November 2015 and June 2016, HP's disclosures regarding . . . gross margin omitted material information regarding the impact of the [pull-in scheme] on these metrics, ***causing HP's disclosures to be incomplete and misleading***."  *Id.*, ¶39.

1    (d)    Defendants affirmatively misrepresented the cause of the declining gross

2  margins and operating profits, blaming the declines on external factors such as "competitive pricing

3  pressures" and "aggressive pricing from our Japanese competitors, given the weakness of the

4  Japanese Yen."  As found in the SEC Order, however:

> [I]n periodic securities filings between November 2015 and June 2016, HP
> repeatedly disclosed decreases in its operating profits caused by declines in HP's
> gross margin.  In each instance, ***HP provided various reasons for the decline in
> gross margin but omitted the material impact that pull-ins and the A-Business were
> having on HP's gross margins***.  Specifically, in its quarterly securities filings for the
> first two quarters of 2016, HP disclosed that its decreasing gross margins were the
> result of "competitive pricing environment" and "unfavorable currency impacts," but
> omitted from its description the impact that its use of pull-ins and A-Business was
> having on its gross margins.

10  *Id.*, ¶43.

11    (e)    The pull-in scheme had a material impact on HP's reported gross margins and

12  Printing operating profit margins.  For each of the quarterly results referenced above, the pull-in

13  scheme negatively impacted Printing operating profit margins.  *See* §VIII.E., *infra*.  In fact,

14  unbeknownst to investors, in each quarter, the primary driver of the decline in operating profit

15  margin was the steep discounting associated with the pull-in scheme, ***not*** the external factors, such as

16  foreign currency issues, cited by Defendants:

| Period | Decline in Profit Margin Reported by HP[14] | Estimated Decline in Profit Margin Caused by the Pull-in Scheme (*see* ¶197, *infra*) |
|---|---|---|
| Q3 2015 | 0.6 pts | Between 0.7 pts and 1.4 pts |
| Q4 2015 | 0.8 pts | Between 0.8 pts and 1.5 pts |
| Q1 2016 | 1.8 pts | Between 0.5 pts and 1.5 pts |

22  Likewise, in each quarter, the primary driver of the change in gross margin was the steep discounting

24  associated with the pull-in scheme:

---

[14]   During the Class Period, even a 0.1 point decline in Printing operating profit margin was material. Based on HP's reported revenues during the Class Period, a 0.1 point decline in Printing operating profit margin represented approximately $5 million of operating profit. Indeed, in each of HP's quarterly earnings calls and SEC filings, HP highlighted and described any changes to Printing operating profit margin of 0.1 point or more.

| Period | Change in Gross Margin Reported by HP[15] | Estimated Change in Gross Margin Caused by the Pull-in Scheme (*see* ¶197, *infra*) |
|---|---|---|
| Q3 2015 | -0.2 pts | Between -0.1 pts and -0.3 pts |
| Q4 2015 | 0.1 pts | Between -0.2 pts and -0.3 pts |
| Q1 2016 | -0.7 pts | Between 0.5 pts and 1.5 pts |

(f)     HP's gross margins and Printing operating profit margins were material to HP's overall financial results.  As a result, those metrics were closely tracked by analysts and investors.  Indeed, because the Supplies business represented almost the entire profit of the Company, even small changes in Supplies profit margins had material impacts on HP's overall financial results.  For example, during the Class Period, the Printing segment represented less than half of HP's consolidated revenues but was responsible for 77% of the Company-wide operating profit.  Within the Printing segment, Supplies represented more than 100% of the Printing segment profit, while the Printing hardware business lost money.  Thus, the operating profit generated from the Supplies business represented at least 80% of HP's Company-wide profits during the Class Period.

**C.     Materially Misleading Statements and Omissions Regarding Supplies Channel Inventory**

117.     As detailed herein, Defendants employed the pull-in scheme to distort the true condition of the Supplies business.  Specifically, the scheme resulted in elevated levels of supplies in HP's distribution channel.  Defendants knew that elevated channel inventory would be viewed negatively by analysts and investors – after all, high channel inventory is an impediment to future revenues – so Defendants designed the scheme to conceal the escalating levels of Supplies channel inventory.

118.     Further, Defendants assured investors throughout the Class Period that Supplies channel inventories were "declining" and within "targeted ranges."  Defendants emphasized that the

---

[15]     During the Class Period, even a 0.1 point change in gross margin was material.  Based on HP's reported revenues during the Class Period, a 0.1 point change in gross margin represented approximately $25 million of gross profit.  Indeed, in each of HP's quarterly earnings calls and SEC filings, HP highlighted and described any changes to gross margin of 0.1 point or more.

reduced channel inventory stabilized HP's flagship Supplies business.  In reality, Defendants' statements related to "channel inventory" only included inventory held by Tier 1 distributors; unbeknownst to investors, those statements omitted significant inventory levels at Tier 2 resellers.  As detailed in the SEC Order, "***HP's failure to describe its overall channel inventory provided the market with only a partial and misleading picture of HP's channel health and caused HP's channel inventory disclosures to be materially misleading***."  SEC Order, ¶44.

119.    Defendants' false and misleading statements and omissions regarding Supplies channel inventory are set forth below.

120.    On November 24, 2015, HP issued an earnings release announcing its financial results Q4 2015 and FY 2015.  The same day, HP held a conference call for analysts, media representatives, and investors during which Defendants Weisler and Lesjak discussed the quarterly results.  On the earnings call, Defendant Lesjak stated:

> ***From a channel inventory perspective . . . we've reduced both hardware and supplies levels year-over-year and sequentially, but we are still slightly above target weeks of supply range for supplies***.

121.    Following the earnings release and earnings call, analysts reiterated Defendants assurances that Supplies channel inventory had meaningfully decreased and was only slightly above HP's target range.  For example:

- "The ***channel inventory for supplies decreased during the quarter***.  This also suggests that demand will increase in the future."  Trefis (Nov. 25, 2015).

- "***Channel inventory in*** both hardware and ***supplies was reduced*** . . . ."  UBS (Nov. 24, 2015).

122.    On February 24, 2016, HP issued an earnings release announcing its financial results for Q1 2016.  The same day, HP held a conference call for analysts, media representatives, and investors during which Defendants Weisler and Lesjak discussed the quarterly results.  On the earnings call, Defendant Weisler blamed the decline in Supplies revenue on a purported decrease in Supplies channel inventory:

> Shifting to supplies, the year-over-year revenue was down 8% in constant currency.  The factors driving the decline that were expected going into the quarter were installed base erosion from declining hardware sales and ***channel inventory adjustments***.

123.    On the same earnings call, Defendant Lesjak stated:

Turning to supplies, revenue was down 14% year-over-year as reported, or 8% in constant currency, and comprised 67% of the total print revenue.  **Supplies channel inventory was slightly above the range, but we reduced the inventory dollar value both year-over-year and sequentially**.  Although the business remained challenged, we made solid progress on our core and growth initiatives.

*        *        *

**And then from a channel inventory perspective** on the hardware side, we are in a very healthy position.  And so there shouldn't be any more channel inventory hardware units adjusted . . . that need to be adjusted.  **On the Supplies side, we are still slightly above our targeted range, and so we do need some additional channel inventory correction in Q2, but we will be through that by the end of the first half [of FY 2016]**.

124.    Following the earnings release and earnings call, analysts highlighted Defendants' assurances that Supplies channel inventory had meaningfully decreased and was only slightly above HP's targeted range.  For example:

- "**[L]ower channel inventory** and new product launches support improving growth in F2H16.  With PC and Printer **channel inventory** at normal levels and **supplies almost back to normal, revenue trajectory should improve** even without a material improvement in end demand." Morgan Stanley (Feb. 25, 2016).

- "Supplies . . . **channel inventory** still **slightly above their targeted range**." Wells Fargo Securities (Feb. 25, 2016).

125.    On March 1, 2016, Defendant Lesjak spoke at the Morgan Stanley Technology, Media & Telecom Conference.  During her presentation, Defendant Lesjak responded to a question from an analyst regarding HP's financial guidance for FY 2016, stating:

**[F]rom a print perspective, specifically around supplies in the first half, we are taking fairly significant channel inventory correction.  And those we do not expect to repeat in the second half, which changes the constant currency kind of revenue growth trajectory of supplies in the back half as well**.  And so those are the – and then you've got the productivity initiatives that build over the course of the year and then these revenues, non-revenue generating cost structure reductions also build over the course of the year, and that leads to a fairly back-end loaded year.

126.    During the same presentation, Defendant Lesjak responded to a question from an analyst regarding Supplies channel inventory, emphasizing that Supplies channel inventory had decreased year-over-year and quarter-over-quarter and was only "slightly" above targeted levels:

[Q:] Thanks.  Obviously the units – or **in the supplies or the supply revenue** – decelerated last quarter.  **Will you explain that to be a function of inventory adjustments?  I am curious if the sell-through in the end market also decelerated,**

*or was it just kind of a constant kind of environment*?  And second question is how important it is for your unit declines on the printing side to moderate for you to hit your objective on the supply side of exiting 2017.

[**Lesjak**:] In terms of what we saw from a sell-out perspective, we did see a little bit of softness at the end of the quarter from a sell-out perspective.  In fact *that was what drove us over slightly the channel inventory levels*, is that we had kind of forecasted what we thought sell-out would do over the course of the quarter, and targeted our channel inventory levels based on that, *and our channel inventory in supplies came down year-over-year and quarter-over-quarter*.  But at the very end, we saw a little bit of softness on the sell-out, and that caused us to be over in channel inventory.

127.     Following the presentation, Morgan Stanley issued an analyst report on March 1, 2016 reiterating Defendant Lesjak's assurances that Supplies channel inventory had decreased, indicating a positive development for future Supplies revenue:

We hosted HP Inc. on Day 2 of the MS TMT conference.  **The company is confident** it can deliver EPS and FCF guidance even if end markets remain weak.

. . . While annual EPS and FCF guidance assumes improvement in market demand during 2016, *the company should still benefit from channel inventory work down* and recent product launches even if the demand environment remains weak.

128.     On May 25, 2016, HP issued a release announcing its financial results for the Q2 2016.  The same day, HP held a conference call for analysts, media representatives, and investors during which Defendants Weisler and Lesjak discussed the quarterly results.  On the earnings call, Defendant Weisler stated:

Let me also highlight that we made this progress, *while reducing hardware and supplies channel inventory globally.  We are now within our targeted ranges*.  And given our progress, we still expect our supplies revenue trajectory in constant currency to stabilize by the end of 2017.

\*          \*          \*

Our supplies trajectory improved, but it was somewhat masked by the channel inventory reductions that we had, *supplies inventory is now back within the ranges globally and that's obviously where we want it to be*.

129.     Also on the same earnings call, Defendant Lesjak stated:

Supplies revenue was down 16% year-over-year as reported, or down 10% in constant currency.  *Considering currency and the channel inventory position, the supplies revenue trajectory has improved.  We reduced channel inventory in the quarter*, which was a 7 point headwind, as compared to the prior year period.  In Q2, supplies revenue mix was 67%, flat sequentially, *and channel inventory was within our targeted range*.

\*          \*          \*

In terms of the channel inventory correction, off the top of my head, I don't remember what the impact was last quarter. *We did have some, we definitely had some channel inventory corrections last quarter as well, but this quarter was larger*, and it was 7 points of the headwind.

*       *       *

[W]e also *took our supplies channel inventory levels down even a bit further than what we had originally intended* because we believe that having a tight handle on the channel inventory levels is good for our business.

130.    In the slide presentation that accompanied the May 25, 2016 earnings call, Defendants highlighted that Supplies channel inventory was "within targeted ranges" as a "[k]ey message[]" for the quarter:



131.    Following the May 25, 2016 earnings release and earnings call, analysts reiterated Defendants' assurances that Supplies channel inventory had meaningfully decreased and was only slightly above HP's target range.  For example:

- "*A key positive is that HPQ reduced printer hardware and supplies channel inventory last quarter, and these levels are now within targeted ranges*."  FBN Securities (May 27, 2016).

- "*Lower channel inventory levels*, new product launches, and investments to place high usage printers set up for a better second half."  Morgan Stanley (May 25, 2016).

- "*The Good: . . . HP reduced supplies channel inventory and was within their targeted range . . . .*"  Wells Fargo Securities (May 25, 2016).

132.    Defendants' Class Period statements regarding Supplies channel inventory, set forth above at ¶¶120, 122-123, 125-126, 128-130, were materially misleading and/or omitted material information, which caused the statements made to be materially misleading for the following reasons:

1       (a)       Defendants concealed that HP had $700 million in excess channel inventory,

2   which Defendants ultimately recognized when they took a $250 million channel inventory reduction

3   on May 25, 2016 and a $450 million inventory reduction less than one month later, on June 21,

4   2016.  These dramatic reductions confirm that Supplies channel inventory was not within targeted

5   ranges and not reducing during the Class Period.

6       (b)       Throughout the Class Period, Defendants' channel inventory statements were

7   misleading because Defendants deliberately excluded significant Tier 2 channel inventory from the

8   channel inventory levels reported to investors.  As found by the SEC Order:

> [O]n quarterly earnings calls between November 2015 and June 2016, HP repeatedly
> made disclosures regarding the level of its channel inventory relative to the
> company's "target weeks of supply range."   HP's use of the phrase "channel
> inventory" without definition gave the impression that the internal measurement
> included all of HP's channel inventory and was a measure of HP's overall channel
> health.  However . . . **HP's internal channel inventory metric included only its Tier
> 1 channel inventory.  HP's failure to describe its overall channel inventory
> provided the market with only a partial and misleading picture of HP's channel
> health and caused HP's channel inventory disclosures to be materially misleading**.

14  SEC Order, ¶44.

15      (c)       The SEC concluded that Defendants' channel inventory statements were

16  materially misleading:

> HP further **failed to disclose facts necessary to make its channel inventory
> disclosures not misleading**, including that the channel inventory metric employed by
> the company in quarterly earnings calls only included channel inventory held by
> channel partners to which HP sold directly and not by channel partners further down
> the distribution chain, thereby disclosing only an incomplete picture of HP's channel
> health.

21  *Id.*, ¶3.

22      (d)       Throughout the Class Period, Defendants concealed the pull-in scheme and its

23  impact on Supplies channel inventory levels.  As concluded in the SEC Order:

> [I]n several instances where HP's channel inventory was above its target range, HP
> omitted from the disclosure the material impact that pull-ins and A-Business were
> having on HP's channel inventory. Specifically, on its quarterly earnings calls in
> November 2015 and February 2016,  **HP omitted from its channel inventory
> disclosure the impact that pull-ins and A-business had in causing channel
> inventory to increase above the target range**.

27  *Id.*, ¶45.

28

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 4:20-
cv-07835-JSW                                                                                        - 42 -
4816-1772-1318.v1

1    (e)    Throughout the Class Period, Defendants distorted the true health of the

2    Supplies business by falsely claiming that purported channel inventory reductions were indicative of

3    future Supplies revenue growth.  For example, in March 2016, Defendant Lesjak claimed that "in the

4    first half [of FY 2016], we are taking fairly significant [Supplies] channel inventory correction [*i.e.*,

5    reduction].  And those we do not expect to repeat in the second half, which changes the constant

6    currency kind of revenue growth trajectory of supplies in the back half as well."  Defendant Weisler

7    also stated that "[o]ur supplies trajectory improved, but it was somewhat masked by the channel

8    inventory reductions that we had."  In reality, however, Supplies channel inventory had increased –

9    not decreased – and future Supplies revenues would not increase until the excess channel inventory

10   was cleared out.

11   (f)    Throughout the Class Period, Defendants distorted the true health of the

12   Supplies business by falsely claiming that current period Supplies revenue was better than it

13   appeared because it had been "masked" by purported channel inventory reductions that had

14   negatively impacted sales.  For example, in May 2016, Defendant Weisler and Lesjak claimed that

15   "[o]ur supplies trajectory improved, but it was somewhat masked by the channel inventory

16   reductions that we had."   In reality, however, Supplies channel inventory had increased – not

17   decreased – and future Supplies revenues would not increase until the excess channel inventory was

18   cleared out.

19   (g)    The amount of excess Supplies channel inventory concealed by Defendants

20   was material to HP's overall results.  As noted in the SEC Order:

21    The $450 million reduction represented 5% of HP's reported Printing segment net
     revenue for the second half of 2016.  Asked by an analyst about the size of the
22    inventory reduction, HP's CFO described it as "***fairly material***, because as I
     mentioned it's about $450 million over a couple of quarters."
23

24   SEC Order, ¶38.  Indeed, the $450 million reduction was in addition to the $250 million reduction in

25   revenue Defendants took in Q2 2016, for a total of $700 million in revenue reduction during the

     Class Period.
26

27   (h)    Accurate information regarding HP's Supplies channel inventory was material

28   to analysts and investors.  As detailed above, analysts closely tracked Supplies channel inventory

each quarter and routinely asked questions regarding channel inventory during quarterly earnings calls.  Analysts and investors viewed lower channel inventory levels as a catalyst for future Supplies revenue growth and, thus, as a barometer for whether HP could meet its stated objective of stabilizing Supplies revenue by the end of FY 2017.  By disclosing inaccurate and incomplete information regarding Supplies channel inventory levels, Defendants misled analysts and investors as to the true condition of the Supplies business during the Class Period.

### D.    Materially Misleading Statements and Omissions Regarding Supplies Revenue

133.    Defendants used the pull-in scheme to artificially inflate Supplies revenue by pulling forward revenues that, absent the scheme, would have materialized, if at all, in future periods.  The scheme was particularly pervasive in the APJ region, where the gray marketing practices began and were most prevalent.  Unbeknownst to investors, the scheme distorted the true condition of the Supplies business and rendered misleading Defendants' Class Period statements that the Supplies business was "on track" to stabilize by the end of FY 2017.

134.    As set forth below, Defendants assured investors that HP was "on track" to stabilize the Supplies business.  In reality, the Supplies business was not "on track."  Rather, the Supplies business would only stabilize if HP took drastic measures to clear excess Supplies inventory that had built up in the channel over the preceding quarters as a direct result of the pull-in scheme.

135.    Defendants' misleading statements and omissions relating to Supplies revenue and the purported stabilization of Supplies revenue are set forth below.

136.    On February 24, 2016, HP issued an earnings release announcing its financial results for Q1 2016.  The same day, HP held a conference call for analysts, media representatives, and investors during which Defendants Weisler and Lesjak discussed the quarterly results.  On the earnings call, Defendants Weisler and Lesjak assured investors that HP would stabilize Supplies revenue by the end of 2017, but failed to disclose that, in order to do so, HP would first need to clear significant excess inventory from the channel and change its entire sales model.  On the call, Defendant Weisler stated, "*we remain confident in our outlook for Supplies revenue in constant currency to stabilize by the end of 2017.*"  On the same call, Defendant Lesjak stated:

So in our outlook for the year, *we do expect that the Supplies revenue trajectory will improve over the course of the year*.  We have very tough compares year-over-year, because in the first half of last year, we had very favorable foreign exchange contracts.  But what also was very clear and we updated this outlook on the Q4 earnings call, that in fact, *the Supplies revenue in constant currency will . . . we expect will stabilize by the end of 2017 and we are reaffirming that today.*

137.    Also on the earnings call, Defendants Weisler and Lesjak highlighted the turnaround in the APJ region.  Defendant Weisler stated, "while revenue continued to be challenged by market contraction in PCs and core printing, *we delivered constant currency revenue growth in APJ* . . . ."

138.    In the earnings presentation that accompanied the February 24, 2016 earnings call, Defendants highlighted that APJ revenue had increased 2% on a constant currency basis, compared with year-over-year revenue declines of at least 6% in each of its other worldwide regions.

139.    Following the February 24, 2016 earnings release and earnings call, analysts reiterated Defendants' assurances that Supplies revenues were on track to stabilize by the end of FY 2017.  For example:

- "In printing, units and supplies all declined by low double digits Y/Y, but *mgmt reiterated a turn in supplies trends by FYE-17*."  Deutsche Bank (Feb. 24, 2016).

- "*Line of sight on stabilization in printer supplies* . . . With *print supplies driving the vast majority of the profitability of the print segment as well as overall HPQ operating profit, the stabilization and recovery of supplies sales will be a key metric* to track over the next two years, in our view."  Deutsche Bank (Mar. 20, 2016).

140.    On March 1, 2016, Defendant Lesjak spoke at the Morgan Stanley Technology, Media & Telecom Conference.  During the presentation, an analyst asked whether HP could stabilize Supplies revenue by the end of FY 2017.  In response, Defendant Lesjak stated that HP was on track to stabilize Supplies revenue.  Defendant Lesjak failed to disclose that in order to stabilize Supplies revenue by the end of FY 2017, HP would need to take significant reductions to inventory – and revenue – in order to clear excess Supplies inventory from the channel and completely overhaul HP's sales model.  Defendant Lesjak stated, in relevant part:

*At the core is the confidence that we have in the Four Box Model around supply and what drives supplies over time*.  Now you got to have – in the model, you got to have accurate assumptions, and you've got to be constantly fine-tuning those assumptions based on what you're seeing in the market and also what big data you are getting back.  We have a lot of printers that have phone home and tell us what's going on.  *And so we are fine-tuning that model, but we have a lot of confidence that those four boxes and the levers within each of them are exactly the right thing*

*to work on, so that over time the constant currency revenue in supplies does stabilize by the end of 2017.*

\*       \*       \*

And the combination of all of these levers that we're pulling to address each of these boxes that drives the fact that on a constant currency basis, *revenue in supplies will stabilize by the end of 2017.*

141.    On May 25, 2016, HP issued a release announcing its financial results for Q2 2016, ended April 30, 2016.  The same day, HP held a conference call for analysts, media representatives, and investors during which Defendants Weisler and Lesjak discussed the quarterly results.  On the earnings call, Defendant Lesjak responded to an analyst question regarding Supplies revenue by assuring that the Four Box Model indicated HP was "on track" to stabilize supplies revenue:

> *So I think the way to think about this is probably to go back to the Four Box Model, and how we think about supplies.  In terms of us being on the trajectory that leads to stabilization in constant currency supplies revenue by the end of 2017*, and I believe Dion said it in his prepared remarks, that when we started the quarter, we had an expectation of what the different elements of the Four Box model are going to do, and then based on the models that we have.  And then we look at the end of the quarter to see how they've responded in actuality, and they were largely in line with what we were expecting, and that says that *our model is predicting, within the quarter, it is doing a good job of predicting what's going to happen to supplies.  So we are on track with that*.

142.    On the same earnings call, Defendant Weisler assured investors that the Supplies revenue trajectory had already improved and was "on track" to stabilize by the end of 2017:

> Let me also highlight that we made this progress [in printing] while reducing hardware and supplies channel inventory globally.  We are now within our targeted ranges.  *And given our progress, we still expect our supplies revenue trajectory in constant currency to stabilize by the end of 2017.*

\*       \*       \*

> *Our supplies trajectory improved*, but it was somewhat masked by the channel inventory reductions that we had, supplies inventory is now back within the ranges globally and that's obviously where we wanted to be.

> So with all of those productivity improvements, continuing to reshape the install base we are focusing on high value units that's evidenced through the continued growth in value multi-function laser.  We said we needed to continue to refresh the product line up, we did that, 15 new devices launched last quarter JetIntelligence, PageWide Array and OfficeJet Pro, and we did for the 11th consecutive quarter in a row, as we did with Instant Ink.  So as Cathie mentioned, all of that translates to what we're seeing transpire as we planned it out to be, *and therefore with all of that we expect to stabilize our supplies revenue trajectory by the end of 2017.*

1
&ast;  &ast;  &ast;

2
[A]nd that there is no single magic pill that changes the supplies trajectory.  So what
we need to do is to continue to focus on all areas of the Four Box Model . . . .

3

&ast;  &ast;  &ast;

4

5
So all these factors drive supplies consumption, not just the install base, and the
model would suggest that *we are on track* to that stabilization by the end of '17 in
constant currency.

6

7
143.   In the earnings presentation that accompanied the earnings call, Defendants

highlighted that HP was "on track" to stabilize Supplies revenue as a "[k]ey message[]":

8

9

10

11

12

13



14
144.   On the May 25, 2016 earnings call, Defendant Weisler also highlighted the purported

15
strong revenue trend in APJ:

16

I am pleased with our second quarter results. . . .

17

18
Amid difficult market conditions, net revenue was in line with our
expectations, down 11% year-over-year as reported or down 5% in constant
currency.  *And in APJ for the second quarter in a row we delivered constant*
*currency revenue growth* with strength in personal assistance across much of the
region.

19

20
145.   In the earnings presentation that accompanied the earnings call, Defendants

21
highlighted that APJ revenue had increased 1% on a constant currency basis, compared with year-

22
over-year revenue declines of at least 6% in each of its other worldwide regions.

23
146.   Following the May 25, 2016 earnings release and earnings call, analysts reiterated

24
Defendants' assurances that Supplies revenues were "on track" to stabilize by the end of 2017.  For

25
example:

26
&bull;   "True Underlying Printer Supplies Trajectory Already Close to Reaching

27
Stabilization; Reiterating Buy Rating."  Maxim Group (May 31, 2016).

28

- "Supplies Will Stabilize! Despite continuing weak performance in Hardware (units - 16% Y/Y) and Supplies (revenue -10% Y/Y c.c.), HPQ insisted it remains on track to deliver stable Supplies revenue by FY17-end. This was a central theme of the call." Jefferies (May 26, 2016).

147.    On June 1, 2016, Defendant Weisler spoke at the Sanford Bernstein Strategic Decisions Conference. During the presentation, an analyst asked whether HP would stabilize Supplies revenue by the end of FY 2017. Defendant Weisler assured the analyst that HP was on track to stabilize Supplies revenue. Defendant Weisler, however, omitted that in order to stabilize Supplies revenue, HP would need to take significant inventory reductions in order to clear excess Supplies inventory from the channel and completely overhaul HP's sales model, an announcement they would make a mere 20 days later. Defendant Weisler stated, in relevant part:

So, when you put all of those things in the mix into the four-box model, based on **what it's telling us at this point in time, we stabilize revenue by the end of 2017 in constant-currency**.

148.    Following the June 1, 2016 investor presentation, analysts reiterated Defendants' assurances that Supplies revenues were on track to stabilize by the end of FY 2017. For example:

Printing on Path to Stabilization by End of FY17

**Meetings with HP highlight confidence in printer supplies stabilization by end of FY17**. . . .

**Investors are focused on printing supplies stability** and FCF generation and cash return. We hosted HP IR in Europe and attended Drupa, a print trade fair, this week . . . **most investors are still waiting for numbers, in particular supplies Y/Y growth, to stabilize**. . . .

. . . **HP still expects stabilization by the end of FY17, and has better visibility compared to the September 2015 analyst day** . . . .

Morgan Stanley (June 1, 2016).

149.    Defendants' Class Period statements regarding Supplies revenue, set forth above at ¶¶136-138, 140-145, 147, were materially misleading and/or omitted material information, which caused the statements made to be materially misleading for the following reasons:

(a)    Due to the undisclosed pull-in scheme, Supplies revenue was not "on track" to stabilize. As detailed herein, reported Supplies revenues during the Class Period included at least $700 million of sales attributable to the pull-in scheme, which materially distorted the true revenue

1   trajectory of the Supplies business.  Because the pull-in scheme involved accelerating sales that

2   would have otherwise materialized in future quarters, it inflated Supplies sales and created a

3   misleading revenue trend – one that appeared "on track" when the opposite was true.  Indeed,

4   Defendants were eventually forced to admit the material revenue impacts of  the scheme when they

5   disclosed massive Supplies revenue reductions of $250 million in Q2 2016 and $450 million for Q3

6   and Q4 2016.  Defendants' statements that Supplies revenue was "on track" to stabilize despite the

7   concealed pull-in scheme were materially misleading.

8              (b)      Defendants concealed that Supplies revenue would only stabilize if HP took

9   drastic measures to clear an excess $700 million of supplies inventory that had built up in the

10   channel over the preceding quarters as a direct result of the pull-in scheme.  Even after taking the

11   initial $250 million channel inventory reduction in Q2 2016, Defendants concealed that Supplies

12   revenue would only stabilize if HP removed an additional $450 million of supplies from channel

13   inventory.  As detailed herein, the significant level of excess channel inventory meant HP's

14   distribution channel partners demanded steeper and steeper sales discounts in exchange for taking on

15   even more Supplies inventory.  The result – an increasing volume of sales at very low margins –

16   meant the Supplies revenue trajectory would not stabilize until the excess channel inventory was

17   cleared out and HP discontinued its practice of excessive discounting.  Indeed, Defendants later

18   admitted that when the Supplies revenue trajectory finally did "stabilize" more than a year after the

19   end of the Class Period, the "stabilization" occurred only "after adjustments for supplies sales model

20   change" in Q3 2016 and Q4 2016.

21              (c)      With respect to the statements about APJ revenue, Defendants concealed that

22   APJ revenue growth was due to the pull-in scheme, which originated and was most prevalent in the

23   APJ region.  Defendants concealed that the APJ revenue growth resulted in lower margins, lower

24   sales in other regions, and elevated levels of worldwide channel inventory.  As found by the SEC

25   Order:

26              Beginning in the second fiscal quarter of 2015 . . . management in one region
             sold printing supplies to distributors known to be involved in selling the HP printing
27              supplies outside of their territory (internally described as "gray marketing," and
             known in the region as "A-Business") causing significant margin erosion and
28              *cannibalization of HP sales in other regions*.

1    SEC Order, ¶2.

2          (d)    Accurate information regarding revenue was material to analysts and

3    investors.  As detailed above, analysts closely tracked revenue each quarter and routinely asked

4    questions regarding revenue during quarterly earnings calls.  By disclosing inaccurate and

5    incomplete information regarding revenue, Defendants misled analysts and investors as to the true

6    condition of the Supplies business during the Class Period.

7    **VIII.   DEFENDANTS ACTED WITH SCIENTER**

8         **A.    Defendants' Admissions of Their Detailed Involvement in and Hands-
               On Management of the Supplies Business Supports Scienter**

9

10         150.    Leading into and throughout the Class Period, Defendants emphasized their personal,

     detailed involvement in overseeing the Supplies business as a reason why investors should trust their

11

12   statements concerning the integral Supplies business – the business that was paramount to the

13   success of HP.  Defendants underscored their personal management of Supplies pricing and channel

14   inventory levels – the two prominent metrics closely tracked by analysts that were directly impacted

15   by the pull-in scheme.  Defendants' detailed involvement in overseeing the Supplies business and, in

16   particular, the very metrics that were the subject of the alleged fraud, establishes that Defendants

17   knew or were reckless in not knowing that their Class Period statements and conduct were materially

18   misleading.

19              **1.    Defendants Acknowledged Repeatedly that It's " All About
                    Supplies"**

20         151.    Time after time, Defendants emphasized that it's "all about supplies."  At the

21   September 15, 2015 inaugural Security Analyst Meeting leading into the Class Period, Defendants

22   told analysts and investors that they were singularly focused on the Supplies business.  For example,

23   Defendant Lores assured investors:

24         I know that this business is all about supplies.  ***Every action that we have – I have
           been describing, the improvements in the product portfolio, the new programs that
25         we are launching, the new services we're launching have one common objective.
           Improve our supplies business***.

26

27   Similarly, Defendants Weisler, Lesjak, and Lores emphasized at least ten separate times during the

28   inaugural Security Analyst Meeting that it was "all about supplies."

     CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 4:20-
     cv-07835-JSW                                                                          - 50 -
     4816-1772-1318.v1

152.     Defendants' emphasis on Supplies continued throughout the Class Period, both internally and externally.  For example, an April 4, 2016 UBS analyst report detailed:

> While HP does make money on some laser printers, generally printers are sold at a loss, which HP views as an investment to garner the high-margin ink and toner supplies.  ***"It's all about supplies" is HP Inc.'s mantra***.  ***At a recent employee meeting, Weisler even spoke of a point of aftermarket supplies share as equivalent to so many jobs***.

153.     An August 5, 2016 *Barron's* article entitled "HP CEO Weisler, CFO Lesjak Reiterate the Strategy," quoting an interview with Defendants Lesjak and Weisler, stated: "***The 'key' thing*** in these established businesses ***is making sure supplies revenue 'is humming well***.'"

154.     Shortly after the Class Period, Defendant Lores summed up Defendants' focus on Supplies:

> ***[A]s we have said repetitively during the last months, we are not confused. Everything that we do in this business has one objective, to grow our supplies business because this business, it's all about supplies***.

155.     Throughout the Class Period, based on Defendants' representations, analysts acknowledged the importance Defendants placed on the Supplies business and asked detailed questions about the business and how Defendants monitored it.  For example, during a June 1, 2016 investor presentation, Toni Sacconaghi of Bernstein stated:

> Okay. Supplies are obviously where the profits are in the printing business, and we've made estimates – you haven't said, but I'll say it -- that supplies are 100% of the profits of HP Inc.  You lose money on hardware.  You make money on PCs.  ***Supplies are 100% of the profits of the Company. So, as Willie Sutton said, you've got to go where the money is***.
>
> ***So, let's spend a little time talking about supply***.

### 2.     Defendants Were Laser Focused on Supplies Pricing and Discounts

156.     Defendants emphasized a particular focus on Supplies pricing and discounting.  As described herein, the pull-in scheme involved offering exorbitant discounts on supplies – sometimes in excess of 40% – to induce distributors to purchase more product than they needed or wanted.  Discounts greater than customary discount levels (which, according to the SEC Order, were in the teens) were approved by the region heads, such as Defendant Bailey.  Additionally, Defendants admitted their detailed involvement in monitoring supplies pricing and discounting.

157.    For example, on November 24, 2015, Defendant Lesjak assured investors:

And it's across those four dimensions that we've talked about, the installed base usage, after-market share, and then also ***making sure that we're careful about what we do from a supplies pricing perspective***.

158.    On February 24, 2016, Defendant Weisler stated:

We need to win back aftermarket share, and we are already executing actions to support an aggressive share improvement plan, including online programs and increased sales coverage to promote the value of original supplies.  And ***we continue to strategically monitor Supplies pricing***, so that currency adjustments don't result in increased aftermarket alternatives pressure.

*          *          *

[W]e have not yet seen a material change from the Japanese competitors.  I think many of our competitors have hedging strategies in place, and it takes some time for movements in any given month to flow through to any other month.  ***It's obviously something that we track very closely, we are continuously running price function value equations relative to our competitors***.

159.    Supplies pricing and discounting levels were also key elements of HP's Four Box Model.  As described below at  ¶¶171-178, during the Class Period, Defendants constantly emphasized that they used the model to track the Supplies business.  In particular, Supplies pricing was regularly called out by Defendants as a key component of the model that they regularly monitored.  For example:

- Defendant Lesjak (September 15, 2015): "I really want to step back and talk about what are the levers or the attributes of a really healthy supplies business.  And so we really think about it on four different dimensions. . . .  Secondly, ***you got to look at what is the pricing of your supplies*** . . . ."

- Defendant Lesjak (November 24, 2015): "We have found that our four-box model is, in fact, very good.  And as we have collected more big data – ***and every week we collect new data, we update, basically, the model***. . . .  So we have a lot of confidence in the model, but you have to work the model all the time.  And it's across those four dimensions that we've talked about, the installed base usage, after-market share, ***and then also making sure that we're careful about what we do from a supplies pricing perspective***."

- Defendant Weisler (February 24, 2016): "***[W]e continue to strategically monitor Supplies pricing*** so that currency adjustments don't result in increased aftermarket alternatives pressure."

- Defendant Lesjak (March 1, 2016): "***The third bucket is really all about pricing supplies: what is the price of supplies***?  And there we've got to make sure that we keep the price relative to aftermarket alternatives without too much of a premium,

because otherwise then you are going to drive folks to do aftermarket alternatives. *So it's kind of constantly fine tuning the pricing*."

- Defendants Weisler and Lesjak (August 5, 2016): "To make supplies revenue work, explained Lesjak, is a 'four-box model.' . . . *There are four key elements that really determine what's going to happen with supplies revenue*. . . . *And then it matters what the pricing is of supplies*. '*Everything we do day to day in print is focused in those four areas*,' said Weisler."

### 3. Defendants Performed Detailed Operational Reviews of the Supplies Business

160. Defendants performed detailed operational reviews of the Printing segment, for which the Supplies business generated the majority of profits. As described herein, during the Class Period, the pull-in scheme had a significant impact on numerous operational metrics in the Supplies business: Supplies revenue was artificially inflated, Supplies profit margins declined as result of steep discounting, and Supplies channel inventories exceeded target levels by $700 million. Defendants' detailed involvement in overseeing these components of the Supplies business was highlighted throughout the Class Period.

161. During the September 15, 2015 inaugural Security Analyst Meeting, Meg Whitman – CEO of the pre-spin off Hewlett-Packard Company – emphasized how Defendants' QBRs had become even more robust with the streamlined Company:

> Last week, *we did our QBRs, our quarterly business reviews and for the first time, I did not do the printing and PC business, Dion [Weisler] did*. We get to the end of three days where we dove deeply into these three businesses and I'm thinking, wow I have two extra days here, because I would have rolled right into PCs for a day and right into printing for a day. If you think about the organic investments, we now have a smaller arena of investments that we're considering and you'll hear from Dion later on this afternoon the ability to invest in printing in a way that we have not invested in printing because of the demands of the Company I think it's going to actually stand us in really good stead.

The QBR presentations, which were reviewed and analyzed by the Defendants, differentiated between A-business and HP's legitimate business.

162. On March 1, 2016, Defendant Lesjak spoke at the Morgan Stanley Technology, Media & Telecom Conference. A Morgan Stanley analyst asked Defendant Lesjak:

> So Cathie, you've spent 30 years at HP. Tell us a little bit about your perspective on the benefits of now running HP Inc. as a much smaller entity than the one that you've navigated for the prior 30 years.

In response, Defendant Lesjak emphasized that because the new HP had only two segments, it allowed the Board, which included Defendant Weisler and herself, to review the Printing and Supplies businesses in minute detail:

> You know, there's kind of three that I'd call out and there's probably more, but let me call out three. The first one that really hit me was one of our very first Board meetings. So we put together a fantastic Board and we picked, which is a little unusual, but we got to pick the vast majority of the Board for the skills and the experiences that we really thought would help us. ***And the very first Board meeting, we spent the entire Board meeting almost on print. Do you know that at HP Co., I am not sure we ever spent that much time with that level of a deep dive on print***? And then the next Board meeting we spent kind of a comparable amount on personal systems. And so just ***having the attention and the wisdom and the experience of these Board members totally focused on two businesses instead of six*** is I think going to really serve us well. I think that we will make better decisions and drive more value.

163.    Defendant Lesjak finished her response by acknowledging that she spent significant time performing detailed operational reviews of HP's specific businesses, which included HP's most important business – Supplies:

> ***And then for me personally***, the last thing I guess I'd say is, because the company is a bit smaller, about half the size, two business segments. ***I spend a lot more time on operational reviews and getting into the detail about the very specific businesses***.

164.    Following the Class Period, Defendant Lesjak explained that the operational reviews involved "drill[ing] down" and analyzing the drivers of the Supplies business' results:

> So not only is a big portion of our profits coming from Print, but ***when you further drill down, a big portion of the profits is really coming from supplies*** because we typically have a business model, where you place the units at very low margins or negative margins and you basically then get the supplies annuity to give you a positive NPV. So ***that means you really have to look at what your supplies business – how to drive your supplies business***.

### 4.    Defendants Set and Monitored Specific Forecasts for Supplies Channel Inventory

165.    As part of their focus on the Supplies business, Defendants paid particular attention to Supplies channel inventory levels. As described herein, the pull-in scheme resulted in elevated channel inventories, which ultimately required HP to record a $700 million charge to clear out excess inventory. Defendants were personally involved in setting and monitoring Supplies channel inventory levels.

166.     According to the SEC Order, HP's Finance Department – led by Defendant Lesjak – set the target levels for supply channel inventory, which was measured by the WOS metric.  SEC Order, ¶14.  The finance team monitored channel inventory levels using weekly "'flash'" reports that compared quarterly metrics, including WOS, against budget based on the actual performance of weeks past and anticipated performance for future weeks.  *Id.*, ¶17.  As Defendant Lesjak acknowledged, "having a **tight handle on the channel inventory levels** is good for our business." And Defendant Bailey was "responsible for the . . . overall financial performance of the HP APJ business" – where the pull-in scheme originated and was most prevalent.

167.     During the September 15, 2015 inaugural Security Analyst Meeting, Defendant Weisler assured:

> [Weisler]: However, we are on it.  **We're on it every single day by country. We know exactly how much inventory we have** . . . .  Now the beauty about supplies is it has a few preservatives built into it, right.  So that's a little better.  So we're really focused on both businesses.  **We're always focused on the channel inventory**.

168.     At a March 1, 2016 investor presentation, Defendant Lesjak responded to an analyst question regarding Supplies channel inventory levels, stating:

> In terms of what we saw from a sell-out perspective, we did see a little bit of softness at the end of the quarter from a sell-out perspective.  In fact **that was what drove us over slightly the channel inventory levels, is that we had kind of forecasted what we thought sell-out would do over the course of the quarter**, and targeted our channel inventory levels based on that, and our channel inventory in supplies came down year-over-year and quarter-over-quarter.  But at the very end, we saw a little bit of softness on the sell-out, and that caused us to be over in channel inventory.

169.     At the same presentation, Defendant Lesjak stated, "[a]t the highest level, **we've got to manage our channel inventory.  It's absolutely critical in this business** that you keep your channel inventory fresh."

170.     On the June 21, 2016 investor call, Defendant Lores acknowledged that it was his responsibility to monitor Tier 1 and Tier 2 channel inventory levels and to hold sales personnel accountable for staying within inventory levels set by the Finance team:

> [W]e will reduce **Tier 1 and Tier 2 supplies channel inventory levels** during Q3 and Q4.  Following these one-time reductions of inventory, we will reduce and tighten the desired ranges for ink and toner in each region.  **It will be critical, as it is today, for me to hold the sales teams accountable to remain within the ranges** going

1  forward.  You can expect us to report on this during the quarterly earnings calls, as
2  we have done in the past.

3      **5.      The Four Box Model: Defendants Used It "Extensively" and
          Updated It with New Data "Every Week"**

4      171.    Defendants repeatedly touted the Four Box Model's ability to track and predict

5  Supplies revenue and channel inventory.  The Four Box Model purportedly allowed Defendants to

6  analyze, in real-time, the four "key levers that . . . drive supplies revenue."  The first box analyzed

7  the size of HP's "installed based" – *i.e.*, how many of HP's hardware printer units were in use.  The

8  second box analyzed "usage" – *i.e.*, the volume of printing being done by HP's installed base of

9  printer units.  The third box analyzed Supplies "pricing" – *i.e.*, the price at which HP was selling its

10 Supplies to distributors, which incorporated the level of discounting being used by HP.  Finally, the

11 fourth box analyzed HP's Supplies "market share" – *i.e.*, the percentage of aftermarket supplies that

12 HP was capturing compared to third-party supplies.

13     172.    Importantly, Defendants told investors that the Four Box Model was able to

14 accurately and reliably predict Supplies revenues because it was based on updated, real-time "big

15 data," which derived from the telemetry data that HP received directly from its printers.  As

16 Defendant Lesjak described it, "***we have a lot of printers that . . . phone home and tell us what's***

17 ***going on***."  Analysts highlighted Defendants' statements about HP's "big data" capabilities and the

18 resulting reliability of the Four Box Model.  In October 2015, Credit Suisse reported that the Four

19 Box Model,

20     provides a degree of predictability in the printing market and HP's business by
        ***leveraging the data generated from HP[]'s large installed base of printers***.  Indeed
21     we note that management has noted that for a significant part of its installed base ***the
        company receives real-time information on printed pages and usage,*** and that this
22     big data has been leveraged to effectively predict its supplies business.

23     173.    Because the Four Box Model provided real-time data on the amount of supplies

24 usage, Defendants could reliably compare the volume of supplies that were sold in a given period

25 with an estimate of the supplies usage, which would reveal the level of inventory that remained in

26 the channel.  In fact, this comparison could be done by specific geographic region because both sales

27 data and telemetry data on usage could be easily traced to a particular country or region.  During the

28 Class Period, as a result of the pull-in scheme, the Four Box Model would have revealed that

supplies sales were far outpacing estimated supplies usage, especially in the APJ region, where sales were being artificially inflated and inventory was building up in the distribution channel as a result of the pull-in scheme.

174.    Defendants stated on an almost constant basis during the Class Period that they reviewed and relied upon the Four Box Model and its results.  For example, on the November 24, 2015 earnings call, Defendant Lesjak stated:

> We have found that our four-box model is, in fact, very good.  And as we have collected more big data – and ***every week we collect new data, we update, basically, the model.***

175.    During a February 24, 2016 investor presentation, Defendant Weisler emphasized that Defendants used the model "extensively," stating:

> So look, ***the Four Box Model is a predictive tool, and we use it extensively***.  It has a lot of complexity built into it.  Not all units are created equally.  We can place a particular unit in one demographic, place exactly the same unit in a different demographic, and it can yield an entirely different usage pattern, and we can have a different price associated with it.  So when you think about all the permutations and combinations associated with that Four Box Model, ***it is something that we focus on very carefully***.  And it shapes the way we place units, it informs how we price, and it even informs how we market.

176.    During a March 1, 2016 investor presentation, Defendant Lesjak responded to a question about the Supplies business and described Defendants' use of the Four Box Model:

> At the core is the confidence that we have in the Four Box Model around supply and what drives supplies over time.  Now you got to have – in the model, you got to have accurate assumptions, and ***you've got to be constantly fine-tuning those assumptions based on what you're seeing in the market and also what big data you are getting back.  We have a lot of printers that have phone home and tell us what's going on.  And so we are fine-tuning that model, but we have a lot of confidence that those four boxes*** and the levers within each of them are exactly the right thing to work on, so that over time the constant currency revenue in supplies does stabilize by the end of 2017.

177.    During the June 1, 2016 call, in response to an analyst's question regarding the Four Box Model's ability to determine the "growth rate of supplies," Defendant Weisler stated that the model contains "***very detailed data that obviously we do not want to share explicitly***."

178.    An August 5, 2016 *Barron's* article, quoting an interview with Defendants Lesjak and Weisler stated: "To make supplies revenue work, explained Lesjak, is a 'four-box model' . . . '***Everything we do day to day in print is focused in those four areas***,' said Weisler."

### 6.   Defendants Were Highly Experienced in Monitoring HP's Channel Inventory Levels

179.   Both Defendants Weisler and Lesjak had significant experience monitoring Supplies channel inventory for signs of unhealthy, excess inventory levels.   In fact, immediately after Defendant Weisler began at HP in 2012 as the Senior Vice President and Managing Director of Printing and Personal Systems in the APJ region, where "he was responsible for all aspects of the business in the region," HP was forced to disclose that a significant level of excess Supplies channel inventory had built-up in that region.

180.   During an August 2012 earnings call, Defendant Lesjak, who was the CFO at the time, described to analysts and investors, "we did end with *higher channel inventories than the underlying demand would suggest and that was especially true for ink supplies*.   What we need to do in that space is continue to focus on channel inventory."   Defendant Lesjak added, "[t]he *channel inventory is more problematic in the supplies area* and not in the hardware area," and "really where *we saw weak demand was predominantly in Europe and Asia*, and that impacted the sell-through in Q3 and obviously hampered our efforts to reduce the channel inventory."   Defendant Lesjak blamed disappointing Supplies revenue on the fact "the demand environment, particularly for consumers, remains a headwind, affecting our success in balancing sell-in and sell-through activity with the channel.   *We need to reduce channel inventory through close inspection and end user demand stimulation*."

181.   Leading up to the start of the Class Period, Defendant Weisler continued to have responsibility over Supplies channel inventory as part of his role overseeing the Printing segment in the APJ region and later across all regions.   For example, on the November 25, 2014 earnings call, CEO Whitman stated:

> *Dion and his team have been addressing the challenges in this business, and have moved quickly to get the supplies channel inventories we identified last quarter back in line with our target range*.   Overall, unit placement trends and supplies growth will take some time to optimize.   But *the team has an aggressive plan in place to address this*, including targeted marketing programs and hiring on more supply specialists.   With these activities, along with a very strong innovation pipeline, *I'm confident that Dion is setting this business up for success*.

182.     Defendant Lesjak spoke frequently on investor calls about her personal involvement monitoring Supplies channel inventory levels.  All told, Defendant Lesjak made at least 25 detailed references to monitoring Supplies channel inventory in the period leading up to the start of the Class Period.  As detailed below, many of the statements were reminiscent of the channel inventory problems HP concealed during the Class Period, including:

- "[T]the bottom line is, folks, the end-user demand for supplies is down, and we actually expect with *the change in channel inventories that we want to make in Q2*, and that's included in our guidance already, but with that change that supplies growth will go yet even more negative than 7% in Q2 and Q3. . . . *Channel inventory weeks were up* year on year across both hardware and *supplies*."[16]

- "Supplies revenue declined 14% due to lower end-user demand and *reductions in channel inventory*.  Last quarter, we outlined several actions that IPG was taking to align its supply chain with lower demand.  IPG made progress against these objectives with both owned and *channel inventory down significantly* since the end of Q1."[17]

- "Supplies revenue declined 13%. *Channel inventory corrections* and currency *accounted for most of this decline* with sales continuing to be flat to slightly down."[18]

- "Compared with a year ago, ESS channel inventory was down a week, IPG was down roughly a half a week, and PSG was flat.  *Beginning in fiscal 2010, we will only report whether channel inventory is within the target range of roughly 4 to 6 weeks, and will provide details in the event that we are outside of this range*."[19]

- "Supplies revenue grew 1% in dollars and 4% in local currency.  And we saw the convergence of sell-in and sell-out on a constant currency basis. . . .  [O]ur channel inventory is in good shape."[20]

- "*Channel inventories* in ESS and IPG are in good shape.  PSG channel inventory is a few days *higher than we would like* and we expect to bring it down in Q4."[21]

---

[16]   Q1 2009 earnings call; February 18, 2009.

[17]   Q2 2009 earnings call; May 19, 2009.

[18]   Q3 2009 earnings call; August 18, 2009.

[19]   Q4 2009 earnings call; November 23, 2009.

[20]   Q1 2010 earnings call; February 17, 2010.

[21]   Q3 2010 earnings call; August 19, 2010.

- "[Analyst:] Cathie, I was hoping you could comment on **channel inventories especially on supplies** . . . ." "[A:] [I]n terms of channel inventories, we actually exited Q4 with channel inventories in really good shape. And so there are no concerns from our perspective, on the channel inventory position."[22]

- "**Channel inventories** in each business ended the quarter **within acceptable ranges**."[23]

- "We ended the quarter with **higher than normal channel inventory in supplies**, especially ink, as sell-through slowed at the end of the quarter. . . . We'll need to begin working through this inventory . . . ."[24]

- "Supplies revenue declined 14% year over year to $4 billion in the quarter. Remember, we entered Q4 with **higher channel inventory than we would have liked**, and we worked to reduce this throughout the quarter. . . . We ended the quarter with **higher channel inventory than we would have liked** in some regions."[25]

- "[W]e did make some progress on **reducing ink supplies channel inventory**, basically from Q4 to Q1 . . . . [A]nd so we did not get the **reduction in channel inventory** in Q1 that we had expected. We do still expect that the channel inventory levels will exit Q2 in **acceptable ranges for supplies** . . . supplies revenue declining 6%, partially due to our focus on **reducing channel inventory**." [26]

- "[S]upplies revenue declining 12% as **we reduced our channel inventory**. We are now within our **acceptable ranges for channel inventory** on a consolidated basis, but the demand environment remains a headwind. . . . IPG revenue declined generally as we expected, due to the . . . IPG's continued focus on **reducing excess channel inventory**. . . . To address the question on the **supplies decline** and how much of that was due to channel inventory, the **vast majority of the decline was due to channel inventory corrections** . . . this quarter . . . we would like to **take channel inventories down** a little bit in Q3."[27]

- "We **need to reduce channel inventory** through close inspection and end user demand stimulation. . . . [W]e did end with higher channel inventories than the

---

[22]  Q4 2010 earnings call; November 22, 2010.

[23]  Q1 2011 earnings call; February 22, 2011.

[24]  Q3 2011 earnings call; August 18, 2011.

[25]  Q4 2011 earnings call; November 21, 2011.

[26]  Q1 2012 earnings call; February 22, 2012.

[27]  Q2 2012 earnings call; May 23, 2012.

underlying demand would suggest and *that was especially true for ink supplies. What we need to do in that space is continue to focus on channel inventory*." [28]

- "[C]hannel inventory levels are within our *acceptable ranges*. Specifically with ink *supplies channel inventory* though, we will be continuing to *reduce the level* . . . ." [29]

- "Supplies were 66% of the mix, roughly flat year over year, and *we continue to manage channel inventory down* with dollar declines for the sixth quarter in a row in Supplies. Channel inventory is within our acceptable ranges. . . . *We have been dogged by ink supplies channel inventory being higher than we would like now for several quarters*, and it is now well within the range. I think it's something like, from the peak, something like 27% down year over year." [30]

- "Supplies were 68% of the revenue mix, up from the prior year, driven by toner. Our *channel inventory* continues to be *within acceptable ranges*. . . . [O]ur *supplies channel inventory* has come into line." [31]

- "Supplies revenue declined 4% against prior year . . . . Our overall *channel inventory has moved slightly above our target range*. This was partly driven by supplies demand from our channel partners seeking to maintain service and reliability levels to their customers. *We need to bring down channel inventory in the fourth quarter*. . . . But as we mentioned, we do have a little bit more work to do to *bring down supplies channel inventory*." [32]

- "*[S]upplies channel inventory levels* are back down *within our targeted range*." [33]

- "Supplies revenue was down 3% over the prior year period, . . . Supplies softness was attributable to weakness in toner. Softer toner drove *channel inventory levels marginally up above our target range. We're actively managing this* . . . ." [34]

- "*[S]upplies . . . inventory levels remain very slightly above our target range* this was primarily due to softer toner sales in Europe but we did make progress *reducing overall toner channel inventory in the quarter*." [35]

---

[28]   Q3 2012 earnings call; August 22, 2012.

[29]   Q4 2012 earnings call; November 20, 2012.

[30]   Q1 2013 earnings call; February 21, 2013.

[31]   Q2 2013 earnings call; May 22, 2013.

[32]   Q3 2013 earnings call; August 21, 2013.

[33]   Q4 2013 earnings call; November 26, 2013.

[34]   Q1 2014 earnings call; February 20, 2014.

- "**Supplies channel inventory levels** decline on a year-over-year basis but have increased sequentially and are **above our target range**. We expect to **bring inventory levels back within the range** in the Fourth Quarter and anticipate **this will pressure our fourth quarter supplies revenue**."[36]

- "[S]upplies revenue was $3.6 billion, down 7% over the prior year period, due to softer demand and a **reduction in channel inventory**. As a result, we ended the quarter with ink and toner **supplies channel inventory well within our target range**."[37]

- "**We will manage supplies channel inventory closely** while driving further stability and supplies revenue in FY15."[38]

- "We exited the quarter with **supplies channel inventory slightly above our desired range**, due to a slowdown in sales in April. We expect to **reduce channel inventory levels** in the second half, and we'll continue to closely monitor demand trends."[39]

- "**Channel inventory for** hardware and **supplies was above our desired ranges** due to expected business continuity planning around the separation, as well as softer than expected market demand. We expect to **reduce channel inventory levels** in Q4. . . . We are going to **bring channel inventory levels back down**."[40]

183.    In sum, there can be no doubt that Defendants understood and closely managed HP's channel inventory levels throughout the Class Period.

**B.    The Newly Formed and Supplies-Focused Nature of HP Supports Scienter**

184.    Defendants knew that HP's spin-off at the outset of the Class Period was a "milestone marker." Indeed, as Defendant Weisler explained to analysts after the Class Period, "the whole genesis behind the separation was that, as 2 smaller more nimbler companies, we would be able to focus on our particular market segments, make the right investment calls that affect our company." For HP, the focus could now be on "the Printing business" so that when "[w]e wake up every day,

---

[35]  Q2 2014 earnings call; May 22, 2014.

[36]  Q3 2014 earnings call; August 20, 2014.

[37]  Q4 2014 earnings call; November 25, 2014.

[38]  Q1 2015 earnings call; February 24, 2015.

[39]  Q2 2015 earnings call; May 21, 2015.

[40]  Q3 2015 earnings call; August 20, 2015.

we think about Printing and Personal Systems, ***it's all we do***."  Defendants emphasized that "our

leadership team [is] completely focused on two segments instead of six segments" and the Board,

whose meetings were attended by Defendants Weisler and Lesjak during the Class Period, was

"***totally focused*** on two businesses instead of six" and "spen[t] all their time focused on just two

segments."

186.    In fact, during the Class Period, Defendants – the leaders of the new Supplies-focused

HP – could, and admittedly did, spend HP's "entire Board meeting almost on print"; "invest in

printing in a way that we have not invested in printing because of the demands of the Company";

"drill down" on the "detail[s]" and "specifics" of the Supplies business in detailed operational

reviews; "go deep" into the business results during "[Weisler's] weekly reviews with the team"; and

conduct multi-day QBRs during which they "dove deep[]" into the Supplies business.  Because

Defendants' new, more nimble Company allowed them to devote their efforts, time, and investments

on the Supplies business, Defendants knew or were reckless in not knowing of the pull-in scheme

and its devastating impact on the fundamentally important business segment and biggest source of

profits.

## C.    Defendants' Conscious Omission of Tier 2 Inventory from Their Public Statements Supports Scienter

186.    Defendants were aware or reckless in not knowing that their statements regarding

channel inventory omitted Tier 2 inventory, rendering them incomplete and misleading.  Indeed,

Defendant Lesjak's Finance Department set the WOS ceilings, which excluded Tier 2 inventory, for

the Supplies business.  SEC Order, ¶14.  Defendants excluded Tier 2 from their public statements

even though HP tracked Tier 2 inventory data and "estimated its Tier 2 channel inventory" internally

throughout the Class Period.  *Id.*, ¶15.  Further, Defendant Lesjak's department routinely monitored

inventory levels using ***weekly "'flash'" reports*** during the Class Period.[41]  *Id.*, ¶17.

---

[41]    In fact, "in late 2015 and early 2016, as WOS in each of HP's three regions . . . exceeded their
ceilings, ***HP's worldwide executives*** demanded that regional managers remain within their WOS
ranges while still delivering sales and operating profit targets," compelling its managers to
manipulate WOS by engaging in "'simultaneous sell-in/sell-through'" sales.  SEC Order, ¶¶30, 33.

1       187.    In addition, at the close of the Class Period, Defendant Lores admitted that it was his

2   responsibility to monitor Tier 1 and Tier 2 channel inventory levels:

> [W]e will reduce **Tier 1 and Tier 2 supplies channel inventory levels** during Q3 and
> Q4.  Following these one-time reductions of inventory, we will reduce and tighten
> the desired ranges for ink and toner in each region.  **It will be critical, as it is today,**
> **for me to hold the sales teams accountable to remain within the ranges going**
> **forward**.

6       188.    Moreover, by virtue of Defendants' prior positions at HPC, they were highly familiar

7   with monitoring WOS levels and Tier 2 inventory levels.  *See* §§VIII.A.4., VIII.A.6.  For example,

8   prior to the Class Period, Defendant Weisler acknowledged that he monitored "***the total inventory***

9   ***across Tier 1 and Tier 2 channels***."  Further, in response to a question during a June 21, 2016

10  investor call regarding Defendants' ability to track channel inventory – particularly the "sell-

11  through" of supplies from Tier 1 to Tier 2 and the "sell-out" of supplies from Tier 2 to end users –

12  Defendants Weisler and Lesjak explained:

> [Defendant Weisler:] ***[O]f course [we're] able to triangulate what we sell-through***
> ***as well is what is reported as sell-out across our systems*** and because there are
> obviously compensation incentives to the channel only based on sell-through and
> sell-out, it's incumbent on those partners to provide us with that information.
>
> [Defendant Lesjak:] [S]o, ***there's fairly regular reporting and it's been the case***
> ***for some time, so that we can really understand what's going on, certainly within***
> ***Tier 1 globally***.  Tier 2 is maybe a bit spottier and we are increasing what we are
> doing in that space but, ***we've got a pretty robust process already***.

18      189.    Nevertheless, throughout the Class Period, "on quarterly earnings calls between

19  November 2015 and June 2016, [Defendants] repeatedly made disclosures regarding the level of its

20  channel inventory relative to the company's 'target weeks of supply range.'"  SEC Order, ¶44.  For

21  example, on a May 25, 2016 earnings call with analysts, Defendant Weisler stated, "***[w]e are now***

22  ***within our targeted ranges***."  Likewise, Defendant Lesjak confirmed, "***[w]e reduced channel***

23  ***inventory in the quarter . . . and channel inventory was within our targeted range***."  These

24  statements were knowingly misleading because Defendants knew of, but omitted, the existence of

25  significant Tier 2 inventory.  As the SEC Order concluded: "Undisclosed to the market, HP only

26  included its Tier 1 channel partners' inventory in its WOS calculation . . . meaning that disclosures

27  about the company's position relative to its channel inventory ceiling ***only told part of the story***

28  regarding HP's channel health."  SEC Order, ¶15.  Indeed, "[b]ecause HP's disclosures only

described its Tier 1 channel inventory, this additional [Tier 2] inventory was not part of HP's channel inventory disclosures." *Id.*, ¶33.

### D. Defendants Weisler's and Lesjak's SOX Certifications and Signing of SEC Filings Support Scienter

190. Defendants' scienter is also underscored by the Sarbanes-Oxley certifications signed by Defendants Weisler and Lesjak throughout the Class Period, which acknowledged their responsibility to investors for establishing and maintaining controls to ensure that material information about HP was made known to them and that the Company's disclosure controls were operating effectively.

191. During the Class Period, Defendants Weisler and Lesjak repeatedly certified that they had undertaken an assessment and evaluation of HP's disclosure controls to ensure that their SEC filings did not contain any false information, including controls designed to ensure all relevant and material information is reviewed by Defendants Weisler and Lesjak prior to certifying those filings pursuant to Sarbanes-Oxley. This further establishes that Defendants Weisler and Lesjak knowingly misled the market, or were reckless in making such representations and executing such certifications because they were at that time aware of and/or recklessly disregarded the existence of the pull-in scheme and its effect on HP's public statements.

### E. The Magnitude of the Scheme Supports Scienter

192. Illustrative analyses of the quarterly impact of the pull-in scheme conducted by Lead Plaintiff demonstrate the magnitude of Defendants' fraud. These analyses, in combination with the SEC Order, provide strong evidence of the pull-in scheme's devastating impact on HP's reported revenues and profit margins in each of the quarterly results presented during the Class Period.

193. As detailed herein, Defendants' pull-in scheme caused at least $700 million of excess inventory to build up in the channel during the Class Period.[42] The scenarios presented below show the quarter-by-quarter build-up of the $700 million of excess channel inventory. Lead Plaintiff

---

[42] On May 25, 2016, Defendants disclosed a negative $257 million revenue impact for Q2 2016 to reduce excess channel inventory. On June 21, 2016, Defendants announced that HP would incur an additional $450 million revenue reduction across Q3 2016 and fourth quarter fiscal 2016 ("Q4 2016") to reduce excess channel inventory. Defendants disclosed additional, smaller channel inventory reductions in Q1 2017 and Q2 2017.

presents several scenarios that assume varying levels of excess inventory build-up per quarter. Notably, the trend of excess inventory build-up over time applied in Lead Plaintiff's analyses is consistent with the SEC Order's conclusion that excess inventory in the channel increased over time, as distribution partners took on more and more supplies due to excessive discounts that they were unable to sell through to end users who did not want or need the supplies:

> Channel inventory . . . refers to inventory sold by HP to its distribution channel that has not yet been sold to end users. ***Increasing channel inventory indicates that HP has sold more to its channel partners than the channel is selling to end users***.

*     *     *

> [The pull-in scheme] ***accelerated in late 2015 and early 2016***, with HP managers offering steeper end-of-quarter discounts in order to meet quarterly sales targets.

*     *     *

> This pattern led to a . . . ***trend of increasing channel inventory and lower margin sales that continued over multiple quarters***. HP's Supplies . . . ***channel inventory increased*** from the middle of its WOS ranges in the fourth quarter of 2014, ***to above its WOS range by the end of the second quarter in 2015***.

194.    Indeed, after the Class Period, Defendant Lesjak acknowledged that the increase in excess channel inventory "in Q3 of 2015 . . . ***was very significant***."

195.    In each of the scenarios presented below, the amount of excess channel inventory added during a particular quarter is compared to HP's reported sales during that quarter. As described herein, the sales associated with Defendants' pull-in scheme caused the increase in Supplies channel inventory because HP's distribution channel partners "already had what they viewed to be sufficient inventory [and] demanded steeper discounts to offset the cost of holding the additional inventory" – *i.e.*, holding excess channel inventory. SEC Order, ¶32. The analyses show that reported Supplies sales were materially inflated as a result of the pull-in scheme.

196.    Next, Lead Plaintiff calculated "Adjusted Printing operating profit margin" and "Adjusted gross margin" – what quarterly operating profit and gross margin would have been absent the steep discounting associated with the pull-in scheme – by estimating the discount HP applied to sales as part of pull-in scheme. Lead Plaintiff applied an estimated discount of 30%, which is conservative in light of the SEC's finding that "[t]o entice distributors to take additional product,

sales managers offered discounts, in some instances *in excess of forty percent* . . . ." *Id.*, ¶26.  The analyses show that HP's Class Period operating profit margins and gross margins were materially, negatively impacted.

197.   The following table illustrates the pull-in scheme's material impact on reported revenues, operating profit margins, and gross margins prior to and throughout the Class Period based on five different scenarios that assume varying levels of excess channel inventory build-up (*e.g.*, Scenario 1 assumes the $700 million of excess inventory was spread equally across the four applicable quarters, while Scenario 2 assumes that $200 million of the $700 million of excess inventory was present in the first applicable quarter).[43]  Under any scenario, the pull-in scheme had a drastic impact on HP's most important metrics, further evidencing Defendants' scienter:

| | | Q1 2015 | Q2 2015 | Q3 2015 | Q4 2015 | Q1 2016 |
|---|---|---|---|---|---|---|
| Scenario 1 | Total excess channel inventory at end of the quarter | $ - | $ 175 | $ 350 | $ 525 | $ 700 |
| | Excess channel inventory added during the quarter | $ - | $ 175 | $ 175 | $ 175 | $ 175 |
| | Estimated pull-in sales as a % of Supplies sales (as reported) | 0% | 5% | 5% | 5% | 6% |
| | Adjusted Printing operating profit margin | 19.2% | 19.0% | 18.7% | 18.2% | 17.9% |
| | Estimated impact of pull-in sales on Printing operating margin (as reported) | 0.0% | -4.1% | -4.5% | -4.7% | -5.2% |
| | Adjusted gross margin | 23.4% | 24.2% | 24.0% | 24.9% | 19.0% |
| | Estimated impact of pull-in sales on gross margin (as reported) | 0.0% | -0.6% | -0.7% | -0.6% | -1.8% |

| | | Q1 2015 | Q2 2015 | Q3 2015 | Q4 2015 | Q1 2016 |
|---|---|---|---|---|---|---|
| Scenario 2 | Total excess channel inventory at end of the quarter | $ - | $ 200 | $ 400 | $ 600 | $ 700 |
| | Excess channel inventory added during the quarter | $ - | $ 200 | $ 200 | $ 200 | $ 100 |
| | Estimated pull-in sales as a % of Supplies sales (as reported) | 0% | 5% | 6% | 6% | 3% |
| | Adjusted Printing operating profit margin | 19.2% | 19.2% | 18.8% | 18.3% | 17.5% |
| | Estimated impact of pull-in sales on Printing operating margin (as reported) | 0.0% | -4.6% | -5.1% | -5.4% | -3.0% |
| | Adjusted gross margin | 23.4% | 24.2% | 24.0% | 24.9% | 18.9% |
| | Estimated impact of pull-in sales on gross margin (as reported) | 0.0% | -0.7% | -0.8% | -0.7% | -1.1% |

| | | Q1 2015 | Q2 2015 | Q3 2015 | Q4 2015 | Q1 2016 |
|---|---|---|---|---|---|---|
| Scenario 3 | Total excess channel inventory at end of the quarter | $ - | $ 50 | $ 200 | $ 400 | $ 700 |
| | Excess channel inventory added during the quarter | $ - | $ 50 | $ 150 | $ 200 | $ 300 |
| | Estimated pull-in sales as a % of Supplies sales (as reported) | 0% | 1% | 4% | 6% | 10% |
| | Adjusted Printing operating profit margin | 19.2% | 18.5% | 18.5% | 18.3% | 18.5% |
| | Estimated impact of pull-in sales on Printing operating margin (as reported) | 0.0% | -1.2% | -3.9% | -5.4% | -8.5% |
| | Adjusted gross margin | 23.4% | 24.0% | 23.9% | 24.9% | 19.3% |
| | Estimated impact of pull-in sales on gross margin (as reported) | 0.0% | -0.2% | -0.6% | -0.7% | -3.1% |

---

[43]   Although not modeled in the scenarios below, the pull-in scheme also had a material negative impact on Q2 2016 Supplies revenue and profit margins.  Defendants took a $250 million channel inventory reduction on May 25, 2016, but HP's distribution channel partners continued to hold at least $450 million of excess channel inventory during the quarter – as recognized by the $450 million inventory reduction taken less than one month later, on June 21, 2016.  As described herein, to induce distribution channel partners to make additional supplies purchases despite the significant excess inventory they already held, Defendants had to offer steeper and steeper sales discounts.  The excessive discounting resulted in low-margin sales, which had a material negative impact on reported profit margins and gross margins during Q2 2016.

|  | | Q1 2015 | Q2 2015 | Q3 2015 | Q4 2015 | Q1 2016 |
|---|---|---|---|---|---|---|
| Scenario 4 | Total excess channel inventory at end of the quarter | $ - | $ 100 | $ 300 | $ 600 | $ 700 |
| | Excess channel inventory added during the quarter | $ - | $ 100 | $ 200 | $ 300 | $ 100 |
| | Estimated pull-in sales as a % of Supplies sales (as reported) | 0% | 3% | 6% | 9% | 3% |
| | Adjusted Printing operating profit margin | 19.2% | 18.7% | 18.8% | 18.8% | 17.5% |
| | Estimated impact of pull-in sales on Printing operating margin (as reported) | 0.0% | -2.4% | -5.1% | -7.8% | -3.0% |
| | Adjusted gross margin | 23.4% | 24.1% | 24.0% | 25.0% | 18.9% |
| | Estimated impact of pull-in sales on gross margin (as reported) | 0.0% | -0.4% | -0.8% | -1.1% | -1.1% |

|  | | Q1 2015 | Q2 2015 | Q3 2015 | Q4 2015 | Q1 2016 |
|---|---|---|---|---|---|---|
| Scenario 5 | Total excess channel inventory at end of the quarter | $ - | $ 100 | $ 400 | $ 600 | $ 700 |
| | Excess channel inventory added during the quarter | $ - | $ 100 | $ 300 | $ 200 | $ 100 |
| | Estimated pull-in sales as a % of Supplies sales (as reported) | 0% | 3% | 9% | 6% | 3% |
| | Adjusted Printing operating profit margin | 19.2% | 18.7% | 19.2% | 18.3% | 17.5% |
| | Estimated impact of pull-in sales on Printing operating margin (as reported) | 0.0% | -2.4% | -7.4% | -5.4% | -3.0% |
| | Adjusted gross margin | 23.4% | 24.1% | 24.1% | 24.9% | 18.9% |
| | Estimated impact of pull-in sales on gross margin (as reported) | 0.0% | -0.4% | -1.1% | -0.7% | -1.1% |

198.    The analyses in the table above establish that regardless of the rate at which channel inventory increased, the undisclosed pull-in scheme had a material and significantly negative impact on HP's reported revenues and profit margins in quarters prior to and during the Class Period. Significantly, Lead Plaintiff's analyses are corroborated by the SEC's finding that HP's "use of the [pull-in scheme] caus[ed] *decreased margins* and *increased channel inventory*." SEC Order, ¶3. Similarly, the SEC confirmed that "HP's end-of-quarter accelerations and pull-ins were at *lower profit margins* than if the sales had materialized in line with anticipated demand." *Id.*, ¶19. The pull-in scheme's significant impact on HP's most important metrics provides further evidence of Defendants' scienter.

## IX.    LOSS CAUSATION

199.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused Lead Plaintiff's and Class members' economic loss. Lead Plaintiff's claims for securities fraud are asserted under the fraud-on-the-market theory of reliance. The markets for HP's common stock were open, well-developed, and efficient at all relevant times. During the Class Period, as detailed herein, Defendants made false and misleading statements regarding Supplies pricing, gross margins, operating profit, channel inventory, and revenue. Defendants' conduct artificially inflated the price of HP common stock and operated as a fraud or deceit on the Class.

200.    The Class Period inflation in HP's stock price was removed when information concealed by Defendants' misleading statements was revealed to the market. The information was disseminated through partial disclosures that revealed the nature and effect of Defendants' alleged

1   conduct.  These disclosures, as more particularly described below, removed artificial inflation from

2   HP common stock, causing economic injury to Lead Plaintiff and other members of the Class.

3         201.   The corrective impact of the partial disclosures during the Class Period alleged

4   herein, however, was tempered by Defendants' continued false and misleading statements that

5   continued to conceal the true nature of Defendants' fraud.  Each partial disclosure did not on its own

6   fully remove the inflation from HP's stock price, because it only partially revealed the nature and

7   extent of the fallout from Defendants' previously misrepresented and concealed conduct.

8   Defendants' continued misrepresentations maintained the price of HP common stock at a level that

9   was inflated by fraud, inducing members of the Class to continue purchasing shares in HP even after

10   Defendants' partial disclosures.

11         202.   The disclosures that corrected the market price to eliminate the inflation maintained

12   by Defendants' fraud are detailed below.  These stock price declines were due to firm-specific,

13   fraud-related disclosures and not the result of market, industry, or firm-specific, non-fraud factors.

14   The following stock price declines are not necessarily comprehensive since fact and expert discovery

15   are not complete.

16         203.   A partial disclosure entered the market on November 24, 2015, when HP filed

17   disappointing Q4 2015 financial results on Form 10-Q and disclosed disappointing operating profit

18   and gross margins caused by weakness in the Supplies business.  As a result of the November 24,

19   2015 partial disclosure, the price of HP stock declined 13.6% on volume of more than 71.9 million

20   shares to close at $12.64 per share on November 25, 2015.  In contrast to the 13.6% decline in HP

21   common stock, the S&P 500 Index and the S&P Information Technology Index were flat.[44]

22         204.   Despite the negative news disclosed on November 24, 2015, Defendants falsely

23   reassured the market on the November 24, 2015 earning call that the disappointing financial results

24   stemmed from currency and competitive pricing issues, not from anything occurring internally at the

25   Company: "The most significant factor [since the inaugural Security Analyst Meeting] was the

26   continued effects of currency movements that have accelerated pricing pressures."  Defendants'

---

27   [44]   For purposes of comparing its stock price performance vis-à-vis its peers and relevant market,
28   HP referred investors to the S&P 500 Index and the S&P Information Technology Index.

1   continued misleading statements and omissions regarding the pull-in scheme maintained artificial

2   inflation in the price of HP's common stock.

3       205.    On January 7, 2016, Wells Fargo Securities downgraded HP from "Outperform" to

4   "Market Perform" due to stagnated growth and "pressures in . . . printer segments [that] are likely to

5   continue in FY16."  Wells Fargo also highlighted "lower supplies demand with stabilization only

6   coming in H2 17."  As a result of the January 7, 2016 downgrade, the price of HP stock declined

7   4.6% on volume of more than 25.4 million shares to close at $10.77 per share on January 7, 2016.  In

8   contrast to the 4.6% decline in HP common stock, the S&P 500 Index was flat and the S&P

9   Information Technology Index was down only 3%.

10      206.    On February 24, 2016, HP filed disappointing Q1 2016 financial results on Form 10-

11  Q and disclosed disappointing operating profit and margins caused by weakness in the Supplies

12  business.  As a result of the February 24, 2016 partial disclosure, the price of HP stock declined

13  4.4% on volume of more than 35.6 million shares to close at $10.34 per share on February 25, 2016.

14  In contrast to the 4.4% decline in HP common stock, the S&P 500 Index and the S&P Information

15  Technology Index both increased slightly.

16      207.    Despite the negative news disclosed on February 24, 2016, Defendants falsely

17  reassured the market on a February 24, 2016 earnings call that the disappointing financial results

18  stemmed from currency and competitive pricing issues, not from anything occurring internally at the

19  Company: "And the pressure there was really around very competitive pricing environments related

20  to currency . . . ."  Defendants also stated that "we made solid progress on our core and growth

21  initiatives."  Defendants' continued misleading statements and omissions regarding the pull-in

22  scheme maintained artificial inflation in the price of HP's common stock.

23      208.    On June 21, 2016, Defendants held a conference call for analysts and investors during

24  which they revealed that HP would reduce Supplies channel inventory by $450 million and, as a

25  result, Supplies revenue would be reduced by $450 million over the second half of fiscal 2016.

26  Defendants also announced a complete overhaul of HP's Printing sales model that "will focus more

27  on selling through the value of our branded supplies products and less through promotions and

28  pricing."  As a result of the June 21, 2016 disclosure, the price of HP stock declined 5.4% on volume

of more than 18.2 million shares to close at $12.61 per share on June 22, 2016.  In contrast to the 5.4% decline in HP common stock, the S&P 500 Index increased slightly and the S&P Information Technology Index was flat.  HP stock continued to fall on this news, closing at $11.55 per share on June 27, 2016 – a 13.3% decline from the stock price immediately preceding the June 21, 2016 announcement.

## X.    APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND THE FRAUD-ON-THE-MARKET DOCTRINE

209.    Lead Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    The omissions and misrepresentations were material;

(c)    HP common stock traded in an efficient market;

(d)    The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of HP common stock; and

(e)    Lead Plaintiff and other members of the Class purchased HP common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

210.    At all relevant times, the market for HP common stock was efficient for the following reasons, among others:

(a)    HP common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    As a regulated issuer, HP filed periodic public reports with the SEC; and

(c)    HP regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

1

**XI.    THE STATUTORY SAFE HARBOR DOES NOT APPLY TO
        DEFENDANTS' MISLEADING STATEMENTS AND MATERIAL
        OMISSIONS**

2

3       211.    Many (if not all) of Defendants' false and misleading statements during the Class

4  Period were not forward-looking statements ("FLS") and/or identified as such by Defendants, and

5  thus did not fall within any "Safe Harbor."

6       212.    Defendants' verbal "Safe Harbor" warnings accompanying its oral FLS issued during

7  the Class Period were ineffective to shield those statements from liability.

8       213.    Defendants are also liable for any false or misleading FLS pleaded because, at the

9  time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was

10 authorized and/or approved by an executive officer of HP who knew that the FLS was false or

11 misleading.  Further, none of the historic or present tense statements made by Defendants were

12 assumptions underlying or relating to any plan, projection or statement of future economic

13 performance, as they were not stated to be such assumptions underlying or relating to any projection

14 or statement of future economic performance when made.

15  **XII.    CLASS ACTION ALLEGATIONS**

16      214.    Lead Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal

17 Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired HP common

18 stock during the Class Period.  Excluded from the Class are Defendants and their families, the

19 officers and directors of the Company, at all relevant times, members of their immediate families and

20 their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or

21 had a controlling interest.

22      215.    The members of the Class are so numerous that joinder of all members is

23 impracticable.  The Company's stock is actively traded on the NYSE, and there were approximately

24 1.8 billion shares of HP stock outstanding during the Class Period.  While the exact number of Class

25 members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate

26 discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed

27 Class.  Record owners and other members of the Class may be identified from records maintained by

28

1   HP or its transfer agents and may be notified of the pendency of this action by mail, using the form

2   of notice similar to that customarily used in securities class actions.

3          216.    Common questions of law and fact predominate and include: (i) whether Defendants

4   violated the 1934 Act; (ii) whether Defendants omitted and/or misrepresented material facts; (iii)

5   whether Defendants knew or recklessly disregarded that their statements were false and misleading;

6   and (iv) whether Defendants' statements, omissions, and/or conduct artificially inflated the price of

7   HP common stock and the extent and appropriate measure of damages.

8          217.    Lead Plaintiff's claims are typical of the claims of the members of the Class as all

9   members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal

10  law that is complained of herein.

11         218.    Lead Plaintiff will fairly and adequately protect the interests of the members of the

12  Class and have retained counsel competent and experienced in class and securities litigation.

13         219.    A class action is superior to all other available methods for the fair and efficient

14  adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the

15  damages suffered by individual Class members may be relatively small per Class member, the

16  expense and burden of individual litigation make it impossible for members of the Class to

17  individually redress the wrongs done to them.  There will be no difficulty in the management of this

18  action as a class action.

19                                            **COUNT I**
                                **For Violation of §10(b) of the 1934 Act and Rule 10b-5**
20                                      **Against All Defendants**

21         220.    Lead Plaintiff incorporates ¶¶1-219 by reference.

22         221.    During the Class Period, Defendants disseminated or approved the false statements

23  specified above, which they knew or recklessly disregarded were misleading in that they contained

24  misrepresentations and failed to disclose material facts necessary in order to make the statements

25  made, in light of the circumstances under which they were made, not misleading.

26         222.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

27                 (a)    Employed devices, schemes, and artifices to defraud;

28

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 4:20-
cv-07835-JSW                                                                        - 73 -
4816-1772-1318.v1

(b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of HP common stock during the Class Period.

223.    Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for HP common stock.  Lead Plaintiff and the Class would not have purchased HP common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements, omissions, and conduct.

224.    As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of HP common stock at artificially inflated prices during the Class Period.

**COUNT II**
**For Violation of §20(a) of the 1934**
**Act Against All Defendants**

225.    Lead Plaintiff incorporates ¶¶1-224 by reference.

226.    During the Class Period, the Defendants acted as controlling persons of HP within the meaning of §20(a) of the 1934 Act.  By virtue of their positions and their power to control public statements about the Company, the Individual Defendants had the power and ability to control the actions of the Company and its employees.  HP controlled the Individual Defendants and its other officers and employees.  By reason of such conduct, Defendants are liable pursuant to §20(a) of the 1934 Act.

**XIII.    PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiff prays for judgment as follows:

A.    Determining that this action is a proper class action, certifying Lead Plaintiff as class representatives under Rule 23 of the Federal Rules of Civil Procedure, and designating Lead Plaintiff's counsel as Class Counsel;

1    B.    Awarding Lead Plaintiff and the members of the Class damages and interest;

2    C.    Awarding Lead Plaintiff's reasonable costs, including attorneys' fees; and

3    D.    Awarding such equitable/injunctive or other relief as the Court may deem just and

4 proper.

5 **XIV.    JURY DEMAND**

6    Lead Plaintiff demands a trial by jury.

7 DATED:  April 21, 2021                    ROBBINS GELLER RUDMAN
                                              & DOWD LLP
8                                          DARRYL J. ALVARADO
                                           RACHEL A. COCALIS
9

10

11                                            s/DARRYL J. ALVARADO
                                           DARRYL J. ALVARADO

12                                         655 West Broadway, Suite 1900
                                           San Diego, CA  92101
13                                         Telephone:  619/231-1058
                                           619/231-7423 (fax)
14                                         dalvarado@rgrdlaw.com
                                           rcocalis@rgrdlaw.com
15
                                           Lead Counsel for Lead Plaintiff
16

17

18

19

20

21

22

23

24

25

26

27

28

1

<u>CERTIFICATE OF SERVICE</u>

2          I hereby certify under penalty of perjury that on April 21, 2021, I authorized the electronic

3   filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send

4   notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I

5   hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the

6   non-CM/ECF participants indicated on the attached Manual Notice List.

7                                             s/ DARRYL J. ALVARADO
                                              DARRYL J. ALVARADO
8
                                              ROBBINS GELLER RUDMAN
9                                                 & DOWD LLP
                                              655 West Broadway, Suite 1900
10                                            San Diego, CA  92101-8498
                                              Telephone:  619/231-1058
11                                            619/231-7423 (fax)

12                                            E-mail:  dalvarado@rgrdlaw.com

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4816-1772-1318.v1

# Mailing Information for a Case 4:20-cv-07835-JSW York County on Behalf of the County of York Retirement Fund v. HP Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Michael Albert**
  malbert@rgrdlaw.com,MAlbert@ecf.courtdrive.com,e_file_SD@rgrdlaw.com

- **Darryl James Alvarado**
  dalvarado@rgrdlaw.com,E_File_SD@rgrdlaw.com,nhorstman@rgrdlaw.com

- **Sara B. Brody**
  sbrody@sidley.com,ddelarocha@sidley.com,sarah-hemmendinger-9052@ecf.pacerpro.com,sfdocket@sidley.com,sara-brody-9555@ecf.pacerpro.com

- **Rachel A. Cocalis**
  rcocalis@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Matthew James Dolan**
  mdolan@sidley.com,kblakeman@sidley.com,sfefilingnoitce@sidley.com,sfdocket@sidley.com,matthew-dolan-7481@ecf.pacerpro.com

- **Brian Michael Lutz**
  BLutz@gibsondunn.com

- **Danielle Suzanne Myers**
  dmyers@rgrdlaw.com,dmyers@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

- **Lissa Marie Percopo**
  lpercopo@gibsondunn.com

- **Darren Jay Robbins**
  darrenr@rgrdlaw.com,e_file_sd@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)