# EXHIBIT 2

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

---

## FORM 8-K

---

### CURRENT REPORT
### PURSUANT TO SECTION 13 OR 15(d) OF
### THE SECURITIES EXCHANGE ACT OF 1934

**October 31, 2015**
**Date of Report (Date of Earliest Event Reported)**

---

# HP Inc.
**(Exact name of registrant as specified in its charter)**

---

| **DELAWARE** | **1-4423** | **94-1081436** |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

| **1501 PAGE MILL ROAD, PALO ALTO, CA** | **94304** |
|---|---|
| (Address of principal executive offices) | (Zip code) |

**(650) 857-1501**
**(Registrant's telephone number, including area code)**

---

# (Hewlett-Packard Company)
**(Former name or former address, if changed since last report)**

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐    Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐    Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐    Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐    Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 1.01.          Entry into a Material Definitive Agreement.**

On October 31, 2015 and November 1, 2015, HP Inc. (formerly Hewlett-Packard Company) entered into several agreements with Hewlett Packard Enterprise Company ("Hewlett Packard Enterprise") that govern the relationship of the parties following the Distribution (as defined below), including the following:

- Separation and Distribution Agreement (the "SDA");

- Transition Services Agreement;

- Tax Matters Agreement;

- Employee Matters Agreement;

- Real Estate Matters Agreement;

- Master Commercial Agreement; and

- Information Technology Service Agreement.

A summary of the principal terms of each of these agreements is set forth in the section entitled "Certain Relationships and Related Person Transactions—Agreements with HP Inc." contained in the Information Statement included as Exhibit 99.1 to Hewlett Packard Enterprise's Current Report on Form 8-K filed with the Securities and Exchange Commission on November 5, 2015, which summaries are incorporated herein by reference. The summaries do not purport to be complete and are qualified in their entirety by reference to the full text of the agreements, each of which is attached hereto as Exhibit 2.1, 2.2, 2.3, 2.4, 2.5, 2.6 and 2.7, respectively, and is incorporated herein by reference.

The information described below under "Item 2.03. Creation of a Direct Financial Obligation under an Off-Balance Sheet Arrangement of a Registrant" is hereby incorporated by reference into this Item 1.01.

**Item 2.01.          Completion of the Acquisition or Disposition of Assets.**

Effective as of 12:01 a.m. Eastern time on November 1, 2015, pursuant to the SDA, HP Inc. completed the previously announced separation of its enterprise technology infrastructure, software, services and financing businesses from its personal systems and printing businesses (the "Separation"), which was accomplished by the distribution of the outstanding common stock of Hewlett Packard Enterprise to HP Inc. stockholders as of the close of business on October 21, 2015, the record date for the distribution (the "Distribution"). HP Inc. stockholders received one share of Hewlett Packard Enterprise common stock for every one share of HP Inc. common stock held at the close of business on the record date.

Hewlett Packard Enterprise is now an independent public company, and its common stock began regular-way trading under the symbol "HPE" on the New York Stock Exchange ("NYSE") on November 2, 2015. HP Inc. distributed a total of approximately 1.805 billion shares of Hewlett Packard Enterprise common stock to the HP Inc. stockholders as of the close of business on the record date.

**Item 2.03.          Creation of a Direct Financial Obligation or Obligation under an Off Balance Sheet Arrangement of a Registrant**

On November 1, 2015, HP Inc. entered into an amended and restated revolving credit facility (the "Credit Agreement"), together with the lenders named therein, Citibank, N.A. ("Citibank"), as co-administrative agent and administrative processing agent, and JPMorgan Chase Bank, N.A., as co-administrative agent, providing for a senior, unsecured revolving credit facility with aggregate lending commitments of $4,000,000,000. Loans under the revolving credit facility may be used for general corporate purposes.

Commitments under the Credit Agreement will be available until the period ending on April 2, 2019, which period may be extended, subject to satisfaction of certain conditions, by up to two, one-year periods.

Borrowings under the Credit Agreement will bear interest at rates per annum, determined, at HP Inc.'s option, by reference either to an alternate base rate ("ABR Borrowing") or to LIBOR ("Eurodollar Borrowing"). ABR Borrowings will bear interest at (a) the highest of (i) the prime rate announced by Citibank, (ii) the Federal Funds Effective Rate plus one-half of 1%, and (iii) one-month LIBOR plus 1%, plus (b) a margin of between zero and 75 basis points, depending on the rating of HP Inc.'s long-term senior unsecured debt. Eurodollar Borrowings will bear interest at (a) the London interbank offered rate for deposits in dollars with a term equivalent to the interest period for such borrowing; plus (b) a margin of between 87.5 and 175 basis points, depending on the rating of HP Inc.'s long-term senior unsecured debt. In addition, HP Inc. will pay a commitment fee on unused commitments between 8 and 25 basis points, depending on the rating of HP Inc.'s long-term senior unsecured debt.

The Credit Agreement contains various customary covenants that limit, among other things, the incurrence of indebtedness by subsidiaries of HP Inc., the grant or incurrence of liens by HP Inc. and its subsidiaries, the entry into sale and leaseback transactions by HP Inc. and its subsidiaries and the entry into certain fundamental change transactions by HP Inc. and its significant subsidiaries. The Credit Agreement contains a covenant pursuant to which HP Inc. will not permit the ratio of consolidated EBITDA to consolidated net interest expense for any period of four consecutive fiscal quarters to be less than 3.0 to 1.0. The Credit Agreement also contains a covenant pursuant to which HP Inc. will not permit the ratio of consolidated total debt to consolidated EBITDA to exceed 4.0 to 1.0 as of the last day of any fiscal quarter.

The Credit Agreement includes customary events of default, including events of default relating to non-payment of amounts due under the Credit Agreement, material inaccuracy of representations and warranties, violation of covenants, non-payment or acceleration of other material indebtedness, bankruptcy and insolvency, unsatisfied material judgments and change of control. Under the Credit Agreement, if an event of default occurs, lenders holding a majority of the revolving commitments will have the right to terminate the commitments and accelerate the maturity of any loans outstanding.

The foregoing description does not purport to be complete and is qualified in its entirety by reference to the full text of the Credit Agreement, which is attached hereto as Exhibit 10.1 and is incorporated herein by reference.

In the ordinary course of their respective financial services businesses, the lenders party to the Credit Agreement, or their respective affiliates, have provided, and may in the future provide, to HP Inc., and persons and entities with relationships with HP Inc., a variety of services, including cash management, investment research and management, commercial banking, hedging, brokerage, and advisory or other financial and non-financial activities and services, for which they received or will receive customary fees and expenses.

**Item 5.02.**          **Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.**

*HP Inc. Board of Directors and Committees*

In connection with the consummation of the Separation, each of Marc L. Andreesen, Klaus Kleinfeld, Raymond J. Lane, Ann M. Livermore, Raymond E. Ozzie, Gary M. Reiner and Patricia F. Russo resigned as a director of HP Inc. to join the board of directors of Hewlett Packard Enterprise, and each of Carl Bass, Chip Bergh, Stacy Brown-Philpot, Stephanie Burns, Mary Anne Citrino, Stacey Mobley, Subra Suresh and Dion Weisler joined HP Inc.'s board of directors, in each case effective as of November 1, 2015.

Effective as of November 1, 2015, the HP Inc. board of directors consists of Shumeet Banerji, Carl Bass, Robert R. Bennett, Chip Bergh, Stacy Brown-Philpot, Stephanie Burns, Mary Anne Citrino, Rajiv L. Gupta, Stacey Mobley, Subra Suresh, Dion Weisler and Margaret C. Whitman. Effective as of November 1, 2015, Ms. Whitman was appointed Nonexecutive Chairman of the Board and the composition of the HP Inc. board of directors' standing committees was reconstituted as follows:

*Audit Committee*
Shumeet Banerji
Robert R. Bennett
Chip Bergh
Mary Anne Citrino (Chair)
Stacy Brown-Philpot

*Nominating, Governance and Social Responsibility Committee*
Shumeet Banerji (Chair)
Stacy Brown-Philpot
Rajiv L. Gupta
Stacey Mobley

*Human Resources and Compensation Committee*
Chip Bergh
Carl Bass
Rajiv L. Gupta (Chair)
Stacey Mobley

*Finance, Investment and Technology Committee*
Robert R. Bennett (Chair)
Carl Bass
Stephanie Burns
Mary Anne Citrino
Subra Suresh
Margaret C. Whitman

In connection with the Separation, the Technology Committee and the Finance and Investment Committee of the board were disbanded and reorganized into one committee called the Finance, Investment and Technology Committee.

*HP Inc. Executive Officers*

Additionally, in connection with the consummation of the Separation, Martin Fink, Henry Gomez, John M. Hirshaw, Christopher P. Hsu, Kirt P. Karros, Michael G. Nefkens, Antonio Neri, Jeff T. Ricci, John F. Schultz, Margaret C. Whitman and Robert Youngjohns resigned as officers of HP Inc. to join Hewlett Packard Enterprise, in each case effective as of November 1, 2015. HP Inc. appointed Dion Weisler (age 48) as President and Chief Executive Officer, Rob Binns (age 47) as Head of Global Treasury and Investor Relations, Ron Coughlin (age 49) as President, Personal Systems business, Jon Flaxman (age 58) as Chief Operating Officer, Catherine A. Lesjak (age 56) as Chief Financial Officer, Enrique Lores (age 50) as President, Printing, Solutions and Services business, Tracy Keogh (age 54) as Chief Human Resources Officer, and Marie Myers (age 47) as Global Controller and Head of Finance Services, in each case effective as of November 1, 2015.

Dion Weisler is the President and Chief Executive Officer of HP Inc. Previously, he served as Executive Vice President of the Printing and Personal Systems Group of Hewlett-Packard Company from June 2013 to November 2015 and as Senior Vice President and Managing Director, Printing and Personal Systems, Asia Pacific and Japan from January 2012 to June 2013. Prior to joining Hewlett-Packard Company, he was Vice President and Chief Operating Officer of the Product and Mobile Internet Digital Home Groups at Lenovo Group Ltd., a technology company, from January 2008 to December 2011.

Rob Binns is the Head of Global Treasury and Investor Relations for HP Inc. In this role, Mr. Binns oversees all treasury activities, including cash management, foreign exchange and capital markets. In addition, Mr. Binns oversees financial planning, including forecasting, long and short range planning, investor relations, credit and collections, investment management and risk management. Mr. Binns joined Hewlett-Packard Company in 2006 as Finance Director for HP Software in the Europe, Middle East and Africa regions following the acquisition of Mercury Interactive. Since then, Mr. Binns has held a number of finance and business roles within HP Software, including Vice President of Worldwide Field Operations. Previously, Mr. Binns was Vice President of Investor Relations, where in both 2014 and 2015, he was recognized by Institutional Investor rankings in the technology sector. Most recently, Mr. Binns was the Vice President and CFO for HP Software responsible for driving all finance activities.

Ron Coughlin is the President of HP Inc.'s Personal Systems business, which focuses on PCs, tablets, accessories and other related services for all customer segments. Mr. Coughlin joined Hewlett-Packard Company from PepsiCo in June 2007 as the senior vice president of the Imaging and Printing Group Worldwide Strategy and Marketing team. In this role, he was responsible for driving global strategy, marketing and planning across all customer segments and global business units. In 2010, Mr. Coughlin transitioned to lead the LaserJet and Enterprise Solutions global business unit. In this role, he was responsible for customer offerings that included HP LaserJet printers, supplies, managed print services and enterprise software solutions. Most recently, Mr. Coughlin ran Consumer Personal Systems.

Jon Flaxman is the Chief Operating Officer of HP Inc., leading the Strategy and Business Management team. In this role, he is responsible for Sales Strategy and Operations, Customer Support, Corporate Strategy, transformational initiatives and infrastructure including IT, Real Estate, Workplace Services and Procurement. Previously, Mr. Flaxman served as Senior Vice President and CFO for Hewlett-Packard Company's Printing and Personal Systems Group, driving all financial activities for the organization. Prior to such role, he was Senior Vice President of Finance for Hewlett-Packard Company's Imaging and Printing Group for four years. From March 2007 to November 2008, Mr. Flaxman was Chief Administrative Officer and Executive Vice President of Hewlett-Packard Company. Mr. Flaxman joined Hewlett-Packard Company in 1981.

Tracy S. Keogh is the Chief Human Resources Officer of HP Inc. Previously, Ms. Keogh served as Executive Vice President, Human Resources of Hewlett-Packard Company from April 2011 to November 2015. Prior to joining Hewlett-Packard Company, Ms. Keogh served as Senior Vice President of Human Resources at Hewitt Associates, a provider of human resources consulting services, from May 2007 until March 2011.

Catherine A. Lesjak is the Chief Financial Officer of HP Inc. Previously, Ms. Lesjak served as Executive Vice President and Chief Financial Officer of Hewlett-Packard Company from 2007 to November 2015. Prior to that, Ms. Lesjak served as Hewlett-Packard Company's interim Chief Executive Officer from August 2010 until November 2010.

Enrique Lores is the President of HP Inc.'s Printing, Solutions and Services business, which engineers ink and laser-based solutions that provide a faster, more affordable, exciting way to print, manage, and realize content. Throughout his 26-year tenure with Hewlett-Packard Company, Mr. Lores held leadership positions across the organization, most recently leading the Separation Management Office for HP Inc. Previously, Mr. Lores was the Senior Vice President and General Manager for Business Personal Systems, where he was responsible for the overall business, including defining product, marketing and sales strategies, end-to-end product development and business execution worldwide. Before his Business Personal Systems role, Mr. Lores was Senior Vice President of Customer Support and Services, providing industry-leading customer care to more than 150 million customers, and helping develop, build and provide industry-leading service offerings.

Marie Myers is the Global Controller and Head of Finance Services of HP Inc. Her current responsibilities include the compliance and controls oversight for the U.S. GAAP and local GAAP accounting in all countries and regions where HP Inc. operates. Prior to that from October 2014 to October 2015, Ms. Myers was Finance Lead for HPI Inc. in the Separation, and held key leadership roles at Hewlett-Packard Company, including: Vice President for PPS HQ and Strategy Finance from May 2012 to October 2015 and Vice President of Finance for PSG Americas from March 2010 to May 2012.

**Item 8.01.      Other Events.**

On November 2, 2015, HP Inc. issued a press release announcing the completion of the Separation. A copy of the press release is attached hereto as Exhibit 99.1 and is incorporated herein by reference.

**Item 9.01.      Financial Statements and Exhibits.**

(b) *Pro Forma Financial Information* . Unaudited pro forma consolidated financial information of HP Inc. giving effect to the Separation, and the related notes thereto, required by Article 11 of Regulation S-X is attached hereto as Exhibit 99.2.

(d) *Exhibits* . See Exhibit Index.

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

HP INC.

DATE: November 5, 2015

By:    /s/ Ruairidh Ross

Name:  Ruairidh Ross

Title:   Deputy General Counsel and Assistant Secretary

**EXHIBIT INDEX**

| Exhibit Number | Description |
|---|---|
| 2.1 | Separation and Distribution Agreement, dated as of October 31, 2015, by and among Hewlett-Packard Company, Hewlett Packard Enterprise Company and the Other Parties Thereto* |
| 2.2 | Transition Services Agreement, dated as of November 1, 2015, by and between Hewlett-Packard Company and Hewlett Packard Enterprise Company* |
| 2.3 | Tax Matters Agreement, dated as of October 31, 2015, by and between Hewlett-Packard Company and Hewlett Packard Enterprise Company* |
| 2.4 | Employee Matters Agreement, dated as of October 31, 2015, by and between Hewlett-Packard Company and Hewlett Packard Enterprise Company* |
| 2.5 | Real Estate Matters Agreement, dated as of October 31, 2015, by and between Hewlett-Packard Company and Hewlett Packard Enterprise Company* |
| 2.6 | Master Commercial Agreement, dated as of November 1, 2015, by and between Hewlett-Packard Company and Hewlett Packard Enterprise Company* |
| 2.7 | Information Technology Service Agreement, dated as of November 1, 2015, by and between Hewlett-Packard Company and HP Enterprise Services, LLC* |
| 10.1 | Five-Year Credit Agreement, dated as of April 2, 2014, as Amended and Restated as of November 1, 2015, among HP Inc., the lenders named therein and Citibank, N.A., as administrative processing agent and co-administrative agent, and JPMorgan Chase Bank, N.A., as co-administrative agent |
| 99.1 | Press Release, dated November 2, 2015, entitled "HP Inc. Ushers in New Era of Innovation, Empowers Everyone, Everywhere to Keep Reinventing" |
| 99.2 | Unaudited pro forma consolidated financial information |

\* Schedules and exhibits have been omitted pursuant to Item 601(b)(2) of Regulation S-K. HP Inc. hereby undertakes to furnish copies of any of the omitted schedules and exhibits upon request by the U.S. Securities and Exchange Commission.

**Exhibit 2.1**

SEPARATION AND DISTRIBUTION AGREEMENT

BY AND AMONG

HEWLETT-PACKARD COMPANY,

HEWLETT PACKARD ENTERPRISE COMPANY

AND

THE OTHER PARTIES HERETO

OCTOBER 31, 2015

**TABLE OF CONTENTS**

| | | Page |
|---|---|---|
| ARTICLE I | DEFINITIONS | 2 |
| Section 1.1 | Certain Definitions | 2 |
| Section 1.2 | Other Terms | 11 |
| | | |
| ARTICLE II | THE REORGANIZATION | 13 |
| Section 2.1 | Transfer of Assets and Assumption of Liabilities Prior to the Distribution | 13 |
| Section 2.2 | Allocation of Assets | 15 |
| Section 2.3 | Allocation of Liabilities | 18 |
| Section 2.4 | Transfer of Excluded Assets and Assumption of Excluded Liabilities Not Effected at or Prior to the Effective Time | 21 |
| Section 2.5 | Transfer of Enterprise Assets and Assumption of Enterprise Liabilities Not Effected at or Prior to the Effective Time | 23 |
| Section 2.6 | Novation of Enterprise Liabilities; Indemnification | 26 |
| Section 2.7 | Novation of Liabilities Other than Enterprise Liabilities; Indemnification | 26 |
| Section 2.8 | Termination of Intercompany Contracts; Settlement of Intercompany Payables and Receivables | 27 |
| Section 2.9 | Treatment of Shared Contracts | 28 |
| Section 2.10 | Reserved | 30 |
| Section 2.11 | Bank Accounts | 30 |
| Section 2.12 | Disclaimer of Representations and Warranties | 30 |
| Section 2.13 | Post-Distribution Cash Adjustment | 31 |
| | | |
| ARTICLE III | THE DISTRIBUTION | 31 |
| Section 3.1 | Actions at or Prior to the Effective Time | 31 |
| Section 3.2 | Conditions Precedent to the Distribution | 33 |
| Section 3.3 | The Distribution and the Subsidiary Stock Exchange | 34 |
| Section 3.4 | Subdivision of Enterprise Common Stock to Accomplish the Distribution | 35 |
| | | |
| ARTICLE IV | ACCESS TO INFORMATION | 36 |
| Section 4.1 | Access to Information | 36 |
| Section 4.2 | Ownership of Information | 37 |
| Section 4.3 | Compensation for Providing Information | 37 |
| Section 4.4 | Record Retention | 38 |
| Section 4.5 | Liability for Information Provided | 38 |
| Section 4.6 | Other Agreements Providing for Exchange of Information | 38 |
| Section 4.7 | Production of Witnesses and Records in Connection with an Action | 39 |
| Section 4.8 | Counsel; Privileges; Legal Materials | 39 |
| | | |
| ARTICLE V | RELEASES | 42 |
| Section 5.1 | Release of Pre-Distribution Claims | 42 |

i

|  |  |  | **Page** |
|---|---|---|---|
| ARTICLE VI | | INDEMNIFICATION, GUARANTEES AND LITIGATION | 45 |
| | Section 6.1 | General Indemnification by Enterprise | 45 |
| | Section 6.2 | General Indemnification by HP | 46 |
| | Section 6.3 | Direct Subsidiary Indemnification | 46 |
| | Section 6.4 | Contribution | 47 |
| | Section 6.5 | Indemnification Obligations Net of Insurance Proceeds and Other Amounts | 48 |
| | Section 6.6 | Certain Matters Relating to Indemnification of Third Party Claims | 48 |
| | Section 6.7 | Additional Matters | 49 |
| | Section 6.8 | Remedies Cumulative | 50 |
| | Section 6.9 | Survival of Indemnities | 50 |
| | Section 6.10 | Guarantees | 50 |
| | Section 6.11 | Management of Actions (other than Corporate Liabilities and Corporate Assets) | 51 |
| | Section 6.12 | Management of Corporate Liabilities and Corporate Assets | 52 |
| | Section 6.13 | Settlement of Actions | 55 |
| ARTICLE VII | | OTHER AGREEMENTS | 55 |
| | Section 7.1 | Further Assurances | 55 |
| | Section 7.2 | Confidentiality | 56 |
| | Section 7.3 | Insurance Matters | 57 |
| | Section 7.4 | Separation Expenses | 60 |
| | Section 7.5 | Transaction Documents | 61 |
| | Section 7.6 | Payments; Interest | 61 |
| | Section 7.7 | Noncompetition Matters | 61 |
| | Section 7.8 | Non-Solicitation and No-Hire | 64 |
| | Section 7.9 | Environmental Remediation | 64 |
| | Section 7.10 | Permits | 66 |
| ARTICLE VIII | | DISPUTE RESOLUTION | 66 |
| | Section 8.1 | General | 66 |
| | Section 8.2 | Negotiation Between Executives | 66 |
| | Section 8.3 | Mandatory Mediation | 67 |
| | Section 8.4 | Binding Arbitration | 67 |
| | Section 8.5 | Interim Equitable Relief | 68 |
| | Section 8.6 | Confidentiality of Negotiation, Mediation and Arbitration | 69 |
| | Section 8.7 | Limitation on Certain Damages | 69 |
| | Section 8.8 | No Effect on Other Commitments | 69 |
| ARTICLE IX | | MISCELLANEOUS | 69 |
| | Section 9.1 | Corporate Power; Facsimile Signatures | 69 |
| | Section 9.2 | Governing Law; Submission to Jurisdiction; Waiver of Trial | 70 |
| | Section 9.3 | Survival of Covenants | 70 |
| | Section 9.4 | Waivers of Default | 70 |
| | Section 9.5 | Force Majeure | 71 |

ii

| | | Page |
|---|---|---|
| Section 9.6 | Notices | 71 |
| Section 9.7 | Termination | 72 |
| Section 9.8 | Severability | 72 |
| Section 9.9 | Entire Agreement | 72 |
| Section 9.10 | Assignment; No Third-Party Beneficiaries | 72 |
| Section 9.11 | Public Announcements | 73 |
| Section 9.12 | Specific Performance | 73 |
| Section 9.13 | Amendment | 73 |
| Section 9.14 | Rules of Construction | 73 |
| Section 9.15 | Counterparts | 74 |
| Section 9.16 | Performance | 74 |

iii

**EXHIBITS**

A  Form of Transition Services Agreement
B  Form of Tax Matters Agreement
C  Form of Employee Matters Agreement
D  Form of Real Estate Matters Agreement
E  Form of Commercial Agreement
F  Form of Amended and Restated Certificate of Incorporation of Enterprise
G  Form of Amended and Restated Bylaws of Enterprise

**SCHEDULES**

| | |
|---|---|
| Schedule 1.1(22) | Enterprise Balance Sheet |
| Schedule 1.1(23) | Enterprise Businesses |
| Schedule 1.1(24)(a)(i) | Enterprise Customer, Distribution, Supply or Vendor Contracts |
| Schedule 1.1(24)(b)(i) | Enterprise Joint Venture or License Agreements |
| Schedule 1.1(24)(e) | Other Enterprise Contracts |
| Schedule 1.1(27) | Enterprise Former Businesses |
| Schedule 1.1(38) | HPI Businesses |
| Schedule 1.1(41) | HPI Former Businesses |
| Schedule 1.1(48) | Intercompany Agreements |
| Schedule 1.1(69) | Transfer Documents |
| Schedule 2.1(a) | Plan of Reorganization |
| Schedule 2.2(a)(i) | Certain Enterprise Assets |
| Schedule 2.2(a)(ii)(A) | Capital Stock of Enterprise Subsidiaries |
| Schedule 2.2(a)(ii)(B) | Capital Stock of Other Enterprise Entities |
| Schedule 2.2(a)(viii)(A) | Enterprise Owned Real Property |
| Schedule 2.2(a)(viii)(B) | Enterprise Leased Real Property |
| Schedule 2.2(a)(ix)(A) | Equipment and Furniture at Enterprise Sites Retained by HPI |
| Schedule 2.2(a)(ix)(B) | Equipment and Furniture at HPI Sites Transferred to Enterprise |
| Schedule 2.2(b)(i) | Certain Excluded Assets |
| Schedule 2.2(b)(ii)(A) | Capital Stock of HPI Subsidiaries |
| Schedule 2.2(b)(ii)(B) | Capital Stock of Other HPI Entities |
| Schedule 2.2(b)(iii) | HPI Contracts |
| Schedule 2.2(b)(vi)(A) | HPI Owned Real Property |
| Schedule 2.2(b)(vi)(B) | HPI Leased Real Property |
| Schedule 2.2(c)(i) | Certain Corporate Assets |
| Schedule 2.3(a)(i) | Certain Enterprise Liabilities |
| Schedule 2.3(a)(ii)(D)(1) | Enterprise Owned and Leased Real Property (Environmental) |
| Schedule 2.3(a)(ii)(D)(2) | HPI Owned and Leased Real Property (Environmental) |
| Schedule 2.3(b)(i) | Certain Excluded Liabilities |
| Schedule 2.3(b)(iii) | Projects with Remediation Obligations and Remediation Cost Trigger |
| Schedule 2.3(c)(iv) | Certain Corporate Liabilities |
| Schedule 2.3(c)(vi)(A) | Environmental Liabilities at Certain Sites |

iv

**SCHEDULES**

| | |
|---|---|
| Schedule 2.3(c)(vi)(B) | Procedures for Certain Third-Party Disposal Sites |
| Schedule 2.3(c)(vi)(E) | Pending Environmental Actions |
| Schedule 2.9(a) | Shared Contracts |
| Schedule 2.11(a)(i) | Enterprise Accounts |
| Schedule 2.11(a)(ii) | HPI Accounts |
| Schedule 2.13 | Post-Distribution Cash Adjustment |
| Schedule 6.1(d) | Transaction Documents – Enterprise Indemnification |
| Schedule 6.2(d) | Transaction Documents – HPI Indemnification |
| Schedule 6.10(a) | Surviving Guarantees |
| Schedule 6.10(a)(i) | Enterprise Guarantees to Be Released |
| Schedule 6.10(a)(ii) | HPI Guarantees to Be Released |
| Schedule 6.11(a) | Enterprise Actions |
| Schedule 6.11(b) | HPI Actions |
| Schedule 6.11(c) | Mixed Actions |
| Schedule 7.1(a) | Specified Cooperation Matters Following the Distribution |
| Schedule 7.6 | Payment Schedule |
| Schedule 7.7 | Restricted Businesses |
| Schedule 7.9 | Remediation Obligations and Other Environmental Liabilities |
| Schedule 8.4(a)(i) | Pre-approved Arbitrators |
| Schedule 9.11 | Forms of Press Releases |

v

**SEPARATION AND DISTRIBUTION AGREEMENT**

This SEPARATION AND DISTRIBUTION AGREEMENT, dated as of October 31, 2015 (this " Agreement "), is by and among Hewlett-Packard Company, a Delaware corporation (" HP "); Hewlett Packard Enterprise Company, a Delaware corporation (" Enterprise "); solely for purposes of Section 6.3(b) and Section 6.7(c) , Hewlett-Packard Bermuda Enterprises LP, a Bermuda limited partnership and wholly owned subsidiary of HP (" BLP 1 D5 "), and Phoenix Holding LP, a Bermuda limited partnership and wholly owned subsidiary of HP (" Inc BLP C5 "); and solely for purposes of Schedule 2.13(d)(iii) and (iv) , Section 6.3(c) and Section 6.7(c) , Hewlett-Packard Munich B.V., a *besloten vennootschap met beperkte aansprakelijkheid* organized under the laws of the Netherlands and wholly owned subsidiary of HP (" Munich D2/D6 "), and Gatriam Holding B.V., a *besloten vennootschap met beperkte aansprakelijkheid* organized under the laws of the Netherlands and wholly owned subsidiary of HP (" E Munich C6 "). Certain terms used in this Agreement are defined in Section 1.1 .

W I T N E S S E T H :

WHEREAS, HP intends to separate the Enterprise Business from the HPI Business and to create a new publicly traded company to operate the Enterprise Business (the " Separation ");

WHEREAS, the Board of Directors of HP and the Board of Directors of Enterprise have approved the transfer of the Enterprise Assets to Enterprise and its Subsidiaries and the assumption by Enterprise and its Subsidiaries of the Enterprise Liabilities, all as more fully described in this Agreement and the other Transaction Documents;

WHEREAS, the Board of Directors of HP has approved the distribution to the holders of the outstanding shares of common stock, $0.01 par value, of HP (the " HP Common Shares ") as of the close of business on the Record Date of all of the issued and outstanding shares of the common stock, $0.01 par value, of Enterprise (the " Enterprise Common Stock "), by means of a *pro rata* distribution and in accordance with a distribution ratio to be determined by the Board of Directors of HP (the " Distribution ");

WHEREAS, HP and Enterprise have prepared, Enterprise has filed with the SEC and the SEC has declared effective, the Form 10, which includes the Information Statement, and which sets forth disclosure concerning Enterprise, the Separation and the Distribution;

WHEREAS, prior to the Effective Time, HP filed a Certificate of Amendment to the Certificate of Incorporation of Hewlett-Packard Company with the Secretary of State of the State of Delaware, to change the name of Hewlett-Packard Company to "HP Inc.", effective as of 11:59 pm, Eastern time, on October 31, 2015;

WHEREAS, for U.S. federal income tax purposes, (i) the Contribution (as defined herein) and the Distribution (together with the Subsidiary Stock Exchange), taken together, are intended to qualify as a reorganization within the meaning of Sections 355 and 368(a)(1)(D) of the Code; and (ii) this Agreement is intended to constitute, and is hereby adopted as, a "plan of reorganization" within the meaning of Section 368 of the Code; and

WHEREAS, it is appropriate and desirable to set forth the principal corporate transactions required to effect the Separation and the Distribution and certain other agreements that will govern certain matters relating to the Separation, the Distribution and the ongoing relationship of HP, Enterprise and their respective Subsidiaries.

NOW, THEREFORE, in consideration of the mutual agreements, provisions and covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties, intending to be legally bound hereby, agree as follows:

ARTICLE I

DEFINITIONS

Section 1.1 Certain Definitions . For purposes of this Agreement, the following terms shall have the meanings specified in this Section 1.1 :

(1) " Action " means any demand, action, claim, dispute, suit, countersuit, arbitration, inquiry, enforcement action, order, consent agreement, settlement agreement, subpoena, proceeding or investigation of any nature (whether criminal, civil, legislative, administrative, regulatory, prosecutorial or otherwise) by or before any federal, state, local, foreign or international Governmental Authority or any arbitration or mediation tribunal.

(2) " Affiliate " means, when used with respect to a specified Person, a Person that directly or indirectly, through one (1) or more intermediaries, controls, is controlled by or is under common control with such specified Person. For the purpose of this definition, " control " (including with correlative meanings, " controlled by " and " under common control with "), when used with respect to any specified Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or other interests, by Contract or otherwise. It is expressly agreed that, from and after the Effective Time, for purposes of this Agreement and the other Transaction Documents, no member of the Enterprise Group shall be deemed to be an Affiliate of any member of the HPI Group, and no member of the HPI Group shall be deemed to be an Affiliate of any member of the Enterprise Group.

(3) " Allowable Costs " shall have the meaning set forth on Schedule 2.3(b)(iii) .

(4) " Approvals or Notifications " means any consents, waivers, approvals, permits or authorizations to be obtained from, notices, registrations or reports to be submitted to, or other filings to be made with, any third Person, including any Governmental Authority.

(5) " Assets " means any and all assets, properties, claims and rights (including goodwill), wherever located (including in the possession of vendors or other third Persons or elsewhere), of every kind, character and description, whether real, personal or mixed, tangible, intangible or contingent, in each case whether or not recorded or reflected, or required to be recorded or reflected, on the books and records or financial statements of the applicable Person, including the following:

(a) all accounting and other books, records and files whether in paper, microfilm, microfiche, computer tape or disc, magnetic tape, electronic or any other form;

(b) all apparatus, computers and other electronic data processing and communications equipment, electronic storage equipment, fixtures, machinery, marketing and transportation systems and related facilities, equipment, furniture, automobiles, trucks, vessels, motor vehicles and other transportation equipment, tools, test devices, prototypes and models and other tangible personal property;

(c) all inventories of materials, parts, raw materials, components, supplies, work-in-process and finished goods and products;

(d) all interests in real property of whatever nature, including easements, whether as owner, mortgagee or holder of a Security Interest in real property, lessor, sublessor, lessee, sublessee or otherwise;

(e) (i) all interests in any capital stock or other equity interests of any Subsidiary or any other Person, (ii) all bonds, notes, debentures or other securities issued by any Subsidiary or any other Person, (iii) all loans, advances or other extensions of credit or capital contributions to any Subsidiary or any other Person and (iv) all other investments in securities of any Person;

(f) all license agreements, leases of personal property, open purchase orders for raw materials, supplies, parts or services and other Contracts;

(g) all deposits, letters of credit and performance and surety bonds;

(h) all written (including in electronic form) or oral technical information, data, specifications, research and development information, engineering drawings and specifications, operating and maintenance manuals, and materials and analyses prepared by consultants and other third Persons;

(i) all intellectual property rights and Technology;

(j) all cost information, sales and pricing data, customer prospect lists, supplier records, customer and supplier lists, customer and vendor data and drawings, correspondence and lists, product data and literature, artwork, design, development, manufacturing and business process files and data, formulations and specifications, quality records and reports and other books, records, studies, surveys, reports, plans and documents;

(k) all prepaid expenses, trade accounts and other accounts and notes receivable;

(l) all rights under Contracts, all claims or rights against any Person, all rights in connection with any bids or offers and all claims, choses in action or similar rights, whether accrued or contingent;

3

(m) all rights under insurance policies and all rights in the nature of insurance, indemnification or contribution;

(n) all licenses, permits, approvals and authorizations which have been issued by any Governmental Authority or other third Person;

(o) all cash or cash equivalents, bank accounts, lock boxes and other deposit arrangements; and

(p) all interest rate, currency, commodity or other swap, collar, cap or other hedging or similar agreements or arrangements.

(6) " C5 Contribution " means the transfer of the Enterprise Assets and Enterprise Liabilities to Inc BLP C5 pursuant to the Reorganization and the C5 Contribution Agreement.

(7) " C5 Contribution Agreement " means the Contribution Agreement, dated as of October 1, 2015, by and between Inc BLP C5 and BLP 1 D5.

(8) " C5 Distribution " means the direct and indirect transfer by BLP 1 D5 of all of its equity interests in Inc BLP C5 to certain Subsidiaries of Munich D2/D6 pursuant to the Reorganization.

(9) " C6 Contribution " means the transfer of the Enterprise Assets and Enterprise Liabilities to E Munich C6 pursuant to the Reorganization and the C6 Contribution Agreement.

(10) " C6 Contribution Agreement " means the Contribution Agreement, dated as of October 14, 2015, by and between Munich D2/D6 and E Munich C6.

(11) " C6 Distribution " means the distribution by Munich D2/D6 of all of its equity interests in E Munich C6 to Hewlett-Packard Mercator B.V. pursuant to the Reorganization.

(12) " Claims Administration " means the administration of claims made under the Shared Insurance Policies, including the reporting of claims to the insurance carriers that issued the Shared Insurance Policies, the management and defense of such claims, the negotiation of the resolution of such claims and the provision of appropriate releases upon settlement of such claims.

(13) " Code " means the Internal Revenue Code of 1986, as amended.

(14) " Commercial Agreement " means the Master Commercial Agreement in substantially the form attached hereto as Exhibit E entered into or to be entered into by and between HP and Enterprise on or prior to the Distribution Date.

(15) " Contract " means any agreement, understanding, contract, obligation, indenture, instrument, lease, promise, commitment or undertaking (whether written or oral and whether express or implied) that is legally binding.

4

(16) " Contribution " means the transfer of the Enterprise Assets and Enterprise Liabilities to Enterprise pursuant to the Reorganization.

(17) " Disclosure Document " means any registration statement (including the Form 10) filed with the SEC by or on behalf of any party or any of its Subsidiaries, and also includes any information statement (including the Information Statement), prospectus, offering memorandum, offering circular, periodic report or similar disclosure document, whether or not filed with the SEC or any other Governmental Authority, in each case, which describes the Reorganization or the Enterprise Group or primarily relates to the transactions contemplated hereby.

(18) " Distribution Agent " means Wells Fargo Shareowner Services.

(19) " Distribution Date " means the date on which HP distributes all of the issued and outstanding shares of Enterprise Common Stock to the holders of HP Common Shares.

(20) " Effective Time " means the time at which the Distribution occurs on the Distribution Date, which shall be deemed to be 12:01 a.m., New York City time.

(21) " Employee Matters Agreement " means the Employee Matters Agreement in substantially the form attached hereto as Exhibit C , entered into or to be entered into by and between HP and Enterprise on or prior to the Distribution Date.

(22) " Enterprise Balance Sheet " means the pro forma balance sheet of the Enterprise Group prepared in accordance with generally accepted accounting principles, including the notes thereto, as of July 31, 2015, as filed with the Information Statement and set forth as Schedule 1.1(22) hereto.

(23) " Enterprise Business " means the enterprise technology infrastructure, software, services and financing businesses of HP, and which as of immediately prior to the Effective Time is comprised of the "Enterprise Group," "Enterprise Services," "Software' and "HP Financial Services" reporting segments of HP, and including (a) the businesses and operations conducted prior to the Effective Time by any member of the Enterprise Group, but excluding those businesses set forth on Schedule 1.1(38) , (b) the businesses and operations set forth on Schedule 1.1(23) , (c) the Enterprise Former Businesses and (d) any other businesses or operations conducted primarily through the use of the Enterprise Assets.

(24) " Enterprise Contracts " means the following Contracts to which HP or any of its Affiliates is a party or by which HP or any of its Affiliates or any of their respective Assets is bound, whether or not in writing, in each case, immediately prior to the Effective Time, except for any such Contract or part thereof that is expressly contemplated to be retained by or transferred to HP or any member of the HPI Group pursuant to any provision of this Agreement or any other Transaction Document:

(a) (i) any customer, distribution, supply or vendor Contracts listed or described on Schedule 1.1(24)(a)(i) and (ii) any other customer, supply or vendor Contracts that relate primarily to the Enterprise Business;

5

(b) (i) any joint venture agreement or license agreement listed or described on Schedule 1.1(24)(b)(i) and (ii) any other joint venture agreement or license agreement that relates primarily to the Enterprise Business;

(c) any Contract or part thereof to the extent providing for any guarantee, indemnity, representation, warranty or other similar Liability of, by or in favor of any member of the Enterprise Group or the HPI Group in respect of an Enterprise Liability or the Enterprise Business;

(d) any Contract or part thereof that is otherwise expressly contemplated pursuant to this Agreement (including Shared Contacts, subject to Section 2.9 ) or any of the other Transaction Documents to be assigned to Enterprise or any member of the Enterprise Group; and

(e) any Contract listed or described on Schedule 1.1(24)(e) (or any applicable licenses, leases, addenda or similar arrangements thereunder as described on Schedule 1.1(24)(e) ) and any other Contract that relates primarily to the Enterprise Business.

(25) " Enterprise Corporate Asset Percentage " and " Enterprise Corporate Liability Percentage " each mean 50%.

(26) " Enterprise Employee " has the meaning set forth in the Employee Matters Agreement.

(27) " Enterprise Former Businesses " means the Former Businesses set forth on Schedule 1.1(27) and any Former Business that, at the time of sale, conveyance, assignment, transfer, disposition, divestiture (in whole or in part) or discontinuation, abandonment, completion or termination of the operations, activities or production thereof, was primarily managed by or associated with the Enterprise Business as then conducted.

(28) " Enterprise Group " means Enterprise, each Subsidiary of Enterprise immediately after the Effective Time, which shall include those entities set forth on Schedule 2.2(a)(ii)(A) , and each other Person that becomes a Subsidiary of Enterprise after the Effective Time (including as a result of transactions that occur following the Effective Time in accordance with the Plan of Reorganization).

(29) " Environmental Conditions " means the presence of Hazardous Materials in the environment, including soil, groundwater, surface water, ambient air or indoor air due to vapor intrusion from groundwater or soil, as a result of a Release prior to the Effective Time at a level that could require investigation, mitigation or remediation under Environmental Law.

(30) " Environmental Law " means any Law relating to (i) the protection of human health or the environment or natural resources; (ii) the use (including manufacturing and processing), emission, handling, transportation, distribution, treatment, storage, removal, recycling, disposal, Release or discharge of Hazardous Materials; (iii) the assessment, investigation, remediation, removal or mitigation of Hazardous Materials; (iv) the exposure of any individual to a Release of Hazardous Materials; (v) Laws relating to recordkeeping,

6

notification, disclosure and reporting requirements with respect to Hazardous Materials; and (vi) occupational health and safety.

(31) " Exchange Act " means the United States Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC thereunder, all as the same shall be in effect at the time that reference is made.

(32) " Force Majeure " means, with respect to a party, an event beyond the control of such party (or any Person acting on its behalf), which by its nature could not have been foreseen by such party (or such Person), or, if it could have been foreseen, was unavoidable, and includes acts of God, storms, floods, riots, fires, sabotage, labor unrest, pandemics, nuclear incidents, civil commotion or civil unrest, interference by civil or military authorities, acts of war (declared or undeclared) or armed hostilities or other national or international calamity or one (1) or more acts of terrorism or failure of energy sources or distribution facilities. For the avoidance of doubt, the receipt by a party of an unsolicited offer from a third Person to acquire all or part of the securities or assets of such party shall not constitute an event of Force Majeure.

(33) " Form 10 " means the registration statement on Form 10 initially filed by Enterprise with the SEC on July 1, 2015 to effect the registration of Enterprise Common Stock pursuant to the Exchange Act in connection with the Distribution, as such registration statement may be amended or supplemented from time to time prior to the Effective Time.

(34) " Former Business " means any corporation, partnership, entity, division, business unit or business, including any business within the meaning of Rule 11-01(d) of Regulation S-X (in each case, including any assets and liabilities comprising the same) that has been sold, conveyed, assigned, transferred or otherwise disposed of or divested (in whole or in part) to a Person that is not a member of the HPI Group or the Enterprise Group or the operations, activities or production of which has been discontinued, abandoned, completed or otherwise terminated (in whole or in part), in each case, prior to the Effective Time.

(35) " Governmental Authority " means any nation or government, any state, municipality or other political subdivision thereof, and any entity, body, agency, commission, department, board, bureau, court, tribunal or other instrumentality, whether federal, state, local, domestic, foreign, transnational or multinational, exercising executive, legislative, judicial, regulatory, administrative or other similar functions of, or pertaining to, government.

(36) " Group " means the HPI Group or the Enterprise Group, as the context requires.

(37) " Hazardous Materials " means any chemical, product, by-product, co-product, material, substance, waste, radioactive and biological materials, petroleum and petroleum products or any fraction thereof, pollutant, emission, discharge, release or contaminant (whether solid, liquid or gas, noise, ion, vapor or electromagnetic and whether individually, or incorporated into a product, or a constituent of waste) that is regulated by or pursuant to, or that can result in Liability under, any Environmental Law.

(38) " HPI Business " means the businesses and operations conducted prior to the Effective Time by any member of the HPI Group that are not included in the Enterprise Business, including (a) the businesses set forth on Schedule 1.1(38) , (b) the HPI Former

7

Businesses and (c) any other businesses or operations conducted primarily through the use of the Excluded Assets.

(39) " HPI Corporate Asset Percentage " and " HPI Corporate Liability Percentage " each mean 50%.

(40) " HPI Employee " has the meaning set forth in the Employee Matters Agreement.

(41) " HPI Former Businesses " means the Former Businesses set forth on Schedule 1.1(41) and any Former Business (other than the Enterprise Business or the Enterprise Former Businesses) that, at the time of sale, conveyance, assignment, transfer, disposition, divestiture (in whole or in part) or discontinuation, abandonment, completion or termination of the operations, activities or production thereof, was primarily managed by or associated with the HPI Business as then conducted.

(42) " HPI Group " means HP and each Person (other than any member of the Enterprise Group) that is a direct or indirect Subsidiary of HP immediately after the Effective Time, which shall include those entities set forth on Schedule 2.2(b)(ii)(A) , and each Person that becomes a Subsidiary of HP after the Effective Time (including as a result of transactions that occur following the Effective Time in accordance with the Plan of Reorganization).

(43) " Information " means information, whether or not patentable or copyrightable, in written, oral, electronic or other tangible or intangible forms, stored in any medium, including studies, reports, records, books, accountant's work papers, contracts, instruments, surveys, discoveries, ideas, concepts, know-how, techniques, designs, specifications, drawings, blueprints, diagrams, models, prototypes, samples, flow charts, data, computer data, disks, diskettes, tapes, computer programs or other software, marketing plans, customer names, communications by or to attorneys (including attorney-client privileged communications), memoranda and other materials prepared by attorneys and accountants or under their direction (including attorney work product), and other technical, financial, employee or business information or data.

(44) " Information Statement " means the information statement to be sent to each holder of HP Common Shares in connection with the Distribution, as filed with the SEC as part of the Form 10, as such information statement may be amended or supplemented from time to time.

(45) " Insurance Policies " means insurance policies and insurance Contracts of any kind, including primary, excess and umbrella policies, comprehensive general liability policies, director and officer liability, fiduciary liability, automobile, aircraft, property and casualty, workers' compensation and employee dishonesty insurance policies, bonds and self-insurance and captive insurance company arrangements, together with the rights, benefits and privileges thereunder.

(46) " Insurance Proceeds " means those monies (a) received by an insured from an insurance carrier, (b) paid by an insurance carrier on behalf of the insured or (c) received (including by way of setoff) from any third Person in the nature of insurance, contribution or indemnification in respect of any Liability; in any such case net of any applicable premium

8

adjustments (including reserves and retrospectively-rated premium adjustments) and net of any costs or expenses, including Taxes, incurred in connection with the receipt thereof.

(47) " Insured Claims " means those Liabilities that, individually or in the aggregate, are covered by the terms and conditions of any of the Shared Insurance Policies, whether or not subject to deductibles, co-insurance, captive insurance, self-insured retentions, uncollectibility or retrospectively-rated premium adjustments.

(48) " Intercompany Agreements " means the agreements listed on Schedule 1.1(48) to be entered into by Enterprise and/or any member of the Enterprise Group, on the one hand, and HP and/or any member of the HPI Group, on the other hand, on or prior to the Distribution Date.

(49) " Law " means any national, foreign, international, multinational, supranational, federal, state, provincial, local or similar law (including common law), statute, code, order, directive, guidance, ordinance, rule, regulation, treaty (including any income tax treaty), license, permit, authorization, approval, consent, decree, injunction, binding judicial or administrative interpretation or other requirement, in each case, enacted, promulgated, issued or entered by a Governmental Authority.

(50) " Liabilities " means any and all debts, guarantees, liabilities, costs, expenses, interest and obligations, whether accrued or fixed, absolute or contingent, matured or unmatured, reserved or unreserved, or determined or determinable, and whether or not recorded or reflected or required to be recorded or reflected on the books and records or financial statements of the applicable Person, including those arising under any Law, claim, demand, Action, whether asserted or unasserted, or order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority and those arising under any Contract, release or warranty, or any fines, damages or equitable relief which may be imposed, in each case, including all costs and expenses relating thereto.

(51) " NYSE " means the New York Stock Exchange.

(52) " Person " means any individual, corporation, partnership, firm, joint venture, association, joint-stock company, trust, unincorporated organization, limited liability company, Governmental Authority or other entity.

(53) " Prime Rate " means the rate that Citibank, N.A. (or any successor thereto or other major money center commercial bank agreed to by the parties) announces from time to time as its prime lending rate, as in effect from time to time.

(54) " Real Estate Matters Agreement " means the Real Estate Matters Agreement, in substantially the form attached hereto as Exhibit D entered into or to be entered into by and between HP and Enterprise on or prior to the Distribution Date.

(55) " Record Date " means the date determined by the Board of Directors of HP (or a committee thereof) as the record date for the Distribution.

(56) " Release " means any release, spill, emission, discharge, leaking, pumping, pouring, dumping, injection, deposit, disposal, dispersal, leaching or migration of Hazardous

9

Materials into the environment (including ambient air, surface water, groundwater and surface or subsurface strata) or within any building or facility.

(57) " <u>Remedial Activities</u> " means the investigation, sampling (including indoor air sampling), analysis, evaluation, assessment (including risk assessment and health assessment), feasibility study, remediation, treatment, removal, transport, disposal, characterization, encapsulation, monitoring, reporting or analysis of Environmental Conditions whether conducted by a consultant or contractor or by a party to this Agreement or any action taken to protect or preserve rights, negotiate or clarify requirements or to enforce limitations on the applicable Governmental Authority.

(58) " <u>Remediation Cost Trigger</u> " means the amount set forth on <u>Schedule 2.3(b)(iii)</u> .

(59) " <u>Remediation Obligations</u> " means the Remedial Activities that are deemed necessary by the party satisfying the Remediation Obligation or required by the applicable Governmental Authority pursuant to Environmental Laws, including agreements and orders with Governmental Authorities and settlement agreements with other responsible parties, property owners and third parties addressing applicable Environmental Laws to the extent pertaining to the projects listed on <u>Schedule 2.3(b)(iii)</u> , until the applicable Governmental Authority has issued a no further action determination, certificate of completion or similar determination as described in <u>Section 7.9</u> .

(60) " <u>Reorganization</u> " means the transfer of the Enterprise Assets that are not already owned by members of the Enterprise Group to members of the Enterprise Group and the assumption of the Enterprise Liabilities that are not already owed by members of the Enterprise Group by members of the Enterprise Group, and the transfer of Excluded Assets that are not already owned by members of the HPI Group to members of the HPI Group and the assumption by members of the Excluded Liabilities that are not already owed by members of the HPI Group by the HPI Group, all as more fully described in this Agreement and the other Transaction Documents and including the steps set forth in the Plan of Reorganization.

(61) " <u>SEC</u> " means the United States Securities and Exchange Commission.

(62) " <u>Security Interest</u> " means any mortgage, security interest, pledge, lien, charge, claim, option, right to acquire, voting or other restriction, right-of-way, covenant, condition, easement, encroachment, restriction on transfer or other encumbrance of any nature whatsoever.

(63) " <u>Service Provider</u> " means, with respect to any Person, any current, former or future employee, officer, consultant, independent contractor or director of such Person.

(64) " <u>Subsidiary</u> " or " <u>subsidiary</u> " means, with respect to any Person, any corporation, limited liability company, joint venture or partnership of which such Person (i) beneficially owns, either directly or indirectly, more than fifty percent (50%) of (A) the total combined voting power of all classes of voting securities of such Person, (B) the total combined equity interests or (C) the capital or profit interests, in the case of a partnership, or (ii) otherwise has the power to vote or direct the vote of, either directly or indirectly, sufficient securities to elect a majority of the board of directors or similar governing body.

10

(65) "Tax" has the meaning set forth in the Tax Matters Agreement.

(66) "Tax Matters Agreement" means the Tax Matters Agreement, in substantially the form attached hereto as Exhibit B entered into or to be entered into by and between HP and Enterprise on or prior to the Distribution Date.

(67) "Technology" means tangible embodiments, whether in electronic, written or other media, of copyrightable works or technology, including designs, design and manufacturing documentation (such as bill of materials, build instructions and test reports), sales documentation (such as marketing materials, installation manuals, service manuals and user manuals) schematics, algorithms, routines, software, databases, lab notebooks, development and lab equipment, processes, prototypes and devices. Technology does not include intellectual property rights (including in the foregoing items), which shall be governed by the applicable Intercompany Agreements.

(68) "Transaction Documents" means this Agreement, the Transition Services Agreement, the Tax Matters Agreement, the Employee Matters Agreement, the Real Estate Matters Agreement, the Commercial Agreement, the Intercompany Agreements and the Transfer Documents.

(69) "Transfer Documents" means the Pre-Distribution Transfer Documents, the Post-Distribution HPI Transfer Documents and the Post-Distribution Enterprise Transfer Documents, including the documents listed on Schedule 1.1(69).

(70) "Transition Services Agreement" means the Transition Services Agreement in substantially the form attached hereto as Exhibit A entered into or to be entered into by and between HP and Enterprise on or prior to the Distribution Date.

Section 1.2 Other Terms. For purposes of this Agreement, the following terms have the meanings set forth in the sections indicated:

| Term | Section |
| --- | --- |
| Agreement | Preamble |
| Amended and Restated Bylaws | Section 3.1(e) |
| Amended and Restated Certificate of Incorporation | Section 3.1(e) |
| Arbitration Act | Section 8.1 |
| Arbitration Demand Notice | Section 8.4(a) |
| BLP 1 D5 | Preamble |
| BLP 1 D5 Indemnification Obligations | Section 6.3(b)(i) |
| Change of Control | Section 7.7(d)(ii) |
| Common Equivalent HP Preferred Stock | Section 3.1(i) |
| Competing Business | Section 7.7(c)(iii) |
| Corporate Assets | Section 2.2(c) |
| Corporate Liabilities | Section 2.3(c) |
| CPR | Section 8.3 |
| CPR Arbitration Rules | Section 8.4(a)(i) |
| Disposed Business | Section 7.7(d)(i) |

11

| Term | Section |
|------|---------|
| Dispute | Section 8.1 |
| Dispute Notice | Section 8.2 |
| Distribution | Recitals |
| Divestiture Period | Section 7.7(c)(iv) |
| E Munich C6 | Preamble |
| E Munich C6 Indemnification Obligations | Section 6.3(c)(i) |
| Enterprise | Preamble |
| Enterprise Accounts | Section 2.11(a) |
| Enterprise Assets | Section 2.2(a) |
| Enterprise Bound Subsidiaries | Section 2.2(a)(ii) |
| Enterprise Common Stock | Recitals |
| Enterprise Confidential Information | Section 7.2(a) |
| Enterprise Counsel | Section 4.8(a) |
| Enterprise Indemnification Obligations | Section 6.1 |
| Enterprise Indemnified Parties | Section 6.2 |
| Enterprise Insurance Policies | Section 7.3(a) |
| Enterprise Liabilities | Section 2.3(a) |
| Enterprise Restricted Business | Section 7.7(b) |
| Excluded Assets | Section 2.2(b) |
| Excluded Liabilities | Section 2.3(b) |
| Existing HP Counsel | Section 4.8(a) |
| Guarantee Release | Section 6.10(b) |
| HP | Preamble |
| HP Common Shares | Recitals |
| HPI Accounts | Section 2.11(a) |
| HPI Confidential Information | Section 7.2(b) |
| HPI Counsel | Section 4.8(a) |
| HPI Indemnification Obligations | Section 6.2 |
| HPI Indemnified Parties | Section 6.1 |
| HPI Insurance Policies | Section 7.3(a) |
| HPI Restricted Business | Section 7.7(a) |
| Inc BLP C5 | Preamble |
| Inc BLP C5 Indemnification Obligations | Section 6.3(b)(ii) |
| Indemnified Party | Section 6.5(a) |
| Indemnifying Party | Section 6.5(a) |
| Indemnity Payment | Section 6.5(a) |
| Joint Insurance Policies | Section 7.3(a) |
| Joint Legal Materials | Section 4.8(d) |
| Legacy Environmental Liabilities | Section 2.3(c)(vi)(B) |
| Legal Materials | Section 4.8(d) |
| Mediation Request | Section 8.3 |
| Mixed Actions | Section 6.11(c) |
| Munich D2/D6 | Preamble |
| Munich D2/D6 Indemnification Obligations | Section 6.3(c)(ii) |

12

| Term | Section |
|---|---|
| Non-Competition Period | Section 7.7(a) |
| Pending Corporate Actions | Section 6.12(b)(i) |
| Pending Environmental Actions | Section 6.12(c)(i) |
| Plan of Reorganization | Section 2.1(a) |
| Post-Distribution Enterprise Transfer Documents | Section 2.4(b) |
| Post-Distribution HPI Transfer Documents | Section 2.5(b) |
| Pre-Distribution Transfer Documents | Section 2.1(b) |
| Procedure | Section 8.3 |
| Remediation Obligation Actions | Section 6.12(c)(ii) |
| Representatives | Section 7.2(a) |
| Separation | Recitals |
| Separation Expenses | Section 7.4(a) |
| Shared Contract | Section 2.9(a) |
| Shared Insurance Policies | Section 7.3(b) |
| Subsidiary Stock Exchange | Section 3.1(i) |
| Subsidiary Stock Recapitalization | Section 3.1(i) |
| Third Party Claim | Section 6.6(a) |

ARTICLE II

THE REORGANIZATION

Section 2.1 Transfer of Assets and Assumption of Liabilities Prior to the Distribution.

(a) In accordance with the plan and structure set forth on Schedule 2.1(a) (such plan and structure being referred to herein as the "Plan of Reorganization") and to the extent not previously effected pursuant to the steps of the Plan of Reorganization that have been completed prior to the date of this Agreement, as promptly as practicable following the date of this Agreement:

(i) Enterprise Assets. HP shall, and shall cause its applicable Subsidiaries to, assign, transfer, convey and deliver to Enterprise or one (1) or more of Enterprise's Subsidiaries designated by Enterprise, and Enterprise or such Subsidiaries shall accept from HP and HP's applicable Subsidiaries, all of HP's and such Subsidiaries' respective direct or indirect right, title and interest in and to all Enterprise Assets;

(ii) Enterprise Liabilities. Enterprise and/or one (1) or more of its Subsidiaries designated by Enterprise shall accept, assume and agree faithfully to perform, discharge and fulfill the Enterprise Liabilities in accordance with their respective terms. Enterprise and such Subsidiaries shall be responsible for all Enterprise Liabilities, regardless of when or where such Enterprise Liabilities arose or arise, or the legal entity that incurred or holds the Enterprise Liability (provided, however, that in furtherance of and without limiting Section 9.10, nothing contained herein shall preclude or inhibit Enterprise from asserting against third parties any defenses available to the legal entity that incurred or holds such Enterprise Liability),

13

or whether the facts on which they are based occurred prior to, at or subsequent to the Effective Time, regardless of where or against whom such Enterprise Liabilities are asserted or determined or whether asserted or determined prior to the date of this Agreement, and regardless of whether arising from or alleged to arise from negligence, recklessness, violation of Law, fraud or misrepresentation by any member of the HPI Group or the Enterprise Group or any of their respective directors, officers, employees, agents or Affiliates;

(iii) Excluded Assets . HP shall cause its applicable Subsidiaries to assign, transfer, convey and deliver to HP or one (1) or more of its other Subsidiaries designated by HP, and HP or such other Subsidiaries shall accept from such applicable Subsidiaries, such applicable Subsidiaries' respective direct or indirect right, title and interest in and to any Excluded Assets specified by HP to be so assigned, transferred, conveyed and delivered; and

(iv) Excluded Liabilities . HP and/or its Subsidiaries designated by HP shall accept and assume from one (1) or more of its other Subsidiaries designated by HP and agree faithfully to perform, discharge and fulfill the Excluded Liabilities of such other Subsidiaries specified by HP, and HP and/or its applicable Subsidiaries shall be responsible for all Excluded Liabilities, regardless of when or where such Excluded Liabilities arose or arise, or the legal entity that incurred or holds the Excluded Liability ( provided , however , that in furtherance of and without limiting Section 9.10 , nothing contained herein shall preclude or inhibit HP from asserting against third parties any defenses available to the legal entity that incurred or holds such Excluded Liability), or whether the facts on which they are based occurred prior to, at or subsequent to the Effective Time, regardless of where or against whom such Excluded Liabilities are asserted or determined or whether asserted or determined prior to the date of this Agreement, and regardless of whether arising from or alleged to arise from negligence, recklessness, violation of Law, fraud or misrepresentation by any member of the HPI Group or the Enterprise Group or any of their respective directors, officers, employees, agents or Affiliates.

(b) In furtherance of the assignment, transfer, conveyance and delivery of the Enterprise Assets and the assumption of the Enterprise Liabilities in accordance with Section 2.1(a)(i) and Section 2.1(a)(ii) , on the date that such Enterprise Assets are assigned, transferred, conveyed or delivered or such Enterprise Liabilities are assumed (i) HP shall execute and deliver, and shall cause its Subsidiaries to execute and deliver, such bills of sale, quitclaim deeds, stock powers, certificates of title, assignments of contracts and other instruments of transfer, conveyance and assignment as and to the extent reasonably necessary to evidence the transfer, conveyance and assignment of all of HP's and its Subsidiaries' (other than Enterprise and its Subsidiaries) right, title and interest in and to the Enterprise Assets to Enterprise and its Subsidiaries and (ii) Enterprise shall execute and deliver, and shall cause its Subsidiaries to execute and deliver, such assumptions of contracts and other instruments of assumption as and to the extent reasonably necessary to evidence the valid and effective assumption of the Enterprise Liabilities by Enterprise and its Subsidiaries. In furtherance of the assignment, transfer, conveyance and delivery of the Excluded Assets and the assumption of the Excluded Liabilities in accordance with Section 2.1(a)(iii) and Section 2.1(a)(iv) , on the date that such Excluded Assets are assigned, transferred, conveyed or delivered or such Excluded Liabilities are assumed (i) HP shall execute and deliver, and shall cause its Subsidiaries to execute and deliver, such bills of sale, quitclaim deeds, stock powers, certificates of title, assignments of contracts and other

14

instruments of transfer, conveyance and assignment as and to the extent reasonably necessary to evidence the transfer, conveyance and assignment of such Excluded Assets and (ii) HP shall execute and deliver, and shall cause its Subsidiaries to execute and deliver, such assumptions of contracts and other instruments of assumption as and to the extent necessary to evidence the valid and effective assumption of such Excluded Liabilities. All of the foregoing documents contemplated by this Section 2.1(b) shall be referred to collectively herein as the " Pre-Distribution Transfer Documents ."

(c) Without limiting any other provision hereof, in connection with the reorganization contemplated by Section 2.1(a) , each of HP and Enterprise will take, and will cause each member of its respective Group to take, such actions as are reasonably necessary to consummate the transactions contemplated by the Plan of Reorganization (whether prior to, at or after the Effective Time). The parties agree that the steps described in the Plan of Reorganization shall be effected in the order and manner prescribed in the Plan of Reorganization.

(d) Enterprise hereby waives compliance by each and every member of the HPI Group with the requirements and provisions of any "bulk-sale" or "bulk-transfer" Laws of any jurisdiction that may otherwise be applicable with respect to the transfer or sale of any or all of the Enterprise Assets to any member of the Enterprise Group.

(e) HP hereby waives compliance by each and every member of the Enterprise Group with the requirements and provisions of any "bulk-sale" or "bulk-transfer" Laws of any jurisdiction that may otherwise be applicable with respect to the transfer or sale of any or all of the Excluded Assets to any member of the HPI Group.

(f) In furtherance of and without limiting Section 9.10 , the parties acknowledge and agree that as between the HPI Group and the Enterprise Group, on the one hand, and any third Person asserting a Liability against a member of the HPI Group or the Enterprise Group, on the other hand, nothing in this Agreement shall alter or otherwise change the legal entity within the HPI Group or the Enterprise Group that may be subject to such Liability.

Section 2.2 Allocation of Assets .

(a) For purposes of this Agreement, " Enterprise Assets " shall mean (without duplication):

(i) the Assets listed or described on Schedule 2.2(a)(i) ;

(ii)(A) the shares of capital stock of, or any other equity or ownership interests in, the Subsidiaries held, directly or indirectly, by HP listed on Schedule 2.2(a)(ii)(A) (" Enterprise Bound Subsidiaries ") and (B) the shares of capital stock of, or any other equity interests in, the entities held by HP listed on Schedule 2.2(a)(ii)(B) ;

(iii) the Enterprise Contracts;

15

(iv) the Assets reflected as Assets of Enterprise and its Subsidiaries in the Enterprise Balance Sheet or the accounting records supporting such balance sheet, subject to Section 2.13 , and any Assets acquired by or for Enterprise or any member of the Enterprise Group subsequent to the date of the Enterprise Balance Sheet which, had they been so acquired on or before such date and owned as of such date, would have been reflected on the Enterprise Balance Sheet if prepared on a consistent basis, subject to any dispositions of such Assets subsequent to the date of the Enterprise Balance Sheet;

(v) the Enterprise Corporate Asset Percentage of any Corporate Assets;

(vi) subject to Section 7.3 , any rights of any member of the Enterprise Group under any Insurance Policies, including any rights thereunder arising after the Effective Time in respect of any Insurance Policies, as provided in this Agreement;

(vii) the intellectual property rights allocated to the Enterprise Group in, and subject to the terms and conditions of, the applicable Intercompany Agreements, and the Technology related to the Enterprise Business;

(viii) (A) the offices, manufacturing facilities and other owned real property listed on Schedule 2.2(a)(viii)(A) and (B) the leases governing the leased real property listed on Schedule 2.2(a)(viii)(B) , in each case, subject to the terms and conditions of the Real Estate Matters Agreement;

(ix) office equipment, trade fixtures and furnishings located at (A) a physical site of which the ownership or a leasehold or subleasehold interest is being transferred to or retained by a member of the Enterprise Group, and which is not subject to a lease or sublease back to a member of the HPI Group as of the Effective Time, but excluding the items listed on Schedule 2.2(a)(ix)(A) , and (B) a physical site of which the ownership or a leasehold or subleasehold interest is being transferred to or retained by a member of the HPI Group and listed on Schedule 2.2(a)(ix)(B) , (in each case excluding any office equipment, trade fixtures and furnishings owned by Persons other than HP and its Subsidiaries); provided that personal computers and other personal equipment shall be retained by the party who, following the Effective Time, retains the services of the applicable Service Provider who, prior to the Effective Time, used such personal computer;

(x) all other Assets that are expressly provided by this Agreement or any other Transaction Document as Assets that have been or have to be transferred to Enterprise or any other member of the Enterprise Group; and

(xi) all Assets owned or held immediately prior to the Effective Time by HP or any of its Subsidiaries primarily relating to or used in the Enterprise Business (the intention of this clause (xi) is only to rectify any inadvertent omission of transfer or conveyance of any Assets that, had the parties given specific consideration to such Asset as of the date of this Agreement, would have otherwise been classified as an Enterprise Asset; provided that no Asset shall be deemed to be an Enterprise Asset solely as a result of this clause (xi) if such Asset is within the category or type of Asset expressly covered by the terms of another Transaction

16

Document unless the party claiming entitlement to such Asset can establish that the omission of the transfer or conveyance of such Asset was inadvertent, and no Asset shall be deemed to be an Enterprise Asset solely as a result of this clause (xi) unless a claim with respect thereto is made by Enterprise on or prior to the second (2nd) anniversary of the Distribution Date).

(b) For the purposes of this Agreement, " Excluded Assets " shall mean (without duplication):

(i) the Assets listed or described on Schedule 2.2(b)(i) ;

(ii) (A) the shares of capital stock of, or any other equity or ownership interests in, the Subsidiaries held, directly or indirectly, by HP listed on Schedule 2.2(b)(ii)(A) and (B) the shares of capital stock of, or any other equity interests in, the entities held by HP listed on Schedule 2.2(b)(ii)(B) ;

(iii) the Contracts listed or described on Schedule 2.2(b)(iii) and, subject to Section 2.9 , the Shared Contracts;

(iv) the HPI Corporate Asset Percentage of any Corporate Assets;

(v) the intellectual property rights allocated to the HPI Group in, and subject to the terms and conditions of, the applicable Intercompany Agreements, and the Technology related to the HPI Business;

(vi) (A) the offices, manufacturing facilities and other owned real property listed on Schedule 2.2(b)(vi)(A) and (B) the leases governing the leased real property listed on Schedule 2.2(b)(vi)(B) , in each case, subject to the terms and conditions of the Real Estate Matters Agreement;

(vii) all other Assets that are expressly contemplated by this Agreement or any other Transaction Document as Assets to be retained by HP or any other member of the HPI Group; and

(viii) subject to Section 2.2(a)(xi) , all Assets of any members of the HPI Group that are not Enterprise Assets.

(c) For the purposes of this Agreement, " Corporate Assets " shall mean (without duplication):

(i) the Assets set forth on Schedule 2.2(c)(i) ; and

(ii) any Assets of HP or any of its Subsidiaries (which were Subsidiaries prior to the Effective Time) (A) to the extent relating to, arising out of or resulting from a general corporate matter of (1) HP or any of its Subsidiaries (which were Subsidiaries prior to the Effective Time) or (2) any Enterprise Former Business or HPI Former Business, and (B) arising or accrued at or prior to the Effective Time.

17

Notwithstanding anything to the contrary herein, any Asset that is a Corporate Asset shall not also be an Enterprise Asset or an Excluded Asset (except to the extent set forth in Section 2.2(a)(v) or Section 2.2(b)(iv) , as applicable).

Section 2.3 Allocation of Liabilities .

(a) For the purposes of this Agreement, " Enterprise Liabilities " shall mean (without duplication):

(i) the Liabilities listed or described on Schedule 2.3(a)(i) ;

(ii) the Liabilities to the extent relating to, arising out of or resulting from:

(A) the operation of the Enterprise Business, as conducted at any time before, at or after the Effective Time (including any Liability relating to, arising out of or resulting from any act or failure to act by any Person, whether or not such act or failure to act is or was within such Person's authority, with respect to the Enterprise Business);

(B) the operation of any business conducted by any member of the Enterprise Group at any time after the Effective Time (including any Liability relating to, arising out of or resulting from any act or failure to act by any Person, whether or not such act or failure to act is or was within such Person's authority, with respect to such business);

(C) the Enterprise Assets; and

(D) any matter subject to or regulated by Environmental Law, in each case relating to, arising out of or resulting from any properties owned, leased or occupied by any member of the Enterprise Group at any time following the Effective Time; provided that this shall not include properties transferred after the Effective Time to effectuate the separation as contemplated in the Real Estate Matters Agreement and shall include: (1) the properties set forth on Schedule 2.3(a)(ii)(D)(1) (Enterprise Owned and Leased Real Property (Environmental)), except for the portion of such properties identified as excluded on Schedule 2.3(a)(ii)(D)(1) , and (2) the premises that are identified as excluded on Schedule 2.3(a)(ii)(D)(2) (HPI Owned and Leased Real Property (Environmental));

(iii) the Liabilities reflected as liabilities or obligations of Enterprise or its Subsidiaries in the Enterprise Balance Sheet or the accounting records supporting such balance sheet, and all Liabilities arising or assumed after the date of the Enterprise Balance Sheet which, had they arisen or been assumed on or before such date and been retained as of such date, would have been reflected on the Enterprise Balance Sheet if prepared on a consistent basis, subject to any discharge of such Liabilities subsequent to the date of the Enterprise Balance Sheet;

(iv) the Liabilities relating to, arising out of or resulting from any indebtedness of any member of the Enterprise Group or any indebtedness secured primarily by any of the Enterprise Assets;

18

(v) subject to Section 6.12 , the Enterprise Corporate Liability Percentage of any Corporate Liabilities; and

(vi) all other Liabilities that are expressly provided by this Agreement or any other Transaction Document as Liabilities to be assumed by Enterprise or any other member of the Enterprise Group, and all agreements, obligations and Liabilities of Enterprise or any other member of the Enterprise Group under this Agreement or any of the other Transaction Documents.

(b) For the purposes of this Agreement, " Excluded Liabilities " shall mean (without duplication):

(i) the Liabilities listed or described on Schedule 2.3(b)(i) ;

(ii) the Liabilities of a member of the HPI Group to the extent relating to, arising out of or resulting from any Excluded Assets;

(iii) the Liabilities to the extent relating to, arising out of or resulting from any matter subject to or regulated by Environmental Law, in each case relating to, arising out of or resulting from:

(A) any properties owned, leased or occupied by any member of the HPI Group at any time following the Effective Time, except as provided in Section 2.3(c)(vi)(A) ; provided that this shall not include properties transferred after the Effective Time to effectuate the separation as contemplated in the Real Estate Matters Agreement and shall include: (1) the properties set forth on Schedule 2.3(a)(ii)(D)(2) (HPI Owned and Leased Real Property (Environmental)), except for the portion of such properties identified as excluded on Schedule 2.3(a)(ii)(D)(2) ; and (2) the premises that are identified as excluded on Schedule 2.3(a)(ii)(D)(1) (Enterprise Owned and Leased Real Property (Environmental)); and

(B) the Remediation Obligations subject to Section 7.9 , Section 2.3(c)(vi)(C) and Section 2.3(c)(vi)(D) ;

(iv) subject to Section 6.12 , the HPI Corporate Liability Percentage of any Corporate Liabilities; and

(v) all other Liabilities that are expressly contemplated by this Agreement or any other Transaction Document as Liabilities to be retained or assumed by HP or any other member of the HPI Group, and all agreements, obligations and other Liabilities of HP or any member of the HPI Group under this Agreement or any of the other Transaction Documents.

Any Liabilities of any member of the HPI Group not referenced in Section 2.3(a) are Excluded Liabilities, and all Excluded Liabilities shall not be Enterprise Liabilities.

(c) For the purposes of this Agreement, " Corporate Liabilities " shall mean (without duplication):

(i) any Liabilities of HP or any of its Subsidiaries (which were Subsidiaries prior to the Effective Time) (A) to the extent relating to, arising out of or resulting from a general corporate matter of (1) HP or any of its Subsidiaries (which were Subsidiaries prior to the Effective Time) or (2) any Enterprise Former Business or HPI Former Business (including any such Liabilities relating to, arising out of or resulting from claims made by or on behalf of holders of any HP securities (including debt securities), in their capacities as such, whether made under any applicable corporation, securities or other Laws, or by or on behalf of any Governmental Authority under any applicable securities Laws, Laws related to the duties of officers or directors or similar Laws), and (B) arising or accrued at or prior to the Effective Time;

(ii) any Liabilities of HP or any of its Subsidiaries (which were Subsidiaries prior to the Effective Time) to the extent relating to, arising out of or resulting from any Action with respect to the Plan of Reorganization or the Distribution (other than any Action related to any Disclosure Document which is addressed in Section 6.3 ) made or brought by any third Person against HP or Enterprise or any member of their respective Groups (which, for the avoidance of doubt, excludes any Action by a party or a member of such party's Group, on the one hand, against another party or member of either party's Group, on the other hand);

(iii) any Liabilities to the extent relating to, arising out of or resulting from any (A) claims for indemnification by any current or former directors or officers, or with respect to general corporate matters under a corporate indemnification policy or bylaw, employees of HP or any of its current or former Subsidiaries, in their capacities as such, or (B) claims for breach of fiduciary duties brought against current or former directors, officers or employees of HP or any of its current or former Subsidiaries, in their capacities as such, in each case to the extent relating to, arising out of or resulting from acts, omissions or events occurring at or prior to the Effective Time;

(iv) the Liabilities set forth on Schedule 2.3(c)(iv) ;

(v) any Liabilities arising out of or based upon any untrue statement or alleged untrue statement of a material fact contained in the Form 10 (including any amendments thereto), the Information Statement (including any amendments or supplements thereto) or any other Disclosure Document, or arising out of or based upon any omission or alleged omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading; and

(vi) any Liabilities, except for the Enterprise Liabilities set forth in Section 2.3(a)(ii)(D) or the Excluded Liabilities set forth in Section 2.3(b) (iii) , to the extent relating to, arising out of or resulting from any matter subject to or regulated by Environmental Law, in each case relating to, arising out of or resulting from conditions in existence prior to the Effective Time, and relating to or arising out of:

20

(A) the properties set forth on Schedule 2.3(c)(vi)(A) (Environmental Liabilities at Certain Sites), except for the Remediation Obligations pursuant to Section 2.3(b)(iii)(B) ;

(B) any property owned or operated by HP or its predecessors prior to the Effective Time and no longer owned or operated by HP as of the Effective Time, or any property to which HP or its predecessors may have sent or Released waste or Hazardous Materials prior to the Effective Time, except to the extent Schedule 2.3(c)(vi)(B) (Procedures for Certain Third-Party Disposal Sites) applies (collectively the " Legacy Environmental Liabilities ");

(C) any reopener or new Action at any of the projects set forth on Schedule 2.3(b)(iii) (Projects with Remediation Obligations and Remediation Cost Trigger) after HP has obtained a no further action determination or certificate of completion or similar determination from the applicable Governmental Authority;

(D) the Remediation Obligations in excess of the Remediation Cost Trigger once HP has met the Remediation Cost Trigger by expenditures of Allowable Costs arising from Remedial Activities at the projects set forth on Schedule 2.3(b)(iii) (Projects with Remediation Obligations and Remediation Cost Trigger);

(E) any Pending Environmental Action set forth on Schedule 2.3(c)(vi)(E) (Pending Environmental Actions) or any other Action that may arise from and after the Effective Time, including Actions by third parties alleging property damage or personal injury relating to, arising out of or resulting from any of the projects set forth on Schedule 2.3(b)(iii) (Projects with Remediation Obligations and Remediation Cost Trigger) or any of the Legacy Environmental Liabilities; and

(F) any other Liability under Environmental Law that is not otherwise allocated under this Section 2.3 .

Notwithstanding anything to the contrary herein, any Liability that is a Corporate Liability shall not also be an Enterprise Liability or an Excluded Liability (except to the extent set forth in Section 2.3(a)(v) or Section 2.3(b)(iv) , as applicable).

Section 2.4 Transfer of Excluded Assets and Assumption of Excluded Liabilities Not Effected at or Prior to the Effective Time .

(a) To the extent any Excluded Asset is transferred or assigned to, or any Excluded Liability is assumed by, a member of the Enterprise Group at or prior to the Effective Time, or is owned or held by a member of the Enterprise Group after the Effective Time, from and after the Effective Time:

(i) Enterprise shall, and shall cause its applicable Subsidiaries to, promptly assign, transfer, convey and deliver to HP or certain of its Subsidiaries designated by HP, and HP or such Subsidiaries shall accept from Enterprise and its applicable Subsidiaries, all of Enterprise's and such Subsidiaries' respective right, title and interest in and to such Excluded Assets; and

21

(ii) HP and/or its Subsidiaries designated by HP shall promptly accept, assume and agree faithfully to perform, discharge and fulfill all such Excluded Liabilities in accordance with their respective terms.

(b) In furtherance of the assignment, transfer, conveyance and delivery of Excluded Assets and the assumption of Excluded Liabilities set forth in Section 2.4(a)(i) and Section 2.4(a)(ii) and without any additional consideration therefor: (i) Enterprise shall execute and deliver, and shall cause its Subsidiaries to execute and deliver, such bills of sale, quitclaim deeds, stock powers, certificates of title, assignments of contracts and other instruments of transfer, conveyance and assignment as and to the extent reasonably necessary to evidence the transfer, conveyance and assignment of all of Enterprise's and its Subsidiaries' right, title and interest in and to the Excluded Assets to HP and its Subsidiaries, and (ii) HP shall execute and deliver, and shall cause its Subsidiaries to execute and deliver, such assumptions of contracts and other instruments of assumption as and to the extent reasonably necessary to evidence the valid and effective assumption of the Excluded Liabilities by HP or its Subsidiaries. All of the foregoing documents contemplated by this Section 2.4(b) shall be referred to collectively herein as the " Post-Distribution Enterprise Transfer Documents ."

(c) To the extent that the transfer or assignment of any Excluded Asset or the assumption of any Excluded Liability requires any Approvals or Notifications, the parties shall use their commercially reasonable efforts to obtain or make such Approvals or Notifications as soon as reasonably practicable; provided , however , that except to the extent expressly provided in any of the other Transaction Documents, neither HP nor Enterprise shall be obligated to contribute capital or pay any consideration in any form (including providing any letter of credit, guaranty or other financial accommodation) to any Person in order to obtain or make such Approvals or Notifications.

(d) If and to the extent that the valid, complete and perfected transfer or assignment to the HPI Group of any Excluded Assets or the assumption by the HPI Group of any Excluded Liabilities would be a violation of applicable Law or require any Approval or Notification that has not been made or obtained at or prior to the Effective Time, then, unless the parties shall mutually otherwise determine, the transfer or assignment to the HPI Group of such Excluded Assets or the assumption by the HPI Group of such Excluded Liabilities shall be automatically deemed deferred and any such purported transfer, assignment or assumption shall be null and void until such time as all legal impediments are removed or such Approvals or Notifications have been obtained or made. Notwithstanding the foregoing, any such Excluded Assets or Excluded Liabilities shall continue to constitute Excluded Assets and Excluded Liabilities for all other purposes of this Agreement.

(e) If any transfer or assignment of any Excluded Asset or any assumption of any Excluded Liability intended to be transferred, assigned or assumed under this Agreement, as the case may be, is not consummated at or prior to the Effective Time, whether as a result of the provisions of Section 2.4(d) or for any other reason, then the parties shall cooperate to effect such transfers as promptly following the Effective Time as practicable and, prior to the effectiveness of such transfer of Assets or assumption of Liabilities, the member of the Enterprise Group retaining such Excluded Asset or such Excluded Liability, as the case may be, shall thereafter hold such Excluded Asset in trust for the use and benefit of the member of the

22

HPI Group entitled thereto (at the expense of the member of the HPI Group entitled thereto) and retain such Excluded Liability for the account of the member of the HPI Group. In addition, the member of the Enterprise Group retaining such Excluded Asset or such Excluded Liability shall, insofar as reasonably possible and to the extent permitted by applicable Law, treat such Excluded Asset or Excluded Liability in the ordinary course of business in accordance with past practice and take such other actions as may be reasonably requested by the member of the HPI Group to whom such Excluded Asset is to be transferred or assigned, or which will assume such Excluded Liability, as the case may be, in order to place such member of the HPI Group in the same position as if such Excluded Asset or Excluded Liability had been transferred, assigned or assumed as contemplated hereby and so that all the benefits and burdens relating to such Excluded Asset or Excluded Liability, as the case may be, including use, risk of loss, potential for gain and dominion, control and command over such Excluded Asset or Excluded Liability, as the case may be, are to inure from and after the Effective Time to the HPI Group. Except to the extent otherwise required by applicable Law, each of HP and Enterprise shall, and shall cause its Affiliates to, (x) for all U.S. federal (and applicable state, local and foreign) income tax purposes, treat any Excluded Asset and any Excluded Liability transferred, assigned or assumed after the Effective Time pursuant to this Section 2.4(e) as having been so transferred, assigned or assumed prior to the Effective Time pursuant to the Reorganization and (y) file all Tax Returns in a manner consistent with such treatment and not take any Tax position inconsistent therewith.

(f) If and when the Approvals or Notifications, the absence of which caused the deferral of transfer or assignment of any Excluded Asset or the deferral of assumption of any Excluded Liability, are obtained or made, and, if and when any other legal impediments for the transfer or assignment of any Excluded Assets or the assumption of any Excluded Liabilities have been removed, the transfer or assignment of the applicable Excluded Asset or the assumption of the applicable Excluded Liability, as the case may be, shall be effected in accordance with the terms of this Agreement and/or the applicable other Transaction Document.

(g) Any member of the Enterprise Group retaining an Excluded Asset or Excluded Liability due to the deferral of the transfer or assignment of such Excluded Asset or the deferral of the assumption of such Excluded Liability, as the case may be, shall not be obligated, in connection with the foregoing, to expend any money unless the necessary funds are advanced (or otherwise made available or agreed in advance to be reimbursed) by HP or the member of the HPI Group entitled to the Excluded Asset or Excluded Liability, as the case may be, other than reasonable out-of-pocket expenses, attorneys' fees and recording or similar fees, all of which shall be promptly reimbursed by HP or the member of the HPI Group entitled to such Excluded Asset or Excluded Liability.

Section 2.5 Transfer of Enterprise Assets and Assumption of Enterprise Liabilities Not Effected at or Prior to the Effective Time .

(a) To the extent any Enterprise Asset is transferred or assigned to, or any Enterprise Liability is assumed by, a member of the HPI Group at or prior to the Effective Time, or is owned or held by a member of the HPI Group after the Effective Time, from and after the Effective Time:

23

(i) HP shall, and shall cause its applicable Subsidiaries to, promptly assign, transfer, convey and deliver to Enterprise or certain of its Subsidiaries designated by Enterprise, and Enterprise or such Subsidiaries shall accept from HP and its applicable Subsidiaries, all of HP's and such Subsidiaries' respective right, title and interest in and to such Enterprise Assets; and

(ii) Enterprise and/or its Subsidiaries designated by Enterprise shall promptly accept, assume and agree faithfully to perform, discharge and fulfill all such Enterprise Liabilities in accordance with their respective terms.

(b) In furtherance of the assignment, transfer, conveyance and delivery of Enterprise Assets and the assumption of Enterprise Liabilities set forth in Section 2.5(a)(i) and Section 2.5(a)(ii) and without any additional consideration therefor: (i) HP shall execute and deliver, and shall cause its Subsidiaries to execute and deliver, such bills of sale, quitclaim deeds, stock powers, certificates of title, assignments of contracts and other instruments of transfer, conveyance and assignment as and to the extent reasonably necessary to evidence the transfer, conveyance and assignment of all of HP's and its Subsidiaries' right, title and interest in and to the Enterprise Assets to Enterprise and its Subsidiaries, and (ii) Enterprise shall execute and deliver, and shall cause its Subsidiaries to execute and deliver, such assumptions of contracts and other instruments of assumption as and to the extent reasonably necessary to evidence the valid and effective assumption of the Enterprise Liabilities by Enterprise or its Subsidiaries. All of the foregoing documents contemplated by this Section 2.5(b) shall be referred to collectively herein as the " Post-Distribution HPI Transfer Documents ."

(c) To the extent that the transfer or assignment of any Enterprise Asset or the assumption of any Enterprise Liability requires any Approvals or Notifications, the parties will use their commercially reasonable efforts to obtain or make such Approvals or Notifications as soon as reasonably practicable; provided , however , that except to the extent expressly provided in any of the other Transaction Documents, neither HP nor Enterprise shall be obligated to contribute capital or pay any consideration in any form (including providing any letter of credit, guaranty or other financial accommodation) to any Person in order to obtain or make such Approvals or Notifications.

(d) If and to the extent that the valid, complete and perfected transfer or assignment to the Enterprise Group of any Enterprise Assets or assumption by the Enterprise Group of any Enterprise Liabilities would be a violation of applicable Law or require any Approval or Notification that has not been obtained or made at or prior to the Effective Time then, unless the parties shall mutually otherwise determine, the transfer or assignment to the Enterprise Group of such Enterprise Assets or the assumption by the Enterprise Group of such Enterprise Liabilities, as the case may be, shall be automatically deemed deferred and any such purported transfer, assignment or assumption shall be null and void until such time as all legal impediments are removed or such Approvals or Notifications have been obtained or made. Notwithstanding the foregoing, any such Enterprise Assets or Enterprise Liabilities shall continue to constitute Enterprise Assets and Enterprise Liabilities for all other purposes of this Agreement.

24

(e) If any transfer or assignment of any Enterprise Asset or any assumption of any Enterprise Liability intended to be transferred, assigned or assumed under this Agreement, as the case may be, is not consummated at or prior to the Effective Time, whether as a result of the provisions of Section 2.5(d) or for any other reason, then the parties shall cooperate to effect such transfers as promptly following the Effective Time as practicable and, prior to the effectiveness of such transfer of Assets or assumption of Liabilities, the member of the HPI Group retaining such Enterprise Asset or such Enterprise Liability, as the case may be, shall thereafter hold such Enterprise Asset in trust for the use and benefit of the member of the Enterprise Group entitled thereto (at the expense of the member of the Enterprise Group entitled thereto) and retain such Enterprise Liability for the account of the member of the Enterprise Group. In addition, the member of the HPI Group retaining such Enterprise Asset or such Enterprise Liability shall, insofar as reasonably possible and to the extent permitted by applicable Law, treat such Enterprise Asset or Enterprise Liability in the ordinary course of business in accordance with past practice and take such other actions as may be reasonably requested by the member of the Enterprise Group to whom such Enterprise Asset is to be transferred or assigned, or which will assume such Enterprise Liability, as the case may be, in order to place such member of the Enterprise Group in the same position as if such Enterprise Asset or Enterprise Liability had been transferred, assigned or assumed as contemplated hereby and so that all the benefits and burdens relating to such Enterprise Asset or Enterprise Liability, as the case may be, including use, risk of loss, potential for gain and dominion, control and command over such Enterprise Asset or Enterprise Liability, as the case may be, are to inure from and after the Effective Time to the Enterprise Group. Except to the extent otherwise required by applicable Law, each of HP and Enterprise shall, and shall cause its Affiliates to, (x) for all U.S. federal (and applicable state, local and foreign) income tax purposes, treat any Enterprise Asset and any Enterprise Liability transferred, assigned or assumed after the Effective Time pursuant to this Section 2.5(e) as having been so transferred, assigned or assumed prior to the Effective Time pursuant to the Reorganization and (y) file all Tax Returns in a manner consistent with such treatment and not take any Tax position inconsistent therewith.

(f) If and when the Approvals or Notifications, the absence of which caused the deferral of transfer or assignment of any Enterprise Asset or the deferral of assumption of any Enterprise Liability pursuant to Section 2.5(d) , are obtained or made, and, if and when any other legal impediments for the transfer or assignment of any Enterprise Asset or the assumption of any Enterprise Liability have been removed, the transfer or assignment of the applicable Enterprise Asset or the assumption of the applicable Enterprise Liability, as the case may be, shall be effected in accordance with the terms of this Agreement and/or the applicable other Transaction Document.

(g) Any member of the HPI Group retaining an Enterprise Asset or Enterprise Liability due to the deferral of the transfer or assignment of such Enterprise Asset or the deferral of the assumption of such Enterprise Liability, as the case may be, shall not be obligated, in connection with the foregoing, to expend any money unless the necessary funds are advanced (or otherwise made available or agreed in advance to be reimbursed) by Enterprise or the member of the Enterprise Group entitled to the Enterprise Asset or Enterprise Liability, other than reasonable out-of-pocket expenses, attorneys' fees and recording or similar fees, all of which shall be promptly reimbursed by Enterprise or the member of the Enterprise Group entitled to such Enterprise Asset or Enterprise Liability.

25

Section 2.6 <u>Novation of Enterprise Liabilities; Indemnification</u> .

(a) Each of HP and Enterprise, at the request of the other, shall use its commercially reasonable efforts to obtain, or to cause to be obtained, as soon as reasonably practicable, any consent, substitution, approval or amendment required to novate or assign all obligations under agreements (including any agreement with the U.S. federal government), leases, licenses and other obligations or Liabilities of any nature whatsoever that constitute Enterprise Liabilities, or to obtain in writing the unconditional release of all parties to such arrangements other than any member of the Enterprise Group, so that, in any such case, the members of the Enterprise Group will be solely responsible for such Liabilities; <u>provided</u> , <u>however</u> , that except as otherwise expressly provided in any of the other Transaction Documents, neither HP nor Enterprise shall be obligated to contribute any capital or pay any consideration in any form (including providing any letter of credit, guaranty or other financial accommodation) to any third Person from whom any such consent, substitution, approval, amendment or release is requested.

(b) If HP or Enterprise is unable to obtain, or to cause to be obtained, any such required consent, substitution, approval, amendment or release, the applicable member of the HPI Group shall continue to be bound by such agreement, lease, license or other obligation or Liability and, unless not permitted by the terms thereof or by Law, Enterprise shall or shall cause a member of the Enterprise Group to, as agent or subcontractor for such member of the HPI Group, as the case may be, pay, perform and discharge fully all the obligations or other Liabilities of such member of the HPI Group that constitute Enterprise Liabilities, as the case may be, thereunder from and after the Effective Time. Enterprise shall indemnify each HPI Indemnified Party, and hold each of them harmless, against any Liabilities (other than Excluded Liabilities) arising in connection therewith; <u>provided</u> that Enterprise shall have no obligation to indemnify any HPI Indemnified Party that has engaged in any knowing violation of Law or fraud in connection therewith. HP shall cause each member of the HPI Group without further consideration to promptly pay and remit, or cause to be paid or remitted, to Enterprise, all money, rights and other consideration received by it or any member of the HPI Group in respect of such performance (unless any such consideration is an Excluded Asset). If and when any such consent, substitution, approval, amendment or release shall be obtained or the obligations under such agreement, lease, license or other obligations or Liabilities shall otherwise become assignable or able to be novated, HP, without payment of further consideration, shall promptly assign, or cause to be assigned, all its obligations and other Liabilities thereunder or any obligations of any member of the HPI Group thereunder to Enterprise or another member of the Enterprise Group specified by Enterprise, and Enterprise, without the payment of any further consideration, shall, or shall cause such other member of the Enterprise Group to, assume such obligations.

Section 2.7 <u>Novation of Liabilities Other than Enterprise Liabilities; Indemnification</u> .

(a) Each of HP and Enterprise, at the request of the other party, shall use its commercially reasonable efforts to obtain, or to cause to be obtained, as soon as reasonably practicable, any consent, substitution, approval or amendment required to novate or assign all obligations under agreements (including any agreement with the U.S. federal government),

26

leases, licenses and other obligations or Liabilities for which a member of the HPI Group and a member of the Enterprise Group are jointly or severally liable and that do not constitute Enterprise Liabilities, or to obtain in writing the unconditional release of all parties to such arrangements other than any member of the HPI Group, so that, in any such case, the members of the HPI Group will be solely responsible for such Liabilities; provided , however , that except as otherwise expressly provided in any of the other Transaction Documents, neither HP nor Enterprise shall be obligated to contribute any capital or pay any consideration in any form (including providing any letter of credit, guaranty or other financial accommodation) to any third Person from whom any such consent, substitution, approval, amendment or release is requested.

(b) If HP or Enterprise is unable to obtain, or to cause to be obtained, any such required consent, substitution, approval, amendment or release, the applicable member of the Enterprise Group shall continue to be bound by such agreement, lease, license or other obligation or Liability and, unless not permitted by the terms thereof or by Law, HP shall or shall cause a member of the HPI Group to, as agent or subcontractor for such member of the Enterprise Group, as the case may be, pay, perform and discharge fully all the obligations or other Liabilities of such member of the Enterprise Group that do not constitute Enterprise Liabilities, as the case may be, thereunder from and after the Effective Time. HP shall indemnify each Enterprise Indemnified Party and hold each of them harmless against any Liabilities (other than Enterprise Liabilities) arising in connection therewith; provided that HP shall have no obligation to indemnify any Enterprise Indemnified Party that has engaged in any knowing violation of Law or fraud in connection therewith. Enterprise shall cause each member of the Enterprise Group without further consideration to promptly pay and remit, or cause to be paid or remitted, to HP or to another member of the HPI Group specified by HP, all money, rights and other consideration received by it or any member of the Enterprise Group in respect of such performance (unless any such consideration is an Enterprise Asset). If and when any such consent, substitution, approval, amendment or release shall be obtained or the obligations under such agreement, lease, license or other obligations or Liabilities shall otherwise become assignable or able to be novated, Enterprise, without payment of further consideration, shall promptly assign, or cause to be assigned, all its obligations and other Liabilities thereunder or any obligations of any member of the Enterprise Group thereunder to HP or to another member of the HPI Group specified by HP, and HP, without the payment of any further consideration shall, or shall cause such other member of the HPI Group to, assume such obligations.

Section 2.8 Termination of Intercompany Contracts; Settlement of Intercompany Payables and Receivables .

(a) Except as set forth in Section 2.8(b) , in furtherance of the releases and other provisions of Section 5.1 , Enterprise and each member of the Enterprise Group, on the one hand, and HP and each member of the HPI Group, on the other hand, hereby terminate, effective as of the Effective Time, any and all Contracts and intercompany Liabilities, whether or not in writing, between or among Enterprise and/or any member of the Enterprise Group, on the one hand, and HP and/or any member of the HPI Group, on the other hand, that are effective or outstanding as of immediately prior to the Effective Time. No such terminated Contract (including any provision thereof that purports to survive termination) or intercompany Liability shall be of any further force or effect from and after the Effective Time. Each party shall, at the

27

reasonable request of any other party, take, or cause to be taken, such other actions as may be necessary to effect the foregoing.

(b) The provisions of Section 2.8(a) shall not apply to any of the following Contracts (or to any of the provisions thereof):

(i) this Agreement and the other Transaction Documents (and each other Contract expressly contemplated by this Agreement or any other Transaction Document to be entered into or continued by the parties or any of the members of their respective Groups after the Effective Time);

(ii) any Contracts to which any Person, other than the parties and their respective wholly owned Subsidiaries, is a party ( it being understood that (A) directors' qualifying shares or similar interests will be disregarded for purposes of determining whether a Subsidiary is wholly owned and (B) to the extent that the rights and obligations of the parties and the members of their respective Groups under any such Contracts constitute Enterprise Assets or Enterprise Liabilities, they shall be assigned pursuant to Section 2.1 );

(iii) any Shared Contracts; and

(iv) any intercompany payables due or receivables owed solely between a member of the Enterprise Group, on the one hand, and a member of the HPI Group, on the other hand, that are effective or outstanding as of immediately prior to the Effective Time, which amounts shall be net settled and paid as of the Effective Time or as promptly as practicable thereafter (and in any event within 30 days) by the member owing such net amount (except for (A) any such intercompany payables or receivables arising pursuant to a Transaction Document, which shall instead be settled in accordance with the terms of such Transaction Document, and (B) any such intercompany payables or receivables booked or recorded after November 10, 2015, which, notwithstanding anything to the contrary herein, shall instead be cancelled without payment).

Section 2.9 Treatment of Shared Contracts .

(a) Without limiting the generality of the obligations set forth in Section 2.1 , unless the parties otherwise agree or the benefits of any Contract described in this Section 2.9 are expressly conveyed to the applicable party pursuant to another Transaction Document, (i) any Contract that is listed on Schedule 2.9(a) (other than any such Contract covering substantially the same services or arrangements that are covered by a Contract entered into by a member of the Group not party to such Contract in connection with the Reorganization) shall be assigned in part to the applicable member(s) of the applicable Group, if so assignable, or appropriately amended prior to, on or after the Effective Time, so that each party or the members of its respective Group shall, as of the Effective Time, be entitled to the rights and benefits, and shall assume the related portion of any Liabilities, inuring to the Enterprise Business or the HPI Business, as applicable, and (ii) (A) any other Contract that is an Excluded Asset or Excluded Liability but, prior to the Effective Time, inured in part to the benefit or burden of any member of the Enterprise Group (other than any such Contract covering substantially the same services or arrangements that are covered by a Contract entered into by a member of the Enterprise Group in connection with the

28

Reorganization), and (B) any other Contract that is an Enterprise Asset or an Enterprise Liability but, prior to the Effective Time, inured in part to the benefit or burden of any member of the HPI Group (other than any such Contract covering substantially the same services or arrangements that are covered by a Contract entered into by a member of the HPI Group in connection with the Reorganization), shall be assigned in part to the applicable member(s) of the applicable Group, if so assignable, or appropriately amended prior to, on or after the Effective Time, so that each party or the members of its respective Group shall, as of the Effective Time, be entitled to the rights and benefits, and shall assume the related portion of any Liabilities, inuring to the Enterprise Business or the HPI Business, as applicable (any Contract referred to in clause (i) or (ii), a " Shared Contract "); provided , however , that in the case of each of clauses (i) and (ii), (x) in no event shall any member of any Group be required to assign any Shared Contract in its entirety or to assign a portion of any Shared Contract which is not assignable (or cannot be amended) by its terms (including any terms imposing consents or conditions on an assignment where such consents or conditions have not been obtained or fulfilled) and (y) if any Shared Contract cannot be so partially assigned by its terms or otherwise, or cannot be amended or if such assignment or amendment would impair the benefits the parties thereto derive from such Shared Contract, then the parties shall, and shall cause each of their respective Subsidiaries to, take such other reasonable and permissible actions (including by providing prompt notice to the other party with respect to any relevant claim of Liability or other relevant matters arising in connection with a Shared Contract so as to allow such other party the ability to exercise any applicable rights under such Shared Contract) to cause a member of the Enterprise Group or the HPI Group, as applicable, to receive the rights and benefits of that portion of each Shared Contract that relates to the Enterprise Business or the HPI Business, as applicable (in each case, to the extent so related), as if such Shared Contract had been assigned to a member of the applicable Group (or appropriately amended) pursuant to this Section 2.9 , and to bear the burden of the corresponding Liabilities (including any Liabilities that may arise by reason of such arrangement), as if such Liabilities had been assumed by a member of the applicable Group pursuant to this Section 2.9 .

(b) Except to the extent otherwise required by applicable Law, each of HP and Enterprise shall, and shall cause its Affiliates to, (x) for all U.S. federal (and applicable state, local and foreign) income tax purposes, treat the portion of each Shared Contract the rights and benefits of which inure to it or a member of its Group as Assets owned by, and/or Liabilities of, as applicable, it or the members of its Group, as applicable, as of no later than immediately prior to the Effective Time, and (y) file all Tax Returns in a manner consistent with such treatment and not take any Tax position inconsistent therewith.

(c) Nothing in this Section 2.9 shall require any member of any Group to make any material payment (except to the extent advanced, assumed or agreed to in advance to be reimbursed by any member of the other Group), incur any material obligation or grant any material concession for the benefit of any member of the other Group or any other third party in order to effect any transaction contemplated by this Section 2.9 .

Section 2.10 <u>Reserved</u> .

Section 2.11 <u>Bank Accounts</u> .

(a) HP and Enterprise each agrees to take, or cause the respective members of their respective Groups to take, prior to the Effective Time (or as soon as possible thereafter), all actions necessary to amend all Contracts governing each bank and brokerage account owned by Enterprise or any other member of the Enterprise Group (collectively, the " <u>Enterprise Accounts</u> "), including all Enterprise Accounts listed or described on <u>Schedule 2.11(a)(i)</u> , so that such Enterprise Accounts, if currently linked (whether by automatic withdrawal, automatic deposit or any other authorization to transfer funds from or to, hereinafter " <u>linked</u> ") to any bank or brokerage account owned by HP or any other member of the HPI Group (collectively, the " <u>HPI Accounts</u> "), including all HPI Accounts listed or described on <u>Schedule 2.11(a)(ii)</u> , are de-linked from such HPI Accounts.

(b) HP and Enterprise each agrees to take, or cause the respective members of their respective Groups to take, prior to the Effective Time (or as soon as possible thereafter), all actions necessary to amend all Contracts governing the HPI Accounts so that such HPI Accounts, if currently linked to any Enterprise Account, are de-linked from such Enterprise Accounts.

(c) With respect to any outstanding checks issued by HP, Enterprise or any of their respective Subsidiaries prior to the Effective Time, such outstanding checks shall be honored from and after the Effective Time by the Person or Group owning the account on which the check is drawn, without limiting the ultimate allocation of Liability for such amounts under this Agreement or any other Transaction Document.

(d) As between HP and Enterprise (and the members of their respective Groups), except to the extent prohibited by applicable Law, all payments and reimbursements received after the Effective Time by either party (or member of its Group) to which the other party (or member of its Group) is entitled under this Agreement, shall be held by such party in trust for the use and benefit of the party entitled thereto and, within sixty (60) days of receipt by such party of any such payment or reimbursement, such party shall pay over, or shall cause the applicable member of its Group to pay over to the other party, the amount of such payment or reimbursement without right of setoff.

Section 2.12 <u>Disclaimer of Representations and Warranties</u> . EACH OF HP (ON BEHALF OF ITSELF AND EACH MEMBER OF THE HPI GROUP) AND ENTERPRISE (ON BEHALF OF ITSELF AND EACH MEMBER OF THE ENTERPRISE GROUP) UNDERSTANDS AND AGREES THAT, EXCEPT AS EXPRESSLY SET FORTH HEREIN, ANY OTHER TRANSACTION DOCUMENT OR ANY OTHER AGREEMENT CONTEMPLATED HEREBY OR THEREBY, NO PARTY TO THIS AGREEMENT OR ANY OTHER TRANSACTION DOCUMENT IS REPRESENTING OR WARRANTING TO ANY OTHER PARTY HERETO OR THERETO IN ANY WAY AS TO THE ASSETS, BUSINESSES OR LIABILITIES TRANSFERRED OR ASSUMED AS CONTEMPLATED HEREBY OR THEREBY; AS TO ANY APPROVALS OR NOTIFICATIONS REQUIRED IN CONNECTION HEREWITH OR THEREWITH; AS TO THE VALUE OR FREEDOM FROM

30

ANY SECURITY INTERESTS OF, OR ANY OTHER MATTER CONCERNING, ANY ASSETS OF SUCH PARTY; AS TO THE ABSENCE OF ANY DEFENSES OR RIGHT OF SETOFF OR FREEDOM FROM COUNTERCLAIM WITH RESPECT TO ANY ACTION OR OTHER ASSET, INCLUDING ANY ACCOUNTS RECEIVABLE, OF ANY PARTY; OR AS TO THE LEGAL SUFFICIENCY OF ANY ASSIGNMENT, DOCUMENT, CERTIFICATE OR INSTRUMENT DELIVERED UNDER THIS AGREEMENT OR OTHER TRANSACTION DOCUMENT TO CONVEY TITLE TO ANY ASSET OR THING OF VALUE UPON THE EXECUTION, DELIVERY AND FILING HEREOF OR THEREOF. EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, ANY OTHER TRANSACTION DOCUMENT OR ANY OTHER AGREEMENT CONTEMPLATED HEREBY OR THEREBY, ALL SUCH ASSETS ARE BEING TRANSFERRED ON AN "AS IS," "WHERE IS" BASIS (AND, IN THE CASE OF ANY REAL PROPERTY, BY MEANS OF A QUITCLAIM OR SIMILAR FORM DEED OR CONVEYANCE) AND THE RESPECTIVE TRANSFEREES SHALL BEAR THE ECONOMIC AND LEGAL RISKS THAT (I) ANY CONVEYANCE SHALL PROVE TO BE INSUFFICIENT TO VEST IN THE TRANSFEREE GOOD TITLE, FREE AND CLEAR OF ANY SECURITY INTEREST, AND (II) ANY NECESSARY APPROVALS OR NOTIFICATIONS ARE NOT OBTAINED OR MADE OR THAT ANY REQUIREMENTS OF LAWS OR JUDGMENTS ARE NOT COMPLIED WITH. TO THE MAXIMUM EXTENT PERMITTED BY LAW, ENTERPRISE HEREBY WAIVES AND DISCLAIMS ANY RIGHTS IT MAY HAVE AGAINST HP IN CONNECTION WITH THE TRANSFER OF THE PROPERTIES SET FORTH ON SCHEDULE 2.3(a)(ii)(D)(1) OR SCHEDULE 2.3(a)(ii)(D)(2) PERTAINING TO DISCLOSURE OF RELEASES OR SUSPECTED RELEASES, THE PRESENCE OF HAZARDOUS MATERIALS WITHIN ANY BUILDING OR FACILITY OR ENVIRONMENTAL CONDITIONS.

Section 2.13 Post-Distribution Cash Adjustment . The parties shall comply with the provisions of Schedule 2.13 with respect to a post-Distribution cash adjustment.

ARTICLE III

THE DISTRIBUTION

Section 3.1 Actions at or Prior to the Effective Time . Prior to the Effective Time and subject to the terms and conditions set forth herein, the following shall occur:

(a) Information Statement . HP shall make available the Information Statement to the holders of HP Common Shares as of the Record Date.

(b) Securities Law Matters . Enterprise shall file any amendments or supplements to the Form 10 as may be necessary or advisable in order to cause the Form 10 to become and remain effective as required by the SEC or federal, state or other applicable securities Laws. HP and Enterprise shall cooperate in preparing, filing with the SEC and causing to become effective registration statements or amendments thereof which are required to reflect the establishment of, or amendments to, any employee benefit and other plans necessary or advisable in connection with the transactions contemplated by this Agreement and the other Transaction Documents. HP and Enterprise will prepare, and Enterprise will, to the extent

31

required by the applicable Law, file with the SEC, any such documentation and any requisite no-action letters which HP determines are necessary or desirable to effectuate the Distribution, and HP and Enterprise shall use their respective reasonable best efforts to obtain all necessary approvals from the SEC with respect thereto as soon as practicable. HP and Enterprise shall take all such actions as may be necessary or appropriate under the securities or "blue sky" Laws of states or other political subdivisions of the United States and shall use commercially reasonable efforts to comply with all applicable foreign securities Laws in connection with the transactions contemplated by this Agreement and the other Transaction Documents.

(c) NYSE Listing . Enterprise shall prepare, file and pursue an application to permit listing of the Enterprise Common Stock on the NYSE, subject to official notice of issuance.

(d) Financing Transactions . In connection with the Separation and prior to the Effective Time, HP and Enterprise shall cooperate with respect to and undertake such financing transactions (which may also include the transfer of cash between the HPI Group and the Enterprise Group) as HP determines to be advisable.

(e) Amended and Restated Certificate of Incorporation and Amended and Restated Bylaws . (i) HP and Enterprise shall each take all necessary action that may be required to provide for the adoption by Enterprise of an amended and restated certificate of incorporation of Enterprise, in substantially the form attached as Exhibit F hereto (the " Amended and Restated Certificate of Incorporation "), and amended and restated bylaws of Enterprise, in substantially the form attached as Exhibit G hereto (the " Amended and Restated Bylaws "), and (ii) Enterprise shall file the Amended and Restated Certificate of Incorporation of Enterprise with the Secretary of State of the State of Delaware.

(f) Distribution Agent . HP shall enter into a distribution agent agreement with the Distribution Agent or otherwise provide instructions to the Distribution Agent regarding the Distribution.

(g) Stock-Based Employee Benefit Plans . At or prior to the Effective Time, HP and Enterprise shall take all actions as are necessary to approve the stock-based employee benefit plans of Enterprise (and the grants of awards under such plans in connection with the Distribution) in order to satisfy the requirements of Rule 16b-3 under the Exchange Act and the applicable rules and regulations of the NYSE.

(h) Satisfying Conditions to the Distribution . HP and Enterprise shall cooperate to cause the conditions to the Distribution set forth in Section 3.2 to be satisfied and to effect the Distribution at the Effective Time upon such satisfaction (or waiver).

(i) Enterprise Bound Subsidiary Stock Exchange . Immediately prior to the Record Date and in connection with the Separation, each of the Enterprise Bound Subsidiaries, in exchange for each HP Common Share then held by such Enterprise Bound Subsidiary (the " Subsidiary Stock Recapitalization "), shall receive from HP one (1) share of preferred stock of HP (the " Common Equivalent HP Preferred Stock "). HP shall redeem each share of Common Equivalent HP Preferred Stock at the Effective Time for a number of shares of Enterprise

32

Common Stock (and cash in lieu of any fractions thereof) having a value (based on the average of the high and low "when issued" trading price of Enterprise Common Stock on the trading day immediately preceding the Distribution Date) equal to the value of one (1) HP Common Share (based on the average of the high and low "regular way" trading price of HP Common Shares on the trading day immediately preceding the Distribution Date) (the " Subsidiary Stock Exchange "). For U.S. federal income tax purposes, (i) the Subsidiary Stock Recapitalization is intended to be treated as a recapitalization within the meaning of Section 368(a) of the Code and (ii) the Subsidiary Stock Exchange is intended to be treated as part of the same distribution (within the meaning of Section 355(a) of the Code) as the Distribution.

Section 3.2 Conditions Precedent to the Distribution . In no event shall the Distribution occur unless each of the following conditions shall have been satisfied (or waived by HP, in whole or in part, in its sole discretion):

(a) the Reorganization shall have been completed in accordance with the Plan of Reorganization (other than those steps that are expressly contemplated to occur at or after the Distribution);

(b) HP shall have received (i) a private letter ruling from the Internal Revenue Service and/or one (1) or more opinions of its external tax advisors, in each case, satisfactory to the Board of Directors of HP, regarding certain U.S. federal income tax matters relating to the Reorganization and related transactions and (ii) an opinion of each of Wachtell, Lipton, Rosen & Katz and Skadden, Arps, Slate, Meagher & Flom, LLP, regarding the qualification of the Contribution and the Distribution, taken together, as a transaction that is generally tax-free for U.S. federal income tax purposes under Sections 355 and 368(a)(1)(D) of the Code;

(c) the Form 10 shall have been declared effective by the SEC, and no stop order suspending the effectiveness of the Form 10 shall be in effect, and no proceedings for such purpose shall be pending before or threatened by the SEC and the Information Statement shall have been made available to holders of HP Common Shares as of the Record Date;

(d) all actions and filings necessary or appropriate under applicable federal, state or foreign securities or "blue sky" Laws and the rules and regulations thereunder shall have been taken and, where applicable, become effective or been accepted;

(e) the Enterprise Common Stock to be delivered in the Distribution shall have been approved for listing on the NYSE, subject only to official notice of issuance;

(f) each of the other Transaction Documents to be executed on or prior to the Distribution Date shall have been duly executed and delivered by the parties thereto;

(g) no order, injunction or decree issued by any court of competent jurisdiction or other legal restraint or prohibition preventing consummation of the Distribution or any of the transactions related thereto, including the Reorganization, shall be in effect;

(h) an independent appraisal firm shall have delivered one (1) or more opinions to the Board of Directors of HP confirming the solvency and financial viability of HP before the consummation of the Distribution and each of HP and Enterprise after the

33

consummation of the Distribution, and such opinions shall be acceptable to HP in form and substance in HP's sole discretion, and such opinions shall not have been withdrawn, rescinded or modified in any respect; and

(i) no event or development shall have occurred or shall exist that, in the judgment of the Board of Directors of HP, in its sole discretion, makes it inadvisable to effect the Reorganization, the Distribution or the other transactions contemplated hereby.

Each of the foregoing conditions is for the sole benefit of HP and shall not give rise to or create any duty on the part of HP or its Board of Directors to waive or not to waive any such condition or to effect the Reorganization and the Distribution, or in any way limit HP's rights of termination set forth in this Agreement. Any determination made by HP prior to the Distribution concerning the satisfaction or waiver of any or all of the conditions set forth in this Section 3.2 shall be conclusive and binding on the parties.

Section 3.3 The Distribution and the Subsidiary Stock Exchange .

(a) Subject to the terms and conditions set forth in this Agreement, (i) at or prior to the Effective Time, HP shall deliver to the Distribution Agent for the benefit of holders of record of HP Common Shares and Common Equivalent HP Preferred Stock on the Record Date, book-entry transfer authorizations for such number of the issued and outstanding shares of Enterprise Common Stock necessary to effect the Distribution and the Subsidiary Stock Exchange, respectively, (ii) the Distribution and the Subsidiary Stock Exchange shall be effective at the Effective Time and (iii) HP shall instruct the Distribution Agent to distribute, on or as soon as practicable after the Effective Time, (A) to each holder of record of HP Common Shares as of the Record Date, by means of a *pro rata* distribution, a number of shares of Enterprise Common Stock to be determined by resolution of the Board of Directors of HP, for every one (1) HP Common Share so held, and (B) to each holder of record of Common Equivalent HP Preferred Stock as of the Record Date, in exchange for such holder's shares of Common Equivalent HP Preferred Stock, a number of shares of Enterprise Common Stock determined in accordance with Section 3.1(i) . Following the Effective Time, Enterprise agrees to promptly provide all book-entry transfer authorizations for shares of Enterprise Common Stock that HP or the Distribution Agent shall require in order to effect the Distribution and the Subsidiary Stock Exchange.

(b) Notwithstanding anything to the contrary contained in this Agreement, HP shall, in its sole and absolute discretion, determine the Distribution Date and all terms of the Distribution, including the form, structure and terms of any transactions and/or offerings to effect the Distribution and the timing of and conditions to the consummation thereof. In addition, HP may at any time and from time to time until the completion of the Distribution decide to abandon the Distribution or modify or change the terms of the Distribution, including by accelerating or delaying the timing of the consummation of all or part of the Distribution.

(c) Shareholders holding a number of HP Common Shares on the Record Date that would entitle such shareholders to receive less than one (1) whole share (in addition to any whole shares) of Enterprise Common Stock in the Distribution will receive cash in lieu of such fractional share. Fractional shares of Enterprise Common Stock will not be distributed in

34

the Distribution nor credited to book-entry accounts. The Distribution Agent shall, as soon as practicable after the Effective Time, (i) determine the number of whole shares and fractional shares of Enterprise Common Stock allocable to each holder of record or beneficial owner of HP Common Shares as of the close of business on the Record Date, (ii) aggregate all such fractional shares into whole shares and sell the whole shares obtained thereby in open market transactions, in each case, at then-prevailing trading prices on behalf of holders who would otherwise be entitled to fractional share interests and (iii) distribute to each such holder, or for the benefit of each such beneficial owner, such holder or owner's ratable share of the cash proceeds (net of fees, discounts and commissions) of such sale, after making appropriate deductions for any amount required to be withheld under the Code or any other applicable Tax Law. Neither HP nor Enterprise or the Distribution Agent will guarantee any minimum sale price for the fractional shares of Enterprise Common Stock. Neither HP nor Enterprise will pay any interest on the proceeds from the sale of fractional shares. The Distribution Agent will have the sole discretion to select the broker-dealers through which to sell the aggregated fractional shares and to determine when, how and at what price to sell such shares.

(d) From and after the Effective Time and until the shares of Enterprise Common Stock are duly transferred in accordance with this Section 3.3 and applicable Law, Enterprise will regard the persons entitled to receive such shares of Enterprise Common Stock as record holders of shares of Enterprise Common Stock in accordance with the terms of the Distribution without requiring any action on the part of such persons. Enterprise agrees that, subject to any transfers of such shares, from and after the Effective Time, (i) each such holder will be entitled to receive all dividends payable on, and exercise voting rights and all other rights and privileges with respect to, the shares of Enterprise Common Stock then held by such holder and (ii) each such holder will be entitled, without any action on the part of such holder, to receive evidence of ownership of the shares of Enterprise Common Stock then held by such holder.

(e) Any shares of Enterprise Common Stock or cash in lieu of fractional shares with respect to shares of Enterprise Common Stock that remain unclaimed by any holders of record of HP Common Shares one hundred eighty (180) days after the Distribution Date shall be delivered to Enterprise, and Enterprise shall hold such shares of Enterprise Common Stock for the account of such holders, and the parties agree that all obligations to provide such shares of Enterprise Common Stock and cash, if any, in lieu of fractional share interests shall be obligations of Enterprise, subject in each case to applicable escheat or other abandoned property Laws, and HP shall have no Liability with respect thereto.

Section 3.4 Subdivision of Enterprise Common Stock to Accomplish the Distribution . Prior to the Distribution, HP and Enterprise shall take all necessary action required to file a Certificate of Amendment to the Certificate of Incorporation of Enterprise with the Secretary of State of the State of Delaware, to increase the number of authorized shares of Enterprise Common Stock and to effect the subdivision and conversion of the outstanding Enterprise Common Stock, so that Enterprise Common Stock then issued and outstanding shall, without any action on the part of the holder thereof, be subdivided and converted into that number of fully paid and non-assessable shares of Enterprise Common Stock issued and outstanding equal to the number of shares of Enterprise Common Stock necessary to effect the Distribution and the Subsidiary Stock Exchange.

35

ARTICLE IV

ACCESS TO INFORMATION

Section 4.1 <u>Access to Information</u> .

(a) Until the fifth (5th) anniversary of the Distribution Date (or such longer period as such access by a party is required under applicable Law), subject to <u>Section 7.2</u> and any other applicable confidentiality obligations, each of HP and Enterprise, on behalf of its respective Group, agrees to provide, or cause to be provided, to the other Group and its Representatives, as soon as reasonably practicable after written request therefor, any Information in the possession or under the control of such respective Group which the requesting party reasonably needs to (i) comply with reporting, disclosure, filing or other requirements imposed on the requesting party (including under applicable securities Laws) by a Governmental Authority having jurisdiction over the requesting party, (ii) carry out its human resources functions or to establish, assume or administer its benefit plans or payroll functions, (iii) satisfy accounting or other similar requirements or (iv) comply with its obligations under this Agreement or any other Transaction Document (including with respect to the completion of the Reorganization after the date of this Agreement); <u>provided</u> that (A) in the case of Information reasonably requested by a party to satisfy its financial and statutory audit requirements, the access contemplated by this <u>Section 4.1(a)</u> shall extend until the tenth (10th) anniversary of the Distribution Date, and (B) in the case of Information reasonably requested by a party to satisfy escheatment audit requirements or environmental requirements, or Information that constitutes materials provided to, or minutes or resolutions of, the Board of Directors of HP prior to the Effective Time, the access contemplated by this <u>Section 4.1(a)</u> shall continue indefinitely; <u>provided</u> , <u>further</u> , that in the event that any party determines that any such provision of Information could be commercially detrimental, violate any Law or agreement or waive any attorney-client privilege, the parties shall take all reasonable measures to permit the compliance with such obligations in a manner that avoids any such detriment or consequence.

(b) Until the fifth (5th) anniversary of the Distribution Date (or such longer period as such access by Enterprise is required under applicable Law), subject to <u>Section 7.2</u> and any other applicable confidentiality obligations, (i) Enterprise and its Representatives shall have access during regular business hours (as in effect from time to time) to the documents and objects of historical significance that relate to the Enterprise Business that are located in archives retained or maintained by any member of the HPI Group and (ii) Enterprise may obtain copies (but not originals unless it is an Enterprise Asset) of documents for *bona fide* business purposes and may obtain objects for exhibition purposes for commercially reasonable periods of time if required for such *bona fide* business purposes; <u>provided</u> that Enterprise shall cause any such objects to be returned promptly in the same condition in which they were delivered to Enterprise, and Enterprise shall comply with any rules, procedures or other requirements, and shall be subject to any restrictions, that are then applicable to HP. Nothing herein shall be deemed to restrict the access of any member of the HPI Group to any such documents or objects or to impose any liability on any member of the HPI Group if any such documents or objects are not maintained or preserved by HP.

36

(c) Until the fifth (5th) anniversary of the Distribution Date (or such longer period as such access by HP is required under applicable Law), subject to Section 7.2 and any other applicable confidentiality obligations, (i) HP and its Representatives shall have access during regular business hours (as in effect from time to time) to the documents and objects of historical significance that relate to the HPI Business that are located in archives retained or maintained by any member of the Enterprise Group and (ii) HP may obtain copies (but not originals unless it is not an Enterprise Asset) of documents for *bona fide* business purposes and may obtain objects for exhibition purposes for commercially reasonable periods of time if required for such *bona fide* business purposes; provided that HP shall cause any such objects to be returned promptly in the same condition in which they were delivered to HP and HP shall comply with any rules, procedures or other requirements, and shall be subject to any restrictions that are then applicable to Enterprise. Nothing herein shall be deemed to restrict the access of any member of the Enterprise Group to any such documents or objects or to impose any liability on any member of the Enterprise Group if any such documents or objects are not maintained or preserved by Enterprise.

(d) Without limiting the generality of the foregoing, until the second (2nd) Enterprise fiscal year-end occurring after the Distribution Date, each of HP and Enterprise shall use its commercially reasonable efforts to cooperate with the other party's Information requests to enable (i) the other party to meet its timetable for dissemination of its earnings releases, financial statements and management's assessment of the effectiveness of its disclosure controls and procedures and its internal control over financial reporting in accordance with Items 307 and 308, respectively, of Regulation S-K and (ii) the other party's accountants to timely complete their review of the quarterly financial statements and audit of the annual financial statements of the other party, including, to the extent applicable to such party, its auditor's audit of its internal control over financial reporting and management's assessment thereof in accordance with Section 404 of the Sarbanes-Oxley Act of 2002 and the SEC's and Public Company Accounting Oversight Board's rules and auditing standards thereunder.

Section 4.2 Ownership of Information . Any Information owned by one (1) Group that is provided to a requesting party pursuant to Section 4.1 shall be deemed to remain the property of the providing party, except where such Information is an Asset of the requesting party pursuant to the provisions of this Agreement or any other Transaction Document. Unless specifically set forth herein, nothing contained in this Agreement shall be construed as granting or conferring rights of license or otherwise in any Information requested or provided pursuant to Section 4.1 .

Section 4.3 Compensation for Providing Information . The party requesting Information pursuant to Section 4.1 agrees to reimburse the other party for the reasonable out-of-pocket costs and expenses, if any, of creating, gathering and copying such Information (including any costs and expenses incurred in any review of Information for purposes of protecting the privileged Information of the providing party or in connection with the restoration of backup tapes for purposes of providing the requested Information), to the extent that such costs are incurred in connection with such other party's provision of Information in response to the requesting party. The party requesting Information pursuant to Section 4.1 agrees to pay the applicable then-prevailing fee for any archive research services performed by the other party.

Section 4.4 Record Retention .

(a) To facilitate the possible exchange of Information pursuant to this Article IV and other provisions of this Agreement, from and after the Effective Time, the parties agree to use their commercially reasonable efforts to retain all Information in their respective possession or control in accordance with the document retention policies or ordinary course practices of HP in effect as of the Effective Time (including any Information that is subject to a "Litigation Hold" issued by either party prior to the Effective Time) or such other document retention policies as may be reasonably adopted by the applicable party from and after the Effective Time ( provided that such other document retention policies at least provide for the retention of documents until the expiration of any applicable statute of limitations and as otherwise required by applicable Law).

(b) Notwithstanding anything to the contrary herein, no party will destroy, or permit any of its Subsidiaries to destroy, any Information contemplated by Section 4.1(a) without first offering to deliver such Information to the other party, at the other party's cost and expense; provided that (i) in the case of any Information relating to a pending or threatened Action that is known to a member of the Group in possession of such Information, the parties shall comply with the requirements of the applicable "Litigation Hold" ( provided that with respect to any pending or threatened Action arising after the Effective Time, the requirements of this clause (i) shall apply only to the extent that the member of the HPI Group or the Enterprise Group that is in possession of such Information has been notified in writing pursuant to a "Litigation Hold" of such pending or threatened Action); and (ii) in no event shall a party destroy, or permit any of its Subsidiaries to destroy, any Information required to be retained by applicable Law.

(c) In the event of either party's or any of its Subsidiaries' inadvertent failure to comply with its applicable document retention policies as required under this Section 4.4 , such party shall be liable to the other party solely for the amount of any monetary fines or penalties imposed or levied against such other party by a Governmental Authority (which fines or penalties shall not include any Liabilities asserted in connection with the claims underlying the applicable Action, other than fines or penalties resulting from any claim of spoliation) as a result of such other party's inability to produce Information caused by such inadvertent failure and, notwithstanding Section 6.1 , Section 6.2 and Section 6.3 , shall not be liable to such other party for any other Liabilities in connection therewith. Notwithstanding the foregoing, no party shall have any Liability to any other party if any Information is destroyed, provided that such party has used its reasonable best efforts to comply with Section 4.4(a) and Section 4.4(b) .

Section 4.5 Liability for Information Provided . No party shall have any Liability to any other party in the event that any Information exchanged or provided pursuant to this Agreement is found to be inaccurate, in the absence of willful misconduct by the party providing such Information.

Section 4.6 Other Agreements Providing for Exchange of Information .

(a) The rights and obligations granted under this Article IV are subject to any specific limitations, qualifications or additional provisions on the sharing, exchange, retention or confidential treatment of Information set forth in any other Transaction Document.

38

(b) When any Information provided by one (1) Group to the other is no longer needed for the purposes contemplated by this Agreement or any other Transaction Document (including any Information that is not relevant to the receiving party's request for such Information) or is no longer required to be retained by applicable Law, the receiving party will promptly, upon the request of the providing party, either (i) return to the providing party all Information in a tangible form (including all copies thereof and all notes, extracts or summaries based thereon) or (ii) certify to the providing party that it has destroyed such Information (and all copies thereof and all notes, extracts or summaries based thereon).

Section 4.7 Production of Witnesses and Records in Connection with an Action .

(a) Notwithstanding anything to the contrary in Section 4.1 , from and after the Effective Time, except in the case of an adversarial Action by one party against another party, each party shall use its reasonable efforts to make available to each other party, upon written request, the former, current and future directors, officers, employees and other Representatives of the members of its respective Group as witnesses, and any books, records or other Information within its control or which it otherwise has the ability to make available, to the extent that any such Person (giving consideration to business demands of such directors, officers, employees and other Representatives) or books, records or other Information may reasonably be required in connection with any Action in which the requesting party may from time to time be involved, regardless of whether such Action is a matter with respect to which indemnification may be sought under this Agreement. Subject to Section 6.12 , the requesting party shall bear all out-of-pocket costs and expenses in connection therewith.

(b) The obligation of the parties to provide witnesses pursuant to this Section 4.7 is intended to be interpreted in a manner so as to facilitate cooperation and shall include the obligation to provide as witnesses officers without regard to whether the witness or the employer of the witness could assert a possible business conflict, except in the case of an adversarial Action by one party against another party.

(c) In connection with any matter contemplated by this Section 4.7 , the parties will enter into a mutually acceptable joint defense agreement so as to maintain to the extent practicable any applicable attorney-client privilege, work product immunity or other applicable privileges or immunities of any member of any Group.

(d) For the avoidance of doubt, the provisions of this Section 4.7 are in furtherance of the provisions of Section 4.1 and shall not be deemed to limit the parties' rights and obligations under Section 4.1 .

Section 4.8 Counsel; Privileges; Legal Materials .

(a) In-house lawyers employed by HP and its Affiliates prior to the Effective Time (" Existing HP Counsel ") have provided legal services to and jointly represented HP and its Affiliates, including members of the HPI Group and the Enterprise Group. From and after the Effective Time, certain Existing HP Counsel will remain employees of one (1) or more members of the HPI Group and provide legal services to and represent only the HPI Group (" HPI

39

Counsel "), and certain Existing HP Counsel will become employees of one (1) or more members of the Enterprise Group and provide legal services to and represent only the Enterprise Group (" Enterprise Counsel "). From and after the Effective Time, (i) HPI Counsel will represent only the HPI Group; (ii) Enterprise Counsel will represent only the Enterprise Group; and (iii) Enterprise Counsel and HPI Counsel will owe a duty of loyalty and other professional obligations only to their respective clients.

(b) The parties have previously been jointly represented by the Existing HP Counsel in various legal matters of common interest. This joint representation included in its scope all matters prior to the Effective Time in which a party or another member of its Group was represented by any of the Existing HP Counsel. Subject to Section 4.8(c) , the parties agree that a joint representation privilege applies to such joint representation. Subject to Section 4.8(c) , from and after the Effective Time, the HPI Group and the Enterprise Group will both continue to jointly own and control all privileges relating to all Information created prior to the Effective Time as a result of the representation of any party or any member of its respective Group by Existing HP Counsel, and the parties agree that the Separation shall not waive or affect any applicable privileges, including the attorney-client privilege, the litigation work product doctrine, the common interest privilege and the joint-client/joint representation privilege. No party may waive any privilege that could be asserted under any applicable Law and in which the other party has a shared privilege, without the prior written consent of the other party, which consent shall not be unreasonably withheld, conditioned or delayed; provided that such prior written consent shall be deemed to be granted unless written objection is made within twenty (20) days after notice has been given by the party requesting such prior written consent. If any dispute arises between HP and Enterprise, or any members of their respective Groups, regarding whether a shared privilege should be waived, each party (i) shall negotiate with the other party in good faith and (ii) shall endeavor to minimize any prejudice to the rights of the other party. Notwithstanding the foregoing, and for the avoidance of doubt, each party shall be permitted to withhold its consent to the waiver of a privilege for the purpose of protecting its own legitimate interests.

(c) Notwithstanding anything to the contrary in this Article IV :

(i) HP shall be entitled, in perpetuity, to control the assertion or waiver of all privileges in connection with any privileged Information that relates solely to the HPI Business and not to the Enterprise Business, whether or not the privileged Information is in the possession or under the control of any member of the HPI Group or any member of the Enterprise Group. HP shall also be entitled, in perpetuity, to control the assertion or waiver of all privileges in connection with any privileged Information that relates solely to any Excluded Liabilities resulting from any Actions that are now pending or may be asserted in the future, whether or not the privileged Information is in the possession or under the control of any member of the HPI Group or any member of the Enterprise Group; and

(ii) Enterprise shall be entitled, in perpetuity, to control the assertion or waiver of all privileges in connection with any privileged Information that relates solely to the Enterprise Business and not to the HPI Business, whether or not the privileged Information is in the possession or under the control of any member of the Enterprise Group or any member of the HPI Group. Enterprise shall also be entitled, in perpetuity, to control the assertion or waiver of

40

all privileges in connection with any privileged Information that relates solely to any Enterprise Liabilities resulting from any Actions that are now pending or may be asserted in the future, whether or not the privileged Information is in the possession or under the control of any member of the Enterprise Group or any member of the HPI Group.

(d) In advance of the Effective Time, the parties agree to cause Existing HP Counsel to separate all legal files, documents and other Information created prior to the Effective Time (the " Legal Materials ") relating primarily to the HPI Business from those relating primarily to the Enterprise Business and deliver them into the possession of the applicable party. All such Legal Materials not separated as of the Effective Time shall be deemed " Joint Legal Materials ." Both HPI Counsel and Enterprise Counsel will have the right, from and after the Effective Time, (i) to access, review and duplicate all Joint Legal Materials in the possession of the other that relate to their respective legal matters and (ii) only with the consent of the other party, to separate and take sole possession of Joint Legal Materials relating solely to either the HPI Business or the Enterprise Business, as applicable. HP and Enterprise shall cause HPI Counsel and Enterprise Counsel, respectively, to maintain and continue their respective Group's compliance with all "Litigation Holds" applicable to any Legal Materials or Joint Legal Materials they possess or come to possess. Notwithstanding anything to the contrary herein, the party designated to direct the defense or prosecution of any Action pursuant to Section 6.11 or Section 6.12 shall be entitled to have and retain possession and own the Legal Materials related to such Action.

(e) The parties acknowledge that the Legal Materials are products of the joint representation by Existing HP Counsel and are privileged from disclosure to others as a result of the attorney-client privilege, the litigation work product doctrine, the common interest/joint defense privilege, the joint-client/joint representation privilege and other applicable privileges and protections. Unless and until the parties agree in writing to waive any and all claims of privilege, as set forth in this Section 4.8 , over any portion of the Legal Materials, the parties shall assert all applicable privileges to resist production of any Legal Materials requested by any third party. If any third party requests or demands, by subpoena or otherwise, any Legal Materials, the party (including any member of its Group) that has received the request or demand shall immediately notify the other party in writing. Each party will then take all reasonable steps necessary to preserve all applicable rights and privileges with respect to such Legal Materials and shall cooperate fully with the other party in any proceedings relating to the disclosure of such Legal Materials. Each party has standing to enforce claims of privilege or similar grounds for withholding disclosure in response to any request or demand for the production of Legal Materials. If any party is served with or otherwise subject to legal process (including a subpoena) requiring it to testify about, produce or otherwise divulge Legal Materials, the party subject to such process will (i) promptly supply the other party with a copy of such subpoena or process; (ii) assert all applicable privileges, protections and objections; (iii) not waive any such privilege; and (iv) make every other reasonable effort to prevent or limit disclosure of the Legal Materials.

(f) Nothing contained in this Agreement shall limit the right of any party to use or disclose (i) documents or information generated by any member of its Group after the Effective Time (other than to the extent such documents or information contain information from the Legal Materials or Joint Legal Materials) or (ii) documents or information that are now, or hereafter become, public information without violation of this Agreement.

41

(g) The parties acknowledge that the HPI Group and the Enterprise Group may have or develop interests adverse to each other following the Effective Time. Each Party hereby waives (i) any and all current and future objections to HPI Counsel, Enterprise Counsel and any outside counsel that represented HP or any of its Affiliates prior to the Effective Time from continuing to represent or in the future representing their respective clients or either party in any matter, including matters in which the HPI Group and the Enterprise Group are adverse and disputes relating to this Agreement or any other Transaction Document, and (ii) all current and future rights to seek disqualification, whether based on the possession or disclosure of confidential information or otherwise, of any of the HPI Counsel, Enterprise Counsel and such outside counsel from any representation of their respective clients or either party in any matter, including matters in which the HPI Group and the Enterprise Group are adverse and disputes relating to this Agreement or any other Transaction Document. If a dispute arises between the parties (or members of their respective Groups) in the future, no party may assert privilege against the other as to any Legal Materials created prior to the Effective Time, and both parties shall be free to make use of such Legal Materials for the purpose of advancing their interests in such dispute.

(h) In furtherance of the parties' agreement under this Section 4.8 , HP and Enterprise shall, and shall cause applicable members of their respective Group to, maintain their respective separate and joint privileges, including by executing joint defense and common interest agreements where necessary or useful for this purpose. HP and Enterprise shall, and shall cause HPI Counsel and Enterprise Counsel, respectively, and their respective outside counsel to, cooperate with each other and take all necessary or reasonably desirable actions to effect the foregoing provisions.

(i) The transfer of all Information pursuant to this Agreement is made in reliance on the agreement of HP and Enterprise set forth in this Section 4.8 and in Section 7.2 to maintain the confidentiality of privileged Information and to assert and maintain all applicable privileges. The parties agree that their respective rights to any access to Information, witnesses and other Persons, the furnishing of notices and documents and other cooperative efforts between the parties contemplated by this Agreement and the transfer of privileged Information between the parties and members of their respective Groups pursuant to this Agreement, shall not be deemed a waiver of any privilege that has been or may be asserted under this Agreement or otherwise.

ARTICLE V

RELEASES

Section 5.1 Release of Pre-Distribution Claims .

(a) Except (i) as provided in Section 5.1(c) , (ii) as may be otherwise expressly provided in this Agreement or any other Transaction Document and (iii) for any matter for which any party is entitled to indemnification or contribution pursuant to Article VI , effective as of the Effective Time, Enterprise does hereby, for itself and each other member of the Enterprise Group, their respective Affiliates, successors and assigns, and all Persons who at any time prior to the Effective Time have been directors, officers, agents or employees of any member of the

42

Enterprise Group (in each case, in their respective capacities as such), remise, release and forever discharge HP and the other members of the HPI Group, their respective Affiliates, successors and assigns, and all Persons who at any time prior to the Effective Time have been shareholders, directors, officers, agents or employees of any member of the HPI Group (in each case, in their respective capacities as such), and their respective heirs, executors, administrators, successors and assigns, from any and all Liabilities whatsoever, whether at Law or in equity (including any right of contribution), whether arising under any Contract, by operation of Law or otherwise, to the extent existing or arising from any acts or events occurring or failing to occur or alleged to have occurred or to have failed to occur or any conditions existing or alleged to have existed prior to the Effective Time, including in connection with the transactions and all other activities to implement the Reorganization, the Distribution and any of the other transactions contemplated by this Agreement or the other Transaction Documents.

(b) Except (i) as provided in Section 5.1(c) , (ii) as may be otherwise expressly provided in this Agreement or any other Transaction Document and (iii) for any matter for which any party is entitled to indemnification or contribution pursuant to Article VI , effective as of the Effective Time, HP does hereby, for itself and each other member of the HPI Group, their respective Affiliates, successors and assigns, and all Persons who at any time prior to the Effective Time have been shareholders, directors, officers, agents or employees of any member of the HPI Group (in each case, in their respective capacities as such), remise, release and forever discharge Enterprise, the respective members of the Enterprise Group, their respective Affiliates, successors and assigns, and all Persons who at any time prior to the Effective Time have been directors, officers, agents or employees of any member of the Enterprise Group (in each case, in their respective capacities as such), and their respective heirs, executors, administrators, successors and assigns, from any and all Liabilities whatsoever, whether at Law or in equity (including any right of contribution), whether arising under any Contract, by operation of Law or otherwise, to the extent existing or arising from any acts or events occurring or failing to occur or alleged to have occurred or to have failed to occur or any conditions existing or alleged to have existed prior to the Effective Time, including in connection with the transactions and all other activities to implement the Reorganization, the Distribution and any of the other transactions contemplated by this Agreement or the other Transaction Documents.

(c) Nothing contained in Section 5.1(a) or Section 5.1(b) shall impair or otherwise impact any right of any party, and as applicable, any member of such party's Group, to enforce this Agreement, any other Transaction Document or any Contracts that are specified in Section 2.8(b) , in each case in accordance with its terms. Nothing contained in Section 5.1(a) or Section 5.1(b) shall release any Person from:

(i) any Liability provided in or resulting from any Contract among any members of the HPI Group or the Enterprise Group that is specified in Section 2.8(b) as not terminating as of the Effective Time, or any other Liability specified in Section 2.8(b) as not terminating as of the Effective Time;

(ii) any Liability, contingent or otherwise, assumed, transferred, assigned or allocated to the Group of which such Person is a member in accordance with, or any other Liability of any member of any Group under, this Agreement or any other Transaction Document;

43

(iii) any Liability for the sale, lease, construction or receipt of goods, property or services purchased, obtained or used in the ordinary course of business by a member of one Group from a member of the other Group prior to the Effective Time;

(iv) any Liability for unpaid amounts for products or services or refunds owing on products or services due on a value-received basis for work done by a member of one Group at the request or on behalf of a member of the other Group;

(v) any Liability provided in or resulting from any Contract that is entered into after the Effective Time between any party (and/or a member of such party's Group), on the one hand, and the other party (and/or a member of the other party's Group), on the other hand;

(vi) any Liability that the parties may have with respect to indemnification or contribution pursuant to this Agreement or otherwise for claims brought against the parties by third Persons, which Liability shall be governed by the provisions of Article VI and, if applicable, the appropriate provisions of the other Transaction Documents; or

In addition, nothing contained in Section 5.1(a) shall release: (A) HP from indemnifying any director, officer or employee of the Enterprise Group who was a director, officer or employee of HP or any of its Affiliates at or prior to the Effective Time, to the extent such director, officer or employee is or becomes a named defendant in any Action with respect to which he or she was entitled to such indemnification from a member of the HPI Group pursuant to then-existing obligations, it being understood that if the underlying obligation giving rise to such Action is an Enterprise Liability or a Corporate Liability, Enterprise shall indemnify HP for such Liability (including HP's costs to indemnify the director, officer or employee) in accordance with the provisions set forth in Article VI ; and (B) Enterprise from indemnifying any director, officer or employee of the HPI Group who was a director, officer or employee of HP or any of its Affiliates at or prior to the Effective Time, to the extent such director, officer or employee is or becomes a named defendant in any Action with respect to which he or she was entitled to such indemnification from a member of the Enterprise Group pursuant to then-existing obligations, it being understood that if the underlying obligation giving rise to such Action is an HPI Liability or a Corporate Liability, HP shall indemnify Enterprise for such Liability (including Enterprise's costs to indemnify the director, officer or employee) in accordance with the provisions set forth in Article VI .

(d) Enterprise shall not make, and shall not permit any member of the Enterprise Group to make, any claim or demand, or commence any Action asserting any claim or demand, including any claim of contribution or any indemnification, against HP or any member of the HPI Group, or any other Person released pursuant to Section 5.1(a) , with respect to any Liabilities released pursuant to Section 5.1(a) . HP shall not make, and shall not permit any member of the HPI Group to make, any claim or demand, or commence any Action asserting any claim or demand, including any claim of contribution or any indemnification, against Enterprise or any member of the Enterprise Group, or any other Person released pursuant to Section 5.1(b) , with respect to any Liabilities released pursuant to Section 5.1(b) .

(e) It is the intent of each of HP and Enterprise, by virtue of the provisions of this Section 5.1 , to provide for a full and complete release and discharge of all Liabilities existing or arising from all acts and events occurring or failing to occur or alleged to have occurred or to have failed to occur and all conditions existing or alleged to have existed prior to the Effective Time, between or among Enterprise or any member of the Enterprise Group, on the one hand, and HP or any member of the HPI Group, on the other hand, except as expressly set forth in Section 5.1(c) . From and after the Effective Time, each party shall cause each member of its respective Group to execute and deliver releases reflecting such provisions at the request of the other party.

ARTICLE VI

INDEMNIFICATION, GUARANTEES AND LITIGATION

Section 6.1 General Indemnification by Enterprise . Subject to Section 6.3 , Enterprise shall indemnify, defend and hold harmless each member of the HPI Group and each of their respective directors, officers and employees, and each of the heirs, executors, successors and assigns of any of the foregoing (collectively, the " HPI Indemnified Parties "), from and against any and all Liabilities of the HPI Indemnified Parties relating to, arising out of or resulting from any of the following items (without duplication) (collectively, the " Enterprise Indemnification Obligations "):

(a) any Enterprise Liability;

(b) the failure of Enterprise or any other member of the Enterprise Group or any other Person to pay, perform or otherwise promptly discharge any Enterprise Liabilities, whether prior to, at or after the Effective Time;

(c) except to the extent it relates to an Excluded Liability, any guarantee, indemnification obligation, surety bond or other credit support agreement, arrangement, commitment or understanding by any member of the HPI Group for the benefit of any member of the Enterprise Group that survives the Effective Time; and

(d) any breach by any member of the Enterprise Group of this Agreement or any of the other Transaction Documents (other than the Transaction Documents set forth on Schedule 6.1(d) , which shall be subject to the indemnification provisions contained therein) or any action by Enterprise in contravention of its Amended and Restated Certificate of Incorporation or Amended and Restated Bylaws;

provided that in no event shall Enterprise have any obligation to indemnify, defend and hold harmless a member of the HPI Group under this Section 6.1 in respect of an Enterprise Indemnification Obligation described in Section 6.3 and for which another member of the Enterprise Group has an obligation to indemnify, defend and hold harmless a member of the HPI Group pursuant to Section 6.3 (including, for the avoidance of doubt, any BLP 1 D5 Indemnification Obligation and any E Munich C6 Indemnification Obligation), and nothing in this Agreement shall be interpreted as giving rise to any such obligation.

45

Section 6.2 <u>General Indemnification by HP</u> . Subject to <u>Section 6.3</u> , HP shall indemnify, defend and hold harmless each member of the Enterprise Group and each of their respective directors, officers and employees, and each of the heirs, executors, successors and assigns of any of the foregoing (collectively, the " <u>Enterprise Indemnified Parties</u> "), from and against any and all Liabilities of the Enterprise Indemnified Parties relating to, arising out of or resulting from any of the following items (without duplication) (collectively, the " <u>HPI Indemnification Obligations</u> "):

(a) any Excluded Liability;

(b) the failure of HP or any other member of the HPI Group or any other Person to pay, perform or otherwise promptly discharge any Excluded Liabilities, whether prior to, at or after the Effective Time;

(c) except to the extent it relates to an Enterprise Liability, any guarantee, indemnification obligation, surety bond or other credit support agreement, arrangement, commitment or understanding by any member of the Enterprise Group for the benefit of any member of the HPI Group that survives the Effective Time; and

(d) any breach by any member of the HPI Group of this Agreement or any of the other Transaction Documents (other than the Transaction Documents set forth on <u>Schedule 6.2(d)</u> , which shall be subject to the indemnification provisions contained therein) or any action by HP in contravention of its certificate of incorporation or bylaws;

<u>provided</u> that in no event shall HP have any obligation to indemnify, defend and hold harmless a member of the Enterprise Group under this <u>Section 6.2</u> in respect of an HPI Indemnification Obligation described in <u>Section 6.3</u> and for which another member of the HPI Group has an obligation to indemnify, defend and hold harmless a member of the Enterprise Group pursuant to <u>Section 6.3</u> (including, for the avoidance of doubt, any Inc BLP C5 Indemnification Obligation and any Munich D2/D6 Indemnification Obligation), and nothing in this Agreement shall be interpreted as giving rise to any such obligation.

Section 6.3 <u>Direct Subsidiary Indemnification</u> .

(a) <u>Transfer Documents Indemnification</u> .

(i) A member of the Enterprise Group (and not Enterprise) shall directly indemnify, defend and hold harmless a member of the HPI Group (and not HP) for any Enterprise Indemnification Obligations to the extent expressly set forth in a Transfer Document.

(ii) A member of the HPI Group (and not HP) shall directly indemnify, defend and hold harmless a member of the Enterprise Group (and not Enterprise) for any HPI Indemnification Obligations to the extent expressly set forth in a Transfer Document.

(b) <u>C5 Contribution Indemnification</u> .

(i) In connection with the C5 Contribution and the C5 Contribution Agreement, BLP 1 D5 (and not Enterprise) shall directly indemnify, defend and hold harmless

46

Inc BLP C5 (and not HP) for any Enterprise Indemnification Obligations in respect of or relating to the C5 Contribution, the C5 Contribution Agreement, BLP 1 D5 and its Subsidiaries or Inc BLP C5 and its Subsidiaries (the "BLP 1 D5 Indemnification Obligations"); provided that BLP 1 D5 Indemnification Obligations shall not include any Enterprise Indemnification Obligation to the extent such Enterprise Indemnification Obligation is addressed by Section 6.3(a) (and BLP 1 D5 shall not be required to indemnify, defend and hold harmless any Person with respect thereto).

(ii) In connection with the C5 Contribution and the C5 Contribution Agreement, Inc BLP C5 (and not HP) shall directly indemnify, defend and hold harmless BLP 1 D5 (and not Enterprise) for any HPI Indemnification Obligations in respect of or relating to the C5 Contribution, the C5 Contribution Agreement, BLP 1 D5 and its Subsidiaries or Inc BLP C5 and its Subsidiaries (the "Inc BLP C5 Indemnification Obligations"); provided that Inc BLP C5 Indemnification Obligations shall not include any HPI Indemnification Obligation to the extent such HPI Indemnification Obligation is addressed by Section 6.3(a) (and Inc BLP C5 shall not be required to indemnify, defend and hold harmless any Person with respect thereto).

(c) C6 Contribution Indemnification.

(i) In connection with the C6 Contribution and the C6 Contribution Agreement, E Munich C6 (and not Enterprise) shall directly indemnify, defend and hold harmless Munich D2/D6 (and not HP) for any Enterprise Indemnification Obligations in respect of or relating to the C6 Contribution, the C6 Contribution Agreement, E Munich C6 and its Subsidiaries or Munich D2/D6 and its Subsidiaries (the "E Munich C6 Indemnification Obligations"); provided that E Munich C6 Indemnification Obligations shall not include any Enterprise Indemnification Obligation to the extent such Enterprise Indemnification Obligation is addressed by Section 6.3(a) or is a BLP 1 D5 Indemnification Obligation (and E Munich C6 shall not be required to indemnify, defend and hold harmless any Person with respect thereto).

(ii) In connection with the C6 Contribution and the C6 Contribution Agreement, Munich D2/D6 (and not HP) shall directly indemnify, defend and hold harmless E Munich C6 (and not Enterprise) for any HPI Indemnification Obligations in respect of or relating to the C6 Contribution, the C6 Contribution Agreement, Munich D2/D6 and its Subsidiaries or E Munich C6 and its Subsidiaries (the "Munich D2/D6 Indemnification Obligations"); provided that Munich D2/D6 Indemnification Obligations shall not include any HPI Indemnification Obligation to the extent such HPI Indemnification Obligation is addressed by Section 6.3(a) or is an Inc BLP C5 Indemnification Obligation (and Munich D2/D6 shall not be required to indemnify, defend and hold harmless any Person with respect thereto).

Section 6.4 Contribution. If the indemnification otherwise provided for in Section 6.1, Section 6.2 or Section 6.3 with respect to Liabilities incurred under any securities Laws, is as a matter of applicable Law unavailable to or insufficient to hold harmless an Indemnified Party in respect of such Liabilities for which they would otherwise be indemnified hereunder, then the Indemnifying Party shall contribute 50% to the amount paid or payable by the Indemnified Party in respect of such non-indemnified Liabilities.

47

Section 6.5 <u>Indemnification Obligations Net of Insurance Proceeds and Other Amounts</u> .

(a) Any Liability subject to indemnification or contribution pursuant to this <u>Article VI</u> will be net of Insurance Proceeds that actually reduce the amount of the Liability. Accordingly, the amount which any party (an " <u>Indemnifying Party</u> ") is required to pay to any Person entitled to indemnification or contribution under this <u>Article VI</u> (an " <u>Indemnified Party</u> ") will be reduced by any Insurance Proceeds theretofore actually recovered by or on behalf of the Indemnified Party in respect of the related Liability. If an Indemnified Party receives a payment (an " <u>Indemnity Payment</u> ") required by this Agreement from an Indemnifying Party in respect of any Liability and subsequently receives Insurance Proceeds in respect of such Liability, then the Indemnified Party will pay to the Indemnifying Party an amount equal to such Insurance Proceeds but not exceeding the amount of the Indemnity Payment paid by the Indemnifying Party in respect of such Liability.

(b) An insurer who would otherwise be obligated to pay any claim shall not be relieved of the responsibility with respect thereto or have any subrogation rights with respect thereto solely by virtue of the indemnification provisions of this Agreement. The Indemnified Party shall use its commercially reasonable efforts to seek to collect or recover any third-party Insurance Proceeds to which the Indemnified Party is entitled in connection with any Liability for which the Indemnified Party seeks indemnification pursuant to this <u>Article VI</u> ; <u>provided</u> that the Indemnified Party's inability to collect or recover any such Insurance Proceeds shall not limit the Indemnifying Party's obligations under this Agreement.

(c) Subject to <u>Section 6.7(c)</u> , any indemnity payment under this <u>Article VI</u> shall be increased to take into account any actual Tax cost incurred by the Indemnified Party arising from the receipt or accrual of such indemnity payment and shall be decreased to take into account any actual reduction in Taxes otherwise payable by the Indemnified Party arising from the incurrence of such indemnified Liability.

Section 6.6 <u>Certain Matters Relating to Indemnification of Third Party Claims</u> .

(a) *Notice of Third Party Claim* . If an Indemnified Party receives written notice that a Person (including any Governmental Authority) that is not a member of the HPI Group or the Enterprise Group has asserted any claim or commenced any Action (collectively, a " <u>Third Party Claim</u> ") that may implicate an Indemnifying Party's obligation to indemnify pursuant to <u>Section 6.1</u> , <u>Section 6.2</u> or <u>Section 6.3</u> , or any other Section of this Agreement or any other Transaction Document, the Indemnified Party shall provide the Indemnifying Party written notice thereof as promptly as practicable (and no later than twenty (20) days) after becoming aware of the Third Party Claim. Such notice shall describe the Third Party Claim in reasonable detail and include copies of all notices and documents (including court papers) received by the Indemnified Party relating to the Third Party Claim. Notwithstanding the foregoing, the failure of an Indemnified Party to provide notice in accordance with this <u>Section 6.6(a)</u> shall not relieve an Indemnifying Party of its indemnification obligations under this Agreement, except to the extent to which the Indemnifying Party is actually prejudiced by the Indemnified Party's failure to provide notice in accordance with this <u>Section 6.6(a)</u> .

48

(b) *Subrogation* . To the extent an indemnification or contribution payment is made by or on behalf of any Indemnifying Party to any Indemnified Party in connection with any Third Party Claim, such Indemnifying Party shall be subrogated to and shall stand in the place of such Indemnified Party as to any right, defense or claim which such Indemnified Party may have relating to such Third Party Claim. Subject to Section 6.11 and Section 6.12 , such Indemnified Party shall cooperate with such Indemnifying Party in a reasonable manner, and at the cost and expense of such Indemnifying Party, in prosecuting any subrogated right, defense or claim.

Section 6.7 Additional Matters .

(a) Indemnification or contribution payments in respect of any Liabilities for which an Indemnified Party is entitled to indemnification or contribution under this Article VI shall be paid by the Indemnifying Party to the Indemnified Party as such Liabilities are incurred upon demand by the Indemnified Party, including reasonably satisfactory documentation setting forth the basis for the amount of such payment (including where reasonably practicable an itemization of costs and expenses, attorney invoices and supporting documentation from other vendors in the form reviewed by the Indemnified Party, and any applicable orders, judgments or settlement agreements). The indemnity and contribution agreements contained in this Article VI shall remain operative and in full force and effect, regardless of (i) any investigation made by or on behalf of any Indemnified Party or (ii) the knowledge by the Indemnified Party of Liabilities for which it might be entitled to indemnification or contribution under this Agreement.

(b) Any claim for indemnification under this Article VI other than in respect of a Third Party Claim shall be asserted by written notice given by the Indemnified Party to the Indemnifying Party. Such Indemnifying Party shall have a period of thirty (30) days after the receipt of such notice to respond thereto. If such Indemnifying Party does not respond within such thirty (30)-day period, such Indemnifying Party shall be deemed to have refused to accept responsibility for such indemnification obligation. If such Indemnifying Party does not respond within such thirty (30)-day period or rejects such claim in whole or in part, such Indemnified Party shall be free to pursue such remedies as may be available to such Indemnified Party pursuant to this Agreement and the other Transaction Documents, as applicable, without prejudice to its continuing rights to pursue indemnification or contribution under this Agreement.

(c) For U.S. federal (and applicable state, local and foreign) income Tax purposes, each of HP, Enterprise, BLP 1 D5, Inc BLP C5, Munich D2/D6 and E Munich C6 agrees to treat, and to cause its Affiliates to treat, (i) any payment required by Schedule 2.13(d)(iii) or Schedule 2.13(d)(iv) , Section 6.3(c) or otherwise in respect of an E Munich C6 Indemnification Obligation or a Munich D2/D6 Indemnification Obligation (other than payments of interest) as either a contribution by Munich D2/D6 to E Munich C6 or as a distribution by E Munich C6 to Munich D2/D6, as the case may be, occurring immediately prior to the C6 Distribution or as a payment of an assumed or retained Liability; (ii) any payment required by Section 6.3(b) or otherwise in respect of a BLP 1 D5 Indemnification Obligation or an Inc BLP C5 Indemnification Obligation (other than payments of interest) as either a contribution by BLP 1 D5 to Inc BLP C5 or a distribution by Inc BLP C5 to BLP 1 D5, as the case may be, occurring immediately prior to the C5 Distribution or as a payment of an assumed or retained Liability; (iii) any other payment required by this Agreement (other than payments of interest) as either a contribution by HP to Enterprise or a distribution by Enterprise to HP, as the case may be,

49

occurring immediately prior to the Distribution or as a payment of an assumed or retained Liability; and (iv) any payment of interest as taxable or deductible, as the case may be, to the party entitled under this Agreement to retain such payment or required under this Agreement to make such payment, in each case, except to the extent otherwise required by applicable Law or a "determination" within the meaning of Section 1313(a) of the Code (or any similar provision of state, local or foreign Law).

Section 6.8 <u>Remedies Cumulative</u> . The rights provided in this <u>Article VI</u> shall be cumulative and, subject to the provisions of <u>Article VIII</u> , shall not preclude assertion by any Indemnified Party of any other rights or the seeking of any and all other remedies against any Indemnifying Party.

Section 6.9 <u>Survival of Indemnities</u> . The rights and obligations of each of HP and Enterprise and their respective Indemnified Parties under this <u>Article VI</u> shall survive the sale or other transfer by any party of any Assets or businesses or the assignment by it of any Liabilities.

Section 6.10 <u>Guarantees</u> .

(a) Except for those guarantees set forth on <u>Schedule 6.10(a)</u> , for which HP or Enterprise or a member of its respective Group, as the case may be, shall remain as guarantor, and the applicable guaranteed party or guaranteed member of the applicable Group shall indemnify and hold harmless such guarantor for any Liabilities arising from or relating thereto (in accordance with the provisions of this <u>Article VI</u> ), or as otherwise specified in any other Transaction Document, at or prior to the Effective Time or as soon as practicable thereafter: (i) HP shall (with the reasonable cooperation of the applicable member(s) of the Enterprise Group) use its reasonable efforts to have any member(s) of the Enterprise Group removed as guarantor of or obligor for and released from any Excluded Liability, including in respect of those guarantees set forth on <u>Schedule 6.10(a)(i)</u> to the extent that they relate to Excluded Liabilities, and (ii) Enterprise shall (with the reasonable cooperation of the applicable member(s) of the HPI Group) use its reasonable efforts to have any member(s) of the HPI Group removed as guarantor of or obligor for and released from any Enterprise Liability, including in respect of those guarantees set forth on <u>Schedule 6.10(a)(ii)</u> to the extent that they relate to Enterprise Liabilities.

(b) To the extent required to obtain a removal or release from a guarantee described in <u>Section 6.10(a)</u> (a " <u>Guarantee Release</u> "):

(i) of any member of the HPI Group, Enterprise or an appropriate member of the Enterprise Group shall execute a guarantee agreement in the form of the existing guarantee or such other form as is agreed to by the relevant parties to such guarantee agreement, except to the extent that such existing guarantee contains representations, covenants or other terms or provisions (A) with which Enterprise or the appropriate member of the Enterprise Group would be reasonably unable to comply or (B) which would be reasonably expected to be breached by Enterprise or the appropriate member of the Enterprise Group; and

(ii) of any member of the Enterprise Group, HP or an appropriate member of the HPI Group shall execute a guarantee agreement in the form of the existing

50

guarantee or such other form as is agreed to by the relevant parties to such guarantee agreement, except to the extent that such existing guarantee contains representations, covenants or other terms or provisions (A) with which HP or the appropriate member of the HPI Group would be reasonably unable to comply or (B) which would be reasonably expected to be breached by HPI or the appropriate member of the HPI Group.

(c) If HP or Enterprise is unable to obtain, or to cause to be obtained, any Guarantee Release, (i) the relevant member of the HPI Group or Enterprise Group, as applicable, that has assumed the Liability with respect to such guarantee shall indemnify and hold harmless the guarantor or obligor for any Liability arising from or relating thereto in accordance with the provisions of this Article VI and shall, or shall cause one (1) of its Subsidiaries to, as agent or subcontractor for such guarantor or obligor, pay, perform and discharge fully all the obligations or other Liabilities of such guarantor or obligor thereunder, and (ii) with respect to such guarantee, each of HP and Enterprise, on behalf of themselves and the members of their respective Groups, agree not to renew or extend the term of, increase its obligations under or transfer to a third Person, any loan, guarantee, lease, contract or other obligation for which the other party or any member of the other party's Group is or may be liable under such guarantee unless all obligations of the other party and the other members of the other party's Group with respect thereto are thereupon terminated by documentation reasonably satisfactory in form and substance to the other party.

Section 6.11 Management of Actions (other than Corporate Liabilities and Corporate Assets) . This Section 6.11 shall govern the direction of pending and future Actions (other than Actions governed by Section 6.12 ) in which members of the Enterprise Group or the HPI Group are named as parties, but shall not alter the allocation of Liabilities set forth in Article II unless expressly set forth in this Section 6.11 .

(a) *Management of Enterprise Actions* . From and after the Effective Time, the Enterprise Group shall direct the defense or prosecution of any (i) Actions set forth on Schedule 6.11(a) and (ii) any other Actions that constitute only Enterprise Liabilities or Enterprise Assets. If an Action that constitutes solely an Enterprise Liability or an Enterprise Asset is commenced after the Effective Time naming a member of the HPI Group as a party thereto, then Enterprise shall use its commercially reasonable efforts to cause such member of the HPI Group to be removed as a party to such Action. No party shall add the other party to any Action pending as of the Effective Time without the prior written consent of the other party.

(b) *Management of HPI Actions* . From and after the Effective Time, the HPI Group shall direct the defense or prosecution of any (i) Actions set forth on Schedule 6.11(b) and (ii) any other Actions that constitute only HPI Liabilities or HPI Assets. If an Action that constitutes solely an HPI Liability or an HPI Asset is commenced after the Effective Time naming a member of the Enterprise Group as a party thereto, then HP shall use its commercially reasonable efforts to cause such member of the Enterprise Group to be removed as a party to such Action. No party shall add the other party to any Action pending as of the Effective Time without the prior written consent of the other party.

(c) *Management of Mixed Actions* . From and after the Effective Time, the parties shall jointly manage (whether as co-defendants or co-plaintiffs) any (i) Actions set forth

51

on Schedule 6.11(c) (except as otherwise set forth therein) and (ii) any other Actions that constitutes both an Enterprise Liability or an Enterprise Asset, on the one hand, and an HPI Liability or an HPI Asset, on the other hand (clauses (i) and (ii), the " Mixed Actions "). The parties shall reasonably cooperate and consult with each other, and to the extent necessary or advisable, maintain a joint defense in a manner that would preserve for both parties and their respective Affiliates any attorney-client privilege, joint defense or other privilege with respect to Mixed Actions. Notwithstanding anything to the contrary herein, and except as set forth in Schedule 6.11(c) , the parties may jointly retain counsel (in which case the cost of counsel shall be shared equally by the parties) or retain separate counsel (in which case each party will bear the cost of its separate counsel) with respect to any Mixed Action; provided that the parties shall share equally discovery and other joint litigation costs. In any Mixed Action, each of HP and Enterprise may pursue separate defenses, claims, counterclaims or settlements to those claims relating to the HPI Business or the Enterprise Business, respectively; provided that each party shall in good faith make all reasonable efforts to avoid adverse effects on the other party. Notwithstanding anything to the contrary herein, (i) if a judgment is obtained with respect to a Mixed Action, the parties shall endeavor in good faith to allocate the Liabilities in respect of such judgment between them based on the HPI Business and the Enterprise Business, and otherwise shall share equally such Liabilities; and (ii) if a recovery is obtained with respect to a Mixed Action, the parties shall endeavor in good faith to allocate the Assets in respect of such recovery between them based on their respective injuries, and otherwise shall share equally such Assets. A party that is not named as a defendant in a Mixed Action may elect to become a party to such Mixed Action, and the party named in such Mixed Action shall reasonably cooperate to have such first party named in such Mixed Action.

(d) *Delegation of Rights of Recovery* . To the maximum extent permitted by applicable Law, the rights to recovery of each party's Subsidiaries in respect of any past, present or future Action are hereby delegated to such party. It is the intent of the parties that the foregoing delegation shall satisfy any Law requiring such delegation to be effected pursuant to a power of attorney or similar instrument. The parties and their respective Subsidiaries shall execute such further instruments or documents as may be necessary to effect such delegation.

Section 6.12 Management of Corporate Liabilities and Corporate Assets .

(a) General Rules . Without limiting the indemnification provisions of Article VI , any amounts owed in respect of any Corporate Liabilities shall be remitted within sixty (60) days following submission by the party entitled to such amount of an invoice (including reasonable supporting Information with respect thereto) to the party owing such amount. Notwithstanding anything to the contrary herein, but subject to compliance with this Section 6.12 , (i) the party incurring any Corporate Liability shall be entitled to reimbursement by the other party (in an amount equal to such other party's HPI Corporate Liability Percentage or Enterprise Corporate Liability Percentage, as applicable) of any reasonable out-of-pocket costs and expenses of defending or managing any such Corporate Liability, from time to time and when invoiced, including in advance of a final determination or resolution of any Corporate Liability; and (ii) it shall not be a defense to any obligation by a party to pay any amounts in respect of any Corporate Liability that (A) such party was not consulted in the defense or management thereof, (B) such party's views or opinions as to the conduct of such defense were not accepted or adopted, (C) such party does not approve of the quality or manner of the defense

52

thereof or (D) such Corporate Liability was incurred by reason of a settlement rather than by a judgment or other determination of Liability.

(b) <u>Management of Actions in respect of Corporate Liabilities and Corporate Assets</u> .

(i) Enterprise shall direct the defense or prosecution of any Action set forth on <u>Schedule 2.2(c)(i)</u> or <u>Schedule 2.3(c)(iv)</u> (the " <u>Pending Corporate Actions</u> "), except as otherwise provided in <u>Schedule 2.2(c)(i)</u> or <u>Schedule 2.3(c)(iv)</u> ; <u>provided</u> that any outside counsel employed by the party directing such Pending Corporate Action with respect thereto shall be subject to the approval of the other party (not to be unreasonably withheld). HP and Enterprise shall reasonably cooperate and consult with each other and, to the extent necessary or advisable with respect to such Pending Corporate Actions, maintain a joint defense in a manner that would preserve for both parties and their respective Affiliates any attorney-client privilege, joint defense or other privilege.

(ii) If an Action is commenced from and after the date of this Agreement in respect of a Corporate Liability (that is not related to a Pending Corporate Action (but if so related, such Action shall instead be directed by the party directing the related Pending Corporate Action) or subject to <u>Section 6.12(c)</u> ), then from and after the Effective Time Enterprise shall (and HP shall not) direct the defense of such Action; <u>provided</u> that any outside counsel employed by Enterprise with respect thereto shall be subject to the approval of HP (not to be unreasonably withheld). HP and Enterprise shall reasonably cooperate and consult with each other and, to the extent necessary or advisable with respect to any such Action, maintain a joint defense in a manner that would preserve for both parties and their respective Affiliates any attorney-client privilege, joint defense or other privilege.

(iii) If either party desires to commence from and after the Effective Time an Action in respect of a Corporate Asset (that is not related to a Pending Corporate Action or subject to <u>Section 6.12(c)</u> ), and HP and Enterprise agree on the commencement of such Action, then Enterprise shall (and HP shall not) direct the prosecution of such Action; <u>provided</u> that any outside counsel employed by Enterprise with respect thereto shall be subject to the approval of HP (not to be unreasonably withheld). The parties shall cooperate and consult with each other, and shall share equally any costs and recoveries, with respect to any such Action.

(iv) If either party desires to commence from and after the Effective Time an Action in respect of a Corporate Asset (that is not related to a Pending Corporate Action or subject to <u>Section 6.12(c)</u> ), and HP and Enterprise do not agree on the commencement of such Action, then the party that desires to commence such Action shall be entitled to commence and direct the prosecution of such Action; <u>provided</u> that, notwithstanding anything to the contrary herein, the party commencing such Action shall bear all of the costs, and receive all of the recoveries, with respect to any such Action.

(v) For the avoidance of doubt, except as set forth on <u>Schedule 2.2(c)(i)</u> or <u>Schedule 2.3(c)(iv)</u> or in <u>Section 6.12(b)(iv)</u> : (A) any costs of defense, payouts or settlements (net of Insurance Proceeds that actually reduce the amount of the Liability) for an Action, to the extent in respect of a Corporate Liability or Corporate Asset, shall be Corporate

53

Liabilities and shared equally by the parties; and (B) any recoveries in an Action, to the extent in respect of a Corporate Liability or Corporate Asset, shall be Corporate Assets and shared equally by the parties.

(c) Management of Pending Environmental Actions and Corporate Environmental Actions . Subject to Section 6.12(a) :

(i) Notwithstanding anything to the contrary herein, HP shall, or shall cause another member of the HPI Group to, direct the defense or prosecution of the Actions listed on Schedule 2.3(c)(vi)(E) (" Pending Environmental Actions ").

(ii) Notwithstanding anything to the contrary herein, if an Action is commenced from and after the Effective Time in respect of any Corporate Liability under Section 2.3(c)(vi) that relates to, arises out of or results from any projects set forth on Schedule 2.3(b)(iii) or that are Legacy Environmental Liabilities under Section 2.3(c)(vi)(B) (such Actions to be referred to collectively as " Remediation Obligation Actions "), HP shall, or shall cause another member of the HPI Group to, direct the defense, prosecution or management of such Remediation Obligation Actions. HP and Enterprise shall reasonably cooperate and consult with each other and, to the extent necessary or advisable with respect to any such Remediation Obligation Actions, maintain a joint defense in a manner that would preserve for both parties and their respective Affiliates any attorney-client privilege, joint defense or other privilege.

(iii) In the event that any Action is commenced that would constitute a Liability under Section 2.3(c)(vi) , the party receiving notice of the Action shall notify the other party promptly. Enterprise acknowledges and agrees that as consideration for HP managing Pending Environmental Actions and Remediation Obligation Actions, HP shall have full decision-making authority with respect to the defense or prosecution and overall management of Pending Environmental Actions and Remediation Obligation Actions, including the exclusive authority to file any appeals or challenges to orders or directives from Governmental Authorities, to enter into settlements with third parties and Governmental Authorities and to interact with Governmental Authorities and third parties. Enterprise, and each member of the Enterprise Group, shall use its reasonable best efforts to assist HP and provide cooperation to HP in the management and administration of the Pending Environmental Actions and the Remediation Obligation Actions. HP shall exercise commercially reasonable efforts to provide Enterprise with advance notice, to the extent such advance notice is practicable, of any media reports regarding the Pending Environmental Actions and the Remediation Obligation Actions.

(iv) Notwithstanding anything to the contrary herein, if an Action is commenced from and after the Effective Time in respect of a Corporate Liability under Section 2.3(c)(vi) that is not a Remediation Obligation Action, HP and Enterprise will confer to determine the appropriate party to manage the Action with the goal of aligning the management of the Action to the party best suited to direct the defense or prosecution of the Action based on its resources and expertise. If HP and Enterprise cannot reach agreement on the assignment within thirty (30) days or any shorter period required to respond to protect or preserve one or both of the parties' rights, Enterprise and HP will alternate the management of such Actions, with Enterprise directing the defense or prosecution of the first such Action, and HP directing the defense or prosecution of the second such Action, in iterative fashion. HP and Enterprise shall

54

reasonably cooperate and maintain a joint defense in a manner that would preserve for both parties and their respective Affiliates any attorney-client privilege, joint defense or other privilege, to the extent necessary or advisable with respect to any such Action.

(v) For the avoidance of doubt, any costs of defense, payouts or settlements (net of Insurance Proceeds that actually reduce the amount of the Liability) for an Action, to the extent in respect of a Corporate Liability under this Section 6.12(c) , shall be Corporate Liabilities and shared equally by the parties.

(d) Management of Other Corporate Liabilities . The parties shall reasonably cooperate and consult with, and notify, each other with respect to the management and disposition of any Corporate Liability not otherwise addressed in Section 6.12(b) , Section 6.12(c) or any other Transaction Document.

Section 6.13 Settlement of Actions . No party managing an Action pursuant to Section 6.11 or Section 6.12(b) shall settle or compromise such Action without the prior written consent of the other party (not to be unreasonably withheld, conditioned or delayed) if such settlement or compromise would result in any non-monetary remedy or relief being imposed upon any member of the other party's Group.

ARTICLE VII

OTHER AGREEMENTS

Section 7.1 Further Assurances .

(a) In addition to the actions specifically provided for elsewhere in this Agreement, each of the parties will cooperate with each other and use (and will cause their respective Subsidiaries to use) commercially reasonable efforts, prior to, at and after the Effective Time, to take, or to cause to be taken, all actions, and to do, or to cause to be done, all things, reasonably necessary on its part under applicable Law or Contractual obligations to consummate and make effective the transactions contemplated by this Agreement and the other Transaction Documents, including the matters set forth on Schedule 7.1(a) .

(b) Without limiting the foregoing, prior to, at and after the Effective Time, each party shall cooperate with the other party, without any further consideration but from and after the Effective Time at the expense of the requesting party, to execute and deliver, or use its commercially reasonable efforts to cause to be executed and delivered, all instruments, including instruments of conveyance, assignment and transfer, and to obtain or make any Approvals or Notifications from or with any Governmental Authority or any other Person under any permit, license, Contract or other instrument, and to take all such other actions as such party may reasonably be requested to take by any other party, consistent with the terms of this Agreement and the other Transaction Documents, in order to effectuate the provisions and purposes of this Agreement and the other Transaction Documents and the transfers of the Enterprise Assets and the assignment and assumption of the Enterprise Liabilities and the other transactions contemplated hereby and thereby. Without limiting the foregoing, each party will, at the reasonable request and expense of the other party, take such other actions as may be reasonably

55

necessary to vest in such other party good and marketable title to the Assets allocated to such other party under this Agreement or any of the other Transaction Documents, if and to the extent it is practicable to do so.

(c) At or prior to the Effective Time, HP and Enterprise in their respective capacities as direct and indirect shareholders of their respective Subsidiaries, shall each ratify any actions that are reasonably necessary or desirable to be taken by their respective Subsidiaries, as the case may be, to effectuate the transactions contemplated by this Agreement or any other Transaction Document.

Section 7.2 Confidentiality .

(a) From and after the Effective Time, subject to Section 7.2(c) and except as contemplated by or otherwise provided in this Agreement or any other Transaction Document, HP shall not, and shall cause its Affiliates and their respective officers, directors, employees, agents and representatives, including attorneys, advisors and other representatives of any Person providing financing (collectively, " Representatives "), not to, directly or indirectly, disclose to any Person, other than Representatives of HP or its Affiliates who reasonably need to know such information in providing services to any member of the HPI Group, or use or otherwise exploit for its own benefit or for the benefit of any third Person, any Enterprise Confidential Information. If any disclosures are made in connection with providing services to any member of the HPI Group under this Agreement or any other Transaction Document, then the Enterprise Confidential Information so disclosed shall be used only as required to perform the services. HP shall use the same degree of care to prevent the unauthorized use or disclosure of the Enterprise Confidential Information by any of its Representatives as it currently uses for its own confidential information, but in no event less than a reasonable standard of care. For purposes of this Section 7.2(a) , any Information to the extent relating to the Enterprise Business, furnished to or otherwise in the possession of any member of the HPI Group as a result of or in connection with the Separation or the performance of any Transaction Document, irrespective of the form of communication, and all notes, analyses, compilations, forecasts, data, translations, studies, memoranda or other documents prepared by HP, any member of the HPI Group or their respective officers, directors and Affiliates, to the extent they contain or otherwise reflect such Information, is hereinafter referred to as " Enterprise Confidential Information ." Enterprise Confidential Information does not include, and there shall be no obligation under this Agreement with respect to, Information that (i) is or becomes generally available to the public, other than as a result of a disclosure by any member of the HPI Group not otherwise permissible under this Agreement, (ii) HP can demonstrate was or became available to HP after the Effective Time from a source other than Enterprise or its Affiliates, provided that such source was not known by HP to be bound by a contractual, legal or fiduciary obligation of confidentiality to Enterprise or any member of the Enterprise Group with respect to such Information, or (iii) is developed independently by a member of the HPI Group without use or reference to the Enterprise Confidential Information.

(b) From and after the Effective Time, subject to Section 7.2(c) and except as contemplated by this Agreement or any other Transaction Document, Enterprise shall not, and shall cause its Affiliates and their respective Representatives not to, directly or indirectly, disclose to any Person, other than Representatives of Enterprise or its Affiliates who reasonably

56

need to know such information in providing services to any member of the Enterprise Group, or use or otherwise exploit for its own benefit or for the benefit of any third Person, any HPI Confidential Information. If any disclosures are made in connection with providing services to any member of the Enterprise Group under this Agreement or any other Transaction Document, then the HPI Confidential Information so disclosed shall be used only as required to perform the services. Enterprise shall use the same degree of care to prevent the unauthorized use or disclosure of the HPI Confidential Information by any of its Representatives as it currently uses for its own confidential information, but in no event less than a reasonable standard of care. For purposes of this Section 7.2(b) , any Information to the extent relating to the HPI Business, furnished to or otherwise in the possession of any member of the Enterprise Group as a result of or in connection with the Separation or the performance of any Transaction Document, irrespective of the form of communication, and all notes, analyses, compilations, forecasts, data, translations, studies, memoranda or other documents prepared by Enterprise, any member of the Enterprise Group or their respective officers, directors and Affiliates, to the extent they contain or otherwise reflect such Information, is hereinafter referred to as " HPI Confidential Information ." HPI Confidential Information does not include, and there shall be no obligation under this Agreement with respect to, Information that (i) is or becomes generally available to the public, other than as a result of a disclosure by any member of the Enterprise Group not otherwise permissible under this Agreement, (ii) Enterprise can demonstrate was or became available to Enterprise after the Effective Time from a source other than HP or its Affiliates; provided that such source was not known by Enterprise to be bound by a contractual, legal or fiduciary obligation of confidentiality to HP or any member of the HPI Group with respect to such Information, or (iii) is developed independently by a member of the Enterprise Group without use or reference to the HPI Confidential Information.

(c) If a member of the HPI Group, on the one hand, or a member of the Enterprise Group, on the other hand, is requested or required (by oral question, interrogatories, requests for information or documents, subpoena, civil investigative demand or similar process) by any Governmental Authority or applicable Law to disclose or provide any Enterprise Confidential Information or HPI Confidential Information (other than with respect to any such Information furnished pursuant to the provisions of Article IV ), as applicable, the Person receiving such request or demand shall use commercially reasonable efforts to provide the other party with written notice of such request or demand as promptly as practicable so that such other party shall have an opportunity to seek an appropriate protective order. The party receiving such request or demand shall take, and cause its Representatives to take, at the requesting party's expense, all other reasonable steps necessary to obtain confidential treatment by the recipient. Subject to the foregoing, the party that received such request or demand may thereafter disclose or provide any Enterprise Confidential Information or HPI Confidential Information, as the case may be, to the extent required by such Governmental Authority or applicable Law (as so advised by counsel).

Section 7.3 Insurance Matters .

(a) Ownership of Insurance Policies . From and after the Effective Time, HP or one (1) or more members of the HPI Group shall continue to own all Insurance Policies, insurance contracts and claim administration contracts of any kind in place as of the Effective Time for which only one (1) or more members of the HPI Group are named insureds as of

57

immediately prior to the Effective Time (collectively, the " HPI Insurance Policies "). From and after the Effective Time, Enterprise or one (1) or more members of the Enterprise Group shall continue to own all Insurance Policies, insurance contracts and claim administration contracts of any kind in place as of the Effective Time for which only one (1) or more members of the Enterprise Group are named insureds as of immediately prior to the Effective Time (collectively, the " Enterprise Insurance Policies "). From and after the Effective Time, HP or one (1) or more members of the HPI Group, on the one hand, and Enterprise or one (1) or more members of the Enterprise Group, on the other hand, shall jointly own all Insurance Policies, insurance contracts and claim administration contracts of any kind in place as of the Effective Time for which one (1) or more members of the HPI Group and one (1) or more members of the Enterprise Group are named insureds as of immediately prior to the Effective Time (collectively, the " Joint Insurance Policies "). Nothing contained herein shall be construed to be an attempted assignment of or a change to any part of the ownership of the HPI Insurance Policies or shall be construed to waive any right or remedy of any member of the HPI Group in respect thereof. Nothing contained herein shall be construed to be an attempted assignment of or a change to any part of the ownership of the Enterprise Insurance Policies or shall be construed to waive any right or remedy of any member of the Enterprise Group in respect thereof. No provision of this Agreement is intended to relieve any insurer of any Liability under any policy.

(b) Coverage for Claims Arising Prior to the Effective Time . Effective as of the Effective Time, HP shall not be obligated to maintain insurance coverage with respect to the Enterprise Business, and Enterprise shall not be obligated to maintain insurance coverage with respect to the HPI Business, except as expressly provided in this Section 7.3(b) . To the extent permitted under the terms of any applicable HPI Insurance Policy or Joint Insurance Policy, each member of the Enterprise Group and each of their respective directors, officers and employees will be successors in interest and will have and be fully entitled to continue to exercise all rights that any of them may have as of the Effective Time (with respect to events occurring prior to the Effective Time, regardless of when claims in respect of such events are reported) as a Subsidiary, Affiliate, division, director, officer or employee of HP prior to the Effective Time under any HPI Insurance Policy or Joint Insurance Policy or any agreements related to the HPI Insurance Policies or Joint Insurance Policies executed and delivered prior to the Effective Time. To the extent permitted under the terms of any applicable Enterprise Insurance Policy or Joint Insurance Policy, each member of the HPI Group and each of their respective directors, officers and employees will be successors in interest and will have and be fully entitled to continue to exercise all rights that any of them may have as of the Effective Time (with respect to events occurring prior to the Effective Time, regardless of when claims in respect of such events are reported) as a Subsidiary, Affiliate, division, director, officer or employee of Enterprise prior to the Effective Time under any Enterprise Insurance Policy or Joint Insurance Policy or any agreements related to the Enterprise Insurance Policies or Joint Insurance Policies executed and delivered prior to the Effective Time. In relation to such Insurance Policies (the " Shared Insurance Policies "), the parties agree to the following:

(i) *Maintenance* . After the Effective Time, HP (and each other member of the HPI Group) and Enterprise (and each other member of the Enterprise Group) shall not, without the consent of Enterprise or HP, respectively (such consent not to be unreasonably withheld, conditioned or delayed), provide any insurance carrier with a release or amend, modify or waive any rights under any Shared Insurance Policy if such release,

58

amendment, modification or waiver thereunder would materially adversely affect any rights of any member of the Group of the other party with respect to insurance coverage otherwise afforded to such other party for claims arising prior to the Effective Time; provided , however , that the foregoing shall not (i) preclude any member of any Group from presenting any claim or from exhausting any Shared Insurance Policy limit, (ii) require any member of any Group to pay any premium or other amount or to incur any other Liability or (iii) require any member of any Group to renew, extend or continue any Shared Insurance Policy in force. Subject to Article IV , each of HP and Enterprise shall share such Information as is reasonably necessary in order to permit the other to manage and conduct its insurance matters in an orderly fashion.

(ii) *Coverage Limits Exceeded* . If the aggregate limits of any Shared Insurance Policies are exceeded by the aggregate of outstanding Insured Claims by the parties or the members of their respective Groups, then the parties agree to allocate the Insurance Proceeds received under such Shared Insurance Policies based upon their respective percentage of the total of their claims that would have been covered under the Shared Insurance Policies if such aggregate limits had not been exceeded. Any party (or any member of its respective Group) that has received Insurance Proceeds in excess of the respective percentage of Insurance Proceeds allocated to such party in accordance with the immediately preceding sentence shall pay to the other party the appropriate amount so that each party (or a member of its respective Group) will have received its respective percentage of such Insurance Proceeds. Each of the parties agrees to use commercially reasonable efforts to maximize available coverage under the Shared Insurance Policies and to take commercially reasonable steps to recover from all other responsible parties in respect of an Insured Claim to the extent the coverage limits under a Shared Insurance Policy have been exceeded or would be exceeded as a result of the Insured Claim.

(iii) *Deductibles and Self-Insurance Retentions* . If the Shared Insurance Policies have either (A) an aggregate deductible or self-insurance retention or (B) an individual deductible or self-insurance retention that applies to each Insured Claim, and the parties (or members of their respective Groups) both have claims under such policy for the same occurrence, then the parties agree that the applicable deductible or self-insurance retention will be borne by the parties in the same proportion as the Insurance Proceeds received by each such party bears to the aggregate Insurance Proceeds received by the parties under the applicable Shared Insurance Policy.

(iv) *Reinstatement of Policy Limits* . To the extent that any Insurance Policy provided for the reinstatement of policy limits, and both HP and Enterprise desire to reinstate such limits, the cost of reinstatement will be shared by HP and Enterprise as the parties may agree. If either party, in its sole discretion, determines that such reinstatement would not be beneficial, that party shall not contribute to the cost of reinstatement and will not make any claim thereunder nor otherwise seek to benefit from the reinstated policy limits.

(v) *Claims Administration* . From and after the Effective Time, HP shall be responsible for Claims Administration with respect to claims of the HPI Group under the Shared Insurance Policies, and Enterprise shall be responsible for Claims Administration with respect to claims of the Enterprise Group under the Shared Insurance Policies. Notwithstanding the foregoing, Enterprise shall provide HP with at least five (5) days' prior written notice before any member of the Enterprise Group settles or seeks settlement authority under any Shared

59

Insurance Policy for an amount equal to or exceeding $20 million with respect to any claim under such Shared Insurance Policy, and HP shall provide Enterprise with at least five (5) days' prior written notice before any member of the HPI Group settles or seeks settlement authority under any Shared Insurance Policy for an amount equal to or exceeding $20 million with respect to any claim under such Shared Insurance Policy.

(vi) *Cooperation* . The parties agree to use their commercially reasonable efforts to cooperate with respect to the various insurance matters contemplated by this Agreement.

(vii) *Premiums* . HP will pay all premiums, Taxes, assessments or similar charges (retrospectively rated or otherwise) in accordance with the Shared Insurance Policies in relation to periods of coverage prior to the Effective Time; provided that the portion of such premiums and other payments paid by HP that HP reasonably determines to be attributable to the Enterprise Business shall be allocated to Enterprise and included on the Enterprise Balance Sheet.

(c) Release . Subject to compliance with this Section 7.3 , in no event will a party have any Liability whatsoever to any member of the other party's Group if any Insurance Policy is terminated or otherwise ceases to be in effect for any reason, is unavailable or inadequate to cover any Liability of any member of either party's Group for any reason whatsoever or is not renewed or extended beyond the current expiration date. Furthermore, each party, on behalf of its Group, releases each member of the other party's Group with respect to any Liabilities whatsoever as a result of the Insurance Policies and insurance practices of the other party's Group as in effect at any time prior to the Effective Time, including as a result of (i) the level or scope of any insurance, (ii) the creditworthiness of any insurance carrier, (iii) the terms and conditions of any Insurance Policy or (iv) the adequacy or timeliness of any notice to any insurance carrier with respect to any claim or potential claim.

Section 7.4 Separation Expenses . Except as otherwise expressly set forth herein or in any other Transaction Document:

(a) HP shall pay for all out-of-pocket fees, costs and expenses of HP, Enterprise and any of their Subsidiaries incurred in connection with the Separation, the Distribution and the other transactions contemplated by this Agreement and the other Transaction Documents (the " Separation Expenses ") that are incurred prior to the Effective Time (but not actually paid prior to the Effective Time) and that are exclusively related to the establishment of HP's operations as a standalone company;

(b) Enterprise shall pay for all Separation Expenses that are incurred prior to the Effective Time (but not actually paid prior to the Effective Time) and that are exclusively related to the establishment of Enterprise's operations as a standalone company;

(c) each of HP and Enterprise shall use commercially reasonable efforts to allocate in good faith all Separation Expenses that are incurred prior to the Effective Time (but not actually paid prior to the Effective Time) and that are not otherwise allocated pursuant to Section 7.4(a) or Section 7.4(b) , based on the proportionate contribution of such Separation

60

Expenses to the establishment of each of HP's and Enterprise's operations as a standalone company, and otherwise the parties shall share such Separation Expenses equally; and

(d) each of HP and Enterprise shall pay for all Separation Expenses that are incurred by such party at or after the Effective Time.

Section 7.5 <u>Transaction Documents</u> . Effective on or prior to the Effective Time, each of HP and Enterprise will, or will cause the applicable members of its Group to, execute and deliver the Transition Services Agreement, the Tax Matters Agreement, the Employee Matters Agreement, the Real Estate Matters Agreement and the Commercial Agreement. To the extent that the provisions of any of the other Transaction Documents conflict with the provisions of this Agreement, the provisions of such other agreement or agreements shall govern with respect to the subject matter addressed thereby. Specifically, the parties intend that, to the extent set forth in such other Transaction Document and unless otherwise provided therein, (i) any representations, warranties, covenants or agreements between the parties with respect to Taxes or other Tax matters (including indemnification for Taxes and control of any Tax Contest (as defined in the Tax Matters Agreement)) shall be governed exclusively by the Tax Matters Agreement ( <u>provided</u> that, for the avoidance of doubt, the covenants and agreements contained in <u>Section 2.4(e)</u> , <u>Section 2.5(e)</u> , <u>Section 2.9(b)</u> , <u>Section 6.5(c)</u> and <u>Section 6.7(c)</u> of this Agreement shall apply in accordance with their terms and nothing in this clause (i) shall be interpreted as affecting the applicability of, or the rights and obligations set forth in, such provisions), (ii) any representations, warranties, covenants or agreements between the parties with respect to employment matters or matters relating to compensation and benefits provided to Service Providers shall be governed exclusively by the Employee Matters Agreement, (iii) any representations, warranties, covenants or agreements between the parties with respect to real property matters shall be governed exclusively by the Real Estate Matters Agreement, (iv) any representations, warranties, covenants or agreements between the parties with respect to the subject matters contemplated by the Commercial Agreement shall be governed exclusively by the Commercial Agreement and (v) any representations, warranties, covenants or agreements between the parties with respect to the subject matters contemplated by any Intercompany Agreement shall be governed exclusively by the applicable Intercompany Agreement.

Section 7.6 <u>Payments; Interest</u> . Notwithstanding anything to the contrary herein, all payments between the parties contemplated by this Agreement, other than payments contemplated by <u>Section 2.13</u> , shall be made in accordance with the payment schedule set forth on <u>Schedule 7.6</u> . Except as expressly provided to the contrary in this Agreement or in any other Transaction Document, any amount not paid when due pursuant to this Agreement or any other Transaction Document (after giving effect to the payment schedule set forth on <u>Schedule 7.6</u> ), shall accrue interest at the rate per annum set forth on <u>Schedule 7.6</u> .

Section 7.7 <u>Noncompetition Matters</u> .

(a) <u>HPI Restricted Business</u> . From the Effective Time through the third (3rd) anniversary of the Distribution Date (the " <u>Non-Competition Period</u> "), Enterprise will not, and will cause its Subsidiaries not to, engage in any HPI Restricted Business or own, operate, control, share any revenues of or have any profit or other equity interest in any business engaged

61

in an HPI Restricted Business. " HPI Restricted Business " shall mean the sale of any of the products or services set forth on Schedule 7.7(a) in any jurisdiction worldwide.

(b) Enterprise Restricted Business . During the Non-Competition Period, HP will not, and will cause its Subsidiaries not to, engage in any Enterprise Restricted Business or own, operate, control, share any revenues of or have any profit or other equity interest in any business engaged in an Enterprise Restricted Business. " Enterprise Restricted Business " shall mean the sale of any of the products or services set forth on Schedule 7.7(b) in any jurisdiction worldwide.

(c) Exceptions . Notwithstanding anything to the contrary set forth in this Section 7.7 , nothing in this Agreement shall prohibit, preclude or in any way restrict HP or Enterprise or their respective Groups from:

(i) [Reserved]

(ii) purchasing or acquiring, or being the holder or beneficial owner of, five percent (5%) or less of the equity securities of any Person;

(iii) acquiring and, after such acquisition, owning an interest in any assets, operations or Person that is engaged in a business activity that would otherwise violate Section 7.7(a) or Section 7.7(b) , as applicable (a " Competing Business "), if (A) such Competing Business represented less than five percent (5%) and $50 million, in each case of the consolidated annual revenues (in the last completed fiscal year prior to the acquisition of such Competing Business) of such acquired assets, operations or Person taken as a whole; and (B) such Competing Business, together with all other Competing Businesses acquired in accordance with this Section 7.7(c) , represented in the aggregate less than $300 million in consolidated annual revenue (as measured for each Competing Business in the last completed fiscal year prior to the acquisition of such Competing Business);

(iv) acquiring and, after such acquisition, owning an interest in any assets, operations or Person that is engaged in Competing Business, if such Competing Business represented consolidated annual revenues in excess of either of the thresholds set forth in Section 7.7(c)(iii)(A) but less than thirty percent (30%) and $300 million, in each case of the consolidated annual revenues (in the last completed fiscal year prior to the acquisition of such Competing Business) of such acquired assets, operations or Person taken as a whole; provided that HP or Enterprise, as applicable, commits in writing to (and does) within twelve (12) months following such acquisition (the " Divestiture Period ") complete the divestiture of at least that portion of the Competing Business such that the restrictions set forth in this Section 7.7 , as applicable, would not operate to restrict such ownership; provided , further , that in no event shall the divesting party be permitted to reacquire such divested portion of the Competing Business prior to the later to expire of the Divestiture Period and the Non-Competition Period. The parties agree that notwithstanding anything to the contrary in this Section 7.7 , the divestiture obligation set forth in this Section 7.7(c)(iv) shall continue to apply even if the Non-Competition Period expires before the expiration of the Divestiture Period.

(d) Dispositions .

(i) If any member of a Group sells or otherwise disposes of a company, product line, business or assets (constituting less than all or substantially all of the assets of such Group) to a third party (a " Disposed Business ") after the Effective Time and prior to the end of the Non-Competition Period, then the Disposed Business (but not the third party acquiror or its other Subsidiaries) shall remain subject to the restrictions set forth in this Section 7.7 , to the same extent as they apply to the disposing party immediately prior to the sale or other disposition of the Disposed Business, from the closing of the sale or other disposition until the end of the Non-Competition Period. In connection with the entry into an agreement providing for such sale or other disposition, the disposing party shall cause the acquiring third party to enter into an agreement, reasonably acceptable to the other party hereto, that subjects the Disposed Business to the restrictions set forth in this Section 7.7 , to the same extent as they apply to the disposing party immediately prior to the sale or other disposition of the Disposed Business, from the closing of the sale or other disposition until the end of the Non-Competition Period.

(ii) If HP or Enterprise undergoes a Change of Control after the Effective Time and prior to the end of the Non-Competition Period, then in connection with the entry into an agreement providing for such Change of Control, such party shall cause the acquiring third party to enter into an agreement, reasonably acceptable to the other party, that subjects the acquired operations and activities to the restrictions set forth in this Section 7.7 , to the same extent as they apply to such party immediately prior to the consummation of the Change of Control, for the remainder of the Non-Competition Period. " Change of Control " shall mean, with respect to HP or Enterprise, as applicable, the occurrence after the Effective Time of any of the following: (A) the sale, conveyance, transfer or other disposition (however accomplished), in one or a series of related transactions, of all or substantially all of the assets of such party's Group to a third Person that is not an Affiliate of such party prior to such transaction or the first of such related transactions; (B) the consolidation, merger or other business combination of such party with or into any other entity, immediately following which the stockholders of such party immediately prior to such transaction fail to own in the aggregate at least a majority of the voting power in the election of directors of all the outstanding voting securities of the surviving party in such consolidation, merger or business combination or of its ultimate publicly traded parent entity; (C) a transaction or series of transactions in which any Person or "group" (as such term is used in Sections 13(d) and 14(d) of the Exchange Act) acquires at least 35% of the outstanding voting securities of such party and effective control of such party (other than (I) a reincorporation, holding company merger or similar corporate transaction in which each of such party's stockholders owns, immediately thereafter, interests in the new parent company in substantially the same percentage as such stockholder owned in such party immediately prior to such transaction, or (II) in connection with a transaction described in clause (B), which shall be governed by such clause (B)); or (D) a majority of the board of directors of such party ceasing to consist of individuals who have become directors as a result of being nominated or elected by a majority of such party's directors.

(e) Remedies; Enforcement . Each party acknowledges and agrees that (i) injury to the other party from any breach of the obligations of such party set forth in this Section 7.7 or Section 7.8 would be irreparable and impossible to measure and (ii) the remedies at law

63

for any breach or threatened breach of this Section 7.7 or Section 7.8 , including monetary damages, would therefore be inadequate compensation for any loss and the other party shall have the right to specific performance and injunctive or other equitable relief in accordance with Section 9.12 , in addition to any and all other rights and remedies at law or in equity, and all such rights and remedies shall be cumulative. Each party understands and acknowledges that that the restrictive covenants and other agreements contained in this Section 7.7 and Section 7.8 are an essential part of this Agreement and the transactions contemplated hereby. It is the intent of the parties that the provisions of this Section 7.7 and Section 7.8 shall be enforced to the fullest extent permissible under applicable Law applied in each jurisdiction in which enforcement is sought. If any particular provision or portion of this Section 7.7 or Section 7.8 shall be adjudicated to be invalid or unenforceable, such provision or portion thereof shall be deemed amended to the minimum extent necessary to render such provision or portion valid and enforceable, such amendment to apply only with respect to the operation of such provision or portion thereof in the particular jurisdiction in which such adjudication is made.

Section 7.8 Non-Solicitation and No-Hire . Each party agrees that, for a period of twelve (12) months from the Distribution Date such party shall not solicit for employment, and for a period of six (6) months from the Distribution Date such party shall not hire, any HPI Employee (for the avoidance doubt, regardless of whether such HPI Employee remains employed with the HPI Group), in the case of Enterprise, or any Enterprise Employee (for the avoidance doubt, regardless of whether such Enterprise Employee remains employed with the Enterprise Group), in the case of HP; provided , however , that this Section 7.8 shall not prohibit: (a) generalized solicitations that are not directed to employees of the other party ( provided that this clause (a) shall not by itself permit the hiring of employees otherwise prohibited by this Section 7.8 ); (b) the solicitation or hiring of a Person whose employment was terminated by the other party (including any termination pursuant to a workforce reduction program but excluding any voluntary termination by such Person); (c) the solicitation or hiring of a Person after receipt by the soliciting or hiring party (in advance of any solicitation or hiring or, in the case of a response to a general solicitation as permitted under clause (a) above, in advance of any subsequent solicitation in connection with the recruiting process or hiring) of the express written consent of the senior Human Resources executive of the other party; or (d) the solicitation or hiring of any Former HPI Employee (as defined in the Employee Matters Agreement) or Former Enterprise Employee (as defined in the Employee Matters Agreement).

Section 7.9 Environmental Remediation . HP and Enterprise agree that the Remediation Obligations at the projects set forth on Schedule 2.3(b)(iii) (Projects with Remediation Obligations and Remediation Cost Trigger) shall be handled in accordance with this Section 7.9 .

(a) HP shall perform, or cause to be performed, the Remediation Obligations set forth on Schedule 2.3(b)(iii) (Projects with Remediation Obligations and Remediation Cost Trigger). As set forth in Section 2.3(c)(vi)(D) , once HP has met the Remediation Cost Trigger by expenditures of Allowable Costs arising from Remedial Activities at the projects set forth on Schedule 2.3(b)(iii) (Projects with Remediation Obligations and Remediation Cost Trigger), any additional costs incurred in fulfilling the Remediation Obligations shall become Corporate Liabilities and managed and shared equally in accordance with Section 6.12(c) .

64

(b) On an annual basis, HP shall provide Enterprise with a summary of the amount expended on fulfilling the Remediation Obligations at each of the projects set forth on Schedule 2.3(b)(iii) (Projects with Remediation Obligations and Remediation Cost Trigger) in the prior year and the amount remaining until HP has met the Remediation Cost Trigger. On a quarterly basis, HP shall provide Enterprise with a summary of changes in the costs forecasted by HP for Remedial Activities at each of the projects set forth on Schedule 2.3(b)(iii) (Projects with Remediation Obligations and Remediation Cost Trigger) in a mutually acceptable form and manner, and such information shall be considered HPI Confidential Information in accordance with Section 7.2(b) . Upon written request from Enterprise ( provided that such request does not occur more than once in a calendar year), HP shall also provide Enterprise with a summary of the Remedial Activities that were completed in the prior year. If HP has completed all Remedial Activities necessary to fulfill all Remediation Obligations and has received a written no further action determination or certificate of completion or similar determination from the applicable Governmental Authority (Completion Notice) for all of the projects set forth on Schedule 2.3(b)(iii) (Projects with Remediation Obligations and Remediation Cost Trigger) and the Remediation Cost Trigger has not been met, HP shall reimburse Enterprise 50% of the difference between the Allowable Costs incurred by HP in fulfilling all Remediation Obligations and the Remediation Cost Trigger.

(c) HP's performance of the Remediation Obligations shall be performed in accordance with applicable Environmental Laws.

(d) Enterprise, and each member of the Enterprise Group, agrees that as part of the consideration for HP performing the Remediation Obligations, HP shall have full decision-making authority with respect to all Remediation Obligations, including the exclusive authority to file any appeals or challenges to orders or directives from Governmental Authorities, to enter into any settlements with third parties and Governmental Authorities, and HP shall have the exclusive authority to interact with Governmental Authorities and third parties regarding these Remediation Obligations.

(e) Enterprise, and each member of the Enterprise Group, shall afford or cause to be afforded to HP and its employees, consultants, contractors and subcontractors, reasonable access to any real property leased or subleased by a member of the Enterprise Group at or near a project where HP may be performing Remedial Activities to fulfill the Remediation Obligations.

(f) Enterprise, and each member of the Enterprise Group, shall use its reasonable best efforts to assist HP in the approval and implementation of the Remedial Activities developed by HP to fulfill the Remediation Obligations.

(g) Enterprise, and each member of the Enterprise Group, shall provide reasonable cooperation to HP regarding implementation of the Remedial Actions, including the execution of documents determined by HP to be necessary and appropriate in connection with the Remedial Actions.

(h) Notwithstanding any other provision of this Agreement, HP shall not be obligated to obtain from any Governmental Authority or third party any consent, substitution,

65

approval or amendment required to novate or assign any obligations or Liabilities under Environmental Law that do not constitute Enterprise Liabilities or to obtain in writing the unconditional release of Enterprise from any such obligations or Liabilities.

(i) HP's Remediation Obligations shall be satisfied when a no further action determination or certificate of completion or similar determination is received from the applicable Governmental Authority. Once HP has received such a written communication from the applicable Governmental Authority, any Remedial Activities required in the future at that property shall be governed by Section 2.3(c)(vi)(C) .

(j) In the event that any Action is commenced that would constitute a Corporate Liability under Section 2.3(c)(vi) , the party receiving notice of the Action shall notify the other party promptly in writing.

(k) Schedule 7.9 sets forth additional provisions for the Remediation Obligations at the projects set forth on Schedule 7.9 .

Section 7.10 Permits . The HPI Group shall cooperate with the Enterprise Group and take actions that are reasonably necessary to finalize or effectuate the transfer of a permit to the Enterprise Group that is designated as an Enterprise Asset and that is not already transferred to a member of the Enterprise Group as of the Effective Time. The HPI Group and the Enterprise Group agree to cooperate with each other regarding the allocation of responsibilities for permits at shared real properties.

ARTICLE VIII
DISPUTE RESOLUTION

Section 8.1 General . Except as expressly provided in this Article VIII or in any other Transaction Document, the procedures set forth in this Article VIII shall apply to any dispute, controversy or claim, whether sounding in contract, tort or otherwise, arising out of or relating to this Agreement or any other Transaction Document or the transactions contemplated hereby or thereby, between or among any members of the HPI Group, on the one hand, and any members of the Enterprise Group, on the other hand (a " Dispute "). Each party agrees on behalf of itself and the members of its Group that the procedures set forth in this Article VIII shall be the sole and exclusive remedy (including to enforce a party's rights to specific performance and injunctive or other equitable relief pursuant to Section 9.12 ) in connection with any such Dispute and irrevocably waives any right to commence any Action in or before any Governmental Authority, except as expressly provided in this Article VIII or in any other Transaction Document and except to the extent provided under the Federal Arbitration Act, 9 U.S.C. §§ 1 et seq. (the " Arbitration Act "), in the case of judicial review of arbitration results or awards. EACH PARTY ON BEHALF OF ITSELF AND EACH MEMBER OF ITS GROUP IRREVOCABLY WAIVES ANY RIGHT TO ANY TRIAL IN A COURT THAT WOULD OTHERWISE HAVE JURISDICTION OVER ANY DISPUTE.

Section 8.2 Negotiation Between Executives . Either party seeking resolution of any Dispute shall first provide written notice thereof to the other party (a " Dispute Notice "). Following delivery of such Dispute Notice, the parties shall attempt in good faith to negotiate a

66

resolution of the Dispute. The negotiations shall be conducted by appropriate executives who have authority to settle the Dispute. All reasonable requests for information made by one party to the other will be honored. If the parties are unable for any reason to resolve a Dispute within thirty (30) days after the delivery of the Dispute Notice or if a party reasonably concludes that the other party is not willing to negotiate in good faith as contemplated by this Section 8.2 , either party may submit the Dispute to mediation in accordance with Section 8.3 .

Section 8.3 Mandatory Mediation . Any Dispute not resolved pursuant to Section 8.2 shall, at the written request of any party (a " Mediation Request "), be submitted to mandatory mediation in accordance with the International Institute for Conflict Prevention & Resolution (" CPR ") Mediation Procedure (the " Procedure ") then in effect, except as otherwise set forth in this Article VIII . The mediation shall be held in Palo Alto, California or such other place as the parties may mutually agree. The parties shall have twenty (20) days from receipt by a party of a Mediation Request to agree on a mediator. If no mediator has been agreed upon by the parties within twenty (20) days of receipt by a party of a Mediation Request, then any party may request (on written notice to the other party), that CPR appoint a mediator in accordance with the Procedure. If the Dispute has not been resolved within the earlier of sixty (60) days of the appointment of a mediator or ninety (90) days after receipt by a party of a Mediation Request, or within such longer period as the parties may agree to in writing, either party may submit the Dispute to binding arbitration in accordance with Section 8.4 ; provided , however , that if one party fails to participate in the mediation, the other party may commence arbitration in accordance with Section 8.4 prior to the expiration of the time periods set forth above.

Section 8.4 Binding Arbitration .

(a) Any Dispute that is not resolved pursuant to Section 8.3 shall, at the written request of any party (an " Arbitration Demand Notice "), be submitted to binding arbitration in accordance with this Section 8.4(a) . If either party shall deliver an Arbitration Demand Notice, the other party may itself deliver an Arbitration Demand Notice to such first party with respect to any related Dispute without the requirement of first delivering a Dispute Notice as contemplated by Section 8.2 or a Mediation Request as contemplated by Section 8.3 . Subject to Section 8.5 , upon delivery of an Arbitration Demand Notice in accordance with this Section 8.4(a) , the Dispute shall be decided in accordance with this Section 8.4(a) .

(i) Any arbitration hereunder will be conducted in accordance with CPR Rules for Administered Arbitration then in effect (the " CPR Arbitration Rules "); provided , however , that to the extent that the provisions of this Agreement and the CPR Arbitration Rules conflict, the provisions of this Agreement (including this Article VIII ) shall govern. Unless the parties otherwise agree, any such arbitration shall be conducted by and before a single arbitrator selected by the parties in accordance with the procedures set forth on Schedule 8.4(a)(i) . Any arbitrator selected pursuant to this Section 8.4(a) shall be neutral and disinterested with respect to each of the parties and the subject matter of the Dispute.

(ii) The arbitrator shall have full power and authority to determine issues of arbitrability but shall otherwise be limited to interpreting or construing the applicable provisions of this Agreement or other Transaction Document, and will have no authority or power to limit, expand, alter, amend, modify, revoke or suspend any condition or provision of

67

this Agreement or other Transaction Document; it being understood that the arbitrator will have full authority to implement the provisions of this Agreement or other Transaction Document and to fashion appropriate remedies for breaches of this Agreement or other Transaction Document (including interim or permanent injunctive relief or other equitable relief); provided , however , that the arbitrator shall not have (i) any authority in excess of the authority a court having jurisdiction over the parties and the Dispute would have absent these arbitration provisions or (ii) any right or power to award special, indirect, punitive, exemplary, consequential, remote, speculative or similar damages in excess of compensatory damages, except to the extent such damages are expressly permitted by the terms of this Agreement or other Transaction Document, as applicable. It is the intention of the parties that in rendering a decision the arbitrator will give effect to the applicable provisions of this Agreement and the other Transaction Documents and follow applicable Law.

(iii) If a party fails or refuses to appear at and participate in an arbitration hearing after due notice, the arbitrator may hear and determine the controversy upon evidence produced by the appearing party. Any decision rendered under such circumstances shall be as valid and enforceable as if the parties had appeared and participated fully at all stages.

(iv) Notwithstanding anything to the contrary herein, the fees of the arbitrator and all other arbitration costs shall be borne equally by each party, except that each party shall be responsible for its own attorney's fees and other costs and expenses, including the costs of witnesses selected by such party.

(v) Any arbitration award shall be an award with a holding in favor of or against a party and shall include findings as to facts, issues or conclusions of law, and shall include a statement of the reasoning on which the award rests. The award must also be in adequate form so that a judgment of a court may be entered thereupon. Judgment upon any such arbitration award may be entered in any court having jurisdiction thereof.

(vi) Any arbitration proceedings hereunder shall be held in Palo Alto, California or such other place as the parties may mutually agree.

(vii) The arbitration, including the interpretation of the provisions of this Article VIII only to the extent they relate to the agreement to arbitrate set forth herein and any procedures pursuant thereto, shall be governed by the Arbitration Act. In all other respects, the interpretation of this Agreement shall be governed as set forth in Section 9.2 .

Section 8.5 Interim Equitable Relief . Regardless of whether a Dispute Notice, Mediation Request or Arbitration Demand Notice has been delivered, prior to the appointment of an arbitrator pursuant to Section 8.4(a) , either party may seek interim equitable relief from any arbitrator set forth on Schedule 8.4(a)(i) in order to preserve and protect the status quo. Such arbitrator shall have the authority to grant any interim equitable relief that a court having jurisdiction over the parties and the Dispute would have authority to grant. Neither the request for, nor the grant or denial of, any such relief shall be deemed a waiver of the dispute resolution obligations set forth herein. The parties agree to be bound by any interim equitable relief granted in accordance with this Section 8.5 , and judgment upon any such award of interim equitable relief may be entered in any court having jurisdiction thereof.

68

Section 8.6 <u>Confidentiality of Negotiation, Mediation and Arbitration</u> . Except as required by applicable Law, each party shall hold, and shall cause its respective Subsidiaries and Representatives to hold, all dispute resolution proceedings pursuant to this <u>Article VIII</u> (including the existence, content and results thereof) in confidence (other than disclosure to its advisors, or to the extent disclosure is otherwise permitted pursuant to <u>Section 7.2,</u> or as may be required in order to enforce any agreement or award) and shall request that the mediator or arbitrator, as applicable, comply with such confidentiality requirement. The parties also agree to jointly request that any court in which a judgment upon any award hereunder is entered or enforced maintain all filings in connection therewith under seal, and to oppose any third-party's request for access to sealed filings. Dispute resolution proceedings pursuant to <u>Section 8.2</u> , <u>Section 8.3</u> , <u>Section 8.4(a)</u> and <u>Section 8.5</u> shall be treated as compromise and settlement negotiations for purposes of applicable rules of evidence.

Section 8.7 <u>Limitation on Certain Damages</u> . Notwithstanding anything to the contrary in this Agreement, and except with respect to any breach of any covenant or agreement contained in <u>Section 7.2</u> , <u>Section 7.7</u> or <u>Section 7.8</u> , neither party nor its Affiliates shall be liable under this Agreement or any other Transaction Document (except as expressly provided in any such other Transaction Document) to the other party for any special, indirect, punitive, exemplary, consequential, remote, speculative or similar damages in excess of compensatory damages arising in connection with the transactions contemplated hereby and thereby (other than any such liability with respect to a Third Party Claim), whether or not advised of the possibility of such damages and whether or not such damages are reasonably foreseeable.

Section 8.8 <u>No Effect on Other Commitments</u> . Unless otherwise agreed in writing, the parties will continue to honor all commitments under this Agreement and each other Transaction Document during the course of resolution of a Dispute pursuant to the provisions of this <u>Article VIII</u> with respect to all matters not subject to such Dispute.

ARTICLE IX

MISCELLANEOUS

Section 9.1 <u>Corporate Power; Facsimile Signatures</u> .

(a) HP represents on behalf of itself and on behalf of other members of the HPI Group, and Enterprise represents on behalf of itself and on behalf of other members of the Enterprise Group, as follows:

(i) each such Person has the requisite corporate power and authority and has taken all corporate action necessary in order to execute, deliver and perform this Agreement and each other Transaction Document to which it is a party and to consummate the transactions contemplated hereby and thereby; and

(ii) this Agreement and each Transaction Document to which it is a party has been duly executed and delivered by it and constitutes a valid and binding agreement of it enforceable in accordance with the terms thereof.

(b) Each party acknowledges that it and each other party is executing certain of the Transaction Documents by facsimile, stamp or mechanical signature, and that delivery of an executed counterpart of a signature page to this Agreement or any other Transaction Document (whether executed by manual, stamp or mechanical signature) by facsimile or by email in portable document format (.pdf) shall be effective as delivery of such executed counterpart of this Agreement or any other Transaction Document. Each party expressly adopts and confirms each such facsimile, stamp or mechanical signature (regardless of whether delivered in person, by mail, by courier, by facsimile or by email in .pdf) made in its respective name as if it were a manual signature delivered in person, agrees that it will not assert that any such signature or delivery is not adequate to bind such party to the same extent as if it were signed manually and delivered in person and agrees that, at the reasonable request of the other party at any time, it will as promptly as reasonably practicable cause each such Transaction Document to be manually executed (any such execution to be as of the date of the initial date thereof) and delivered in person, by mail or by courier.

(c) Notwithstanding any provision of this Agreement or any other Transaction Document, neither HP nor Enterprise shall be required to take or omit to take any act that would violate its fiduciary duties to any minority stockholders of any non-wholly owned Subsidiary of HP or Enterprise, as the case may be ( it being understood that directors' qualifying shares or similar interests will be disregarded for purposes of determining whether a Subsidiary is wholly owned).

Section 9.2 Governing Law; Submission to Jurisdiction; Waiver of Trial .

(a) This Agreement and, unless expressly provided therein, each other Transaction Document, shall be governed by and construed and interpreted in accordance with the Laws of the State of Delaware without giving effect to the principles of conflicts of law thereof.

(b) Subject to Article VIII , each of HP and Enterprise, on behalf of itself and the members of its Group, hereby irrevocably (i) agrees that any Dispute shall be subject to the exclusive jurisdiction of the state and federal courts located in the State of Delaware, (ii) waives any claims of *forum non conveniens* and agrees to submit to the jurisdiction of such courts and (iii) agrees that service of any process, summons, notice or document by U.S. registered mail to its respective address set forth in Section 9.6 shall be effective service of process for any litigation brought against it in any such court or for the taking of any other acts as may be necessary or appropriate in order to effectuate any judgment of said courts.

Section 9.3 Survival of Covenants . Except as expressly set forth in this Agreement or any other Transaction Document, the covenants and other agreements contained in this Agreement and each other Transaction Document, and liability for the breach of any obligations contained herein or therein, shall survive each of the Reorganization and the Distribution and shall remain in full force and effect.

Section 9.4 Waivers of Default . A waiver by a party of any default by the other party of any provision of this Agreement or any other Transaction Document shall not be deemed a waiver by the waiving party of any subsequent or other default. No failure or delay by

70

a party in exercising any right, power or privilege under this Agreement or any other Transaction Document shall operate as a waiver thereof, nor shall a single or partial exercise thereof prejudice any other or further exercise thereof or the exercise of any other right, power or privilege. No waiver by any party of any provision of this Agreement shall be effective unless explicitly set forth in writing and executed by the party so waiving.

Section 9.5 <u>Force Majeure</u> . No party (or any Person acting on its behalf) shall have any liability or responsibility for failure to fulfill any obligation (other than a payment obligation) under this Agreement or, unless otherwise expressly provided therein, any other Transaction Document, so long as and to the extent to which the fulfillment of such obligation is prevented, frustrated, hindered or delayed as a consequence of circumstances of Force Majeure. A party claiming the benefit of this provision shall, as soon as reasonably practicable after the occurrence of any such event, (a) notify the other parties of the nature and extent of any such Force Majeure and (b) use due diligence to remove any such causes and resume performance under this Agreement or the applicable other Transaction Document as soon as feasible.

Section 9.6 <u>Notices</u> . All notices, requests, claims, demands and other communications under this Agreement and, to the extent applicable and unless otherwise provided therein, under each of the other Transaction Documents, shall be in writing and shall be given or made (and shall be deemed to have been duly given or made upon receipt) by delivery in person, by overnight courier service, by facsimile with receipt confirmed (followed by delivery of an original via overnight courier service) or by registered or certified mail (postage prepaid, return receipt requested) to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this <u>Section 9.6</u> ):

If to HP, to:

>
> HP Inc.
> 1501 Page Mill Road
> Palo Alto, California 94304
> Attention: General Counsel
> Facsimile: (650) 857-8728

with a copy to:

>
> Wachtell, Lipton, Rosen & Katz
> 51 West 52nd Street
> New York, New York 10019
> Attention: Andrew R. Brownstein
>          Benjamin M. Roth
> Facsimile: (212) 403-2000

If to Enterprise, to:

>
> Hewlett-Packard Enterprise Company
> 3000 Hanover Street
> Palo Alto, California 94304

71

Attention: General Counsel
Facsimile: (650) 857-2012

with a copy to:

Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, New York 10019
Attention: Andrew R. Brownstein
          Benjamin M. Roth
Facsimile: (212) 403-2000

Section 9.7 <u>Termination</u> . Notwithstanding any provision to the contrary, this Agreement may be terminated and the Distribution abandoned at any time prior to the Effective Time by and in the sole discretion of HP without the prior approval of any Person, including Enterprise. After the Effective Time, this Agreement may not be terminated except by an agreement in writing signed by each of the parties. In the event of such termination, this Agreement shall become void and no party, or any of its officers and directors, shall have any liability to any Person by reason of this Agreement.

Section 9.8 <u>Severability</u> . If any provision of this Agreement or any other Transaction Document or the application thereof to any Person or circumstance is determined by a court of competent jurisdiction to be invalid, void or unenforceable, the remaining provisions hereof or thereof, or the application of such provision to Persons or circumstances or in jurisdictions other than those as to which it has been held invalid or unenforceable, shall remain in full force and effect and shall in no way be affected, impaired or invalidated thereby. Upon such determination, the parties shall negotiate in good faith in an effort to agree upon such a suitable and equitable provision to effect the original intent of the parties.

Section 9.9 <u>Entire Agreement</u> . This Agreement, the other Transaction Documents and the schedules and exhibits hereto and thereto constitutes the entire agreement of the parties with respect to the subject matter of this Agreement and supersedes all prior agreements and undertakings, both written and oral, between or on behalf of the parties with respect to the subject matter of this Agreement.

Section 9.10 <u>Assignment; No Third-Party Beneficiaries</u> . This Agreement shall not be assigned by any party without the prior written consent of the other party, except that a party may assign any or all of its rights and obligations under this Agreement in connection with a sale or disposition of any assets or entities or lines of business of such party or in connection with a merger transaction in which such party is not the surviving entity; <u>provided</u> , <u>however</u> , that in each case, no such assignment shall release such party from any liability or obligation under this Agreement. The provisions of this Agreement and the obligations and rights under this Agreement shall be binding upon, inure to the benefit of and be enforceable by (and against) the parties and their respective successors and permitted transferees and assigns. Except as provided in <u>Article VI</u> with respect to Indemnified Parties, this Agreement is for the sole benefit of the parties to this Agreement and members of their respective Groups and their permitted successors and assigns, and nothing in this Agreement, express or implied, is intended to or shall confer

72

upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

Section 9.11 Public Announcements . From and after the Effective Time, HP and Enterprise shall consult with each other before issuing, and give each other the opportunity to review and comment upon, any press release or other public statement that relates to the transactions contemplated by this Agreement and the other Transaction Documents, and shall not issue any such press release or make any such public statement prior to such consultation, except as may be required by applicable Law, court process or by obligations pursuant to any listing agreement with any national securities exchange or national securities quotation system. The parties agree that the initial press releases to be issued with respect to the completion of the Distribution shall be substantially in the forms of Schedule 9.11 .

Section 9.12 Specific Performance . Subject to Article VIII , in the event of any actual or threatened default in, or breach of, any of the terms, conditions and provisions of this Agreement or any other Transaction Document (except as otherwise provided therein), the party or parties who are, or are to be, thereby aggrieved shall have the right to specific performance and injunctive or other equitable relief (on an interim or permanent basis) of their rights under this Agreement or such other Transaction Document, in addition to any and all other rights and remedies at law or in equity, and all such rights and remedies shall be cumulative. The parties agree that the remedies at law for any breach or threatened breach, including monetary damages, may be inadequate compensation for any loss and that any defense in any action for specific performance that a remedy at law would be adequate is waived. Any requirements for the securing or posting of any bond with such remedy are waived by each of the parties.

Section 9.13 Amendment . No provision of this Agreement or any other Transaction Document (except as otherwise provided therein) may be amended or modified except by a written instrument signed by each of the parties hereto or thereto, as applicable.

Section 9.14 Rules of Construction . Interpretation of this Agreement shall be governed by the following rules of construction: (a) words in the singular shall be held to include the plural and vice versa, and words of one gender shall be held to include the other gender as the context requires; (b) references to the terms "Article," "Section," "paragraph," "clause," "Exhibit" and "Schedule" are references to the Articles, Sections, paragraphs, clauses, Exhibits and Schedules of this Agreement unless otherwise specified; (c) the terms "hereof," "herein," "hereby," "hereto," and derivative or similar words refer to this entire Agreement, including the Schedules and Exhibits hereto; (d) references to "$" shall mean U.S. dollars; (e) the word "including" and words of similar import when used in this Agreement shall mean "including without limitation," unless otherwise specified; (f) the word "or" shall not be exclusive; (g) references to "written" or "in writing" include in electronic form; (h) unless the context requires otherwise, references to "party" shall mean HP or Enterprise, as appropriate, and references to "parties" shall mean HP and Enterprise; (i) provisions shall apply, when appropriate, to successive events and transactions; (j) the table of contents and headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement; (k) HP and Enterprise have each participated in the negotiation and drafting of this Agreement and if an ambiguity or question of interpretation should arise, this Agreement shall be construed as if drafted jointly by the parties and no

73

presumption or burden of proof shall arise favoring or burdening either party by virtue of the authorship of any of the provisions in this Agreement or any interim drafts of this Agreement; and (l) a reference to any Person includes such Person's successors and permitted assigns.

Section 9.15 Counterparts . This Agreement may be executed in one (1) or more counterparts, and by each party in separate counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement.

Section 9.16 Performance . HP will cause to be performed, and hereby guarantees the performance of, all actions, agreements and obligations set forth in this Agreement or in any other Transaction Document to be performed by any member of the HPI Group. Enterprise will cause to be performed, and hereby guarantees the performance of, all actions, agreements and obligations set forth in this Agreement or in any other Transaction Document to be performed by any member of the Enterprise Group. Each party (including its permitted successors and assigns) further agrees that it will (a) give timely notice of the terms, conditions and continuing obligations contained in this Section 9.16 to all of the other members of its Group, and (b) cause all of the other members of its Group not to take any action inconsistent with such party's obligations under this Agreement, any other Transaction Document or the transactions contemplated hereby or thereby.

[ *The remainder of this page is intentionally left blank* .]

74

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed on the date first written above by their respective duly authorized officers.

HEWLETT-PACKARD COMPANY

By: /s/ Catherine A. Lesjak
    Name: Catherine A. Lesjak
    Title: Attorney-in-Fact

HEWLETT PACKARD ENTERPRISE COMPANY

By: /s/ Rishi Varma
    Name: Rishi Varma
    Title: Secretary

HEWLETT-PACKARD BERMUDA ENTERPRISES LP

By: /s/ Sergio Letelier
    Name: Sertio Letelier
    Title: Vice President

PHOENIX HOLDING LP

By: /s/ Catherine A. Lesjak
    Name: Catherine A. Lesjak
    Title: Attorney-in-Fact

HEWLETT-PACKARD MUNICH B.V.

By: /s/ Catherine A. Lesjak
    Name: Catherine A. Lesjak
    Title: Attorney-in-Fact

*[Signature Page to Separation and Distribution Agreement]*

GATRIAM HOLDING B.V.

By: /s/ Sergio Letelier
       Name: Sertio Letelier
       Title: Vice President

*[Signature Page to Separation and Distribution Agreement]*

*EXECUTION VERSION*

**TRANSITION SERVICES AGREEMENT**

This TRANSITION SERVICES AGREEMENT, dated as of November 1, 2015 and effective as of the Distribution Date (this " Agreement "), is by and between Hewlett-Packard Company, a Delaware corporation (" HP " or " HPI "), and Hewlett Packard Enterprise Company, a Delaware corporation (" Enterprise " or " HPE "). HP and Enterprise are sometimes collectively referred to as the " Parties " and each is individually referred to as a " Party ." Unless otherwise defined in this Agreement, all capitalized terms used in this Agreement shall have the meaning set forth in the Separation and Distribution Agreement, dated as of the date hereof, by and between the Parties and other parties named therein (as amended, modified or supplemented from time to time in accordance with its terms, the " Separation Agreement ").

**RECITALS**

WHEREAS, the Board of Directors of HP has determined that it is in the best interests of HP and its shareholders to separate the Enterprise Business from the HPI Business and to create a new publicly traded company to operate the Enterprise Business;

WHEREAS, HP and Enterprise have entered into the Separation Agreement;

WHEREAS, in order to facilitate and provide for an orderly transition under the Separation Agreement, the Parties desire to enter into this Agreement to set forth the terms and conditions pursuant to which each of the Parties shall provide to the other certain Services (as defined herein); and

WHEREAS, the Separation Agreement requires execution and delivery of this Agreement by HP and Enterprise on or prior to the Distribution Date.

NOW, THEREFORE, in consideration of the foregoing and the mutual agreements contained in this Agreement, the Parties, intending to be legally bound, hereby agree as follows:

**ARTICLE I**
**DEFINITIONS**

The following capitalized terms used in this Agreement shall have the meanings set forth below:

" Additional Services " shall have the meaning set forth in Section 2.3(a) .

" Affiliates " shall have the meaning set forth in the Separation Agreement.

" Agreement " shall have the meaning set forth in the Preamble.

" Arbitration Act " shall have the meaning set forth in Section 8.1 .

" Arbitration Demand Notice " shall have the meaning set forth in Section 8.4(a) .

" CPR " shall have the meaning set forth in Section 8.3 .

" CPR Arbitration Rules " shall have the meaning set forth in Section 8.4(b) .

" Data Processing Agreement " shall have the meaning set forth in Section 3.4 .

" Designated System " shall have the meaning set forth in Section 3.5(e) .

" Dispute " shall have the meaning set forth in Section 8.1 .

" Dispute Notice " shall have the meaning set forth in Section 8.2 .

" Distribution Date " shall have the meaning set forth in the Separation Agreement.

" Effective Time " shall have the meaning set forth in the Separation Agreement.

" Enterprise " shall have the meaning set forth in the Preamble.

" Enterprise Business " shall have the meaning set forth in the Separation Agreement.

" Enterprise Confidential Information " shall have the meaning set forth in the Separation Agreement.

" Enterprise Group " shall have the meaning set forth in the Separation Agreement.

" Enterprise Indemnified Parties " shall have the meaning set forth in the Separation Agreement.

" Enterprise Services " shall have the meaning set forth in Section 2.1 .

" Enterprise TSA Manager " shall have the meaning set forth in Section 2.6(a) .

" Exit Costs " shall have the meaning set forth in Section 4.1(b) .

" Force Majeure " shall mean, with respect to a Party, an event beyond the control of such Party (or any Person acting on its behalf), which by its nature could not reasonably have been foreseen by such Party (or such Person), or, if it could have reasonably been foreseen, was unavoidable, and includes acts of God, storms, floods, riots, fires, sabotage, civil commotion or civil unrest, interference by civil or military authorities, acts of war (declared or undeclared) or armed hostilities or other national or international calamity or one (1) or more acts of terrorism or failure of energy sources or distribution facilities.

" Governmental Authority " shall have the meaning set forth in the Separation Agreement.

" Group " shall have the meaning set forth in the Separation Agreement.

" HP " shall have the meaning set forth in the Preamble.

" HPE " shall have the meaning set forth in the Preamble.

" HPI " shall have the meaning set forth in the Preamble.

2

" <u>HPI Business</u> " shall have the meaning set forth in the Separation Agreement.

" <u>HPI Confidential Information</u> " shall have the meaning set forth in the Separation Agreement.

" <u>HPI Group</u> " shall have the meaning set forth in the Separation Agreement.

" <u>HPI Indemnified Parties</u> " shall have the meaning set forth in the Separation Agreement.

" <u>HPI Services</u> " shall have the meaning set forth in <u>Section 2.1</u> .

" <u>HPI TSA Manager</u> " shall have the meaning set forth in <u>Section 2.6(a)</u> .

" <u>Indemnified Parties</u> " shall mean the Enterprise Indemnified Parties and the HPI Indemnified Parties.

" <u>Information</u> " shall have the meaning set forth in the Separation Agreement.

" <u>Intellectual Property</u> " shall have the meaning set forth in the Separation Agreement.

" <u>Joint Developments</u> " shall have the meaning set forth in <u>Section 3.6(a)</u> .

" <u>Law</u> " shall have the meaning set forth in the Separation Agreement.

" <u>Liabilities</u> " has the meaning set forth in the Separation Agreement.

" <u>Losses</u> " shall have the meaning set forth in <u>Section 6.4(a)</u> .

" <u>Markup</u> " shall have the meaning set forth in <u>Section 4.1(a)</u> .

" <u>Mediation Request</u> " shall have the meaning set forth in <u>Section 8.3</u> .

" <u>New Services</u> " shall have the meaning set forth in <u>Section 2.4</u> .

" <u>Non-Registering Party</u> " shall have the meaning set forth in <u>Section 3.6(c)</u> .

" <u>Party</u> " and " <u>Parties</u> " shall have the respective meanings set forth in the Preamble.

" <u>Person</u> " shall have the meaning set forth in the Separation Agreement.

" <u>Procedure</u> " shall have the meaning set forth in <u>Section 8.3</u> .

" <u>Provider</u> " shall mean the Party or its Subsidiary providing a Service under this Agreement.

" <u>Recipient</u> " shall mean the Party or its Subsidiary to whom a Service is provided under this Agreement.

" <u>Registering Party</u> " shall have the meaning set forth in <u>Section 3.6(c)</u> .

3

" Representatives " shall have the meaning set forth in the Separation Agreement.

" Separation Agreement " shall have the meaning set forth in the Preamble.

" Service Charge " shall have the meaning set forth in Section 4.1(a) .

" Service Adjustments " shall have the meaning set forth in Section 2.3(b) .

" Service Extension " shall have the meaning set forth in Section 7.1(c) .

" Service Increases " shall have the meaning set forth in Section 2.3(b) .

" Services " shall have the meaning set forth in Section 2.1 .

" Service Schedule " means a Schedule to this Agreement that is included in Schedule A or Schedule B hereto and that sets forth terms of a specific Service to be provided hereunder.

" Stranded Costs " shall have the meaning set forth in Section 4.1(b) .

" Subsidiaries " shall have the meaning set forth in the Separation Agreement.

" Tax " shall have the meaning set forth in the Separation Agreement.

" Termination Charges " shall have the meaning set forth in Section 7.1(b)(iii) .

" Transaction Documents " shall have the meaning set forth in the Separation Agreement.

" TSA-Licensed Software " shall have the meaning set forth in Section 3.5(a) .

" TSA Managers " means the Enterprise TSA Manager and the HPI TSA Manager.

" TSA Owner " shall have the meaning set forth in Section 2.6(c) .

" Transaction Taxes " shall have the meaning set forth in Section 4.2(a) .

" VAT " shall have the meaning set forth in Section 4.2(a) .

" Workstream Representative " shall have the meaning set forth in Section 2.6(b) .

## ARTICLE II
### SERVICES, DURATION AND CONTRACT MANAGEMENT

Section 2.1 **Services** . Subject to the terms and conditions of this Agreement, (a) HP shall provide or cause to be provided to Enterprise and Enterprise's Subsidiaries, as applicable, the services listed on Schedule A to this Agreement, which will be provided pursuant to the Service Schedules incorporated therein (collectively, the " HPI Services ") and (b) Enterprise shall provide or cause to be provided to HP and HP's Subsidiaries, as applicable, the services listed on Schedule B to this Agreement, which will be provided pursuant to the Service Schedules

4

incorporated therein (collectively, the " Enterprise Services ," and, collectively with the HPI Services, any Additional Services, any Service Adjustments and any New Services, the " Services "). All Services shall be for the sole use and benefit of the respective Recipient and its respective Affiliates.

Section 2.2 **Duration of Services** . Subject to the terms of this Agreement, each of HP and Enterprise shall provide or cause to be provided to the respective Recipients or their Affiliates, as applicable, each Service from the start date specified in the applicable Service Schedule until the earliest to occur of, with respect to each such Service, (a) the expiration of the term for such Service (or, subject to the terms of Section 7.1(c) , the expiration of any Service Extension) as set forth on the applicable Service Schedule; (b) the date on which such Service is terminated under Section 7.1(b) ; or (c) the expiration or termination of this Agreement.

Section 2.3 **Additional Services and Service Adjustments** .

(a) If, within ninety (90) days after the Distribution Date, either Party (i) identifies a service that (x) the HPI Group provided to the Enterprise Group prior to the Distribution Date that Enterprise reasonably needs in order for the Enterprise Business to continue to operate in substantially the same manner in which the Enterprise Business operated prior to the Distribution Date, and such service was not included on Schedule A (other than because the Parties agreed in writing that such service shall not be provided), or (y) the Enterprise Group provided to the HPI Group prior to the Distribution Date that HP reasonably needs in order for the HPI Business to continue to operate in substantially the same manner in which the HPI Business operated prior to the Distribution Date, and such service was not included on Schedule B (other than because the Parties agreed in writing that such service shall not be provided), and (ii) provides a written change request (in the form agreed by the Parties) to the other Party requesting such additional services within ninety (90) days after the Distribution Date, then such other Party shall negotiate in good faith to provide such requested additional services (such requested additional services, the " Additional Services "); provided , however , that neither Party shall be obligated to provide any Additional Service (x) if it does not, in its reasonable judgment, have adequate resources to provide such Additional Service, (y) if the provision of such Additional Service would significantly disrupt the operation of its businesses or (z) if the Parties are unable to reach agreement on the terms thereof (including with respect to Service Charges therefor). If the Parties agree to any such Additional Service, then the Parties shall document such terms in a Service Schedule to be incorporated in Schedule A or Schedule B , as applicable. The Service Schedule shall describe in reasonable detail the nature, scope, service period(s), and other terms applicable to such Additional Services. Each such Service Schedule, as agreed to in writing by the Parties, shall be deemed part of this Agreement as of the date of such agreement and the Additional Services set forth therein shall be deemed "Services" provided under this Agreement, in each case subject to the terms and conditions of this Agreement.

(b) After the Distribution Date, if a Provider or Recipient desires to adjust any Services or change the manner in which Services are provided (such adjustments and changes, " Service Adjustments "), then such Provider or Recipient, as applicable, will provide a written change request (in the form agreed by the Parties) to the other Party, and the Parties shall negotiate in good faith to make such Service Adjustments, provided that, if a Service Adjustment

5

requested by a Recipient (i) is an increase, relative to historical levels prior to the Distribution Date, to the volume, amount, level or frequency, as applicable, of any Service provided by a Provider, or is an increase to the volumes specified in the applicable Service Schedule, and (ii) such increase is reasonably determined by the Recipient as necessary for the Recipient to operate its businesses (such increases, " Service Increases "), then such Provider shall negotiate in good faith to provide such Service Increase; provided , however , that the Provider shall not be obligated to provide any Service Increase if the Provider and Recipient are unable to reach agreement on the terms thereof (including with respect to Service Charges therefor); provided , further , that notwithstanding the foregoing, if such higher volume or quantity results from fluctuations occurring in the ordinary course of business of the Recipient, the Provider shall use commercially reasonable efforts to provide such requested higher volume or quantity. If the Parties agree to any Service Adjustment, then the Parties shall document such terms in an amendment to the applicable Service Schedule. Each amended Service Schedule, as agreed to in writing by the Parties, shall be deemed part of this Agreement as of the date of such agreement and the Service Adjustments set forth therein shall be deemed "Services" provided under this Agreement, in each case subject to the terms and conditions of this Agreement.

Section 2.4 **New Services** . If, within ninety (90) days after the Distribution Date, a Party desires the other Party to provide additional or different services which such other Party is not expressly obligated to provide under this Agreement (excluding, for the avoidance of doubt, any Additional Services or Service Adjustments, the " New Services "), then such Party will provide a written change request (in the form agreed by the Parties) to the other Party within ninety (90) days after the Distribution Date. The Party receiving such request shall negotiate in good faith to provide such New Service; provided , however , that no Party shall be obligated to provide any New Services, including because the Parties are unable to reach agreement on the terms thereof (including with respect to Service Charges therefor). If the Parties agree to any such New Service, then the Parties shall document such terms in a Service Schedule to be incorporated in Schedule A or Schedule B , as applicable. The Service Schedule shall describe in reasonable detail the nature, scope, service period(s), termination provisions and other terms applicable to such New Services. Each supplement to the applicable Service Schedule, as agreed to in writing by the Parties, shall be deemed part of this Agreement as of the date of such agreement and the New Services set forth therein shall be deemed "Services" provided under this Agreement, in each case subject to the terms and conditions of this Agreement. The Parties shall in good faith determine any costs and expenses, including any start-up costs and expenses, which would be incurred by the Provider in connection with the provision of such New Service, which costs and expenses shall be borne solely by the Recipient.

Section 2.5 **Services Not Included** . No Services provided under this Agreement shall be construed as accounting, legal or tax advice or shall create any fiduciary obligations on the part of any Provider or any of its Affiliates to any Person, including to the Recipient or any of its Affiliates, and the Recipient shall not rely on, or construe, any Services rendered by or on behalf of the Provider as such professional advice.

Section 2.6 **Contract Management** .

(a) TSA Managers. HP and Enterprise will each designate the respective individual set forth in Schedule C to act as its initial services manager (the " HPI TSA Manager "

6

and " Enterprise TSA Manager ," respectively). The TSA Managers will be directly responsible for coordinating and managing the delivery of the Services provided by the applicable Party and have authority to act on such Party's behalf with respect to matters relating to the provision of Services under this Agreement. The TSA Managers will work with the personnel of their respective Group, including the Workstream Representatives, to periodically address issues and matters raised by such personnel relating to the provision of the Services. Notwithstanding the requirements of Section 9.4 , communications between the Parties regarding routine matters under this Agreement shall be made through the Parties' TSA Managers. Each Party shall notify the other of the appointment of a different TSA Manager in accordance with Section 9.4 .

(b) Workstream Representatives. Each Party will designate a representative for each workstream within which Services are provided to such Party (e.g., finance, go to market, human resources, information technology, marketing, supply chain, support and services, tax) (each, a " Workstream Representative "). The Workstream Representatives will work with their respective TSA Owners to address issues relating to the Services, and will keep the TSA Managers informed of such issues.

(c) TSA Owners. Each Service Schedule sets forth an HP and Enterprise representative (each, a " TSA Owner ") who will be responsible for the coordination of the Services provided under the applicable Service Schedule. The TSA Owners will keep their respective Workstream Representatives reasonably informed of any issues that arise with respect to the Services provided under their applicable Service Schedule. Each Party shall notify the other of the appointment of a different TSA Owner in accordance with Section 9.4 .

Section 2.7 **Personnel** .

(a) The Provider of any Service will make available to the Recipient of such Service such personnel as Provider determines may be necessary to provide such Service. Except as otherwise set forth in a Service Schedule, the Provider will have the right, in its sole discretion, to (i) designate which personnel it will assign to perform such Service and (ii) remove and replace such personnel at any time; provided , further , that the Provider will use its commercially reasonable efforts to limit the disruption to the Recipient in the transition of the Services to different personnel.

(b) In the event that the provision of any Service by the Provider requires the cooperation and services of the personnel of the Recipient, the Recipient will make available to the Provider such personnel (who shall be appropriately qualified for purposes of so supporting the provision of such Service by the Provider) as may be necessary for the Provider to provide such Service. The Recipient will have the right, in its sole discretion, to (i) designate which personnel it will make available to the Provider in connection with the provision of such Service and (ii) remove and replace such personnel at any time; provided , however , that the Recipient will use its commercially reasonable efforts to limit the disruption to the Provider in the transition of such personnel.

(c) All employees and representatives of any Provider who provide Services under this Agreement shall be deemed for purposes of all compensation and employee benefits matters to be employees or representatives of such Provider and not employees or representatives

7

of the Recipient or any of its Affiliates. In performing the Services, such employees and representatives shall be under the direction, control and supervision of the Provider (and not the Recipient) and Provider shall have the sole right to exercise all authority with respect to the employment (including termination of employment), assignment and compensation of such employees and representatives.

(d) A Provider may hire or engage one or more subcontractors to perform any or all of its obligations under this Agreement; provided , however , that (i) such Provider shall use the same degree of care in selecting any such subcontractor as it would if such contractor was being retained to provide similar services to the Provider, and (ii) such Provider shall in all cases remain primarily responsible for all of its obligations under this Agreement with respect to the scope of the Services, the standard for services as set forth herein and the content of the Services provided to the Recipient.

(e) Nothing in this Agreement shall grant the Provider, or its employees, agents and third-party providers that are performing the Services, the right directly or indirectly to control or direct the operations of the Recipient or any member of its Group. Such employees, agents and third-party providers shall not be required to report to the management of the Recipient nor be deemed to be under the management or direction of the Recipient. The Recipient acknowledges and agrees that, except as may be expressly set forth herein as a Service (including any Additional Services, Service Adjustments or New Services) or otherwise expressly set forth in the Separation Agreement, another Transaction Document or any other applicable agreement, no Provider or any member of its Group shall be obligated to provide, or cause to be provided, any service or goods to any Recipient or any member of its Group.

Section 2.8 **Non-Exclusivity** . Nothing in this Agreement shall preclude any Recipient from obtaining, in whole or in part, services of any nature that may be obtainable from the Provider, from its own employees or from providers other than the Provider.

## ARTICLE III
## ADDITIONAL ARRANGEMENTS

Section 3.1 **Computer-Based and Other Resources** . Each Party and its Subsidiaries shall cause all of their personnel having access to the computer software, networks, hardware, technology or computer-based resources of the other Party and its Subsidiaries in connection with the performance, receipt or delivery of a Service, to comply with all security guidelines (including physical security, network access, internet security, confidentiality and personal data security guidelines) of such other Party and its Affiliates of which written notice is provided by such other Party. Each Party shall ensure that the access contemplated by this Section 3.1 shall be used by its personnel only for the purposes contemplated by, and subject to the terms of, this Agreement. Except as expressly provided in the Separation Agreement, any other Transaction Document or any other applicable agreement or as required in connection with the performance, receipt or delivery of a Service, each of the Parties and its Affiliates shall cease using (and shall cause their employees to cease using) the services made available by the other Party and its Affiliates prior to the Distribution Date.

Section 3.2 **Access Rights** .

8

(a) Enterprise shall, and shall cause its Subsidiaries to, allow HP and its Subsidiaries and their respective Representatives reasonable access to the facilities of Enterprise and its Subsidiaries necessary for HP to fulfill its obligations under this Agreement.

(b) HP shall, and shall cause its Subsidiaries to, allow Enterprise and its Subsidiaries and their respective Representatives reasonable access to the facilities of HP and its Subsidiaries necessary for Enterprise to fulfill its obligations under this Agreement.

(c) Notwithstanding the other rights of access of the Parties under this Agreement, each Party shall, and shall cause its Subsidiaries to, afford, following not less than five (5) business days' prior written notice from the other Party and during normal business hours, (i) the other Party, its Subsidiaries and Representatives escorted access to the facilities and personnel of the relevant Providers and (ii) a third party designated by the other Party and approved by the relevant Provider (such approval not to be unreasonably withheld), reasonable access to the information, systems and infrastructure of the Provider, in each case as reasonably necessary for the other Party to verify the Provider's compliance with its obligations hereunder and the adequacy of internal controls over information technology, reporting of financial data and related processes employed in connection with the Services, including in connection with verifying compliance with Section 404 of the Sarbanes-Oxley Act of 2002; provided , however , (A) such access shall not unreasonably interfere with any of the business or operations of such Provider, (B) if a Party determines that providing such access could violate any applicable Law or agreement or waive any attorney-client privilege, then the Parties shall use commercially reasonable efforts to permit such access in a manner that avoids each of such harm and consequence, (C) if a Party determines that providing such access requires a third-party consent, such access shall be subject to the receipt of such third-party consent, and (D) any third party that is provided access pursuant to this Section will be required to execute a non-disclosure agreement that restricts such third party from disclosing confidential information of the audited Provider to the Party that engaged such third party, except to the extent required to report on the extent to which the audited Provider is not in compliance with its obligations or its controls are not adequate.

(d) Except as otherwise permitted by the other Party in writing, each Party shall permit only its authorized Representatives, contractors, invitees or licensees to access the other Party's facilities.

Section 3.3 **Cooperation** . It is understood that it will require the significant efforts of both Parties to implement this Agreement and to ensure performance of this Agreement by the Parties at the agreed-upon levels in accordance with all of the terms and conditions of this Agreement. The Parties will cooperate, acting in good faith and using commercially reasonable efforts, to effect a smooth and orderly transition of the Services provided under this Agreement from the Provider to the Recipient (including, as applicable, the assignment or transfer of the rights and obligations under any third-party contracts relating to the Services); provided , however , that this Section 3.3 shall not require either Party to incur any out-of-pocket costs or expenses unless and except as expressly provided in a Service Schedule or elsewhere in this Agreement or otherwise agreed to in writing by the Parties.

9

Section 3.4 **Data Protection** . Concurrently with the execution and delivery hereof, the Parties will execute and deliver the Data Processing Agreement attached as Schedule D (the " Data Processing Agreement ").

Section 3.5 **Software License Terms** .

(a) Software that is made available by a Provider to Recipient in connection with any Service (any such Software being referred to herein as " TSA-Licensed Software ") provided hereunder will be subject to the terms set forth in this Section 3.5 except as otherwise provided in the applicable Service Schedule. The Provider hereby grants to the Recipient a non-exclusive, non-transferable license to use, in object code form, any TSA-Licensed Software that is made available by the Provider pursuant to a Service Schedule. For the avoidance of doubt, the Provider that makes available any TSA-Licensed Software in connection with the provision of any Service retains the unrestricted right to enhance or otherwise modify such TSA-Licensed Software at any time, provided that such enhancements or other modifications do not disrupt the provision of such Service to the Recipient.

(b) The Recipient may not exceed the number of licenses, agents, tiers, nodes, seats, or other use restrictions or authorizations, if any, specified in the applicable Service Schedule. Some TSA-Licensed Software may require license keys or contain other technical protection measures. The Recipient acknowledges that the Provider may monitor the Recipient's compliance with use restrictions and authorizations remotely, or otherwise. If the Provider makes a license management program available which records and reports license usage information, the Recipient agrees to appropriately install, configure and execute such license management program.

(c) Unless otherwise permitted by the Provider, the Recipient may only make copies or adaptations of the TSA-Licensed Software for archival purposes or when copying or adaptation is an essential step in the authorized use of TSA-Licensed Software. If the Recipient makes a copy for backup purposes and installs such copy on a backup device, the Recipient may not operate such backup installation of the TSA-Licensed Software without paying an additional license fee, except in cases where the original device becomes inoperable. If a copy is activated on a backup device in response to failure of the original device, the use on the backup device must be discontinued when the original or replacement device becomes operable. The Recipient may not copy the TSA-Licensed Software onto or otherwise use or make it available on, to, or through any public or external distributed network. Licenses that allow use over the Recipient's intranet require restricted access by authorized users only.

(d) The Recipient must reproduce all copyright notices that appear in or on the TSA-Licensed Software (including documentation) on all permitted copies or adaptations. Copies of documentation are limited to internal use.

(e) Notwithstanding anything to the contrary herein, certain TSA-Licensed Software may be licensed under the applicable Service Schedule for use only on a computer system owned, controlled, or operated by or solely on behalf of the Recipient and may be further identified by the Provider by the combination of a unique number and a specific system type (" Designated System ") and such license will terminate in the event of a change in either the system number or system type, an unauthorized relocation, or if the Designated System ceases to be within the possession or control of the Recipient.

10

(f) The Recipient will not modify, reverse engineer, disassemble, decrypt, decompile, or make derivative works of the TSA-Licensed Software. Where the Recipient has other rights mandated under statute, the Recipient will provide the Provider with reasonably detailed information regarding any intended modifications, reverse engineering, disassembly, decryption, or decompilation and the purposes therefor.

(g) The Recipient may permit a consultant or subcontractor to use TSA-Licensed Software at the licensed location for the sole purpose of providing services to the Recipient.

(h) Upon expiration or termination of the Service Schedule under which TSA-Licensed Software is made available, the Recipient will destroy the TSA-Licensed Software. The Recipient will remove and destroy or return to the Provider any copies of the TSA-Licensed Software that are merged into adaptations, except for individual pieces of data in the Recipient's database. The Recipient will provide certification of the destruction of TSA-Licensed Software, and copies thereof, to the Provider. The Recipient may retain one copy of the TSA-Licensed Software subsequent to expiration or termination solely for archival purposes.

(i) The Recipient may not sublicense, assign, transfer, rent, or lease the TSA-Licensed Software to any other person except as permitted in this Section 3.5 .

(j) The Recipient agrees that the Provider may engage a third party designated by the Provider and approved by the Recipient (such approval not to be unreasonably withheld) to audit the Recipient's compliance with the Software License terms. Any such audit will be at the Provider's expense, require reasonable notice, and will be performed during normal business hours. Such third party will be required to execute a non-disclosure agreement that restricts such third party from disclosing confidential information of the Recipient to the Provider, except to the extent required to report on the extent to which the Recipient is not in compliance with the Software License terms.

Section 3.6 **Joint Developments** .

(a) Certain Service Schedules contemplate that the Parties or their respective Affiliates will engage in specified joint development activities with respect to software, technology or other subject matter (" Joint Developments "). Unless otherwise provided in an applicable Service Schedule, Joint Developments shall be governed by this Section 3.6 . Any trade secrets or other confidential information embodied in or comprising any Joint Development shall be deemed to be HPI Confidential Information and Enterprise Confidential Information.

(b) Joint Developments, and all Intellectual Property therein and thereto, shall be jointly owned by the Parties or their applicable Affiliates. Each Party and its Affiliates will have the right to (i) use and exploit the Joint Developments, (ii) license the Joint Developments to third parties on a non-exclusive basis, and (iii) transfer its joint ownership interest in any or all Joint Developments to any third party, in each case (x) without restriction, (y) without the consent of the other Party, and (z) without the obligation to account to the other Party for profits derived therefrom.

11

(c) Should either Party or an Affiliate thereof desire at any time to register a copyright covering any Joint Development or seek patent protection for any invention included in the Joint Developments in any jurisdiction, such Party (the " Registering Party ") shall notify the other Party (the " Non-Registering Party ") in writing of its intent and the reasons therefor. The Non-Registering Party promptly shall communicate in writing any objections it may have with respect thereto. In the absence of any written objections within thirty (30) days after the date of such notice, the Registering Party shall be free to proceed with the desired registration in the name of both Parties. In the event of any such objections by the Non-Registering Party, the Parties shall discuss and negotiate reasonably and in good faith to resolve the objections based on each Party's business objectives with respect to the relevant item of Joint Developments. The Registering Party will consult with the Non-Registering Party with respect to any material developments in prosecuting any patent application or other application filed by the Registering Party pursuant to this Section 3.6(c) with respect to Intellectual Property covering a Joint Development and consider in good faith any comments or feedback received from the Non-Registering Party. The Parties shall share equally any actual and reasonable out-of-pocket expenses (excluding the value of the time of either Party's employees) incurred in connection with any such registration. The Registering Party promptly shall provide the Non-Registering Party with copies of each application and issued registration or issued patent under this Section 3.6(c) .

(d) If either Party or any Affiliate thereof become aware of any actual infringement or misappropriation of Joint Developments by a third party, such Party shall communicate within a reasonable time the details to the other Party and the Parties will meet and confer regarding any enforcement action with respect to such Joint Developments. If the Parties decide jointly to bring an action for infringement or misappropriation of such Joint Developments, the Parties shall equally share all actual and reasonable expenses associated therewith (except for the value of the time of each party's employees in connection with the action; each Party shall alone bear its employee expenses) and any resulting damages or compensation, including any amounts paid in settlement. If the Parties decide not to jointly bring such an action, either Party or any of its Affiliates may, at its own expense (including, as the Parties shall agree on a case by case basis, compensation, if any, of the other party for the value of time of the other party's employees as reasonably required in connection with the action), enforce any Intellectual Property covering the relevant Joint Development against any third party infringer without the consent of the other Party, subject to the following: (i) neither Party shall have any obligation to be joined as a party plaintiff in such action without its prior written consent, which may be granted or withheld in its sole discretion, regardless of whether such joinder is required in order to confer jurisdiction in the jurisdiction in which the action is to be brought, (ii) if either Party brings any such action on its own, including cases in which the other party consents to be named as party plaintiff, the Party bringing the action agrees to defend, indemnify and hold harmless the other Party for all losses, costs, liabilities and expenses arising out of or related to the bringing of such action, and (iii) the Party bringing such action shall not take any action, or make any admissions, that may affect the validity of any registration for the jointly-owned Intellectual Property being asserted in such action or the confidentiality of any jointly-owned trade secrets in any Joint Developments without the prior written consent of the

12

other Party. If the enforcing Party or its Affiliate recovers any damages or compensation for any action the enforcing Party or such Affiliate, including any settlement, the enforcing party or the subsidiaries of the enforcing Party shall retain one hundred percent (100%) of such damages. If the Parties cooperate in any such enforcement action, then any recovery of damages or compensation shall be allocated pursuant to mutual agreement.

Section 3.7 **Cybersecurity Services Standards and Policies** . Each of the Parties agrees that, during the term of this Agreement, it and its Affiliates will adhere to the HP Information Security Standards and HP Information Security Policy existing as of the Effective Date and attached as Schedule E hereto, as they may hereafter be amended from time to time by written agreement of the Parties.

Section 3.8 **Shared Applications** . The Parties acknowledge that they or their respective Affiliates may be required in connection with the provision or receipt of any Service to access or use a software application and related data that is being accessed or used concurrently by the other Party or the other Party's Affiliates. The Parties agree to reasonably cooperate to ensure that such concurrent use or access of such applications and related data does not result in the disruption of either Party's or its Affiliates business activities.

Section 3.9 **Cooperation Regarding Routine Requests for Information and Certain Services** .

(a) The Parties acknowledge and agree that the Parties and their Affiliates will require in the conduct of their respective businesses documents or information in the possession of the other Party or the other Party's Affiliates from time to time during the term of this Agreement. Without limiting any Party's obligations under any other provision of this Agreement with respect to cooperation and the provision of information or access to books and records, each Party agrees that it and its Affiliates will reasonably cooperate with the other Party and the other Party's Affiliates with respect to routine requests for documents or information that the other Party and the other Party's Affiliates reasonably may make from time to time, including promptly responding to any telephonic requests for information that the other Party or the other Party's Affiliates may make from time to time. For the avoidance of doubt, nothing in this Section 3.9(a) requires a Party to provide any consulting or other services to the requesting Party or the requesting Party's Affiliates or to incur any expenses (other than the expense associated with its personnel responding to requests for information).

(b) Each Party agrees that, in addition to any other obligations it may have under this Agreement (including any Service Schedule) or the Separation Agreement, it and its Affiliates will use commercially reasonable efforts to make available its personnel to provide to the other Party and the other Party's Affiliates such additional routine services and support, including the provision of Information, as may be reasonably requested by the other Party or the other Party's Affiliates from time to time. Notwithstanding the foregoing, if the amount of time expended by any individual providing such services and support represents or is expected to represent more than twenty percent (20%) of such individual's work time during a calendar month, then the Parties will enter into a Service Schedule to be incorporated in Schedule A or Schedule B , as applicable, that will describe in reasonable detail the nature, scope, service period(s), payment and other terms applicable thereto. None of the services and support,

13

including the provision of Information, provided under this Section 3.9(b) shall include the licensing or assignment of any Intellectual Property except to the extent expressly provided in a Service Schedule entered into pursuant to this Section 3.9(b) .

**ARTICLE IV**
**SERVICE FEES; TAXES**

Section 4.1 **Costs and Disbursements** .

(a) Except as otherwise provided in the applicable Service Schedule, the Recipient of a Service shall pay to the Provider of such Service a fee for the Service (each fee constituting a " Service Charge "). The Service Charge will be (i) a fixed monthly fee, as set forth in the applicable Service Schedule, which is an amount equal to the Provider's estimated cost to provide such Service, plus a markup equal to a percentage of such costs that is specified in Schedule F (the " Markup "), (ii) the Provider's actual cost to provide the Services under the Service Schedule, which will be determined in accordance with the methodology specified in the applicable Service Schedule, plus the Markup, or (iii) calculated using another pricing methodology, as specified in the applicable Service Schedule. In addition, Services under certain Service Schedules will be provided to the Recipient at no charge. For Services for which the Service Charges are based on actual costs incurred by the Provider, the actual costs incurred by the Provider will be determined on a monthly basis or on such other frequency as may be provided in the applicable Service Schedule or mutually agreed by the Parties and the Provider shall provide with the applicable invoice all substantiation of actual costs that the Recipient may reasonably request.

(b) If (i) exit costs associated with the provision of Services under any Service Schedule are identified in such Service Schedule (" Exit Costs ") or (ii) stranded costs associated with the provision of Services under any Service Schedule are identified in Schedule H (" Stranded Costs "), the Exit Costs or Stranded Costs, as applicable, shall be pro-rated and paid on a monthly basis by the Recipient to the Provider over the duration of the Service Schedule. In the event of an early termination of such Service Schedule, the unamortized Exit Costs and Stranded Costs will be paid by the Recipient in accordance with Section 7.1(b)(iii) .

(c) During the term of this Agreement, the amount of a Service Charge for any Service may increase or decrease to the extent of: (i) any increases or decreases mutually agreed to by the Parties, (ii) any Service Charges applicable to any Additional Services, Service Adjustments or New Services, (iii) any increase in the applicable Service Charge during a Service Extension, in accordance with Section 7.1(c) , and (iv) any increase in the rates or charges imposed by any unaffiliated third-party provider that is providing Services. Together with any invoice for Service Charges, the Provider shall provide the Recipient with appropriate documentation to support the calculation of such Service Charges.

(d) Except as set forth in Section 4.1(a) , Section 4.1(g) or Section 7.1(b)(iii) , the Provider shall be responsible for all out-of-pocket costs and expenses incurred by the Provider or its Affiliates in connection with providing the Services (including necessary travel-related expenses) to the extent that such costs and expenses are not reflected in the Service Charge for such Services.

14

(e) Unless otherwise agreed in writing by the Parties prior to the provision of the applicable Services, the amounts payable under this Agreement (i) for Services provided in the United States will be invoiced by the Party that is the Provider of the Services and paid by the Party that is the Recipient of the Services and (ii) for Services provided outside the United States will be invoiced by the Affiliate of the Party that is the Provider of the Services and paid by the Affiliate of the Party that is the Recipient of the Services. The Provider will provide an invoice to the Recipient no later than the 15 th day of each month for the Service Charges, pro-rated Exit Costs and Stranded Costs, and Transaction Taxes payable for, and reimbursable expenses incurred during, the prior month. The Recipient shall pay the amounts stated as due in each monthly invoice by wire transfer (or such other method of payment as may be agreed between the Parties) to the Provider within thirty (30) days of the receipt of each such invoice, including appropriate documentation as described herein, as instructed by the Provider. The Recipient shall notify the Provider promptly, and in no event later than thirty (30) days following receipt of the Provider's invoice, of any disputed amounts. If the Recipient does not notify the Provider of any disputed amounts within such thirty (30)-day period, then Recipient will be deemed to have accepted the Provider's invoice. Any such Dispute shall be handled in accordance with Article VIII . The Recipient shall pay any undisputed amount in accordance with this Section 4.1(e) . All amounts due and payable hereunder shall be invoiced and paid in (A) U.S. dollars or (B) if the Parties so agree, a foreign currency agreed by the Parties. With respect to any Provider that is domiciled outside of the United States that provides Services to a Recipient that is domiciled outside the United States, if required by any applicable Law or otherwise reasonably requested by a Party or an Affiliate thereof, any such Provider and such Recipient will enter into a local country agreement providing for the performance of such Services. Section 4.2 shall apply to these invoices accordingly. The Provider shall provide supporting information and documentation as reasonably requested by the Recipient to validate any amounts payable by the Recipient pursuant to this Section 4.1 .

(f) Subject to the confidentiality provisions applicable pursuant to Section 5.4 , each Party shall, and shall cause its Subsidiaries to, provide, upon ten (10) days' prior written notice from the other Party, any information within such Party's or its Subsidiaries' possession that the requesting Party reasonably requests in connection with any Services being provided to such requesting Party by an unaffiliated third-party provider, including any applicable invoices, agreements documenting the arrangements between such third-party provider and the Provider and other supporting documentation; provided , however , that each Party shall make no more than one (1) such request during any fiscal quarter.

(g) Any costs and expenses incurred by either Party in connection with obtaining any third-party consent contemplated by Section 5.1(b) that is required to allow the Provider to perform or cause to be performed any Service shall be borne by the Recipient.

Section 4.2 **Tax Matters** .

(a) Without limiting any provisions of this Agreement, the Service Charges (and prices charged therefor) are exclusive of, and the Recipient shall be responsible for, (i) all

15

excise, sales, use, transfer, stamp, documentary, filing, recordation and other similar transaction Taxes, (ii) any value added, goods and services or similar recoverable transaction Taxes (" VAT ") and (iii) any related interest and penalties (collectively, " Transaction Taxes ") that Provider is not at fault for causing, in each case imposed or assessed as a result of the provision of Services by the Provider. To the extent that cross-border Services to be performed hereunder fall within Article 44 of the EU VAT Directive or the relevant equivalent national provision and the Provider is not required to charge VAT, the Recipient agrees that it will itself account for VAT in its own jurisdiction on the performance of such cross-border Services made to it hereunder and will provide to the Provider a valid VAT registration number, certificate (or equivalent documentation) in the jurisdiction with respect to the country or region of receipt of such cross-border Services. The Provider will issue legally compliant invoices to the Recipient usable by the Recipient to recover (by way of credit or refund) Transaction Taxes in jurisdictions where they are recoverable. In the event the Tax authorities question the Transaction Tax treatment of the Services provided, the Provider and the Recipient will work together to issue corrected invoices where applicable. The Recipient and the Provider agree to utilize commercially reasonable efforts to collaborate regarding any requests for information, audit, controls or similar requests of the Tax authorities concerning Transaction Taxes and which involve the Services provided under this Agreement. The Provider and the Recipient agree to take commercially reasonable actions to cooperate in obtaining any refund, return or rebate, or applying zero-rating for Services giving rise to any Transaction Taxes, including filing any necessary exemption or other similar forms or providing valid VAT identification numbers or other relevant registration numbers, certificates or other similar documents. The Recipient shall promptly reimburse the Provider for any costs incurred by the Provider or its Affiliates in connection with the Recipient obtaining a refund or overpayment of refund, return, rebate or the like of any Transaction Tax. For the avoidance of doubt, any applicable gross receipts-based or net income-based Taxes imposed on payments received by Provider shall be borne by the Provider unless the Provider is required by Law to collect or obtain, or allowed to separately invoice for and collect or obtain, reimbursement of such Taxes from the Recipient.

(b) If the Parties agree that the Service Charges will be invoiced and paid centrally by the Parties, then no non-recoverable taxes will be invoiced by the Provider as a result of such invoicing and payment arrangement.

(c) The Recipient shall be entitled to deduct and withhold Taxes required by applicable Law to be withheld on payments made to the Provider pursuant to this Agreement. To the extent any amounts are so withheld, the Recipient shall (i) pay such deducted and withheld amount to the proper Governmental Authority and (ii) promptly provide to the Provider evidence of such payment to such Governmental Authority. The Provider shall not "gross up" any amounts invoiced to the Recipient to account for any Taxes required to be withheld by applicable Law. The Provider shall, prior to the date of any payment to be made pursuant to this Agreement, make commercially reasonable efforts to provide the Recipient any certificate or other documentary evidence (A) required by any applicable Law or (B) which the Provider is entitled by any applicable Law to provide in order to reduce the amount of any Taxes that may be deducted or withheld from such payment, and the Recipient agrees to accept and act in reliance on any such duly and properly executed certificate or other applicable documentary evidence.

16

Section 4.3 **No Right to Set-Off** . Subject to the Recipient's right to withhold disputed amounts in accordance with Section 4.1(e) , the Recipient shall timely pay the full amount of Service Charges and shall not set off, counterclaim or otherwise withhold any amount owed to the Provider under this Agreement on account of any obligation owed by the Provider to the Recipient.

**ARTICLE V**
**STANDARD FOR SERVICE**

Section 5.1 **Standard for Service** .

(a) Each Provider agrees (i) to perform any Services that it provides hereunder with substantially the same nature, quality, standard of care and service levels at which the same or similar services were performed by or on behalf of such Provider prior to the Distribution Date or, if not so previously provided, then substantially similar to those which are applicable to similar services provided to the Provider's Affiliates or other business units; (ii) if specific target performance metrics are set forth in a particular Service Schedule, it will provide the applicable Services in accordance with such metrics, and (iii) upon receipt of written notice from the Recipient identifying any outage, interruption or other failure of any Service, to respond to such outage, interruption or other failure of such Service in a manner that is substantially similar to the manner in which such Provider or its Affiliates responded to any outage, interruption or other failure of the same or similar services prior to the Distribution Date or, with respect to services for which same or similar services were not provided prior to the Distribution Date, in a manner that is substantially similar to the manner in which such Provider or its Affiliates responds with respect to internally provided services. The Parties acknowledge that an outage, interruption or other failure of any Service shall not be deemed to be a breach of the provisions of this Section 5.1(a) so long as the applicable Provider complies with the foregoing clause (iii).

(b) Nothing in this Agreement shall require the Provider to perform or cause to be performed any Service to the extent that the manner of such performance would constitute a violation of applicable Law or any existing contract or agreement with a third party. If the Provider is or becomes aware of any potential violation on the part of the Provider, the Provider shall promptly send a written notice to the Recipient of any such potential violation. The Parties each agree to cooperate and use commercially reasonable efforts to obtain any necessary third-party consents required under any existing contract or agreement with a third party to allow the Provider to perform or cause to be performed any Service in accordance with the standards set forth in Section 5.1(a) , subject to Section 4.1(g) . If, with respect to a Service, the Parties, despite the use of such commercially reasonable efforts, are unable to obtain a required third-party consent or the performance of such Service by the Provider would continue to constitute a violation of applicable Law, the Provider shall use commercially reasonable efforts in good faith to provide such Services in a manner as closely as possible to the standards described in Section 5.1(a) that would apply absent the exception provided for in the first sentence of this Section 5.1(b) .

Section 5.2 **Disclaimer of Warranties** . EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, THE PARTIES ACKNOWLEDGE AND AGREE THAT THE

17

SERVICES ARE PROVIDED AS-IS, THAT EACH RECIPIENT ASSUMES ALL RISKS AND LIABILITIES ARISING FROM OR RELATING TO ITS USE OF AND RELIANCE UPON THE SERVICES AND EACH PROVIDER, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, MAKES NO REPRESENTATION OR WARRANTY WITH RESPECT THERETO. EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH PROVIDER HEREBY EXPRESSLY DISCLAIMS ALL REPRESENTATIONS AND WARRANTIES REGARDING THE SERVICES, WHETHER EXPRESS OR IMPLIED, EITHER IN FACT OR BY OPERATION OF LAW, BY STATUTE OR OTHERWISE, INCLUDING ANY REPRESENTATION OR WARRANTY IN REGARD TO QUALITY, PERFORMANCE, NONINFRINGEMENT, COMMERCIAL UTILITY, MERCHANTABILITY OR FITNESS OF ANY SERVICE FOR A PARTICULAR PURPOSE.

Section 5.3 **Compliance with Laws and Regulations** . Each Party shall be responsible for its own compliance and its subcontractors' compliance with any and all Laws applicable to its performance under this Agreement. No Party shall knowingly take any action in violation of any such applicable Law that results in liability being imposed on the other Party.

Section 5.4 **Treatment of Confidential Information** . HPI Confidential Information or Enterprise Confidential Information that is disclosed by the respective Party or any its Subsidiaries in connection with the provision or receipt of Services shall be subject to the confidentiality and use restrictions set forth in Section 7.2 of the Separation Agreement.

**ARTICLE VI**
**LIABILITY LIMITATIONS AND INDEMNIFICATION**

Section 6.1 **Consequential and Other Damages** . Notwithstanding anything to the contrary contained in the Separation Agreement or this Agreement, except for breaches of confidentiality obligations or in the case of gross negligence or willful misconduct, no Party shall be liable to the other Party or any of its Affiliates or Representatives, whether in contract, tort (including negligence and strict liability) or otherwise, at law or equity, for any special, indirect, incidental, punitive or consequential damages whatsoever (including lost profits or damages calculated on multiples of earnings approaches), which in any way arise out of, relate to or are a consequence of, the performance or nonperformance by such Party (including any Affiliates and Representatives and any unaffiliated third-party providers, in each case, providing any applicable Services) under this Agreement or the provision of, or failure to provide, any Services under this Agreement, including with respect to business interruptions or claims of customers, even if such Party has been advised of the possibility of such damages.

Section 6.2 **Limitation of Liability** . Except for (a) payment of Service Charges, (b) breaches of confidentiality obligations, (c) claims arising from gross negligence or willful misconduct, and (d) liability for indemnification with respect to third-party claims pursuant to Section 6.4 or 6.5 , the Liability of a Party and its Affiliates and Representatives, collectively, for any act or failure to act in connection with a Service Schedule (including the performance or breach of such Service Schedule), or from the sale, delivery, provision or use of any Services provided under or contemplated by a Service Schedule, whether in contract, tort (including negligence and strict liability) or otherwise, at law or equity, shall not exceed the aggregate Service Charges actually paid to such Party and its Affiliates under such Service Schedule up to the date of the event giving rise to such liability.

18

Section 6.3 **Obligation to Re-perform; Liabilities** . In the event of any breach of this Agreement by any Provider with respect to the provision of any Services (with respect to which the Provider can reasonably be expected to re-perform in a commercially reasonable manner), the Provider shall (a) promptly correct in all material respects such error, defect or breach or re-perform in all material respects such Services at the request of the Recipient and at the sole cost and expense of the Provider and (b) subject to the limitations set forth in Sections 6.1 and 6.2 , reimburse the Recipient and its Affiliates and Representatives for Liabilities attributable to such breach by the Provider. The remedy set forth in this Section 6.3 shall be the sole and exclusive remedy of the Recipient for any such breach of this Agreement. Any request for re-performance in accordance with this Section 6.3 by the Recipient must be in writing and specify in reasonable detail the particular error, defect or breach, and such request must be made no more than one (1) month from the date such error, defect or breach becomes apparent or should have reasonably become apparent to the Recipient.

Section 6.4 **HP Indemnity** .

(a) From and after the Distribution Date, HP in its capacity as a Recipient and on behalf of each of the other members of the HPI Group in their capacity as Recipients, shall indemnify, defend and hold harmless Enterprise and the other Enterprise Indemnified Parties from and against any and all liabilities, losses, damages, claims, costs, expenses, interest, awards, judgments and penalties (including reasonable fees for outside counsel, accountants and other outside consultants) (collectively, " Losses ") suffered or incurred by the Enterprise Indemnified Parties in connection with a third-party claim against such Enterprise Indemnified Parties, which Losses result from any Services provided by any member of the Enterprise Group hereunder, except to the extent such Losses arise out of an Enterprise Group member's (i) breach of this Agreement, (ii) violation of Laws in providing the Services, (iii) violation of third-party rights (including such third-party rights embodied in patents, trademarks, copyrights and trade secrets) in providing the Services, or (iv) gross negligence or willful misconduct in providing the Services.

(b) From and after the Distribution Date, HP, in its capacity as a Provider and on behalf of each of the other members of the HPI Group in their capacity as Providers, shall indemnify, defend and hold harmless Enterprise and the other Enterprise Indemnified Parties from and against any and all Losses suffered or incurred by the Enterprise Indemnified Parties in connection with a third-party claim against such Enterprise Indemnified Parties, which Losses result from (i) a breach of this Agreement by HP or any other member of the HPI Group in connection with the provision of Services, or (ii) the gross negligence or willful misconduct of HP or any other member of the HPI Group in its performance of its obligations hereunder; provided , however , that HP shall not be deemed to have breached the Agreement, or been grossly negligent or to have engaged in willful misconduct, to the extent that Losses arise as a result of information provided by or on behalf of the Enterprise Indemnified Parties to HP or any other member of the HPI Group or any actions taken or omitted to be taken by the HP or any other member of the HPI Group upon the written direction or instruction of the Enterprise Indemnified Parties.

19

Section 6.5 **Enterprise Indemnity** .

(a) From and after the Distribution Date, Enterprise in its capacity as a Recipient and on behalf of each of the other members of the Enterprise Group in their capacity as Recipients, shall indemnify, defend and hold harmless HP and the other HP Indemnified Parties from and against any and all Losses suffered or incurred by the HP Indemnified Parties in connection with a third-party claim against such HP Indemnified Parties, which Losses result from any Services provided by any member of the HPI Group hereunder, except to the extent such Losses arise out of an HPI Group member's (i) breach of this Agreement, (ii) violation of Laws in providing the Services, (iii) violation of third-party rights (including such third-party rights embodied in patents, trademarks, copyrights and trade secrets) in providing the Services, or (iv) gross negligence or willful misconduct in providing the Services.

(b) From and after the Distribution Date, Enterprise, in its capacity as a Provider and on behalf of each of the other members of the Enterprise Group in their capacity as Providers, shall indemnify, defend and hold harmless HP and the other HP Indemnified Parties from and against any and all Losses suffered or incurred by the HP Indemnified Parties in connection with a third-party claim against such HP Indemnified Parties, which Losses result from (i) a breach of this Agreement by Enterprise or any other member of the Enterprise Group in connection with the provision of Services, or (ii) the gross negligence or willful misconduct of Enterprise or any other member of the Enterprise Group in its performance of its obligations hereunder; provided , however , that Enterprise shall not be deemed to have breached the Agreement, or been grossly negligent or to have engaged in willful misconduct, to the extent that Losses arise as a result of information provided by or on behalf of the HP Indemnified Parties to Enterprise or any other member of the Enterprise Group or any actions taken or omitted to be taken by the Enterprise or any other member of the Enterprise Group upon the written direction or instruction of the HP Indemnified Parties.

Section 6.6 **Indemnification Procedures** . The provisions of Section 6.6  of the Separation Agreement shall govern claims for indemnification under this Agreement, provided that, for purposes of this Section 6.6 , in the event of any conflict between the provisions of Section 6.6 of the Separation Agreement and this Article VI , the provisions of this Agreement shall control.

Section 6.7 **Liability for Payment Obligations** . Nothing in this Article VI shall be deemed to eliminate or limit, in any respect, HP's or Enterprise's express obligation in this Agreement to pay Service Charges for Services rendered in accordance with this Agreement.

Section 6.8 **Exclusion of Other Remedies** . The provisions of Sections 6.3 , 6.4 and 6.5 shall, to the maximum extent permitted by applicable Law, be the sole and exclusive remedies of the HPI Group and the Enterprise Group, as applicable, for any Liability, whether arising from statute, principle of common or civil law, principles of strict liability, tort, contract or otherwise under this Agreement.

Section 6.9 **Other Indemnification Obligations Unaffected** . For avoidance of doubt, this Article VI applies solely to the specific matters and activities covered by this Agreement (and not to matters specifically covered by the Separation Agreement or the other Transaction Documents).

20

**ARTICLE VII**
**TERM AND TERMINATION**

Section 7.1 **Term and Termination** .

(a) This Agreement shall be effective on the Distribution Date and shall terminate upon the earlier to occur of: (i) the last date on which either Party is obligated to provide any Service to the other Party in accordance with the terms of this Agreement and (ii) the mutual written agreement of the Parties to terminate this Agreement in its entirety.

(b) (i) Without prejudice to a Recipient's rights with respect to a Force Majeure set forth in Section 9.19 , a Recipient may from time to time terminate this Agreement with respect to the entirety of any individual Service but not a portion thereof:

(A) for any reason or no reason, effective as of the end of a calendar month ending no earlier than ninety (90) days after the Effective Date, upon providing (i) with respect to Service Schedules with an original duration less than or equal to twelve (12) months, at least forty-five (45) days' prior written notice to the Provider, (ii) with respect to Service Schedules with an original duration greater than twelve (12) months, ninety (90) days' prior written notice to the Provider, or (iii) notice in accordance with such other notice period as may be specified in the applicable Service Schedule, provided that this provision will not prevent the expiration of any Service Schedules with a duration that is less than ninety (90) days; or

(B) if the Provider of such Service has failed to perform any of its material obligations under this Agreement with respect to such Service, and such failure shall continue to exist thirty (30) days after receipt by the Provider of written notice of such failure from the Recipient.

(ii) A Provider may terminate this Agreement with respect to one or more Services, in whole but not in part, at any time upon prior written notice to the Recipient if the Recipient has failed to perform any of its material obligations under this Agreement relating to such Services, including making payment of Service Charges when due, and such failure shall continue uncured for a period of thirty (30) days after receipt by the Recipient of a written notice of such failure from the Provider.

(iii) In the event of a termination under Section 7.1(b)(i) or (ii) , the Recipient shall pay to the Provider (A) any unamortized Exit Costs and Stranded Costs and (B) any breakage or termination fees, and other termination costs not included in the Exit Costs or Stranded Costs, payable by the Provider, solely as a result of the early termination of this Agreement, with respect to any resources or pursuant to any other third-party agreements that were used by the Provider to provide such Service (or an equitably allocated portion thereof, in the case of any such equipment, resources or agreements that also were used for purposes other than providing Services) (" Termination Charges "). The Provider will provide to the Recipient an invoice for the unamortized Exit Costs and Stranded Costs, and Termination Charges, within thirty (30) days following the date of any termination of this Agreement under Section 7.1(b)(i) or (ii) and will provide reasonable documentary evidence to substantiate such Termination Charges.

21

(iv) The relevant Schedule shall be updated to remove any Service terminated under Section 7.1(b)(i) or (ii) .

(v) In the event that any Service is terminated other than at the end of a month, and the Service Charge associated with such Service is a fixed fee, such Service Charge shall be pro-rated appropriately. The Parties acknowledge that there may be interdependencies among the Services being provided under this Agreement that may not be identified on the applicable Service Schedules and agree that, if the Provider's ability to provide a particular Service in accordance with this Agreement is materially and adversely affected by the termination of another Service in accordance with Section 7.1(b)(i)(A) , then the Parties shall negotiate in good faith to amend the Service Schedule relating to such affected continuing Service.

(c) If the Recipient reasonably determines that it will require a Service to continue beyond the duration identified in the applicable Service Schedule or the end of a subsequent extension period, the Recipient may request the Provider to extend such Service for the desired renewal period(s) (each, a " Service Extension ") by written notice to the Provider no less than forty-five (45) days prior to end of the then-current Service duration. The Provider shall use commercially reasonable efforts to comply with such Service Extension request; provided , however , that (i) the Service Extensions with respect to each Service Schedule shall not extend the duration of such Service Schedule more than twelve (12) months beyond its original duration, as specified in the applicable Service Schedule, (ii) the Provider will not be in breach of its obligations under this Section 7.1(c) if it is unable to comply with a Service Extension request through the use of commercially reasonable efforts such as where a third-party consent that is required in order for the Provider to continue to provide the applicable Services during the requested Service Extension cannot be obtained by the Provider through the use of commercially reasonable efforts, and (iii) each Service Extension is permissible under applicable Law. The Mark-Up for a Service Extension will increase in accordance with Schedule F . With respect to each Service Schedule under which the Service Charge is a fixed fee and the annual aggregate Service Charges exceed $3,000,000, and for which the Recipient timely provides an extension request, the Provider and the Recipient will negotiate in good faith the amount of the fixed fee on which the Service Charge will be based for the Service Extension. The amount of such fixed fee to which the Parties agree will then be increased by the Markup to determine the new fixed monthly Service Charge payable during the Service Extension. The Parties shall amend the terms of the applicable Service Schedule to reflect the new Service duration and Service Charge, if applicable, within five (5) days following (A) the Recipient's request for a Service Extension, with respect to Service Schedules other than those described in the foregoing two sentences or (B) following the Parties' agreement on the applicable Service Charge, with respect to Service Schedules described in the foregoing two sentences, in each case subject to the conditions set forth in this Section 7.1(c) . Each such amended Service Schedule, as agreed to in writing by the Parties, shall be deemed part of this Agreement as of the date of such agreement.

Section 7.2 **Effect of Termination** . Upon termination of any Service pursuant to this Agreement, the Provider of the terminated Service will have no further obligation to provide the

22

terminated Service, and the applicable Recipient will have no obligation to pay any future Service Charges relating to any such Service; provided , however , that the Recipient shall remain obligated to the relevant Provider for (a) the Service Charges owed and payable in respect of Services provided prior to the effective date of termination and (b) any applicable unamortized Exit Costs or Stranded Costs, and Termination Charges, payable in accordance with Section 7.1(b)(iii) . In connection with the termination of any Service, the provisions of this Agreement not relating solely to such terminated Service shall survive any such termination, and in connection with a termination of this Agreement, Article I , Article VI (including liability in respect of any indemnifiable Liabilities under this Agreement arising or occurring on or prior to the date of termination), this Section 7.2 , Article VIII , Article IX , all confidentiality obligations under this Agreement and liability for all due and unpaid Service Charges, unamortized Exit Costs and Stranded Costs, and Termination Charges, shall continue to survive indefinitely.

**ARTICLE VIII**
**DISPUTE RESOLUTION**

Section 8.1 **General** . Except as expressly provided in this Article VIII , the procedures set forth in this Article VIII shall apply to any dispute, controversy or claim, whether sounding in contract, tort or otherwise, arising out of or relating to this Agreement or the transactions contemplated hereby or between or among any members of the HPI Group, on the one hand, and any members of the Enterprise Group, on the other hand (a " Dispute "). Each Party agrees on behalf of itself and the members of its Group that the procedures set forth in Article VIII shall be the sole and exclusive remedy in connection with any such Dispute and irrevocably waives any right to commence any Action in or before any Governmental Authority, except as expressly provided in this Article VIII , and except to the extent provided under the Federal Arbitration Act, 9 U.S.C. §§1 et seq. (the " Arbitration Act "), in the case of judicial review of arbitration results or awards. EXCEPT AS EXPRESSLY PROVIDED IN THIS ARTICLE VIII , EACH PARTY ON BEHALF OF ITSELF AND EACH MEMBER OF ITS GROUP IRREVOCABLY WAIVES ANY RIGHT TO ANY TRIAL IN A COURT THAT WOULD OTHERWISE HAVE JURISDICTION OVER ANY DISPUTE. Except as required by applicable Law, and without limiting Section 8.6 , all dispute resolution proceedings pursuant to this Article VIII shall be confidential and shall not be disclosed by any Party (other than disclosure to its advisors or to the extent disclosure is otherwise permitted pursuant to Section 5.4 ) and shall be treated as compromise and settlement negotiations for purposes of applicable rules of evidence.

Section 8.2 **Negotiations between Parties' Designated Representatives** . The Parties shall make a good faith attempt to resolve any Dispute through negotiation. In the event of any Dispute, the Party that desires to initiate the dispute resolution process will provide a notice of the Dispute (" Dispute Notice ") to the other Party. The Parties agree that the HP Services Manager and the Enterprise Services Manager (or such other persons as HP and Enterprise may designate) shall negotiate in good faith in an attempt to resolve such Dispute amicably. If such Dispute has not been resolved to the mutual satisfaction of HP and Enterprise within thirty (30) days after the initial written notice of the Dispute (or such longer period as the Parties may agree), then the Parties' second tier negotiating teams specified in Schedule G shall meet within thirty (30) days after the end of the first thirty (30) day negotiating period to attempt to resolve the Dispute. During the course of negotiations under this Section 8.2 , all reasonable requests

23

made by one Party to the other for information, including reasonable requests for copies of relevant documents, will be honored. The specific format for such negotiations will be left to the discretion of the designated negotiating teams but may include the preparation of agreed upon statements of fact or written statements of position furnished to the other Party. If the Parties are unable for any reason to resolve a Dispute within thirty (30) days after second tier negotiating team, first meet to attempt to resolve the Dispute delivery of the Dispute Notice or if a Party reasonably concludes that the other Party is not willing to negotiate in good faith as contemplated by this Section 8.2 , either Party may submit the Dispute to mandatory mediation in accordance with Section 8.3 .

Section 8.3 **Mandatory Mediation** . Any Dispute not resolved pursuant to Section 8.2 shall, at the written request of any Party (a " Mediation Request "), be submitted to mandatory mediation in accordance with the International Institute for Conflict Prevention & Resolution (" CPR ") Mediation Procedure (the " Procedure ") then in effect, except as otherwise set forth in this Article VIII . The mediation shall be held in Palo Alto, California or such other place as the Parties may mutually agree. The Parties shall have twenty (20) days from receipt by a Party of a Mediation Request to agree on a mediator. If no mediator has been agreed upon by the Parties within twenty (20) days of receipt by a Party of a Mediation Request, then any Party may request (on written notice to the other Party), that CPR appoint a mediator in accordance with the Procedure. If the Dispute has not been resolved within the earlier of sixty (60) days of the appointment of a mediator or ninety (90) days after receipt by a Party of a Mediation Request, or within such longer period as the Parties may agree to in writing, either Party may submit the Dispute to binding arbitration in accordance with Section 8.4 ; provided , however , that if one Party fails to participate in either the mediation, the other Party may commence arbitration in accordance with Section 8.4 prior to the expiration of the time periods set forth above.

Section 8.4 **Binding Arbitration** .

(a) Any Dispute not resolved pursuant to Section 8.3 shall, at the written request of any Party (an " Arbitration Demand Notice "), be submitted to binding arbitration in accordance with this Section 8.4 . If either Party shall deliver an Arbitration Demand Notice, the other Party may itself deliver an Arbitration Demand Notice to such first Party with respect to any related Dispute without the requirement of first delivering a Dispute Notice as contemplated by Section 8.2 or a Mediation Request as contemplated by Section 8.3 . Subject to Section 8.5 , upon delivery of an Arbitration Demand Notice pursuant to this Section 8.4 , the Dispute shall be decided in accordance with this Section 8.4 .

(b) Any arbitration hereunder will be conducted in accordance with CPR Rules for Administered Arbitration then in effect (the " CPR Arbitration Rules "); provided , however , that to the extent that the provisions of this Agreement and the CPR Arbitration Rules conflict, the provisions of this Agreement (including this Article VIII ) shall govern. Unless the Parties otherwise agree, any such arbitration shall be conducted by and before a single arbitrator. Any arbitrator selected pursuant to this Section 8.4 shall be neutral and disinterested with respect to each of the Parties and the subject matter of the Dispute.

(c) The arbitrator shall have full power and authority to determine issues of arbitrability but shall otherwise be limited to interpreting or construing the applicable provisions

24

of this Agreement, and will have no authority or power to limit, expand, alter, amend, modify, revoke or suspend any condition or provision of this Agreement; it being understood that the arbitrator will have full authority to implement the provisions of this Agreement and to fashion appropriate remedies for breaches of this Agreement (including interim or permanent injunctive relief); provided , however , that the arbitrator shall not have (i) any authority in excess of the authority a court having jurisdiction over the Parties and the Dispute would have absent these arbitration provisions or (ii) any right or power to award special, indirect, punitive, exemplary, consequential, remote, speculative or similar damages in excess of compensatory damages, except to the extent such damages are expressly permitted by the terms of this Agreement. It is the intention of the Parties that in rendering a decision the arbitrator will give effect to the applicable provisions of this Agreement and follow applicable Law.

(d) If a Party fails or refuses to appear at and participate in an arbitration hearing after due notice, the arbitrator may hear and determine the controversy upon evidence produced by the appearing Party. Any decision rendered under such circumstances shall be as valid and enforceable as if the Parties had appeared and participated fully at all stages.

(e) Notwithstanding anything to the contrary herein, the fees of the arbitrator and all other arbitration costs shall be borne equally by each Party, except that each Party shall be responsible for its own attorney's fees and other costs and expenses, including the costs of witnesses selected by such Party.

(f) Any arbitration award shall be an award with a holding in favor of or against a Party and shall include findings as to facts, issues or conclusions of law, and shall include a statement of the reasoning on which the award rests. The award must also be in adequate form so that a judgment of a court may be entered thereupon. Judgment upon any arbitration award hereunder may be entered in any court having jurisdiction thereof.

(g) Any arbitration proceedings hereunder shall be held in Palo Alto, California or such other place as the Parties may mutually agree.

(h) The arbitration, including the interpretation of the provisions of this Article VIII only to the extent they relate to the agreement to arbitrate set forth herein and any procedures pursuant thereto, shall be governed by the Arbitration Act. In all other respects, the interpretation of this Agreement shall be governed as set forth in Section 9.7 .

Section 8.5 **Interim Equitable Relief** . Regardless of whether a Dispute Notice, Mediation Request or Arbitration Demand Notice has been delivered, prior to the time at which the mediator or arbitrator is appointed pursuant to this Article VIII , either Party may seek interim equitable relief in a court of competent jurisdiction if necessary in order to preserve and protect the status quo. Neither the request for, nor the grant or denial of, any such relief shall be deemed a waiver of the dispute resolution obligations set forth herein, and a mediator or arbitrator may order the Parties to petition the court to dissolve, continue or modify any such order.

Section 8.6 **Confidentiality of Mediation and Arbitration Results** . Except as required by applicable Law, the Parties shall hold, and shall cause their respective Subsidiaries and Representatives to hold, the existence, content and result of mediation or arbitration in

25

accordance with the provisions of this Article VIII in confidence (other than disclosure to its advisors, to the extent disclosure is otherwise permitted pursuant to Section 5.4 or as may be required in order to enforce any agreement or award). Each of the Parties shall request that the mediator or arbitrator, as applicable, comply with such confidentiality requirement.

**ARTICLE IX**
**GENERAL PROVISIONS**

Section 9.1 **No Agency** . Nothing in this Agreement shall be deemed in any way or for any purpose to constitute any Party an agent of an unaffiliated Party in the conduct of such other Party's business. The Provider of any Service under this Agreement shall act as an independent contractor and not as the agent of the Recipient in performing such Service, maintaining control over its employees, its subcontractors and their employees and complying with all withholding of income at source requirements, whether federal, national, state, local or foreign.

Section 9.2 **Further Assurances** . Each Party hereto shall take, or cause to be taken, any and all reasonable actions, including the execution, acknowledgment, filing and delivery of any and all documents and instruments that any other Party hereto may reasonably request in order to effect the intent and purpose of this Agreement and the transactions contemplated hereby.

Section 9.3 **Audit Assistance** . Each of the Parties and their respective Subsidiaries are or may be subject to regulation and audit by Governmental Authorities (including taxing authorities), standards organizations, customers or other parties to contracts with such Parties or their respective Subsidiaries under applicable Law, standards or contract provisions. If a Governmental Authority, standards organization, customer or other Party to a contract with a Party or its Subsidiary exercises its right to examine or audit such Party's or its Subsidiary's books, records, documents or accounting practices and procedures pursuant to such applicable Law, standards or contract provisions, and such examination or audit relates to the Services, then the other Party shall provide, at the sole cost and expense of the requesting Party, all assistance reasonably requested by the Party that is subject to the examination or audit in responding to such examination or audits or requests for Information, to the extent that such assistance or Information is within the reasonable control of the cooperating Party and is related to the Services.

Section 9.4 **Notices** . Except with respect to routine communications by a TSA Manager or TSA Owner under Section 2.6 , all notices, requests, claims, demands and other communications under this Agreement shall be in writing and shall be given or made (and shall be deemed to have been duly given or made upon receipt) by delivery in person, by overnight courier service, by facsimile or electronic transmission with receipt confirmed (followed by delivery of an original via overnight courier service) or by registered or certified mail (postage prepaid, return receipt requested) to the respective parties at the following addresses (or at such other address for a Party as shall be specified in a notice given in accordance with this Section 9.4 ):

(i) if to HP, to:

26

HP Inc.
1501 Page Mill Road
Palo Alto, California 94304
Attention: General Counsel
Facsimile: (650) 857-8728

with a copy to:

Gibson, Dunn & Crutcher LLP
1881 Page Mill Road
Palo Alto, California 94304
Attention: David Kennedy
Facsimile: (650) 849-5004

(ii) if to Enterprise, to:

Hewlett Packard Enterprise Company
3000 Hanover Street
Palo Alto, California 94304
Attention: General Counsel
Facsimile: (650) 857-2012

with a copy to:

Gibson, Dunn & Crutcher LLP
1881 Page Mill Road
Palo Alto, California 94304
Attention: David Kennedy
Facsimile: (650) 849-5004

Section 9.5 **Severability** . If any provision of this Agreement or the application thereof to any Person or circumstance is determined by a court of competent jurisdiction to be invalid, void or unenforceable, the remaining provisions hereof or thereof, or the application of such provision to Persons or circumstances or in jurisdictions other than those as to which it has been held invalid or unenforceable, shall remain in full force and effect and shall in no way be affected, impaired or invalidated thereby. Upon such determination, the Parties shall negotiate in good faith in an effort to agree upon such a suitable and equitable provision to effect the original intent of the Parties.

Section 9.6 **Entire Agreement** . This Agreement, the Separation Agreement and the other Transaction Documents and the schedules and exhibits hereto and thereto constitute the entire agreement of the Parties with respect to the subject matter of this Agreement and supersede all prior agreements and undertakings, both written and oral, between or on behalf of the Parties with respect to the subject matter of this Agreement.

Section 9.7 **Governing Law; Submission to Jurisdiction; Waiver of Trial** .

27

(a) This Agreement shall be governed by and construed and interpreted in accordance with the Laws of the State of Delaware without giving effect to the principles of conflicts of law thereof.

(b) Each of HP and Enterprise, on behalf of itself and the members of its Group, hereby irrevocably (i) agrees that any Dispute shall be subject to the exclusive jurisdiction of the state and federal courts located in the State of Delaware, (ii) waives any claims of *forum non conveniens* and agrees to submit to the jurisdiction of such courts and (iii) agrees that service of any process, summons, notice or document by U.S. registered mail to its respective address set forth in Section 9.4 shall be effective service of process for any litigation brought against it in any such court or for the taking of any other acts as may be necessary or appropriate in order to effectuate any judgment of said courts.

Section 9.8 **Facsimile Signatures** . Each Party acknowledges that it may be executing this Agreement by facsimile, stamp or mechanical signature, and that delivery of an executed counterpart of a signature page to this Agreement (whether executed by manual, stamp or mechanical signature) by facsimile or by email in portable document format (.pdf) shall be effective as delivery of such executed counterpart of this Agreement. Each Party expressly adopts and confirms each such facsimile, stamp or mechanical signature (regardless of whether delivered in person, by mail, by courier, by facsimile or by email in .pdf) made in its respective name as if it were a manual signature delivered in person, agrees that it will not assert that any such signature or delivery is not adequate to bind such Party to the same extent as if it were signed manually and delivered in person and agrees that, at the reasonable request of the other Party at any time, it will as promptly as reasonably practicable cause this Agreement to be manually executed (any such execution to be as of the date of the initial date thereof) and delivered in person, by mail or by courier.

Section 9.9 **Assignability; No Third Party Beneficiaries** . This Agreement shall not be assigned by any Party without the prior written consent of the other Party, except that a Party may assign any or all of its rights and obligations under this Agreement in connection with a sale or disposition of any assets or entities or lines of business of such Party or in connection with a merger transaction in which such Party is not the surviving entity; provided , however , that, in each case, no such assignment shall release such Party from any liability or obligation under this Agreement. The provisions of this Agreement and the obligations and rights under this Agreement shall be binding upon, inure to the benefit of and be enforceable by (and against) the Parties and their respective successors and permitted transferees and assigns. Except as provided in Sections 6.4 and 6.5 with respect to Indemnified Parties, this Agreement is for the sole benefit of the Parties to this Agreement and members of their respective Groups and their permitted successors and assigns, and nothing in this Agreement, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

Section 9.10 **Public Announcements** . From and after the Effective Time, HP and Enterprise shall consult with each other before issuing, and give each other the opportunity to review and comment upon, any press release or other public statement that relates to the transactions contemplated by this Agreement, and shall not issue any such press release or make any such public statement prior to such consultation, except as may be required by applicable Law, court process or by obligations pursuant to any listing agreement with any national securities exchange or national securities quotation system.

Section 9.11 **Specific Performance** . Subject to Article VIII , in the event of any actual or threatened default in, or breach of, any of the terms, conditions and provisions of this Agreement (except as otherwise provided therein), the Party who is, or is to be, thereby aggrieved shall have the right to specific performance and injunctive or other equitable relief (on an interim or permanent basis) of its rights under this Agreement, in addition to any and all other rights and remedies at law or in equity, and all such rights and remedies shall be cumulative. The Parties agree that the remedies at law for any breach or threatened breach, including monetary damages, may be inadequate compensation for any loss and that any defense in any action for specific performance that a remedy at law would be adequate is waived. Any requirements for the securing or posting of any bond with such remedy are waived by each of the Parties.

Section 9.12 **Amendment** . No provision of this Agreement may be amended or modified except by a written instrument signed by each of the Parties.

Section 9.13 **Rules of Construction** . Interpretation of this Agreement shall be governed by the following rules of construction: (a) words in the singular shall be held to include the plural and vice versa, and words of one gender shall be held to include the other gender as the context requires; (b) references to the terms "Article," "Section," "paragraph," "clause," "Schedule" are references to the Articles, Sections, paragraphs, clauses, and Schedules of this Agreement unless otherwise specified; (c) the terms "hereof," "herein," "hereby," "hereto," and derivative or similar words refer to this entire Agreement, including the Schedules hereto; (d) references to "$" shall mean U.S. dollars; (e) the word "including" and words of similar import when used in this Agreement shall mean "including without limitation," unless otherwise specified; (f) the word "or" shall not be exclusive; (g) references to "written" or "in writing" include in electronic form; (h) provisions shall apply, when appropriate, to successive events and transactions; (i) the table of contents and headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement; (j) HP and Enterprise have each participated in the negotiation and drafting of this Agreement and if an ambiguity or question of interpretation should arise, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or burdening either Party by virtue of the authorship of any of the provisions in this Agreement or any interim drafts of this Agreement; and (k) a reference to any Person includes such Person's successors and permitted assigns.

Section 9.14 **Counterparts** . This Agreement may be executed in one (1) or more counterparts, and by each Party in separate counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement.

Section 9.15 **Performance** . HP will cause to be performed, and hereby guarantees the performance of, all actions, agreements and obligations set forth in this Agreement to be performed by any member of the HPI Group. Enterprise will cause to be performed, and hereby guarantees the performance of, all actions, agreements and obligations set forth in this

29

Agreement to be performed by any member of the Enterprise Group. Each Party (including its permitted successors and assigns) further agrees that it will (a) give timely notice of the terms, conditions and continuing obligations contained in this <u>Section 9.15</u> to all of the other members of its Group, and (b) cause all of the other members of its Group not to take any action inconsistent with such Party's obligations under this Agreement or the transactions contemplated hereby.

Section 9.16 **Title to Intellectual Property** . Except as expressly provided for under the terms of this Agreement, the Recipient acknowledges that it shall acquire no right, title or interest (including any license rights or rights of use) in any Intellectual Property which is owned or licensed by the Provider, by reason of the provision of the Services provided hereunder. The Recipient shall not remove or alter any copyright, trademark, confidentiality or other proprietary notices that appear on any Intellectual Property owned or licensed by the Provider. The Recipient shall not attempt to decompile, translate, reverse engineer or make excessive copies of any Intellectual Property owned or licensed by the Provider, and the Recipient shall promptly notify the Provider of any such attempt, regardless of whether by the Recipient or any third party, of which the Recipient becomes aware.

Section 9.17 **Survival of Covenants** . Except as expressly set forth in this Agreement, the covenants and other agreements contained in this Agreement, and liability for the breach of any obligations contained herein, shall survive each of the Reorganization and the Distribution and shall remain in full force and effect.

Section 9.18 **Waivers of Default** . A waiver by a Party of any default by the other Party of any provision of this Agreement shall not be deemed a waiver by the waiving Party of any subsequent or other default. No failure or delay by a Party in exercising any right, power or privilege under this Agreement shall operate as a waiver thereof, nor shall a single or partial exercise thereof prejudice any other or further exercise thereof or the exercise of any other right, power or privilege. No waiver by any Party of any provision of this Agreement shall be effective unless explicitly set forth in writing and executed by the Party so waiving.

Section 9.19 **Force Majeure** . No Party (or any Person acting on its behalf) shall have any liability or responsibility for failure to fulfill any obligation (other than a payment obligation) under this Agreement so long as and to the extent to which the fulfillment of such obligation is prevented, frustrated, hindered or delayed as a consequence of circumstances of Force Majeure. A Party claiming the benefit of this provision shall, as soon as reasonably practicable after the occurrence of any such event, (a) notify the other Party of the nature and extent of any such Force Majeure and (b) use due diligence to remove any such causes and resume performance under this Agreement as soon as feasible.

[ *The remainder of this page is intentionally left blank.* ]

30

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed and delivered by their respective duly authorized officers, all as of the Effective Date.

HEWLETT-PACKARD COMPANY

By:    /s/ Catherine A. Lesjak
Name: Catherine A Lesjak
Title: Executive Vice President and Chief Executive Officer

HEWLETT PACKARD ENTERPRISE COMPANY

By:    /s/ Rishi Varma
Name: Rishi Varma
Title: Secretary

*[Signature Page for Transition Services Agreement]*

TAX MATTERS AGREEMENT

BY AND BETWEEN

HEWLETT-PACKARD COMPANY

AND

HEWLETT PACKARD ENTERPRISE COMPANY

31 October, 2015

**TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|
| **SECTION 1.** | **DEFINITION OF TERMS.** | 1 |
| **SECTION 2.** | **ALLOCATION OF PRE-DISTRIBUTION PERIOD TAX LIABILITIES.** | 12 |
| *Section 2.01* | *General Rule.* | 12 |
| *Section 2.02* | *Pre-Distribution Period Taxes Below the $25,000,000 Threshold* | 12 |
| *Section 2.03* | *Allocation of Pre-Distribution Period Tax.* | 12 |
| *Section 2.04* | *Certain Transaction and Other Taxes.* | 13 |
| *Section 2.05* | *Foreign Taxes.* | 15 |
| **SECTION 3.** | **PREPARATION AND FILING OF TAX RETURNS.** | 15 |
| *Section 3.01* | *General.* | 15 |
| *Section 3.02* | *HP's Responsibility.* | 15 |
| *Section 3.03* | *Enterprise's Responsibility.* | 15 |
| *Section 3.04* | *Tax Reporting Practices.* | 15 |
| *Section 3.05* | *Consolidated or Combined Tax Returns.* | 16 |
| *Section 3.06* | *Right to Review Tax Returns.* | 16 |
| *Section 3.07* | *Refunds, Carrybacks and Amended Returns.* | 17 |
| *Section 3.08* | *Apportionment of Tax Attributes.* | 19 |
| **SECTION 4.** | **TAX PAYMENTS.** | 19 |
| *Section 4.01* | *Payment of Taxes with Respect to Certain Mixed Business Tax Returns.* | 19 |
| *Section 4.02* | *Payment of Taxes with Respect to Single Business Tax Returns.* | 20 |
| *Section 4.03* | *Indemnification Payments.* | 20 |
| **SECTION 5.** | **TAX BENEFITS.** | 21 |
| *Section 5.01* | *Tax Benefits.* | 21 |
| **SECTION 6.** | **EMPLOYEE BENEFITS MATTERS** | 22 |
| *Section 6.01* | *HP and Enterprise Income Tax Deductions in Respect of Certain Equity Awards and Compensation.* | 22 |
| *Section 6.02* | *Withholding and Reporting.* | 22 |
| *Section 6.03* | *Pension Deductions.* | 23 |
| **SECTION 7.** | **TAX-FREE STATUS.** | 24 |
| *Section 7.01* | *Restrictions on HP and Enterprise.* | 24 |
| *Section 7.03* | *Definition of Tainting Act.* | 26 |
| **SECTION 8.** | **COOPERATION AND RELIANCE.** | 26 |
| *Section 8.01* | *Assistance and Cooperation.* | 26 |
| *Section 8.02* | *Income Tax Return Information.* | 27 |
| *Section 8.03* | *Reliance by HP.* | 27 |

**TABLE OF CONTENTS**
**(continued)**

| | | Page |
|---|---|---|
| *Section 8.04* | *Reliance by Enterprise.* | 27 |
| *Section 8.05* | *Nonperformance.* | 28 |
| *Section 8.06* | *Costs.* | 28 |
| **SECTION 9.** | **TAX RECORDS.** | 28 |
| *Section 9.01* | *Retention of Tax Records.* | 28 |
| *Section 9.02* | *Access to Tax Records.* | 28 |
| **SECTION 10.** | **TAX CONTESTS.** | 29 |
| *Section 10.01* | *Notice.* | 29 |
| *Section 10.02* | *Control of Tax Contests.* | 29 |
| **SECTION 11.** | **EFFECTIVE DATE; TERMINATION OF PRIOR INTERCOMPANY TAX ALLOCATION AGREEMENTS.** | 31 |
| **SECTION 12.** | **SURVIVAL OF OBLIGATIONS.** | 31 |
| **SECTION 13.** | **TREATMENT OF PAYMENTS; TAX GROSS UP.** | 31 |
| *Section 13.01* | *Treatment of Tax Indemnity and Tax Benefit Payments.* | 31 |
| *Section 13.02* | *Tax Gross Up.* | 32 |
| *Section 13.03* | *Interest Under This Agreement.* | 32 |
| **SECTION 14.** | **DISAGREEMENTS.** | 32 |
| *Section 14.01* | *Discussion.* | 32 |
| *Section 14.02* | *Escalation.* | 33 |
| *Section 14.03* | *Referral to Tax Advisor for Computational Disputes.* | 33 |
| *Section 14.04* | *Injunctive Relief.* | 33 |
| **SECTION 15.** | **LATE PAYMENTS.** | 33 |
| **SECTION 16.** | **EXPENSES.** | 34 |
| **SECTION 17.** | **GENERAL PROVISIONS.** | 34 |
| *Section 17.01* | *Notices.* | 34 |
| *Section 17.02* | *Binding Effect.* | 34 |
| *Section 17.03* | *Waiver.* | 35 |
| *Section 17.04* | *Severability.* | 35 |
| *Section 17.05* | *Authority.* | 35 |
| *Section 17.06* | *Further Action.* | 35 |
| *Section 17.07* | *Integration.* | 35 |
| *Section 17.08* | *Rules of Construction.* | 36 |
| *Section 17.09* | *No Double Recovery.* | 36 |
| *Section 17.10* | *Counterparts.* | 36 |
| *Section 17.11* | *Governing Law.* | 36 |

**TABLE OF CONTENTS**
(continued)

| | | Page |
|---|---|---|
| *Section 17.12* | *Jurisdiction.* | 36 |
| *Section 17.13* | *Amendment.* | 37 |
| *Section 17.14* | *HP or Enterprise Affiliates.* | 37 |
| *Section 17.15* | *Successors.* | 37 |
| *Section 17.16* | *Injunctions.* | 37 |

- 3 -

**TAX MATTERS AGREEMENT**

This TAX MATTERS AGREEMENT (this " Agreement ") is entered into by and between Hewlett-Packard Company, a Delaware corporation (" HP "), and Hewlett Packard Enterprise Company, a Delaware corporation and wholly owned subsidiary of HP (" Enterprise ") (HP and Enterprise are sometimes collectively referred to herein as the " Companies " and, as the context requires, individually referred to herein as the " Company ").

**RECITALS**

WHEREAS, the Board of Directors of HP has determined that it is in the best interests of HP and its shareholders to separate the Enterprise Business from the HPI Business and to create a new publicly traded company to operate the Enterprise Business;

WHEREAS, the Board of Directors of HP and the Board of Directors of Enterprise have approved the transfer of the Enterprise Assets to Enterprise and its Affiliates and the assumption by Enterprise and its Affiliates of the Enterprise Liabilities, all as more fully described in the Separation and Distribution Agreement by and between HP and Enterprise (the " Separation and Distribution Agreement ") and the other Transaction Documents;

WHEREAS, the Board of Directors of HP has further preliminarily approved the distribution to the holders of the issued and outstanding common shares, $0.01 par value, of HP (the " HP Common Shares ") as of the close of business on the Record Date, by means of a pro rata distribution, of all of the issued and outstanding shares of the common stock, $0.01 par value, of Enterprise (the " Enterprise Common Stock "), other than any such shares to be exchanged pursuant to the Subsidiary Stock Exchange, on the basis of one (1) share of Enterprise Common Stock for every one (1) HP Common Share (the " Distribution "), subject to final approval of the Board of Directors of HP;

WHEREAS, for U.S. federal income tax purposes, the Contribution and the Distribution, taken together (and, together with the Subsidiary Stock Exchange), are intended to qualify as a reorganization within the meaning of Section 368(a)(1)(D) of the Code;

WHEREAS, it is the intention of the Companies that the distribution (and exchange) of Enterprise Common Stock to the stockholders of HP, except for cash received in lieu of any fractional shares, will qualify as tax-free under Section 355(a) of the Code to such stockholders and as tax-free to HP under Section 361(c) of the Code; and

WHEREAS, in connection with the Contribution and Distribution, the Companies desire to set forth their agreement with respect to tax matters for taxable periods prior to and including the Distribution Date.

NOW, THEREFORE, in consideration of the foregoing and the terms, conditions, covenants and provisions of this Agreement, each of the Companies mutually covenants and agrees as follows:

**Section 1. Definition of Terms** . For purposes of this Agreement (including the recitals hereof), the following terms have the following meanings, and capitalized terms used but

not otherwise defined herein shall have the meaning ascribed to them in the Separation and Distribution Agreement:

" **$25,000,000 Threshold** " has the meaning set forth in Section 2.02 of this Agreement.

" **Active Business** " means the business conducted by each of the Active Business Entities (as defined herein) as of the Distribution Date.

" **Active Business Entities** " Hewlett-Packard Singapore (Private) Ltd., Hewlett Packard Enterprise Singapore Pte. Ltd., Hewlett-Packard Taiwan Limited, HP Taiwan Information Technology Limited, Hewlett-Packard GlobalSoft Private Limited, Global E-Business Operations Private Limited and HP Computing and Printing Systems India Private Limited, along with their successors or assigns.

" **Acting Party** " has the meaning set forth in Section 7.01 of this Agreement.

" **Affiliate** " means any entity that is directly or indirectly "controlled" by either the person in question or an Affiliate of such person. "Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract or otherwise. The term Affiliate shall refer to Affiliates of a person as determined immediately after the Distribution.

" **Agreement** " means this Tax Matters Agreement.

" **Assets** " has the meaning set forth in the Separation and Distribution Agreement.

**"Available Enterprise Pension Tax Benefit"** has the meaning set forth in Section 6.03(a) of this Agreement.

**"Available HP Pension Tax Benefit"** has the meaning set forth in Section 6.03(b) of this Agreement.

**"BLP1"** means Hewlett-Packard Bermuda Enterprises L.P.

**"BLP3"** means Phoenix Holding L.P.

**"BLP1/BLP3 Contribution Agreement"** means the Contribution Agreement by and between BLP1 and BLP3 dated October 1, 2015.

**"BLP1/BLP3 Taxes"** means Taxes allocated between BLP1 and BLP3 in Annex 1 to the BLP1/BLP3 Contribution Agreement.

" **Business Day** " means any day other than a Saturday, Sunday or a day on which banks are required to be closed in New York, New York.

" **Capital Stock** " means all classes or series of capital stock of a Company, including (i) common stock, (ii) all options, warrants and other rights to acquire such capital stock and (iii) all instruments properly treated as stock in the Company for U.S. federal income tax purposes.

- 2 -

" **Claiming Party** " has the meaning set forth in Section 3.07(a) of this Agreement.

" **Code** " means the U.S. Internal Revenue Code of 1986, as amended.

" **Companies** " and " **Company** " shall have the meaning provided in the first sentence of this Agreement.

" **Contribution** " has the meaning set forth in the Separation and Distribution Agreement.

" **Controlling Party** " shall have the meaning set forth in Section 10.02(b) of this Agreement.

" **Correlative Detriment** " has the meaning set forth in Section 3.07(a) of this Agreement.

" **Dispute** " shall have the meaning set forth in Section 14.01 of this Agreement.

" **Distribution** " has the meaning set forth in the Recitals.

" **Distribution Date** " has the meaning set forth in the Separation and Distribution Agreement.

" **Distribution Taxes** " means any and all Taxes (a) required to be paid by or imposed on a Company or any of its Affiliates resulting from, or directly arising in connection with, the failure of the Contribution and Distribution (together with the Subsidiary Stock Exchange), taken together, to qualify as a reorganization described in Sections 355(a) and 368(a)(1)(D) of the Code (or the failure to qualify under or the application of corresponding provisions of the Tax Laws of other jurisdictions); (b) required to be paid by or imposed on a Company or any of its Affiliates resulting from, or directly arising in connection with, the failure of the stock distributed in the Distribution or the Subsidiary Stock Exchange to constitute "qualified property" for purposes of Sections 355(d), 355(e) and Section 361(c) of the Code (or any corresponding provision of the Tax Laws of other jurisdictions); (c) required to be paid by or imposed on a Company or any of its Affiliates resulting from the failure of any Separation Transaction to qualify for the intended treatment as tax-free or tax-deferred, in whole or in part.

" **Distribution Tax-Related Losses** " shall mean (a) all Distribution Taxes imposed pursuant to any Final Determination; (b) all reasonable accounting, legal and other professional fees and court costs incurred in connection with such Distribution Taxes; and (c) all reasonable costs and expenses and all damages associated with shareholder litigation or controversies and any amount paid by any member of the HP Group or member of the Enterprise Group in respect of the liability of shareholders, whether paid to shareholder or to the IRS or any other Tax Authority, in each case, resulting from the failure of the Contribution and the Distribution to have Tax-Free Status or from the failure of a Separation Transaction to qualify for intended treatment as tax-free or tax-deferred, in whole or in part.

" **Due Date** " means the date (taking into account all valid extensions) upon which a Tax Return is required to be filed with or Taxes are required to be paid to a Tax Authority, whichever is applicable.

- 3 -

" **E Munich** " means Gatrium Holding BV.

" **Effective Time** " has the meaning set forth in the Separation and Distribution Agreement.

" **Employee Matters Agreement** " means the Employee Matters Agreement by and between HP and Enterprise dated as of 31 October, 2015.

" **Employment Tax** " means any Tax the liability or responsibility for which is allocated pursuant to the Employee Matters Agreement.

" **Enterprise** " shall have the meaning provided in the first sentence of this Agreement.

" **Enterprise Adjustment** " means any proposed adjustment by a Tax Authority or claim for refund asserted in a Tax Contest to the extent Enterprise would be solely responsible for any resulting Tax under this Agreement or the Foreign Separation Agreements or solely entitled to receive any resulting Tax Benefit under this Agreement or the Foreign Separation Agreements.

" **Enterprise Business** " has the meaning set forth in the Separation and Distribution Agreement.

" **Enterprise Common Stock** " has the meaning set forth in the Recitals.

**"Enterprise Full Taxpayer"** means the assumption that each relevant member of the Enterprise Group (a) is subject to the highest marginal regular statutory income Tax rate, (b) has sufficient taxable income to permit the realization or receipt of the relevant Tax Benefit at the earliest possible time, (c) will not utilize any Tax Attribute other than a Tax Attribute arising from the adjustment at issue, and (d) is not subject to the alternative minimum tax.

" **Enterprise Group** " means Enterprise and its Affiliates, as determined immediately after the Distribution.

" **Enterprise Single Business Tax Return** " means any Tax Return including any consolidated, combined or unitary Tax Return, that includes assets or activities relating only to the Enterprise Business.

" **Enterprise Tainting Act** " has the meaning set forth in Section 7.02(b) of this Agreement.

" **Fifty-Percent or Greater Interest** " shall have the meaning ascribed to such term for purposes of Sections 355(d) and (e) of the Code.

" **Final Determination** " means the final resolution of liability for any Tax, which resolution may be for a specific issue or adjustment or for a taxable period, (a) by IRS Form 870 or 870-AD (or any successor forms thereto), on the date of acceptance by or on behalf of the taxpayer, or by a comparable form under the laws of a State, local, or foreign taxing jurisdiction, except that a Form 870 or 870-AD or comparable form shall not constitute a Final Determination to the extent that it reserves (whether by its terms or by operation of law) the right of the

- 4 -

taxpayer to file a claim for refund or the right of the Tax Authority to assert a further deficiency in respect of such issue or adjustment or for such taxable period (as he case may be); (b) by a decision, judgment, decree, or other order by a court of competent jurisdiction, which has become final and unappealable; (c) by a closing agreement or accepted offer in compromise under Sections 7121 or 7122 of the Code, or a comparable agreement under the laws of a State, local, or foreign taxing jurisdiction; (d) by any allowance of a refund or credit in respect of an overpayment of Tax, but only after the expiration of all periods during which such refund may be recovered (including by way of offset) by the jurisdiction imposing such Tax; (e) by a final settlement resulting from a treaty-based competent authority determination; or (f) by any other final disposition, including by reason of the expiration of the applicable statute of limitations or by mutual agreement of the parties.

" **Foreign Separation Agreements** " means the BLP1/BLP3 Contribution Agreement and the Munich/E Munich Separation Agreement.

" **Foreign Taxes** " means BLP1/BLP3 Taxes and Munich/E Munich Taxes.

" **Group** " means the HP Group or the Enterprise Group, or both, as the context requires.

" **HP** " shall have the meaning provided in the first sentence of this Agreement.

" **HP Adjustment** " means any proposed adjustment by a Tax Authority or claim for refund asserted in a Tax Contest to the extent HP would be solely responsible for any resulting Tax under this Agreement or the Foreign Separation Agreements or solely entitled to receive any resulting Tax Benefit under this Agreement or the Foreign Separation Agreements.

" **HPI Business** " shall have the meaning provided in the Separation and Distribution Agreement.

" **HP Common Shares** " shall have the meaning provided in the Recitals.

" **HP Full Taxpayer** " means the assumption that each relevant member of the HP Group (a) is subject to the highest marginal regular statutory income Tax rate, (b) has sufficient taxable income to permit the realization or receipt of the relevant Tax Benefit at the earliest possible time, (c) will not utilize any Tax Attribute other than a Tax Attribute arising from the adjustment at issue, and (d) is not subject to the alternative minimum tax.

" **HP Group** " means HP and its Affiliates, excluding any entity that is a member of the Enterprise Group.

" **HP Single Business Tax Return** " means any Tax Return including any consolidated, combined or unitary Tax Return, that includes assets or activities relating only to the HPI Business.

" **HP Tainting Act** " has the meaning set forth in Section 7.02(a) of this Agreement.

" **Income Taxes** mean:

- 5 -

(a)     all Taxes based upon, measured by, or calculated with respect to (i) net income or profits (including, any capital gains, minimum tax or any Tax on items of tax preference, but not including sales, use, real, or personal property, gross or net receipts, value added, excise, leasing, transfer or similar Taxes), or (ii) multiple bases (including, corporate franchise, doing business and occupation Taxes) if one or more bases upon which such Tax is determined is described in clause (a)(i) above; and

(b)     any related interest and any penalties, additions to such Tax or additional amounts imposed with respect thereto by any Tax Authority.

" **Income Tax Returns** " mean all Tax Returns that relate to Income Taxes.

" **Indemnitee** " shall have the meaning set forth in Section 13.03 of this Agreement.

" **Indemnitor** " shall have the meaning set forth in Section 13.03 of this Agreement.

" **IRS** " means the United States Internal Revenue Service.

" **Joint Adjustment** " means any proposed adjustment by a Tax Authority or claim for refund asserted in a Tax Contest which is neither an Enterprise Adjustment nor an HP Adjustment.

" **Law** " means any U.S. or non-U.S. federal, national, supranational, state, provincial, local or similar statute, law, ordinance, regulation, rule, code, administrative pronouncement, order, requirement or rule of law (including common law), or any income tax treaty.

" **Liabilities** " has the meaning set forth in the Separation and Distribution Agreement.

**"Maximum Enterprise Pension Tax Benefit"** has the meaning set forth in Section 6.03(a).

**"Maximum HP Pension Tax Benefit"** has the meaning set forth in Section 6.03(b).

" **Mixed Business Tax Return** " means any Tax Return including any consolidated, combined or unitary Tax Return, that relates to at least one asset or activity that is part of the HPI Business, on the one hand, and at least one asset or activity that is part of the Enterprise Business, on the other hand.

" **Munich** " means Hewlett-Packard Munich BV.

" **Munich/E Munich Contribution Agreement** " means the Contribution and Assignment Agreement by and between Munich and E Munich dated October 14, 2015.

" **Munich/E Munich Taxes** " means Taxes allocated between Munich and E Munich in Annex 4 to the Munich/E Munich Contribution Agreement.

- 6 -

" **Net PTE Tax Payments** " shall mean, for a given Company, with respect to a particular pool of PTE, the amount of Taxes payable by a Company to a Taxing Authority with respect to the subpart F inclusion giving rise to such PTE (calculated using the assumptions set forth under HP Full Taxpayer or Enterprise Full Taxpayer, as the case may be), increased by any amounts payable by such Company to the other Company pursuant to Section 2.03 of this Agreement with respect to the subpart F inclusion giving rise to such PTE or pursuant to Section 5.01(a) of this Agreement with respect to such PTE, reduced by any amounts receivable by such Company from the other Company pursuant to Section 2.03 of this Agreement with respect to the subpart F inclusion giving rise to such PTE or pursuant to Section 5.01(a) of this Agreement with respect to such PTE.

" **Net Receivable Tax Payments** " shall mean, for a given Company, with respect to a particular receivable described in Section 5.01(a)(ii), the amount of Taxes payable by a Company to a Taxing Authority with respect to the Tax Item giving rise to such receivable (calculated using the assumptions set forth under HP Full Taxpayer or Enterprise Full Taxpayer, as the case may be), increased by any amounts payable by such Company to the other Company pursuant to Section 2.03 of this Agreement with respect to the Tax Item giving rise to such receivable or pursuant to Section 5.01(a) of this Agreement with respect to such receivable, reduced by any amounts receivable by such Company from the other Company pursuant to Section 2.03 of this Agreement with respect to the Tax Item giving rise to such receivable or pursuant to Section 5.01(a) of this Agreement with respect to such receivable.

" **Non-Acting Party** " has the meaning set forth in Section 7.01 of this Agreement.

" **Non-Controlling Party** " shall have the meaning set forth in Section 10.02(c) of this Agreement.

" **Past Practices** " shall have the meaning set forth in Section 3.04(a) of this Agreement.

" **Payment Date** " means (i) with respect to any HP federal consolidated Income Tax Return, the due date for any required installment of estimated taxes determined under Section 6655 of the Code, the due date (determined without regard to extensions) for filing the return determined under Section 6072 of the Code, and the date the return is filed, and (ii) with respect to any other Tax Return, the corresponding dates determined under the applicable Tax Law.

" **Payor** " shall have the meaning set forth in Section 4.03 of this Agreement.

" **Pension Contribution** " means any contribution or other payment of any kind made by HP pursuant to its obligations with respect to the U.S. Pension Plans.

" **Person** " means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization or a governmental entity or any department, agency or political subdivision thereof, without regard to whether any entity is treated as disregarded for U.S. federal income tax purposes.

" **Post-Distribution Period** " means any Tax Period beginning after the Distribution Date, and, in the case of any Straddle Period, the portion of such Straddle Period beginning the day after the Distribution Date.

" **Post-Distribution Ruling** " has the meaning set forth in Section 7.01 of this Agreement.

" **Pre-Distribution Period** " means any Tax Period ending on or before the Distribution Date, and, in the case of any Straddle Period, the portion of such Straddle Period ending on the Distribution Date.

" **Preliminary Tax Advisor** " has the meaning set forth in Section 14.03 of this Agreement.

" **Prime Rate** " has the meaning set forth in the Separation and Distribution Agreement.

" **Privilege** " means any privilege that may be asserted under applicable law, including, any privilege arising under or relating to the attorney-client relationship (including the attorney-client and work product privileges), the accountant-client privilege and any privilege relating to internal evaluation processes.

" **Proposed Acquisition Transaction** " means a transaction or series of transactions (or any agreement, understanding or arrangement, within the meaning of Section 355(e) of the Code and Treasury Regulation Section 1.355-7, or any other regulations promulgated thereunder, to enter into a transaction or series of transactions), whether such transaction is supported by Company management or shareholders, is a hostile acquisition, or otherwise, as a result of which a Company would merge or consolidate with any other Person or as a result of which any Person or any group of related Persons would (directly or indirectly) acquire, or have the right to acquire, from a Company and/or one or more holders of outstanding shares of Capital Stock, a number of shares of Capital Stock that would, when combined with any other changes in ownership of Capital Stock pertinent for purposes of Section 355(e) of the Code, comprise forty percent (40%) or more of (A) the value of all outstanding shares of stock of the Company as of the date of such transaction, or in the case of a series of transactions, the date of the last transaction of such series, or (B) the total combined voting power of all outstanding shares of voting stock of the Company as of the date of such transaction, or in the case of a series of transactions, the date of the last transaction of such series. Notwithstanding the foregoing, a Proposed Acquisition Transaction shall not include (A) the adoption by a Company of a shareholder rights plan or (B) issuances by a Company that satisfy Safe Harbor VIII (relating to acquisitions in connection with a person's performance of services) or Safe Harbor IX (relating to acquisitions by a retirement plan of an employer) of Treasury Regulation Section 1.355-7(d). For purposes of determining whether a transaction constitutes an indirect acquisition, any recapitalization resulting in a shift of voting power or any redemption of shares of stock shall be treated as an indirect acquisition of shares of stock by the non-exchanging shareholders. This definition and the application thereof are intended to monitor compliance with Section 355(e) of the Code and shall be interpreted accordingly. Any clarification of, or change in, the statute or regulations promulgated under Section 355(e) of the Code shall be incorporated in this definition and its interpretation.

" **PTE** " shall have the meaning set forth in Section 5.01(a) of this Agreement.

" **Record Date** " has the meaning set forth in the Separation and Distribution Agreement.

- 8 -

" **Refund** " means any refund of Taxes (including any overpayment of Taxes that can be refunded or, alternatively, applied to future Taxes payable), including any interest paid on or with respect to such refund of Taxes; provided , however , the amount of the refund of Taxes shall be net of any Taxes imposed by any Tax Authority on the receipt of the refund.

" **Remaining PTE Value** " shall mean, for a given Company, with respect to a particular pool of PTE described in Section 5.01(a), (i) the gross amount of such PTE created in the foreign Affiliates of such Company reduced by the Net PTE Tax Payments of such Company calculated with respect to such pool of PTE, multiplied by (ii) fifty-seven percent (57%), and multiplied by (iii) the highest marginal U.S. statutory corporate income tax rate at the time of the creation of such pool of PTE.

" **Remaining Receivable Value** " shall mean, for a given Company, with respect to a particular receivable described in Section 5.01(a)(ii), (i) the gross amount of such receivable held by such Company reduced by the Net Receivable Tax Payments of such Company calculated with respect to such receivable, multiplied by (ii) fifty-seven percent (57%), and multiplied by (iii) the highest marginal U.S. statutory corporate income tax rate at the time of the creation of such receivable.

" **Required Party** " shall have the meaning set forth in Section 4.03 of this Agreement.

" **Responsible Company** " means, with respect to any Tax Return, the Company having responsibility for preparing and filing such Tax Return under this Agreement.

" **Restricted Period** " means the period beginning at the Effective Time and ending on the two-year anniversary of the day after the Distribution Date.

" **Retention Date** " shall have the meaning set forth in Section 9.01 of this Agreement.

" **Ruling** " means a private letter ruling issued by the IRS to HP in connection with the Separation Transactions.

" **Ruling Request** " means any letter filed by HP with the IRS requesting a ruling regarding certain tax consequences of the Separation Transactions (including all attachments, exhibits, and other materials submitted with such ruling request letter) and any amendment or supplement to such ruling request letter.

" **Separation and Distribution Agreement** " shall have the meaning provided in the Recitals.

" **Separation Plan** " means the (i) the country plan separation steps described in the Implementation Workbook – v.1.9.10 (09-25-15) as amended from time to time, (ii) the Global Plan (CFC Extraction) (Version 6) dates August 2, 2015, as amended from time to time, and (iii) Global Plan (US Separation) (Version 7) dates August 21, 2015, as amended from time to time, all attached hereto as Exhibit A.

" **Separation Tax** " has the meaning set forth in Section 2.04(a)(i) of this Agreement.

- 9 -

" **Separation Transactions** " means those transactions undertaken by the Companies and their Affiliates pursuant to the Separation Plan to separate ownership of the Enterprise Business form ownership of the HPI Business.

" **Single Business Tax Return** " means any Tax Return including any consolidated, combined or unitary Tax Return, that includes assets or activities relating only to the HPI Business, on the one hand, or the Enterprise Business, on the other (but not both).

" **Straddle Period** " means any Tax Period that begins on or before and ends after the Distribution Date.

" **Subsidiary Stock Exchange** " has the meaning set forth in the Separation and Distribution Agreement.

" **Tainting Act** " has the meaning set forth in Section 7.03 of this Agreement.

" **Tax** " or " **Taxes** " means any income, gross income, gross receipts, profits, capital stock, franchise, withholding, payroll, social security, workers compensation, unemployment, disability, property, *ad valorem* , stamp, excise, severance, occupation, service, sales, use, license, lease, transfer, import, export, value added, alternative minimum, estimated or other tax (including any fee, assessment, or other charge in the nature of or in lieu of any tax) imposed by any governmental entity or political subdivision thereof, and any interest, penalties, additions to tax, or additional amounts in respect of the foregoing; provided , however , the term "Tax" or "Taxes" shall not include customs duties.

" **Tax Advisor** " means a United States tax counsel or accountant of recognized national standing.

" **Tax Attribute** " shall mean a net operating loss, net capital loss, investment credit, foreign tax credit, excess charitable contribution, general business credit or any other Tax Item that could reduce a Tax.

" **Tax Authority** " means, with respect to any Tax, the governmental entity or political subdivision thereof that imposes such Tax, and the agency (if any) charged with the collection of such Tax for such entity or subdivision.

" **Tax Benefit** " means any refund, credit, or other reduction in otherwise required Tax payments (determined on a "with and without" basis assuming the HP Group or Enterprise Group, as the case may be, is a HP Full Taxpayer or an Enterprise Full Taxpayer, respectively).

" **Tax Contest** " means an audit, review, examination, or any other administrative or judicial proceeding with the purpose or effect of redetermining Taxes (including any administrative or judicial review of any claim for refund).

" **Tax-Free Status** " means the qualification of the Contribution and Distribution (together with the Subsidiary Stock Exchange), taken together, (a) as a reorganization described in Sections 355(a) and 368(a)(1)(D) of the Code, (b) as a transaction in which the stock distributed thereby is "qualified property" for purposes of Sections 355(d), 355(e) and 361(c) of the Code

- 10 -

and (c) as a transaction in which HP, Enterprise and the shareholders of HP recognize no income or gain for U.S. federal income tax purposes pursuant to Sections 355, 361 and 1032 of the Code, other than, in the case of HP and Enterprise, intercompany items or excess loss accounts taken into account pursuant to the Treasury Regulations promulgated pursuant to Section 1502 of the Code.

" **Tax Item** " means any item of income, gain, loss, deduction, expense or credit, or other attribute that may have the effect of increasing or decreasing any Tax. For purposes of the $25,000,000 Threshold, multiple Tax Items arising from the same transaction or series of related transactions or relating to the same underlying Tax or a substantially identical underlying Tax imposed by the same Tax Authority issue shall be aggregated.

" **Tax Law** " means the law of any governmental entity or political subdivision thereof relating to any Tax.

" **Tax Opinions/Rulings** " means the opinions of Tax Advisors and/or the rulings by the IRS deliverable to HP in connection with the Contribution and the Distribution or otherwise with respect to the Separation Transactions.

" **Tax Period** " means, with respect to any Tax, the period for which the Tax is reported as provided under the Code or other applicable Tax Law.

" **Tax Records** " means any Tax Returns, Tax Return workpapers, documentation relating to any Tax Contests, and any other books of account or records (whether or not in written, electronic or other tangible or intangible forms and whether or not stored on electronic or any other medium) required to be maintained under the Code or other applicable Tax Laws or under any record retention agreement with any Tax Authority.

" **Tax-Related Losses** " means (i) all federal, state and local Taxes (including interest and penalties thereon) imposed pursuant to any settlement, Final Determination, judgment or otherwise; (ii) all accounting, legal and other professional fees, and court costs incurred in connection with such Taxes; and (iii) all costs, expenses and damages associated with stockholder litigation or controversies and any amount paid by HP (or any HP Affiliate) or Enterprise (or any Enterprise Affiliate) in respect of the liability of shareholders, whether paid to shareholders or to the IRS or any other Tax Authority, in each case, resulting from the failure of the Contribution and the Distribution to have Tax-Free Status or from the failure of a Separation Transaction to qualify for intended treatment as tax-free or tax-deferred, in whole or in part.

" **Tax Return** " or " **Return** " means any report of Taxes due, any claim for refund of Taxes paid, any information return with respect to Taxes, or any other similar report, statement, declaration, or document required to be filed under the Code or other Tax Law, including any attachments, exhibits, or other materials submitted with any of the foregoing, and including any amendments or supplements to any of the foregoing.

" **Transaction Documents** " has the meaning set forth in the Separation and Distribution Agreement.

- 11 -

" **Transfer Pricing Adjustment** " shall mean any proposed or actual allocation by a Tax Authority of any Tax Item between or among any member of the HP Group and any member of the Enterprise Group with respect to any Pre- Distribution Period.

" **Treasury Regulations** " means the regulations promulgated from time to time under the Code as in effect for the relevant Tax Period.

" **TSA** " means the Transition Services Agreement by and between HP and Enterprise dated as of 31 October, 2015.

" **Unqualified Tax Opinion** " means an unqualified "will" opinion of a Tax Advisor, on which the Companies may rely to the effect that a transaction will not affect the Tax-Free Status. Any such opinion must assume that the Contribution and Distribution would have qualified for Tax-Free Status if the transaction in question did not occur.

" **U.S. Pension Plans** " has the meaning set forth in the Employee Matters Agreement.

**Section 2. Allocation of Pre-Distribution Period Tax Liabilities.**

*Section 2.01 General Rule* .

*(a) HP Liability* . HP shall be liable for, and shall indemnify and hold harmless the Enterprise Group from and against any liability for, Pre-Distribution Period Taxes which are allocated to HP under this Section 2, with such amounts to be calculated on the basis that each member of the Enterprise Group is an Enterprise Full Taxpayer.

*(b) Enterprise Liability* . Enterprise shall be liable for, and shall indemnify and hold harmless the HP Group from and against any liability for, Pre-Distribution Period Taxes which are allocated to Enterprise under this Section 2, with such amounts to be calculated on the basis that each member of the HP Group is an HP Full Taxpayer.

*Section 2.02 Pre-Distribution Period Taxes Below the $25,000,000 Threshold* Notwithstanding any provision in this Agreement or the Separation and Distribution Agreement to the contrary, except as otherwise provided in Section 2.04 hereof, the Company that is primarily liable (or whose Affiliates are primarily liable) under applicable Tax Law shall be solely liable for any and all Pre-Distribution Period Taxes (including adjustments to such Pre-Distribution Period Taxes) relating to a particular Tax Return of twenty-five million dollars ($25,000,000) or less (the "$ 25,000,000 Threshold "), calculated by utilizing the assumptions set forth in the description of HP Full Taxpayer or Enterprise Full Taxpayer, as the case may be. For purpose of calculating the $25,000,000 Threshold, Taxes resulting from the adjustments of any single Tax Item in one or more Pre-Distribution Periods for which payments may be required under this Agreement shall be aggregated.

*Section 2.03 Allocation of Pre-Distribution Period Tax* . Except as provided in Section 2.04, Pre-Distribution Period Taxes shall be allocated as follows:

*(a) Allocation of Pre-Distribution Period Tax Relating to Mixed Business Tax Returns* .

- 12 -

(i) With respect to any Mixed Business Tax Return, HP shall be responsible for any and all Pre-Distribution Period Taxes due with respect to or required to be reported on any such Tax Return (including any increase in such Tax as a result of a Final Determination) which Taxes are predominantly attributable to the HPI Business;

(ii) With respect to any Mixed Business Tax Return, Enterprise shall be responsible for any and all Pre-Distribution Period Taxes due with respect to or required to be reported on any such Tax Return (including any increase in such Tax as a result of a Final Determination) which Taxes are predominantly attributable to the Enterprise Business;

(iii) With respect to any Mixed Business Tax Return, each Company shall be responsible for fifty percent (50%) of any and all Pre-Distribution Period Taxes due with respect to or required to be reported on any such Tax Return (including any increase in such Tax as a result of a Final Determination) which Taxes are not predominantly attributable to either the HPI Business or the Enterprise Business.

*(b) Allocation Pre-Distribution Period Tax Relating to Single Business Tax Returns* .

(i) HP shall be responsible for any and all Pre-Distribution Period Taxes due with respect to or required to be reported on any HP Single Business Tax Return (including any increase in such Tax as a result of a Final Determination) for all Tax Periods; and

(ii) Enterprise shall be responsible for any and all Pre-Distribution Period Taxes due with respect to or required to be reported on any Enterprise Single Business Tax Return (including any increase in such Tax as a result of a Final Determination) for all Tax Periods.

*(c) Attribution of Taxes* . For purposes of Section 2.03(a), a Tax shall be considered attributable to the HPI Business or the Enterprise Business, as the case may be, to the extent that such Tax would result if such Tax Return were prepared on a separate basis taking into account only the operations and assets of the HPI Business or the Enterprise Business, as the case may be. A Tax shall be considered predominantly attributable to the HPI Business or the Enterprise Business, as the case may be, to the extent that the amount of such Tax attributable to the HPI Business or the Enterprise Business, as the case may be, under this Section 2.03(c) exceeds ninety percent (90%) of the amount of such Tax. For the avoidance of doubt, those Taxes shown on Schedule 2.03(c) shall be considered attributable to the HPI Business or the Enterprise Business to the extent specified therein.

*Section 2.04 Certain Transaction and Other Taxes* .

*(a) HP Liability* . HP shall be liable for, and shall indemnify and hold harmless the Enterprise Group from and against any liability for:

- 13 -

(i) Any Tax imposed by any Tax Authority on any transfer occurring pursuant to the Separation Transactions to the extent that such transfer is not intended to qualify as tax-free or tax-deferred (in whole or in part) pursuant to the Separation Plan (a " Separation Tax ") on any member of the HP Group (if such member is primarily liable for such Tax under applicable Tax Law);

(ii) Any increase in a Separation Tax for which a member of the HP Group is primarily liable under applicable Tax Law as a result of a Final Determination if such increase does not exceed five million dollars ($5,000,000), with any such increase calculated by utilizing the assumptions set forth in the description of HP Full Taxpayer;

(iii) Fifty percent (50%) of any increase in a Separation Tax where such increase exceeds five million dollars ($5,000,000), with any such increase calculated by utilizing the assumptions set forth in the description of HP Full Taxpayer or Enterprise Full Taxpayer, as the case may be;

(iv) Any Tax resulting from a breach by HP of any covenant in this Agreement, the Separation and Distribution Agreement or any Transaction Document; and

(v) Any Tax-Related Losses for which HP is responsible pursuant to Section 7.02 of this Agreement.

*(b) Enterprise Liability* . Enterprise shall be liable for, and shall indemnify and hold harmless the HP Group from and against any liability for:

(i) Any Separation Tax imposed by any Tax Authority on any member of the Enterprise Group (if such member is primarily liable under applicable Tax Law for such Tax);

(ii) Any increase in a Separation Tax for which a member of the Enterprise Group is primarily liable under applicable Tax Law as a result of a Final Determination if such increase does not exceed five million dollars ($5,000,000), with any such increase calculated by utilizing the assumptions set forth in the description of Enterprise Full Taxpayer;

(iii) Fifty percent (50%) of any increase in a Separation Tax where such increase exceeds five million dollars ($5,000,000), with any such increase calculated by utilizing the assumptions set forth in the description of HP Full Taxpayer or Enterprise Full Taxpayer, as the case may be;

(iv) Any Tax resulting from a breach by Enterprise of any covenant in this Agreement, the Separation and Distribution Agreement or any Transaction Document; and

(v) Any Tax-Related Losses for which Enterprise is responsible pursuant to Section 7.02 of this Agreement.

- 14 -

*Section 2.05 Foreign Taxes* . Notwithstanding any provision in this Agreement or the Separation and Distribution Agreement to the contrary, neither HP nor Enterprise shall have any liability under this Section 2 for any Pre-Distribution Period Foreign Taxes. For the avoidance of doubt, the liability for any Pre-Distribution Period Foreign Taxes shall be allocated between BLP1 and BLP3 or Munich and E Munich, as the case may be, as set forth in the Foreign Separation Agreements.

**Section 3. Preparation and Filing of Tax Returns** .

*Section 3.01 General* . Tax Returns shall be prepared and filed when due (including extensions) in accordance with this Section 3. The Companies shall provide, and shall cause their Affiliates to provide, assistance and cooperation to one another in accordance with Section 8 with respect to the preparation and filing of Tax Returns, including providing information required to be provided in Section 8.

*Section 3.02 HP's Responsibility* . HP has the exclusive obligation and right to prepare and file, or to cause to be prepared and filed:

*(a)* All Mixed Business Tax Returns for which HP or any of its Affiliates is legally responsible to prepare and file under applicable Law; and

*(b)* All HP Single Business Tax Returns.

*Section 3.03 Enterprise's Responsibility* . Enterprise shall prepare and file, or shall cause to be prepared and filed, all Tax Returns required to be filed by or with respect to members of the Enterprise Group other than those Tax Returns which HP is required to prepare and file under Section 3.02. The Tax Returns required to be prepared and filed by Enterprise under this Section 3.03 shall include any Enterprise Single Business Tax Return and any Mixed Business Tax Return for which Enterprise or any of its Affiliates is legally responsible to prepare and file under applicable Law.

*Section 3.04 Tax Reporting Practices* .

*(a) General Rule* . With respect to any Tax Return that either Company has the obligation and right to prepare and file, or cause to be prepared and filed, under Section 3.01 or Section 3.02, for any Pre-Distribution Period or any Straddle Period (or Post-Distribution Period to the extent items reported on such Tax Return might reasonably be expected to affect items as reported on any Tax Return for any Pre-Distribution Period or any Straddle Period), such Tax Return shall be prepared in accordance with past practices, accounting methods, elections or conventions (" Past Practices "), including, for example, the methodology historically adopted by the Companies for the accrual of non-U.S. Taxes for purposes of computing any foreign tax credit for U.S. tax purposes, used with respect to the Tax Returns in question (unless there is no reasonable basis for the use of such Past Practices), and to the extent any items are not covered by Past Practices (or in the event that there is no reasonable basis for the use of such Past Practices), in accordance with reasonable Tax accounting practices selected by the Company preparing and filing the Tax Return.

- 15 -

*(b) Reporting of Separation Transactions* . The Tax treatment reported on any Tax Return of the Separation Transactions shall be consistent with the treatment thereof in the Ruling Requests and the Tax Opinions/Rulings, unless there is no reasonable basis for such Tax treatment. The Tax treatment of the Separation Transactions reported on any Tax Return for which Enterprise is the Responsible Company shall be consistent with that on any Tax Return filed or to be filed by HP or any member of the HP Group or caused or to be caused to be filed by HP, unless there is no reasonable basis for such Tax treatment. In the event that a Company shall determine that there is no reasonable basis for the Tax treatment described in either of the preceding two sentences, such Company shall notify the other Company twenty (20) Business Days prior to filing the relevant Tax Return and the Companies shall attempt in good faith to agree on the manner in which the relevant portion of the Separation Transactions shall be reported.

*Section 3.05 Consolidated or Combined Tax Returns* . Enterprise will elect and join and will cause its Affiliates to elect and join, in filing any consolidated, combined or unitary Tax Returns that HP determines are required to be filed or that HP chooses to file pursuant to Section 3.02 with respect to any Pre-Distribution Period. HP will cause its Affiliates to elect and join, in filing any consolidated, combined or unitary Tax Returns that Enterprise determines are required to be filed or that Enterprise chooses to file pursuant to Section 3.03 with respect to any Pre-Distribution Period.

*Section 3.06 Right to Review Tax Returns* .

*(a)* Except as otherwise agreed by the Parties, in the case of any material Tax Returns, to the extent not previously filed, no later than thirty (30) days prior to the Due Date of each such Tax Return (reduced to fifteen (15) days for state or local Tax Returns), the Responsible Company shall make available or cause to be made available drafts of such Tax Return (together with all related work papers) to the other Company. The other Company shall have access to any and all data and information necessary for the preparation of all such Tax Returns and the Companies shall cooperate fully in the preparation and review of such Tax Returns. Subject to the preceding sentence, no later than fifteen (15) days after receipt of such Tax Returns (reduced to ten (10) days for state or local Tax Returns), the other Company shall have a right to object to such Tax Return (or items with respect thereto) by written notice to the Responsible Company; such written notice shall contain such disputed item (or items) and the basis for its objection. For purposes of this Section 3.06(a), a Tax Return is "material" with respect to a Company who is not the Responsible Company if it could reasonably be expected to reflect, with respect to such Company, (A) Tax liability equal to or in excess of twenty-five million dollars ($25,000,000), (B) a credit or credits equal to or in excess of twenty-five million dollars ($25,000,000), or (C) a loss or losses equal to or in excess of twenty-five million dollars ($25,000,000).

*(b)* With respect to a Tax Return submitted by the Responsible Company to the other Company pursuant to Section 3.06(a), if the other Company does not object by proper written notice described in Section 3.06(a), such Tax Return shall be deemed to have been accepted and agreed upon, and to be final and conclusive, for purposes of this Section 3.06(b). If a Company does object by proper written notice described in Section 3.06(a), the Companies shall act in good faith to resolve any such dispute as promptly as practicable; provided , however , that,

- 16 -

notwithstanding anything to the contrary contained herein, if the Companies have not resolved the disputed item or items by the day five (5) days prior to the Due Date of such Tax Return, such Tax Return shall be filed as prepared pursuant to Section 3.06 (revised to reflect all initially disputed items that the Companies have agreed upon prior to such date).

(c) In the event a Tax Return is filed that includes any disputed item for which proper notice was given pursuant to Section 3.06(a) that was not finally resolved and agreed upon, such disputed item (or items) shall be resolved in accordance with Section 14. In the event that the resolution of such disputed item (or items) in accordance with Section 14 with respect to a Tax Return is inconsistent with such Tax Return as filed, the Responsible Company (with cooperation from the other Company) shall, as promptly as practicable, amend such Tax Return to properly reflect the final resolution of the disputed item (or items). In the event that the amount of Taxes shown to be due and owing on a Tax Return is adjusted as a result of a resolution pursuant to Section 14, proper adjustment shall be made to the amounts previously paid or required to be paid in accordance with Section 4 in a manner that reflects such resolution.

Section 3.07 *Refunds, Carrybacks and Amended Returns* .

*(a) Refunds* .

(i) Each Party (and its Affiliates) (the " Claiming Party ") shall be entitled to Refunds that relate to Taxes for which it (or its Affiliates) is liable for hereunder.

(ii) Notwithstanding Section 3.07(a)(i), to the extent a claim for a Refund results in a Correlative Detriment to the other Party (or its Affiliates), any such Refund that is received by the Claiming Party (or its Affiliates) shall, and only to the extent thereof, be paid to the other Party (or its Affiliates) that incurs such Correlative Detriment. A " Correlative Detriment " is an increase in a Tax of a Party (or its Affiliates) that occurs as a result of the Tax position that is the basis for a claim for Refund by the Claiming Party or for a Final Determination, utilizing the assumptions set forth in the description of HP Full Taxpayer or Enterprise Full Taxpayer, as the case may be.

(iii) Any Refund or portion thereof to which a Claiming Party is entitled pursuant to this Section 3.07(a) that is received or deemed to have been received as described herein by the other Company (or its Affiliates) shall be paid by such other Company to the Claiming Party in immediately available funds in accordance with Section 4. To the extent a Company (or its Affiliates) applies or causes to be applied an overpayment of Taxes as a credit toward or a reduction in Taxes otherwise payable (or a Tax Authority requires such application in lieu of a Refund) and such Refund, if received, would have been payable by such Party to the Claiming Party pursuant to this Section 3.07(a), such Party shall be deemed to have actually received a Refund to the extent thereof on the date on which the overpayment is applied to reduce Taxes otherwise payable.

- 17 -

(iv) Notwithstanding anything to the contrary in this Agreement, any Company that has claimed (or caused one or more of its Affiliates to claim) a Refund shall be liable for any Taxes that become due and payable as a result of the subsequent adjustment, if any, to the Refund claim.

*(b) Carrybacks.*

(i) Each of the Companies shall be permitted (but not required) to carry back (or to cause its Affiliates to carry back) a Tax Attribute realized in a Post-Distribution Period or a Straddle Period to a Pre-Distribution Period or a Straddle Period only if such carryback cannot reasonably result in the other Company (or its Affiliates) being liable for additional Taxes. If a carryback could reasonably result in the other Company (or its Affiliates) being liable for additional Taxes, such carryback shall be permitted only if such Company consents to such carryback.

(ii) Notwithstanding anything to the contrary in this Agreement, any Company that has claimed (or caused one or more of its Affiliates to claim) a Tax Attribute carryback shall be liable for any Taxes that result from such carryback claim or become due and payable as a result of the subsequent adjustment, if any, to the carryback claim.

(iii) A Company shall be entitled to any Refund that is attributable to, and would not have arisen but for, a carryback of a Tax Attribute by such Company pursuant to the provisions set forth in Section 3.07(b).

(iv) A Company shall be entitled to any Tax Benefit of five million dollars ($5,000,000) or more actually realized by the other Company or its Affiliates as a result of any carryback of a Tax Attribute by such first Company.

*(c) Amended Tax Returns*

(i) Notwithstanding Section 3.01, a Company (or its Affiliates) that is entitled to file an amended Tax Return for a Pre-Distribution Period or a Straddle Period shall be permitted to prepare and file such amended Tax Return at its own cost and expense; provided , however , that such amended Tax Return shall be prepared in a manner (i) consistent with the past practice of the Companies (and their Affiliates) unless otherwise modified by a Final Determination or required by applicable Tax Law; and (ii) consistent with (and the Companies and their Affiliates shall not take any position inconsistent with) the Tax Opinions/Rulings. Notwithstanding anything to contrary contained herein, if such amended Tax Return could reasonably result in the other Company becoming responsible for a payment of Taxes pursuant to Section 4, then such amended Tax Return shall be permitted only if the consent of such other Company is obtained. The consent of such other Company shall be deemed to be obtained in the event that a Company (or its Affiliate) is required by Law to file an amended Tax Return as a result of an adjustment.

- 18 -

(ii) A Company (or its Affiliate) that is entitled to file an amended Tax Return for a Post-Distribution Period shall be permitted to do so without the consent of the other Company.

(iii) A Company that is permitted (or whose Affiliate is permitted) to file an amended Tax Return shall not be relieved of any liability for payments pursuant to this Agreement or the Foreign Separation Agreements notwithstanding that the Company consented to the filing of such amended Tax Return giving rise to such liability.

*Section 3.08 Apportionment of Tax Attributes* . Each Company shall make its own determination as to the existence and the amount of the Tax Attributes to which it or its Affiliates are entitled after the Effective Time; provided , however , that such determination shall be made in a manner that is (a) reasonably consistent with the past practices of the Companies; (b) in accordance with the rules prescribed by applicable Law, including the Code and the Treasury Regulations; (c) consistent with the Tax Opinions/Rulings; and (d) reasonably determined by the Company to minimize the aggregate cash Tax liability of the Companies for all Pre-Distribution Periods and the portion of all Straddle Periods ending on the Distribution Date. Each Company agrees to provide the other Company with all of the information supporting the Tax Attribute determinations made by that Company pursuant to this Section 3.08.

**Section 4. Tax Payments.**

*Section 4.01 Payment of Taxes with Respect to Certain Mixed Business Tax Returns.*

*(a) Computation and Payment of Tax Due* . At least three (3) Business Days prior to any Payment Date for any such Tax Return, the Responsible Company shall compute the amount of Tax required to be paid to the applicable Tax Authority (taking into account the requirements of Section 3.04 relating to consistent reporting practices, as applicable) with respect to such Tax Return on such Payment Date. The Responsible Company shall pay such amount to such Tax Authority on or before such Payment Date. The Responsible Company shall provide notice to the other Company setting forth such other Company's responsibility for the amount of Taxes paid to the Tax Authority and provide proof of payment of such Taxes.

*(b) Computation and Payment of Liability With Respect To Tax Due* . Within thirty (30) Business Days following the earlier of (i) the due date (including extensions) for filing any such Tax Return (excluding any Tax Return with respect to payment of estimated Taxes or Taxes due with a request for extension of time to file) or (ii) the date on which such Tax Return is filed, if HP is the Responsible Company, then Enterprise shall pay to HP the amount allocable to the Enterprise Group under the provisions of Section 2, and if Enterprise is the Responsible Company, then HP shall pay to Enterprise the amount allocable to the HP Group under the provisions of Section 2, in each case, plus interest computed at the Prime Rate on the amount of the payment based on the number of days from the earlier of (i) the due date of the Tax Return (including extensions) or (ii) the date on which such Tax Return is filed, to the date of payment. For the avoidance of doubt, however, the thirty (30) Business Day period described herein shall not commence unless and until the Responsible Company notifies the other Company pursuant to Section 4.01(a) hereof, nor shall interest accrue during any time period where such notification has not been received.

- 19 -

*(c) Adjustments Resulting in Underpayments* . In the case of any adjustment pursuant to a Final Determination with respect to any such Tax Return, the Responsible Company shall pay to the applicable Tax Authority when due any additional Tax due with respect to such Tax Return required to be paid as a result of such adjustment pursuant to a Final Determination. The Responsible Company shall compute the amount attributable to the Enterprise Group in accordance with Section 2 and Enterprise shall pay to HP any amount due HP (or HP shall pay Enterprise any amount due Enterprise) under Section 2 within thirty (30) Business Days from the later of (i) the date the additional Tax was paid by the Responsible Company or, in an instance where no cash payments is due to a Tax Authority, the date of such Final Determination, or (ii) the date of receipt of a written notice and demand from the Responsible Company for payment of the amount due, accompanied by evidence of payment and a statement detailing the Taxes paid and describing in reasonable detail the particulars relating thereto. Any payments required under this Section 4.01(c) shall include interest computed at the Prime Rate based on the number of days from the date the additional Tax was paid by the Responsible Company (or, in an instance where no cash payments is due to a Tax Authority, the date of such Final Determination) to the date of the payment under this Section 4.01(c).

Section 4.02 *Payment of Taxes with Respect to Single Business Tax Returns* . Each Company shall pay, or shall cause to be paid, to the applicable Tax Authority when due all Taxes owed by such Company or a member of such Company's Group with respect to a Single Business Tax Return.

Section 4.03 *Indemnification Payments.*

*(a)* If any Company (the " Payor ") is required under applicable Tax Law to pay to a Tax Authority a Tax that another Company (the " Required Party ") is liable for under this Agreement, the Payor shall provide notice to the Required Party for the amount due, accompanied by evidence of payment and a statement detailing the Taxes paid and describing in reasonable detail the particulars relating thereto. Such Required Party shall have a period of thirty (30) days after the receipt of notice to respond thereto. Unless the Required Party disputes the amount it is liable for under this Agreement, the Required Party shall reimburse the Payor within forty-five (45) Business Days of delivery by the Payor of the notice described above. To the extent the Required Party does not agree with the amount the Payor claims the Required Party is liable for under this Agreement, the dispute shall be resolved in accordance with Section 14. Any reimbursement shall include interest on the Tax payment computed at the Prime Rate based on the number of days from the date of the payment to the Tax Authority to the date of reimbursement under this Section 4.03.

*(b)* Any Tax indemnity payment required to be made by the Required Party pursuant to Section 4 shall be reduced by any corresponding Tax Benefit payment required to be made to the Required Party by the other Company pursuant to Section 5. For the avoidance of doubt, a Tax Benefit payment is treated as corresponding to a Tax indemnity payment to the extent the Tax Benefit realized is directly attributable to the same Tax Item (or adjustment of such Tax Item pursuant to a Final Determination) that gave rise to the Tax indemnity payment.

- 20 -

*(c)* All indemnification payments under this Agreement shall be made by HP directly to Enterprise and by Enterprise directly to HP; *provided* , *however* , that if the Companies mutually agree with respect to any such indemnification payment, any member of the HP Group, on the one hand, may make such indemnification payment to any member of the Enterprise Group, on the other hand, and vice versa. All indemnification payments shall be treated in the manner described in Section 13.

**Section 5. Tax Benefits.**

*Section 5.01 Tax Benefits.*

*(a)* If a member of the Enterprise Group realizes any Tax Benefit as a result of an adjustment pursuant to a Final Determination to any Taxes for which a member of the HP Group is liable hereunder or under the Foreign Separation Agreements and such Tax Benefit would not have arisen but for such adjustment (determined on a "with and without" basis, assuming the HP Group or Enterprise Group, as the case may be, is an HP Full Taxpayer or an Enterprise Full Taxpayer, respectively), or if a member of the HP Group realizes any Tax Benefit as a result of an adjustment pursuant to a Final Determination to any Taxes for which a member of the Enterprise Group is liable hereunder or under the Foreign Separation Agreements and such Tax Benefit would not have arisen but for such adjustment (determined on a "with and without" basis, assuming the HP Group or Enterprise Group, as the case may be, is an HP Full Taxpayer or an Enterprise Full Taxpayer, respectively), Enterprise or HP, as the case may be, shall make a payment to the other company within one hundred and twenty (120) Business Days following such realization of the Tax Benefit, in an amount equal to such Tax Benefit, plus interest on such amount computed at the Prime Rate based on the number of days from the date of such actual realization of the Tax Benefit to the date of payment of such amount under this Section 5.01(a). For purposes of Section 5.01, a Company shall be deemed to realize a Tax Benefit relating to—

(i) any previously taxed earnings and profits, as described in Section 959 of the Code (" PTE "), at the time of such adjustment in an amount such that the payment made by the Company realizing the Tax Benefit pursuant to this Section 5.01(a) with respect to such PTE shall cause (i) the Net PTE Tax Payments of HP less the Remaining PTE Value held by HP to equal (ii) the Net PTE Tax Payments of Enterprise less the Remaining PTE Value held by Enterprise, as shown in Exhibit B (and shall not, for the avoidance of doubt, be deemed to realize any further Tax Benefits with respect to such PTE at any later time);

(ii) any receivable arising pursuant to Section 4.01 of Revenue Procedure 99-32 at the time such receivable is created, in an amount such that the payment made by the Company realizing the Tax Benefit pursuant to this Section 5.01(a) with respect to such receivable shall cause (i) the Net Receivable Tax Payments of HP less the Remaining Receivable Value held by HP to equal (ii) the Net Receivable Tax Payments of Enterprise less the Remaining Receivable Value held by Enterprise (and shall not, for the avoidance of doubt, be deemed to realize any further Tax Benefits with respect to such receivable at any later time); and

- 21 -

(iii) any foreign tax credits, as described in Section 902 of the Code, at the time such Company would be eligible to claim a credit under Section 902 of the Code (disregarding any limitations for these purposes) with respect to a pool of earnings and profits including any such foreign tax credits, and shall not, for the avoidance of doubt, be deemed to realize any further Tax Benefits with respect to such foreign tax credits at any later time; provided , however , no Tax Benefit shall be realized (i) to the extent that the statutory tax rate of the legal entity paying such foreign tax (as adjusted to account for any lower rate granted pursuant to a Tax incentive, Tax ruling, Tax holiday or similar arrangement) for the year of such foreign tax is less than fifteen (15) percent, or (ii) to the extent that the Final Determination resulting in such foreign tax credits also produces increased earnings and profits for U.S. federal income tax purposes.

(b) No later than one hundred and twenty (120) Business Days after a Tax Benefit described in Section 5.01(a) is realized by a member of the HP Group or a member of the Enterprise Group, HP (if a member of the HP Group realizes such Tax Benefit) or Enterprise (if a member of the Enterprise Group realizes such Tax Benefit) shall provide the other Company with notice of the amount payable to such other Company by HP or Enterprise pursuant to this Section 5. In the event that HP or Enterprise disagrees with any such calculation described in this Section 5.01(b), HP or Enterprise shall so notify the other Company in writing within thirty (30) Business Days of receiving the written calculation set forth above in this Section 5.01(b). HP and Enterprise shall endeavor in good faith to resolve such disagreement, and, failing that, the amount payable under this Section 5 shall be determined in accordance with the disagreement resolution provisions of Section 14 as promptly as practicable.

(c) For the avoidance of doubt, this Section 5 shall apply to any adjustment under Section 482 of the Code or any similar provisions by any Tax Authority increasing the amount of payments received or deemed received by (1) any member of the HP Group from any member of the Enterprise Group or (2) any member of the Enterprise Group from any member of the HP Group.

## Section 6. Employee Benefits Matters

*Section 6.01 HP and Enterprise Income Tax Deductions in Respect of Certain Equity Awards and Compensation* . Unless otherwise required by applicable Law, solely the member of the Group for which the relevant individual is currently employed or, if such individual is not currently employed by a member of the Group, was most recently employed at the time of the vesting, exercise, disqualifying disposition, payment or other relevant taxable event, as appropriate, in respect of equity awards and other compensation shall be entitled to claim any Income Tax deduction in respect of such equity awards and other compensation on its respective Tax Return associated with such event.

*Section 6.02 Withholding and Reporting* . The Company (or its Affiliate) that claims the deduction described in Section 6.01 shall be responsible for all applicable Taxes (including withholding and excise taxes) and shall satisfy, or shall cause to be satisfied, all applicable Tax reporting obligations in respect of compensation (other than compensation attributable to equity awards) that gives rise to the deduction. Section 5.03(k)(ii) of the Employee Matters Agreement

- 22 -

shall govern withholding and reporting obligations with respect to equity awards. The Companies shall cooperate (and shall cause their Affiliates to cooperate) so as to permit the Company (or Affiliate thereof) claiming such deduction described in Section 6.01 to discharge any applicable Tax withholding and Tax reporting obligations, including the appointment of a Company (or its Affiliate) claiming the deduction as the withholding and reporting agent if that Company (or any of its Affiliates) is not otherwise required or permitted to withhold or report under applicable Law.

Section 6.03 Pension Deductions.

(a) Within one hundred and twenty (120) Business Days after the due date (including extensions) of the Tax Return for any taxable year, if the Maximum Enterprise Pension Tax Benefit (as defined below) exceeds the amount of payments previously made under this Section 6.03(a) (such excess, the " Available Enterprise Pension Tax Benefit "), Enterprise shall make a payment to HP in an amount equal to the lesser of (i) the greater of (x) fifty million dollars ($50,000,000) and (y) the excess of Tax Benefits actually realized by the Enterprise Group for such taxable year and earlier post-Distribution taxable years arising as a result of one or more Pension Contributions made by one or more members of the HP Group following the Distribution, calculated on a "with and without" basis, over amounts previously paid pursuant to this Section 6.03(a), and (ii) the Available Enterprise Pension Tax Benefit. The " Maximum Enterprise Pension Tax Benefit " shall equal the amount of the Tax Benefit that would be realized by the Enterprise Group as a result of all Pension Contributions made by one or more members of the HP Group in any taxable year or years following the Distribution, calculated using the assumptions set forth under Enterprise Full Taxpayer.

(b) Within one hundred and twenty (120) Business Days after the due date (including extensions) of the Tax Return for any taxable year, if the Maximum HP Pension Tax Benefit (as defined below) exceeds the amount of payments previously made under this Section 6.03(b) (such excess, the " Available HP Pension Tax Benefit "), HP shall make a payment to Enterprise in an amount equal to the lesser of (i) the greater of (x) fifty million dollars ($50,000,000) and (y) the excess of Tax Benefits actually realized by the HP Group for such taxable year and earlier post-Distribution taxable years arising as a result of one or more Pension Contributions made by one or more members of the Enterprise Group following the Distribution, calculated on a "with and without" basis, over amounts previously paid pursuant to this Section 6.03(b), and (ii) the Available HP Pension Tax Benefit. The " Maximum HP Pension Tax Benefit " shall equal the amount of the Tax Benefit that would be realized by the HP Group as a result of all Pension Contributions made by one or more members of the Enterprise Group in any taxable year or years following the Distribution, calculated using the assumptions set forth under HP Full Taxpayer.

(c) For each year in which a Pension Contribution that may result in a payment pursuant to Section 6.03(a) or (b) is made, the Companies shall determine the portion of deductions attributable to the Enterprise Group, on the one hand, and the HP Group, on the other hand, as a result of such Pension Contribution, with any disputes resolved pursuant to Section 14.03. The Companies shall file Tax Returns and otherwise report consistently with such allocation, except to the extent otherwise required by a Final Determination.

**Section 7. Tax-Free Status.**

*Section 7.01 Restrictions on HP and Enterprise* . During the Restricted Period, neither HP nor Enterprise shall:

*(a)* enter into any Proposed Acquisition Transaction, approve any Proposed Acquisition Transaction for any purpose, or allow any Proposed Acquisition Transaction to occur with respect to HP or Enterprise;

*(b)* merge or consolidate with any other Person or liquidate or partially liquidate; or approve or allow any merger, consolidation, liquidation, or partial liquidation of any of the Active Business Entities;

*(c)* approve or allow the discontinuance, cessation, or sale or other transfer (to an Affiliate or otherwise) of, or a material change in, any Active Business;

*(d)* approve or allow the sale, issuance, or other disposition (to an Affiliate or otherwise), directly or indirectly, of any share of, or other equity interest or an instrument convertible into an equity interest in, any of the Active Business Entities;

*(e)* sell or otherwise dispose of more than 35 percent of its consolidated gross or net assets, or approve or allow the sale or other disposition (to an Affiliate or otherwise) of more than 35 percent of its consolidated gross or net assets of HP, Enterprise or more than 35 percent of the consolidated gross or net assets of any of the Active Business Entities (in each case, excluding sales in the ordinary course of business and measured based on fair market values as of the Distribution Date);

*(f)* amend its certificate of incorporation (or other organizational documents), or take any other action or approve or allow the taking of any action, whether through a stockholder vote or otherwise, affecting the voting rights of HP or Enterprise stock;

*(g)* issue shares of a new class of nonvoting stock or approve or allow HP or Enterprise to issue shares of a new class of nonvoting stock;

*(h)* purchase, directly or through any Affiliate, any of its outstanding stock after the Distribution, other than through stock purchases meeting the requirements of Section 4.05(1)(b) of Revenue Procedure 96-30 (without regard to the effect of Revenue Procedure 2003-48 on Revenue Procedure 96-30);

*(i)* take any action or fail to take any action, or permit any member of the HP Group or any member of the Enterprise Group to take any action or fail to take any action, that is inconsistent with any representation or covenant made in the Tax Opinions/Rulings or the Ruling Request; or

*(j)* take any action or permit any other member of the HP Group or member of the Enterprise Group to take any action (including any transactions with a third-party or any transaction with any Company) that, individually or in the aggregate (taking into account other transactions described in this Section 7.01) would be reasonably likely to adversely affect (A) the

- 24 -

Tax-Free Status of the Contribution and Distribution, or (B) the qualification of any Separation Transaction under U.S. federal, state, local or non-U.S. Tax Law as wholly or partially tax-free or tax-deferred (including, but not limited to, those transactions described in any of the Tax Opinions/Rulings received with respect to such Separation Transaction);

provided , however , that HP and Enterprise shall be permitted to take such action or one or more actions set forth in the foregoing clauses (a) through (j) if, prior to taking any such actions, the Party taking the action (the " Acting Party ") shall (1) have received a favorable private letter ruling from the IRS, or a ruling from another Tax Authority that confirms that such action or actions will not result in Distribution Taxes, taking into account such actions and any other relevant transactions in the aggregate (a " Post-Distribution Ruling "), in form and substance satisfactory to the other Party (the " Non-Acting Party ") in its discretion, which discretion shall be reasonably exercised in good faith solely to prevent the imposition on the Non-Acting Party, or responsibility for payment by the Non-Acting Party, of Distribution Taxes (which discretion shall include consideration of the reasonableness of any representations made in connection with such Post-Distribution Ruling) or (2) have received an Unqualified Tax Opinion that confirms that such action or actions will not result in Distribution Taxes, taking into account such actions and any other relevant transactions in the aggregate, in form and substance satisfactory to the Non-Acting Party (including any representations or assumptions that may be included in such Unqualified Tax Opinion), acting reasonably and in good faith solely to prevent the imposition on the Non-Acting Party, or responsibility for payment by the Non-Acting Party, of Distribution Taxes. The Acting Party shall provide a copy of the Post-Distribution Ruling or the Unqualified Tax Opinion described in this paragraph to the Non-Acting Party as soon as practicable prior to taking or failing to take any action set forth in the foregoing clause (a) through (j). The Non-Acting Party's evaluation of a Post-Distribution Ruling or Unqualified Tax Opinion may consider, among other factors, the appropriateness of any underlying assumptions, representations, and covenants made in connection with such Post-Distribution Ruling or Unqualified Tax Opinion. The Acting Party shall bear all costs and expenses of securing any such Post-Distribution Ruling or Unqualified Tax Opinion and shall reimburse the Non-Acting Party for all reasonable out-of-pocket costs and expenses that the Non-Acting Party may incur in good faith in seeking to obtain or evaluate any such Post-Distribution Ruling or Unqualified Tax Opinion.

Section 7.02 Liability for Distribution Tax-Related Losses . In the event that Distribution Taxes become due and payable to a Tax Authority pursuant to a Final Determination, then, notwithstanding anything to the contrary in this Agreement:

(a) if such Distribution Taxes are attributable to a Tainting Act, as defined in Section 7.03, of any member of the HP Group (an " HP Tainting Act "), then HP shall be responsible for any Distribution Tax-Related Losses;

(b) if such Distribution Taxes are attributable to a Tainting Act, as defined in Section 7.03, of any member of the Enterprise Group (an " Enterprise Tainting Act "), then Enterprise shall be responsible for any Distribution Tax-Related Losses;

(c) if such Distribution Taxes are attributable to both a HP Tainting Act and an Enterprise Tainting Act, then responsibility for such Distribution Tax-Related Losses shall be

- 25 -

shared by HP and Enterprise according to relative fault (provided, however, that in the event that Distribution Tax-Related Losses may result both from an action of or with respect to one Company described in Section 7.03(b) and an action of with respect to the other Company not described in Section 7.03(b), the Company undertaking the action described in Section 7.03(b) or with respect to whom such action is undertaken shall bear sole responsibility); and

*(d)* if such Distribution Taxes are not attributable to a HP Tainting Act or an Enterprise Tainting Act, then responsibility for such Distribution Tax-Related Losses shall be shared fifty percent (50%) by HP and fifty percent (50%) by Enterprise.

*Section 7.03 Definition of Tainting Act* . For purposes of this Agreement, a Tainting Act is:

*(a)* any act, or failure or omission to act, by any Company (or any of its Affiliates) following the Distribution that results in any Company (or any of its Affiliates) being responsible for such Distribution Taxes pursuant to a Final Determination, regardless of whether such act or failure to act (i) is covered by a Post-Distribution Ruling or Unqualified Tax Opinion, or (ii) occurs during or after the Restricted Period; or

*(b)* the direct or indirect acquisition of all or a portion of the stock of any Company (or any transaction or series of related transactions that is deemed to be such an acquisition for purposes of Section 355(e) of the Code and the Treasury Regulations promulgated thereunder) by any means whatsoever by any Person, including pursuant to an issuance of stock by any Company.

**Section 8. Cooperation and Reliance.**

*Section 8.01 Assistance and Cooperation.*

*(a)* The Companies shall cooperate (and cause their respective Affiliates to cooperate) with each other and with each other's agents, including accounting firms and legal counsel, in connection with Tax matters relating to the Companies and their Affiliates including (i) preparation and filing of Tax Returns, (ii) determining the liability for and amount of any Taxes due (including estimated Taxes) or the right to and amount of any refund of Taxes, (iii) examinations of Tax Returns, and (iv) any administrative or judicial proceeding in respect of Taxes assessed or proposed to be assessed. Such cooperation shall include making all information and documents in their possession relating to the other Company and its Affiliates available to such other Company as provided in Section 9. Each of the Companies shall also make available to the other, as reasonably requested and available, personnel (including officers, directors, employees and agents of the Companies or their respective Affiliates) responsible for preparing, maintaining, and interpreting information and documents relevant to Taxes, and personnel reasonably required as witnesses or for purposes of providing information or documents in connection with any administrative or judicial proceedings relating to Taxes. In the event that a member of the HP Group, on the one hand, or a member of the Enterprise Group, on the other hand, suffers a Tax detriment as a result of a Transfer Pricing Adjustment, the Companies shall cooperate pursuant to this Section 8 to seek any competent authority relief that may be available with respect to such Transfer Pricing Adjustment.

- 26 -

*(b)* Any information or documents provided under this Section 8 shall be kept confidential by the Company receiving the information or documents, except as may otherwise be necessary in connection with the filing of Tax Returns or in connection with any administrative or judicial proceedings relating to Taxes. Notwithstanding any other provision of this Agreement or any other agreement, (i) neither Company nor any Affiliate shall be required to provide the other Company or any Affiliate or any other Person access to or copies of any information or procedures (including the proceedings of any Tax Contest) other than information or procedures that relate solely to the first Company, the business or assets of the first Company or any of its Affiliates and (ii) in no event shall any Company or its Affiliates be required to provide the other Company, any of the other Company's Affiliates or any other Person access to or copies of any information if such action could reasonably be expected to result in the waiver of any Privilege. In addition, in the event that a Company determines that the provision of any information to the other Company or an Affiliate of the other Company could be commercially detrimental, violate any Law or agreement or waive any Privilege, the parties shall use reasonable best efforts to permit compliance with its obligations under this Section 8 in a manner that avoids any such harm or consequence.

*Section 8.02 Income Tax Return Information* . Enterprise and HP acknowledge that time is of the essence in relation to any request for information, assistance or cooperation made by HP or Enterprise pursuant to Section 8.01 or this Section 8.02. Enterprise and HP acknowledge that failure to conform to the deadlines set forth herein or reasonable deadlines otherwise set by HP or Enterprise could cause irreparable harm. Each Company shall provide to the other Company information and documents relating to its Group required by the other Company to prepare Tax Returns. Any information or documents the Responsible Company requires to prepare such Tax Returns shall be provided in such form as the Responsible Company reasonably requests and in sufficient time for the Responsible Company to file such Tax Returns on a timely basis.

*Section 8.03 Reliance by HP* . If any member of the Enterprise Group supplies information to a member of the HP Group in connection with a Tax liability and an officer of a member of the HP Group signs a statement or other document under penalties of perjury in reliance upon the accuracy of such information, then upon the written request of such member of the HP Group identifying the information being so relied upon, the chief financial officer of Enterprise (or any officer of Enterprise as designated by the chief financial officer of Enterprise) shall certify in writing that to his or her knowledge (based upon consultation with appropriate employees) the information so supplied is accurate and complete.

*Section 8.04 Reliance by Enterprise* . If any member of the HP Group supplies information to a member of the Enterprise Group in connection with a Tax liability and an officer of a member of the Enterprise Group signs a statement or other document under penalties of perjury in reliance upon the accuracy of such information, then upon the written request of such member of the Enterprise Group identifying the information being so relied upon, the chief financial officer of HP (or any officer of HP as designated by the chief financial officer of HP) shall certify in writing that to his or her knowledge (based upon consultation with appropriate employees) the information so supplied is accurate and complete.

- 27 -

*Section 8.05 Nonperformance* . If a Company (or any of its Affiliates) fails to comply with any of its obligations set forth in this Section 8 upon reasonable request and notice by the other Company (or any of its Affiliates) and such failure results in the imposition of additional Taxes, the nonperforming party shall be liable in full for such additional Taxes.

*Section 8.06 Costs* . Each Company shall devote the personnel and resources necessary in order to carry out this Section 8 and shall make its employees available on a mutually convenient basis to provide explanations of any documents or information provided hereunder. Each Company shall carry out its responsibilities under this Section 8 charging to the other only the out-of-pocket costs actually incurred or as otherwise provided in the TSA.

**Section 9. Tax Records** .

*Section 9.01 Retention of Tax Records* . Each Company shall preserve and keep all Tax Records exclusively relating to the assets and activities of its Group for Pre-Distribution Periods, and HP shall preserve and keep all other Tax Records relating to Taxes of the Groups for Pre-Distribution Periods, for so long as the contents thereof may become material in the administration of any matter under the Code or other applicable Tax Law, but in any event until the later of (i) the expiration of any applicable statutes of limitations, or (ii) seven years after the Distribution Date (such later date, the " Retention Date "). After the Retention Date, each Company may dispose of such Tax Records upon 90 Business Days' prior written notice to the other Company. If, prior to the Retention Date, (a) a Company reasonably determines that any Tax Records which it would otherwise be required to preserve and keep under this Section 9 are no longer material in the administration of any matter under the Code or other applicable Tax Law and the other Company agrees, then such first Company may dispose of such Tax Records upon 90 Business Days' prior notice to the other Company. Any notice of an intent to dispose given pursuant to this Section 9.01 shall include a list of the Tax Records to be disposed of describing in reasonable detail each file, book, or other record accumulation being disposed. The notified Company shall have the opportunity, at its cost and expense, to copy or remove, within such 90-day period, all or any part of such Tax Records. If, at any time prior to the Retention Date, a Company determines to decommission or otherwise discontinue any computer program or information technology system used to access or store any Tax Records, then such Company may decommission or discontinue such program or system upon 90 Business Days' prior notice to the other Company and the other Company shall have the opportunity, at its cost and expense, to copy, within such 90-day period, all or any part of the underlying data relating to the Tax Records accessed by or stored on such program or system.

*Section 9.02 Access to Tax Records* . The Companies and their respective Affiliates shall make available to each other for inspection and copying during normal business hours upon reasonable notice all Tax Records (and, for the avoidance of doubt, any pertinent underlying data accessed or stored on any computer program or information technology system) in their possession and shall permit the other Company and its Affiliates, authorized agents and representatives and any representative of a Tax Authority or other Tax auditor direct access during normal business hours upon reasonable notice to any computer program or information technology system used to access or store any Tax Records, in each case to the extent reasonably required by the other Company in connection with the preparation of Tax Returns or financial accounting statements, audits, litigation, or the resolution of items under this Agreement (or Tax

- 28 -

items under the Foreign Separation Agreements). To the extent any Tax Records are required to be or are otherwise transferred by the Companies or their respective Affiliates to any person other than an Affiliate, the Company or its respective Affiliate shall transfer such records to the other Company at such time.

**Section 10. Tax Contests** .

*Section 10.01 Notice* . Each of the Companies shall provide prompt notice to the other Company of any written communication from a Tax Authority regarding any pending or threatened Tax audit, assessment or proceeding or other Tax Contest of which it becomes aware related to Taxes for which it is indemnified by the other Company hereunder or under the Foreign Separation Agreements. Such notice shall attach copies of the pertinent portion of any written communication from a Tax Authority and contain factual information (to the extent known) describing any asserted Tax liability in reasonable detail and shall be accompanied by copies of any notice and other documents received from any Tax Authority in respect of any such matters. If an indemnified party has knowledge of an asserted Tax liability with respect to a matter for which it is entitled to indemnification hereunder or under the Foreign Separation Agreements and such party fails to give the indemnifying party prompt notice of such asserted Tax liability and the indemnifying party is entitled under this Agreement to contest the asserted Tax liability, then (i) if the indemnifying party is precluded from contesting the asserted Tax liability in any forum as a result of the failure to give prompt notice, the indemnifying party shall have no obligation to indemnify the indemnified party for such Tax liability or any other Taxes arising from such failure, and (ii) if the indemnifying party is not precluded from contesting the asserted Tax liability in any forum, but such failure to give prompt notice results in a material monetary detriment to the indemnifying party, then any amount which the indemnifying party is otherwise required to pay the indemnified party pursuant to this Agreement or the Foreign Separation Agreements shall be reduced by the amount of such detriment.

*Section 10.02 Control of Tax Contests* .

*(a) Controlling Party* . In the case of any Tax Contest with respect to any Tax Return, the Company that would be primarily liable under applicable Law to pay the applicable Tax Authority the Taxes resulting from such Tax Contest shall administer and control such Tax Contest.

*(b) Settlement Rights* . The Controlling Party must obtain the prior consent of the Non-Controlling Party prior to contesting, litigating, compromising or settling any Tax Contest related to an adjustment which the Non-Controlling Party may reasonably be expected to become liable to make any indemnification payment under Section 4 (or any payment under Section 5). Unless waived by the parties in writing, in connection with any potential adjustment in a Tax Contest as a result of which adjustment the Non-Controlling Party may reasonably be expected to become liable to make any indemnification payment under Section 4 (or any payment under Section 5 ) to the Controlling Party under this Agreement or under the Foreign Separation Agreements: (i) the Controlling Party shall keep the Non-Controlling Party informed in a timely manner of all actions taken or proposed to be taken by the Controlling Party with respect to such potential adjustment in such Tax Contest; (ii) the Controlling Party shall provide the Non-Controlling Party copies of any written materials relating to such potential adjustment in such

- 29 -

Tax Contest received from any Tax Authority; (iii) the Controlling Party shall timely provide the Non-Controlling Party with copies of any correspondence or filings submitted to any Tax Authority or judicial authority in connection with such potential adjustment in such Tax Contest; (iv) the Controlling Party shall consult with the Non-Controlling Party (including, without limitation, regarding the use of outside advisors to assist with the Tax Contest) and offer the Non-Controlling Party a reasonable opportunity to comment before submitting any written materials prepared or furnished in connection with such potential adjustment in such Tax Contest; and (v) the Controlling Party shall defend such Tax Contest diligently and in good faith. The failure of the Controlling Party to take any action specified in the preceding sentence with respect to the Non-Controlling Party shall not relieve the Non-Controlling Party of any liability and/or obligation which it may have to the Controlling Party under this Agreement or the Foreign Separation Agreements except to the extent that the Non-Controlling Party was actually harmed by such failure, and in no event shall such failure relieve the Non-Controlling Party from any other liability or obligation which it may have to the Controlling Party. In the case of any Tax Contest described in Section 10.02(a) or (b), " Controlling Party " means the Company entitled to control the Tax Contest under such Section and " Non-Controlling Party " means the other Company.

*(c) Tax Contest Participation* . Unless waived by the parties in writing, the Controlling Party shall provide the Non-Controlling Party with written notice reasonably in advance of, and the Non-Controlling Party shall have the right to attend, any formally scheduled meetings with Tax Authorities or hearings or proceedings before any judicial authorities in connection with any potential adjustment in a Tax Contest pursuant to which the Non-Controlling Party may reasonably be expected to become liable to make any indemnification payment (or any payment under Section 5 ) to the Controlling Party under this Agreement or under the Foreign Separation Agreements. The failure of the Controlling Party to provide any notice specified in this Section 10.02(c) to the Non- Controlling Party shall not relieve the Non-Controlling Party of any liability and/or obligation which it may have to the Controlling Party under this Agreement or the Foreign Separation Agreements except to the extent that the Non-Controlling Party was actually harmed by such failure, and in no event shall such failure relieve the Non-Controlling Party from any other liability or obligation which it may have to the Controlling Party.

*(d) Power of Attorney* . Each member of the Enterprise Group shall execute and deliver to HP (or such member of the HP Group as HP shall designate) any power of attorney or other similar document reasonably requested by HP (or such designee) in connection with any Tax Contest (as to which HP is the Controlling Party) described in this Section 10 . Each member of the HP Group shall execute and deliver to Enterprise (or such member of the Enterprise Group as Enterprise shall designate) any power of attorney or other similar document requested by Enterprise (or such designee) in connection with any Tax Contest (as to which Enterprise is the Controlling Party) described in this Section 10 .

*(e) Costs* . All external out-of-pocket costs and expenses that are incurred by the Controlling Party with respect to a Tax Contest related to an adjustment which the Non-Controlling Party may reasonably be expected to become liable to make any indemnification payment under Section 4 (or any payment under Section 5) shall be shared by the Companies according to each Company's relative share of the potential Tax liability with respect to the Tax

- 30 -

Contest as determined under this Agreement or the Foreign Separation Agreements; provided , however, that a Non-Controlling Party shall not be liable for fees payable to outside advisors to the extent that the Controlling Party failed to consult with the Non-Controlling Party pursuant to Section 10.02(b) hereof. If the Controlling Party incurs out-of-pocket costs and expenses to be shared under this Section 10.02(e) during a fiscal quarter, such Controlling Party shall provide notice to the Non-Controlling Party within thirty (30) days after the end of such fiscal quarter for the amount due from such Non-Controlling Party pursuant to this Section 10.02(e), describing in reasonable detail the particulars relating thereto. Such Non-Controlling Party shall have a period of thirty (30) days after the receipt of notice to respond thereto. Unless the Non-Controlling Party disputes the amount it is liable for under this Section 10.02(e), the Non-Controlling Party shall reimburse the Controlling Party within forty-five (45) Business Days of delivery by the Controlling Party of the notice described above. To the extent the Non-Controlling Party does not agree with the amount the Controlling Party claims the Non-Controlling Party is liable for under this Section 10.02(e), the dispute shall be resolved in accordance with Section 14. Any reimbursement shall include interest computed at the Prime Rate based on the number of days from the end of the relevant fiscal quarter to the date of reimbursement under this Section 10.02(e). During the first month of each fiscal quarter in which it expects to incur costs for which reimbursement may be sought under this Section 10.02(e), the Controlling Party will provide the Non-Controlling Party with a good faith estimate of such costs.

**Section 11. Effective Date; Termination of Prior Intercompany Tax Allocation Agreements** . This Agreement shall be effective as of the date hereof. As of the date hereof, (i) all prior intercompany Tax allocation agreements or arrangements shall be terminated, and (ii) amounts due under such agreements as of the date hereof shall be settled as of the date hereof. Upon such termination and settlement, no further payments by or to HP or by or to Enterprise, with respect to such agreements shall be made, and all other rights and obligations resulting from such agreements between the Companies and their Affiliates shall cease at such time. Any payments pursuant to such agreements shall be disregarded for purposes of computing amounts due under this Agreement; provided that to the extent appropriate, as determined by HP, payments made pursuant to such agreements shall be credited to Enterprise or HP, respectively, in computing their respective obligations pursuant to this Agreement, in the event that such payments relate to a Tax liability that is the subject matter of this Agreement for a Tax Period that is the subject matter of this Agreement. For the avoidance of doubt, this Section 11 shall not apply to the Foreign Separation Agreements.

**Section 12. Survival of Obligations** . The representations, warranties, covenants and agreements set forth in this Agreement shall be unconditional and absolute and shall remain in effect without limitation as to time.

**Section 13. Treatment of Payments; Tax Gross Up** .

*Section 13.01 Treatment of Tax Indemnity and Tax Benefit Payments* . In the absence of any change in Tax treatment under the Code or other applicable Tax Law,

*(a)* any Tax indemnity payments made by a Company under Section 4 shall be treated for Tax purposes by the payor and the recipient as distributions or capital contributions, as appropriate, occurring immediately before the Distribution (but only to the extent the payment

- 31 -

does not relate to a Tax allocated to the payor in accordance with Section 1552 of the Code or the regulations thereunder or Treasury Regulation Section 1.1502-33(d) (or under corresponding principles of other applicable Tax Laws)) or as payments of an assumed or retained liability, and

*(b)* any Tax Benefit payments made by a Company under Section 5, shall be treated for Tax purposes by the payor and the recipient as distributions or capital contributions, as appropriate, occurring immediately before the Distribution (but only to the extent the payment does not relate to a Tax allocated to the payor in accordance with Section 1552 of the Code or the regulations thereunder or Treasury Regulation Section 1.1502-33(d) (or under corresponding principles of other applicable Tax Laws)) or as payments of an assumed or retained liability.

*Section 13.02 Tax Gross Up* . If notwithstanding the manner in which Tax indemnity payments and Tax Benefit payments were reported, there is an adjustment to the Tax liability of a Company as a result of its receipt of a payment pursuant to this Agreement or the Foreign Separation Agreements (disregarding for these purposes any such adjustment which arises solely as a result of a failure of the recipient Company to distribute such payment in the manner described in Section 361(b)(1)(A)) such payment shall be appropriately adjusted so that the amount of such payment, reduced by fifty percent (50%) of the amount of all Income Taxes payable with respect to the receipt thereof (but taking into account all correlative Tax Benefits resulting from the payment of such Income Taxes), shall equal the amount of the payment which the Company receiving such payment would otherwise be entitled to receive pursuant to this Agreement; provided , however , that to the extent such Tax indemnity payment is made as a result of a Company's breach of any covenant in this Agreement, the Separation and Distribution Agreement or any Transaction Document or as a result of a Distribution Tax-Related Loss for which a Company is solely responsible under Section 7, such payment shall be appropriately adjusted so that the amount of such payment, reduced by the amount of all Income Taxes payable with respect to the receipt thereof (but taking into account all correlative Tax Benefits resulting from the payment of such Income Taxes), shall equal the amount of the payment which the Company receiving such payment would otherwise be entitled to receive pursuant to this Agreement.

*Section 13.03 Interest Under This Agreement* . Anything herein to the contrary notwithstanding, to the extent one Company (" Indemnitor ") makes a payment of interest to another Company (" Indemnitee ") under this Agreement with respect to the period from the date that the Indemnitee made a payment of Tax to a Tax Authority to the date that the Indemnitor reimbursed the Indemnitee for such Tax payment, the interest payment shall be treated as interest expense to the Indemnitor (deductible to the extent provided by law) and as interest income by the Indemnitee (includible in income to the extent provided by law). The amount of the payment shall not be adjusted to take into account any associated Tax Benefit to the Indemnitor or increase in Tax to the Indemnitee.

**Section 14. Disagreements** .

*Section 14.01 Discussion* . The Companies mutually desire that friendly collaboration will continue between them. Accordingly, they will try, and they will cause their respective Group members to try, to resolve in an amicable manner all disagreements and misunderstandings connected with their respective rights and obligations under this Agreement

- 32 -

or the Foreign Separation Agreements, including any amendments hereto. In furtherance thereof, in the event of any dispute or disagreement (a " Dispute ") between any member of the HP Group and any member of the Enterprise Group as to the interpretation of any provision of this Agreement or the performance of obligations hereunder or under the Foreign Separation Agreements (to the extent related to Taxes), the Tax departments of the Companies shall negotiate in good faith to resolve the Dispute.

Section 14.02 *Escalation* . If such good faith negotiations do not resolve the Dispute, then the matter, upon written request of either Company, will be referred for resolution to representatives of the parties at a senior level of management of the parties pursuant to the procedures set forth in Article VIII of the Separation and Distribution Agreement.

Section 14.03 *Referral to Tax Advisor for Computational Disputes* . Notwithstanding anything to the contrary in Section 14, with respect to any Dispute involving computational matters, if the Companies are not able to resolve the Dispute through the discussion process set forth in Section 14.01, then the Companies shall not refer the dispute to the escalation process set forth in Section 14.02, but rather the Dispute will be referred to a Tax Advisor acceptable to each of the Companies to act as an arbitrator in order to resolve the Dispute. In the event that the Companies are unable to agree upon a Tax Advisor within fifteen (15) Business Days following the completion of the discussion process, the Companies shall each separately retain an independent, nationally recognized law or accounting firm (each, a " Preliminary Tax Advisor "), which Preliminary Tax Advisors shall jointly select a Tax Advisor on behalf of the Companies to act as an arbitrator in order to resolve the Dispute. The Tax Advisor may, in its discretion, obtain the services of any third-party appraiser, accounting firm or consultant that the Tax Advisor deems necessary to assist it in resolving such disagreement. The Tax Advisor shall furnish written notice to the Companies of its resolution of any such Dispute as soon as practical, but in any event no later than thirty (30) Business Days after its acceptance of the matter for resolution. Any such resolution by the Tax Advisor will be conclusive and binding on the Companies. Following receipt of the Tax Advisor's written notice to the Companies of its resolution of the Dispute, the Companies shall each take or cause to be taken any action necessary to implement such resolution of the Tax Advisor. Each Company shall pay its own fees and expenses (including the fees and expenses of its representatives) incurred in connection with the referral of the matter to the Tax Advisor (and the Preliminary Tax Advisors, if any). All fees and expenses of the Tax Advisor (and the Preliminary Tax Advisors, if any) in connection with such referral shall be shared equally by the Companies.

Section 14.04 *Injunctive Relief* . Nothing in this Section 14 will prevent either Company from seeking injunctive relief if any delay resulting from the efforts to resolve the Dispute through the process set forth above could result in serious and irreparable injury to either Company. Notwithstanding anything to the contrary in this Agreement, HP and Enterprise are the only members of their respective Group entitled to commence a dispute resolution procedure under this Agreement, and each of HP and Enterprise will cause its respective Group members not to commence any dispute resolution procedure other than through such party as provided in this Section 14.

**Section 15. Late Payments** . Any amount owed by one party to another party under this Agreement which is not paid when due shall bear interest at the Prime Rate plus two percent,

- 33 -

compounded semiannually, from the due date of the payment to the date paid. To the extent interest required to be paid under this Section 15 duplicates interest required to be paid under any other provision of this Agreement, interest shall be computed at the higher of the interest rate provided under this Section 15 or the interest rate provided under such other provision.

**Section 16. Expenses** . Except as otherwise provided in this Agreement, each party and its Affiliates shall bear their own expenses incurred in connection with preparation of Tax Returns, Tax Contests, and other matters related to Taxes under the provisions of this Agreement.

**Section 17. General Provisions** .

*Section 17.01 Notices* . All notices, requests, claims, demands and other communications under this Agreement shall be in writing and shall be given or made (and shall be deemed to have been duly given or made upon receipt) by delivery in person, by overnight courier service, by facsimile or electronic transmission with receipt confirmed (followed by delivery of an original via overnight courier service) or by registered or certified mail (postage prepaid, return receipt requested) to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 17.01):

| If to HP: | with a copy to: |
|---|---|
| HPI Inc.<br>5400 Legacy Drive<br>MS H1-4A-66<br>Plano, TX 75024 | HPI Inc.<br>5400 Legacy Drive<br>MS H1-4A-66<br>Plano, TX 75024 |
| Attention : Barb Barton-Weiszhaar,<br>Senior Vice President, Tax | Attention : Brian Lynn, Vice President,<br>Corporate Tax |
| If to Enterprise: | with a copy to: |
| Hewlett Packard Enterprise Company<br>5400 Legacy Drive<br>MS H1-4A-66<br>Plano, TX 75024 | Hewlett Packard Enterprise Company<br>5400 Legacy Drive<br>MS H1-4A-66<br>Plano, TX 75024 |
| Attention : Jeremy Cox, Senior Vice President, Tax | Attention : Troy Wagnon, Director, Tax Compliance |

A party may change the address for receiving notices under this Agreement by providing written notice of the change of address to the other parties.

*Section 17.02 Binding Effect* . This Agreement shall be binding upon and inure to the benefit of the parties hereto and their successors and assigns.

- 34 -

*Section 17.03 Waiver* . The parties may waive a provision of this Agreement only by a writing signed by the party intended to be bound by the waiver. A party is not prevented from enforcing any right, remedy or condition in the party's favor because of any failure or delay in exercising any right or remedy or in requiring satisfaction of any condition, except to the extent that the party specifically waives the same in writing. A written waiver given for one matter or occasion is effective only in that instance and only for the purpose stated. A waiver once given is not to be construed as a waiver for any other matter or occasion. Any enumeration of a party's rights and remedies in this Agreement is not intended to be exclusive, and a party's rights and remedies are intended to be cumulative to the extent permitted by law and include any rights and remedies authorized in law or in equity.

*Section 17.04 Severability* . If any provision of this Agreement or the application thereof to any Person or circumstance is determined by a court of competent jurisdiction to be invalid, void or unenforceable, the remaining provisions hereof or thereof, or the application of such provision to Persons or circumstances or in jurisdictions other than those as to which it has been held invalid or unenforceable, shall remain in full force and effect and shall in no way be affected, impaired or invalidated thereby. Upon such determination, the parties shall negotiate in good faith in an effort to agree upon such a suitable and equitable provision to effect the original intent of the parties.

*Section 17.05 Authority* . Each of the parties represents to the other that (a) it has the corporate or other requisite power and authority to execute, deliver and perform this Agreement, (b) the execution, delivery and performance of this Agreement have been duly authorized by all necessary corporate or other action, (c) it has duly and validly executed and delivered this Agreement, and (d) this Agreement is a legal, valid and binding obligation, enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and general equity principles.

*Section 17.06 Further Action* . The parties shall execute and deliver all documents, provide all information, and take or refrain from taking action as may be necessary or appropriate to achieve the purposes of this Agreement, including the execution and delivery to the other parties and their Affiliates and representatives of such powers of attorney or other authorizing documentation as is reasonably necessary or appropriate in connection with Tax Contests (or portions thereof) under the control of such other parties in accordance with Section 10.

*Section 17.07 Integration* . This Agreement, together with each of the exhibits and schedules appended hereto and (where relevant) the Foreign Separation Agreements, constitutes the final agreement between the parties, and is the complete and exclusive statement of the parties' agreement on the matters contained herein. All prior and contemporaneous negotiations and agreements between the parties with respect to the matters contained herein are superseded by this Agreement, as applicable. In the event of any inconsistency between this Agreement and the Separation and Distribution Agreement, or any other agreements relating to the transactions contemplated by the Separation and Distribution Agreement, with respect to matters addressed herein, the provisions of this Agreement shall control.

- 35 -

*Section 17.08 Rules of Construction* . Interpretation of this Agreement shall be governed by the following rules of construction: (a) words in the singular shall be held to include the plural and vice versa, and words of one gender shall be held to include the other gender as the context requires; (b) references to the terms "Section," "paragraph," "clause," "Exhibit" and "Schedule" are references to the Sections, paragraphs, clauses, Exhibits and Schedules of this Agreement unless otherwise specified; (c) the terms "hereof," "herein," "hereby," "hereto," and derivative or similar words refer to this entire Agreement, including the Schedules and Exhibits hereto; (d) references to "$" shall mean U.S. dollars; (e) the word "including" and words of similar import when used in this Agreement shall mean "including without limitation," unless otherwise specified; (f) the word "or" shall not be exclusive; (g) references to "written" or "in writing" include in electronic form; (h) unless the context requires otherwise, references to "party" shall mean HP or Enterprise, as appropriate, and references to "parties" shall mean HP and Enterprise; (i) provisions shall apply, when appropriate, to successive events and transactions; (j) the table of contents and headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement; (k) HP and Enterprise have each participated in the negotiation and drafting of this Agreement and if an ambiguity or question of interpretation should arise, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or burdening either party by virtue of the authorship of any of the provisions in this Agreement or any interim drafts of this Agreement; and (l) a reference to any Person includes such Person's successors and permitted assigns.

*Section 17.09 No Double Recovery* . No provision of this Agreement shall be construed to provide an indemnity or other recovery for any costs, damages, or other amounts for which the damaged party has been fully compensated under any other provision of this Agreement or under any other agreement or action at law or equity. Unless expressly required in this Agreement, a party shall not be required to exhaust all remedies available under other agreements or at law or equity before recovering under the remedies provided in this Agreement.

*Section 17.10 Counterparts* . This Agreement may be executed in one (1) or more counterparts, and by each party in separate counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement.

*Section 17.11 Governing Law* . This Agreement and shall be governed by and construed and interpreted in accordance with the Laws of the State of Delaware without giving effect to the principles of conflicts of law thereof.

*Section 17.12 Jurisdiction* . If any dispute arises out of or in connection with this Agreement, except as expressly contemplated by another provision of this Agreement, the parties irrevocably (and the parties will cause each other member of their respective Group to irrevocably) (i) agrees that any dispute shall be subject to the exclusive jurisdiction of the state and federal courts located in the State of Delaware, (ii) waives any claims of *forum non conveniens* and agrees to submit to the jurisdiction of such courts and (iii) agrees that service of any process, summons, notice or document by U.S. registered mail to its respective address set forth in Section 17.01 shall be effective service of process for any litigation brought against it in any such court or for the taking of any other acts as may be necessary or appropriate in order to effectuate any judgment of said courts.

- 36 -

*Section 17.13 Amendment* . No provision of this Agreement (except as otherwise provided therein) may be amended or modified except by a written instrument signed by each of the parties hereto or thereto, as applicable.

*Section 17.14 HP or Enterprise Affiliates* . If, at any time, HP or Enterprise acquires or creates one or more Affiliates that are includable in the HP Group or Enterprise Group, as the case may be, they shall be subject to this Agreement and all references to the HP Group or Enterprise Group, as the case may be, herein shall thereafter include a reference to such Affiliates.

*Section 17.15 Successors* . This Agreement shall be binding on and inure to the benefit of any successor by merger, acquisition of assets, or otherwise, to any of the parties hereto (including but not limited to any successor of HP or Enterprise succeeding to the Tax attributes of either under Section 381 of the Code), to the same extent as if such successor had been an original party to this Agreement.

*Section 17.16 Injunctions* . The parties acknowledge that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with its specific terms or were otherwise breached. The parties hereto shall be entitled to an injunction or injunctions to prevent breaches of the provisions of this Agreement and to enforce specifically the terms and provisions hereof in any court having jurisdiction, such remedy being in addition to any other remedy to which they may be entitled at law or in equity.

- 37 -

IN WITNESS WHEREOF, each party has caused this Agreement to be executed on its behalf by a duly authorized officer on the date first set forth above.

HEWLETT-PACKARD COMPANY, a Delaware corporation

By:  /s/ Catherine A. Lesjak

Name:  Catherine A. Lesjak

Title:    Executive Vice President and Chief Financial Officer

HEWLETT PACKARD ENTERPRISE COMPANY,
a Delaware corporation

By:   /s/ Rishi Varma

Name:   Rishi Varma

Title:    Secretary

[Signature Page to Tax Matters Agreement]

- 38 -

Exhibit 2.4

# EMPLOYEE MATTERS AGREEMENT

**by and between**

**HELWETT-PACKARD COMPANY**

**and**

**HEWLETT PACKARD ENTERPRISE COMPANY**

**Dated as of October 31, 2015**

**TABLE OF CONTENTS**

|  | Page |
|---|---|
| ARTICLE I DEFINITIONS | 1 |
| ARTICLE II GENERAL PRINCIPLES | 8 |
| ARTICLE III RETIREMENT PLANS | 14 |
| ARTICLE IV HEALTH AND WELFARE PLANS | 18 |
| ARTICLE V EXECUTIVE BENEFITS AND OTHER BENEFITS | 22 |
| ARTICLE VI GENERAL AND ADMINISTRATIVE | 32 |
| ARTICLE VII MISCELLANEOUS | 34 |

**EMPLOYEE MATTERS AGREEMENT**

This Employee Matters Agreement (this " Agreement "), dated as of October 31, 2015, with effect as of the Effective Time, is entered into by and between Hewlett-Packard Company, a Delaware corporation (" HP "), and Hewlett Packard Enterprise Company, a Delaware corporation (" Enterprise ," and together with HP, the " Parties ").

**RECITALS** :

WHEREAS, HP and Enterprise have entered into a Separation and Distribution Agreement pursuant to which the Parties have set out the terms on which, and the conditions subject to which, they wish to implement the Separation (as defined in the Separation Agreement) (such agreement, as amended, restated or modified from time to time, the " Separation Agreement ").

WHEREAS, in connection therewith, HP and Enterprise have agreed to enter into this Agreement to allocate between them assets, liabilities and responsibilities with respect to certain employee compensation, pension and benefit plans, programs and arrangements and certain employment matters.

NOW THEREFORE, in consideration of the mutual agreements, covenants and other provisions set forth in this Agreement, the Parties hereby agree as follows:

**ARTICLE I**
**DEFINITIONS**

Unless otherwise defined in this Agreement, capitalized words and expressions and variations thereof used in this Agreement or in its Schedules have the meanings set forth below. Capitalized terms used and not otherwise defined herein shall have the meanings set forth in the Separation Agreement.

1.1 " Action " has the meaning given to that term in the Separation Agreement.

1.2 " Affiliate " has the meaning given to that term in the Separation Agreement.

1.3 " Agreement " means this Employee Matters Agreement, including all the Schedules hereto and has the meaning set forth in the preamble to this Agreement.

1.4 " Approved Leave of Absence " means an absence from active service pursuant to an approved leave.

1.5 " Auditing Party " has the meaning set forth in Section 6.4(a).

1.6 " Benefit Plan " means, with respect to an entity or any of its Subsidiaries, (a) each "employee welfare benefit plan" (as defined in Section 3(1) of ERISA) and each other employee benefits arrangement, policy or payroll practice (including, without limitation, severance pay, sick leave, vacation pay, salary continuation, disability, retirement, deferred compensation, bonus, stock option or other equity-based compensation, hospitalization, medical or life)

sponsored or maintained by such entity or by any of its Subsidiaries (or to which such entity or any of its Subsidiaries contributes or is required to contribute) and (b) each "employee pension benefit plan" (as defined in Section 3(2) of ERISA), occupational pension plan or arrangement or other pension arrangement sponsored, maintained or contributed to by such entity or any of its Subsidiaries (or to which such entity or any of its Subsidiaries contributes or is required to contribute). For the avoidance of doubt, "Benefit Plans" includes Health and Welfare Plans. When immediately preceded by "HP," Benefit Plan means any Benefit Plan sponsored, maintained or contributed to by HP or an HPI Entity or any Benefit Plan with respect to which HP or an HPI Entity is a party. When immediately preceded by "Enterprise," Benefit Plan means any Benefit Plan sponsored, maintained or contributed to by Enterprise or any Enterprise Entity or any Benefit Plan with respect to which Enterprise or an Enterprise Entity is a party.

1.7 " CEO " means Margaret C. Whitman.

1.8 " COBRA " means the continuation coverage requirements for "group health plans" under Title X of the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, and as codified in Code § 4980B and ERISA §§ 601 through 608.

1.9 " Code " means the Internal Revenue Code of 1986, as amended, or any successor federal income tax law. Reference to a specific Code provision also includes any proposed, temporary or final regulation in force under that provision.

1.10 " Comprehensive Plan " has the meaning set forth in Section 4.1(f).

1.11 " Delayed Transfer Employee " means each Enterprise Employee who was identified to transfer to the HPI Group through the OD&S process, but who, as of 12:01 am local time on the Operational Separation Date, is either actively employed by, or on Approved Leave of Absence or Garden Leave from, IN30.

1.12 " Demerger " means the demerger of IN30 from the Enterprise Group.

1.13 " Destination LOA Employee " means an HPI Destination LOA Employee or an Enterprise Destination LOA Employee, as applicable.

1.14 " DEU Account " means (a) when immediately preceded by "HP," an account consisting of dividend equivalent units relating to HP Common Shares granted under an HP Stock Plan or (b) when immediately preceded by "Enterprise," an account consisting of dividend equivalent units relating to shares of Enterprise Common Stock granted under the Enterprise Stock Plan.

1.15 " Distribution Date " has the meaning given to that term in the Separation Agreement.

1.16 " Effective Time " has the meaning given to that term in the Separation Agreement.

1.17 " Enterprise " has the meaning set forth in the preamble to this Agreement.

1.18 " Enterprise 401(k) Contribution " has the meaning set forth in Section 3.2(c).

-2-

1.19 " Enterprise 401(k) Plan " means the 401(k) plan established by Enterprise, as in effect on the date of this Agreement.

1.20 " Enterprise 401(k) Plan Trust " means a trust relating to the Enterprise 401(k) Plan intended to qualify under Section 401(a) and be exempt under Section 501(a) of the Code.

1.21 " Enterprise Business " has the meaning given to that term in the Separation Agreement.

1.22 " Enterprise Common Stock " has the meaning given to that term in the Separation Agreement.

1.23 " Enterprise Destination LOA Employee " means an HPI Employee who:

(a) was on Approved Leave of Absence from an HPI Entity as of the Operational Separation Date,

(b) was allocated to the Enterprise Group pursuant to the OD&S Process,

(c) did not transfer to an Enterprise Entity as of the Operational Separation Date, and

(d) returns to active employment (i) before the LOA Return Deadline or (ii) under circumstances in which applicable Law requires an Enterprise Entity to offer employment to such HPI Employee.

1.24 " Enterprise Employee " means any individual (a) who, as of 12:01 am local time on the Operational Separation Date, is either actively employed by, or on Approved Leave of Absence or Garden Leave from, an Enterprise Entity, (b) who transfers from an HPI Entity to an Enterprise Entity after 12:01 am local time on the Operational Separation Date and before the Distribution Date or (c) who is hired by any Enterprise Entity after 12:01 am local time on the Operational Separation Date; provided , however , that Enterprise Employee will not include any individual who transfers from an Enterprise Entity to an HPI Entity after 12:01 am local time on the Operational Separation Date and before the Distribution Date.

1.25 " Enterprise Entities " means the members of the Enterprise Group.

1.26 " Enterprise Equity Awards " means the Enterprise Options, Enterprise RSU Awards, Enterprise PARSU Awards, Enterprise DEU Accounts and Enterprise SARs.

1.27 " Enterprise ESPP " means the Hewlett Packard Enterprise Company 2015 Employee Stock Purchase Plan.

1.28 " Enterprise Executive DC Plan " means the Enterprise executive deferred compensation plan, effective as of the Distribution Date, as described in Article V.

1.29 " Enterprise Group " has the meaning given to that term in the Separation Agreement.

-3-

1.30 " Enterprise HRC Committee " has the meaning set forth in Section 5.2(b).

1.31 " Enterprise Incentive Plans " means the cash-based annual or other short-term incentive plans of Enterprise or any Enterprise Entity, all as in effect as of the time relevant to the applicable provisions of this Agreement.

1.32 " Enterprise Non-Employee Director " means each member of the Enterprise Board of Directors as of immediately after the Effective Time who is not an Enterprise Employee.

1.33 " Enterprise Ratio " means the quotient obtained by dividing (a) the HP Stock Value by (b) the Enterprise Stock Value, carried out to six decimal places.

1.34 " Enterprise Stock Plan " means the Hewlett Packard Enterprise Company 2015 Stock Incentive Plan.

1.35 " Enterprise Stock Value " means the opening per share price of Enterprise Common Stock on the New York Stock Exchange on November 2, 2015.

1.36 " ERISA " means the Employee Retirement Income Security Act of 1974, as amended. Reference to a specific provision of ERISA also includes any proposed, temporary or final regulation in force under that provision.

1.37 " Former Employees " means both Former Enterprise Employees and Former HPI Employees.

1.38 " Former Enterprise Employee " means any individual (a) whose employment with an Enterprise Entity terminated prior to 12:01 am local time on the Operational Separation Date and (b) who did not subsequently become employed by an Enterprise Entity or an HPI Entity prior to the Distribution Date.

1.39 " Former HPI Employee " means any individual (a) whose employment with an HPI Entity terminated prior to 12:01 am local time on the Operational Separation Date and (b) who did not subsequently become employed by an Enterprise Entity or an HPI Entity prior to the Distribution Date.

1.40 " Garden Leave " means an absence from active service at the request of an employer during a statutory or contractual notice period preceding termination of employment.

1.41 " Health and Welfare Plans " means any plan, fund or program which was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, medical (including PPO, EPO and HDHP coverages as well as retirement medical savings accounts and retiree medical), dental, prescription, vision, short-term disability, long-term disability, life, accidental death and disability, employee assistance, group legal services, wellness, cafeteria (including premium payment, health flexible spending account and dependent care flexible spending account components), travel reimbursement, transportation, or other benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs or day care centers, scholarship funds, or prepaid legal services, including any

-4-

such plan, fund or program as defined in Section 3(1) of ERISA. When immediately preceded by "HP," Health and Welfare Plan means any Health and Welfare Plan sponsored, maintained or contributed to by HP or an HPI Entity or any Health and Welfare Plan with respect to which HP or an HPI Entity is a party. When immediately preceded by "Enterprise," Health and Welfare Plan means any Health and Welfare Plan sponsored, maintained or contributed to by Enterprise or any Enterprise Entity or any Health and Welfare Plan with respect to which Enterprise or an Enterprise Entity is a party.

1.42 " HP " has the meaning set forth in the preamble to this Agreement.

1.43 " HP 401(k) Contribution " has the meaning set forth in Section 3.2(c).

1.44 " HP 401(k) Plan " means the Hewlett-Packard Company 401(k) Plan as in effect as of the time relevant to the applicable provision of this Agreement.

1.45 " HP 401(k) Plan Trust " means a trust relating to the HP 401(k) Plan intended to qualify under Section 401(a) and be exempt under Section 501(a) of the Code.

1.46 " HP Common Shares " has the meaning given to that term in the Separation Agreement.

1.47 " HP Equity Awards " means the HP Options, HP RSU Awards, HP PARSU Awards, HP DEU Accounts and HP SARs.

1.48 " HP ESPP " means the Hewlett-Packard Company 2011 Employee Stock Purchase Plan.

1.49 " HP Excess Plans " means all non-qualified retirement plans, agreements or arrangements maintained by any HPI Entity or Enterprise Entity for U.S. employees or former U.S. employees as of the Operational Separation Date, including without limitation the Hewlett-Packard Company Excess Benefit Plan, the EDS Benefit Restoration Plan, the EDS 1998 Supplemental Executive Retirement Plan, the Tandem Computers Incorporated Deferred Compensation Plan, the Hewlett-Packard Company Cash Account Pension Restoration Plan, and the individual agreements listed on Schedule 1.49 , in each case in effect as of the time relevant to the applicable provision of this Agreement.

1.50 " HP Executive DC Plan " means the Hewlett-Packard Company Executive Deferred Compensation Plan, in effect as of the time relevant to the applicable provision of this Agreement.

1.51 " HP HRC Committee " has the meaning set forth in Section 5.2(b).

1.52 " HP Incentive Plans " means the cash-based annual or other short-term incentive plans of HP or any HPI Entity, all as in effect as of the time relevant to the applicable provisions of this Agreement, including without limitation the Hewlett-Packard Company 2005 Pay-for-Results Plan, as amended.

1.53 " HP Non-Employee Director " means each member of the HP Board of Directors

-5-

as of immediately after the Effective Time who is not an HPI Employee.

1.54 " HP Post-Separation Stock Value " means the opening per share price of HP Common Shares on the New York Stock Exchange on November 2, 2015.

1.55 " HP Ratio " means the quotient obtained by dividing (a) the HP Stock Value by (b) the HP Post-Separation Stock Value, carried out to six decimal places.

1.56 " HP Stock Plans " means (a) the Second Amended and Restated Hewlett-Packard Company 2004 Stock Incentive Plan, (b) the Hewlett-Packard Company 2000 Stock Plan, as amended, and (c) each other compensatory equity plan assumed by HP from time to time pursuant to which any HP Equity Awards remain outstanding as of immediately prior to the Distribution Date, including, in each case, any sub-plan or addendum thereto.

1.57 " HP Stock Value " means the closing per share price of HP Common Shares trading "regular way with due bills" on the New York Stock Exchange on October 30, 2015.

1.58 " HPI Business " has the meaning given to that term in the Separation Agreement.

1.59 " HPI Destination LOA Employee " means each Enterprise Employee (other than any Delayed Transfer Employee) who:

(a) was on Approved Leave of Absence from an Enterprise Entity as of the Operational Separation Date,

(b) was allocated to the HPI Group pursuant to the OD&S Process,

(c) did not transfer to an HPI Entity as of the Operational Separation Date, and

(d) returns to active employment (i) before the LOA Return Deadline or (ii) under circumstances in which applicable Law requires an HPI Entity to offer employment to such Enterprise Employee.

1.60 " HPI Employee " means any individual (a) who, as of 12:01 am local time on the Operational Separation Date, is either actively employed by, or on Approved Leave of Absence or Garden Leave from, any HPI Entity, (b) who transfers from an Enterprise Entity to an HPI Entity after 12:01 am local time on the Operational Separation Date and before the Distribution Date or (c) who is hired by any HPI Entity after 12:01 am local time on the Operational Separation Date; provided , however , that HPI Employee will not include any individual who transfers from an HPI Entity to an Enterprise Entity after 12:01 am local time on the Operational Separation Date and before the Distribution Date.

1.61 " HPI Entities " means the members of the HPI Group.

1.62 " HPI Group " has the meaning given to that term in the Separation Agreement.

1.63 " IN30 " means the Enterprise Entity identified as IN30.

-6-

1.64 " Individual Agreement " means any individual (a) employment contract, (b) retention, severance or change in control agreement, (c) expatriate (including any international assignee) contract or agreement (including agreements and obligations regarding repatriation, relocation, equalization of taxes and living standards in the host country), or (d) other agreement containing restrictive covenants (including confidentiality, non-competition and non-solicitation provisions) with an HPI Employee or Enterprise Employee that is in effect immediately prior to the Operational Separation Date.

1.65 " Liability " has the meaning given to that term in the Separation Agreement.

1.66 " LOA Return Deadline " means the date that is one (1) year after the Distribution Date.

1.67 " Non-parties " has the meaning set forth in Section 6.4(b).

1.68 " Non-U.S. Retirement Plan " means each HP Benefit Plan or Enterprise Benefit Plan, whether or not intended to be tax-qualified, the primary purpose of which is to provide retirement benefits to HPI Employees, Enterprise Employees and/or Former Employees who are or were employed by an HPI Entity or Enterprise Entity located outside of the U.S.

1.69 " OD&S Process " means HP's Organizational Design and Selection process.

1.70 " Operational Separation Date " means with respect to each applicable jurisdiction, the effective date of the Pre-Distribution Transfer Documents applicable to the HPI Entities and Enterprise Entities operating in such jurisdiction.

1.71 " Option " means (a) when immediately preceded by "HP," an option (including a performance-contingent option (" PCSO ")) to purchase HP Common Shares granted pursuant to an HP Stock Plan or (b) when immediately preceded by "Enterprise," an option (including a PCSO) to purchase shares of Enterprise Common Stock following the Effective Time granted under the Enterprise Stock Plan.

1.72 " PARSU Award " means (a) when immediately preceded by "HP," an award of performance-adjusted restricted stock units relating to HP Common Shares granted under an HP Stock Plan for which the applicable performance conditions have not been satisfied or waived or (b) when immediately preceded by "Enterprise," an award of performance-adjusted restricted stock units relating to shares of Enterprise Common Stock granted under the Enterprise Stock Plan.

1.73 " Parties " has the meaning set forth in the preamble to this Agreement.

1.74 " Person " has the meaning given to that term in the Separation Agreement.

1.75 " Record Date " has the meaning given to that term in the Separation Agreement.

1.76 " RSU Award " means (a) when immediately preceded by "HP," an award of service-based vesting restricted stock units relating to HP Common Shares granted under an HP Stock Plan or (b) when immediately preceded by "Enterprise," an award of service-based vesting

-7-

restricted stock units relating to shares of Enterprise Common Stock granted under the Enterprise Stock Plan. RSU Awards shall include any award of performance-adjusted restricted stock units for which the performance conditions have been satisfied or waived. RSU Awards shall not include DEU Accounts.

1.77 " SAR " means (a) when immediately preceded by "HP," a stock appreciation right relating to HP Common Shares granted pursuant to an HP Stock Plan or (b) when immediately preceded by "Enterprise," a stock appreciation right relating to shares of Enterprise Common Stock granted pursuant to the Enterprise Stock Plan.

1.78 " Separation " has the meaning given to that term in the Separation Agreement.

1.79 " Separation Agreement " has the meaning set forth in the recitals to this Agreement.

1.80 " Service Provider " has the meaning set forth in the Separation Agreement.

1.81 " Severance Benefits " has the meaning set forth in Section 5.7.

1.82 " Subsidiary " has the meaning given to that term in the Separation Agreement.

1.83 " Transaction Documents " has the meaning given to that term in the Separation Agreement.

1.84 " Transfer Documents " has the meaning given to that term in the Separation Agreement.

1.85 " U.S. " means the 50 United States of America and the District of Columbia.

1.86 " U.S. Pension Plans " has the meaning set forth in Section 3.1.

1.87 " Value Factor " means the quotient obtained by dividing (a) the HP Stock Value by (b) the sum of (i) the Enterprise Stock Value and (ii) the HP Post-Separation Stock Value, carried out to six decimal places.

**ARTICLE II**
**GENERAL PRINCIPLES**

2.1 Transfer of Employees .

(a) *Transfers Prior to Operational Separation Date* . Except as otherwise agreed by the Parties and subject to Section 2.1(b), Section 2.1(c), and Section 2.1(d), effective as of the Operational Separation Date, (i) each employee who was allocated to the HPI Group through the OD&S Process was employed by an HPI Entity, and (ii) each employee who was allocated to the Enterprise Group through the OD&S Process was employed by an Enterprise Entity.

-8-

(b) *LOA Employees* .

(i) The Enterprise Group and the HPI Group shall use commercially reasonable efforts to ensure that (A) each Enterprise Destination LOA Employee becomes employed by an Enterprise Entity on or as soon as possible after such employee's return to active employment, and (B) each HPI Destination LOA Employee becomes employed by an HPI Entity on or as soon as possible after such employee's return to active employment.

(ii) The Parties shall use commercially reasonable efforts to apply the provisions of this Agreement to any Destination LOA Employee who commences employment pursuant to this Section 2.1(b) by substituting each reference to the "Operational Separation Date" with a reference to the date that the Destination LOA Employee commences employment with the applicable destination group and shall reasonably cooperate to make any adjustments in the application of the provisions of this Agreement as are necessary or appropriate in order to effectuate such application.

(iii) Notwithstanding the foregoing or anything else in this Agreement to the contrary, except as may be required by applicable Law, neither Party shall be required to provide any specific compensation, benefits or other terms and conditions of employment for any Destination LOA Employee.

(c) *Non-Transfer Garden Leave Employees* .

(i) Each HPI Employee allocated to the Enterprise Group pursuant to the OD&S Process who (A) is on a Garden Leave as of the Operational Separation Date, and (B) does not transfer to an Enterprise Entity as of the Operational Separation Date shall remain on the HP payroll and any applicable HP Benefit Plans and the Enterprise Group shall reimburse the HPI Group for the cost of the compensation and benefits paid or provided to such employee during the period beginning on the Operational Separation Date and ending on the date that such employee's employment with the HPI Group terminates, and any severance costs required by Section 5.7.

(ii) Each Enterprise Employee allocated to the HPI Group pursuant to the OD&S Process who (A) is on a Garden Leave as of the Operational Separation Date, and (B) does not transfer to an HPI Entity as of the Operational Separation Date shall remain on the Enterprise payroll and any applicable Enterprise Benefit Plans and the HPI Group shall reimburse the Enterprise Group for the cost of the compensation and benefits paid or provided to such employee during the period beginning on the Operational Separation Date and ending on the date that such employee's employment with the Enterprise Group terminates, and any severance costs required by Section 5.7.

(iii) The Parties shall cooperate in good faith to determine the basis for, and amount of, the reimbursements contemplated by this Section 2.1(c), taking into account any Tax benefits realized by reason of the payment or provision of the applicable compensation and benefits and the cost of providing any non-cash benefits.

-9-

(d) *Delayed Transfer Employees* .

(i) HP and Enterprise shall use commercially reasonable efforts to ensure that each Delayed Transfer Employee becomes employed by an HPI Entity on or as soon as possible after the effective date of the Transaction Documents with respect to the Demerger, provided that the Delayed Transfer Employee remains actively employed by, or on an Approved Leave of Absence from, IN30 as of such effective date.

(ii) Notwithstanding the foregoing or anything else in this Agreement to the contrary, except as may be required by applicable Law, HP shall not be required to provide any specific compensation, benefits or other terms and conditions of employment for any Delayed Transfer Employee.

2.2 Assumption and Retention of Liabilities; Related Assets; Management of Certain Actions .

(a) From and after the Operational Separation Date, except as expressly provided otherwise in this Agreement or in any Transfer Document, the HPI Entities shall assume or retain and HP hereby agrees to pay, perform, fulfill and discharge, in due course in full:

(i) all Liabilities (including those arising under any Action) with respect to the employment of all HPI Employees, whether arising before, on or after the Operational Separation Date;

(ii) all Liabilities (including those arising under any Action) with respect to the employment of each Former Employee who HP and Enterprise reasonably agree was providing services primarily to the HPI Business at the time of termination of employment, whether arising before, on or after the Operational Separation Date;

(iii) fifty percent (50%) of the Liabilities (including those arising under any Action) with respect to the employment of each Former Employee who HP and Enterprise do not reasonably agree was providing services primarily to the HPI Business or the Enterprise Business at the time of termination of employment, in each case whether arising before, on or after the Operational Separation Date; and

(iv) any other Liabilities expressly assigned to HP or any HPI Entity under this Agreement or in any Transfer Document.

All Assets held in trust to fund the HP Benefit Plans and all insurance policies funding the HP Benefit Plans shall be Excluded Assets (as defined in the Separation Agreement), except (A) to the extent specifically provided otherwise in this Agreement or in any Transfer Document and (B) any shares of Enterprise Common Stock received by the Israeli trust funding HP Options and HP RSU Awards covered by Section 102 of the Israeli Income Tax Ordinance [New Version] 1961 shall be Enterprise Assets.

(b) From and after the Operational Separation Date, except as expressly provided otherwise in this Agreement or in any Transfer Document, the Enterprise Entities shall

-10-

assume or retain, as applicable, and Enterprise hereby agrees to pay, perform, fulfill and discharge, in due course in full:

(i) all Liabilities (including those arising under any Action) with respect to the employment of all Enterprise Employees, whether arising before, on or after the Operational Separation Date;

(ii) all Liabilities (including those arising under any Action) with respect to the employment of each Former Employee who HP and Enterprise reasonably agree was providing services primarily to the Enterprise Business at the time of termination of employment, whether arising before, on or after the Operational Separation Date;

(iii) fifty percent (50%) of the Liabilities (including those arising under any Action) with respect to the employment of each Former Employee who HP and Enterprise do not reasonably agree was providing services primarily to the HPI Business or the Enterprise Business at the time of termination of employment, in each case whether arising before, on or after the Operational Separation Date; and

(iv) any other Liabilities expressly assigned to Enterprise or any Enterprise Entity under this Agreement or in any Transfer Document.

All Assets held in trust to fund the Enterprise Benefit Plans and all insurance policies funding the Enterprise Benefit Plans shall be Enterprise Assets (as defined in the Separation Agreement), except to the extent specifically provided otherwise in this Agreement or in any Transfer Document.

(c) Notwithstanding anything in this Agreement or the Separation Agreement to the contrary, (i) all Liabilities described in Section 2.3(c)(iii) of the Separation Agreement (relating to claims for indemnification and breach of fiduciary duty) and (ii) all Liabilities with respect to compensation and benefits of Service Providers who are consultants or independent contractors shall be governed exclusively by the Separation Agreement.

(d) Notwithstanding the foregoing provisions of this Section 2.2, except as otherwise provided in any Transaction Document, with respect to Delayed Transfer Employees:

(i) The Enterprise Entities shall assume or retain, as applicable, and Enterprise hereby agrees to pay, perform, fulfill and discharge, in due course in full, (A) all Liabilities under all Enterprise Benefit Plans with respect to all Delayed Transfer Employees and their respective dependents and beneficiaries and (B) all Liabilities (including those arising under any Action) with respect to the employment of all Delayed Transfer Employees to the extent arising in connection with or as a result of their employment with the Enterprise Group; and

(ii) The HPI Entities shall assume or retain, as applicable, and HP hereby agrees to pay, perform, fulfill and discharge, in due course in full, (A) all Liabilities under all HP Benefit Plans with respect to all Delayed Transfer Employees who become employed by the HPI Group and their respective dependents and

-11-

beneficiaries and (B) all Liabilities (including those arising under any Action) with respect to the employment of all Delayed Transfer Employees who become employed by the HPI Group to the extent arising in connection with or as a result of their employment with the HPI Group.

(e) <u>Management of Actions</u> .

(i) For any Action (other than any OFCCP matter) arising after the Effective Time:

(A) if all Liabilities arising under such Action are allocated pursuant to this Section 2.2 to HP, the direction of such Action shall be governed by Section 6.11(b) of the Separation Agreement,

(B) if all Liabilities arising under such Action are allocated pursuant to this Section 2.2 to Enterprise, the direction of such Action shall be governed by Section 6.11(a) of the Separation Agreement,

(C) if all Liabilities arising under such Action are allocated pursuant to Section 2.2 equally to HP and Enterprise, the direction of such Action shall be governed by Section 6.12(b) of the Separation Agreement, and

(D) except as otherwise provided in the preceding clause (C), if the Liabilities arising under such Action are allocated pursuant to this Section 2.2 in part to HP and in part to Enterprise, the direction of such Action shall be governed by Section 6.11(c) of the Separation Agreement.

(ii) Notwithstanding anything herein or in Section 6.11(c) of the Separation Agreement to the contrary, the following framework shall govern the management of Office of Federal Contract Compliance Program (" <u>OFCCP</u> ") matters:

(A) The management of the OFCCP matters listed on Schedule 6.11(c) of the Separation Agreement shall be led by the Party designated as "manager" on Schedule 6.11(c) to the Separation Agreement.

(B) Those OFFCP matters not listed on Schedule 6.11(c) to the Separation Agreement that arise after the Distribution Date shall initially be managed by either HP or Enterprise, whichever is the primary tenant of the site location at issue in the OFCCP matter, with the other Party providing support and assistance to the managing Party, unless otherwise, or as may subsequently be, reasonably agreed in good faith by HP and Enterprise.

2.3 <u>Reimbursements</u> . To the extent that this Agreement allocates to the Enterprise Group the Liability for compensation or benefits that will be provided under an HP Benefit Plan after the Operational Separation Date, or allocates to the HPI Group the Liability for compensation or benefits that will be provided under an Enterprise Benefit Plan after the Operational Separation Date, the Party responsible for the Liability under this Agreement will promptly reimburse the Party providing the compensation or benefits.

-12-

2.4 <u>Non-Duplication of Benefits; Service Credit</u> .

(a) HP and Enterprise shall agree on methods and procedures, including, without limitation, amending the respective Benefit Plan documents, to prevent HPI Employees and Enterprise Employees from receiving duplicative benefits from the HP Benefit Plans and the Enterprise Benefit Plans.

(b) The HP Benefit Plans shall, and HP shall cause each HPI Entity to, recognize each HPI Employee's recognized service with HP or any of its Subsidiaries or their respective predecessor entities at or before the Operational Separation Date, with respect to those HP Benefit Plans adopted, maintained or substituted by the HPI Group on or following the Operational Separation Date or as otherwise required by applicable Law, to the same extent that such service was recognized by HP and its Subsidiaries for similar purposes prior to the Operational Separation Date, except that (i) service will not be recognized to the extent that such recognition would result in a duplication of benefits for an HPI Employee for the same period of service and (ii) service will not be recognized for purposes of determining severance benefits under any HP Benefit Plan for any HPI Employee or HPI Destination LOA Employee who received severance from an Enterprise Entity as a result of the acceptance of an offer of employment from, or transfer to, an HPI Entity in connection with the Separation.

(c) The Enterprise Benefit Plans shall, and Enterprise shall cause each Enterprise Entity to, recognize each Enterprise Employee's recognized service with HP or any of its Subsidiaries or their respective predecessor entities at or before the Operational Separation Date, with respect to those Enterprise Benefit Plans adopted, maintained or substituted by the Enterprise Group on or following the Operational Separation Date or as otherwise required by applicable Law, to the same extent that such service was recognized by HP and its Subsidiaries for similar purposes prior to the Operational Separation Date, except that (i) service will not be recognized to the extent that such recognition would result in a duplication of benefits for an Enterprise Employee for the same period of service and (ii) service will not be recognized for purposes of determining severance benefits under any Enterprise Benefit Plan for any Enterprise Employee or Enterprise Destination LOA Employee who received severance from an HPI Entity as a result of the acceptance of an offer of employment from, or transfer to, an Enterprise Entity in connection with the Separation.

(d) For the avoidance of doubt, the provisions of this Section 2.4 shall not apply to any HPI Employee or Enterprise Employee who experiences a termination of employment from the HPI Group or Enterprise Group after the Operational Separation Date and is then hired or re-hired by either an HPI Entity or an Enterprise Entity, other than (i) any HPI Destination LOA Employee who is hired by an HPI Entity or any Enterprise Destination LOA Employee who is hired by an Enterprise Entity in accordance with Section 2.1(b) or (ii) any Delayed Transfer Employee who becomes employed by an HPI Entity in accordance with Section 2.1(d).

2.5 <u>Commercially Reasonable Efforts</u> . HP and Enterprise shall use commercially reasonable efforts to (a) enter into any necessary agreements to accomplish the assumptions and transfers of Assets and Liabilities contemplated by this Agreement, and (b) provide for the maintenance of the necessary participant records, the appointment of trustees and the

-13-

engagement of recordkeepers, investment managers, providers, insurers, and other third parties reasonably necessary for maintaining and administering the HP Benefit Plans and the Enterprise Benefit Plans.

2.6 <u>Regulatory Compliance</u> . HP and Enterprise shall, in connection with the actions taken pursuant to this Agreement, reasonably cooperate in making any and all appropriate filings required under the Code, ERISA and any applicable securities, labor and exchange control laws, implementing all appropriate communications with participants, transferring appropriate records and taking all such other actions as the requesting party may reasonably determine to be necessary or appropriate to implement the provisions of this Agreement in a timely manner.

2.7 <u>Payroll; Tax Reporting of Compensation</u> .

(a) Responsibility for all applicable tax withholding and reporting obligations in respect of compensation (other than compensation attributable to equity awards) payable to HPI Employees, Enterprise Employees and Former Employees shall be governed by Article VI of the Tax Matters Agreement. Section 5.3(k)(ii) shall govern withholding and reporting obligations with respect to equity awards held by HPI Employees, Enterprise Employees and Former Employees.

(b) To the extent that, for administrative reasons, any payment on or following the Operational Separation Date is made (i) by an HPI Entity in respect of a Liability allocated to the Enterprise Entities pursuant to Section 2.2 or otherwise or (ii) by an Enterprise Entity in respect of a Liability allocated to the HPI Entities pursuant to Section 2.2 or otherwise, such payment shall be deemed made, in the case of a payment described in clause (i), on behalf of the Enterprise Entities and, in the case of a payment described in clause (ii), on behalf of the HPI Entities.

## ARTICLE III
## RETIREMENT PLANS

3.1 <u>U.S. Qualified Defined Benefit and Profit Sharing Plans</u> . From and after the Operational Separation Date, HP shall retain or assume, as applicable, and HP hereby agrees to pay, perform, fulfill and discharge, in due course as required by Law, all Liabilities with respect to the Hewlett-Packard Company Pension Plan and the Hewlett-Packard Company Deferred Profit-Sharing Plan and each other defined benefit pension plan sponsored by HP and its Subsidiaries immediately prior to the Operational Separation Date that is subject to Title IV or Section 302 of ERISA or Section 412 of the Code (collectively, the " <u>U.S. Pension Plans</u> "). Effective as of the Distribution Date, Enterprise shall be released as a participating employer in all U.S. Pension Plans and, from and after the Distribution Date, neither Enterprise nor any member of the Enterprise Group shall be liable for any Liabilities arising under or with respect to any U.S. Pension Plans.

3.2 <u>U.S. 401(k) Plan Matters</u> .

(a) *HP 401(k)* . HP shall retain and be solely responsible for all Liabilities for plan benefits under the HP 401(k) Plan relating to (i) HPI Employees, (ii) Former Employees and

-14-

(iii) any Enterprise Employees whose employment with the applicable Enterprise Entity terminated prior to the Distribution Date.

(b) *Enterprise 401(k)* . Enterprise has established the Enterprise 401(k) Plan and the Enterprise 401(k) Plan Trust prior to the date hereof. For Enterprise Employees who remained employed by an Enterprise Entity immediately prior to the Distribution Date, HP has caused the Assets and Liabilities (including any outstanding loans) under the HP 401(k) Plan attributable to such Enterprise Employees to be transferred in kind to the Enterprise 401(k) Plan and the Enterprise 401(k) Plan Trust as of, or immediately prior to, the Distribution Date. Enterprise shall cause the Enterprise 401(k) Plan to assume and be solely responsible for all Liabilities for plan benefits under the Enterprise 401(k) Plan relating to Enterprise Employees whose accounts are transferred from the HP 401(k) Plan pursuant to this Section 3.2(b) and Section 3.2(c). HP and Enterprise agree to cooperate in making all appropriate filings and taking all reasonable actions required to implement the provisions of this Section 3.2; provided , that Enterprise acknowledges that it will be responsible for complying with any requirements and applying for any Internal Revenue Service determination letters with respect to the Enterprise 401(k) Plan.

(c) *Fourth Quarter 2015 Matching Contributions* . All company matching contributions for all participants in the HP 401(k) Plan in respect of the fourth quarter of HP's 2015 fiscal year that have not been made prior to the Distribution Date will be contributed to the HP 401(k) Plan as soon as practicable following the Distribution Date. Such contributions will be made by HP in respect of HPI Employees and any Enterprise Employees whose employment with the applicable Enterprise Entity terminated prior to the Distribution Date (the aggregate amount thereof, the " HP 401(k) Contribution ") and will be made by Enterprise in respect of Enterprise Employees who remained employed by an Enterprise Entity immediately prior to the Distribution Date (the aggregate amount thereof, the " Enterprise 401(k) Contribution "). The amount that HP actually contributes to the HP 401(k) Plan pursuant to this Section 3.2(c) shall be equal to (i) the HP 401(k) Contribution, less (ii) the aggregate amount of the forfeiture account in the HP 401(k) Plan as of the Distribution Date multiplied by a fraction, the numerator of which is the HP 401(k) Contribution and the denominator of which is the sum of the HP 401(k) Contribution and the Enterprise 401(k) Contribution. The amount that Enterprise actually contributes to the HP 401(k) Plan pursuant to this Section 3.2(c) shall be equal to (i) the Enterprise 401(k) Contribution, less (ii) the aggregate amount of the forfeiture account in the HP 401(k) Plan as of the Distribution Date multiplied by a fraction, the numerator of which is the Enterprise 401(k) Contribution and the denominator of which is the sum of the HP 401(k) Contribution and the Enterprise 401(k) Contribution. As promptly as practicable after the contributions described in this Section 3.2(c) are made to the HP 401(k) Plan, HP will cause the remaining account balances under the HP 401(k) Plan of the Enterprise Employees who remained employed by an Enterprise Entity immediately prior to the Distribution Date to be transferred in kind to the Enterprise 401(k) Plan and the Enterprise 401(k) Plan Trust.

(d) *Stock Considerations – HP 401(k) Plan* . To the extent that HPI Employees, Former Employees or Enterprise Employees whose employment with the applicable Enterprise Entity terminated prior to the Distribution Date receive shares of Enterprise Common Stock in connection with the Separation with respect to HP Common Shares held under the HP 401(k) Plan, such shares will be deposited in an Enterprise Common Stock fund under the HP

-15-

401(k) Plan, subject to such limitations as are determined by HP or the applicable fiduciary of the HP 401(k) Plan. Following the Distribution Date, participants in the HP 401(k) Plan shall not be permitted to acquire shares of Enterprise Common Stock in the Enterprise Common Stock fund under the HP 401(k) Plan and HP shall promptly amend the HP 401(k) Plan document to provide for the elimination of the Enterprise Common Stock fund as an investment option under the HP 401(k) Plan and the liquidation of the Enterprise Common Stock held in the Enterprise Common Stock fund to be completed no later than the first anniversary of the Distribution Date, unless the relevant plan fiduciary determines that it would be imprudent to liquidate the Assets by such date, in which case such liquidation shall occur as soon as the relevant plan fiduciary reasonably determines liquidation would be prudent. HP shall assume sole responsibility for ensuring that the HP 401(k) plans is maintained in compliance with applicable Laws with respect to holding HP Common Shares and shares of Enterprise Common Stock.

(e) *Stock Considerations – Enterprise 401(k) Plan* . To the extent that Enterprise Employees hold HP Common Shares in the HP Common Share fund under the Enterprise 401(k) Plan, such shares shall continue to be held pursuant to the Enterprise 401(k) Plan following the Distribution Date subject to such limitations as are determined by Enterprise or the applicable fiduciary of the Enterprise 401(k) Plan. Following the Distribution Date, Enterprise Employees shall not be permitted to acquire HP Common Shares in the HP Common Share fund under the Enterprise 401(k) Plan and Enterprise shall promptly amend the Enterprise 401(k) Plan document to provide for the elimination of the HP Common Share fund as an investment option under the Enterprise 401(k) Plan and the liquidation of the HP Common Shares held in the HP Common Shares fund to be completed no later than the first anniversary of the Distribution Date, unless the relevant plan fiduciary determines that it would be imprudent to liquidate the Assets by such date, in which case such liquidation shall occur as soon as the relevant plan fiduciary reasonably determines liquidation would be prudent. Enterprise shall assume sole responsibility for ensuring that the Enterprise 401(k) plan is maintained in compliance with applicable Laws with respect to holding shares of Enterprise Common Stock and HP Common Shares.

3.3 Non-U.S. Retirement Plans . The applicable terms governing treatment of the Non-U.S. Retirement Plans shall be as set forth in Schedule 3.3 .

3.4 U.S. Non-Qualified Retirement Arrangements .

(a) HP shall assume or retain, or cause an HPI Entity to assume or retain, all Assets and all Liabilities arising out of or relating to the HP Excess Plans, and shall make payments to all participants in the HP Excess Plans in accordance with the applicable terms of the HP Excess Plans.

(b) Enterprise shall notify HPI of the occurrence of (i) any payment event with respect to an Enterprise Employee under an HP Excess Plan and (ii) the "separation from service" under Section 409A of the Code of any Enterprise Employee who participates in an HP Excess Plan, whether or not such separation from service is a payment event, in each case, as promptly as practicable but in no event later than thirty (30) days thereafter, and shall promptly provide to HP any other relevant information reasonably requested by HP for purposes of

-16-

administering payments pursuant to the HP Excess Plans to Enterprise Employees and Former Enterprise Employees.

(c) HP and Enterprise acknowledge that none of the transactions contemplated by the Separation Agreement will, in and of itself, constitute a "separation from service" under Section 409A of the Code or trigger a payment or distribution of compensation under any HP Excess Plans for any HPI Employees, Enterprise Employees or Former Employees and, consequently, that the payment or distribution of any compensation to which any HPI Employee, Enterprise Employee or Former Employee is entitled under the HP Excess Plans will occur only at such time or times as provided in the applicable plan document or the applicable deferral election.

3.5 Certain International Retirement Benefits .

(a) *International Retirement Arrangements* . HP shall assume or retain, or cause an HPI Entity to assume or retain, all Assets and all Liabilities arising out of or relating to the International Retirement Arrangements maintained by any HPI Entity or Enterprise Entity as of the Operational Separation Date, and shall make payments to all participants in the International Retirement Arrangements as of the Operational Separation Date in accordance with the applicable terms of such programs as in effect from time to time.

(b) *International Retirement Guarantee Programs* .

(i) For HPI Employees, Former Employees in the U.S., and Former HPI Employees outside of the U.S., HP shall assume or retain, or cause an HPI Entity to assume or retain, all Assets and all Liabilities arising out of or relating to the International Retirement Guarantee programs maintained by any HPI Entity or Enterprise Entity as of the Operational Separation Date, and shall make payments to all such HPI Employees, Former Employees in the U.S., and Former HPI Employees outside of the U.S. who participated in the International Retirement Guarantee programs as of the Operational Separation Date in accordance with the applicable terms of such programs as in effect from time to time.

(ii) For Enterprise Employees and Former Enterprise Employees outside of the U.S., Enterprise shall assume or retain, or cause an Enterprise Entity to assume or retain, all Assets and all Liabilities arising out of or relating to the International Retirement Guarantee programs maintained by any HPI Entity or Enterprise Entity as of the Operational Separation Date, and shall make payments to all such Enterprise Employees and Former Enterprise Employees outside of the U.S. who participated in the International Retirement Guarantee programs as of the Operational Separation Date in accordance with the applicable terms of such programs as in effect from time to time.

(c) *Global Retirement Supplement* .

(i) For HPI Employees receiving cash payments pursuant to a Global Retirement Supplement program as of the Operational Separation Date, HPI shall assume or retain, or cause an HPI Entity to assume or retain, all Liabilities for the continuation of

-17-

such payments after the Operational Separation Date, in accordance with the terms of the HP Global Retirement Supplement program as in effect from time to time.

(ii) For Enterprise Employees receiving cash payments pursuant to a Global Retirement Supplement program as of the Operational Separation Date, Enterprise shall assume or retain, or cause an Enterprise Entity to assume or retain, all Liabilities for the continuation of such payments after the Operational Separation Date, in accordance with the terms of the Enterprise Global Retirement Supplement program as in effect from time to time.

## ARTICLE IV
## HEALTH AND WELFARE PLANS

4.1 Health and Welfare Plans .

(a) Establishment of Health and Welfare Plans . Except as otherwise expressly provided in this Agreement or in any Transfer Document, effective as of the Operational Separation Date:

(i) the Parties shall have taken all necessary action to ensure that (A) all HPI Employees and any Former Employees who were participants in the HP Health and Welfare Plans at the time of separation from employment and who remain entitled to coverage thereunder (" HPI H&W Employees ") are covered by the HP Health and Welfare Plans and (B) all Enterprise Employees and any Former Employees who were participants in the Enterprise Health and Welfare Plans at the time of separation from employment and who remain entitled to coverage thereunder (" Enterprise H&W Employees ") are covered by Enterprise Health and Welfare Plans.

(ii) HP shall be responsible for all Liabilities relating to, arising out of or resulting from (A) health and welfare coverage (including COBRA continuation coverage) for HPI H&W Employees and their covered dependents and (B) claims incurred under the HP Health and Welfare Plans prior to, on or following the Operational Separation Date.

(iii) Enterprise shall be responsible for all Liabilities relating to, arising out of or resulting from (A) health and welfare coverage (including COBRA continuation coverage) for Enterprise H&W Employees and their covered dependents and (B) claims incurred under the Enterprise Health and Welfare Plans prior to, on or following the Operational Separation Date.

(b) True-Up for Period through the Operational Separation Date . No later than April 30, 2016, (i) HP shall provide to Enterprise an invoice for the actual cost, as determined by HP's global actuary, of any claims incurred at any time prior to the Operational Separation Date but not reported as of the Distribution Date under the HP Health and Welfare Plans with respect to Enterprise Employees and (ii) Enterprise shall provide to HP an invoice for the actual cost, as determined by Enterprise's global actuary, of any claims incurred prior to the Operational Separation Date but not reported as of the Distribution Date under the Enterprise Health and Welfare Plans with respect to HPI Employees. If the amount of the invoice delivered

-18-

by HP exceeds the amount of the invoice delivered Enterprise, then Enterprise shall remit to HP the amount of such excess not later than sixty (60) days following the invoice date or, if the amount of the invoice delivered by Enterprise exceeds the amount of the invoice delivered by HP, then HP shall remit to Enterprise the amount of such excess not later than sixty (60) days following the invoice date.

(c) <u>Transition Period for U.S. Enterprise Employees Receiving Self-Insured Health and Welfare Benefits under an HP Health and Welfare Plan</u>. Notwithstanding anything herein to the contrary, each Enterprise Employee who is receiving self-insured health and welfare benefits under an HP Health and Welfare Plan covering U.S. employees as of the Operational Separation Date shall continue to participate in such HP Health and Welfare Plan until December 31, 2015 (including, if applicable, pursuant to the health care continuation requirements of COBRA following the incurrence of a COBRA qualifying event under the HP Health and Welfare Plans after the Operational Separation Date). No later than September 30, 2016, HP shall provide to Enterprise an invoice for the actual cost, as determined by HP's global actuary, of any claims incurred by such Enterprise Employees under such HP Health and Welfare Plans from the Distribution Date through December 31, 2015 and Enterprise shall remit to HP the amount of the invoice not later than sixty (60) days following the invoice date.

(d) <u>Long-Term Disability</u>. Notwithstanding anything herein to the contrary, each Former Enterprise Employee who is receiving long-term disability benefits under an HP Health and Welfare Plan maintained for the benefit of U.S. participants as of the Operational Separation Date shall continue to participate in such HP Health and Welfare Plan following the Operational Separation Date in accordance with its terms and all Liabilities incurred under such HP Health and Welfare Plan in respect of such Former Enterprise Employee shall be retained by HP.

(e) <u>Claims Incurrence</u>. For purposes of this Section 4.1, a claim is deemed to be incurred: (i) with respect to medical, dental, vision and/or prescription drug benefits, on the date the health services giving rise to such claim are rendered; (ii) with respect to life insurance, accidental death and dismemberment and business travel accident insurance, on the date the event giving rise to such claim occurs; and (iii) with respect to disability benefits, on the date a person's disability begins, as determined by the disability benefit insurance carrier or claim administrator, giving rise to such claim.

(f) <u>Subrogation</u>.

(i) To the extent that there is a subrogation right under the Hewlett-Packard Company Comprehensive Welfare Benefits Plan (the "<u>Comprehensive Plan</u>") for self-insured U.S. medical claims with respect to a claim incurred before August 1, 2015 by an Enterprise Employee or his or her covered dependents, an amount equal to any subrogation recoveries received by the Comprehensive Plan on or before October 31, 2016 will be divided equally between the Parties and applied to any current claims due for funding of the Comprehensive Plan (or any successor plan established by Enterprise).

(ii) If a subrogation right under the Comprehensive Plan arises with respect to a claim incurred by an Enterprise Employee or his or her covered dependents

-19-

between August 1, 2015 and December 31, 2015, the amount of any subrogation recoveries received by the Comprehensive Plan will be applied in full to any funding obligation by Enterprise for the Comprehensive Plan (or any successor plan established by Enterprise).

(iii) The Parties will work in good faith to address any issues with respect to settlements or special handling of any subrogation claims.

(g) Flexible Spending Accounts . With respect to each Enterprise Employee, the parties shall use commercially reasonable efforts to ensure that any health or dependent care flexible spending accounts as of the Operational Separation Date of such Enterprise Employee (whether positive or negative) under HP Health and Welfare Plans that are health or dependent care flexible spending account plans are transferred, as soon as practicable after the Operational Separation Date, from the HP Health and Welfare Plans to the corresponding Enterprise Health and Welfare Plans. Such Enterprise Health and Welfare Plans shall assume responsibility as of the Operational Separation Date for all outstanding health or dependent care flexible spending account claims under the corresponding HP Health and Welfare Plans of each Enterprise Employee for the calendar year in which the Operational Separation Date occurs.

(h) COBRA Compliance .

(i) Effective as of the Operational Separation Date, HP or another HPI Entity shall be responsible for administering compliance with the health care continuation requirements of COBRA with respect to HPI Employees and Former Employees and their respective covered dependents who incur a COBRA qualifying event under the HP Health and Welfare Plans at any time before, on or after the Operational Separation Date.

(ii) Subject to Section 4.1(c), effective as of the Operational Separation Date, Enterprise or another Enterprise Entity shall be responsible for administering compliance with the health care continuation requirements of COBRA with respect to Enterprise Employees and their covered dependents who incur a COBRA qualifying event under the Enterprise Health and Welfare Plans at any time after the Operational Separation Date.

(iii) The Parties hereto agree that the consummation of the transactions contemplated by this Agreement and the Separation Agreement shall not constitute a COBRA qualifying event for any purpose of COBRA.

(i) Retiree Medical .

(i) *Retirement Medical Savings Account Program* .

(A) Effective as of the Operational Separation Date, for each HPI Employee and Former Employee, HPI shall retain, or cause the applicable HPI Entity to retain, all Liabilities for (I) the balance in the HP retirement medical savings account program of such HPI Employee or Former Employee and (II) all claims, whether arising before, on or after the Operational Separation Date, under the HP

-20-

retirement medical savings account program of such HPI Employee or Former Employee.

(B) Effective as of the Operational Separation Date, (I) Enterprise has established a retirement medical savings account program which is substantially similar in all material respects as of the Operational Separation Date to the HP retirement medical savings account program for each Enterprise Employee, (II) any balance in the HP retirement medical savings account program as of the Operational Separation Date of each Enterprise Employee has transferred to a new voluntary employees' beneficiary association trust sponsored by Enterprise and (III) the Enterprise retirement medical savings account program has assumed responsibility for all outstanding and unsatisfied claims under the corresponding HP retirement medical savings account program of each Enterprise Employee.

(ii) *U.S. Subsidized Retiree Medical Plans* . From and after the Operational Separation Date, HP shall retain or assume, as applicable, and HP hereby agrees to pay, perform, fulfill and discharge, in due course, all Liabilities under all subsidized retiree medical programs maintained by any HPI Entity or Enterprise Entity in the U.S. as of immediately prior to the Operational Separation Date for all eligible HPI Employees, Enterprise Employees and Former Employees.

(iii) *Employee Pay All Retiree Medical* .

(A) From and after the Operational Separation Date, HP shall retain or assume, as applicable, and HP hereby agrees to pay, perform, fulfill and discharge, in due course, all Liabilities for all eligible HPI Employees and Former Employees under all employee-pay-all retiree medical programs maintained in the U.S. by any HPI Entity or Enterprise Entity as of immediately prior to the Operational Separation Date.

(B) Effective as of the Operational Separation Date, Enterprise has established an employee-pay-all retiree medical program for employees in the U.S. and, from and after the Operational Separation Date, Enterprise Employees in the U.S. who retire from Enterprise shall not be eligible to participate in the employee-pay-all retiree medical program maintained by HP and each such Enterprise Employee shall participate in the Enterprise employee-pay-all retiree medical program, as in effect from time to time, if and to the extent that such Enterprise Employee is eligible for such program in accordance with its terms.

(iii) *Puerto Rico Retiree Medical Plan* . From and after the Operational Separation Date, HP shall retain or assume, as applicable, and HP hereby agrees to pay, perform, fulfill and discharge, in due course, all Liabilities for all eligible HPI Employees, Enterprise Employees and Former Employees under any retiree medical program maintained by any HPI Entity or Enterprise Entity as of immediately prior to the Operational Separation Date for current and former employees in Puerto Rico.

(iv) *Brazil Retiree Medical Plan* . From and after the Operational Separation Date, Enterprise shall retain or assume, as applicable, and Enterprise hereby agrees to pay, perform, fulfill and discharge, in due course, all Liabilities for all eligible HPI Employees, Enterprise Employees and Former Employees under any retiree medical program maintained by any HPI Entity or Enterprise Entity as of immediately prior to the Operational Separation Date for current and former employees in Brazil.

(v) *Canada Retiree Medical Plan* .

(A) From and after the Operational Separation Date, Enterprise shall retain or assume, as applicable, and Enterprise hereby agrees to pay, perform, fulfill and discharge, in due course, all Liabilities for all eligible Enterprise Employees and Former Employees under any retiree medical program maintained by any HPI Entity or Enterprise Entity as of immediately prior to the Operational Separation Date for current and former employees in Canada.

(B) Effective as of the Operational Separation Date, an HPI Entity has established a retiree medical program for employees in Canada and, from and after the Operational Separation Date, HPI Employees in Canada who retire from an HPI Entity shall not be eligible to participate in the retiree medical program maintained by Enterprise from time to time and each such HPI Employee shall participate in the HPI Entity's retiree medical program if and to the extent that such HPI Employee is eligible for such program in accordance with its terms as in effect from time to time.

(j) Vacation; Paid Time Off . For the avoidance of doubt, (i) to the extent that applicable Law requires that vacation or other paid time off accrued by an employee during employment with the HPI Group be paid to such employee in cash upon his or her commencement of employment with the Enterprise Group pursuant to Section 2.1 of this Agreement, the Enterprise Group shall be solely responsible for all Liabilities in respect of such payment and (ii) to the extent that applicable Law requires that vacation or other paid time off accrued by an employee during employment with the Enterprise Group be paid to such employee in cash upon his or her commencement of employment with the HPI Group pursuant to Section 2.1 of this Agreement, the HPI Group shall be solely responsible for all Liabilities in respect of such payment.

4.2 Workers' Compensation Liabilities . The treatment of workers' compensation liabilities in connection with the Separation shall be governed by the Separation Agreement.

## ARTICLE V
## EXECUTIVE BENEFITS AND OTHER BENEFITS

5.1 No Change in Control . The Parties hereto agree that none of the transactions contemplated by the Separation Agreement or any of the Transaction Documents, including, without limitation, this Agreement, constitutes a "change in control," "change of control" or similar term, as applicable, within the meaning of any Benefit Plan, the HP Stock Plans or the Enterprise Stock Plan.

-22-

5.2 Incentive Plans; Long-Term Cash Awards .

(a) *HP Incentive Plans* . Effective as of the Operational Separation Date, the Parties have taken such actions, or caused the taking of such actions, as are necessary to ensure that all HPI Employees are covered by the HP Incentive Plans. Subject to Section 5.2(c), HP shall be solely responsible for determining the amount of, and paying, all awards due to be paid after the Operational Separation Date to HPI Employees and Former Employees who were participants in the HP Incentive Plans at the time of separation from employment, under the HP Incentive Plans, whether earned before, on or after the Operational Separation Date.

(b) *Enterprise Incentive Plans* . Effective as of the Operational Separation Date, the Parties have taken such actions, or caused the taking of such actions, as are necessary to ensure that all Enterprise Employees are covered by the Enterprise Incentive Plans. Subject to Section 5.2(c), Enterprise shall be solely responsible for determining the amount of, and paying, all awards due to be paid after the Operational Separation Date to Enterprise Employees and Former Employees who were participants in the Enterprise Incentive Plans at the time of separation from employment, under the Enterprise Incentive Plans, whether earned before, on or after the Operational Separation Date; provided , that (i) with respect to each Enterprise Employee who was an executive officer of HP during the fiscal year ending October 31, 2015, his or her award in respect of such fiscal year will be determined based on the level of achievement of the applicable performance goals previously determined by the HR and Compensation Committee of the HP Board of Directors (the " HP HRC Committee ") and (ii) if requested, as soon as practicable following October 31, 2015, HP shall provide Enterprise with the information reasonably necessary for the HR and Compensation Committee of the Enterprise Board of Directors (the " Enterprise HRC Committee ") to determine the level of achievement of such performance goals.

(c) HP and Enterprise agree to conduct a "true up/true-down" of their respective bonus accruals for fiscal year 2015 consistent with HP's past practice of doing so based upon the process set forth in Schedule 5.2(c). As soon as reasonably practicable following the Distribution, the Enterprise Chief Financial Officer shall share with the HP Chief Financial Officer the proposed fiscal year 2015 bonus accrual true-up/true-down for Enterprise, which shall be subject to review and consent by the HP Chief Financial Officer, which consent shall not be unreasonably withheld or delayed. As soon as reasonably practicable following the Distribution, the HP Chief Financial Officer shall share with the Enterprise Chief Financial Officer the proposed fiscal year 2015 bonus accrual true-up/true-down for HP, which shall be subject to review and consent by the Enterprise Chief Financial Officer, which consent shall not be unreasonably withheld or delayed. Each of the Parties will pay bonuses in respect of fiscal year 2015 based on the accruals determined in accordance with this Section 5.2(c).

(d) *Long-Term Cash Awards* . Effective as of the Operational Separation Date, (i) HP shall be solely responsible for paying, when due, all long-term restricted cash awards held by HPI Employees as of the Operational Separation Date and (ii) Enterprise shall be solely responsible for paying, when due, all long-term restricted cash awards held by Enterprise Employees as of the Operational Separation Date.

5.3 HP Stock Plans . HP and Enterprise shall use commercially reasonable efforts to

-23-

take all actions necessary or appropriate so that each outstanding HP Equity Award granted under any HP Stock Plan shall be adjusted as set forth in this Section 5.3. Following the Separation, for any award adjusted under this Section 5.3, any reference to a "change in control," "change of control," "ownership change event," or similar definition in an award agreement, employment agreement, the HP Stock Plans or other HP plan or policy (x) with respect to equity awards denominated in HP Common Shares after the Separation, shall be deemed to refer to a "change in control," "change of control," "ownership change event," or similar definition as set forth in the applicable award agreement, employment agreement, the applicable HP Stock Plan or other HP plan or policy, and (y) with respect to equity awards denominated in shares of Enterprise Common Stock after the Separation, such reference shall be deemed to refer to a "change in control," "change of control," "ownership change event," or similar event relating to Enterprise.

(a) *Outstanding HP Options (including PCSOs) and HP SARs Held by HPI Employees, HP Non-Employee Directors (other than the CEO), Former Employees and Certain Other Participants* . Each HP Option and HP SAR held by (w) an HPI Employee, (x) an HP Non-Employee Director (other than the CEO), (y) a Former Employee or (z) any other participant who is neither employed by, or a director of, an Enterprise Entity or an HPI Entity as of immediately prior to the Effective Time, that is outstanding and unexercised as of immediately prior to the Effective Time, shall be subject to the same terms and conditions after the Effective Time as the terms and conditions applicable to such HP Option or HP SAR immediately prior to the Effective Time; provided , however , that from and after the Effective Time:

(i) the number of HP Common Shares subject to such HP Option or HP SAR, rounded down to the nearest whole number of shares, shall be equal to the product obtained by multiplying (A) the number of HP Common Shares subject to such HP Option or HP SAR immediately prior to the Effective Time by (B) the HP Ratio;

(ii) the per share exercise price of such HP Option or HP SAR, rounded up to the nearest whole cent, shall be equal to the quotient obtained by dividing (A) the per share exercise price of such HP Option or HP SAR immediately prior to the Effective Time by (B) the HP Ratio; and

(iii) the performance conditions applicable to each such HP Option that is a PCSO will be appropriately adjusted so that the ratio of the post-adjustment exercise price to each post-adjustment stock price hurdle is the same as the ratio of the pre-adjustment exercise price to each pre-adjustment stock price hurdle.

(b) *Outstanding HP Options (including PCSOs) and HP SARs Held by Certain Enterprise Employees (other than the CEO) and Enterprise Non-Employee Directors* . Each HP Option and HP SAR held by (x) an Enterprise Employee (other than the CEO) who remains employed by an Enterprise Entity as of immediately prior to the Effective Time or (y) an Enterprise Non-Employee Director, that is outstanding and unexercised as of immediately prior to the Effective Time, shall be converted into an Enterprise Option or an Enterprise SAR, as applicable, and shall otherwise be subject to the same terms and conditions after the Effective Time as the terms and conditions applicable to the corresponding HP Option or HP SAR

-24-

immediately prior to the Effective Time; provided , however , that from and after the Effective Time:

(i) the number of shares of Enterprise Common Stock subject to such Enterprise Option or Enterprise SAR, rounded down to the nearest whole number of shares, shall be equal to the product obtained by multiplying (A) the number of HP Common Shares subject to the corresponding HP Option or HP SAR immediately prior to the Effective Time by (B) the Enterprise Ratio;

(ii) the per share exercise price of such Enterprise Option or Enterprise SAR, rounded up to the nearest whole cent, shall be equal to the quotient obtained by dividing (A) the per share exercise price of the corresponding HP Option or HP SAR immediately prior to the Effective Time by (B) the Enterprise Ratio; and

(iii) the performance conditions applicable to each such Enterprise Option that is a PCSO will be appropriately adjusted so that (A) they relate to the stock price appreciation of Enterprise Common Stock and (B) the ratio of the post-adjustment exercise price to each post-adjustment stock price hurdle is the same as the ratio of the pre-adjustment exercise price to each pre-adjustment stock price hurdle.

(c) *Vested Outstanding HP Options (including PCSOs) Held by the CEO* . Each HP Option held by the CEO that is outstanding, vested and unexercised as of immediately prior to the Effective Time shall be converted into both an HP Option and an Enterprise Option, and shall otherwise be subject to the same terms and conditions after the Effective Time as the terms and conditions applicable to such HP Option immediately prior to the Effective Time; provided , however , that from and after the Effective Time:

(i) the number of HP Common Shares subject to such HP Option, rounded down to the nearest whole number of shares, shall be equal to the product obtained by multiplying (A) the number of HP Common Shares subject to the corresponding HP Option immediately prior to the Effective Time by (B) the Value Factor;

(ii) the number of shares of Enterprise Common Stock subject to such Enterprise Option, rounded down to the nearest whole number of shares, shall be equal to the product obtained by multiplying (A) the number of HP Common Shares subject to the corresponding HP Option immediately prior to the Effective Time by (B) the Value Factor;

(iii) the per share exercise price of such HP Option, rounded up to the nearest whole cent, shall be equal to the quotient obtained by dividing (A) the per share exercise price of the corresponding HP Option immediately prior to the Effective Time by (B) the HP Ratio; and

(iv) the per share exercise price of such Enterprise Option, rounded up to the nearest whole cent, shall be equal to the quotient obtained by dividing (A) the per share exercise price of the corresponding HP Option immediately prior to the Effective Time by (B) the Enterprise Ratio.

-25-

(d) *Unvested Outstanding HP Options (including PCSOs) Held by the CEO* . Each HP Option held by the CEO that is outstanding and unvested as of immediately prior to the Effective Time shall be converted into an Enterprise Option, and shall otherwise be subject to the same terms and conditions after the Effective Time as the terms and conditions applicable to the corresponding HP Option immediately prior to the Effective Time; provided , however , that from and after the Effective Time:

(i) the number of shares of Enterprise Common Stock subject to such Enterprise Option, rounded down to the nearest whole number of shares, shall be equal to the product obtained by multiplying (A) the number of HP Common Shares subject to the corresponding HP Option immediately prior to the Effective Time by (B) the Enterprise Ratio;

(ii) the per share exercise price of such Enterprise Option, rounded up to the nearest whole cent, shall be equal to the quotient obtained by dividing (A) the per share exercise price of the corresponding HP Option immediately prior to the Effective Time by (B) the Enterprise Ratio;

(iii) the service-based vesting conditions applicable to each such unvested Enterprise Option will relate solely to the CEO's continued employment with the Enterprise Group; and

(iv) the performance conditions applicable to each such Enterprise Option that is a PCSO will be appropriately adjusted so that (A) they relate to the stock price appreciation of Enterprise Common Stock and (B) the ratio of the post-adjustment exercise price to each post-adjustment stock price hurdle is the same as the ratio of the pre-adjustment exercise price to each pre-adjustment stock price hurdle.

(e) *Outstanding HP RSU Awards Held by HPI Employees, HP Non-Employee Directors (other than the CEO), Former Employees and Certain Other Participants* . Each HP RSU Award held by (w) an HPI Employee, (x) an HP Non-Employee Director (other than the CEO), (y) a Former Employee or (z) any other participant who is neither employed by, or a director of, an Enterprise Entity or an HPI Entity as of immediately prior to the Effective Time, that is outstanding as of immediately prior to the Effective Time, shall be subject to the same terms and conditions after the Effective Time as the terms and conditions applicable to such HP RSU Award immediately prior to the Effective Time, including any deferral election applicable to the delivery of vested shares; provided , however , that from and after the Effective Time, the number of HP Common Shares to which such HP RSU Award relates shall be equal to the product, rounded down to the nearest whole number of shares, obtained by multiplying (i) the number of HP Common Shares to which such HP RSU Award related immediately prior to the Effective Time by (ii) the HP Ratio.

(f) *Outstanding HP RSU Awards Held by Certain Enterprise Employees and Enterprise Non-Employee Directors* . Each HP RSU Award held by (x) an Enterprise Employee who remains employed by an Enterprise Entity as of immediately prior to the Effective Time or (y) an Enterprise Non-Employee Director, in each case that is outstanding as of immediately prior to the Effective Time, shall be converted into an Enterprise RSU Award, and shall

-26-

otherwise be subject to the same terms and conditions after the Effective Time as the terms and conditions applicable to the corresponding HP RSU Award immediately prior to the Effective Time, including any deferral election applicable to the delivery of vested shares; provided , however , that from and after the Effective Time, the number of shares of Enterprise Common Stock to which such Enterprise RSU Award relates shall be equal to the product, rounded down to the nearest whole number of shares, obtained by multiplying (i) the number of HP Common Shares to which the corresponding HP RSU Award related immediately prior to the Effective Time by (ii) the Enterprise Ratio.

(g) *Outstanding HP DEU Accounts Held by HPI Employees, HP Non-Employee Directors (other than the CEO), Former Employees and Certain Other Participants* . Each HP DEU Account held by (w) an HPI Employee, (x) an HP Non-Employee Director (other than the CEO), (y) a Former Employee or (z) any other participant who is neither employed by, or a director of, an Enterprise Entity or an HPI Entity as of immediately prior to the Effective Time, that is outstanding as of immediately prior to the Effective Time, shall be subject to the same terms and conditions after the Effective Time as the terms and conditions applicable to such HP DEU Account immediately prior to the Effective Time, including any deferral election applicable to the delivery of vested shares; provided , however , that from and after the Effective Time, the number of HP Common Shares to which such HP DEU Account relates shall be equal to the product, rounded to four decimal places, obtained by multiplying (i) the number of HP Common Shares to which such HP DEU Account related immediately prior to the Effective Time by (ii) the HP Ratio.

(h) *Outstanding HP DEU Accounts Held by Certain Enterprise Employees and Enterprise Non-Employee Directors* . Each HP DEU Account held by (x) an Enterprise Employee who remains employed by an Enterprise Entity as of immediately prior to the Effective Time or (y) an Enterprise Non-Employee Director, that is outstanding as of immediately prior to the Effective Time, shall be converted into an Enterprise DEU Account, and shall otherwise be subject to the same terms and conditions after the Effective Time as the terms and conditions applicable to the corresponding HP DEU Account immediately prior to the Effective Time, including any deferral election applicable to the delivery of vested shares; provided , however , that from and after the Effective Time, the number of shares of Enterprise Common Stock to which such Enterprise DEU Account relates shall be equal to the product, rounded to four decimal places, obtained by multiplying (i) the number of HP Common Shares to which the corresponding HP DEU Account related immediately prior to the Effective Time by (ii) the Enterprise Ratio.

(i) *Outstanding HP PARSU Awards Held by HPI Employees, Former Employees and Certain Other Participants* . Each HP PARSU Award held by (x) an HPI Employee, (y) a Former Employee or (z) any other participant who is neither employed by, or a director of, an Enterprise Entity or an HPI Entity as of immediately prior to the Effective Time, that is outstanding as of immediately prior to the Effective Time, shall be subject to the same terms and conditions after the Effective Time as the terms and conditions applicable to such HP PARSU Award immediately prior to the Effective Time, including any deferral election applicable to the delivery of vested shares; provided , however , that from and after the Effective Time:

-27-

(i) the number of HP Common Shares to which such HP PARSU Award relates shall be equal to the product, rounded down to the nearest whole number of shares, obtained by multiplying (A) the number of HP Common Shares to which such HP PARSU Award related immediately prior to the Effective Time by (B) the HP Ratio; and

(ii) the performance conditions applicable to each such HP PARSU Award shall be such conditions as are determined by the HP HRC Committee as soon as reasonably practicable following the Effective Time.

(j) *Outstanding HP PARSU Awards Held by Certain Enterprise Employees* . Each HP PARSU Award held by an Enterprise Employee who remains employed by an Enterprise Entity as of immediately prior to the Effective Time, that is outstanding as of immediately prior to the Effective Time, shall be converted into an Enterprise PARSU Award, and shall otherwise be subject to the same terms and conditions after the Effective Time as the terms and conditions applicable to the corresponding HP PARSU Award immediately prior to the Effective Time, including any deferral election applicable to the delivery of vested shares; provided , however , that from and after the Effective Time:

(i) the number of shares of Enterprise Common Stock to which such Enterprise PARSU Award relates shall be equal to the product, rounded down to the nearest whole number of shares, obtained by multiplying (A) the number of HP Common Shares to which the corresponding HP PARSU Award related immediately prior to the Effective Time by (B) the Enterprise Ratio; and

(ii) the performance conditions applicable to each such Enterprise PARSU Award shall be such conditions as are determined by the Enterprise HRC Committee as soon as reasonably practicable following the Effective Time.

(k) *Tax Reporting and Withholding* .

(i) After the Effective Time, HP Equity Awards, regardless of by whom held, shall be settled by HP, and Enterprise Equity Awards, regardless of by whom held, shall be settled by Enterprise.

(ii) Unless prohibited by law, following the Effective Time:

(A) Upon the occurrence of income recognition events with respect to Enterprise Equity Awards, Enterprise shall be solely responsible for ensuring the satisfaction of all applicable tax withholding requirements.

(B) Upon the occurrence of income recognition events with respect to HP Equity Awards, HP shall be solely responsible for ensuring the satisfaction of all applicable tax withholding requirements.

(C) HP shall be responsible for all income tax reporting in respect of HP Equity Awards held by HPI Employees, Former HPI Employees and HP Non-Employee Directors, and Enterprise will be responsible for all income tax

-28-

reporting in respect of Enterprise Equity Awards and in respect of HP Equity Awards held by Enterprise Employees whose employment terminates prior to the Distribution Date and Former Enterprise Employees.

(l) *Establishment of Enterprise Stock Plan* . Effective as of no later than immediately prior to the Effective Time, Enterprise shall have adopted the Enterprise Stock Plan under which the Enterprise Equity Awards shall be issued, and Enterprise shall issue all such awards under the Enterprise Stock Plan.

(m) *Registration and Other Regulatory Requirements* . Prior to the Effective Time, Enterprise shall have filed a Form S-8 registration statement with respect to, and caused to be registered pursuant to the Securities Act of 1933, as amended, the Enterprise Common Stock authorized for issuance under the Enterprise Stock Plan. The parties shall take such additional actions as are deemed necessary or advisable to comply with securities laws and other legal requirements associated with equity compensation awards in affected non-U.S. jurisdictions.

5.4 Employee Stock Purchase Plan .

(a) *HP ESPP* . The administrator of the HP ESPP shall take all actions necessary and appropriate to provide that: (i) the regularly scheduled offering period in which the Record Date would occur will be shortened so that the purchase date occurs at the latest practicable time prior to the Record Date; (ii) all participant payroll deductions and other contributions under the HP ESPP shall cease on or before the purchase date described in clause (i) of this paragraph; (iii) Enterprise Employees will not be eligible to participate in any offering periods under the HP ESPP after the completion of the offering period described in clause (i) of this paragraph; and (iv) the administrator of the HP ESPP shall determine in its sole discretion the time at which the next offering period following the offering period described in clause (i) of this paragraph shall commence.

(b) *Enterprise ESPP* . Effective immediately prior to the Effective Time, Enterprise shall have adopted the Enterprise ESPP. Enterprise shall, in its sole discretion, determine (i) the time at which the Enterprise ESPP shall first be offered, (ii) the offering periods and terms of the options granted thereunder, (iii) the Enterprise Entities designated for participation in the Enterprise ESPP and (iv) any additional administrative or compliance requirements necessary or appropriate for offering the Enterprise ESPP to Enterprise Employees.

5.5 Employment Agreements .

(a) *Assignment* . Subject to applicable Law and except (i) as provided otherwise in the Transfer Documents, (ii) in the event an Individual Agreement is superseded, or (iii) as otherwise agreed by the Parties, effective as of the Operational Separation Date, (A) HP shall have assigned, or caused an HPI Entity to assign, to an Enterprise Entity designated by Enterprise, all Individual Agreements between any Enterprise Employee and any HPI Entity and (B) Enterprise shall have assigned, or caused an Enterprise Entity to assign, to an HPI Entity designated by HP, all Individual Agreements between any HPI Employee and any Enterprise Entity; provided , however , that to the extent that assignment of any applicable Individual Agreement is not permitted by the terms of such agreement, effective as of the Operational

-29-

Separation Date, (1) with respect to Individual Agreements described in clause (A), each member of the Enterprise Group shall be considered to be a successor to each member of the HP Group for purposes of, and a third-party beneficiary with respect to, such Individual Agreement, such that each member of the Enterprise Group shall enjoy all of the rights and benefits under such agreement (including rights and benefits as a third-party beneficiary) and (2) with respect to Individual Agreements described in clause (B), each member of the HPI Group shall be considered to be a successor to each member of the Enterprise Group for purposes of, and a third-party beneficiary with respect to, such Individual Agreement, such that each member of the HPI Group shall enjoy all of the rights and benefits under such agreement (including rights and benefits as a third-party beneficiary).

(b) *Assumption* . Effective as of the Operational Separation Date, (i) Enterprise will assume and honor, or will cause a member of the Enterprise Group to assume and honor, any Individual Agreement assigned to Enterprise or a member of the Enterprise Group pursuant to Section 5.5(a)(A) and (ii) HP will assume and honor, or will cause a member of the HPI Group to assume and honor, any Individual Agreement assigned to HP or a member of the HPI Group pursuant to Section 5.5(a)(B).

5.6 Executive DC Plans .

(a) HP shall retain, or cause the applicable HPI Entity to retain, all Liabilities for the account balances and accrued benefits of (i) HPI Employees, (ii) Former Employees and (iii) any Enterprise Employee who does not remain employed by an Enterprise Entity as of the Distribution Date, under the HP Executive DC Plan.

(b) Effective as of the Distribution Date, Enterprise shall have established the Enterprise Executive DC Plan, which is substantially similar in all material respects as of the Distribution Date to the HP Executive DC Plan. As of the Distribution Date, Enterprise shall, and shall cause the Enterprise Executive DC Plan to, assume all Liabilities under the HP Executive DC Plan for the account balances and accrued benefits of Enterprise Employees who remain employed by an Enterprise Entity as of the Distribution Date, and HP and the HP Executive DC Plan shall be relieved of all such Liabilities. As of the Distribution Date, Enterprise shall, and shall cause the Enterprise Executive DC Plan to, recognize and maintain all elections, including deferral, payment time and form, and beneficiary elections, made under the HP Executive DC Plan by Enterprise Employees who remain employed by an Enterprise Entity as of the Distribution Date.

5.7 Severance .

(a) *Severance Liabilities of Enterprise* . Enterprise shall be solely responsible for all Liabilities in respect of all the costs of providing benefits under any applicable severance, separation, redundancy, termination or similar plan, program, practice, contract, agreement, law or regulation (such benefits to include any medical or other welfare benefits, outplacement benefits, accrued vacation, and taxes) (collectively, " Severance Benefits ") relating to:

(i) the termination or alleged termination of employment of:

-30-

(A) any Enterprise Employee (other than any such employee covered by Section 5.7(b)) that occurs on or after the Operational Separation Date; and

(B) any HPI Employee who is allocated to the Enterprise Group pursuant to the OD&S Process but does not transfer to an Enterprise Entity as of the Operational Separation Date and whose employment with the HPI Group is terminated prior to the first anniversary of the Distribution Date at the earliest time that is permitted by applicable Law;

(ii) an Enterprise Employee's or Enterprise Destination LOA Employee's acceptance of an offer of employment from an Enterprise Entity in connection with the Separation; and

(iii) Former Employees in accordance with the provisions of Section 2.2(b).

(b) *Severance Liabilities of HPI* . HP shall be solely responsible for all Liabilities in respect of all the costs of providing the Severance Benefits relating to:

(i) the termination or alleged termination of employment of:

(A) any HPI Employee (other than any such employee covered by Section 5.7(a)) that occurs on or after the Distribution Date;

(B) any Enterprise Employee who is allocated to the HPI Group pursuant to the OD&S Process but does not transfer to an HPI Entity as of the Operational Separation Date and whose employment with the Enterprise Group is terminated prior to the first anniversary of the Operational Separation Date at the earliest time that is permitted by applicable Law; and

(C) any Delayed Transfer Employee who does not transfer to an HPI Entity in connection with the Demerger and whose employment with the Enterprise Group is terminated at the earliest time following the effective date of the Transaction Documents with respect to the Demerger that is permitted by applicable Law;

(ii) an HPI Employee's or HPI Destination LOA Employee's acceptance of an offer of employment from an HPI Entity in connection with the Separation; and

(iii) Former Employees in accordance with the provisions of Section 2.2(a).

(c) *Severance Benefits in Excess of Statutory Minimum* .

(i) Any Severance Benefits in excess of the applicable statutory minimum severance benefits to be provided by an HPI Entity and reimbursed by an Enterprise Entity pursuant to the terms of this Agreement shall be subject to the

-31-

reasonable prior review and approval of Enterprise, other than with respect to any such amounts mandated by a plan or agreement in effect prior to the Operational Separation Date.

(ii) Any Severance Benefits in excess of the applicable statutory minimum severance benefits to be provided by an Enterprise Entity and reimbursed by an HPI Entity, pursuant to the terms of this Agreement, shall be subject to the reasonable prior review and approval of HP, other than with respect to any such amounts mandated by a plan or agreement in effect prior to the Operational Separation Date.

5.8 Mobility Benefits . All Liabilities in respect of mobility payments and benefits that are due to HPI Employees, Enterprise Employees and Former Employees after the Operational Separation Date will be governed by Sections 2.2(a)(i)-(iii) and 2.2(b)(i)-(iii).

## ARTICLE VI
## GENERAL AND ADMINISTRATIVE

6.1 Sharing of Participant Information . Subject to applicable Laws, HP and Enterprise shall share, and HP shall cause each other HPI Entity to share, and Enterprise shall cause each other Enterprise Entity to share with each other and their respective agents and vendors (without obtaining releases) all participant information necessary for the efficient and accurate administration of each of the Enterprise Benefit Plans and the HP Benefit Plans. HP and Enterprise and their respective authorized agents shall, subject to applicable laws, be given reasonable and timely access to, and may make copies of, all information relating to the subjects of this Agreement in the custody of the other Party, to the extent necessary for such administration. Until the Distribution Date, all participant information shall be provided in the manner and medium applicable to participating companies in HP Benefit Plans generally, and thereafter all participant information shall be provided in a manner and medium as may be mutually agreed to by HP and Enterprise.

6.2 Reasonable Efforts/Cooperation . Each of the Parties hereto will use its commercially reasonable efforts to promptly take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable under applicable laws and regulations to consummate the transactions contemplated by this Agreement. Each of the Parties hereto shall cooperate fully on any issue relating to the transactions contemplated by this Agreement for which the other Party seeks a determination letter or private letter ruling from the Internal Revenue Service, an advisory opinion from the Department of Labor or any other filing (including, but not limited to, securities, labor law or exchange control filings (remedial or otherwise)), consent or approval with respect to or by a governmental agency or authority in any jurisdiction in the U.S. or abroad.

6.3 No Third-Party Beneficiaries . This Agreement is solely for the benefit of the Parties and is not intended to confer upon any other Persons any rights or remedies hereunder. Except as expressly provided in this Agreement, nothing in this Agreement shall preclude HP or any other HPI Entity, at any time after the Distribution Date, from amending, merging, modifying, terminating, eliminating, reducing, or otherwise altering in any respect any HP Benefit Plan, any benefit under any Benefit Plan or any trust, insurance policy or funding vehicle

-32-

related to any HP Benefit Plan. Except as expressly provided in this Agreement, nothing in this Agreement shall preclude Enterprise or any other Enterprise Entity, at any time after the Distribution Date, from amending, merging, modifying, terminating, eliminating, reducing, or otherwise altering in any respect any Enterprise Benefit Plan, any benefit under any Benefit Plan or any trust, insurance policy or funding vehicle related to any Enterprise Benefit Plan.

6.4 Audit Rights With Respect to Information Provided .

(a) Each of HP and Enterprise, and their duly authorized representatives, shall have the right, subject to applicable Laws, to conduct reasonable audits with respect to all information required to be provided to it by the other Party under this Agreement. The Party conducting the audit (the " Auditing Party ") may adopt reasonable procedures and guidelines for conducting audits and the selection of audit representatives under this Section 6.4. The Auditing Party shall have the right to make copies of any records at its expense, subject to any restrictions imposed by applicable laws and to any confidentiality provisions set forth in the Separation Agreement, which are incorporated by reference herein. The Party being audited shall provide the Auditing Party's representatives with reasonable access during normal business hours to its operations, computer systems and paper and electronic files, and provide workspace to its representatives. After any audit is completed, the Party being audited shall have the right to review a draft of the audit findings and to comment on those findings in writing within thirty business days after receiving such draft.

(b) The Auditing Party's audit rights under this Section 6.4 shall include the right to audit, or participate in an audit facilitated by the Party being audited, of any Subsidiaries and Affiliates of the Party being audited and to require the other Party to request any benefit providers and third parties with whom the Party being audited has a relationship, or agents of such Party, to agree to such an audit to the extent any such Persons are affected by or addressed in this Agreement (collectively, the " Non-parties "). The Party being audited shall, upon written request from the Auditing Party, provide an individual (at the Auditing Party's expense) to supervise any audit of a Non-party. The Auditing Party shall be responsible for supplying, at the Auditing Party's expense, additional personnel sufficient to complete the audit in a reasonably timely manner. The responsibility of the Party being audited shall be limited to providing, at the Auditing Party's expense, a single individual at each audited site for purposes of facilitating the audit.

6.5 Fiduciary Matters . It is acknowledged that actions required to be taken pursuant to this Agreement may be subject to fiduciary duties or standards of conduct under ERISA or other applicable law, and no Party shall be deemed to be in violation of this Agreement if it fails to comply with any provisions hereof based upon its good faith determination that to do so would violate such a fiduciary duty or standard. Each Party shall be responsible for taking such actions as are deemed necessary and appropriate to comply with its own fiduciary responsibilities and shall fully release and indemnify the other Party for any Liabilities caused by the failure to satisfy any such responsibility.

6.6 Consent of Third Parties . If any provision of this Agreement is dependent on the consent of any third party (such as a vendor) and such consent is withheld, the Parties hereto shall use commercially reasonable efforts to implement the applicable provisions of this

-33-

Agreement to the full extent practicable. If any provision of this Agreement cannot be implemented due to the failure of such third party to consent, the Parties hereto shall negotiate in good faith to implement the provision in a mutually satisfactory manner. The phrase "commercially reasonable efforts" as used herein shall not be construed to require any Party to incur any non-routine or unreasonable expense or Liability or to waive any right.

**ARTICLE VII**
**MISCELLANEOUS**

7.1 <u>Effect If Effective Time Does Not Occur</u>. If the Separation Agreement is terminated prior to the Effective Time, then this Agreement shall terminate and all actions and events that are, under this Agreement, to be taken or occur effective immediately prior to or as of the Effective Time, or as of the Distribution Date, or otherwise in connection with the Separation Transactions, shall not be taken or occur except to the extent specifically agreed by HP and Enterprise.

7.2 <u>Relationship of Parties</u>. Nothing in this Agreement shall be deemed or construed by the Parties or any third party as creating the relationship of principal and agent, partnership or joint venture between the Parties, it being understood and agreed that no provision contained herein, and no act of the Parties, shall be deemed to create any relationship between the Parties other than the relationship set forth herein.

7.3 <u>Affiliates</u>. Each of HP and Enterprise shall cause to be performed, and hereby guarantees the performance of, all actions, agreements and obligations set forth in this Agreement to be performed by another HPI Entity or an Enterprise Entity, respectively.

7.4 <u>Transfer Documents</u>. Notwithstanding anything to the contrary in this Agreement, to the extent that any provision of this Agreement is inconsistent with a provision of any Transfer Document, the applicable provision of the Transfer Document shall control.

7.5 <u>Incorporation of Separation Agreement Provisions</u>. The following provisions of the Separation Agreement are hereby incorporated herein by reference, and unless otherwise expressly specified herein, such provisions shall apply as if fully set forth herein <u>mutatis mutandis</u> (references in this Section 7.5 to an "Article" or "Section" shall mean Articles or Sections of the Separation Agreement, and references in the material incorporated herein by reference shall be references to the Separation Agreement): Article V (relating to Releases); Sections 6.1-6.9 (relating to Indemnification); Section 7.2 (relating to Confidentiality); Article VIII (relating to Dispute Resolution); and Article IX (relating to Miscellaneous).

7.6 <u>Section 409A of the Code</u>. The Parties acknowledge that the provisions of this Agreement, the Separation Agreement and any Transaction Documents shall be interpreted and implemented in a manner that is intended to avoid the imposition on HPI Employees, Enterprise Employees, Former Employees, HP Non-Employee Directors or Enterprise Non-Employee Directors of taxes under Section 409A of the Code. Notwithstanding the foregoing, neither the Parties nor any of their Affiliates shall have any liability to any HPI Employee, Enterprise Employee, Former Employee, HP Non-Employee Director or Enterprise Non-Employee Director in the event that Section 409A applies to any payment in a manner that results in adverse tax

-34-

consequences for such individual.

*[Remainder of Page Intentionally Left Blank.]*

-35-

IN WITNESS WHEREOF, the Parties have caused this Employee Matters Agreement to be duly executed as of the day and year first above written.

**HEWLETT-PACKARD COMPANY**

By:   /s/ Catherine A. Lesjak
Name: Catherine A. Lesjak
Title: Executive Vice President and Chief Financial Officer

**HEWLETT PACKARD ENTERPRISE COMPANY**

By:   /s/ Rishi Varma
Name: Rishi Varma
Title: Secretary

**Schedule 3.3**

**Non-U.S. Retirement Plans**

**ARTICLE I**

**DEFINED BENEFIT PENSION PLANS**

1.1 <u>Obligations and Assets remaining with One Company</u>

(a) From and after the Operational Separation Date, Enterprise shall assume or retain, or cause an Enterprise Entity to assume or retain, all Assets and all Liabilities arising out of or relating to the defined benefit pension plans maintained by any HPI Entity or Enterprise Entity as of the Operational Separation Date, and shall make payments to all participants in such plans in accordance with the applicable terms of such plans as in effect from time to time, in the following countries:

(i) Canada;

(ii) Greece;

(iii) Ireland;

(iv) New Zealand;

(v) Sri Lanka; and

(vi) United Kingdom.

(b) From and after the Operational Separation Date, HPI shall assume or retain, or cause an HPI Entity to assume or retain, all Assets and all Liabilities arising out of or relating to the defined benefit pension plans maintained by any HPI Entity or Enterprise Entity as of the Operational Separation Date, and shall make payments to all participants in the such plans in accordance with the applicable terms of such plans as in effect from time to time, in:

(i) Puerto Rico.

1.2 <u>Multiple Employer Pension Plans</u>

(a) This Section 1.2 shall apply with respect to current and former employees eligible to participate in the defined benefit pension plans in the following countries:

(i) Australia;

(ii) Belgium;

(iii) Brazil;

(iv) Japan; <u>provided</u>, <u>however</u>, this Section 1.2 shall not apply to the

Schedule 3.3 – Page 1 of 9

Assets, Liabilities or obligations of the Parties with respect to the Japan Directors Plan, which shall be governed by Section 1.3 below;

(v) Netherlands; and

(vi) Switzerland.

(b) Effective as of the Operational Separation Date (or such later date as agreed by the Parties), the Parties shall have taken such actions, or caused the taking of such actions, as are necessary to ensure that all HPI Employees, Enterprise Employees and Former Employees who are participants in the defined benefit pension plans available to eligible employees in the countries listed in Section 1.2(a) at the time of separation from employment are covered by a multiple employer defined benefit pension plan.

(c) Within each applicable multiple employer defined benefit pension plan, HP shall be allocated the Assets (if any) and Liabilities relating to eligible HPI Employees and Enterprise shall be allocated the Assets (if any) and Liabilities relating to eligible Enterprise Employees.

(d) Within each applicable multiple employer defined benefit pension plan, HP and Enterprise shall be allocated the Assets (if any) and Liabilities relating to eligible Former Employees as follows:

(i) Australia: Enterprise shall be allocated the Assets (if any) and Liabilities relating to eligible Former Employees;

(ii) Belgium: Enterprise shall be allocated the Assets (if any) and Liabilities relating to eligible Former Employees;

(iii) Brazil: Enterprise shall be allocated the Assets (if any) and Liabilities relating to eligible Former Employees;

(iv) Japan (excluding the Japan Directors Plan): Enterprise shall be allocated the Assets (if any) and Liabilities relating to eligible Former Employees;

(v) Netherlands: (A) HP shall be allocated the Assets (if any) and Liabilities relating to eligible Former Employees who provided services primarily to the HPI Business and (B) Enterprise shall be allocated the Assets (if any) and Liabilities relating to eligible Former Employees who provided services primarily to the Enterprise Business; and

(vi) Switzerland: (A) HP shall be allocated the Assets (if any) and Liabilities relating to eligible Former Employees who provided services primarily to the HPI Business and (B) Enterprise shall be allocated the Assets (if any) and Liabilities relating to eligible Former Employees who provided services primarily to the Enterprise Business and any Former Employee who cannot reasonably be determined to have provided services primarily to either the HPI Business or the Enterprise Business.

Schedule 3.3 – Page 2 of 9

(e) The allocation of Assets in Sections 1.2(c) and (d) above shall be in proportion to the Liabilities determined on a US GAAP basis, or such other basis required by local law or agreed by the parties.

1.3 Countries in which Pension Plans are Split

(a) This Section 1.3 shall apply with respect to current or former employees eligible to participate in the defined benefit pension plans in the following countries:

(i) Austria;

(ii) Belgium;

(iii) Finland;

(iv) France;

(v) Germany;

(vi) India;

(vii) Indonesia;

(viii) Italy;

(ix) Japan, solely with respect to the Japan Directors Plan;

(x) Korea;

(xi) Mexico;

(xii) Pakistan;

(xiii) Philippines;

(xiv) Spain;

(xv) Switzerland, solely with respect to the Swiss International Retirement Guarantee (notwithstanding anything to the contrary in the Employee Matters Agreement);

(xvi) Taiwan;

(xvii) Thailand;

(xviii) Turkey; and

(xix) United Arab Emirates.

(b) From and after the Operational Separation Date (or a date after the Operational Separation Date and on or before the Distribution Date with respect to Belgium and the Swiss International Retirement Guarantee), Enterprise shall retain or assume, as applicable, and Enterprise hereby agrees to pay, perform, fulfill and discharge, in due course, all Assets and Liabilities for all eligible Enterprise Employees and Former Employees under any defined benefit pension plan maintained by any HPI Entity or Enterprise Entity as of immediately prior to the Operational Separation Date for such employees in the countries listed in Section 1.3(a); provided , however , that this Section 1.3(b) shall not apply with respect to (i) Former Employees eligible to participate in such plans in Spain and (ii) Enterprise Employees who were employed in legal entity TW10 who are eligible to participate in such plans in Taiwan immediately prior to the Operational Separation Date and who are Taiwan citizens or married to Taiwan citizens (" ETW10 PQ Employees ").

(c) From and after the Operational Separation Date, HP shall retain or assume, as applicable, and HP hereby agrees to pay, perform, fulfill and discharge, in due course, all Assets and Liabilities for all eligible HPI Employees under any defined benefit pension plan maintained by any HPI Entity or Enterprise Entity as of immediately prior to the Operational Separation Date for such employees in the countries listed in Section 1.3(a). HP shall also retain or assume, as applicable, and HP hereby agrees to pay, perform, fulfill and discharge, in due course, all Assets and Liabilities for all eligible Former Employees in Spain under any defined benefit pension plan maintained by any HPI Entity or Enterprise Entity as of immediately prior to the Operational Separation Date.

(d) Effective as of the Operational Separation Date, Enterprise has caused the Assets relating to the HPI Employees eligible to participate in the applicable defined benefit pension plans in the countries (other than Spain) listed in Section 1.3(a) to be transferred to the applicable HP defined benefit pension plan. The amount(s) to be transferred for funded plans shall be based on the funded status under US GAAP, or such other basis as required by local law or agreed by the Parties; no amounts shall be transferred with respect to unfunded plans; provided , however , that the treatment of Assets relating to HPI Employees eligible to participate in the applicable defined benefit pension plans in Taiwan shall be governed by Section 1.3(g).

(e) Effective as of the Operational Separation Date, HP has caused the Assets relating to the Enterprise Employees eligible to participate in the applicable defined benefit pension plans in Spain to be transferred to the applicable Enterprise defined benefit pension plan. The amount(s) to be transferred for funded plans shall be based on the funded status under US GAAP, or such other basis as required by local law or agreed by the Parties; no amounts shall be transferred with respect to unfunded plans.

(f) Effective as of the Operational Separation Date, the relevant HPI entity shall pay to the relevant Enterprise Entity an amount, as reasonably estimated by the Parties, equal to the funded Projected Benefit Obligation (as defined under US GAAP) for the ETW10 PQ Employees under the HP Taiwan defined benefit pension plan as of the Operational Separation Date. Upon the retirement of any ETW10 PQ Employee from an Enterprise Entity, such Enterprise Entity shall provide such employee with a retirement benefit equal to (i) the benefit to which such employee would have been entitled under the HP Taiwan defined benefit

Schedule 3.3 – Page 4 of 9

pension plan, less (ii) the benefit to which such employee is entitled under the Enterprise Taiwan defined contribution plan.

(g) Effective as of the Operational Separation Date, the relevant Enterprise Entity shall pay to the relevant HPI Entity an amount, as reasonably estimated by the Parties, equal to the funded Projected Benefit Obligation (as defined under US GAAP) for the HPI Employees eligible to participate in the applicable defined benefit pension plans in Taiwan as of the Operational Separation Date. This payment is required due to the inability of pension Assets to be transferred from the pension plan in Taiwan that is remaining with Enterprise and for which a special approval was received to form a new HP pension plan for HPI Employees who had previously participated in this plan.

(h) For the avoidance of doubt, the Parties acknowledge that in some of the countries listed in Section 1.3(a), there are some pension plans with no participants who are HPI Employees and therefore no Assets or Liabilities will be transferred to an HPI entity with respect to such plans.

1.4 To the extent not addressed in this Agreement, or if the Parties agree to other treatment, the Parties will work together in good faith to effectuate the appropriate allocation and transfer of Assets and Liabilities of the relevant defined benefit pension plans.

## ARTICLE II

## DEFINED CONTRIBUTION PENSION PLANS

2.1 For purposes of this Article II of Schedule 3.3, the following capitalized terms shall have the meanings set forth below:

(a) " Enterprise Non-US DC Plan " shall mean, for each current or former employee located outside of the United States, the defined contribution retirement plan sponsored or maintained by Enterprise or any Enterprise Entity, or sponsored or maintained by a governmental entity for the benefit of current and former employees of Enterprise or any Enterprise Entity, in the country in which such current or former employee is located.

(b) " HP Non-US DC Plan " shall mean, for each current or former employee located outside of the United States, the defined contribution retirement plan sponsored or maintained by HP or any HPI Entity, or sponsored or maintained by a governmental entity for the benefit of current and former employees of HP or any HPI Entity, in the country in which such current or former employee is located.

(c) " Non-US DC Plans " shall mean the Enterprise Non-US DC Plans and the HP Non-US DC Plans.

2.2 Active Employee Balances

(a) For each applicable country, other than Ireland, Italy and the United Kingdom:

Schedule 3.3 – Page 5 of 9

(i) The accounts of all HPI Employees under the Non-US DC Plans as of the Operational Separation Date will be retained by, or transferred to, as applicable, the HP Non-US DC Plan. HP shall cause the HP Non-US DC Plan to retain or assume, as applicable, all Assets and Liabilities (including any outstanding loans) for defined contribution account balances relating to HPI Employees whose accounts are retained by, or transferred to, as applicable, the HP Non-US DC Plan. For any HPI Employees who participated in an Enterprise Non-US DC Plan for which Assets are held by Enterprise or an Enterprise Entity, effective as of the Operational Separation Date, Enterprise has caused the Assets and Liabilities (including any outstanding loans) under the Enterprise Non-US DC Plan attributable to such HPI Employees to be transferred to the HP Non-US DC Plan.

(ii) The accounts of all Enterprise Employees under the Non-US DC Plans as of the Operational Separation Date will be retained by, or transferred to, as applicable, the Enterprise Non-US DC Plan. Enterprise shall cause the Enterprise Non-US DC Plan to retain or assume, as applicable, all Assets and Liabilities (including any outstanding loans) for defined contribution account balances relating to Enterprise Employees whose accounts are retained by, or transferred to, as applicable, the Enterprise Non-US DC Plan. For any Enterprise Employees who participated in an HP Non-US DC Plan for which Assets are held by HP or an HPI Entity, effective as of the Operational Separation Date, HP has caused the Assets and Liabilities (including any outstanding loans) under the HP Non-US DC Plan attributable to such Enterprise Employees to be transferred to the Enterprise Non-US DC Plan.

(b) For each of Italy and the United Kingdom:

(i) The accounts of all HPI Employees under the HP Non-US DC Plan for such country as of the Operational Separation Date will be retained by the HP Non-US DC Plan. HP shall cause the HP Non-US DC Plan to retain all Assets and Liabilities (including any outstanding loans) for defined contribution account balances relating to such HPI Employees whose accounts are retained by the HP Non-US DC Plan.

(ii) Any accounts of HPI Employees under the Enterprise Non-US DC Plan as of the Operational Separation Date will be retained by such Enterprise Non-US DC Plan unless and until the HPI Employee elects, in accordance with local law and the terms of the Enterprise Non-US DC Plan, to transfer his or her account balance to the HP Non-US DC Plan. For any account of an HPI Employee that is so transferred, (A) HP shall cause the HP Non-US DC Plan to assume all Assets and Liabilities (including any outstanding loans) for defined contribution account balances relating to such HPI Employee and (B) if the Enterprise Non-US DC Plan is a plan for which Assets are held by Enterprise or an Enterprise Entity, Enterprise will cause the Assets and Liabilities (including any outstanding loans) under the Enterprise Non-US DC Plan attributable to such HPI Employee to be transferred to the HP Non-US DC Plan.

(iii) The accounts of all Enterprise Employees under the Enterprise Non-US DC Plan as of the Operational Separation Date will be retained by the Enterprise Non-US DC Plan. Enterprise shall cause the Enterprise Non-US DC Plan to retain all

Schedule 3.3 – Page 6 of 9

Assets and Liabilities (including any outstanding loans) for defined contribution account balances relating to such Enterprise Employees whose accounts are retained by the Enterprise Non-US DC Plan.

(iv) Any accounts of Enterprise Employees under the HP Non-US DC Plan as of the Operational Separation Date will be retained by such HP Non-US DC Plan unless and until the Enterprise Employee elects, in accordance with local law and the terms of the HP Non-US DC Plan, to transfer his or her account balance to the Enterprise Non-US DC Plan. For any account of an Enterprise Employee that is so transferred, (A) Enterprise shall cause the Enterprise Non-US DC Plan to assume all Assets and Liabilities (including any outstanding loans) for defined contribution account balances relating to such Enterprise Employee and (B) if the HP Non-US DC Plan is a plan for which Assets are held by HP or an HPI Entity, HP will cause the Assets and Liabilities (including any outstanding loans) under the HP Non-US DC Plan attributable to such Enterprise Employee to be transferred to the Enterprise Non-US DC Plan.

(c) For Ireland:

(i) The HP Non-US DC Plan maintained in Ireland prior to the Operational Separation Date was transferred to Enterprise effective as of the Operational Separation Date (such plan, as transferred, the " Transferred Ireland DC Plan "). All accounts of HPI Employees and Enterprise Employees under the Transferred Ireland DC Plan as of the Operational Separation Date will be retained by such Transferred Ireland DC Plan; provided that any such HPI Employee may elect, in accordance with local law and the terms of the Transferred Ireland DC Plan, to transfer his or her account balance to the new HP Non-US DC Plan in Ireland adopted by HP effective as of the Operational Separation Date (the " New HP Ireland DC Plan "). For all account balances of HPI Employees that are not so transferred, Enterprise shall cause the Transferred Ireland DC Plan to retain all Assets and Liabilities (including any outstanding loans) for such account balances. For any account balance of an HPI Employee that is so transferred, (A) HP shall cause the New HP Ireland DC Plan to assume all Assets and Liabilities (including any outstanding loans) for defined contribution account balances relating to such HPI Employee and (B) Enterprise will cause the Assets and Liabilities (including any outstanding loans) under the Transferred Ireland DC Plan attributable to such HPI Employee to be transferred to the New HP Ireland DC Plan.

2.3 Inactive Employee Balances

(a) For each applicable country other than Brazil, Mexico, Korea, Taiwan, Denmark, Greece, Israel, Turkey and Ireland:

(i) The accounts of all Former Employees under the HP Non-US DC Plan as of the Operational Separation Date will be retained by the HP Non-US DC Plan and HP shall cause the HP Non-US DC Plan to retain all Assets and Liabilities (including any outstanding loans) for defined contribution account balances relating to such Former Employees whose accounts are retained by such HP Non-US DC Plan.

Schedule 3.3 – Page 7 of 9

(ii) The accounts of all Former Employees under the Enterprise Non-US DC Plan as of the Operational Separation Date will be retained by the Enterprise Non-US DC Plan and Enterprise shall cause the Enterprise Non-US DC Plan to retain all Assets and Liabilities (including any outstanding loans) for defined contribution account balances relating to such Former Employees whose accounts are retained by the Enterprise Non-US DC Plan.

(b) For each of Brazil, Mexico, Korea, Taiwan, Denmark, Greece, Israel and Turkey:

(i) The accounts under the Non-US DC Plans as of the Operational Separation Date of all Former Employees who provided services primarily to the HPI Business will be retained by, or transferred to, as applicable, the HP Non-US DC Plan. HP shall cause the HP Non-US DC Plan to retain or assume, as applicable, all Assets and Liabilities (including any outstanding loans) for defined contribution account balances relating to such Former Employees whose accounts are retained by, or transferred to, as applicable, the HP Non-US DC Plan. For any such Former Employee who participated in an Enterprise Non-US DC Plan for which Assets are held by Enterprise or an Enterprise Entity, effective as of the Operational Separation Date, Enterprise has caused the Assets and Liabilities (including any outstanding loans) under the Enterprise Non-US DC Plan attributable to such Former Employee to be transferred to the HP Non-US DC Plan.

(ii) The accounts under the Non-US DC Plans as of the Operational Separation Date of all Former Employees who provided services primarily to the Enterprise Business will be retained by, or transferred to, as applicable, the Enterprise Non-US DC Plan. Enterprise shall cause the Enterprise Non-US DC Plan to retain or assume, as applicable, all Assets and Liabilities (including any outstanding loans) for defined contribution account balances relating to such Former Employees whose accounts are retained by, or transferred to, as applicable, the Enterprise Non-US DC Plan. For any such Former Employees who participated in an HP Non-US DC Plan for which Assets are held by HP or an HPI Entity, effective as of the Operational Separation Date, HP has caused the Assets and Liabilities (including any outstanding loans) under the HP Non-US DC Plan attributable to such Former Employees to be transferred to the Enterprise Non-US DC Plan.

(c) For Ireland:

(i) All accounts of Former Employees under the Transferred Ireland DC Plan as of the Operational Separation Date will be retained by such Transferred Ireland DC Plan. Enterprise shall cause the Transferred Ireland DC Plan to retain all Assets and Liabilities (including any outstanding loans) for defined contribution account balances relating to such Former Employees whose accounts are retained by the Transferred Ireland DC Plan.

2.4 For the avoidance of doubt, the provisions of this Article II of Schedule 3.3 shall not apply to the defined contribution retirement plans maintained in the United States and the treatment of such plans shall by governed by Article III of this Agreement. To the extent not

Schedule 3.3 – Page 8 of 9

addressed in this Agreement, or if the Parties agree to other treatment, the Parties will work together in good faith to effectuate the appropriate treatment and transfer of accounts for the Non-US DC Plans. For each Non-US DC Plan that is a multiple employer defined contribution plan, the transferring and retaining of Assets and Liabilities contemplated by this Article II of Schedule 3.3 will be effectuated by adjusting the Assets and Liabilities attributable to the participating HP Entity and Enterprise Entity within such Non-US DC Plan. Notwithstanding anything herein to the contrary, transfers of outstanding loans as contemplated by the provisions of this Article II of Schedule 3.3 shall be required only to the extent permitted by applicable Law and the terms of the applicable Non-US DC Plans, and with respect to any outstanding loan that cannot be transferred, the Parties will cooperate in good faith to agree and effectuate an appropriate treatment for such loan.

**REAL ESTATE MATTERS AGREEMENT**

This Real Estate Matters Agreement (this "Agreement") is entered into on October 31, 2015, 2015, by and between Hewlett-Packard Company, a Delaware corporation ("HP"), and Hewlett Packard Enterprise Company, a Delaware corporation ("Enterprise").

R E C I T A L S :

WHEREAS, effective as of the Go Live Date and in accordance with the Separation and Distribution Agreement dated as of October 31, 2015 by and between the parties (the "Separation Agreement"), HP has transferred or will transfer to Enterprise, certain assets owned by HP but necessary to the Enterprise Business;

WHEREAS, effective as of the Go Live Date and in accordance with the Separation Agreement, Enterprise has transferred or will transfer to HP, certain assets owned by Enterprise but necessary to the HPI Business; and

WHEREAS, the parties desire to set forth certain agreements regarding real estate matters.

NOW, THEREFORE, in consideration of the foregoing, the covenants and agreements set forth below, and other good and valuable consideration, the sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

ARTICLE I

DEFINITIONS

Section 1.1 Definitions . The following terms, as used herein, shall have the meanings stated below. Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Separation Agreement.

(a) "Actual Completion Date" means, with respect to each Property, the date upon which completion of the transfer, assignment, lease or sublease of that Property actually takes place.

(b) "Additional Properties" means any leased or owned properties acquired by HP or Enterprise after the date of the Separation Agreement and before the Go Live Date.

(c) "Colocation Sites Spreadsheet" means the spreadsheet prepared by HP entitled "Colocation Sites" and attached as Schedule 2, as updated from time to time prior to the Go Live Date by mutual written agreement of the parties.

(d) "Enterprise Lease" means, in relation to each Enterprise Property, the lease(s) or sublease(s) or license(s) under which Enterprise or its applicable Subsidiary holds such Enterprise Property and any other supplemental document completed prior to the Actual Completion Date.

(e) "Enterprise Leased Properties" means those Properties identified as "Leased" by Enterprise and its Subsidiaries and listed in the Owned and Leased Properties Spreadsheet, which Properties are currently under lease by Enterprise (or its Subsidiaries) and will be transferred by lease assignment to HP (or its Subsidiaries) as of the Go Live Date.

(f) "Enterprise Leaseback Properties" means each of (a) those Enterprise Owned Properties identified as "Owned" by Enterprise identified in the "Leaseback Properties" column of the Owned and Leased Properties Spreadsheet, with respect to part of which HP is to grant a lease to Enterprise and (b) those Enterprise Leased Properties identified as "Leased" by Enterprise and identified in the "Leaseback Properties" column of the Owned and Leased Properties Spreadsheet, with respect to part of which HP is to sublease to Enterprise. Enterprise Leaseback Properties will be transferred through deed transfer or lease assignment (as applicable) by Enterprise (or its Subsidiaries) to HP (or its Subsidiaries) and a portion of which will then be leased or subleased (as applicable) back to Enterprise (or its Subsidiaries) as of the Go Live Date.

(g) "Enterprise New Lease Properties" means those Properties identified as "Owned" by Enterprise and its Subsidiaries and listed in the "Sublease and New Lease Properties" area of the Colocation Sites Spreadsheet, which Properties are currently owned by Enterprise (or its Subsidiaries) and a portion of which will be leased to HP (or its Subsidiaries) as of the Go Live Date.

(h) "Enterprise Owned Properties" means those Properties identified as "Owned" by Enterprise and its Subsidiaries and listed in the Owned and Leased Properties Spreadsheet, which Properties are currently owned by Enterprise (or its Subsidiaries) and will transfer by deed to HP (or its Subsidiaries) as of the Go Live Date.

(i) "Enterprise Property" means the Enterprise Owned Properties, the Enterprise Leased Properties, the Enterprise Sublease Properties, the Enterprise New Lease Properties and the Enterprise Leaseback Properties.

(j) "Enterprise Sublease Property" means those Properties identified as "Leased" by Enterprise and its Subsidiaries and listed in the "Sublease and New Lease Properties" area of the Colocation Sites Spreadsheet, which Properties are currently leased by Enterprise (or its Subsidiaries) and a portion of which will be subleased to HP (or its Subsidiaries) as of the Go Live Date.

(k) "Go Live Date" means (i) August 1, 2015, with respect to the countries listed on Schedule 3A, (ii) September 1, 2015, with respect to the countries listed on Schedule 3B and (iii) November 1, 2015, with respect to the countries listed on Schedule 3C.

(l) "HP Lease" means, in relation to each Property, the lease(s) or sublease(s) or license(s) under which HP or its applicable Subsidiary holds such Property and any other supplemental document completed prior to the Actual Completion Date.

(m) "Landlord" means the landlord or sublandlord under a HP Lease or Enterprise Lease, and its successors and assigns, and includes the holder of any other interest

2

which is superior to the interest of the landlord or sublandlord under such HP Lease or Enterprise Lease.

(n) "Lease Assignment Form" means the form lease assignment attached hereto as Exhibit 2.

(o) "Lease Consents" means all consents, waivers or amendments required from the Landlord or other third parties under the Relevant Leases to assign the Relevant Leases to Enterprise or HP, as applicable, or to sublease the Sublease Properties to Enterprise or HP, as applicable or to sublease the Leaseback Properties to HP or Enterprise, as applicable.

(p) "Lease Form" means the form lease attached hereto as Exhibit 3.

(q) "Leaseback Properties" means each of (a) those Owned Properties identified as "Owned" by HP and identified in the "Leaseback Properties" column of the Owned and Leased Properties Spreadsheet, with respect to part of which Enterprise is to grant a lease to HP and (b) those Leased Properties identified as "Leased" by HP and identified in the "Leaseback Properties" column of the Owned and Leased Properties Spreadsheet, with respect to part of which Enterprise is to sublease to HP. Leaseback Properties will be transferred through deed transfer or lease assignment (as applicable) by HP (or its Subsidiaries) to Enterprise (or its Subsidiaries) and a portion of which will then be leased or subleased (as applicable) back to HP (or its Subsidiaries) as of the Go Live Date.

(r) "Leased Properties" means those Properties identified as "Leased" by HP and its Subsidiaries (other than Enterprise and Enterprise's Subsidiaries) and listed in the Owned and Leased Properties Spreadsheet, which Properties are currently under lease by HP (or its Subsidiaries) and will be transferred by lease assignment to Enterprise (or its Subsidiaries) as of the Go Live Date.

(s) "New Lease Properties" means those Properties identified as "Owned" by HP and its Subsidiaries (other than Enterprise and Enterprise's Subsidiaries) and listed in the "Sublease and New Lease Properties" area of the Colocation Sites Spreadsheet, which Properties are currently owned by HP (or its Subsidiaries) and a portion of which will be leased to Enterprise (or its Subsidiaries) as of the Go Live Date.

(t) "Owned and Leased Properties Spreadsheet" means the spreadsheet prepared by HP entitled "Owned & Leased Properties to be Transferred" and attached as Schedule 1, as updated from time to time prior to the Go Live Date by mutual written agreement of the parties.

(u) "Owned Properties" means those Properties identified as "Owned" by HP and its Subsidiaries (other than Enterprise and Enterprise's Subsidiaries) and listed in the Owned and Leased Properties Spreadsheet, which Properties are currently owned by HP (or its Subsidiaries) and will transfer by deed to Enterprise (or its Subsidiaries) as of the Go Live Date.

(v) "Property" means the Owned Properties, the Leased Properties, the Sublease Properties, the New Lease Properties, the Leaseback Properties, the Additional Properties, and the Enterprise Properties.

3

(w) "Real Estate Services" means any services relating to the occupation or use of a Property or the carrying out of either the Enterprise Business or HP's other businesses at a Property, including, without limitation, cleaning, garbage disposal, repair, maintenance, receptionist services, utilities, mail delivery, copying and facsimile services.

(x) "Relevant Leases" means those of HP Leases or Enterprise Lease with respect to which the Landlord's consent is required for assignment or sublease to a third party or which prohibit assignments or subleases.

(y) "Retained Parts" means each of those parts of (i) the Owned Properties and the Leased Properties which, following transfer or assignment to Enterprise, are intended to be leased or subleased to HP, (ii) the Enterprise Owned Properties and the Enterprise Leased Properties which, following the Go Live Date, are intended to be leased or subleased to Enterprise and (iii) those parts of the Sublease Properties and the New Lease Properties which will not, and which are not intended to, be leased or subleased to Enterprise in accordance with this Agreement.

(z) "Sublease Form" means the form sublease attached hereto as Exhibit 4.

(aa) "Sublease Property" means those Properties identified as "Leased" by HP and listed in the "Sublease and New Lease Properties" area of the Colocation Sites Spreadsheet, which Properties are currently leased by HP (or its Subsidiaries) and a portion of which will be subleased to Enterprise (or its Subsidiaries) as of the Go Live Date.

## ARTICLE II

## PROPERTY IN THE UNITED STATES

Section 2.1 <u>Owned Property</u> .

(a) HP shall convey or cause its applicable Subsidiary to convey each of the Owned Properties (together with all rights and easements appurtenant thereto) to Enterprise or its applicable Subsidiary, subject to the other provisions of this Agreement and (to the extent not inconsistent with the provisions of this Agreement) the terms of the Separation Agreement and the other Transaction Documents. Such conveyance shall be completed on the Go Live Date.

(b) Subject to the completion of the conveyance to Enterprise or its applicable Subsidiary of the relevant Owned Property, with respect to each Owned Property which is a Leaseback Property, Enterprise shall grant to HP or its applicable Subsidiary a lease of that part of the relevant Owned Property identified in the Colocation Sites Spreadsheet and HP or its applicable Subsidiary shall accept the same. Such lease shall be completed immediately following completion of the transfer of the relevant Owned Property to Enterprise or its applicable Subsidiary.

Section 2.2 <u>Enterprise Owned Property</u> .

(a) Enterprise shall convey or cause its applicable Subsidiary to convey each of the Enterprise Owned Properties (together with all rights and easements appurtenant thereto)

4

to HP or its applicable Subsidiary, subject to the other provisions of this Agreement and (to the extent not inconsistent with the provisions of this Agreement) the terms of the Separation Agreement and the other Transaction Documents. Such conveyance shall be completed on the Go Live Date.

(b) Subject to the completion of the conveyance to HP or its applicable Subsidiary of the relevant Enterprise Owned Property, with respect to each Enterprise Owned Property which is a Enterprise Leaseback Property, HP shall grant to Enterprise or its applicable Subsidiary a lease of that part of the relevant Enterprise Owned Property identified in the Colocation Sites Spreadsheet and Enterprise or its applicable Subsidiary shall accept the same. Such lease shall be completed immediately following completion of the transfer of the relevant Enterprise Owned Property to HP or its applicable Subsidiary.

Section 2.3 <u>Leased Property</u> .

(a) HP shall assign or cause its applicable Subsidiary to assign, and Enterprise or its applicable Subsidiary shall accept and assume, HP's or its Subsidiary's interest in the Leased Properties, subject to the other provisions of this Agreement and (to the extent not inconsistent with the provisions of this Agreement) the terms of the Separation Agreement and the other Transaction Documents. Such assignment shall be completed on the later of: (i) the Go Live Date; and (ii) the earlier of (A) the tenth (10th) business day after the relevant Lease Consent has been granted and (B) the date agreed upon by the parties in accordance with Section 2.12(a) below.

(b) Subject to the completion of the assignment to Enterprise or its applicable Subsidiary of the relevant Leased Property, with respect to each Leased Property which is also a Leaseback Property, Enterprise or its applicable Subsidiary shall grant to HP or its applicable Subsidiary a sublease of that part of the relevant Leased Property identified in the Colocation Sites Spreadsheet and HP or its applicable Subsidiary shall accept the same. Such sublease shall be completed immediately following completion of the transfer of the relevant Leased Property to Enterprise or its applicable Subsidiary.

Section 2.4 <u>Enterprise Leased Property</u> .

(a) Enterprise shall assign or cause its applicable Subsidiary to assign, and HP or its applicable Subsidiary shall accept and assume, Enterprise's or its Subsidiary's interest in the Enterprise Leased Properties, subject to the other provisions of this Agreement and (to the extent not inconsistent with the provisions of this Agreement) the terms of the Separation Agreement and the other Transaction Documents. Such assignment shall be completed on the later of: (i) the Go Live Date; and (ii) the earlier of (A) the tenth (10th) business day after the relevant Lease Consent has been granted and (B) the date agreed upon by the parties in accordance with Section 2.12(a) below.

(b) Subject to the completion of the assignment to HP or its applicable Subsidiary of the relevant Enterprise Leased Property, with respect to each Enterprise Leased Property which is also a Enterprise Leaseback Property, HP or its applicable Subsidiary shall grant to Enterprise or its applicable Subsidiary a sublease of that part of the relevant Enterprise

5

Leased Property identified in the Colocation Sites Spreadsheet and Enterprise or its applicable Subsidiary shall accept the same. Such sublease shall be completed immediately following completion of the transfer of the relevant Enterprise Leased Property to HP or its applicable Subsidiary.

Section 2.5 Sublease Properties .

(a) HP shall grant or cause its applicable Subsidiary to grant to Enterprise or its applicable Subsidiary a sublease of that part of the relevant Sublease Property identified in the Colocation Sites Spreadsheet and Enterprise or its applicable Subsidiary shall accept the same, subject to the other provisions of this Agreement and (to the extent not inconsistent with the provisions of this Agreement) the terms of the Separation Agreement and the other Transaction Documents. Such sublease shall be completed on the later of: (a) the Go Live Date; and (b) the earlier of (i) the tenth (10th) business day after the relevant Lease Consent has been granted and (ii) the date agreed upon by the parties in accordance with Section 2.12(a) below.

Section 2.6 Enterprise Sublease Properties .

(a) Enterprise shall grant or cause its applicable Subsidiary to grant to HP or its applicable Subsidiary a sublease of that part of the relevant Enterprise Sublease Property identified in the Colocation Sites Spreadsheet and HP or its applicable Subsidiary shall accept the same, subject to the other provisions of this Agreement and (to the extent not inconsistent with the provisions of this Agreement) the terms of the Separation Agreement and the other Transaction Documents. Such sublease shall be completed on the later of: (a) the Go Live Date; and (b) the earlier of (i) the tenth (10th) business day after the relevant Lease Consent has been granted and (ii) the date agreed upon by the parties in accordance with Section 2.12(a) below.

Section 2.7 New Lease Properties .

(a) HP shall grant or cause its applicable Subsidiary to grant to Enterprise or its applicable Subsidiary a lease of those parts of the New Lease Properties identified in the Colocation Sites Spreadsheet and Enterprise or its applicable Subsidiary shall accept the same, subject to the other provisions of this Agreement and (to the extent not inconsistent with the provisions of this Agreement) the terms of the Separation Agreement and the other Transaction Documents. Such lease shall be completed on the Go Live Date.

Section 2.8 Enterprise New Lease Properties .

(a) Enterprise shall grant or cause its applicable Subsidiary to grant to HP or its applicable Subsidiary a lease of those parts of the Enterprise New Lease Properties identified in the Colocation Sites Spreadsheet and HP or its applicable Subsidiary shall accept the same, subject to the other provisions of this Agreement and (to the extent not inconsistent with the provisions of this Agreement) the terms of the Separation Agreement and the other Transaction Documents. Such lease shall be completed on the Go Live Date.

Section 2.9 Obtaining the Lease Consents .

6

(a) Except with respect to any Properties which the parties agree should be dealt with by the Service Level Agreements referred to in Section 2.16 below, HP and Enterprise confirm that, with respect to each Leased Property, Enterprise Leased Property, Sublease Property, Leaseback Property which is a Leased Property, Enterprise Sublease Property and Enterprise Leaseback Property which is a Enterprise Leased Property, to the extent required by the Relevant Lease, an application has been made or will be made by the Go Live Date to the relevant Landlord for the Lease Consents required with respect to the transactions contemplated by this Agreement. For purposes of this Section 2.9, (i) for any Property requiring Landlord Consent that the tenant/subtenant/licensee prior to the Go Live Date is HP or its Subsidiaries (other than Enterprise and its Subsidiaries), HP will have primary responsibility for requesting, negotiating and obtaining the Lease Consent and (ii) for any Property requiring Landlord Consent that the tenant/subtenant/licensee prior to the Go Live Date is Enterprise or its Subsidiaries, Enterprise will have primary responsibility for requesting, negotiating and obtaining the Lease Consent (each party having primary responsibility of a Relevant Lease being the "Responsible Party").

(b) HP and Enterprise will each use their reasonable commercial efforts to obtain the Lease Consents, but the Responsible Party shall not be required to commence judicial proceedings for a declaration that a Lease Consent has been unreasonably withheld or delayed, nor shall the Responsible Party be required to pay any consideration in excess of that required by the Relevant Lease or that which is typical in the open market to obtain the relevant Lease Consent.

(c) Enterprise and HP will promptly satisfy the lawful requirements of the Landlord, and HP and Enterprise, as applicable will take all steps to assist the Responsible Party in obtaining the Lease Consents, including, without limitation:

(i) if properly required by the Landlord, entering into an agreement with the relevant Landlord to observe and perform the tenant's obligations contained in the Relevant Lease throughout the remainder of the term of the Relevant Lease, subject to any statutory limitations of such liability;

(ii) if properly required by the Landlord, providing a guarantee, surety or other security (including, without limitation, a security deposit) for the obligations of Enterprise or HP, as applicable, or its applicable Subsidiary as tenant under the Relevant Lease, and otherwise taking all steps which are necessary and which Enterprise or HP, as applicable, is capable of doing to meet the lawful requirements of the Landlord so as to ensure that the Lease Consents are obtained; and

(iii) using all reasonable commercial efforts to assist the Responsible Party with obtaining the Landlord's consent to the release of any guarantee, surety or other security which Responsible Party or its Subsidiary may have previously provided to the Landlord and, if required, offering the same or equivalent security to the Landlord in order to obtain such release.

Notwithstanding the foregoing, (1) except with respect to guarantees, sureties or other security referenced in Section 2.9(c)(ii) above, Enterprise or HP, as applicable, shall not be required to

7

obtain a release of any obligation entered into by the Responsible Party or its Subsidiary with any Landlord or other third party with respect to any Property and (2) Enterprise or HP, as applicable, shall not communicate directly with any of the Landlords for which it is not the Responsible Party unless Enterprise or HP, as applicable, can show the Responsible Party reasonable grounds for doing so.

(d) If, with respect to any Leased Properties, HP and Enterprise are unable to obtain a release by the Landlord of any guarantee, surety or other security which the Responsible Party or its Subsidiary has previously provided to the Landlord, Enterprise or HP, as applicable, shall indemnify, defend, protect and hold harmless the Responsible Party and its Subsidiary from and after the Go Live Date against all losses, costs, claims, damages, or liabilities incurred by the Responsible Party or its Subsidiary as a result of such guarantee, surety or other security.

Section 2.10 <u>Occupation by Enterprise</u> .

(a) Subject to compliance with Section 2.10(b) below, in the event that the Actual Completion Date for any Owned Property, New Lease Property, Leased Property or Sublease Property does not occur on the Go Live Date, Enterprise shall, commencing on the Go Live Date, be entitled to occupy and receive the rental income from the relevant Property (except to the extent that the same is a Retained Part) as a licensee upon the terms and conditions contained in the HP Lease (as to Leased Properties), upon the terms and conditions contained in the Sublease Form (as to Sublease Properties) or upon the terms and conditions contained in the Lease Form (as to Owned Properties and New Lease Properties). Such license shall not be revocable prior to the date for completion as provided in Sections 2.1(a), 2.3(a) or 2.5(a) unless an enforcement action or forfeiture by the relevant Landlord due to Enterprise's occupation of the Property constituting a breach of the HP Lease cannot, in the reasonable opinion of HP, be avoided other than by requiring Enterprise to immediately vacate the relevant Property, in which case HP may by notice to Enterprise immediately require Enterprise to vacate the relevant Property. Enterprise will be responsible for all costs, expenses and liabilities incurred by HP or its applicable Subsidiary as a consequence of such occupation, except for any losses, claims, costs, demands and liabilities incurred by HP or its Subsidiary as a result of any enforcement action taken by the Landlord against HP or its Subsidiary with respect to any breach by HP or its Subsidiary of the Relevant Lease in permitting Enterprise to so occupy the Property without obtaining the required Lease Consent, for which HP or its Subsidiary shall be solely responsible. Enterprise shall not be entitled to make any claim or demand against, or obtain reimbursement from, HP or its applicable Subsidiary with respect to any costs, losses, claims, liabilities or damages incurred by Enterprise as a consequence of being obliged to vacate the Property or in obtaining alternative premises, including, without limitation, any enforcement action which a Landlord may take against Enterprise.

(b) In the event that the Actual Completion Date for any Owned Property, New Lease Property, Leased Property or Sublease Property does not occur on the Go Live Date, whether or not Enterprise occupies a Property as licensee as provided in Section 2.10(a) above, Enterprise shall, effective as of the Go Live Date, (i) pay HP all rents, service charges, insurance premiums and other sums payable by HP or its applicable Subsidiary under any Relevant Lease (as to Leased Properties), under the Lease Form (as to Owned Properties or New Lease Properties) or under the Sublease Form (as to Sublease Properties), (ii) observe the tenant's

8

covenants, obligations and conditions contained in the HP Lease (as to Leased Properties) or in the Sublease Form (as to Sublease Properties) and (iii) indemnify, defend, protect and hold harmless HP and its applicable Subsidiary from and against all losses, costs, claims, damages and liabilities arising on account of any breach thereof by Enterprise.

(c) HP shall supply promptly to Enterprise copies of all invoices, demands, notices and other communications received by HP or its or its applicable Subsidiaries or agents in connection with any of the matters for which Enterprise may be liable to make any payment or perform any obligation pursuant to Section 2.10(b), and shall, at Enterprise's cost, take any steps and pass on any objections which Enterprise may have in connection with any such matters. Enterprise shall promptly supply to HP any notices, demands, invoices and other communications received by Enterprise or its agents from any Landlord while Enterprise occupies any Property without the relevant Lease Consent.

Section 2.11 <u>Occupation by HP</u> .

(a) Subject to compliance with Section 2.11(b) below, in the event that the Actual Completion Date for any Enterprise Owned Property, Enterprise New Lease Property, Enterprise Leased Property or Enterprise Sublease Property does not occur on the Go Live Date, HP shall, commencing on the Go Live Date, be entitled to occupy and receive the rental income from the relevant Property (except to the extent that the same is a Retained Part) as a licensee upon the terms and conditions contained in the Enterprise Lease (as to Enterprise Leased Properties) or upon the terms and conditions contained in the Sublease Form (as to Enterprise Sublease Properties) or upon the terms and conditions contained in the Lease Form (as to Enterprise Owned Properties or Enterprise New Lease Properties). Such license shall not be revocable prior to the date for completion as provided in Sections 2.2(a), 2.4(a) or 2.6(a) unless an enforcement action or forfeiture by the relevant Landlord due to HP's occupation of the Property constituting a breach of the Enterprise Lease cannot, in the reasonable opinion of Enterprise, be avoided other than by requiring HP to immediately vacate the relevant Property, in which case Enterprise may by notice to HP immediately require HP to vacate the relevant Property. HP will be responsible for all costs, expenses and liabilities incurred by Enterprise or its applicable Subsidiary as a consequence of such occupation, except for any losses, claims, costs, demands and liabilities incurred by Enterprise or its Subsidiary as a result of any enforcement action taken by the Landlord against Enterprise or its Subsidiary with respect to any breach by Enterprise or its Subsidiary of the Relevant Lease in permitting HP to so occupy the Property without obtaining the required Lease Consent, for which Enterprise or its Subsidiary shall be solely responsible. HP shall not be entitled to make any claim or demand against, or obtain reimbursement from, Enterprise or its applicable Subsidiary with respect to any costs, losses, claims, liabilities or damages incurred by HP as a consequence of being obliged to vacate the Property or in obtaining alternative premises, including, without limitation, any enforcement action which a Landlord may take against HP.

(b) In the event that the Actual Completion Date for any Enterprise Owned Property, Enterprise New Lease Property, Enterprise Leased Property or Enterprise Sublease Property does not occur on the Go Live Date, whether or not HP occupies a Property as licensee as provided in Section 2.11(a) above, HP shall, effective as of the Go Live Date, (i) pay Enterprise all rents, service charges, insurance premiums and other sums payable by Enterprise

9

or its applicable Subsidiary under any Relevant Lease (as to Enterprise Leased Properties), under the Lease Form (as to Enterprise Owned Properties or Enterprise New Lease Properties) or under the Sublease Form (as to Enterprise Sublease Properties), (ii) observe the tenant's covenants, obligations and conditions contained in the Enterprise Lease (as to Enterprise Leased Properties) or in the Sublease Form (as to Enterprise Sublease Properties) and (iii) indemnify, defend, protect and hold harmless Enterprise and its applicable Subsidiary from and against all losses, costs, claims, damages and liabilities arising on account of any breach thereof by HP.

(c) Enterprise shall supply promptly to HP copies of all invoices, demands, notices and other communications received by Enterprise or its or its applicable Subsidiaries or agents in connection with any of the matters for which HP may be liable to make any payment or perform any obligation pursuant to Section 2.11(b), and shall, at HP's cost, take any steps and pass on any objections which HP may have in connection with any such matters. HP shall promptly supply to Enterprise any notices, demands, invoices and other communications received by HP or its agents from any Landlord while HP occupies any Property without the relevant Lease Consent.

Section 2.12 <u>Obligation to Complete</u> .

(a) If, with respect to any Leased Property, Enterprise Leased Property, Sublease Property or Enterprise Sublease Property, at any time the relevant Lease Consent is formally and unconditionally refused in writing, HP and Enterprise shall commence good faith negotiations and use commercially reasonable efforts to determine how to allocate the applicable Property, based on the relative importance of the applicable Property to the operations of each party, the size of the applicable Property, the number of employees of each party at the applicable Property, the value of assets associated with each business, the cost to relocate, and the potential risk and liability to each party in the event an enforcement action is brought by the applicable Landlord. Such commercially reasonable efforts shall include consideration of alternate structures to accommodate the needs of both parties and the allocation of the costs thereof, including entering into amendments of the size, term or other terms of the Relevant Lease, restructuring a proposed lease assignment to be a sublease and relocating one party. If the parties are unable to agree upon an allocation of the Property within fifteen (15) days after commencement of negotiations between the parties as described above, then either party may, by delivering written notice to the other, require that the matter be referred to the Chief Financial Officers of both parties. In such event, the Chief Financial Officers shall use commercially reasonable efforts to determine the allocation of the Property, including having a meeting or telephone conference within ten (10) days thereafter. If the parties are unable to agree upon the allocation of an applicable Property within fifteen (15) days after the matter is referred to the Chief Financial Officers of the parties as described above, the disposition of the applicable Property and the risks associated therewith shall be allocated between the parties as set forth in subparts (b) and (c) of this section below.

(b) If, with respect to any Leased Property or Enterprise Leased Property, the parties are unable to agree upon the allocation of a Property as set forth in Section 2.12(a), the Responsible Party may by written notice to the other party elect to apply to the relevant Landlord for consent to sublease all of the relevant Property to the other party for the remainder of the Relevant Lease term less one (1) day at a rent equal to the rent from time to time under the

10

Relevant Lease, but otherwise on substantially the same terms and conditions as the Relevant Lease. If the Responsible Party makes such an election, until such time as the relevant Lease Consent is obtained and a sublease is completed, the provisions of Section 2.10 and 2.11, as applicable, will apply and, on the grant of the Lease Consent required to sublease the Property in question, the Responsible Party shall sublease or cause its applicable Subsidiary to sublease to the other party or its Subsidiary the relevant Property in accordance with Section 2.5.

(c) If the parties are unable to agree upon the allocation of a Property as set forth in Section 2.12(a) and the Responsible Party does not make an election pursuant to Section 2.12(b) above, the Responsible Party may elect by written notice to the other party to require the other party to vacate the relevant Property immediately or by such other date as may be specified in the notice served by the Responsible Party (the "Notice Date"), in which case the other party shall vacate the relevant Property on the Notice Date but shall indemnify the Responsible Party and its applicable Subsidiary from and against all costs, claims, losses, liabilities and damages in relation to the relevant Property arising from and including the Go Live Date to and including the later of the Notice Date and date on which such other party vacates the relevant Property, except for any costs, losses, damages, claims and liabilities incurred by the Responsible Party or its Subsidiary with respect to any enforcement action taken by the Landlord against the Responsible Party or its Subsidiary with respect to any breach by the Responsible Party or its Subsidiary of the Relevant Lease in permitting the other party to so occupy the Property without obtaining the required Lease Consent. The other party shall not be entitled to make any claim or demand against or obtain reimbursement from the Responsible Party or its applicable Subsidiary with respect to any costs, losses, claims, liabilities or damages incurred by the other party as a consequence of being obliged to vacate the Property or obtaining alternative premises, including, without limitation, any enforcement action which a Landlord may take against the other party.

Section 2.13 <u>Form of Transfer</u> .

(a) The transfer or assignment to Enterprise of each relevant Owned Property and Leased Property or to HP of each relevant Enterprise Owned Property and Enterprise Leased Property shall be in substantially the form attached in Exhibit 1, with such amendments as are reasonably required by HP or Enterprise, respectively, with respect to a particular Property, including, without limitation, in all cases where a relevant Landlord has required a guarantor or surety to guarantee the obligations of Enterprise or HP, respectively, contained in the relevant Lease Consent or any other document which Enterprise or HP, respectively, is required to complete, the giving of such guarantee by a guarantor or surety, and the giving by Enterprise or HP, respectively, and any guarantor or surety of Enterprise's or HP's, respectively, obligations of direct obligations to HP or Enterprise, respectively, or third parties where required under the terms of any of the Lease Consent or any covenant, condition, restriction, easement, lease or other encumbrance to which the Property is subject.

(b) The subleases to be granted to Enterprise or HP with respect to the relevant Sublease Properties or Enterprise Sublease Property shall be substantially in the form of the Sublease Form and shall include such amendments which in the reasonable opinion of HP are necessary with respect to a particular Property or the relevant Lease Consent. Such amendments shall be submitted to Enterprise for approval, which approval shall not be unreasonably withheld or delayed.

11

(c) The leases and subleases to be granted by Enterprise to HP with respect to the Leaseback Properties or by HP to Enterprise with respect to the Enterprise Leaseback Properties shall be substantially in the form of the Lease Form or the Sublease Form, as applicable, with such amendments as are, in the reasonable opinion of HP, necessary with respect to a particular Property. Such amendments shall be submitted to Enterprise for approval, which approval shall not be unreasonably withheld or delayed.

(d) The leases to be granted to Enterprise with respect to the New Lease Properties or to HP with respect to the Enterprise New Lease Properties shall be substantially in the form of the Lease Form and shall include such amendments which in the reasonable opinion of HP are necessary with respect to a particular Property. Such amendments shall be submitted to Enterprise for approval, which approval shall not be unreasonably withheld or delayed.

(e) HP and Enterprise agree that to the extent either party desires to pursue the separation of the master lease to a Sublease Property, Enterprise Sublease Property, Leaseback Property that is a Leased Property or Enterprise Leaseback Property Enterprise Leased Property instead of pursuing a sublease, the other party will cooperate in such separation of master lease; provided that all costs relating thereto will be the sole responsibility of the party requesting the separation of the master lease. To the extent that the parties pursue separation of a master lease rather than a sublease but such separation of master lease has not occurred by the Go Live Date, HP and Enterprise will equitably share the space and cost of the space, pursuant to the process described in Sections 2.10 and 2.11 for Sublease Properties and Enterprise Sublease Properties, respectively, that have not yet received Landlord consent.

Section 2.14 <u>Casualty; Lease Termination</u> .

(a) The parties hereto shall grant and accept transfers, assignments, leases or subleases of the Properties as described in this Agreement, regardless of any casualty damage or other change in the condition of the Properties. In addition, in the event that a HP Lease with respect to a Leased Property or a Sublease Property or a Enterprise Lease with respect to a Enterprise Leased Property or a Enterprise Sublease Property is terminated prior to the Go Live Date, (a) HP and Enterprise, respectively, shall not be required to assign or sublease such Property, (b) Enterprise and HP, respectively, shall not be required to accept an assignment or sublease of such Property and (c) neither party shall have any further liability with respect to such Property hereunder.

Section 2.15 <u>Fixtures and Fittings</u> .

(a) The provisions of the Separation Agreement and the other Transaction Documents shall apply to any equipment, office equipment, trade fixtures, furniture and any other personal property located at each Property (excluding any equipment, office equipment, trade fixtures, furniture and any other personal property owned by third parties).

Section 2.16 <u>Services</u> .

(a) As necessary, HP and Enterprise each agree that, on or about the Go Live Date, they shall each enter into a facility services agreement (a "Service Level Agreement") with the other whereby, with respect to any of the Sublease Properties, the New Lease Properties and

12

the Leaseback Properties, each party shall agree to supply to, or perform for the benefit of, the other party (and the other party shall accept) such Real Estate Services as each party currently supplies to or performs for the benefit of the other with respect to such Properties, on the same terms and conditions as currently apply, and at the cost and other terms as set forth in the Service Level Agreements.

(b) Notwithstanding anything to the contrary herein, the parties agree and acknowledge that there may be circumstances in which the parties mutually agree that a formal lease or sublease will not be entered into in order to establish shared occupancy of a Property, in which case such occupancy shall be (and the Service Level Agreement referenced in Section 2.16(a) above shall provide that the applicable party may occupy the relevant Property on a temporary basis) on the relevant terms and conditions set forth in the Lease Form or the Sublease Form, as applicable.

Section 2.17 Adjustments .

(a) HP and Enterprise each acknowledge and agree that Additional Properties may be acquired by HP or Enterprise prior to the Go Live Date. Such Additional Properties shall be treated hereunder as Owned Properties, Leased Properties, Sublease Properties, New Lease Properties and/or Leaseback Properties or Enterprise Owned Properties, Enterprise Leased Properties, Enterprise Sublease Properties, Enterprise New Lease Properties and/or Enterprise Leaseback Properties by mutual agreement of the parties based on whether the Additional Property was acquired by or for the Enterprise Business or HP's other businesses. In the event that the parties are unable to agree by the Go Live Date as to how any Additional Property is to be treated, the matter shall be determined in accordance with the procedure set forth in Section 2.12(a) above. In the event that the parties are unable to agree within ten (10) business days of the Go Live Date as to the allocation of an Additional Property, the matter in dispute shall be determined in accordance with the following guidelines:

(i) Properties which are occupied as to fifty percent (50%) or more of the total area for the purposes of the Enterprise Business shall be treated as Owned Properties, Leased Properties, Enterprise Sublease Properties or Enterprise New Lease Properties (as appropriate) and the part which is not occupied by the Enterprise Business or a third party shall be treated as a Leaseback Property, if applicable; and

(ii) Properties which are occupied as to less than fifty percent (50%) for the purposes of the Enterprise Business shall be treated as Enterprise Owned Properties, Enterprise Leased Properties, Sublease Properties or New Lease Properties (as appropriate) and the part which is occupied by the Enterprise Business or a third party shall be treated as a Enterprise Leaseback Property, if applicable.

(b) Following agreement or determination with respect to the Additional Properties, the parties shall enter into and complete all such documents as may be required to give effect to such agreement or determination.

(c) HP and Enterprise each acknowledge and agree that their respective requirements with regard to each of the Properties may alter between the date of this Agreement

13

and the Go Live Date, in which case the parties may mutually agree in writing to re-characterize the relevant Property as an Owned Property, Leased Property, Sublease Property, New Lease Property and/or Leaseback Property or Enterprise Owned Property, Enterprise Leased Property, Enterprise Sublease Property, Enterprise New Lease Property and/or Enterprise Leaseback Property, as appropriate.

Section 2.18 <u>Costs</u> .

(a) The Responsible Party shall pay all reasonable costs and expenses incurred in connection with obtaining the Lease Consents, including, without limitation, Landlord's consent fees and attorneys' fees and any costs and expenses relating to re-negotiation of HP Leases and Enterprise Leases, as applicable. The owner of the relevant Property shall also pay all reasonable costs and expenses in connection with the transfer of the Property, including title insurance premiums, escrow fees, recording fees, and any transfer taxes arising as a result of the transfers.

Section 2.19 <u>Signing and Ratification</u> .

(a) HP and Enterprise hereby ratify and authorize all signatures to any document entered into in connection with this Agreement by HP and Enterprise, or each's respective Subsidiaries, and the parties agree that to the extent any challenges arise to the authority of any such signature from and after the date hereof, HP and Enterprise will cooperate to ratify such signatures and prepare any corporate authorizations or resolutions necessary therefor.

ARTICLE III

PROPERTY OUTSIDE THE UNITED STATES

With respect to each of the Properties located outside the United States listed in the Owned and Leased Property Spreadsheet and the Colocation Sites Spreadsheet, as well as any additional properties acquired by HP, Enterprise or a Subsidiary prior to the Go Live Date, HP and Enterprise will use the appropriate form document attached hereto, translated into the local language, if customary under local practice, and modified to comply with local legal requirements to cause the appropriate transfers, assignments, leases, subleases licenses or leasebacks to occur. Such transfers, assignments, leases, subleases licenses or leasebacks shall, so far as the law in the jurisdiction in which such property is located permits, be on the same terms and conditions as provided in Article II of this Agreement. In the event of a conflict between the terms of this Agreement and the terms of such local agreements, the terms of the local agreements shall prevail.

ARTICLE IV

MISCELLANEOUS

Section 4.1 <u>Entire Agreement</u> . This Agreement, the Separation Agreement, the other Transaction Documents and the Exhibits and Schedules referenced or attached hereto and thereto, constitutes the entire agreement between the parties with respect to the subject matter

14

hereof and shall supersede all prior written and oral and all contemporaneous oral agreements and understandings with respect to the subject matter hereof.

Section 4.2 <u>Governing Law</u> . This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware as to all matters regardless of the laws that might otherwise govern under principles of conflicts of laws applicable thereto. Notwithstanding the foregoing, the applicable Property transfers shall be performed in accordance with the laws of the jurisdiction in which the applicable Property is located.

Section 4.3 <u>Notices</u> . Any notice, demand, offer, request or other communication required or permitted to be given by either party pursuant to the terms of this Agreement shall be in writing and shall be deemed effectively given the earlier of (i) when received, (ii) when delivered personally, (iii) upon delivery of e-mail (with delivery receipt confirmation requested) provided that a hard copy of the notice is sent via overnight delivery, (iv) one (1) business day after being deposited with an overnight courier service or (v) four (4) days after being deposited in the U.S. mail, First Class with postage prepaid, and addressed to the attention of the party's General Counsel at the address of its principal executive office or such other address as a party may request by notifying the other in writing.

Section 4.4 <u>Parties in Interest</u> . This Agreement, including the Schedules and Exhibits hereto, and the other documents referred to herein, shall be binding upon and inure solely to the benefit of each party hereto and their legal representatives and successors, and nothing in this Agreement, express or implied, is intended to confer upon any other Person any rights or remedies of any nature whatsoever under or by reason of this Agreement.

Section 4.5 <u>Counterparts</u> . This Agreement, including the Schedules and Exhibits hereto, and the other documents referred to herein, may be executed in counterparts, each of which shall be deemed to be an original but all of which shall constitute one and the same agreement.

Section 4.6 <u>Binding Effect; Assignment</u> . This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective legal representatives and successors. This Agreement may not be assigned by any party hereto. The Schedules and/or Exhibits attached hereto or referred to herein are an integral part of this Agreement and are hereby incorporated into this Agreement and made a part hereof as if set forth in full herein.

Section 4.7 <u>Severability</u> . If any term or other provision of this Agreement or the Schedules or Exhibits attached hereto is invalid, illegal or incapable of being enforced by any rule of law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that transactions contemplated hereby are fulfilled to the fullest extent possible.

15

Section 4.8 <u>Failure or Indulgence Not Waiver</u> . No failure or delay on the part of any party hereto in the exercise of right hereunder shall impair such right or be construed to be a waiver of, or acquiescence in, any breach of any representation, warranty or agreement herein, nor shall any single or partial exercise of any such right preclude other or further exercise thereof or of any other right.

Section 4.9 <u>Amendment</u> . No change or amendment will be made to this Agreement except by an instrument in writing signed on behalf of each of the parties to such agreement.

Section 4.10 <u>Authority</u> . Each of the parties hereto represents to the other that (a) it has the corporate or other requisite power and authority to execute, deliver and perform this Agreement, (b) the execution, delivery and performance of this Agreement by it have been duly authorized by all necessary corporate or other action, (c) it has duly and validly executed and delivered this Agreement, and (d) this Agreement is a legal, valid and binding obligation, enforceable against it in accordance with its terms subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and general equity principles.

Section 4.11 <u>Interpretation</u> . The headings contained in this Agreement, in any Exhibit or Schedule hereto and in the table or contents to this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. Any capitalized term used in any Schedule or Exhibit but not otherwise defined therein, shall have the meaning assigned to such term in this Agreement. When a reference is made in this Agreement to an Article or a Section, Exhibit or Schedule, such reference shall be to an Article or Section of, or an Exhibit or Schedule to, this Agreement unless otherwise indicated.

Section 4.12 Dispute Resolution. Any dispute, controversy or claim arising out of or relating to this Agreement, to the extent not specified in this Agreement, shall be resolved in accordance with the Separation Agreement.

[ *The remainder of this page is intentionally left blank* .]

16

IN WITNESS WHEREOF, each of the parties hereto have caused this Real Estate Matters Agreement to be executed on its behalf by its officers thereunto duly authorized on the day and year first above written.

HEWLETT-PACKARD COMPANY, a Delaware corporation

By: /s/ Robyn DeLane Walker
    Name: Robyn DeLane Walker
    Title: Real Estate Strategy & Transactions Manager
    (Interim)

HEWLETT PACKARD ENTERPRISE COMPANY, a Delaware corporation

By: /s/ William Roberts
    Name: William Roberts
    Title: VP, Real Estate Strategy & Transactions

*Signature Page to Real Estate Matters Agreement*

Exhibit 2.6

# MASTER COMMERCIAL AGREEMENT

between

## HEWLETT-PACKARD COMPANY

and

## HEWLETT PACKARD ENTERPRISE COMPANY

**Dated: November 1, 2015**

**TABLE OF CONTENTS**

| | | |
|---|---|---|
| 1. | DEFINITIONS | 1 |
| 2. | INCORPORATION OF ADDITIONAL TERMS; ORDER OF PRECEDENCE | 6 |
| 3. | TERM | 7 |
| 4. | SCOPE | 7 |
| 5. | CONTRACT MANAGEMENT | 9 |
| 6. | PERSONNEL | 9 |
| 7. | INTELLECTUAL PROPERTY | 10 |
| 8. | AUDIT RIGHTS AND RECORDS RETENTION | 11 |
| 9. | PRICING | 11 |
| 10. | CONFIDENTIALITY AND DATA PROTECTION | 11 |
| 11. | REPRESENTATIONS AND WARRANTIES | 13 |
| 12. | INDEMNIFICATION | 14 |
| 13. | LIMITATION OF LIABILITY | 16 |
| 14. | DISPUTE RESOLUTION | 17 |
| 15. | TERMINATION | 20 |
| 16. | MISCELLANEOUS | 22 |

**Master Commercial Agreement**

**TABLE OF EXHIBITS**

Exhibit 1        Existing Agreements

Exhibit 2        Contract Management

Exhibit 3        Catalog Requirements

Exhibit 4        Form of Local Country Participation Agreement

**Master Commercial Agreement**

i

## MASTER COMMERCIAL AGREEMENT

This **MASTER COMMERCIAL AGREEMENT** is entered into as of November 1, 2015 (the " Effective Date ") by and between Hewlett-Packard Company, a Delaware corporation, having a place of business at 1501 Page Mill Road, Palo Alto, California 94304 (" HPI "), and Hewlett Packard Enterprise Company, a Delaware corporation, having a place of business at 3000 Hanover Street, Palo Alto, California 94304 (" HPE "). HPI and HPE are sometimes collectively referred to as the " Parties " and each is individually referred to as a " Party ."

WHEREAS, the Board of Directors of HPI has determined that it is in the best interests of HPI and its shareholders to separate its various businesses into two separate publicly-traded companies;

WHEREAS, HPI and HPE and other parties named therein have entered into the Separation and Distribution Agreement dated as of the date hereof (as amended, modified or supplemented from time to time in accordance with its terms, the " Separation Agreement ") pursuant to which the Enterprise Business (as defined in the Separation Agreement) will be held by HPE and the HPI Business (as defined in the Separation Agreement) will be retained by HPI (the " Separation ");

WHEREAS, the Enterprise Business and the HPI Business were parties to various commercial agreements and arrangements pursuant to which products and services of the HPI Business were provided to the Enterprise Business and products and services of the Enterprise Business were provided to the HPI Business; and

WHEREAS, HPI and HPE wish to (1) provide for the continuing performance following the Separation of existing commercial agreements and arrangements which support third-party customers, (2) enter into a new agreement under which each Party and its Affiliates may purchase commercially available products and services from the other Party and its Affiliates (for internal use, for incorporation into products or services on an OEM basis, for resale, or to support a Party's provision of managed services to its customers, as applicable); and (3) conduct alliance, joint marketing and joint development activities, all pursuant to the terms and conditions in the Master Agreement.

NOW THEREFORE, in consideration of the mutual agreements, provisions and covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound hereby, agree as follows:

1.    **DEFINITIONS**

Unless otherwise defined herein, capitalized terms and certain other terms used herein will have the meanings set forth below.

| | |
|---|---|
| *Additional Terms* | means, individually and collectively, as the context requires, the (1) Internal Use Agreement, (2) OEM and Supply Chain Agreement, (3) Partner Agreement, (4) Managed Service Provider Agreement, and (5) Strategic Alliance and Development Agreement. |
| *Affiliate* | means, with respect to either Party, a Person that, directly or indirectly, Controls, is Controlled by, or is under common Control, with such Party. |

**Master Commercial Agreement**

1

| | |
|---|---|
| *Agreement* | means the terms and conditions set forth in the body of this Master Commercial Agreement, excluding the Exhibits attached hereto, the Appendices attached thereto, the documents incorporated therein by reference, and the Additional Terms. |
| *Buyer* | means either Party or an Affiliate thereof in its capacity as a buyer of Products or Services from the other Party or an Affiliate thereof under the Master Agreement. |
| *Change of Control* | means, with respect to a Party, the occurrence after the Effective Date of any of the following: (1) the sale, conveyance, transfer or other disposition (however accomplished), in one or a series of related transactions, of all or substantially all of the assets of such party's Group (as defined in the Separation Agreement) to a third Person that is not an Affiliate of such party prior to such transaction or the first of such related transactions; (2) the consolidation, merger or other business combination of such Party with or into any other entity, immediately following which the stockholders of such Party immediately prior to such transaction fail to own in the aggregate at least a majority of the voting power in the election of directors of all the outstanding voting securities of the surviving party in such consolidation, merger or business combination or of its ultimate publicly traded parent entity; (3) a transaction or series of transactions in which any Person or "group" (as such term is used in Sections 13(d) and 14(d) of the Exchange Act) acquires at least 35% of the outstanding voting securities of such Party and effective control of such Party (other than (a) a reincorporation, holding company merger or similar corporate transaction in which each of such Party's stockholders owns, immediately thereafter, interests in the new parent company in substantially the same percentage as such stockholder owned in such Party immediately prior to such transaction, or (b) in connection with a transaction described in clause (2), which will be governed by such clause (2)); or (4) a majority of the board of directors of such Party ceasing to consist of individuals who have become directors as a result of being nominated or elected by a majority of such Party's directors. |
| *Control* and its derivatives *Controlled* and *Controlling* | means, with respect to a Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or other interest, by contract or otherwise. |
| *Custom Products* | means Products that are modified, altered or customized, in accordance with a Statement of Work, to meet the Buyer's or Customer's requirements. |
| *Custom Support Services* | means non-standard Support Services that are as agreed and described in the applicable Statement of Work. |
| *Customer* | means an end customer of the Buyer, provided that a business unit or Affiliate of the Buyer may not be a Customer. |
| *Customer Contract* | means an agreement between the Buyer and a Customer. |
| *days* | means calendar days, unless otherwise specified. |

**Master Commercial Agreement**

2

| | |
|---|---|
| *Data Breach* | means an unauthorized disclosure of or access to personally identifiable information of the Buyer or a Customer resulting from the Seller's breach of its obligations with respect to such personally identifiable information, including those obligations set forth in Article 10. |
| *Deliverable* | means all deliverables or other tangible work product prepared by the Seller in the course of the provision of Services to the Buyer or a Customer and specifically identified in a SOW and to be delivered to the Buyer or a Customer under such SOW, excluding Products. |
| *Development Agreement* | has the meaning set forth in the Strategic Alliance and Development Agreement. |
| *Exchange Act* | means the Securities Exchange Act of 1934, as amended. |
| *Flow Down Terms* | means the terms and conditions in a Customer Contract with which the Seller must comply in the Seller's performance under the applicable Transaction Document. The Flow Down Terms for a particular Customer engagement will be set forth, or incorporated by reference, in the Transaction Documents entered into between the Buyer and Seller for such engagement. |
| *Force Majeure* | means, with respect to a Party, an event beyond the control of such Party (or any person acting on its behalf), which by its nature could not reasonably have been foreseen by such Party (or such person), or, if it could have reasonably been foreseen, was unavoidable, and includes acts of God, storms, floods, riots, fires, sabotage, civil commotion or civil unrest, interference by civil or military authorities, acts of war (declared or undeclared) or armed hostilities or other national or international calamity or one or more acts of terrorism or failure of energy sources or distribution facilities. |
| *Governmental Authority* | means any nation or government, any state, municipality or other political subdivision thereof, and any entity, body, agency, commission, department, board, bureau, court, tribunal or other instrumentality, whether federal, state, local, domestic, foreign, transnational or multinational, exercising executive, legislative, judicial, regulatory, administrative or other similar functions of, or pertaining to, government. |
| *Hardware* | means computer and related devices and equipment, related documentation, accessories, supplies, consumables, parts and upgrades. |
| *include* and its derivatives *including* and *includes* | means include without limitation. |
| *Intellectual Property* | means all (1) patents, patent applications, patent disclosures and inventions (whether patentable or not), (2) Marks, (3) copyrights and copyrightable works (including mask works) and registrations and applications thereof, (4) computer software programs (including source code and object code), data, databases and documentation thereof, (5) trade secrets and other confidential information (including ideas formulas, compositions, inventions, improvements, know-how, research and development information, drawings, specifications, flowcharts, |

**Master Commercial Agreement**

3

schematics, protocols, programmer notes, designs, design rights, developments, discoveries, plans, business plans, proposals, technical data, financial and marketing plans and customer and supplier lists and information), (6) business processes, methodologies and frameworks, (7) moral rights, privacy and publicity rights, neighboring rights, and performance rights, and (8) all other proprietary or intellectual property rights recognized by Law.

| | |
|---|---|
| *Internal Use Agreement* | means that certain Internal Use Agreement entered into by the Parties as of November 1, 2015, which applies to the purchase of Products and Services for internal use purposes of the Buyer. |
| *Laws* | means any national, foreign, international, multinational, supranational, federal, state, provincial, local or similar law (including common law), statute, code, order, directive, guidance, ordinance, rule, regulation, treaty (including any income tax treaty), license, permit, authorization, approval, consent, decree, injunction, binding judicial or administrative interpretation or other requirement, in each case, enacted, promulgated, issued or entered by any Governmental Authority. |
| *Local Country Participation Agreement* | means an agreement, substantially in the form set forth in <u>Exhibit 4</u> , between Affiliates of the Parties that are located outside of the United States. |
| *Losses* | means liabilities, losses, damages, claims, actions, costs, expenses, interest, awards, judgments, fines and penalties (including reasonable attorneys' fees). |
| *Malware* | means viruses, Trojan horses, worms, spyware, back doors, email bombs, malicious code and similar items. |
| *Managed Service Provider Agreement* | means that certain Managed Service Provider Agreement entered into by the Parties as of November 1, 2015, which applies to the provision of Products and Services to the Buyer for use in providing managed services and solutions to Customers. |
| *Marks* | means service marks, trade dress, trade names, logos, insignias, corporate names, internet domain names, and registrations and applications for the registration thereof, together with all of the goodwill associated therewith. |
| *Master Agreement* | means this Master Commercial Agreement, the Additional Terms, all Exhibits attached hereto, and all Appendices attached thereto. |
| *Material Breach* | means a Party's material breach of its obligations under the Master Agreement which (1) causes substantial and continuing damages to the other Party or any its Affiliates or (2) has a material adverse impact on the other Party or its Affiliates or their businesses. |
| *OEM and Supply Chain Agreement* | means that certain OEM and Supply Chain Agreement entered into by the Parties as of November 1, 2015, which applies to the purchase of Products and Services for purposes of (1) integrating, embedding, bundling or otherwise incorporating with products and services of the Buyer and (2) reselling to Customers, where the applicable Products and Services are not available to the Buyer through the Seller's reseller |

**Master Commercial Agreement**

4

| | |
|---|---|
| | partner program. |
| *Order* | means an agreement entered into under the Master Agreement, pursuant to which the Buyer will purchase standard Products and Services from the Seller. An Order will include any Supporting Materials. |
| *Partner Agreement* | means that certain Partner Agreement entered into by the Parties as of November 1, 2015, which applies to the purchase of Products and Services for purposes of reselling them to Customers. |
| *Person* | means any individual, corporation, partnership, firm, joint venture, association, joint-stock company, trust, unincorporated organization, limited liability company, Governmental Authority or other entity. |
| *Products* | means any products that the Seller offers on a commercial basis to any customers during the Term, including Hardware and Software, as well as any Custom Products described in a Statement of Work. |
| *Professional Services* | means IT consulting, training or other services as described in a Statement of Work or applicable Supporting Material. |
| *Records* | means the Seller's records and supporting documentation that are created, generated, collected or processed and stored by the Seller in the ordinary course of performance of its obligations under the Master Agreement. |
| *Safeguards* | means technical or operational measures (including policies and procedures) designed to reduce the chance of the loss of data or access to data by an unauthorized party through any means. |
| *Seller* | means either Party or an Affiliate thereof in its capacity as a seller of its Products and Services to the other Party, or an Affiliate of the other Party, under the Master Agreement. |
| *Seller-Branded* | means Products and Services bearing a trademark or service mark of the Seller or an Affiliate of the Seller. |
| *Seller Partners* | means the Seller's distributors, dealers or resellers that (1) the Seller has authorized to sell its Products and Services and (2) have executed either a distributor, partner or reseller agreement with the Seller. |
| *Seller Personnel* | means an employee, agent, contractor, subcontractor, or other representative of the Seller performing any of the Seller's obligations under the Master Agreement. |
| *Services* | means services that the Seller offers on a commercial basis to any customers during the Term, as well as any Custom Support Services, Professional Services and other non-standard Services described in a Statement of Work or Supporting Material. |
| *Software* | means machine-readable instructions and data (and copies thereof), and related updates and upgrades, licensed materials, user documentation, user manuals, and operating procedures. Software may be a separate Product and Software that is bundled with other Products. In the event that, in connection with a particular transaction, the Seller will license source code to the Buyer, then this definition will be amended in the applicable Transaction Document. |

**Master Commercial Agreement**

5

| | |
|---|---|
| *Specification* | means technical information about Products published in the Seller's Product manuals, user documentation, and technical data sheets in effect on the date the Seller delivers such Products. |
| *Statement of Work* or *SOW* | means a statement of work entered into under the Master Agreement that describes the Custom Products, Custom Support Services, Professional Services and other non-standard Services to be provided by the Seller. |
| *Strategic Alliance and Development Agreement* | means that certain Strategic Alliance and Development Agreement entered into by the Parties as of November 1, 2015, which applies to alliance, joint marketing and joint development activities between the Parties and their Affiliates. |
| *Support Services* | means Services for Hardware maintenance and repair, Software maintenance, training, installation and configuration, and other standard support services provided by the Seller, as well as Custom Support Services. |
| *Supporting Materials* | means any documentation that is incorporated into Transaction Documents by reference or attachment, as may be further described in the applicable Additional Terms. |
| *Teaming Agreement* | has the meaning set forth in the Strategic Alliance and Development Agreement. |
| *Transaction Documents* | means, collectively, the (1) Internal Use Transaction Documents, (2) OEM and Supply Chain Transaction Documents, (3) Reseller Transaction Documents, (4) Managed Service Provider Transaction Documents and (5) Strategic Alliance and Development Transaction Documents. |

## 2.   INCORPORATION OF ADDITIONAL TERMS; ORDER OF PRECEDENCE

**2.1 Incorporation of Additional Terms.** The Additional Terms are incorporated herein by reference and made a part hereof.

**2.2 Order of Precedence.**

**(A) Agreement, Additional Terms and Exhibits.** In the event of a conflict, ambiguity or inconsistency between the terms and conditions set forth in this Agreement and any Additional Terms or any Exhibit attached hereto, then unless the Additional Terms or Exhibit expressly sets forth the applicable Sections of this Agreement that are to be excluded or modified, the terms and conditions in this Agreement will control.

**(B) Agreement and Transaction Documents.** In the event of a conflict, ambiguity or inconsistency between the terms and conditions set forth in this Agreement and any Transaction Document, the terms and conditions in this Agreement will control, provided that, if Flow Down Terms are set forth in or incorporated by reference into the applicable Transaction Document, then such Flow Down Terms will control.

**(C) Additional Terms and Transaction Documents.** In the event of a conflict, ambiguity or inconsistency between the terms and conditions set forth in the applicable Additional Terms and any Transaction Document entered into under such Additional Terms, then, except as set

**Master Commercial Agreement**

6

forth in the applicable Additional Terms, the terms and conditions in the Transaction Document will control.

## 3.    TERM

**3.1 Term of the Master Agreement.** The Master Agreement will become effective on the Effective Date and will continue in full force and effect until 11:59 p.m. (Pacific Time) on the third anniversary of the Effective Date (the " Initial Term "), unless earlier terminated in accordance with Section 15.1 or renewed in accordance with this Section. At least nine months prior to the then-existing expiration date, the Parties will meet to discuss whether either Party desires to renew the Master Agreement beyond the then-existing date of expiration, and will begin negotiating the terms, including the duration, of such renewal. If, during such negotiation period, a Party determines that it wants to renew the Master Agreement, such Party will provide notice to the other Party at least six months prior to the then-existing expiration date. If the other Party agrees to such renewal, and the Parties reach agreement on the terms and conditions of such renewal, then the Master Agreement will renew for the agreed duration (each such renewal period, a " Renewal Term "). The Initial Term and any Renewal Terms are collectively referred to herein as the " Term ."

**3.2 Term of Transaction Document.** A Transaction Document will become effective on the effective date specified therein, or, if no effective date is specified, on the date such Transaction Document is, with respect to (A) Orders, accepted by the Seller and (B) Statements of Work, fully executed by the Buyer and Seller, and in each case will remain in effect for the period of time set forth in the Transaction Document, unless earlier terminated in accordance with Section 15.2 or its terms, or renewed in accordance with its terms.

## 4.    SCOPE

**4.1 General.**

During the Term, the Seller and Buyer may enter into:

**(A)** Orders and Statements of Work under the (1) Internal Use Agreement pursuant to which the Buyer purchases or licenses, as applicable, Products and Services from the Seller for its own internal use (" Internal Use Transaction Documents "), (2) OEM and Supply Chain Agreement pursuant to which the Buyer purchases or licenses, as applicable, Products and Services from the Seller to integrate, embed, bundle or otherwise incorporate with its products and services and sell the end product or service, including solutions sold "as a service," to its Customers, or to resell to Customers where the Products and Services are not available through the Seller's established reseller programs (" OEM and Supply Chain Transaction Documents "), (3) Managed Service Provider Agreement pursuant to which the Buyer purchases or licenses, as applicable, Products and Services from the Seller to use to provide managed services and solutions to its Customers, where the Buyer retains title to Products (" Managed Service Provider Transaction Documents "), or (4) Partner Agreement pursuant to which the Buyer purchases or licenses, as applicable, Products and Services from the Seller under the Seller's established partner programs to resell to Customers (" Partner Transaction Documents "), in each case subject to the Master Agreement and any additional terms and conditions specified in the applicable Order or Statement of Work;

**(B)** alliances under the Strategic Alliance and Development Agreement, including Teaming Agreements and Development Agreements, to jointly pursue business opportunities and

**Master Commercial Agreement**

7

engage in joint development activities (" Strategic Alliance and Development Transaction Documents "), in each case, subject to the Master Agreement and any additional terms and conditions specified in the applicable Teaming Agreement, Development Agreement or other alliance agreement.

**4.2 Existing Agreements.** As of the Effective Date, the Parties and certain of their Affiliates are parties to existing arrangements and agreements for the sale of Products and provision of Services for the purposes set forth in Section 4.1 (" Existing Agreements "). Existing Agreements for Products and Services will continue in full force and effect, notwithstanding the Parties' execution of the Master Agreement, if such Existing Agreement (A) is listed in Exhibit 1 or (B) specifies that such Existing Agreement is subject to the terms and conditions set forth in the form of the Master Agreement as of August 1, 2015 (collectively, the " Continuing Agreements "). Any Existing Agreements other than as described in subsections (A) and (B) above will be terminated as of the Effective Date, and the Parties may choose to enter into a Transaction Document under the Master Agreement for the receipt of the applicable Products and Services. The Seller, on behalf of itself and its Affiliates that are parties to the Continuing Agreements, agrees to continue to provide to the Buyer the Products and Services being provided under the Continuing Agreements as of the Effective Date, in accordance with the terms of the applicable Continuing Agreement. If a Continuing Agreement listed in Exhibit 1 does not include particular terms that are included in the Agreement or the Additional Terms that are applicable to the nature of Products and Services provided under such Continuing Agreement, then such terms will be deemed to be incorporated into such Continuing Agreement, provided that the terms in the Agreement or the Additional Terms will not replace any terms included in the Continuing Agreement. As of the Effective Date, references in a Continuing Agreement to an HPI Business unit will be deemed to be references to HPI, and references to an HPE Business unit will be deemed to be references to HPE.

**4.3 Local Country Participation Agreements.** The Parties agree and acknowledge that an Affiliate of a Party located outside of the United States may want to purchase Products and Services of the other Party or an Affiliate thereof. In order for the Buyer and Seller to comply with applicable Laws in a particular country or mitigate tax or regulatory liabilities, it may be necessary to modify certain terms of the Master Agreement with respect to the applicable Transaction Documents. In that case, and subject to additional requirements set forth in the applicable Additional Terms, the Buyer or Seller may request, and the Buyer and Seller will negotiate in good faith, a Local Country Participation Agreement, which will incorporate and be subject to the terms of the Master Agreement. Each such Local Country Participation Agreement will only deviate from the terms and conditions set forth in the Master Agreement and the applicable Transaction Document to the extent necessary to address applicable local Laws, or tax or regulatory issues, and in no event will a Local Country Participation Agreement amend or override any provision of the Master Agreement except to address applicable local Laws or tax or regulatory issues.

**4.4 Purchases from Seller Partners.** The Parties acknowledge and agree that nothing in the Master Agreement limits the right of the Buyer to purchase any Products or Services from any Seller Partner, provided that a Party and Affiliates thereof will only purchase Products and Services for its internal use from the other Party or Affiliates thereof, and will not make such purchases from Seller Partners, except as permitted in the Internal Use Agreement. Any purchases from Seller Partners will be subject to the terms and conditions set forth in the relevant agreement between the applicable Seller Partner and the Buyer, and of the terms and conditions set forth in the Master Agreement relating to the purchase by the Buyer from the Seller of any Products or Services (including pricing and pricing-related terms) will not apply to such purchases, unless otherwise specified in the applicable Additional Terms.

**Master Commercial Agreement**

8

**4.5 Excluded Services.** The Master Agreement is not applicable to Services provided pursuant to that certain (A) Information Technology Service Agreement entered into by and between HPI and Hewlett Packard Enterprise Services, LLC as of November 1, 2015 or (B) Operating Agreement entered into by and between HPI and Hewlett Packard Financial Services Company as of November 1, 2015.

**4.6 Product Changes.** Each Party will provide the other Party notice of discontinued Products and Services at least 60 days prior to such discontinuance. The Seller will provide the Buyer the statements of direction for Products and Services upon the Buyer's reasonable request and in accordance with the Seller's standard roadmap policy.

## 5. CONTRACT MANAGEMENT

**5.1 Executive Sponsors.** Each Party will appoint one representative to provide leadership and guidance to such Party's governance organization and activities, progress the goals and objectives of the relationship, and resolve escalated issues in accordance with the dispute escalation procedures (each, an " Executive Sponsor "). Either Party may replace its Executive Sponsor at any time upon notice to the other; provided, however, that if a Party is dissatisfied in any way with such a replacement, the Parties will work in good faith to communicate and resolve such dissatisfaction. The Executive Sponsors as of the Effective Date are identified in Exhibit 2 .

**5.2 Relationship Managers.** Each Party will appoint two representatives to be the designated managers for the Parties' relationship with respect to the Master Agreement in its capacity as a Buyer and a Seller (each, a " Relationship Manager "). Either Party may replace a Relationship Manager at any time upon notice to the other; provided, however, that if a Party is dissatisfied in any way with such a replacement, the Parties will work in good faith to communicate and resolve such dissatisfaction. The Relationship Managers as of the Effective Date are identified in Exhibit 2 . The Relationship Managers will set up and manage a global governance structure for the Parties' relationship.

**5.3 Additional Governance Roles and Processes.** Additional governance roles and processes may be set forth in the Additional Terms.

**5.4 Quarterly Account Reviews.** The Executive Sponsors and Relationship Managers of each Party will participate in account review meetings on a quarterly basis to review the status of the Parties' relationship and discuss goals for the following quarter.

## 6. PERSONNEL

**6.1 General.** All Seller Personnel will be deemed to be the Seller's agents, employees or contractors and not employees, agents, or contractors of the Buyer. The Seller assumes full liability for all acts and omissions of Seller Personnel while providing Products or performing Services, and the acts or omissions of Seller Personnel will be deemed to be acts or omissions of the Seller. The Seller will at all times remain the employer of all of its employees performing the Services, and will perform all of the responsibilities of an employer under applicable Laws. Each Party agrees to cause its Affiliates to perform the obligations contemplated to be performed by such Affiliates by the Master Agreement.

**6.2 Use of Subcontractors.** Subject to any limitations set forth in the applicable Additional Terms, a Seller may subcontract its obligations under a Transaction Document to a subcontractor. No

**Master Commercial Agreement**

subcontracting or delegation will release the Seller from its responsibility for its obligations under the Master Agreement and Transaction Documents, and the Seller will be responsible for all acts and omissions of Seller's subcontractors, including compliance or noncompliance with any term of the Master Agreement or Transaction Documents. Any work performed by the Seller's subcontractors will be deemed work performed by the Seller. The Seller will be responsible for all payments to the Seller's subcontractors. The Seller will ensure that any Person to which the Seller subcontracts or delegates any performance of the Services or any obligations set forth in the Master Agreement or a Transaction Document complies with the Master Agreement and such Transaction Document.

**6.3 Requirements and Conduct.** The Seller will cause any Seller Personnel, when at the Buyer's or a Customer's facilities, to comply with the Buyer's or such Customer's, as applicable, rules, regulations and work conduct policies.

**6.4 Removal.** With respect to Seller Personnel performing Services for the Buyer or a Customer, if the Buyer requests in good faith that any such Seller Personnel be removed from the performance of such Services, then upon receipt of such request, the Seller will have a reasonable period of time (but no longer than five business days) to remove such Seller Personnel from performance of such Services and replace such individual.

7.    **INTELLECTUAL PROPERTY**

**7.1 Ownership.** No transfer of ownership of any Intellectual Property will occur under the Master Agreement.

**7.2 Licenses.** No license or rights to Intellectual Property of either Party or its Affiliates is granted under the Master Agreement, except as set forth in Section 7.4 and except as may be set forth in any Additional Terms or Transaction Documents. All rights in a Party's or its Affiliates' Intellectual Property not expressly granted in any Additional Terms or Transaction Documents are expressly reserved by each Party or its Affiliates, as applicable.

**7.3 U.S. Federal Government Use** . If any software is licensed to the Buyer or a Customer under the Master Agreement for use in the performance of a U.S. government prime contract or subcontract, the Buyer agrees and will cause the applicable Customer to agree, that, such software is delivered as "commercial computer software" as defined in DFARS 252.227-7014 (Jun 1995), or as a "commercial item" as defined in FAR 2.101(a), or as "restricted computer software" as defined in FAR 52.227-20 (Jun 1987), or any equivalent agency regulation or contract clause, whichever is applicable.

**7.4 Trademarks.** Except as set forth in this Section, and except as expressly permitted by and subject to the requirements of any applicable Additional Terms, no rights are granted under the Master Agreement to a Party or its Affiliates to use any Marks of the other Party or such other Party's Affiliates. Each Party grants to the other Party a limited non-exclusive, non-transferable permission to use its Marks during the Term only as necessary to develop and maintain the custom catalogs described in Exhibit 3 , provided that any such use will be subject to the licensing Party's approval in each such instance, and such use will be in accordance with any standards for such use provided by the other Party. All goodwill arising from the use of the other Party's or its Affiliates' marks will inure to and be owned by the other Party. All rights not expressly granted are reserved to the owner of the Marks, and the use of the other Party's or its Affiliates' Marks will never mean, or be implied to mean, that there is a transfer of ownership of such Marks between the Parties or their Affiliates, or any license or permission to use the Marks other than as expressly set forth in this Section 7.4 .

**Master Commercial Agreement**

10

## 8.    AUDIT RIGHTS AND RECORDS RETENTION

**8.1 Audit Rights.** The Parties agree that each Party in its capacity as a Buyer (the " Auditing Party ") will have the right during the Term and for the time period that the other Party in its capacity as a Seller is required to maintain Records pursuant to Section 8.2 , to engage a third party designated by the Auditing Party and approved by the other Party (the " Audited Party ") to audit, following not less than five business days' prior written notice, the Audited Party's Records to verify the Audited Party's compliance with the terms and conditions of the Master Agreement and Transaction Documents. Any such audit will be at the Auditing Party's expense, require reasonable notice, and will be performed during normal business hours. Such third party will be required to execute a non-disclosure agreement that restricts such third party from disclosing Confidential Information of the Audited Party to the Auditing Party, except to the extent required to report on the extent to which the Audited Party is not in compliance with the terms and conditions of the Master Agreement and Transaction Documents.

**8.2 Records Retention.** The Seller will maintain Records for at least the greater of (A) two years following the expiration or termination of the Master Agreement and (B) the time period required under its internal records retention policy.

## 9.    PRICING

The prices for the Products and Services provided under a Transaction Document will be as set forth in the applicable Transaction Document and will be determined in accordance with the pricing methodology set forth in the applicable Additional Terms.

## 10.    CONFIDENTIALITY AND DATA PROTECTION

**10.1 Confidential Information.**

**(A)** General . Each Party acknowledges that they may be furnished with, receive or otherwise have access to information of or concerning the other Party or the other Party's Affiliates that such other Party or its Affiliates considers to be confidential, a trade secret or otherwise restricted. As used in the Master Agreement, " Confidential Information " will mean all information, in any form, furnished or made available, directly or indirectly, by one Party or its Affiliates or their Customers (the " Disclosing Party ") to the other Party or its Affiliates (the " Receiving Party ") or the Receiving Party's officers, directors, principals, employees, agents, auditors, advisors, bankers, attorneys and other representatives (the " Representatives ") in connection with the Master Agreement or Transaction Documents that is marked confidential, restricted, or with a similar designation or which, given the nature of the information or the circumstances of disclosure, should reasonably be understood to be confidential, including the Disclosing Party's data, business, customer information, business practices, data processes, computer or software products or programs and all related documentation, cost and pricing data, know-how, marketing or business plans, research and development information, analytical methods and procedures, hardware design, technology, financial information, and personnel or customer data. The Master Agreement will be Confidential Information of both Parties.

**(B)** Obligations . The Receiving Party will, and will cause its Representatives (1) to hold Confidential Information in strict confidence and apply at least the standard of care used by the Receiving Party in protecting its own confidential information, but in no event less than a reasonable standard of care, and not to disclose such Confidential Information to any third party without the Disclosing Party's prior consent, except as permitted by Section 10.1(C) , and (2) without the written

**Master Commercial Agreement**

11

permission of the Disclosing Party, not to use any Confidential Information of the Disclosing Party except as reasonably required to exercise its rights or perform its obligations under the Master Agreement or Transaction Documents. In the event of any possession, use, disclosure or loss of, or inability to account for, any Confidential Information other than as permitted by the Master Agreement, the Receiving Party will promptly (a) notify the Disclosing Party upon becoming aware thereof; (b) provide to the Disclosing Party all known details and take such actions as may be necessary or reasonably requested by the Disclosing Party to pursue its legal rights and remedies and to minimize the possession, use, disclosure or loss; and (c) cooperate in all reasonable respects with the Disclosing Party to minimize the violation and any damage resulting therefrom.

(C) <u>Compelled Disclosure</u> . The Receiving Party may disclose Confidential Information as required to satisfy any legal requirement of a Governmental Authority, provided that, immediately upon receiving any such request and to the extent that it may legally do so, the Receiving Party advises the Disclosing Party of the request prior to making such disclosure so that the Disclosing Party may interpose an objection to such disclosure, take action to ensure confidential handling of the Confidential Information, or take such other action as it deems appropriate to protect the Confidential Information.

(D) <u>Exclusions</u> . Except with respect to personally identifiable information, <u>Section 10.1(B)</u> will not apply to any particular information that the Receiving Party can demonstrate: (1) was, at the time of disclosure to it, in the public domain; (2) after disclosure to it, was published or otherwise became part of the public domain through no fault of the Receiving Party; (3) was in the possession of the Receiving Party at the time of disclosure to it; (4) was received after disclosure to it from a third party who had a lawful right to disclose such information to it without any obligation to restrict its further use or disclosure; or (5) was independently developed by the Receiving Party without reference to Confidential Information.

(E) <u>No Implied Rights</u> . Each Party's Confidential Information will remain the property of that Party. Nothing contained in this Article will be construed as obligating a Party to disclose its Confidential Information to the other Party, or as granting to or conferring on a Party, expressly or impliedly, any rights or license to the Confidential Information of the other Party.

**10.2 Data.**

(A) <u>Ownership</u> . Each Party's data will be and remain, as between the Parties, the property of such Party. Neither Party nor its Affiliates will possess or assert any lien or other encumbrance or right against or to the other Party's data, and neither Party will have any rights to any data obtained from the other Party or the other Party's Customers, except as expressly set forth in a Transaction Document.

(B) <u>Training and Awareness</u> . In the event that the Seller will have access to data of the Buyer or Customers, including personal data, the Seller will ensure that its personnel (including employees and contractors) performing the applicable Services receive access to and training on the Seller's cybersecurity and data privacy policies and procedures as needed to perform the applicable Services. The Seller will provide the Buyer with access to such policies and procedures, which are considered proprietary and confidential information of the Seller. The Buyer will provide the Seller with its own policies and procedures related to cybersecurity and data privacy that are directly applicable to the applicable Services. If the policies and procedures conflict with each other, the Seller will follow its

**Master Commercial Agreement**

12

own policies and procedures unless otherwise required by Law or pursuant to written agreement of the Buyer.

**(C)** <u>Policies and Overview</u> . The Seller will maintain Safeguards appropriate to the sensitivity of data being stored, transmitted, processed, maintained, modified, or analyzed on behalf of the Buyer. The Seller may change such Safeguards at any time due to changes in applicable Laws or to changes in the Seller's business practices or the business environment where the Seller is operating. The Seller and Buyer understand that cybersecurity and data privacy threats are dynamic and evolving. Accordingly, the Seller's Safeguards will contain measures designed to safeguard against these threats based on the Seller's assessment of the threat landscape, but such measures are not a guarantee of protection.

**(D)** <u>Buyer Responsibilities</u> . The Buyer is responsible for implementing protective measures to safeguard data, including appropriate policies and procedures, technical measures (e.g., encryption, firewalls, multi-factor authentication, etc.), and training of affected personnel, whether employees or contractors. In all cases, the Buyer is responsible for complying with applicable Laws.

**(E)** <u>Compliance with Law</u> . Data that is accessed, stored, transmitted, processed, maintained, modified or analyzed (collectively, " <u>Accessed</u> ") by the Seller, its partners, or its contractors on behalf of the Buyer or Customers, or with the purpose of providing products or services to the Buyer or Customers, may be subject to various legal and regulatory standards depending on the jurisdiction where the parties or data subjects are located or where the data is Accessed. If the Buyer intends to purchase Services from the Seller that would result in any personally identifiable information (financial, medical, or otherwise) being Accessed by the Seller, the Buyer is responsible for notifying the Seller prior to the initiation of the applicable Services. The Seller will work in good faith with the Buyer to enter into any supplemental agreements required by applicable Laws regarding the handling of personally identifiable information Accessed by the Seller through the performance of the applicable Services.

**(F)** <u>Breach Notification</u> . The Seller will comply with data breach notice requirements where specifically applicable to data. If the Seller discovers that any legally protected information Accessed by the Seller, its partners, or its contractors as a result of the performance of the applicable Services has been accessed by a third party through any means without authorization, the Seller will notify the Buyer's designated representative within two days of becoming aware of the access, but in no event later than required by applicable Law.

**(G)** <u>Liability</u> . The Seller will not be liable for the Buyer's failure to abide by appropriate and reasonable security standards for the protection of the Buyer's or Customer data. To the extent that Buyer or Customer data containing personally identifiable information is Accessed by the Seller, the Seller will use appropriate and reasonable Safeguards to secure the personally identifiable information against unauthorized or unlawful access. The Buyer and Seller acknowledge that Safeguards do not completely eliminate all threats to data security or data integrity. In the event of a Data Breach that is directly caused by the Seller's failure to comply with applicable Laws, the Seller will be responsible for legally imposed damages, fines and penalties required to be paid by the Buyer in connection with such Data Breach, as well as the costs of preparation and mailing of notification letters and credit monitoring services for impacted individuals for up to 12 months.

11.    **REPRESENTATIONS AND WARRANTIES**

**Master Commercial Agreement**

13

**11.1 Organization and Good Standing.** Each Party represents and warrants that it is a corporation duly incorporated, validly existing and in good standing under the Laws of the State of Delaware.

**11.2 Authorization.** Each Party represents and warrants that it has all requisite corporate power and authority to execute, deliver and perform its obligations under the Master Agreement and the execution, delivery and performance of the Master Agreement by such Party has been duly authorized by such Party.

**11.3 Licenses and Qualifications.** Each Party represents and warrants that it is duly licensed, authorized or qualified to do business in every jurisdiction in which a license, authorization or qualification is required for the transaction of business of the character transacted by it, except where the failure to be so licensed, authorized or qualified would not have a material adverse effect on its ability to fulfill its obligations under the Master Agreement.

**11.4 Compliance with Law.** Each Party represents and warrants that it is in compliance with all Laws applicable to its obligations under the Master Agreement and has obtained all applicable permits and licenses required of it in connection with its obligations under the Master Agreement.

**11.5 Absence of Conflicts.** Each Party represents and warrants that there is no outstanding litigation, arbitrated matter or other dispute to which it is a party which, if decided unfavorably to such Party, would reasonably be expected to have a material adverse effect on its ability to fulfill its obligations under the Master Agreement, and that its execution of the Master Agreement will not conflict with, result in a breach of, or constitute a default under any other agreement to which it is a party or by which it is bound.

**11.6 Power and Authority.** Each Party represents that it has full power and authority to grant the other Party the rights granted herein without the consent of any other party and any materials developed or furnished by one Party to the other Party under the Master Agreement are free of any and all restrictions, settlements, judgments or adverse claims.

**11.7 Disclaimer.** EXCEPT AS SPECIFIED IN THIS ARTICLE, THE ADDITIONAL TERMS AND ANY TRANSACTION DOCUMENTS, NEITHER PARTY NOR ITS AFFILIATES MAKES ANY WARRANTIES WITH RESPECT TO THE PRODUCTS, SERVICES AND ANY OTHER MATERIALS PROVIDED BY SUCH PARTY OR ITS AFFILIATES AND EXPLICITLY DISCLAIMS ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NONINFRINGEMENT AND TITLE.

## 12.    INDEMNIFICATION

**12.1 General.** Each Party (as " Indemnifying Party ") will indemnify, defend and hold harmless the other Party and its Affiliates, and their respective officers, directors, employees, agents, successors and permitted assigns (collectively, " Indemnified Party "), from and against any and all Losses incurred by Indemnified Party arising out of any third-party action, suit or proceeding alleging: (A) Indemnifying Party's breach of any warranty, or inaccuracy of any representation, set forth in Article 11 ; (B) bodily injury (including death) or damage to or loss of real or tangible personal property resulting from Indemnifying Party's gross negligence or willful misconduct; (C) Indemnifying Party's breach of its obligations with respect to Indemnified Party's Confidential Information or data, including those obligations set forth in Article 10 ; (D) Indemnifying Party's failure to comply with any applicable Law in

**Master Commercial Agreement**

14

the performance of its obligations under the Master Agreement; or (E) Indemnifying Party's fraud, willful misconduct or gross negligence in connection with the performance of its obligations under the Master Agreement, except, in the case of each of the foregoing, to the extent that such Losses were caused by Indemnified Party's gross negligence or willful misconduct.

**12.2 Infringement.**

**(A)** Indemnifying Party will defend, at its expense, Indemnified Party and its Customers against any action, suit or proceeding brought against Indemnified Party or such Customers by a third party alleging infringement or misappropriation of Intellectual Property arising from Indemnified Party's or such Customers' use of Indemnifying Party's Seller-Branded Products, Deliverables or Intellectual Property licensed pursuant to Additional Terms, or receipt of Indemnifying Party's Services (such Seller-Branded Products, Deliverables, Intellectual Property and Services, collectively " Seller-Provided Resources "), and will indemnify Indemnified Party and its Customers for all amounts finally awarded by a court or agreed in a settlement and reasonable attorney's fees resulting from such action, suit or proceeding, except to the extent that the infringement or misappropriation arises out of (1) third-party content within such Seller-Provided Resources; (2) a modification of such Seller-Provided Resources other than by Indemnifying Party (unless such modification was authorized by Indemnifying Party); (3) a modification of such Seller-Provided Resources by Indemnifying Party in accordance with Indemnified Party's specifications or instructions; (4) combination, operation or use of such Seller-Provided Resources with non-Seller-Provided Resources if the claim of infringement or misappropriation could have been avoided had such combination, operation or use not occurred; (5) use of such Seller-Provided Resources for purposes not contemplated by the Master Agreement, applicable Transaction Documents or applicable Specifications and documentation provided by the Seller; or (6) a Seller-Branded Product or Deliverable that is not at the most current release level if the most current release level is non-infringing and has been made available to Indemnified Party at no additional cost.

**(B)** If the Buyer or a Customer is enjoined from, or if the Seller believes the Buyer or a Customer may be enjoined from, using any Seller-Provided Resource as a result of any action or proceeding brought by a third party alleging infringement or misappropriation, or if the Seller believes that such a claim may arise, the Seller will, in addition to indemnifying the Buyer as provided in this Section, (1) promptly, at Indemnifying Party's expense, secure the right to continue using such Seller-Provided Resource, or (2) if this cannot be accomplished with commercially reasonable efforts, then, at Indemnifying Party's cost and expense, replace or modify such Seller-Provided Resource to make it non-infringing, provided that any such replacement or modification will not degrade the performance or quality of such Seller-Provided Resource, or (3) if neither of the foregoing can be accomplished by Indemnifying Party with commercially reasonable efforts, and only in such event, then the Buyer will, as applicable (a) return the applicable Seller-Branded Product or Deliverable and receive a refund of the amount paid for the affected Product if the claim is brought in the first year after purchase or the depreciated value if the claim is brought thereafter, (b) cease use of the applicable Intellectual Property, in which case the Seller will refund any amounts paid for such Intellectual Property, or (c) cease use of the applicable Service, in which case the Seller will, with respect to (i) Support Services, refund any prepaid amounts for the applicable Service and the ongoing fees will be equitably adjusted to reflect such removal, and (ii) Professional Services, refund the amount paid for the applicable Professional Services. The remedies set forth in this Section state the Seller's entire liability, and the Buyer's sole and exclusive remedies, with respect to any infringement or misappropriation by Seller-Provided Resources of any third-party Intellectual Property rights.

**12.3 Indemnification Procedures.**

**Master Commercial Agreement**

15

**(A)** To be entitled to indemnification under Section 12.1 or Section 12.2 , Indemnified Party must promptly (and in no event later than 10 days) after receipt by Indemnified Party of notice of the assertion or the commencement of any action, proceeding or other claim by a third party in respect of which Indemnified Party will seek indemnification pursuant to Section 12.1 or Section 12.2 , notify Indemnifying Party of such claim. Indemnified Party's failure to notify Indemnifying Party within such time period will not relieve Indemnifying Party of its obligations under the Master Agreement except to the extent that Indemnifying Party can demonstrate that it was prejudiced by such failure, and Indemnifying Party will not be required to reimburse Indemnified Party for any litigation expenses during the period in which Indemnified Party failed to notify Indemnifying Party. Within 15 days following receipt of notice from Indemnified Party relating to any claim, but no later than 10 days before the date on which any response to a complaint or summons is due, Indemnifying Party will notify Indemnified Party if Indemnifying Party acknowledges its indemnification obligation and elects to assume control of the defense and settlement of that claim (a " Notice of Election ").

**(B)** If Indemnifying Party delivers a Notice of Election relating to any claim within the required notice period, Indemnifying Party will be entitled to have sole control over the defense and settlement of such claim, provided that (1) Indemnified Party will be entitled to participate in the defense of such claim and to employ counsel at its own expense to assist in the handling of such claim and (2) Indemnifying Party will obtain the prior approval of Indemnified Party before entering into any settlement of such claim or ceasing to defend against such claim. After Indemnifying Party has delivered a Notice of Election relating to any claim in accordance with Section 12.3(A) , Indemnifying Party will not be liable to Indemnified Party for any legal expenses incurred by Indemnified Party in connection with the defense of that claim. In addition, Indemnifying Party will not be required to indemnify Indemnified Party for any amount paid or payable by Indemnified Party in the settlement of any claim for which Indemnifying Party has delivered a timely Notice of Election if such amount was agreed to without the consent of Indemnifying Party.

**(C)** If Indemnifying Party does not deliver a Notice of Election relating to a claim, or otherwise fails to acknowledge its indemnification obligation or to assume the defense of a claim, within the required notice period, Indemnified Party will have the right to defend the claim in such manner as it may deem appropriate, at the cost and expense of Indemnifying Party, including payment of any judgment or award and the costs of settlement or compromise of the claim. Indemnifying Party will promptly reimburse Indemnified Party for all such costs and expenses, including payment of any judgment or award and the costs of settlement or compromise of the claim.

**12.4 Subrogation.** In the event that Indemnifying Party will be obligated to indemnify Indemnified Party pursuant to this Article, Indemnifying Party will, upon fulfillment of its obligations with respect to indemnification, including payment in full of all amounts due pursuant to its indemnification obligations, be subrogated to the rights of Indemnified Party with respect to the claims to which such indemnification relates.

## 13.    LIMITATION OF LIABILITY

**13.1** EXCEPT AS OTHERWISE PROVIDED IN SECTION 13.3 AND SECTION 13.4 , IN NO EVENT WILL EITHER PARTY OR ITS AFFILIATES BE LIABLE UNDER THE MASTER AGREEMENT TO THE OTHER PARTY, THE OTHER PARTY'S AFFILIATES OR ANY THIRD PARTY FOR ANY CONSEQUENTIAL, INDIRECT, INCIDENTAL, EXEMPLARY, PUNITIVE OR SPECIAL DAMAGES, INCLUDING LOST REVENUES OR PROFITS, DAMAGES FOR BUSINESS INTERRUPTION, OR LOSS OF OR DAMAGE TO DATA, WHETHER ARISING OUT OF BREACH OF CONTRACT, TORT (INCLUDING BREACH OF WARRANTY, NEGLIGENCE AND STRICT

**Master Commercial Agreement**

LIABILITY IN TORT) OR OTHERWISE, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES IN ADVANCE.

13.2 Except as otherwise provided in Section 13.3 and Section 13.4 , the aggregate liability of a Party or, if applicable, its Affiliate, whether arising out of breach of contract, tort (including breach of warranty, negligence and strict liability in tort) or otherwise, in connection with (A) a breach of a Transaction Document will not exceed an amount equal to the greater of (1) the total amounts paid or payable by the Buyer to the Seller under such Transaction Document for the 12 months prior to the month in which the most recent event giving rise to liability occurred and (2) $1,000,000, and (B) a breach of the Master Agreement that arises in connection with the provision of particular Products or Services under one or more Transaction Documents will not exceed an amount equal to the greater of (1) the total amounts paid or payable by the Buyer to the Seller under the affected Transaction Documents for the 12 months prior to the month in which the most recent event giving rise to liability occurred and (2) $1,000,000.

13.3 The exclusions set forth in Section 13.1 and the limitations set forth in Section 13.2 will not apply with respect to Losses arising from: (A) fraud, willful misconduct or gross negligence of a Party or its Affiliates in performing its obligations under the Master Agreement; (B) claims that are subject to indemnification pursuant to Article 12 (other than Losses arising from Data Breaches); (C) bodily injury (including death) or damage to or loss of real or tangible personal property resulting from the other Party's or its Affiliates' negligence or willful misconduct; (D) a Party's or its Affiliates' breach of Article 10 (other than Losses arising from Data Breaches); (E) a Party's or its Affiliates' infringement or misappropriation of the other Party's Intellectual Property; (F) a Party's or its Affiliates' willful repudiation of the Master Agreement or Transaction Documents; or (G) any additional exclusions set forth in the applicable Additional Terms.

13.4 The exclusions set forth in Section 13.1 and the limitations set forth in Section 13.2 will not apply with respect to Losses arising from Data Breaches, provided that (A) the liability will be limited to legally imposed damages, fines and penalties required to be paid by the Buyer in connection with such Data Breach, costs of preparation and mailing of notification letters and credit monitoring services for impacted individuals for up to 12 months, (B) the liability of a Party or, if applicable, its Affiliates, under the affected Transaction Documents for such amounts will not exceed the greater of (1) two times the total amounts paid or payable by Buyer to Seller under the applicable Transaction Documents for the 12 months prior to the month in which the most recent event giving rise to liability occurred and (2) $24,000,000, provided further that such limitations will not apply with respect to Data Breaches occasioned by the fraud, willful misconduct or gross negligence of a Party in performing its obligations under the Master Agreement.

## 14.    DISPUTE RESOLUTION

14.1 **General.** Except as expressly provided in this Article, the procedures set forth in this Article will apply to any dispute, controversy or claim, whether in contract, tort or otherwise, arising out of or relating to the Master Agreement, between the Parties (each, a " Dispute "). Each Party agrees that the procedures set forth in this Article will be the sole and exclusive procedures in connection with any such Dispute and irrevocably waives any right to commence any action in or before any Governmental Authority, except as expressly provided in this Article, and except to the extent provided under the Federal Arbitration Act, 9 U.S.C. §§1 et seq. (the " Arbitration Act "), in the case of judicial review of arbitration results or awards. EXCEPT AS EXPRESSLY PROVIDED IN THIS ARTICLE, EACH PARTY HEREBY

**Master Commercial Agreement**

17

IRREVOCABLY WAIVES ANY RIGHT TO ANY TRIAL IN A COURT THAT WOULD OTHERWISE HAVE JURISDICTION OVER ANY DISPUTE.

**14.2 Negotiations between Parties' Designated Representatives.** The Parties will make a good faith attempt to resolve any Dispute through negotiation. In the event of a Dispute, the Party that desires to initiate the dispute resolution process will provide a notice of the Dispute (" Dispute Notice ") to the other Party. If the Dispute arises out of or relates to any Additional Terms, then the governance contacts identified in the applicable Additional Terms will first negotiate in good faith in an attempt to resolve such Dispute amicably. If the Dispute does not arise out of or relate to any particular Additional Terms, or if the governance contacts identified in the applicable Additional Terms are not able to resolve the Dispute to the mutual satisfaction of the Parties within five business days after the initial written notice of the Dispute (or such longer period as the Parties may agree), then the applicable Relationship Managers (or such other persons as each Party may designate) will negotiate in good faith in an attempt to resolve such Dispute. If such Dispute has not been resolved to the mutual satisfaction of the Parties within 30 days after the initial written notice of the Dispute (or such longer period as the Parties may agree), then the Executive Sponsors will meet within 30 days after the end of the first 30-day negotiating period to attempt to resolve the Dispute. During the course of negotiations under this Section, all reasonable requests made by one Party to the other for information, including reasonable requests for copies of relevant documents, will be honored. The specific format for such negotiations will be left to the discretion of the designated negotiating teams but may include the preparation of agreed upon statements of fact or written statements of position furnished to the other Party. If the Parties are unable for any reason to resolve a Dispute within 30 days after the Executive Sponsors first meet to attempt to resolve the Dispute or if a Party reasonably concludes that the other Party is not willing to negotiate in good faith as contemplated by this Section, either Party may submit the Dispute to mandatory mediation in accordance with Section 14.3 .

**14.3 Mandatory Mediation.** Any Dispute not resolved pursuant to Section 14.2 will, at the written request of any Party (a " Mediation Request "), be submitted to mandatory mediation in accordance with the International Institute for Conflict Prevention & Resolution (" CPR ") Mediation Procedure (the " Procedure ") then in effect, except as otherwise set forth in this Article. The mediation will be held in Palo Alto, California or such other place as the Parties may mutually agree. The Parties will have 20 days from receipt by a Party of a Mediation Request to agree on a mediator. If no mediator has been agreed upon by the Parties within 20 days of receipt by a Party of a Mediation Request, then any Party may request (on notice to the other Party) that CPR appoint a mediator in accordance with the Procedure. If the Dispute has not been resolved within the earlier of 60 days of the appointment of a mediator or 90 days after receipt by a Party of a Mediation Request, or within such longer period as the Parties may agree to in writing, either Party may submit the Dispute to binding arbitration in accordance with Section 14.4 ; provided, however, that if one Party fails to participate in the mediation, the other Party may commence arbitration in accordance with Section 14.4 prior to the expiration of the time periods set forth above.

**14.4 Arbitration.**

**(A)** Any Dispute that arises under the Master Agreement that is not resolved pursuant to Section 14.2 or Section 14.3 will, at the written request of either Party (an " Arbitration Demand Notice "), be submitted to binding arbitration in accordance with this Section. If either Party delivers an Arbitration Demand Notice, the other Party may itself deliver an Arbitration Demand Notice to such first Party with respect to any related Dispute without the requirement of first delivering a Dispute Notice as contemplated by Section 14.2 or a Mediation Request as contemplated by Section

**Master Commercial Agreement**

18

14.3 . Subject to Section 14.6 , upon delivery of an Arbitration Demand Notice pursuant to this Section, the Dispute will be decided in accordance with this Section.

(B) Any arbitration hereunder will be conducted in accordance with CPR Rules for Administered Arbitration then in effect (the " CPR Arbitration Rules "); provided, however, that to the extent that the provisions of the Master Agreement and the CPR Arbitration Rules conflict, the provisions of the Master Agreement (including this Article) will govern. Unless the Parties otherwise agree, any such arbitration will be conducted by and before a single arbitrator. Any arbitrator selected pursuant to this Section will be neutral and disinterested with respect to each of the Parties and the subject matter of the Dispute.

(C) The arbitrator will have full power and authority to determine issues of arbitrability but will otherwise be limited to interpreting or construing the applicable provisions of the Master Agreement and Transaction Documents and will have no authority or power to limit, expand, alter, amend, modify, revoke or suspend any condition or provision of the Master Agreement or Transaction Documents; it being understood that the arbitrator will have full authority to implement the provisions of the Master Agreement and Transaction Documents, and to fashion appropriate remedies for breaches of the Master Agreement and Transaction Documents (including interim or permanent injunctive relief); provided, however, that the arbitrator will not have (1) any authority in excess of the authority a court having jurisdiction over the Parties and the Dispute would have absent these arbitration provisions or (2) any right or power to award special, indirect, punitive, exemplary, consequential, remote, speculative or similar damages in excess of compensatory damages, except to the extent such damages are expressly permitted by the terms of the Master Agreement. It is the intention of the Parties that in rendering a decision the arbitrator will give effect to the applicable provisions of the Master Agreement and Transaction Documents and follow applicable Law.

(D) If a Party fails or refuses to appear at and participate in an arbitration hearing after due notice, the arbitrator may hear and determine the controversy upon evidence produced by the appearing Party. Any decision rendered under such circumstances will be as valid and enforceable as if the Parties had appeared and participated fully at all stages.

(E) Notwithstanding anything to the contrary herein, the fees of the arbitrator and all other arbitration costs will be borne equally by each Party, except that each Party will be responsible for its own attorney's fees and other costs and expenses, including the costs of witnesses selected by such Party.

(F) Any arbitration award will be an award with a holding in favor of or against a Party and will include findings as to facts, issues or conclusions of law, and will include a statement of the reasoning on which the award rests. The award must also be in adequate form so that a judgment of a court may be entered thereupon. Judgment upon any arbitration award hereunder may be entered in any court having jurisdiction thereof.

(G) Any arbitration proceedings hereunder will be held in Palo Alto, California or such other place as the Parties may mutually agree.

(H) The arbitration, including the interpretation of the provisions of this Article only to the extent they relate to the agreement to arbitrate set forth herein and any procedures pursuant thereto, will be governed by the Arbitration Act. In all other respects, the interpretation of the Master Agreement and Transaction Documents will be governed as set forth in Section 14.5 .

**Master Commercial Agreement**

19

**14.5 Governing Law, Jurisdiction and Venue.** The Master Agreement, and performance under the Master Agreement, will be governed by and construed and interpreted in accordance with the Laws of the State of Delaware without giving effect to the principles of conflicts of law thereof. The Parties irrevocably and unconditionally consent to venue in the State of Delaware (and hereby waive any claims of *forum non conveniens* with respect to such venue) and to the exclusive jurisdiction of the state and federal courts in Delaware. The Parties further consent to the jurisdiction of any state court located within a district that encompasses assets of a Party against which a judgment has been rendered for the enforcement of such judgment against the assets of such Party.

**14.6 Equitable Remedies.** Each Party acknowledges that, in the event the receiving Party breaches (or attempts or threatens to breach) its obligations under Article 10 or restrictions on its right to use Intellectual Property of the other Party, including as may be set forth in a Transaction Document, the disclosing Party may be irreparably harmed. In such a circumstance, the disclosing Party may proceed directly to court. If a court of competent jurisdiction should find that the receiving Party has breached (or attempted or threatened to breach) any such obligations, the receiving Party agrees that, without any additional findings of irreparable injury or other conditions to injunctive relief, it will not oppose the entry of an appropriate order compelling its performance and restraining it from any further breaches (or attempted or threatened breaches).

**14.7 Confidentiality of Dispute Resolution Proceedings.** Except as required by applicable Law, the existence, content and result of all Dispute resolution proceedings pursuant to this Article will be confidential and will not be disclosed by any Party (other than to the extent disclosure is permitted pursuant to Section 10.1 or as may be required in order to enforce any agreement or award). Each of the Parties will request that the mediator or arbitrator, as applicable, comply with such confidentiality requirement.

**14.8 Continued Performance.** Each Party agrees to continue performing its obligations under the Master Agreement and Transaction Documents while a dispute is being resolved except to the extent the issue in dispute precludes performance (dispute over payment will not be deemed to preclude performance) and without limiting either Party's right to terminate the Master Agreement and Transaction Documents, as provided in Article 15 .

15.    **TERMINATION**

**15.1 Termination of the Master Agreement.** In the event that a Party:

**(A)** commits a Material Breach that is capable of being cured within 30 days after notice of breach from the other Party, but is not cured in such 30-day period;

**(B)** commits a Material Breach that is not capable of being cured within 30 days but is capable of being cured within 60 days and fails to (1) proceed promptly and diligently to correct the breach and (2) cure the breach within 60 days of notice thereof;

**(C)** commits a Material Breach that is not capable of being cured with due diligence within 60 days of notice thereof;

**(D)** commits numerous breaches of its duties or obligations under the Master Agreement which collectively constitute a Material Breach; or

**Master Commercial Agreement**

20

**(E)** becomes insolvent, files a voluntary petition in bankruptcy or an involuntary petition is filed against it and is not dismissed within 45 days, is adjudged bankrupt, makes an assignment of its assets for the benefit of its creditors, or becomes subject to a receivership,

then the other Party may, by giving notice to the breaching Party, terminate the Master Agreement, in whole or in part, as of a date specified in the notice of termination, without cost or penalty.

**15.2 Termination of a Transaction Document.** In the event that a party to a Transaction Document:

**(A)** commits a material breach of its obligations under a Transaction Document that is capable of being cured within 30 days after notice of breach from the other Party, but is not cured in such 30-day period;

**(B)** commits a material breach of its obligations under a Transaction Document that is not capable of being cured within 30 days but is capable of being cured within 60 days and fails to (1) proceed promptly and diligently to correct the breach and (2) cure the breach within 60 days of notice thereof;

**(C)** commits a material breach of its obligations under a Transaction Document that is not capable of being cured with due diligence within 60 days of notice thereof;

**(D)** commits numerous breaches of its duties or obligations under a Transaction Document which collectively constitute a material breach of its obligations under the Transaction Document; or

**(E)** becomes insolvent, files a voluntary petition in bankruptcy or an involuntary petition is filed against it, is adjudged bankrupt, makes an assignment of its assets for the benefit of its creditors, or becomes subject to a receivership,

then the other party to the Transaction Document may, by giving notice to the breaching party, terminate the Transaction Document, as of a date specified in the notice of termination, without cost or penalty.

**15.3 Effect of Termination or Expiration.**

**(A)** In the event of expiration of the Master Agreement, or termination of the Master Agreement in whole, any Transaction Documents then in effect will continue until their expiration or termination in accordance with their terms, and the terms of the Master Agreement will survive with respect to each such Transaction Document until such expiration or termination, provided that the Parties may not enter into any new Transaction Documents under the Master Agreement.

**(B)** In the event of termination of the Master Agreement in part such that particular Additional Terms are terminated, any Transaction Documents entered into under such Additional Terms that are then in effect will continue until their expiration or termination in accordance with their terms, and the terms of the applicable Additional Terms will survive with respect to each such Transaction Document until such expiration or termination, provided that the Parties may not enter into any new Transaction Documents under such applicable Additional Terms.

**Master Commercial Agreement**

**(C)** In the event of termination of a Transaction Document, (1) any unfulfilled obligations under such Transaction Document will be cancelled, (2) the Buyer will pay to the Seller any fees for Products properly provided and Services properly performed through the effective date of termination, and (3) each party will promptly return to the other party or destroy (and provide certification of such destruction to the other party) any materials that constitute such other party's Confidential Information. Where the Transaction Document involves provision of ongoing services to a Customer, any termination assistance Services that will be provided by the Seller will be set forth in the applicable Transaction Document.

**15.4 Survival.** The provisions of Article 8 , Article 10 , Article 12 , Article 13 , Article 14 , this Section, Section 16.8 , Section 16.14 , as well as any other provision of the Master Agreement which contemplates performance or observance subsequent to termination or expiration of the Master Agreement, will survive termination or expiration of the Master Agreement and continue in full force and effect.

## 16. MISCELLANEOUS

**16.1 Binding Nature and Assignment.** The Master Agreement will be binding on the Parties and their respective successors and assigns. Neither Party may, nor will either Party have the power to, assign, novate or transfer any or all of its rights or obligations under the Master Agreement, including to an Affiliate, without the prior consent of the other Party (not to be unreasonably withheld). Any Change of Control, or assignment by operation of Law, order of any court, or pursuant to any plan of liquidation, will be deemed an assignment for which prior consent is required and any assignment made without any such consent will be void and of no effect as between the Parties. The Parties agree and acknowledge that, if a Party requests the consent of the other Party to an assignment of the Master Agreement by such Party pursuant to this Section (including a deemed assignment that would occur as a result of a Change of Control of such Party), it would not be unreasonable for such other Party to withhold its consent to such proposed assignment if the proposed assignee (or the Person that is acquiring Control of such Party in a transaction that will result in a Change of Control) is a competitor of such other Party. In the event of a Change in Control with respect to a Party, such Party will notify the other Party, and provide such information regarding such change as required by the other Party, within five days prior to the intended date of change, or on the earliest date that such Party is legally permitted to provide such information, but not later than five business days after the Change of Control has occurred. An assignment of the Master Agreement by a Party (including a Change of Control) to which the other Party has not consented in accordance with this Section will be deemed to be a Material Breach by such Party that is not capable of being cured.

**16.2 Entire Agreement; Amendment.** The Master Agreement constitutes the entire agreement between the Parties with respect to the subject matter hereof and supersedes all prior agreements, whether written or oral, with respect to the subject matter contained in the Master Agreement. No amendment of the Master Agreement will be valid unless in writing and signed by an authorized representative of each Party (as designated by each Party from time to time).

**16.3 Consents and Approvals.** Where agreement, approval, authorization, acceptance, consent, or similar action by either Party is required under the Master Agreement, such action will be in writing and, except where expressly provided as being in the discretion of a Party, will not be unreasonably delayed or withheld. An approval or consent given by a Party under the Master Agreement will not relieve the other Party from responsibility for complying with the requirements of

**Master Commercial Agreement**

22

the Master Agreement, nor will it be construed as a waiver of any rights under the Master Agreement, except as and to the extent otherwise expressly provided in such approval or consent.

**16.4 Force Majeure.** Except for a Party's payment obligations and obligations under <u>Article 12</u>, neither Party will be liable for any default or delay in the performance of its obligations under the Master Agreement if and to the extent such default or delay is caused, directly or indirectly, by a Force Majeure. In the event of a Force Majeure, the affected Party will give prompt written notice to the other Party and will use its commercially reasonable efforts to resume performance as soon as practicable.

**16.5 UN Convention.** The United Nations Convention on Contracts for the International Sale of Goods will not apply to the Master Agreement or to the transactions processed under the Master Agreement.

**16.6 Compliance with Export Laws.** Each Party acknowledges that the Products and Services may be subject to the export laws of the United States and other countries. Each Party will comply with all applicable export and import laws (including national and international laws prohibiting or restricting exports to embargoes or sanctioned countries, including, as of the Effective Date, Cuba, Iran, North Korea, North Sudan (Khartoum) and Syria). The Seller will obtain all required export or import authorizations prior to export, import or transfer of Products and Services within the scope of such laws. The Buyer will not sell or provide Products or Services to any party subject to trade sanctions, restrictions or controls imposed by the U.S. government or other national governments. The Seller may suspend its performance under the Master Agreement in the event of the Buyer's violation of these obligations or to the extent required by applicable Laws.

**16.7 Compliance with Anti-Corruption Laws.** The Parties acknowledge they are familiar with the U.S. Foreign Corrupt Practices Act, the UK Bribery Act and anti-corruption legislation in other relevant jurisdictions. The Parties agree that they will not, in connection with the Master Agreement: (A) make any payment to; (B) transfer anything of value to; (C) offer, promise or give a financial or other advantage or request to; or (D) agree to receive or accept a financial or other advantage from, in each case either directly or indirectly, (1) any government official or employee (including employees of a government corporation or public international organization); (2) any political party or candidate for public office or (3) any other person or entity with an intent to obtain or retain business or otherwise gain an improper business advantage.

**16.8 Notices.** All notices, requests, demands and determinations under the Master Agreement (other than routine operational communications), will be in writing and will be deemed duly given (A) when delivered by hand, (B) one business day after being given to an express courier with a reliable system for tracking delivery, (C) when sent by confirmed facsimile or electronic mail with a copy sent by another means specified in this Section, or (D) four business days after the day of mailing, when mailed by U.S. mail, registered or certified, return receipt requested, postage prepaid, and addressed as follows:

In the case of HPI:          HP Inc.
                             11445 Compaq Center Drive West
                             Houston, TX 77070
                             Attn: Joseph Romero
                             Email: joe.romero@hp.com

**Master Commercial Agreement**

and                          HP Inc.
                             1501 Page Mill Road
                             Palo Alto, CA 94304
                             Attn: Joshua Brenkel
                             Email: jos.brenkel@hp.com

With a copy to:              HP Inc.
                             1501 Page Mill Road
                             Palo Alto, CA 94304
                             Attn: Office of the General Counsel

In the case of HPE:          Hewlett Packard Enterprise Company
                             165 Dascomb Road
                             Andover, MA 01810
                             Attn: Kathy McCurdy
                             Email: kathy.mccurdy@hpe.com

and                          Hewlett Packard Enterprise Company
                             3000 Hanover Street
                             Mailstop 1520
                             Palo Alto, CA 94304
                             Attn: Jonathan Thomas
                             Email: jonathant@hpe.com

With a copy to:              Hewlett Packard Enterprise Company
                             3000 Hanover Street
                             Palo Alto, CA 94304
                             Attn: Office of the General Counsel

A Party may from time to time change its address or designee for notification purposes by giving the other Party prior notice of the new address or designee and the date upon which it will become effective.

**16.9 Relationship of Parties.** Each Party in providing Products and the Services to the other Party, is acting as an independent contractor, and has the sole right and obligation to supervise, manage, contract, direct, procure, perform or cause to be performed, all work to be performed by such Party under the Master Agreement. Neither Party is an agent of the other Party and has no authority to represent the other Party or the other Party's Affiliates as to any matters, except as expressly authorized in the Master Agreement.

**16.10 Non-Exclusive Relationship.** Except as otherwise set forth in the applicable Additional Terms, nothing in the Master Agreement will be construed to preclude the Seller from providing to, or the Buyer from acquiring from, another entity products and services similar to the Products and Services.

**Master Commercial Agreement**

24

**16.11 Severability.** In the event that any provision of the Master Agreement conflicts with the Law under which the Master Agreement is to be construed or if any such provision is held invalid by a competent authority, such provision will be deemed to be restated to reflect as nearly as possible the original intentions of the Parties in accordance with applicable Law. The remainder of the Master Agreement will remain in full force and effect.

**16.12 Waivers.** A delay or omission by either Party to exercise any right or power under the Master Agreement will not be construed to be a waiver thereof. A waiver by either of the Parties of any of the covenants to be performed by the other Party or any breach thereof will not be construed to be a waiver of any succeeding breach thereof or of any other covenant specified herein.

**16.13 Cumulative Remedies.** Except as otherwise expressly provided herein, all remedies provided for in the Master Agreement will be cumulative and in addition to and not in lieu of any other remedies available to either Party at law or in equity.

**16.14 Publicity.** Except as may be expressly permitted by any Additional Terms, neither Party nor its Affiliates may use the name of the other Party or refer to it or any of its Affiliates, directly or indirectly, in any advertisement, promotion, news release, marketing materials, user lists, customer lists, websites, professional or trade publication, or for any other public purpose, without the prior approval of the other Party. The foregoing does not prevent announcements intended solely for internal distribution or disclosures to the extent required to meet legal or regulatory requirements beyond the reasonable control of the disclosing Party, which will be coordinated with and approved by the other Party prior to release.

**16.15 Third Party Beneficiaries.** The Master Agreement is entered into solely between, and may be enforced only by, the Parties and Affiliates that are Buyers or Sellers, and the Master Agreement will not be deemed to create any rights in, or obligations of a Party to, third parties other than Indemnified Parties and Affiliates that are Buyers or Sellers.

**16.16 Negotiated Agreement.** The Parties agree that the terms and conditions of the Master Agreement are the result of negotiations between the Parties and that the Master Agreement will not be construed in favor of or against any Party by reason of the extent to which any Party or its professional advisors participated in the preparation of the Master Agreement.

**16.17 Covenant of Good Faith.** Each Party agrees that, in its respective dealings with the other Party under or in connection with the Master Agreement, it will act in good faith.

**16.18 Covenant of Further Assurances.** Each Party covenants and agrees that, subsequent to the execution and delivery of the Master Agreement and without any additional consideration, each Party will execute and deliver any further legal instruments and perform any acts that are or may become necessary to effectuate the purposes of the Master Agreement.

**16.19 Headings.** The headings used in the Master Agreement are intended solely for convenience of reference and will not amplify, limit, modify or otherwise be used in the interpretation of any provision of the Master Agreement.

**16.20 Electronic Orders; EDI.** Where facilitated under local Law, the Buyer and Seller may do business electronically, including Order placement and acceptance. Once accepted, such Orders will create fully enforceable obligations subject to the terms of the Master Agreement. Such Orders and

**Master Commercial Agreement**

acceptances will be deemed for all purposes to be an original signed writing. The Buyer and Seller will adopt commercially reasonable security measures for password and access protection.

**16.21 Counterparts; Electronic Signatures.** The Master Agreement may be executed in several counterparts, all of which taken together will constitute one single agreement between the Parties. Each Party acknowledges that it may be executing the Master Agreement by facsimile, stamp or mechanical signature, and that delivery of an executed counterpart of a signature page to the Master Agreement (whether executed by manual, stamp or mechanical signature) by facsimile or by email in portable document format (.pdf) will be effective as delivery of such executed counterpart of the Master Agreement. Each Party expressly adopts and confirms each such facsimile, stamp or mechanical signature (regardless of whether delivered in person, by mail, by courier, by facsimile or by email in .pdf) made in its respective name as if it were a manual signature delivered in person, agrees that it will not assert that any such signature or delivery is not adequate to bind such Party to the same extent as if it were signed manually and delivered in person.

**Master Commercial Agreement**

26

IN WITNESS WHEREOF, the Parties have each caused the Master Agreement to be signed and delivered by its duly authorized officer, all as of the Effective Date.

**HEWLETT-PACKARD COMPANY**

/s/ Catherine A. Lesjak
_____
Signature

Catherine A. Lesjak
_____
Name

Executive Vice
President and Chief
Financial Officer
_____
Title

**HEWLETT PACKARD ENTERPRISE COMPANY**

/s/ Rishi Varma
_____
Signature

Rishi Varma
_____
Name

Secretary
_____
Title

*Signature Page to Master Commercial Agreement*

# INFORMATION TECHNOLOGY SERVICE AGREEMENT

**between**

**HEWLETT-PACKARD COMPANY**

**and**

**HP ENTERPRISE SERVICES, LLC**

**Dated: November 1, 2015**

**TABLE OF CONTENTS**

1.  CONSTRUCTION AND DEFINITIONS                                                      1

    1.1  Background, Objectives and Construction.                                      1

    1.2  Definitions.                                                                   2

    1.3  Incorporation and References.                                                  2

    1.4  Headings and Cross-References.                                                 3

    1.5  Local Agreements.                                                              3

    1.6  Guarantee.                                                                     4

2.  TERM                                                                              4

    2.1  Term.                                                                          4

    2.2  Renewal.                                                                       4

3.  MIGRATION AND TRANSITION                                                          4

    3.1  Migration.                                                                     4

    3.2  Transition.                                                                    4

4.  SERVICES                                                                          5

    4.1  Description of the Services.                                                   5

    4.2  Required Improvements.                                                         6

    4.3  Non-Exclusivity; Right to Insource and Re-Source the Services.                 7

    4.4  Deliverables.                                                                  7

    4.5  Operational Reports.                                                           8

    4.6  Support for Acquisitions, Expansions and Divestitures.                         8

5.  PROJECTS                                                                          9

    5.1  Project Requests.                                                              9

    5.2  Project Work Orders.                                                          10

    5.3  Project Staffing.                                                             11

    5.4  Project Reporting.                                                            11

    5.5  Reprioritization and Cancellation.                                            11

6.  COOPERATION WITH THIRD PARTIES                                                   11

    6.1  General.                                                                      11

    6.2  Cooperation on Service Problems.                                              12

    6.3  Disputes Related to Cooperation.                                              13

7.  REQUIRED CONSENTS                                                                13

**IT Service Agreement**

i

7.1     HPES Required Consents.                                                    13

7.2     HPI Required Consents.                                                     14

7.3     Compliance with Required Consents.                                         14

7.4     Costs and Fees.                                                            14

7.5     Alternative Approaches.                                                    14

8.   COMPLIANCE WITH AND CHANGES IN APPLICABLE LAWS                                15

8.1     HPI.                                                                       15

8.2     HPES.                                                                      15

8.3     Changes in Laws.                                                           15

8.4     Cooperation with Regulators.                                              16

9.   SERVICE LEVELS                                                                16

9.1     General.                                                                   16

9.2     Satisfaction Surveys.                                                      16

10.  SERVICE PROVIDER PERSONNEL                                                    16

10.1    Background Checks.                                                         16

10.2    Requirements and Conduct.                                                  17

10.3    Key HPES Positions.                                                        18

10.4    Removal and Replacement.                                                   19

10.5    Use of Subcontractors.                                                     20

10.6    Turnover.                                                                  20

10.7    Additional HPES Responsibilities.                                          21

10.8    Non-Solicitation of Employees.                                            21

11.  THIRD PARTY CONTRACTS                                                         21

11.1    General.                                                                   21

11.2    Assigned Contracts.                                                        21

11.3    Managed Contracts.                                                         22

12.  EQUIPMENT, SYSTEMS AND NETWORKS                                               22

12.1    Equipment.                                                                 22

12.2    HPI Systems.                                                               23

12.3    Networks.                                                                  23

13.  INTELLECTUAL PROPERTY RIGHTS AND SOFTWARE                                     24

13.1    License to HPES.                                                           24

13.2    License to HPI.                                                            24

**IT Service Agreement**

ii

13.3    Developed IP.                                                          25

13.4    License to Embedded HPES IP.                                           25

13.5    Further Assurances.                                                    25

13.6    Residual Knowledge.                                                    25

14.  SERVICE LOCATIONS                                                         26

14.1    Service Locations.                                                     26

14.2    Safety and Security Procedures.                                        27

15.  HPI RESPONSIBILITIES                                                      27

15.1    Responsibilities.                                                      27

15.2    Savings Clause.                                                        27

16.  MANAGEMENT AND CONTROL                                                    28

16.1    Architecture, Standards and Strategic Direction.                      28

16.2    Governance Organizations.                                             28

16.3    Governance Reports and Meetings.                                      29

16.4    Policies and Procedures Manuals.                                      29

16.5    Knowledge Sharing.                                                    29

16.6    Change Control.                                                       29

16.7    Quality Assurance and Improvement Programs.                           32

16.8    HPI Policies and Procedures.                                          32

17.  INSPECTIONS, AUDITS, RECORDS RETENTION AND LITIGATION SUPPORT            33

17.1    Inspections and Monitoring.                                           33

17.2    Audit Rights.                                                         33

17.3    Audit Follow-up.                                                      34

17.4    Controls Audit Reports.                                              34

17.5    Remediation of Deficiencies.                                          35

17.6    Compliance Audit Requirements.                                        35

17.7    Records Retention.                                                    35

17.8    Litigation Requests.                                                  36

18.  CHARGES                                                                   36

18.1    General.                                                              36

18.2    Pass-Through Expenses.                                                37

18.3    Out-of-Pocket Expenses.                                              37

18.4    Taxes.                                                                37

**IT Service Agreement**

| | | | |
|---|---|---|---|
| 18.5 | No COLA or Currency Pricing Adjustments. | | 39 |
| 18.6 | Benchmarking. | | 39 |
| 19. | INVOICING AND PAYMENT | | 40 |
| 19.1 | Monthly Invoices. | | 40 |
| 19.2 | Timeliness of Invoices. | | 40 |
| 19.3 | Payment Due. | | 40 |
| 19.4 | No Payment for Unperformed Services. | | 41 |
| 19.5 | No Acceptance. | | 41 |
| 19.6 | Accountability. | | 41 |
| 19.7 | Proration. | | 41 |
| 19.8 | Prepaid Items. | | 41 |
| 19.9 | Refunds and Credits. | | 41 |
| 19.10 | Set-Off. | | 41 |
| 19.11 | Disputed Charges. | | 41 |
| 20. | CONFIDENTIALITY AND DATA PROTECTION | | 42 |
| 20.1 | Confidential Information. | | 42 |
| 20.2 | HPI Data. | | 44 |
| 20.3 | Personal Data and Privacy Requirements. | | 46 |
| 20.4 | HPI Right of Termination. | | 46 |
| 21. | REPRESENTATIONS AND WARRANTIES | | 47 |
| 21.1 | By HPI. | | 47 |
| 21.2 | By HPES. | | 47 |
| 21.3 | Pass-Through Warranties. | | 48 |
| 21.4 | Disclaimer. | | 48 |
| 22. | ADDITIONAL COVENANTS | | 48 |
| 22.1 | By HPI. | | 48 |
| 22.2 | By HPES. | | 48 |
| 23. | INSURANCE | | 50 |
| 23.1 | Insurance Coverage. | | 50 |
| 23.2 | Insurance Conditions. | | 51 |
| 23.3 | Risk of Loss. | | 52 |
| 24. | INDEMNITIES | | 52 |
| 24.1 | Indemnity by HPES. | | 52 |

**IT Service Agreement**

| | | |
|---|---|---|
| 24.2 | Indemnity by HPI. | 53 |
| 24.3 | Infringement. | 54 |
| 24.4 | Indemnification Procedures. | 54 |
| 24.5 | Subrogation. | 55 |
| 25. | LIABILITY | 55 |
| 26. | CONTINUED PROVISION OF SERVICES | 55 |
| 26.1 | Force Majeure. | 55 |
| 26.2 | Disaster Recovery and Business Continuity. | 56 |
| 26.3 | Alternate Source; Termination. | 57 |
| 26.4 | Allocation of Resources. | 57 |
| 27. | STEP-IN RIGHTS | 57 |
| 27.1 | Step-In Rights. | 57 |
| 27.2 | Step-Out. | 58 |
| 28. | DISPUTE RESOLUTION | 58 |
| 28.1 | Informal Dispute Resolution. | 58 |
| 28.2 | Formal Dispute Resolution. | 59 |
| 28.3 | Governing Law, Jurisdiction and Venue. | 59 |
| 28.4 | Equitable Remedies. | 59 |
| 28.5 | Continued Performance. | 60 |
| 29. | TERMINATION BY HPI | 60 |
| 29.1 | Termination for Cause. | 60 |
| 29.2 | Termination for Convenience. | 60 |
| 29.3 | Termination for Multiple Critical Service Level Defaults. | 60 |
| 29.4 | Termination Upon Change of Control. | 61 |
| 29.5 | Termination for Insolvency. | 61 |
| 29.6 | Other Terminations. | 61 |
| 29.7 | Partial Terminations. | 61 |
| 29.8 | Termination Charges. | 63 |
| 29.9 | Charges Payable by HPES Upon Expiration or Termination. | 63 |
| 29.10 | Extension of Termination or Expiration Effective Date. | 63 |
| 30. | TERMINATION BY HPES | 63 |
| 31. | DISENGAGEMENT SERVICES | 63 |
| 31.1 | General. | 63 |

**IT Service Agreement**

| | | |
|---|---|---|
| 31.2 | Disengagement Period. | 64 |
| 31.3 | Charges for Disengagement Services. | 64 |
| 31.4 | Bid Assistance. | 64 |
| 32. | MISCELLANEOUS | 65 |
| 32.1 | Binding Nature and Assignment. | 65 |
| 32.2 | Entire Agreement; Amendment. | 65 |
| 32.3 | Conflict of Interest; Compliance with Anti-Corruption Laws. | 65 |
| 32.4 | Export. | 66 |
| 32.5 | Notices. | 66 |
| 32.6 | Relationship of Parties. | 67 |
| 32.7 | Equal Opportunity Employer. | 67 |
| 32.8 | Severability. | 67 |
| 32.9 | Consents and Approval. | 68 |
| 32.10 | Waiver of Default; Cumulative Remedies. | 68 |
| 32.11 | Survival. | 68 |
| 32.12 | Public Disclosures. | 68 |
| 32.13 | Service Marks. | 68 |
| 32.14 | Third Party Beneficiaries. | 69 |
| 32.15 | Covenant of Good Faith. | 69 |
| 32.16 | Covenant of Further Assurances. | 69 |
| 32.17 | Negotiated Agreement. | 69 |
| 32.18 | Counterparts. | 69 |

**IT Service Agreement**

**TABLE OF SCHEDULES AND APPENDICES**

Schedule 1          Defined Terms

Schedule 2          Transition Services

Schedule 3-A        Description of Infrastructure Services

    Appendix 3-A.1       Servers, Storage and Cloud Services

    Appendix 3-A.2       Data Center Services

    Appendix 3-A.3       Managed Network Services

    Appendix 3-A.4       Managed Security Services

    Appendix 3-A.5       Identity and Access Administration Services

    Appendix 3-A.6       Cross-Functional Services

    Appendix 3-A.7       Service Desk Services

    Appendix 3-A.8       End User Computing Services

    Appendix 3-A.9       Application Operations Services

    Appendix 3-A.10      Enterprise Print Services

Schedule 3-B        Description of Application Services

    Appendix 3-B.1       Application Development Services

    Appendix 3-B.2       Application Maintenance Services

Schedule 3-C        Application Matrix

Schedule 4          Service Level Methodology

    Appendix 4-A         Initial Service Levels

    Appendix 4-B         Service Levels

    Appendix 4-C         Customer Satisfaction Survey

    Appendix 4-D         Management Satisfaction Survey

Schedule 5          Charges Methodologies

    Appendix 5-A         Charges and Rates

    Appendix 5-B         Financial Responsibility Matrix

    Appendix 5-C         Form of Invoice

    Appendix 5-D         Resource Profiles

**IT Service Agreement**

Appendix 5-E       Resource Unit Definitions and Counting Rules

Appendix 5-F       Transferred Asset Charges

Schedule 6      Governance

Appendix 6-A       HPES Personnel

Appendix 6-B       Form of Project Work Order

Appendix 6-C       Form of Change Request/Change Proposal

Schedule 7      Data Security Requirements

Schedule 8      Reports

Schedule 9      Assigned and Managed Contracts

Schedule 10     Equipment and Software

Schedule 11     Service Locations

Appendix 11-A      Service Location Requirements

Appendix 11-B      HPI Service Location Requirements

Schedule 12     Approved Subcontractors

Schedule 13     HPI Policies and Procedures

Schedule 14     Controls Audit Report

Schedule 15     Disaster Recovery and Business Continuity

Appendix 15-A      Summary of DR/BC Plans

Schedule 16     Disengagement Services

Schedule 17     Form of Local Agreement

Schedule 18     Form of Guarantee

Schedule 19     Liability Provisions

**IT Service Agreement**

ii

**INFORMATION TECHNOLOGY SERVICE AGREEMENT**

This **INFORMATION TECHNOLOGY SERVICE AGREEMENT** (this " Agreement ") is entered into as of November 1, 2015 (the " Effective Date ") by and between Hewlett-Packard Company, a Delaware corporation, having a place of business at 1501 Page Mill Road, Palo Alto, California 94304 (to be renamed as HP Inc., " HPI "), and HP Enterprise Services, LLC, a Delaware limited liability company, having a place of business at 3000 Hanover Street, Palo Alto, California 94304 (" HPES "). As used in this Agreement, " Party " means either HPI or HPES, as appropriate, and " Parties " means HPI and HPES, collectively.

## 1.    CONSTRUCTION AND DEFINITIONS

### 1.1    Background, Objectives and Construction.

**(A)    Background.**

This Agreement is being made and entered into with reference to the following facts:

(1) In October 2014, HP decided to split into two companies, HP Inc. and Hewlett Packard Enterprise Company;

(2) HPI is a supplier of personal computers and printers, and associated services;

(3) HPES, a subsidiary of Hewlett Packard Enterprise Company, is a provider of enterprise IT services, software, storage and servers;

(4) HPES is an established provider of a broad range of IT products and services, with the skills, qualifications, expertise and experience necessary to perform and manage the provision of IT products and services;

(5) HPI is interested in entering into a contract that would govern the provision of certain IT products and services to HPI and other Service Recipients by HPES;

(6) HPI and HPES entered into negotiations and discussions that culminated in this Agreement; and

(7) This Agreement sets forth the terms and conditions that will govern HPES' provision and the Service Recipients' receipt of certain IT products and services.

**(B)    Objectives.**

HPI and HPES have agreed upon the following specific goals and objectives for this Agreement:

(1) Implement a scalable IT sourcing model and a comprehensive demand management and forecasting process for IT products and services that is flexible and responsive to changes in the Service Recipients' business environments, operations and requirements;

**IT Service Agreement**

1

(2) The financial terms of this Agreement will reduce HPI's overall cost of basic IT products and services and enable HPI to pursue its IT initiatives;

(3) Create a sustainable delivery model for IT products and services that utilizes sourcing management and governance processes to maintain and improve the quality of IT service delivery;

(4) Expand HPI's access to global IT talent and skills for all IT services in order to enable HPI to continue to compete in global markets; and

(5) Avoid unanticipated degradation in Services resulting from Transition activities.

**(C)    Construction.**

The provisions of this Section are intended to be a general introduction to this Agreement and are not intended to expand the scope of the Parties' obligations under this Agreement or to alter the plain meaning of the terms and conditions of this Agreement. However, to the extent the terms and conditions of this Agreement do not address a particular circumstance or are otherwise unclear or ambiguous, such terms and conditions are to be interpreted and construed so as to give effect to the provisions in this Section.

**1.2    Definitions.**

Unless otherwise defined in this Agreement, capitalized terms used in this Agreement will have the meanings set forth in Schedule 1 . Other terms used in this Agreement are defined where they are used and have the meanings there indicated. Those terms, acronyms, phrases and abbreviations utilized in the IT services industry or other pertinent business context will be interpreted in accordance with their generally understood meaning in such industry or business context.

**1.3    Incorporation and References.**

**(A)    Incorporation of Schedules, Appendices and Attachments.**

The Schedules, Appendices and other attachments attached hereto are hereby incorporated into this Agreement by reference and deemed part of this Agreement for all purposes. All references to this Agreement will include such Schedules, Appendices and other attachments. In the event of a conflict, ambiguity or inconsistency between the terms and conditions set forth in the body of this Agreement (excluding the Schedules, Appendices and other attachments hereto, and any documents incorporated by reference into this Agreement) and any Schedule, Appendix or other attachment hereto, or any document incorporated by reference into this Agreement, such conflict, ambiguity or inconsistency will be resolved by giving precedence to the document higher in the following order of priority: (1) first, the terms and conditions in the body of this Agreement; (2) second, the provisions in the Schedule; (3) third, the provisions in the Appendix or other attachment to the Schedule; and (4) fourth, the documents incorporated by reference into this Agreement.

**(B)    References.**

(1) References to any Law mean references to such Law in any form,

**IT Service Agreement**

2

including in any changed or supplemented form, or to any newly adopted Law replacing such Law.

(2) References to and the use of the word "include" and its derivatives (such as "including" and "includes") means "include without limitation."

(3) References to and the use of the word "days" means calendar days and references to "months" means calendar months, unless otherwise specified.

(4) References to the obligations of HPES include HPES Agents in any context where HPES Agents are providing goods or performing services related to such obligations. Such references do not include any reference that would make an HPES Agent a party to this Agreement. Unless otherwise provided in this Agreement, an HPES Agent may not exercise any right of HPES under this Agreement.

(5) References to HPI apply to Affiliates of HPI in accordance with the following:

(a) References to HPI include Affiliates of HPI where this is expressly so stated.

(b) References to the business, operations, methodologies, policies, procedures and the like of HPI include Affiliates of HPI to the extent such Affiliates are Service Recipients.

(c) References to sale, assignment, grant or the like by HPI means that HPI will perform the act on behalf of itself and on behalf of Affiliates of HPI. References to assets being in the name of HPI include Affiliates of HPI.

(6) References to the "Term" include any Disengagement Periods unless expressly stated otherwise.

### 1.4    Headings and Cross-References.

The Article and Section headings and the table of contents used in this Agreement are for reference and convenience only and will not enter into the interpretation of this Agreement. Any reference herein to a particular Article or Section number or Schedule, Appendix or other attachment will mean that the reference is to the specified Article or Section in, or Schedule, Appendix or other attachment to, this Agreement, except to the extent that the cross-reference expressly refers to another document.

### 1.5    Local Agreements.

The Parties agree and acknowledge that HPI may require HPES to provide the Services to HPI Service Locations or Service Recipients that are located outside of the United States. In order for the Parties to comply with applicable Laws in a particular country or mitigate tax or regulatory liabilities, it may be necessary to modify certain terms of this Agreement. In that case, a Party may request and the Parties will negotiate in good faith an applicable Local Agreement, based upon the form set forth in Schedule 18 , which will incorporate and be subject to the terms of this Agreement. Each such Local Agreement will only deviate from the terms and conditions set forth in this Agreement to the extent

**IT Service Agreement**

3

necessary to address applicable local Laws, or tax or regulatory issues, and in no event will a Local Agreement amend or override any provision of this Agreement except to address applicable local Laws or tax or regulatory issues.

**1.6    Guarantee.**

Concurrently with the execution of this Agreement, HPES' parent, Hewlett Packard Enterprise Company (" HPES Parent "), executed a guarantee, substantially in the form set forth in Schedule 18 , in favor of HPI and the other applicable Service Recipients pursuant to which HPES Parent guarantees (i) all of HPES' obligations under this Agreement and (ii) all of the applicable HPES Affiliates' obligations under Local Agreements.

**2.    TERM**

**2.1    Term.**

This Agreement will become effective on the Effective Date and will continue in full force and effect until 11:59 p.m. (Pacific Time) on the fifth anniversary of the Effective Date (the " Initial Term "), unless extended in accordance with Section 2.2 or earlier terminated in accordance with the terms herein.

**2.2    Renewal.**

HPI will have the right to extend the then-current Term for up to one year (a " Renewal Term ") on the same terms and conditions (including at the pricing then in effect) by giving notice to HPES no less than 120 days prior to the expiration of the then-current Term. The Initial Term and the Renewal Terms are collectively referred to herein as the " Term ."

**3.    MIGRATION AND TRANSITION**

**3.1    Migration.**

From the period of August 1, 2015 through the Effective Date, the Parties transitioned certain IT functions from HPI to HPES (the " Migration ") as part of the activities required to separate HP, legally and operationally and in anticipation of the transaction contemplated by this Agreement. HPES represents and warrants to HPI that, as of the Effective Date, it is ready to commence performing the Services in accordance with the terms of this Agreement, including with respect to pricing, applicable Service Levels and other performance obligations. In the event that such representation and warranty is not true and correct, HPES will reimburse HPI for any costs or expenses incurred by HPI as a result of the failure of such representation and warranty to be true and correct. In the event that HPES is required to perform any Migration activities following the Effective Date, HPES will complete such activities at its own cost and expense and in such a manner so as to not materially disrupt or cause any material adverse impact on the Service Recipients' businesses and IT operations.

**3.2    Transition.**

**(A)    General.**

Commencing on the Effective Date, HPES will perform the Functions described in and in accordance with the Transition Plan (such services being, collectively, the " Transition ").

**IT Service Agreement**

4

**(B)    Performance of Transition.**

(1) The initial draft of the plan for the Transition (the " Transition Plan ") will be delivered to HPI by HPES no later than 10 days following the Effective Date. The Transition Plan will set forth (1) specific dates (each such date, a " Transition Delivery Date ") that certain Deliverables (each, a " Transition Deliverable ") will be provided by HPES to HPI and certain Milestones (each, a " Transition Milestone ") will be achieved by HPES, (2) the Acceptance Period for each Transition Deliverable and Transition Milestone, and (3) the date by which the applicable Transition Deliverable or Transition Milestone is scheduled to be Accepted or rejected by HPI (the " Transition Milestone Date "). Within 10 business days following the Effective Date, HPES will develop a further detailed Transition Plan. HPES will cooperate and work closely with HPI in finalizing the Transition Plan, and any subsequent changes thereto will be subject to HPI's approval.

(2) HPES will perform the Transition in accordance with this Agreement, including the requirements set forth in Appendix 2-A and the Transition Plan, and in such a manner so as to not materially disrupt or cause any material adverse impact on the Service Recipients' businesses and IT operations, cause any degradation of the Services then being received by the Service Recipients. HPES will provide the cooperation and assistance that is reasonably required and requested by HPI in connection with HPI's evaluation or testing of Transition Deliverables and confirmation that the Transition Milestones have been properly achieved by HPES.

**4.    SERVICES**

**4.1    Description of the Services.**

**(A)    General.**

Commencing on the Effective Date and continuing throughout the Term, HPES will provide to HPI and, as directed by HPI from time to time during the Term, to Affiliates of HPI, HPI Agents and any other third party designated by HPI (each, a " Service Recipient "), the Functions listed below, as such Functions may evolve in accordance with Section 4.2 , or be supplemented, enhanced, modified or replaced in accordance with this Agreement. HPI will be responsible for payment of the Charges for Functions provided to the Service Recipients and for the Service Recipients' compliance with the terms of the Agreement.

(1) the Functions described this Agreement, including Schedule 3-A and Schedule 3-B ; and

(2) the Functions that were performed during the 12 months preceding the Effective Date by the applicable employees, independent contractors, contractors, and service providers of HPI who were (a) transferred to HPES, (b) displaced or (c) whose Functions were displaced, in each case, as a result of this Agreement, even if such Functions are not specifically described in this Agreement, provided that such Functions are reasonably related to, or necessary for the proper performance of, the Functions described in this Agreement.

**(B)    Implied Services.**

If any Functions not specifically described in this Agreement are required for the proper performance and provision of the Services in accordance with the requirements of this Agreement

**IT Service Agreement**

5

(including the Service Levels), such Functions will be deemed to be implied by and included within the scope of the Services (and provided to the Service Recipients at no additional charge) to the same extent and in the same manner as if expressly described in this Agreement.

(C)    **Additional Resources.**

Except as otherwise expressly provided in this Agreement, including the Financial Responsibility Matrix, HPES will be responsible for providing the labor, materials, services, facilities, Equipment, Software, technical knowledge, training, expertise and other resources necessary for the proper performance and provision of the Services in accordance with the requirements of this Agreement (including the Service Levels), collectively, for the Charges that are set forth in Schedule 5 and at no additional charge to HPI.

(D)    **Increase or Decrease in Services.**

The Services will be variable in volume in accordance with and subject to Schedule 5 , and HPES will increase or decrease the amount of the Services provided under this Agreement according to Service Recipients' demand for such Services. The Charges for the Services will vary based on the Service Recipients' consumption of the Services in accordance with the applicable Charges Methodology. Increases in the volume or consumption of the Services will not be considered New Services.

(E)    **Due Diligence.**

HPES acknowledges and agrees that it was solely responsible, at no cost or charge to HPI, for any due diligence activities, including the obtaining or requesting of any information necessary to provide the Services in accordance with this Agreement, and the evaluation of any such information prior to entering into this Agreement. HPES acknowledges and agrees that it has carried out to its satisfaction adequate due diligence activities and validation and verification activities on the Service Recipients (including on any applicable Equipment, Software, systems, third party contracts or personnel) or any other aspects of the Service Recipients' operations so that it can properly perform the Services in accordance with the terms of this Agreement. HPES acknowledges and agrees that there will not be any opportunity or provisions that will allow for any adjustments to the terms of this Agreement (e.g., to the applicable Charges, Service Levels or description of the Services) after the Effective Date due to HPES' failure to conduct adequate due diligence, except as may be agreed by HPI in its sole discretion, or except to the extent that HPES reasonably relied on materially inaccurate information provided to HPES by HPI, or material misrepresentations made by HPI, during the due diligence process.

**4.2    Required Improvements.**

(A) HPES will cause the Services and the Service Delivery Resources, as approved by HPI, to evolve and to be modified, enhanced, supplemented and replaced as necessary for the Services and the Service Delivery Resources to keep current with industry best practices and a level of technology that is (1) used by HPES and other top-tier IT providers in providing services similar to the Services to other customers, including HPI Competitors and (2) in general use within the IT outsourcing industry. Any changes to the Services and Service Delivery Resources implemented in accordance with this Section that constitute a Change will be implemented pursuant to the Change Control Procedure.

(B) Throughout the Term, HPES will: (1) identify and apply best practice techniques,

**IT Service Agreement**

6

methods and technologies in the performance of the Services; (2) train HPES Personnel in the use of new techniques, methods and technologies that are in general use within HPES' organization and the IT industry; and (3) make necessary investments to keep and maintain the Service Delivery Resources at the level of currency defined in this Section.

**(C)** HPES will meet with HPI at least once during every 180-day period throughout the Term to inform HPI of: (1) any investments, modifications, enhancements and improvements that HPES is required or proposes to make to the Services or Service Delivery Resources pursuant to this Section; (2) new information processing technology or business processes HPES is developing; (3) any pending or actual changes in Law that could reasonably be expected to affect the provision or receipt of the Services; and (4) technology or process trends and directions of which HPES is otherwise aware that could reasonably be expected to have an impact on HPI's IT operations or business.

**4.3    Non-Exclusivity; Right to Insource and Re-Source the Services.**

HPES acknowledges and agrees that this Agreement does not give HPES any exclusive rights with respect to the provision of any products or services to the Service Recipients. Except as otherwise provided in Schedule 5 , nothing under this Agreement will be construed as a requirements contract or be interpreted to prevent a Service Recipient from obtaining from third parties (" Re-Sourcing "), or providing to itself (" Insourcing "), any of the Services or services similar to the Services. HPI will have the right to Re-source or Insource any of the Services in accordance with the terms of this Agreement.

**4.4    Deliverables.**

**(A)** Each Deliverable developed or otherwise provided by HPES as part of the Services (including any Software Deliverable) will be subject to the Acceptance procedures set forth in Schedule 6 .

**(B)** HPES will cause each Deliverable, following Acceptance by HPI, to (1) be free from defects in materials, design and workmanship; (2) conform with any applicable Acceptance Criteria, documentation, manuals, specifications or requirements or any other requirements agreed upon by the Parties; and (3) be free and clear of all liens, claims, charges, debts or other encumbrances, provided that, with respect to Developed IP that is Software, the warranties in (1) and (2) will apply for 90 days following Acceptance, unless HPES has maintenance obligations under the Agreement with respect to such Deliverables, in which case HPES will be responsible for nonconformities as part of the applicable Services in accordance with the terms of this Agreement.

**(C)** In addition, in the case of Software Deliverables, HPES will provide HPI with the complete object code and, if the Software Deliverable is Developed IP, the complete source code, for such Software Deliverable. Each Software Deliverable will: (1) be provided on media that is free of defects in materials and workmanship under normal use; (2) not contain any Malware; and (3) not contain any Software that requires as a condition of its use, modification or distribution that such Software (or other Software incorporated into, derived from or distributed with such Software) be (a) disclosed or distributed in source code form, (b) licensed for the purpose of making derivative works or (c) redistributed at no charge. HPES will provide HPI with all Related Documentation (and other documentation that is IP) that is customarily provided with such Software Deliverable and such Related Documentation (and other documentation that is IP) will be accurate, current, complete and sufficient to enable an individual reasonably skilled in the applicable subject matter to use and maintain the Software Deliverable without reference to any other person or materials.

**IT Service Agreement**

7

**(D)** In the event of a breach of this Section, HPES will, at its sole cost and expense, correct such breach as soon as reasonably practicable, by repairing or replacing the applicable Deliverable such that the repaired or replacement Deliverable complies with the requirements of this Section. If the breach is not corrected within such reasonable time, HPI may (as determined by HPI in its sole discretion): (1) extend the time (for the period of time reasonably determined by HPI) for HPES to correct such breach; (2) receive an appropriate, agreed upon reduction in the Charges for such Deliverable; or (3) in addition to its other rights and remedies under this Agreement, receive a refund of all Charges for such Deliverables and Related Deliverables to the extent HPI returns or certifies destruction of the applicable Deliverables and Related Deliverables.

**(E)** If HPI selects the option set forth in Section 4.4(D)(1) and the breach remains uncorrected at the end of the extended time period, HPI will have the same options as when the Deliverable was first submitted to HPI. Any repaired or replacement Deliverable will be subject to the same representations, warranties, covenants and remedies described in this Section.

**(F)** All Deliverables will be electronically delivered to HPI, with no transfer of any tangible personal property, in the format and to the location directed by HPI.

**4.5    Operational Reports.**

**(A)** HPES will provide to HPI the operational reports (A) described in this Agreement, including the reports listed in Schedule 8 at the frequency and in the format specified therein, and (B) requested by HPI on an ad hoc or periodic basis (collectively, " Reports "). Within 90 days following the Effective Date, HPES will provide to HPI an updated and revised Schedule 8 that, with HPI's approval, will replace the Schedule 8 attached to this Agreement as of the Effective Date. All Reports will be provided at no additional charge to HPI or the other Service Recipients, provided that ad hoc reports that must be created manually and cannot be created utilizing the existing HPES Personnel, are subject to an additional Charge calculated using the applicable rates set forth in the Rate Card. Unless otherwise specified in this Agreement, all Reports to be provided on a periodic basis will be provided monthly on the 15th day of each month in an electronic format.

**(B)** HPES will validate the data comprising the Reports provided under the Agreement, including by analyzing such underlying data. Such analysis will include a review of each data source for validity and accuracy, using a statistically significant number of validation points. In the event that such data is reasonably suspected to be invalid, HPES will (1) notify HPI no later than five days after suspecting such invalid data, and (2) engage with the applicable Report recipient to investigate and resolve such invalid data.

**4.6    Support for Acquisitions, Expansions and Divestitures.**

**(A)    Acquisitions and Expansions.**

(1) With respect to a potential Acquisition or Expansion Event, upon HPI's request, HPES will provide support (including assessments of any technology environments included or impacted by such Acquisition or Expansion Event, potential integration approaches, and the impact of the Acquisition or Expansion Event on the Services, Service Levels, Charges and other aspects of this Agreement) as requested by HPI to assist HPI with its assessment of the components of the Acquisition or Expansion Event to which the Services will relate. Such support will be provided within the time frame agreed upon by the Parties.

**IT Service Agreement**

8

(2) As requested by HPI, HPES will provide, subject to additional Charges calculated using the applicable rates in the Rate Card, personnel to staff vacancies and to provide management for the IT functions needed to support any Acquisition or Expansion Event, including, to the extent necessary, onsite support at any location of the Acquisition or Expansion Entity.

(3) In the event of an Acquisition or Expansion Event, HPI may elect to have HPES provide some or all of the Services to an Acquisition or Expansion Entity. Such Services will be provided to such Acquisition or Expansion Entity in accordance with the then-existing terms of this Agreement, including the applicable Charges Methodology. Except with respect to any one-time charges for transition services, the Charges for the Services will be calculated as if HPI's demand for the Services increased by the volumes necessary to support the Acquisition or Expansion Entity at the applicable then-current Charges and in accordance with the Charges Methodology applicable to such Services. If transition services are required in order to commence providing Services to the Acquisition or Expansion Entity, HPES will provide such transition services as required by HPI. HPES will complete such transition services within the time frames agreed upon by the Parties and HPI will pay any one-time charges agreed upon by the Parties with respect to such transition, calculated using the applicable rates set forth in the Rate Card.

(4) If an Acquisition or Expansion Entity has an existing contract with HPES that covers or relates to the subject matter of this Agreement, HPI may, at its option, (a) retain the entity's existing contract in effect until the expiration or termination of such existing contract, after which such entity may receive the benefits of this Agreement as a Service Recipient, or (b) immediately terminate such existing contract, after which such entity may receive the benefits of this Agreement as a Service Recipient. The termination of the existing contract will be without cost or penalty and without payment of any termination charges for any categories of services provided under the existing contract that fall within the Towers under this Agreement, and continue to be delivered pursuant to this Agreement.

**(B)** **Divestitures.**

If HPI divests an entity, business or brand, in whole or in part (a " <u>Divested Entity</u> "), HPI may elect to (a) reduce the volume of Services (and any related commitments thereto) provided to HPI by the volume of the Services that was provided to the Divested Entity, or (b) have HPES continue to provide the Services to such Divested Entity in accordance with the then-existing terms of this Agreement, including the applicable Charges Methodology, for a period determined by HPI, not to exceed 12 months from the effective date of such divestiture, and thereafter reduce the volume of Services (and any related commitments thereto) provided to HPI by the volume of the Services that was provided to the Divested Entity. HPI will exercise on behalf of the Divested Entity any rights such Divested Entity may have under this Agreement. If transition services are required in order to terminate the provision of Services to a Divested Entity, HPES will provide such services as required by HPI. HPES will complete such transition services within the time frames agreed upon by the Parties and HPI will pay any one-time charges agreed upon by the Parties with respect to such transition, calculated using the applicable rates set forth in the Rate Card.

**5.    PROJECTS**

**5.1    Project Requests.**

**(A)** From time to time, HPI may request HPES to perform Projects. HPI may initiate

**IT Service Agreement**

9

a request for a new Project by providing such request in writing (each such request, a " Project Request ") to HPES.

**(B)** HPES will, within the time frame specified in such Project Request (and in no event more than five business days from receipt of such request), at no charge to HPI, prepare and deliver to HPI a proposed Project work order (each, a " Project Work Order "), as described in Section 5.2 .

**(C)** Notwithstanding any request made to HPES by HPI pursuant to this Section, HPI will have the right to contract with a third party to provide, or propose to provide, services that are the same or similar to the Services to be provided in connection with the Project.

**5.2** **Project Work Orders.**

Each proposed Project Work Order prepared by HPES will be in the form attached to Schedule 6 and will, at a minimum, contain the following information:

**(A)** a detailed description of the scope of work to be performed by HPES to complete and implement the Project, including any required Deliverables;

**(B)** any specific Service Levels that will apply to the completion and implementation of such Project, including HPES' agreement to meet applicable Service Levels;

**(C)** an anticipated schedule for completing and implementing the Project and any related Deliverables, including Milestones and credits for failing to achieve Acceptance of Milestones and Deliverables;

**(D)** the HPES Personnel that will be assigned to each activity specified in the Project Work Order, including the location of such HPES Personnel (i.e., onsite, offsite, onshore, offshore);

**(E)** HPES' proposed productivity measures for the activities specified in the Project Work Order;

**(F)** a description of the Acceptance Criteria and Acceptance Testing procedures to be used by HPI in connection with any Acceptance Testing of such Project and any Related Deliverables and Milestones;

**(G)** the estimated number of personnel hours needed to complete the Project;

**(H)** one or more fee quotes, based on the following pricing mechanisms: (a) the applicable hourly rate, in accordance with the Rate Card, (b) if the Project consists of multiple units of work for which there are pre-defined one-time Charges, the number of pre-defined work units multiplied by the applicable pre-defined one-time Charge, or (c) if requested by HPI, a fixed fee or other pricing mechanism;

**(I)** any increase or decrease in the Charges on an ongoing basis caused by such Project (which adjustments will be made in accordance with the applicable Charges Methodology), the date any such Charges adjustments would go into effect, and the reasons for such adjustments; and

**(J)** any adjustment to the Service Levels on an ongoing basis caused by such Project, the date any such adjustments would go into effect, and the reasons for such adjustments.

**IT Service Agreement**

10

HPES will not commence performing any services in connection with a Project, and HPI will not be responsible for any Charges applicable to such Project, until the Parties have executed the applicable Project Work Order. Any change to a Project Work Order will be made pursuant to the Change Control Procedure.

**5.3     Project Staffing.**

The HPES Personnel assigned to perform Projects will possess the training, education, experience, competence and skill to perform such work, and will be fully qualified to complete such Projects.

**5.4     Project Reporting.**

HPES will provide weekly status reports for each Project, consisting of schedule updates, the previous week's activities, the following week's activities, risks, issues and open action items. Such reporting will be performed by the HPES Contract Manager or designee and will be at no incremental charge to HPI.

**5.5     Reprioritization and Cancellation.**

HPES acknowledges and agrees that HPI will have the right, in its sole discretion, to reprioritize, suspend for up to 120 days, or terminate, any Project upon 10 days' notice to the HPES Contract Manager. If HPI suspends the Project, and the duration of such suspension is 30 days or less, HPES will retain the HPES Personnel assigned to the Project at the time of such suspension. If HPI suspends the Project, and the duration of such suspension is more than 30 days, HPES will have no obligation to retain the HPES Personnel assigned to the Project and HPI acknowledges that such HPES Personnel may not be available to work on such Project at the end of the suspension period. HPI will reimburse HPES for (A) any Out-of-Pocket Expenses resulting from such reprioritization or suspension and (B) Labor Costs for HPES Personnel assigned to the Project at the time of reprioritization or suspension that HPES is not able to redeploy; provided, however, that (1) HPES used commercially reasonable efforts to mitigate such Out-of-Pocket Expenses and Labor Costs, (2) HPES notified HPI of such Out-of-Pocket Expenses and Labor Costs promptly after HPES became aware that such Out-of-Pocket Expenses and Labor Costs would be incurred, and (3) HPI's decision to reprioritize or suspend such Project is not the direct result of HPES' failure to perform its obligations in accordance with the applicable Project Work Order or the terms of this Agreement. If HPI suspends a Project for HPI's convenience and does not provide notice to HPES to resume the Project within 120 days, HPI will terminate the applicable Project Work Order. If HPI terminates a Project Work Order, HPES will stop performing the Project work in an orderly manner as of the date specified by HPI. Such cancellation will be without cost or penalty and without payment of termination charges, provided that, if such termination is for HPI's convenience, such termination will be subject to HPI's payment of (a) any termination charges specified in the applicable Project Work Order, and (b) Charges for chargeable Project work performed by HPES up to the date of termination specified in HPI's notice of termination.

**6.     COOPERATION WITH THIRD PARTIES**

**6.1     General.**

**(A)** HPES acknowledges that it is performing the Services in a multi-vendor environment and agrees that it may be necessary for HPES to coordinate its responsibilities with the

**IT Service Agreement**

11

efforts of third party providers or suppliers providing products or services to the Service Recipients (collectively, " Third Party Providers "), which coordination efforts may include proactively communicating with the Third Party Providers regarding Service issues and coordination issues, acting as the single point of intake and resolution for Third Party Providers' questions and issues, scheduling meetings for discussion and exchange of information as appropriate, and providing guidance to Third Party Providers with respect to HPES' and the Service Recipients' IT environments as they relate to the Services. HPES will cooperate with any Third Party Provider to the extent required for HPES to provide the Services in accordance with this Agreement and to the extent required for such Third Party Provider to provide its products or services to the Service Recipients. Such coordination and cooperation will be at no additional charge to HPI unless it results in a Change or material additional cost to HPES, in which case it will be addressed through the Change Control Procedure.

**(B)** HPES' obligation to coordinate and cooperate with Third Party Providers will include the following, to the extent requested by HPI or a Third Party Provider and as necessary for a Third Party Provider (as determined by HPI) to provide products and services to HPI:

(1) providing information and data concerning the Services (including the manner in which the Services are provided), the Systems, and other resources used to provide the Services, including information regarding any System configurations and settings, operating environments, System constraints and other operating parameters;

(2) providing access to and use of the Policies and Procedures Manuals;

(3) providing access to any Service Locations;

(4) providing access to any Reports; and

(5) providing access to and use of the Systems, HPES IP and Service Delivery Resources;

provided, however, that provision of access to (a) HPES Service Locations will be subject to compliance with HPES' reasonable security policies and (b) Confidential Information of HPES will be subject to the conditions set forth in Section 20.1(B)(2) .

**6.2    Cooperation on Service Problems.**

HPES will cooperate with Third Party Providers to establish the root cause of any failure by (A) HPES to perform its obligations under this Agreement, to the extent such failure affects the Third Party Provider's performance of its obligations to the Service Recipients and (B) any Third Party Provider to perform its obligations relating to the Service Recipients (each such failure described in (A) and (B), a " Service Problem "). To the extent the root cause of a Service Problem falls within the responsibility of HPES or a Third Party Provider to correct, each will provide to the other, as requested, reasonable assistance and support regarding the resolution of the Service Problem. HPI will use commercially reasonable efforts to cause Third Party Providers to cooperate with HPES in a manner consistent with this Section. Subject to Section 6.3 , in no event will such assistance and support affect the overall allocation of responsibility between HPES and Third Party Providers regarding (1) HPES' performance of its obligations under this Agreement (including HPES' performance of the Services in accordance with the Service Levels) and (2) any Third Party Provider's obligations relating to the Service Recipients. HPES will not be responsible for performing any Third Party Provider's obligations to the Service Recipients.

**IT Service Agreement**

12

**6.3**    **Disputes Related to Cooperation.**

**(A)** HPES will use commercially reasonable efforts to resolve any dispute between HPES and a Third Party Provider (each, a " Third Party Provider Dispute ") without HPI's intervention no later than five days after HPES becomes aware of such Third Party Provider Dispute.

**(B)** If HPES and the Third Party Provider (" Disputing Parties ") are not able to resolve such Third Party Provider Dispute within such five-day period:

(1) HPES will: (a) promptly provide notice to HPI of the Third Party Provider Dispute; (b) provide information to HPI concerning the Third Party Provider Dispute; and (c) provide HPES' recommendation for remedying the Third Party Provider Dispute. HPI may request additional information concerning the Third Party Provider Dispute and require the Disputing Parties to attend meetings to determine the appropriate resolution of the Third Party Provider Dispute; and

(2) HPI may direct one of the Disputing Parties to begin to perform any services necessary to cure the Service Problem based on HPI's reasonable belief regarding which Disputing Party has responsibility to provide the disputed services. If HPI directs HPES to perform such services, HPI will so inform HPES and HPES will immediately commence performance of such services. Subject to Section 6.3(C) , any such services performed by HPES will be performed at no additional charge to HPI.

**(C)** If either Party wishes to pursue further the resolution of the Third Party Provider Dispute, either Party may submit the issue to the other Party for resolution in accordance with Article 28 . Pending final adjudication of a dispute, HPES will continue to perform the Services in accordance with the terms of this Agreement. If it is determined through the dispute resolution procedures that HPES is not responsible under this Agreement for curing the disputed Service Problem, HPI will compensate HPES (using the applicable rates set forth in the Rate Card) for HPES' performance of the services necessary to cure the Service Problem. If it is determined that HPES is responsible under this Agreement for curing the disputed Service Problem, HPES will refund any amounts paid by HPI to HPES for HPES' efforts to correct the disputed Service Problem.

**7.**    **REQUIRED CONSENTS**

**7.1**    **HPES Required Consents.**

HPES, with the cooperation of HPI, will obtain and maintain any licenses, consents, authorizations or approvals, other than the HPI Required Consents, that are necessary for HPES to provide the Services (collectively, the " HPES Required Consents "), including those consents that are necessary to allow:

**(A)** HPES to (1) grant any licenses or rights of use to HPES IP, or (2) assign any of its interests in the Developed IP, in each case as described in Article 13 ;

**(B)** the Service Recipients to use any HPES Equipment in connection with their use and receipt of the Services;

**(C)** HPI to take an assignment to any Equipment leases as set forth in Section 31.1(B)(2) ;

**IT Service Agreement**

13

**(D)** HPI to take an assignment to any third party contracts pursuant to <u>Section 31.1(B)(3)</u> ; and

**(E)** HPES to use in its provision of the Services, and the Service Recipients to access and use in their receipt of the Services, any other services, resources, materials or other items contracted for or licensed or leased by HPES from third parties.

**7.2    HPI Required Consents.**

HPI, with the cooperation of HPES, will obtain and maintain any licenses, consents, authorizations or approvals (collectively, the " <u>HPI Required Consents</u> ") that are necessary to allow:

**(A)** HPI to grant any of the licenses or rights with respect to HPI IP described in <u>Section 13.1</u> ;

**(B)** HPES to use any HPI Provided Equipment as permitted by this Agreement;

**(C)** HPES to take an assignment of any Assigned Contracts pursuant to <u>Section 11.2</u> or to manage any Managed Contracts pursuant to <u>Section 11.3</u> ; and

**(D)** HPES to use, in its provision of the Services, any other services, resources, materials or other items contracted for or licensed or leased by HPI from third parties, including with respect to third party Software.

**7.3    Compliance with Required Consents.**

HPES will comply with the requirements of the HPES Required Consents and the HPI Required Consents (to the extent that the terms of the HPI Required Consents have been disclosed in writing to HPES by HPI). HPI will comply with the requirements of each of the HPI Required Consents and the HPES Required Consent (to the extent that the terms of the HPES Required Consents have been disclosed in writing to HPI by HPES).

**7.4    Costs and Fees.**

Each Party will pay any costs, expenses and fees (including license, re-licensing, transfer or upgrade fees or termination charges) as may be required to obtain such Party's Required Consents.

**7.5    Alternative Approaches.**

If a Party is unable to obtain a Required Consent, then, unless and until such Required Consent is obtained, HPES and HPI will determine and adopt, subject to HPI's approval, such alternative approaches as are necessary and sufficient for the Services to be provided without such Required Consent. If such alternative approaches are required for a period longer than 60 days following the Effective Date, the Parties will equitably adjust the terms of this Agreement, including the Charges in accordance with the applicable Charges Methodology to reflect (A) if the alternative approach is required because HPES is unable to obtain an HPES Required Consent, any additional costs and expenses being incurred by the Service Recipients and any Services not being received by the Service Recipients, or (B) if the alternative approach is required because HPI is unable to obtain an HPI Required Consent, any additional costs and expenses being incurred by HPES. In addition, if HPES fails to obtain an HPES Required Consent within 60 days following the Effective Date and such failure has a material adverse impact on the Service

**IT Service Agreement**

14

Recipients' receipt of the Services, HPI may, upon notice to HPES, terminate this Agreement without regard to Section 29.1 , in whole or in part, as of the termination date specified in the notice, without cost or penalty and without the payment of any termination charges, subject to Section 7.1(B) of Schedule 5 . The failure to obtain any HPES Required Consent will not relieve HPES of its obligations under this Agreement and HPES will not be entitled to any additional compensation or reimbursement of any amounts in connection with obtaining or failing to obtain any HPES Required Consent or implementing any alternative approach required by such failure.

## 8. COMPLIANCE WITH AND CHANGES IN APPLICABLE LAWS

### 8.1 HPI.

HPI will comply with all Laws applicable to HPI and its business (i.e., Laws under which HPI would be liable in the case of non-compliance) that affect its use or receipt of the Services.

### 8.2 HPES.

(A) HPES will (1) comply with all Laws applicable to HPES as a provider of IT outsourcing services and (2) perform the Services in a manner that does not cause HPI to be out of compliance with Laws applicable to the Services.

(B) Without limiting HPES' obligations under Section 8.2(A) , HPI may direct HPES on the method of compliance with any Laws applicable to HPES' performance of the Services. HPES will comply with all such direction, provided that HPES will not be responsible to HPI for a failure to comply with a Law to the extent that such non-compliance is due to HPES' reliance on, and compliance with, HPI's direction pursuant to this Section in respect of such Law.

(C) HPES will provide HPI (or its designee) access to any information, Service Locations and HPES Personnel as HPI reasonably deems is necessary to confirm that HPES is in compliance with any Law applicable to HPI.

(D) If HPES is not in compliance with Section 8.2(A) , then: (1) HPES will immediately undertake such measures as are necessary to establish compliance with the Law; (2) if HPES does not take action in accordance with Section 8.2(D)(1) , HPI (or its designee) may, at HPES' cost and expense, undertake such measures as HPI may require and that are necessary to establish compliance with the Law; or (3) if such non-compliance causes the Service Recipients to become subject to any formal action by a Governmental Authority, which will include any material investigation, fine or penalty levied by such Governmental Authority, HPI may, upon notice to HPES, terminate this Agreement without regard to Section 29.1 , in whole or in part, as of the termination date specified in the notice, without cost or penalty and without the payment of any termination charges, subject to Section 7.1(B) of Schedule 5 .

### 8.3 Changes in Laws.

(A) HPES will promptly notify HPI of any changes in Law of which it becomes aware that may relate to: (1) the Service Recipients' use or receipt of the Services or HPES' performance of the Services; and (2) the protection, transmission, handling, storage or other treatment of Personal Data, to the extent related to HPES' performance of the Services. The Parties will work together to identify the impact of such changes on the Service Recipients' use or receipt and HPES' performance of the Services.

**IT Service Agreement**

15

**(B)** Unless a change in Law causes the performance of the Services to become illegal, HPES will perform the Services regardless of changes in Law.

**(C)** Subject to Section 8.3(D) , each Party will bear the cost of compliance with any changes in Laws (not related to the Services) applicable to such Party (e.g., Laws relating to the employment of its employees, employee tax withholding applicable to its employees or environmental and health and safety Laws relating to its employees or facilities).

**(D)** HPI will bear the costs to comply with any change in Law described in Section 8.1 . HPES will bear the costs to comply with any change in Law described in Section 8.2(A) .

**(E)** If any change in a Law applicable to the Services, including a change in an applicable tax rate, is expected to increase the Service Recipients' annual costs with respect to receipt of the Services by more than 10 percent of the then-current annual Charges, HPI may, upon notice to HPES, terminate this Agreement without regard to Section 29.1 , in whole or in part, as of the termination date specified in the notice, (1) in the case of a change in Law described in Section 8.2(A) , without cost or penalty and without the payment of any termination charges, and (2) in the case of any change in Law described in Section 8.1 , without cost or penalty subject to the payment of any applicable termination charges set forth in Section 7.2(A) of Schedule 5 .

**8.4    Cooperation with Regulators.**

As directed by HPI and subject to HPES' obligations under Section 20.1(B)(3) , HPES will work in an open and cooperative way with Governmental Authorities that regulate HPI, including by: (A) meeting with such Governmental Authorities; (B) coordinating with HPI to provide to representatives or appointees of such Governmental Authorities any materials, records and information relating to the Services or allowing any such representatives or appointees access to such materials, records and information relating to the Services and providing such facilities as such representatives or appointees may reasonably require; and (C) permitting representatives or appointees of such Governmental Authorities to have access to any of its premises to the extent related to the Services, as required by such representatives or appointees.

## 9.    SERVICE LEVELS

**9.1    General.**

HPES will perform the Services in a manner that meets or exceeds the quantitative Service Levels and other performance requirements (each, a " Service Level ") described in this Agreement. HPES will measure and report on its performance against the Service Levels, and pay Service Level Credits, in accordance with Schedule 4 .

**9.2    Satisfaction Surveys.**

HPES will conduct management and customer satisfaction surveys (each, a " Satisfaction Survey ") in accordance with Schedule 4.

## 10.    SERVICE PROVIDER PERSONNEL

**10.1    Background Checks.**

**IT Service Agreement**

16

**(A)** Before assigning any HPES Personnel to perform the Services, HPES will conduct, in compliance with applicable Laws and at HPES' cost and expense, an educational, prior work experience and criminal background check on each such individual. For each individual HPES Personnel who resides in the United States or performs any Services while in the United States, background checks will include, at a minimum, the background check procedures required by the applicable HPI Policy specified in <u>Schedule 13</u> and (1) verification of such individual's identity, based on original documentation, (2) verification of such individual's educational degrees or diplomas earned, based on original documentation or confirmation from the applicable educational institution, (3) verification of such individual's prior employment history for the previous seven years, based on original documentation or confirmation from the applicable employer, and (4) a criminal background check, including fingerprinting of such individual. For HPES Personnel who reside outside the United States or perform any Services while outside the United States, HPES will conduct, in compliance with all applicable Laws and at HPES' cost and expense, the background check procedures specified in this Section and the applicable Local Agreement, if any. If no such background check procedures are specified for a country, HPES will perform the background check specified for the United States except to the extent prohibited by applicable Law in such country. HPES will obtain the consent of any individual prior to performing the background checks described in this Section. HPES will also conduct, in compliance with applicable Laws and at HPES' cost and expense, a five-panel drug screen. HPES will maintain copies of background checks during the Term and, upon HPI's request, provide HPI with such copies for its review.

**(B)** HPES will not assign any individual to perform the Services (1) whose background check is not consistent with the information provided by such individual, (2) who tests positive for illegal substances, (3) who has been convicted of, pled guilty or nolo contendere to a crime involving breach of trust, dishonesty, injury or attempted injury to any property or person, or (4) who refuses to provide consent with respect to performance of the background checks and drug screens described in this Section, and HPES will promptly notify HPI if HPES at any time learns that any individual who has been assigned to perform the Services does not meet any of these requirements. At HPI's request, HPES will certify in writing to HPI that each individual HPES Personnel has tested negative for illegal substances, and does not have a felony conviction, a conviction of a crime punishable by imprisonment of more than one year, a conviction of a crime that is job-related in nature, or any conviction that would render such individual not bondable as an employee according to customary bond underwriting criteria used by HPES' insurer.

**10.2    Requirements and Conduct.**

**(A)** HPES will assign an adequate number of HPES Personnel to perform the Services. HPES Personnel will possess the experience, skills and qualifications necessary to perform the Services in accordance with this Agreement and any additional experience, skills and qualifications agreed upon by the Parties. HPES acknowledges and agrees that it will be the responsibility of HPES to provide adequate levels of training and education so that the HPES Personnel remain current as to industry and technology best practices and developments and changes to the Services, Systems, Service Delivery Resources or any other resources, methods or processes used by HPES to provide the Services. If requested by HPI, HPES will cause HPES Personnel to attend training sessions provided by HPI.

**(B)** HPES will ensure that all HPES Personnel are legally authorized to work in the country or countries from which they perform the Services, and are free from any legal or contractual restraints prohibiting them from working or exercising their skills, including employment agreements or non-competition agreements with other or former employers. HPES will be solely responsible for

**IT Service Agreement**

17

compliance with immigration and visa Laws and requirements in respect of the HPES Personnel. HPES represents and warrants that all HPES Personnel (1) will hold appropriate and valid visas or other work authorizations for the jurisdiction in which such individuals will be working, each of which will be valid for a period at least equal to the anticipated duration of each such individual's assignment to the HPI account, and (2) will not be provided by HPES with any technology or information in violation of any Export Controls.

(C) Upon HPI's request, HPES will provide HPI with a list of (i) all dedicated HPES Personnel providing the Services, (ii) all HPES Personnel with access to HPI's networks, and (iii) an organization chart reflecting the structure of such HPES Personnel in (i) and (ii). The HPES Personnel designated as such in Schedule 6 will be assigned to the HPI account on a full-time, dedicated basis.

(D) HPES Personnel located at HPI Service Locations may only provide services from such Service Locations that support HPI's business operations and not the business operations of HPES or any other customer of HPES.

(E) HPES will ensure that all HPES Personnel comply with (1) the confidentiality provisions of this Agreement, both during and after the Term, and (2) the provisions of this Article. Prior to assigning an individual to perform the Services, HPES will ensure that such individual has entered into a confidentiality agreement with terms at least as stringent as the confidentiality obligations set forth in this Agreement and an intellectual property assignment agreement sufficient to effectuate HPES' assignment of Developed IP to HPI as required by this Agreement.

(F) While at HPI Service Locations, HPES will cause all HPES Personnel to (1) comply with the requests, standard rules and regulations of the applicable Service Recipients regarding safety and health, personal and professional conduct (including the wearing of an identification badge and adhering to facility regulations and general safety practices or procedures, and including any drug testing policies and business conduct and ethics policies applicable to the Service Recipients' employees) generally applicable to such HPI Service Locations and (2) otherwise conduct themselves in a professional and businesslike manner.

(G) The Parties agree that the HPES Relationship Manager, HPES Contract Manager and any other HPES Personnel designated by the HPI Contract Manager, will be located at either the HPI corporate campus in Palo Alto or as otherwise agreed by the Parties.

**10.3   Key HPES Positions.**

(A) Certain HPES Personnel positions that are critical to the Services (each, a " Key HPES Position ") are set forth in Schedule 6 . HPI may from time to time change the positions designated as Key HPES Positions, provided that, without HPES' consent, the number of Key HPES Positions will not exceed the number then-currently specified in Schedule 6 .

(B) HPES will designate: (1) an individual who will be responsible for managing the overall relationship established by this Agreement and to whom all communications concerning this Agreement will be addressed (the " HPES Relationship Manager "); and (2) an individual who will (a) serve as the single point of accountability for the Services and (b) have day-to-day authority for making operational decisions and otherwise ensuring HPI's reasonable satisfaction with the Services (the " HPES Contract Manager "). These positions will have the additional roles and responsibilities described in Schedule 6 and will be Key HPES Positions. The compensation of the HPES Relationship Manager and

**IT Service Agreement**

18

the HPES Contract Manager will include significant financial incentives based on HPI's satisfaction with the Services.

**(C)** Before assigning any individual to fill a Key HPES Position, whether as an initial assignment or as a replacement, HPES will: (1) notify HPI of the proposed assignment; (2) introduce the individual to appropriate representatives of HPI; (3) provide HPI with a résumé and any other information available to HPES regarding the individual that may be requested by HPI; and (4) obtain HPI's approval for such assignment. If HPI objects to such individual, HPES will, as soon as reasonably possible, propose a replacement.

**(D)** Subject to Section 10.4 , HPES will not replace or reassign an individual filling a Key HPES Position for a minimum of 24 months (or shorter duration specified in Schedule 6 ) from the date such individual is first assigned to a Key HPES Position, unless: (1) HPI consents to such reassignment or replacement, or (2) such individual (a) voluntarily resigns from, or is dismissed by, HPES, (b) fails to perform his or her duties and responsibilities pursuant to this Agreement or (c) dies, is disabled or is placed on long-term medical leave, in which case HPES will (i) give HPI as much notice as reasonably possible of such development and (ii) expeditiously identify and obtain HPI's approval of a suitable replacement. Individuals filling Key HPES Positions may not be reassigned until a suitable replacement has been approved by HPI, and no such transfer will occur at a time or in a manner that would have an adverse impact on delivery of the Services.

**(E)** HPES will not assign any individual serving in a Key HPES Position to the account of any HPI Competitor without HPI's consent (1) while such individual is assigned to the HPI account and (2) for a period of six months following the date that such individual is removed from, or ceases to provide the Services in connection with, the HPI account.

**10.4   Removal and Replacement.**

**(A)** If HPI requests that any HPES Personnel be removed from the HPI account where HPI's request is the result of such individual's (1) tortious or illegal conduct or moral turpitude or (2) repeated violations of this Agreement, then HPES will immediately remove such individual from the HPI account.

**(B)** If HPI requests that any HPES Personnel be removed from the HPI account for reasons other than as provided in Section 10.4(A) , then upon receipt of such request, HPES will have a reasonable period of time (but in any event no more than 10 days) to (1) investigate such matter and take appropriate action, which may include (a) removing the applicable person from the HPI account and providing HPI with prompt notice of such removal, and (b) replacing the applicable person with a similarly qualified individual; or (2) taking other appropriate disciplinary action to prevent a recurrence.

**(C)** HPES will notify HPI as soon as possible after dismissing or reassigning any HPES Personnel. If HPES terminates any HPES Personnel for cause, HPES will notify HPI of this action and will work with HPI to assess any potential impacts on the Service Recipients of the individual's termination or prior performance.

**(D)** HPES will, as soon as reasonably possible, replace any individual HPES Personnel who is removed, terminated, resigns or otherwise ceases to perform the Services with an individual with equal or better qualifications to perform the Services. HPES will use commercially reasonable efforts to provide for an appropriate transition (overlap) period for any individual who is replaced, and will use

**IT Service Agreement**

19

commercially reasonable efforts to minimize any disruption such replacement may cause in the performance of the Services.

**(E)** HPES will not invoice HPI for, and HPI will have no obligation to pay, any amounts with respect to time to train any HPES Personnel, including with respect to training an individual replacing an individual who was removed from the HPI account.

### 10.5   Use of Subcontractors.

**(A)** HPES will not subcontract or delegate performance of the Services or any other obligations under this Agreement, including to an Affiliate of HPES, without the prior consent of HPI, which consent HPI may withhold in its sole discretion. Prior to entering into a subcontract with a subcontractor, HPES will give HPI reasonable prior notice specifying the components of the Services affected, the scope of the proposed subcontract, and the identity and qualifications of the proposed HPES Agent. At HPI's request, HPES will forward to HPI a description of the scope and material terms (other than financial) of the proposed subcontract.

(1) The subcontractors that are approved as of the Effective Date (and the Services that such subcontractors are approved to perform) are set forth in Schedule 12 .

(2) HPI will have the right to direct HPES to replace, and HPES will comply with such direction, an HPES Agent if (a) the HPES Agent's performance is materially deficient or not in compliance with the terms and conditions of this Agreement, (b) good faith doubts exist concerning the HPES Agent's ability to render future performance because of changes in the HPES Agent's ownership, management, financial condition or otherwise, or (c) there have been material misrepresentations by or concerning the HPES Agent.

**(B)** No subcontracting or delegation will release HPES from its responsibility for its obligations under this Agreement, and HPES will be responsible for all acts and omissions of the HPES Agents, including compliance or non-compliance with any term of this Agreement. Any work performed by HPES Agents will be deemed work performed by HPES. HPES will be responsible for all payments to the HPES Agents. HPES will ensure that any entity to which HPES subcontracts or delegates any performance of the Services or any obligations set forth in this Agreement complies with this Agreement.

**(C)** HPES will not disclose HPI Confidential Information to an HPES Agent unless and until such HPES Agent has agreed in writing to protect the confidentiality of such Confidential Information in a manner no less restrictive than that required of HPES under this Agreement.

### 10.6   Turnover.

HPI and HPES agree that it is in their best interests to keep the turnover of HPES Personnel to a reasonably low level. Accordingly, if HPI reasonably believes that the turnover of HPES Personnel is excessive and so notifies HPES, HPES will (A) provide data concerning its turnover, (B) meet with HPI to discuss the reasons for, and impact of, the turnover, (C) promptly provide HPI with a remediation plan in accordance with its existing retention policies for HPI's review and approval, and (D) promptly implement such plan following such review and approval, at its cost and expense. Notwithstanding transfer, attrition or other turnover of HPES Personnel, HPES will remain obligated to perform the Services without degradation and in accordance with the Service Levels and other terms of this

**IT Service Agreement**

20

Agreement.

**10.7    Additional HPES Responsibilities.**

HPES will at all times remain the employer of all of its employees (and remain liable for all HPES Personnel) performing the Services, and HPES will perform all of the responsibilities of an employer under applicable Laws. HPES will be responsible for: (A) selecting and hiring its employees legally, including compliance with all applicable Laws in connection therewith; (B) assuming full responsibility for the actions of HPES Personnel while performing Services; (C) the supervision, direction and control of HPES Personnel performing Services; (D) paying its employees' wages and other benefits that HPES offers to such employees in accordance with applicable Laws; (E) paying or withholding all required payroll taxes and mandated insurance premiums; (F) providing worker's compensation coverage for employees as required by Law; and (G) fulfilling its obligations with respect to unemployment compensation.

**10.8    Non-Solicitation of Employees.**

Except as set forth below, during the Term and for 12 months after the expiration or termination of this Agreement, neither HPI nor HPES will, and will cause each of their Affiliates to not, directly or indirectly, hire, solicit or seek to procure (other than solicitation through general advertising and hiring as a result of such solicitation), without the prior consent of the other Party, the employment of any employee of the other Party or its Affiliates who is or was actively involved in the performance, consumption or evaluation of the Services. The provisions of this Section will not restrict HPI from employing (or soliciting the employment of) any HPES employees in accordance with Section 31.1(B)(1) .

**11.    THIRD PARTY CONTRACTS**

**11.1    General.**

HPES will structure its arrangements with third party providers of services, Equipment, Software and other resources that are dedicated to the performance of the Services so that the relevant contracts may be assigned to HPI or the Successor Supplier, without payment of any transfer fee, upon the termination or expiration of this Agreement and so that the ongoing payments under those arrangements payable by HPI or the Successor Supplier after such assignment are consistent with, and no higher than, the fees payable by HPES prior to such assignment. If HPES is not able to accomplish the foregoing after using commercially reasonable efforts, HPES will notify HPI and discuss with HPI the consequences (including any impact on the Services and Service Levels) of HPES not being able to use the applicable resources from the provider that will not allow the assignment sought by HPI. If, following that discussion, HPI directs HPES to not use such resources, and HPES is not able to find a suitable workaround, HPES will be relieved of its obligations hereunder to the extent its ability to perform is adversely impacted by the inability to use such third party resources.

**11.2    Assigned Contracts.**

Effective as of the Effective Date and subject to HPI having obtained any applicable HPI Required Consents, HPI will assign to HPES, and HPES will assume from HPI, the Assigned Contracts. HPES will pay directly, or reimburse HPI if HPI has paid, the charges and other amounts under the Assigned Contracts, where such charges are attributable to the periods on or after the Effective Date. HPES will comply with the duties imposed on HPI under such contracts.

**IT Service Agreement**

21

**11.3  Managed Contracts.**

**(A)    General.**

Effective as of the Effective Date and subject to HPI having obtained any applicable HPI Required Consents, HPES will manage, administer and maintain the Managed Contracts as described in this Section. HPES will provide HPI with no less than 90 days' prior notice of any renewal, termination or cancellation dates and fees with respect to a Managed Contract. HPES will not renew, modify, terminate or cancel, or request or grant any consents or waivers under any Managed Contract without HPI's prior consent. Any fees or charges or other liability or obligation imposed upon HPI in connection with any such renewal, modification, termination or cancellation of, or consent or waiver under, the Managed Contracts that is obtained or given without HPI's consent will be paid or discharged, as applicable, by HPES.

**(B)    Managed Contract Invoices.**

HPES will (1) receive all Managed Contract invoices, (2) review and correct any errors in any such Managed Contract invoices in a timely manner, and (3) submit such Managed Contract invoices to HPI within a reasonable period of time prior to the due date or the date on which HPI may pay such Managed Contract invoice with a discount. HPI will pay the Managed Contract invoices received and approved by HPES. HPI will only be responsible for payment of Managed Contract invoices and will not be responsible to HPES for any management, administration or maintenance fees of HPES in connection with the Managed Contract invoices. HPI will be responsible for any late fees in respect of the Managed Contract invoices, provided that HPES submitted the applicable Managed Contract invoices for payment within a reasonable period of time prior to the date any such Managed Contract invoice is due, but in no event later that 14 days prior to the date upon which payment is due. If HPES fails to submit a Managed Contract invoice to HPI for payment in accordance with the preceding sentence, HPES will be responsible for any discount not received or any late fees in respect of such Managed Contract invoice.

**(C)    Performance Under Managed Contracts.**

HPES will promptly notify HPI of any breach of, misuse, or fraud in connection with any Managed Contracts of which HPES becomes aware, and will cooperate with HPI to prevent or stay any such breach, misuse or fraud.

**12.    EQUIPMENT, SYSTEMS AND NETWORKS**

**12.1  Equipment.**

**(A)    HPI Provided Equipment.**

The Equipment that will be provided by HPI for HPES' use in the provision of the Services (such Equipment, " HPI Provided Equipment ") is set forth in Schedule 10 . HPI will provide HPES with access to such HPI Provided Equipment on an "as is, where is" basis for use by HPES in providing the Services. HPES will be responsible, at HPI's direction and in accordance with Schedule 5 , for procuring any upgrades or replacements with respect to such HPI Provided Equipment. HPES will manage and maintain HPI Provided Equipment in the manner such HPI Provided Equipment was maintained as of the Effective Date, unless otherwise agreed by the Parties. The HPI Provided Equipment as of the Effective Date is identified in Schedule 10 .

**IT Service Agreement**

22

**(B)    HPES Equipment.**

HPES will install, operate, and manage all of the HPES Equipment, in accordance with the standards necessary to provide the Services pursuant to and in accordance with the Agreement. HPES will maintain the HPES Equipment that is Transferred Assets in the manner maintained as of the Effective Date and pursuant to Schedule 5 , unless otherwise agreed by the Parties. All right, title and interest in and to any such HPES Equipment will be and remain in HPES, and HPI will not have any title or ownership interest in the HPES Equipment.

**(C)    New Equipment.**

Pursuant to Schedule 5 and at HPI's direction, HPES will acquire new Equipment in addition to, or in replacement of, Transferred Assets or HPI Provided Equipment and, if such new Equipment is replacing HPI Provided Equipment, in accordance with the provisions of Section 12.1(D) . Such new Equipment will be purchased or leased in the name of HPES and charged pursuant to Schedule 5 (including any maintenance charges arising therefrom), except for purchases or leases of upgrades or replacements for HPI Provided Equipment, which will be purchased or leased in HPI's name.

**(D)    Procurement Responsibilities.**

With respect to HPI Provided Equipment or new Equipment contemplated by Section 12.1(C) procured by HPES pursuant to the provisions of this Article, HPES' responsibilities will include: (1) evaluating the Equipment and the qualifications of the Equipment vendor; (2) negotiating competitive pricing and terms; (3) ordering, receiving, configuring, installing, testing, maintaining and distributing all such Equipment; (4) performing tracking and asset management for all such Equipment; and (5) tracking license counts and ensuring that the Service Recipients remain compliant with applicable license restrictions.

**(E)    Equipment Disposal.**

HPES will be responsible for the disposal of HPES Equipment and HPI Provided Equipment no longer required by HPES for the provision of the Services. HPES will dispose of all such Equipment in a manner consistent with applicable Law and HPI Policies. HPES will be responsible for all costs, charges or fees associated with the disposal of HPES Equipment and HPI Provided Equipment.

**12.2   HPI Systems.**

If HPI grants HPES the right to use or access any HPI Systems, such use or access by HPES will be subject to the rights granted by HPI in Section 13.1 . HPES' use and access will be subject to applicable HPI Policies and HPI will have the right to deny, revoke, restrict or otherwise block access to any HPI Systems at any time.

**12.3   Networks.**

**(A)    HPES Data Connections.**

HPES will provide, at no additional cost or expense to HPI, data connections from a HPES Service Location to another HPES Service Locations (the " HPES Data Connections "). HPI will retain sole financial and administrative responsibility to provide, at no additional cost or expense to HPES, all other data

**IT Service Agreement**

23

connections, including between HPI-designated points of access to HPI's data networks, HPES will be responsible for procuring any upgrades and replacements with respect to the HPES Data Connections. HPES will be responsible for managing and maintaining the HPES Data Connections, and for managing and maintaining the firewalls at its end of the HPES Data Connections and all HPES networks and Equipment beyond such firewall Equipment.

**(B)      HPI Networks.**

If HPI grants HPES the right to use or access any HPI networks, such use or access by HPES will be solely for the purpose of providing the Services. HPES' use and access will be subject to applicable HPI Policies. HPI will have the right to deny, revoke, restrict or otherwise block access to any HPI networks at any time.

## 13.      INTELLECTUAL PROPERTY RIGHTS AND SOFTWARE

**13.1   License to HPES.**

To the extent HPES requires use of HPI IP in connection with providing the Services, HPI hereby grants to HPES, during the Term, a global, fully paid-up, royalty-free, non-exclusive, non-transferable license for HPES and HPES Agents to Use the HPI IP, but only to the extent permitted by the terms of any applicable third party agreements (which HPI will communicate to HPES). The HPI Software that HPI will provide to HPES as of the Effective Date is identified in Schedule 10 .

**13.2   License to HPI.**

**(A)      License of HPES Non-Software IP.**

(1) With respect to HPES IP that is not HPES Software, HPES hereby grants, and will procure from any applicable third party the right to grant, a global, fully paid-up, royalty-free, non-exclusive, perpetual, irrevocable license to the Service Recipients to Use such HPES IP as necessary for HPI to receive and use the Services and services similar to the Services. Such license extends to third parties providing services to the Service Recipients to the extent necessary for such services to be provided by such third parties; provided, however, that such third parties are bound by confidentiality obligations similar to those of HPI under this Agreement.

(2) If the Services involve the delivery of a lecture, training course, speech, or other performance, HPES hereby grants to HPI a license to record (by videotape, audio tape, any electric media or any combination thereof) the performance, reproduce such recordings, and transmit, display and perform any such recording for any HPI audience.

**(B)      License of HPES Software.**

(1) HPES hereby grants, and will procure from any applicable third party the right to grant, a global, fully paid-up, royalty-free, non-exclusive, perpetual, irrevocable license to the Service Recipients to Use the HPES Software (other than HPES Software designated as "Term Limited" in Schedule 10 ). HPES hereby grants, and will procure from any applicable third party the right to grant, a global, fully paid-up, royalty-free, non-exclusive, irrevocable license to use the HPES Software designated as "Term Limited" in Schedule 10 only during the Term. The license rights granted in this Section extend to third parties providing services to HPI to the extent necessary for such services to be

**IT Service Agreement**

24

provided by such third parties; provided, however, that such third parties are bound by confidentiality obligations similar to those of HPI under this Agreement.

(2) The HPES Software that HPES will use to provide the Services is set forth in <u>Schedule 10</u>. Prior to using any HPES Software that is not identified in <u>Schedule 10</u> to provide the Services, HPES will: (a) submit such HPES Software to HPI for HPI's review and approval; and (b) with respect to HPES Software that is licensed or leased from a third party, structure the applicable software license agreement in accordance with <u>Section 11.1</u>. If HPES is unable to obtain such right, then prior to using such Software, HPES will notify HPI of the approximate cost of obtaining such right or obtaining a separate license to such HPES Software. Upon HPI's request, HPES will provide HPI with a list of all HPES Software being used to provide the Services as of the date of such request.

**13.3  Developed IP.**

HPI will own and have all right, title and interest in and to the Developed IP. To the extent any Developed IP is not deemed a "work for hire" by operation of Law, HPES hereby irrevocably assigns, transfers and conveys all of its, and will cause HPES Personnel to assign, transfer and convey to HPI all of their, right, title and interest in and to the Developed IP, including all Intellectual Property Rights thereto. HPES will, and will cause all HPES Agents and HPES Personnel (whether former or current) to: (A) cooperate with and assist HPI, both during and after the Term, in perfecting, maintaining, and enforcing HPI's rights in all right, title, and interest in any Developed IP, including all Intellectual Property Rights thereto, and (B) execute and deliver to HPI any documents or take any other actions as may reasonably be necessary, or as HPI may reasonably request, to perfect, maintain, protect, or enforce HPI's rights in such Developed IP.

**13.4  License to Embedded HPES IP.**

HPES will not include or incorporate any HPES IP in any Deliverable or Developed IP unless: (A) HPES identifies such HPES IP to HPI in advance and in writing; and (B) HPI agrees in advance to such inclusion or incorporation. Notwithstanding the foregoing, HPES hereby grants HPI, and will procure from any applicable third party the right to grant, a global, fully paid-up, royalty-free, non-exclusive, perpetual, irrevocable license for HPI to Use any HPES IP embedded in, practiced by, or required for the use of, any Deliverable or Developed IP, solely in connection with such Deliverable or Developed IP, provided that no portion of such HPES IP is unbundled or separated from the applicable Deliverable or Developed IP or used as a standalone product or development tool.

**13.5  Further Assurances.**

HPES hereby assigns, and will cause all HPES Personnel to assign, to HPI any and all claims, past, present, or future, of any nature whatsoever, HPES or HPES Personnel may have for infringement, misappropriation, or violation of any Intellectual Property Right assigned to HPI pursuant to this Agreement.

**13.6  Residual Knowledge.**

Nothing contained in this Agreement will restrict a Party from the use of any general ideas, concepts, know-how, methodologies, processes, technologies, algorithms or techniques retained in the unaided mental impressions of such Party's personnel relating to the Services that either Party, individually or jointly, develops or discloses under this Agreement, provided that in doing so such Party

**IT Service Agreement**

25

does not breach its obligations under Article 20 or infringe the Intellectual Property Rights of the other Party or third parties that have licensed or provided materials to the other Party.

## 14.    SERVICE LOCATIONS

### 14.1    Service Locations.

(A) HPES will provide the Services to HPI solely from (1) the HPI Facilities and (2) HPES Service Locations. The list of Service Locations to be used by HPES in the delivery of the Services, and the Services that may be provided from each such Service Location, are set forth in Schedule 11 . HPES Service Locations will meet and comply with the requirements attached to Schedule 11 .

(B) Commencing on the Effective Date and continuing for the duration specified in Schedule 11 , HPI will provide to HPES, subject to any requirements or limitations set forth in Schedule 11 , the use of space designated by HPI in the HPI Service Locations listed in Schedule 11 for HPES' use in performing the Services, together with reasonable office furnishings, janitorial services, land-line telephones (excluding inter-LATA and long-distance charges), parking, access to servers, printers (excluding paper and toner cartridges), and utilities, in each case at the same levels offered to HPI personnel working at the applicable HPI Service Location (collectively, the " HPI Facilities "). The HPI Facilities will be made available to HPES on an "as is, where is" basis, with no warranties whatsoever. HPES will not provide or market services to a third party or to itself from an HPI Service Location without HPI's consent, to be given in HPI's sole discretion. HPES will be responsible for providing all other facilities and support it needs to provide the Services. HPI may change the location of an HPI Facility upon notice to HPES. In the event HPI relocates an HPI Facility, HPES will provide the Services from or to such new HPI Facility, as applicable, at no additional cost to HPI, provided that, with respect to the relocation of an HPI Facility that is a primary HPES Personnel work location, (1) the new HPI Facility will be located within 100 miles from the original HPI Facility and HPI will be responsible for HPES' reasonable de-installation and set-up costs related to such relocation, and (2) to the extent the new HPI Facility is not located within 100 miles from the original HPI Facility, such change will be subject to the Change Control Procedure.

(C) If (1) outsourcing providers (similar to HPES in size and market share) withdraw from providing services similar to the Services from an offshore location in the same geography of an applicable HPES Service Location, (2) HPI, in its reasonable business judgment, determines, based on one or more of the following factors: (a) unsatisfactory disaster recovery aspects of the applicable HPES Service Location, (b) heightened data privacy and security risks, (c) inadequate protection of Intellectual Property Rights, (d) infrastructure unreliability, or (e) political or regulatory instability, that the risks presented by HPES' provision of the Services, or any portion of the Services, from an offshore HPES Service Location will materially adversely affect the Services (including with respect to Service Levels or potential costs to HPI), or (3) a country in which an HPES Service Location is located is placed on the Department of State's Travel Warning list, HPI will, in each case, have the right to direct HPES to relocate HPES' provision of the applicable Services to an HPES Service Location located in a geography that is reasonably acceptable to HPI at no additional cost to HPI.

(D) If HPES requests HPI's approval to provide Services from a location other than a location described in Section 14.1(A) , HPES will provide to HPI a written relocation proposal that sets forth a description of the proposed new location, the reasons for the proposed relocation, the risks, benefits and anticipated effects of the contemplated relocation, including anticipated operational,

**IT Service Agreement**

26

technical, security, regulatory and other effects, as well as any other information requested by HPI. HPES will specify in the relocation proposal the amount of any HPES cost reductions resulting from the relocation that HPES will pass through to HPI in the form of reduced Charges. HPES will permit HPI to inspect the proposed Service Location. HPI may, in its sole discretion, approve or reject any proposal submitted by HPES pursuant to this Section. HPES will be responsible for all costs, including additional tax costs, and other expenses incurred by HPES, and any new or additional costs, including additional tax costs, and other expenses incurred by the Service Recipients that are related to any HPES-initiated relocation to, or use of, any location other than the locations described in Section 14.1(A) .

**(E)** With respect to HPES Service Locations that are data centers, in the event that HPES transfers ownership of a data center, HPES will either (i) ensure, in its arrangements with the successor entity, that HPES may continue to provide, and HPI may continue to receive, the applicable Services from such data center for the duration of the Term, or (ii) transfer such Services to another HPI approved data center without any adverse impact on the terms and conditions set forth in this Agreement. HPI may negotiate directly with the successor entity to acquire resources in relation to the applicable data center that are not provided by HPES under this agreement (e.g., connectivity).

**(F)** With respect to the HPES Service Location in Austin, Texas, that is a data center, HPES will accommodate HPI's additional capacity and HPI will have a right of first refusal with respect to any additional capacity located in such Austin, Texas, data center.

**14.2    Safety and Security Procedures.**

HPES will maintain and enforce at the HPES Service Locations safety and security procedures that are at least equal to the most stringent of the following: (A) applicable HPI Policies relating to safety and security and the safety and security requirements specified in Schedule 13 ; and (B) any higher standards otherwise agreed upon by the Parties.

**15.    HPI RESPONSIBILITIES**

**15.1    Responsibilities.**

In addition to HPI's responsibilities as expressly set forth elsewhere in this Agreement, HPI will be responsible for the following:

**(A)** HPI will designate (1) an individual who will be responsible for managing the overall relationship established by this Agreement and to whom all communications regarding this Agreement will be addressed (the " HPI Relationship Manager ") and (2) an individual to whom HPES' operational communications concerning this Agreement may be addressed (the " HPI Contract Manager "). The HPI Relationship Manager and HPI Contract Manager will have the additional roles and responsibilities described in Schedule 6 .

**(B)** HPI will cooperate with HPES, including by making available in a timely manner management decisions, information, approvals and Acceptances, as reasonably requested by HPES so that HPES may fulfill its obligations and responsibilities under this Agreement. The HPI Contract Manager or his or her designee will be the principal point of contact with respect to HPI for obtaining decisions, information, approvals and Acceptances under this Agreement.

**15.2    Savings Clause.**

**IT Service Agreement**

27

HPES' nonperformance of its obligations under this Agreement will be excused if, and to the extent, HPES' performance of an obligation pursuant to this Agreement is directly prevented by the failure of HPI or another Service Recipient to perform any of its obligations or responsibilities pursuant to or as contemplated by this Agreement or acts or omissions of a Third Party Provider (provided that, if HPES is responsible for managing the applicable Third Party Provider pursuant to this Agreement, HPES has fulfilled such obligations) (a " Relief Event "); provided, however, that HPES: (A) mitigates the impact of such Relief Event; (B) continues to use commercially reasonable efforts (including emergency fixes and workarounds) to perform such obligation; and (C) promptly notifies HPI of such failure, describing in reasonable detail the nature of such failure. To the extent HPES is required to perform corrective action or additional services as a result of nonperformance by HPI, a Service Recipient or a Third Party Provider (subject to the condition set forth above), HPI will reimburse HPES for the Out-of-Pocket Expenses and incremental Labor Costs incurred by HPES in the performance of such actions or services (to the extent that the HPES cannot perform such actions or services with HPES Personnel that are then-assigned to the HPI account), in accordance with Section 18.3 .

## 16.   MANAGEMENT AND CONTROL

### 16.1   Architecture, Standards and Strategic Direction.

HPES will comply with the HPI Architecture and any modifications to the HPI Architecture made available to HPES. To the extent that such modifications materially increase or decrease HPES' costs to provide the Services, the Parties will negotiate an equitable adjustment to the Charges with respect to such increased or decreased cost in accordance with the Change Control Procedure. If HPI provides relief to HPES from performing the Services in compliance with a requirement of the HPI Architecture, such relief will only be valid if HPI provides a written variance approved by the person designated by HPI. Otherwise, if HPES discovers or is notified of a failure to comply with the HPI Architecture, HPES will immediately: (A) notify HPI; and (B) if HPES was responsible for the failure, investigate and cure such failure no later than 10 days after HPES first discovers or is notified of such failure.

### 16.2   Governance Organizations.

#### (A)   Executive Management Committee.

Within 30 days following the Effective Date, the HPI Relationship Manager and the HPES Relationship Manager will appoint an equal number of representatives to serve on a steering committee (the " Executive Management Committee "). Representatives on the Executive Management Committee appointed by HPES will be Key HPES Positions, subject to the requirements set forth in Section 10.3 . HPI will designate one of its representatives on the Executive Management Committee to act as the chairperson. The Executive Management Committee will be authorized and responsible for (1) advising with respect to HPI's strategic and tactical decisions regarding the establishment, budgeting and implementation of HPI's priorities and plans for the Services and (2) monitoring and resolving disagreements regarding the provision of the Services and the Service Levels. HPES may not change any of its representatives on the Executive Management Committee without HPI's prior approval. The Executive Management Committee may include representatives from Third Party Providers.

#### (B)   Other Governance Bodies.

In addition to the Executive Management Committee, HPI and HPES will establish the governance organizations (e.g., committees and positions) as set forth in Schedule 6 in accordance with

**IT Service Agreement**

28

the time frames set forth in <u>Schedule 6</u> .

        **(C)**        **Governance Procedures and Processes.**

In addition to the processes and procedures specifically identified in the body of this Agreement, HPI and HPES will establish the governance processes and procedures described in <u>Schedule 6</u> in accordance with the time frames set forth in <u>Schedule 6</u> .

**16.3**   **Governance Reports and Meetings.**

        **(A)**        **Governance Reports.**

HPES will provide all governance-related reports described in <u>Schedule 8</u> . Such reports will be (1) no less comprehensive than the reporting conducted by or provided to HPI prior to the Effective Date, (2) issued weekly or at such other frequency as is specified in <u>Schedule 8</u> , and (3) delivered to such individuals as designated by HPI.

        **(B)**        **Governance Meetings.**

HPES will participate in the meetings described in <u>Schedule 6</u> and any other meetings requested by HPI in connection with this Agreement. HPES will prepare and circulate an agenda sufficiently in advance of each such meeting to give participants an opportunity to prepare for the meeting. HPES will incorporate into such agenda items that HPI desires to discuss. At HPI's request, HPES will prepare and circulate minutes promptly after each meeting.

**16.4**   **Policies and Procedures Manuals.**

HPES will be responsible for developing, maintaining and updating a Service Summary Guide pursuant to and in accordance with <u>Appendix 3-A.6</u> that sets forth the policies and procedures with respect to each Tower (the " <u>Policies and Procedures Manual</u> "). The Policies and Procedures Manual will be suitable for use by the Service Recipients to understand the Services. HPES will perform the Services in accordance with the Policies and Procedures Manual. In the event of a conflict between the provisions of this Agreement and a Policies and Procedures Manual, the provisions of this Agreement will control.

**16.5**   **Knowledge Sharing.**

HPES will: (A) explain and review the procedures set forth in the Policies and Procedures Manuals with HPI at least once every quarter; (B) upon HPI's request, assist HPI subject matter experts (as designated by HPI) in understanding the performance of the Services, including attending meetings with HPI or, subject to the confidentiality obligations set forth in <u>Article 20</u> , its designee to the extent necessary for such designee to provide products and services to HPI; and (C) provide such training and documentation as HPI may request from time to time to enable HPI to understand and operate the Systems used to provide the Services and to understand and provide the Services after expiration or termination of this Agreement.

**16.6**   **Change Control.**

HPES will comply with the procedures set forth in this Section with respect to any Changes.

**IT Service Agreement**

29

**(A)    Operational Change Control.**

(1) Prior to using any new Software or new Equipment to provide the Services, HPES will have verified that the item (a) is consistent with the HPI Architecture, standards and strategic direction specified by HPI, (b) has been properly installed, (c) is operating in accordance with its specifications, and (d) is performing its intended functions in a reliable manner.

(2) HPES will not make any Changes without first obtaining HPI's approval in accordance with Section 16.6(B) . All operational Changes will be implemented in accordance with HPI's change management procedure listed in Schedule 13 .

(3) HPES will assist the Service Recipients in moving programs from development and test environments to production environments in a controlled and documented manner, so that no Changes are introduced into the programs by HPES during such activity.

**(B)    Change Control Procedure.**

(1) From time to time during the Term, HPI or HPES may request to implement a Change to the Services or HPI may request that HPES perform a New Service (each, a " Change Request "). Each Change Request will be substantially in the form attached to Schedule 6 .

(2) Within five days following HPES' receipt of a Change Request from HPI, HPES will provide HPI with a written response to the Change Request substantially in the form attached to Schedule 6 (each, a " Change Proposal "), containing the following information, to the extent applicable:

(a) a description of any Changes to the Services and Deliverables to be provided by HPES in connection with the Change Request and any Service Levels, or changes in any Service Levels, that will apply in connection with the Change Request;

(b) a schedule for commencing and completing the Change Request;

(c) when appropriate, a description of any new Software or Equipment to be provided by HPES in connection with the Change Request;

(d) a description of the HPES Personnel necessary to complete and implement the Change Request, including the location of such personnel (i.e., onsite, offsite, onshore, offshore);

(e) when appropriate, a list of any existing Software or Equipment to be used in connection with the Change Request;

(f) when appropriate, Acceptance Criteria and Acceptance Testing procedures for any Software or any products, packages or services to be delivered or provided to the Service Recipients in connection with the Change Request;

(g) if the Change Request would require HPES to expend or commit material additional resources or efforts, or permit HPES to expend materially fewer resources or efforts, a quotation for any increase or decrease in the Charges, as applicable, to implement or perform the

**IT Service Agreement**

30

Change Request that will take into account resources and expenses of HPES for then-existing Services that would no longer be required following implementation of the applicable Changes; and

(h) the response period within which HPI must provide notice of its acceptance or rejection of the Change Proposal, which will be no less than 10 days from the date of delivery of the Change Proposal to HPI.

(3) With respect to Change Requests submitted by HPES, if requested by HPI following HPI's review of the Change Request, HPES will, within 10 days following HPI's request, provide a Change Proposal containing the information described in Section 16.6(B)(2) .

**(C)    Effectiveness of a Change.**

(1) If HPI does not accept or reject a Change Proposal within the response period, HPES will provide notice to HPI of the expiration of the response period and, if HPI does not accept or reject the Change Proposal within an additional five days from receipt of such notice, then HPI will be deemed to have rejected the Change Proposal. If HPI rejects a Change Proposal, the Change Request will be closed and the Change Proposal will not be implemented. If a Change Proposal is accepted by HPI, the Parties will execute such Change Proposal (each such executed Change Proposal, a " Change Order "). HPES will not commence performing any services, functions or responsibilities under a Change Proposal until the HPES Contract Manager has received a fully executed Change Order. Each Change Order will incorporate therein and be subject to all of the terms and conditions of this Agreement. Each Change Order will be consecutively numbered to facilitate identification. In the event of any conflict between the terms and conditions of this Agreement and any Change Order, the terms and conditions of this Agreement will govern unless otherwise expressly agreed in the applicable Change Order by specific reference to the provision of this Agreement that is to be superseded.

(2) In the event that a Change Order covers multiple HPES clients, HPES will perform the Change Order for HPI at a cost which takes into account HPI's proportional share of the costs to perform such Change Order.

(3) Upon execution of a Change Proposal, HPES will implement and perform the Change Order in accordance with its terms, the Charges will be adjusted as agreed upon in the Change Order, the Services will be considered changed as set forth therein, and any New Services agreed upon therein will thereafter be deemed "Services" and will be subject to the provisions of this Agreement. HPES will be responsible for coordinating all Changes with HPI (and any third parties designated by HPI) and cooperating with HPI (and any third parties designated by HPI) to ensure that all Changes to the Services and HPI's technical environment are made in a consistent and controlled manner so as to minimize any disruption to HPI's business operations.

**(D)    Change Request Log.**

(1) HPES will be responsible for tracking and reporting all Changes implemented by HPES in a Change Request log (each, a " Change Request Log "). Each entry made in the Change Request Log will consist of the following fields: (a) Change Request number, (b) name of the originator of the Change Request, (c) a brief description of the Change, (d) the current status of the Change, and (e) the date that the Change Request was entered in the Change Request Log.

(2) The status of the Change Request or Change Proposal (as applicable) at

**IT Service Agreement**

31

any stage in the Change Control Procedure will be one of the following, or substantially similar: (a) raised (i.e., that the Change Request has been entered in the Change Request Log, but no Change Proposal has been issued), (b) pending (i.e., that the Change Request has been raised and the Change Proposal has been issued), (c) approved (i.e., awaiting implementation), (d) closed (i.e., all implementation tasks have been completed), or (e) rejected (i.e., closed and not implemented).

**(E)   Failure to Agree.**

In the event the Parties fail to agree upon a proposed Change, and no Change Order is executed with respect to such Change, then a Party may submit the matter to the dispute resolution process set forth in Article 28 .

**(F)   Third Party Services.**

HPI will have the right to contract with a third party to perform any New Service. Upon HPI's request, HPES will assist the Service Recipients in identifying qualified third party suppliers to provide New Services. In the event HPI contracts with a Third Party Provider to perform any New Service, HPES will cooperate with any such third party in accordance with Article 6 .

**16.7   Quality Assurance and Improvement Programs.**

HPES will develop and include in the Policies and Procedures Manuals quality assurance processes and procedures for the delivery of the Services. HPES' processes and procedures will comply with HPI Policies relating to quality assurance. HPES will produce and maintain complete documentation for all processes and Services performed, from initiation through completion of all such activities, and have such documentation readily available for review by HPI, its designated representatives, accreditation or regulatory authorities, or Governmental Authorities. HPES will conduct an annual quality self-audit and, in accordance with Section 17.3(B) , provide HPI with the results in writing. In the event that such self-audit reveals deficiencies in HPES' quality assurances processes and procedures that are applicable to the Services, HPES will remediate such deficiency in accordance with Section 17.5 . HPES will permit HPI to perform, at a minimum, annual quality management audits at HPES Service Locations, in accordance with Section 17.2 . HPES will remediate any deficiencies uncovered during such an audit in accordance with Section 17.5 .

**16.8   HPI Policies and Procedures.**

Prior to the Effective Date, HPI made available to HPES in writing all HPI policies with which HPES is obligated to comply as of the Effective Date, including those HPI Policies set forth in Schedule 13 , and subsequent additions and changes to such policies during the Term will be implemented in accordance with the Change Control Procedures (those policies listed in Schedule 13 , together with additions and changes implemented during the Term, collectively, the " HPI Policies "). HPES will comply with all HPI Policies in its performance of the Services. HPES' compliance with additional HPI Policies or changes to existing HPI Policies will have no effect on the Charges, except to the extent that such additions and changes materially increase or decrease HPES' costs to provide the Services, in which case the Parties will negotiate an equitable adjustment to the Charges (in accordance with the applicable Charges Methodology) with respect to such increased or decreased costs in accordance with the Change Control Procedure. If HPI provides relief to HPES from performing the Services in compliance with a requirement of the HPI Policies, such relief will only be valid if HPI provides a written variance approved by the HPI Contract Manager. Otherwise, if HPES discovers or is notified of a failure to comply with an

**IT Service Agreement**

32

HPI Policy, HPES will (A) promptly notify HPI and (B) if HPES was responsible for the failure, investigate and cure such failure no later than 10 days after HPES first discovers or is notified of such failure.

## 17.  INSPECTIONS, AUDITS, RECORDS RETENTION AND LITIGATION SUPPORT

### 17.1  Inspections and Monitoring.

HPI will have the right, upon reasonable notice, to (A) inspect all Service Locations and to observe any HPES Personnel as he or she performs the Services and (B) review and monitor all Systems, HPI Data, training materials, job aids and other materials dedicated in providing the Services (whether located at an HPES Service Location or an HPI Service Location). With respect to any interactions between HPES and a Service Recipient, HPI will have the right to monitor such interactions, electronically, remotely or otherwise. In addition, HPI will have the right to intervene with respect to any interaction between HPES and a Service Recipient.

### 17.2  Audit Rights.

**(A)** HPES will maintain a complete audit trail of all financial transactions and non-financial activities resulting from this Agreement in accordance with Section 17.7 . Subject to Section 17.2(D) , HPES will, during the Term and for the period HPES is required to maintain Records under this Agreement, provide to HPI Auditors access during normal business hours (and in the case of a Governmental Authority, at any time required by such Governmental Authority) to any Service Location, to HPES Personnel, and to any Records (within the time frame set forth in Section 17.7 ), for the purpose of performing audits and inspections of HPES to:

(1) verify the accuracy of Charges and invoices;

(2) verify the integrity of HPI Data and examine the Systems that process, store, secure, support and transmit HPI Data; and

(3) examine HPES' performance of the Services and conformance to the terms of this Agreement, including, to the extent applicable to the Services and to the Charges therefor, performing audits: (a) of practices and procedures; (b) of Systems, Equipment and Software; (c) of supporting information and calculations regarding compliance with Service Levels; (d) of general controls and security practices and procedures; (e) of Disaster recovery and backup procedures; (f) of the efficiency and costs of HPES in performing the Services (but only to the extent affecting Charges for, or timing of, the Services); and (g) as necessary to enable HPI to meet, or to confirm that HPES is meeting, requirements of applicable Law.

**(B)** HPES will provide to HPI Auditors (1) such assistance as they reasonably require, and (2) on HPES' premises (or, if the audit is being performed of an HPES Agent, such HPES Agent's premises, as necessary), space, office furnishings (including lockable cabinets), telephone and facsimile services, utilities and office-related Equipment and duplicating services as such HPI Auditors may reasonably require to perform the audits described in this Article. HPI Auditors and other representatives will comply with HPES' reasonable security requirements.

**(C)** HPES will conduct audits of or pertaining to the Services in such manner and at such times as is consistent with the audit practices of well-managed operations performing services similar to the Services.

**IT Service Agreement**

**(D)** HPI Auditors will not conduct more than one audit during each 12-month period, provided that this limitation will not apply to (1) Information Security Assessments conducted in accordance with <u>Schedule 7</u>, (2) audits conducted in response to Auditable Events, (3) the reporting requirements and assistance described in <u>Section 17.6</u> or (4) audits conducted in accordance with <u>Section 16.7</u>.

**17.3   Audit Follow-up.**

**(A)** Following any inspection or audit conducted by an HPI Auditor, HPI will conduct, or request the HPI Auditor to conduct, an exit conference with HPES to obtain factual concurrence with issues identified in the review. HPES will participate in such exit conferences as required by HPI.

**(B)** HPES will promptly provide an appropriate summary of the results and findings of any review or audit conducted by HPES (including by internal audit staff, external auditors, inspectors, Governmental Authority or other representatives), relating to HPES' operating practices and procedures that reveals a condition or event that could reasonably be expected to have an adverse impact on the Services or the Service Recipients.

**(C)** HPES and HPI will meet to review each audit report produced pursuant to an audit conducted in accordance with <u>Section 17.2</u> or provided to HPI pursuant to <u>Section 17.3(B)</u> promptly after the issuance thereof and agree upon the appropriate manner, if any, in which to respond to the changes suggested by the audit report. Any deficiencies identified by any such audit report will be remediated in accordance with <u>Section 17.5</u>.

**(D)** HPI and HPES will develop operating procedures for the sharing of audit and regulatory findings and reports related to HPES' operating practices and procedures produced by auditors or regulators of either Party.

**17.4   Controls Audit Reports.**

**(A)** Upon the Effective Date and upon each anniversary thereof during the Term, HPES will obtain a Controls Audit Report for each Service Location that is a data center. If necessary, the first such Controls Audit Report will include a bridge letter with respect to the period from the issue date to the Effective Date. HPES will provide HPI with a copy of each such Controls Audit Report within 15 days of HPES' receipt thereof from the applicable Controls Auditor. HPES will bear all costs and expenses associated with obtaining and delivering each Controls Audit Report.

**(B)** As requested by HPI, HPES will either (1) certify to HPI in writing that during each applicable Controls Audit Gap Period no changes have been made to (a) the Services or the Systems, (b) the manner in which the Services or Systems are provided or operated, (c) applicable controls, or (d) the Control Objectives, that could reasonably be expected to have any adverse impact on the contents of, or opinions set forth in, the applicable Controls Audit Report; or (2) provide HPI with a written description of any such changes.

**(C)** Each Controls Audit Report will be Confidential Information of HPES; provided, however, that notwithstanding the foregoing or the confidentiality provisions of this Agreement, HPI (and HPI's independent auditors) will be permitted to disclose any Controls Audit Report (or any of the content thereof) to any person, entity or Governmental Authority as necessary for HPI to comply with the Compliance Audit Requirements or any other applicable Law.

**IT Service Agreement**

34

**(D)** The Control Objectives will include those set forth in <u>Schedule 14</u>. HPI may update the Control Objectives at any time during the Term, provided that, subject to the Change Control Procedure, HPI will be responsible for any additional costs incurred by HPES in complying with the updated Control Objectives to the extent that such updated Control Objectives apply only to HPI and not to any other customer of HPES. To the extent that such updated Control Objectives apply to other customers of HPES, then the costs associated with compliance with such updated Control Objectives will be, subject to the Change Control Procedure, equitably allocated among HPI and such other customers.

**17.5   Remediation of Deficiencies.**

If any inspection or audit conducted pursuant to this Article (including any audits or testing performed in connection with the preparation of the Controls Audit Reports) or <u>Schedule 7</u> reveals a condition or event that could reasonably be expected to have an adverse impact on any of HPES' internal controls and procedures relating to the Services, then, in each case, HPES will develop a plan that will cure such deficiencies that is reasonably acceptable to HPI (the "<u>Remediation Plan</u>") within 15 days after (1) with respect to inspections or audits conducted by an HPI Auditor, HPI notifies HPES of any such deficiency and (2) with respect to any inspections or audit conducted by HPES or HPES Agents, HPES becomes aware of such deficiency. Such Remediation Plan will provide a comprehensive plan to remediate or address any such deficiencies within no more than 30 days (unless a longer period is reasonably necessary) after HPI approves the Remediation Plan. Once such Remediation Plan has been approved by HPI, HPES will remediate and cure such deficiencies as set forth in such Remediation Plan. HPES will provide information or data that is reasonably required to permit HPI to determine whether such deficiencies have been properly remediated. If HPES fails to remediate a deficiency within the time frame set forth in the applicable Remediation Plan, such deficiency has an adverse impact on the Services and HPES fails to cure such deficiency promptly of HPI's notice of such failure to perform such remediation, HPI may, upon notice to HPES, terminate this Agreement without regard to <u>Section 29.1</u>, in whole or in part, as of the termination date specified in the notice, without cost or penalty and without the payment of any termination charges, subject to <u>Section 7.1(B)</u> of <u>Schedule 5</u>.

**17.6   Compliance Audit Requirements.**

HPES recognizes that the Service Recipients are subject to the Compliance Audit Requirements. Subject to the terms of this Article, HPES will provide the assistance reasonably requested by the Service Recipients in connection with the Compliance Audit Requirements, which will include the reporting requirements and assistance set forth in <u>Appendix 3-A.6</u>. HPES will comply with HPI's financial reporting and control processes as set forth in the Policies and Procedures Manuals (and as such processes are revised from time to time by HPI) and provide the Service Recipients with copies of all related Records as necessary for the Service Recipients to satisfy the Compliance Audit Requirements. HPES will recommend and, subject to HPI approval and in accordance with the Change Control Procedure, implement compliance measures to satisfy the Compliance Audit Requirements.

**17.7   Records Retention.**

If HPES has not previously returned such information to HPI pursuant to and in accordance with <u>Section 20.1(B)(5)</u>, HPES will maintain, and provide HPI, within (A) 24 hours of request with respect to onsite Records or (B) 72 hours of request with respect to offsite Records, with access to Records in accordance with the following: (1) for non-financial operational Records, for a period of three years following the expiration or termination of this Agreement; (2) for financial Records, for a period of seven years following the expiration or termination of this Agreement; (3) for certain designated documents,

**IT Service Agreement**

35

in hardcopy format for the period of time required by applicable country regulations; (4) where applicable, in accordance with generally accepted accounting principles for the applicable jurisdiction applied on a consistent basis; and (5) in all cases, in accordance with the records retention policy of HPI, as provided to HPES in writing, provided that, notwithstanding the foregoing, the records retention period will extend until such time as all pending matters relating to this Agreement (e.g., disputes) are closed. The records, documents and other information described in this Section may be provided by HPI to other Service Recipients, as necessary, for such Service Recipients to satisfy their internal audit requirements. Before destroying or otherwise disposing of any such records or supporting documentation, HPES will provide HPI with 90 days' prior notice and offer HPI the opportunity to recover such information or to request HPES to deliver such information to HPI, with HPI paying HPES' Out-of-Pocket Expenses associated with such delivery.

**17.8   Litigation Requests.**

**(A)** HPES recognizes that (1) HPI may, from time to time, sue third parties, be sued by third parties, or have grounds to believe that one or more lawsuits will be filed by or against HPI, (2) HPI may be the subject of governmental or similar investigations and requests or demands for information, and (3) HPI may conduct internal investigations. If any of the foregoing events occurs, HPES hereby agrees to cooperate and create and implement a process to comply, in a timely manner, with requests from HPI and HPI's legal counsel or other third parties providing litigation or investigation support services to HPI, as directed by HPI, to view, preserve (including in accordance with Section 7.3 of Schedule 7 ), and provide to HPI or its designee (in the format requested by HPI), any HPI Data, reports and other information (collectively, the " Requested Information ") related to the Services or under HPES' control, including such information as is created by or for HPI or HPI's employees and associated communications that are located or stored on HPES' servers, systems, applications, equipment, tapes or other media. HPES acknowledges and agrees that HPES may, in some instances, be required to use an existing or set up a new non-production environment to retrieve Requested Information that is archived, and if requested by HPI, HPES will provide access to such environment so that HPI or its designee may download the Requested Information, and HPES will maintain and support an access method for allowing such downloads, as determined by HPI. HPES will provide such Requested Information within 24 hours of HPI's request (or such earlier time as may be required by the circumstances).

**(B)** If HPES receives a request (whether a discovery request, subpoena or other similar request) or is required by Law or legal process to disclose HPI Data, HPES will promptly notify HPI of such requested or required disclosure and furnish HPI with all known details of such requested or required disclosure prior to disclosing any such HPI Data. HPES will cooperate with and take any actions requested by HPI so that HPI may, in its sole discretion, seek to block or minimize the disclosure of HPI Data.

**18.   CHARGES**

**18.1   General.**

All Charges for the Services are set forth in Schedule 5 . HPI will not be required to pay HPES any amounts for the Services in addition to those that are payable to HPES pursuant to Schedule 5 , except pursuant to a Project Work Order or through the Change Control Procedure. HPES will be solely responsible for managing its resources so as to provide the Services in compliance with the Service Levels and the other terms of this Agreement. To the extent HPES has provided to HPI any services

**IT Service Agreement**

36

comparable to the Services and has been compensated for such services, HPI will not be obligated to pay for any such Services.

**18.2   Pass-Through Expenses.**

**(A)** All Pass-Through Expenses are set forth in <u>Schedule 5</u>. HPES will arrange for delivery by third parties to HPES of invoices for Pass-Through Expenses, and HPES will promptly review such invoices and provide HPI with the original invoice, together with a statement identifying which charges are proper and valid and should be paid by HPI. HPI acknowledges that HPES will have no obligation to verify the accuracy of any taxes included on such original notice.

**(B)** HPES will use commercially reasonable efforts to minimize the amount of Pass-Through Expenses. With respect to services or materials paid for on a Pass-Through Expense basis, HPI reserves the right to: (1) obtain such services or materials directly from a third party; (2) designate the third party source for such services or materials; (3) designate the particular services or materials (e.g., Equipment make and model) HPES will obtain, provided that, if HPES demonstrates to HPI that such designation will have an adverse impact on HPES' ability to meet the Service Levels, such designation will be subject to HPES' approval; (4) designate the terms for obtaining such services or materials (e.g., purchase or lease, lump sum payment or payment over time); (5) require HPES to identify and consider multiple sources for such services or materials or to conduct a competitive procurement; and (6) review and approve the applicable Pass-Through Expenses before entering into a contract for particular services or materials.

**18.3   Out-of-Pocket Expenses.**

**(A)** Except as otherwise set forth in this Agreement, all Out-of-Pocket Expenses and incidental expenses that have been or will be incurred and paid for by HPES in connection with the provision of the Services are included in the Charges and are not separately reimbursable by HPI to HPES.

**(B)** All Out-of-Pocket Expenses that are reimbursable by HPI to HPES pursuant to this Agreement will be (1) listed in <u>Schedule 5</u> or otherwise approved by HPI in advance; (2) incurred in accordance with applicable HPI Policies; (3) itemized in the monthly invoice issued by HPES immediately following the month in which such incidental expenses were incurred and paid by HPES with sufficient detail to permit HPI to determine whether such incidental expenses comply with applicable HPI Policies; and (4) accompanied by copies of all applicable documentary evidence (e.g., copies of receipts).

**18.4   Taxes.**

**(A)     General.**

The Charges are exclusive of any applicable Service Taxes which HPI is responsible for, and HPI shall pay HPES all Service Taxes in accordance with local country laws, unless HPI provides HPES with a valid and applicable exemption certificate. HPI will be financially responsible for Service Taxes that are required to be remitted by HPES only to the extent HPES issues a legally valid invoice with the detail required by <u>Section 18.4(D)</u>. HPES will collect and remit any Service Taxes in all applicable jurisdictions where HPES is legally required to collect and remit Services Taxes as required by Law.

**(B)     Income Taxes.**

**IT Service Agreement**

37

Each Party will be responsible for its own Income Taxes and any taxes on its personal property. Where HPI is required by the laws of any foreign tax jurisdiction to withhold income or other similar taxes from a payment, the amount payable by HPI upon which the withholding is based shall be paid to HPES net of such withholding. HPI shall pay any such withholding to the applicable tax authority and timely provide HPES with applicable tax documentation necessary for HPES to reclaim such withholding taxes. If such documentation has not been provided by HPI to HPES within 120 days, HPES will notify HPI of any outstanding documentation at this 120 day mark, from which HPI will have an additional 30 days from the notification date to provide HPES with such required documentation, or HPES shall invoice HPI for such withholding taxes.

**(C)    Tax on Inputs.**

(1) Each Party will be responsible for any Service Taxes payable on Equipment, Software or property such Party owns or leases from a third party, or for which such Party is financially responsible under this Agreement.

(2) HPES will be responsible for all Service Taxes on any goods or services used or consumed by HPES in providing the Services (including services obtained from HPES Agents) where such taxes are imposed on HPES' acquisition or use of such goods or services.

**(D)    Invoicing.**

To the extent that any Service Tax is to be paid by HPI, HPES will separately identify such Service Tax by taxing jurisdiction. The Parties will reasonably cooperate to segregate the Charges into the following separate payment streams: (1) those for taxable goods or Services; (2) those for nontaxable goods or Services; (3) those for which Service Tax has already been paid; and (4) those for which HPES functions merely as a paying agent for HPI in receiving goods, supplies or services (including leasing and licensing arrangements) that otherwise are nontaxable or have been previously subject to Service Tax. Changes to the invoicing and payment structure may result in additional withholding tax and/or Service Tax costs. To the extent that any such change is implemented, the requesting Party will be financially responsible for any additional withholding tax and/or Service Tax costs that arise.

**(E)    Filings and Registrations.**

Each Party represents, warrants and covenants that it will file appropriate tax returns, and pay applicable taxes owed arising from or related to the provision of the Services in applicable jurisdictions.

**(F)    Cooperation.**

In accordance with the indemnification procedures set forth in Article 24 , HPI and HPES will promptly notify each other and coordinate with each other in the response to and settlement of any claims for Service Taxes asserted by applicable Tax Authorities that HPI or HPES is responsible for under this Agreement. HPES reserves the right to settle any and all audit claims for taxes, without notification to, or approval by, HPI; provided, however, that in such event, HPI shall not be responsible for such settled taxes. In addition, each of HPI and HPES will reasonably cooperate with the other to more accurately determine each Party's tax liability and (without incurring additional net costs) to minimize the other Party's tax liability, to the extent legally permissible. Each of HPI and HPES will provide and

**IT Service Agreement**

38

make available to the other any resale certificates, information regarding out-of-state sales or use of Equipment, materials or services, and any other exemption certificates or information requested by the other Party. HPI and HPES each will be entitled to any tax refunds, credits or rebates obtained with respect to the taxes for which such Party is financially responsible under this Agreement.

**18.5   No COLA or Currency Pricing Adjustments.**

The Parties agree and acknowledge that the Charges will be inclusive of, and not subject to adjustment to account for, any inflation or cost of living increases or fluctuation in any currency exchange rates.

**18.6   Benchmarking.**

**(A)** HPI will have the right, commencing upon the second anniversary of the Effective Date and not more than once per 12-month period per Tower thereafter, to benchmark the Charges for the Services at the Tower level upon 20 days' notice to HPES. The purpose of any benchmarking exercise is to ensure that HPI is receiving competitive market pricing and Service quality with respect to the management, delivery and receipt of the Services.

**(B)** A benchmarking under this Section will be conducted by an independent industry-recognized benchmarking service provider designated by HPI and approved by HPES (the " Benchmarker "). HPES agrees that each of IDC, Forrester and Gartner are acceptable as Benchmarkers as of the Effective Date. The fees and costs of the Benchmarker will be shared equally by HPI and HPES. The Parties will cooperate with the Benchmarker, including, as appropriate, by making available knowledgeable personnel and pertinent documents and records.

**(C)** The Benchmarker will perform the benchmarking in accordance with the Benchmarker's documented procedures, which will be provided to the Parties prior to the start of the benchmarking process. The Benchmarker will compare the Charges and Service Levels applicable to the Services being benchmarked to the costs being incurred, and service levels being provided, in a representative sample of IT operations by or for other entities. The Benchmarker will select the representative sample from entities (1) identified by the Benchmarker and approved by the Parties and (2) identified by a Party and approved by the Benchmarker. The following conditions apply to the representative sample: (a) it will include at least five and no more than eight entities, (b) it may include entities that have not outsourced IT operations, and (c) it may include entities that are outsourcing customers of HPES. In conducting the benchmarking, the Benchmarker will normalize the data used to perform the benchmarking to accommodate, as appropriate, differences in volume of services, scope of services, service levels, financing or payment streams, and other pertinent factors.

**(D)** The Benchmarker will commence the benchmarking exercise within 30 days following receipt of HPI's request and issue its initial report to the Parties within 120 days following receipt of HPI's request. Each Party will be provided a reasonable opportunity (but no more than 30 days) to review, comment on and request changes to the Benchmarker's proposed findings. Within 10 days of receiving any comments from the Parties, the Benchmarker will issue a final report of its findings and conclusions.

**(E)** If, in the final report of the Benchmarker, the Charges for the benchmarked Services are not in the top third of the representative sample (viewed from the perspective most favorable to HPI), then HPES will develop a plan for HPI's review and approval to bring the Charges

**IT Service Agreement**

39

within the top third within 90 days after the Benchmarker's issuance of the final report. HPES will implement such plan once approved by HPI. If, in the final report of the Benchmarker, the Charges for the benchmarked Services are within the top third of the representative sample (viewed from the perspective most favorable to HPI), then no further action will be required. If HPES does not provide a plan or implement such plan to reduce the Charges as required by this Section, then HPI may, upon 90 days' notice to HPES, terminate this Agreement without regard to Section 29.1 , in whole or in part, without cost or penalty subject to the payment of any applicable termination charges set forth in Section 7.2(B) of Schedule 5 .

## 19.    INVOICING AND PAYMENT

### 19.1    Monthly Invoices.

**(A)** HPES will issue a single consolidated invoice to HPI for all Services provided under this Agreement. HPES will invoice HPI no later than the 15 th day of each month for Charges for the Services provided, and reimbursable Out-of-Pocket Expenses incurred, in the preceding month. Invoicing and payment will be as agreed by the Parties and documented in Schedule 5.

**(B)** In addition to the requirements set forth in Schedule 5 , each invoice will comply with the requirements set forth in this Section. Each invoice will provide such detail as reasonably specified by HPI. As part of the invoice, HPES will include the calculations utilized to establish the Charges. HPES will also provide a summary view of the invoice in a format and at a level of detail specified by HPI. The form of invoice to be issued by HPES is attached to Schedule 5 . Upon HPI's request, HPES will participate in periodic invoicing meetings with HPI in order to review Charges and resolve exceptions.

**(C)** HPES will supply HPI with copies of reports and, where available, electronic files that reflect a detailed auditable record of the resources used to deliver the Services for each month during the Term. This information will be provided to HPI with each invoice that HPES provides under this Agreement.

### 19.2    Timeliness of Invoices.

HPES will invoice HPI no later than 120 days after the end of the month in which any amounts become due and payable by HPI to HPES, provided that in no event will any amounts which become due and payable in a fiscal year be invoiced later than 60 days following the beginning of the subsequent fiscal year. If HPES submits an invoice to HPI, and such invoice is not in compliance with such timing requirements, then HPI will not be liable for payment of the applicable invoiced amounts.

### 19.3    Payment Due.

**(A)** Subject to the other provisions of this Article, all undisputed amounts on valid invoices provided for under Section 19.1 and properly submitted to HPI pursuant to this Agreement will be due and payable by HPI within 30 days after receipt thereof. Any amount due under this Agreement for which a time for payment is not otherwise specified will be due and payable within 30 days after receipt of a valid invoice for such amount. If undisputed amounts are not paid within such 30-day period, such amounts will accrue interest until paid at a rate equal to the then-current official cash rate of the Federal Reserve Bank of San Francisco plus two percent, calculated daily.

**IT Service Agreement**

40

**(B)** To the extent a credit may be due to HPI under this Agreement, HPES will either (1) credit such amount on the invoice for the following month or (2) pay such amounts to HPI within 30 days.

**(C)** All payments by HPI to HPES and credits that are paid to HPI from HPES will be paid electronically pursuant to the instructions provided by each Party.

**19.4   No Payment for Unperformed Services.**

If HPES fails to provide the Services in accordance with this Agreement, the Charges will be adjusted in a manner such that HPI is not responsible for the payment of any Charges for Services that HPES fails to provide.

**19.5   No Acceptance.**

The payment of HPES' invoices by HPI will not constitute acceptance of such Services by HPI, and HPI reserves all rights thereof.

**19.6   Accountability.**

HPES will maintain complete and accurate records of and supporting documentation for the amounts billable to and payments made by HPI hereunder in accordance with generally accepted accounting principles applied on a consistent basis. HPES agrees to provide HPI with documentation and other information with respect to each invoice as may be reasonably requested by HPI to verify accuracy and compliance with the provisions of this Agreement.

**19.7   Proration.**

Periodic Charges under this Agreement are to be computed on a calendar month basis, and will be prorated for any partial month.

**19.8   Prepaid Items.**

Where HPI has prepaid for a service or function for which HPES is assuming financial responsibility under this Agreement, HPES will refund to HPI, upon either Party identifying the prepayment, that portion of such prepaid expense that is attributable to periods on and after the Effective Date.

**19.9   Refunds and Credits.**

If HPES should receive a refund, credit or other rebate for goods or services previously paid for by HPI, HPES will promptly notify HPI of such refund, credit or rebate and will promptly pay the full amount of such refund, credit or rebate, as the case may be, to HPI.

**19.10  Set-Off.**

With respect to any amount to be paid by HPI under this Agreement, HPI may deduct from such amount any amount that HPES is obligated to pay or credit to HPI under this Agreement.

**19.11  Disputed Charges.**

**IT Service Agreement**

HPI will pay undisputed Charges when such payments are due under this Article. HPI may withhold payment of particular Charges that HPI disputes in good faith, provided that (A) the amount HPI may withhold at any one time, pending resolution of such dispute, will not in the aggregate exceed an amount equal to $55,000,000 (the " Escrow Threshold ") and (B) HPI provides HPES with notice of the amounts that will be withheld and the reason for withholding such amounts prior to the due date of the invoice from which such amounts are being withheld. If the aggregate amount of Charges then under dispute exceeds the Escrow Threshold, then HPI will deposit disputed Charges in excess of the Escrow Threshold into an interest-bearing escrow account. The Parties agree that such escrow account will be mutually established by the Parties at Citibank, N.A. or another financial institution as may be agreed upon by the Parties. The costs of such escrow account will be borne by the Party that does not prevail in the dispute. The escrow account will be mutually established pursuant to an escrow agreement in the form of a standard form of escrow agreement provided by the financial institution. To the extent amounts withheld by HPI are determined to be payable to HPES, such payment will be made within 60 days after such dispute is resolved and will include the amount withheld, together with interest on amounts withheld in accordance with Section 19.3(A) , calculated from the date such amount would have been due but for HPI's withholding pursuant to this Section, until received for payment by HPES.

## 20.   CONFIDENTIALITY AND DATA PROTECTION

### 20.1   Confidential Information.

#### (A)   General.

(1) HPES and HPI each acknowledge that they may be furnished with, receive or otherwise have access to information of or concerning the other Party that such Party considers to be confidential, a trade secret or otherwise restricted. As used in this Agreement, " Confidential Information " will mean all information, in any form, furnished or made available directly or indirectly by one Party to the other that is marked confidential, restricted, or with a similar designation or which, given the nature of the information or the circumstances of disclosure, should reasonably be understood to be confidential. In the case of HPI, Confidential Information also will include, whether or not designated "Confidential Information," (a) HPI IP; (b) Developed IP; (c) the specifications, designs, documents, correspondence, Software, documentation, data and other materials and work products produced by or for HPES in the course of performing the Services; (d) all information concerning the operations, affairs and businesses of the Service Recipients, the financial affairs of the Service Recipients, and the relations of the Service Recipients with their customers, employees and service providers (including customer lists, customer information, account information, pricing information and consumer markets); (e) Software provided to HPES by or through the Service Recipients; (f) HPI Data; (g) Personal Data; (h) other information or data stored on magnetic media or otherwise or communicated orally, and obtained, received, transmitted, processed, stored, archived or maintained by HPES under this Agreement; and (i) the terms and conditions of this Agreement (collectively, the " HPI Confidential Information ").

(2) Nothing in this Section is intended to limit the obligations of HPES under Section 20.2 and Section 20.3 with respect to HPI Data and Personal Data, and to the extent there is any conflict between the provisions of this Section as they pertain to HPI Data and Personal Data and the provisions of Section 20.2 or Section 20.3 , the requirements of Section 20.2 and Section 20.3 will control over the provisions of this Section.

#### (B)   Obligations.

**IT Service Agreement**

(1) HPI and HPES will each (a) hold Confidential Information received from the other Party in confidence and, except as expressly permitted by Section 20.1(B)(2) or Section 20.1(B)(3) , or by the express, prior approval of the disclosing Party in each instance, which approval may be withheld or granted by the disclosing Party in its sole discretion, not provide, disseminate, sell, assign, lease, transfer or otherwise dispose of, disclose to or make available any Confidential Information of the disclosing Party to any third party, and (b) use at least the same degree of care as it employs to avoid unauthorized disclosure of its own information, but in any event no less than commercially reasonable efforts, to prevent disclosing to third parties the Confidential Information of the other Party.

(2) HPES may disclose HPI Confidential Information to its employees, directors, attorneys, auditors, accountants and properly authorized entities (as and to the extent necessary for performance of the Services), and the Service Recipients may disclose Confidential Information of HPES to its employees, directors, attorneys, auditors, accountants and third parties (including Third Party Providers), as and to the extent necessary for the Service Recipients to obtain the benefits of this Agreement in the conduct of its business and to coordinate HPES' services with those of any Third Party Providers, where in each such case: (a) the recipient has a need to know the Confidential Information for purposes of performing his or her obligations under or with respect to this Agreement (or, with respect to Third Party Providers, the applicable Third Party Service Contract) or as otherwise naturally occurs in such person's scope of responsibility; (b) such disclosure is made pursuant to obligations of confidentiality that are no less stringent than those set forth in this Section; and (c) such disclosure is not in violation of Law. The receiving Party assumes full responsibility for the acts or omissions of any person or entity to whom it discloses Confidential Information of the disclosing Party regarding their use of such Confidential Information.

(3) A Party may disclose Confidential Information of the other Party as required to satisfy any legal requirement of a Governmental Authority, provided that, immediately upon receiving any such request and to the extent that it may legally do so, such Party advises the other Party of the request prior to making such disclosure so that the other Party may interpose an objection to such disclosure, take action to ensure confidential handling of the Confidential Information, or take such other action as it deems appropriate to protect the Confidential Information.

(4) HPES will use HPI Confidential Information only for the purpose of meeting its obligations or exercising its rights under this Agreement, and will not, without limitation, use any HPI Confidential Information: (a) as otherwise prohibited by this Agreement, including prohibitions applicable to HPI Data and Personal Data; (b) to compete directly or indirectly with any Service Recipient; or (c) to interfere with any actual or proposed business of any Service Recipient.

(5) As requested by HPI during the Term and upon expiration or any termination of this Agreement and completion of HPES' obligations under this Agreement, or with respect to any particular HPI Confidential Information, on such earlier date that the same will no longer be required by HPES to perform the Services, HPES will promptly return to HPI (in a form requested by HPI) or destroy (and provide such proof of destruction as is reasonably requested by HPI), all material in any medium that contains, refers to, or relates to such HPI Confidential Information, and will not retain any copies of such HPI Confidential Information.

(6) HPES will cause each HPES Personnel to comply with these confidentiality provisions.

**IT Service Agreement**

43

(7) In the event of any possession, use, disclosure or loss of, or inability to account for, any Confidential Information of the disclosing Party other than as permitted by this Agreement, the receiving Party will promptly (a) notify the disclosing Party upon becoming aware thereof; (b) provide to the disclosing Party all known details and take such actions as may be necessary or reasonably requested by the disclosing Party to pursue its legal rights and remedies and to minimize the possession, use, disclosure or loss; and (c) cooperate in all reasonable respects with the disclosing Party to minimize the violation and any damage resulting therefrom.

**(C)    Exclusions.**

Except with respect to Personal Data, Section 20.1(B) will not apply to any particular information that HPES or HPI can demonstrate: (1) was, at the time of disclosure to it, in the public domain; (2) after disclosure to it, was published or otherwise became part of the public domain through no fault of the receiving Party; (3) was in the possession of the receiving Party at the time of disclosure to it; (4) was received after disclosure to it from a third party who had a lawful right to disclose such information to it without any obligation to restrict its further use or disclosure; or (5) was independently developed by the receiving Party without reference to Confidential Information of the furnishing Party.

**(D)    No Implied Rights.**

Subject to the provisions of Article 13 , each Party's Confidential Information will remain the property of that Party. Nothing contained in this Article will be construed as obligating a Party to disclose its Confidential Information to the other Party, or as granting to or conferring on a Party, expressly or impliedly, any rights or license to the Confidential Information of the other Party.

**20.2   HPI Data.**

**(A)    Ownership.**

(1) HPI Data will be and remain, as between the Parties, the property of HPI. HPES will not possess or assert any lien or other right against or to HPI Data. To the extent HPES has or acquires any rights in HPI Data, HPES hereby irrevocably assigns, transfers and conveys to HPI all of its right, title and interest in and to the HPI Data, including all Intellectual Property Rights thereto. HPI may designate another entity of HPI for the ownership provided for in this Section, in which case the references to HPI in this Section will be to such HPI entity. HPES will, and will cause all HPES Agents and HPES Personnel (whether former or current) to: (a) cooperate with and assist HPI, both during and after the Term, in perfecting, maintaining, protecting and enforcing HPI's right, title, and interest in any HPI Data, including all Intellectual Property Rights thereto, and (b) execute and deliver to HPI any documents or take any other actions as may reasonably be necessary, or as HPI may reasonably request, to perfect, maintain, protect, or enforce HPI's right, title and interest in such HPI Data.

(2) Nothing in this Section is intended to limit the obligations of HPES under Section 20.1 and Section 20.3 with respect to HPI Confidential Information addressed in such Sections. To the extent there is any conflict between the provisions of this Section and the provisions of Section 20.1 or Section 20.3 as they pertain to HPI Data, the specific requirements of Section 20.3 will control over the provisions of this Section, and the provisions of this Section will control over the provisions of Section 20.1 .

**(B)    Protection of HPI Data.**

**IT Service Agreement**

44

HPES will establish and maintain safeguards to prevent and guard against the unauthorized disclosure, destruction, loss or alteration of HPI Data in the possession or control of HPES that are no less rigorous than (1) the requirements set forth in Schedule 7 , or (2) standards maintained by HPES for its own information of a similar nature. HPI will have the right to establish backup security for HPI Data and to keep backup HPI Data and HPI Data files in its possession if it chooses.

**(C)    Storage, Error Correction.**

(1) Regardless of whether HPI approves the provision of certain Services from a Service Location located outside of a country in which the applicable Service Recipient receives the Services, in no event will HPES install HPI Software on any server or other Equipment, or store any HPI Data on any server or other Equipment, located at a Service Location outside of a country in which the applicable Service Recipient receives the Services, except as expressly permitted by this Agreement.

(2) HPES will promptly (a) notify HPI of any errors or inaccuracies in HPI Data if and when HPES becomes aware of such errors or inaccuracies, (b) correct any such errors or inaccuracies at its cost and expense to the extent such errors or inaccuracies are caused by HPES' act or omission and (c) correct any such errors or inaccuracies upon HPI's request and at HPI's cost and expense to the extent such errors or inaccuracies are not caused by HPES' act or omission. In the event of a dispute as to which Party caused such error or inaccuracy, HPES will promptly correct such error or inaccuracy at its cost and expense as directed by HPI pending the resolution of such dispute in accordance with the dispute resolution procedures set forth in Article 28 . If it is determined through such dispute resolution procedures that HPES did not cause such error or inaccuracy, HPI will compensate HPES (using the applicable rates set forth in the Rate Card) for HPES' performance of the services necessary to correct such error or inaccuracy.

**(D)    Security Breaches.**

(1) In the event of a Security Breach involving HPI Data, HPES will notify HPI in accordance with Schedule 7 .

(2) Following such notice, HPES will, at its cost and expense, (a) provide HPI with all known details relating to such Security Breach, (b) promptly (and in any event as soon as reasonably practical) perform a root cause analysis to determine the scope of the Systems and data that have been compromised (or potentially compromised) and the cause of such Security Breach, and thereafter promptly furnish the details of such investigation and results of such root cause analysis to HPI, and (c) cooperate in the investigation of the Security Breach at HPI's request.

(3) HPI reserves the right to be a participant in, and HPES will cooperate with such participation in, any Security Breach investigations conducted by HPES, including HPI's review of forensic data relating to the Security Breach.

(4) HPES will document responsive actions taken in connection with any incident involving a Security Breach in accordance with all applicable Laws.

(5) To the extent the Security Breach is within HPES' areas of control, HPES will (i) provide to HPI, within 24 hours following discovery of the Security Breach, an oral notification of such Security Breach, and (ii) provide to HPI, within 48 hours following discovery of the Security Breach, with a written remediation plan that details the actions HPES will take to remedy the Security Breach,

**IT Service Agreement**

45

remediate such Security Breach, and take commercially reasonable actions to prevent its recurrence. If any HPES Personnel has attempted to circumvent or has circumvented the data safeguards required by this Section, HPES will immediately terminate such person's access to Systems controlled by HPES and HPI may immediately terminate such individual's access to the Systems controlled by HPI.

**20.3   Personal Data and Privacy Requirements.**

**(A)     General.**

In order for HPES to fulfill its obligations under this Agreement, it may be necessary for the Service Recipients to provide HPES with, or with access to, Personal Data. HPES will comply with the requirements set forth in Schedule 7 with respect to any Personal Data received from the Service Recipients, or to which HPES has access to, under this Agreement.

**(B)     Personal Data Security Breaches.**

(1) To the extent the Personal Data Security Breach is within HPES' areas of control, HPES will: (a) take the actions required by Schedule 7 and Section 20.2(D) ; (b) assist and cooperate with HPI in HPI's investigation of the Personal Data Security Breach, including by (i) providing HPI (or any third party designated by HPI) with access to any HPES Personnel to the extent such HPES Personnel have knowledge of any activities giving rise to or information related to the Personal Data Security Breach, (ii) providing HPI with physical access to the Service Locations and resources affected by the Personal Data Security Breach, (iii) facilitating interviews with HPES Personnel and others involved in the Personal Data Security Breach, and (iv) making available to HPI all relevant records, logs, files and data relating to the Personal Data Security Breach; (c) cooperate with HPI (as required by HPI) in any litigation or other formal action relating to the Personal Data Security Breach; (d) provide such information and assistance as is required to timely respond to or otherwise address any inquiry, access request, complaint, enforcement notice or similar action made by applicable data subjects; (e) cooperate with law enforcement or regulatory officials (as requested by HPI) in connection with any investigations or government actions relating to such Personal Data Security Breach; and (f) promptly take such measures as are reasonably necessary to prevent a recurrence of such Personal Data Security Breach (including as set forth in any HPI-approved remediation plan).

(2) HPI will have the sole right to determine (a) whether notice of a Personal Data Security Breach is to be provided to any individuals, Governmental Authorities, consumer reporting agencies or others (b) the contents of such notice, (c) whether any type of remediation may be offered to affected persons, and (d) the nature and extent of any such remediation. HPES will provide any such notices as directed by HPI.

(3) If the Personal Data Security Breach is caused by HPES' acts or omissions, HPES will be responsible for (a) fines, penalties, interest and other amounts required to be paid by HPI under any Law or by Governmental Authority, or incurred to satisfy an order or directive of a Governmental Authority; and (b) expenses, liabilities, assessments and costs (including reasonable attorney's fees and disbursements) incurred by HPI in connection with such Personal Data Security Breach, including: (i) expenses incurred by HPI in responding to a Personal Data Security Breach, including for forensic experts and consultants typically engaged in data breach responses; and (ii) the costs of preparation and mailing of notification letters, credit monitoring services, toll-free information services for affected individuals, and any similar services that companies typically make available to affected individuals in connection with personal data security breaches.

**IT Service Agreement**

**20.4    HPI Right of Termination.**

Any violation by HPES of a material obligation under this Article will constitute a material breach by HPES of this Agreement, and, if not subject to cure, HPES cannot demonstrate to HPI's satisfaction that the violation or a similar violation will not recur, or if subject to cure but not cured by HPES within five days, HPI may, upon notice to HPES, terminate this Agreement without regard to Section 29.1 , in whole or in part, as of the termination date specified in the notice, without cost or penalty and without the payment of any termination charges, subject to Section 7.1(B) of Schedule 5 .

## 21.    REPRESENTATIONS AND WARRANTIES

### 21.1    By HPI.

HPI represents and warrants that:

**(A)** HPI is a corporation duly incorporated, validly existing and in good standing under the Laws of the State of Delaware;

**(B)** HPI has all requisite corporate power and authority to execute, deliver and perform its obligations under this Agreement and the execution, delivery and performance of this Agreement by HPI has been duly authorized by HPI;

**(C)** HPI is duly licensed, authorized or qualified to do business and is in good standing in every jurisdiction in which a license, authorization or qualification is required for the ownership or leasing of its assets or the transaction of business of the character transacted by it, except where the failure to be so licensed, authorized or qualified would not have a material adverse effect on HPI's ability to fulfill its obligations under this Agreement; and

**(D)** HPI is in compliance with all Laws applicable to HPI's obligations under this Agreement and has obtained all applicable material permits and licenses required of HPI in connection with its obligations under this Agreement.

### 21.2    By HPES.

HPES represents and warrants that:

**(A)** HPES is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Delaware;

**(B)** HPES has all requisite corporate power and authority to execute, deliver and perform its obligations under this Agreement and the execution, delivery and performance of this Agreement by HPES has been duly authorized by HPES and will not conflict with, result in a breach of, or constitute a default under any other agreement to which HPES is a party or by which HPES is bound;

**(C)** HPES is duly licensed, authorized or qualified to do business and is in good standing in every jurisdiction in which a license, authorization or qualification is required for the ownership or leasing of its assets or the transaction of business of the character transacted by it, except where the failure to be so licensed, authorized or qualified would not have a material adverse effect on HPES' ability to fulfill its obligations under this Agreement;

**IT Service Agreement**

**(D)** HPES is in compliance with all Laws applicable to HPES' obligations under this Agreement and has obtained all applicable permits and licenses required of HPES in connection with its obligations under this Agreement;

**(E)** there is no outstanding litigation, arbitrated matter or other dispute to which HPES is a party which, if decided unfavorably to HPES, would reasonably be expected to have a material adverse effect on HPES' ability to fulfill its obligations under this Agreement; and

**(F)** HPES and HPES Agents have full power and authority to grant HPI the rights granted herein without the consent of any other party and any materials developed or furnished by HPES and HPES Agents to HPI are free of any and all restrictions, settlements, judgments or adverse claims.

### 21.3 Pass-Through Warranties.

HPES will, to the extent permissible, pass through to HPI all available warranties and provide all available (including extended) applicable original equipment manufacturer and additional warranties for third party Equipment used to provide the Services. HPES will obtain and pass through to HPI any warranties required by the specifications for Equipment procured on behalf of HPI. HPI will, to the extent permissible, pass through to HPES all available warranties and provide all available (including extended) applicable original equipment manufacturer and additional warranties for Equipment owned or leased by HPI used to provide the Services prior to the Effective Date, to the extent that such Equipment was transferred to HPES pursuant to this Agreement or as part of the activities conducted to separate HP.

### 21.4 Disclaimer.

EXCEPT AS SPECIFIED IN THIS ARTICLE, NEITHER HPI NOR HPES MAKES ANY OTHER WARRANTIES WITH RESPECT TO THE SERVICES OR THE SYSTEMS OR EQUIPMENT AND EACH EXPLICITLY DISCLAIMS ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

## 22. ADDITIONAL COVENANTS

### 22.1 By HPI.

HPI covenants and agrees with HPES that during the Term, HPI will obtain all applicable material permits and licenses required of HPI in connection with its obligations under this Agreement.

### 22.2 By HPES.

HPES covenants and agrees with HPI that during the Term:

**(A)** HPES will provide the Services with promptness, diligence and in a professional manner, in accordance with the practices and professional standards used in well-managed operations performing services similar to the Services, and HPES will use adequate numbers of qualified individuals with suitable training, education, experience and skill to perform the Services;

**(B)** Except as otherwise provided in this Agreement, HPES will maintain the Systems, HPES Equipment, and HPES Software so that they operate in accordance with their

**IT Service Agreement**

48

specifications, including (1) maintaining HPES Equipment in good operating condition, subject to normal wear and tear, (2) undertaking repairs and preventive maintenance on HPES Equipment in accordance with the applicable Equipment manufacturer's recommendations, and (3) performing Software maintenance in accordance with the applicable Software provider's documentation and recommendations;

**(C)** HPES will use commercially reasonable efforts to (1) use efficiently the resources or services necessary to provide the Services and (2) perform the Services in the most cost-effective manner consistent with the required level of quality and performance;

**(D)** HPES will provide the Services using proven, current technology, Equipment and Software that the Parties anticipate will enable the Service Recipients to take advantage of technological advancements in their industries, subject to the Change Control Procedure;

**(E)** HPES will obtain all applicable permits and licenses required of HPES in connection with its obligations under this Agreement;

**(F)** HPES will maintain each HPES Service Location so that it continuously meets and is certified to comply with the requirements of ISO/IEC 27002, and HPES will maintain such certifications throughout the Term;

**(G)** all Financial Statements will fairly and accurately represent the business, properties, financial condition, and results of operations of HPES as of their respective dates or periods covered, and HPES will immediately notify HPI of any subsequent material adverse change in HPES' business, properties, financial condition or operations;

**(H)** the HPES Provided Resources will not infringe upon the Intellectual Property Rights of any third party, subject to the exceptions set forth in Section 24.1(A) ;

**(I)** HPES will promptly notify HPI if HPES learns of any claim, pending or threatened, or any fact upon which a claim could be made, that asserts that an HPES Provided Resource may infringe upon the Intellectual Property Rights of any third party;

**(J)** without limiting HPES' obligations under this Agreement, HPES and HPES Agents will not code into the Systems, and HPES will use commercially reasonable efforts to prevent from being introduced into the Systems by third parties, any viruses, Trojan horses, worms, spyware, back doors, email bombs, malicious code or similar items (collectively, " Malware "), provided that, in the event that Malware is found to have been introduced into the Systems (1) as a result of HPES' failure to comply with this Section or its other obligations under this Agreement, HPES will, at its cost and expense, mitigate the effects of the Malware and, if the Malware causes a loss of operational efficiency or loss of data, mitigate and restore such losses or (2) other than as a result of HPES' failure to comply with its obligations, HPES will, if instructed by HPI, at HPI's cost and expense, use commercially reasonable efforts to mitigate the effects of the Malware and, if the Malware causes a loss of operational efficiency or loss of data, mitigate and restore such losses;

**(K)** HPES and HPES Agents will not code or introduce into the Systems any Software or Equipment that would have the effect of disabling or otherwise shutting down all or any portion of the Services. With respect to any disabling code that may be part of the Software, HPES will not invoke such disabling code at any time (whether during or after the Term) for any reason. If at any time the

**IT Service Agreement**

49

licensor of any HPES Third Party Software invokes or threatens to invoke any disabling code in HPES Third Party Software licensed to HPES which could adversely affect the Services, HPES will use its best efforts to preclude such action on the part of such licensor;

**(L)** neither HPES nor any HPES Agents will make any unauthorized representations on HPI's behalf or about HPI, nor commit or bind HPI other than as specifically authorized by HPI under this Agreement;

**(M)** HPES or HPES Agents will not include in any Developed IP any Encumbered Code; and

**(N)** all facilities at HPES Service Locations will be maintained and operated in accordance with applicable HPI Policies and all applicable Laws, building codes and ordinances to the extent that failure to comply with such applicable Laws, building codes and ordinances could reasonably be expected to have an adverse effect on HPI's receipt of the Services.

**23.    INSURANCE**

**23.1   Insurance Coverage.**

HPES will, during the Term and for such additional periods as may be specified below, have and maintain in force, at its sole cost and expense including premiums, deductibles, self-insured retentions and any other insurance or claim related costs, at least the following insurance coverages:

**(A)** Worker's compensation insurance or other similar social insurance in accordance with the Laws of the country, state or territory exercising jurisdiction over the employee with the minimum limits required by Law.

**(B)** Employer's liability insurance in an amount of not less than $1,000,000 per each accident and disease.

**(C)** Commercial general liability insurance, including products, completed operations liability and personal injury, advertising liability and contractual liability, with a minimum combined single limit of $1,000,000 per occurrence and $2,000,000 general aggregate. This coverage will include as an additional insured.

**(D)** Commercial automobile liability insurance for all owned, non-owned, hired and permissive use vehicles, with a minimum combined single limit of $1,000,000 each accident for bodily injury and property damage. This coverage will include HPI as an additional insured.

**(E)** All-risk property insurance, including property that is in the possession, care, custody or control of HPES pursuant to this Agreement. Such policy will also include electronic data processing (EDP) providing coverage for all risk of loss for damage to equipment, hardware, software, data, media, valuable papers, including extra expense coverage, with a minimum limit adequate to cover such risks on a replacement cost basis. This coverage will include HPI as an additional insured as its interest may appear.

**(F)** Commercial crime insurance, including blanket coverage for employee dishonesty and computer fraud for loss or damage arising out of or in connection with any fraudulent or

**IT Service Agreement**

50

dishonest acts committed by HPES Personnel, acting alone or in collusion with others, including money, securities and property of others in their possession, care, custody or control, with a minimum limit per event of $10,000,000. This coverage will include HPI as a joint loss payee under a joint loss payee endorsement as its interest may appear.

**(G)** Professional liability (errors and omissions) insurance (including cyber risk liability) covering liability for loss or damage due to an act, error, omission or negligence, or due to machine malfunction, invasion or infringement of the right of privacy or publicity, including the torts of intrusion upon seclusion, publication or private facts, false light, or misappropriation of name or likeness, with a minimum limit per event of $50,000,000.

**(H)** Umbrella liability insurance in a minimum amount of $50,000,000 in excess of the coverage amounts set forth in Section 23.1(B) , Section 23.1(C) , and Section 23.1(D) .

**23.2   Insurance Conditions.**

**(A)** The insurance coverages set forth in Section 23.1 will be primary, and all coverage will be non-contributing with respect to any other insurance or self-insurance which may be maintained by HPI. All coverage required by Section 23.1 will include a waiver of subrogation and a waiver of any insured-versus-insured exclusion regarding HPI. To the extent any coverage is written on a claims-made basis, it will have a retroactive date at or prior to the Effective Date and will allow for reporting of claims for at least three years following the expiration or termination of this Agreement.

**(B)** HPES will provide to HPI, within 10 business days after the Effective Date and at HPI's request thereafter, certificates of insurance evidencing that the coverages required under this Agreement are in effect and maintained in force during the Term (and, with respect to claims-made policies, for at least five years after the expiration or termination of this Agreement). Upon HPI's request, HPES will permit HPI to examine the originals of the policies that relate to the insurance described in this Section. The third party insurers selected by HPES will have an A.M. Best rating of A-, X or better, or, if such ratings are no longer available, with a comparable rating from a recognized insurance rating agency. With respect to such third party insurers, HPI will have the right to require HPES to obtain the insurance required under this Article from another insurance carrier in the event HPI determines that HPES' then-current insurance carrier does not have an A.M. Best rating of A-, X or better or is not licensed or authorized to conduct business in all states in which HPI does business. HPES will require that HPES Agents, if any, maintain insurance coverages as specified in reasonable amounts naming HPES as an additional insured or loss payee where relevant or HPES will ensure that HPES Agents, if any, are endorsed as additional insureds on such HPES coverages. HPES will be, at its sole cost and expense, responsible for any loss or damage resulting from any HPES Agents and HPES' insurance is deemed to be primary for any such losses

**(C)** In the case of loss or damage or other event that requires notice or other action under the terms of any insurance coverage specified in Section 23.1 , HPES will be solely responsible to take such action. HPES will provide HPI with contemporaneous notice and with such other information as HPI may request regarding the event.

**(D)** The provisions of this Article will in no way limit the liability of HPES. The obligations under this Article are mandatory; failure of HPI to request certificates of insurance or insurance policies will not constitute a waiver of HPES' obligations and requirements to maintain the minimal coverages specified. HPES will maintain in its files evidence of all HPES Agents' insurance

**IT Service Agreement**

51

coverage.

**23.3   Risk of Loss.**

Each Party will be responsible for risk of loss of, and damage to, any Equipment, Software or other materials in its possession or under its control.

**24.   INDEMNITIES**

**24.1   Indemnity by HPES.**

HPES will indemnify, defend and hold harmless HPI and the other Service Recipients, and their respective officers, directors, employees, agents, successors and assigns, from and against any Losses suffered, incurred or sustained by any such indemnitee or to which any such indemnitee becomes subject, resulting from, arising out of or relating to any third party claim:

**(A)** that HPES Provided Resources infringe upon the Intellectual Property Rights of any third party, except to the extent that such claim (1) results from activities that HPES was required or instructed by HPI to perform or (2) arises out of (a) a modification by HPI (unless such modification was authorized by HPES), (b) HPI's combination, operation or use of the HPES Provided Resource with products or resources not provided by HPES (unless such combination, operation or use was authorized by or at the written direction of HPES, or contemplated by this Agreement or documentation for such HPES Provided Resource), or (c) HPES' compliance with written specifications or directions provided by HPI to HPES;

**(B)** relating to the inaccuracy, untruthfulness or breach of any representation or warranty made by HPES in Section 21.2 ;

**(C)** relating to any amounts, including taxes, interest and penalties, assessed against any Service Recipient that are the obligation of HPES under this Agreement;

**(D)** relating to a breach of any covenant set forth in Section 22.2 ;

**(E)** relating to personal injury (including death) resulting from HPES' acts or omissions;

**(F)** relating to tangible personal or real property damage caused by HPES' negligence or willful misconduct;

**(G)** relating to HPES' failure to observe or perform any duties or obligations to be observed or performed on or after the Effective Date by HPES under any Third Party Service Contracts, including Assigned Contracts and Managed Contracts;

**(H)** by another customer of HPES arising from Services or Systems provided by HPES;

**(I)** relating to (1) HPES' failure to comply with any Law for which it is responsible pursuant to Section 8.2(A) , (2) HPES' performance of the Services in a manner that causes any Service Recipient to be out of compliance with any Law, or (3) any fine or other penalty imposed by Law arising as a result of a breach of any of HPES' obligations under this Agreement;

**IT Service Agreement**

52

**(J)** relating to HPES' failure to obtain or maintain any HPES Required Consents or comply with any HPI Required Consents;

**(K)** relating to (1) a violation of Law for the protection of persons or members of a protected class or category of persons by HPES, including unlawful discrimination, (2) work-related injury, except as may be covered by HPES' workers' compensation plan, or death caused by HPES, and (3) any representations, oral or written, made by HPES to any Service Recipient's employees or contractors (or employees of a Service Recipient's service providers);

**(L)** relating to a breach of Article 20 ;

**(M)** relating to any fraud, willful misconduct, intentional tortious conduct or gross negligence of HPES or any HPES Agents or HPES Personnel under this Agreement, including in connection with the provision of the Services; and

**(N)** by an HPES Agent or any HPES Personnel relating to a claim by such HPES Agent or HPES Personnel against HPES.

HPES will indemnify HPI and the other Service Recipients from any costs and expenses incurred in connection with the enforcement of this Section.

**24.2 Indemnity by HPI.**

HPI will indemnify, defend and hold harmless HPES and its officers, directors, employees, agents, successors and assigns from and against any Losses suffered, incurred or sustained by any such indemnitee or to which any such indemnitee becomes subject, resulting from, arising out of or relating to any third party claim:

**(A)** that any HPI IP (including HPI Software), or HPI Provided Equipment infringes upon the Intellectual Property Rights of any third party, except to the extent that such claim (1) results from activities that HPI was required or instructed by HPES to perform or (2) arises out of (a) a modification by HPES (unless the modification was in accordance with HPI's written instructions), (b) HPES' combination, operation or use of such Software or Equipment with products or resources not provided by HPI (unless such combination, operation or use was at the written direction of HPI), or (c) HPI's compliance with written specifications or directions provided by HPES to HPI;

**(B)** relating to the inaccuracy, untruthfulness or breach of any representation or warranty made by HPI in Section 21.1 ;

**(C)** relating to a breach of any covenant set forth in Section 22.1 ;

**(D)** relating to any amounts, including taxes, interest and penalties, assessed against HPES which are the obligation of HPI under this Agreement;

**(E)** relating to personal injury (including death) resulting from HPI's acts or omissions;

**(F)** relating to tangible personal or real property damage caused by HPI's negligence or willful misconduct;

**IT Service Agreement**

53

**(G)** relating to HPI's acts or omissions with respect to HPI's or its designee's performance of the Services during a step-in;

**(H)** by Service Recipients arising from the Services provided to such Service Recipients;

**(I)** relating to HPI's failure to observe or perform any duties or obligations to be observed or performed on or prior to the Effective Date by HPI under any Assigned Contracts;

**(J)** relating to HPI's failure to obtain or maintain any HPI Required Consents or comply with any HPES Required Consents;

**(K)** by an HPI Agent or any HPI personnel (except to the extent arising from any act or omission of HPES); and

**(L)** relating to a breach of HPI's obligations under Section 20.1 .

HPI will indemnify HPES from any costs and expenses incurred in connection with the enforcement of this Section.

**24.3  Infringement.**

If any HPES Provided Resource becomes, or in HPES' reasonable opinion is likely to become, the subject of an infringement, including misappropriation, claim or proceeding, HPES will, in addition to indemnifying HPI and the other Service Recipients as provided in this Article and to the other rights that HPI may have under this Agreement, (A) promptly, at HPES' expense, secure the right to continue using such HPES Provided Resource, or (B) if this cannot be accomplished with commercially reasonable efforts, then, at HPES' cost and expense, replace or modify such HPES Provided Resource to make it non-infringing, provided that any such replacement or modification will not degrade the performance or quality of such HPES Provided Resource or any affected component of the Services, or (C) if neither of the foregoing can be accomplished by HPES with commercially reasonable efforts, and only in such event, then remove such HPES Provided Resource from the Services, in which case the Charges will be equitably adjusted to reflect such removal.

**24.4  Indemnification Procedures.**

With respect to third party claims the following procedures will apply:

**(A)** Promptly after receipt by any entity entitled to indemnification under Section 24.1 or Section 24.2 of notice of the assertion or the commencement of any action, proceeding or other claim by a third party in respect of which the indemnitee will seek indemnification pursuant to any such Section, the indemnitee will notify the indemnitor of such claim. No failure to so notify an indemnitor will relieve it of its obligations under this Agreement except to the extent that it can demonstrate damages attributable to such failure. Within 15 days following receipt of notice from the indemnitee relating to any claim, but no later than 10 days before the date on which any response to a complaint or summons is due, the indemnitor will notify the indemnitee if the indemnitor acknowledges its indemnification obligation and elects to assume control of the defense and settlement of that claim (a " Notice of Election ").

**IT Service Agreement**

54

**(B)** If the indemnitor delivers a Notice of Election relating to any claim within the required notice period, the indemnitor will be entitled to have sole control over the defense and settlement of such claim, provided that (1) the indemnitee will be entitled to participate in the defense of such claim and to employ counsel at its own expense to assist in the handling of such claim; and (2) the indemnitor will obtain the prior approval of the indemnitee before entering into any settlement of such claim or ceasing to defend against such claim. After the indemnitor has delivered a Notice of Election relating to any claim in accordance with Section 24.4(A), the indemnitor will not be liable to the indemnitee for any legal expenses incurred by the indemnitee in connection with the defense of that claim. In addition, the indemnitor will not be required to indemnify the indemnitee for any amount paid or payable by the indemnitee in the settlement of any claim for which the indemnitor has delivered a timely Notice of Election if such amount was agreed to without the consent of the indemnitor.

**(C)** If the indemnitor does not deliver a Notice of Election relating to a claim, or otherwise fails to acknowledge its indemnification obligation or to assume the defense of a claim, within the required notice period, the indemnitee will have the right to defend the claim in such manner as it may deem appropriate, at the cost and expense of the indemnitor, including payment of any judgment or award and the costs of settlement or compromise of the claim. The indemnitor will promptly reimburse the indemnitee for all such costs and expenses, including payment of any judgment or award and the costs of settlement or compromise of the claim.

**24.5  Subrogation.**

In the event that an indemnitor will be obligated to indemnify an indemnitee pursuant to this Article, the indemnitor will, upon fulfillment of its obligations with respect to indemnification, including payment in full of all amounts due pursuant to its indemnification obligations, be subrogated to the rights of the indemnitee with respect to the claims to which such indemnification relates.

## 25.  LIABILITY

The limitations on liability applicable to this Agreement are set forth in Schedule 19.

## 26.  CONTINUED PROVISION OF SERVICES

**26.1  Force Majeure.**

**(A)** No Party will be liable for any default or delay in the performance of its obligations under this Agreement if and to the extent such default or delay is caused, directly or indirectly, by fire, flood, earthquake, elements of nature or acts of God, riots, civil disorders, or any other cause beyond the reasonable control of such Party, provided that the nonperforming Party is without fault in causing such default or delay, and such default or delay could not have been prevented by the use of commercially reasonable precautions, including, with respect to HPES, by HPES meeting its obligations for performing Disaster recovery services as described in Section 26.2 (a "Force Majeure Event").

**(B)** In the case of a Force Majeure Event, the nonperforming Party will be excused from further performance or observance of the obligations so affected for as long as such circumstances prevail and such Party continues to use commercially reasonable efforts to recommence performance or observance whenever and to whatever extent possible without delay. Any Party so delayed in its performance will promptly notify the Party to whom performance is due by telephone (to be confirmed

**IT Service Agreement**

55

in writing within two days of the inception of such delay) and describe at a reasonable level of detail the circumstances causing such delay.

**26.2   Disaster Recovery and Business Continuity.**

(A) The Parties acknowledge and agree that, as of the Effective Date, with respect to the HPES Service Locations owned by HPES prior to the Effective Date (each, a " Existing HPES Service Location "), HPES has provided HPI with access to HPES' existing disaster recovery and business continuity plans for each HPES Service Location owned by HPES prior to the Effective Date (each, an " Existing DR/BC Plan ") and a summary of each Existing DR/BC Plan is attached to Schedule 15 . HPES will execute the Existing DR/BC Plans upon the occurrence of a Disaster, in accordance with the provisions of such plans and the RTOs, RPOs and other requirements set forth therein or otherwise in Schedule 15 .

(B) With respect to the HPES Service Locations that were acquired in connection with the HP separation (each, an " Inherited HPES Service Location "), HPES will execute the applicable disaster recovery and business continuity plan (collectively the " Inherited DR/BC Plans ", together with the Existing DR/BC Plans, the " DR/BC Plans ") upon the occurrence of a Disaster, in accordance with the provisions of such plans. During Transition, HPES will perform assessments of the disaster recovery and business continuity plans for each of the Inherited HPES Service Locations and following each such assessment, unless HPES demonstrates that any Inherited DR/BC Plan is insufficient to allow HPES to meet the RTOs, RPOs and other requirements specified therein, HPES will comply with such RTOs, RPOs and other requirements following the applicable assessment. If HPES demonstrates that any Inherited DR/BC Plan is insufficient to allow HPES to meet the RTOs, RPOs and other requirements specified therein, the Parties will agree to adjust the applicable RTOs, RPOs or other requirements or HPES will update the applicable Inherited DR/BC Plan on a Project basis.

(C) In the event that HPES revises or updates any DR/BC Plan so as could reasonably be expected to adversely impact the performance of the Services, HPES will promptly provide notice of such impact, the Parties will agree on a remediation plan to remedy such adverse impact, and HPES will execute such remediation plan. HPES will: (1) update and test (at the frequency set forth therein) the operability of the DR/BC Plans to ensure that the same are fully operational (the test results of such tests to be made available to HPI upon request); and (2) certify to HPI at least once during every 12-month period during the Term that the applicable DR/BC Plan is fully operational. Unless otherwise specified in this Section, HPES will perform its obligations under this Section at no additional cost to HPI.

(D) HPES will cooperate with HPI and Third Party Providers in joint Disaster recovery and business continuity planning and testing activities, subject to the Parties' respective risk management policies and procedures. HPES will provide HPI with a draft copy of the results of all Disaster recovery tests conducted by or for HPES to the extent such results are relevant to the Services. HPES will allow HPI to participate in (1) any determinations regarding whether the Business Continuity Plan and the Disaster Recovery Plan has, or will, meet the RTOs and RPOs or HPI's business recovery objectives and (2) any official or final statement of the results of any Disaster recovery and business continuity testing activities.

(E) Upon HPI's request, HPES will participate in any periodic crisis "table top" exercises conducted by HPI at any time during the Term; provided, that, other than with respect to Transition, HPES will not be obligated to participate in any more than 2 such exercises per year. HPES' participation will include developing Disaster scenarios and making any HPES Personnel available to support such crisis "table top" exercises (including on site at HPI Service Locations), as requested by HPI.

**IT Service Agreement**

56

**26.3  Alternate Source; Termination.**

**(A)** If the performance of all or a portion of the Services is prevented, hindered or delayed for more than and cannot be restored within the RTOs established for such Services in <u>Schedule 15</u> , or three days, in the case of all Services that do not have RTOs established, then HPI may procure such Services from an alternate source, and HPES will be liable for payment for such Services from the alternate source for so long as the prevention, hindrance, or delay in performance continues, but no longer than 180 days from the commencement of use of the alternate source. For the avoidance of doubt, HPI's payment obligations to HPES will not be affected by the preceding provision.

**(B)** If the performance of all or any material portion of the Services is prevented, hindered or delayed for more than seven days as a result of a Force Majeure Event, HPI, at its sole discretion, may, upon no less than seven days' notice to HPES, terminate this Agreement, in whole or in part, as of the termination date specified in the notice, without cost or penalty subject to payment of any applicable termination charges set forth in <u>Section 7.2(B)</u> of <u>Schedule 5</u> . If the performance of a non-material portion of the Services is prevented, hindered, or delayed for more than seven days as a result of a Force Majeure Event, HPI, at its sole discretion, may, upon no less than seven days' notice to HPES, terminate the affected Services as of the termination date specified in the notice, without cost or penalty subject to payment of any applicable termination charges set forth in <u>Schedule 5</u> .

**26.4  Allocation of Resources.**

Whenever a Force Majeure Event or a Disaster causes HPES to allocate limited resources between or among HPES' customers, HPES will not give any other customers of HPES priority over HPI unless such customers have specifically contracted for priority in such events. HPES will not redeploy or reassign any individual in a Key HPES Position to another account in the event of a Force Majeure Event.

**27.  STEP-IN RIGHTS**

**27.1  Step-In Rights.**

In the event (A) of a material disruption (including a disruption arising out of a Force Majeure Event or repeated Service Level failures) to a Service classified as being subject to step-in rights in <u>Schedule 3-A</u> or <u>Schedule 3-B</u> , as applicable, that is not cured within 15 days following the commencement of the disruption or (B) HPI is directed, or required, by Law or Governmental Authority to step in, HPI may step in and supervise or perform, or designate an HPI Agent to step in and supervise or perform, HPES' performance of the impacted Services, until such time that HPES can demonstrate the ability to resume the performance of such Services, provided that HPI or its designee may not exercise HPI's step-in rights with respect to resources that are used by HPES to support other HPES customers and which cannot be readily segmented. Following the Step-In Date, HPI will not be obligated to pay the Charges for such impacted Services for the duration of the step-in period and, if HPI steps in as a result of the circumstances described in subsection (A), HPES will reimburse HPI for HPI's costs and expenses incurred as a result of exercising its rights under this Section to the extent such costs and expenses exceed the Charges that would have been payable by HPI for the impacted Services had HPI not exercised its step-in rights. HPI's exercise of its rights under this Section will not constitute a waiver by HPI of any rights it may have (including HPI's rights to terminate this Agreement) before, on or after the Step-In Date. HPES will cooperate with HPI or such HPI Agent in respect of such step-in, including by providing access to Software, Equipment and Service Locations and any other assistance and information requested by HPI or the HPI Agent, and by providing HPI or such HPI Agent space at the

**IT Service Agreement**

57

HPES Service Location. In the event HPI exercises its right to terminate this Agreement in connection with the events giving rise to a step-in, HPI may initiate or continue exercising its step-in rights during a Disengagement Period. Notwithstanding any of the foregoing, HPI's exercise of such Step-In Rights will not exceed 180 days in duration, regardless of the cause of such Step-In.

**27.2    Step-Out.**

**(A)** If HPI exercised its step-in rights in accordance with Section 27.1 , HPI may elect to cease exercising its right to step-in at any time by giving notice to HPES (a " Step-Out Notice ").

**(B)** Within three business days after the Step-In Date, HPES will develop a plan to demonstrate to HPI how it will resume the proper performance of the applicable Services (a " Step-Out Plan "), and will submit the Step-Out Plan to HPI for approval. Approval by HPI of the Step-Out Plan will not constitute a waiver by HPI of any rights it may have if HPES is unable to perform any of its obligations in accordance with the terms of this Agreement after the Step-Out Date. The Step-Out Plan and delivery of the Services will remain HPES' responsibility.

**(C)** Following receipt and review of the Step-Out Plan, HPI will either (1) confirm the date for resumption of the affected Services by HPES as being the date set out in the Step-Out Notice or (2) subject to the last sentence of Section 27.1 , revise the date to reflect the time to implement the Step-Out Plan and the state of readiness of HPES. The date notified by HPI under clause (1) or clause (2) will be the " Step-Out Date ." Once HPI has notified HPES of a Step-Out Date, HPES will devote the necessary resources to implement the Step-Out Plan such that delivery of the affected Services by HPES is restored to the Service Levels, and that the affected Services are delivered in accordance with all other provisions of this Agreement, from the Step-Out Date.

**(D)** During any step-in period, the Parties will meet at least weekly to discuss progress toward remedying the event which gave rise to exercise of the step-in right, including deciding whether or not HPES can resume performance of the affected Services. By exercising its right to step-in HPI will not, and will not be deemed to, assume any obligation to resolve the event giving rise to its right to step-in or relieve HPES of any obligation or liability in relation to that event or relieve HPES of any of its other obligations or liabilities under this Agreement.

## 28.    DISPUTE RESOLUTION

The Parties will adhere to the procedures set forth in this Article in all disputes arising under this Agreement. All deadlines specified in this Article may be extended or shortened by agreement of the Parties. The procedures specified in this Article will be the sole and exclusive procedures for the resolution of disputes between the Parties arising out of or relating to this Agreement; provided, however, that a Party may seek injunctive relief in accordance with the provisions of this Article. Despite such action, the Parties will continue to participate in good faith in the procedures specified in this Article.

**28.1    Informal Dispute Resolution.**

**(A)** Prior to the initiation of litigation, as described in this Article, the Parties will first attempt to resolve their dispute informally, as set forth in this Section. Either Party may initiate the informal dispute resolution process set forth in this Section by giving notice of a dispute (" Notice of Dispute "). The Notice of Dispute and the response will include (1) a statement of the dispute and (2) the

**IT Service Agreement**

58

name and title of the Contract Manager who will represent that Party in attempting to resolve the dispute and of any other person who will accompany the Contract Manager.

**(B)** Within 10 business days of the delivery of the Notice of Dispute, the Contract Managers of each Party will meet (and will continue to meet as often as the Parties reasonably deem necessary) in order to gather from and furnish to the other all information with respect to the matter at issue which the Parties believe to be appropriate and germane in connection with its resolution and attempt in good faith to resolve such dispute.

**(C)** If, within 15 business days of the delivery of the Notice of Dispute, the Contract Managers are unable to resolve the dispute, either Party may escalate the dispute to the Relationship Managers. The Relationship Managers of each Party will meet (and will continue to meet as often as the Parties reasonably deem necessary) in order to attempt in good faith to resolve such dispute.

**(D)** During the course of informal dispute resolution, all reasonable requests made by one Party to another for non-privileged information reasonably related to the dispute will be honored in order that each of the Parties may be fully advised of the other's position. All negotiations and proceedings pursuant to this Section will be confidential and will be treated as compromise and settlement negotiations for purposes of applicable rules of evidence.

**28.2    Formal Dispute Resolution.**

Litigation of a dispute may be commenced by either Party upon the earlier to occur of any of the following: (A) either Party concludes in good faith that amicable resolution through informal dispute resolution in accordance with Section 28.1 does not appear likely; (B) 20 business days have elapsed from the delivery of the Notice of Dispute (this period will be deemed to run notwithstanding any claim that the process described in Section 28.1 was not followed or completed); (C) commencement of litigation is appropriate to avoid the expiration of an applicable limitations period or to preserve a superior position with respect to other creditors; or (D) a Party makes a good faith determination, including as provided in Section 28.4 , that a breach of this Agreement by the other Party is such that a temporary restraining order or other injunctive relief is necessary.

**28.3    Governing Law, Jurisdiction and Venue.**

This Agreement and performance under this Agreement will be governed by and construed in accordance with the Laws of the State of California without regard to its choice of Law principles. The Parties irrevocably and unconditionally consent to venue in the State of California (and hereby waive any claims of forum non conveniens with respect to such venue) and to the exclusive jurisdiction of competent California state courts in Santa Clara County or federal courts in the Northern District of California for all litigation which may be brought with respect to the terms of, and the transactions and relationships contemplated by, this Agreement. The Parties further consent to the jurisdiction of any state court located within a district that encompasses assets of a Party against which a judgment has been rendered for the enforcement of such judgment against the assets of such Party.

**28.4    Equitable Remedies.**

HPES acknowledges that, in the event it breaches (or attempts or threatens to breach) its obligations provided in Article 17 , Article 20 or Article 31 , HPI may be irreparably harmed. HPI acknowledges that, in the event it breaches (or attempts or threatens to breach) its obligations provided

**IT Service Agreement**

59

in Section 20.1 , HPES may be irreparably harmed. In either such a circumstance, the non-breaching Party may proceed directly to court. If a court of competent jurisdiction should find that a Party has breached (or attempted or threatened to breach) any such obligations, such Party agrees that, without any additional findings of irreparable injury or other conditions to injunctive relief, it will not oppose the entry of an appropriate order compelling performance by such Party and restraining it from any further breaches (or attempted or threatened breaches).

### 28.5   Continued Performance.

Each Party agrees to continue performing its obligations under this Agreement while a dispute is being resolved except to the extent the issue in dispute precludes performance (dispute over payment will not be deemed to preclude performance) and without limiting either Party's right to terminate this Agreement as provided in Article 29 .

## 29.    TERMINATION BY HPI

### 29.1   Termination for Cause.

In the event that:

**(A)** HPES commits a material breach of an obligation under this Agreement that is capable of being cured within 30 days after notice of breach from HPI to HPES, but is not cured in such 30-day period;

**(B)** HPES commits a material breach of an obligation under this Agreement that is not capable of being cured within 30 days but is capable of being cured within 60 days and fails to (1) proceed promptly and diligently to correct the breach, (2) develop within 30 days following notice of breach from HPI a complete plan for curing the breach, and (3) cure the breach within 60 days of notice thereof;

**(C)** HPES commits a material breach of an obligation under this Agreement that is not subject to cure with due diligence within 60 days of notice thereof; or

**(D)** HPES commits numerous breaches of its duties or obligations which collectively constitute a material breach of an obligation under this Agreement;

HPI may, by giving notice to HPES, terminate this Agreement, in whole or in part, as of a date specified in the notice of termination, without cost or penalty and without payment of any termination charges by HPI, subject to Section 7.1(B) of Schedule 5 to the Agreement.

### 29.2   Termination for Convenience.

Following the second anniversary of the Effective Date, HPI may terminate this Agreement, in whole or in part, for convenience and without cause at any time by giving HPES at least 90 days' prior notice designating the termination date and paying to HPES on the effective date of termination the amounts described in Section 29.8 . If a purported termination for cause by HPI is determined by a competent authority not to have been properly a termination for cause, then such termination by HPI will be deemed to have been a termination for convenience.

### 29.3   Termination for Multiple Critical Service Level Defaults.

**IT Service Agreement**

60

In the event HPES (A) experiences three or more consecutive Critical Service Level Defaults with respect to the same Critical Service Level or (B) experiences four or more Critical Service Level Defaults with respect to the same Critical Service Level within a rolling six-month period, then HPI may, by giving notice to HPES, terminate this Agreement, in whole or in part, as of a date specified in the notice of termination, without cost or penalty and without payment of any termination charges by HPI, subject to Section 7.1(B) of Schedule 5 to the Agreement. In no event will this Section limit HPI's right to terminate this Agreement in accordance with Section 29.1 .

**29.4   Termination Upon Change of Control.**

Other than with respect to any change of Control occurring as a part of the split of HP, publicly announced in October 2014, in the event, after the Effective Date, (A) another entity directly or indirectly, in a single transaction or series of related transactions, acquires either Control of HPES or all or substantially all of the assets of HPES or the business unit of HPES providing the Services, or (B) HPES is merged with or into another entity to form a new entity, then, at any time within nine months after the last to occur of such events, HPI may, by giving at least 90 days' prior notice to HPES, terminate this Agreement, in whole or in part, as of a date specified in the notice of termination, without cost or penalty and without payment of any termination charges by HPI, subject to the payment of any applicable termination charges set forth in Section 7.2(C) of Schedule 5 .

**29.5   Termination for Insolvency.**

If (A) a Party files a voluntary petition in bankruptcy or an involuntary petition is filed against it; (B) a Party is adjudged bankrupt; (C) a court assumes jurisdiction of the assets of a Party under a federal reorganization act, or other statute; (D) a trustee or receiver is appointed by a court for all or a substantial portion of the assets of a Party; (E) a Party becomes insolvent, suspends business or ceases to conduct its business in the ordinary course; (F) a Party makes an assignment of its assets for the benefit of its creditors, then the other Party may, by giving at least 60 days' prior notice to such Party, terminate this Agreement, as of a date specified in the notice of termination, without cost or penalty and without payment of any termination charges. Each Party will provide prompt notice to the other Party of any such event relating to it.

**29.6   Other Terminations.**

In addition to the termination rights set forth in this Article, this Agreement may be terminated as provided in Section 7.5 , Section 8.2(D) , Section 17.5 , Section 18.6(E) , Section 20.4 , Section 26.3(B) , Section 32.3(B) and Section 2.2(F) of Schedule 19 .

**29.7   Partial Terminations.**

Where HPI may terminate this Agreement in part, HPI may terminate a Tower, Sub-Tower or multiple Towers or Sub-Towers. If HPI chooses to terminate this Agreement in part, the Charges payable under this Agreement will be adjusted as follows: (A) if this entire Agreement is terminated, all Charges will cease, (B) if a partial termination eliminates a Tower altogether, then all Charges for that Tower will cease, (C) if a partial termination eliminates a Service altogether, then all Charges for that Service will cease (subject to any adjustments provided by Schedule 5 ), and (D) if a partial termination reduces the volume of a Service provided but does not eliminate the Service, then the Charges will be adjusted in accordance with the applicable Charges Methodology.

**IT Service Agreement**

61

"Sub-Tower" as used in this Section, means, with respect to each Tower, the sub-towers as set forth below:

| Tower | Sub-Tower |
|---|---|
| Servers, Storage, and Cloud | ¡ Monitoring and management of servers (physical, virtual, private cloud) |
| | ¡ Monitoring and management of storage (SAN storage, monthly backup) |
| Data Center | ¡ Houston and Austin Data Centers |
| | ¡ Remote Data Centers |
| | ¡ Disaster Recovery and Business Continuity |
| Managed Network | ¡ Monitoring and management of network data devices (routers, switches, WAPs, firewalls) |
| | ¡ Monitoring and management of network voice devices (PBXs, voice gateways, voicemail systems, IP phones) |
| | ¡ Contact Center Support |
| | ¡ Partner Connectivity Services |
| | ¡ Telecom Expense Management |
| Managed Security | ¡ Security Operations Center services |
| | ¡ IDS / IPS monitoring, management |
| | ¡ Vulnerability Management, Threat Analytics & Intelligence services |
| | ¡ Policy compliance management |
| | ¡ Digital investigative services |
| Identify & Access Mgt. | ¡ End user account access management and administration |
| | ¡ Device and system account access management and administration |
| | ¡ Enterprise Directory and Active Directory |
| Service Desk | ¡ Level 1 support in English, French, Latin American Spanish, Mandarin Chinese, Korean, Latin American Portuguese, and Japanese |
| | ¡ SPOC for all HPI Contacts |
| End User Computing | ¡ On-site end user device management and support via dedicated technicians |
| | ¡ Sharepoint |
| | ¡ Email, Messaging and Chat |
| | ¡ Remote end user device management and support |
| | ¡ O365 Wrapper Services |
| | ¡ Depot services and Walk-In Centers |
| Cross Functional | ¡ Release, Change, Incident, Problem, Configuration, Service, Project & Demand Management |
| | ¡ Asset Management and Procurement |
| | ¡ Compliance Support |
| Enterprise Print | ¡ Enterprise Print Infrastructure Management |
| | ¡ Enterprise Document Management and Document Database Design |
| Application Operations and Support | ¡ L2 Support Functions, including Incident and Problem Management for 655 in-scope Applications |
| | ¡ Application operations and support for 933 in-scope Applications |
| | ¡ SAP Deep Level Support (L3-L4) |
| | ¡ SAP Database Support |
| Application Development | ¡ GSCS SAP applications |
| | ¡ GSCS Non-SAP applications |
| | ¡ CSS applications |
| Application Maintenance | ¡ GSCS SAP applications |
| | ¡ GSCS Non-SAP applications |
| | ¡ CSS applications |

**IT Service Agreement**

**29.8  Termination Charges.**

No termination charges will be payable by HPI in connection with the termination of this Agreement, except as set forth in Article 7 of Schedule 5 . Where termination charges are payable by HPI under this Agreement, such termination charges will fully compensate HPES for all costs and expenses (including any amounts payable by HPES to HPES Agents or any other third parties) associated with the termination of any of this Agreement. HPI will not be responsible for payment of any other amounts to HPES, except for any charges calculated in accordance with the applicable Charges Methodology for Services properly performed in accordance with this Agreement up until the effective date of termination.

**29.9  Charges Payable by HPES Upon Expiration or Termination.**

Upon expiration or termination of this Agreement, HPES will refund any Charges that were prepaid by HPI on a pro rata basis to the extent that such represent pre-payment for Services not performed.

**29.10  Extension of Termination or Expiration Effective Date.**

HPI may extend the effective date of termination or expiration one or more times as it elects, at its discretion, by notice to HPES at least 60 days prior to the then-current effective date of termination or expiration, provided that the total of all such extensions will not exceed 180 days following the original effective date of termination or expiration.

**30.    TERMINATION BY HPES**

In the event that HPI fails to pay HPES undisputed past due Charges totaling an amount equal to three times the average monthly Charges for the past rolling 12 month period and fails to make such payment within 30 days of receipt of notice from HPES of the failure to make such payment, HPES may, by giving notice to HPI, terminate this Agreement as of the date specified in such notice of termination.

**31.    DISENGAGEMENT SERVICES**

**31.1  General.**

**(A)** If this Agreement terminates or expires for any reason (including termination by HPES in accordance with Article 30 ), at HPI's request, HPES will, during the Disengagement Period, provide the Disengagement Services to the Service Recipients and their successors and assigns, as applicable. The quality and level of performance (including Service Levels) during the Disengagement Period will not be degraded. After the expiration of each Disengagement Period, HPES will (1) answer questions from any Service Recipient or HPI's designee regarding the terminated Services on an "as needed" basis for a reasonable period of time thereafter and (2) deliver to HPI any remaining HPI-owned reports and documentation still in HPES' possession.

**(B)** " Disengagement Services " will include the obligations set forth in Schedule 16 , the obligation to continue to provide the Services, and the following:

(1) HPI or HPI's designee will be permitted to undertake, without interference from HPES, to hire any HPES Personnel dedicated to performing the Services that are

**IT Service Agreement**

subject to termination or expiration as of the date HPES receives notice of termination, or, in the case of expiration, within the six-month period prior to expiration. HPES will waive, and will cause its HPES Agents to waive, their rights, if any, under contracts with such personnel restricting the ability of such personnel to be recruited or hired by HPI or HPI's designee. HPI or its designees will have reasonable access to such personnel for interviews and recruitment and HPES will not interfere with HPI's or HPI's designee's efforts to hire such individual (including by making counteroffers).

(2) At HPI's request, HPES will (a) assign to HPI or its designees leases for some or all of the Equipment that was, as of the date of termination or expiration, dedicated to providing the Services that are subject to termination or expiration, and HPI will assume the obligations under such leases that relate to periods after such date and (b) sell to HPI or its designees, at the lower of HPES' then-current book value or fair market value, some or all of the Equipment owned by HPES that was necessary as of the date of termination or expiration dedicated for providing the Services that are subject to termination or expiration. HPES will also provide all End User and other documentation relevant to such Equipment which is in HPES' possession. Upon HPI's review and approval of any maintenance agreements for such Equipment, HPI will assume responsibility under any such maintenance agreements to the extent such responsibilities relate to periods after the date of termination or expiration. HPI will pay all taxes, shipping, transfer and similar charges payable to third parties in connection with the transfers of such Equipment.

(3) At HPI's request, HPES will assign to HPI or its designees (i) the contracts for third party services dedicated to the performance of the Services that are subject to termination or expiration and (ii) the Assigned Contracts that relate to the Services that are subject to termination or expiration. With respect to contracts for third party services that are not dedicated to the performance of the Services, HPES will assist HPI with obtaining rights to such services on terms and conditions similar to HPES' terms and conditions for such services. HPES will be entitled to retain the right to utilize any such third party services in connection with the performance of services for any other HPES customer.

**31.2   Disengagement Period.**

HPES will provide, at HPI's request, the Disengagement Services during the period commencing (A) six months prior to expiration of this Agreement or on such earlier date as HPI may request or (B) upon a notice of termination (including notice based upon default by HPI) of this Agreement or of non-renewal of this Agreement, and continuing for up to 18 months (the " Disengagement Period "). Actions by HPES under this Section will be subject to the other provisions of this Agreement.

**31.3   Charges for Disengagement Services.**

The steady-state Services that HPES continues to provide during a Disengagement Period will be provided for the Charges applicable to such Services, as set forth in Schedule 5 . HPES will use commercially reasonable efforts to perform the other Disengagement Services at no additional Charge to HPI using the HPES Personnel assigned to the HPI account as of the date of notice of the termination or expiration. If HPES is unable to do so, HPES will notify HPI and, if HPI elects for HPES to perform the Disengagement Services for an additional Charge, then the Charges will be calculated using the applicable rates set forth in the Rate Card.

**31.4   Bid Assistance.**

In the process of evaluating whether to undertake or allow termination, expiration or renewal of

**IT Service Agreement**

64

this Agreement, HPI or other Service Recipients may consider obtaining, or determine to obtain, offers for performance of services similar to the Services following termination or expiration of this Agreement. As and when reasonably requested by HPI for use in this process, HPES will provide to HPI or other Service Recipients such information and other cooperation regarding performance of the Services as would be reasonably necessary for a third party to prepare an informed, non-qualified offer for such services, and for a third party not to be disadvantaged compared to HPES if HPES were to be invited by HPI to submit a proposal. The types of information and level of cooperation to be provided by HPES pursuant to this Section will be no less than those initially provided by HPI to HPES prior to commencement of this Agreement. HPES' support in this respect will include providing information regarding Equipment, Software, Service Level performance, volumetrics, staffing and other matters as applicable to this Section.

## 32. MISCELLANEOUS

### 32.1 Binding Nature and Assignment.

This Agreement will be binding on the Parties and their respective successors and assigns. Neither Party may, or will have the power to, assign this Agreement without the prior consent of the other, except that HPI may assign its rights and obligations under this Agreement without the approval of HPES, provided that the assignee or transferee assumes all obligations under this Agreement and such assignee or transferee has a credit worthiness that is similar to or greater than HPI's credit worthiness. Subject to the foregoing, any assignment by operation of Law, order of any court, or pursuant to any plan of merger, consolidation or liquidation, will be deemed an assignment for which prior consent is required and any assignment made without any such consent will be void and of no effect as between the Parties.

### 32.2 Entire Agreement; Amendment.

This Agreement, including any Schedules referred to herein and attached hereto and any Appendices referred to therein and attached thereto, each of which is incorporated herein for all purposes, constitutes the entire agreement between the Parties with respect to the subject matter hereof and supersedes all prior agreements, whether written or oral, with respect to the subject matter contained in this Agreement. No amendment of this Agreement will be valid unless in writing and signed by an authorized representative of each Party (as designated by each Party from time to time).

### 32.3 Conflict of Interest; Compliance with Anti-Corruption Laws.

(A) HPES acknowledges that provision of the Services and acceptance of compensation, if any, from HPI for the Services does not violate the standards of business conduct of HPES.

(B) HPES will not pay any salaries, commissions, fees or make any payments or rebates to any employee or agent of HPI, or to any designee of such employee or agent, or favor any employee or agent of HPI, or any designee of such employee or agent, or otherwise provide any gifts, entertainment, services or goods to such employees or agents which might unduly influence HPI's actions with respect to HPES, or which might violate any Law (collectively, " Gratuities "). HPES agrees that its obligation to HPI under this Section will also be binding upon HPES Agents. If HPI has, before or after the Effective Date, provided any Gratuities in violation of this Section, HPI may, upon notice to HPES, terminate this Agreement without regard to Section 29.1 , in whole or in part, as of the

**IT Service Agreement**

65

termination date specified in the notice, without cost or penalty and without the payment of any termination charges, subject to <u>Section 7.1(B)</u> of <u>Schedule 5</u> to the Agreement.

**(C)** HPES will comply (and will ensure its officers, directors, employees and contractors, HPES Agents, agents and any person or entity acting on its behalf or under its control with respect to this Agreement comply) with all applicable U.S. and international anti-corruption Laws, including the U.S. Foreign Corrupt Practices Act and the UK Bribery Act. No payments or transfers of value will be made with respect to the Services contemplated by this Agreement which have the purpose or effect of public or commercial bribery, acceptance or acquiescence in extortion, kickbacks or other unlawful or improper means of obtaining or retaining business or directing business to any person or entity. HPES will cooperate in HPI's efforts to enforce the terms of this provision, including by providing upon request from HPI: (1) certification of compliance with this provision as signed by an authorized representative of HPES; and (2) reasonable and prompt cooperation at HPES' cost and expense with respect to any investigation relating to this provision.

### 32.4  Export.

Each Party will comply with all Export Controls. Prior to exporting (or requesting that the other Party export) any technology or material (including data) from one country to another country in connection with the Services, the originator of such technology or other material will promptly (with cooperation and assistance from the other Party): (A) identify the Export Controls applicable to such technology and materials, including any required licenses, consents, authorizations or approvals; (B) notify the other Party of such Export Controls; (C) obtain any such required licenses, consents, authorizations and approvals; and (D) provide any documents requested by the other Party to demonstrate compliance with the Export Controls. In addition, HPES will not access any HPI Data or provide any Services from a country embargoed by the United States.

### 32.5  Notices.

All notices, requests, demands and determinations under this Agreement (other than routine operational communications), will be in writing and will be deemed duly given (A) when delivered by hand, (B) one business day after being given to an express courier with a reliable system for tracking delivery, (C) when sent by confirmed facsimile or electronic mail with a copy sent by another means specified in this Section, or (D) four business days after the day of mailing, when mailed by U.S. mail, registered or certified, return receipt requested, postage prepaid, and addressed as follows:

> In the case of HPI:  Hewlett-Packard Company
> 1501 Page Mill Road
> Palo Alto, CA 94304
> Attn: **Chief Information Officer**
>
> Following the change of name of Hewlett-Packard Company to
> HP Inc.:
>
> HP Inc.
> 1501 Page Mill Road
> Palo Alto, CA 94304
> Attn: **Chief Information Officer**

**IT Service Agreement**

66

With a copy to:        Hewlett-Packard Company
                       1501 Page Mill Road
                       Palo Alto, CA 94304
                       Attn: **General Counsel**

                       Following the change of name of Hewlett-Packard Company to
                       HP Inc.:

                       HP Inc.
                       1501 Page Mill Road
                       Palo Alto, CA 94304
                       Attn: **General Counsel**

In the case of HPE:    HP Enterprise Services, LLC
                       5400 Legacy Drive
                       Plano, TX 75024
                       Attn: Senior Vice President, General Manager, Americas

With a copy to:        HP Enterprise Services, LLC
                       5400 Legacy Drive
                       Plano, TX 75024
                       Attn: Deputy General Counsel, Services

A Party may from time to time change its address or designee for notification purposes by giving the other Party prior notice of the new address or designee and the date upon which it will become effective.

**32.6  Relationship of Parties.**

HPES, in furnishing the Services, is acting as an independent contractor, and HPES has the sole right and obligation to supervise, manage, contract, direct, procure, perform or cause to be performed, all work to be performed by HPES under this Agreement. HPES is not an agent of HPI and has no authority to represent HPI or any other Service Recipient as to any matters, except as expressly authorized in this Agreement.

**32.7  Equal Opportunity Employer.**

HPES represents that (A) it is an equal opportunity employer and does not discriminate on the basis of race, sex, age, national origin, disability, marital status, veteran status or any other basis forbidden by Law; (B) Services will be provided in conformance with the above-stated nondiscrimination policy and all applicable equal opportunity laws and policies; and (C) it will not directly or indirectly violate the letter or spirit of such Laws and policies.

**32.8  Severability.**

In the event that any provision of this Agreement conflicts with the Law under which this Agreement is to be construed or if any such provision is held invalid by a competent authority, such

**IT Service Agreement**

67

provision will be deemed to be restated to reflect as nearly as possible the original intentions of the Parties in accordance with applicable Law. The remainder of this Agreement will remain in full force and effect.

### 32.9  Consents and Approval.

Where agreement, approval, authorization, acceptance, consent, or similar action by either Party is required under this Agreement, such action will be in writing and, except where expressly provided as being in the discretion of a Party, will not be unreasonably delayed or withheld. An approval or consent given by a Party under this Agreement will not relieve the other Party from responsibility for complying with the requirements of this Agreement, nor will it be construed as a waiver of any rights under this Agreement, except as and to the extent otherwise expressly provided in such approval or consent.

### 32.10  Waiver of Default; Cumulative Remedies.

**(A)** A delay or omission by either Party to exercise any right or power under this Agreement will not be construed to be a waiver thereof. A waiver by either of the Parties of any of the covenants to be performed by the other Party or any breach thereof will not be construed to be a waiver of any succeeding breach thereof or of any other covenant specified herein.

**(B)** Except as otherwise expressly provided herein, all remedies provided for in this Agreement will be cumulative and in addition to and not in lieu of any other remedies available to either Party at law or in equity.

### 32.11  Survival.

Any provision of this Agreement which contemplates performance or observance subsequent to termination or expiration of this Agreement will survive termination or expiration of this Agreement and continue in full force and effect.

### 32.12  Public Disclosures.

Neither Party may use the name of the other Party or refer to it or any of its Affiliates, directly or indirectly, in any advertisement, promotion, news release, marketing materials, user lists, customer lists, websites, professional or trade publication, or for any other public purpose, without the prior approval of the other Party. The foregoing does not prevent announcements intended solely for internal distribution or disclosures to the extent required to meet legal or regulatory requirements beyond the reasonable control of the disclosing Party, which will be coordinated with and approved by the other Party prior to release.

### 32.13  Service Marks.

HPI trademarks, trade names, and any other HPI proprietary or other Intellectual Property Rights that may need to be used by HPES in performance of the Services may only be used by HPES with HPI's express, prior consent and only in the specific manner approved by HPI. HPES acknowledges that it does not have nor will it obtain any proprietary interest in such trademarks, trade names or other HPI proprietary or other Intellectual Property Rights. HPES agrees not to use such trademarks and trade names, or any other proprietary or other Intellectual Property Rights, or marks or names confusingly

**IT Service Agreement**

68

similar thereto, as part of its corporate or business name, or on its letterhead or other business stationery or cards. HPES trademarks, trade names, and any other HPES proprietary or other Intellectual Property Rights that may need to be used by HPI in connection with the Services may only be used by HPI with HPES' express, prior consent and only in the specific manner approved by HPES. HPI acknowledges that it does not have nor will it obtain any proprietary interest in such trademarks, trade names or other HPES proprietary or other Intellectual Property Rights. HPI agrees not to use such trademarks and trade names, or any other proprietary or other Intellectual Property Rights, or marks or names confusingly similar thereto, as part of its corporate or business name, or on its letterhead or other business stationery or cards.

**32.14 Third Party Beneficiaries.**

This Agreement is entered into solely between, and may be enforced only by, HPI and HPES, and this Agreement will not be deemed to create any rights in, or obligations of a Party to, third parties other than the Service Recipients.

**32.15 Covenant of Good Faith.**

Each Party agrees that, in its respective dealings with the other Party under or in connection with this Agreement, it will act in good faith.

**32.16 Covenant of Further Assurances.**

HPI and HPES covenant and agree that, subsequent to the execution and delivery of this Agreement and without any additional consideration, each of HPI and HPES will execute and deliver any further legal instruments and perform any acts that are or may become necessary to effectuate the purposes of this Agreement.

**32.17 Negotiated Agreement.**

The Parties agree that the terms and conditions of this Agreement are the result of negotiations between the Parties and that this Agreement will not be construed in favor of or against any Party by reason of the extent to which any Party or its professional advisors participated in the preparation of this Agreement.

**32.18 Counterparts.**

This Agreement may be executed in several counterparts, all of which taken together will constitute one single agreement between the Parties.

**IT Service Agreement**

69

IN WITNESS WHEREOF, HPI and HPES have each caused this Agreement to be signed and delivered by its duly authorized officer, all as of the Effective Date.

**HEWLETT-PACKARD COMPANY**                    **HP ENTERPRISE SERVICES, LLC**

| /s/ Jon Flaxman | /s/ Mike Nefkens |
|---|---|
| Signature | Signature |
| Jon Flaxman | Mike Nefkens |
| Name | Name |
| Chief Operating Officer | Executive Vice President, Enterprise Services |
| Title | Title |

**IT Service Agreement**

70

**SCHEDULE 1**

**DEFINED TERMS**

**to the**

**INFORMATION TECHNOLOGY SERVICE AGREEMENT**

**between**

**HP INC.**

**and**

**HP ENTERPRISE SERVICES, LLC**

*HPI Confidential Information*

**Schedule 1**
**Defined Terms**

| | |
|---|---|
| *Abandoned* | means a call to the Service Desk is considered "Abandoned" under the following conditions: (1) the caller elects to be routed to voice mail or a status box, (2) the call is terminated by the caller prior to waiting thirty (30) seconds, or (3) if the call is terminated by the caller prior to the caller making a final option selection from the IVR system and being placed into a call queue. A call is also considered 'Abandoned' in all other cases where a live agent does not answer. |
| *Acceptance and its derivatives* | means the determination by HPI, in accordance with the acceptance procedures described in Schedule 6 to the Agreement, following achievement or completion of a Migration Milestone, Migration Deliverable or other Milestone or Deliverable by HPES, that such Migration Milestone, Migration Deliverable or other Milestone or Deliverable is in compliance with its Acceptance Criteria or Non-Software Deliverable Requirements, as applicable. |
| *Acceptance Criteria* | has the meaning set forth in Section 11.1 of Schedule 6 to the Agreement. |
| *Acceptance Period* | has the meaning set forth in Section 11.2, Section 11.3 and Section 11.4 of Schedule 6 to the Agreement. |
| *Acceptance Testing* | has the meaning set forth in Section 11.2 of Schedule 6 to the Agreement. |
| *Account Provisioning* | means the initial provisioning and ongoing management of user accounts and credentials required to access HPI applications, software, and systems. Account provisioning includes user account creations, modifications, deletions, and the logging and reporting functions associated with each type of user account creation, modification, or deletion. |
| *ACL* | means Access Control List. |
| *"Acquisition Entity" or "Expansion Entity"* | means any entity or business that is the subject of an Acquisition or Expansion Event. |
| *"Acquisition Event" or "Expansion Event"* | means the (1) acquisition by HPI of an entity or business or (2) expansion of HPI's business to include a new entity or business by direct or indirect ownership, lease, license, franchise or similar arrangement. |
| *Adaptive Maintenance* | means activities that ensure, within applicable Service Levels, that Application performance is not affected by changes to interfacing Applications, new Applications, or packages and technical |

**Schedule 1 (Defined Terms)**
**IT Service Agreement**

1

*HPI Confidential Information*

environment changes.

| | |
|---|---|
| *Affiliate* | means, with respect to a Party, an entity under the majority ownership or Control of, under common majority ownership or Control with, or which owns or Controls, such Party. |
| *Agreement* | means that certain Information Technology Service Agreement by and between HP Inc. and HP Enterprise Services, LLC, dated as of November 1, 2015. |
| *Amount at Risk* | has the meaning set forth in Section 2.6(D) of Schedule 4 to the Agreement. |
| *Appliance* | means a specialized Server, Virtual Server Instance, or Device dedicated to a specific task for which hardware and software is bundled into the product and all applications are pre-installed. |
| *Application* | means all programs and other Software (including the supporting documentation, media, interfaces, on-line help facilities, and tutorials) that perform user- or business-related information processing functions. |
| *Application Development* | means the methodologies, processes and activities to create custom-developed Applications, as described in Appendix 3-B.1 . |
| *"Application Programming Interface" or "API"* | means a set of rules, protocols, configuration settings and tools that enable Software programs to operate or Interface. |
| *Architecture Lab* | means the facilities, hardware, software, processes, personnel and all other resources that enable HPI to assess new technologies and test changes and additions to its IT environment, as described in Schedule 2-B . |
| *Asset Registry* | has the meaning set forth in Section 2.7(A) of Schedule 5 to the Agreement. |
| *"Asset Management System" or "AMS"* | means the software and associated hardware systems used to manage the financial and commercial lifecycle of Devices, Software Licenses, or other IT assets that HPI determines from time to time are to be managed in this manner. |
| *Assigned Contracts* | means the third party agreements that have been or will be assigned to HPES and identified as "Assigned Contracts" in Schedule 9 to the Agreement. |
| *Auditable Event* | means any (1) loss of or unauthorized access to, or reasonably suspected loss of or unauthorized access to, HPI Confidential Information, (2) Security Breach, (3) financial anomalies relating to |

**Schedule 1 (Defined Terms)**
**IT Service Agreement**

2

*HPI Confidential Information*

| | |
|---|---|
| | any Charges or other financial matters under the Agreement, or (4) failure by HPES to perform a material obligation under the Agreement. |
| *Authorized User* | means HPI, any of its Affiliates, and other persons and entities authorized by HPI or its Affiliates in the ordinary course of business to receive and/or use the Services in accordance with the terms and conditions of this Agreement, including, for example, customers, contractors and joint ventures. |
| *Backup and Recovery Procedure* | means the actions to be performed when executing processes to (1) backup data stored in information systems, and (2) recover data from backed up locations to a recovery system where processing can be resumed. Procedures must include serial processes, dependencies, roles, and responsibilities for all personnel involved in the process, plus timelines, estimates, and key indicator or Milestones for the defined processes. |
| *"Basic Input / Output System" or "BIOS"* | means the software that initializes and identifies system devices upon the boot up of a computing device, generally a Conventional Device. |
| *Benchmarker* | has the meaning set forth in <u>Section 18.6(B)</u> of the Agreement. |
| *Budgeted* | means the HPI approved dollars, hours or events for a given task or Project. |
| *Build* | means a process or Service in which professional technical specialists deploy infrastructure or Applications into the HPI environment according to their respective blueprints created during a design phase, following a mutually agreed project and change methodology. |
| *Build Requirements* | means the actions and resources needed to execute the Build of a compute capability or component. |
| *Business Continuity* | means the activity of responding to and recovering business operations following the declaration of a Disaster. |
| *Business Continuity Plan* | has the meaning set forth in <u>Section 26.2(B)</u> of the Agreement. |
| *Business Hours / Support Hours* | means 8:00am to 6:00pm Monday through Friday in the time zone of the location receiving the Services. |
| *Business Loss Damages* | means damages alleging loss of profit, loss of anticipated savings or business interruption losses. |
| *Cables* | means refers to the following: (1) cables used to connect hardware |

**Schedule 1 (Defined Terms)**
**IT Service Agreement**

3

*HPI Confidential Information*

and Peripherals together, (2) cables used to connect Devices to the nearest cable termination points such as a LAN port, patch panel, or power source, and (3) cables used to connect Devices together within close proximity, such as Devices within the same rack, telephony closet, or test lab.

| | |
|---|---|
| *Cabling* | means wires and cabling, typically greater than twenty-five (25) feet in length, used to connect termination points at one location within a facility to another location within a facility, such as a wall jack to a telephony closet, a Switch to Wireless Access Points, or racks to other racks. |
| *Calendar Days* | means all days of the calendar, including weekends and holidays. |
| *Capacity* | means the maximum throughput that a Configuration Item or IT service can deliver whilst meeting agreed Service Level targets. For some types of CIs, Capacity may be the size or volume (e.g., disk drive). |
| *Capacity Management* | means the process responsible for ensuring that the Capacity of IT services and IT infrastructure is able to deliver agreed Service Level targets in a cost effective and timely manner. Capacity Management considers all resources required to deliver the IT service, and plans for short, medium and long term business requirements. |
| *Change* | means any change to (1) the Services, (2) the Systems that would materially alter the functionality, performance standards or technical environment of the Systems, (3) the manner in which the Services are provided, (4) the composition of the Services or (5) the cost to HPI to make use or receive the benefit of the Services. |
| *"Change Advisory Board" or "CAB"* | means an identified set of HPI and HPES representatives assigned the task of reviewing, approving, and coordinating all Changes and oversight of the Change Management Process. |
| *Change Control Procedure* | means the change control procedure described in Section 16.6(B) of the Agreement. |
| *Change Management* | means the discipline responsible for controlling the life cycle of all Technical Changes. |
| *Change Management Process* | means the HPI process for performing Change Management with respect to Technical Changes. |
| *Change Manager* | means the person(s) or organization(s) responsible for the evaluation and oversight of Change requests and Change implementation. |

**Schedule 1 (Defined Terms)**
**IT Service Agreement**

4

*HPI Confidential Information*

*Change Order*                                      has the meaning set forth in <u>Section 16.6(C)(1)</u> of the Agreement.

*Change Owner*                                      means the person(s) or organization(s) responsible for the proposal and justification of a Change.

*Change Proposal*                                   has the meaning set forth in <u>Section 16.6(B)(2)</u> of the Agreement.

*Change Records*                                    means a record containing the details of a Technical Change. each Change Record documents the lifecycle of a single Technical Change. A Change Record is created for every request for Technical Change that is received, even those that are subsequently rejected. Change Records should reference the Configuration Items that are affected by the Technical Change. Change Records are stored in the Configuration Management System.

*Change Request*                                    has the meaning set forth in <u>Section 16.6(B)(1)</u> of the Agreement.

*Change Request Log*                                has the meaning set forth in <u>Section 16.6(D)(1)</u> of the Agreement.

*Change Schedule*                                   means the schedule of dates for the delivery of Changes set forth in a Work Order.

*Change Window*                                     means regular, scheduled window(s) of time from time to time specified or Approved by HPI during which Technical Changes or Releases may be implemented without special Approval by HPI.

*Charges*                                           means all of the compensation payable by HPI to HPES for providing the Services, as set forth in <u>Schedule 5</u> to the Agreement.

*Charges Methodology*                               has the meaning set forth in <u>Schedule 5</u> to the Agreement.

*Circuit*                                           means a discrete (specific) path (wired or wireless) between two or more points of a network along which signals can be carried.

*Clock Hours*                                       means the actual elapsed hours from the time of an event (e.g., the logging of an Incident), regardless of Business Day/Business Hour considerations.

*Clock Minutes*                                     means regardless of Business Day/Business Hour considerations, the actual elapsed minutes from the time of an event, up to a maximum of sixty (60) minutes, at which point a Clock Hour is counted and the counter for Clock Minutes resets to zero.

*Cloud*                                             means a set of compute, storage, network and software capabilities that enable application software to be operated using internet-enabled devices.

*HPI Confidential Information*

| | |
|---|---|
| *Command* | means the authority to dictate and direct all actions performed in support of the IT environment. |
| *"Common Attack Pattern Enumeration and Classification" or "CAPEC"* | means a comprehensive dictionary and classification taxonomy of known attacks that can be used by analysts, developers, testers, and educators to advance community understanding and enhance defenses. |
| *"Common Configuration Enumeration" or "CCE"* | means a set of unique identifiers to security-related system configuration issues in order to improve workflow by facilitating fast and accurate correlation of configuration data across multiple information sources and tools. |
| *"Common Platform Enumeration" or "CPE"* | means a common of referring to IT products and platforms in a standardized way that is suitable for machine interpretation and processing. |
| *"Common Vulnerabilities and Exposures" or "CVE"* | means a dictionary of publicly known information security vulnerabilities and exposures. |
| *"Common Weakness Enumeration" or "CWE"* | means a unified, measurable set of software weaknesses that enables more effective discussion, description, selection, and use of software security tools and services that can find these weaknesses in source code and operational systems as well as better understanding and management of software weaknesses related to architecture and design. |
| *"Common Weakness Risk Analysis Framework" or "CWRAF"* | means a framework for scoring software weaknesses in a consistent, flexible, open manner, while accommodating context for the various business domains. |
| *"Common Weakness Scoring System" or "CWSS"* | means an industry-standard mechanism for prioritizing software weaknesses in a consistent, flexible, open manner. |
| *Compliance Audit Requirements* | means, collectively, (1) the requirements of the Securities and Exchange Commission Act of 1934 and all amendments thereto, including the Sarbanes-Oxley Act of 2002, and any requirements pertaining thereto established by Law, including requirements imposed by auditing standards or reporting requirements promulgated by the American Institute of Certified Public Accountants, the Public Company Accounting Oversight Board or the Securities and Exchange Commission; and (2) the European Union 8 th Company Law Directive (Directive 2006/43/EC), and any requirements pertaining thereto established by Law. |
| *Compute Platform* | means any Application and its support system which include server / storage systems, middleware, web servers, URL, and databases. |

**Schedule 1 (Defined Terms)**
**IT Service Agreement**

6

*HPI Confidential Information*

| | |
|---|---|
| *Compute Services* | means the Services to be performed relating to the support and maintenance of HPI, Servers, Cloud, Back-up and Storage. |
| *"Computer Security Incident Response and Resolution" or "CSIRT"* | means the individuals, tools, processes and Security Event Escalation Procedures that make up a response unit, formed at the instance of a Security Incident and focused on the remediation or Resolution of the Security Incident. |
| *Confidential Information* | has the meaning set forth in <u>Section 20.1(A)(1)</u> of the Agreement. |
| *"Configuration Item" or "CI"* | means any component or element that needs to be managed in order to deliver a Service. Information about each CI is to be recorded in a Configuration Record within the Configuration Management System and maintained throughout its lifecycle as part of Configuration Management Services. |
| *Configuration Management* | means the discipline responsible for maintaining information about Configuration Items required to deliver an IT service, including their relationships. This information is managed throughout the lifecycle of the CI. |
| *"Configuration Management Database" or "CMDB"* | means a set of tools and databases that are used to manage HPI's configuration data. The CMDB includes information about Incidents, Problems, Known Errors, Technical Changes and Releases. It may contain data about employees, HPES, HPI locations, business units, customers, and End Users. The CMDB includes tools for collecting, storing, managing, updating, and presenting data about all Configuration Items and their relationships. The CMDB is maintained as part of Configuration Management Services and is used by all IT service management processes, including HPES. |
| *Configuration Management Process* | means the HPI process for managing the configuration of Configuration Items. |
| *Configure* | means along with its variants, (e.g., "Configuring"), "Configure" refers to the building or setting of parameters within a Device, software, or process that determines its operational characteristics, performance, or available features. |
| *Contact Center* | means a central point in from which HPI manages customer contacts. |
| *Contact Center Platform* | means the technology environment designed to support Contact Center functions. |
| *Contract Manager* | means the HPI Contract Manager or the HPES Contract Manager. |

**Schedule 1 (Defined Terms)**
**IT Service Agreement**

7

*HPI Confidential Information*

| | |
|---|---|
| *Contract Year* | means, beginning upon the Effective Date, each successive 12-month period of the Term. |
| *Control and its derivatives* | means with regard to any entity the legal, beneficial or equitable ownership, directly or indirectly, of 50 percent or more of the capital stock (or other ownership interest, if not a corporation) of such entity ordinarily having voting rights, or effective control of the activities of such entity regardless of the percentage of ownership. |
| *Controls Audit Gap Period* | means the period of time between the issuance of a Controls Audit Report by the Controls Auditor and the date of the assessment by HPI management of the adequacy of HPI's controls pursuant to the Compliance Audit Requirements. |
| *Controls Audit Reports* | Means, as of the Effective Date, the report in the form set forth in Schedule 14 . |
| *Controls Auditor* | means an independent certified public accounting firm based in the United States (which firm will be selected by HPI) with reasonably substantial experience performing examinations and issuing opinions with respect to SSAE 16 (or a successor standard) for companies in the printing and personal computer systems industry (or service providers to such companies). |
| *Conventional Device* | means a desktop or laptop computer used to perform personal computing tasks. Conventional Devices may execute any HPI standard operating system including, but not limited to Windows, Linux, IOS, Android, or Google Chrome. |
| *Core Device Software* | means the Operating Systems, BIOS, firmware, and OEM-provided Software necessary for the basic operations of a Device. |
| *Core Image Software* | means a defined set of application software, systems software, metadata, tools and drivers that constitute the underlying Image for Devices. For clarity, the Core Image is installed on Devices and specific applications, data, and other software may be layered based on a usage profile assigned to the End User. |
| *Core ITIL Functions* | means the ITIL processes supported by the ITSM tool, including Incident Management, Problem Management, Request Fulfillment, Configuration Management, Change Management, Release Management, Access Management, and Event Management. |
| *COTS Software* | means commercial off-the-shelf Software. |
| *Creditable Default* | means a Service Level Default whereby a Service Level Credit will be |

**Schedule 1 (Defined Terms)**
**IT Service Agreement**

8

*HPI Confidential Information*

calculated by HPES.

| | |
|---|---|
| *Critical Service Level* | means those Service Levels categorized as "Critical Service Levels" in <u>Schedule 4</u> to the Agreement. |
| *Critical Service Level Default* | means a Service Level Default with respect to a Critical Service Level. |
| *Customer Satisfaction Survey* | has the meaning set forth in <u>Section 5.1</u> of <u>Schedule 4</u> to the Agreement. |
| *"CybOX" or Cyber Observable Expression* | means a standardized schema for the specification, capture, characterization, and communication of events or stateful properties that are observable in the operational domain. |
| *Data Breaches* | has the meaning set forth in <u>Section 2.2(D)</u> of <u>Schedule 18</u> to the Agreement. |
| *Data Center Device* | means any Device that is housed in a HPES Service Location, including Servers, Storage Subsystems, Backup and Recovery systems, tape libraries, mainframes, mainframe Storage, midrange systems, and Data Center Network Devices, supported by HPES as part of the Services. |
| *Decommission* | means refers to, with respect to an IMACD, the on-site disconnection and removal of a new Device (including associated attachments, features, accessories, software, firmware, Peripherals, and Cabling). |
| *Deep Packet Inspection* | means a form of computer network packet filtering that examines the data part (and possibly also the header) of a packet as it passes an inspection point, searching for protocol non-compliance, viruses, spam, intrusions, or defined criteria to decide whether the packet may pass or if it needs to be routed to a different destination, or, for the purpose of collecting statistical information. |
| *Default Triggers* | means the criteria that, if missed, will cause HPES to default on a Service Level. |
| *"Degradation" or "Degraded"* | means the measurable gradual or temporary reduction in the throughput, speed, attentiveness, response time, or other performance characteristics of the applicable Service or item such that Normal Operations are not maintained. |
| *Deliverable* | means any products, documentation or other similar items provided by HPES to the Service Recipients under the Agreement and is either expressly designated by or reasonably contemplated by the Parties as a deliverable to be transferred from HPES to HPI, |

**Schedule 1 (Defined Terms)**
**IT Service Agreement**

9

*HPI Confidential Information*

owned by HPI, and subject to the rights and obligations set forth in this Agreement as a "Deliverable."

| | |
|---|---|
| *Deliverable Requirements Document* | has the meaning set forth in <u>Section 11.1</u> of <u>Schedule 6</u> to the Agreement. |
| *Demand Management Process* | means the unified and prescribed methods and procedures used to accept, evaluate and process the intake of Service Requests. |
| *Developed IP* | means any IP developed by HPES (alone or with others) pursuant to the Agreement that is (1) a modification or enhancement of HPI IP (including HPI Software) or (2) an original non-derivative work provided to HPI under the Agreement either expressly designated by or reasonably contemplated by the Parties as owned by HPI. |
| *Development Stage Gate* | means the step of the project lifecycle that involves the design and development of the new product and design of the operations or production process required for full scale production. |
| *Device* | means a combination of hardware, Peripherals, Cables, printers, and Core Device Software. |
| *Directories* | means along with its variant "Directory," refers to the capabilities required to manage common directories and authentication protocols. |
| *Disaster* | means a Force Majeure Event or other business continuity event that affects HPES' ability to perform the Services. |
| *Disaster Recovery Plan* | has the meaning set forth in <u>Section 26.2(B)</u> of the Agreement. |
| *Disaster Recovery Services* | has the meaning set forth in <u>Section 1.1</u> of <u>Schedule 15</u> to the Agreement. |
| *Disengagement Period* | has the meaning set forth in <u>Section 31.2</u> of the Agreement. |
| *Disengagement Services* | means the assistance described in <u>Section 31.1(B)</u> of the Agreement. |
| *Disk* | means the Work Product that is stored on a physical disk. |
| *Dispute Resolution Procedure* | means the disputes, controversies or claims concerning, arising out of or relating to this Agreement. |
| *Disputing Parties* | has the meaning set forth in <u>Section 6.3(B)</u> of the Agreement. |
| *Divested Entity* | has the meaning set forth in <u>Section 4.6(B)</u> of the Agreement. |
| *DML* | has the meaning set forth in <u>Appendix 3-A.8</u> to the Agreement. |

**Schedule 1 (Defined Terms)**
**IT Service Agreement**

10

*HPI Confidential Information*

| | |
|---|---|
| *"DMZ Perimeter" or "Site Perimeter"* | means a physical or logical subnetwork that contains and exposes an organization's external-facing services to a larger and untrusted network, usually the Internet. |
| *"Domain Name System" or "DNS"* | means a hierarchical distributed naming system for computers, services, or any resource connected to a network. |
| *Dot Level Upgrade* | means those upgrades that make incremental improvements or corrections to software and are typically designated with an increment to the version number to the right of the decimal place. For example, this would include an upgrade from a current operating software version 2.4 to an operating software version 2.5, or an upgrade from an application version 5.07 to an application version 5.12. |
| *Downtime* | means the time when a Configuration Item or IT service is not Available during its agreed service window. |
| *DR/BC Plans* | has the meaning set forth in Section 26.2(B) of the Agreement. |
| *Duo Security* | means a two-factor authentication service provided by Duo Security, Inc. |
| *"Dynamic Host Configuration Protocol" or "DHCP"* | means a communications protocol that manages and automates the assignment of Internet Protocol (IP) addresses in a network. |
| *Effective Date* | has the meaning set forth in the preamble to the Agreement. |
| *Eligible Hardware* | means the Hardware and Equipment, and associated Software that, in the event of a transition of service responsibility, would be candidates for transfer from HPES to an alternate supplier or to HPI. |
| *Emergency Patch* | means upgrades from OEMs or software developers that address security deficiencies or other vulnerabilities that make the HPI IT Environment susceptible to compromise and require immediate installation / activation. |
| *Encumbered Code* | means any Software, including any libraries or any other components of Software, which imposes any limitation, restriction or condition on the right or ability of HPI to use or distribute such Software, including any Software (1) licensed under the General Public License or any other license agreement or arrangement obligating HPI to make source or object code available to third parties as a condition of use, (2) subject to any restrictions on use, including the number of copies which may be made or the number of simultaneous users, or (3) requiring any other action by HPI, including the payment of royalties. |

**Schedule 1 (Defined Terms)**
**IT Service Agreement**

11

*HPI Confidential Information*

| | |
|---|---|
| *End User* | means any individual who is designated by HPI or any other Service Recipient to receive or use the Services. |
| *End User Services* | means the Services to be performed by HPES related to End User Computing, Service Desk, and User Administration. |
| *Enterprise Directory* | means a structured data repository that maintains the definitive source of information regarding employees and organizational structures and is used by other IT systems to facilitate business and systems workflows. |
| *Enterprise Records Management System* | means a system that provides a controlled, secure and auditable manner of managing documents throughout their lifecycles, including enforcement of retention policies, document creation and approval workflow, access and edit rights, and status and version control. |
| *Enterprise Volumes* | has the meaning set forth in <u>Section 2.1(B)</u> of <u>Schedule 5</u> to the Agreement. |
| *"Enterprise Essential" or "Entity Essential"* | means, with respect to the criticality level for applications, system resources, or facilities required for critical business function, a disruption that severely impacts HPI's ability to generate revenue or meet commitments to customers, employees, or third party partners, and (1) no alternative method exists to meet that commitment, (2) there is time sensitivity to deliver, or (3) failure to deliver may result in damaging HPI's business viability or reputation. |
| *Environmental Maintenance* | means those activities required to evolve software and systems to maintain compliance with agreed technology roadmaps. |
| *Equipment* | means the computer and telecommunications equipment (without regard to the entity owning or leasing such equipment) used by HPES to provide the Services. Equipment includes the following: (1) computer equipment, including associated attachments, features, accessories, peripheral devices and other computer equipment; (2) telecommunications equipment, including private branch exchanges, multiplexors, modems, CSUs/DSUs, hubs, bridges, routers, switches and other telecommunications equipment; and (3) related services (e.g., maintenance and support services, upgrades, subscription services) provided by third parties (e.g., manufacturer and lessor) in the same contract covering the provision of such Equipment. |
| *Escrow Threshold* | has the meaning set forth in <u>Section 19.11</u> of the Agreement. |

**Schedule 1 (Defined Terms)**
**IT Service Agreement**

12

*HPI Confidential Information*

| | |
|---|---|
| *EU Data Protection Directive* | means Directive 95/46/EC of the European Parliament and Council of 24 October 1995 and Directive 2002/58/EC of the European Parliament and Council of 12 July 2002, in each case as amended from time to time, and all legislation and Laws implementing such directives in any country to which the same will apply. |
| *Event Correlation* | means a process that involves elimination of duplicate Event signals, prioritizing and filtering Events, and analyzing Events to determine root cause. |
| *Event Handling Process* | means the procedures and requirements that describe the actions required to correctly recognize, address and resolve an event. |
| *Event Management* | means a process that helps leverage automation to manage events. |
| *Executive Management Committee* | has the meaning set forth in Section 16.2(A) of the Agreement |
| *Existing DR/BC Plan* | has the meaning set forth in Section 26.2(A) of the Agreement. |
| *Existing HPES Service Location* | has the meaning set forth in Section 26.2(A) of the Agreement. |
| *Exit Plan* | has the meaning set forth in Section 3.1 of Schedule 16 to the Agreement. |
| *Export Controls* | means all export and national security Laws of the United States and all other applicable Governmental Authorities. |
| *Feasibility Study* | means the analyzing of the impact of a proposed Change to the IT environment, including characteristics such as cost, risk, performance, availability and maintainability, and delivering a recommendation based on that analysis. |
| *Federation* | means interoperation between different security domains to enable identity authentication across those domains without the need to create a separate identity in each domain. |
| *Financial Analysis and Reporting* | means the Key Activity described in Appendix 3-A.6 . |
| *Financial Management Process* | means the procedures and requirements that describe the data, aggregations, format and data types of financial tracking and reporting required. |
| *Financial Planning* | means the action of projecting financial impacts of business and IT decisions based on historical data and analytic examination of current expenditures. |

**Schedule 1 (Defined Terms)**
**IT Service Agreement**

13

*HPI Confidential Information*

| | |
|---|---|
| *Financial Responsibility Matrix* | means the matrix set forth in <u>Appendix 5-B</u> to <u>Schedule 5</u> to the Agreement, which identifies each Party's financial responsibility for the resources used to provide the Services. |
| *Financial Statements* | means all financial statements, reports and other information furnished by HPES to HPI or reported by HPES to the Securities and Exchange Commission or similar Governmental Authority. |
| *Firewall* | means a Device that controls the transmission of data between two networks based on a set of rules and configurations. For pricing purposes, a Firewall shall include firewall chassis. |
| *"First Contact Resolution" or "FCR"* | means the percentage of live contacts (voice call or chat), designated as FCR by HPES, that are considered Resolved during the End User's first live contact to the Service Desk. A contact is considered Resolved upon first live contact only if the agent who first answers the phone call or chat session Resolves the call or chat or provides a warm hand-off to another technician who Resolves the call or chat and the End User provides verbal confirmation that the call or chat was Resolved on the initial contact with the Service Desk. In addition, FCR may include e-mail or web tickets as mutually agreed upon by the Parties. |
| *Fixed Non-Recurring Charge* | has the meaning set forth in <u>Section 2.2</u> of <u>Schedule 5</u> to the Agreement. |
| *Fixed Recurring Charge* | has the meaning set forth in <u>Section 2.3</u> of <u>Schedule 5</u> to the Agreement. |
| *Force Majeure Event* | has the meaning set forth in <u>Section 26.1(A)</u> of the Agreement. |
| *FTE Charge* | has the meaning set forth in <u>Section 2.5(A)</u> of <u>Schedule 5</u> to the Agreement. |
| *Function* | means any service, function or responsibility. |
| *Global Server Load Balancer* | means a technology solution to expand the Application Delivery Controller function across multiple Data Centers, which provides: 1) disaster recovery to protect from site outages, 2) an intelligent way to respond to Domain Name System (DNS) queries, beyond simple load balancing. and 3) distribution of user application requests based on business policies, data center conditions, network conditions, and application performance, which provides holistic control of HPI's global traffic to promote high availability and maximum application performance. |
| *Go-Live* | means the first productive use of the Software, Service, Device, |

**Schedule 1 (Defined Terms)**
**IT Service Agreement**

14

*HPI Confidential Information*

System, or Solution.

| | |
|---|---|
| *Governance* | means, with respect to the Governance Model, the processes, roles and actions put in place to define and regulate the interactions between HPI and the HPES in the execution of the Agreement over the Term. |
| *Governance Model* | has the meaning set forth in <u>Section 1.1</u> of <u>Schedule 6</u> to the Agreement. |
| *Governmental Authority* | means any U.S. or non-U.S. federal, state, municipal, local, territorial, provincial or other governmental department, regulatory authority, or legislative, judicial or governmental administrative body. |
| *Gratuities* | has the meaning set forth in <u>Section 32.3(B)</u> of the Agreement. |
| *Hardware* | means the collection of physical elements that enable an IT function such as computing, processing, switching, or storing data. |
| *"High Availability" or "HA"* | means a multi-processing compute system that is continuously operational for a desirably long period of time and can quickly recover from a failure. |
| *HPES* | has the meaning set forth in the preamble to the Agreement, as interpreted in accordance with <u>Section 1.3(B)(4)</u> of the Agreement. |
| *HPES Agent* | means an Affiliate, agent, contractor, subcontractor, or other representative of HPES performing any of HPES' obligations under the Agreement. |
| *HPES Contract Manager* | has the meaning set forth in <u>Section 10.3(B)</u> of the Agreement. |
| *HPES Data Connections* | has the meaning set forth in <u>Section 12.3(A)</u> of the Agreement. |
| *HPES Equipment* | means, other than HPI Provided Equipment, the Equipment used by HPES to provide the Services in accordance with the Agreement. |
| *HPES IP* | means IP that is licensed or owned by HPES (other than HPI IP) that is used in connection with the Services. |
| *HPES Parent* | has the meaning set forth in <u>Section 1.6</u> of the Agreement. |
| *HPES Personnel* | means employees or contractors of HPES, or of HPES Agents, who provide the Services or any component thereof. |
| *HPES Provided Resources* | means the Services, HPES IP, HPES Equipment, Developed IP, Deliverables, and any other resources or items provided to any |

**Schedule 1 (Defined Terms)**
**IT Service Agreement**

15

*HPI Confidential Information*

Service Recipient by HPES or used to provide the Services.

| | |
|---|---|
| *HPES Relationship Manager* | *used in Schedule 6* |
| *HPES Relationship Manager* | has the meaning set forth in <u>Section 10.3(B)</u> of the Agreement. |
| *HPES Required Consents* | has the meaning set forth in <u>Section 7.1</u> of the Agreement. |
| *HPES Service Delivery Manager* | means individuals designated by HPES to interact with HPI with respect to all of the Services or identified portions of the Services, and such individual(s) will have specific responsibilities and authorities with respect to the Services. |
| *HPES Service Location* | means an HPES service location identified in <u>Schedule 11</u> to the Agreement. |
| *HPES Software* | means any HPES IP that is Software. |
| *HPI* | has the meaning set forth in the preamble to the Agreement. |
| *HPI Agent* | means an agent, contractor, subcontractor or other representative of HPI other than HPES or any HPES Agent exercising any of HPI's rights or performing any of HPI's obligations under the Agreement. |
| *HPI Architecture* | means HPI's IT architecture policies and standards as provided by HPI from time to time during the Term. |
| *HPI Auditors* | means internal HPI audit staff, external HPI auditors, inspectors, Governmental Authorities, entities authorized to review compliance with PCI DSS, and other representatives (that are not competitors of HPES) as HPI may from time to time designate in writing. |
| *HPI Competitor* | means any individual or entity that provides products or performs services similar to that of the following entities: |

- Amazon

- Apple

- Asus

- Brother

- Canon

- Dell

- Epson

- Google

- Huawei

- Konica-Minolta

- Kyocera

**Schedule 1 (Defined Terms)**
**IT Service Agreement**

16

*HPI Confidential Information*

- Lenovo
- Lexmark
- Microsoft
- Quanta Computer
- Ricoh
- Samsung
- Sharp
- Xerox

| | |
|---|---|
| *HPI Confidential Information* | has the meaning set forth in <u>Section 20.1(A)(1)</u> of the Agreement. |
| *HPI Contract Manager* | has the meaning set forth in <u>Section 15.1(A)</u> of the Agreement. |
| *HPI Data* | has the meaning set forth in <u>Article 1</u> of <u>Schedule 7</u> to the Agreement. |
| *HPI Facilities* | has the meaning set forth in <u>Section 14.1(B)</u> of the Agreement. |
| *HPI IP* | means IP that is licensed or owned by HPI (other than the HPES IP) that is used by HPES in connection with the Services. |
| *HPI Policies* | has the meaning set forth in <u>Section 16.8</u> of the Agreement. |
| *HPI Provided Equipment* | has the meaning set forth in <u>Section 12.1(A)</u> of the Agreement. |
| *HPI Relationship Manager* | has the meaning set forth in <u>Section 15.1(A)</u> of the Agreement. |
| *HPI Required Consents* | has the meaning set forth in <u>Section 7.2</u> of the Agreement. |
| *HPI Service Delivery Manager* | means individuals designated by HPI to interact with HPES with respect to all of the Services or identified portions of the Services, and such individual(s) will have specific responsibilities and authorities with respect to the Services. The HPI Service Delivery Manager is also responsible for ensuring that there is seamless integration between the HPI end user and the Services provided and solutions delivered by HPES. |
| *HPI Service Locations* | means any location where End Users are located or at which HPI will receive the Services. |
| *HPI Software* | means Software that is owned, licensed, leased or otherwise obtained by HPI (excluding HPES Software). |
| *HPI Systems* | means, collectively, HPI Software and HPI Provided Equipment. |
| *HPI Third Party Software* | means the Software that is licensed or leased by HPI from a third |

**Schedule 1 (Defined Terms)**
**IT Service Agreement**

17

party and used in connection with the provision of the Services.

*Identity and Access Management Services* — means the Services regarding the creation, disabling, modification or removal of access.

*Identity Service Engine* — means a network administration product that enables the creation and enforcement of security and access policies for endpoint devices connected to the company's routers and switches.

*Image* — means a collection of integrated software elements, including Operating System, applications, interfaces, utilities, and layered software products, that have been tested for Normal Operation on a specified hardware configuration. An Image may be a core set of software products installed as a Core Image, with other software layered on top of the Core Image based on a user or Device profile.

*Incident* — means an unplanned interruption to the standard operation of any Equipment, Software, System, business process or service or a reduction in the quality of the operation of any Equipment, Software, System, business process or service.

*Incident Impact—High* — A High level incident results in a major financial or business impact on HPI's ability to operate. High level incidents are generally at the site or local level and typically affect a single workgroup, customer or partner organization.

*Incident Impact—Low* — A Low level incident results in a minimal financial or business impact on HPI's ability to operate. Low Level incidents are generally localized, typically affect a single user, workgroup, customer or partner organization.

*Incident Impact—Medium* — A Medium level incident results in a moderate financial or business impact on HPI's ability to operate. Medium level incidents are generally at the site or local level and typically affect a single workgroup, customer or partner organization.

*Incident Impact—Top* — A Top level incident results in a serious financial or business impact on HPI's ability to operate. Top level incidents are generally global or regional in coverage and typically affect multiple workgroups, multiple customers or partner organizations.

*Incident Management* — means the discipline responsible for managing the lifecycle of all Incidents. The primary objective of Incident Management is to return the IT service to End Users to Normal Operations as quickly as possible.

*Incident Management Process* — means the process for performing Incident Management with respect to Incidents.

**Schedule 1 (Defined Terms)**
**IT Service Agreement**

18

*HPI Confidential Information*

| | |
|---|---|
| *Incident Resolution* | means the activities to solve and Incident and restore services within acceptable timeframes, which may involve the use of a workaround. |
| *"Incident Resolution Bridge" or "IRB"* | means a conference call that is established by HPI or HPES to coordinate the resolution of Incidents. |
| *Income Tax* | means any tax on or measured by the net income of a corporation, partnership, joint venture, trust, limited liability company, limited liability partnership, association or other organization or entity (including taxes on capital or net worth that are imposed as an alternative to a tax based on net or gross income), or taxes which are of the nature of excess profits tax, gross receipts tax, minimum tax on tax preferences, alternative minimum tax, accumulated earnings tax, personal holding company tax, capital gains tax or franchise tax for the privilege of doing business. |
| *Information System* | means any systems, including, but not limited to, net-services, networks, computers, personal computing device, mobile devices, removable media, communication systems and other information systems used and all associated authentication methodologies. |
| *Infrastructure* | means the collective parts (e.g., Equipment, Software) that enable compute processing, electronic data handling and access to said resources that make up the HPI IT Environment. |
| *Inherited DR/BC Plans* | has the meaning set forth in <u>Section 26.2(B)</u> of the Agreement. |
| *Inherited HPES Service Location* | has the meaning set forth in <u>Section 26.2(B)</u> of the Agreement. |
| *Initial Term* | has the meaning set forth in <u>Section 2.1</u> of the Agreement. |
| *Insourcing* | has the meaning set forth in <u>Section 4.3</u> of the Agreement. |
| *"Install, Move, Add, Change, Decommission" or "IMACD"* | means services performed to Install, Move, Add, Change, or Decommission a Service, Device (including associated attachments, features, accessories, software, firmware, Peripherals, and Cabling) or other item. |
| *Intellectual Property Rights* | means all past, present, and future rights of the following types, which may exist or be created under the Laws of any jurisdiction in the world: (1) rights associated with works of authorship, including exclusive exploitation rights, copyrights, artists' rights, moral rights, and mask works; (2) trademark and trade name rights and similar rights; (3) trade secret rights; (4) patents and industrial property rights; (5) other proprietary rights in intellectual property of every kind and nature; and (6) rights in or relating to registrations, renewals, extensions, combinations, divisions, and reissues of, and |

*HPI Confidential Information*

applications for, any of the rights referred to in subsections (1) through (5) of this sentence.

| | |
|---|---|
| *Interface* | means the following: (a) when used as a noun, a computer program developed by, or licensed to, HPI or HPES to (i) translate or convert data from a HPI or HPES format into another format used by HPES at HPI as a standard format, or (ii) translate or convert data in a format used by HPES or a third party provider to a format supported by HPES at HPI or vice versa, and (b) when used as a verb, to operate as described above. |
| *Intranet* | means a computer network that uses Internet protocol technology to share information, operational systems, or computing services within an organization. |
| *IP* | means all algorithms, APIs, apparatus, circuit designs and assemblies, databases and data collections, devices, masks, designs, diagrams, documentation, drawings, flow charts, formulae, discoveries, ideas, creations and inventions (whether or not patentable or reduced to practice), know-how, literary works or other works of authorship, materials, marketing and development plans, marks (including brand names, product names, logos, and slogans), methods, models, network configurations and architectures, procedures, processes, protocols, schematics, computer programs and Software code (in any form including source code and executable or object code), specifications, subroutines, techniques, tools, uniform resource identifiers, user interfaces, web sites, works of authorship, and other forms of technology and intellectual property. |
| *IP Telephony* | means the technologies that use the Internet Protocol's packet-switched connections to exchange voice, fax, and other forms of information that have traditionally been carried over the dedicated circuit-switched connections of the public switched telephone network. |
| *Issue Log* | has the meaning set forth in <u>Section 4.2</u> of <u>Schedule 6</u> to the Agreement. |
| *IT* | means information technology. |
| *"IT Service Management System" or "ITSM"* | means the HPI system from time to time that consists of an integrated set of hardware, software, processes, and procedures dedicated to logging, documenting, and supporting the Response and Resolution of Incidents, Service Requests, and Problems, and for supporting Core ITIL Functions. |
| *ITIL* | means a set of best practice guidance for IT Service Management. |

**Schedule 1 (Defined Terms)**
**IT Service Agreement**

20

*HPI Confidential Information*

ITIL (Information Technology Infrastructure Library) is owned by the OGC and consists of a series of publications giving guidance on the provision of quality IT Services, and on the processes and facilities needed to support them.

| | |
|---|---|
| *Key HPES Position* | has the meaning set forth in Section 10.3(A) of the Agreement. |
| *Key Performance Indicators or KPIs* | has the meaning set forth in Section [2.2] of Schedule 4 to the Agreement. |
| *Known Error* | means a problem that has a documented Root Cause and a Workaround. Known Errors are created and managed throughout their lifecycle by Problem Management. |
| *Known Error Database* | means a database containing all Known Errors. |
| *LATA* | means local access transport area. |
| *Law* | means all federal, state, provincial, regional, territorial and local laws, statutes, ordinances, regulations, rules, executive orders, supervisory requirements, directives, circulars, opinions, interpretive letters and other official releases of or by any government, or any authority, department or agency thereof, including the Securities and Exchange Commission and the Public Accounting Oversight Board. In addition, "Laws" will include Privacy Laws. |
| *Labor Costs* | means the labor opportunity cost of HPES Personnel that are billable on a time and material basis and that are unbilled due to the exercise of HPI's rights pursuant to Section 5.5 of the Agreement. |
| *Legacy Contract* | means any contract between HP and a third party service or product supplier under which services, products or functions similar to the Services are provided to HP, regardless of which Party may retain such contract after the Effective Date. |
| *Local Agreement* | means an agreement between an HPES Affiliate and an HPI Affiliate that is based upon Schedule 17 to the Agreement and executed in accordance with Section 1.5 of the Agreement. |
| *Losses* | means all losses, liabilities, damages and claims, and all related costs and expenses (including reasonable legal fees and disbursements and costs of investigation, litigation, settlement, judgment, interest and penalties). |
| *Maintenance Window* | means a period of time designated in advance during which Technical Changes may be performed on a Configuration Item (or as otherwise specified). |

**Schedule 1 (Defined Terms)**
**IT Service Agreement**

21

*HPI Confidential Information*

| | |
|---|---|
| *Major Incident* | A high-priority Incident that is classified as Top Impact and Mission Critical per the Priority Matrix. In response to a Major Incident multiple parties are needed to triage and resolve the Incident to minimize impact to the business, or because a high level of escalation and communication about the Incident are required to stakeholders and End Users. |
| *Major Level Upgrade* | means upgrades that make significant improvements or corrections to the Software and are typically designated with an increment to the version number to the left of the decimal place. Some major upgrades are denoted not by numeric increments, but by new titles. For clarity, examples include an upgrade from a current operating software Version 2.4 to an operating software Version 3.0, or an upgrade from Microsoft Windows XP to Microsoft Windows 7. |
| *Malware* | has the meaning set forth in Section 22.2(J) of the Agreement. |
| *"Malware Attribute Enumeration and Characterization" or "MAEC"* | means a standardized language for encoding and communicating high-fidelity information about malware based upon attributes such as behaviors, artifacts, and attack patterns. |
| *Managed Contracts* | means the third party agreements for which HPES assumes management responsibility that are identified as "Managed Contracts" in Schedule 9 to the Agreement. |
| *Management Information Base* | means the database that houses specific information about a Device or network component, used to manage entities in by technical support teams. |
| *Manager Satisfaction Survey* | has the meaning set forth in Section 6.2 of Schedule 4 to the Agreement. |
| *Mean Opinion Score (MOS)* | means a test used in telephony networks to obtain a human user's view of the quality of the network (whether through human feedback or machine-based interpolation). |
| *Measurement Period* | means the period during which HPES' performance against a particular Service Level will be measured, as set forth in Schedule 4 to the Agreement. |
| *Measurement Source* | means the Tool or methodology identified in Appendix 4-A and Appendix 4-B to Schedule 4 to the Agreement. |
| *Methods and Procedures Manual* | means the reference document agreed by the Parties that describes the methods and procedures for managing activities under the Agreement, such as IT service management processes. |

**Schedule 1 (Defined Terms)**
**IT Service Agreement**

22

*HPI Confidential Information*

| | |
|---|---|
| *Migration* | has the meaning set forth in <u>Section 3.1</u> of the Agreement. |
| *Migration Plan* | has the meaning set forth in <u>Section 3.1</u> of the Agreement. |
| *Milestone* | means a significant event designated as such in a project plan, including the Transformation Plan. |
| *Minor Enhancement* | means the definition, analysis, design, development, and implementation of minor application changes to add new functionality or supplement existing functionality, including minor upgrades, codes changes required for performance improvement and environment maintenance. Minor Enhancements require an estimated effort of less than or equal to 40 hours. |
| *Mission Critical* | The criticality level for applications, system resources, or facilities required for critical business function. A disruption severely impacts HPI's ability to generate revenue or meet commitments to customers, employees, or third party partners, and; no alternative method exists to meet that commitment, and; there is time sensitivity to deliver, and; failure to deliver may result in damaging HPI's business viability or reputation. |
| *Misuse Detection* | means an approach in detecting potential insider threats to vulnerable company data, in which abnormal system behavior is defined first, and then any other behavior is defined as normal behavior. |
| *Mobile Device* | means an End User-provided laptop, tablet, or smart phone with data and email connectivity, including BlackBerry, Windows Mobile, iPhone, iPad, Android, and similar Devices. Mobile Devices do not have HPI Core Images. |
| *Mobility Manager* | means the technology service that enables mobile workers access to enterprise content and applications, while allowing administrators to safeguard corporate information. |
| *Model Clauses* | means the standard contractual clauses issued by the European Commission, pursuant to the EU Data Protection Directive 95/46/EC, for transfers of personal data from the European Economic Area to third countries that are not recognized as providing adequate protection measures. The Model Clauses as of the Effective Date are set forth in <u>Schedule 17</u>. |
| *N-1* | means a previous release of a manufacturer's software application, operating system or firmware product that is available publicly and is different than the product installed in the current environment, where "N" refers to the updated release from such manufacturer, as such release is usually identified by a number and/or letter code, |

**Schedule 1 (Defined Terms)**
**IT Service Agreement**

23

*HPI Confidential Information*

termed the "revision number", "release level", "revision level", or simply "revision".

| | |
|---|---|
| *Network* | means its variants (e.g., "HPI Network") the networks, consisting of Network Devices, Software, Cables, and Cabling, that are used to create, connect, and transmit data between or among Devices that reside in HPI Locations, or between such Devices and items in the HPI Data Centers. |
| *Network Address Translation* | means the remapping of one IP address space into another by modifying network address information in Internet Protocol datagram packet headers while they are in transit across a traffic routing device. |
| *"Network Management Tool" or "NMT"* | means an integrated set of hardware, software, processes, and procedures dedicated to monitoring, logging, configuring, and managing Network Devices. |
| *"Network Operations Center" or "NOC"* | means the equipment, software, tools, services and capabilities that make up a centralized 24x7x365 facility that monitors and manages network operations. |
| *Network Service* | means a network capability that delivers a service to applications, infrastructure and/or end users, which consists of all required enabling components (e.g., transport, circuits, devices, protocols, configurations, tools). |
| *"Network Time Protocol" or "NTP"* | means the industry protocol for synchronizing the clocks of computer systems over packet-switched, variable latency data networks. |
| *New Service* | means any service that is then-currently outside the scope of the Services. |
| *Non-Billable Activities* | has the meaning set forth in Article 4 of Schedule 5 to the Agreement. |
| *Non-Software Deliverable* | has the meaning set forth in Schedule 6 to the Agreement. |
| *Non-Software Deliverable Requirements* | has the meaning set forth in Schedule 6 to the Agreement. |
| *Normal* | The criticality level for applications, system resources, or facilities required for normal business function. A disruption has minor or peripheral business process, and; causes minimal customer impact, and; an alternate solution is available at the time of disruption, and; loss of productivity is manageable for short periods of time. |

**Schedule 1 (Defined Terms)**
**IT Service Agreement**

24

*HPI Confidential Information*

| | |
|---|---|
| *Normal Operations* | means the performance level and operational parameters of the applicable Devices, equipment, or Services that is at a level that is the least of: (1) the applicable OEM's specifications, (2) software developer specifications, (3) third party provider specifications, or (4) specifications in the Agreement. |
| *Notice of Dispute* | has the meaning set forth in <u>Section 28.1(A)</u> of the Agreement. |
| *Notice of Election* | has the meaning set forth in <u>Section 24.4(A)</u> of the Agreement. |
| *OEM* | means original equipment manufacturer. |
| *Open LDAP* | means an open source implementation of the Lightweight Directory Access Protocol (LDAP) developed by the Open LDAP Project. |
| *"Open Vulnerability and Assessment Language" or "OVAL"* | means an information security community effort to standardize how to assess and report upon the machine state of computer systems, including a language to encode system details, and an assortment of content repositories held throughout the community. |
| *"Operating Level Agreement" or "OLA"* | means the documented specifications for interactions and interfacing between HPES and other organizations with whom HPES must interact in the delivery of the Service. |
| *Operating System* | means computer operating systems including, Windows operating systems, Linux operating systems, Unix operating systems, and any other operating systems that exist in the HPI environment. |
| *Organizational Change Management* | means managing the effect of new business processes, changes in organizational structure or cultural changes within an enterprise. |
| *Outage* | means the period during which there is loss of availability of any Device, Equipment, application, CI, or Service. |
| *Out-of-Pocket Expenses* | means reasonable, demonstrable and actual out-of-pocket expenses incurred by HPES for Equipment, materials, supplies or Services provided to or for a Service Recipient, but not including HPES' overhead costs (or allocations thereof), internal administrative expenses or other mark-ups. |
| *Partnership-Reasonable* | means applying a level of resources and effort that would typically be applied by a business partner in the accomplishment of a goal. |
| *Party (and Parties)* | has the meaning set forth in the preamble to the Agreement. |
| *Pass-Through Expenses* | means third party charges that are both (1) to be paid directly or |

**Schedule 1 (Defined Terms)**
**IT Service Agreement**

*HPI Confidential Information*

reimbursed by HPI, and (2) to be administered by HPES.

| | |
|---|---|
| *Patch* | means a piece of software, including Dot Level Upgrades, designed to update, fix problems with, or add features to an application, Device software, Device firmware, or supporting data. |
| *Patch Management* | means the resources, processes and tools used to identify, evaluate, install and verify software patches for hardware and software components of the HPI IT environment. |
| *PCI DSS* | has the meaning set forth in <u>Section 3.5(A)</u> of <u>Schedule 7</u> to the Agreement. |
| *Perfective Maintenance* | means the process of modifying Software or Applications to implement new or changed user requirements which concern functional enhancements. |
| *Performance Data* | means the information and Reports that detail HPES' Performance or the Performance of the HPI IT Environment (both at the aggregate and component level) over a period of time. |
| *Performance Failure* | means a failure of HPES to meet a Service Level, whether or not the failure is excused. |
| *Performance Improvement* | means an increase to the Performance Standards. |
| *Performance Quality Control* | means the testing of Software, Equipment, or other elements of the Services in order to ensure that the Services adhere to the Performance Standards. |
| *Performance Standards* | means refers to, either individually and collectively, the quantitative and qualitative performance standards and commitments for the Services contained in this Agreement, including the Service Levels. |
| *Peripherals* | means the accessories typically connected to and used with a piece of Hardware, including monitors, mice, docking stations, and USB-connected accessories. |
| *Personal Data* | has the meaning set forth in <u>Schedule 7</u> to the Agreement. |
| *Personal Data Security Breach* | has the meaning set forth in <u>Schedule 7</u> to the Agreement. |
| *Personnel* | means all personnel, including both HPI Personnel and HPES Personnel, who play a role in the management and/or execution of the Services described in this Agreement. |
| *Physical Server* | means an individual physical Server containing processors, |

**Schedule 1 (Defined Terms)**
**IT Service Agreement**

26

*HPI Confidential Information*

memory, network interface cards, and disk drives.

| | |
|---|---|
| *"Point of Contact" or "POC"* | means personnel designated by a Party from time to time to serve as its point of contact for either general or specific purposes, including as may be specified in this Agreement or Work Order. |
| *"Policies and Procedures Manual" or "Service Summary Guide" or "SSG"* | has the meaning set forth in <u>Section 0</u> of the Agreement. |
| *Port* | means for pricing purposes (a) in the LAN environment, an individual receptacle to which a Device can be attached or connected to in a network switch, and (b) in the voice environment, the termination point on the common equipment (such as a PBX) configured for use and to which an active station connects. |
| *Portal* | means a network connection point serving as a guide or point of entry to a specific compute capability of data repository and usually including a search engine or a collection of links to other capabilities as determined by the portal function. |
| *Power Over Ethernet* | means a system which enables electrical power to pass along with data on Ethernet cabling. |
| *Preventative Maintenance* | means the process of providing parts, support actions, Patches, and/or software Upgrades to proactively prevent the occurrence of an Incident. |
| *Primary Device* | means the primary device assigned to End-Users. |
| *Priority* | The assignment of a priority value that is calculated by a definition matrix within the ITSM tool. In the event that there is a discrepancy in priority, the Priority will be set by the Business Relationship Manager or designated Super User or Trusted User. |
| *Priority 1* | A Ticket in which there is a major and/or critical impact to the business functions or critical process of HPI or a Group requiring immediate attention and a viable work-around is unavailable and/or impractical (e.g., issues that negatively impact the fundamental ability of the business, regulatory issues, health & safety issue, or any issues that compromise financial management processes). |
| *Priority 2* | A Ticket in which there is a significant impact to a business function or process of HPI, which occurs during any business or operations cycle requiring prompt attention and response and an immediate work around for resolution is unavailable or impractical. |

**Schedule 1 (Defined Terms)**
**IT Service Agreement**

27

*HPI Confidential Information*

| | |
|---|---|
| *Priority 3* | A Ticket in which there is a non-critical impact or a critical impact where an immediate workaround is available. The issue will be managed in accordance with SLA prioritization. |
| *Priority 4* | An issue that affects business utility but is not prohibiting people from accomplishing their critical work, or an event or activity scheduled with HPI. Examples include: a work department printer is not available, but another, nearby printer is available for that department's use. a single business process/system is experiencing performance issues by multiple people. |
| *Privacy Laws* | means all Laws designed or intended to protect data or information that can be used to identify a specific individual, including (1) the federal Gramm-Leach-Bliley Act, the FTC regulations promulgated pursuant thereto (including 16 CFR § 313, 16 CFR § 314, 12 CFR § 332 and 12 CFR § 364), and any state privacy Laws; (2) the Health Insurance Portability and Accountability Act of 1996 (45 CFR parts 160 and 164) and regulations; (3) all Laws relating to data privacy, transborder data flow or data protection, such as the EU Data Protection Directive; (4) other Laws related to medical records and patient privacy, financial information, confidentiality, and consumer protection; and (5) industry or operational standards to which HPI is bound in writing, which are enforceable by third parties, including PCI DSS. |
| *Problem Management* | means the discipline responsible for managing the lifecycle of all Problems. The primary objectives of Problem Management are to prevent Incidents from happening, and to minimize the impact of Incidents that cannot be prevented. |
| *Problem Management Process* | means the process for performing Problem Management with respect to Problems. |
| *Problem Record* | means a record containing the details of a Problem. Each Problem Record documents the lifecycle of a single Problem. |
| *Procedure* | means a set of instructions or steps that define the required actions to lead to a desired result and are typically integrated into Support processes and documented for accountability and repeatability. |
| *Production* | means an environment that is intended for use by End Users and HPI customers. |
| *Project* | means any discrete amount of work undertaken, in accordance with Article 5 of the Agreement, to create a product, solution or service. Each Project must be carried out pursuant to the Project request and approval process set forth in Article 6 of the |

**Schedule 1 (Defined Terms)**
**IT Service Agreement**

28

*HPI Confidential Information*

Agreement. Notwithstanding the foregoing, in no event will any of the following activities be considered Projects for purposes of the Agreement, whether or not such activities are described in a Project Work Order: (1) any activity that is already within the scope of the Services; and (2) any activities that were not approved by HPI pursuant to the Project request and approval process set set forth in Article 5 of the Agreement.

| | |
|---|---|
| *Project Closeout Activities* | means the tasks, work flows, and activities that are to be conducted prior to a Project's completion. |
| *Project Management* | means a set of processes and a disciplined approach to the management of project tasks that includes, at a minimum, task identification, inter-task dependencies, anticipated durations, and significant Milestone events. |
| *Project Manager* | means a person designated as having the responsibility for oversight and the successful completion of a defined project. |
| *Project Plan* | means the documented Deliverables, Milestones, activities, and resources for a Project. |
| *Project Request* | has the meaning set forth in Section 5.1(A) of the Agreement. |
| *Project Risk Log* | means the record of all Risks associated with an in-flight Project. |
| *Project Work Order* | has the meaning set forth in Section 5.1(B) of the Agreement. |
| *Proposal* | means a proposal submitted by HPES that lists new products available to HPI as a part of a new Work Order or an Attachment to this Agreement. |
| *Publish* | means the activity of physically or electronically (or both) distributing or posting Developed materials and keeping such materials are current and updated on an ongoing basis. |
| *"Quality of Service or "QoS"* | means a collection of network management technologies and techniques, with the goal of providing guarantees on the ability of a network to deliver predictable throughput and service parameters. |
| *Rate Card* | means the schedule of hourly rates for HPES Personnel set forth in Appendix 5-A to Schedule 5 to the Agreement. |
| *Reconfigure* | means the rearrangement or re-organization of the components that make up a Device, Application, network or other types of hardware or software. |
| *Records* | means all records and supporting documentation, including all HPI |

*HPI Confidential Information*

|  |  |
|---|---|
|  | Data and all transactions, authorizations, system changes, implementations, soft document access, reports, analyses, and other data and information, that is created, generated, collected or processed and stored by HPES in the ordinary course of performance of its obligations under the Agreement. |
| *Regulatory Mandates* | means mandates issued by industry or governmental bodies that result in a need for the elimination, altering or addition of services, capabilities or functionality in the HPI IT environment. |
| *Related Deliverable* | means any Deliverable that is related to or dependent on a Deliverable. |
| *Related Documentation* | means, with respect to Software, all materials, documentation, specifications, technical manuals, user manuals, flow diagrams, file descriptions and other written information that describes the function and use of such Software. |
| *Relationship Manager* | means either the HPI Relationship Manager or the HPES Relationship Manager. |
| *Release Management* | means the discipline responsible for planning, scheduling and controlling the movement of Releases to test and live environments. The primary objective of Release Management is to ensure that the integrity of the live environment is protected and that the correct components are released. |
| *Release Manager* | means the resource responsible for leading the Release Management process. |
| *Relief Event* | has the meaning set forth in Section 15.2 of the Agreement. |
| *Remediation Plan* | has the meaning set forth in Section 17.5 of the Agreement. |
| *Renewal Term* | has the meaning set forth in Section 2.2 of the Agreement. |
| *Reports* | has the meaning set forth in Section 4.5 of the Agreement. |
| *Requested Information* | has the meaning set forth in Section 17.8(A) of the Agreement. |
| *Required Consents* | means (1) with respect to HPES, the HPES Required Consents and (2) with respect to HPI, the HPI Required Consents. |
| *Resolution Time* | means the elapsed time between the creation of a Ticket in the applicable system (e.g., ITSM) and the Resolution of the Incident or Service Request. |
| *"Resource Unit" or "RU"* | has the meaning set forth in Section 2.1(A) of Schedule 5 to the |

**Schedule 1 (Defined Terms)**
**IT Service Agreement**

30

*HPI Confidential Information*

Agreement.

| | |
|---|---|
| *Re-Sourcing* | has the meaning set forth in <u>Section 4.3</u> of the Agreement. |
| *Response Time* | means the elapsed time between the creation of a Ticket in the applicable system (e.g., ITSM) and the initial Response from an assigned technician. |
| *Rogue Access Points* | means unauthorized wireless network entry points. |
| *"Role Based Access Control" or "RBAC"* | means a method of regulating access to computer or network resources based on the roles of individual users within an enterprise. In this context, access is the ability of an individual user to perform a specific task, such as view, create, or modify a file. |
| *"Rough Order of Magnitude" or ROM"* | means an estimate of costs and time provided in the early stages of a Project when the scope and requirements have not been fully defined. |
| *RPOs* | means the maximum age of the data, expressed as a period of time prior to a disruption, for recovered Applications or Services, as such RPO is specified in <u>Schedule 15</u> to the Agreement. |
| *RTOs* | means the number of hours (or days) specified in <u>Schedule 15</u> to the Agreement within which HPES will implement the Business Continuity Plan and Disaster Recovery Plan and fully restore the affected Services. |
| *Satisfaction Survey* | has the meaning set forth in <u>Section 9.2</u> of the Agreement. |
| *SCM* | has the meaning set forth in <u>Section 3.1</u> of <u>Appendix 3-A.9</u> to the Agreement. |
| *Secure Token* | means authentication token used to perform two-factor authentications. |
| *Security Awareness* | means the program to increase the knowledge and improve the attitude that members of an organization possess regarding the protection of the physical, and especially informational, assets of an organization. |
| *Security Breach* | means (1) actual, suspected or alleged (a) physical or logical trespass on a facility, computing system or Data System, (b) intrusion, hacking, loss or theft of a computer, notebook, desktop, other mobile device, hard drive, or any information storage device, or (c) loss, theft, alteration or destruction of HPI Data; (2) a reported privacy complaint HPES receives in relation to the HPI Data (regardless of the source of the complaint) or the Services; or |

**Schedule 1 (Defined Terms)**
**IT Service Agreement**

31

*HPI Confidential Information*

|  |  |
|---|---|
|  | (3) other unauthorized access that is reasonably believed to have resulted in the misuse, compromise, or unauthorized release of HPI Data. |
| *Security Event* | means a change of state related to systems security which has significance for the management of a Configuration Item or IT service, including any alert or notification created by any IT service, Configuration Item or monitoring tool. |
| *"Security Information and Event Management Tool" or "SIEM Tool"* | means a tool or suite of tools capable of performing Security Event Management functions. |
| *Security Leadership* | means the HPI Personnel responsible for making decisions related to security and standards. |
| *"Security Operations Center" or "SOC"* | means a centralized function that deals with security issues, on an organizational and technical level and supervises the security of the IT environment, using data processing technology. |
| *"Segregation of Duties" or "SOD"* | means an internal control designed to prevent error and fraud by ensuring that at least two individuals are responsible for the separate parts of a task. |
| *Server Instance* | means a single instance of a virtualized Server (see Virtual Server Instance). |
| *Service Commencement Date* | means the date, following the applicable Migration Completion Date and HPES' assumption of responsibility for performance of the applicable Services, on which HPES begins to provide the applicable Services to one or more Service Recipients in accordance with the Agreement. |
| *Service Continuity Plan Testing* | means the activity of testing the effectiveness of the Service Continuity Plan to meet expected results. |
| *Service Delivery Designee* | means individuals designated by HPI (also called "HPI Service Delivery Designee") from time to time to interact with HPES with respect to all of the Services or identified portions of the Services, and such individual(s) will have specific responsibilities and authorities with respect to the Services. |
| *Service Delivery Resources* | means the methods, processes, Tools, Software, Equipment and other resources being used to provide the Services. |
| *Service Desk Abandonment Rate* | means the number of Service Desk calls not answered, divided by the total number of live contacts offered, with the result expressed as a percentage. |

**Schedule 1 (Defined Terms)**
**IT Service Agreement**

32

*HPI Confidential Information*

| | |
|---|---|
| *Service Invoicing* | means the Key Activity described in <u>Appendix 3-A.6</u> to <u>Schedule 3</u> to the Agreement. |
| *Service Level* | has the meaning set forth in <u>Section 10.1</u> of the Agreement. |
| *Service Level Credit* | means the credit that will be due to HPI from HPES in the event of a Critical Service Level Default. |
| *Service Level Credit Pool* | has the meaning set forth in <u>Section 2.7</u> of <u>Schedule 4</u> to the Agreement. |
| *Service Level Default* | means a failure by HPES to perform in accordance with a Service Level, or to measure or report on its performance against a Service Level, during the applicable Measurement Period that is not otherwise exempted pursuant to <u>Section 2.7</u> of <u>Schedule 4</u> or <u>Section 15.2</u> of this Agreement. |
| *"Service Level Metrics" or "Service Levels"* | means the specific performance metrics measuring the quality, efficiency or other aspects of HPES' performance of the Services which HPES is to meet or exceed. |
| *Service Level Report* | has the meaning set forth in [ <u>Section 2.2]</u> of <u>Schedule 4</u> to the Agreement. |
| *Service Locations* | means, collectively, the HPI Facilities and the HPES Service Locations. |
| *Service Portfolio* | means the set of Services to be provided under this Agreement. |
| *Service Portfolio Management* | means a set of processes and a disciplined approach to the management of the Service Portfolio. |
| *Service Problem* | has the meaning set forth in <u>Section 6.2</u> of the Agreement. |
| *Service Recipient* | has the meaning set forth in <u>Section 4.1(A)</u> of the Agreement. |
| *Service Request Fulfillment* | means the discipline responsible for managing the lifecycle of all service requests. |
| *Service Tax* | means any and all present or future, sales, use, goods and services, value-added, excise, gross receipts, COFINS, ISS, PIS and other similar transaction based taxes that are assessed against a Party by a Tax Authority on the provision of the Services as a whole, or on the Charges, or on any particular Service received by any Service Recipient from HPES, but excluding Income Taxes. HPES prices are exclusive of Services Tax. |
| *Services* | means the Migration Services, Transformation Services, and the Functions described in <u>Section 4.1(A)</u> of the Agreement. |

**Schedule 1 (Defined Terms)**
**IT Service Agreement**

33

*HPI Confidential Information*

| | |
|---|---|
| *Severance Charge* | means an amount equal to 50 percent of the sum of the actual separation costs incurred by HPES as a result of HPI's termination of Services pursuant to the Agreement, provided that such amount will be limited to actual separation costs associated with the HPES Personnel identified as exclusively dedicated to the HPI account as of the date of such termination. |
| *Shared Allocation Percentage* | has the meaning set forth in <u>Section 2.7(B)</u> of <u>Schedule 5</u> to the Agreement. |
| *Shared-Risk / Shared-Reward* | means a process of sharing the benefits (usually financial) of a project or action to change a service delivery aspect based on the level of investment (usually cost) made in the implementation and maintenance of the project or action. |
| *"Simple Network Management Protocol" or "SMNP"* | means the Internet-standard protocol for managing devices (e.g., Routers or servers) on IP networks. |
| *"Single Point of Contact" or "SPOC"* | means the single, identified individual responsible for managing an Incident or Project. |
| *Six-Month Measurement Period* | has the meaning set forth in <u>Section 2.2</u> of <u>Schedule 4</u> to the Agreement. |
| *Smart Hands* | means the operations resources at a data center that provide skilled support, typically for reporting visual aspects of Device states, reboots of Devices or other scripted operational duties. |
| *Software* | means the source code and object code versions of any computer programs, including applications used to assist in the execution of business processes or for personal productivity, operating system software, various middleware products and software tools used to develop applications, computer software languages, utilities, other computer programs and Related Documentation, in whatever form or media, including the tangible media upon which such applications programs, operating system software, computer software languages, utilities, other computer programs and Related Documentation are recorded or printed, together with all corrections, improvements, updates and releases thereof. |
| *Solution Document* | means a document that outlines the technical design, architecture, and supporting processes of the solution being deployed. |
| *Solution Manager* | means SAP's central support and system management suite to assist users in adopting new developments, managing the application lifecycle, and running SAP solutions. |
| *Source Code Migration* | means the process of migrating Software source code from one |

**Schedule 1 (Defined Terms)**
**IT Service Agreement**

34

*HPI Confidential Information*

environment to another.

| | |
|---|---|
| *SSAE 16* | means the Statement on Standards for Attestation Engagements 16, as issued by the American Institute of Certified Public Accountants. |
| *Step-In Date* | means the date that HPI or HPI's designee steps in to perform a Service in accordance with Section 27.1 of the Agreement. |
| *Step-Out Date* | has the meaning set forth in Section 27.2(C) of the Agreement. |
| *Step-Out Notice* | has the meaning set forth in Section 27.2(A) of the Agreement. |
| *Step-Out Plan* | has the meaning set forth in Section 27.2(B) of the Agreement. |
| *Storage Management* | means the operational processes and disciplines associated with the work functions underpinning the support tasks of managing HPI Storage. |
| *"Structured Threat Information eXpression" or "STIE"* | means a collaborative community-driven effort to define and develop a standardized language to represent structured cyber threat information. The STIE Language intends to convey the full range of potential cyber threat information and strives to be fully expressive, flexible, extensible, automatable, and as human-readable as possible. |
| *Subsystems* | means an integrated collection of (a) Storage controllers and/or host bus adapters, (b) Storage devices such as disks, CD-ROMs, tapes, media loaders and robots, and (c) any required control software, that provides Storage services to one or more Devices, either HPI controlled or HPES controlled. |
| *Sub-Tower* | has the meaning set forth in Section 29.7 of the Agreement. |
| *Successor Supplier* | means a supplier of services to substitute for or replace the Services, whether HPI (where HPI is providing such services for itself) or a third party designated by HPI, following the expiration or termination (in whole or in part) of the Agreement. |
| *Support* | means the supporting of a Device as well as performing all onsite labor activities required to repair a defective Device. |
| *Support Level* | has the meaning set forth in Section 3.3(B) of Schedule 5 to the Agreement. |
| *Systems* | means any systems, Equipment or Software used by HPES or any HPES Agents in connection with the provision of the Services. |

**Schedule 1 (Defined Terms)**
**IT Service Agreement**

*HPI Confidential Information*

| | |
|---|---|
| *Tax Authority* | means any Governmental Authority or other fiscal, revenue, customs or excise authority, body or official competent to impose, collect or assess tax. |
| *Technical Change* | means the addition, modification or removal of anything that is likely to have an effect on HPI's receipt and use of any of the Services or an effect on the (a) HPI IT Environment, (b) HPI Network, (c) HPI Systems, (d) HPI Software, or (e) other HPI Resources. A change to the On-Site HPES Resources will not be considered a Technical Change, but solely to the extent such change does not impact the HPI IT Environment. Technical Changes will be handled pursuant to the Change Management Process. A Technical Change may cause a Change and vice versa. |
| *Technical Change Request* | means a request for a Technical Change. Refer to "Technical Change." |
| *Technical Representatives* | has the meaning set forth in Task 11.3 of Appendix 3-A.8 to the Agreement. |
| *Term* | has the meaning set forth in Section 2.2 of the Agreement. |
| *Termination Charge* | has the meaning set forth in Section 7.1(A) of Schedule 5 to the Agreement. |
| *Testing Procedures* | has the meaning set forth in Section 3.3 of Schedule 15 to the Agreement. |
| *Third Party Provider Dispute* | has the meaning set forth in Section 6.3(A) of the Agreement. |
| *Third Party Providers* | has the meaning set forth in Section 6.1(A) of the Agreement. |
| *Third Party Service Contracts* | means any and all contracts pursuant to which a third party is providing products or services to the Service Recipients. |
| *Time Tracking System* | has the meaning set forth in Section 2.4 of Schedule 5 to the Agreement. |
| *Tools* | means any testing, monitoring or other tools or utilities and related know-how, methodologies, processes, technologies, or algorithms. |
| *Tower* | means each category of Services described in Appendix 3-A.1 through Appendix 3-A.11, Appendix 3-B.1 and Appendix 3-B.2. |
| *Tower Services Charge* | has the meaning set forth in Section 3.2 of Schedule 5 to the Agreement. |
| *Transferred Assets* | means the assets transferred from HPI to HPES as part of the HP |

**Schedule 1 (Defined Terms)**
**IT Service Agreement**

36

*HPI Confidential Information*

separation as such assets are identified in the asset registry issued by the separation management office established as part of the HP separation as of the Effective Date, as amended.

| | |
|---|---|
| *Transferred Asset Charge* | has the meaning set forth in <u>Section 2.7(A)</u> of the Agreement. |
| *Transition* | has the meaning set forth in <u>Section 3.2(A)</u> of the Agreement. |
| *Transition Deliverables* | has the meaning set forth in <u>Section 3.2(B)(1)</u> of the Agreement. |
| *Transition Delivery Date* | has the meaning set forth in <u>Section 3.2(B)(1)</u> of the Agreement. |
| *Transition Milestone* | has the meaning set forth in <u>Section 3.2(B)(1)</u> of the Agreement. |
| *Transition Milestone Date* | has the meaning set forth in <u>Section 3.2(B)(1)</u> of the Agreement. |
| *Transition Plan* | has the meaning set forth in <u>Section 3.2(B)(1)</u> of the Agreement. |
| *Transition Services* | means the Functions described in <u>Section 3.2</u> of the Agreement that are the responsibility of HPES. |
| *Trojan* | means a non-self-replicating type of malware program containing malicious code that, when executed, carries out actions determined by the nature of the Trojan, typically causing loss or theft of data, and possible system harm. |
| *"Trusted Automated eXchange of Indicator Information" or "TAXII"* | means a set of services and message exchanges that, when implemented, enable sharing of actionable cyber threat information across organization and product/service boundaries. |
| *U.S.* | means United States of America. |
| *Unified Communications* | means the integration of real-time, enterprise, communication services such as instant messaging (chat), presence information, voice (including IP telephony), mobility features (including extension mobility and single number reach), audio, web & video conferencing, fixed-mobile convergence (FMC), desktop sharing, data sharing (including web connected electronic interactive whiteboards), call control and speech recognition with non-real-time communication services such as unified messaging (integrated voicemail, e-mail, SMS and fax). |
| *"Uninterruptible Power Supply" or "UPS"* | means an electrical device that provides emergency power to a load when the primary input power source fails. |
| *Unit-Based Charge* | has the meaning set forth in <u>Section 2.1(A)</u> of <u>Schedule 5</u> to the Agreement. |

**Schedule 1 (Defined Terms)**
**IT Service Agreement**

*HPI Confidential Information*

| | |
|---|---|
| *Use* | means the right to access, load, execute, store, transmit, display, perform, distribute, copy, maintain, modify, enhance and create (and have created) derivative works. |
| *Useful Life Calculations* | has the meaning set forth in <u>Section 2.8(C)</u> of <u>Schedule 5</u> to the Agreement. |
| *"User Acceptance Testing" or "UAT"* | means the testing of a Software Deliverable by End Users prior to Acceptance. |
| *User ID* | means a unique identifier for a requestor of access to and use of system resources that can be: (1) authenticated to determine its valid use, and (2) used by system resources to determine access rights. User IDs are typically associated with End Users, but may also identify other requestors, such as service or machine accounts. |
| *Validation Period* | has the meaning set forth in <u>Section 3.2(D)(1)</u> of <u>Schedule 4</u> to the Agreement. |
| *Virtual Instance* | means a single operating system instance installed on Virtual Hosts. For clarity, there may be multiple Virtual Server Instances on a Virtual Host. |
| *Virtualization* | means the act of creating a virtual (rather than actual) version of something, including (but not limited to) a virtual computer hardware platform, operating system (OS), storage device, or computer network resource. |
| *Voice Device* | means telephony Devices including PBXs, IP telephony systems, gateways, ACDs, IVRs, handsets, wireless headsets, and voicemail systems. |
| *Voice System* | means a set of interacting or interdependent technology components capable of delivering voice telephony services. |
| *Vulnerability Management* | means the cyclical practice of identifying, classifying, remediating, and mitigating vulnerabilities, especially in software and firmware. |
| *"WAN Acceleration Management" or "Wide Area Acceleration Services* | means the optimization network bandwidth typically through compression and caching of data, dynamic modification of TCP parameters, and enforcement of QoS prioritization. |
| *WarDial* | means the technique of automatically scanning a list of telephone numbers, usually done to gain access to private information. |
| *"Web SSO" or "Web Services Security"* | means a system consisting of an agent installed on web servers, and a central infrastructure that includes a Directory and servers or logic to manage authentication and access control. |

**Schedule 1 (Defined Terms)**
**IT Service Agreement**

38

*HPI Confidential Information*

| | |
|---|---|
| *"Wide Area Network" or "WAN"* | means transmission networks, consisting of Network Devices, software, telecommunications facilities, lines, interconnected devices, cabling, SONET rings, ATM, frame relay, leased lines, and other services as they become available, that are used to create, connect, and transmit data, voice, and video signals between or among (1) LANs, (2) MANs, and (3) non-HPI Locations that do business with HPI and for which HPI is responsible for providing connectivity. The WAN shall include all long distance voice, data, and video (image) traffic to be routed over the WANs and MANs. |
| *Wind Down Charge* | means the sum of all (1) pre-paid, non-refundable amounts owed pursuant to any contract between HPES and a third party (e.g., an annual maintenance contract) that is exclusively dedicated to support the HPI account, and (2) amounts required to prematurely terminate any occupancy leases, sub-contracts or purchase orders between HPES and a third party that are primarily dedicated to support the HPI account. |
| *"Wireless Access Point" or "WAP"* | means an intermediary device that exchanges information between various wireless configured Devices by allowing them to connect to a network using Wi-Fi, Bluetooth, and related standards. The WAP usually connects to a network switch, and can relay data between wireless configured Devices and wired Devices on the network. |

**Schedule 1 (Defined Terms)**
**IT Service Agreement**

39

FIVE-YEAR CREDIT AGREEMENT

dated as of

April 2, 2014,
as Amended and Restated as of November 1, 2015,

among

HP INC.,

The Lenders Party Hereto,

CITIBANK, N.A.,
as Administrative Processing Agent and Co-Administrative Agent

and

JPMORGAN CHASE BANK, N.A.,
as Co-Administrative Agent

———————————

CITIGROUP GLOBAL MARKETS INC.,

J.P. MORGAN SECURITIES LLC,

BNP PARIBAS SECURITIES CORP.,

HSBC SECURITIES (USA) INC.,

MIZUHO BANK, LTD.

and

MERRILL LYNCH, PIERCE, FENNER & SMITH, INCORPORATED,

as Joint Lead Arrangers and Joint Bookrunners

———————————

BNP PARIBAS,
HSBC BANK USA, NATIONAL ASSOCIATION,
MIZUHO BANK, LTD.
and
BANK OF AMERICA, N.A.,

as Co-Syndication Agents

TABLE OF CONTENTS

## ARTICLE I

Definitions

| | | |
|---|---|---:|
| SECTION 1.01. | Defined Terms | 1 |
| SECTION 1.02. | Classification of Loans and Borrowings | 26 |
| SECTION 1.03. | Terms Generally | 26 |
| SECTION 1.04. | Accounting Terms; GAAP | 26 |
| SECTION 1.05. | Exchange Rates | 27 |

## ARTICLE II

The Credits

| | | |
|---|---|---:|
| SECTION 2.01. | Commitments | 27 |
| SECTION 2.02. | Loans and Borrowings | 27 |
| SECTION 2.03. | Requests for Revolving Borrowings | 28 |
| SECTION 2.04. | Swingline Loans | 29 |
| SECTION 2.05. | Funding of Borrowings | 31 |
| SECTION 2.06. | Interest Elections | 32 |
| SECTION 2.07. | Termination and Reduction of Commitments | 33 |
| SECTION 2.08. | Repayment of Loans; Evidence of Debt | 34 |
| SECTION 2.09. | Prepayment of Loans | 35 |
| SECTION 2.10. | Fees | 36 |
| SECTION 2.11. | Interest | 36 |
| SECTION 2.12. | Alternate Rate of Interest | 37 |
| SECTION 2.13. | Increased Costs | 38 |
| SECTION 2.14. | Break Funding Payments | 39 |
| SECTION 2.15. | Taxes | 40 |
| SECTION 2.16. | Payments Generally; Pro Rata Treatment; Sharing of Setoffs | 44 |
| SECTION 2.17. | Mitigation Obligations; Replacement of Lenders | 46 |
| SECTION 2.18. | Defaulting Lenders | 46 |
| SECTION 2.19. | Increase in Revolving Commitments | 48 |
| SECTION 2.20. | Extension of Maturity Date | 50 |
| SECTION 2.21. | Additional Reserve Costs | 51 |
| SECTION 2.22. | Redenomination of Certain Designated Foreign Currencies | 51 |

## ARTICLE III

Representations and Warranties

| | | |
|---|---|---:|
| SECTION 3.01. | Organization; Powers | 52 |
| SECTION 3.02. | Authorization; Enforceability | 52 |
| SECTION 3.03. | Governmental Approvals; No Conflicts | 52 |

| SECTION 3.04. | Financial Condition; No Material Adverse Change | 52 |
| SECTION 3.05. | Litigation and Environmental Matters | 53 |
| SECTION 3.06. | Compliance with Laws and Agreements | 53 |
| SECTION 3.07. | Investment Company Status | 53 |
| SECTION 3.08. | Taxes | 53 |
| SECTION 3.09. | ERISA | 54 |
| SECTION 3.10. | Federal Reserve Regulations | 54 |
| SECTION 3.11. | Pari Passu Status | 54 |
| SECTION 3.12. | Anti-Corruption Laws and Sanctions | 54 |

ARTICLE IV

Conditions

| SECTION 4.01. | Restatement Effective Date | 54 |
| SECTION 4.02. | Each Credit Event | 56 |

ARTICLE V

Affirmative Covenants

| SECTION 5.01. | Financial Statements and Other Information | 57 |
| SECTION 5.02. | Notices of Material Events | 58 |
| SECTION 5.03. | Existence; Conduct of Business | 59 |
| SECTION 5.04. | Payment of Obligations | 59 |
| SECTION 5.05. | Maintenance of Properties; Insurance | 60 |
| SECTION 5.06. | Books and Records; Inspection Rights | 60 |
| SECTION 5.07. | Compliance with Laws | 60 |
| SECTION 5.08. | Use of Proceeds | 60 |

ARTICLE VI

Negative Covenants

| SECTION 6.01. | Subsidiary Indebtedness | 61 |
| SECTION 6.02. | Liens | 62 |
| SECTION 6.03. | Sale and Leaseback Transactions | 64 |
| SECTION 6.04. | Fundamental Changes | 64 |
| SECTION 6.05. | Financial Covenants | 65 |

- ii -

ARTICLE VII

Events of Default

ARTICLE VIII

The Administrative Agent

ARTICLE IX

Miscellaneous

| SECTION 9.01. | Notices | 70 |
|---|---|---|
| SECTION 9.02. | Waivers; Amendments | 72 |
| SECTION 9.03. | Expenses; Indemnity; Damage Waiver | 73 |
| SECTION 9.04. | Successors and Assigns | 75 |
| SECTION 9.05. | Survival | 78 |
| SECTION 9.06. | Counterparts; Integration; Effectiveness | 79 |
| SECTION 9.07. | Severability | 79 |
| SECTION 9.08. | Right of Setoff | 80 |
| SECTION 9.09. | Governing Law; Jurisdiction; Consent to Service of Process | 80 |
| SECTION 9.10. | WAIVER OF JURY TRIAL | 81 |
| SECTION 9.11. | Headings | 81 |
| SECTION 9.12. | Confidentiality | 81 |
| SECTION 9.13. | Authorization to Distribute Certain Materials to Public-Siders; Material Non-Public Information | 82 |
| SECTION 9.14. | Patriot Act | 83 |
| SECTION 9.15. | Conversion of Currencies | 83 |
| SECTION 9.16. | No Fiduciary Duty | 83 |

SCHEDULES:

Schedule 2.01    -    Commitments
Schedule 3.05    -    Litigation and Environmental Matters
Schedule 6.01    -    Existing Subsidiary Indebtedness

EXHIBITS:

Exhibit A       -    Form of Assignment and Assumption
Exhibit B-1     -    Form of Opinion of Borrower's Counsel
Exhibit B-2     –    Form of Solvency Certificate
Exhibit C-1     –    Form of U.S. Tax Certificate for Non-U.S. Lenders that are not Partnerships for U.S. Federal Income Tax Purposes
Exhibit C-2     –    Form of U.S. Tax Certificate for Non-U.S. Lenders that are Partnerships for U.S. Federal Income Tax Purposes
Exhibit C-3     –    Form of U.S. Tax Certificate for Non-U.S. Participants that are not Partnerships for U.S. Federal Income Tax Purposes
Exhibit C-4     –    Form of U.S. Tax Certificate for Non-U.S. Participants that are Partnerships for U.S. Federal Income Tax Purposes

- iii -

CREDIT AGREEMENT dated as of April 2, 2014, as amended and restated as of November 1, 2015 (the " Agreement "), among HP INC., the LENDERS party hereto, CITIBANK, N.A., as Administrative Processing Agent and Co-Administrative Agent, and JPMORGAN CHASE BANK, N.A., as Co-Administrative Agent.

The Borrower, the Lenders, the Administrative Agent and the Co-Administrative Agent are party to the Credit Agreement dated as of April 2, 2014 (as in effect immediately prior to its amendment and restatement pursuant hereto, the " Original Credit Agreement "). In connection with the Separation Transactions, the Borrower has requested that the Lenders agree to amend and restate the Original Credit Agreement in the form hereof in order, among other things, to enable the Borrower to (a) borrow on a revolving credit basis on and after the Restatement Effective Date and at any time and from time to time prior to the Maturity Date a principal amount not in excess of the equivalent of US$4,000,000,000 at any time outstanding, and (b) have same-day availability swingline facilities provided by certain Lenders and backstopped by certain tranches of the lending commitments referred to in clause (a) above for Swingline Loans denominated in Euro or Sterling in an aggregate principal amount not in excess of the equivalent of US$1,500,000,000 at any time outstanding. The Lenders are willing to amend and restate the Original Credit Agreement in the form hereof and to extend such credit to the Borrower pursuant hereto, in each case on the terms and subject to the conditions herein set forth. Accordingly, the parties hereto agree as follows:

ARTICLE I

Definitions

SECTION 1.01. Defined Terms. As used in this Agreement, including the recitals above, the following terms have the meanings specified below:

" ABR ", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, bears interest at a rate determined by reference to the Alternate Base Rate.

" Adjusted LIBO Rate " means, with respect to any Eurocurrency Borrowing denominated in Dollars for any Interest Period (or, solely for purposes of clause (c) of the defined term "Alternate Base Rate", for purposes of determining the Alternate Base Rate as of any date), an interest rate per annum (rounded upwards, if necessary, to the next 1/100 of 1%) equal to (a) the LIBO Rate for such Interest Period (or such date, as applicable) multiplied by (b) the Statutory Reserve Rate.

" Administrative Agent " means the Administrative Processing Agent or any successor thereto appointed in accordance with Article VIII, or when such term is used in relation to Multicurrency Swingline Loans (including with respect to delivery of notices), the Multicurrency Swingline Agent.

" Administrative Processing Agent " means Citibank, N.A., in its capacity as administrative processing agent for the Lenders hereunder.

" Administrative Questionnaire " means an Administrative Questionnaire in a form supplied by the Administrative Agent.

" Affiliate " means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

" Agent Parties " has the meaning assigned to such term in Section 9.01(d).

" Agreement " has the meaning assigned to such term in the preamble.

" Agreement Currency " has the meaning assigned to such term in Section 9.15(b).

" Alternate Base Rate " means, for any day, a rate per annum equal to the highest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus $1/2$ of 1%, and (c) the Adjusted LIBO Rate for a one-month Interest Period commencing on such day (or if such day is not a Business Day, the immediately preceding Business Day) plus 1%; provided that, for the avoidance of doubt, for purposes of this definition, the Adjusted LIBO Rate on any day shall be based on the rate per annum equal to the London interbank offered rate as administered by the ICE Benchmark Administration (or any other Person that takes over the administration of such rate) for deposits in Dollars (for delivery on such day) with a term of one month as displayed on the Reuters screen page that displays such rate (currently page LIBOR01) (or, in the event such rate does not appear on a page of the Reuters screen, on the appropriate page of such other information service that publishes such rate as shall be selected by the Administrative Agent from time to time in its reasonable discretion) at approximately 11:00 a.m., London time, two Business Days prior to such day. Any change in the Alternate Base Rate due to a change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted LIBO Rate shall be effective from and including the effective date of such change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted LIBO Rate, respectively.

" Anti-Corruption Laws " means all laws, rules, and regulations of any jurisdiction applicable to the Borrower and the Subsidiaries from time to time concerning or relating to bribery or corruption.

" Applicable Creditor " has the meaning assigned to such term in Section 9.15(b).

" Applicable Funding Account " means an account of the Borrower that is specified in a written notice from a Financial Officer of the Borrower delivered to and approved by the Administrative Agent for the funding of the proceeds of Loans hereunder, which account shall be maintained by the Borrower (i) with the Administrative Agent in New York City, in the case of funding proceeds of Loans in Dollars, and (ii) with a financial institution other than the Administrative Agent in London, in the case of funding proceeds of Loans in a Designated Foreign Currency.

2

" Applicable Percentage " means, with respect to any Lender and any Class of Loans or Commitments, the percentage of the Commitments of such Class represented by such Lender's Commitments of such Class; provided that in the case of Section 2.18 when a Defaulting Lender shall exist, "Applicable Percentage" shall mean the percentage of the total Commitments (disregarding any Defaulting Lender's Commitment) represented by such Lender's Commitment. If the Commitments have terminated or expired, the Applicable Percentages shall be determined based upon the Commitments of the relevant Class most recently in effect, giving effect to any assignments and to any Lender's status as a Defaulting Lender at the time of determination.

" Applicable Rate " means, for any day on or after the Restatement Effective Date and with respect to any ABR Loan, Eurocurrency Loan, or the commitment fees payable hereunder, the applicable rate per annum set forth below in basis points per annum under the caption "ABR Spread," "Eurocurrency Spread" or "Commitment Fee Rate," as the case may be, based upon the Ratings of S&P, Moody's and Fitch, respectively, applicable on such date to the Index Debt:

| Index Debt Ratings: | ABR Spread | Eurocurrency Spread | Commitment Fee Rate |
|---|---|---|---|
| Category 1 Rating of A, A2 or A | 0.0 | 87.5 | 8.0 |
| Category 2 Rating of A-, A3 or A- | 0.0 | 100.0 | 10.0 |
| Category 3 Rating of BBB+, Baa1 or BBB+ | 12.5 | 112.5 | 12.5 |
| Category 4 Rating of BBB, Baa2 or BBB | 25.0 | 125.0 | 15.0 |
| Category 5 Rating of BBB-, Baa3 or BBB- | 50.0 | 150.0 | 20.0 |
| Category 6 Rating of BB+, Ba1 or BB+ or lower | 75.0 | 175.0 | 25.0 |

" Assignment and Assumption " means an assignment and assumption entered into by a Lender and an assignee (with the consent of any party whose consent is required by Section 9.04), and accepted by the Administrative Agent, in the form of Exhibit A hereto or any other form approved by the Administrative Agent.

3

" Attributable Debt " means, with respect to any Sale and Leaseback Transaction, the present value (discounted at the rate set forth or implicit in the terms of the lease included in such Sale and Leaseback Transaction, compounded semiannually) of the total obligations of the lessee for rental payments during the remaining term of the lease included in such Sale and Leaseback Transaction (including any period for which such lease has been extended). In the case of any lease that is terminable by the lessee upon payment of a penalty, the Attributable Debt shall be the lesser of the Attributable Debt determined assuming termination upon the first date such lease may be terminated (in which case the Attributable Debt shall also include the amount of the penalty, but no rent shall be considered as required to be paid under such lease subsequent to the first date upon which it may be so terminated) or the Attributable Debt determined assuming no such termination. Any determination of any rate implicit in the terms of the lease included in such Sale and Leaseback Transaction made in accordance with generally accepted financial practices by the Borrower shall be binding and conclusive absent manifest error.

" Availability Period " means the period from and including the Original Effective Date to but excluding the earlier of the Maturity Date and the date of termination of the Commitments.

" Bankruptcy Event " means, with respect to any Person, such Person becomes the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, administrator, custodian, assignee for the benefit of creditors or similar Person charged with the reorganization or liquidation of its business publicly appointed for it, or, in the good faith determination of the Administrative Agent, has taken any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any such proceeding or appointment, provided that a Bankruptcy Event shall not result solely by virtue of any ownership interest, or the acquisition of any ownership interest, in such Person by a Governmental Authority or instrumentality thereof, unless such ownership interest results in or provides such Person with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Person (or such Governmental Authority or instrumentality) to reject, repudiate, disavow or disaffirm any contracts or agreements made by such Person.

" Board " means the Board of Governors of the Federal Reserve System of the United States of America.

" Borrower " means HP Inc., a Delaware corporation, which, prior to consummation of the Separation Transactions, was named Hewlett-Packard Company.

" Borrower Agent " means agents of the Borrower acting in capacity with, or benefitting from, this Agreement or the proceeds of any Borrowing.

4

" <u>Borrowing</u> " means (a) a group of Loans of the same Type, made, converted or continued on the same date and, in the case of Eurocurrency Loans, as to which a single Interest Period is in effect and denominated in the same currency or (b) a Swingline Loan.

" <u>Borrowing Minimum</u> " means (a) in the case of a Borrowing denominated in Dollars, US$25,000,000 and (b) in the case of a Borrowing denominated in any Designated Foreign Currency, the smallest amount of such Designated Foreign Currency that is a multiple of 1,000,000 units of such currency that has a US Dollar Equivalent in excess of US$25,000,000.

" <u>Borrowing Multiple</u> " means (a) in the case of a Borrowing denominated in Dollars, US$5,000,000 and (b) in the case of a Borrowing denominated in any Designated Foreign Currency, 1,000,000 units of such currency.

" <u>Borrowing Request</u> " means a request by the Borrower for a Revolving Borrowing in accordance with Section 2.03.

" <u>Business Day</u> " means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed; <u>provided</u> that, (a) when used in connection with a Eurocurrency Loan, a European Swingline Loan or a UK Swingline Loan, the term "Business Day" shall also exclude any day on which banks are not open for dealings in deposits in the applicable currency in the London interbank market, and (b) when used in connection with a Loan denominated in Euro (including a European Swingline Loan), the term "Business Day" shall also exclude any day on which the TARGET2 payment system is not open for the settlement of payments in Euro.

" <u>Capital Lease Obligations</u> " of any Person means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP; provided that (a) any lease that was treated as an operating lease under GAAP at the time it was entered into that later becomes a capital lease as a result of a change in GAAP during the life of such lease, including any renewals, and (b) any lease entered into after the date of this Agreement that would have been considered an operating lease under the provisions of GAAP in effect as of October 31, 2014, in each case, shall be treated as an operating lease for all purposes under this Agreement, including for purposes of determining "Attributable Debt".

" <u>Category</u> " means a category of Index Debt Ratings set forth in the table included in the definition of Applicable Rate in this Section 1.01.

" <u>Change in Control</u> " means (a) the acquisition of ownership, directly or indirectly, beneficially or of record, by any Person or group (within the meaning of the

5

Securities Exchange Act of 1934, as amended and the rules of the Securities and Exchange Commission thereunder as in effect on the date hereof) of shares representing more than 37.5% of the aggregate ordinary voting power represented by the issued and outstanding capital stock of the Borrower, or (b) (i) the Borrower consolidates with or merges into another corporation (where the Borrower is not the surviving corporation) or (except for the Separation Transactions) conveys, transfers or leases all or substantially all of its properties and assets (determined on a consolidated basis for the Borrower and the Subsidiaries taken as a whole) to any Person or (ii) any corporation consolidates with or merges into the Borrower or a Subsidiary in a transaction in which the outstanding voting stock of the Borrower is changed into or exchanged for cash, securities or other property, other than a transaction solely between the Borrower and a Subsidiary or a transaction involving only stock consideration which is permitted under Section 6.04.

" Change in Law " means (a) the adoption of any law, rule or regulation after the date of this Agreement, (b) any change in any law, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the date of this Agreement, or (c) compliance by any Lender (or, for purposes of Section 2.13(b), by any lending office of such Lender or by such Lender's direct or indirect holding company, if any) with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement; provided that (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, requirements and directives thereunder, issued in connection therewith or in implementation thereof, and (ii) all requests, rules, guidelines, requirements and directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a Change in Law, regardless of the date enacted, adopted, issued or implemented.

" Class ", when used in reference to (a) any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are Revolving Loans or Swingline Loans, and (b) any Commitment, refers to whether such Commitment is a Revolving Commitment or a Swingline Commitment.

" Co-Administrative Agent " means Citibank, N.A. or JPMorgan Chase Bank, N.A., each in its capacity as co-administrative agent for the Lenders hereunder.

" Code " means the Internal Revenue Code of 1986, as amended from time to time.

" Commitment " means a Revolving Commitment or a Swingline Commitment.

" Commitment Letter " means the Commitment Letter dated September 10, 2015, among the Borrower, Citibank, N.A., Citigroup Global Markets, Inc., JPMorgan Chase Bank, N.A., J.P. Morgan Securities LLC, BNP Paribas, BNP Paribas Securities Corp., HSBC Bank USA, National Association, HSBC Securities (USA) Inc., Bank of America, N.A. and Merrill Lynch, Pierce, Fenner & Smith Incorporated.

6

" Communications " has the meaning assigned to such term in Section 5.01(e).

" Consolidated Current Liabilities " means, on any date, the consolidated current liabilities (other than the short-term portion of any long-term Indebtedness of the Borrower or any Subsidiary) of the Borrower and the Subsidiaries, as such amounts would appear on a consolidated balance sheet of the Borrower prepared as of such date in accordance with GAAP.

" Consolidated EBITDA " means, for any period, Consolidated Net Income for such period plus (a) without duplication and to the extent deducted in determining such Consolidated Net Income, the sum of (i) consolidated interest expense for such period, (ii) consolidated income tax expense for such period, (iii) all amounts attributable to depreciation and amortization for such period, (iv) cash expenses, including cash reorganization expenses, relating to the Separation Transactions, and other non-recurring cash expenses, in each case paid during the initial period of four fiscal quarters ending after the date on which the Spin-Off is consummated, (v) any extraordinary or non-recurring non-cash charges, including non-cash restructuring charges, for such period (it being understood that non-cash goodwill and intangible asset impairment charges will be deemed to be non-recurring non-cash charges); provided , however , that cash expenditures in respect of charges referred to in this clause (v) shall be deducted in determining Consolidated EBITDA for the period during which such expenditures are made, (vi) stock-based employee compensation expense, and (vii) losses from sales and dispositions of assets outside the ordinary course of business, and minus (b) without duplication and to the extent included in determining such Consolidated Net Income, (i) any extraordinary or non-recurring gains for such period and (ii) gains from sales or dispositions of assets outside the ordinary course of business, all determined on a consolidated basis in accordance with GAAP.

" Consolidated Intangible Assets " means, on any date, the consolidated intangible assets of the Borrower and the Subsidiaries, as such amounts would appear on a consolidated balance sheet of the Borrower prepared in accordance with GAAP. As used herein, "intangible assets" means the value (net of any applicable reserves) as shown on such balance sheet of (i) all patents, patent rights, trademarks, trademark registrations, servicemarks, trade names, business names, brand names, copyrights, designs (and all reissues, divisions, continuations and extensions thereof), or any right to any of the foregoing, (ii) goodwill, and (iii) all other intangible assets.

" Consolidated Net Assets " means, on any date, the excess of Consolidated Total Assets over Consolidated Current Liabilities.

" Consolidated Net Income " means, for any period, the net income or loss of the Borrower and the Subsidiaries for such period determined on a consolidated basis in accordance with GAAP; provided that there shall be excluded (a) the income of any

7

Person (other than the Borrower or any Subsidiary) in which any other Person (other than the Borrower or any Subsidiary or any director holding qualifying shares in compliance with applicable law) owns an Equity Interest, except to the extent of the amount of dividends or other distributions actually paid to the Borrower or any of the Subsidiaries during such period and (b) the income or loss of any Person accrued prior to the date it becomes a Subsidiary or is merged into or consolidated with the Borrower or any Subsidiary or the date that such Person's assets are acquired by the Borrower or any Subsidiary.

" Consolidated Net Interest Expense " means, for any period, the excess of (a) the sum of (i) the interest expense (including imputed interest expense in respect of Capital Lease Obligations) of the Borrower and the Subsidiaries for such period, determined on a consolidated basis in accordance with GAAP, (ii) any interest accrued during such period in respect of Indebtedness of the Borrower or any Subsidiary that is required to be capitalized rather than included in consolidated interest expense for such period in accordance with GAAP, plus (iii) any cash payments made during such period in respect of obligations referred to in clause (b)(iii) below that were amortized or accrued in a previous period, minus (b) the sum of (i) interest income of the Borrower and the Subsidiaries for such period, determined on a consolidated basis in accordance with GAAP, (ii) to the extent included in such consolidated interest expense for such period, non-cash amounts attributable to amortization of financing costs paid in a previous period, plus (iii) to the extent included in such consolidated interest expense for such period, non-cash amounts attributable to amortization of debt discounts or accrued interest payable in kind for such period.

" Consolidated Net Tangible Assets " means, on any date, the excess of Consolidated Total Assets over the sum of (i) Consolidated Current Liabilities and (ii) Consolidated Intangible Assets.

" Consolidated Total Assets " means, on any date, the consolidated total assets of the Borrower and the Subsidiaries, as such amounts would appear on a consolidated balance sheet of the Borrower prepared as of such date in accordance with GAAP.

" Consolidated Total Debt " means, on any date, the aggregate principal amount on such date of all Indebtedness of the Borrower and its consolidated Subsidiaries (x) of the types referred in clauses (a), (b), (c), (d), (f), (g) and (i) of the definition of such term, and (y) of the types referred to in clauses (e), (f) and (h) of such definition relating to Indebtedness of others of the types referred to in clause (a), in each case in the amount that would be reflected as a liability on a balance sheet of the Borrower and the Subsidiaries prepared as of such date on a consolidated basis in accordance with GAAP; provided , however , that for the avoidance of doubt, Consolidated Total Debt shall exclude fair value adjustments under the acquisition method of accounting to the book balances of Indebtedness.

8

" Consolidated Total Revenues " means, for any period, the consolidated total revenues of the Borrower and the Subsidiaries for such period determined on a consolidated basis in accordance with GAAP.

" Control " means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. " Controlled " has a meaning correlative thereto.

" Credit Party " means the Administrative Agent, each Swingline Lender and each other Lender.

" Default " means any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

" Defaulting Lender " means any Lender that (a) has failed, within two Business Days of the date required to be funded or paid, (i) to fund any portion of its Loans, (ii) to fund any portion of its participations in Swingline Loans or (iii) to pay to any Credit Party any other amount required to be paid by it hereunder, unless, in the case of clause (i) above, such Lender notifies the Administrative Agent in writing that such failure is the result of such Lender's good faith determination that a condition precedent to funding (specifically identified in such writing, including, if applicable, by reference to a specific Default) has not been satisfied, (b) has notified the Borrower or any Credit Party in writing, or has made a public statement, to the effect that it does not intend or expect to comply with any of its funding obligations under this Agreement (unless such writing or public statement indicates that such position is based on such Lender's good-faith determination that a condition precedent (specifically identified in such writing, including, if applicable, by reference to a specific Default) to funding a Loan cannot be satisfied) or generally under other agreements in which it commits to extend credit, (c) has failed, within three Business Days after request by a Credit Party made in good faith to provide a certification in writing from an authorized officer of such Lender that it will comply with its obligations (and is financially able to meet such obligations) to fund prospective Loans and participations in Swingline Loans, provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon such Credit Party's receipt of such certification in form and substance satisfactory to it and the Administrative Agent or (d) has (i) become the subject of a Bankruptcy Event, or (ii) had publicly appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity; provided that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any

9

contracts or agreements made with such Lender. Any determination by the Administrative Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) through (d) above shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender upon delivery of written notice of such determination to the Borrower, each Swingline Lender and each other Lender.

" Designated Foreign Currency " means (a) Euro and (b) Sterling.

" Dollars ", " US$ " or " $ " refers to lawful money of the United States of America.

" Electronic Signature " means an electronic sound, symbol or process attached to, or associated with, a contract or other record and adopted by a person with the intent to sign, authenticate or accept such contract or record.

" EMU Legislation " means the legislative measures of the European Union for the introduction of, changeover to or operation of the Euro in one or more member states.

" Environmental Laws " means all laws, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions, or binding agreements issued, promulgated or entered into by any Governmental Authority, relating in any way to (i) the environment, (ii) preservation or reclamation of natural resources, (iii) the generation, use, handling, transportation, storage, treatment, disposal, release or threatened release of any Hazardous Material, or (iv) to the extent related to exposure to, or to the sale, distribution or marketing of products containing, Hazardous Material, health and safety matters.

" Environmental Liability " means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), directly or indirectly resulting from or based upon (a) the violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment, or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

" Equity Interests " means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity interests in any Person, or any obligations convertible into or exchangeable for, or giving any Person a right, option or warrant to acquire such equity interests or such convertible or exchangeable obligations.

" ERISA " means the Employee Retirement Income Security Act of 1974, as amended from time to time.

" ERISA Affiliate " means any trade or business (whether or not incorporated) that, together with the Borrower, is treated as a single employer under Section 414(b) or (c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

10

" ERISA Event " means (a) any "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder with respect to a Plan (other than an event for which the 30-day notice period is waived), (b) the existence with respect to any Plan of an "accumulated funding deficiency" (as defined in Section 412 of the Code or Section 302 of ERISA), whether or not waived, (c) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan, (d) the incurrence by the Borrower or any of its ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Plan, (e) the receipt by the Borrower or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan, (f) the incurrence by the Borrower or any of its ERISA Affiliates of any liability with respect to the withdrawal or partial withdrawal from any Plan or Multiemployer Plan, (g) the receipt by the Borrower or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from the Borrower or any ERISA Affiliate of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent, within the meaning of Title IV of ERISA, (h) the occurrence of a "prohibited transaction" with respect to which the Borrower or any of the Subsidiaries is a "disqualified person" (within the meaning of Section 4975 of the Code) or with respect to which the Borrower or any such Subsidiary could otherwise be liable, or (i) any other event or condition with respect to a Plan or Multiemployer Plan that could result in liability of the Borrower or any Subsidiary under Title IV of ERISA.

" Euro " means the single currency of the European Union as constituted by the Treaty on European Union and as referred to in the EMU Legislation.

" Euro Overnight Rate " means, with respect to any European Swingline Loan, the London interbank offered rate as administered by the ICE Benchmark Administration (or any other Person that takes over the administration of such rate) for deposits in Euros for an overnight period as displayed on the Reuters screen page that displays such rate (currently LIBOR01) (or, in the event such rate does not appear on a page of the Reuters screen, on the appropriate page of such other information service that publishes such rate as shall be selected by the Administrative Agent from time to time in its reasonable discretion); provided that if the Euro Overnight Rate, determined as provided above, would be less than zero, the Euro Overnight Rate shall be zero for all purposes of this Agreement.

" Eurocurrency ", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, bear interest at a rate determined by reference to the Adjusted LIBO Rate or LIBO Rate (but no ABR Loan or ABR Borrowing will in any event be deemed to be a Eurocurrency Loan or Eurocurrency Borrowing hereunder).

11

" European Swingline Loan " means a Swingline Loan denominated in Euro.

" Event of Default " has the meaning assigned to such term in Article VII.

" Exchange Rate " means on any day, for purposes of determining the US Dollar Equivalent of any other currency, the rate at which such other currency may be exchanged into Dollars, as set forth at approximately 11:00 a.m., London time, on such day on the Reuters World Currency Page for such currency, or any successor or substitute screen provided by Reuters. In the event that such rate does not appear on any Reuters World Currency Page or any successor or substitute screen provided by Reuters or its successors, the Exchange Rate shall be determined by reference to such other publicly available service for displaying exchange rates as may be agreed upon by the Administrative Agent and the Borrower.

" Excluded Taxes " means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated) and franchise Taxes, in each case (i) imposed by the jurisdiction under the laws of which such Recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable lending office is located or (ii) that are Other Connection Taxes, (b) any branch profits Taxes imposed by the United States of America or any similar Tax imposed by any other jurisdiction described in clause (a) above, (c) any Taxes, including withholding taxes, imposed under FATCA, (d) in the case of a Lender, any U.S. federal withholding Tax resulting from any laws in effect and that would apply to amounts payable to such Lender with respect to an applicable interest in a Loan or Commitment at the time such Lender acquired such interest in the Loan or Commitment (other than pursuant to an assignment request by the Borrower under Section 2.17(b)) or designates a new lending office, except to the extent that such Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts from the Borrower with respect to such withholding Taxes pursuant to Section 2.15(a), and (e) any Taxes attributable to such Recipient's failure to comply with Section 2.15(g).

" Existing Credit Agreements " means (i) the Five-Year Credit Agreement and (ii) the Term Loan Agreement dated as of April 30, 2015 among Hewlett-Packard Company, the lenders party thereto, and JPMorgan Chase Bank, N.A., as administrative agent.

" Existing Maturity Date " has the meaning assigned to such term in Section 2.20(a).

" Extension Effective Date " has the meaning assigned to such term in Section 2.20(a).

" Extension Notice " has the meaning assigned to such term in Section 2.20(a).

12

" FATCA " means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code, as such Code section exists as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any applicable intergovernmental agreements with respect thereto and any fiscal or regulatory legislation, rules or practices adopted pursuant to any of the foregoing.

" Federal Funds Effective Rate " means, for any day, the weighted average (rounded upwards, if necessary, to the next 1/100 of 1%) of the rates on overnight Federal funds transactions with members of the Federal Reserve System, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary, to the next 1/100 of 1%) of the quotations for such day for such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it. Notwithstanding the foregoing, if the Federal Funds Effective Rate, determined as provided above, would otherwise be less than zero, then the Federal Funds Effective Rate will be deemed to be zero for all purposes of this Agreement.

" Financial Officer " means, with respect to any Person, the chief financial officer, principal accounting officer, treasurer or controller of such Person.

" Fitch " means Fitch Ratings, Inc., or any successor to its rating agency business.

" Five-Year Credit Agreement " means the Five-Year Credit Agreement dated as of March 30, 2012, as amended and restated as of September 13, 2012, as further amended, among Hewlett-Packard Company, the lenders party thereto, JPMorgan Chase Bank, N.A., as administrative processing agent and co-administrative agent, and Citibank, N.A., as co-administrative agent.

" Foreign Lender " means any Lender that is organized under the laws of a jurisdiction other than that in which the Borrower is located. For purposes of this definition, the United States of America, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

" Foreign Subsidiary " means any Subsidiary that is organized under the laws of a jurisdiction other than the United States of America or any state thereof or the District of Columbia.

" GAAP " means generally accepted accounting principles in the United States of America.

" Governmental Authority " means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity

13

exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national body exercising such powers or functions, such as the European Union or the European Central Bank).

" Guarantee " of or by any Person (the " guarantor ") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the " primary obligor ") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation, or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or obligation; provided that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business.

" Hazardous Materials " means all explosive, radioactive, hazardous, or toxic substances, wastes or materials, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes, and all other substances or wastes regulated pursuant to any Environmental Law.

" Hedging Agreement " means any interest rate protection agreement, foreign currency exchange agreement, commodity price protection agreement or other interest or currency exchange rate or commodity price hedging arrangement.

" Hewlett Packard Enterprise Company " means Hewlett Packard Enterprise Company, a Delaware corporation, which, prior to consummation of the Separation Transactions, was a wholly owned subsidiary of the Borrower.

" HPI Businesses " means the businesses, assets and operations of the Borrower and its subsidiaries that are not being transferred to Hewlett Packard Enterprise Company pursuant to the Separation Transactions.

" Incremental Facility Amendment " means an Incremental Facility Amendment, in form and substance reasonably satisfactory to the Administrative Agent, among the Borrower, the Administrative Agent and one or more Incremental Lenders, establishing Incremental Revolving Commitments as are contemplated by Section 2.19.

" Incremental Lender " means a Lender with an Incremental Revolving Commitment.

" Incremental Revolving Commitment " means, with respect to any Lender, the commitment, if any, of such Lender, established pursuant to an Incremental Facility

14

Amendment and Section 2.19, to make Revolving Loans and to acquire participations in Swingline Loans hereunder, expressed as an amount representing the maximum aggregate permitted amount of such Lender's Revolving Exposure under such Incremental Facility Amendment.

" Incremental Revolving Facility " means an incremental portion of the Revolving Commitments established hereunder pursuant to an Incremental Facility Amendment providing for Incremental Revolving Commitments.

" Indebtedness " of any Person means, without duplication, (a) all obligations of such Person for borrowed money or with respect to deposits or advances of any kind, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person, (d) all obligations of such Person in respect of the deferred purchase price of property or services (excluding current accounts payable incurred in the ordinary course of business), (e) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed (but if such Indebtedness has not been assumed by and is otherwise non-recourse to such Person, only to the extent of the lesser of the fair market value of the property subject to such Lien and the amount of such Indebtedness), (f) all Guarantees by such Person of Indebtedness of others (except to the extent that such Guarantees guarantee Indebtedness or other obligations of a Subsidiary), (g) all Capital Lease Obligations of such Person, (h) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty, and (i) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.

" Indemnified Taxes " means Taxes other than Excluded Taxes.

" Index Debt " means senior unsecured long-term indebtedness for borrowed money of the Borrower that is not guaranteed by any other Person or subject to any other credit enhancement.

" Information " has the meaning assigned to such term in Section 9.12.

" Information Statement " means the amended Form 10 Information Statement and related registration statement relating to the Separation Transactions filed by the Borrower and Hewlett Packard Enterprise Company with the SEC on September 28, 2015.

" Interest Election Request " means a request by the Borrower to convert or continue a Revolving Borrowing in accordance with Section 2.06.

15

" Interest Payment Date " means (a) with respect to any ABR Loan (other than a Swingline Loan), the last day of each March, June, September and December, (b) with respect to any Eurocurrency Loan, the last day of the Interest Period applicable to the Borrowing of which such Loan is a part and, in the case of a Eurocurrency Borrowing with an Interest Period of more than three months' duration, each day prior to the last day of such Interest Period that occurs at intervals of three months' duration after the first day of such Interest Period, and (c) with respect to any Swingline Loan, the day that such Loan is required to be repaid.

" Interest Period " means, with respect to any Eurocurrency Borrowing, the period commencing on the date of such Borrowing and ending on the numerically corresponding day in the calendar month that is one, two, three or six months (or, if available to each Lender, seven or 14 days or nine or 12 months) thereafter, as the Borrower may elect; provided that (i) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day and (ii) any Interest Period pertaining to a Eurocurrency Borrowing that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period. For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing.

" Interpolated Rate " means, with respect to any Eurocurrency Borrowing for any Impacted Interest Period, a rate per annum which results from interpolating on a linear basis between (a) the applicable Screen Rate for the longest maturity for which a Screen Rate is available that is shorter than such Impacted Interest Period and (b) the applicable Screen Rate for the shortest maturity for which a Screen Rate is available that is longer than such Impacted Interest Period, in each case at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period (or in the case of a Eurocurrency Borrowing denominated in Sterling, at approximately 11:00 a.m., London time, on the date of such Borrowing).

" Judgment Currency " has the meaning assigned to such term in Section 9.15(b).

" Lender Parent " means, with respect to any Lender, any Person as to which such Lender is, directly or indirectly, a subsidiary.

" Lenders " means the Persons listed on Schedule 2.01 and any other Person that shall have become a party hereto pursuant to an Assignment and Assumption, other than any such Person that ceases to be a party hereto pursuant to an Assignment and Assumption. Unless the context requires otherwise, the term "Lenders" includes the Swingline Lenders.

16

" LIBO Rate " means, with respect to any Eurocurrency Borrowing in any currency for any Interest Period, the rate equal to the London interbank offered rate as administered by the ICE Benchmark Administration (or any other Person that takes over the administration of such rate) for deposits in the applicable currency (for delivery on the first day of such Interest Period) for a period equal in length to such Interest Period with a term equivalent to such Interest Period as displayed on the Reuters screen page that displays such rate (currently page LIBOR01) or, in the event such rate does not appear on a page of the Reuters screen, on the appropriate page of such other information service that publishes such rate as shall be selected by the Administrative Agent from time to time in its reasonable discretion (in each case, the " Screen Rate "), at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period (or in the case of a Borrowing denominated in Sterling, at approximately 11:00 a.m. on the date of such Borrowing); provided that if the LIBO Screen Rate is less than zero, such rate will be deemed to be zero for purposes of this Agreement; provided , further , that if the Screen Rate shall not be available at such time for such Interest Period (an " Impacted Interest Period ") with respect to the applicable currency, then the LIBO Rate will be the Interpolated Rate; provided that if any Interpolated Rate is less than zero, such rate will be deemed to be zero for purposes of this Agreement.

" Lien " means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset and (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing but excluding any operating leases) relating to such asset.

" Loan Documents " means this Agreement, including without limitation, schedules and exhibits hereto) and any agreements entered into by the Borrower with or in favor of the Administrative Agent and/or the Lenders in connection with this Agreement, including any promissory notes delivered pursuant to Section 2.08(e) and any amendments, modifications or supplements thereto or waivers thereof.

" Loans " means the loans made by the Lenders to the Borrower pursuant to this Agreement.

" Local Time " means (a) with respect to a Loan or Borrowing denominated in Dollars, New York City time, and (b) with respect to a Loan or Borrowing denominated in any Designated Foreign Currency, London time.

" Margin Stock " means "margin stock" as defined in Regulation U.

" Material Adverse Effect " means a material adverse effect on (a) the actual business, assets, operations and financial condition of the Borrower and the Subsidiaries, taken as a whole, (b) the ability of the Borrower to perform any of its material obligations under this Agreement, or (c) the rights of or benefits available to the Lenders under this Agreement.

17

" Material Indebtedness " means Indebtedness (other than the Loans), or obligations in respect of one or more Hedging Agreements, of any one or more of the Borrower and the Subsidiaries in an aggregate principal amount exceeding $250,000,000. For purposes of determining Material Indebtedness, the "principal amount" of the obligations of the Borrower or any Subsidiary in respect of any Hedging Agreement at any time shall be the maximum aggregate amount (giving effect to any netting agreements) that the Borrower or such Subsidiary would be required to pay if such Hedging Agreement were terminated at such time.

" Material Subsidiary " means each Significant Subsidiary and any two or more Subsidiaries (which may but need not include a Significant Subsidiary) each of which has become the subject of any event or circumstance referred to in clause (h), (i) or (j) of Article VII, and which, if considered together as a single consolidated Subsidiary, would collectively constitute a "Significant Subsidiary" within the meaning of the definition of such term herein.

" Maturity Date " means the fifth anniversary of the Original Effective Date, as such date may be extended pursuant to Section 2.20 hereof; provided that, if such date is not a Business Day, the Maturity Date shall be the immediately preceding Business Day.

" Moody's " means Moody's Investors Service, Inc., or any successor thereto.

" Multicurrency Swingline Agent " means Citibank International Limited, in its capacity as the swingline agent for Multicurrency Swingline Loans.

" Multicurrency Swingline Loan " means a European Swingline Loan or a UK Swingline Loan.

" Multiemployer Plan " means a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

" Original Credit Agreement " has the meaning assigned to such term in the recitals hereto.

" Original Effective Date " means April 2, 2014.

" Other Connection Taxes " means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

" Other Taxes " means any and all present or future recording, stamp, court or documentary, intangible, filing or similar Taxes, charges or levies arising from any

18

payment made under any Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to the sale of a participation interest or an assignment (other than an assignment made pursuant to Section 2.17(b)).

" Participant " has the meaning assigned to such term in Section 9.04(e).

" Participant Register " has the meaning assigned to such term in Section 9.04(e).

" Patriot Act " has the meaning assigned to such term in Section 9.14.

" PBGC " means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

" Permitted Encumbrances " means

(i) Liens imposed by law for taxes that are not yet due or are being contested in compliance with Section 5.04,

(ii) carriers', warehousemen's, mechanics', materialmen's, repairmen's and other like Liens imposed by law, arising in the ordinary course of business and securing obligations that are not overdue by more than 30 days or are being contested in compliance with Section 5.04,

(iii) pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations,

(iv) margin deposits posted to secure obligations in respect of Hedging Agreements entered into in the ordinary course of business;

(v) pledges of cash and deposits to secure the performance of bids, trade and commercial contracts (including ordinary course accounts payable), leases, statutory obligations, appeal bonds and other obligations of a like nature, in each case in the ordinary course of business,

(vi) deposits and customary pledges securing obligations under surety and performance bonds,

(vii) judgment liens (and pledges of cash and deposits securing surety and appeal bonds) in respect of judgments that do not constitute an Event of Default under clause (k) of Article VII,

(viii) easements, zoning restrictions, rights-of-way and similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any monetary obligations and do not materially detract from the value of the affected property or interfere with the ordinary conduct of business of the Borrower or any Subsidiary, and

19

(ix) Liens under ordinary course commercial contracts securing trade payables covering the goods purchased (and proceeds and products thereof), pending payment;

provided that the term "Permitted Encumbrances" shall not include any Lien securing Indebtedness.

" Person " means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

" Plan " means any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of which the Borrower or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

" Platform " has the meaning assigned to such term in Section 5.01(e).

" Prime Rate " means the rate of interest per annum publicly announced from time to time by Citibank, N.A. as its prime rate in effect at its principal office in New York City; each change in the Prime Rate shall be effective from and including the date such change is publicly announced as being effective.

" Public-Sider " means a Lender or any representative of such Lender that does not want to receive material non-public information within the meaning of the federal and state securities laws.

" Ratings " means, as of any date of determination, the Index Debt ratings of the Borrower that have been most recently assigned by S&P, Moody's or Fitch. For purposes of the foregoing, (a) if any of S&P, Moody's or Fitch shall not have in effect a Rating for the Index Debt (other than by reason of the circumstances referred to in the last sentence of this definition), then such rating agency shall be deemed to have established a Rating in Category 6 under the definition of the term Applicable Rate, (b) if the Ratings established or deemed to have been established by S&P, Moody's and Fitch for the Index Debt shall fall within different Categories, (i) if two of the Ratings fall within the same Category and the other Rating is one Category higher or one Category lower than the two same Ratings, the Applicable Rate shall be based on the two Ratings within the same Category, (ii) if two of the Ratings fall within the same Category and the other Rating is two or more Categories above the two same Ratings, the Applicable Rate shall be determined by reference to the Category next above that of the two same Ratings, (iii) if two of the Ratings are in the same Category and the other Rating is two or more Categories below the two same Ratings, the Applicable Rate shall be determined by reference to the Category next below that of the two same Ratings, and (iv) if each of the three Ratings fall within different Categories, then the Applicable Rate shall be based on

20

the assigned Rating that is in between the highest and the lowest of such Ratings, and (c) if the Ratings established or deemed to have been established by S&P, Moody's and Fitch for the Index Debt shall be changed (other than as a result of a change in the rating system of S&P, Moody's or Fitch), such change shall be effective as of the date on which it is first announced by the applicable rating agency. Each change in the Applicable Rate shall apply during the period commencing on the effective date of such change and ending on the date immediately preceding the effective date of the next such change. If the rating system of S&P, Moody's or Fitch shall change, if any such rating agency shall cease to be in the business of rating corporate debt obligations or if any such rating agency shall cease to rate any Index Debt of the Borrower (and such decision is not based directly or indirectly on any action taken by the Borrower, or the failure by the Borrower to take any action, in each case with respect to such rating agency or otherwise), the Borrower and the Lenders shall negotiate in good faith to amend the definition of Applicable Rate to reflect such changed rating system or the unavailability of Ratings from such rating agency and, pending the effectiveness of any such amendment, the Applicable Rate shall be determined by reference to the Rating most recently in effect prior to such change or cessation.

" Recipient " means (a) the Administrative Agent, and (b) any Lender, as applicable.

" Register " has the meaning set forth in Section 9.04(c).

" Regulation D " means Regulation D of the Board from time to time in effect and all official rulings and interpretations thereunder or thereof.

" Regulation T " means Regulation T of the Board from time to time in effect and all official rulings and interpretations thereunder or thereof.

" Regulation U " means Regulation U of the Board from time to time in effect and all official rulings and interpretations thereunder or thereof.

" Regulation X " means Regulation X of the Board from time to time in effect and all official rulings and interpretations thereunder or thereof.

" Related Parties " means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, employees and agents of such Person and such Person's Affiliates.

" Required Lenders " means, at any time, Lenders having Revolving Exposures and unused Revolving Commitments representing more than 50% of the sum, without duplication, of the total Revolving Exposures and unused Revolving Commitments at such time; provided that, whenever there is one or more Defaulting Lenders, the Revolving Exposure of, and the unused Revolving Commitment of, each Defaulting Lender shall be excluded for purposes of making a determination of Required Lenders.

21

" Restatement Effective Date " means the date on which the conditions set forth in Section 4.01 to the amendment and restatement of the Original Credit Agreement in the form hereof are satisfied.

" Revolving Commitment " means, with respect to each Lender, the commitment, if any, of such Lender to make Revolving Loans and to acquire participations in Swingline Loans hereunder, expressed as an amount representing the maximum aggregate permitted amount of such Lender's Revolving Exposure hereunder, as such commitment may be (a) reduced from time to time pursuant to Section 2.07, (b) increased or established from time to time pursuant to Section 2.19 and (c) reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to Section 9.04. The initial amount of each Lender's Revolving Commitment is set forth on Schedule 2.01, or in the Assignment and Assumption or the Incremental Facility Amendment pursuant to which such Lender shall have assumed its Revolving Commitment, as applicable. The initial aggregate amount of the Lenders' Revolving Commitments is $4,000,000,000.

" Revolving Exposure " means, at any time, the sum of (a) the US Dollar Equivalent of Revolving Loans outstanding at such time and (b) the Swingline Exposure at such time. The Revolving Exposure of any Lender at any time shall be such Lender's Applicable Percentage of the total Revolving Exposure at such time.

" Revolving Loan " means a Loan made pursuant to Section 2.01.

" Sale and Leaseback Transaction " means any arrangement whereby the Borrower or a Subsidiary shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereinafter acquired, and thereafter rent or lease from the buyer or transferee of the sold or transferred property that it intends to use for substantially the same purpose or purposes as the property sold or transferred; provided that any (i) such sale of any fixed or capital assets that is made for cash consideration in an amount not less than the cost of such fixed or capital asset and is consummated within 90 days after the acquisition or completion of the fixed or capital asset and (ii) any such transaction effected entirely between the Borrower and any Subsidiaries or entirely between one or more Subsidiaries shall not be deemed to be a Sale and Leaseback Transaction.

" Sanctioned Country " means, at any time, a country or territory which is the target of comprehensive Sanctions (at the time of this Agreement, Crimea, Cuba, Iran, North Korea, Sudan and Syria).

" Sanctioned Person " means, at any time, (a) any Person listed in any Sanctions-related list of designated or blocked Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State, or by the United Nations Security Council, the European Union or any EU member state, (b) any Person organized or ordinarily resident in a Sanctioned Country or (c) any Person owned or controlled by, or acting on behalf of, any such Person described in the foregoing clauses (a) and (b).

22

" Sanctions " means economic or financial measures against targeted countries, governments, territories, individuals, entities or vessels, as enumerated in national legislation, regulation or other mechanism carrying the force of law, and which are imposed, administered or enforced from time to time by (a) the U.S. government, including the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, or (b) the European Union or Her Majesty's Treasury of the United Kingdom.

" Screen Rate " has the meaning set forth in the definition of "LIBO Rate".

" SEC " means the United States Securities and Exchange Commission.

" Securitization Transaction " means the sale or transfer by the Borrower or the Subsidiaries of lease and other accounts receivable to a limited purpose financing vehicle (which may be a Subsidiary) which finances such acquisition, in part, by issuing debt securities or equity interests to third parties either directly or through one or more intermediaries, in each case in a manner that does not result in either (i) the incurrence by the Borrower or the Subsidiaries of Indebtedness that would be reflected on a consolidated balance sheet of the Borrower and the Subsidiaries prepared in accordance with GAAP or (ii) the incurrence by the Borrower or the Subsidiaries of Indebtedness with recourse to the Borrower or the Subsidiaries (other than recourse against the Borrower's or such Subsidiaries' retained interest in the limited purpose financing vehicle which finances the acquisition of the lease or other accounts receivable).

" Separation Transactions " means the (i) transfer of substantially all the assets, liabilities and operations of the enterprise technology, infrastructure, software, services and financing businesses to Hewlett Packard Enterprise Company and subsidiaries of Hewlett Packard Enterprise Company and (ii) distribution by the Borrower to its shareholders, on a pro-rata basis, of all the outstanding shares of Hewlett Packard Enterprise Company common stock (the " Spin-Off "), in each case, in accordance in all material respects with, and as described in, the Information Statement.

" Significant Subsidiary " means any Subsidiary (i) the net assets of which were greater than 5% of Consolidated Net Assets as of the last day of the most recent fiscal period for which financial statements have been delivered pursuant to Section 5.01(a) or (b) (or, prior to the first delivery of such financial statements, greater than 5% of Consolidated Net Assets as of the date of the most recent financial statements referred to in Section 3.04(a)) or (ii) the total revenues of which were greater than 10% of Consolidated Total Revenues for the four-fiscal-quarter period ending on the last day of the most recent fiscal period for which financial statements have been delivered pursuant to Section 5.01(a) or (b) (or, prior to the first delivery of such financial statements, greater than 10% of Consolidated Total Revenues for the four-fiscal-quarter period ending on the last day of the most recent fiscal period set forth in the most recent financial statements referred to in Section 3.04(a)). For purposes of making the determinations required by this definition, total revenues and net assets of Foreign Subsidiaries shall be converted into Dollars at the rates used in preparing the financial statements of the Borrower to be delivered pursuant to Section 5.01(a) or (b) (or, prior to the first delivery of such financial statements, at the rates used in preparing the Borrower's most recent financial statements referred to in Section 3.04(a)).

23

" S&P " means Standard & Poor's Ratings Services LLC, a subsidiary of McGraw Hill Financial, Inc.

" Statutory Reserve Rate " means a percentage expressed as a decimal equal to the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) established by the Board to which the Administrative Agent or any Lender is subject, for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D). Such reserve percentages shall include those imposed pursuant to such Regulation D. Eurocurrency Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D or any comparable regulation.

" Sterling " means the lawful money of the United Kingdom.

" Sterling Overnight Rate " means, with respect to any UK Swingline Loan, the London interbank offered rate as administered by the ICE Benchmark Administration (or any other Person that takes over the administration of such rate) for deposits in Sterling for an overnight period as displayed on the Reuters screen page that displays such rate (currently LIBOR01) (or, in the event such rate does not appear on a page of the Reuters screen, on the appropriate page of such other information service that publishes such rate as shall be selected by the Administrative Agent from time to time in its reasonable discretion); provided that if the Sterling Overnight Rate, determined as provided above, would be less than zero, the Sterling Overnight Rate shall be zero for all purposes of this Agreement.

" subsidiary " means, with respect to any Person (the " parent ") at any date, any corporation, limited liability company, partnership, association or other entity (a) the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, (b) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, controlled or held, or (c) that is, as of such date, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

" Subsidiary " means any subsidiary of the Borrower.

" Swingline Commitment " means, with respect to a Swingline Lender, the commitment of such Lender to make Swingline Loans in an aggregate principal amount at any time outstanding not in excess of the US Dollar Equivalent amount set forth with respect to such Swingline Lender on Schedule 2.01. The aggregate amount of the Swingline Commitments on the Restatement Effective Date is US$1,500,000,000.

24

" Swingline Exposure " means at any time, the sum of the US Dollar Equivalents of the outstanding Swingline Loans at such time. The Swingline Exposure of any Lender at any time shall be its Applicable Percentage of the total Swingline Exposure at such time.

" Swingline Lender " means each Lender with a Swingline Commitment referred to as such in Schedule 2.01.

" Swingline Loan " means a Loan made pursuant to Section 2.04.

" Taxes " means any and all present or future taxes, levies, imposts, duties, deductions, charges or withholdings imposed by any Governmental Authority.

" Total Leverage Ratio " means on any date of determination, the ratio of (a) Consolidated Total Debt on such date to (b) Consolidated EBITDA for the period of four consecutive fiscal quarters of the Borrower most recently ended on or prior to such date.

" Transactions " means the execution, delivery and performance by the Borrower of this Agreement, the borrowing of Loans, the use of the proceeds thereof, and the transactions to be effected on the Restatement Effective Date.

" Type ", when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to the LIBO Rate (including the Adjusted LIBO Rate) or the Alternate Base Rate.

" UK Swingline Loan " means a Swingline Loan denominated in Sterling.

" US Dollar Equivalent " means, on any date of determination, (a) with respect to any amount in Dollars, such amount, and (b) with respect to any amount in any Designated Foreign Currency, the equivalent in Dollars of such amount, determined by the Administrative Agent pursuant to Section 1.05 using the Exchange Rate with respect to such Designated Foreign Currency at the time in effect for such amount under the provisions of such Section.

" US Person " means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

" US Swingline Loan " means a Swingline Loan denominated in US Dollars.

" Wholly Owned Subsidiary " means a Subsidiary of which securities or other ownership interests (except for directors' qualifying shares and other de minimis amounts of outstanding securities or ownership interests) representing 100% of the ordinary voting power or, in the case of a partnership, 100% of the general partnership interests are, at the time any determination is being made, owned, controlled or held by the Borrower or one or more Wholly Owned Subsidiaries of the Borrower or by the Borrower and one or more Wholly Owned Subsidiaries of the Borrower.

25

" Withdrawal Liability " means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

SECTION 1.02. Classification of Loans and Borrowings. For purposes of this Agreement, Loans may be classified and referred to by Class ( e.g. , a "Revolving Loan") or by Type ( e.g. , a "Eurocurrency Loan") or by Class and Type ( e.g. , a "Eurocurrency Revolving Loan"). Borrowings also may be classified and referred to by Class ( e.g. , a "Revolving Borrowing") or by Type ( e.g. , a "Eurocurrency Borrowing") or by Class and Type ( e.g. , a "Eurocurrency Revolving Borrowing").

SECTION 1.03. Terms Generally. The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise, (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference to any statute, regulation or other law shall be construed (i) as referring to such statute, regulation or other law as from time to time amended, supplemented or otherwise modified (including by succession of comparable successor statutes, regulations or other laws) and (ii) to include all official rulings and interpretations thereunder, (c) any reference herein to any Person shall be construed to include such Person's successors and assigns, (d) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (e) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, (f) the phrase "to the best of the knowledge" shall mean the belief of the officers of the Borrower and the Subsidiaries directly participating in or associated with the due diligence and negotiations in connection with the Transactions, and (g) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

SECTION 1.04. Accounting Terms; GAAP. Except as otherwise expressly provided herein, including in the definition of "Capital Lease Obligations", all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; provided that, if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the date hereof in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower

26

that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.

SECTION 1.05. Exchange Rates. The Administrative Agent shall determine the US Dollar Equivalent of any Borrowing (other than a Swingline Loan) denominated in a currency other than Dollars as of the date of the commencement of the initial Interest Period therefor and as of the last Business Day of each calendar month, in each case using the Exchange Rate for such currency in relation to Dollars in effect on the date that is three Business Days prior to the date on which the initial Interest Period shall commence or the last Business Day of a calendar month, as the case may be, and each such amount shall, except as provided in the last sentence of this Section, be the US Dollar Equivalent of such Borrowing until the next required calculation thereof pursuant to this sentence. The Administrative Agent shall determine the US Dollar Equivalent of any Swingline Loan denominated in Euro or Sterling as of the date on which such Loan is made, using the Exchange Rate for Euro or Sterling, as the case may be, in relation to Dollars in effect on such date, and each such amount shall, except as provided in the last sentence of this Section, be the US Dollar Equivalent of such Swingline Loan. The Administrative Agent shall notify the Borrower and the Lenders of each calculation of the US Dollar Equivalent of each Borrowing. For purposes of Section 6.05, amounts in currencies other than Dollars shall be translated into Dollars at the currency exchange rates used in preparing the Borrower's annual and quarterly financial statements.

ARTICLE II

The Credits

SECTION 2.01. Commitments. Subject to the terms and conditions and relying on the representations and warranties (subject to Section 4.02(a)) set forth herein, each Lender agrees, severally and not jointly, to make Revolving Loans to the Borrower from time to time during the Availability Period in Dollars or a Designated Foreign Currency in an aggregate principal amount that will not result in (i) such Lender's Revolving Exposure exceeding such Lender's Revolving Commitment or (ii) the sum of the total Revolving Exposures exceeding the total Revolving Commitments. Within the foregoing limits and subject to the terms and conditions set forth herein, the Borrower may borrow, prepay and reborrow Revolving Loans during the Availability Period.

SECTION 2.02. Loans and Borrowings. (a) Each Revolving Loan shall be made as part of a Borrowing consisting of Revolving Loans of the same Type and denominated in the same currency made by the Lenders ratably in accordance with their individual Revolving Commitments. The failure of any Lender to make any Revolving Loan required to be made by it shall not relieve any other Lender of its obligations hereunder; provided that the Revolving Commitments of the Lenders are several and no Lender shall be responsible for any other Lender's failure to make Revolving Loans as required.

27

(b) Subject to Section 2.12, (i) each Revolving Borrowing denominated in Dollars shall be comprised entirely of (A) Eurocurrency Loans or (B) ABR Loans, as the Borrower may request in accordance herewith, and each Revolving Borrowing denominated in a Designated Foreign Currency shall be comprised entirely of Eurocurrency Loans. Each Lender at its option may make any Eurocurrency Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan; provided that any exercise of such option shall not affect the obligation of the Borrower to repay such Loan in accordance with the terms of this Agreement.

(c) At the commencement of each Interest Period for any Eurocurrency Borrowing, such Borrowing shall be in an aggregate amount that is an integral multiple of the Borrowing Multiple and not less than the Borrowing Minimum. At the time that each ABR Revolving Borrowing is made, such Borrowing shall be in an aggregate amount that is an integral multiple of $5,000,000 and not less than $25,000,000. Each Swingline Loan shall be in an amount that is an integral multiple of the Borrowing Multiple and not less than the Borrowing Minimum. Borrowings of more than one Type and Class may be outstanding at the same time; provided that there shall not at any time be more than a total of 10 Eurocurrency Revolving Borrowings outstanding.

(d) Notwithstanding any other provision of this Agreement, the Borrower shall not be entitled to request, or to elect to convert or continue, any Borrowing if the Interest Period requested with respect thereto would end after the Maturity Date.

SECTION 2.03. Requests for Revolving Borrowings. To request a Revolving Borrowing, the Borrower shall notify the Administrative Agent of such request by telephone or by telecopy (a) in the case of a Eurocurrency Borrowing, not later than 12:00 noon, Local Time, three Business Days before the date of the proposed Borrowing or (b) in the case of an ABR Borrowing, not later than 12:00 noon, Local Time, on the Business Day of the proposed Borrowing. Each such Borrowing Request shall be irrevocable and, if telephonic, shall be confirmed promptly by hand delivery or telecopy to the Administrative Agent of a written Borrowing Request in a form agreed to by the Administrative Agent and the Borrower and signed by the Borrower. Each such telephonic and written Borrowing Request shall specify the following information in compliance with Section 2.02:

(i) the currency and aggregate amount of the requested Borrowing;

(ii) the date of such Borrowing, which shall be a Business Day;

(iii) the Type of the requested Borrowing;

28

(iv) in the case of a Eurocurrency Borrowing, the initial Interest Period to be applicable thereto, which shall be a period contemplated by the definition of the term "Interest Period"; and

(v) the location and number of the Borrower's account to which funds are to be disbursed, which shall comply with the requirements of Section 2.05.

If no election as to the Type of Revolving Borrowing is specified, then the requested Revolving Borrowing shall be (A) in the case of a Borrowing denominated in Dollars, an ABR Borrowing, and (B) in the case of a Borrowing denominated in a Designated Foreign Currency, a Eurocurrency Borrowing. If no Interest Period is specified with respect to any requested Eurocurrency Revolving Borrowing, then the Borrower shall be deemed to have selected an Interest Period of one month's duration. Any Borrowing Request that shall fail to specify any of the information required by clause (i), (ii) or (v) of the immediately preceding paragraph may be rejected by the Administrative Agent if such failure is not corrected promptly after the Administrative Agent shall give written or telephonic notice thereof to the Borrower and, if so rejected, will be of no force or effect. Promptly following receipt of a Borrowing Request in accordance with this Section, the Administrative Agent shall advise each Lender of the details thereof and of the amount of such Lender's Loan to be made as part of the requested Borrowing.

SECTION 2.04. Swingline Loans. (a) Subject to the terms and conditions set forth herein, each Swingline Lender agrees to make Swingline Loans to the Borrower denominated in Dollars or Designated Foreign Currencies from time to time during the Availability Period, in an aggregate amount at any time outstanding that will not result in (i) the Swingline Exposure exceeding US$1,500,000,000, (ii) the aggregate Dollar Equivalent amount of outstanding Swingline Loans made by any Swingline Lender exceeding such Lender's Swingline Commitment, (iii) the aggregate Dollar Equivalent Amount of such Swingline Lender's outstanding Revolving Loans and Swingline Loans (including participations in outstanding Swingline Loans) exceeding the amount of such Swingline Lender's Revolving Commitment, or (iv) the aggregate Revolving Exposure exceeding the aggregate amount of the Revolving Commitments; provided that no Swingline Lender shall be required to make a Swingline Loan to refinance an outstanding Swingline Loan. Each Swingline Loan denominated in Dollars will be an ABR Loan. Within the foregoing limits and subject to the terms and conditions set forth herein, the Borrower may borrow, prepay and reborrow Swingline Loans.

(b) To request a Swingline Loan, the Borrower shall notify the Administrative Agent of such request in writing (or, in the case of a US Swingline Loan, by telephone (confirmed by telecopy)) not later than (i) 12:00 noon, Local Time, on the day of any such proposed US Swingline Loans and (ii) 10:00 a.m., Local Time, on the day of any such proposed European Swingline Loans or UK Swingline Loans. Each such notice shall be irrevocable and shall specify the requested borrowing date (which shall be a Business Day), the currency and the aggregate principal amount of the requested Swingline Loan (which shall comply with Section 2.02(c)). The Administrative Agent will promptly notify each

29

Swingline Lender of any such notice received from the Borrower and of such Swingline Lender's share of the requested Swingline Borrowing. Each Swingline Lender shall make its share of each requested Swingline Loan available to the Borrower (pro rata in accordance with the relative amounts of the Swingline Commitments of the Swingline Lenders) in the requested currency by means of a transfer of funds by 2:00 p.m., Local Time, on the requested date of such Swingline Loan, (i) to the Applicable Funding Account, in the case of US Swingline Loans, and (ii) to the account of the Administrative Agent most recently designated by it for such purpose, in the case of Multicurrency Swingline Loans. The Administrative Agent will make such Multicurrency Swingline Loans available to the Borrower by promptly transferring the amounts so received pursuant to clause (ii) of the immediately preceding sentence, in like funds, to the Applicable Funding Account.

(c) Any Swingline Lender may by written notice given to the Administrative Agent not later than 10:00 a.m., Local Time, on any Business Day require the Lenders to acquire and fund participations on such Business Day in all or a portion of the Swingline Loans of such Swingline Lender outstanding. Such notice shall specify the aggregate amount and currency of the Swingline Loans in which the Lenders will participate. Promptly upon receipt of such notice, the Administrative Agent will give notice thereof to each Lender, specifying in such notice each Lender's share, based on such Lender's Applicable Percentage, of such Swingline Loans. Each Lender hereby absolutely and unconditionally agrees, upon receipt of notice as provided above, to pay to the Administrative Agent (in Dollars or the relevant Designated Foreign Currency, as the case may be), for the account of the applicable Swingline Lender, such Lender's Applicable Percentage of such Swingline Loan or Loans. Each Lender acknowledges and agrees that its obligation to acquire and fund participations in Swingline Loans pursuant to this paragraph is absolute and unconditional and shall not be affected by any circumstance whatsoever, including the occurrence and continuance of a Default or reduction or termination of the Commitments, and that each such payment shall be made without any offset, abatement, withholding or reduction whatsoever. Each Lender shall comply with its obligations under this paragraph by wire transfer of immediately available funds, in the same manner as provided in Section 2.05 with respect to Loans made by such Lender (and Section 2.05, including with respect to interest payable in respect of unfunded amounts, shall apply, mutatis mutandis , to the payment obligations of the Lenders), and the Administrative Agent shall promptly pay to the applicable Swingline Lender the amounts so received by it from the Lenders. The Administrative Agent shall notify the Borrower of any participations in any Swingline Loan acquired pursuant to this paragraph and thereafter any amounts received by the Administrative Agent from the Borrower (or other party on behalf of the Borrower) in respect of a Swingline Loan shall be promptly remitted by the Administrative Agent to the Lenders that shall have made their payments pursuant to this paragraph and to the applicable Swingline Lender, as their interests may appear; provided that any such payment so remitted shall be repaid to the Administrative Agent if and to the extent such payment is required to be refunded to the Borrower for any reason. The purchase of participations in a Swingline Loan pursuant to this paragraph shall not relieve the Borrower of any default in the

30

payment thereof. Notwithstanding the foregoing, a Lender shall not have any obligation to acquire a participation in a Swingline Loan pursuant to this paragraph if an Event of Default shall have occurred and be continuing at the time such Swingline Loan was made and such Lender shall have notified the applicable Swingline Lender in writing, at least one Business Day prior to the time such Swingline Loan was made, that such Event of Default has occurred and that such Lender will not acquire participations in Swingline Loans made while such Event of Default is continuing.

(d) Notwithstanding anything to the contrary in this Agreement, if any Swingline Exposure exists at the time a Lender becomes a Defaulting Lender, (i) the Borrower shall make arrangements satisfactory to the Swingline Lenders eliminating the risk of the Swingline Lenders with respect to each Defaulting Lender's participation therein or (ii) in the event no such satisfactory arrangements are made, the Borrower shall be required to prepay the outstanding Swingline Loans in an amount equal to the Swingline Exposure of the Defaulting Lender or, if agreed by each Swingline Lender, cash collateralize Swingline Loans in the amount of the Swingline Exposure of the Defaulting Lender on terms satisfactory to each Swingline Lender (in which case any such cash collateral held by the Administrative Agent for the account of any Swingline Lender will be applied as a payment of Swingline Loans immediately prior to any exercise by such Swingline Lender of its rights to require the funding of participations in such Loans pursuant to Section 2.04(c)). In the event the Borrower prepays or cash collateralizes the Swingline Loans in the amount of the Swingline Exposure of the Defaulting Lender pursuant to clause (ii) above, then the Lenders other than the Defaulting Lender will be required to fund participations in the remaining Swingline Loans under Section 2.04(c) in accordance with their Applicable Percentages determined, in accordance with the definition of such term herein, without taking into account the Commitment of such Defaulting Lender (it being understood that such funding of participations shall not result in such Lender's Revolving Exposure exceeding such Lender's Revolving Commitment).

SECTION 2.05. <u>Funding of Borrowings.</u> (a) Each Lender shall make each Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds in the applicable currency, in the case of a Eurocurrency Loan by 12:00 noon, Local Time, and in the case of an ABR Loan by 2:00 p.m., Local Time, to the account of the Administrative Agent most recently designated by it for such purpose by notice to the Lenders; <u>provided</u> that Swingline Loans shall be made as provided in Section 2.04. The Administrative Agent will make such Loans available to the Borrower by promptly crediting the amounts so received, in like funds, to the Applicable Funding Account.

(b) Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with paragraph (a) of this Section and may, in reliance

31

upon such assumption, make available to the Borrower a corresponding amount. In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable Lender and the Borrower severally agree to pay to the Administrative Agent forthwith on demand such corresponding amount with interest thereon, for each day from and including the date such amount is made available to the Borrower to but excluding the date of payment to the Administrative Agent, at (i) in the case of such Lender, (x) in the case of Loans in Dollars, the greater of (A) the Federal Funds Effective Rate and (B) a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation and (y) in the case of Loans in Designated Foreign Currencies, the rate reasonably determined by the Administrative Agent to be the cost to it of funding such amount, or (ii) in the case of the Borrower, the interest rate applicable to a Swingline Loan in the relevant currency. If such Lender pays such amount to the Administrative Agent, then such amount shall constitute such Lender's Loan included in such Borrowing.

SECTION 2.06. Interest Elections. (a) Each Borrowing initially shall be of the Type specified in the applicable Borrowing Request and, in the case of a Eurocurrency Borrowing, shall have an initial Interest Period as specified in such Borrowing Request. Thereafter, the Borrower may elect to convert such Borrowing to a different Type or to continue such Borrowing and, in the case of a Eurocurrency Borrowing, may elect Interest Periods therefor, all as provided in this Section. The Borrower may elect different options with respect to different portions of the affected Borrowing, in which case each such portion shall be allocated ratably among the Lenders holding the Loans comprising such Borrowing, and the Loans comprising each such portion shall be considered a separate Borrowing. This Section shall not apply to Swingline Borrowings, which may not be converted or continued.

(b) To make an election pursuant to this Section, the Borrower shall notify the Administrative Agent of such election by telephone by the time that a Borrowing Request would be required under Section 2.03 if the Borrower were requesting a Revolving Borrowing of the Type and in the currency resulting from such election to be made on the effective date of such election; provided that any notice of election to convert a Eurocurrency Borrowing into an ABR Borrowing at the end of its then-current Interest Period must be made by the time that a Borrowing Request for a Eurocurrency Borrowing would be required under Section 2.03. Each such telephonic Interest Election Request shall be irrevocable and shall be confirmed promptly by hand delivery or telecopy to the Administrative Agent of a written Interest Election Request in a form approved by the Administrative Agent and signed by the Borrower. Notwithstanding any other provision of this Section, the Borrower will not be permitted to change the currency of any Borrowing.

(c) Each telephonic and written Interest Election Request shall specify the following information in compliance with Section 2.02:

(i) the Borrowing to which such Interest Election Request applies and, if different options are being elected with respect to different portions thereof, the

32

portions thereof to be allocated to each resulting Borrowing (in which case the information to be specified pursuant to clauses (iii) and (iv) below shall be specified for each resulting Borrowing);

(ii) the effective date of the election made pursuant to such Interest Election Request, which shall be a Business Day;

(iii) whether the resulting Borrowing is to be an ABR Borrowing or a Eurocurrency Borrowing; and

(iv) if the resulting Borrowing is a Eurocurrency Borrowing, the Interest Period to be applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of the term "Interest Period."

If any such Interest Election Request requests a Eurocurrency Borrowing but does not specify an Interest Period, then the Borrower shall be deemed to have selected an Interest Period of one month's duration.

(d) Promptly following receipt of an Interest Election Request, the Administrative Agent shall advise each Lender of the details thereof and of such Lender's portion of each resulting Borrowing.

(e) If the Borrower fails to deliver a timely Interest Election Request with respect to a Eurocurrency Borrowing prior to the end of the Interest Period applicable thereto, then, unless such Borrowing is repaid as provided herein, at the end of such Interest Period such Borrowing shall be converted to a one-month Eurocurrency Borrowing. Notwithstanding any contrary provision hereof, if an Event of Default has occurred and is continuing and the Administrative Agent, at the request of the Required Lenders, so notifies the Borrower, then, so long as an Event of Default is continuing (i) no outstanding Borrowing denominated in Dollars may be converted to or continued as a Eurocurrency Borrowing and (ii) unless repaid, each Eurocurrency Borrowing denominated in Dollars shall be converted to an ABR Borrowing at the end of the Interest Period applicable thereto.

SECTION 2.07. <u>Termination and Reduction of Commitments.</u> (a) Unless previously terminated, the Commitments shall terminate on the Maturity Date.

(b) The Borrower may at any time terminate, or from time to time reduce, the Revolving Commitments; <u>provided</u> that (i) each reduction of the Revolving Commitments shall be in an amount that is an integral multiple of $1,000,000 and not less than $25,000,000 and (ii) the Borrower shall not terminate or reduce the Revolving Commitments if, after giving effect to any concurrent prepayment of the Loans in accordance with Section 2.09, the aggregate Revolving Exposures would exceed the aggregate Revolving Commitments.

(c) The Borrower shall notify the Administrative Agent of any election to terminate or reduce the Revolving Commitments under paragraph (b) of this Section at least three Business Days prior to the effective date of such

33

termination or reduction, specifying such election and the effective date thereof. Promptly following receipt of any notice, the Administrative Agent shall advise the Lenders of the contents thereof. Each notice delivered by the Borrower pursuant to this Section shall be irrevocable; provided that a notice of termination of the Revolving Commitments delivered by the Borrower may state that such notice is conditioned upon the effectiveness of other credit facilities, in which case such notice may be revoked by the Borrower (by notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied. Any termination or reduction of the Revolving Commitments shall be permanent. Each reduction of the Revolving Commitments shall be made ratably among the Lenders in accordance with their individual Applicable Percentages.

SECTION 2.08. Repayment of Loans; Evidence of Debt. (a) The Borrower hereby unconditionally promises to pay (i) to the Administrative Agent for the account of each Lender the then unpaid principal amount of each Revolving Loan (other than a Swingline Loan) on the Maturity Date, and (ii) to the Administrative Agent for the account of each Swingline Lender the then unpaid principal amount of each Swingline Loan on the earlier of the Maturity Date and the first date after such Swingline Loan is made that is the 15th or the last day of a calendar month and is at least five Business Days after the date on which such Swingline Loan is made (it being understood that Swingline Loans may be prepaid at anytime in accordance with Section 2.09); provided that, on each date that a Revolving Borrowing is made in any currency, the Borrower shall repay all Swingline Loans denominated in such currency that were outstanding on the date such Borrowing was requested.

(b) Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(c) The Administrative Agent shall maintain accounts in which it shall record (i) the amount and currency of each Loan made hereunder, the Type thereof and the Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder, and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

(d) The entries made in the accounts maintained pursuant to paragraph (b) or (c) of this Section shall be prima facie evidence of the existence and amounts of the obligations recorded therein; provided that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to repay the Loans in accordance with the terms of this Agreement.

(e) Any Lender may request that Loans made by it be evidenced by a promissory note. In such event, the Borrower shall prepare, execute and deliver to such Lender a promissory note payable to the order of such Lender (or, if requested

34

by such Lender, to such Lender and its registered assigns) and in a form approved by the Administrative Agent. Thereafter, the Loans evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to Section 9.04) be represented by one or more promissory notes in such form payable to the order of the payee named therein (or, if such promissory note is a registered note, to such payee and its registered assigns).

SECTION 2.09. Prepayment of Loans. (a) The Borrower shall have the right at any time and from time to time to prepay any Borrowing in whole or in part, subject to prior notice in accordance with paragraph (d) of this Section and payment of any amounts required under Section 2.14.

(b) In the event and on each occasion that the sum of the total Revolving Exposures exceeds the total Revolving Commitments, then (i) on the last day of any Interest Period for any Eurocurrency Borrowing and (ii) on each other date on which any ABR Revolving Borrowing or Swingline Loan shall be outstanding, the Borrower shall prepay Loans in an aggregate amount equal to the lesser of (A) the amount necessary to eliminate such excess (after giving effect to any other prepayment of Loans on such day) and (B) the amount of the applicable Revolving Borrowings and Swingline Loans referred to in clause (i) or (ii), as applicable; provided , however , that, in any event, the Borrower shall prepay Revolving Loans or Swingline Loans in an aggregate amount sufficient to eliminate such excess by the 90th day after such excess first arises. If at any time the sum of the total Revolving Exposures exceeds 105% of the total Revolving Commitments, then the Borrower shall, not later than the next Business Day, prepay one or more Borrowings in an aggregate principal amount sufficient to (x) reduce the sum of the total Revolving Exposures to an amount not in excess of the total Revolving Commitments.

(c) Prior to any prepayment of Borrowings the Borrower shall select the Borrowing or Borrowings to be prepaid and shall specify such selection in the notice of such prepayment pursuant to paragraph (d) below.

(d) The Borrower shall notify the Administrative Agent (and, in the case of prepayment of a Swingline Loan, the Swingline Lenders) by telephone (confirmed by telecopy) or by telecopy of any prepayment hereunder (i) in the case of prepayment of a Eurocurrency Revolving Borrowing, not later than 12:00 noon, Local Time, three Business Days before the date of prepayment, (ii) in the case of prepayment of an ABR Revolving Borrowing or a US Swingline Borrowing, not later than 12:00 noon, Local Time, on the Business Day of prepayment and (iii) in the case of a prepayment of a Multicurrency Swingline Borrowing, by 10:00 a.m., Local Time, on the Business Day of prepayment. Each such notice shall be irrevocable and shall specify the prepayment date and the principal amount of each Borrowing or portion thereof, to be prepaid; provided that, if a notice of prepayment is given in connection with a conditional notice of termination of the Commitments as contemplated by Section 2.07, then such notice of prepayment may be revoked if such notice of termination is revoked in accordance with Section 2.07. Promptly

35

following receipt of any such notice relating to a Revolving Borrowing, the Administrative Agent shall advise the applicable Lenders of the contents thereof. Each partial prepayment of any Revolving Borrowing shall be in an amount that would be permitted in the case of a Revolving Borrowing of the same Type as provided in Section 2.02. Each prepayment of a Revolving Borrowing shall be applied ratably to the Loans included in the prepaid Borrowing, and each prepayment of a Swingline Borrowing shall be applied ratably to the Swingline Loans (or participations therein) included in such prepaid Borrowing. Prepayments shall be accompanied by accrued interest to the extent required by Section 2.11.

SECTION 2.10. Fees. (a) The Borrower agrees to pay to the Administrative Agent for the account of each Lender a commitment fee at a per annum rate equal to the Applicable Rate in effect from time to time applied to the daily unused amount of the Revolving Commitment of such Lender during the period from and including the Restatement Effective Date to but excluding the Maturity Date or such earlier date on which the Revolving Commitments terminate. Accrued commitment fees shall be payable in arrears on the last day of March, June, September and December of each year and on the date on which the Revolving Commitments terminate, commencing on the first such date to occur after the Original Effective Date. All commitment fees shall be computed on the basis of a year of 360 days and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(b) The Borrower agrees to pay the Administrative Agent, for its own account, the fees in the amounts and at the times previously agreed upon by the Borrower and the Administrative Agent.

(c) All fees payable hereunder shall be paid on the dates due, in immediately available funds, to the Administrative Agent for distribution, in the case of commitment fees, to the Lenders.

SECTION 2.11. Interest. (a) The Loans comprising each ABR Borrowing shall bear interest at the Alternate Base Rate plus the Applicable Rate.

(b) The Loans comprising each Eurocurrency Borrowing shall bear interest at the Adjusted LIBO Rate, in the case of Borrowings in Dollars, and at the LIBO Rate, in the case of Borrowings in a Designated Foreign Currency, for the Interest Period in effect for such Borrowing plus the Applicable Rate.

(c) Each Swingline Loan shall bear interest (i) in the case of a US Swingline Loan, at the Alternate Base Rate plus the Applicable Rate, (ii) in the case of a European Swingline Loan, at the Euro Overnight Rate plus the Applicable Rate applicable to Eurocurrency Loans, and (iii) in the case of a UK Swingline Loan, at the Sterling Overnight Rate plus the Applicable Rate applicable to Eurocurrency Loans.

(d) Notwithstanding the foregoing, if any principal of or interest on any Loan or any fee or other amount payable by the Borrower hereunder is not paid

36

when due, whether at stated maturity, upon acceleration or otherwise, such overdue amount shall bear interest from the date on which such amount became due until such amount is paid in full, after as well as before judgment, at a rate per annum equal to (i) in the case of overdue principal of any Loan, 2% plus the rate otherwise applicable to such Loan as provided in the preceding paragraphs of this Section or (ii) in the case of any other amount, 2% plus the rate applicable to ABR Loans as provided in paragraph (a) of this Section.

(e) Accrued interest on each Loan shall be payable in arrears on each Interest Payment Date for such Loan and, in the case of Revolving Loans, upon termination of the Revolving Commitments; provided that (i) interest accrued pursuant to paragraph (d) of this Section shall be payable on demand, (ii) in the event of any repayment or prepayment of any Loan (other than a prepayment of an ABR Revolving Loan prior to the end of the Availability Period), accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment, and (iii) in the event of any conversion of any Eurocurrency Loan prior to the end of the current Interest Period therefor, accrued interest on such Loan shall be payable on the effective date of such conversion. All interest shall be payable in the currency in which the applicable Loan is denominated.

(f) All interest hereunder shall be computed on the basis of a year of 360 days, except that interest computed by reference to the Alternate Base Rate at times when the Alternate Base Rate is based on the Prime Rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year) and interest on any Loan denominated in Sterling shall be computed on the basis of a year of 365 days, and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day). The applicable Alternate Base Rate, Adjusted LIBO Rate or LIBO Rate shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error.

SECTION 2.12. Alternate Rate of Interest. If prior to the commencement of any Interest Period for a Eurocurrency Borrowing:

(i) the Administrative Agent determines (which determination shall be conclusive absent manifest error) that adequate and reasonable means do not exist for ascertaining the Adjusted LIBO Rate or the LIBO Rate, as applicable, for such Interest Period; or

(ii) the Administrative Agent is advised by the Required Lenders that the Adjusted LIBO Rate or the LIBO Rate, as applicable, for such Interest Period will not adequately and fairly reflect the cost to such Lenders of making or maintaining their Loans included in such Borrowing for such Interest Period;

then the Administrative Agent shall give notice thereof to the Borrower and the Lenders by telephone or telecopy as promptly as practicable thereafter and, until the Administrative Agent notifies the Borrower and the Lenders that the circumstances

37

giving rise to such notice no longer exist, (i) any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Eurocurrency Borrowing of the affected type (including Loans denominated in a particular currency, as applicable) shall be ineffective, and such Borrowing shall be converted to or continued on the last day of the Interest Period applicable thereto as (A) if such Borrowing is denominated in Dollars, an ABR Revolving Borrowing, or (B) if such Borrowing is denominated in any other currency, a Revolving Borrowing bearing interest at such rate as the affected Lenders and the Borrower may agree adequately reflects the costs to such Lenders of making or maintaining their Loans (or, in the absence of such agreement, shall be repaid as of the last day of the current Interest Period applicable thereto), and (ii) if any Borrowing Request requests a Eurocurrency Revolving Borrowing in Dollars, such Borrowing shall be made as an ABR Borrowing (or such Borrowing shall not be made if the Borrower revokes (and in such circumstances, such Borrowing Request may be revoked notwithstanding any other provision of this Agreement) such Borrowing Request by telephonic notice, confirmed promptly in writing, not later than one Business Day prior to the proposed date of such Borrowing) and (iii) any request by a Borrower for a Eurocurrency Borrowing denominated in a currency other than Dollars shall be ineffective; provided that if the circumstances giving rise to such notice affect only one type of Borrowings (for example, Loans having certain Interest Periods or denominated in a particular currency), then the other types of Borrowing shall be permitted.

SECTION 2.13. Increased Costs. (a) If any Change in Law shall:

(i) impose, modify or deem applicable any reserve, special deposit, liquidity or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender (except any such reserve or other requirement reflected in the Adjusted LIBO Rate or in additional interest paid pursuant to Section 2.21); or

(ii) impose on any Lender or the London interbank market any other condition, cost or expense (other than Taxes) affecting this Agreement or Eurocurrency Loans made by such Lender;

and the result of any of the foregoing shall be to increase the cost to such Lender of making, continuing, converting to or maintaining any Eurocurrency Loan (or of maintaining its obligation to make any such Loan) or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or otherwise), then the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered.

(b) If any Lender determines that any Change in Law affecting such Lender or any lending office of such Lender or such Lender's holding company, if any, regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's direct or indirect holding company, if any, as a consequence of this

38

Agreement or the Loans made by such Lender, to a level below that which such Lender or such Lender's direct or indirect holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's direct or indirect holding company with respect to capital or liquidity adequacy), then from time to time the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's direct or indirect holding company for any such reduction suffered.

(c) A certificate of a Lender setting forth in reasonable detail the amount or amounts necessary to compensate such Lender or its direct or indirect holding company, as the case may be, as specified in paragraph (a) or (b) of this Section shall be delivered to the Borrower and shall be conclusive absent manifest error. The Borrower shall pay such Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

(d) Failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation; provided that the Borrower shall not be required to compensate a Lender pursuant to this Section for any increased costs or reductions incurred more than 120 days prior to the date that such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor; provided further that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 120-day period referred to above shall be extended to include the period of retroactive effect thereof.

(e) Notwithstanding any other provision of this Section 2.13, no Lender shall demand compensation for any increased costs or reduction referred to above if it shall not be the general policy or practice of such Lender to demand such compensation in similar circumstances and unless such demand is generally consistent with such Lender's treatment of comparable borrowers of such Lender in the United States with respect to similarly affected commitments or loans under agreements with such borrowers having provisions similar to this Section 2.13 (it being understood that this sentence shall not limit the discretion of any Lender to waive the right to demand such compensation in any given case).

(f) If any Lender shall subsequently recoup any costs (other than from the Borrower) for which such Lender has previously been compensated by the Borrower under this Section 2.13, such Lender shall remit to the Borrower an amount equal to the amount of such recoupment.

SECTION 2.14. Break Funding Payments. In the event of (a) the payment of any principal of any Eurocurrency Loan prior to the last day of an Interest Period applicable thereto (including as a result of an Event of Default), (b) the conversion of any Eurocurrency Loan prior to the last day of the Interest Period applicable thereto, (c) the failure to borrow, convert, continue or prepay any Eurocurrency Loan on the date specified in any notice delivered pursuant hereto (except in the case when such notice

39

may be revoked under Section 2.09(d) or Section 2.12 and is revoked in accordance therewith), or (d) the assignment of any Eurocurrency Loan other than on the last day of the Interest Period applicable thereto as a result of a request by the Borrower pursuant to Section 2.17, then, in any such event, the Borrower shall compensate each Lender for the loss (excluding loss of margin), cost and expense it may reasonably incur as a result of such event; provided , however , that the Borrower shall not compensate any Lender for any cost of terminating or liquidating any hedge or related trading position (such as a rate swap, basis swap, forward rate transaction, interest rate option, cap, collar or floor transaction, swaption or any other similar transaction). Such compensable loss, cost or expense to any Lender shall be deemed to include an amount determined by such Lender to be the excess, if any, of (i) the amount of interest which would have accrued on the principal amount of such Loan had such event not occurred, at the Adjusted LIBO Rate or LIBO Rate, as the case may be, that would have been applicable to such Loan, for the period from the date of such event to the last day of the then current Interest Period therefor (or, in the case of a failure to borrow, convert or continue, for the period that would have been the Interest Period for such Loan), over (ii) the amount of interest which would accrue on such principal amount for such period at the interest rate which such Lender would bid were it to bid, at the commencement of such period, for dollar deposits of a comparable amount and period from other banks in the Eurocurrency market. A certificate of any Lender setting forth in reasonable detail any amount or amounts that such Lender is entitled to receive pursuant to this Section shall be delivered to the Borrower and shall be conclusive absent manifest error. The Borrower shall pay such Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

SECTION 2.15. Taxes. (a) Any and all payments by or on account of any obligation of the Borrower hereunder shall be made free and clear of and without deduction for any Indemnified Taxes or Other Taxes; provided that if the Borrower shall be required to deduct any Indemnified Taxes or Other Taxes from such payments, then (i) the sum payable shall be increased as necessary so that after making all such required deductions (including such deductions applicable to additional sums payable under this Section) the Administrative Agent or Lender (as the case may be) receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Borrower shall make such deductions, and (iii) the Borrower shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

(b) In addition, the Borrower shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c) The Borrower shall indemnify the Administrative Agent and each Lender, within 15 days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes paid by the Administrative Agent or such Lender, as the case may be, on or with respect to any payment by or on account of any obligation of the Borrower hereunder (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section) and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or

40

legally imposed or asserted by the relevant Governmental Authority. A certificate setting forth in reasonable detail the amount of such payment or liability delivered to the Borrower by a Lender, or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(d) Each Lender shall severally indemnify the Administrative Agent, within 15 days after written demand therefor, for the full amount of any Taxes attributable to such Lender that are paid or payable by the Administrative Agent in connection with this Agreement (but, in the case of any Indemnified Taxes or Other Taxes, only to the extent that the Borrower has not already indemnified the Administrative Agent for such Indemnified Taxes or Other Taxes and without limiting the obligation of the Borrower to do so) and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate setting forth in reasonable detail the amount of such payment or liability delivered to the applicable Lender by the Administrative Agent shall be conclusive absent manifest error.

(e) As soon as practicable after any payment of Indemnified Taxes or Other Taxes by the Borrower to a Governmental Authority, the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(f) If the Administrative Agent or a Lender determines, in its good-faith judgment, that it has received a refund of any Taxes or Other Taxes as to which it has been indemnified by the Borrower or with respect to which the Borrower has paid additional amounts pursuant to this Section 2.15, it shall pay over such refund to the Borrower (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower under this Section 2.15 with respect to the Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses of the Administrative Agent or such Lender and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); provided that the Borrower, upon the request of the Administrative Agent or such Lender, agrees to repay the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority. This Section shall not be construed to require the Administrative Agent or any Lender to make available its Tax returns (or any other information relating to its Taxes which it deems confidential) to the Borrower or any other Person.

(g) (i) Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly

41

completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 2.15(g)(ii)(A), (ii)(B) and (ii)(D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii) Without limiting the generality of the foregoing:

(a) any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed originals of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(b) any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(i) in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed originals of IRS Form W-8BEN or W-8BEN-E, as applicable, establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or W-8BEN-E, as applicable, establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(ii) executed originals of IRS Form W-8ECI;

(iii) in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit C-1 to the effect that such

42

Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed originals of IRS Form W-8BEN or W-8BEN-E, as applicable; or

(iv) to the extent a Foreign Lender is not the beneficial owner, executed originals of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN or W-8BEN-E, a U.S. Tax Compliance Certificate substantially in the form of Exhibit C-2 or Exhibit C-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit C-4 on behalf of each such direct and indirect partner

(c) any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed originals of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(d) If a payment made to a Lender under any Loan Document would be subject to U.S. Federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent, at the time or times prescribed by applicable law and at such time or times reasonably requested by the Administrative Agent or the Borrower, such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Administrative Agent or the Borrower as may be necessary for the Administrative Agent or the Borrower, as the case may be, to comply with its obligations under FATCA, to determine that such Lender has or has not complied with such Lender's obligations under FATCA and, as necessary, to determine the amount to deduct and withhold from such payment. Solely for purposes of this Section 2.15(g)(ii), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

43

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(h) For purposes of determining withholding Taxes imposed under FATCA, from and after the Restatement Effective Date, the Borrower and the Administrative Agent shall treat (and the Lenders hereby authorize the Administrative Agent to treat) the Loans as not qualifying as a "grandfathered obligation" within the meaning of Treasury Regulation Section 1.1471-2(b)(2)(i).

SECTION 2.16. Payments Generally; Pro Rata Treatment; Sharing of Setoffs. (a) The Borrower shall make each payment required to be made by it hereunder (whether of principal, interest or fees, or of amounts payable under Sections 2.13, 2.14 or 2.15, or otherwise) prior to 2:00 p.m., Local Time, on the date when due, in immediately available funds, without setoff or counterclaim. Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. All such payments shall be made to such account as may be specified by the Administrative Agent for the account of the applicable Lenders, except that payments pursuant to Sections 2.13, 2.14, 2.15 and 9.03 shall be made directly to the Persons entitled thereto. The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof. If any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension (but in no case shall any payment so extended be due after the Maturity Date). All payments hereunder of principal or interest in respect of any Loan (or of any breakage indemnity in respect of any Loan) shall be made in the currency of such Loan; all other payments hereunder and under each other Loan Document shall be made in Dollars, except as otherwise expressly provided. Any payment required to be made by the Administrative Agent hereunder shall be deemed to have been made by the time required if the Administrative Agent shall, at or before such time, have taken the necessary steps to make such payment in accordance with the regulations or operating procedures of the clearing or settlement system used by the Administrative Agent to make such payment.

(b) If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, interest and fees then due hereunder, such funds shall be applied (i) first, towards payment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, and (ii) second, towards payment of principal then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties.

(c) If any Lender shall, by exercising any right of set off or counterclaim or otherwise, obtain payment in respect of any principal of or interest

44

on any of its Loans or participations in Swingline Loans resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans of the relevant Class and accrued interest thereon than the proportion received by any other Lender, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Loans of other Lenders of such Class to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans of such Class; provided that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this paragraph shall not be construed to apply to any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or Participant, other than to the Borrower or any Subsidiary or Affiliate thereof (as to which the provisions of this paragraph shall apply). The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

(d) Unless the Administrative Agent shall have received written notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due. In such event, if the Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at (i) the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation (in the case of an amount denominated in Dollars) and (ii) the rate reasonably determined by the Administrative Agent to be the cost to it of funding such amount (in the case of an amount denominated in any Designated Foreign Currency).

(e) If any Lender shall fail to make any payment required to be made by it pursuant to Section 2.04(c), 2.05(a) or 2.16(d), then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under such Sections until all such unsatisfied obligations are fully paid.

45

SECTION 2.17. <u>Mitigation Obligations; Replacement of Lenders.</u> (a) If any Lender requests compensation under Section 2.13, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.15, or if the Borrower is required to pay any additional interest to any Lender pursuant to Section 2.21, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.13, 2.15 or 2.21, as the case may be, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.

(b) If (i) any Lender requests compensation under Section 2.13, (ii) the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.15, (iii) the Borrower is required to pay any additional interest to any Lender pursuant to Section 2.21, (iv) any Lender becomes a Defaulting Lender, or (v) any Lender is a Non-Consenting Lender under Section 2.20, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 9.04), all its interests, rights and obligations under this Agreement to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); <u>provided</u> that (i) to the extent required by Section 9.04, the Borrower shall have received the prior written consent of the Administrative Agent and the Swingline Lenders, which consent shall not be unreasonably withheld, (ii) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans and participations in Swingline Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts), and (iii) in the case of any such assignment resulting from a claim for compensation under Section 2.13 or payments required to be made pursuant to Section 2.15 or additional interest required pursuant to Section 2.21, such assignment will result in a material reduction in such compensation or payments. A Lender shall not be required to make any such assignment and delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

SECTION 2.18. <u>Defaulting Lenders.</u>

Notwithstanding any provision of this Agreement to the contrary, if any Lender becomes a Defaulting Lender, then the following provisions shall apply for so long as such Lender is a Defaulting Lender:

(a) fees shall cease to accrue on the unfunded portion of the Commitment of such Defaulting Lender pursuant to Section 2.10;

46

(b) the Commitment and Revolving Exposure of such Defaulting Lender shall not be included in determining whether the Required Lenders or any other requisite Lenders have taken or may take any action hereunder (including any consent to any amendment, waiver or other modification pursuant to Section 9.02); provided , that this clause (b) shall not apply to the vote of a Defaulting Lender in the case of an amendment, waiver or other modification requiring the consent of all Lenders or each Lender affected thereby;

(c) if any Swingline Exposure exists at the time such Lender becomes a Defaulting Lender then:

(i) all or any part of the Swingline Exposure of such Defaulting Lender shall be reallocated among the non-Defaulting Lenders in accordance with their respective Applicable Percentages, but only to the extent that the sum of all non-Defaulting Lenders' Revolving Exposures plus such Defaulting Lender's Swingline Exposure does not exceed the total of all non-Defaulting Lenders' Commitments; provided that no reallocation under this clause (i) shall constitute a waiver or release of any claim of any party hereunder against a Defaulting Lender arising from that Lender having become a Defaulting Lender, including any claim of a non-Defaulting Lender as a result of such non-Defaulting Lender's increased exposure following such reallocation;

(ii) if the reallocation described in clause (i) above cannot, or can only partially, be effected, the Borrower shall within one Business Day following notice by the Administrative Agent prepay such Swingline Exposure; and

(d) so long as such Lender is a Defaulting Lender, no Swingline Lender shall be required to fund any Swingline Loan, unless it is satisfied that the related exposure will be fully covered by the Commitments of the non-Defaulting Lenders, and participating interests in any newly made Swingline Loan shall be allocated among non-Defaulting Lenders in a manner consistent with Section 2.18(c)(i) (and such Defaulting Lender shall not participate therein).

If (i) a Bankruptcy Event with respect to a Lender Parent shall occur following the date hereof and for so long as such event shall continue or (ii) any Swingline Lender has a good faith belief that any Lender has defaulted in fulfilling its obligations under one or more other agreements in which such Lender commits to extend credit, no Swingline Lender shall be required to fund any Swingline Loan, unless the Swingline Lenders shall have entered into arrangements with the Borrower or such Lender, satisfactory to the Swingline Lenders to defease any risk to the Swingline Lenders in respect of such Lender hereunder.

In the event that the Administrative Agent, the Borrower and each Swingline Lender agree that a Defaulting Lender has adequately remedied all matters that caused such Lender to be a Defaulting Lender, then the Swingline Exposure of the

47

Lenders shall be readjusted to reflect the inclusion of such Lender's Commitment and on such date such Lender shall purchase at par such of the Loans of the other Lenders (other than Swingline Loans) as the Administrative Agent shall determine may be necessary in order for such Lender to hold such Loans in accordance with its Applicable Percentage; provided that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while such Lender was a Defaulting Lender; provided , further , that, except as otherwise expressly agreed by the affected parties, no change hereunder of a Lender's status from a Defaulting Lender to a non-Defaulting Lender will constitute a waiver or release of any claim of any party hereunder arising from such Lender's having been a Defaulting Lender.

SECTION 2.19. Increase in Revolving Commitments. (a) The Borrower may on one or more occasions during the Availability Period request, by written notice to the Administrative Agent, the establishment of Incremental Revolving Commitments to be provided by Incremental Lenders and in connection therewith cause additional Swingline Commitments to be provided by such Incremental Lenders (not exceeding, in the aggregate for all such new or increased Swingline Commitments, the aggregate amount of such Incremental Commitments); provided , however , that (i) the amount of each Incremental Facility shall be no less than $75,000,000 and (ii) the aggregate amount of all the Incremental Revolving Commitments established hereunder shall not exceed $500,000,000. Each such notice shall specify (i) the date on which the Borrower proposes that the Incremental Revolving Commitments shall be effective, which shall be a date not less than 10 Business Days (or such shorter period as may be agreed to by the Administrative Agent) after the date on which such notice is delivered to the Administrative Agent and (ii) the amount of the Incremental Revolving Commitments being requested (it being agreed that (A) any Lender approached to provide any Incremental Revolving Commitment may elect or decline, in its sole discretion, to provide such Incremental Revolving Commitment and (B) any Person other than an existing Lender that the Borrower proposes to become an Incremental Lender shall be subject to the approval of the Administrative Agent and the Swingline Lenders (which approval shall not be unreasonably withheld).

(b) The terms and conditions of any Incremental Revolving Commitments and Loans and other extensions of credit to be made thereunder shall be identical to those of the Revolving Commitments hereunder and the Loans and other extensions of credit made thereunder, and shall be treated as a single class with such Revolving Commitments and Loans.

(c) The Incremental Revolving Commitments shall be effected pursuant to one or more Incremental Facility Amendments executed and delivered by the Borrower, each Incremental Lender providing such Incremental Revolving Commitments and the Administrative Agent; provided that no Incremental Facility or Incremental Revolving Commitments or new or increased Swingline Commitments relating thereto will become effective unless (i) no Default shall have occurred and be continuing at the time of, and immediately after giving effect to, the effectiveness of such Incremental Revolving Commitments, (ii) on the date of effectiveness thereof, the representations and warranties set forth in Article III hereof

48

shall be true and correct in all material respects on and as of the date of such effectiveness, except where such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects as of such earlier date, (iii) the Administrative Agent shall have received a certificate dated the date of such effectiveness confirming satisfaction as of such date of the conditions referred to in clauses (i) and (ii), (iv) the Borrower shall make any payments required to be made pursuant to Section 2.14 in connection with such Incremental Revolving Commitments and the related transactions under this Section, and (v) the Borrower shall have delivered to the Administrative Agent such legal opinions, board resolutions, secretary's certificates, officer's certificates and other documents, consistent with those delivered under Section 4.01 hereof, as shall reasonably be requested by the Administrative Agent in connection with such Incremental Facility. Each Incremental Facility Amendment may, without the consent of any Lender other than the Incremental Lenders party thereto, effect such amendments to this Agreement as may be necessary or appropriate, in the opinion of the Administrative Agent, to give effect to the provisions of this Section.

(d) Upon the effectiveness of an Incremental Revolving Commitment of any Incremental Lender, (i) such Incremental Lender shall be deemed to be a "Revolving Lender" and, as applicable, a Swingline Lender, hereunder, and shall thereafter be entitled to all the rights of, and benefits accruing to, Lenders hereunder and shall be bound by all agreements, acknowledgements and other obligations of Lenders hereunder, and (ii)(A) such Incremental Revolving Commitment shall constitute (or, in the event such Incremental Lender already has a Revolving Commitment, shall increase) the Revolving Commitment of such Incremental Lender and (B) the aggregate Revolving Commitments shall be increased by the amount of such Incremental Revolving Commitment, in each case, subject to further increase or reduction from time to time as set forth in the definition of the term "Revolving Commitment". For the avoidance of doubt, upon the effectiveness of any Incremental Revolving Commitments, the Revolving Exposure of the Incremental Revolving Lender holding such Commitment, and the Applicable Percentages of all the Revolving Lenders, shall automatically be adjusted to give effect thereto.

(e) On the date of effectiveness of any Incremental Revolving Commitments, each Revolving Lender shall assign to each Incremental Revolving Lender holding such Incremental Revolving Commitment, and each such Incremental Revolving Lender shall purchase from each Revolving Lender, at the principal amount and in the currency thereof (together with accrued interest in the applicable currency), such interests in the outstanding Revolving Loans and funded participations in Swingline Loans outstanding on such date as shall be necessary in order that, after giving effect to all such assignments and purchases, such Revolving Loans and funded participations in Swingline Loans will be held by all the Revolving Lenders (including such Incremental Revolving Lenders) ratably in accordance with their Applicable Percentages after giving effect to the effectiveness of such Incremental Revolving Commitment.

49

(f) The Administrative Agent shall notify the Lenders promptly upon receipt by the Administrative Agent of any notice from the Borrower referred to in paragraph (a) of this Section and of the effectiveness of any Incremental Revolving Facility, in each case advising the Lenders of the details thereof and of the Applicable Percentages of the Revolving Lenders after giving effect thereto and of the assignments required to be made pursuant to paragraph (e) of this Section.

SECTION 2.20. Extension of Maturity Date. (a) The Borrower may, on no more than two occasions during the term of this Agreement, by written notice (an " Extension Notice ") delivered to the Administrative Agent not less than 30 days and not more than 60 days prior to any anniversary of the Original Effective Date, request a one-year extension of the Maturity Date then in effect (the " Existing Maturity Date ") to be effective on such anniversary (the " Extension Effective Date "); provided that (i) no Default shall have occurred and be continuing on the Extension Effective Date, (ii) the representations and warranties set forth in Article III hereof shall be true and correct in all material respects on and as of the Extension Effective Date, except where such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects as of such earlier date, and (iii) the Administrative Agent shall have received a certificate, dated the Extension Effective Date and signed by a Vice President or a Financial Officer of the Borrower, confirming compliance with the conditions precedent set forth in clauses (i) and (ii) of this paragraph (a).

(b) The effectiveness of any extension of the Maturity Date shall require the prior written consent of the Required Lenders, each Lender participating in such extension of the Maturity Date, and the Administrative Agent. The Administrative Agent shall promptly furnish a copy of the Extension Notice to each Lender, and shall request that each Lender either agree or not agree to such extension no later than 10 days prior to the requested Extension Effective Date. Any Lender not responding within the above time period shall be deemed not to have consented to such extension. The decision to agree or withhold agreement to any extension of the Maturity Date hereunder shall be at the sole discretion of each Lender. The Revolving Commitment of any Lender that has declined to agree to any requested extension of the Maturity Date (a " Non-Consenting Lender ") shall terminate on the Existing Maturity Date, and the principal amount of any outstanding Loans made by such Lender, together with any accrued interest thereon, and any accrued fees and other amounts payable to or for the account of such Lender hereunder, shall be due and payable on the Existing Maturity Date, and such Non-Consenting Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.13, 2.14, 2.15 and 9.03 with respect to facts and circumstances occurring prior to the date it ceased being a party. Notwithstanding the foregoing provisions of this paragraph, the Borrower shall have the right, prior to an Extension Effective Date, pursuant to, and in accordance with, Section 2.17(b), to replace a Non-Consenting Lender with a Lender or other financial institution that will agree to an extension of the Maturity Date.

50

SECTION 2.21. Additional Reserve Costs.

(a) If and so long as any Lender is required to comply with reserve assets, liquidity, cash margin or other requirements of any monetary or other authority (including any such requirement imposed by the European Central Bank or the European System of Central Banks, but excluding requirements reflected in the Statutory Reserve Rate) in respect of any of such Lender's Eurocurrency Loans in any Designated Foreign Currency, such Lender may require the Borrower to pay, contemporaneously with each payment of interest on each of such Lender's Eurocurrency Loans subject to such requirements, additional interest on such Loan at a rate per annum specified by such Lender to be the cost to such Lender of complying with such requirements in relation to such Loan.

(b) Any additional interest owed pursuant to paragraph (a) above shall be determined by the relevant Lender, which determination shall be conclusive absent manifest error, and notified to the Borrower (with a copy to the Administrative Agent) at least five Business Days before each date on which interest is payable for the relevant Loan, and such additional interest so notified to the Borrower by such Lender shall be payable to the Administrative Agent for the account of such Lender on each date on which interest is payable for such Loan.

SECTION 2.22. Redenomination of Certain Designated Foreign Currencies. (a) Each obligation of any party to this Agreement to make a payment denominated in the national currency unit of any member state of the European Union that adopts the Euro as its lawful currency after the date hereof shall be redenominated into Euro at the time of such adoption (in accordance with the EMU Legislation). If, in relation to the currency of any such member state, the basis of accrual of interest expressed in this Agreement in respect of that currency shall be inconsistent with any convention or practice in the London Interbank Market for the basis of accrual of interest in respect of the Euro, such expressed basis shall be replaced by such convention or practice with effect from the date on which such member state adopts the Euro as its lawful currency (and the Administrative Agent shall give notice thereof to the Borrower and the Lenders); provided that if any Borrowing in the currency of such member state is outstanding immediately prior to such date, such replacement shall take effect, with respect to such Borrowing, at the end of the then current Interest Period.

(b) Without prejudice and in addition to any method of conversion or rounding prescribed by any EMU Legislation and (i) without limiting the liability of the Borrower for any amount due under this Agreement and (ii) without increasing any Commitment of any Lender, all references in this Agreement to minimum amounts (or integral multiples thereof) denominated in the national currency unit of any member state of the European Union that adopts the Euro as its lawful currency after the date hereof shall, immediately upon such adoption, be replaced by references to such minimum amounts (or integral multiples thereof) as shall be specified herein with respect to Borrowings denominated in Euro.

(c) Each provision of this Agreement shall be subject to such reasonable changes of construction as the Administrative Agent (with the consent of the Borrower (not to be unreasonably withheld)) may from time to time specify to be appropriate to reflect the adoption of the Euro by any member state of the European Union and any relevant market conventions or practices relating to the Euro.

51

ARTICLE III

Representations and Warranties

The Borrower represents and warrants to the Lenders that:

SECTION 3.01. Organization; Powers. Each of the Borrower and the Significant Subsidiaries is duly organized, validly existing and in good standing (if applicable) under the laws of the jurisdiction of its organization, has all requisite power and authority to carry on its business as now conducted and, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, is qualified to do business and in good standing (if applicable) in every jurisdiction where such qualification is required.

SECTION 3.02. Authorization; Enforceability. The Transactions are within the Borrower's and the applicable Subsidiaries' corporate powers and have been duly authorized by all necessary corporate and, if required, stockholder action. This Agreement has been duly executed and delivered by the Borrower and constitutes a legal, valid and binding obligation of the Borrower, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

SECTION 3.03. Governmental Approvals; No Conflicts. The Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except such as have been obtained or made and are in full force and effect, (b) will not violate any applicable law or regulation or the charter, by-laws or other organizational documents of the Borrower or any of the Significant Subsidiaries or any order of any Governmental Authority, (c) will not violate or result in a default under any indenture, material agreement or other material instrument binding upon the Borrower or any of the Significant Subsidiaries or its assets, or give rise to a right thereunder to require any payment to be made by the Borrower or any of the Significant Subsidiaries, and (d) will not result in the creation or imposition of any Lien on any material amount of assets of the Borrower or any of the Significant Subsidiaries.

SECTION 3.04. Financial Condition; No Material Adverse Change. (a) The Borrower has heretofore furnished to the Administrative Agent for delivery to the Lenders its consolidated balance sheet and statements of income, stockholders' equity and cash flows as of and for the fiscal year ended October 31, 2014, reported on by Ernst & Young LLP, independent registered public accounting firm. Such financial statements present fairly, in all material respects, the financial position and results of operations and cash flows of the Borrower and the Subsidiaries as of such date and for such period in accordance with GAAP.

52

(b) Since October 31, 2014, other than the Separation Transactions, there has been no material adverse change in the actual business, assets, operations or financial condition of the Borrower and the Subsidiaries, taken as a whole.

SECTION 3.05. Litigation and Environmental Matters. (a) Except as disclosed in the Borrower's Annual Report on Form 10-K for the fiscal year ended October 31, 2014, the quarterly reports on Form 10-Q or current reports on Form 8-K filed subsequent thereto but prior to the Restatement Effective Date, or any amendments thereof filed subsequent thereto but prior to the Restatement Effective Date, and except as set forth on Schedule 3.05, there are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending or, to the knowledge of the Borrower, threatened against the Borrower or any of the Significant Subsidiaries (i) as to which there is a reasonable possibility of an adverse determination and that, if adversely determined, could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect or (ii) that involve this Agreement or the Transactions.

(b) Except as disclosed in the Borrower's Annual Report on Form 10-K for the fiscal year ended October 31, 2014, the quarterly reports on Form 10-Q or current reports on Form 8-K filed subsequent thereto but prior to the Restatement Effective Date, or any amendments thereof filed subsequent thereto but prior to the Restatement Effective Date, except as set forth on Schedule 3.05 and except with respect to any other matters that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, neither the Borrower nor any of the Significant Subsidiaries (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has become subject to any Environmental Liability, or (iii) has received notice of any claim with respect to any Environmental Liability.

SECTION 3.06. Compliance with Laws and Agreements. None of the Borrower or any of the Significant Subsidiaries or any of their respective properties or assets is in violation of, nor will the continued operation of their properties and assets as currently conducted violate, any law, rule or regulation or indenture, agreement or other instrument, or is in default with respect to any judgment, writ, injunction, decree or order of any Governmental Authority or indenture, agreement or other instrument, where such violation or default could reasonably be expected to result in a Material Adverse Effect. No Default has occurred and is continuing.

SECTION 3.07. Investment Company Status. The Borrower is not, and is not "controlled" by, an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940.

SECTION 3.08. Taxes. Each of the Borrower and the Subsidiaries has timely filed or caused to be filed all Tax returns and reports required by law to have been filed, and has paid or caused to be paid all Taxes shown to be due and payable on such Tax returns, except (a) any Taxes that are being contested in good faith by appropriate proceedings and for which the Borrower or such Subsidiary, as applicable, has set aside on its books adequate reserves or (b) to the extent that the failure to do so could not reasonably be expected to result in a Material Adverse Effect.

53

SECTION 3.09. <u>ERISA.</u> No ERISA Event has occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events for which liability is reasonably expected to occur, could reasonably be expected to result in a Material Adverse Effect. Any underfunding with respect to one or more Plans (based on the assumptions used for purposes of Financial Accounting Standards No. 87) could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

SECTION 3.10. <u>Federal Reserve Regulations.</u> (a) Neither the Borrower nor any of the Subsidiaries is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of buying or carrying Margin Stock.

(b) No part of the proceeds of any Loan will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, for any purpose that entails a violation of, or that is inconsistent with, the provisions of the Regulations of the Board, including Regulation T, Regulation U and Regulation X. If required by law and requested by the Administrative Agent or any Lender, the Borrower will furnish to the Administrative Agent and each Lender a statement to the foregoing effect in conformity with the requirements of FR Form G-3 or FR Form U-1 referred to in Regulation U.

SECTION 3.11. <u>Pari Passu Status.</u> The obligations of the Borrower under this Agreement rank, and will rank, at least <u>pari passu</u> in priority of payment and in all other respects with all unsecured Indebtedness of the Borrower.

SECTION 3.12. <u>Anti-Corruption Laws and Sanctions</u>. The Borrower has implemented and maintains in effect policies and procedures designed to promote compliance by the Borrower, its Subsidiaries and their respective directors, officers, employees and Borrower Agents with Anti-Corruption Laws and applicable Sanctions. None of the Borrower or any Subsidiary of the Borrower is a Sanctioned Person. The Borrower and its Subsidiaries and, to the knowledge of the Borrower, its and their respective directors, officers, employees and Borrower Agents are in compliance with Anti-Corruption Laws and applicable Sanctions in all material respects. No proceeds of any Loans will be used directly, or to the knowledge of the Borrower, indirectly for the purpose of financing the activities of any Sanctioned Person or in any Sanctioned Country (unless, in each case, authorized by Sanctions), or for the purpose of engaging in any activity in violation of Sanctions.

ARTICLE IV

Conditions

SECTION 4.01. <u>Restatement Effective Date.</u> The amendment and restatement of the Original Agreement in the form hereof, and the obligations of the

54

Lenders to make Loans and acquire participations in Swingline Loans pursuant hereto, shall become effective on the date on which each of the following conditions is satisfied (or waived in accordance with Section 9.02):

(a) The Administrative Agent (or its counsel) shall have received from the Borrower, each Lender and the Administrative Agent either (i) a counterpart of this Agreement (which may include telecopy or electronic transmission of a signed signature page of this Agreement) signed on behalf of such party or (ii) written evidence satisfactory to the Administrative Agent that such party has signed a counterpart of this Agreement.

(b) The Separation Transactions shall have been consummated in accordance with and as described in the Information Statement, without any changes or deviations therefrom that could reasonably be expected to be materially adverse to the Lenders, except for any such changes or deviations that have been approved by the Required Lenders.

(c) The Administrative Agent shall have received a favorable written opinion (addressed to the Administrative Agent and the Lenders and dated the Restatement Effective Date) of Ruairidh Ross, Vice President, Deputy General Counsel and Assistant Secretary of the Borrower (or any internal or outside counsel designated by the Borrower), substantially in the form of Exhibit B-1, and covering such matters relating to the Borrower, this Agreement or the Transactions as the Lenders shall reasonably request. The Borrower hereby requests such counsel to deliver such opinion.

(d) The Administrative Agent shall have received such documents and certificates as the Administrative Agent may reasonably request relating to the organization, existence and good standing of the Borrower in its jurisdiction of organization, the authorization of the Transactions and any other legal matters relating to the Borrower, the Subsidiaries, this Agreement or the Transactions, all in form and substance reasonably satisfactory to the Administrative Agent.

(e) The Borrower shall have provided the Administrative Agent and the Lenders with certain pro forma financial information reasonably requested by the Administrative Agent (it being agreed that this condition was satisfied on September 14, 2015).

(f) The Administrative Agent shall have received certificates dated the Restatement Effective Date (i) signed by a Vice President or a Financial Officer of the Borrower confirming compliance with the conditions set forth in paragraphs (a) and (b) of Section 4.02 as of such date (but without excluding the representation and warranty set forth in Section 3.04(b) or Section 3.05) and (ii) signed by a Financial Officer of the Borrower, substantially in the form of Exhibit B-2, with respect to the solvency on such date of the Borrower and the Subsidiaries, on a consolidated basis, after giving effect to the Separation Transactions and the other transactions to be consummated on the Restatement Effective Date.

55

(g) There shall not have occurred or come to the attention of the Lenders any event or circumstance (for the avoidance of doubt, other than consummation of the Separation Transactions) that has resulted or could reasonably be expected to result in a material adverse change in the actual business, assets, operations or financial condition of the HPI Businesses since October 31, 2014.

(h) The Borrower shall have permanently reduced the Revolving Commitments under the Original Credit Agreement to an aggregate amount not in excess of $4,000,000,000 (and the Lenders party hereto hereby waive any prior notice requirement under the Original Credit Agreement with respect to delivery of any notice of such reduction to become effective on the Restatement Effective Date).

(i) The principal of and accrued interest on all loans outstanding, and all fees and other amounts accrued or owing, under the Existing Credit Agreements (other than in respect of contingent obligations with respect to which no claims have been made) shall have been paid in full, the lending commitments thereunder shall have been terminated, and the Administrative Agent shall have received reasonably satisfactory evidence of the foregoing.

(j) All fees, cost reimbursements and out-of-pocket expenses required to be paid or reimbursed on or prior to the Restatement Effective Date pursuant hereto (including under the Original Credit Agreement) or pursuant to the Commitment Letter, to the extent invoiced prior to (or, in the case of cost reimbursement and out-of-pocket expenses, not fewer than two Business Days prior to) the Restatement Effective Date, shall have been paid or will be paid on the Restatement Effective Date substantially concurrently with the effectiveness of this Agreement.

The Administrative Agent shall notify the Borrower and the Lenders of the Restatement Effective Date, and such notice shall be conclusive and binding. Notwithstanding the foregoing, the amendment and restatement of the Original Agreement in the form hereof and obligations of the Lenders to make Loans hereunder shall not become effective unless each of the foregoing conditions is satisfied (or waived pursuant to Section 9.02) at or prior to 5:00 p.m., New York City time, on November 30, 2015 (and, in the event such conditions are not so satisfied or waived, the Commitments shall terminate at such time).

SECTION 4.02. Each Credit Event. The obligation of each Lender to make a Loan on the occasion of any Borrowing is subject to the satisfaction of the following conditions:

(a) The representations and warranties of the Borrower set forth in this Agreement (other than the representations and warranties set forth in Section 3.04(b) and Section 3.05) shall be true and correct on and as of the date of such Borrowing.

(b) At the time of and immediately after giving effect to such Borrowing, no Default shall have occurred and be continuing.

56

Each Borrowing shall be deemed to constitute a representation and warranty by the Borrower on the date thereof as to the matters specified in paragraphs (a) and (b) of this Section.

## ARTICLE V

### Affirmative Covenants

Until the Commitments have expired or been terminated and the principal of and interest on each Loan and all fees payable hereunder shall have been paid in full, the Borrower covenants and agrees with the Lenders that:

SECTION 5.01. Financial Statements and Other Information. The Borrower will furnish to the Administrative Agent for delivery to each Lender:

(a) on or before the earlier of (i) the date by which the Annual Report on Form 10-K of the Borrower (without giving effect to any extension thereof) for each fiscal year is required to be filed under the rules and regulations of the SEC and (ii) 90 days after the end of such fiscal year, its audited consolidated balance sheet and related statements of operations, stockholders' equity and cash flows as of the end of and for such year (for the avoidance of doubt, including in respect of the fiscal year ending October 31, 2015), setting forth in each case in comparative form the figures for the previous fiscal year, all reported on by Ernst & Young LLP or other independent registered public accounting firm of recognized national standing (without a "going concern" or like qualification or exception and without any qualification or exception as to the scope of such audit) to the effect that such consolidated financial statements present fairly in all material respects the financial condition and results of operations of the Borrower and the Subsidiaries on a consolidated basis in accordance with GAAP consistently applied;

(b) on or before the earlier of (i) the date by which the Quarterly Report on Form 10-Q of the Borrower for each of the first three fiscal quarters of each fiscal year is required to be filed under the rules and regulations of the SEC (without giving effect to any extension thereof) and (ii) 45 days after the end of each of the first three fiscal quarters of such fiscal year, its consolidated balance sheet and related statements of operations, stockholders' equity and cash flows as of the end of and for such fiscal quarter and the then elapsed portion of the fiscal year, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year, all certified by one of its Financial Officers as presenting fairly in all material respects the financial condition and results of operations of the Borrower and the Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes;

(c) not later than the date by which financial statements are required to be delivered under clause (a) or (b) above, a certificate of a Financial Officer of

the Borrower (i) certifying as to whether a Default has occurred and, if a Default has occurred, specifying the details thereof and any action taken or proposed to be taken with respect thereto and (ii) setting forth reasonably detailed calculations demonstrating compliance with Section 6.05;

(d) promptly following any request therefor, such other information regarding the operations, business affairs and financial condition of the Borrower or any Subsidiary, or compliance with the terms of this Agreement or with the requirements of the Patriot Act or any other "know your customer" or similar laws or regulations, as the Administrative Agent or any Lender may reasonably request (it being understood that the Borrower shall not be required to provide any information which is subject to confidentiality restrictions, the nature of which prohibit such disclosure notwithstanding the provisions of Section 9.12 hereof); and

(e) all information, documents and other materials that the Borrower is obligated to deliver to the Administrative Agent under this Agreement, including all notices, requests, and other reports, certificates and other information materials, but excluding any such information that (i) is required to be delivered pursuant to clauses (a) and (b) of this Section 5.01, (ii) relates to a request for a new, or a conversion of an existing, Borrowing or other extension of credit (including any Interest Election Request or Interest Period relating thereto), (iii) relates to the payment of any principal or other amount due under this Agreement prior to the scheduled date therefor, (iv) provides notice of any Default or Event of Default, or (v) is required to be delivered to satisfy any condition precedent to the effectiveness of this Agreement and/or any Borrowing or other extension of credit hereunder (all such non-excluded information being referred to herein collectively as " Communications "), by transmitting the Communications in an electronic/soft medium in a format acceptable to the Administrative Agent. In addition, the Borrower agrees to continue to provide the Communications to the Administrative Agent in the manner specified in this Agreement, but only to the extent requested by the Administrative Agent. The Borrower further agrees that the Administrative Agent may make the Communications available to the Lenders by posting the Communications on Intralinks or a substantially similar electronic transmission system, access to which is controlled by the Administrative Agent (the " Platform ").

Reports required to be delivered pursuant to clauses (a) and (b) of this Section 5.01 shall be deemed to have been delivered on the date on which the Borrower posts such reports on its website at www.hp.com or when such reports are posted on the SEC's website at www.sec.gov; provided that the Borrower shall deliver to the Administrative Agent, not later than the date on which financial statements are required to be delivered under clause (b) above, the certification of a Financial Officer, as required by clause (b).

SECTION 5.02. Notices of Material Events. Promptly after a Financial Officer or any other executive officer of the Borrower becomes aware of the following, the Borrower will furnish to the Administrative Agent for delivery to each Lender written notice of the following:

(a) any Event of Default or Default, specifying the nature and extent thereof and the corrective action (if any) taken or proposed to be taken with respect thereto;

58

(b) the filing or commencement of, or any written notice of intention of any Person to file or commence, any action, suit or proceeding, whether at law or in equity or by or before any arbitrator or Governmental Authority, against or affecting the Borrower or any Affiliate thereof that, if not cured or if adversely determined, could reasonably be expected to result in a Material Adverse Effect;

(c) the occurrence of any ERISA Event that, alone or together with any other ERISA Events that have occurred, if not cured or if adversely determined, could reasonably be expected to result in liability of the Borrower and the Subsidiaries in an aggregate amount exceeding $200,000,000; and

(d) any other development or event that has resulted in, or could reasonably be expected to result in, a Material Adverse Effect.

Each notice delivered under this Section shall be accompanied by a statement of a Financial Officer or other executive officer of the Borrower setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

SECTION 5.03. Existence; Conduct of Business. The Borrower will, and will cause each of the Significant Subsidiaries to, do or cause to be done all things reasonably necessary to preserve, renew and keep in full force and effect its legal existence and the rights, licenses, permits, privileges and franchises material to the conduct of its business; provided that the foregoing shall not prohibit any merger, consolidation, liquidation, dissolution or asset disposition permitted under Section 6.04; provided further that neither the Borrower nor any of the Significant Subsidiaries shall be required to preserve any rights, licenses, permits, privileges or franchises or any Significant Subsidiary's existence if the Borrower or such Subsidiary determines that the preservation thereof is no longer desirable in the conduct of the business of the Borrower or such Subsidiary, as the case may be, and that the loss thereof would not materially adversely affect the Borrower, such Subsidiary or the Lenders with respect to any Commitments or Borrowing hereunder.

SECTION 5.04. Payment of Obligations. The Borrower will, and will cause each of the Subsidiaries to, pay its obligations, other than Indebtedness but including Tax liabilities, that, if not paid, could result in a Material Adverse Effect before the same shall become delinquent or in default, except where (a) the validity or amount thereof is being contested in good faith, (b) the Borrower or such Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with GAAP, and (c) the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect.

59

SECTION 5.05. Maintenance of Properties; Insurance. The Borrower will, and will cause each of the Subsidiaries to, (a) keep and maintain all property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, and (b) maintain, with financially sound and reputable insurance companies, insurance in such amounts and against such risks as are customarily maintained by companies engaged in the same or similar businesses operating in the same or similar locations; provided , however , that the Borrower and the Subsidiaries may instead self-insure to the same general extent as other companies of similar size, type and financial condition as the Borrower or such Subsidiary, and to the extent such policies are consistent with prudent business practice.

SECTION 5.06. Books and Records; Inspection Rights. The Borrower will, and will cause each of the Subsidiaries to, keep proper books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to its business and activities sufficient to permit the preparation of the consolidated financial statements of the Borrower and the Subsidiaries in accordance with GAAP. The Borrower will, and will cause each of the Subsidiaries to, permit any representatives designated by the Administrative Agent or any Lender (which representatives shall be reasonably acceptable to the Borrower), upon reasonable prior notice, to visit and inspect its properties, to examine and make extracts from its books and records, and to discuss its affairs, finances and condition with its officers and independent accountants, all at such reasonable times and as often as reasonably requested; provided that such designated representatives agree to any reasonable confidentiality obligations proposed by the Borrower, including, but not limited to, confidentiality obligations agreed to by the Lenders under or in connection with this Agreement.

SECTION 5.07. Compliance with Laws. (a) The Borrower will, and will cause each of the Subsidiaries to, comply with all laws, rules, regulations and orders of any Governmental Authority applicable to it or its property, including all Environmental Laws, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(b) The Borrower will maintain in effect and enforce in all material respects policies and procedures designed to promote compliance by the Borrower, its Subsidiaries and their respective directors, officers, employees and Borrower Agents with Anti-Corruption Laws and applicable Sanctions.

SECTION 5.08. Use of Proceeds. (a) The proceeds of the Loans will be used only for general corporate purposes. No part of the proceeds of any Loan will be used, whether directly or indirectly, for any purpose that entails a violation of any of the Regulations of the Board, including Regulation T, Regulation U and Regulation X.

(b) The Borrower will not permit the proceeds of any Loans to be used directly, or to the knowledge of the Borrower, indirectly for the purpose of financing the activities of any Sanctioned Person or in any Sanctioned Country (unless, in each case, authorized by Sanctions), or for the purpose of engaging in any activity in violation of Sanctions.

60

ARTICLE VI

Negative Covenants

Until the Commitments have expired or terminated and the principal of and interest on each Loan and all fees payable hereunder have been paid in full, the Borrower covenants and agrees with the Lenders that:

SECTION 6.01. Subsidiary Indebtedness . The Borrower will not permit any Subsidiary to create, incur, assume or permit to exist any Indebtedness or Attributable Debt, except:

(a) Indebtedness, including Guarantees and obligations in respect of letters of credit and letters of guaranty, existing on the Restatement Effective Date and set forth on Schedule 6.01 (i) individually, identifying the relevant Subsidiary and Indebtedness, in the case of any issue or item of Indebtedness having an outstanding principal amount in excess of $100,000,000 and (ii) in the aggregate with respect to all other such Indebtedness;

(b) Guarantees of Indebtedness of any Subsidiary to the extent such Indebtedness is otherwise permitted under this Agreement;

(c) Indebtedness of any Subsidiary to the Borrower or any other Subsidiary;

(d) Indebtedness of any Person that becomes a Subsidiary (or of any Person not previously a Subsidiary that is merged or consolidated with or into a Subsidiary in a transaction permitted hereunder) after the date hereof; or Indebtedness of any Person that is assumed by any Subsidiary in connection with an acquisition of assets by such Subsidiary, provided that (i) such Indebtedness exists at the time such Person becomes a Subsidiary (or is so merged or consolidated) or such assets are acquired and is not created in contemplation of or in connection with such Person becoming a Subsidiary (or such merger or consolidation) or such assets being acquired and (ii) no other Subsidiary (other than a Subsidiary into which the acquired Person is merged or any Subsidiary of the acquired Person) shall Guarantee or otherwise become liable for the payment of such Indebtedness, except to the extent that such Guarantee is incurred pursuant to Section 6.01(g);

(e) Indebtedness incurred to finance the purchase price, construction cost or improvement cost incurred in connection with the acquisition, construction or improvement of assets, including Capital Lease Obligations; provided that (i) such Indebtedness is incurred prior to or within one year after, the date of acquisition, construction or improvement of such assets, (ii) such Indebtedness does not exceed the amount of such purchase price or cost of the asset and (iii) any Lien securing such Indebtedness is permitted under Section 6.02(f);

61

(f) Indebtedness of Subsidiaries that are limited purpose financing vehicles for Securitization Transactions incurred to finance such Securitization Transactions, provided that such Securitization Transactions otherwise comply with the provisions hereof;

(g) other Indebtedness of Subsidiaries, including Attributable Debt in respect of Sale and Leaseback Transactions permitted by Section 6.03; provided that the sum, without duplication, of (i) the aggregate outstanding principal amount of Indebtedness permitted by this clause (g), plus (ii) the aggregate outstanding principal amount of Indebtedness and other obligations secured by Liens permitted by Section 6.02(g), plus (iii) the outstanding Attributable Debt in respect of Sale and Leaseback Transactions permitted by Section 6.03 shall not exceed at any time the greater of $700,000,000 and 12.5% of Consolidated Net Tangible Assets as of the most recent fiscal quarter end for which financial statements of the Borrower have been delivered pursuant to Section 5.01(a) or (b);

(h) Indebtedness incurred in connection with the extension of maturity of, or refunding or refinancing of, in whole or in part, any Indebtedness or Attributable Debt outstanding pursuant to Section 6.01(a),(d), (e) or (g), provided that (i) such extension of, or refunding refinancing shall not increase the principal amount of the Indebtedness or Attributable Debt being extended, or refunded or refinanced by more than the amount of accrued interest thereon and fees, expenses and premiums paid in connection with such extension, refunding or refinancing and (ii) any such refinancing Indebtedness in respect of Indebtedness incurred under Section 6.01(g) will be deemed to utilize the basket referred to in Section 6.01(g), but such Indebtedness shall be permitted even if such Indebtedness is incurred at a time when such Indebtedness would not otherwise be permitted to be incurred under such clause;

(i) Indebtedness arising in connection with customary cash management services and from the honoring by a bank or financial institution of a check, draft or similar instrument drawn against insufficient funds, in each case in the ordinary course of business; and

(j) Indebtedness as an account party in respect of trade letters of credit.

SECTION 6.02. Liens. The Borrower will not, and will not permit any Subsidiary to, create, incur, assume or permit to exist any Lien on any property or asset now owned or hereafter acquired by it, except:

(a) Permitted Encumbrances;

(b) Liens on any property or asset of a Subsidiary securing Indebtedness of such Subsidiary to the Borrower or to another Subsidiary;

62

(c) any Lien on any property or asset of the Borrower or any Subsidiary existing on the Restatement Effective Date; provided that (i) such Lien shall not apply to any other property or asset of the Borrower or any Subsidiary other than extensions and accessions thereto and (ii) such Lien shall secure only those obligations which it secures on the Restatement Effective Date and extensions, renewals and replacements thereof permitted by Section 6.01(g);

(d) any Lien existing on any property or asset prior to the acquisition thereof by the Borrower or any Subsidiary or existing on any property or asset of any Person that becomes a Subsidiary after the date hereof prior to the time such Person becomes a Subsidiary; provided that (i) such Lien is not created in contemplation of or in connection with such acquisition or such Person becoming a Subsidiary, as the case may be, (ii) such Lien shall not apply to any other property or assets of the Borrower or any Subsidiary other than extensions and accessions thereto and (iii) such Lien shall secure only those obligations which it secures on the date of such acquisition or the date such Person becomes a Subsidiary, as the case may be, and extensions, renewals, refinancings and replacements thereof that do not increase the outstanding principal amount thereof by more than the amount of accrued interest thereon and fees, expenses and premiums paid in connection with such refinancing;

(e) Liens arising under Securitization Transactions entered into on lease and other accounts receivable sold or transferred pursuant to such Securitization Transactions or on interests retained by the Borrower or any Subsidiary in any securitization vehicle utilized to effect such a Securitization Transaction;

(f) any Lien given to secure Indebtedness or other obligations (including, in the case of Subsidiaries, Indebtedness incurred pursuant to Section 6.01(e)) incurred to finance the payment of the purchase price, construction cost or improvement cost of the acquisition, construction or improvement of assets; provided that (i) such Lien shall attach solely to the assets acquired, constructed or improved (including any assets which are attached or otherwise adjoining such assets), (ii) such Lien has been created or incurred by the Borrower or a Subsidiary simultaneously with, or within one year after, the date of acquisition, construction or improvement of such assets, (iii) the Indebtedness or other obligations secured thereby shall not exceed the amount of such purchase price or cost of the asset and (iv) such Lien shall secure only those obligations which it secures on the date of such acquisition, construction or improvement of assets, as the case may be, and extensions, renewals and replacements thereof that do not increase the outstanding principal amount thereof by more than the amount of accrued interest thereon and fees, expenses and premiums paid in connection with such refinancing;

(g) other Liens securing Indebtedness or other obligations of the Borrower or any Subsidiary; provided that the sum, without duplication, at any time of (i) the aggregate outstanding principal amount of Indebtedness and other obligations secured by Liens permitted by this clause (g) plus (ii) the aggregate

63

outstanding principal amount of Indebtedness of Subsidiaries permitted by Section 6.01(g), plus (iii) the outstanding Attributable Debt in respect of Sale and Leaseback Transactions permitted by Section 6.03 shall not exceed at any one time the greater of $700,000,000 and 12.5% of Consolidated Net Tangible Assets as of the most recent fiscal quarter end for which financial statements of the Borrower have been delivered pursuant to Section 5.01(a) or (b); and

(h) Liens in respect of Indebtedness incurred in connection with the extension of maturity of, or refunding or refinancing of, in whole or in part, any secured Indebtedness incurred under Section 6.02(g), provided that (i) such extension of, or refunding or refinancing shall not increase the principal amount of the secured Indebtedness or Attributable Debt being extended, or refunded or refinanced by more than the amount of accrued interest thereon and fees, expenses and premiums paid in connection with such extension, refunding or refinancing and (ii) any such secured Indebtedness will be deemed to utilize the basket referred to in Section 6.02(g), but such secured Indebtedness (and the Liens in respect thereof) shall be permitted even if the such secured Indebtedness is incurred at a time when such secured Indebtedness would not otherwise be permitted to be incurred under such clause.

SECTION 6.03. Sale and Leaseback Transactions. The Borrower will not, and will not permit any Subsidiary to, enter into any Sale and Leaseback Transaction; provided that the Borrower may, and may permit any Subsidiary to, enter into Sale and Leaseback Transactions provided the sum, without duplication, of (i) the aggregate outstanding Attributable Debt in respect of Sale and Leaseback Transactions permitted by this Section plus (ii) the aggregate outstanding principal amount of Indebtedness of Subsidiaries permitted by Section 6.01(g), plus (ii) the aggregate outstanding principal amount of Indebtedness or other obligations secured by Liens permitted by Section 6.02(g) shall not exceed at any one time the greater of $700,000,000 and 12.5% of Consolidated Net Tangible Assets as of the most recent fiscal quarter end for which financial statements of the Borrower have been delivered pursuant to Section 5.01(a) or (b).

SECTION 6.04. Fundamental Changes. The Borrower will not, and will not permit any Significant Subsidiary to, merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or sell, transfer, lease or otherwise dispose of (in one transaction or in a series of transactions) all or substantially all of the assets of the Borrower and its Subsidiaries taken as a whole (in each case, whether now owned or hereafter acquired), or liquidate or dissolve, except that, if at the time thereof and immediately after giving effect thereto no Default shall have occurred and be continuing, (i) any Subsidiary or other Person may merge into or consolidate with the Borrower in a transaction in which the Borrower is the surviving corporation, (ii) any Subsidiary may merge into or consolidate with any Subsidiary in a transaction in which the surviving entity is a Wholly Owned Subsidiary, (iii) any Subsidiary may sell, transfer, lease or otherwise dispose of its assets to the Borrower or to a Wholly Owned Subsidiary, (iv) any Subsidiary may liquidate or dissolve if the Borrower determines in good faith that such liquidation or dissolution is in the best interests of the Borrower and is not

64

materially disadvantageous to the Lenders, (v) any Subsidiary may merge into or consolidate with any other Person if the surviving Person is or becomes by virtue of such transaction a Wholly Owned Subsidiary, and the Borrower determines in good faith that such merger or consolidation is in the best interests of the Borrower and would not materially adversely affect the Lenders, (vi) the Borrower or any Subsidiary may merge into or consolidate with any other Person; provided that the Borrower or such Subsidiary is the surviving corporation, (vii) any Subsidiary may merge with any other Person in a transaction in which the surviving entity is not a Subsidiary; provided that such transaction does not constitute the disposition of all or substantially all assets of the Borrower and its subsidiaries taken as a whole, and (viii) the Borrower may consummate the Separation Transactions.

SECTION 6.05. Financial Covenants. (a) The Borrower will not permit the Total Leverage Ratio on the last day of any fiscal quarter ending after the Restatement Effective Date to exceed 4.0 to 1.0

(b) The Borrower will not permit the ratio of Consolidated EBITDA to Consolidated Net Interest Expense for any period of four consecutive fiscal quarters ending prior to the Maturity Date (for the avoidance of doubt, including in respect of the period ending October 31, 2015) to be less than 3.0 to 1.0.

ARTICLE VII

Events of Default

If any of the following events (" Events of Default ") shall occur:

(a) the Borrower shall fail to pay any principal of any Loan when and as the same shall become due and payable;

(b) the Borrower shall fail to pay any interest on any Loan or any fee or any other amount (other than an amount referred to in clause (a) of this Article) payable under this Agreement, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of five Business Days;

(c) any representation or warranty made or, pursuant to Section 4.02, deemed made by or on behalf of the Borrower or any Subsidiary in or in connection with this Agreement or any amendment or modification hereof or waiver hereunder, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with this Agreement or any amendment or modification hereof or waiver hereunder, shall prove to have been false or misleading in any material respect when made or deemed made;

65

(d) the Borrower shall fail to observe or perform any covenant, condition or agreement contained in Section 5.02(a), 5.03 (with respect to the Borrower's existence), 5.08(b) or Article VI;

(e) the Borrower shall fail to observe or perform any covenant, condition or agreement contained in this Agreement (other than those specified in clause (a), (b) or (d) of this Article), and such failure shall continue unremedied for a period of 30 days after notice thereof from the Administrative Agent or any Lender to the Borrower (which notice will be given at the request of any Lender);

(f) the Borrower or any Subsidiary shall fail to make any payment (whether of principal or interest and regardless of amount) in respect of any Material Indebtedness when and as the same shall become due and payable and such failure shall continue after the applicable grace period, if any, specified in the agreement or instrument relating to such Material Indebtedness;

(g) any event or condition occurs that results in any Material Indebtedness becoming due prior to its scheduled maturity or that requires the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity; provided that this clause (g) shall not apply to (i) secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness, (ii) any conversion, repurchase or redemption of any Material Indebtedness scheduled by the terms thereof to occur on a particular date and not subject to any contingent event or condition related to the creditworthiness, financial performance or financial condition of the Borrower or the applicable Subsidiaries, or (iii) any repurchase or redemption of any Material Indebtedness pursuant to any put option exercised by the holder of such Material Indebtedness; provided that such put option is exercisable at times specified in the terms of the Material Indebtedness and is not subject to any contingent event or condition related to the creditworthiness, financial performance or financial condition of the Borrower or the applicable Subsidiaries;

(h) an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of the Borrower or any Material Subsidiary or its debts, or of a substantial part of its assets, under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Borrower or any Material Subsidiary or for a substantial part of its assets, and, in any such case referred to in (i) or (ii) above, such proceeding or petition shall continue undismissed for 60 days or an order or decree approving or ordering any of the foregoing shall be entered;

(i) the Borrower or any Material Subsidiary shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (ii) consent to the institution

66

of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in clause (h) of this Article, (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Borrower or any Material Subsidiary or for a substantial part of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, or (v) make a general assignment for the benefit of creditors;

(j) the Borrower or any Material Subsidiary shall admit in writing its inability, or fail generally, to pay its debts as they become due;

(k) one or more judgments for the payment of money in an aggregate amount in excess of $250,000,000 shall be rendered by a court of competent jurisdiction against the Borrower, any Subsidiary or any combination thereof, and the same shall remain undischarged for a period of 45 consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of the Borrower or any Subsidiary to enforce any such judgment;

(l) an ERISA Event shall have occurred that, in the opinion of the Required Lenders, when taken together with all other ERISA Events that have occurred, could reasonably be expected to result in a Material Adverse Effect; or

(m) a Change in Control shall occur;

then, and in every such event (other than an event with respect to the Borrower described in clause (h) or (i) of this Article), and at any time thereafter during the continuance of such event, the Administrative Agent may, and at the request of the Required Lenders shall, by notice to the Borrower, take either or both of the following actions, at the same or different times: (i) terminate the Commitments, and thereupon the Commitments shall terminate immediately, and (ii) declare the Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable so long as, at the time of such later declaration, an Event of Default is continuing), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of the Borrower accrued hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower; and in case of any event with respect to the Borrower described in clause (h) or (i) of this Article, the Commitments shall automatically terminate and the principal of the Loans then outstanding, together with accrued interest thereon and all fees and other obligations of the Borrower accrued hereunder, shall automatically become due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower.

67

ARTICLE VIII

The Administrative Agent

Each of the Lenders hereby irrevocably appoints the Administrative Agent as its agent, and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof, together with such actions and powers as are reasonably incidental thereto.

The bank serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent, and such bank and its Affiliates may accept deposits from, lend money to, and generally engage in any kind of business with the Borrower or any Subsidiary or other Affiliate thereof as if it were not the Administrative Agent hereunder.

The Administrative Agent shall not have any duties or obligations except those expressly set forth herein. Without limiting the generality of the foregoing, (a) the Administrative Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing, (b) the Administrative Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby that the Administrative Agent is required to exercise in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 9.02); provided that the Administrative Agent shall not be required to take any action that, in its opinion, could expose the Administrative Agent to liability or be contrary to applicable law, and (c) except as expressly set forth herein, the Administrative Agent shall not have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of the Subsidiaries that is communicated to or obtained by the bank serving as Administrative Agent or any of its Affiliates in any capacity. The Administrative Agent shall not be liable for any action taken or not taken by it with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 9.02) or in the absence of its own gross negligence or willful misconduct. The Administrative Agent shall be deemed not to have knowledge of any Default unless and until written notice thereof is given to the Administrative Agent by the Borrower or a Lender, and the Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement, (ii) the contents of any certificate, report or other document delivered hereunder or in connection herewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent. In addition, for the avoidance of doubt, the Lenders hereby acknowledge that none of the Joint Lead Arrangers, Joint Bookrunners, or Co-Syndication Agents, set forth

68

on the cover page of this Agreement shall have any powers, duties or responsibilities under this Agreement, except in its capacity, as applicable, as the Administrative Agent, Swingline Lender or a Lender hereunder.

The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed or sent by the proper Person (whether or not such Person in fact meets the requirements set forth herein for being the signatory, sender or authenticator thereof). The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to be made by the proper Person (whether or not such Person in fact meets the requirements set forth herein for being the signatory, sender or authenticator thereof), and shall not incur any liability for relying thereon. The Administrative Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

The Administrative Agent may perform any and all its duties and exercise its rights and powers by or through any one or more sub-agents appointed by the Administrative Agent. The Administrative Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers through their respective Related Parties. The exculpatory provisions of the preceding paragraphs shall apply to any such sub-agent selected by the Administrative Agent with reasonable care and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.

Subject to the appointment and acceptance of a successor Administrative Agent as provided in this paragraph, the Administrative Agent may resign at any time by notifying the Lenders and the Borrower. Upon any such resignation, the Required Lenders shall have the right, in consultation with the Borrower, to appoint a successor. If no successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its resignation, then the retiring Administrative Agent may, on behalf of the Lenders, appoint a successor Administrative Agent which shall be a bank with an office in New York, New York, or an Affiliate of any such bank. If the Person serving as the Administrative Agent becomes a Defaulting Lender under clause (d) of the definition of such term, the Required Lenders may, to the extent permitted by applicable law, by notice in writing to the Borrower and such Person, remove such Person as Administrative Agent and, in consultation with the Borrower, appoint a successor. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment by the 30th day following the date of such notice (or such earlier day as shall be agreed by the Required Lenders), then such removal shall nonetheless become effective in accordance with such notice on such 30th day (or agreed earlier date). Upon the acceptance of its appointment as Administrative Agent hereunder by a successor,

69

such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent, and the retiring Administrative Agent shall be discharged from its duties and obligations hereunder. The fees payable by the Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After the Administrative Agent's resignation hereunder, the provisions of this Article and Section 9.03 shall continue in effect for the benefit of such retiring Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while it was acting as Administrative Agent.

Each Lender represents that it is engaged in making, acquiring and holding commercial loans in the ordinary course of its business and that it has, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement as a Lender and to make, acquire and hold Loans hereunder. Each Lender shall, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any related agreement or any document furnished hereunder or thereunder and in deciding whether or to the extent to which it will continue as a Lender or assign or otherwise transfer its rights, interests and obligations hereunder.

Each Lender, by delivering its signature page to this Agreement, or delivering its signature page to an Assignment and Assumption pursuant to which it shall become a Lender hereunder, shall be deemed to have acknowledged receipt of, and consented to and approved, each document required to be delivered to, or be approved by or satisfactory to, the Administrative Agent or the Lenders on the Original Effective Date.

ARTICLE IX

Miscellaneous

SECTION 9.01. Notices. (a) Except in the case of notices and other communications expressly permitted to be given by telephone and as otherwise set forth in subsection (b), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed, e-mail, by certified or registered mail or sent by telecopy, as follows:

(i) if to the Borrower, to it at Hewlett-Packard Company, 3000 Hanover Street, Palo Alto, CA 94304, Attention of Treasurer (Fax No. (650) 857-2652), with a copy to the General Counsel at the same address and to Fax No. (650) 857-4837;

70

(ii) if to the Administrative Agent, Citibank, N.A., 1615 Brett Road, New Castle, Delaware 19720, Attention: Bank Loan Syndications, Telecopy Number: (646) 274-5080, Email: GLAgentOfficeOps@citi.com, with a copy to Citibank, N.A., One Sansome Street, San Francisco, California 94104, Email: sean.klimchalk@citi.com; provided that if any notice or other communication relates to Multicurrency Swingline Loans, then an additional copy shall be delivered, mailed or sent by telecopy to Citigroup Centre, 25 Canada Square, 5th Floor, Canary Wharf, London E14 5LB, Attention: EMEA Loans Agency, Fax No. +44 (0) 20 7492 3980; and

(iii) if to any other Lender, to it at its address (or e-mail or fax number) set forth on Schedule 2.01 or in its Administrative Questionnaire.

(b) Communications to the Lenders may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites, including the Platform) pursuant to procedures approved by the Administrative Agent; provided that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication. The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other Communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or Communications.

(c) The Administrative Agent agrees that the receipt of the Communications by the Administrative Agent at its e-mail address set forth above shall constitute effective delivery of the Communications to the Administrative Agent for purposes of this Agreement. Each Lender agrees that notice to it (as provided in the next sentence) specifying that the Communications have been posted to the Platform shall constitute effective delivery of the Communications to such Lender for purposes of this Agreement. Each Lender agrees (A) to notify the Administrative Agent in writing (including by electronic communication) from time to time of such Lender's e-mail address to which the foregoing notice may be sent by electronic transmission and (B) that the foregoing notice may be sent to such e-mail address.

(d) The Platform is provided "as is" and "as available". The Agent Parties (as defined below) do not warrant the accuracy or completeness of the Communications or the adequacy of the Platform and expressly disclaim liability for errors or omissions in the Communications. No warranty of any kind, express, implied or statutory, including any warranty of merchantability, fitness for a particular purpose, non-infringement of third-party rights or freedom from viruses or other code defects, is made by the Agent Parties in connection with the Communications or the Platform. In no event shall the Administrative Agent or any of its Affiliates or any of their respective officers, directors, employees, agents, advisors or representatives (collectively, " Agent Parties ") have any liability to the Borrower, any Lender or any other Person or entity for damages of any kind,

71

including direct or indirect, special, incidental or consequential damages, losses or expenses (whether in tort, contract or otherwise) arising out of the Borrower's or the Administrative Agent's transmission of Communications through the Internet, except to the extent the liability of any Agent Party is found in a final, nonappealable judgment by a court of competent jurisdiction to have resulted primarily from the gross negligence or wilful misconduct of, or breach of this Agreement by, such Agent Party.

Any party hereto may change its address, telecopy number or e-mail address for notices and other communications hereunder by notice to the other parties hereto. All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt.

SECTION 9.02. <u>Waivers; Amendments.</u> (a) No failure or delay by the Borrower, the Administrative Agent or any Lender in exercising any right or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Borrower, the Administrative Agent and the Lenders hereunder are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of this Agreement or consent to any departure by the Borrower therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default, regardless of whether the Administrative Agent or any Lender may have had notice or knowledge of such Default at the time.

(b) Neither this Agreement nor any provision hereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Borrower and the Required Lenders or by the Borrower and the Administrative Agent with the consent of the Required Lenders; <u>provided</u> that no such agreement shall (i) increase or extend the Commitment of any Lender without the written consent of such Lender, (ii) decrease the principal amount of any Loan or decrease the rate of interest thereon, or decrease any fees payable hereunder, without the written consent of each Lender affected thereby, (iii) postpone the scheduled date of payment of the principal amount of any Loan, or any interest thereon, or any fees payable hereunder, or decrease the amount of, waive or excuse any such payment, or postpone the scheduled date of expiration of any Commitment, without the written consent of each Lender affected thereby, (iv) change Section 2.16(b) or (c) in a manner that would alter the pro rata sharing of payments required thereby, without the written consent of each Lender, (v) change any of the provisions of this Section or the definition of "Required Lenders" or any other provision hereof specifying the number or percentage of Lenders required to waive, amend or modify any rights hereunder or make any determination or grant any consent hereunder, without the written consent of each Lender, or (vi) change any provisions of this Agreement in a

72

manner that by its terms adversely affects the rights in respect of payments due to Lenders holding Loans of any Class differently than those holding Loans of any other Class, without the written consent of Lenders holding a majority in interest of the outstanding Loans and unused Commitments of each affected Class; and provided further that (A) no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent or the Swingline Lenders hereunder without the prior written consent of the Administrative Agent or the Swingline Lenders, as the case may be and (B) any waiver, amendment or modification of this Agreement that by its terms affects the rights or duties under this Agreement of the Revolving Lenders (but not the Swingline Lender) or the Swingline Lender (but not the Revolving Lenders) may be effected by an agreement or agreements in writing entered into by the Borrower and the requisite percentage in interest of the affected Class of Lenders that would be required to consent thereto under this Section if such Class of Lenders were the only Class of Lenders hereunder at the time. Notwithstanding the foregoing, any provision of this Agreement may be amended by an agreement in writing entered into by the Borrower, the Required Lenders and the Administrative Agent (and, if their rights or obligations are affected thereby, the Swingline Lenders) if (i) by the terms of such agreement the Commitment of each Lender not consenting to the amendment provided for therein shall terminate upon the effectiveness of such amendment and (ii) at the time such amendment becomes effective, each Lender not consenting thereto receives payment in full of the principal of and interest accrued on each Loan made by it and all other amounts owing to it or accrued for its account under this Agreement. Notwithstanding the foregoing, (1) any provision of this Agreement may be amended by an agreement in writing entered into by the Borrower and the Administrative Agent to cure any ambiguity, omission, mistake, defect or inconsistency so long as, in each case, the Lenders shall have received at least five Business Days prior written notice thereof and the Administrative Agent shall not have received, within five Business Days of the date of such notice to the Lenders, a written notice from (x) the Required Lenders stating that the Required Lenders object to such amendment or (y) if affected by such amendment, any Swingline Lender stating that it objects to such amendment, and (2) the Commitments and Revolving Exposure of any Lender that is at the time a Defaulting Lender shall not be included in determining whether all Lenders or the Required Lenders have taken or may take any action hereunder (including any consent to any amendment or waiver pursuant to this Section 9.02); provided that any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender which affects such Defaulting Lender differently than other affected Lenders shall require the consent of such Defaulting Lender.

SECTION 9.03. Expenses; Indemnity; Damage Waiver. (a) The Borrower shall pay (i) all reasonable out-of-pocket expenses incurred by the Administrative Agent and its Affiliates, including the reasonable fees, charges and disbursements of counsel for the Administrative Agent, in connection with the due diligence investigation of the Borrower, the syndication of the credit facilities provided for herein, the preparation and administration of this Agreement or any amendments, modifications or waivers of the provisions hereof (whether or not the transactions contemplated hereby or thereby shall be consummated); provided , however , that only one

73

outside counsel may act on behalf of the Administrative Agent and the Lenders in connection with the preparation and negotiation of this Agreement, and (ii) all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent or any Lender, including the reasonable and documented fees, charges and disbursements of any counsel for the Administrative Agent or any Lender (such fees, charges and disbursements not to include allocated costs of internal counsel), in connection with the enforcement or protection of its rights in connection with this Agreement, including its rights under this Section, or in connection with the Loans made hereunder, including all such reasonable and documented out-of pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans.

(b) The Borrower shall indemnify the Administrative Agent and each Lender, and each Related Party of any of the foregoing Persons (each such Person being called an " Indemnitee ") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses, including the reasonable and documented fees, charges and disbursements of any counsel for any Indemnitee (not to include allocated costs of internal counsel), incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement or any agreement or instrument contemplated hereby, the performance by the parties hereto of their respective obligations hereunder or the consummation of the Transactions or any other transactions contemplated hereby, (ii) any Loan or the use of the proceeds therefrom, (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by the Borrower or any of the Subsidiaries, or any Environmental Liability related in any way to the Borrower or any of the Subsidiaries; provided that any such losses, claims, damages, liabilities and expenses arise out of or in connection with such Indemnitee's acting as Administrative Agent, Co-Administrative Agent or a Lender under this Agreement, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Borrower or any Subsidiary and regardless of whether any Indemnitee is a party thereto; provided that such indemnity set forth in the foregoing clauses (i), (ii), (iii) and (iv) shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or wilful misconduct of, or violation of law by, such Indemnitee. The Borrower will not be liable under this Agreement for any amount paid by an Indemnitee to settle any claims or actions if the settlement is entered into without the Borrower's consent, which consent may not be withheld unless such settlement is unreasonable in light of such claims or actions against, and defenses available to, such Indemnitee. Anything in this Section 9.03(b) to the contrary notwithstanding, the Borrower shall not be liable for the fees and expenses of more than one primary outside counsel and one local outside counsel per jurisdiction retained by each Indemnitee in connection with the defense of any action for which indemnification is sought hereunder. The Borrower shall have no obligation to any Indemnitee under this Section 9.03(b) for matters for which such Indemnitee has been fully compensated pursuant to any other provision of this Agreement. This Section 9.03(b) shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

74

(c) To the extent that the Borrower fails to pay any amount required to be paid by it to the Administrative Agent or any Swingline Lender under paragraph (a) or (b) of this Section, each Lender severally agrees to pay to the Administrative Agent or such Swingline Lender, as the case may be, such Lender's Applicable Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent or such Swingline Lender in its capacity as such. For purposes hereof, a Lender's "pro rata share" shall be determined based upon its share of the sum of the total Loans and unused Revolving Commitments at the time of such determination.

(d) To the extent permitted by applicable law, the Borrower shall not assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, the Transactions or any Loan or the use of the proceeds thereof.

(e) All amounts due under this Section shall be payable promptly after written demand therefor.

(f) The provisions of this Section 9.03 shall remain operative and in full force and effect regardless of the expiration of the term of this Agreement, the consummation of the transactions contemplated hereby, the repayment of any of the Loans, the expiration of the Commitments, the invalidity or unenforceability of any term or provision of this Agreement or any investigation made by or on behalf of the Administrative Agent or any Lender.

SECTION 9.04. Successors and Assigns. (a) The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b) Any Lender may assign to one or more assignees (other than any Defaulting Lender, natural person or investment vehicle or trust for the primary

75

benefit of a natural person or relatives of a natural person), all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it); provided that (i) except in the case of an assignment to a Lender or an Affiliate of a Lender, each of the Borrower and the Administrative Agent (and, in the case of an assignment, other than to an existing Lender or an Affiliate of a Lender, of all or a portion of a Commitment or any Lender's obligations in respect of its Swingline Exposure, each of the Swingline Lenders) must give their prior written consent to such assignment (each such consent not to be unreasonably withheld or delayed), (ii) except in the case of an assignment to a Lender or an Affiliate of a Lender or an assignment of the entire remaining amount of the assigning Lender's Commitment, the amount of the Commitment of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $5,000,000 and shall be an integral multiple of $5,000,000 unless each of the Borrower and the Administrative Agent otherwise consents, (iii) each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement, except that this clause (iii) shall not be construed to prohibit the assignment of a proportionate part of all the assigning Lender's rights and obligations in respect of one Class of Loans, (iv) the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500 (payable by the assignor or assignee), (v) the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire, and (vi) except in the case of an assignment to a Swingline Lender, no assignment of all or any portion of a Swingline Commitment shall become effective until after the Multicurrency Swingline Agent has received all information that it has reasonably requested pursuant to "know your customer" or similar laws or regulations; and provided further that any consent of the Borrower otherwise required under this paragraph shall not be required if an Event of Default under clause (h) or (i) of Article VII has occurred and is continuing. Subject to acceptance and recording thereof pursuant to paragraph (d) of this Section, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, shall have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be (i) entitled to the benefits of Sections 2.13, 2.14, 2.15 and 9.03 with respect to facts and circumstances occurring prior to the effective date of such assignment, and (ii) subject to the confidentiality provisions hereof). Any purported sale, assignment, delegation or transfer by a Lender of rights or obligations under this Agreement that does not comply with this paragraph shall be null and void and instead be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (e) of this Section.

(c) The Administrative Agent, acting for this purpose as an agent of the Borrower, shall maintain at one of its offices in The City of New York a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitment of, and principal amount (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the " Register "). The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Administrative Agent and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(d) Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in paragraph (b) of this Section and any written consent to such assignment required by paragraph (b) of this Section, the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register; provided that if either the assigning Lender or the assignee shall have failed to make any payment required to be made by it pursuant to Sections 2.04(b) or (c), 2.05(b), 2.16(d) or 9.03(c), the Administrative Agent shall have no obligation to accept such Assignment and Assumption and record the information therein in the Register unless and until such payment shall have been made in full, together with accrued interest thereon. No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(e) Any Lender may, without the consent of the Borrower, the Administrative Agent or the Swingline Lenders, sell participations to one or more banks or other entities (each, a " Participant ") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, and (iii) the Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the first proviso to Section 9.02(b) that affects such Participant. Subject to paragraph (f)

77

of this Section, the Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.13, 2.14 and 2.15 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section; provided that such Participant agrees to be subject to the provisions of Section 2.17 as if it were an assignee under paragraph (b) of this Section. To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 9.08 as though it were a Lender; provided such Participant agrees to be subject to Section 2.16(c) as though it were a Lender. Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under this Agreement (the " Participant Register "); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register to any Person (including the identity of any Participant or any information relating to a Participant's interest in any Commitments, Loans or its other obligations under this Agreement) except to the extent that such disclosure is necessary to establish that such Commitment, Loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

(f) A Participant shall not be entitled to receive any greater payment under Sections 2.13 or 2.15 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation. A Participant that would be a Foreign Lender if it were a Lender shall not be entitled to the benefits of Section 2.15 unless the Borrower is notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Borrower, to comply with Section 2.15(g) as though it were a Lender.

(g) Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or central bank, and this Section shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

SECTION 9.05. Survival. All covenants, agreements, representations and warranties made by the Borrower herein and in the certificates or other instruments delivered in connection with or pursuant to this Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement ( provided , however , that such representations and warranties shall be made or deemed made only as of the Original Effective Date, the Restatement Effective

78

Date, the times of any Borrowings hereunder, or such other dates on or as of which such representations and warranties are specifically required to be made pursuant to the provisions hereof, including, as applicable, in connection with any Incremental Facility under Section 2.19 or any extension of the Maturity Date pursuant to Section 2.20) and the making of any Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid and so long as the Commitments have not expired or terminated. The provisions of Sections 2.13, 2.14, 2.15 and 9.03 and Article VIII shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans, the expiration or termination of the Commitments or the termination of this Agreement or any provision hereof.

SECTION 9.06. <u>Counterparts; Integration; Effectiveness.</u> This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which, when taken together, shall constitute a single contract. This Agreement and any separate letter agreements with respect to fees payable to the Administrative Agent and certain Lenders constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. The amendment and restatement of the Original Credit Agreement effected hereby will not constitute a novation of the obligations of the Borrower under the Original Credit Agreement, which shall (except as paid or discharged in connection with the effectiveness hereof) continue as obligations of the Borrower hereunder. Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or other electronic imaging shall be effective as delivery of a manually executed counterpart of this Agreement. The words "execution," "signed," "signature," "delivery" and words of like import in or relating to any document to be signed in connection with this Agreement and the transactions contemplated hereby shall be deemed to include Electronic Signatures, deliveries or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

SECTION 9.07. <u>Severability.</u> Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be

79

ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

SECTION 9.08. Right of Setoff. If an Event of Default shall have occurred and be continuing, each Lender and each of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations at any time owing by such Lender or Affiliate to or for the credit or the account of the Borrower against any and all of the obligations of the Borrower now or hereafter existing under this Agreement held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement and although such obligations may be unmatured. Each Lender shall promptly notify the Borrower and the Administrative Agent after any such setoff and application made by such Lender. The rights of each Lender under this Section are in addition to other rights and remedies (including other rights of setoff) which such Lender may have.

SECTION 9.09. Governing Law; Jurisdiction; Consent to Service of Process. (a) This Agreement shall be construed in accordance with and governed by the law of the State of New York.

(b) Each of the parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(c) Each of the parties hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement in any court referred to in paragraph (b) of this Section. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d) Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 9.01. Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

80

SECTION 9.10. <u>WAIVER OF JURY TRIAL.</u> EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL SUIT, ACTION OR PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

SECTION 9.11. <u>Headings.</u> Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

SECTION 9.12. <u>Confidentiality.</u> Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' directors, officers, employees and agents, including accountants, legal counsel and other advisors on a need-to-know basis (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority, (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) to any other party to this Agreement, (e) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Agreement or the enforcement of rights hereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its advisors) to any securitization, swap or derivative transaction relating to the Borrower, any Subsidiary, and the obligations hereunder, (g) on a confidential basis to any rating agency in connection with rating the Borrower or the credit facilities provided for herein, (h) with the consent of the Borrower, or (i) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section or (ii) becomes available to the Administrative Agent or any Lender on a nonconfidential basis from a source other than the Borrower. If any Lender or the Administrative Agent is required by any Governmental Authority or any other Person to disclose Information or otherwise intends to disclose any Information pursuant to clause (c) of this Section, unless prohibited by law such Lender or the Administrative Agent, as the case may be, shall promptly notify the Borrower in writing so as to provide the Borrower with the opportunity to seek a

81

protective order or take such other actions that are deemed appropriate by the Borrower to protect the confidentiality of the Information. For the purposes of this Section, " Information " means all information received from the Borrower relating to the Borrower or its business, other than any such information that is available to the Administrative Agent or any Lender on a nonconfidential basis prior to disclosure by the Borrower and other than information pertaining to this Agreement routinely provided by arrangers to data service providers, including league table providers, that serve the lending industry. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information. Each Lender confirms that it maintains internal policies and procedures, including "ethical wall" procedures, intended to protect against the unlawful use of confidential information and such procedures apply to the Information.

SECTION 9.13. Authorization to Distribute Certain Materials to Public-Siders; Material Non-Public Information. (a) EACH LENDER ACKNOWLEDGES THAT INFORMATION FURNISHED TO IT PURSUANT TO THIS AGREEMENT MAY INCLUDE MATERIAL NON-PUBLIC INFORMATION CONCERNING THE BORROWER AND ITS SUBSIDIARIES OR SECURITIES THEREOF AND CONFIRMS THAT IT HAS DEVELOPED COMPLIANCE PROCEDURES REGARDING THE USE OF MATERIAL NON-PUBLIC INFORMATION AND THAT IT WILL HANDLE SUCH MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH THOSE PROCEDURES AND APPLICABLE LAW, INCLUDING FEDERAL AND STATE SECURITIES LAWS.

(b) ALL INFORMATION, INCLUDING REQUESTS FOR WAIVERS AND AMENDMENTS, FURNISHED BY THE BORROWER OR THE ADMINISTRATIVE AGENT PURSUANT TO, OR IN THE COURSE OF ADMINISTERING, THIS AGREEMENT WILL BE SYNDICATE-LEVEL INFORMATION, WHICH MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION ABOUT THE BORROWER AND ITS SUBSIDIARIES OR SECURITIES THEREOF. ACCORDINGLY, EACH LENDER REPRESENTS TO THE BORROWER AND THE ADMINISTRATIVE AGENT THAT IT HAS IDENTIFIED IN ITS ADMINISTRATIVE QUESTIONNAIRE A CREDIT CONTACT WHO MAY RECEIVE INFORMATION THAT MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH ITS COMPLIANCE PROCEDURES AND APPLICABLE LAW.

(c) If the Borrower does not file this Agreement with the SEC, then the Borrower hereby authorizes the Administrative Agent to distribute the execution version of this Agreement and the Loan Documents to all Lenders, including their Public-Siders. The Borrower acknowledges its understanding that Public-Siders and their firms may be trading in any of the Parties' respective securities while in possession of the Loan Documents.

82

(d) The Borrower represents and warrants that none of the information in the Loan Documents constitutes or contains material non-public information within the meaning of the federal and state securities laws. To the extent that any of the executed Loan Documents constitutes at any time a material non-public information within the meaning of the federal and state securities laws after the date hereof, the Company agrees that it will promptly make such information publicly available by press release or public filing with the SEC

SECTION 9.14. Patriot Act. Each Lender hereby notifies the Borrower that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the " Patriot Act "), it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Lender to identify the Borrower in accordance with the Patriot Act.

SECTION 9.15. Conversion of Currencies. (a) If, for the purpose of obtaining judgment in any court, it is necessary to convert a sum owing hereunder in one currency into another currency, each party hereto agrees, to the fullest extent that it may effectively do so, that the rate of exchange used shall be that at which in accordance with normal banking procedures in the relevant jurisdiction the first currency could be purchased with such other currency on the Business Day immediately preceding the day on which final judgment is given.

(b) The obligations of the Borrower in respect of any sum due to any party hereto or any holder of the obligations owing hereunder (the " Applicable Creditor ") shall, notwithstanding any judgment in a currency (the " Judgment Currency ") other than the currency in which such sum is stated to be due hereunder (the " Agreement Currency "), be discharged only to the extent that, on the Business Day following receipt by the Applicable Creditor of any sum adjudged to be so due in the Judgment Currency, the Applicable Creditor may in accordance with normal banking procedures in the relevant jurisdiction purchase the Agreement Currency with the Judgment Currency; if the amount of the Agreement Currency so purchased is less than the sum originally due to the Applicable Creditor in the Agreement Currency, the Borrower agrees, as a separate obligation and notwithstanding any such judgment, to indemnify the Applicable Creditor against such loss. The obligations of the Borrower contained in this Section 9.15 shall survive the termination of this Agreement and the payment of all other amounts owing hereunder.

SECTION 9.16. No Fiduciary Duty. The Borrower acknowledges that the Administrative Agent, the Co-Administrative Agent, each Lender and the Affiliates of each of the foregoing may have economic interests that conflict with those of the Borrower, the Subsidiaries and their Affiliates. The Borrower, on behalf of itself and the Subsidiaries, agrees that in connection with all aspects of the Transactions and any communications in connection therewith, the Borrower, the Subsidiaries and their Affiliates, on the one hand, and the Administrative Agent, the Co-Administrative Agent, each Lender and the Affiliates of each of them, on the other hand, will have a business

83

relationship that does not create, by implication or otherwise, any fiduciary duty on the part of the Administrative Agent, the Co-Administrative Agent, the Lenders or any Affiliate of any of them, and no such duty will be deemed to have arisen in connection with any such transactions or communications.

84

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

HP INC.,

by    /s/ Catherine Lesjak

Name:  Catherine Lesjak

Title:   EVP/CFO

CITIBANK, N.A., individually and as Administrative Processing Agent and Co-Administrative Agent,

by    /s/ Susan Olsen

Name:  Susan Olsen

Title:   Vice President

CITIBANK INTERNATIONAL LIMITED, as Multicurrency Swingline Agent,

by    /s/ Steve Wright

Name:  Steve Wright

Title:

JPMORGAN CHASE BANK, N.A., individually and as Co-Administrative Agent,

by    /s/ Donatus O. Anusionwu

Name:  Donatus O. Anusionwu

Title:   Vice President

SIGNATURE PAGE TO THE HEWLETT-PACKARD FIVE-YEAR CREDIT AGREEMENT

BNP PARIBAS,

by   /s/ Nicolas Rabier

Name:  Nicolas Rabier
Title:  Managing Director

[1] by   /s/ Karim Remtoula

Name:  Karim Remtoula
Title:  Vice President

---

[1] For any institution that requires an additional signature line.

SIGNATURE PAGE TO THE HEWLETT-PACKARD FIVE-YEAR CREDIT AGREEMENT

HSBC Bank USA,

by    /s/ David Wagstaff
Name:  David Wagstaff
Title:  Managing Director

[1] by
Name:
Title:

---

[1]    For any institution that requires an additional signature line.

SIGNATURE PAGE TO THE HEWLETT-PACKARD FIVE-YEAR CREDIT AGREEMENT

MIZUHO BANK, LTD.,

by    /s/ Bertram H. Tang
            —————————————————
Name:  Bertram H. Tang
Title:    Authorized Signatory

[1] by   —————————————————
Name:
Title:

---

[1]    For any institution that requires an additional signature line.

SIGNATURE PAGE TO THE HEWLETT-PACKARD FIVE-YEAR CREDIT AGREEMENT

DEUTSCHE BANK AG NEW YORK BRANCH,

by      /s/ Virginia Cosenza
Name:   Virginia Cosenza
Title:  Vice President

[1] by   /s/ Ming K. Chu
Name:   Ming K. Chu
Title:  Vice President

---

[1]   For any institution that requires an additional signature line.

SIGNATURE PAGE TO THE HEWLETT-PACKARD FIVE-YEAR CREDIT AGREEMENT

Wells Fargo Bank, National Association,

by      /s/ Lacy Houstoun
Name:   Lacy Houstoun
Title:   Director

[1] by
Name:
Title:

---

[1]   For any institution that requires an additional signature line.

SIGNATURE PAGE TO THE HEWLETT-PACKARD FIVE-YEAR CREDIT AGREEMENT

Bank of America, N.A.,

by      /s/ Jeannette Lu
Name:   Jeannette Lu
Title:  Vice President

[1] by
Name:
Title:

---

[1]     For any institution that requires an additional signature line.

SIGNATURE PAGE TO THE HEWLETT-PACKARD FIVE-YEAR CREDIT AGREEMENT

Barclays Bank PLC,

by    /s/ Ronnie Glenn
_____

Name:  Ronnie Glenn
Title:  Vice President

[1] by    _____
Name:
Title:

---

[1]    For any institution that requires an additional signature line.

SIGNATURE PAGE TO THE HEWLETT-PACKARD FIVE-YEAR CREDIT AGREEMENT

SANTANDER BANK, N.A.,

by    /s/ William Maag
Name:  William Maag
Title:  Managing Director

[1] by
Name:
Title:

---

[1]    For any institution that requires an additional signature line.

SIGNATURE PAGE TO THE HEWLETT-PACKARD FIVE-YEAR CREDIT AGREEMENT

SOCIETE GENERALE,

by     /s/ Kimberly Metzger
Name:   Kimberly Metzger
Title:   Director

[1] by
Name:
Title:

---

[1]    For any institution that requires an additional signature line.

SIGNATURE PAGE TO THE HEWLETT-PACKARD FIVE-YEAR CREDIT AGREEMENT

The Bank of Tokyo-Mitsubishi UFJ, Ltd.,

by      /s/ Lillian Kim
Name:   Lillian Kim
Title:   Director

[1] by
Name:
Title:

---

[1]   For any institution that requires an additional signature line.

SIGNATURE PAGE TO THE HEWLETT-PACKARD FIVE-YEAR CREDIT AGREEMENT

Morgan Stanley Bank, N.A.,

by   /s/ Roberto Ellinghaus

Name:  Roberto Ellinghaus

Title:   Authorized Signatory

[1] by

Name:

Title:

---

[1]    For any institution that requires an additional signature line.

SIGNATURE PAGE TO THE HEWLETT-PACKARD FIVE-YEAR CREDIT AGREEMENT

Australia and New Zealand Banking Group Limited,

by  /s/ Robert Grillo

Name:  Robert Grillo
Title:  Director

[1] by

Name:
Title:

---

[1]   For any institution that requires an additional signature line.

SIGNATURE PAGE TO THE HEWLETT-PACKARD FIVE-YEAR CREDIT AGREEMENT

Bank of China Los Angeles Branch,

by       /s/ Lixin Guo
Name:   Lixin Guo
Title:    SVP and Branch Manager

[1] by
Name:
Title:

---

[1]   For any institution that requires an additional signature line.

SIGNATURE PAGE TO THE HEWLETT-PACKARD FIVE-YEAR CREDIT AGREEMENT

The Bank of New York Mellon,

by     /s/ David B. Wirl                   

Name:  David B. Wirl
Title:    Managing Director

[1] by                        

Name:
Title:

---

[1]    For any institution that requires an additional signature line.

SIGNATURE PAGE TO THE HEWLETT-PACKARD FIVE-YEAR CREDIT AGREEMENT

Crédit Agricole Corporate & Investment Bank,

| by | /s/ Mike McIntyre |
|---|---|
| Name: | Mike McIntyre |
| Title: | Director |

| [1] by | /s/ Aaron Sansone |
|---|---|
| Name: | Aaron Sansone |
| Title: | Vice President |

---

[1]   For any institution that requires an additional signature line.

SIGNATURE PAGE TO THE HEWLETT-PACKARD FIVE-YEAR CREDIT AGREEMENT

Credit Suisse AG, Cayman Island Branch,

    by       /s/ Christopher Day
    Name:  Christopher Day
    Title:    Authorized Signatory

[1] by    /s/ Franziska Schoch
    Name:  Franziska Schoch
    Title:    Authorized Signatory

---

[1]    For any institution that requires an additional signature line.

SIGNATURE PAGE TO THE HEWLETT-PACKARD FIVE-YEAR CREDIT AGREEMENT

Goldman Sachs Bank USA,

by      /s/ Michelle Latzoni
Name:   Michelle Latzoni
Title:   Authorized Signatory

[1] by
Name:
Title:

---

[1]   For any institution that requires an additional signature line.

SIGNATURE PAGE TO THE HEWLETT-PACKARD FIVE-YEAR CREDIT AGREEMENT

ING Bank N.V., Dublin Branch,

by    /s/ Sean Hassett
Name:  Sean Hassett
Title:   Director

[1] by   /s/ Maurice Kenny
Name:  Maurice Kenny
Title:   Director

---

1    For any institution that requires an additional signature line.

SIGNATURE PAGE TO THE HEWLETT-PACKARD FIVE-YEAR CREDIT AGREEMENT

ROYAL BANK OF CANADA,

by     /s/ Mark Gronich
_____
Name:   Mark Gronich
Title:    Authorized Signatory

[1] by    
_____
Name:
Title:

---

[1]    For any institution that requires an additional signature line.

SIGNATURE PAGE TO THE HEWLETT-PACKARD FIVE-YEAR CREDIT AGREEMENT

Standard Chartered Bank,

by     /s/ Felipe Macia A2789

Name:   Felipe Macia A2789

Title:    Managing Director Syndications, Americas

[1] by

Name:

Title:

---

[1]    For any institution that requires an additional signature line.

SIGNATURE PAGE TO THE HEWLETT-PACKARD FIVE-YEAR CREDIT AGREEMENT

Lender: U.S. Bank,

by        /s/ Lukas Coleman
Name:   Lukas Coleman
Title:    Vice President

[1] by
Name:
Title:

---

[1]    For any institution that requires an additional signature line.

Schedule 2.01

REVOLVING COMMITMENTS

| Lender | Revolving Commitment |
|---|---|
| Citibank, N.A. | $ 332,444,444.45 |
| JPMorgan Chase Bank, N.A. | $ 332,444,444.44 |
| BNP Paribas | $ 332,444,444.44 |
| HSBC Bank USA, National Association | $ 332,444,444.44 |
| Mizuho Bank, Ltd. | $ 332,444,444.44 |
| Deutsche Bank AG New York Branch | $ 257,777,777.78 |
| Wells Fargo Bank, National Association | $ 257,777,777.78 |
| Bank of America, N.A. | $ 257,777,777.78 |
| Barclays Bank PLC | $ 168,888,888.89 |
| Santander Bank, N.A. | $ 168,888,888.89 |
| Société Générale | $ 168,888,888.89 |
| The Bank of Tokyo-Mitsubishi UFJ, Ltd. | $ 140,000,000.00 |
| Morgan Stanley Bank, N.A. | $ 117,777,777.78 |
| Australia and New Zealand Banking Group Limited | $ 80,000,000.00 |
| Bank of China, Los Angeles Branch | $ 80,000,000.00 |
| The Bank of New York Mellon | $ 80,000,000.00 |
| Credit Agricole Corporate & Investment Bank | $ 80,000,000.00 |
| Credit Suisse AG, Cayman Islands Branch | $ 80,000,000.00 |
| Goldman Sachs Bank USA | $ 80,000,000.00 |
| ING Bank N.V., Dublin Branch | $ 80,000,000.00 |
| Royal Bank of Canada | $ 80,000,000.00 |
| Standard Chartered Bank | $ 80,000,000.00 |
| U.S. Bank National Association | $ 80,000,000.00 |
| **Total** | $4,000,000,000.00 |

SWINGLINE COMMITMENTS

| Swingline Lender | Swingline Commitment |
|---|---|
| Citibank, N.A. | $ 250,000,000 |
| JPMorgan Chase Bank, N.A. | $ 250,000,000 |
| BNP Paribas | $ 250,000,000 |
| HSBC Bank USA, National Association | $ 250,000,000 |
| Bank of America, N.A. | $ 250,000,000 |
| Mizuho Bank, Ltd. | $ 250,000,000 |
| **Total** | **$1,500,000,000** |

Schedule 3.05

LITIGATION AND ENVIRONMENTAL MATTERS

*Litigation, Proceedings and Investigations*

<u>Copyright Levies</u> . As described below, proceedings are ongoing or have been concluded involving HP Inc. in certain European Union (" <u>EU</u> ") member countries, including litigation in Germany, Belgium and Austria, seeking to impose or modify levies upon equipment (such as multi-function devices (" <u>MFDs</u> "), personal computers (" <u>PCs</u> ") and printers) and alleging that these devices enable producing private copies of copyrighted materials. Descriptions of some of the ongoing proceedings are included below. The levies are generally based upon the number of products sold and the per-product amounts of the levies, which vary. Some EU member countries that do not yet have levies on digital devices are expected to implement similar legislation to enable them to extend existing levy schemes, while some other EU member countries have phased out levies or are expected to limit the scope of levy schemes and applicability in the digital hardware environment, particularly with respect to sales to business users. HP Inc., other companies and various industry associations have opposed the extension of levies to the digital environment and have advocated alternative models of compensation to rights holders.

VerwertungsGesellschaft Wort (" <u>VG Wort</u> "), a collection agency representing certain copyright holders, instituted legal proceedings against HP Inc. in the Stuttgart Civil Court seeking to impose levies on printers. On December 22, 2004, the court held that HP Inc. is liable for payments regarding all printers using ASCII code sold in Germany but did not determine the amount payable per unit. HP Inc. appealed this decision in January 2005 to the Stuttgart Court of Appeals. On May 11, 2005, the Stuttgart Court of Appeals issued a decision confirming that levies are due. On June 6, 2005, HP Inc. filed an appeal to the German Federal Supreme Court in Karlsruhe. On December 6, 2007, the German Federal Supreme Court issued a judgment that printers are not subject to levies under existing law. VG Wort appealed the decision by filing a claim with the German Federal Constitutional Court challenging the ruling that printers are not subject to levies. On September 21, 2010, the Constitutional Court published a decision holding that the German Federal Supreme Court erred by not referring questions on interpretation of German copyright law to the Court of Justice of the European Union (" <u>CJEU</u> ") and therefore revoked the German Federal Supreme Court decision and remitted the matter to it. On July 21, 2011, the German Federal Supreme Court stayed the proceedings and referred several questions to the CJEU with regard to the interpretation of the European Copyright Directive. On June 27, 2013, the CJEU issued its decision responding to those questions. The German Federal Supreme Court subsequently scheduled a joint hearing on this matter with other cases relating to reprographic levies on printers and PCs that was held on October 31, 2013. The German Federal Supreme Court issued a decision on July 3, 2014 partially granting the claim of VG Wort. The German Federal Supreme Court decision provides that levies are due where the printer is used with a PC to make permitted reprographic copies in a single process under the control of the same person, but no levies are due on a printer for reprographic copies made with a "scanner-PC-printer" product chain. The case has been remitted to the Stuttgart Civil Court to assess the amount to be paid per printer unit. The industry association BITKOM and VG Wort signed a settlement agreement defining the levies due on printers sold in Germany from 2001—2007. HP Inc. opted to join the settlement agreement on August 10, 2015.

In September 2003, VG Wort filed a lawsuit against Fujitsu Technology Solutions GmbH (" Fujitsu ") in the Munich Civil Court in Munich, Germany seeking to impose levies on PCs. This is an industry test case in Germany, and HP Inc. has agreed not to object to the delay if VG Wort sues HP Inc. for such levies on PCs following a final decision against Fujitsu. On December 23, 2004, the Munich Civil Court held that PCs are subject to a levy and that Fujitsu must pay €12 plus compound interest for each PC sold in Germany since March 2001. Fujitsu appealed this decision in January 2005 to the Munich Court of Appeals. On December 15, 2005, the Munich Court of Appeals affirmed the Munich Civil Court decision. Fujitsu filed an appeal with the German Federal Supreme Court in February 2006. On October 2, 2008, the German Federal Supreme Court issued a judgment that PCs were not photocopiers within the meaning of the German copyright law that was in effect until December 31, 2007 and, therefore, were not subject to the levies on photocopiers established by that law. VG Wort subsequently filed a claim with the German Federal Constitutional Court challenging that ruling. In January 2011, the Constitutional Court published a decision holding that the German Federal Supreme Court decision was inconsistent with the German Constitution and revoking the German Federal Supreme Court decision. The Constitutional Court also remitted the matter to the German Federal Supreme Court for further action. On July 21, 2011, the German Federal Supreme Court stayed the proceedings and referred several questions to the CJEU with regard to the interpretation of the European Copyright Directive. On June 27, 2013, the CJEU issued its decision responding to those questions. The German Federal Supreme Court subsequently scheduled a joint hearing on that matter with other cases relating to reprographic levies on printers that was held on October 31, 2013. The German Federal Supreme Court issued a decision on July 3, 2014 partially granting the claim of VG Wort. The German Federal Supreme Court decision provides that levies are due for audio-visual copying of standing text and pictures using a PC as the last device in a single reproduction process under the control of the same person, but no levies are due on a PC for reprographic copies made using a "PC-printer" or a "scanner-PC-printer" chain. The case has been remitted to the Munich Court of Appeals to assess the amount to be paid per PC unit.

Reprobel, a cooperative society with the authority to collect and distribute the remuneration for reprography to Belgian copyright holders, requested by extra-judicial means that HP Inc. amend certain copyright levy declarations submitted for inkjet MFDs sold in Belgium from January 2005 to December 2009 to enable it to collect copyright levies calculated based on the generally higher copying speed when the MFDs are operated in draft print mode rather than when operated in normal print mode. In March 2010, HP Inc. filed a lawsuit against Reprobel in the French-speaking chambers of the Court of First Instance of Brussels seeking a declaratory judgment that no copyright levies are payable on sales of MFDs in Belgium or, alternatively, that copyright levies payable on such MFDs must be assessed based on the copying speed when operated in the normal print mode set by default in the device. On November 16, 2012, the court issued a decision holding that Belgium law is not in conformity with EU law in a number of respects and ordered that, by November 2013, Reprobel substantiate that the amounts claimed by Reprobel are commensurate with the harm resulting from legitimate copying under the reprographic exception. HP Inc. subsequently appealed that court decision to the Courts of Appeal in Brussels seeking to

confirm that the Belgian law is not in conformity with EU law and that, if Belgian law is interpreted in a manner consistent with EU law, no payments by HP Inc. are required or, alternatively, the payments already made by HP Inc. are sufficient to comply with its obligations under Belgian law. On October 23, 2013, the Court of Appeal in Brussels stayed the proceedings and referred several questions to the CJEU relating to whether the Belgian reprographic copyright levies system is in conformity with EU law. The case was heard by the CJEU on January 29, 2015 and the non-binding Opinion of the Advocate General was delivered on June 11, 2015.

Based on industry opposition to the extension of levies to digital products, HP Inc.'s assessments of the merits of various proceedings and HP Inc.'s estimates of the number of units impacted and the amounts of the levies, HP Inc. has accrued amounts that it believes are adequate to address the matters described above. However, the ultimate resolution of these matters and the associated financial impact on HP Inc., including the number of units impacted and the amount of levies imposed, remains uncertain.

*Fair Labor Standards Act Litigation* . HP Inc. is involved in several lawsuits in which the plaintiffs are seeking unpaid overtime compensation and other damages based on allegations that various employees of Electronic Data Systems Corporation (" EDS ") or HP Inc. have been misclassified as exempt employees under the Fair Labor Standards Act (" FLSA ") and/or in violation of the California Labor Code or other state laws. Those matters include the following:

- *Cunningham and Cunningham, et al. v. Electronic Data Systems Corporation* is a purported collective action filed on May 10, 2006 in the United States District Court for the Southern District of New York claiming that current and former EDS employees allegedly involved in installing and/or maintaining computer software and hardware were misclassified as exempt employees. Another purported collective action, *Steavens, et al. v. Electronic Data Systems Corporation* , was filed on October 23, 2007 in the same court alleging similar facts. The *Steavens* case was consolidated for pretrial purposes with the *Cunningham* case. On December 14, 2010, the court granted conditional certification of a class consisting of employees in 20 legacy EDS job codes in the consolidated *Cunningham / Steavens* matter. On December 11, 2013, HP Inc. and plaintiffs' counsel in the consolidated *Cunningham/Steavens* matter, and the *Salva* matter described below, mediated these cases and reached a settlement agreement. The court approved the settlement on June 16, 2015 and HP Inc. funded the settlement on July 27, 2015.

- *Salva v. Hewlett-Packard Company* is a purported collective action filed on June 15, 2012 in the United States District Court for the Western District of New York alleging that certain information technology employees allegedly involved in installing and/or maintaining computer software and hardware were misclassified as exempt employees under the Fair Labor Standards Act. On December 11, 2013, HP Inc. and plaintiffs' counsel in the consolidated *Cunningham/Steavens* matter and the *Salva* matter mediated these cases and reached a settlement agreement. The court consolidated the *Salva* matter into the *Cunningham/Steavens* matter and approved the settlement on June 16, 2015 and HP Inc. funded the settlement on July 27, 2015.

- *Karlbom, et al. v. Electronic Data Systems Corporation* is a class action filed on March 16, 2009 in California Superior Court alleging facts similar to the *Cunningham* and *Steavens* matters. The parties are engaged in discovery.

- *Benedict v. Hewlett-Packard Company* is a purported class action filed on January 10, 2013 in the United States District Court for the Northern District of California alleging that certain technical support employees allegedly involved in installing, maintaining and/or supporting computer software and/or hardware for HP Inc. were misclassified as exempt employees under the Fair Labor Standards Act. The plaintiff has also alleged that HP Inc. violated California law by, among other things, allegedly improperly classifying these employees as exempt. On February 13, 2014, the court granted the plaintiff's motion for conditional class certification. On May 7, 2015, the plaintiffs filed a motion to certify a Rule 23 state class of certain Technical Solutions Consultants in California, Massachusetts, and Colorado that they claim were improperly classified as exempt from overtime under state law. On July 30, 2015, the court dismissed the Technology Consultant and certain Field Technical Support Consultant opt-ins from the conditionally certified FLSA collective action.

*India Directorate of Revenue Intelligence Proceedings*.  On April 30 and May 10, 2010, the India Directorate of Revenue Intelligence (the "DRI") issued show cause notices to Hewlett-Packard India Sales Private Ltd ("HP Inc. India"), a subsidiary of HP Inc., seven HP Inc. India employees and one former HP Inc. India employee alleging that HP Inc. India underpaid customs duties while importing products and spare parts into India and seeking to recover an aggregate of approximately $370 million, plus penalties. Prior to the issuance of the show cause notices, HP Inc. India deposited approximately $16 million with the DRI and agreed to post a provisional bond in exchange for the DRI's agreement to not seize HP Inc. India products and spare parts and to not interrupt the transaction of business by HP Inc. India.

On April 11, 2012, the Bangalore Commissioner of Customs issued an order on the products-related show cause notice affirming certain duties and penalties against HP Inc. India and the named individuals of approximately $386 million, of which HP Inc. India had already deposited $9 million. On December 11, 2012, HP Inc. India voluntarily deposited an additional $10 million in connection with the products-related show cause notice. On April 20, 2012, the Commissioner issued an order on the parts-related show cause notice affirming certain duties and penalties against HP Inc. India and certain of the named individuals of approximately $17 million, of which HP Inc. India had already deposited $7 million. After the order, HP Inc. India deposited an additional $3 million in connection with the parts-related show cause notice so as to avoid certain penalties.

HP Inc. India filed appeals of the Commissioner's orders before the Customs Tribunal along with applications for waiver of the pre-deposit of remaining demand amounts as a condition for hearing the appeals. The Customs Department has also filed cross-appeals before the Customs

Tribunal. On January 24, 2013, the Customs Tribunal ordered HP Inc. India to deposit an additional $24 million against the products order, which HP Inc. India deposited in March 2013. The Customs Tribunal did not order any additional deposit to be made under the parts order. In December 2013, HP Inc. India filed applications before the Customs Tribunal seeking early hearing of the appeals as well as an extension of the stay of deposit as to HP Inc. India and the individuals already granted until final disposition of the appeals. On February 7, 2014, the application for extension of the stay of deposit was granted by the Customs Tribunal until disposal of the appeals. On October 27, 2014, the Customs Tribunal commenced hearings on the cross-appeals of the Commissioner's orders. The Customs Tribunal rejected HP Inc. India request to remand the matter to the Commissioner on procedural grounds. The hearing scheduled to reconvene on April 6, 2015 was cancelled at the request of the Customs Tribunal. A new hearing date has not been set.

_Russia GPO and Other Anti-Corruption Investigations_ . The German Public Prosecutor's Office (" German PPO ") has been conducting an investigation into allegations that current and former employees of HP Inc. engaged in bribery, embezzlement and tax evasion relating to a transaction between Hewlett-Packard ISE GmbH in Germany, a former subsidiary of HP Inc., and the General Prosecutor's Office of the Russian Federation. The approximately €35 million transaction, which was referred to as the Russia GPO deal, spanned the years 2001 to 2006 and was for the delivery and installation of an IT network. The German PPO issued an indictment of four individuals, including one current and two former HP Inc. employees, on charges including bribery, breach of trust and tax evasion. The German PPO also requested that HP Inc. be made an associated party to the case, and, if that request is granted, HP Inc. would participate in any portion of the court proceedings that could ultimately bear on the question of whether HP Inc. should be subject to potential disgorgement of profits based on the conduct of the indicted current and former employees. The Regional Court of Leipzig will determine whether the matter should be admitted to trial. The Polish Central Anti-Corruption Bureau is also investigating potential corrupt actions by a former employee of Hewlett-Packard Polska Sp. z o.o., an indirect subsidiary of HP Inc., in connection with certain public-sector transactions in Poland. HP Inc. is cooperating with these investigating agencies.

On December 2, 2014, plaintiffs Petroleos Mexicanos and Pemex Exploracion filed a complaint against HP Inc. and HP Inc. Mexico in the United States District Court for the Northern District of California alleging violations of the Racketeer Influenced and Corrupt Organizations Act (RICO Act), fraudulent concealment, tortious interference, and violations of the California Unfair Competition Law in connection with alleged improper payments provided to Pemex officials by third-parties retained by HP Inc. Mexico. These allegations arise from the same subject-matter as a previously disclosed 2014 Non-Prosecution Agreement between HP Inc. Mexico and the DOJ and a simultaneous cease-and-desist order against HP Inc. issued by the SEC. On February 9, 2015, HP Inc. and HP Inc. Mexico filed a motion to dismiss the complaint in its entirety. On July 13, 2015, the court granted the motion to dismiss and gave the plaintiffs leave to amend their complaint. The plaintiffs filed a first amended complaint on July 31, 2015. On August 21, 2015, HP Inc. and HP Inc. Mexico filed a motion to dismiss the first amended complaint. The hearing on this motion to dismiss is scheduled for December 10, 2015. HP Inc. does not believe that the resolution of this matter will have a material impact on its financial statements.

*ECT Proceedings* . In January 2011, the postal service of Brazil, Empresa Brasileira de Correios e Telégrafos (" ECT "), notified an HP Inc. subsidiary in Brazil (" HP Inc. Brazil ") that it had initiated administrative proceedings to consider whether to suspend HP Inc. Brazil's right to bid and contract with ECT related to alleged improprieties in the bidding and contracting processes whereby employees of HP Inc. Brazil and employees of several other companies allegedly coordinated their bids and fixed results for three ECT contracts in 2007 and 2008. In late July 2011, ECT notified HP Inc. Brazil it had decided to apply the penalties against HP Inc. Brazil and suspend HP Inc. Brazil's right to bid and contract with ECT for five years, based upon the evidence before it. In August 2011, HP Inc. Brazil appealed ECT's decision. In April 2013, ECT rejected HP Inc. Brazil's appeal, and the administrative proceedings were closed with the penalties against HP Inc. Brazil remaining in place. In parallel, in September 2011, HP Inc. Brazil filed a civil action against ECT seeking to have ECT's decision revoked. HP Inc. Brazil also requested an injunction suspending the application of the penalties until a final ruling on the merits of the case. The court of first instance has not issued a decision on the merits of the case, but it has denied HP Inc. Brazil's request for injunctive relief. HP Inc. Brazil appealed the denial of its request for injunctive relief to the intermediate appellate court, which issued a preliminary ruling denying the request for injunctive relief but reducing the length of the sanctions from five to two years. HP Inc. Brazil appealed that decision and, in December 2011, obtained a ruling staying enforcement of ECT's sanctions until a final ruling on the merits of the case. HP Inc. expects the decision to be issued in 2015 and any subsequent appeal on the merits to last several years.

*Abstrax Proceeding* . On February 28, 2014, Abstrax, Inc. (" Abstrax "), a company with a principal place of business in Mesa, Arizona, filed a patent infringement lawsuit against HP Inc. Abstrax claimed to market software for sales operations and manufacturing operations for configurable products, including those in the custom shutter industry. The case was pending in U.S. District Court for the Eastern District of Texas, Marshall Division. Abstrax asserted one patent, U.S. Patent 6,240,328, which is directed generally to a method of generating assembly instructions. In its complaint, Abstrax claimed that HP Inc.'s methods and processes of manufacturing configurable servers, storage, networking devices, PCs, laptops, imaging and printing devices and their sub-systems infringe its patent, as do the products made by the accused processes. Abstrax also claimed that HP Inc.'s alleged infringement was willful and that the case was exceptional. On November 14, 2014, HP Inc. filed a petition with the U.S. Patent and Trademark Office challenging the validity of the Abstrax patent based on prior art. In late January 2015, Abstrax dropped its infringement allegations against the manufacturing of PCs and imaging and printing devices from its expert reports. On March 4, 2015, the court heard HP Inc.'s motion challenging the subject matter of the patent under 35 U.S.C. Section 101. Trial was scheduled for May 11, 2015. The parties settled the matter in April 2015. The district court litigation was dismissed on May 5, 2015. HP Inc.'s challenge to the validity of the patent was terminated on May 18, 2015.

*Stockholder Litigation* . As described below, HP Inc. is involved in various stockholder litigation matters commenced against certain current and former HP Inc. executive officers and/or certain current and former members of HP Inc.'s board of directors in which the plaintiffs are seeking to

recover damages related to HP Inc.'s allegedly inflated stock price, certain compensation paid by HP Inc. to the defendants, other damages and/or injunctive relief:

- *A.J. Copeland v. Raymond J. Lane, et al. ("Copeland I")* is a lawsuit filed on March 7, 2011 in the United States District Court for the Northern District of California alleging, among other things, that the defendants breached their fiduciary duties and wasted corporate assets in connection with HP Inc.'s alleged violations of the Foreign Corrupt Practices Act of 1977 (" FCPA "), HP Inc.'s severance payments made to Mark Hurd (a former Chairman of HP Inc.'s board of directors and HP Inc.'s Chief Executive Officer), and HP Inc.'s acquisition of 3PAR Inc. The lawsuit also alleges violations of Section 14(a) of the Securities Exchange Act of 1934 (the " Exchange Act ") in connection with HP Inc.'s 2010 and 2011 proxy statements. On February 8, 2012, the defendants filed a motion to dismiss the lawsuit. On October 10, 2012, the court granted the defendants' motion to dismiss with leave to file an amended complaint. On November 1, 2012, the plaintiff filed an amended complaint adding an unjust enrichment claim and claims that the defendants violated Section 14(a) of the Exchange Act and breached their fiduciary duties in connection with HP Inc.'s 2012 proxy statement. On December 13, 14 and 17, 2012, the defendants moved to dismiss the amended complaint. On December 28, 2012, the plaintiff moved for leave to file a third amended complaint. On May 6, 2013, the court denied the motion for leave to amend, granted the motions to dismiss with prejudice and entered judgment in the defendants' favor. On May 31, 2013, the plaintiff filed an appeal with the United States Court of Appeals for the Ninth Circuit. The appeal has been fully briefed and an oral argument date has been scheduled for October 20, 2015.

- *A.J. Copeland v. Léo Apotheker, et al. ("Copeland II")* is a lawsuit filed on February 10, 2014 in the United States District Court for the Northern District of California alleging, among other things, that the defendants used their control over HP Inc. and its corporate suffrage process in effectuating, directly participating in and/or aiding and abetting violations of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder, and violations of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder. The complaint asserts claims for breach of fiduciary duty, waste of corporate assets, unjust enrichment, and breach of the duty of candor. The claims arise out of the circumstances at HP Inc. relating to its 2013 and 2014 proxy statements, the departure of Mr. Hurd as Chairman of HP Inc.'s board of directors and HP Inc.'s Chief Executive Officer, alleged violations of the FCPA, and HP Inc.'s acquisition of 3PAR Inc. and Autonomy Corporation plc (" Autonomy "). On February 25, 2014, the court issued an order granting HP Inc.'s administrative motion to relate *Copeland II* to *Copeland I* . On April 8, 2014, the court granted the parties' stipulation to stay the action pending resolution of *Copeland I* by the United States Court of Appeals for the Ninth Circuit.

- *Cement & Concrete Workers District Council Pension Fund v. Hewlett-Packard Company, et al.* is a putative securities class action filed on August 3, 2012 in the United States District Court for the Northern District of California alleging, among other things, that from November 13, 2007 to August 6, 2010 the defendants violated Sections 10(b) and 20(a) of the Exchange Act by making statements regarding HP Inc.'s Standards of Business Conduct (" SBC ") that were false and misleading because Mr. Hurd, who was serving as HP Inc.'s Chairman and Chief Executive Officer during that period, had been violating the SBC and concealing his misbehavior in a manner that jeopardized his continued employment with HP Inc. On February 7, 2013, the defendants moved to dismiss the amended complaint. On August 9, 2013, the court granted the defendants' motion to dismiss with leave to amend the complaint by September 9, 2013. The plaintiff filed an amended complaint on September 9, 2013, and the defendants moved to dismiss that complaint on October 24, 2013. On June 25, 2014, the court issued an order granting the defendants' motions to dismiss and on July 25, 2014, plaintiff filed a notice of appeal to the United States Court of Appeals for the Ninth Circuit. On November 4, 2014, the plaintiff-appellant filed its opening brief in the Court of Appeals for the Ninth Circuit. HP Inc. filed its answering brief on January 16, 2015 and the plaintiff-appellant's reply brief was filed on March 2, 2015. Oral argument has not yet been scheduled.

*Autonomy-Related Legal Matters*

*Investigations* . As a result of the findings of an ongoing investigation, HP Inc. has provided information to the U.K. Serious Fraud Office, the U.S. Department of Justice (" DOJ ") and the SEC related to the accounting improprieties, disclosure failures and misrepresentations at Autonomy that occurred prior to and in connection with HP Inc.'s acquisition of Autonomy. On November 21, 2012, DOJ representatives advised HP Inc. that they had opened an investigation relating to Autonomy. On February 6, 2013, representatives of the U.K. Serious Fraud Office advised HP Inc. that they had also opened an investigation relating to Autonomy. On January 19, 2015, the U.K. Serious Fraud Office notified HP Inc. that it was closing its investigation and had decided to cede jurisdiction of the investigation to the U.S. authorities. HP Inc. is cooperating with the DOJ and the SEC, whose investigations are ongoing.

*Litigation* . As described below, HP Inc. is involved in various stockholder litigation relating to, among other things, its October 2011 acquisition of Autonomy and its November 20, 2012 announcement that it recorded a non-cash charge for the impairment of goodwill and intangible assets within its Software segment of approximately $8.8 billion in the fourth quarter of its 2012 fiscal year and HP Inc.'s statements that, based on HP Inc.'s findings from an ongoing investigation, the majority of this impairment charge related to accounting improprieties, misrepresentations to the market and disclosure failures at Autonomy that occurred prior to and in connection with HP Inc.'s acquisition of Autonomy and the impact of those improprieties, failures and misrepresentations on the expected future financial performance of the Autonomy business over the long term. This stockholder litigation was commenced against, among others,

certain current and former HP Inc. executive officers, certain current and former members of HP Inc.'s board of directors and certain advisors to HP Inc. The plaintiffs in these litigation matters are seeking to recover certain compensation paid by HP Inc. to the defendants and/or other damages. These matters include the following:

- *In re HP Inc. Securities Litigation* consists of two consolidated putative class actions filed on November 26 and 30, 2012 in the United States District Court for the Northern District of California alleging, among other things, that from August 19, 2011 to November 20, 2012, the defendants violated Sections 10(b) and 20(a) of the Exchange Act by concealing material information and making false statements related to HP Inc.'s acquisition of Autonomy and the financial performance of HP Inc.'s enterprise services business. On May 3, 2013, the lead plaintiff filed a consolidated complaint alleging that, during that same period, all of the defendants violated Sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5(b) by concealing material information and making false statements related to HP Inc.'s acquisition of Autonomy and that certain defendants violated SEC Rule 10b-5(a) and (c) by engaging in a "scheme" to defraud investors. On July 2, 2013, HP Inc. filed a motion to dismiss the lawsuit. On November 26, 2013, the court granted in part and denied in part HP Inc.'s motion to dismiss, allowing claims to proceed against HP Inc. and Margaret C. Whitman based on alleged statements and/or omissions made on or after May 23, 2012. The court dismissed all of the plaintiff's claims that were based on alleged statements and/or omissions made between August 19, 2011 and May 22, 2012. The lead plaintiff filed a motion for class certification on November 4, 2014 and, on December 15, 2014, the defendants filed their opposition to the motion. On June 9, 2015, HP Inc. entered into a settlement agreement with the lead plaintiff in the consolidated securities class action. Under the terms of the settlement, HP Inc., through its insurers, will contribute $100 million to a settlement fund that will be used to compensate persons who purchased HP Inc.'s shares during the period from August 19, 2011 through November 20, 2012. No individual is contributing to the settlement. HP Inc. and its current and former officers, directors, and advisors will be released from any Autonomy-related securities claims as part of the settlement. On July 17, 2015, the court granted preliminary approval to the settlement. The court has set a hearing date of November 13, 2015 to determine whether to grant final approval to the settlement.

- *In re Hewlett-Packard Shareholder Derivative Litigation* (the " Federal Court Derivative Action ") consists of seven consolidated lawsuits filed beginning on November 26, 2012 in the United States District Court for the Northern District of California alleging, among other things, that

the defendants violated Sections 10(b) and 20(a) of the Exchange Act by concealing material information and making false statements related to HP Inc.'s acquisition of Autonomy and the financial performance of HP Inc.'s enterprise services business. The lawsuits also allege that the defendants breached their fiduciary duties, wasted corporate assets and were unjustly enriched in connection with HP Inc.'s acquisition of Autonomy and by causing HP Inc. to repurchase its own stock at allegedly inflated prices between August 2011 and October 2012. One lawsuit further alleges that certain individual defendants engaged in or assisted insider trading and thereby breached their fiduciary duties, were unjustly enriched and violated Sections 25402 and 25403 of the California Corporations Code. On May 3, 2013, the lead plaintiff filed a consolidated complaint alleging, among other things, that the defendants concealed material information and made false statements related to HP Inc.'s acquisition of Autonomy and Autonomy's Intelligent Data Operating Layer technology and thereby violated Sections 10(b) and 20(a) of the Exchange Act, breached their fiduciary duties, engaged in "abuse of control" over HP Inc., corporate waste and were unjustly enriched. The litigation was stayed until June 2014. The lead plaintiff filed a stipulation of proposed settlement on June 30, 2014. The court declined to grant preliminary approval to this settlement, and, on December 19, 2014, also declined to grant preliminary approval to a revised version of the settlement. On January 22, 2015, the lead plaintiff moved for preliminary approval of a further revised version of the settlement. On March 13, 2015, the court issued an order granting preliminary approval to the settlement. On July 24, 2015, the court held a hearing to entertain any remaining objections to the settlement and decide whether to grant final approval of the settlement. On July 30, 2015, the court granted final approval to the settlement and denied all remaining objections to the settlement. Certain objectors to the settlement have appealed the court's final approval order.

• *In re HP Inc. ERISA Litigation* consists of three consolidated putative class actions filed beginning on December 6, 2012 in the United States District Court for the Northern District of California alleging, among other things, that from August 18, 2011 to November 22, 2012, the defendants breached their fiduciary obligations to HP Inc.'s 401(k) Plan and its participants and thereby violated Sections 404(a)(1) and 405(a) of the Employee Retirement Income Security Act of 1974, as amended, by concealing negative information regarding the financial performance of Autonomy and HP Inc.'s enterprise services business and by failing to restrict participants from investing in HP Inc. stock. On August 16, 2013, HP Inc. filed a motion to dismiss the lawsuit. On March 31,

2014, the court granted HP Inc.'s motion to dismiss this action with leave to amend. On July 16, 2014, the plaintiffs filed a second amended complaint containing substantially similar allegations and seeking substantially similar relief as the first amended complaint. On June 15, 2015, the court granted HP Inc.'s motion to dismiss the second amended complaint in its entirety and denied plaintiffs leave to file another amended complaint. On July 2, 2015, plaintiffs appealed the court's order to the United States Court of Appeals for the Ninth Circuit.

- _Vincent Ho v. Margaret C. Whitman, et al._ is a lawsuit filed on January 22, 2013 in California Superior Court alleging, among other things, that the defendants breached their fiduciary duties and wasted corporate assets in connection with HP Inc.'s acquisition of Autonomy and by causing HP Inc. to repurchase its own stock at allegedly inflated prices between August 2011 and October 2012. On April 22, 2013, the court stayed the lawsuit pending resolution of the Federal Court Derivative Action. Two additional derivative actions, _James Gould v. Margaret C. Whitman, et al._ and _Leroy Noel v. Margaret C. Whitman, et al_ ., were filed in California Superior Court on July 26, 2013 and August 16, 2013, respectively, containing substantially similar allegations and seeking substantially similar relief. Those actions were also stayed pending resolution of the Federal Court Derivative Action. All the claims asserted in the these matters (other than those asserted against Michael Lynch, Sushovan Hussain, the former chief financial officer of Autonomy, and Deloitte UK and Qatalyst) have been released under the terms of the settlement of the Federal Court Derivative Action. Following final approval of the settlement of the Federal Court Derivative Action, the _Ho_ matter was dismissed with prejudice on August 13, 2015.

- _Cook v. Whitman, et al._ is a lawsuit filed on March 18, 2014 in the Delaware Chancery Court, alleging, among other things, that the defendants breached their fiduciary duties and wasted corporate assets in connection with HP Inc.'s acquisition of Autonomy. On May 15, 2014, HP Inc. moved to dismiss or stay the _Cook_ matter. On July 22, 2014, the Delaware Chancery Court stayed the motion pending the United States District Court's hearing on preliminary approval of the proposed settlement in the Federal Court Derivative Action. All the claims asserted in the these matters (other than those asserted against Michael Lynch, Sushovan Hussain, the former chief financial officer of Autonomy, and Deloitte UK and Qatalyst) have been released under the terms of the settlement of the Federal Court Derivative Action. Following final approval of the Federal Court Derivative Settlement, the _Cook_ matter was dismissed on August 19, 2015.

*Environmental*

HP Inc.'s operations and products are subject to various federal, state, local and foreign laws and regulations concerning environmental protection, including laws addressing the discharge of pollutants into the air and water, the management and disposal of hazardous substances and wastes, the cleanup of contaminated sites, the content of HP Inc.'s products and the recycling, treatment and disposal of those products. In particular, HP Inc. faces increasing complexity in its product design and procurement operations as it adjusts to new and future requirements relating to the chemical and materials composition of its products, their safe use, and the energy consumption associated with those products, including requirements relating to climate change. HP Inc. is also subject to legislation in an increasing number of jurisdictions that makes producers of electrical goods, including computers and printers, financially responsible for specified collection, recycling, treatment and disposal of past and future covered products (sometimes referred to as "product take-back legislation"). HP Inc. could incur substantial costs, its products could be restricted from entering certain jurisdictions, and it could face other sanctions, if it were to violate or become liable under environmental laws or if its products become non-compliant with environmental laws. HP Inc.'s potential exposure includes fines and civil or criminal sanctions, third-party property damage or personal injury claims and clean-up costs. The amount and timing of costs to comply with environmental laws are difficult to predict.

HP Inc. is party to, or otherwise involved in, proceedings brought by U.S. or state environmental agencies under the Comprehensive Environmental Response, Compensation and Liability Act (" CERCLA "), known as "Superfund," or state laws similar to CERCLA, and may become a party to, or otherwise involved in, proceedings brought by private parties for contribution towards clean-up costs. HP Inc. is also conducting environmental investigations or remediations at several current or former operating sites pursuant to administrative orders or consent agreements with state environmental agencies.

Schedule 6.01

EXISTING SUBSIDIARY INDEBTEDNESS

None.

EXHIBIT A

[FORM OF]

ASSIGNMENT AND ASSUMPTION

This Assignment and Assumption (this " <u>Assignment and Assumption</u> ") is dated as of the Effective Date set forth below and is entered into by and between the Assignor (as defined below) and the Assignee (as defined below). Capitalized terms used in this Assignment and Assumption and not otherwise defined herein have the meanings specified in the Credit Agreement dated as of April 2, 2014, as amended and restated on November 1, 2015 (as further amended, restated, supplemented or otherwise modified from time to time, the " <u>Credit Agreement</u> "), among HP Inc. (the " <u>Borrower</u> "), the Lenders party thereto, Citibank, N.A., as administrative agent (in such capacity, the " <u>Administrative Agent</u> ") and Co-Administrative Agent, and JPMorgan Chase Bank, N.A., as Co-Administrative Agent, receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Assumption as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below, (i) all of the Assignor's rights and obligations in its capacity as a Lender under the Credit Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all of such outstanding rights and obligations of the Assignor under the facility identified below (including participations in any Swingline Loans included in such facility) and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of the Assignor (in its capacity as a Lender) against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including, but not limited to, contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned pursuant to clauses (i) and (ii) above being referred to herein collectively as the " <u>Assigned Interest</u> "). Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment and Assumption, without representation or warranty by the Assignor.

1.    Assignor (the " <u>Assignor</u> "):

2.    Assignee (the " <u>Assignee</u> "):

        [Assignee is an Affiliate of: [Name of Lender]]

3.    Borrower: HP Inc.

4.    Administrative Agent: Citibank, N.A.

5.     Assigned Interest:

| | Aggregate Amount of Commitment/Loans of all Lenders | Amount of Commitment/Loans Assigned | Percentage Assigned of Commitment/ Loans [2] |
|---|---|---|---|
| Commitment | $ | $ | % |
| Loans | $ | $ | % |

Effective Date:          , 20[   ] [TO BE INSERTED BY ADMINISTRATIVE AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE REGISTER THEREFOR].

---

[2]     Set forth, to at least 8 decimals, as a percentage of the Commitment/Loans of all Lenders thereunder.

The terms set forth in this Assignment and Assumption are hereby agreed to:

[NAME OF ASSIGNOR], as
Assignor,

by
Name:
Title:

[NAME OF ASSIGNEE] [3] , as
Assignee,

by
Name:
Title:

---

[3]   Must not be a Defaulting Lender, natural person or investment vehicle or trust for the primary benefit of a natural person or relatives of a natural person.

[Consented to and] 4 Accepted:

CITIBANK, N.A.,
as Administrative Agent,

by _____
Name:
Title:

[Consented to:]

[[EACH SWINGLINE LENDER],
as Swingline Lender,

by _____
Name:
Title:] 5

[HP INC.,
as Borrower,

by _____
Name:
Title:] 6

_____

4    No consent of the Administrative Agent shall be required for an assignment to a Lender or an Affiliate of a Lender.
5    No consent of the Swingline Lenders shall be required for an assignment to a Lender or an Affiliate of a Lender.
6    No consent of the Borrower shall be required for an assignment to a Lender, an Affiliate of a Lender or, if an Event of Default under clause (h) or (i) of Article VII of the Credit Agreement has occurred and is continuing, any other assignee.

ANNEX 1

STANDARD TERMS AND CONDITIONS FOR
ASSIGNMENT AND ASSUMPTION [7]

1. Representations and Warranties.

1.1 <u>Assignor.</u> The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Credit Agreement, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Credit Agreement, (iii) the financial condition of the Borrower or any of its Subsidiaries or Affiliates or (iv) the performance or observance by the Borrower or any other Person of any of their respective obligations under the Credit Agreement.

1.2. <u>Assignee.</u> The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it satisfies the requirements, if any, specified in the Credit Agreement that are required to be satisfied by it in order to acquire the Assigned Interest and become a Lender, (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement as a Lender thereunder and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it has received a copy of the Credit Agreement, together with copies of the most recent financial statements delivered pursuant to Section 5.01 thereof, and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Assumption and to purchase the Assigned Interest on the basis of which it has made such analysis and decision independently and without reliance on the Administrative Agent or any other Lender, and (v) attached to this Assignment and Assumption is any documentation required to be delivered by it pursuant to Section 2.15(g) of the Credit Agreement, duly completed and executed by the Assignee; and (b) agrees that (i) it will, independently and without reliance on the Assignor, the Administrative Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Credit Agreement, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Credit Agreement are required to be performed by it as a Lender.

2. <u>Payments.</u> From and after the Effective Date, the Administrative Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignor for amounts which have accrued to but excluding the Effective Date and to the Assignee for amounts which have accrued from and after the Effective Date.

---

[7]   Capitalized terms used and not otherwise defined herein have the meanings specified in the Credit Agreement dated as of April 2, 2014, as amended and restated on November 1, 2015 (as further amended, restated, supplemented or otherwise modified from time to time, the " <u>Credit Agreement</u> "), among HP Inc., the Lenders party thereto, Citibank, N.A., as Administrative Agent and Co-Administrative Agent, and JPMorgan Chase Bank, N.A., as Co-Administrative Agent.

3. <u>General Provisions.</u> This Assignment and Assumption shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. This Assignment and Assumption may be executed in any number of counterparts, which together shall constitute one instrument. Delivery of an executed counterpart of a signature page of this Assignment and Assumption by facsimile or other electronic transmission shall be as effective as delivery of a manually executed counterpart of this Assignment and Assumption. This Assignment and Assumption shall be construed in accordance with and governed by the law of the State of New York.

[FORM OF]

OPINION OF BORROWER'S COUNSEL

[See attached]

Form of Opinion of Internal Counsel

November 1, 2015
To the Lenders party to the
Five-Year Credit Agreement referred to below
and to Citibank, N.A., as Administrative Agent under the Credit Agreement

      Re: HP Inc. — Five-Year Credit Agreement

Ladies and Gentlemen:

I am Senior Vice President, Deputy General Counsel and Assistant Secretary of HP Inc., a Delaware corporation (the "Borrower"). This opinion is being delivered to you pursuant to Section 4.01(c) of the Five-Year Credit Agreement, dated as of April 2, 2014, as amended and restated on November 1, 2015 (the "Agreement"), among the Borrower, the lending institutions from time to time party thereto (the "Lenders"), Citibank, N.A., as administrative processing agent and co-administrative agent for the Lenders (the "Administrative Agent") and JPMorgan Chase Bank, N.A., as co-administrative agent. Capitalized terms used but not defined herein have the meanings assigned to them in the Agreement.

In that connection, I have examined originals, or copies certified or otherwise identified to our satisfaction, of such documents, corporate records and other instruments as we have deemed necessary or appropriate for purposes of this opinion, including (i) the Agreement, (ii) the Certificate of Incorporation of the Borrower, (iii) the Bylaws of the Borrower and (iv) the resolutions adopted by the Board of Directors of the Borrower on September 3, 2015. I have also examined such other documents as I have considered necessary to examine in order to give the opinions set forth herein.

In rendering my opinion, I have assumed the due authorization, execution and delivery of the Agreement by all parties thereto other than the Borrower; the genuineness and authenticity of all signatures on original documents by all parties thereto other than the Borrower; the authenticity of all documents submitted to me as originals; the conformity to originals of all documents submitted to me as copies; the accuracy, completeness and authenticity of certificates of public officials; that you have received all documents you were to receive under the Agreement; and that the Agreement and the documents and agreements executed and delivered in connection therewith are the only agreements relating to the rights and obligations of the parties under the Agreement. As to certain questions of fact material to such opinions, I have relied, when relevant facts were not independently established by me, upon certificates of public officials.

I am a member of the bar of the State of New York. My opinions are expressed only with respect to the federal laws of the United States of America, the law of State of New York and the General Corporation Law of the State of Delaware. I assume no obligation to revise or supplement any of these opinions should such laws be changed by legislative action, judicial decision or otherwise. I express no opinion as to whether the laws of any particular jurisdiction apply, and no opinion to the extent that the laws of any jurisdiction other than those identified above are applicable to the subject matter hereof.

My opinions are limited to the facts as they presently exist. I express no opinion as to, and disclaim any undertaking or obligation to update any of these opinions in respect of, changes of circumstances or events that occur subsequent to the date hereof.

Based on the foregoing and subject to the qualifications set forth herein, I am of the opinion as follows:

1. The Borrower has all necessary corporate power and authority to execute and deliver the Agreement and to perform its obligations thereunder.

2. The execution and delivery by the Borrower of the Agreement and the performance by the Borrower of its obligations thereunder and the Borrowings, if any, under the Agreement (a) are within the Borrower's corporate powers, (b) have been duly authorized by all necessary corporate action, and (c) require no authorization, approval or other action by or in respect of, or notice to, consent of, order of or filing with, any Governmental Authority.

3. The Agreement has been duly executed and delivered by the Borrower and constitutes a legal, valid and binding obligation of the Borrower, enforceable against the Borrower in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer and other similar laws relating to or affecting creditors' rights generally and to general principles of equity from time to time in effect (regardless of whether enforcement is sought in a proceeding in equity or at law).

This opinion is rendered only to the Administrative Agent and the Lenders under the Agreement and their permitted successors and assigns under the Agreement and is solely for their benefit in connection with the above transactions. This opinion may not be relied upon by any other person or for any other purpose, or used, circulated, quoted or otherwise referred to for any of purpose.

Very truly yours,

_____

Ruairidh Ross

Senior Vice President, Deputy General Counsel and Assistant Secretary

Form of Opinion of Gibson, Dunn & Crutcher LLP

November 1, 2015

The Lenders listed on Schedule I hereto,
    and Citibank, N.A., as Administrative
    Agent (collectively, the "Lender Parties")

Re:   Five-Year Credit Agreement dated as of April 2, 2014 and amended and restated on
    November 1, 2015 among HP Inc., the Lenders party thereto, Citibank, N.A., as
    Administrative Processing Agent and Co-Administrative Agent, and JPMorgan Chase Bank,
    N.A. as Co-Administrative Agent

Ladies and Gentlemen:

We have acted as special counsel to HP Inc., a Delaware corporation (the "Borrower"), in connection with the Five-Year Credit Agreement dated as of April 2, 2014 and amended and restated on November 1, 2015 (the "Credit Agreement") among the Borrower, the Lenders from time to time party thereto, Citibank, N.A., as Administrative Process Agent and Co-Administrative Agent for the Lenders, and JPMorgan Chase Bank, N.A. as Co-Administrative Agent for the Lenders. Terms defined in the Credit Agreement and not otherwise defined herein are used herein as therein defined.

This opinion is delivered pursuant to Section 4.01(c) of the Credit Agreement.

In rendering this opinion, we have examined originals or copies, certified or otherwise identified to our satisfaction as being true copies, of the Credit Agreement and such other documents as we have deemed necessary to render our opinion set forth herein. As to certain factual matters, we have relied to the extent we deemed appropriate and without independent investigation upon a certificate of officers of the Borrower.

Based upon the foregoing and in reliance thereon, and subject to the qualifications, exceptions, assumptions and limitations herein contained, we are of the opinion that:

1. The execution and delivery by the Borrower of the Credit Agreement, and the incurrence of debt and performance of its obligations thereunder, do not result in a breach or violation of Regulation U or Regulation X of the Board of Governors of the Federal Reserve System ("Regulation U" and "Regulation X", respectively). Regulation T of the Board of Governors of the Federal Reserve System ("Regulation T") does not apply to any Lender that is not a "creditor" (as defined in Regulation T). Regulation T defines "creditor" as any broker or dealer (as defined in Sections 3(a)(4) and 3(a)(5) of the Securities Exchange Act of 1934 (the

The Lender Parties
November [    ], 2015
Page 2

"1934 Act")), any member of a national securities exchange, or any person associated with a broker or dealer (as defined in Section 3(a)(18) of the 1934 Act), except for business entities controlling or under common control with the creditor; and

2. The Borrower is not required to register as an "investment company" within the meaning of the Investment Company Act of 1940, as amended (the "Investment Company Act").

In connection with our opinion in paragraph 1 above, we have assumed, without independent investigation, that (i) solely with respect to factual matters, the representation and warranty of the Borrower set forth in Section 3.10(a) of the Credit Agreement is and will be true and correct at all relevant times and (ii) less than 25% of the value of the assets of the Borrower and its Subsidiaries taken as a whole, or of any of the Borrower and any of its Subsidiaries, individually, subject to the negative covenants in the Credit Agreement consists and will consist at all relevant times of "margin stock" within the meaning of Regulation U or Regulation X. Except as expressly set forth herein, we express no opinion with respect to Regulation T.

This opinion is limited to (1) Regulation T, Regulation U, and Regulation X and (2) the Investment Company Act, in each case as currently in effect and the facts as they currently exist. We assume no obligation to revise or supplement this opinion in the event of future changes in such regulations or the interpretations thereof or such facts.

This opinion is rendered as of the date hereof to the Lender Parties in connection with the Credit Agreement and may not be relied upon by any other Person or by them in any other context. The Lender Parties may not furnish this opinion or copies hereof to any other person except (i) to bank examiners and other regulatory authorities should they so request in connection with their normal examinations, (ii) to the independent auditors and attorneys of the Lender Parties, (iii) pursuant to order or legal process of any court or governmental agency, (iv) in connection with any legal action to which any of the Lender Parties is a party arising out of the transactions contemplated by the Credit Agreement, or (v) any potential permitted assignee of or participant in the interest of any Lender Party under the Credit Agreement for its information. Notwithstanding the foregoing, parties referred to in clause (v) of the immediately preceding sentence who become Lenders after the date hereof may rely on this opinion as if it were addressed to them (provided that such delivery shall not constitute a re-issue or reaffirmation of this opinion as of any date after the date hereof). This opinion may not be quoted without the prior written consent of this Firm.

Very truly yours,

**Schedule I**

**Lenders**

Citibank, N.A.
JPMorgan Chase Bank, N.A.
BNP Paribas
HSBC Bank USA, National Association
Mizuho Bank, Ltd.
Deutsche Bank AG New York Branch
Wells Fargo Bank, National Association
Bank of America, N.A.
Barclays Bank PLC
Santander Bank, N.A.
Société Générale
The Bank of Tokyo-Mitsubishi UFJ, Ltd.
Morgan Stanley Bank, N.A.
Australia and New Zealand Banking Group Limited
Bank of China, Los Angeles Branch
The Bank of New York Mellon
Credit Agricole Corporate & Investment Bank
Credit Suisse AG, Cayman Islands Branch
Goldman Sachs Bank USA
ING Bank N.V., Dublin Branch
Royal Bank of Canada
Standard Chartered Bank
U.S. Bank National Association

EXHIBIT B-2

[FORM OF]

SOLVENCY CERTIFICATE

November 1, 2015

Reference is made to the Credit Agreement dated as of April 2, 2014, as amended and restated on November 1, 2015 (as further amended, restated, supplemented or otherwise modified from time to time, the " Credit Agreement "), among HP Inc. (the " Borrower "), the Lenders party thereto, Citibank, N.A., as Administrative Agent and Co-Administrative Agent, and JPMorgan Chase Bank, N.A., as Co-Administrative Agent. Capitalized terms used in this Solvency Certificate and not otherwise defined herein have the meanings specified in the Credit Agreement.

This certificate is being delivered pursuant to Section 4.01(f) of the Credit Agreement. The undersigned hereby certifies (a) that he or she is knowledgable about the financial and accounting matters of the Borrower and the Subsidiaries and (b) that, on behalf of the Borrower in his or her capacity as a Financial Officer thereof, as of the date hereof after giving effect to the Credit Agreement, Separation Transactions and other transactions to be consummated on the date hereof:

(a)     the fair value of the assets of the Borrower and the Subsidiaries, taken as a whole, exceeds their debts and liabilities, subordinated, contingent or otherwise;

(b)     the present fair saleable value of the assets of the Borrower and the Subsidiaries, taken as a whole, is greater than the amount that will be required to pay the probable liability on their debts and other liabilities, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured;

(c)     the Borrower and the Subsidiaries, taken as a whole, are able to pay their debts and liabilities, subordinated, contingent or otherwise, as such debts and liabilities become absolute and matured; and

(d)     the Borrower and the Subsidiaries, taken as a whole, do not have unreasonably small capital with which to conduct the business in which they are engaged, as such business is conducted at the time of and is proposed to be conducted following the Restatement Effective Date.

For purposes of the foregoing, the amount of any contingent liability at any time shall be computed as the amount that would reasonably be expected to become an actual and matured liability.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the undersigned has executed this Solvency Certificate in such undersigned's capacity as a Financial Officer of the Borrower, on behalf of the Borrower, as of the date first stated above.

HP INC.

by _____

Name:

Title:

EXHIBIT C-1

[FORM OF]

U.S. TAX COMPLIANCE CERTIFICATE
(For Foreign Lenders That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is made to the Credit Agreement dated as of April 2, 2014, as amended and restated on November 1, 2015 (as further amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), among HP Inc. (the "Borrower"), the Lenders party thereto, Citibank, N.A., as administrative agent (in such capacity, the "Administrative Agent") and Co-Administrative Agent, and JPMorgan Chase Bank, N.A., as Co-Administrative Agent.

Pursuant to the provisions of Section 2.15 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the Loan(s) (as well as any promissory note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (iv) it is not a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Borrower with a certificate of its non-US Person status on IRS Form W-8BEN or IRS Form W-8BEN-E (or successor form), as applicable. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower and the Administrative Agent, and (2) the undersigned shall have at all times furnished the Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein have the meanings given to them in the Credit Agreement.

[NAME OF LENDER]

By: _____
Name:
Title:

Date:          , 20[    ]

EXHIBIT C-2

[FORM OF]

U.S. TAX COMPLIANCE CERTIFICATE

(For Foreign Participants That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is made to the Credit Agreement dated as of April 2, 2014, as amended and restated on November 1, 2015 (as further amended, restated, supplemented or otherwise modified from time to time, the " Credit Agreement "), among HP Inc. (the " Borrower "), the Lenders party thereto, Citibank, N.A., as administrative agent (in such capacity, the " Administrative Agent ") and Co-Administrative Agent, and JPMorgan Chase Bank, N.A., as Co-Administrative Agent.

Pursuant to the provisions of Section 2.15 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the participation in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such participation, (iii) with respect to such participation, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or IRS Form W-8BEN-E (or successor form), as applicable, or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or IRS Form W-8BEN-E (or successor form), as applicable, from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein have the meanings given to them in the Credit Agreement.

[NAME OF PARTICIPANT]

By: _____
Name:
Title:

Date: _____ , 20[    ]

EXHIBIT C-3

[FORM OF]

U.S. TAX COMPLIANCE CERTIFICATE
(For Foreign Participants That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is made to the Credit Agreement dated as of April 2, 2014, as amended and restated on November 1, 2015 (as further amended, restated, supplemented or otherwise modified from time to time, the " Credit Agreement "), among HP Inc. (the " Borrower "), the Lenders party thereto, Citibank, N.A., as administrative agent (in such capacity, the " Administrative Agent ") and Co-Administrative Agent, and JPMorgan Chase Bank, N.A., as Co-Administrative Agent.

Pursuant to the provisions of Section 2.15 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the participation in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code, and (iv) it is not a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with a certificate of its non-US Person status on IRS Form W-8BEN or IRS Form W-8BEN-E (or successor form), as applicable. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender in writing, and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein have the meanings given to them in the Credit Agreement.

[NAME OF PARTICIPANT]

By: _____
Name:
Title:

Date:          , 20[    ]

EXHIBIT C-4

[FORM OF]

U.S. TAX COMPLIANCE CERTIFICATE
(For Foreign Lenders That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is made to the Credit Agreement dated as of April 2, 2014, as amended and restated on November 1, 2015 (as further amended, restated, supplemented or otherwise modified from time to time, the " Credit Agreement "), among HP Inc. (the " Borrower "), the Lenders party thereto, Citibank, N.A., as administrative agent (in such capacity, the " Administrative Agent ") and Co-Administrative Agent, and JPMorgan Chase Bank, N.A., as Co-Administrative Agent.

Pursuant to the provisions of Section 2.15 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the Loan(s) (as well as any promissory note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such Loan(s) (as well as any promissory note(s) evidencing such Loan(s)), (iii) with respect to the extension of credit pursuant to this Credit Agreement or any other Loan Document, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Borrower with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or IRS Form W-8BEN-E (or successor form), as applicable, or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or IRS Form W-8BEN-E (or successor form), as applicable, from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower and the Administrative Agent, and (2) the undersigned shall have at all times furnished the Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein have the meanings given to them in the Credit Agreement.

[NAME OF LENDER]

By: _____
Name:
Title:

Date:          , 20[     ]



HP Inc.
1501 Page Mill Road
Palo Alto, CA 94304

hp.com

**Media Statement**

**HP Inc. Ushers in New Era of Innovation, Empowers Everyone, Everywhere to Keep Reinventing**

Editorial contacts

**Corporate Communications**
mediarelations@hp.com

www.hp.com/go/newsroom

PALO ALTO, Calif., Nov. 2, 2015 – Today, HP Inc. (HPQ) celebrated its global launch as a new, publicly listed Fortune 100 corporation. A global leader in printing and personal systems, the company is focused on creating technology that makes life better for everyone, everywhere.

Backed by nearly 50,000 employees and drawing from a 76-year legacy of engineered innovation, the reinvented HP Inc. aims to create a world where technology works around the needs of society and adapts to every business and person, to their context and environment, helping them move from ideation to creation effortlessly and naturally.

*"In an ever-changing, connected world, HP Inc. will keep reinventing itself, its technologies and what tomorrow holds, so industries, communities and individuals can keep reinventing how they operate, ideate and create what matters the most to them," said Dion Weisler, president and chief executive officer, HP Inc. "We approach this challenge with the heart and energy of a startup coupled with the brain, muscle and determination of a Fortune 100 corporation."*

The company will build on its market leadership in printing and PCs to make it easier and more enjoyable for customers to print, as well as introduce personal systems that combine outstanding design and user experience with great value. HP Inc. will also pursue growth in adjacent markets, such as copiers, graphics printing and commercial mobility in key verticals. Finally, the company will define future market categories through its 3D printing and immersive computing platforms that fuse together the physical and digital worlds.

*"We intend to amaze through the people we hire, the technology we create, the experiences we enable and the way we treat our customers and each other," said Weisler. "We have a once in a lifetime opportunity to spark a flame that could change the world forever. We have every intention of seizing this moment and will keep reinventing for generations to come."*

For more information, visit the HP Inc. newsroom at www.hp.com.

**About HP Inc.**

HP Inc. creates technology that makes life better for everyone, everywhere. Through our portfolio of printers, PCs, mobile devices, solutions, and services, we engineer experiences that amaze. More information about HP (NYSE: HPQ) is available at  http://www.hp.com .

**Forward-Looking Statements**

This document contains forward-looking statements within the meaning of the safe harbor provisions of the Private Securities Litigation Reform Act of 1995. Such statements involve risks, uncertainties and assumptions. If such risks or uncertainties materialize or such assumptions prove incorrect, the results of HP Inc. and its consolidated subsidiaries could differ materially from those expressed or implied by such forward-looking statements. All

Page 1 of 2

statements other than statements of historical fact are statements that could be deemed forward-looking statements, including any statements of expectation or belief and any statements of assumptions underlying any of the foregoing. Risks, uncertainties and assumptions include the possibility the company's business may not perform as expected; that the company may be unable to successfully implement separation strategies; and other risks that are described in the company's reports to the U.S. Securities and Exchange Commission, including but not limited to the risks described in the company's Annual Report on Form 10-K for its fiscal year ended October 31, 2014 and the company's Quarterly Reports on Form 10-Q for its fiscal quarters ended April 30, 2015 and July 31, 2015. The company assumes no obligation to update these forward-looking statements.

© 2015 HP Inc. The information contained herein is subject to change without notice. The only warranties for HP products and services are set forth in the express warranty statements accompanying such products and services. Nothing herein should be construed as constituting an additional warranty. HP shall not be liable for technical or editorial errors or omissions contained herein.

Page 2 of 2

**HP INC. AND SUBSIDIARIES**
**UNAUDITED PRO FORMA CONSOLIDATED CONDENSED FINANCIAL STATEMENTS**

On November 1, 2015, HP Inc. (formerly known as "Hewlett-Packard Company") completed the previously announced separation of its enterprise technology infrastructure, software, services and financing businesses from its personal systems and printing businesses (the "Separation"), which was accomplished by the distribution of one hundred percent (100%) of the outstanding common stock of Hewlett Packard Enterprise to HP Inc. stockholders as of the close of business on October 21, 2015, the record date for the distribution (the "Distribution"). HP Inc. stockholders received one share of Hewlett Packard Enterprise common stock for every one share of HP Inc. common stock held at the close of business on the record date. Hewlett Packard Enterprise is now an independent public company under the symbol "HPE" on the New York Stock Exchange.

The following unaudited pro forma consolidated condensed statements of earnings of HP Inc. for the nine months ended July 31, 2015 and for each of the three fiscal years ended October 31, 2014, 2013, and 2012 reflect HP Inc.'s results of operations as if the Distribution had occurred on November 1, 2011. The following unaudited pro forma consolidated condensed balance sheet of HP Inc. as of July 31, 2015 assumes that the Distribution had occurred on July 31, 2015. Beginning in the first quarter of fiscal 2016, Hewlett Packard Enterprise's historical financial results for periods prior to the Distribution will be reflected in HP Inc.'s consolidated condensed financial statements as discontinued operations.

The unaudited pro forma consolidated condensed financial statements are presented based on information currently available, are intended for information purposes and, are not intended to represent what HP Inc.'s financial position and results of operations actually would have been had the Distribution occurred on the dates indicated. In addition, the unaudited pro forma consolidated condensed financial statements are not necessarily indicative of HP Inc.'s financial position and results of operations for any future period.

The unaudited pro forma consolidated condensed financial statements and the accompanying notes should be read in conjunction with:

i.     the audited consolidated financial statements and accompanying notes and "Management's Discussion and Analysis of Financial Condition and Results of Operations" included in HP Inc.'s Form 10-K for the fiscal year ended October 31, 2014 and

ii.    the unaudited consolidated condensed financial statements and accompanying notes and "Management's Discussion and Analysis of Financial Condition and Results of Operations" included in HP Inc.'s Form 10-Q for the nine months ended July 31, 2015.

The Historical column in the unaudited pro forma consolidated condensed financial statements reflects HP Inc.'s historical financial statements for the periods presented and does not reflect any adjustments related to the Distribution and related events.

The Hewlett Packard Enterprise Separation column in the unaudited pro forma consolidated condensed financial statements were derived from the unaudited pro forma combined financial statements and the combined financial statements included in Hewlett Packard Enterprise's Form 10 filed with the Securities and Exchange Commission ("SEC") on October 7, 2015, adjusted to exclude certain items which are relevant to the continuing operations of HP Inc. and to reflect the retention of the marketing optimization software product group.

The pro forma adjustments are based on available information and assumptions that HP Inc.'s management believes are reasonable, that reflect the impacts of events directly attributable to the Distribution and related transaction agreements that are factually supportable, and for purposes of the statements of earnings, are expected to have a continuing impact on HP Inc. The pro forma adjustments do not reflect future events that may occur after the Distribution, including potential selling, general and administrative dis-synergies and the expected charges or the expected realization of any cost savings or other synergies related to the restructuring plan approved on September 14, 2015.

**HP INC. AND SUBSIDIARIES**
**Unaudited Pro Forma Consolidated Condensed Statement of Earnings**
**Nine months ended July 31, 2015**
**(In millions, except per share amounts)**

| | Historical | Hewlett Packard Enterprise Separation | Pro Forma Adjustments | Notes | Pro Forma HP Inc. |
|---|---|---|---|---|---|
| Net revenue: | | | | | |
| Products | $ 51,940 | $ (14,150) | $  — | | $  37,790 |
| Services | 25,428 | (24,021) | — | | 1,407 |
| Financing income | 273 | (273) | — | | — |
| Total net revenue | 77,641 | (38,444) | — | | 39,197 |
| Costs and expenses: | | | | | |
| Cost of products | 40,035 | (9,423) | — | | 30,612 |
| Cost of services | 19,016 | (18,004) | — | | 1,012 |
| Financing interest | 182 | (182) | — | | — |
| Research and development | 2,568 | (1,659) | — | | 909 |
| Selling, general and administrative | 9,096 | (5,974) | 311 | (A) | 3,433 |
| Amortization of intangible assets | 685 | (609) | — | | 76 |
| Restructuring charges | 426 | (404) | — | | 22 |
| Acquisition-related charges | 70 | (69) | — | | 1 |
| Separation costs | 750 | — | (750) | (B) | — |
| Defined benefit plan settlement | 114 | (178) | — | | (64) |
| Impairment of data center assets | 136 | (136) | — | | — |
| Total operating expenses | 73,078 | (36,638) | (439) | | 36,001 |
| Earnings from operations | 4,563 | (1,806) | 439 | | 3,196 |
| Interest and other, net | (421) | 44 | 88 | (C) | (289) |
| Earnings before taxes | 4,142 | (1,762) | 527 | | 2,907 |
| Provision for taxes | (911) | 478 | (183) | (D) | (616) |
| Net earnings | $  3,231 | $  (1,284) | $   344 | | $   2,291 |
| Net earnings per share: | | | | | |
| Basic | $    1.78 | | | | $    1.26 |
| Diluted | $    1.75 | | | | $    1.24 |
| Weighted-average shares used to compute net earnings per share: | | | | | |
| Basic | 1,817 | | | | 1,817 |
| Diluted | 1,842 | | | | 1,842 |

**HP INC. AND SUBSIDIARIES**
**Unaudited Pro Forma Consolidated Condensed Statement of Earnings**
**Fiscal year ended October 31, 2014**
**(In millions, except per share amounts)**

| | Historical | Hewlett Packard Enterprise Separation | Pro Forma Adjustments | Notes | Pro Forma HP Inc. |
|---|---|---|---|---|---|
| Net revenue: | | | | | |
| Products | $ 73,726 | $ (19,113) | $ — | | $ 54,613 |
| Services | 37,327 | (35,289) | — | | 2,038 |
| Financing income | 401 | (401) | — | | — |
| Total net revenue | 111,454 | (54,803) | — | | 56,651 |
| Costs and expenses: | | | | | |
| Cost of products | 56,469 | (12,413) | — | | 44,056 |
| Cost of services | 28,093 | (26,718) | — | | 1,375 |
| Financing interest | 277 | (277) | — | | — |
| Research and development | 3,447 | (2,149) | — | | 1,298 |
| Selling, general and administrative | 13,353 | (8,761) | 637 | (A) | 5,229 |
| Amortization of intangible assets | 1,000 | (871) | — | | 129 |
| Restructuring charges | 1,619 | (1,443) | — | | 176 |
| Acquisition-related charges | 11 | (11) | — | | — |
| Total operating expenses | 104,269 | (52,643) | 637 | | 52,263 |
| Earnings from operations | 7,185 | (2,160) | (637) | | 4,388 |
| Interest and other, net | (628) | 103 | 134 | (C) | (391) |
| Earnings before taxes | 6,557 | (2,057) | (503) | | 3,997 |
| Provision for taxes | (1,544) | 454 | 183 | (D) | (907) |
| Net earnings | $ 5,013 | $ (1,603) | $ (320) | | $ 3,090 |
| Net earnings per share: | | | | | |
| Basic | $ 2.66 | | | | $ 1.64 |
| Diluted | $ 2.62 | | | | $ 1.62 |
| Weighted-average shares used to compute net earnings per share: | | | | | |
| Basic | 1,882 | | | | 1,882 |
| Diluted | 1,912 | | | | 1,912 |

3/7

**HP INC. AND SUBSIDIARIES**
**Unaudited Pro Forma Consolidated Condensed Statement of Earnings**
**Fiscal year ended October 31, 2013**
**(In millions, except per share amounts)**

| | Historical | Hewlett Packard Enterprise Separation | Pro Forma Adjustments | Notes | Pro Forma HP Inc. |
|---|---|---|---|---|---|
| Net revenue: | | | | | |
| Products | $ 72,398 | $ (19,304) | $ — | | $ 53,094 |
| Services | 39,453 | (37,274) | — | | 2,179 |
| Financing income | 447 | (447) | — | | — |
| Total net revenue | 112,298 | (57,025) | — | | 55,273 |
| Costs and expenses: | | | | | |
| Cost of products | 55,632 | (12,463) | — | | 43,169 |
| Cost of services | 30,436 | (28,851) | — | | 1,585 |
| Financing interest | 312 | (312) | — | | — |
| Research and development | 3,135 | (1,926) | — | | 1,209 |
| Selling, general and administrative | 13,267 | (8,561) | 623 | (A) | 5,329 |
| Amortization of intangible assets | 1,373 | (1,175) | — | | 198 |
| Restructuring charges | 990 | (822) | — | | 168 |
| Acquisition-related charges | 22 | (21) | — | | 1 |
| Total operating expenses | 105,167 | (54,131) | 623 | | 51,659 |
| Earnings from operations | 7,131 | (2,894) | (623) | | 3,614 |
| Interest and other, net | (621) | 73 | 89 | (C) | (459) |
| Earnings before taxes | 6,510 | (2,821) | (534) | | 3,155 |
| Provision for taxes | (1,397) | 641 | 139 | (D) | (617) |
| Net earnings | $ 5,113 | $ (2,180) | $ (395) | | $ 2,538 |
| Net earnings per share: | | | | | |
| Basic | $ 2.64 | | | | $ 1.31 |
| Diluted | $ 2.62 | | | | $ 1.30 |
| Weighted-average shares used to compute net earnings per share: | | | | | |
| Basic | 1,934 | | | | 1,934 |
| Diluted | 1,950 | | | | 1,950 |

4/7

**HP INC. AND SUBSIDIARIES**
**Unaudited Pro Forma Consolidated Condensed Statement of Earnings**
**Fiscal year ended October 31, 2012**
**(In millions, except per share amounts)**

| | Historical | Hewlett Packard Enterprise Separation | Pro Forma Adjustments | Notes | Pro Forma HP Inc. |
|---|---|---|---|---|---|
| Net revenue: | | | | | |
| Products | $ 77,887 | $ (20,468) | $ — | | $ 57,419 |
| Services | 42,008 | (39,973) | — | | 2,035 |
| Financing income | 462 | (462) | — | | — |
| Total net revenue | 120,357 | (60,903) | — | | 59,454 |
| Costs and expenses: | | | | | |
| Cost of products | 59,468 | (12,376) | — | | 47,092 |
| Cost of services | 32,600 | (31,305) | — | | 1,295 |
| Financing interest | 317 | (317) | — | | — |
| Research and development | 3,399 | (2,111) | — | | 1,288 |
| Selling, general and administrative | 13,500 | (8,669) | 475 | (A) | 5,306 |
| Amortization of intangible assets | 1,784 | (1,567) | — | | 217 |
| Impairment of goodwill and intangible assets | 18,035 | (16,808) | — | | 1,227 |
| Restructuring charges | 2,266 | (1,912) | — | | 354 |
| Acquisition-related charges | 45 | (35) | — | | 10 |
| Total operating expenses | 131,414 | (75,100) | 475 | | 56,789 |
| Earnings from operations | (11,057) | 14,197 | (475) | | 2,665 |
| Interest and other, net | (876) | 171 | 62 | (C) | (643) |
| Earnings before taxes | (11,933) | 14,368 | (413) | | 2,022 |
| Provision for taxes | (717) | 444 | 98 | (D) | (175) |
| Net (loss) earnings | $ (12,650) | $ 14,812 | $ (315) | | $ 1,847 |
| Net (loss) earnings per share: | | | | | |
| Basic | $ (6.41) | | | | $ 0.94 |
| Diluted | $ (6.41) | | | | $ 0.93 |
| Weighted-average shares used to compute net (loss) earnings per share: | | | | | |
| Basic | 1,974 | | | | 1,974 |
| Diluted | 1,974 | | | | 1,984 |

5/7

**HP INC. AND SUBSIDIARIES**
**Unaudited Pro Forma Consolidated Condensed Balance Sheet**
**As of July 31, 2015**
**(In millions, except par value)**

| | Historical | Hewlett Packard Enterprise Separation | Pro Forma Adjustments | Notes | Pro Forma HP Inc. |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| Current assets: | | | | | |
| Cash and cash equivalents | $ 17,171 | $ (11,500) | $ 1,129 | (E) | $ 6,800 |
| Accounts receivable | 12,753 | (7,927) | — | | 4,826 |
| Financing receivables | 2,804 | (2,804) | — | | — |
| Inventory | 6,700 | (2,298) | — | | 4,402 |
| Other current assets | 12,570 | (6,717) | 63 | (H) | 5,916 |
| Total current assets | 51,998 | (31,246) | 1,192 | | 21,944 |
| Property, plant and equipment | 11,028 | (9,570) | — | | 1,458 |
| Long-term financing receivables and other assets | 8,733 | (7,669) | 327 | (F)(H) | 1,391 |
| Goodwill | 33,025 | (27,345) | — | | 5,680 |
| Intangible assets | 2,249 | (2,140) | — | | 109 |
| Total assets | $107,033 | $ (77,970) | $ 1,519 | | $ 30,582 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | | |
| Current liabilities: | | | | | |
| Notes payable and short-term borrowings | $ 11,034 | $ (752) | $ (7,243) | (G) | $ 3,039 |
| Accounts payable | 15,549 | (4,882) | — | | 10,667 |
| Employee compensation and benefits | 3,348 | (2,592) | — | | 756 |
| Taxes on earnings | 629 | (356) | (273) | (H) | — |
| Deferred revenue | 6,277 | (5,260) | — | | 1,017 |
| Accrued restructuring | 330 | (281) | — | | 49 |
| Other accrued liabilities | 11,866 | (4,932) | 198 | (H) | 7,132 |
| Total current liabilities | 49,033 | (19,055) | (7,318) | | 22,660 |
| Long-term debt | 14,468 | (15,093) | 7,243 | (G) | 6,618 |
| Other liabilities | 16,089 | (8,994) | 768 | (F)(H) | 7,863 |
| Stockholders' equity: | | | | | |
| HP stockholders' equity | | | | | |
| Preferred stock, $0.01 par value (300 shares authorized; none issued) | — | — | — | | — |
| Common stock, $0.01 par value (9,600 shares authorized; 1,801 shares issued and outstanding at July 31, 2015) | 18 | — | — | | 18 |
| Additional paid-in capital | 2,101 | — | — | | 2,101 |
| Retained earnings / Parent Company investment in Hewlett Packard Enterprise | 30,764 | (39,241) | 826 | (I) | (7,651) |
| Accumulated other comprehensive loss | (5,848) | 4,821 | — | | (1,027) |
| Total HP stockholders' equity | 27,035 | (34,420) | 826 | | (6,559) |
| Non-controlling interests | 408 | (408) | — | | — |
| Total stockholders' equity | 27,443 | (34,828) | 826 | | (6,559) |
| Total liabilities and stockholders' equity | $107,033 | $ (77,970) | $ 1,519 | | $ 30,582 |

6/7

**HP INC. AND SUBSIDIARIES**
**UNAUDITED PRO FORMA CONSOLIDATED CONDENSED FINANCIAL STATEMENTS**

**Notes to Unaudited Pro Forma Consolidated Condensed Financial Statements**

The unaudited pro forma consolidated condensed statements of earnings for the nine months ended July 31, 2015 and for the fiscal year ended October 31, 2014, 2013 and 2012 and the unaudited pro forma consolidated condensed balance sheet as of July 31, 2015 include the following pro forma adjustments:

(A)    Reflects general corporate overhead costs which were historically allocated to Hewlett Packard Enterprise.

(B)    Reflects the removal of all non-recurring separation costs which are incurred and included in HP Inc.'s historical results of operations for the nine months ended July 31, 2015. These costs were primarily related to third-party consulting, contractor fees and other incremental costs and are not expected to have a continuing impact on HP Inc.'s results of operations following the completion of the Separation.

(C)    Represents the allocation of interest to Hewlett Packard Enterprise using the average effective interest rate based on (i) debt assumed by Hewlett Packard Enterprise; and (ii) debt repaid as part of the Separation.

(D)    Represents the tax impact of pro forma adjustments at the applicable statutory income tax rates.

(E)    In connection with the Separation, the HP Inc. Cash and cash equivalents balance at the Distribution date is to expected to be $6.8 billion.

(F)    Represents incremental assets and liabilities related to certain indemnifications between HP Inc. and Hewlett Packard Enterprise.

(G)    Represents the change in long-term and short-term portion of the debt pursuant to (i) debt assumed by Hewlett Packard Enterprise; and (ii) debt repaid as part of the Separation.

(H)    Reflects certain tax reclassifications and remeasurement and includes the tax effects of the Tax Matters Agreement executed in connection with the Separation.

(I)    Retained earnings was adjusted as a result of notes (E), (F) and (H) above.

7/7