ROBBINS GELLER RUDMAN
  & DOWD LLP
DARREN J. ROBBINS (168593)
DARRYL J. ALVARADO (253213)
RACHEL A. COCALIS (312376)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
darrenr@rgrdlaw.com
dalvarado@rgrdlaw.com
rcocalis@rgrdlaw.com
Lead Counsel for Lead Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| YORK COUNTY ON BEHALF OF THE COUNTY OF YORK RETIREMENT FUND, Individually and on Behalf of All Others Similarly Situated,<br><br>                              Plaintiff,<br><br>        vs.<br><br>HP INC., et al.,<br><br>                              Defendants. | Case No. 4:20-cv-07835-JSW<br><br>CLASS ACTION<br><br>PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED COMPLAINT |

4841-9293-2086.v1

**TABLE OF CONTENTS**

Page

I.     ISSUES TO BE DECIDED ..................................................................................1

II.    SUMMARY OF THE FRAUDULENT SCHEME ..........................................1

III.   RULE 12(b)(6) LEGAL STANDARD .............................................................4

IV.    DEFENDANTS FAIL TO CONTEST SCHEME LIABILITY ......................4

V.     THE ACTIONABLE MISREPRESENTATIONS AND OMMISSIONS .........5

       A.    The Channel Inventory Statements Were Materially Misleading...........6

       B.    The Pricing and Margin Statements Were Materially Misleading .........8

       C.    The APJ Growth Statements Were Materially Misleading....................9

       D.    The "On Track" Statements Were Materially Misleading....................10

VI.    PLAINTIFFS ADEQUATELY ALLEGE SCIENTER.....................................11

VII.   PLAINTIFFS ALLEGE LOSS CAUSATION ................................................17

VIII.  THE CLAIMS ARE TIMELY AND PLAINTIFFS HAVE STANDING ........19

       A.    The Statute of Limitations Does Not Bar Plaintiffs' Claims .................19

       B.    The Statute of Repose Does Not Bar Plaintiffs' Claims.......................21

       C.    Plaintiffs Have Standing .....................................................................22

IX.    THE COMPLAINT STATES A CLAIM UNDER §20(a) ...............................25

X.     CONCLUSION................................................................................................25

**TABLE OF AUTHORITIES**

**Page**

**CASES**

*Aldridge v. A.T. Cross Corp.*,
  284 F.3d 72 (1st Cir. 2002).....................................................................................12

*Alfus v. Pyramid Tech. Corp.*,
  764 F. Supp. 598 (N.D. Cal. 1991).........................................................................24

*Amorosa v. AOL Time Warner Inc.*,
  409 F. App'x 412 (2d Cir. 2011) ............................................................................20

*Anschutz Corp. v. Merrill Lynch and Co. Inc.*,
  785 F. Supp. 2d 799 (N.D. Cal. 2011),
  *motion to certify appeal denied*, 2011 WL 2160888
  (N.D. Cal. June 1, 2011) ...........................................................................................9

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)...................................................................................................4

*Azar v. Yelp, Inc.*,
  2018 WL 6182756 (N.D. Cal. Nov. 27, 2018) .................................................8, 14

*Backe v. Novatel Wireless Inc.*,
  642 F. Supp. 2d 1169 (S.D. Cal. 2009)...................................................................16

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)...................................................................................................4

*Blackie v. Barrack*,
  524 F.2d 891 (9th Cir. 1975) .............................................................................23, 24

*Booth v. Strategic Realty Tr., Inc.*,
  2014 WL 3749759 (N.D. Cal. July 29, 2014)....................................................19, 20

*Bos. Ret. Sys. v. Uber Techs., Inc.*,
  2020 WL 4569846 (N.D. Cal. Aug. 7, 2020) ........................................................7, 8

*Brody v. Transitional Hosps. Corp.*,
  280 F.3d 997 (9th Cir. 2002) ....................................................................................8

*Cheever v. Huawei Device USA, Inc.*,
  2019 WL 8883942 (N.D. Cal. Dec. 4, 2019)............................................................4

4841-9293-2086.v1

*China Agritech, Inc. v. Resh*,
　_U.S._, 138 S. Ct. 1800 (2018).................................................................................22

*Crowell v. Ionics, Inc.*,
　343 F. Supp. 2d 1 (D. Mass. 2004).................................................................24, 25

*Cutler v. Kirchner*,
　696 F. Appx 809 (9th Cir. 2017).............................................................................11

*Dekalb Cnty. Pension Fund v. Transocean Ltd.*,
　817 F.3d 393 (2d Cir. 2016)....................................................................................22

*Dura Pharms., Inc. v. Broudo*,
　544 U.S. 336 (2005).................................................................................................17

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chi.*
　*v. JP Morgan Chase Co.*,
　553 F.3d 187 (2d Cir. 2009)....................................................................................16

*Elec. Workers Pension Fund, Loc. 103, I.B.E.W. v. HP Inc.*,
　2021 WL 1056549 (N.D. Cal. Mar. 19, 2021)..........................................14, 17, 23

*Est. of Saunders v. Comm'r*,
　745 F.3d 953 (9th Cir. 2014) .......................................................................4, 23, 25

*Evanston Police Pension Fund v. McKesson Corp.*,
　411 F. Supp. 3d 580 (N.D. Cal. 2019) ....................................................................14

*Ferreira v. Funko Inc.*,
　2021 WL 880400 (C.D. Cal. Feb. 25, 2021).....................................................11, 12

*Ferris v. Wynn Resorts Ltd.*,
　2021 WL 3216462 (D. Nev. July 28, 2021) .....................................................24, 25

*Freidus v. Barclays Bank PLC*,
　734 F.3d 132 (2d Cir. 2013)....................................................................................20

*Gammel v. Hewlett-Packard Co.*,
　2013 WL 1947525 (C.D. Cal. May 8, 2013) .....................................................12, 16

*Glazer Cap. Mgmt., LP v. Magistri*,
　549 F.3d 736 (9th Cir. 2008) ...............................................................................9, 14

*Hanon v. Dataproducts Corp.*,
　976 F.2d 497 (9th Cir. 1992) ...................................................................................25

*Hefler v. Wells Fargo & Co.*,
　2018 WL 1070116 (N.D. Cal. Feb. 27, 2018) .........................................................25

*Howard v. Everex Sys., Inc.*,
 228 F.3d 1057 (9th Cir. 2000) ..................................................................................25

*In re Allstate Corp. Sec. Litig.*,
 966 F.3d 595 (7th Cir. 2020) ...................................................................................22

*In re Alphabet, Inc. Sec. Litig.*,
 1 F.4th 687 (9th Cir. 2021) ...................................................................................5, 14

*In re Amgen Inc. Sec. Litig.*,
 2014 WL 12585809 (C.D. Cal. Aug. 4, 2014)........................................................15

*In re Apple Inc., Sec. Litig.*,
 2020 WL 2857397 (N.D. Cal. June 2, 2020)..........................................................10

*In re BofI Holding, Inc. Sec. Litig.*,
 977 F.3d 781 (9th Cir. 2020) ...................................................................................18

*In re Daou Sys., Inc.*,
 411 F.3d 1006 (9th Cir. 2005) ...................................................................................8

*In re ECOtality, Inc. Sec. Litig.*,
 2014 WL 4634280 (N.D. Cal. Sept. 16, 2014) ........................................................15

*In re Finisar Corp. Derivative Litig.*,
 2012 WL 2873844 (N.D. Cal. July 12, 2012).........................................................16

*In re Gilead Scis. Sec. Litig.*,
 536 F.3d 1049 (9th Cir. 2008) .................................................................................17

*In re LendingClub Sec. Litig.*,
 254 F. Supp. 3d 1107 (N.D. Cal. 2017) ..................................................................10

*In re Marvell Tech. Grp. Ltd. Sec. Litig.*,
 2008 WL 4544439 (N.D. Cal. Sept. 29, 2008) ......................................................21

*In re Marvell Tech. Grp., Ltd. Sec. Litig.*,
 No. 5:06-cv-06286 (N.D. Cal.) ...............................................................................21

*In re Mattel, Inc. Sec. Litig.*,
 2021 WL 1259405 (C.D. Cal. Jan. 26, 2021) .........................................................19

*In re MGM Mirage Sec. Litig.*,
 2013 WL 5435832 (D. Nev. Sept. 26, 2013)..........................................................11

*In re Montage Tech. Grp. Ltd. Sec. Litig.*,
 78 F. Supp. 3d 1215 (N.D. Cal. 2015).................................................................14, 25

*In re Mylan N.V. Sec. Litig.*,
 2018 WL 1595985 (S.D.N.Y. Mar. 28, 2018) .......................................................16

*In re Obalon Therapeutics, Inc.*,
    2019 WL 4729461 (S.D. Cal. Sept. 25, 2019)........................................................................20

*In re Qualcomm Inc. Sec. Litig.*,
    2019 WL 1239301 (S.D. Cal. Mar. 18, 2019) ........................................................................14

*In re Quality Sys., Inc. Sec. Litig.*,
    865 F.3d 1130 (9th Cir. 2017) ................................................................................................13

*In re Solarcity Corp. Sec. Litig.*,
    274 F. Supp. 3d 972, 1087-88 (N.D. Cal. 2017)....................................................................25

*In re Symbol Techs., Inc. Sec. Litig.*,
    2013 WL 6330665 (E.D.N.Y. Dec. 5, 2013) ..........................................................................24

*In re Under Armour Sec. Litig.*,
    2021 WL 1985015 (D. Md. May 18, 2021).............................................................................16

*In re UTStarcom, Inc. Sec. Litig.*,
    617 F. Supp. 2d 964 (N.D. Cal. 2009) ...................................................................................17

*In re VeriFone Holdings, Inc. Sec. Litig.*,
    704 F.3d 694 (9th Cir. 2012) .............................................................................................5, 16

*In re VeriSign, Inc.*,
    2005 WL 88969 (N.D. Cal. Jan. 13, 2005).......................................................................23, 24

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs.,*
    *and Prods. Liab. Litig.*,
    2017 WL 3058563 (N.D. Cal. July 19, 2017)........................................................................24

*In re WageWorks, Inc., Sec. Litig.*,
    2020 WL 2896547 (N.D. Cal. June 1, 2020) (White, J.)........................................................18

*Kelly v. Elec. Arts, Inc.*,
    71 F. Supp. 3d 1061 (N.D. Cal. 2014) ..............................................................................24, 25

*Khoja v. Orexigen Therapeutics, Inc.*,
    899 F.3d 988 (9th Cir. 2018) ...................................................................................... *passim*

*Klein on behalf of Qlik Techs., Inc. v. Qlik Techs., Inc.*,
    906 F.3d 215 (2d Cir. 2018).....................................................................................................22

*LB Partners, L.P. v. Neutrogena Corp.*,
    1995 WL 714447 (C.D. Cal. Aug. 9, 1995)............................................................................24

*Lee v. City of L.A.*,
    250 F. 3d 668 (9th Cir. 2001), *overruled on other grounds* ..................................................12

4841-9293-2086.v1

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
   416 F.3d 940 (9th Cir. 2005) ...............................................................................11

*Loos v. Immersion Corp.*,
   762 F.3d 880 (9th Cir. 2014) ...............................................................................18

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
   797 F.3d 160 (2d Cir. 2015).................................................................................16

*Lorenzo v. S.E.C.*,
   _U.S._, 139 S. Ct. 1094 (2019)..............................................................................5

*Martin v. Altisource Residential Corp.*,
   2019 WL 2762923 (D.V.I. July 2, 2019),
   *motion to certify appeal denied*, 2019 WL 3945249
   (D.V.I. Aug. 21, 2019)..........................................................................................21

*Melendres v. Arpaio*,
   784 F.3d 1254 (9th Cir. 2015) .........................................................................23, 24

*Merck & Co., Inc. v. Reynolds*,
   559 U.S. 633 (2010)..........................................................................................19, 20

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
   540 F.3d 1049 (9th Cir. 2008) ..........................................................................17, 18

*Miller v. Thane Int'l, Inc.*,
   519 F.3d 879 (9th Cir. 2008) ...................................................................................5

*Mineworkers' Pension Scheme v. First Solar Inc.*,
   881 F.3d 750 (9th Cir. 2018) ........................................................................2, 17, 18

*Mulderrig v. Amyris, Inc.*,
   492 F. Supp. 3d 999 (N.D. Cal. 2020) ...................................................................11

*Mulligan v. Impax Labs., Inc.*,
   36 F. Supp. 3d 942 (N.D. Cal. 2014)......................................................................11

*Murphy v. Precision Castparts Corp.*,
   2017 WL 3084274 (D. Or. June 27, 2017),
   *rep. & rec. adopted*, 2017 WL 3610523
   (D. Or. Aug. 22, 2017)......................................................................................10, 11

*N.M. State Inv. Council v. Ernst & Young LLP*,
   641 F.3d 1089 (9th Cir. 2011) ................................................................................15

*New York Hotel Trades Council & Hotel Ass'n of
   NYC, Inc. Pension Fund v. Impax Labs., Inc.*,
   843 F. App'x 27 (9th Cir. 2021) .............................................................................18

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda*,
    730 F.3d 1111 (9th Cir. 2013) ...................................................................................17

*Okla. Firefighters Pension and Ret. System v. Lexmark Int'l, Inc.*,
    367 F. Supp. 3d 16 (S.D.N.Y. 2019)...........................................................................15

*Paciga v. Invuity Inc.*,
    2019 WL 3779694 (N.D. Cal. Aug. 12, 2019) ...........................................................15

*Peace Officers' Annuity and Benefit Fund of Ga. v. DaVita Inc.*,
    372 F. Supp. 3d 1139 (D. Colo. 2019)...................................................................24, 25

*Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*,
    2020 WL 1181366 (D. Conn. Mar. 10, 2020) ............................................................24

*Petrie v. Elec. Game Card, Inc.*,
    2015 WL 475958 (C.D. Cal. Feb. 5, 2015)................................................................25

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
    759 F.3d 1051 (9th Cir. 2014) ....................................................................................15

*Prodanova v. H.C. Wainwright & Co., LLC*,
    993 F.3d 1097 (9th Cir. 2021) ....................................................................................16

*Puddu v. 6D Glob. Techs., Inc.*,
    2021 WL 1198566 (S.D.N.Y. Mar. 30, 2021) ............................................................5

*Reese v. BP Expl. (Alaska), Inc.*,
    643 F.3d 681 (9th Cir. 2011) ......................................................................................5

*Reese v. Malone*,
    747 F.3d 557 (9th Cir. 2014), *overruled on other grounds* ..................................11, 13, 15, 16

*Ret. Sys. v. ANZ Sec., Inc.*,
    137 S. Ct. 2042 (2017)................................................................................................21

*Ret. Sys. v. S. Co.*,
    2018 WL 1558577 (N.D. Ga. Mar. 29, 2018)............................................................20

*Rieckborn v. Jefferies LLC*,
    81 F. Supp. 3d 902 (N.D. Cal. 2015)......................................................................19, 20

*Rihn v. Acadia Pharms. Inc.*,
    2016 WL 5076147 (S.D. Cal. Sept. 19, 2016)...........................................................10

*S. Ferry LP #2 v. Killinger*,
    687 F. Supp. 2d 1248 (W.D. Wash. 2009)............................................................12, 13, 14

*S.E. Pa. Transp. Auth. v. Orrstown Fin. Servs., Inc.*,
    2016 WL 7117455 (M.D. Pa. Dec. 7, 2016).............................................................16

4841-9293-2086.v1

*SEB Inv. Mgmt. AB v. Align Tech., Inc.*,
    485 F. Supp. 3d 1113 (N.D. Cal. 2020) ...........................................................................14

*Shenwick v. Twitter, Inc.*,
    282 F. Supp. 3d 1115 (N.D. Cal. 2017) ..................................................................... *passim*

*Shurkin v. Golden State Vintners Inc.*,
    471 F. Supp. 2d 998 (N.D. Cal. 2006) ........................................................................24, 25

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007)........................................................................................................4, 11

*Thomas v. Magnachip Semiconductor Corp.*,
    167 F. Supp. 3d 1029 (N.D. Cal. 2016) ...........................................................................16

*Vasquez v. Libre by Nexus, Inc.*,
    2018 WL 5623791 (N.D. Cal. Aug. 20, 2018) ..................................................................5

*Webb v. Solarcity Corp.*,
    884 F.3d 844 (9th Cir. 2018) ...........................................................................................14

*West v. EHealth, Inc.*,
    2016 WL 948116 (N.D. Cal. Mar. 14, 2016)......................................................................7

*Wochos v. Tesla, Inc.*,
    985 F.3d 1180 (9th Cir. 2021) .........................................................................................10

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009),
    *amended* (Feb. 10, 2009) .................................................................................................15

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
    §77k...................................................................................................................................20
    §78j(b) ............................................................................................................1, 19, 20, 21
    §78t(a) .......................................................................................................................19, 25

28 U.S.C.
    §1658(b)............................................................................................................................21

4841-9293-2086.v1

Federal Rules of Civil Procedure
Rule 8 .................................................................................................................................25
Rule 10b-5 ............................................................................................................................9
Rule 10b-5(a)-(c) ......................................................................................................1, 2, 4, 5
Rule 10b-5(b) .......................................................................................................................5
Rule 12 ...............................................................................................................................19
Rule 12(b)(6) .................................................................................................................4, 17
Rule 15(a)(2) ......................................................................................................................25
Rule 17 ...............................................................................................................................22
Rule 23 ...............................................................................................................................24
Rule 23(a) .....................................................................................................................23, 24

17 CFR
§202.5(d) ...........................................................................................................................17

**SECONDARY AUTHORITIES**

Securities & Federal Corporate Law
§17:47 ...............................................................................................................................21

**LEGISLATIVE HISTORY**

Private Securities Litigation Reform Act of 1995 ("PSLRA")
Pub. L. No. 104-67, 109 Stat. 737 (1995) ..........................................................................12

4841-9293-2086.v1

**APPENDIX OF DEFINED TERMS**

| | |
|---|---|
| "Alvarado Decl." | Declaration of Darryl J. Alvarado in Support of Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Consolidated Complaint, filed concurrently herewith |
| "Analyst Meeting" | HP's inaugural Security Analyst Meeting, held on September 15, 2015 |
| "APJ" | HP's Asia Pacific and Japan Region |
| "Bailey" | Richard Bailey, President of HP's APJ region during the Class Period |
| "Class Period" | November 6, 2015-June 21, 2016 |
| "Complaint" or "Consolidated Complaint" | Consolidated Complaint for Violation of the Federal Securities Laws (ECF 37) |
| "Defendants" | HP Inc., Dion J. Weisler, Catherine A. Lesjak, Enrique Lores, and Richard Bailey |
| "HP" or "Company" | HP Inc. |
| "HPC" | Hewlett-Packard Company |
| "Lead Plaintiff" or "Maryland Electrical" | Maryland Electrical Industry Pension Fund |
| "Lesjak" | Catherina A. Lesjak, CFO of HP during the Class Period |
| "Lores" | Enrique Lores, President of HP's Imaging & Printing business during the Class Period |
| "Model" | Four Box Model |
| "Motion" or "MTD" | Defendants' Motion to Dismiss the Consolidated Complaint (ECF 45) |
| "Plaintiffs" | Maryland Electrical and York County, collectively |
| "PSLRA" | Private Securities Litigation Reform Act of 1995 |
| "QBRs" | Quarterly Business Reviews |
| "SEC" | Securities and Exchange Commission |
| "SEC Order" | Order Instituting Cease-and-Desist Proceedings Pursuant to §8A of the Securities Act of 1933 and §21C of the Securities Exchange Act of 1934, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order (ECF 37-1) |
| "Weisler" | Dion J. Weisler, CEO of HP during the Class Period |
| "WOS" | HP's Weeks of Supply inventory metric |

PLTS' MEM. OF LAW IN OPP. TO DEFS' MOT. TO DISMISS - 4:20-cv-07835-JSW        - x -

4841-9293-2086.v1

**APPENDIX OF DEFINED TERMS**

| "York County" | York County on behalf of the County of York Retirement Fund |
|---|---|
| "York County Decl." | Declaration of York County on behalf of the County of York Retirement Fund in Support of Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Consolidated Complaint, filed concurrently herewith |

4841-9293-2086.v1

## I.    ISSUES TO BE DECIDED

1.    Whether the Complaint sufficiently pleads scheme liability, falsity, scienter, and loss causation under Section 10(b) and Rule 10b-5(a)-(c).[1]

2.    Whether Plaintiffs have standing to assert the alleged claims, and whether they are timely under the statutes of limitations and repose.

## II.    SUMMARY OF THE FRAUDULENT SCHEME

This case concerns a straightforward pull-in scheme perpetrated to conceal the true state of HP's Supplies business – far and away the Company's most important segment. ¶2.[2]  One analyst "estimate[d] supplies account for ***110%***" of HP's operating profit, concluding that "***supplies growth is the most important driver of profit growth for HP***."  ¶3.

HP split from HPC immediately prior to the Class Period and in the months leading up to its formation, Supplies revenues had declined for multiple quarters in a row and channel inventory levels were elevated.  ¶4.  These metrics were critical to investors' evaluation of HP given the Supplies business' singular importance to HP's profitability and growth and, as a result, analysts probed frequently about these concerning trends.  *Id.*; *see also* ¶34 (Jeffries analyst: "When Will Supplies Stabilize?").  To quell the market's concerns, Defendants held an inaugural Analyst Meeting just prior to the Class Period.  ¶5.  At the meeting, Defendants emphasized that "[e]very action that . . . we're launching ha[s] one common objective.  Improve our supplies business." ¶¶3-5, 24, 36, 38.  Indeed, Defendants emphasized no fewer than 10 times that the new HP was "***all about supplies***," leaving investors with the impression that the Supplies business would generate reliable growth. ¶¶4, 36.  Defendants also assured that they were "always focused on the channel inventory" and that HP's new structure allowed Defendants to be laser focused on the Supplies business. ¶¶39-40.  Analysts reported enthusiastically on that promised focus.  ¶41.

[1]    Through silence, Defendants concede: (1) the materiality of the alleged misrepresentations and omissions; (2) their connection to the purchase or sale of HP stock; (3) reliance; and (4) damages.

[2]    The Complaint constitutes Plaintiffs' statement of facts.  In the interest of brevity, detailed herein is a summary of the scheme that highlights allegations pertinent to Defendants' arguments.  All "¶" or "¶¶" references are to the Complaint.  Unless noted otherwise, emphasis is added and internal citations and quotation marks are omitted.

PLTS' MEM. OF LAW IN OPP. TO DEFS' MOT. TO DISMISS - 4:20-cv-07835-JSW                    - 1 -

4841-9293-2086.v1

During the Class Period, Defendants continued to tell investors that HP was delivering on the promises made at the Analyst Meeting. ¶5. *First*, Defendants understated reported margin declines and told investors that the declines were due to external factors, such as "currency movements." *See* ¶¶95-100, 102-07, 109-13, 115. *Second*, Defendants assured investors that channel inventories were "declining" and that WOS was "within [HP's] target ranges." *See* ¶¶120, 122-23, 125-26, 128-30. *Third*, Defendants represented that HP was experiencing steady revenue growth in HP's fastest growing region – APJ. ¶¶137-38, 144-45. *Fourth*, Defendants assured investors that the Supplies business was "on track" and "[s]tabilizing." *See* ¶¶136, 140-43, 147.

In truth, however, Defendants hid ballooning channel inventory and engaged in a pull-in scheme that eroded Supplies margins and profits, increased channel inventories, and sent HP's efforts to stabilize Supplies woefully "off track." ¶6. The scheme included two sales practices known as (i) "gray marketing" or "A-business" and (ii) "accelerations" or "pull-ins." ¶¶49-50.

"*Gray marketing*" or "*A-business*" is the practice of selling supplies to channel partners at steep discounts who then sell those supplies outside of their assigned territories. ¶50. Gray marketing was strictly forbidden by HP policy because it erodes profit margins, cannibalizes sales in other regions, and leads to channel inventory build-up. *Id.* Indeed, engaging in the practice was a fireable offense. *Id.* Nevertheless, HP executives – recognizing the importance of meeting their financial plans – pressured sales personnel to meet Supplies quotas during the Class Period despite weakening demand. ¶51. As such, the APJ region resorted to offering enormous discounts ("eclipse" discounts) to distributors that it knew participated in gray marketing to push unwanted product into the channel. *Id.*; ¶77. This prohibited practice in APJ had a snowball effect on all of HP's other regions, which negatively impacted Supplies margins worldwide. ¶54.

"*Accelerations*" or "*pull-ins*" are sales made pursuant to enormous discounts that would have occurred, if at all, in later periods. ¶5. "Beginning in early 2015 and undisclosed to the market," Defendants began engaging in this sales practice to "accelerate sales into the channel to increase quarterly revenue." ¶¶81-82. At this time, Lesjak's team, who received weekly inventory "flash" reports, "began to see regular gaps, near the ends of the quarters between the flash reports and budget." ¶81. But, as the Class Period began, HP actually *accelerated* this practice. *Id.* Class

Period e-mails confirm that HP knew that its partners "'d[id] not want to carry the level of toner that we push into their warehouses . . . . *[b]ut we push more toner in to help deliver on our financial plans*.'"  ¶82.  Thus, "[t]his [acceleration] pattern led a *known trend of increasing channel inventory and lower margin sales that continued over multiple quarters*."  ¶81.

Despite the devastating impacts of these practices, Defendants ramped up their prohibited efforts throughout the Class Period.  ¶8.  As HP exceeded its WOS – the metric provided to the market as an indicator of channel health – "*HP's worldwide executives demanded that regional managers remain within their WOS ranges while still delivering sales and operating profit targets*."  ¶58.  Worse, and unbeknownst to investors, the WOS metric included only "Tier 1" channel inventory, not "Tier 2" or other inventory further down the distribution chain.  ¶6.  HP also engaged in "simultaneous sell-in/sell-through deals" whereby supplies sold to Tier 1 immediately passed through to Tier 2 and beyond and thus out of the disclosed inventory metrics, thereby inflating Supplies sales without any visible channel inventory implications.  ¶59.

Defendants knew or recklessly disregarded that the pull-in scheme rendered their Class Period statements misleading.  ¶¶7, 150-98.  By their own admission, the Supplies business was Defendants' primary focus, as the new HP was "*all about supplies*."  ¶¶151-55.  Further, Defendants admitted that they monitored Supplies pricing and inventory and assured investors that they had the data to understand HP's performance, including data from the Model.  ¶¶156-59.  In fact, Weisler led QBRs during which Defendants "dove deep" into the minutiae of the Supplies business, including the review of QBR presentations that differentiated between A-business and legitimate sales.  ¶¶160-64.  And, internal presentations revealed that in some cases A-business actually *exceeded* legitimate business.  ¶55.  Bailey, as the region head of APJ, had to approve these policy-violating discounts.  ¶52.  Unsurprisingly, during the Class Period, HP internally "recognized that the A-business was 'cannibalizing' sales . . . and reducing HP's margins."  ¶79.

Defendants also knew that their channel inventory statements were independently misleading.  Lesjak set channel inventory ceilings and quantified inventory in Tier 1 and Tier 2 channels according to "a pretty robust process."  ¶¶64, 188.  Her department also monitored WOS inventory targets using weekly flash reports that compared quarterly inventory metrics against

4841-9293-2086.v1

HP's budget.  ¶¶165-70.  Weisler and Lesjak, who were intimately familiar with monitoring WOS and Tier 2 inventory levels, repeatedly advised investors about whether HP was within its WOS ranges.  *See id.*; ¶¶179-83.  Further, Lores was responsible for monitoring Tier 1 and Tier 2 inventory levels and keeping sales teams accountable to their inventory ceilings.  ¶¶166, 170.

When the effects of the scheme and the extent of the channel inventory problems could no longer be completely concealed, Defendants announced disappointing margins and revenue and ultimately recognized the need to clear out ***$700 million*** in excess Supplies inventory.  ¶9.  These partial disclosures revealed the impact of the scheme on HP's most important metrics, causing HP's stock price to decline and investors to suffer significant monetary damage.  *Id*.  Nevertheless, Defendants' self-serving disclosures hid the actual scheme and their roles therein.  Then, on September 30, 2020, Defendants' scheme was laid bare when the SEC issued its order finding that HP violated the federal securities laws and imposed a $6,000,000 sanction against HP.  ¶10.

## III.   RULE 12(b)(6) LEGAL STANDARD

The Court must "accept all factual allegations in the complaint as true" and "assess all the allegations holistically."  *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322, 326 (2007). A complaint need only contain sufficient factual matter that states a claim for relief that is "'plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In deciding plausibility, the Court may "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678; *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 572 (2007) (inferences in plaintiff's favor).

## IV.   DEFENDANTS FAIL TO CONTEST SCHEME LIABILITY

Defendants engaged in a course of conduct that operated as a fraud on investors, known as "scheme liability."  ¶12 (asserting claims pursuant to "SEC Rule ***10b-5(a)-(c)***").  Defendants contend that the scheme claims fail because "Plaintiff does not allege any fraudulent conduct independent of the supposed misstatements challenged in the Complaint."  MTD at 24 n.8.  Their unsupported "argument" – relegated to a one-sentence footnote – is waived.  *See Est. of Saunders v. Comm'r*, 745 F.3d 953, 962 n.8 (9th Cir. 2014).[3]  More to the point, the Ninth Circuit has rejected

---

[3]   *See also Cheever v. Huawei Device USA, Inc.*, 2019 WL 8883942, at *3 (N.D. Cal. Dec. 4, 2019) ("Because Defendants relegate the argument to a footnote, the Court will decline to consider

Defendants' argument:

> Alphabet's argument that Rule 10b-5(a) and (c) claims cannot overlap with Rule 10b-5(b) statement liability claims is foreclosed by *Lorenzo*, which rejected the petitioner's argument that Rule 10b-5(a) and (c) "concern 'scheme liability claims' and are violated only when conduct other than misstatements is involved." Rather, *Lorenzo* explained that "considerable overlap" exists among the subsections . . . .

*In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 709 (9th Cir. 2021) (*quoting Lorenzo v. S.E.C.*, _U.S._, 139 S. Ct. 1094, 1101-02 (2019)); *see also Puddu v. 6D Glob. Techs., Inc.*, 2021 WL 1198566, at *11 (S.D.N.Y. Mar. 30, 2021) ("[T]he existence of a 'manipulative or deceptive act'" can be established "by pointing to alleged misrepresentations or omissions."). In any event, the gravamen of the Complaint concerns Defendants' "straightforward fraudulent scheme." ¶2; *see also* ¶23 ("Each Defendant is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of HP common stock."). Thus, Defendants' argument that Bailey and Lores should be dismissed because they did not make any statements (MTD at 16-17) misses the point. Both were integral to the fraudulent course of business and were included as scheme liability Defendants. Thus, the claims remain against all Defendants.

## V.     THE ACTIONABLE MISREPRESENTATIONS AND OMMISSIONS

A complaint alleges falsity when it "specifi[es] each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012). A statement is misleading "if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Reese v. BP Expl. (Alaska), Inc.*, 643 F.3d 681, 691 (9th Cir. 2011). "[L]iterally true" statements may be misleading due to "their context and manner of presentation." *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008). "[A] duty to disclose does arise where an omission is misleading because it affirmatively create[s] an impression of a state of affairs that differs in a material way from the one that actually exists." *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1135 (N.D. Cal. 2017); *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d

_____

it."). Any additional scheme liability arguments that Defendants intend to raise on reply "are waived." *Vasquez v. Libre by Nexus, Inc.*, 2018 WL 5623791, at *6 (N.D. Cal. Aug. 20, 2018).

988, 1008-09 (9th Cir. 2018).

### A.    The Channel Inventory Statements Were Materially Misleading

Throughout the Class Period, Defendants assured investors that Supplies channel inventory was "declining," "reduc[ing]," and that WOS was only "slightly above" or "within [HP's] target ranges." *See* ¶¶120, 122-23, 125-26, 128-30.  These assurances provided the misleading impression that inventory was declining to healthy levels.  ¶¶45, 117, 121, 124, 127, 131.

In truth, Defendants were engaged in the pull-in scheme, which "led to a *known trend of increasing channel inventory*."  ¶81.  For example, Defendants "'pa[id] the channel to take additional shipments'" and accelerated this practice throughout the Class Period.  ¶¶56-57.  Class Period e-mails confirm that HP's partners "'d[id] not want to carry the level of toner that we push into their warehouses. . . . *[b]ut we push more toner in to help deliver on our financial plans*.'" *Id.*  Further, when HP surpassed its "do not exceed" channel inventory ceilings early in the Class Period, Defendants concealed the increasing inventory by "encourag[ing] sales from Tier 1 to Tier 2," which allowed HP "to sell into Tier 1 to increase revenue without exceeding the WOS ceilings." ¶83.  As one Printing segment manager explained in describing the "unhealthy levels of stock" in Tier 1 and Tier 2, "'*we needed the Supplies Revenue & we used significant amounts of contra to push in Supplies at T1 to > 2 weeks above their optimal levels*.'" ¶58.  And Defendants engaged in "simultaneous sell-in/sell-through deals" that further bloated inventory.  ¶59.

Defendants' inventory statements are separately misleading because they failed to disclose that WOS excluded inventory from Tier 2 and "channel partners further down the distribution chain."  ¶132(c).  "HP's use of the phrase 'channel inventory' without definition gave the impression that [WOS] included all of HP's channel inventory and was a measure of HP's overall channel health." ¶132(b).  Thus, "*HP's failure to describe its overall channel inventory provided the market with only a partial and misleading picture of HP's channel health and caused HP's channel inventory disclosures to be materially misleading*." *Id.*

*Shenwick* is instructive.  There, plaintiff alleged statements were misleading because Twitter failed to disclose DAU, a user engagement metric.  282 F. Supp. 3d at 1135.  The court found statements about user growth and "engagement trends" were misleading, noting that "'once

PLTS' MEM. OF LAW IN OPP. TO DEFS' MOT. TO DISMISS - 4:20-cv-07835-JSW          - 6 -

4841-9293-2086.v1

defendants chose to tout' positive information'" about user engagement, "they were 'bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information.'" *Id.* at 1137-40.  Here, Defendants' statements conveyed that channel inventory levels were declining and would continue to do so, which analysts understood would cause "demand [to] increase in the future" and "revenue trajectory [to] improve."  ¶¶45, 124; *see also Shenwick*, 282 F. Supp. 3d at 1136 (analysts' interpretation relevant to falsity).

Defendants' claim that these statements were not misleading because HP did not have complete Tier 2 data misses the mark.  MTD at 16.  Regardless of the data's completeness, once Defendants touted HP's improved channel inventory and WOS levels, they had to disclose that those levels only included Tier 1 inventory and excluded all other inventory.  This disclosure would have alerted investors that the published metric only told part of the story.  *See Shenwick*, 282 F. Supp. 3d at 1138-39 (once defendants tout one metric, they must to disclose additional information as well so that investors are apprised of the true state of affairs); *Khoja*, 899 F.3d at 1010 (once defendants tout results, they must also disclose that data was incomplete so they did not appear more promising than they were).  *West v. EHealth, Inc.* – Defendants' authority on this point – actually supports Plaintiffs.  There, defendants "explicitly explained" the specific contours of the disclosed data.  2016 WL 948116, at *6 (N.D. Cal. Mar. 14, 2016).  Here, although Defendants knew that WOS excluded large swaths of inventory, they concealed this fact from the market.

Defendants point to the statement that WOS was "'slightly above'" target levels – while conspicuously failing to address their statements that inventory was "declining" and "reduc[ing]" – but ignore that WOS *significantly understated* true inventory levels because it omitted Tier 2. And their claim that these statements are fraud by hindsight fails.  MTD at 15-16.  The Complaint alleges that inventory was understated at the time the statements were made; indeed, Defendants – in real time – led QBRs, reviewed QBR presentations, approved gray marketing discounts, had access to flash reports, reviewed data from the Model, monitored channel inventory, and pressured sales teams to engage in deceptive practices to hide the increasing inventory.  *Infra* §VI.; *see also Bos. Ret. Sys. v. Uber Techs., Inc.*, 2020 WL 4569846, at *8 (N.D. Cal. Aug. 7, 2020) (rejecting

fraud-by-hindsight claim where complaint relied on contemporaneous facts).[4]

### B.    The Pricing and Margin Statements Were Materially Misleading

Defendants told investors that disappointing margins were due to temporary, external factors.  *See* ¶¶95-100, 102-07, 109-113, 115.  In reality, to meet revenue quotas, HP executives pressured sales teams to engage in low margin gray marketing sales, which involved offering enormous "eclipse" discounts – ***three to four times normal discount levels and in excess of 40%*** – to push excess product to distributors.  ¶¶53, 55.  This was no surprise to Defendants, who reviewed QBR presentations that explicitly called out gray marketing, which was prohibited because it eroded margins.  *Id.*  Bailey even approved these policy-violating discounts.  ¶52.  And, internal documents showed that A-business actually exceeded legitimate sales in some cases, causing HP to "***recognize[] that the A-Business was . . . reducing HP's margins***."  ¶¶51, 79.

Worse yet, Defendants accelerated the unsustainable and ever-increasing pattern of "pay[ing] the channel to take additional shipments within a given quarter" during the Class Period, which caused a race to the bottom in terms of pricing.  ¶¶56, 81.  Indeed, a Class Period e-mail confirmed it "bec[ame] increasingly difficult to get partners to place orders at any price" as HP was already "at historical highs with [its] accelerations."  ¶57.  To entice further accelerations, another email acknowledged that HP "***used significant amounts of contra to push in Supplies***" because "we needed the Supplies Revenue."  ¶58.  Unsurprisingly, the scheme "***led to a known trend of . . . lower margin sales that continued over multiple quarters***."  ¶81.  Thus, because "HP disclosed that its decreasing gross margins were the result of . . . 'unfavorable currency impacts,' but omitted from its description the impact that its use of pull-ins and A-Business was having on its gross margins," "***HP's disclosures [were] incomplete and misleading***."  ¶¶80, 116(c)-(d).  In sum, Defendants "create[d] an impression" that margin declines were due to external factors, rather than the true cause "that actually existe[d]."  *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002); *see also Azar v. Yelp, Inc.*, 2018 WL 6182756, at *11 (N.D. Cal. Nov. 27,

---

[4]   Defendants' authority is inapplicable.  *See In re Daou Sys., Inc.*, 411 F.3d 1006, 1021 (9th Cir. 2005) (statement that "'healthy'" pipeline "'would fuel future earnings growth,'" inactionable where plaintiffs "provide[d] no specific facts, however, to substantiate the speculative claim that Daou had little or no chance of actually obtaining certain contracts").

2018) (statements blaming external factors created misleading "impression that these were one-off aberrations"); *see also* ¶¶101, 108, 114.

Defendants claim the scheme may not have been the "primary factor" impacting margins.[5] But Plaintiffs quantified the scheme's materially negative impacts on margins throughout the Class Period, which was bolstered by the SEC's similar finding.[6] ¶¶116(e), 192-98. Decreasing margins also coincided with Defendants' increased use of low-margin sales. ¶116(b). And while Defendants quibble with Plaintiffs' calculations showing that the scheme had a material impact on margins, that is inappropriate at this stage. *See Shenwick*, 282 F. Supp. 3d at 1141 (rejecting defendants' "various problems with Plaintiff's calculations" as "resolution of those issues should occur through discovery, not at the motion to dismiss phase"). Regardless, the calculations are based entirely on underlying alleged facts, including: (1) Defendants disclosed over $700 million in channel inventory reductions on April 30, 2016 and June 21, 2016 (¶193, n.42); (2) the scheme and trend of increasing channel inventory began in Q2 2015 and continued over multiple quarters (¶193); (3) the scheme accelerated in late 2015 and early 2016 (*Id.*); (4) HP exceeded its "do not exceed" inventory levels by the end of Q2 2015 as a result of the scheme (*Id.*); (5) Defendants admitted the excess inventory in Q3 2015 "was very significant" (¶194); and (6) Supplies discounts were "in excess of forty percent." ¶¶195-96.[7] The margin statements are actionable.

**C.    The APJ Growth Statements Were Materially Misleading**

The APJ revenue growth statements (¶¶137-38, 144-45) were misleading because Defendants concealed that, as a result of the scheme, (i) APJ revenue growth was artificially

_____

[5]    Defendants argue that the primary factors were in fact currency and competitive headwinds. MTD at 13-14. It is not Plaintiffs' burden, however, to disprove Defendants' "version of the facts at the pleading stage." *See Khoja*, 899 F.3d at 999. Defendants' argument should also be disregarded as it concerns materiality, which they do not challenge.

[6]    Citing *Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 748 (9th Cir. 2008), Defendants claim that the SEC's conclusion is irrelevant. MTD at 14. In fact, in *Glazer* "***the Ninth Circuit looked to an SEC cease-and-desist order that had been imposed pursuant to a regulatory settlement in order to find that plaintiffs had adequately alleged falsity under Rule 10b-5***." *Anschutz Corp. v. Merrill Lynch and Co. Inc.*, 785 F. Supp. 2d 799, 820 (N.D. Cal. 2011), *motion to certify appeal denied*, 2011 WL 2160888 (N.D. Cal. June 1, 2011).

[7]    Plaintiffs' use of a 30% discount in its calculations was conservative in light of the SEC's finding that HP "offered discounts, in some instances ***in excess of forty percent*** . . . ." ¶196.

PLTS' MEM. OF LAW IN OPP. TO DEFS' MOT. TO DISMISS - 4:20-cv-07835-JSW                    - 9 -

4841-9293-2086.v1

inflated and (ii) the purported growth came at the cost of lower margins, lower sales in other regions, and elevated worldwide channel inventory.  *See Murphy v. Precision Castparts Corp.*, 2017 WL 3084274, at *9 (D. Or. June 27, 2017) ("growth" statements actionable where defendant "did not include disclosure of the additional facts that [company] was aggressively pulling in sales"), *rep. & rec. adopted*, 2017 WL 3610523 (D. Or. Aug. 22, 2017); *In re Apple Inc., Sec. Litig.*, 2020 WL 2857397, at *11 (N.D. Cal. June 2, 2020) (statements touting high rates of upgrades required disclosure that new software, which slowed operations, contributed to upgrade rate); *In re LendingClub Sec. Litig.*, 254 F. Supp. 3d 1107, 1118 (N.D. Cal. 2017) (statement misleading because loans were not organic but "inflated artificially through self-dealing").  Thus, Defendants' only challenge – that the statements were literally true – fails.  *Khoja*, 899 F.3d at 1008-09 (literally true statement misleading if defendant fails to "'disclos[e] adverse information that cuts against the positive information'").

### D.    The "On Track" Statements Were Materially Misleading

Defendants' assurances that the Supplies business was "on track" to stabilize (¶¶136, 140-43, 147) gave the impression that, based on the then-existing state of affairs, HP's key business was turning around.  ¶¶139, 146, 148.  In truth, the Supplies business was not "on track" and would only stabilize if HP took drastic measures to clear excess inventory that built up due to the scheme. ¶149; *see also Rihn v. Acadia Pharms. Inc.*, 2016 WL 5076147, at *5-*6 (S.D. Cal. Sept. 19, 2016) (statement that company was "'on track'" to submit application misleading where it "created an impression of a state of affairs that differed in a material way from the one that actually existed").  Defendants' claim that the statements are not misleading because Supplies eventually did stabilize is a red-herring.  MTD at 12.  It was only *after* HP had completely overhauled its sales model and took a $700 million Supplies channel inventory reduction that this "stabilization" occurred.

Defendants argue that "on track" statements are always forward-looking, citing *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1186 (9th Cir. 2021).  But *Tesla* simply holds that "on track" statements that fail to go "beyond the assertion of a future goal" are forward-looking; such statements remain actionable if they "describe[] specific, concrete circumstances that have already occurred."  *Tesla*, 985 F.3d at 1192 ("'on track'" statements tied to "intermediate benchmarks" are "outside the safe

4841-9293-2086.v1

harbor").[8]  Here, the "on track" statements were tied to such intermediate circumstances.  *See, e.g.*, ¶141 (Lesjak stating Supplies was "on track" based on analysis of the Model versus actual performance, which was "in line with what we were expecting"), ¶147 (Weisler stating, "based on what [the Model is] telling us at this point in time, we [will] stabilize revenue"); ¶142.[9]

## VI.   PLAINTIFFS ADEQUATELY ALLEGE SCIENTER

Plaintiffs adequately plead scienter where they allege defendants "'made false or misleading statements either intentionally or with deliberate recklessness.'"  *Reese v. Malone*, 747 F.3d 557, 569 (9th Cir. 2014), *overruled on other grounds*; *Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1013 (N.D. Cal. 2020) ("'[r]ecklessly turning a "blind eye" to impropriety is equally culpable conduct'").  The scienter inference "need not be . . . the 'most plausible of competing inferences.'"  *Tellabs*, 551 U.S. at 324.  A complaint survives if, "[w]hen the allegations are accepted as true and taken collectively, . . . a reasonable person [would] deem the inference of scienter at least as strong as any opposing inference." *Id.* at 326.

***Defendants' Conscious Omission of Tier 2 Inventory from Their Public Statements***. Defendants do not dispute that they knew WOS excluded Tier 2 and other inventory.  Nor could they – (i) Lesjak was responsible for setting WOS (¶186); (ii) Defendants estimated Tier 2 inventory according to what Lesjak touted as "a pretty robust process" (¶188); (iii) Lesjak's department received weekly inventory flash reports (¶166); (iv) Lores admitted it was his responsibility to monitor Tier 1 ***and*** Tier 2 inventory (¶170); (v) Defendants repeatedly advised investors whether they were within WOS ranges (¶¶120, 123, 125-26, 128-30); and, (vi)

---

[8]   *See also Murphy*, 2017 WL 3084274, at *13 ("on-track" statements were actionable statements of present condition); *In re MGM Mirage Sec. Litig.*, 2013 WL 5435832, at *7 (D. Nev. Sept. 26, 2013) (same); *Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 965 (N.D. Cal. 2014) (same).

[9]   Even if forward-looking, Defendants' purported cautionary language is insufficient under the Ninth Circuit's "stringent" standard.  *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 947 (9th Cir. 2005).  To be sure, cautioning of supposed future problems that already exist is not meaningful.  *Cutler v. Kirchner*, 696 F. Appx 809, 813 (9th Cir. 2017).  Here, HP's risk disclosure was not meaningful as Defendants knew that the risk that HP could have excess inventory had already materialized by February 2016 when the first "on track" statement was made. *See supra* §V.A.  If anything, Defendants' inventory risk disclosure was misleading. *See Ferreira v. Funko Inc.*, 2021 WL 880400, at *18 (C.D. Cal. Feb. 25, 2021) ("risk disclosure was misleading and was not meaningful . . . because it sets forth various hypothetical risks associated with maintaining excess inventory without disclosing that this risk had materialized").

Defendants were highly familiar with monitoring WOS and Tier 2 levels (¶¶165-70, 179-83).

***The Newly Formed and Supplies-Focused HP***. Defendants knew HP's spin-off was a "milestone marker." ¶184. Because Supplies "account[ed] for 110%" of the new HP's operating profit, Defendants repeatedly emphasized that HP was "***all about supplies***." ¶¶3, 36-7, 39. Indeed, at the Analyst Meeting, Lores, Lesjak, and Weisler repeated the phrase no fewer than 10 times. *See Gammel v. Hewlett-Packard Co.*, 2013 WL 1947525, at *21 (C.D. Cal. May 8, 2013) ("It is far from implausible that a corporate executive who had spent months building excitement and momentum around important, new technology products might recklessly misrepresent the inability to deliver on those promises."); *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002) (scienter inferred where "corporate officers understood . . . that the success . . . of taking the old line company into a new world, was important to their own survival and that of the company"); *Shenwick*, 282 F. Supp. 3d at 1145 (statements emphasized at Analyst Day support scienter).[10]

***Defendants' Detailed Involvement in and Hands-On Management***. Following their promises at the Analyst Meeting, Defendants assured that they were laser focused on supplies pricing and inventory and that they had access to information such that "[they] knew what [they] were] talking about." *S. Ferry LP #2 v. Killinger*, 687 F. Supp. 2d 1248, 1259-60 (W.D. Wash. 2009) (inferring scienter from defendants' admissions). Lesjak promised that "every week we collect new [pricing and discount] data . . . we're careful about what we do from a supplies pricing perspective." ¶¶157, 159;[11] *see also* ¶158 (Weisler: "we continue to strategically monitor Supplies pricing . . . . ***It's obviously something that we track very closely***."). Critically, Defendants assured investors they used HP's Model "extensively," which allowed them to analyze, in real-time, the price at which HP was selling supplies, ***including the level of discounting used***. *See* ¶¶171-78

---

[10] Because of the split and the smaller nature of HP, Defendants said they spent "entire Board meeting almost on print"; "invest[ed] in printing in a way that we have not"; and "[went] deep" into results during "[Weisler's] weekly reviews . . . ." ¶185. Thus, they were at least reckless. *Id.*

[11] Defendants' use of a document submitted for judicial notice to challenge the attribution of this statement to Lesjak is improper under the law and the facts. *See Lee v. City of L.A.*, 250 F. 3d 668, 690 (9th Cir. 2001) (reversing court's order taking judicial notice over "disputed facts stated in public records" to support its ruling), *overruled on other grounds*; *see also Khoja*, 899 F.3d at 998; Alvarado Decl., Ex. 1 at 18 (Thomson Reuters transcript attributing statement to Lesjak).

(Lesjak and Weisler assuring investors the Model is "very good" and "we use it extensively . . . *it is something that we focus on very carefully*. And . . . it informs how we price."). Further, in response to an analyst's question regarding the Model's ability to determine Supplies' "growth rate," Weisler responded it has "very detailed data." ¶177. Lesjak also stated she spent significant time in operational reviews "drill[ing] down" on the Supplies business results. ¶164.

Similarly, Defendants were keenly focused on Supplies channel inventory levels. *See* ¶¶165-69, 179-83. For example, Weisler assured investors: "*We're always focused on the channel inventory*." ¶167. And Lesjak provided detailed responses to analyst questions regarding inventory. ¶¶168-69. Defendants also repeatedly reported on inventory levels and WOS. ¶¶120, 123, 125-26, 128-30; *see also Shenwick*, 282 F. Supp. 3d at 1147 ("As the Ninth Circuit has explained, an assertion that Defendants were unaware of an alleged issue can be "'directly contradicted by the fact that [they] specifically addressed it in [their] statement[s].'"); *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1145 (9th Cir. 2017) (scienter where "[defendants] themselves told investors they had real-time access to, and knowledge of, sales information"). Critically, Lesjak set WOS, her team tracked channel inventory through weekly flash reports, and Lores monitored Tier 1 and Tier 2 inventory levels. ¶¶64, 170. Defendants also touted their experience in managing channel inventory levels. ¶¶179-83; *see also* ¶182 (quoting Lesjak's 25 detailed references to monitoring Supplies channel inventory). Because Defendants "represented repeatedly . . . [they] had adequate information" with a "high degree of specificity," their admissions support scienter. *S. Ferry*, 687 F. Supp. 2d at 1259-60.

***The "Core Operations" Doctrine***. This doctrine supports an inference of scienter where "'defendants had actual access to the disputed information'" or where "it would be 'absurd' to suggest that management was without knowledge of the matter." *Reese*, 747 F.3d at 575-76. Here, considering the allegations holistically – including that (i) the Supplies business was HP's most critical business; (ii) Defendants had actual access to disputed information; and (iii) Defendants repeatedly spoke about Supplies' margins, pricing, channel inventory, and revenue growth ***and*** the real-time data available to them – it would absurd to suggest that Defendants were "without knowledge" of the scheme. *Id.*; *see Shenwick*, 282 F. Supp. 3d at 1147 (finding scienter on actual

access where the defendant referenced data because he arguably "'bridged the scienter gap . . . by referencing the data directly'"); *see also Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 601-02 (N.D. Cal. 2019) (scienter where defendants "touted intimate knowledge" of pricing).  Further supporting scienter, Defendants responded to analysts' questions on channel inventory and pricing.  *See, e.g.*, *S. Ferry*, 687 F. Supp. 2d at 1259; *In re Qualcomm Inc. Sec. Litig.*, 2019 WL 1239301, at *11 (S.D. Cal. Mar. 18, 2019).[12]

At bottom, it would be absurd to suggest that the CEO, CFO, President of the Printing Segment, and President of APJ were unaware of a widespread scheme devastating the business they oversaw and that provided the "*vast majority*" of HP's total operating profit.  ¶¶3, 24, 26.  As Lesjak explained at the Analyst Meeting, "revenue streams from supplies" was the "[f]irst" of "three key elements" supporting HP's balance sheet.  ¶37; *see also Shenwick*, 282 F. Supp. 3d at 1145-46 (finding it would be "'absurd'" to argue defendants were unaware of trends in DAU metric particularly because, "[a]t Analyst Day, Twitter described its DAU to MAU ratio as one of its five 'major growth drivers'").[13]  Defendants' roles further bolster the inference of scienter. *Alphabet*, 1 F.4th at 706 ("we may consider a senior executive's role . . . includ[ing] . . . whether, given the importance of the information, 'it would be "absurd" to suggest that management was without knowledge of the matter'").  Here, as in *Alphabet*, "allegations in the complaint raise the strong inference that [Defendants] w[ere] vitally concerned with [Supplies's] operations," received flash and QBR "reports of . . . operating results," and made "'key operating decisions.'"  *Id.*[14]

---

[12]  Defendants' authority is inapt.  *See Webb v. Solarcity Corp.*, 884 F.3d 844, 857 (9th Cir. 2018) (division was "a relatively *minor* portion of the company's overall business"); *Glazer*, 549 F.3d at 746-47 (scheme was kept a secret "even within the company"); *Elec. Workers Pension Fund, Loc. 103, I.B.E.W. v. HP Inc.*, 2021 WL 1056549 (N.D. Cal. Mar. 19, 2021) (concerning the adequacy of *different* scienter allegations regarding a *different* alleged fraud in a *different* Class Period, and the plaintiff has since filed an amended complaint).

[13]  *See also In re Montage Tech. Grp. Ltd. Sec. Litig.*, 78 F. Supp. 3d 1215, 1226 (N.D. Cal. 2015) (scienter where company omitted that distributor accounting for 71% of its revenue was owned by an affiliate); *Azar*, 2018 WL 6182756, at *20 (scienter where "segment 'accounted for approximately 70% of [Yelp's] advertising revenues' and [those] revenues in turn accounted for 'approximately 90%' of Yelp's total revenue"); *SEB Inv. Mgmt. AB v. Align Tech., Inc.*, 485 F. Supp. 3d 1113, 1133 (N.D. Cal. 2020) (finding "a substantial discount on Align's main revenue source squarely qualifies as facts critical to a business's core operations").

[14]  Defendants imply that Lesjak – the head of the Finance Department – never had access to flash reports.  MTD at 20.  But the reports fall "within [her] bailiwick," and thus, provide a "compelling"

4841-9293-2086.v1

***The Magnitude of the Scheme***.  Defendants' scheme caused at least $700 million of excess channel inventory, corresponding to a $700 million reduction in Supplies revenue.  ¶¶9, 66.  Plaintiffs' analyses of Defendants' reductions confirm the scheme's severely negative impact on HP's reported margins and revenue.  ¶¶192-98 (showing reported decline in profit margin understated by ***100%*** in some cases).  Lesjak even admitted that the charge's magnitude was "***fairly material . . . it's a fairly substantial change to channel inventory***."  ¶71; *see N.M. State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1100-02 (9th Cir. 2011); *see also Okla. Firefighters Pension and Ret. System v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 38 (S.D.N.Y. 2019) ("inventory drawdown between $50 million and $70 million" supported inference of scienter as "the magnitude of the aftershock suggests more than a careless mistake or trivial miscalculation").[15]

***Temporal Proximity***.  Defendants' misleading statements were made within months of the Analyst Meeting and the corrective disclosures.  Thus, the timing of the statements supports scienter.  *See Shenwick*, 282 F. Supp. 3d at 1148 ("timing of Defendants' statements is suggestive of scienter" where Defendants' misleading statements "came just a few months after their . . . projections at Analyst Day," and only a few months elapsed between the misleading statements and the disclosures); *see also Reese*, 747 F.3d at 571, 575 (separation of "three to six months" between "the statements and the contradictory disclosures" contributes to a finding of scienter).

***Weisler's and Lesjak's SOX Certifications***.  Given Lesjak's and Weisler's high-ranking

---

inference of scienter.  *In re Amgen Inc. Sec. Litig.*, 2014 WL 12585809, at *12 (C.D. Cal. Aug. 4, 2014).  Defendants alternatively claim the reports do not contain information that alerted them to the sales practices (MTD at 21), but the SEC found that "HP began to see regular gaps, near the ends of the quarters between the flash reports and budget" alerting them to the scheme.  ¶81.  Further, the QBR reports and the Model provided Defendants with access to unmanipulated information regarding the scheme, rendering Defendants' authority inapplicable.  *Cf. Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1000-01 (9th Cir. 2009) (data was manipulated and no allegation defendants knew of manipulation), *amended* (Feb. 10, 2009); *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1061-62 (9th Cir. 2014) (plaintiffs offered only "impressions of witnesses"); *Paciga v. Invuity Inc.*, 2019 WL 3779694, at *6 (N.D. Cal. Aug. 12, 2019) (reports had ***no*** information alerting them to wrongdoing); *In re ECOtality, Inc. Sec. Litig.*, 2014 WL 4634280, at *11 (N.D. Cal. Sept. 16, 2014) (same).

[15]  Defendants' only retort is that the analyses in ¶197 are wrong.  MTD at 22 n.7.  But as noted above (§V.B.), Plaintiffs' calculations are well-pleaded and Defendants' "problems with Plaintiff's calculations" "should . . . not [be resolved] at the motion to dismiss phase."  *Shenwick* 282 F. Supp. 3d at 1141.  And, ***Defendants admitted*** the reduction was "material."  ¶71.

PLTS' MEM. OF LAW IN OPP. TO DEFS' MOT. TO DISMISS - 4:20-cv-07835-JSW                    - 15 -

4841-9293-2086.v1

positions and the importance of the Supplies business, their Sarbanes-Oxley certifications (¶191) further support a strong inference of scienter.  *See In re Mylan N.V. Sec. Litig.*, 2018 WL 1595985, at \*13, \*16-\*17 (S.D.N.Y. Mar. 28, 2018) ("Defendants' position at the company, the importance of EpiPen to Mylan's bottom line, and Defendants' SOX certifications all give rise to the strong inference that the individual Defendants knew" about the scheme.); *see also Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1043 (N.D. Cal. 2016) (SOX certifications probative of scienter.); *Backe v. Novatel Wireless Inc.*, 642 F. Supp. 2d 1169, 1187 (S.D. Cal. 2009) (same).

*Motive*.  Defendants had a powerful motive to conceal the scheme: they had to fulfill their promises made at the Analyst Meeting for the new, Supplies-dependent HP.  *See Shenwick*, 282 F. Supp. 3d at 1149 (finding scienter absent insider trading where "Plaintiff's theory of the case is that Defendants felt pressure to live up to the targets announced at Analyst Day").[16]

*The SEC's Cease-And-Desist Order*.  The Ninth Circuit has repeatedly inferred scienter from government settlements, investigations, and complaints.  *See VeriFone*, 704 F.3d at 706-07 (SEC complaint); *Reese*, 747 F.3d at 574 (scienter based on "information . . . which came to light through discovery related to government investigations").[17]

Defendants claim the SEC Order's failure to charge Weisler and Lesjak with actual knowledge is dispositive, but the Ninth Circuit has held that courts may "***draw no inference*** from the SEC's decision not to plead scienter or charge defendants with fraud.  ***The district court erred in concluding that 'the SEC's decision not to plead scienter hurts plaintiffs' ability to plead a strong inference of scienter***.'"  *VeriFone*, 704 F.3d at 707 n.5; *see also Under Armour*, 2021 WL 1985015, at \*5 ("SEC's decision not to plead scienter does not impede the Plaintiffs' ability to plead a strong inference of scienter[.]").[18]  Indeed, the SEC admonishes that its decision not to

---

[16]  Defendants' citation to *Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097 (9th Cir. 2021), is inapt as a motive is alleged here.  And, "motive is not required to adequately plead scienter." *Gammel*, 2013 WL 1947525, at \*21.

[17]  *See also Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 180 (2d Cir. 2015) (SEC cease-and-desist order); *In re Under Armour Sec. Litig.*, 2021 WL 1985015 (D. Md. May 18, 2021) (SEC cease-and-desist order); *S.E. Pa. Transp. Auth. v. Orrstown Fin. Servs., Inc.*, 2016 WL 7117455, at \*22 (M.D. Pa. Dec. 7, 2016) (same).

[18]  *See also In re Finisar Corp. Derivative Litig.*, 2012 WL 2873844, at \*12 (N.D. Cal. July 12, 2012) (quoting *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d

recommend enforcement "must in no way be construed as indicating that the party has been exonerated," and that "[t]he attempted use of such a communication as a purported defense . . . would be *clearly inappropriate and improper*." 17 CFR §202.5(d); *Procedures Relating to the Commencement of Enforcement Proceedings and Termination of Staff Investigations*, SEC Release No. 336 (1972). And, the SEC Order refers to unnamed individuals' actual knowledge – not Defendants specifically – and thus does not exonerate Defendants. SEC Order, ¶48. Nor does it say anything about recklessness. Anyway, the SEC Order found the unnamed individuals "learned of" the scheme "quarters after the actual conduct had [first] taken place" "in early 2015" (*i.e.*, multiple quarters *before* the Class Period). SEC Order, ¶¶16, 49.

## VII.   PLAINTIFFS ALLEGE LOSS CAUSATION

Pleading loss causation is "not meant to impose a great burden on a plaintiff" as it requires "no more than the familiar test for proximate cause." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005); *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018). Loss causation ordinarily should "'not to be decided on a Rule 12(b)(6) motion to dismiss.'" *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008). Here, Plaintiffs satisfy this standard by alleging that the misrepresentations and omissions artificially inflated HP stock, and that the inflation dissipated through four partial disclosures that partially revealed the economic truth concealed by the scheme. ¶¶69, 199. Each disclosure caused a significant HP-specific stock price decline. ¶¶203, 205-06, 208. These allegations provide Defendants with the "indication" of the casual connection Plaintiffs "ha[ve] in mind." *Dura*, 544 U.S. at 347.[19]

Relying on an overly-restrictive view of loss causation enunciated in *Metzler Inv. GMBH*

187, 200 n.5 (2d Cir. 2009)) ("SEC charges simply are not a prerequisite to pleading recklessness . . . ."); *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 975 n.15 (N.D. Cal. 2009) (discretionary prosecutorial determinations of the SEC are not "determinative of whether Defendants, in fact, committed securities fraud").

[19] Another approach to loss causation concerns the materialization of the risk. *Nuveen Mun. High Income Opportunity Fund v. City of Alameda*, 730 F.3d 1111, 1120 (9th Cir. 2013). Under this test, "'a misstatement or omission is the "proximate cause" of an investment loss if the risk that caused the loss was within the zone of risk *concealed* by the misrepresentations and omissions alleged by a disappointed investor.'" *Id*. (emphasis in original). The Complaint alleges that materialized risk here: the weaker margins, revenue, and excess channel inventory were the materialization of the state of affairs concealed by the pull-in scheme.

PLTS' MEM. OF LAW IN OPP. TO DEFS' MOT. TO DISMISS - 4:20-cv-07835-JSW                - 17 -

4841-9293-2086.v1

*v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1063 (9th Cir. 2008) and *Loos v. Immersion Corp.*, 762 F.3d 880, 887-88 (9th Cir. 2014), Defendants contend that Plaintiffs fail to "identify a single challenge statement that was 'corrected'" or demonstrate that investors "'learned of and reacted to th[e] fraud, as opposed to merely reacting to reports of the defendants poor financial health generally.'"  MTD at 23.  But the Ninth Circuit subsequently distinguished *Metzler* and *Loos*, clarifying that the "more restrictive test" they suggest "should be understood as fact-specific variants of the basic proximate cause test" and held that "'there are an "***infinite variety***" of ways for a tort to cause a loss.'" *First Solar*, 881 F.3d at 753-54.[20]  *First Solar* made clear that "plaintiff may . . . prove loss causation by showing that the stock price fell upon the revelation of an earnings miss, ***even if the market was unaware at the time that fraud had concealed the miss***."  *Id.* at 754; *see also New York Hotel Trades Council & Hotel Ass'n of NYC, Inc. Pension Fund v. Impax Labs., Inc.*, 843 F. App'x 27, 31 (9th Cir. 2021) (loss causation satisfied where defendants attributed earnings misses to competition but the decreased margins and misses were due to undisclosed scheme).  To be sure, "'[d]isclosure of the fraud is not a sine qua non of loss causation, which may be shown even where the alleged fraud is not necessarily revealed prior to the economic loss.'" *First Solar*, 881 F.3d at 753.  Indeed, this Court – relying on *First Solar* – recently rejected Defendants' argument.  *See In re WageWorks, Inc., Sec. Litig.*, 2020 WL 2896547, at *8 (N.D. Cal. June 1, 2020) (White, J.).  Defendants' argument also fails because "a disclosure 'need not precisely mirror the earlier misrepresentation.'" *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 790 (9th Cir. 2020).  Because the disclosures revealed a negative economic condition that was caused by Defendants' scheme, the Complaint adequately alleges loss causation.

Defendants' claim that the model change was an "'intervening event'" on June 21, 2016.  MTD at 24.  But they admitted the change was done ***because of*** the practices underlying the concealed scheme.  ¶69 n.8.  Defendants also claim that because the stock price did not drop when HP reduced inventory by $250 million on May 25, 2016, investors as a matter of law could not have been reacting to the $450 million reduction on June 21, 2016.  MTD at 24.  But these charges

[20]  Defendants' other district court cases are inapplicable because they were decided prior to *First Solar*, which they failed to acknowledge, let alone distinguish.  MTD at 23-24.

sent different signals to the market. In contrast to the $250 million reduction – billed as a one-time charge in connection with quarterly results – the $450 million reduction was a serial charge disclosed on a specially-convened conference call that was nearly double the charge taken just weeks earlier. Naturally, analysts were shocked and reacted negatively to the abrupt announcement. *See, e.g.,* ¶72. Anyway, "conclusively deciding reasons for the market's reaction is premature, and reasonable theories concerning that reaction do not warrant Rule 12 dismissal." *In re Mattel, Inc. Sec. Litig.*, 2021 WL 1259405, at *12 (C.D. Cal. Jan. 26, 2021).

## VIII.   THE CLAIMS ARE TIMELY AND PLAINTIFFS HAVE STANDING

### A.   The Statute of Limitations Does Not Bar Plaintiffs' Claims

The two-year statute for securities fraud claims "'does not begin to run *until the fraud is discovered*.'" *Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 644-45 (2010) (emphasis in original). A defendant faces a "'*considerable burden*'" in establishing that claims are time-barred. *Booth v. Strategic Realty Tr., Inc.*, 2014 WL 3749759, at *5 (N.D. Cal. July 29, 2014); *see also id.* ("*Merck* seemed to make defendants' burden *even more onerous*, since it shifted the application of 'inquiry notice' in plaintiffs' favor"; as a result, "the Ninth Circuit strongly favors any legitimate factual disputes over the timeliness of a securities claim being determined by the fact-finder."). To meet their heavy burden, defendants must prove that plaintiffs discovered the facts required to plead all of the elements of their Section 10(b) and 20(a) securities fraud claims. A "reasonably diligent plaintiff" has not "discovered" one of the facts until he can "plead" that fact "with sufficient detail and particularity to survive a 12(b)(6) motion to dismiss." *Rieckborn v. Jefferies LLC*, 81 F. Supp. 3d 902, 915 (N.D. Cal. 2015). The "discovery" of scienter "facts" is especially crucial in fraud cases. *Merck*, 559 U.S. at 637, 644, 649.

Here, Plaintiffs allege that the September 30, 2020 SEC Order was the first public revelation of the facts underlying the fraudulent scheme and the fact that Defendants' consciously omitted Tier 2 inventory from their inventory statements. For example, the SEC Order unveiled internal e-mails, including one warning that "'partners do not want to carry the level of toner that we push into their warehouses. . . . *[b]ut we push more toner in to help deliver on our financial plans*.'" ¶82. It also revealed that while Defendants publicly disclosed only Tier 1 inventory they

4841-9293-2086.v1

deliberately omitted HP's estimated Tier 2 inventory. ¶¶87, 186. And it also exposed that, in late 2015, as inventory "exceeded their ceilings, HP's *worldwide executives demanded that regional managers . . . still deliver[] sales and operating profit targets*." ¶83.

Defendants claim that their fraud was fully out in the open on June 21, 2016 when they announced the model change to "'eliminat[e] grey marketing'" and reduce "discount[ing] as much as we've been discounting." MTD at 6, 8; ¶69 n.8. This disclosure may have alerted investors to the existence of increased discounts, but it revealed nothing about the scheme, which resulted from top-down pressure from executives, or Defendants' consciously false inventory statements. ¶¶53-55, 83, 87. Rather, these facts were not known until the SEC Order. *Cf. Monroe Cnty. Emps.' Ret. Sys. v. S. Co.*, 2018 WL 1558577, at *5 (N.D. Ga. Mar. 29, 2018) (finding that "Defendants have failed to identify any fact that indicates Plaintiffs discovered evidence of scienter prior to the publication of The New York Times article").

Indeed, in announcing the model change, Lesjak *disclaimed* any fraud, assuring that, absent the change, inventory would have been "[at the] right levels." ECF 47-9 at 6. And the SEC found that Defendants strategically timed the "model change" to hide the true cause of the disappointing news. *See* SEC Order, ¶36. Because Defendants actively "concealed . . . that [they] made a misstatement with an intent to deceive" on the call, the statute did not begin on that date. *Merck*, 559 U.S. at 649. It is thus unsurprising that Defendants fail to cite a single Section 10(b) fraud case finding claims time-barred simply because they were brought more than two years after the final corrective disclosure, instead citing only to non-fraud Section 11 cases that do not have a scienter element. *See Freidus v. Barclays Bank PLC*, 734 F.3d 132 (2d Cir. 2013); *Amorosa v. AOL Time Warner Inc.*, 409 F. App'x 412, 416 (2d Cir. 2011) (same); *In re Obalon Therapeutics, Inc.*, 2019 WL 4729461, at *12 (S.D. Cal. Sept. 25, 2019) (same).[21] And critically, facts sufficient to establish falsity – which triggered the statute of limitations in the Section 11 cases cited by

---

[21]    Indeed, courts in this District have distinguished Defendants' cases as narrowly applicable to the rare situation where "disclosures contained the '*same alleged untruths and omissions*'" sufficient to establish falsity in a §11 case. *Booth*, 2014 WL 3749759, at *5; *see also Rieckborn*, 81 F. Supp. 3d at 915 ("[T]he instant case is distinguishable from those cited by defendants [including *Freidus*], in which the disclosures at issue concerned '*precisely*' the information the defendants had allegedly misrepresented or concealed.").

Defendants – are not sufficient to establish scienter. *See* Bloomenthal & Wolff, *3C Sec. & Fed. Corp. Law* §17:47 (2d ed.).

### B.    The Statute of Repose Does Not Bar Plaintiffs' Claims

The statute of repose states that any "action" alleging a securities fraud claim must be "brought" within five years of the alleged violation. 28 U.S.C. §1658(b). This action was brought on November 5, 2020. *See* ECF 1. Even Defendants' Proposed Order on this Motion specifies, "***Date Action Filed: November 5, 2020***." ECF 45-1 at 1. The fact that the Court-appointed Lead Plaintiff – Maryland Electrical – filed a Consolidated Complaint in this same, timely-filed action does not restart the clock for statute of repose purposes.

For these reasons, the court in *Martin v. Altisource* rejected Defendants' argument that a lead plaintiff's filing was barred by the statute of repose, finding that "***[b]y any reasonable understanding, we are in the same action (or suit, or proceeding) that was brought [on November 5, 2020], even though the Plaintiffs have changed***." *Martin v. Altisource Residential Corp.*, 2019 WL 2762923, at *6 (D.V.I. July 2, 2019), *motion to certify appeal denied*, 2019 WL 3945249 (D.V.I. Aug. 21, 2019). Relying on the Supreme Court's decision in *Calpers*, the *Martin* court noted that because the statute of repose only "bars 'suits,' 'actions,' or 'proceedings' brought after the given time period," and the operative complaint "was filed in this suit (or action, or proceeding) that began in 2015, no allegations therein are barred by the statute of repose, even though new Plaintiffs have since been added." 2019 WL 2762923, at *6 (citing *Cal. Pub. Emps.' Ret. Sys. v. ANZ Sec., Inc.*, 137 S. Ct. 2042 (2017)). Similarly, in *Marvell*, the court based its repose analysis for plaintiffs' §10(b) claim from the date that the "first of the consolidated complaints" was filed. *In re Marvell Tech. Grp. Ltd. Sec. Litig.*, 2008 WL 4544439, at *2, *11 (N.D. Cal. Sept. 29, 2008). In other words, the statute of repose was triggered only once, by the first complaint filed in the action ***prior to*** the court's appointment of ***different*** lead plaintiffs and those lead plaintiffs' filing of a consolidated class action complaint. *Id.*; *see also In re Marvell Tech. Grp., Ltd. Sec. Litig.*, No. 5:06-cv-06286 (N.D. Cal.), ECF 1, 114, 135.

Further, the case name and the case civil action number remain the same and the original class plaintiff – York County – remains as the case's named plaintiff. The only difference is that

PLTS' MEM. OF LAW IN OPP. TO DEFS' MOT. TO DISMISS - 4:20-cv-07835-JSW                    - 21 -

4841-9293-2086.v1

the Lead Plaintiff leads the prosecution of its, York County's, and the class's claims. And even if the Complaint was treated as a separate "action" – which it obviously is not – by order of the Court, the Complaint was consolidated into the action timely filed by York County. *See* ECF 30 at 2 (appointing Lead Plaintiff and ordering that all subsequent actions "***shall be consolidated into this action***"); *In re Allstate Corp. Sec. Litig.*, 966 F.3d 595, 616 (7th Cir. 2020) ("Plaintiffs here sought only to rearrange the seating chart within a single, ongoing action.").[22]

The contrary rule Defendants urge would frustrate the purpose of the PSLRA. *See China Agritech, Inc. v. Resh*, _U.S._, 138 S. Ct. 1800, 1807 (2018) ("The PSLRA . . . aims to draw all potential lead plaintiffs into the suit so that the district court will have the full roster of contenders" to consider.). Defendants' rule would wholly preclude that process in an action – like this one – filed near the statute of repose's accrual date. And, the lead plaintiff process allows plaintiffs to "apply for ***the role***" of lead plaintiff "in the first-filed class action," demonstrating that being appointed lead plaintiff is tantamount to assuming a "role" in an existing action, not starting an entirely new action. *Id.* at 1807 n.3, 1812.[23] In any event, the Complaint cannot be dismissed as Defendants failed to challenge the scheme liability claims on repose grounds. *See* MTD at 24 n.8.

### C.    Plaintiffs Have Standing

Defendants argue that Lead Plaintiff lacks standing to prosecute claims related to

---

[22]   To be clear, York County remains active in this action and stands willing to take a more active role should the Court deem it necessary. *See* York County Decl. And, York County's complaint has never been adjudicated and this Court held that Defendants need not respond to it because "an amended complaint is generally filed following the Court's appointment of lead plaintiff" and "Defendants should not be required to respond to a complaint in this case until after lead plaintiff and lead counsel have been appointed and have filed an amended complaint." ECF 17 at 1.

[23]   Defendants have no authority for the draconian rule they urge. Their lone case – *Dekalb Cnty. Pension Fund v. Transocean Ltd.*, 817 F.3d 393, 412 (2d Cir. 2016) – concerned the "'substitution'" of a plaintiff as the purported real party in interest pursuant to Rule 17 in a case where the original plaintiff lacked standing. Plaintiffs are unaware of any case applying *DeKalb Cnty.* to prevent a PSLRA-appointed lead plaintiff from filing a consolidated complaint in the same, first-filed action, and Defendants cite none. *DeKalb Cnty.* held substitution would be improper because the original plaintiff itself lacked standing when filing the original complaint and, therefore, the action "'***was a nullity***'" from the start. *Id.* at 412. The unique application of *DeKalb Cnty.* was confirmed in a later Second Circuit opinion, which permitted the substitution of a later plaintiff and distinguished *DeKalb Cnty.* as being limited to the scenario where "the original plaintiff lacked standing and the court thus lacked subject matter jurisdiction ab initio." *Klein on behalf of Qlik Techs., Inc. v. Qlik Techs., Inc.*, 906 F.3d 215, 227 n.7 (2d Cir. 2018). Here, there is no dispute that York County – the original plaintiff – had standing to file the claims.

4841-9293-2086.v1

misrepresentations made after it sold its HP shares – *i.e.*, after December 30, 2015.  But Defendants concede that Lead Plaintiff purchased shares during the Class Period and sold after at least one corrective disclosure.  Thus, Lead Plaintiff indisputably has individual standing to prosecute the alleged claims.  Moreover, the alleged claims are on behalf of all HP investors during the Class Period stemming from common misrepresentations and omissions made in furtherance of the pull-in scheme.  Thus, where, as here, the alleged misrepresentations are part of a "common course of conduct," "'the questions common to all investors will be relatively substantial,'" regardless of timing of individual transactions.  *Blackie v. Barrack*, 524 F.2d 891, 902-03 (9th Cir. 1975).[24]

Defendants' timing arguments conflate standing with Rule 23(a)'s requirements – a conflation that has been roundly rejected.  *See Melendres v. Arpaio*, 784 F.3d 1254, 1261 (9th Cir. 2015).  Following *Melendres*, it is without dispute that courts must employ the "class certification approach" to standing.  *Id.* at 1262.  Under this approach, "'***once the named plaintiff demonstrates her individual standing to bring a claim, the standing inquiry is concluded***.'"  *Id.* at 1261-62; *see also id.* at 1262 ("'Representative parties who have a direct and substantial interest have standing; the question whether they may be allowed to present claims on behalf of others who have similar, but not identical, interests depends not on standing, but on'" a Rule 23(a) analysis.).  Thus, "'any issues regarding the relationship between the class representative and the passive class members – such as dissimilarity in injuries suffered [based on, for example, timing of purchases] – are relevant only to class certification, ***not to standing***.'"  *Id.*

Many courts follow this approach.  For instance, in *VeriSign*, defendants sought partial summary judgment on the basis that the plaintiffs did not have standing to represent absent class

---

[24] Defendants argue in a stray footnote that even if the claims are not barred, all of the November 5, 2015 statements are inactionable because they "appear in a 10-Q filed by Hewlett-Packard Company before the Class Period" and were not included in HP's November 5 Form 8-K.  MTD at 11 n.3.  This claim fails, first, because it is false and, second, because it is waived as it was raised exclusively in a footnote.  *Est. of Saunders*, 745 F.3d at 962 n.8.  In fact, HP's inflated pro forma gross margin and operating profit margin for the nine months ended July 31, 2015 were ***published for the first time on November 5, 2015***.  ECF 47-2 at 521; ¶95.  Moreover, the Form 8-K advised investors that the "consolidated condensed statements of earnings of HP Inc. for the nine months ended July 31, 2015" – published to investors for the first time on November 5, 2015 – "***should be read in conjunction with*** . . . HP Inc.'s Form 10-Q for the nine months ended July 31, 2015" filed on September 8, 2015.  *Id.*

members who relied on misrepresentations made after the named plaintiffs' acquisitions of VeriSign stock. *In re VeriSign, Inc.*, 2005 WL 88969, at *4 (N.D. Cal. Jan. 13, 2005). The court rejected the claim as "conflat[ing] Article III's standing requirements with Fed. R. Civ. P. 23's class action requirements." *Id.* at *4-*5. The court correctly determined that it was enough for Article III that the lead plaintiffs alleged they relied on certain of defendants' pre-purchase misrepresentations and that the lead plaintiffs were damaged thereby; having established "individual standing," any further "inquiry is governed by [Rule 23(a)]." *Id.*; *see also Peace Officers' Annuity and Benefit Fund of Ga. v. DaVita Inc.*, 372 F. Supp. 3d 1139, 1150 (D. Colo. 2019) (rejecting post-purchase standing argument as an improper "attempt to convert questions of Plaintiffs' typicality or adequacy under Rule 23 into a standing question"); *Alfus v. Pyramid Tech. Corp.*, 764 F. Supp. 598, 605-06 (N.D. Cal. 1991) (rejecting claim that plaintiff could not pursue claims for misstatements after purchases, finding it "arbitrary" and noting that accepting it would wrongly "imply that only someone who bought on the last day of a class period would be able to bring an action based on the logical dates alleged in the Amended Complaint"); *Crowell v. Ionics, Inc.*, 343 F. Supp. 2d 1, 13-14 (D. Mass. 2004) (rejecting identical claim where – like here – plaintiff "alleges a common scheme to defraud"); *In re Symbol Techs., Inc. Sec. Litig.*, 2013 WL 6330665, at *16 (E.D.N.Y. Dec. 5, 2013) (rejecting identical post-purchase claim); *LB Partners, L.P. v. Neutrogena Corp.*, 1995 WL 714447, at *8 (C.D. Cal. Aug. 9, 1995) (plaintiff had standing to sue on misrepresentations made after last purchase as "*Alfus* is consistent with the Supreme Court [precedent]"). And, the court in *Ferris v. Wynn Resorts Ltd.* rejected defendant's "post-purchase" standing arguments, finding that the statements were "part of a common scheme" (citing *Blackie*, 524 F.2d at 891) and noting "[t]he issue raised by the defendants may be more relevant at the class certification stage." 2021 WL 3216462, at *13 (D. Nev. July 28, 2021); *see also Ont. Tchrs.' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*, 2020 WL 1181366, at *13 (D. Conn. Mar. 10, 2020) (same). The same result should follow here.[25] Anyway, the Complaint cannot be

---

[25]  Defendants' authority – *Shurkin v. Golden State Vintners Inc.*, 471 F. Supp. 2d 998 (N.D. Cal. 2006) and *Kelly v. Elec. Arts, Inc.*, 71 F. Supp. 3d 1061 (N.D. Cal. 2014) – predate and conflict with *Melendres*, which "**clearly controls**" now. *See In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., and Prods. Liab. Litig.*, 2017 WL 3058563, at *4 (N.D. Cal. July 19, 2017). And, unlike

dismissed as Defendants do not challenge the scheme claims on standing.  *See* MTD at 24 n.8.

## IX.    THE COMPLAINT STATES A CLAIM UNDER §20(a)

Defendants wrongly claim that Plaintiffs do not allege control with regard to Lores and Bailey.  MTD at 24 n.9.  First, because the argument is relegated to a stray footnote, it is waived.  *See Est. of Saunders*, 745 F.3d at 962 n.8.  Second, "[w]hether [a defendant] is a controlling person is an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions."  *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000); *see also Hefler v. Wells Fargo & Co.*, 2018 WL 1070116, at *14 (N.D. Cal. Feb. 27, 2018) (control allegations subject to Rule 8).  Here, Lores, an HP Executive Officer, was the President of the Printing segment and spoke about Supplies at public events, such as the Analyst Meeting and the June 21, 2016 call.  Bailey was President of APJ and directed the scheme through approval of eclipse discounts.  *See Montage*, 78 F. Supp. 3d at 1228 ("'[c]ourts have found general allegations concerning an individual's title and responsibilities to be sufficient to establish control'").[26]

## X.    CONCLUSION

For the foregoing reasons, the Motion should be denied in its entirety.  If, however, the Court finds the allegations of the Complaint lacking, Plaintiffs should have an opportunity to amend and would respectfully request 45 days to do so.  *See* Fed. R. Civ. P. 15(a)(2).

DATED:  August 20, 2021

s/ DARRYL ALVARADO
DARRYL J. ALVARADO

here, plaintiffs in *Shurkin* and *Kelly* did not allege a common scheme.  *Cf. Crowell*, 343 F. Supp. 2d at 13 (standing for post-purchase misrepresentations where "statements allegedly were made in furtherance of a common scheme to defraud"); *DaVita Inc.*, 372 F. Supp. 3d at 1150 ("'cases . . . which apply a "common course of conduct analysis" to standing questions are better reasoned than cases that require the lead plaintiff to have purchased on the last day of the class period'"); *Ferris*, 2021 WL 3216462, at *13 (same).  Defendants' other authority, *In re Solarcity Corp. Sec. Litig.*, did "not reach the issue of standing" (274 F. Supp. 3d 972, 1087-88 (N.D. Cal. 2017)), and, *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 501 (9th Cir. 1992), concerned a lack of individual standing.

[26]  *See also Petrie v. Elec. Game Card, Inc.*, 2015 WL 475958, at *7 (C.D. Cal. Feb. 5, 2015) (making statements demonstrates control).  Defendants' challenge to the §20(a) claim against HP, Lesjak, and Weisler, fails as Plaintiffs have adequately pled a primary violation (*supra* at §IV.-VIII.).

4841-9293-2086.v1

ROBBINS GELLER RUDMAN
  & DOWD LLP
DARREN J. ROBBINS
DARRYL J. ALVARADO
RACHEL A. COCALIS
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
darrenr@rgrdlaw.com
dalvarado@rgrdlaw.com
rcocalis@rgrdlaw.com

Lead Counsel for Lead Plaintiff

4841-9293-2086.v1

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on August 20, 2021, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ DARRYL J. ALVARADO
DARRYL J. ALVARADO

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  dalvarado@rgrdlaw.com

4841-9293-2086.v1

# Mailing Information for a Case 4:20-cv-07835-JSW York County on Behalf of the County of York Retirement Fund v. HP Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Michael Albert**
  malbert@rgrdlaw.com,MAlbert@ecf.courtdrive.com,e_file_SD@rgrdlaw.com

- **Darryl James Alvarado**
  dalvarado@rgrdlaw.com,E_File_SD@rgrdlaw.com,nhorstman@rgrdlaw.com,mkuwashima@rgrdlaw.com

- **Sara B. Brody**
  sbrody@sidley.com,ddelarocha@sidley.com,sarah-hemmendinger-9052@ecf.pacerpro.com,sfdocket@sidley.com,sara-brody-9555@ecf.pacerpro.com

- **Rachel A. Cocalis**
  rcocalis@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Matthew James Dolan**
  mdolan@sidley.com,sfefilingnoitce@sidley.com,sfdocket@sidley.com,matthew-dolan-7481@ecf.pacerpro.com

- **Katherine Leigh Henderson**
  khenderson@wsgr.com,lnicolini@wsgr.com

- **Michael James Kahn**
  MJKahn@gibsondunn.com,molave@gibsondunn.com

- **Brian Michael Lutz**
  BLutz@gibsondunn.com

- **Danielle Suzanne Myers**
  dmyers@rgrdlaw.com,dmyers@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

- **Lissa Marie Percopo**
  lpercopo@gibsondunn.com

- **Darren Jay Robbins**
  darrenr@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Steven Mark Schatz**
  sschatz@wsgr.com,eblackey@wsgr.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)