ROBBINS GELLER RUDMAN
 & DOWD LLP
DARREN J. ROBBINS (168593)
DARRYL J. ALVARADO (253213)
RACHEL A. COCALIS (312376)
T. ALEX B. FOLKERTH (338140)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
darrenr@rgrdlaw.com
dalvarado@rgrdlaw.com
rcocalis@rgrdlaw.com
afolkerth@rgrdlaw.com

Lead Counsel for Lead Plaintiff Maryland Electrical
Industry Pension Fund and Plaintiff York County on
behalf of the County of York Retirement Fund

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| YORK COUNTY ON BEHALF OF THE COUNTY OF YORK RETIREMENT FUND, Individually and on Behalf of All Others Similarly Situated,<br><br>         Plaintiff,<br><br>  vs.<br><br>HP INC., et al.,<br><br>         Defendants. | Case No. 4:20-cv-07835-JSW (LJC)<br><br>CLASS ACTION<br><br>PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' RENEWED MOTION TO DISMISS THE CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |

4871-8650-5592.v1

**TABLE OF CONTENTS**

**Page**

I.      ISSUES TO BE DECIDED ..................................................................................................1

II.     INTRODUCTION ...........................................................................................................1

III.    SUMMARY OF THE FRAUDULENT SCHEME .........................................................2

IV.     PLAINTIFFS' CLAIMS ARE TIMELY ......................................................................6

      A.   Lead Plaintiff's Same-Court, Same-Action Number, Same-Claims, Same-Proposed-Class, Consolidated Complaint Is Timely ..............................................6

      B.   York County's Complaint Is Timely .......................................................................10

V.      PLAINTIFFS HAVE STANDING TO ASSERT THE ALLEGED CLAIMS ................11

VI.     PLAINTIFFS ADEQUATELY PLEAD A SCHEME LIABILITY CLAIM ..................15

VII.    PLAINTIFFS ADEQUATELY PLEAD MATERIAL MISREPRESENTATIONS AND OMISSIONS ........................................................................................................16

      A.   The Channel Inventory Statements and Omissions ................................................17

      B.   The Pricing and Margin Statements and Omissions ..............................................19

      C.   The APJ Growth Statements and Omissions ..........................................................22

      D.   The "On Track" Statements and Omissions ...........................................................22

VIII.   PLAINTIFFS ADEQUATELY ALLEGE SCIENTER .................................................23

      A.   Defendants Had Actual Knowledge........................................................................25

      B.   The Core-Operations Doctrine Supports Scienter ................................................28

      C.   Additional Allegations of Scienter..........................................................................30

      D.   The Ninth Circuit Aptly Rejected Defendants' Competing Inference....................31

IX.     PLAINTIFFS ALLEGE LOSS CAUSATION...............................................................32

X.      THE COMPLAINT STATES A CLAIM UNDER §20(a)..............................................35

XI.     CONCLUSION...............................................................................................................35

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Aldridge v. A.T. Cross Corp.*,
284 F.3d 72 (1st Cir. 2002).............................................................................................................30

*Alfus v. Pyramid Tech. Corp.*,
764 F. Supp. 598 (N.D. Cal. 1991)..................................................................................................14

*Anschutz Corp. v. Merrill Lynch and Co. Inc.*,
785 F. Supp. 2d 799 (N.D. Cal. 2011),
*motion to certify appeal denied*, 2011 WL 2160888
(N.D. Cal. June 1, 2011).................................................................................................................22

*Azar v. Yelp, Inc.*,
2018 WL 6182756 (N.D. Cal. Nov. 27, 2018)..........................................................................20, 29

*Backe v. Novatel Wireless Inc.*,
642 F. Supp. 2d 1169 (S.D. Cal. 2009)............................................................................................31

*Baker v. Carr*,
369 U.S. 186 (1962).........................................................................................................................11

*Bao v. Solarcity Corp.*,
2016 WL 54133 (N.D. Cal. Jan. 5, 2016).........................................................................................35

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008)...........................................................................................................17

*Betz v. Trainer Wortham & Co., Inc.*,
829 F. Supp. 2d 860 (N.D. Cal. 2011).............................................................................................11

*Blackie v. Barrack*,
524 F.2d 891 (9th Cir. 1975)......................................................................................................11, 13

*Bos. Ret. Sys. v. Uber Techs., Inc.*,
2020 WL 4569846 (N.D. Cal. Aug. 7, 2020)...................................................................................19

*Brody v. Transitional Hosps. Corp.*,
280 F.3d 997 (9th Cir. 2002)...........................................................................................................20

*China Agritech, Inc. v. Resh*,
__ U.S. __, 138 S. Ct. 1800 (2018)....................................................................................................9

*City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*,
2019 WL 6877195 (N.D. Cal. Dec. 17, 2019)..................................................................................22

*Crowell v. Ionics, Inc.*,
  343 F. Supp. 2d 1 (D. Mass. 2004) ...................................................................................14

*Cutler v. Kirchner*,
  696 F. App'x 809 (9th Cir. 2017) ....................................................................................23

*De Vito v. Liquid Holdings Grp., Inc.*,
  2018 WL 6891832 (D.N.J. Dec. 31, 2018) .......................................................................9

*DeKalb Cnty. Pension Fund v. Transocean Ltd*,
  817 F.3d 393 (2d Cir. 2016)..............................................................................................9

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005)........................................................................................................32

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009)............................................................................................31

*Elec. Workers Pension Fund, Loc. 103, I.B.E.W. v. HP Inc.*,
  2021 WL 1056549 (N.D. Cal. Mar. 19, 2021)................................................................28

*Eminence Cap., LLC v. Aspeon, Inc.*,
  316 F.3d 1048 (9th Cir. 2003) ........................................................................................35

*Est. of Saunders v. C.I.R.*,
  745 F.3d 953 (9th Cir. 2014) .....................................................................................16, 35

*Evanston Police Pension Fund v. McKesson Corp.*,
  411 F. Supp. 3d 580 (N.D. Cal. 2019) ............................................................................30

*Fallick v. Nationwide Mut. Ins. Co.*,
  162 F.3d 410 (6th Cir. 1998) ..........................................................................................12

*Ferris v. Wynn Resorts Ltd.*,
  2021 WL 3216462 (D. Nev. July 28, 2021) ....................................................................15

*Fialkov v. Microsoft Corp.*,
  72 F. Supp. 3d 1220 (W.D. Wash. 2014)........................................................................19

*Friends of Yosemite Valley v. Kempthorne*,
  520 F.3d 1024 (9th Cir. 2008) ........................................................................................20

*Gammel v. Hewlett-Packard Co.*,
  2013 WL 1947525 (C.D. Cal. May 8, 2013) ..................................................................30

*Gammel v. Hewlett-Packard Co.*,
  905 F. Supp. 2d 1052 (C.D. Cal. 2012) ..........................................................................29

PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' RENEWED
MOTION TO DISMISS THE CONSOLIDATED COMPLAINT - 4:20-cv-07835-JSW (LJC)        - iii -
4871-8650-5592.v1

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
  63 F.4th 747 (9th Cir. 2023) ...............................................................................................20, 22

*Glazer Cap. Mgmt., LP v. Magistri*,
  549 F.3d 736 (9th Cir. 2008) ...............................................................................................21, 28

*Gratz v. Bollinger*,
  539 U.S. 244 (2003)....................................................................................................................13

*Hanon v. Dataproducts Corp.*,
  F.2d 497, 509 (9th Cir. 1992) ....................................................................................................15

*Hefler v. Wells Fargo & Co.*,
  2018 WL 1070116 (N.D. Cal. Feb. 27, 2018) ...........................................................................35

*Hevesi v. Citigroup Inc.*,
  366 F.3d 70 (2d Cir. 2004).........................................................................................................13

*Hoang v. ContextLogic, Inc.*,
  No. 5:21-cv-03930, ECF 98 (N.D. Cal. Mar. 10, 2023) ............................................................21

*Hogan v. Pilgrim's Pride Corp.*,
  73 F.4th 1150 (10th Cir. 2023) .................................................................................................7, 10

*Howard v. Everex Sys., Inc.*,
  228 F.3d 1057 (9th Cir. 2000) ....................................................................................................35

*In re Alphabet, Inc. Sec. Litig.*,
  1 F.4th 687 (9th Cir. 2021) ...........................................................................................15, 23, 29

*In re Amgen Inc. Sec. Litig.*,
  2014 WL 12585809 (C.D. Cal. Aug. 4, 2014)............................................................................26

*In re Apple Inc., Sec. Litig.*,
  2020 WL 2857397 (N.D. Cal. June 2, 2020)..............................................................................22

*In re Asacol Antitrust Litig.*,
  907 F.3d 42 (1st Cir. 2018).....................................................................................................12, 13

*In re Atmel Corp. Derivative Litig.*,
  2007 WL 2070299 (N.D. Cal. July 16, 2007 .............................................................................16

*In re BofI Holding, Inc. Sec. Litig.*,
  977 F.3d 781 (9th Cir. 2020) ......................................................................................................34

*In re Connetics Corp. Sec. Litig.*,
  542 F. Supp. 2d 996 (N.D. Cal. 2008) ...................................................................................13, 14

*In re Daou Sys., Inc.*,
    411 F.3d 1006 (9th Cir. 2005) .........................................................................................19

*In re ECOtality, Inc. Sec. Litig.*,
    2014 WL 4634280 (N.D. Cal. Sept. 16, 2014) ...............................................................26

*In re Finisar Corp. Derivative Litig.*,
    2012 WL 2873844 (N.D. Cal. July 12, 2012) .................................................................31

*In re FirstEnergy Corp. Sec. Litig.*,
    2022 WL 681320 (S.D. Ohio Mar. 7, 2022) ...................................................................15

*In re Ford Motor Co./Citibank (S.D.), N.A.*,
    264 F.3d 952 (9th Cir. 2001) ...........................................................................................10

*In re Galena Biopharma, Inc. Sec. Litig.*,
    117 F. Supp. 3d 1145 (D. Or. 2015) ...............................................................................16

*In re Gilead Scis. Sec. Litig.*,
    536 F.3d 1049 (9th Cir. 2008) .........................................................................................32

*In re Infineon Tech. AG Sec. Litig.*,
    2008 WL 11333947 (N.D. Cal. Aug. 13, 2008) ...............................................................6

*In re Juniper Networks, Inc. Sec. Litig.*,
    542 F. Supp. 2d 1037 (N.D. Cal. 2008) ............................................................................6

*In re LendingClub Sec. Litig.*,
    254 F. Supp. 3d 1107 (N.D. Cal. 2017) ..........................................................................22

*In re LexinFintech Holdings Ltd. Sec. Litig.*,
    2021 WL 5530949 (D. Or. Nov. 24, 2021)......................................................................8

*In re Marvell Tech. Grp. Ltd. Sec. Litig.*,
    2008 WL 4544439 (N.D. Cal. Sept. 29, 2008) .............................................................6, 8

*In re Mattel, Inc. Sec. Litig.*,
    2021 WL 1259405 (C.D. Cal. Jan. 26, 2021) .................................................................34

*In re Maxim Integrated Prods., Inc., Derivative Litig.*,
    574 F. Supp. 2d 1046 (N.D. Cal. 2008) ..........................................................................11

*In re Montage Tech. Grp. Ltd. Sec. Litig.*,
    78 F. Supp. 3d 1215 (N.D. Cal. 2015) ......................................................................29, 35

*In re Mylan N.V. Sec. Litig.*,
    2018 WL 1595985 (S.D.N.Y. Mar. 28, 2018) ................................................................31

*In re Nektar Therapeutics Sec. Litig.*,
  34 F.4th 828 (9th Cir. 2022) ....................................................................................21, 34

*In re Nio, Inc. Sec. Litig.*,
  2023 WL 5048615 (E.D.N.Y. Aug. 8, 2023).................................................................8, 9

*In re NVIDIA Corp. Sec. Litig.*,
  768 F.3d 1046 (9th Cir. 2014) ........................................................................................26

*In re Plantronics, Inc. Sec. Litig.*,
  2022 WL 3653333 (N.D. Cal. Aug. 17, 2022) ...........................................................22, 29

*In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions*,
  148 F.3d 283 (3d Cir. 1998)............................................................................................15

*In re Qualcomm Inc. Sec. Litig.*,
  2019 WL 1239301 (S.D. Cal. Mar. 18, 2019) .................................................................25

*In re Quality Sys., Inc. Sec. Litig.*,
  865 F.3d 1130 (9th Cir. 2017) ........................................................................................28

*In re Symbol Techs., Inc. Sec. Litig.*,
  2013 WL 6330665 (E.D.N.Y. Dec. 5, 2013) ...................................................................14

*In re Under Armour Sec. Litig.*,
  2021 WL 1985015 (D. Md. May 18, 2021).................................................................24, 31

*In re VeriFone Holdings, Inc. Sec. Litig.*,
  704 F.3d 694 (9th Cir. 2012) ...........................................................................17, 24, 31

*In re VeriSign, Inc.*,
  2005 WL 88969 (N.D. Cal. Jan. 13, 2005).................................................................11, 14

*In re Vivendi Univ., S.A.*,
  242 F.R.D. 76 (S.D.N.Y. 2007) ......................................................................................15

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs.,*
  *and Prods. Liab. Litig.*,
  2017 WL 3058563 (N.D. Cal. July 19, 2017)..................................................................13

*In re WageWorks, Inc., Sec. Litig.*,
  2020 WL 2896547 (N.D. Cal. June 1, 2020)...................................................................33

*Iron Workers Loc. 580 Joint Funds v. Nvidia Corp.*,
  2020 WL 1244936 (N.D. Cal. Mar. 16, 2020)................................................................21

*Irving Firemen's Relief & Ret. Fund v. Uber Techs., Inc.*,
  998 F.3d 397 (9th Cir. 2021) ..........................................................................................34

*Khoja v. Orexigen Therapeutics, Inc.*,
   899 F.3d 988 (9th Cir. 2018) ................................................................17, 18, 21, 22

*Kirola v. City & Cnty. of S.F.*,
   860 F.3d 1164 (9th Cir. 2017) ................................................................2, 13

*LB Partners, L.P. v. Neutrogena Corp.*,
   1995 WL 714447 (C.D. Cal. Aug. 9, 1995)................................................................15

*Leber v. Citigroup 401(k) Plan Inv. Comm.*,
   323 F.R.D. 145 (S.D.N.Y. 2017) ................................................................9

*Lierboe v. State Farm Mut. Auto. Ins. Co.*,
   350 F.3d 1018 (9th Cir. 2003) ................................................................9

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
   416 F.3d 940 (9th Cir. 2005) ................................................................23

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
   797 F.3d 160 (2d Cir. 2015)................................................................24

*Lorenzo v. SEC*, __ U.S. __,
   139 S. Ct. 1094 (2019)................................................................16

*Malhotra v. Equitable Life Assurance Soc'y*,
   364 F. Supp. 2d 299 (E.D.N.Y. 2005) ................................................................11

*Martin v. Altisource Residential Corp.*,
   2019 WL 2762923 (D.V.I. July 2, 2019) ................................................................8

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011)................................................................30

*Melendres v. Arpaio*,
   784 F.3d 1254 (9th Cir. 2015) ................................................................1, 11, 12, 13

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
   540 F.3d 1049 (9th Cir. 2008) ................................................................22, 32, 33

*Miller v. Thane Int'l, Inc.*,
   519 F.3d 879 (9th Cir. 2008) ................................................................17

*Mineworkers' Pension Scheme v. First Solar Inc.*,
   881 F.3d 750 (9th Cir. 2018) ................................................................1, 3, 32, 33

*Morrison v. YTB Int'l, Inc.*,
   649 F.3d 533 (7th Cir. 2011) ................................................................12

*Mulderrig v. Amyris, Inc.*,
    492 F. Supp. 3d 999 (N.D. Cal. 2020) ...............................................................................24

*Murphy v. Precision Castparts Corp.*,
    2017 WL 3084274 (D. Or. June 27, 2017) ........................................................................22

*N.M. State Inv. Council v. Ernst & Young LLP*,
    641 F.3d 1089 (9th Cir. 2011) .........................................................................................29

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
    693 F.3d 145 (2d Cir. 2012)........................................................................................12, 13

*New York Hotel Trades Council & Hotel Ass'n of NYC,*
    *Inc. Pension Fund v. Impax Labs., Inc.*,
    843 F. App'x 27 (9th Cir. 2021) ...........................................................................9, 10, 33

*Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*,
    380 F.3d 1226 (9th Cir. 2004) .........................................................................................28

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda*,
    730 F.3d 1111 (9th Cir. 2013) .........................................................................................32

*Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*,
    2023 WL 3781645 (N.D. Tex. June 2, 2023) .....................................................................9

*Okla. Firefighters Pension and Ret. System v. Lexmark Int'l, Inc.*,
    367 F. Supp. 3d 16 (S.D.N.Y. 2019).................................................................................29

*Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
    774 F.3d 598 (9th Cir. 2014) .....................................................................................32, 33

*Paciga v. Invuity Inc.*,
    2019 WL 3779694 (N.D. Cal. Aug. 12, 2019) .................................................................26

*Palm Harbor Special Fire Control & Rescue Dist.*
    *Firefighters Pension Plan v. First Solar Inc.*,
    2023 WL 4161355 (D. Ariz. June 23, 2023) ....................................................................34

*Peace Officers' Annuity and Benefit Fund of Ga. v. DaVita Inc.*,
    372 F. Supp. 3d 1139 (D. Colo. 2019)........................................................................14, 15

*Pension Plan Board v. Teva Pharm. Indus. Ltd.*,
    2020 WL 1181366 (D. Conn. Mar. 10, 2020) ............................................................13, 15

*Petrie v. Elec. Game Card, Inc.*,
    2015 WL 475958 (C.D. Cal. Feb. 5, 2015).......................................................................35

*Police and Fire Ret. Sys. of City of Detroit v. IndyMac MBS, Inc.*,
    721 F.3d 95 (2d Cir. 2013)..................................................................................................9

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
   759 F.3d 1051 (9th Cir. 2014) ......................................................................................26

*Prodanova v. H.C. Wainwright & Co., LLC*,
   993 F.3d 1097 (9th Cir. 2021) ......................................................................................30

*Reese v. Malone*,
   747 F.3d 557 (9th Cir. 2014) ................................................................................. *passim*

*Ret. Sys. v. ANZ Sec., Inc.*,
   582 U.S. 497 (2017).............................................................................................. *passim*

*Rihn v. Acadia Pharms. Inc.*,
   2016 WL 5076147 (S.D. Cal. Sept. 19, 2016)...............................................................23

*S. Ferry LP #2 v. Killinger*,
   687 F. Supp. 2d 1248 (W.D. Wash. 2009).............................................................27, 28

*Schleicher v. Wendt*,
   2009 WL 761157 (S.D. Ind. Mar. 20, 2009)..................................................................13

*Se. Pa. Transp. Auth. v. Orrstown Fin. Servs. Inc.*,
   12 F.4th 337 (3d Cir. 2021) .................................................................................8, 9, 10

*SEB Inv. Mgmt. AB v. Align Tech., Inc.*,
   485 F. Supp. 3d 1113 (N.D. Cal. 2020) ........................................................................29

*SEC v. Cotton*,
   2006 WL 6382128 (C.D. Cal. Dec. 21, 2006) ...............................................................16

*Shenwick v. Twitter, Inc.*,
   282 F. Supp. 3d 1115 (N.D. Cal. 2017) ................................................................. *passim*

*Shurkin v. Golden State Vintners Inc.*,
   471 F. Supp. 2d 998 (N.D. Cal. 2006) ....................................................................13, 14

*Sosna v. Iowa*,
   419 U.S. 393 (1975)......................................................................................................12

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007).....................................................................................................24

*Thomas v. Magnachip Semiconductor Corp.*,
   167 F. Supp. 3d 1029 (N.D. Cal. 2016) ........................................................................31

*True Health Chiropractic Inc. v. McKesson Corp.*,
   2014 WL 2860318 (N.D. Cal. June 23, 2014) ...............................................................10

*Veal v. LendingClub Corp.*,
423 F. Supp. 3d 785 (N.D. Cal. 2019) .........................................................................................29

*Warth v. Seldin*,
422 U.S. 490 (1975)......................................................................................................................15

*Webb v. Solarcity Corp.*,
884 F.3d 844 (9th Cir. 2018) .......................................................................................................28

*West v. EHealth, Inc.*.
2016 WL 948116 (N.D. Cal. Mar. 14, 2016)................................................................................18

*Weston v. DocuSign, Inc.*,
2023 WL 3000583 (N.D. Cal. Apr. 18, 2023) .................................................................23, 28, 33

*Winer Fam. Tr. v. Queen*,
503 F.3d 319 (3d Cir. 2007).........................................................................................................15

*Wochos v. Tesla, Inc.*,
985 F.3d 1180 (9th Cir. 2021) ......................................................................................................23

*Yan v. ReWalk Robotics Ltd.*,
973 F.3d 22 (1st Cir. 2020)...........................................................................................................15

*York Cnty. on Behalf of Cnty. of York Ret. Fund v. HP, Inc.*,
65 F.4th 459 (9th Cir. 2023) ............................................................................................... *passim*

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009), *amended* (Feb. 10, 2009) ...........................................................26

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
§77k........................................................................................................................................12
§78j(b).............................................................................................................................. *passim*
§78t(a) ....................................................................................................................................35
§78u-4(a)(3)(A)(i) ....................................................................................................................6

28 U.S.C.
§1658....................................................................................................................................6, 7
§1658(b)....................................................................................................................................6

17 CFR
§202.5(d)................................................................................................................................31

Federal Rules of Civil Procedure
    Rule 12 ................................................................................................10, 15, 34
    Rule 12(b)(6)........................................................................................................32
    Rule 12(g)(2)...................................................................................................15, 16
    Rule 15(c)..........................................................................................................9, 10
    Rule 17(a)(3) .........................................................................................................9
    Rule 23 .............................................................................................12, 13, 14, 15
    Rule 23(a)............................................................................................11, 12, 14
    Rule 24 ..................................................................................................................9

**APPENDIX OF DEFINED TERMS**

| | |
|---|---|
| "Analyst Meeting" | HP's inaugural Security Analyst Meeting, held on September 15, 2015 |
| "APJ" | HP's Asia Pacific and Japan Region |
| "Bailey" | Richard Bailey, President of HP's APJ region during the Class Period |
| "Class Period" | November 5, 2015 - June 21, 2016 |
| "Complaint" or "Consolidated Complaint" | Consolidated Complaint for Violation of the Federal Securities Laws (ECF 37) |
| "Defendants" | HP Inc., Dion J. Weisler, Catherine A. Lesjak, Enrique Lores, and Richard Bailey |
| "First Motion" | Defendants' Motion to Dismiss the Consolidated Complaint (ECF 45) |
| "HP" or "Company" | HP Inc. |
| "HPC" | Hewlett-Packard Company |
| "Lead Plaintiff" or "Maryland Electrical" | Maryland Electrical Industry Pension Fund |
| "Lesjak" | Catherine A. Lesjak, CFO of HP during the Class Period |
| "Lores" | Enrique Lores, President of HP's Imaging & Printing business during the Class Period |
| "Model" | Four Box Model |
| "Motion" or "Mtn." | Defendants' Renewed Motion to Dismiss the Consolidated Complaint (ECF 69) |
| "Oral Argument" | *York County v. HP, Inc.*, No. 22-15501, Oral Argument, (9th Cir. Feb. 6, 2023) https://www.ca9.uscourts.gov/media/audio/?20230206/22-15501/ |
| "Plaintiffs" | Maryland Electrical and York County, collectively |
| "PSLRA" | Private Securities Litigation Reform Act of 1995 |
| "QBRs" | Quarterly Business Reviews |
| "SEC" | Securities and Exchange Commission |
| "SEC Order" | Order Instituting Cease-and-Desist Proceedings Pursuant to §8A of the Securities Act of 1933 and §21C of the Securities Exchange Act of 1934, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order (ECF 37-1) |
| "Weisler" | Dion J. Weisler, CEO of HP during the Class Period |
| "WOS" | HP's Weeks of Supply inventory metric |
| "York County" | York County on behalf of the County of York Retirement Fund |
| "York County Decl." | Declaration of York County on behalf of the County of |

| | York Retirement Fund in Support of Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Consolidated Complaint (ECF 52) |

## I.    ISSUES TO BE DECIDED

1.    Whether this action is timely under the statute of repose.

2.    Whether Plaintiffs have standing to challenge misstatements made in 2016.

3.    Whether the Complaint sufficiently pleads scheme liability, falsity, scienter, and loss causation under §10(b) and Rule 10b-5(a)-(c).

## II.    INTRODUCTION

This case is about a straightforward pull-in scheme and misrepresentations and omissions perpetrated to conceal the true state of HP's Supplies business – the Company's most important segment.  Defendants' scheme and misrepresentations created the false impression that profits and channel inventory were improving and masked the true state of HP's financial and channel inventory health.  When Defendants could no longer conceal the truth, they disclosed disappointing margins and revenue and ultimately recognized the need to clear out *$700 million* in excess inventory – negative results that were proximately caused by the pull-in scheme.  These disclosures caused HP's stock price to decline and investors to suffer significant monetary damage.  Plaintiffs did not learn of the pull-in scheme until the SEC issued a detailed Order finding that Defendants' conduct and misrepresentations alleged herein violated the federal securities laws.

Understanding that the SEC Order and Ninth Circuit opinion establish their liability, Defendants lodge a series of legal arguments in the hopes that one sticks.  But while their arguments are numerous, they are not meritorious.  In fact, they have been repeatedly rejected by courts around the country.  Indeed, the Ninth Circuit recently rejected many of them in *York Cnty. on Behalf of Cnty. of York Ret. Fund v. HP, Inc.*, 65 F.4th 459 (9th Cir. 2023).

*First*, the statute of repose does not bar the misstatement claim.  Defendants' nonsensical proposed rule that a lead plaintiff's same-court, same-action number, same-claims, same-proposed-class Complaint somehow comprises a different "action" flies in the face of common sense, binding law, and this Court's orders.

*Second*, because Lead Plaintiff indisputably has individual standing arising from its purchases of HP stock, it has *class standing* to represent purchasers who were damaged by related misstatements.  *See Melendres v. Arpaio*, 784 F.3d 1254, 1261-62 (9th Cir. 2015) (holding "once the

named plaintiff demonstrates her individual standing to bring a claim, the standing inquiry is concluded"); *accord Kirola v. City & Cnty. of S.F.*, 860 F.3d 1164, 1176 (9th Cir. 2017). Judge Bybee understood this critical distinction when concluding during the Ninth Circuit argument: "*I don't think this case should be dismissed for standing*." Oral Argument at 3:30-3:56.

*Third*, Defendants' belated argument that the scheme liability claim fails because Plaintiffs do not allege conduct apart from misstatements is belied by the Complaint's detailed pull-in allegations and, in any event, has been expressly rejected by the Ninth Circuit.

*Finally*, Defendants' throwaway arguments as to falsity, scienter, and loss causation are easily dispensed with.[1] Their statements and omissions are actionable because they created a materially misleading impression, as confirmed by the SEC Order. And, upon examining the Complaint's scienter allegations, the Ninth Circuit concluded: "HP disclosed information about its supply channel health that contradicted its own internal data . . . [which] *creates a strong inference that HP knowingly misled the public as to the state of the company*." *York Cnty.*, 65 F.4th at 467-68. Lastly, Defendants' overly restrictive loss causation argument has been repeatedly rejected by the Ninth Circuit and this Court. The Motion should be denied.

### III.    SUMMARY OF THE FRAUDULENT SCHEME

Defendants' pull-in scheme was designed to conceal the true state of HP's Supplies business – far and away the Company's most important segment. ¶2.[2] According to Weisler, HP's "business as a whole generates the *vast majority* of its profit from our Printing segment," particularly the Supplies business. ¶26. One analyst "estimate[d] supplies account for *110%*" of HP's operating profit, concluding that "*supplies growth is the most important driver of profit growth for HP*." ¶3.

HP split from HPC immediately prior to the Class Period and in the months leading up to its formation, Supplies revenues had declined for multiple quarters in a row and channel inventory

---

[1]    Through silence, Defendants concede the following elements required for §10(b) and Rule 10b-5 claims: (1) the materiality of the alleged misrepresentations and omissions; (2) their connection to the purchase or sale of HP stock; (3) reliance; and (4) damages.

[2]    The Complaint constitutes Plaintiffs' statement of facts. In the interest of brevity, detailed herein is a summary of the scheme that highlights allegations pertinent to Defendants' arguments. Unless otherwise noted, all "¶" or "¶¶" references are to the Complaint and emphasis is added and internal citations and quotation marks are omitted.

levels were elevated. ¶¶4, 24. These metrics were critical to investors' evaluation of HP given Supplies' singular importance to HP's profitability and growth. As a result, analysts probed frequently about these concerning trends. *Id.*; *see also* ¶34 (Jeffries analyst: "When Will Supplies Stabilize?"). To quell the market's concerns, Defendants held an inaugural Analyst Meeting just prior to the Class Period. ¶5. At the meeting, Defendants emphasized that "[e]very action that . . . we're launching ha[s] one common objective. Improve our supplies business." ¶¶3-5, 24, 36, 38. Indeed, Defendants emphasized no fewer than *10 times* that the new HP was "*all about supplies*," leaving investors with the impression that the Supplies business would generate reliable growth. ¶¶4, 36. In the same vein, Defendants assured that they were "always focused on the channel inventory" and that HP's new structure allowed Defendants to be laser focused on Supplies. ¶¶39-40. Analysts reported enthusiastically on that promised focus. ¶41.

During the Class Period, Defendants continued to tell investors that HP was delivering on the promises made at the Analyst Meeting. ¶5. *First*, Defendants told investors that channel inventories were "declining" and that WOS was "within [HP's] target ranges." *See* ¶¶120, 122-123, 125-126, 128-130. *Second*, Defendants understated reported declines in pricing, operating profits, and margins, telling investors that the declines were due to temporary external factors, such as "currency movements." *See* ¶¶95-100, 102-107, 109-113, 115. *Third*, Defendants represented that HP was experiencing steady revenue growth in APJ – HP's fastest growing region – "with strength in personal assistance" "amid difficult market conditions" and revenue declines worldwide. ¶¶137-138, 144-145. *Fourth*, Defendants assured investors that the Supplies business was "on track" and "stabiliz[ing]." *See* ¶¶136, 140-143, 147.

In truth, however, Defendants hid ballooning channel inventory and engaged in a pull-in scheme that eroded Supplies margins and profits, increased channel inventories, and sent HP's efforts to stabilize Supplies woefully "off track." ¶6. The scheme included two sales practices known as (i) "gray marketing" or "A-Business" and (ii) "accelerations" or "pull-ins." ¶¶49-50, 56.

"*Gray marketing*" or "*A-Business*" is the practice of selling supplies at steep discounts to channel partners who then sell those supplies outside of their assigned territories. ¶50. Gray marketing was strictly forbidden by HP policy as it erodes margins, cannibalizes sales in other

regions, and leads to channel inventory build-up. *Id.* Indeed, engaging in the practice was a fireable offense. *Id.* Nevertheless, HP executives – recognizing the importance of meeting their financial plans – pressured sales personnel to meet Supplies quotas during the Class Period despite weakening demand. ¶51. Thus, the APJ region resorted to offering enormous discounts (known internally as "eclipse" discounts) to distributors that it knew participated in gray marketing to push unwanted product into the channel. *Id.*; ¶77. This prohibited practice had a snowball effect on all of HP's other regions, which negatively impacted Supplies' pricing and margins worldwide. ¶54.

"*Accelerations*" or "*pull-ins*" are sales – made pursuant to enormous discounts – that would have occurred, if at all, in later periods. ¶5. "[B]eginning in early 2015 and undisclosed to the market," Defendants began using pull-ins to "accelerate sales into the channel to increase quarterly revenue." ¶¶81-82. At this time, Lesjak's team, who received weekly inventory "flash" reports, "began to see regular gaps, near the ends of the quarters between the flash [reports] . . . and budget." ¶81. But, as the Class Period began, HP actually *accelerated* this practice. *Id.* Class Period emails confirm that HP knew that its partners "d[id] not want to carry the level of toner that we push into their warehouses . . . *[b]ut we push more toner in to help deliver on our financial plans*." ¶82. Thus, "[t]his [acceleration] pattern led a *known trend of increasing channel inventory and lower margin sales that continued over multiple quarters*." ¶81.

Despite the devastating impacts of these deceptive practices, Defendants ramped up their prohibited conduct throughout the Class Period. ¶8. As HP exceeded its WOS – the metric provided to the market as an indicator of HP's overall channel health – "*HP's worldwide executives demanded that regional managers remain within their WOS ranges while still delivering sales and operating profit targets*." ¶58. Worse, unbeknownst to investors, the WOS metric included only "Tier 1" channel inventory, not "Tier 2" or other inventory further down the distribution chain. ¶6. HP also engaged in "simultaneous sell-in/sell-through deals" whereby supplies sold to Tier 1 immediately passed through to Tier 2 and beyond and thus out of the disclosed inventory metrics, thereby inflating Supplies sales without any visible channel inventory implications. ¶59.

Defendants knew or recklessly disregarded that the pull-in scheme rendered their Class Period statements misleading. ¶¶7, 150-198. By their own admission, the Supplies business was

Defendants' primary focus, as the new HP was "*all about supplies*." ¶¶151-155. Further, Defendants admitted that they monitored Supplies pricing and inventory and assured investors that they had the data to understand HP's performance, including data from the Model. ¶¶156-159; 171-178. In fact, Weisler led QBRs during which Defendants "dove deep[]" into the minutiae of the Supplies business, including the review of detailed QBR presentations. ¶¶160-164. These QBR presentations expressly differentiated between A-business and legitimate sales (*id.*), and thus, would have alerted Defendants to the fact that the prohibited practice was occurring by early 2015. Further, HP's internal reports revealed that in some cases A-business actually *exceeded* legitimate business (¶55), and Bailey, as the region head of APJ, had to approve these policy-violating discounts. ¶52. Unsurprisingly, the SEC determined that during the Class Period, HP internally "recognized that the A-business was cannibalizing sales . . . and reducing HP's margins" in multiple regions. ¶79.

Defendants also knew that their channel inventory statements – deceptively and consciously confined to Tier 1 inventory – were misleading. Although they monitored Tier 2 inventory, Defendants knew that WOS *excluded* Tier 1 inventory. Lesjak set channel inventory ceilings and quantified inventory in Tier 1 and Tier 2 channels according to "a pretty robust process." ¶¶64, 188. Weisler and Lesjak, who were intimately familiar with monitoring WOS and Tier 2 inventory levels, repeatedly advised investors about whether HP was within its WOS ranges. *See id.*; ¶¶179-183. Further, Lores was responsible for monitoring Tier 1 and Tier 2 inventory levels and keeping sales teams accountable to their inventory ceilings. ¶¶166, 170. Critically, Lesjak's department monitored WOS inventory targets using weekly "flash reports" that compared quarterly inventory metrics against HP's budget. ¶¶165-170. According to the SEC, *in early 2015 "HP began to see regular gaps, near the ends of quarters between [Lesjak's team's] flash [reports] . . . and budget*," and HP's continued "pattern [of accelerations] *led to a known trend* of increasing channel inventory and lower margin sales that continued over multiple quarters." *Id.*; *see also* ¶81.

When the economic effects of the scheme, misrepresentations, and omissions could no longer be entirely concealed, Defendants announced disappointing margins and revenue and ultimately recognized the need to clear out *$700 million* in excess Supplies inventory. ¶9. These partial disclosures revealed the impact of the scheme on HP's most important metrics, causing HP's stock

PLTFS' MEM. OF LAW IN OPP. TO DEFS' RENEWED MOT. TO DISMISS - 4:20-cv-07835-JSW (LJC)                                                                                                                          - 5 -
4871-8650-5592.v1

price to decline and investors to suffer significant monetary damage. *Id*. Nevertheless, Defendants' self-serving disclosures hid the actual scheme and their roles therein. Defendants' scheme was laid bare on September 30, 2020, however, when the SEC issued its order finding that HP violated the federal securities laws and imposed a $6,000,000 sanction. ¶10.

## IV.   PLAINTIFFS' CLAIMS ARE TIMELY

Under the relevant statute of repose, an "action . . . may be brought not later than . . . 5 years after [Defendants'] violation." 28 U.S.C. §1658(b). York County initiated this action on November 5, 2020, which was not later than five years after the alleged fraudulent acts. ECF 1. Thereafter, Maryland Electrical filed a successful motion for appointment as lead plaintiff, *see* 15 U.S.C. §78u-4(a)(3)(A)(i), and – pursuant to the Court's order – filed the operative Complaint in York County's timely action. ECFs 30, 37.

### A.   Lead Plaintiff's Same-Court, Same-Action Number, Same-Claims, Same-Proposed-Class, Consolidated Complaint Is Timely

The relevant date for calculating the repose period under §1658 is the date of the first-filed complaint (*i.e.*, ECF 1), regardless of whether a consolidated (or even an amended) complaint is later filed in the same action by a different lead plaintiff. *See, e.g.*, *In re Infineon Tech. AG Sec. Litig.*, 2008 WL 11333947, at *2, *4 (N.D. Cal. Aug. 13, 2008); *In re Juniper Networks, Inc. Sec. Litig.*, 542 F. Supp. 2d 1037, 1051 (N.D. Cal. 2008); *In re Marvell Tech. Grp. Ltd. Sec. Litig.*, 2008 WL 4544439, at *2, *11 (N.D. Cal. Sept. 29, 2008). This makes sense because the Supreme Court has adopted a common-sense reading of the term "action" in §1658: "The term action . . . refers to a judicial proceeding, or perhaps to a suit – ***not*** to the general content of claims." *Cal. Pub. Emps.' Ret. Sys. v. ANZ Sec., Inc.*, 582 U.S. 497, 514 (2017) ("*CalPERS*").

Here, there is only one action – the one York County initiated on November 5, 2020. Indeed: (i) every page on this docket – including Defendants' Motion – bears the civil action number assigned following the filing of York County's complaint; (ii) the number after the colon is "20" because this action was brought on November 5, 2020; (iii) York County remains the named plaintiff; and (iv) Defendants even admitted in their previous proposed order that this action was initiated when York County filed its complaint (ECF 45-1 at 1 ("***Date Action Filed: November 5,***

*2020*.")). Thus, the relevant – and timely – filing date is November 5, 2020. *See Hogan v. Pilgrim's Pride Corp.*, 73 F.4th 1150, 1152 n.1, 1161 (10th Cir. 2023) (finding where, as here, the original named plaintiff "remained the only plaintiff named in the case caption" "***Defendants had no vested right to repose*** " "*[s]o long as the case remained open*").[3]

Nevertheless, because the Ninth Circuit noted that whether York County or Lead Plaintiff's Complaint supplied the "relevant filing date" was "vital" to the repose analysis (*York Cnty.*, 65 F.4th at 466 n.3), Defendants baldly contend that the relevant filing date of this action is when "[Lead] Plaintiff filed its [Consolidated] Complaint on April 21, 2021." Mtn. at 8. Defendants do not cite even a ***single case*** holding that a consolidated class complaint filed on the same docket constitutes a new "action" for repose purposes. And their argument that Lead Plaintiff's same-court, same-number, same-claims, same-proposed-class Complaint should be treated as a different "action" or "judicial proceeding" cannot be reconciled with *CalPERS*'s holding that the term "action" must be given its "ordinary understanding." 582 U.S. at 514; *see also Hogan*, 73 F.4th at 1161 (holding "the natural reading of the language bring a right of action that involves a claim [from §1658] is to ***initiate*** or ***commence*** a claim. . . . It would therefore be a peculiar interpretation of ***bring a right of action that involves*** a claim to say that it encompasses ***continuing to pursue a claim***," and noting "*CalPERS* . . . do[es] not alter this analysis because tolling pertains to the time within which a plaintiff must first bring a suit or a claim and, as we have explained, ***filing the SAC did not constitute bringing a claim***.").[4]

While Defendants have no authority for the proposition that a consolidated complaint filed in

[3] York County's complaint has never been adjudicated as this Court held that Defendants need not respond to it because "an amended complaint is generally filed following the Court's appointment of lead plaintiff" and "Defendants should not be required to respond to a complaint in this case until after lead plaintiff and lead counsel have been appointed and have filed an amended complaint." ECF 17 at 1. To be clear, York County remains active in this action and stands willing to take a more active role should the Court deem it necessary. *See* York County Decl.

[4] Contrary to Defendants' suggestion that the Ninth Circuit viewed the April 21, 2021 date to be relevant to the repose analysis, the Ninth Circuit held that it "need not answer [that question] here." *York Cnty.*, 65 F.4th at 466 n.3. In fact, Judge Bybee was skeptical of Defendants' argument, remarking: "My problem with [Defendants'] argument is the York filing. That does complicate things. . . . If the claims aren't different and Maryland is within York's original filing and Maryland could be – the District Court could decide at a later period that Maryland was a better representative than York for whatever reason, what's the issue?" Oral Argument at 15:35-38; 21:07-23.

the same case constitutes a new "action," several courts have rejected it. For example, in *In re LexinFintech Holdings Ltd. Sec. Litig.*, "a putative class action plaintiff file[d] an amended complaint asserting a claim and then [the] court appoint[ed] a different lead plaintiff in the same case, who file[d] a further amended complaint" after the repose period expired. 2021 WL 5530949, at \*17 (D. Or. Nov. 24, 2021). Upon holding that the new lead plaintiff's amended complaint "**simply restates an existing claim in this case**," the court observed: "the [defendant] does not cite any authority for the proposition that the appointment of a lead plaintiff in a putative class action turns the case into one so separate from the original that the lead plaintiff may not rely on the originally brought claims to satisfy the statute of repose." *Id.* Further, the court made clear that "nothing in . . . *CalPERS* [] supports [defendant's] argument"; in fact, the Court explained that "*CalPERS* is inapposite to the pending case, in which a putative class action plaintiff files an amended complaint asserting a claim and then a court appoints a different lead plaintiff *in the same case*, who files a further amended complaint asserting the same claim." *Id.* Similarly, the court in *Martin v. Altisource Residential Corp.* rejected defendants' *CalPERS*-based argument that a lead plaintiff's complaint is barred by the statute of repose, holding that "*[b]y any reasonable understanding, we are in the same action (or suit, or proceeding) that was brought [by the initial plaintiff], even though the Plaintiffs have changed*." 2019 WL 2762923, at \*6 (D.V.I. July 2, 2019); *see also Marvell*, 2008 WL 4544439, at \*2, \*11 (basing repose analysis in §10(b) class action on the "first of the consolidated complaints").[5]

Further, courts reject Defendants' claim that "[w]hen no class has been certified, no class claims exist" (Mtn. at 10) where, as here, there has only ever been one action. *See In re Nio, Inc. Sec. Litig.*, 2023 WL 5048615, at \*4 (E.D.N.Y. Aug. 8, 2023) (rejecting similar argument at class certification because "no tolling of the statute of repose is necessary here, as . . . this case was filed

---

[5]   To be sure, *CalPERS* does not bar the Complaint. Unlike here, *CalPERS* dealt with two **separate** actions: a putative class of investors reached a settlement with defendants but CalPERS, "apparently convinced it could obtain a more favorable recovery in its **separate suit, opted out of the class**." 582 U.S. at 503; *see also Se. Pa. Transp. Auth. v. Orrstown Fin. Servs. Inc.*, 12 F.4th 337, 352 (3d Cir. 2021) ("*SEPTA*") ("*CalPERS*, however, does not help Defendants [because] the tolling at issue there would have been a true exception to the statute of repose . . . **a defendant does not have a substantive right to repose when – as here – a plaintiff brings an action against the defendant containing the claims at issue during the repose period**.").

within the statute of repose and has ***continued uninterrupted***, without . . . individual opt-outs (as in *CalPERS*), or other disruption," and thus, "the filing of a timely class action complaint ***commences the action for all members of the class as subsequently determined***.").[6]

Defendants' proposed rule – that a consolidated complaint constitutes a new "action" – "would present enormous practical difficulties" and frustrate the purpose of the PSLRA. *SEPTA*, 12 F.4th at 346. "Under Defendants' approach, either plaintiffs bringing putative class actions would be obligated to file [months before the expiry of the statute of repose] to guarantee sufficient time to conduct [the PSLRA-mandated lead-plaintiff process] or all unnamed class members who would otherwise simply participate as class members would be forced to file individual cases to preserve their claims." *Nio*, 2023 WL 5048615, at *4. Such a rule flies in the face of the PSLRA, which "aims to draw all potential lead plaintiffs into the suit so that the district court will have the full roster of contenders" to consider. *China Agritech, Inc. v. Resh*, __ U.S. __, 138 S. Ct. 1800, 1807 (2018).[7] Further, Defendants' approach would preclude that process in an action, like this one, filed

---

[6] Defendants' cases – *Lierboe* and *Six Flags* – have nothing to do with repose. *See Lierboe v. State Farm Mut. Auto. Ins. Co.*, 350 F.3d 1018 (9th Cir. 2003) (reversing class certification decision and remanding for dismissal where class representative was inadequate); *Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*, 2023 WL 3781645 (N.D. Tex. June 2, 2023) (no mention of repose). Defendants' other authority (Mtn. at 11-12) is inapt because, unlike the situations in those cases, ***York County's complaint was never dismissed***. In *DeKalb Cnty. Pension Fund v. Transocean Ltd.*, the original plaintiff filed a complaint within the repose period, a second plaintiff appeared and was appointed lead plaintiff, and the two then filed an amended complaint. 817 F.3d 393, 399-400 (2d Cir. 2016). The original plaintiff was dismissed for lack of standing, and the second plaintiff then filed a ***new***, second amended complaint as sole lead plaintiff, which was dismissed on repose grounds. *Id.* at 400. The second plaintiff argued that its new complaint should "relate back" to the original filing date under Rule 17(a)(3), which the court rejected because the original complaint "was a nullity" based on the original plaintiff's lack of standing. *Id.* at 412-13; *see also Police and Fire Ret. Sys. of City of Detroit v. IndyMac MBS, Inc.*, 721 F.3d 95, 101 (2d Cir. 2013) ("[A]bsent circumstances that would render the ***newly asserted claims*** . . . timely, neither Federal Rule of Civil Procedure 24 nor the Rule 15(c) relation back doctrine permits members of a putative class, who are not named parties, to intervene in the class action as named parties in order to revive claims ***that were dismissed from the class complaint for want of jurisdiction***."); *De Vito v. Liquid Holdings Grp., Inc.*, 2018 WL 6891832, at *22 (D.N.J. Dec. 31, 2018) ("[N]o party asserted a viable claim within the statute-of-repose period."); *Leber v. Citigroup 401(k) Plan Inv. Comm.*, 323 F.R.D. 145, 152 (S.D.N.Y. 2017) (court reversed its prior decision allowing a new class representative to be added, after the repose period expired, to assert claims that had previously been dismissed due to the other class representatives' lack of standing).

[7] The lead plaintiff process allows plaintiffs to "apply for the role" of lead plaintiff "in the first-filed action," demonstrating that being appointed lead plaintiff is tantamount to assuming a "role" in an existing action, not starting an entirely new action. *Id.* at 1807 n.3, 1812.

near the expiration of the repose period.

In any event, even if the Complaint were (incorrectly) treated as a separate "action," it was consolidated into *this* action by order of the Court. *See* ECF 30 at 1 (appointing Lead Plaintiff and ordering that all subsequent actions "***shall be consolidated into this action***"). Alternatively, Lead Plaintiff's Complaint "relates back" to the date of York County's complaint under Rule 15(c). *See, e.g.*, *Hogan*, 73 F.4th at 1157-58; *SEPTA*, 12 F.4th at 345-53; *True Health Chiropractic Inc. v. McKesson Corp.*, 2014 WL 2860318, at *2-*4 (N.D. Cal. June 23, 2014). In sum, Lead Plaintiff's Complaint – filed within this timely action – is not barred by the statute of repose.

## B.  York County's Complaint Is Timely

Recognizing that Lead Plaintiff's Complaint is not a different action, Defendants now devote an entire section of their Motion – absent from their First Motion – to arguing that **York County's** complaint was time-barred. Mtn. at 12-13.

As an initial matter, this argument is waived under Rule 12, which provides that a defendant who fails to assert a failure-to-state-a-claim defense in a pre-answer Rule 12 motion cannot assert the argument in a later pre-answer motion. *See* Fed. R. Civ. P. 12(g)(2), (h)(2). Additionally, arguments regarding York County's complaint were mooted by the filing of the operative Complaint because "in a consolidated action, a consolidated complaint is the operative pleading and supersedes all previously filed complaints." *In re Ford Motor Co./Citibank (S.D.), N.A.*, 264 F.3d 952, 965 (9th Cir. 2001)); *see also Hogan*, 73 F.4th at 1153 ("Because the SAC superseded the FAC, the sufficiency of the FAC is a moot issue.").

Even if Defendants' arguments were not waived and moot, they are wrong on the merits. First, they claim the alleged misstatements in the November 5, 2015 8-K rely solely on statements in a September 8, 2015 10-Q that were not sufficiently incorporated by reference. Mtn. at 12-13. But the November 5, 2015 8-K did incorporate the misleading statements from the September 8, 2015 10-Q, directing investors that the 8-K "***should be read in conjunction with***" the previously filed 10-Q. ECF 47-2 at 521; ¶95. And even if the 8-K did not incorporate the earlier misrepresentations (it did), the 8-K included ***new*** misleading information: it disclosed the pro forma earnings statements that formed the basis of the inflated "pro forma gross margin of 19.3% and operating profit margin

of 8.2%" – alleged misrepresentations – for the ***very first time***.  ¶95; *compare* ECF 47-2 at 522 (November 2015 8-K) *with* ECF 47-3 (September 2015 10-Q; no pro forma earnings statements). Second, Defendants wrongly claim that even if the statements were properly incorporated, the statute of repose nevertheless began running when the statements were first made on September 8, 2015. Mtn. at 12-13.  But it is axiomatic that the repose period starts anew upon republication of misleading information; indeed, as Defendants themselves concede elsewhere in their brief, "the five-year period begins to run with respect to ***each violation when it occurs***."  Mtn. at 8 (quoting *In re Maxim Integrated Prods., Inc., Derivative Litig.*, 574 F. Supp. 2d 1046, 1071 (N.D. Cal. 2008)).[8]

## V.       PLAINTIFFS HAVE STANDING TO ASSERT THE ALLEGED CLAIMS

There is no dispute that Lead Plaintiff has Article III standing.  As Defendants concede, Lead Plaintiff purchased shares during the Class Period and sold after at least one corrective disclosure. *See* Mtn. at 8.  This is all that is required to establish the requisite "personal stake in the outcome of the controversy as to assure . . . concrete adverseness" – *i.e.*, standing – in a securities fraud case. *In re VeriSign, Inc.*, 2005 WL 88969, at \*3-\*5 (N.D. Cal. Jan. 13, 2005) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)).  Further, the alleged claims are on behalf of all HP investors during the Class Period stemming from common misrepresentations and omissions made in furtherance of the pull-in scheme.  Thus, where, as here, the alleged misrepresentations are part of a "common course of conduct," "the questions common to all investors will be relatively substantial," regardless of timing of individual transactions. *Blackie v. Barrack*, 524 F.2d 891, 902-03 (9th Cir. 1975).

Defendants half-heartedly assert – in a fleeting paragraph – that the Complaint must be dismissed because Lead Plaintiff does not have ***individual*** standing for misstatements in 2016. Mtn. at 9.  But this oft-rejected argument conflates standing with Rule 23(a)'s requirements – a conflation that has been roundly rejected.  Indeed, the Ninth Circuit made clear in *Melendres* that "once the named plaintiff demonstrates her individual standing to bring a claim, ***the standing inquiry is***

---

[8]   Defendants' authority (Mtn. at 13) does not help them. *See Betz v. Trainer Wortham & Co., Inc.*, 829 F. Supp. 2d 860, 864 (N.D. Cal. 2011) (rejecting "continuing violations" theory but recognizing that "each false representation may constitute a separate violation of Section 10(b)"); *Malhotra v. Equitable Life Assurance Soc'y*, 364 F. Supp. 2d 299, 306 (E.D.N.Y. 2005) (plaintiff's 1999 ***purchases*** were not actionable because they were in reliance on an omission from 1992).

*concluded*." 784 F.3d at 1262; *see also id.* at 1262 ("Representative parties who have a direct and substantial interest have standing; the question whether they may be allowed to present claims on behalf of others who have similar, but not identical, interests depends not on standing, but on" a Rule 23(a) analysis). Thus, "any issues regarding the relationship between the class representative and the passive class members – such as dissimilarity in injuries suffered [based on, for example, timing of purchases] – are relevant only to class certification, *not to standing*." *Id.*[9] Notably, despite briefing this issue multiple times, *Defendants are silent as to Melendres and class standing*.

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145 (2d Cir. 2012) is on point. There, the plaintiff brought suit under §11 of the Securities Act for misrepresentations in the offering documents for seventeen different offerings, yet had purchased shares in only two of them. *Id.* at 149. The Second Circuit reversed the district court's dismissal of offerings in which NECA had not purchased, holding that NECA had "class standing" for these alleged offerings – even if it lacked *individual* standing – because "the nature and content of the specific misrepresentation alleged" in those offerings was sufficiently similar to the offerings NECA did have standing to challenge, giving NECA the "necessary stake in litigating" those offerings. *Id.* at 162-65. In so holding, *NECA* "distill[ed]" the relevant Supreme Court cases "down to a *broad standard for class standing*" – "in a putative class action, a plaintiff has class standing if he plausibly alleges (1) that he personally has suffered some actual . . . injury as a result of the putatively illegal conduct of the defendant, and (2) that such conduct implicates the same set of concerns as the conduct alleged to have caused injury to other members of the putative class by the

---

[9] The class-standing approach is well-recognized. *Sosna v. Iowa*, 419 U.S. 393, 403 (1975) ("This conclusion [that plaintiff had standing] does not automatically establish that [plaintiff] is entitled to litigate the interests of the class she seeks to represent, but it does shift the focus of examination from the elements of justiciability to . . . Rule 23(a)."); *see also In re Asacol Antitrust Litig.*, 907 F.3d 42, 49 (1st Cir. 2018) ("In keeping with [Supreme Court] precedent, we have trained our Article III focus in class actions on the incentives of the named plaintiffs to adequately litigate issues of importance to them. . . . *Nothing in this precedent, though, suggests that the claims of the named plaintiffs must in all respects be identical to the claims of each class member*."); *Morrison v. YTB Int'l, Inc.*, 649 F.3d 533, 536 (7th Cir. 2011) (differences between plaintiffs' and absent class members' claims "ha[ve] *nothing to do with standing*"); *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 422 (6th Cir. 1998) (district court's analysis was "fundamentally flawed" as it "confuse[d] the issue of a plaintiff's standing under Article III vis-à-vis a defendant with the relationship between a potential class representative and absent class members, which is governed by Rule 23").

same defendants." *Id.* at 162 (citing *Gratz v. Bollinger*, 539 U.S. 244, 267 (2003)); *accord Melendres*, 784 F.3d at 1263 (also citing *Gratz*, 539 U.S. at 265).[10]

Here, Lead Plaintiff (and York County) has individual standing. And because Lead Plaintiff's and every absent class member's claims are based on Defendants' "common course of conduct" (*Blackie*, 524 F.2d at 902-03) and arise from the same "set of concerns" (*Melendres*, 784 F.3d at 1264), Lead Plaintiff indisputably has class standing to advance claims arising from all of the alleged misstatements. This is especially true in light of *Melendres*'s admonition that courts not "parse too finely" the relief sought and the injury alleged, but "consider instead the context of the inquiry." 784 F.3d at 1263; *see also Kirola*, 860 F.3d at 1176 (holding plaintiff had standing to represent a class of individuals in an Americans With Disabilities Act class action even where plaintiff had not visited certain of the sites giving rise to alleged ADA violations and had therefore not been personally injured by those violations); *Ontario Tchrs.' Pension Plan Board v. Teva Pharm. Indus. Ltd.*, 2020 WL 1181366, at *13 (D. Conn. Mar. 10, 2020) (class standing test met in §10(b) class action where lead plaintiff's last purchase occurred before some challenged statements because every class member's "losses resulted from Defendants' sustained course of conduct originating at the beginning of the class period").[11] Consistent with Lead Plaintiff's class standing to

[10]   A contrary rule would make no sense – "[r]equiring that the claims of the class representative be in all respects identical to those of each class member in order to establish standing would . . . render superfluous the Rule 23 commonality and predominance requirements because any case that survived such a strict Article III analysis would by definition present only common issues." *Asacol*, 907 F.3d at 49. And "classes are routinely certified in securities fraud cases even where there are individual issues with respect to some parts of the case, such as affirmative defenses or damages." *Schleicher v. Wendt*, 2009 WL 761157, at *13 (S.D. Ind. Mar. 20, 2009). Indeed, if Lead Plaintiff's trading history is relevant at all (it is not), it can be considered in the class-certification process. *See* Fed. R. Civ. P. 23; *cf. Hevesi v. Citigroup Inc.*, 366 F.3d 70, 82 n.13 (2d Cir. 2004) ("[A]ny requirement that a different lead plaintiff be appointed to bring every single available claim would ***contravene the main purpose of having a lead plaintiff*** – namely, to empower one or several investors with a major stake in the litigation to exercise control over the litigation as a whole."). And, while the Ninth Circuit's analysis in *Blackie*, 524 F.2d at 902, illustrates that Lead Plaintiff can readily satisfy the relevant criteria at that future stage, Plaintiffs may also add a class representative.

[11]   For this reason, the Court's footnote in its prior Order (ECF 58 at 6 n.1), which merely described Lead Plaintiff's lack of ***individual*** standing for statements after its last purchase, does not preclude Lead Plaintiff from pursuing class claims for those statements. Further, Defendants led the Court to error by citing *Shurkin v. Golden State Vintners Inc.*, 471 F. Supp. 2d 998 (N.D. Cal. 2006) – a case that predates and conflicts with *Melendres*, which "clearly controls" now. *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., and Prods. Liab. Litig.*, 2017 WL 3058563, at *4 (N.D. Cal. July 19, 2017). And even before *Melendres*, courts recognized that *Shurkin* was an outlier. *See In re*

pursue all of the alleged misstatements, Judge Bybee concluded during the Ninth Circuit argument: "***I don't think this case should be dismissed for standing***." Oral Argument at 3:30-3:56.

Numerous courts follow this approach. For instance, in *VeriSign*, defendants sought partial summary judgment, arguing that plaintiffs did not have standing to represent absent class members who relied on misrepresentations made after the named plaintiffs' acquisitions of VeriSign stock. 2005 WL 88969, at *4. The court rejected the argument, holding that it "conflat[ed] Article III's standing requirements with Fed. R. Civ. P. 23's class action requirements." *Id.* at *4-*5. The court correctly determined that it was enough for Article III that the lead plaintiffs alleged they relied on certain of defendants' pre-purchase misrepresentations and that the lead plaintiffs were damaged thereby; having established "individual standing," any further "inquiry is governed by [Rule 23(a)]." *Id.*; *see also Alfus v. Pyramid Tech. Corp.*, 764 F. Supp. 598, 606 (N.D. Cal. 1991) (rejecting similar argument as "arbitrary," noting it would wrongly "imply that only someone who bought on the last day of a class period would be able to bring an action based on the logical dates alleged in the Amended Complaint"); *Connetics*, 542 F. Supp. 2d at 1003 (finding that although lead plaintiff had "no claim with regard to losses suffered during [certain] drop[s] in the share price," lead plaintiff "established Article III standing sufficient to invoke the court's jurisdiction, [which is] all that is required"); *Crowell v. Ionics, Inc.*, 343 F. Supp. 2d 1, 13-14 (D. Mass. 2004) (finding plaintiff had class standing for post-purchase misrepresentations where – like here – he "alleges a common scheme to defraud"); *In re Symbol Techs., Inc. Sec. Litig.*, 2013 WL 6330665, at *16 (E.D.N.Y. Dec. 5, 2013) (rejecting post-purchase standing argument as "merit[less]" "because Lead Plaintiff is not required to have standing to assert all claims on behalf of the potential class members"); *Peace Officers' Annuity and Benefit Fund of Ga. v. DaVita Inc.*, 372 F. Supp. 3d 1139, 1150 (D. Colo. 2019) (rejecting post-purchase standing argument as an improper "attempt to convert questions of

*Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996, 1003 (N.D. Cal. 2008). In fact, even Defendants no longer suggest *Shurkin* is applicable, ***conspicuously omitting it from their brief***. Further, in *Shurkin*, the court first held on the merits that the plaintiff did not state a claim as to either of the two statements for which it had individual standing. *See id.* at 1013-17. Thus, when the court reached the question of standing, the ***plaintiff had no remaining live claims*** – only the class's claims arising from statements made ***after*** the plaintiff sold his shares. *See id.* at 1022-24. By contrast, here, as Defendants concede, Lead Plaintiff has individual standing.

Plaintiffs' typicality or adequacy under Rule 23 into a standing question"); *Teva Pharm.*, 2020 WL 1181366, at \*13 (same); *Ferris v. Wynn Resorts Ltd.*, 2021 WL 3216462, at \*13 (D. Nev. July 28, 2021) (same).  This nearly unbroken line of cases "is consistent with . . . Supreme Court [precedent]." *LB Partners, L.P. v. Neutrogena Corp.*, 1995 WL 714447, at \*8 (C.D. Cal. Aug. 9, 1995) (holding the plaintiff had standing to sue on misrepresentations made after last purchase) (citing *Warth v. Seldin*, 422 U.S. 490, 502 (1975)).  The same result should follow here.[12]

## VI.  PLAINTIFFS ADEQUATELY PLEAD A SCHEME LIABILITY CLAIM

Defendants' course of conduct – including pull-ins, gray marketing, and misrepresentations – operated as a fraud on investors, giving rise to Plaintiffs' "scheme liability" claim.  *See* ¶12. Defendants apparently regret not moving to dismiss this claim in their First Motion (*see* ECF 50 at 4-5), so they now include one paragraph addressing it.  Mtn. at 19.  But Rule 12 does not allow Defendants a mulligan.  *See* Fed. R. Civ. P. 12(g)(2).  In any event, their arguments lack merit.

First, Defendants wrongly claim that Plaintiffs' §10(b) "Count" refers only to statements.  *Cf.* ¶220 (incorporating ¶¶1-119); *see also* ¶12 (asserting claims pursuant to "SEC Rule *10b-5(a)-(c)*"). Further, the misstatement and scheme "categories are not mutually exclusive, and Plaintiffs' decision to plead both theories under the same Count is consistent with a complementary view."  *In re FirstEnergy Corp. Sec. Litig.*, 2022 WL 681320, at \*7 (S.D. Ohio Mar. 7, 2022).

Second, Defendants argue Plaintiffs fail to allege a scheme claim that is distinct from the misstatements claim.  Mtn. at 19.  But the Ninth Circuit has rejected this argument.  *See In re*

---

[12]  Defendants' cases are inapt.  *See Hanon v. Dataproducts Corp.*, F.2d 497, 509 (9th Cir. 1992) (summary judgment granted as to *plaintiff's individual standing* following denial of class certification); *Yan v. ReWalk Robotics Ltd.*, 973 F.3d 22, 35 (1st Cir. 2020) (class representative lacked *individual standing* as there were "no relevant Exchange Act omissions or misstatements until months after [plaintiff] purchased his shares").  And the plaintiff in *Winer* did not allege a common scheme.  *Compare Winer Fam. Tr. v. Queen*, 503 F.3d 319, 325-26 (3d Cir. 2007) *with In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions*, 148 F.3d 283, 306-07 (3d Cir. 1998) ("[I]t is clear that all of the named representatives have a valid case or controversy with respect to [the] alleged . . . scheme. . . .  *[O]nce the named parties have demonstrated they are properly before the court, the issue [becomes] one of compliance with the provisions of Rule 23, not one of Article III standing*."); *see also DaVita*, 372 F. Supp. 3d at 1150 (distinguishing *Winer* on these grounds); *In re Vivendi Univ., S.A.*, 242 F.R.D. 76, 87 (S.D.N.Y. 2007) ("With respect to class . . . standing, it is well established that where, as here, plaintiffs allege that their losses were the result of a sustained course of conduct that propped up defendants' stock price throughout the class period, the class may be represented by an individual who purchased his shares prior to the close of the class period.") (collecting cases).

*Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 709 (9th Cir. 2021) ("Alphabet's argument . . . is foreclosed by *Lorenzo [v. SEC*, __ U.S. __, 139 S. Ct. 1094 (2019)], which rejected the petitioner's argument that Rule 10b-5(a) and (c) "concern scheme liability claims and are violated only when conduct other than misstatements is involved."). More to the point, this is the quintessential case in which Plaintiffs have alleged deceptive conduct ***beyond*** misstatements. The gravamen of the Complaint concerns Defendants' "fraudulent scheme," in which they engaged in prohibited A-Business and "accelerated, or pulled-in, sales to artificially inflate the results of HP's most important business segment." ¶¶2, 5; *see also* ¶23 ("Each Defendant is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of HP common stock."). In fact, Defendants' argument is belied by their own Motion, which includes a section devoted to "***The Challenged Sales Practices***" alleged in the Complaint. Mtn. at 5 (emphasis in original).

At bottom, it cannot be seriously contested that the Complaint states a scheme claim. *See, e.g.*, *SEC v. Cotton*, 2006 WL 6382128, at *5 (C.D. Cal. Dec. 21, 2006) (upholding allegations that "Defendant engaged in a scheme of channel-stuffing to boost Lantronix's revenue figures"); *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1193-94 (D. Or. 2015) (rejecting identical argument and collecting cases); *Lorenzo*, 139 S. Ct. at 1101 (holding scheme "provisions capture a wide range of conduct.").[13] Finally, because Defendants acknowledge that, as in their First Motion, their standing and repose arguments apply only to Plaintiffs' misstatements claim (Mtn. at 19), Defendants concede that the Complaint cannot be dismissed.

## VII.   PLAINTIFFS ADEQUATELY PLEAD MATERIAL MISREPRESENTATIONS AND OMISSIONS

[13]   For this reason, Defendants' claim that Bailey and Lores should be dismissed because they did not make any statements (Mtn. at 13-14) misses the point. Both were integral to the fraudulent course of business and are proper scheme Defendants. In a footnote, Defendants note that Lores and Bailey were added to this action in the Complaint. But arguments raised in footnotes are waived. *See Est. of Saunders v. C.I.R.*, 745 F.3d 953, 962 n.8 (9th Cir. 2014). Further, to the extent Defendants are raising a repose argument, it is waived under Rule 12(g)(2). *See* Fed. R. Civ. P. 12(g)(2), (h)(2). Even if the argument were properly made, it is wrong – courts in this District allow the addition of new defendants in a lead plaintiff's consolidated complaint and still calculate the repose period from the first-filed complaint. *See, e.g.*, *In re Atmel Corp. Derivative Litig.*, 2007 WL 2070299, at *1, *7 (N.D. Cal. July 16, 2007) (initial complaint filed July 27, 2006; consolidated complaint adding defendants filed November 3, 2006; leave to amend granted "so that the Consolidated Plaintiffs may allege independent wrongful acts that occurred on or after July 27, 2001.").

A complaint alleges falsity when it "specifi[es] each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012). A statement is misleading "if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008). "[A] duty to disclose does arise where an omission is misleading because it affirmatively create[s] an impression of a state of affairs that differs in a material way from the one that actually exists." *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1135 (N.D. Cal. 2017); *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008-09 (9th Cir. 2018). "[L]iterally true" statements may be misleading due to "their context and manner of presentation." *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008).

### A.    The Channel Inventory Statements and Omissions

Throughout the Class Period, Defendants assured investors that Supplies channel inventory was "declining" and "reduc[ing]," and that WOS was only "slightly above" or "within [HP's] target range." *See* ¶¶120-123, 125-126, 128-130. These assurances provided the misleading impression that inventory was declining to healthy levels. ¶¶45, 117, 121, 124, 127, 131. In truth, Defendants were engaged in the pull-in scheme, which "led to a ***known trend of increasing channel inventory***." ¶81. For example, Defendants "pa[id] the channel to take additional shipments" and accelerated this practice throughout the Class Period. ¶¶56-57. Class Period emails confirm that HP's partners "d[id] not want to carry the level of toner that we push into their warehouses . . . ***[b]ut we push more toner in to help deliver on our financial plans***." *Id.* As one Printing segment manager explained in describing the "unhealthy levels of stock" in Tiers 1 and 2, "***we needed the Supplies Revenue & we used significant amounts of contra to push in Supplies at T1 to > 2 weeks above their optimal levels***." ¶¶58, 82.

Further, because WOS consciously and deceptively excluded inventory from Tier 2 and "channel partners further down the distribution chain," "HP's use of the phrase channel inventory without definition gave the impression that [WOS] included all of HP's channel inventory and was a measure of HP's overall channel health." ¶¶132(b)-(c). Defendants capitalized on their deception.

For example, when HP surpassed its "do not exceed" channel inventory ceilings early in the Class Period, Defendants concealed the increasing inventory by "encourag[ing] sales from Tier 1 to Tier 2," which allowed HP "to sell into Tier 1 to increase revenue without exceeding the WOS ceilings." ¶¶58, 83.  Defendants also engaged in "simultaneous sell-in/sell-through deals" that further bloated Tier 2 inventory.  ¶59.  Thus, the SEC found that "***HP's failure to describe its overall channel inventory provided the market with only a partial and misleading picture of HP's channel health and caused HP's channel inventory disclosures to be materially misleading***."  ¶118.

*Shenwick* is instructive.  There, plaintiff alleged statements were misleading because Twitter failed to disclose DAU, a user engagement metric.  282 F. Supp. 3d at 1135.  The court found statements about user growth and "engagement trends" were misleading, noting that "once defendants cho[o]se to tout positive information" about user engagement, "they [were] bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information."  *Id*. at 1137-40.  Here, Defendants issued positive statements concerning inventory but omitted that their inventory metric excluded a large amount of inventory.  Analysts took Defendants at their word, reporting that HP's seemingly positive inventory trends would cause "demand [to] increase in the future" and "revenue trajectory [to] improve."  ¶¶45, 124; *see also Shenwick*, 282 F. Supp. 3d at 1136 (analysts' interpretation relevant to falsity).

Defendants claim that their inventory statements were not misleading because HP did not have complete Tier 2 data.  Mtn. at 19.  But regardless of the data's completeness, once Defendants touted HP's improved channel inventory and WOS levels, they had a duty to disclose that those levels only told part of the story and that Tier 2 inventory was consciously excluded.  *See Shenwick*, 282 F. Supp. 3d at 1138-39; *Khoja*, 899 F.3d at 1010 (once defendants tout results, they must also disclose that data was incomplete so they did not appear more promising than they were).  *West v. EHealth, Inc.* – Defendants' authority – actually supports Plaintiffs.  There, defendants "explicitly explained" the specific contours of the disclosed data.  2016 WL 948116, at *6 (N.D. Cal. Mar. 14, 2016).  Here, by contrast, although Defendants knew WOS excluded large swaths of inventory, they concealed this fact from the market and capitalized on their deception to further the scheme.

Defendants also point to their statements that WOS was "slightly above" or "within" target

levels (Mtn. at 18) – while conspicuously failing to address their statements that inventory was declining and "reduc[ing]" – but ignore that WOS **significantly understated** true inventory levels because it omitted Tier 2 inventory.  ¶132.  And their throwaway fraud by hindsight claim fails. Mtn. at 18.  The Complaint alleges that inventory was understated at the time the statements were made; Defendants – in real time – led QBRs, reviewed QBR presentations, approved gray marketing discounts, had access to flash reports, monitored channel inventory, and pressured sales teams to engage in deceptive practices to hide the increasing inventory.  *Infra* §VIII.A.  Indeed, the Ninth Circuit concluded Plaintiffs "plausibly alleged" that "HP disclosed information about its supply channel health that **contradicted its own internal data**" at the time the statements were made.  *York Cnty.*, 65 F.4th at 467-68; *see also Bos. Ret. Sys. v. Uber Techs., Inc.*, 2020 WL 4569846, at *8 (N.D. Cal. Aug. 7, 2020) (not fraud-by-hindsight where complaint relied on contemporaneous facts).[14]

### B.      The Pricing and Margin Statements and Omissions

Defendants told investors that declines in Supplies pricing, margins, and profits were due to temporary, external factors.  *See* ¶¶95-100, 102-107, 109-113, 115.  In truth, to meet revenue quotas, HP executives pressured sales teams to engage in low-margin A-Business, which involved offering enormous "eclipse" discounts – **three to four times normal discount levels and in excess of 40%** – to push excess product to distributors.  ¶¶53, 55.  This was no surprise to Defendants, who reviewed QBR presentations that explicitly called out A-Business, which was prohibited because it eroded margins.  *Id.*  Bailey even approved these policy-violating discounts.  ¶52.  And, internal documents showed that A-Business sometimes exceeded legitimate sales, causing HP to "**recognize[] that the A-Business was . . . reducing HP's margins**."  ¶¶51, 79.

---

[14]   Defendants' authority is inapt.  *See In re Daou Sys., Inc.*, 411 F.3d 1006, 1021 (9th Cir. 2005) (statement that "healthy" pipeline "would fuel future earnings growth" inactionable where plaintiffs "provide[d] no specific facts . . . to substantiate the speculative claim that Daou had little or no chance of actually obtaining certain contracts").  In *Fialkov v. Microsoft Corp.*, the plaintiffs failed to allege that defendants "regarded or should have regarded its then-held inventory as worrisomely large."  72 F. Supp. 3d 1220, 1230 (W.D. Wash. 2014).  Here, by contrast, the SEC found Lesjak's team began to see worrisome gaps between the "flash [reports] . . . and budget" and "a **known trend of increasing channel inventory**."  ¶¶81, 186.  And, Defendants' claim that the $450 million charge was a result of the "new business model" – not increased inventory – is a strawman, as the model was overhauled **because of** the scheme and the excess inventory it caused.  *See* ¶69 & n.8.

Worse yet, Defendants accelerated the unsustainable and ever-increasing pattern of "pay[ing] the channel to take additional shipments within a given quarter" during the Class Period, which caused a race to the bottom in terms of pricing. ¶¶56, 81. Indeed, a Class Period email confirmed it "bec[ame] increasingly difficult to get partners to place orders at any price" as HP was already "at historical highs with [its] accelerations." ¶57. To entice further accelerations, another email acknowledged that HP "*used significant amounts of contra to push in Supplies*" because "we needed the Supplies Revenue." ¶58. Unsurprisingly, the SEC found the scheme "*led to a known trend of . . . lower margin sales that continued over multiple quarters*." ¶81.

In sum, Defendants "create[d] an impression" that its Supplies pricing, margin, and profit declines were due to external factors, rather than a significant cause "that actually existe[d]." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002); *see also Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 770 (9th Cir. 2023) (statements blaming revenue miss on conditions in EMEA were misleading where plaintiffs alleged "a significant cause of the missed revenue guidance was [also] the misclassification of illusory deals"); *Azar v. Yelp, Inc.*, 2018 WL 6182756, at *11 (N.D. Cal. Nov. 27, 2018) (statements blaming external factors created misleading "impression that these were one-off aberrations"); *see also* ¶¶101, 108, 114. Thus, the SEC Order concluded that because "HP disclosed that its decreasing gross margins were the result of . . . unfavorable currency impacts, but omitted from its description the impact that its use of pull-ins and A-Business was having on its gross margins," "*HP's disclosures [were] incomplete and misleading*." ¶¶80, 116(c)-(d).

Defendants only address the alleged misstatements that the "primary factors' causing declining margins were unfavorable currency impacts and a competitive pricing environment." Mtn. at 16-17. Because Defendants do not make any meaningful argument to dismiss the pricing and operating profit misstatements, they must proceed.[15] *See Friends of Yosemite Valley v. Kempthorne*,

---

[15] *See, e.g.*, ¶99 (Weisler assuring investors that HP did not rely on discounting to stay competitive: "[w]e can't compete on price alone. So we are balancing our pricing actions with increased marketing and sales activity . . . ."); ¶100 ("From an operating profit perspective, we delivered 17.4% . . . . Currency headwinds and competitive pricing were only partially offset . . . ."); ¶112 ("Operating profits for printing was 17.3% . . . driven by currency and competitive pricing").

520 F.3d 1024, 1033 (9th Cir. 2008) ("Arguments not raised by a party in its opening brief are deemed waived."). Further, Defendants' claim that the scheme may not have been the "primar[y]" cause of declining margins fails.[16] Plaintiffs allege that the scheme had a materially negative impact on margins throughout the Class Period – an allegation bolstered by the SEC's similar finding. ¶¶116(e), 192-198. Decreasing margins specifically coincided with Defendants' increasing use of low-margin sales. ¶116(b). And while Defendants quibble with Plaintiffs' calculations showing that the scheme had a material impact on margins, that argument is inappropriate at this stage. *See Shenwick*, 282 F. Supp. 3d at 1141 (rejecting defendants' "various problems with Plaintiff's calculations" as "resolution of those issues should occur through discovery, not at the motion to dismiss phase"). Further, the calculations are based entirely on underlying alleged facts, including: (1) Defendants disclosed over $700 million in channel inventory reductions on May 25, 2016 and June 21, 2016 (¶193 & n.42); (2) the scheme and trend of increasing channel inventory began in Q2 2015 and continued over multiple quarters (¶193); (3) the scheme accelerated in late 2015 and early 2016 (*id.*); (4) HP exceeded its "do not exceed" inventory levels by the end of Q2 2015 as a result of the scheme (¶58); (5) Defendants admitted the excess inventory in Q3 2015 "was very significant" (¶194); and (6) Supplies discounts were "in excess of forty percent." ¶¶195-196. At bottom, these allegations – corroborated by the SEC's conclusion that the scheme had a "material impact" on HP's margins such that these statements were "incomplete and misleading" (¶116) – are based on facts and Defendants' admissions.[17] The statements cannot be dismissed.

---

[16] Defendants offer the fact-bound argument that the primary factors were in fact currency and competitive headwinds. Mtn. at 17. It is not Plaintiffs' burden, however, to disprove Defendants' "version of the facts at the pleading stage." *See Khoja*, 899 F.3d at 999.

[17] For these reasons, Defendants' authority is inapt. *See Iron Workers Loc. 580 Joint Funds v. Nvidia Corp.*, 2020 WL 1244936, at *8 (N.D. Cal. Mar. 16, 2020) (expert's opinion was unreliable where plaintiffs failed to "identify the source of [certain] data, . . . indicate any sort of interaction between [expert] and former or current NVIDIA employees or review of its financial data" or provide any allegations supporting its assumption that "market share in crypto mining market is equal to its market share in the gaming market"); *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 837 & n.5 (9th Cir. 2022) (expert's opinion concerning statistical analysis of patient data was "seemingly estimated from visually looking at . . . a tiny graphic whose y-axis is marked by large increments of 500 (0, 500, 1000, etc.)," and the court disproved his opinion "[u]sing the same logic"); *Hoang v. ContextLogic, Inc.*, No. 5:21-cv-03930, ECF 98 at 30 (N.D. Cal. Mar. 10, 2023) (holding "there may be facts that render Defendants' disclosure false or misleading," but unlike here "Plaintiffs have not pled them"). Grasping at straws, Defendants cite *Glazer Cap. Mgmt., LP v.*

### C.    The APJ Growth Statements and Omissions

Defendants touted APJ revenue growth "with strength in personal assistance" "[a]mid difficult market conditions" and revenue declines worldwide. ¶¶137-138, 144-145. Their statements were misleading because Defendants concealed that, as a result of the scheme, (i) APJ revenue growth was artificially inflated and (ii) the purported growth was unsustainable because it came at the cost of lower margins, lower sales in other regions, and elevated worldwide channel inventory. *See Murphy v. Precision Castparts Corp.*, 2017 WL 3084274, at *9 (D. Or. June 27, 2017) ("growth" statements actionable where defendant "did not include disclosure of the additional facts that [the company] was aggressively pulling in sales"), *rep. & rec. adopted*, 2017 WL 3610523 (D. Or. Aug. 22, 2017); *In re Plantronics, Inc. Sec. Litig.*, 2022 WL 3653333, at *10 (N.D. Cal. Aug. 17, 2022) ("growth" statements misleading where they "did not include the undisclosed [pull-in] sales practice, which generated unsustainable sales"); *In re LendingClub Sec. Litig.*, 254 F. Supp. 3d 1107, 1118 (N.D. Cal. 2017) (statement misleading because growth was "inflated artificially through self-dealing"). Thus, Defendants' sole challenge – that the statements were true and HP need not disclose adverse facts (Mtn. at 17) – fails. Literally true statements are misleading if a defendant fails to "disclos[e] adverse information that cuts against the positive information." *Khoja*, 899 F.3d at 1008-09; *see also Murphy*, 2017 WL 3084274, at *9; *Plantronics*, 2022 WL 3653333, at *10.[18]

### D.    The "On Track" Statements and Omissions

Defendants' assurances that Supplies business was "on track" to stabilize (¶¶139, 140-143,

---

*Magistri*, 549 F.3d 736, 748 (9th Cir. 2008), to claim that the SEC's conclusion – based on a thorough investigation and deposition testimony – is irrelevant. Mtn. at 17. But in *Glazer*, "**the Ninth Circuit looked to an SEC cease-and-desist order that had been imposed pursuant to a regulatory settlement in order to find that plaintiffs had adequately alleged falsity under Rule 10b-5.**" *Anschutz Corp. v. Merrill Lynch and Co. Inc.*, 785 F. Supp. 2d 799, 820 (N.D. Cal. 2011), *motion to certify appeal denied*, 2011 WL 2160888 (N.D. Cal. June 1, 2011).

[18]    Defendants' authority either supports Plaintiffs or is inapt. *See In re Apple Inc., Sec. Litig.*, 2020 WL 2857397, at *11 (N.D. Cal. June 2, 2020) (statements touting high upgrade rates required disclosure that new software, which slowed operations, contributed to upgrade rate); *City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, 2019 WL 6877195, at *12 (N.D. Cal. Dec. 17, 2019) (plaintiffs failed to allege "general[]" statements created a misleading impression); *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1070-71 (9th Cir. 2008) (unlike here, plaintiffs alleged "every statement . . . related to the company's financial health or performance was, by definition, false" but failed to explain "how and why the statements were false is decidedly vague").

147) gave the impression that, based on the then-existing state of affairs, HP's key business was turning around. ¶¶139, 146, 148.  In truth, the Supplies business was not "on track" and would only stabilize if HP took drastic measures to clear excess inventory that built up due to the scheme. ¶149; *see also Rihn v. Acadia Pharms. Inc.*, 2016 WL 5076147, at *5-*6 (S.D. Cal. Sept. 19, 2016) (statement that company was "on track" to submit application misleading where it "created an impression of a state of affairs that differed in a material way from the one that actually existed").

Defendants claim "on track" statements are always forward-looking, citing *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1186 (9th Cir. 2021).  Mtn. at 14.  But *Tesla* simply holds that "on track" statements that fail to go "beyond the assertion of a future goal" are forward-looking; such statements remain actionable if, as here, they "describe[] specific, concrete circumstances that have already occurred."  *Compare Tesla*, 985 F.3d at 1192 ("on track" statements tied to "intermediate benchmarks" are "outside the safe harbor") *with* ¶141 (Lesjak: Supplies was "on track" based on analysis of the Model versus actual performance, which was "in line with what we were expecting"), ¶147 ("based on what [the Model is] telling us at this point in time, we [will] stabilize revenue").

Even if it applied, the PSLRA safe harbor cannot shield Defendants' misstatements.  First, Defendants' purported cautionary language is insufficient under the Ninth Circuit's "stringent" standard.  *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 947 (9th Cir. 2005); *see also Weston v. DocuSign, Inc.*, 2023 WL 3000583, at *15 (N.D. Cal. Apr. 18, 2023) (language must "discredit the [misstatements] so obviously that the risk of real deception drops to nil").  Second, disclosing "a risk in the abstract" but omitting "that it had already . . . come to fruition" is not only insufficient, it is itself misleading.  *Cutler v. Kirchner*, 696 F. App'x 809, 813 (9th Cir. 2017); *see also Alphabet*, 1 F.4th at 703.  Here, Defendants knew by February 2016, when the first "on track" statement was made, that HP had excess inventory and that stabilization would require drastic measures.  ¶134; *see infra* §VIII.  The "on-track" statements are actionable.[19]

## VIII.   PLAINTIFFS ADEQUATELY ALLEGE SCIENTER

[19]   Defendants' claim that the statements are not misleading because Supplies eventually did stabilize is a red herring.  Mtn. at 15.  It was only *after* HP had completely overhauled its sales model and took a $700 million Supplies inventory reduction that this "stabilization" occurred.

Plaintiffs adequately plead scienter where they allege defendants "made false or misleading statements either intentionally or with deliberate recklessness." *Reese v. Malone*, 747 F.3d 557, 569 (9th Cir. 2014); *Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1013 (N.D. Cal. 2020) ("Recklessly turning a blind eye to impropriety is equally culpable conduct."). The scienter inference "need not be . . . the most plausible of competing inferences." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007). A complaint survives, "[w]hen the allegations are accepted as true and taken collectively, . . . a reasonable person [would] deem the inference of scienter at least as strong as any opposing inference." *Id.* at 326.

Here, whether the Complaint sufficiently alleges a strong inference of scienter is not a close call. Indeed, the Ninth Circuit previously held:

> [Defendants] fail[ed] to show that the SEC Order did not provide information necessary for Maryland Electrical to **plead an adequate complaint**. . . . The order claims that HP disclosed information about its supply channel health that contradicted its own internal data. ***The disclosure of information that contradicts internal data creates a strong inference that HP knowingly misled the public as to the state of the company***.

*York Cnty.*, 65 F.4th at 467-68; *see also id.* at 468 ("Maryland Electrical has plausibly alleged that the SEC Order provided facts and context without which it could not have otherwise pleaded scienter.").[20] Indeed, the Complaint includes voluminous allegations of Defendants' actual knowledge (*see infra* §VIII.A.), and courts routinely infer scienter from government complaints, settlements, and investigations. *See, e.g.*, *VeriFone*, 704 F.3d at 706-07 (inferring scienter from SEC complaint); *Reese*, 747 F.3d at 574 (inferring scienter based on "information . . . which came to light through discovery related to government investigations"). Moreover, because Defendants merely recycle arguments they made before the Ninth Circuit, they have failed to provide any reason for this Court to disagree with the Ninth Circuit.[21] Thus, the Motion should be denied.

---

[20] *See also Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 180 (2d Cir. 2015) (scienter bolstered by SEC cease-and-desist order); *In re Under Armour Sec. Litig.*, 2021 WL 1985015 (D. Md. May 18, 2021) (same).

[21] Defendants' claim that the Ninth Circuit did not "suggest" that Plaintiffs plausibly alleged scienter (Mtn. at 21) is belied by the plain text of the opinion. The Ninth Circuit was required to examine Plaintiffs' scienter allegations as the statute of limitations does not start "until [Plaintiffs] can plead [scienter] with sufficient detail and particularity **to survive a 12(b)(6) motion to dismiss**." *York Cnty.*, 65 F.4th at 465. Indeed, legal commentators have noted the Ninth Circuit's scienter

### A.    Defendants Had Actual Knowledge

Leading up to the Class Period, Defendants knew HP's spin-off was a "milestone marker." ¶184.  Because Supplies "account[ed] for 110%" of the new HP's operating profit, Defendants repeatedly emphasized that HP was "***all about supplies***" at Analyst Day.   ¶¶3, 36-37, 39.  Defendants continued to assure investors that they were keenly focused on Supplies channel inventory levels and touted their experience and involvement in managing inventory.  ¶¶165-169, 179-83.   For example, Weisler promised investors: "***We're always focused on the channel inventory***."   ¶167.   Unsurprisingly, as analysts probed about inventory levels (¶¶168-169), Defendants not only provided detailed responses to their questions, but repeatedly reported on WOS and inventory levels.  ¶¶120, 123, 125-126, 128-130, 168-169; *see also In re Qualcomm Inc. Sec. Litig.*, 2019 WL 1239301, at *11 (S.D. Cal. Mar. 18, 2019) (statements "in response to questions from analysts" contribute to a strong inference of scienter).

At the same time that Defendants made these detailed statements regarding HP's purported inventory levels and WOS – deceptively and consciously confined to Tier 1 inventory – they had robust information regarding inventory held at Tier 2 and below.  Indeed, Lores was responsible for monitoring Tier 2 inventory levels; Lesjak set WOS and admitted to "estimat[ing] Tier 2 channel inventory" each quarter according to what she touted as "a pretty robust process"; Lesjak's department monitored channel inventory levels using weekly "flash" reports that compared quarterly metrics, including WOS, against the budget based on the actual performance of weeks past and anticipated performance for future weeks; and, Defendants were highly familiar with monitoring WOS and Tier 2 levels.  ¶¶64, 165-170, 179-183, 186-189.

Defendants also had substantial information alerting them to the pull-in scheme's

findings.  *See, e.g.*, 48 No. 5 Professional Liability Reporter NL 28 ("The court acknowledged . . . HP disclosed information about its supply channel health that contradicted its own internal data. ***This finding, the court ruled, supported a strong inference of scienter***."); Cal. Prac. Guide Corps., Conflict of Interest Limitations, Ch. 6-E (observing "plaintiff lacked sufficient information to plead scienter until SEC issued cease-and-desist order against defendant"); 41 No. 6 Fletcher Corp Law Adviser NL 1 ("***The disclosure of information that contradicted internal data created a strong inference that HP knowingly misled the public as to the state of the company***."); 29 No. 05 Westlaw Journal Securities Litigation and Regulation 08 ("Circuit Judge Jay Bybee wrote . . . the SEC settlement put HP's prior statements in a new context, revealing that ostensibly innocuous ***statements were actually intentional misrepresentations***.").

PLTFS' MEM. OF LAW IN OPP. TO DEFS' RENEWED MOT. TO DISMISS - 4:20-cv-07835-JSW (LJC)                                                                                                        - 25 -
4871-8650-5592.v1

manipulation of WOS and its ill effects on inventory levels.  According to the SEC Order – supported by internal documents and testimony – HP managers' increasing "pattern" of accelerations "*led to a known trend* of increasing channel inventory . . . that continued over multiple quarters," and Lesjak's team "began to see regular gaps, near the ends of quarters between flash [reports]" – utilized to monitor WOS – and the budget by early 2015. ¶¶64, 81-82, 166; *see also* ¶85 (SEC finding HP's 2015 Form 10-K "failed to disclose *the known trend of increased quarter-end discounting leading to . . . an increase in channel inventory*").[22]  And, "in late 2015" "as WOS in each of HP's three regions approached or exceeded their ceilings, *HP's worldwide executives demanded that regional managers*" still deliver their sales goals, leading managers to further the scheme by engaging in deals "which had no WOS implications" but "further increased HP's Tier 2" inventory – which Defendants admittedly monitored according to a "robust" process.  ¶¶83-84.

Under these circumstances, where Defendants made "detailed factual statement[s]" about WOS and related channel inventory disclosures "contradicting important [Tier 2] data to which [they] had access, a strong inference arises that [they] knowingly misled the public as to [their statements'] clear meaning."  *Reese*, 747 F.3d at 572; *see also York Cnty.*, 65 F.4th at 467-68 (holding the Complaint "plausibly alleged" that "*HP disclosed information about its supply channel health that contradicted its own internal data*" which "*creates a strong inference that HP knowingly misled the public as to the state of the company*").  Indeed, given the importance of Supplies, Defendants' focus on channel inventory, their access to Tier 2 data, and the evident gaps in

---

[22]  Defendants imply that Plaintiffs do not tie the flash reports to Lesjak – the head of the Finance Department.  Mtn. at 23.  But the reports fall "within [her] bailiwick," and thus, provide a "compelling" inference of scienter.  *In re Amgen Inc. Sec. Litig.*, 2014 WL 12585809, at *12 (C.D. Cal. Aug. 4, 2014).  Defendants alternatively claim the reports do not contain information that alerted them to the sales practices (Mtn. at 23), but the SEC found that "HP began to see regular gaps, near the ends of the quarters between the flash [reports] . . . and budget" alerting them to the scheme. ¶81.  Further, the QBR and flash reports and the Model provided Defendants with access to unmanipulated information regarding the scheme, rendering Defendants' authority inapt.  *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1000-01 (9th Cir. 2009) (data was manipulated and no allegation defendants knew of manipulation), *amended* (Feb. 10, 2009); *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1061-62 (9th Cir. 2014) (plaintiffs offered only "impressions of witnesses"); *Paciga v. Invuity Inc.*, 2019 WL 3779694, at *6 (N.D. Cal. Aug. 12, 2019) (reports had *no* information alerting them to wrongdoing); *In re ECOtality, Inc. Sec. Litig.*, 2014 WL 4634280, at *11 (N.D. Cal. Sept. 16, 2014) (same); *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1061-64 (9th Cir. 2014) (same).

the flash reports, "it would be absurd to suggest that [Defendants] w[ere] without knowledge of the" misleading nature of their WOS and channel inventory disclosures. *Reese*, 747 F.3d at 576. That inference is all the more compelling because Defendants not only omitted Tier 2 data, but they also failed to disclose that WOS excluded that data, thus leading investors to believe that WOS accurately reflected HP's *overall* channel health. ¶186.

Further, Plaintiffs adequately allege facts demonstrating that Defendants knew or should have been alerted to the ill effects of the pull-in scheme on pricing, margins, and operating profits. Leading up to and throughout the Class Period, Defendants touted their laser focus on pricing and discounting, emphasizing that they had access to information from the Model such that "[they] knew what [they were] talking about." *S. Ferry LP #2 v. Killinger*, 687 F. Supp. 2d 1248, 1259-60 (W.D. Wash. 2009).[23] While Defendants touted their access to information and made detailed statements regarding pricing, margins, and profits, HP's QBR presentations – reviewed in Weisler's QBR meetings – explicitly differentiated between *prohibited* A-Business and HP's legitimate business, and in some cases internal documents showed that A-business exceeded legitimate business. ¶55; *see also* ¶¶77-78 (SEC Order revealing "[i]nternal company documents described the A-Business in 2015 and the first half of 2016 [as] being conducted at *contra levels three to four times HP's normal contra rates*" and that "*discounts in some instances [were] in excess of forty percent* for A-Business sales, while discounts for local distributors were in the teens"). And, according to the SEC, HP's accelerations also "*led to a known trend of . . . lower margin sales* that continued over multiple quarters" and resulted in Lesjak's team seeing by early 2015 regular gaps near the ends of the quarters between the flash reports – used to monitor profits – and HP's budget. ¶¶64, 81-82, 166. Bailey even personally signed off on the eclipse discounts for prohibited A-Business. ¶¶52, 55, 156.

---

[23]   *E.g.*, ¶¶157, 159 (Lesjak: "every week we collect new [pricing and discount] data"; "we're careful about what we do from a supplies pricing perspective."); ¶158 (Weisler: "we continue to strategically monitor Supplies pricing . . . . *It's obviously something that we track very closely*."). Indeed, Defendants used HP's Model "extensively," which allowed them to analyze, in real-time, the price at which HP was selling supplies, *including the level of discounting used*. *See* ¶¶171-178 (Lesjak and Weisler assuring investors and analysts in response to their inquiries that the Model is "very good" has "very detailed data" and "we use it extensively . . . *it is something that we focus on very carefully*. And . . . it informs how we price."). Further, Lesjak spent significant time in operational reviews "drill[ing] down" on the Supplies business results. ¶164.

In sum, Defendants' assertions of detailed knowledge and monitoring of pricing and discounting, combined with the "hard numbers" gap between the flash reports and budget that persisted over multiple quarters and led to "a known trend of . . . lower margin sales," support scienter. *Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1231 (9th Cir. 2004) (finding that a defendants' admission that "[w]e know exactly how much we have sold" combined with "hard numbers" regarding the defendants' sales, sufficed to plead scienter). Likewise, Defendants would know or were at least reckless in failing to realize that the gross discounting deviations from the norm approved by Bailey and identified in QBR presentations and internal documents suggested improper discounting and prohibited A-Business in connection with a pull-in scheme. *Id.*; *see also Shenwick*, 282 F. Supp. 3d at 1147 ("As the Ninth Circuit has explained, an assertion that Defendants were unaware of an alleged issue can be directly contradicted by the fact that [they] specifically addressed it in [their] statement[s]," and finding scienter where the defendant "bridged the scienter gap . . . by referencing the data directly").[24]  Thus, as the Ninth Circuit correctly concluded, the Complaint plausibly alleges Defendants had access to information contradicting their misstatements, which "***creates a strong inference that HP knowingly misled the public as to the state of the company***." *York Cnty.*, 65 F.4th at 467.

### B.     The Core-Operations Doctrine Supports Scienter

This doctrine supports an inference of scienter where "it would be absurd to suggest that management was without knowledge of the matter." *Reese*, 747 F.3d at 575-76.  Here, where Supplies drove the "vast majority" of HP's profits and "revenue streams from supplies" was the "[f]irst" of "three key elements" supporting HP's balance sheet, it would be "absurd" to suggest that

---

[24]   *See also In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1145 (9th Cir. 2017) (scienter where "[defendants] themselves told investors they had real-time access to, and knowledge of, sales information"); *Killinger*, 687 F. Supp. 2d at 1259-60 (where, as here, defendants "represented repeatedly . . . [they] had adequate information" with a "high degree of specificity," their admissions support scienter); *Weston*, 2023 WL 3000583, at *21 ("statements on different earnings calls that indicate [defendants] closely tracked . . . data" supports scienter). Defendants' authority (Mtn. at 22) is inapposite. *See Webb v. Solarcity Corp.*, 884 F.3d 844, 857 (9th Cir. 2018) (division was "a relatively ***minor*** portion of the company's overall business"); *Glazer*, 549 F.3d at 746-47 (scheme was kept a secret "even within the company"); *Elec. Workers Pension Fund, Loc. 103, I.B.E.W. v. HP Inc.*, 2021 WL 1056549 (N.D. Cal. Mar. 19, 2021) (concerning the adequacy of ***different*** scienter allegations regarding a ***different*** alleged fraud in a ***different*** Class Period, and the ***parties have since settled for millions of dollars***).

the CEO, CFO, President of the Printing Segment, and President of APJ were unaware of a widespread scheme devastating their most critical business. ¶¶3, 24, 26, 37; *see also Alphabet*, 1 F.4th at 706 (doctrine supported scienter where the complaint alleged "that [Defendants] w[ere] vitally concerned with . . . operations," received "reports of . . . operating results," and made "key operating decisions"); *Shenwick*, 282 F. Supp. 3d at 1145-46 (finding it would be "absurd" to argue defendants were unaware of trends in DAU metric particularly because, "[a]t Analyst Day, Twitter described its DAU to MAU ratio as one of its five major growth drivers").[25]

*Plantronics* is on point.  There, the court found the core operations doctrine supported a strong inference of scienter in an analogous pull-in context:

> [T]he undisclosed [pull-in] sales practice and its effects on the Company's revenues and financial health were significant based on the $65 million channel inventory reduction announced at the end of the Class Period to allegedly alleviate the accumulation caused by the undisclosed sales practice, [so] the Court may infer that individual Defendants were aware of the undisclosed sales practice and its effects by virtue of their positions as CEO and CFO . . . .

2022 WL 3653333, at *18.  Here, the inference that "Defendants were aware of the undisclosed sales practice and its effects on the Company[]" is even stronger because HP's inventory reduction was ***more than ten times*** greater than in *Plantronics*, and Lesjak admitted that the magnitude of the charge was "***fairly material . . . [as] it's a fairly substantial change to channel inventory***." ¶¶9, 66, 71; *see also N.M. State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1100-02 (9th Cir. 2011) (magnitude of scheme bolsters scienter); *Okla. Firefighters Pension and Ret. System v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 38 (S.D.N.Y. 2019) ("inventory drawdown between $50 million and $70 million" bolsters scienter as "the magnitude of the aftershock suggests more than a careless

---

[25]  *Cf. In re Montage Tech. Grp. Ltd. Sec. Litig.*, 78 F. Supp. 3d 1215, 1226 (N.D. Cal. 2015) (scienter where company omitted that distributor accounting for 71% of its revenue was owned by an affiliate); *Azar*, 2018 WL 6182756, at *20 (scienter where "segment accounted for approximately 70% of [Yelp's] advertising revenues and [those] revenues in turn accounted for approximately 90% of Yelp's total revenue"); *SEB Inv. Mgmt. AB v. Align Tech., Inc.*, 485 F. Supp. 3d 1113, 1133 (N.D. Cal. 2020) (finding "a substantial discount on Align's main revenue source squarely qualifies as facts critical to a business's core operations").  Defendants' claim that Supplies' importance to HP does not support scienter (Mtn. at 24) is not credible.  Further, their authority is inapt. *Gammel v. Hewlett-Packard Co.*, 905 F. Supp. 2d 1052, 1078 (C.D. Cal. 2012) (unlike here, there were no allegations of actual access or that defendants were "laser focused" and monitoring product at issue); *Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 817 (N.D. Cal. 2019) (unlike here, "core operation doctrine [wa]s not alleged in the [complaint]," and there were no allegations of actual access).

mistake or trivial miscalculation"). At bottom, the Complaint's well-pled allegations concerning the Individual Defendants' "statements touting their knowledge of the [Supplies business, including pricing and channel inventory], combined with the magnitude of the [scheme], its significance to [the Company's] revenues, and the executive defendants' roles at the company, are sufficient to satisfy a core operations theory of scienter." *Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 601-02 (N.D. Cal. 2019).

### C.   Additional Allegations of Scienter

***Motive for the Newly-Formed and Supplies-Focused HP***. Defendants had a powerful motive to conceal the scheme: they had to fulfill their promises made at the Analyst Meeting for the new, Supplies-dependent HP. As noted *supra*, because Defendants knew HP's spin-off was a "milestone marker" and Supplies "account[ed] for 110%" of the new HP's profits, Lores, Lesjak, and Weisler emphasized at Analyst Day that HP was "***all about supplies***." ¶¶3, 36-37, 39, 184; *see also* ¶38 (Lores promising: "Every action . . . ha[s] one common objective. Improve our supplies business"). As such, Plaintiffs sufficiently allege a strong motive here. *See Shenwick*, 282 F. Supp. 3d at 1149 (finding scienter absent insider trading where "Plaintiff's theory of the case is that Defendants felt pressure to live up to the targets announced at Analyst Day" prior to the Class Period); *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002) (scienter inferred where "corporate officers understood . . . that the success . . . of taking the old line company into a new world, was important to their own survival and that of the company").[26]

***Temporal Proximity***. Defendants' misleading statements were made within months of the Analyst Meeting and the corrective disclosures. The timing of the statements therefore supports scienter. *See Shenwick*, 282 F. Supp. 3d at 1148 ("timing of Defendants' statements is suggestive of scienter" where Defendants' misleading statements "came just a few months after their . . . projections at Analyst Day," and only a few months elapsed between the misleading statements and

---

[26]   Defendants' citation to *Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097 (9th Cir. 2021), is inapt because motive is alleged here and, regardless, Defendants' own authority recognizes that "motive is not required to adequately plead scienter." *Gammel v. Hewlett-Packard Co.*, 2013 WL 1947525, at *21 (C.D. Cal. May 8, 2013); *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 48 (2011).

the disclosures); *see also Reese*, 747 F.3d at 571, 575 (separation of "three to six months" between "the statements and the contradictory disclosures" contributes to a finding of scienter).

***SOX Certifications***.   Given Lesjak's and Weisler's high-ranking positions and the importance of the Supplies business, their Sarbanes-Oxley certifications (¶191) further support a strong inference of scienter.  *See In re Mylan N.V. Sec. Litig.*, 2018 WL 1595985, at *13, *16-*17 (S.D.N.Y. Mar. 28, 2018) ("Defendants' position at the company, the importance of EpiPen to Mylan's bottom line, and Defendants' SOX certifications all give rise to the strong inference that the individual Defendants knew" about the scheme.); *see also Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1043 (N.D. Cal. 2016) (SOX certifications probative of scienter); *Backe v. Novatel Wireless Inc.*, 642 F. Supp. 2d 1169, 1187 (S.D. Cal. 2009) (same).

**D.    The Ninth Circuit Aptly Rejected Defendants' Competing Inference**

Defendants claim the SEC Order's failure to charge the Individual Defendants with actual knowledge is dispositive.  Mtn. at 20-21.  But the Ninth Circuit rejected "HP['s] claims that the SEC Order actually undermines Maryland Electrical's complaint," holding: "[T]he SEC's decision not to charge a defendant with fraud does ***not*** hurt[] a plaintiffs ability to plead a strong inference of scienter."  *York Cnty.*, 65 F.4th at 468; *see also VeriFone*, 704 F.3d at 707 n.5 (demanding that a court "***draw no inference*** from the SEC's decision not to plead scienter or charge defendants with fraud").[27]  Indeed, the SEC admonishes that its decision not to recommend enforcement "must in no way be construed as indicating that the party has been exonerated," and that "[t]he attempted use of such a communication as a purported defense . . . would be ***clearly inappropriate and improper***."  17 CFR §202.5(d); *Procedures Relating to the Commencement of Enforcement Proceedings and Termination of Staff Investigations*, SEC Release No. 336, 1972 WL 128568 (Sept. 27, 1972).

Further, as the Ninth Court correctly noted, Defendants' competing inference – that they knew nothing about the scheme until planning the model change (announced on the last day of the

---

[27]    *See also Under Armour*, 2021 WL 1985015, at *5 ("SEC's decision not to plead scienter does not impede the Plaintiffs' ability to plead a strong inference of scienter[.]"); *In re Finisar Corp. Derivative Litig.*, 2012 WL 2873844, at *12 (N.D. Cal. July 12, 2012) (quoting *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 200 n.5 (2d Cir. 2009)) ("SEC charges simply are not a prerequisite to pleading recklessness . . . .").

Class Period) – is unavailing. *York Cnty.*, 65 F.4th at 468 (holding that even if "other information in the SEC Order could" undermine scienter, "such facts are irrelevant at this stage, where we must accept Maryland Electrical's allegations as true" and the scienter inference "need not be irrefutable"). Indeed, the SEC Order, which only refers to unnamed individuals' actual knowledge – not Defendants specifically – cannot exonerate the Individual Defendants. SEC Order, ¶49.[28] Further, the Order *says nothing about recklessness*. The Complaint adequately pleads scienter.

## IX. PLAINTIFFS ALLEGE LOSS CAUSATION

Pleading loss causation is "not meant to impose a great burden on a plaintiff"; it requires "no more than the familiar test for proximate cause." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005); *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018). Loss causation ordinarily should "not to be decided on a Rule 12(b)(6) motion to dismiss." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008). Here, Plaintiffs plead loss causation by alleging that the scheme and alleged misrepresentations and omissions artificially inflated HP stock, and that the inflation dissipated following four disclosures that partially revealed the economic truth concealed by the fraud. ¶¶69, 199. Each disclosure caused a significant HP-specific stock price decline. ¶¶203, 205-206, 208. These allegations provide Defendants with the "indication" of the casual connection Plaintiffs "ha[ve] in mind," which is all that is required. *Dura*, 544 U.S. at 347.[29]

Relying on *Metzler*, 540 F.3d at 1063 and *Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 608 (9th Cir. 2014), Defendants urge an overly-restrictive and oft-rejected view of loss causation, arguing that Plaintiffs fail to "identify a single challenged statement that was

---

[28]   Even if one assumes the unnamed individuals in the SEC Order are the Individual Defendants, it further supports scienter. The SEC found the individuals "learned of" the scheme "quarters after the actual conduct had taken place" – and that the conduct started taking place "in early 2015" (*i.e.*, multiple quarters *before* the Class Period). SEC Order, ¶¶16, 49. Indeed, Defendants concede they learned of the scheme when HP began planning its sales model shift – which occurred *in Q1 2016* (*i.e.*, the outset of the Class Period, given HP's fiscal calendar). ¶16 n.1; SEC Order, ¶34.

[29]   Another approach to loss causation concerns the materialization of the risk. *Nuveen Mun. High Income Opportunity Fund v. City of Alameda*, 730 F.3d 1111, 1120 (9th Cir. 2013). Under this test, "a misstatement or omission is the "proximate cause" of an investment loss if the risk that caused the loss was within the zone of risk *concealed* by the misrepresentations and omissions alleged by a disappointed investor." *Id*. The Complaint alleges that materialized risk here: the weaker margins, revenue, and excess channel inventory were the materialization of the state of affairs concealed by the pull-in scheme.

PLTFS' MEM. OF LAW IN OPP. TO DEFS' RENEWED MOT. TO DISMISS - 4:20-cv-07835-JSW (LJC)
4871-8650-5592.v1

- 32 -

corrected" or "demonstrat[e] that any of the four stock drops was caused by the fraud" as opposed to the disclosures of disappointing financial results. Mtn. at 25-26. But there is no requirement that a corrective disclosure admit fraud or falsity of previous misstatements. Indeed, the Ninth Circuit subsequently clarified *Metzler* and *Apollo* in *First Solar*, explaining that the "more restrictive test" they suggest "should be understood as fact-specific variants of the basic proximate cause test" and held that "there are an ***infinite variety*** of ways for a tort to cause a loss." 881 F.3d at 753-54.

In *First Solar*, the Ninth Circuit affirmed the district court's holding that a press release which "simply revised the company's earnings and revenue guidance and did not mention the [subject of the fraud]" was sufficient for loss causation as the revisions revealed "the financial impacts of [the fraud]."[30] Thus, *First Solar* made clear that a "plaintiff may . . . prove loss causation by showing that the stock price fell upon the revelation of an ***earnings miss***, ***even if the market was unaware at the time that fraud had concealed the miss***." 881 F.3d at 754. To be sure, "***[d]isclosure of the fraud is not a sine qua non of loss causation, which may be shown even where the alleged fraud is not necessarily revealed prior to the economic loss***." *Id.* at 753; *see also New York Hotel Trades Council & Hotel Ass'n of NYC, Inc. Pension Fund v. Impax Labs., Inc.*, 843 F. App'x 27, 31 (9th Cir. 2021) (reversing district court's order in part upon finding plaintiffs pled loss causation for disclosures regarding "decreased gross margins and earnings misses" that defendants attributed to increased competition, but plaintiffs alleged were due to the undisclosed scheme).

Thus, courts – including this one – reject Defendants' narrow loss causation argument. *See In re WageWorks, Inc., Sec. Litig.*, 2020 WL 2896547, at *8 (N.D. Cal. June 1, 2020) (White, J.) (rejecting similar argument that "none of the alleged corrective disclosures specifically identify fraud" as incompatible with *First Solar*); *see also Weston*, 2023 WL 3000583, at *23 (plaintiffs' "alleg[ations] that DocuSign's stock dropped after the company revealed billings misses . . . plausibly shows loss causation under *[First Solar]*" for more than 50 misstatements). In addition, Defendants' argument fails because "a disclosure need not precisely mirror the earlier

---

[30]  *First Solar, Inc. v. Mineworkers' Pension Scheme*, No. 18-164, Brief for the United States as Amicus Curiae at 21 (U.S. May 15, 2019), *available at* https://www.supremecourt.gov/DocketPDF/18/18-164/99854/20190515150818947_18-164%20First%20Solar.pdf.

PLTFS' MEM. OF LAW IN OPP. TO DEFS' RENEWED MOT. TO DISMISS - 4:20-cv-07835-JSW (LJC)                                                                                                    - 33 -
4871-8650-5592.v1

misrepresentation." *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 790 (9th Cir. 2020).[31]  In sum, because the disclosures revealed negative economic conditions caused by the scheme, the Complaint adequately alleges loss causation.

Next, Defendants claim that the model change on June 21, 2016, was an "intervening event." Mtn. at 26.  But they admitted the change was implemented ***because of*** the practices underlying the concealed scheme.  ¶69 & n.8.  In fact, Weisler admitted the change was designed to "eliminat[e] grey marketing," while Lesjak conceded that, following the model shift, "we will have higher revenue as a result of not having to discount as much as we've been discounting." *Id.*  And, Lores disclosed that the change was instituted to "prevent gray marketing" and "reduce the discounts . . . offered to channel partners." *Id.*  The causal connection is clear.

Finally, Defendants claim that because the stock price did not drop when HP reduced inventory by $250 million on May 25, 2016, investors as a matter of law could not have been reacting to the $450 million reduction on June 21, 2016.  Mtn. at 26.  These charges, however, sent very different signals to the market.  In contrast to the $250 million reduction – billed as a one-time charge in connection with quarterly results – the $450 million reduction was a serial charge disclosed on a specially-convened conference call that was nearly double the charge taken just weeks earlier. Naturally, analysts were shocked and reacted negatively to the abrupt announcement.  *See, e.g.*, ¶72. In any event, "conclusively deciding reasons for the market's reaction is premature, and reasonable theories concerning that reaction do not warrant Rule 12 dismissal." *In re Mattel, Inc. Sec. Litig.*, 2021 WL 1259405, at *12 (C.D. Cal. Jan. 26, 2021).

---

[31]  Grasping at straws, Defendants cite inapposite authority.  Mtn. at 25-26.  For example, the disclosure in *Nektar* concerned the results of a different clinical trial than the one plaintiffs alleged to have been falsely reported.  34 F.4th at 838-40.  Thus, unlike here, there could not be a causal connection between the stock decline and alleged fraud.  *Id.*; *see also Palm Harbor Special Fire Control & Rescue Dist. Firefighters Pension Plan v. First Solar Inc.*, 2023 WL 4161355, at *7 (D. Ariz. June 23, 2023) (disclosures were unrelated to alleged fraud).  And in *Irving Firemen's Relief & Ret. Fund v. Uber Techs., Inc.*, 998 F.3d 397, 407 (9th Cir. 2021), which was not a fraud-on-the-market case, the plaintiffs alleged that the disclosures of "eight purported [disparate] corporate scandals that took place throughout the course of a year . . . resulted in a year-long decline in Uber's valuation," but . . . "fail[ed] to link Uber's reduced valuation to any particular scandal."  Further, the Ninth Circuit was concerned with the temporal component of the loss causation allegations and that valuations of Uber ***increased*** in response to some disclosures.  *Id.* at 407-08.  Here, by contrast, each partial disclosure caused an HP-specific stock price decline upon the revelation of an economic truth concealed by Defendants' fraud.

## X.     THE COMPLAINT STATES A CLAIM UNDER §20(a)

Defendants claim Plaintiffs have not sufficiently pled control person liability as to Lesjak and Weisler because they have not alleged a "primary violation" under §10(b).  Mtn. at 26-27.  But as set forth above, the Complaint adequately pleads a primary violation.

Next, Defendants argue Plaintiffs do not allege control as to Lores and Bailey.  Mtn. at 27 n.9.  Their argument – relegated to a footnote – is waived.  *See Est. of Saunders*, 745 F.3d at 962 n.8.  Regardless, it fails.  "Whether [a defendant] is a controlling person is an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions."  *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000); *see also Hefler v. Wells Fargo & Co.*, 2018 WL 1070116, at *14 (N.D. Cal. Feb. 27, 2018) (control allegations subject to Rule 8); *Montage*, 78 F. Supp. 3d at 1228 ("Courts have found general allegations concerning an individual's title and responsibilities to be sufficient to establish control.").  Here, Lores, an Executive Officer, was the President of Printing, responsible for Supplies' day-to-day operations, and spoke on HP's behalf about Supplies at the Analyst Meeting and the June 21, 2016 call.  ¶¶19, 21, 28, 36, 70; *see also Petrie v. Elec. Game Card, Inc.*, 2015 WL 475958, at *7 (C.D. Cal. Feb. 5, 2015) (making statements demonstrates control).  Bailey was President of APJ and directed the scheme through his approval of eclipse discounts.  ¶¶20-21, 52.  This is sufficient.  *See Montage*, 78 F. Supp. 3d at 1228.[32]

## XI.    CONCLUSION

For the foregoing reasons, the Motion should be denied in its entirety.  If, however, the Court finds any allegation lacking, Plaintiffs should have an opportunity to amend and would respectfully request 45 days to do so.  *See Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051-52 (9th Cir. 2003) (leave to amend should be granted "with extreme liberality").

DATED:  August 18, 2023                         Respectfully submitted,

                                                s/ DARRYL J. ALVARADO
                                                DARRYL J. ALVARADO

---

[32]   Defendants' sole authority – *Bao v. Solarcity Corp.*, 2016 WL 54133, at *9 (N.D. Cal. Jan. 5, 2016) – is inapt.  There, unlike here, the defendant's mere "leadership team" membership was insufficient as there was "no[] indicat[ion] that he participate[d] in its day-to-day oversight."  *Id.*

ROBBINS GELLER RUDMAN
  & DOWD LLP
DARREN J. ROBBINS
DARRYL J. ALVARADO
RACHEL A. COCALIS
T. ALEX B. FOLKERTH
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
darrenr@rgrdlaw.com
dalvarado@rgrdlaw.com
rcocalis@rgrdlaw.com
afolkerth@rgrdlaw.com

Lead Counsel for Lead Plaintiff Maryland
Electrical Industry Pension Fund and Plaintiff
York County on behalf of the County of York
Retirement Fund

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on August 18, 2023, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

 s/ DARRYL J. ALVARADO
DARRYL J. ALVARADO

ROBBINS GELLER RUDMAN
    & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

Email:  dalvarado@rgrdlaw.com

4871-8650-5592.v1

# Mailing Information for a Case 4:20-cv-07835-JSW York County on Behalf of the County of York Retirement Fund v. HP Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Michael Albert**
  malbert@rgrdlaw.com,MAlbert@ecf.courtdrive.com,e_file_SD@rgrdlaw.com

- **Darryl James Alvarado**
  dalvarado@rgrdlaw.com,E_File_SD@rgrdlaw.com,nhorstman@rgrdlaw.com,mkuwashima@rgrdlaw.com

- **Sara B. Brody**
  sbrody@sidley.com,ddelarocha@sidley.com,sarah-hemmendinger-9052@ecf.pacerpro.com,sfdocket@sidley.com,sara-brody-9555@ecf.pacerpro.com

- **Rachel A. Cocalis**
  rcocalis@rgrdlaw.com,e_file_sd@rgrdlaw.com,ckopko@rgrdlaw.com

- **Matthew James Dolan**
  mdolan@sidley.com,sfefilingnoitce@sidley.com,sfdocket@sidley.com,matthew-dolan-7481@ecf.pacerpro.com

- **Timothy A.B. Folkerth**
  afolkerth@rgrdlaw.com,E_File_SD@rgrdlaw.com,MicheleH@rgrdlaw.com

- **Katherine Leigh Henderson**
  khenderson@wsgr.com,lnicolini@wsgr.com

- **Michael James Kahn**
  LSYoung@gibsondunn.com,jnam@gibsondunn.com,JMacEbong@gibsondunn.com,MJKahn@gibsondunn.com

- **Brian Michael Lutz**
  BLutz@gibsondunn.com

- **Danielle Suzanne Myers**
  dmyers@rgrdlaw.com,shawnw@rgrdlaw.com,dmyers@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

- **Lissa Marie Percopo**
  lpercopo@gibsondunn.com

- **Darren Jay Robbins**
  darrenr@rgrdlaw.com,e_file_sd@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)