1

2

3

4                                UNITED STATES DISTRICT COURT

5                               NORTHERN DISTRICT OF CALIFORNIA

6

7    YORK COUNTY ON BEHALF OF THE              Case No.  20-cv-07835-JSW
     COUNTY OF YORK RETIREMENT
8    FUND,
                                               **ORDER GRANTING IN PART AND**
9                   Plaintiff,                 **DENYING IN PART RENEWED**
                                               **MOTION TO DISMISS**
10          v.
                                               Re: Dkt. No. 69
11   HP INC., et al.,

12                  Defendants.

13          Now before the Court is the renewed motion to dismiss filed by Defendants HP Inc.

14   ("HP"), Dion J. Weisler, Catherine A. Lesjak, Enrique Lores, and Richard Bailey (individually,

15   "Individual Defendants"; collectively, "Defendants.")  The Court has considered the parties'

16   papers, relevant legal authority, and the record in the case, and it finds this matter suitable for

17   disposition without oral argument.  *See* N.D. Civ. L.R. 7-1(b).  The Court HEREBY GRANTS, IN

18   PART, AND DENIES, IN PART, the motion to dismiss with leave to amend.

19                                          **BACKGROUND**

20          HP maintains "Printing" and "Personal Systems" businesses.  (Dkt. No. 37, Consolidated

21   Complaint ("Consol. Compl."), ¶ 24.)  Within the Printing business is the "Supplies" business,

22   which sells toner, ink cartridges, and related printing supplies.  (*Id.* ¶ 25.)  The Supplies business

23   is "fundamental" to HP's success and accounts for the majority of HP's profits.  (*Id.* ¶¶ 28-29.)

24          Lead Plaintiff Maryland Electrical Industry Pension Fund ("Maryland Electrical") is a

25   former HP shareholder who alleges, on behalf of a purported class, that Defendants engaged in a

26   fraudulent scheme to artificially inflate the value of HP common stock.  (*Id.* ¶ 23.)  The alleged

27   scheme centered on the Supplies business.

28          Prior to and during the Class Period, HP publicly assured its investors that the Supplies

business was healthy and that any downward trends in profits and pricing were due to reasons outside of HP's control, including "currency movements that have accelerated pricing pressures." (*Id.* ¶ 43.)  Defendants also reassured investors that channel inventory[1] was decreasing and was within or only "slightly above" HP's targeted range.  (*Id.* ¶¶ 118, 120.)  Defendants allegedly reiterated these false or misleading statements on the following dates: November 5, 2015; November 24, 2015; December 16, 2015; February 24, 2016; March 1, 2016; March 3, 2016; May 25, 2016; June 1, 2016; and June 3, 2016.  (*Id.* ¶¶ 95-100, 102-107, 109-113, 115, 122-123, 126, 128-130, 140.)

According to Maryland Electrical, Defendants knew that the Supplies business was in reality not healthy at the time of the challenged representations.  (*Id.* ¶ 5.)  While publicly reassuring investors on the one hand, Defendants secretly engaged in a "pull-in" or "acceleration" scheme on the other.  (*Id.*)  The pull-in scheme consisted of "gray marketing," which is "the practice of selling supplies to channel partners at steep discounts who then sold those supplies outside of their assigned territories and further down the inventory channel."  (*Id.*)  The scheme also involved "accelerating, or pulling-in," meaning that HP offered discounts to induce purchases of supplies that channel partners did not yet want or need.  (*Id.* ¶¶ 5, 49.)  For clarity, this Order refers to these combined business practices as the "acceleration scheme."

The acceleration scheme was centered in HP's Asia Pacific and Japan Region ("APJ"). (*Id.* ¶ 52.)  HP sold Supplies products at steep discounts in APJ to known gray marketers who then sold the products in other regions.  (*Id.*)  HP then offered lower prices outside of APJ to compete with the HP products sold by gray marketers, resulting in channel stuffing in those regions and a domino effect of gray marketing in yet other regions.  (*Id.* ¶ 54.)  The result was lower prices, sales, and profits for HP around the world.

Maryland Electrical further alleges that Defendants intentionally concealed concerning information.  For example, HP publicly reported only Tier 1 inventory, even though it internally

---

[1] As defined by the U.S. Securities and Exchange Commission ("SEC"), "channel inventory" in this case "refers to inventory sold by HP to its distribution channel that has not yet been sold to end users.  Increasing channel inventory indicates that HP has sold more to its channel partners than the channel is selling to end users."  (Dkt. No. 37-1, SEC Order, at 2 n.2.)

United States District Court
Northern District of California

tracked Tier 2 inventory.[2]  (*Id.* ¶¶ 32, 60.)  HP also allegedly made "simultaneous sell-in/sell-through deals," by which it sold supplies to Tier 1 distributors that were instantly passed through to Tier 2 distributors.  (*Id.* ¶ 59.)  These sell-through deals concealed the amount of product in the Supplies channel inventory.  Defendants knew that the Supplies business was suffering because then-CFO Lesjak received weekly reports regarding channel inventory levels, but they did not disclose that information with stakeholders.  (*Id.* ¶ 31.)

As a result of these practices, according to Maryland Electrical, HP was required to clear out $700 million in excess Supplies channel inventory.  (*Id.* ¶ 66.)  Maryland Electrical further claims that the value of HP common stock was artificially inflated by the misrepresentations and omissions, and that the value dropped upon partial disclosures of HP's true Supplies performance.  (*Id.* ¶¶ 199-208.)  Maryland Electrical contends that it would not have purchased HP common stock at the price it paid if it had been aware of Defendants' misrepresentations and omissions.  (*Id.* ¶ 223.)

The SEC uncovered HP's practices after a years-long investigation.  On September 30, 2020, the SEC issued an order detailing the above practices and accepting a settlement offer from HP for $6 million.  (Dkt. No. 37-1, SEC Order.)  Among the SEC's findings were that HP's channel inventory representations were "materially misleading."  (*See id.* at 10, ¶¶ 50-52.)  Maryland Electrical contends that it became aware of Defendants' scienter due to the SEC Order.

The Individual Defendants were HP officers during the proposed Class Period.  (*See id.* ¶¶ 17-20.)  Weisler served as CEO and a member of HP's Board of Directors during the Class Period.  (*Id.* ¶ 17.)  Lesjak was the CFO for HP and regularly attended Board meetings.  (*Id.* ¶ 18.)  Lores was the President of HP's Imaging & Printing business during the Class Period, and now serves as President and CEO.  (*Id.* ¶ 19.)  Bailey was President of APJ during the Class Period.  (*Id.* ¶ 20.)  According to Plaintiffs, each of the Individual Defendants had the power and authority to control HP's representations, and they knowingly made or permitted to be made false or materially misleading representations.  (*Id.* ¶¶ 21-23.)

---

[2] "Tier 1" inventory is inventory held by partners to whom HP sells directly.  "Tier 2" refers to partners to whom Tier 1 distributors sell products but who are not end users.

Based on these allegations, Maryland Electrical brings two claims for relief on behalf of itself and a putative class: (1) violation of Section 10(b) of the Securities Exchange Act of 1934 (the "1934 Act"), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, and (2) violation of Section 20 of the 1934 Act, 15 U.S.C. § 78t(a).

The Court will address additional allegations as needed in its analysis.

## PROCEDURAL HISTORY

York County filed the initial complaint in this action on November 5, 2020.  (Dkt. No. 1.)  Two months later, on January 4, 2021, Maryland Electrical moved as a class member to be appointed Lead Plaintiff pursuant to the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(a)(3)(B)(iii).  (Dkt. No. 19.)  The Court granted Maryland Electrical's motion and appointed it Lead Plaintiff on February 11, 2021.  (Dkt. No. 30.)

Maryland Electrical filed the operative Consolidated Complaint on April 21, 2021.  (Dkt. No. 37, Consol. Compl.)  The Consolidated Complaint identifies Maryland Electrical, HP, and Individual Defendants as the parties.  (*Id.* ¶¶ 15-23.)  York County remains in the case caption, but it is not identified anywhere in the body of the Consolidated Complaint.  (*See id.*)

Defendants moved to dismiss the action as time-barred.  (Dkt. No. 45.)  Defendants also contended that Maryland Electrical lacks standing and that the Consolidated Complaint failed to state a claim under Rule 12(b)(6).  (*Id.*)  In their motion, Defendants referred to "Plaintiff" in the singular as Maryland Electrical.  (*Id.*)

Maryland Electrical opposed and referred to "Plaintiffs" in the plural.  (Dkt. No. 50.)  York County filed a separate declaration in support of Maryland Electrical's opposition.  (Dkt. No. 51.)  In that declaration, York County stated that it understood it remained a party to the action and that it was willing to take on a more active role if need be.  (Dkt. No. 52, ¶¶ 3-5.)

The Court granted Defendants' motion on the basis of the statute of limitations.  (Dkt. No. 58.)  In finding the claims time-barred, the Court reasoned that all of the challenged representations "were publicly disclosed and premised upon publicly available information" prior to the limitations period.  (*Id.* at 5.)  The Court did not reach the remainder of Defendants' arguments, but it reasoned in a footnote that Maryland Electrical lacks standing because it sold its

1   HP shares prior to the challenged representations.  (*Id.* at 6 n.1.)

2   Both Maryland Electrical and York County appealed.  (Dkt. No. 60.)  The Court of

3   Appeals for the Ninth Circuit reversed, finding that the Court had misapplied California's

4   discovery rule.  *York Cnty. on Behalf of Cnty. of York Ret. Fund v. HP, Inc.*, 65 F.4th 459, 463

5   (9th Cir. 2023); (Dkt. No. 62, at 17.)  The Ninth Circuit declined to rule on Maryland Electrical's

6   standing, the statute of repose, or the adequacy of the Consolidated Complaint, and it remanded to

7   this Court to address those issues in the first instance.  (*Id.* at 18.)

8   Upon remand, the Court granted Defendants' motion to file a renewed motion to dismiss.

9   (Dkt. No. 67.)  The renewed motion is now before the Court.  (Dkt. No. 69, Mot.)

10   **ANALYSIS**

11   **A.    Legal Standard Applicable to a Motion to Dismiss Securities Claims.**

12   A motion to dismiss is proper under Rule 12(b)(6) where the pleadings fail to state a claim

13   upon which relief can be granted.  Fed. R. Civ. P. 8(a)(2).  "[D]etailed factual allegations are not

14   required" to survive a motion to dismiss if the complaint contains sufficient factual allegations to

15   "state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

16   (citing *Bell Atl. v. Twombly*, 550 U.S. 544, 570 (2007)).  "Labels and conclusions[] and a

17   formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555.

18   "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to

19   draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556

20   U.S. at 678.  If the allegations are insufficient to state a claim, a court should grant leave to amend

21   unless amendment would be futile.  *Reddy v. Litton Indus., Inc.*, 912 F.2d 291, 296 (9th Cir. 1990).

22   Claims sounding in fraud or mistake are subject to heightened pleading requirements.  A

23   plaintiff bringing a securities fraud claim "must satisfy the dual pleading requirements of Federal

24   Rule of Civil Procedure 9(b) and the PSLRA."  *Prodanova v. H.C. Wainwright & Co., LLC*, 993

25   F.3d 1097, 1106 (9th Cir. 2021) (quoting *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981,

26   990 (9th Cir. 2009)).  Federal Rule of Civil Procedure 9(b) requires plaintiffs to "state with

27   particularity the circumstances regarding fraud or mistake."  Fed. R. Civ. Proc. 9(b).  Thus,

28   "[a]verments of fraud must be accompanied by 'the who, what, when, where, and how' of the

United States District Court
Northern District of California

misconduct charged." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1107 (9th Cir. 2003) (quoting *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997)).  The PSLRA's "exacting" standards requires "the complaint . . . [to] specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading," and to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1140 (9th Cir. 2017) ("*Quality Systems*") (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007)); *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705 (9th Cir. 2016) (quoting *Nat'l Elevator Indus. Pension Fund v. VeriFone Holdings, Inc.*, 704 F.3d 694, 701 (9th Cir. 2012)).

When a party moves to dismiss for failure to state a claim under Rule 12(b)(6), a District Court generally accepts as true all well-pleaded material facts and draws all reasonable inferences in favor of the plaintiff.  *Faulkner v. ADT Servs., Inc.*, 706 F.3d 1017, 1019 (9th Cir. 2013). However, with regard to scienter under the PSLRA, a court must consider "competing inferences rationally drawn from the facts alleged. . . [A]n inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.  "Falsity is subject to a particularity requirement and the *reasonable inference* standard of plausibility set out in *Twombly* and *Iqbal*, and scienter is subject to a particularity requirement and a *strong inference* standard of plausibility." *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 766 (9th Cir. 2023) (emphasis in original).

## B.    Requests for Judicial Notice.

The Court "may judicially notice a fact that is not subject to reasonable dispute because it: (i) is generally known within the trial court's territorial jurisdiction; or (ii) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201.  District courts have discretion to take judicial notice or incorporate documents into the pleadings by reference without converting a motion to dismiss into a motion for summary judgment under Rule 12(d).  *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018).

Defendants request judicial notice of ten exhibits, each of which are referenced multiple

times throughout the Consolidated Complaint.  (Dkt. No. 70.)  These documents include HP's

SEC filings, transcripts of earning calls, and transcripts of investor presentations.  Maryland

Electrical does not oppose.

The Court concludes all of the documents are subject to judicial notice and that Maryland

Electrical has incorporated some of those documents by reference into the Consolidated

Complaint.  By taking judicial notice, the Court does not assume the truth of any statements

contained within the documents.  The Court will indicate which, if any, noticed contents are relied

on for the purposes of this Order.

## C.   Maryland Electrical Has Standing.

Defendants argue that Maryland Electrical lacks standing to challenge statements made in

2016 given that it purchased and sold its HP common stock in 2015 only.  Defendants rely on

*Lierboe v. State Farm Mutual Automobile Insurance Co.* for the proposition that the entire case

must be dismissed where the sole named plaintiff does not have a viable claim.  *See Lierboe*, 350

F.3d 1018, 1023 (9th Cir. 2003).  Because the Court concludes below that Maryland Electrical has

a viable claim, Defendants' argument fails.  *See In re Volkswagen "Clean Diesel" Mktg., Sales

Pracs., & Prod. Liab. Litig.*, No. MDL 2672 CRB, 2017 WL 3058563, at *4 (N.D. Cal. July 19,

2017) (denying identical argument where lead plaintiff stated a claim).

In *Melendres v. Arpaio*, the Ninth Circuit adopted the "class certification approach" to

address "dissimilarities between the claims of named and unnamed plaintiffs."  784 F.3d 1254,

1261-62 (9th Cir. 2015).  So long as the named plaintiff has a claim, it has standing to challenge

the defendants' common conduct relating to "the same type of relief or the same kind of injury" as

unnamed class members.  *Id.* at 1263.  The named plaintiff's adequacy and typicality is then tested

at the class certification stage.  *Id.* at 1262-63.

Here, pursuant to *Melendres*, Maryland Electrical has standing because it purchased and

sold HP common stock during the putative Class Period.  *Melendres*, 784 F.3d at 1263.

Defendants' alleged misrepresentations and omissions were common to the period in which

Maryland Electrical traded HP stock and in the remainder of the putative class period.  Although

Maryland Electrical could not pursue individual claims based upon Defendants' representations in

United States District Court
Northern District of California

7

2016, whether Maryland Electrical can pursue class claims for those representations is a question of adequacy, not standing.  *See id.*; *see also In re Volkswagen*, 2017 WL 3058563, at *4 (finding lead plaintiff had standing to represent "putative class members who purchased. . . bonds in different tranches or offerings" in which the lead plaintiff did not participate).

**D.     The Action Was Timely.**

Securities fraud claims are subject to both a statute of limitations and a statute of repose. 28 U.S.C. section 1658(b) provides that "a private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws. . . may be brought not later than the earlier of – (1) 2 years after the discovery of the facts constituting the violation; or (2) 5 years after such violation."  28 U.S.C. § 1658.

The Ninth Circuit has found that this action was brought within two years of discovery of the facts constituting the violation because it was filed within two years of the issuance of the SEC Order.  *York Cnty.*, 65 F.4th at 467-68.  The Ninth Circuit instructed this Court to determine timeliness by first identifying the "critical date" – that is, the limitations period subtracted from the date of filing.  *Id.* at 465-66.  The Court can then determine what alleged conduct occurred before and after the critical date.  *Id.*  Here, the law of the case dictates that "the facts constituting the violation" were not discoverable until after the critical date.

Defendants argue that the Consolidated Complaint is nevertheless untimely under Section 1658(b)(2) because it was filed more than five years after the misstatements—beyond the statute of repose.  In order to determine whether Maryland Electrical's claims are timely under the statute of repose, the Court must disentangle a number of knotted threads.

The first knot centers on the meaning of "be brought" in the context of a securities class action.  *See* 28 U.S.C. § 1658.  Defendants contend that the instant action was "brought" on April 21, 2021, when Maryland Electrical filed the Consolidated Complaint as Lead Plaintiff.  Maryland Electrical counters that the relevant date is instead November 5, 2020, when York County filed the initial complaint in this action.

Finding, as the Court does, that the action was "brought" on November 5, 2020, the Court must next confront the snag of whether York County's November 5, 2020 complaint was itself

United States District Court
Northern District of California

1   timely under the statute of repose.

2          Finally, the Court must untangle the issue of whether Maryland Electrical's otherwise

3   untimely amended complaint may relate back to York County's timely prior complaint for any or

4   all of the Defendants.  In untying this last knot, the Court confronts the issues of whether York

5   County remains a party to this case and whether York County's party status matters for purposes

6   of determining the timeliness of the action.

7          **1.     The Action Was "Brought" On November 5, 2020.**

8          Defendants argue that the action commenced on April 21, 2021 for purposes of

9   determining the "critical date."  According to Defendants, because no class had been certified on

10  the basis of York County's original complaint, Maryland Electrical's claims did not exist until it

11  filed the Consolidated Complaint.  Maryland Electrical counters that this argument is illogical,

12  would pose practical difficulties, and defies precedent.

13         Federal Rule of Civil Procedure 3 provides that "[a] civil action is commenced by filing a

14  complaint with the court."  Fed. R. Civ. Proc. 3.  Rule 3 does not state that a civil action is

15  commenced anew with each iteration of a complaint.  Here, York County filed its original

16  complaint with the Court on November 5, 2020, thereby initiating the action under Rule 3.

17         Nothing suggests that the parties are engaged in anything other than a continuous action

18  initiated upon the filing of York County's complaint.  From the outset, HP anticipated an amended

19  complaint would be filed as they "generally" are "in securities class actions like this one."  (Dkt.

20  No. 11, at 1.)  Maryland Electrical filed a motion to be appointed Lead Plaintiff in the action

21  initiated by York County; it did not file a separate suit.  HP did not file a renewed Certificate of

22  Interested Entities pursuant to Rule 7.1 or Civil Local Rule 3-15 with its first filing after the filing

23  of the Consolidated Complaint.  The case caption and number remain the same.  The document

24  numbers run consecutively beginning with York County's complaint.  There is no indication from

25  the text of the PSLRA that the appointment of a lead plaintiff other than the original filer creates a

26  new action.[3]

27  _____

28  [3] The PSLRA directs courts to determine "the member or members of the purported plaintiff class. . . most capable of adequately representing the interests of class members. . . ."  15 U.S.C. § 78u–

1   In sum, by every measure and by the common understanding of the term "civil action," this

2   action was commenced on November 5, 2020.  *See California Pub. Employees' Ret. Sys. v. ANZ*

3   *Sec., Inc.*, 582 U.S. 497, 514 (2017) (holding the term "action" must be given its "ordinary

4   understanding"); *see also Martin v. Altisource Residential Corp.*, No. CV 15-24, 2019 WL

5   2762923, at *6 (D.V.I. July 2, 2019) (finding "[b]y any reasonable understanding, we are in the

6   same action (or suit, or proceeding) that was brought in 2015, even though the Plaintiffs have

7   changed.")

8           **2.      York County's Original Complaint Was Timely.**

9           Defendants argue that the action was untimely when commenced.  They claim that York

10   County solely alleged misrepresentations from September 2015, before the critical date of

11   November 5, 2015.  Maryland Electrical responds that Defendants waived this argument under

12   Federal Rule of Civil Procedure 12(g)(2) by not raising it in their original motion to dismiss.

13   Maryland Electrical asserts that HP's November 5, 2015 8-K contained new misrepresentations

14   and incorporated by reference prior misrepresentations from HP's September 2015 10-Q.

15           **a.      The Court Exercises Its Discretion to Consider the Timeliness of York**
16           **County's Original Complaint.**

17           Rule 12(g)(2) proscribes successive Rule 12 motions which raise defenses not asserted in a

18   prior motion and which were available to the moving party at the time of the prior motion.  Fed. R.

19   Civ. Proc. 12(g)(2).  Rule 12(h)(2) provides that a defense of "failure to state a claim upon which

20   relief can be granted" may be raised in a responsive pleading, a 12(c) motion, or at trial.  Fed. R.

21   Civ. Proc. 12(h)(2).

22           Defendants contend that they raised the timeliness of York County's original complaint in

23   their original motion to dismiss.  (*See* Dkt. No. 45, at 11 n.3.)  However, Defendants did not

24   expressly contend that the original complaint was untimely.  Rather, in a footnote, they pointed

25   out their position that the statements in the September 2015 10-Q were not incorporated by

26

27   ────────────────

28   4(a)(3)(B)(i).  In the event more than one putative class action has been filed "asserting
     substantially the same claim or claims . . .the court shall appoint the most adequate plaintiff as
     lead plaintiff for the consolidated actions. . ."  *Id.* § (ii).

United States District Court
Northern District of California

1    reference into the November 2015 8-K.  Even if the Court were to infer that Defendants intended

2    this note to raise an argument regarding timeliness, "[a]rguments raised only in footnotes. . . are

3    generally deemed waived."  *Est. of Saunders v. C.I.R.*, 745 F.3d 953, 962 n.8 (9th Cir. 2014).

4    Even so, declining to rule on Defendants' contention at this time would unnecessarily

5    cause further delays in this long-pending case.  Because judicial economy may be impaired by

6    applying Rule 12(g)(2) to avoid the merits of a successive 12(b)(6) motion, the Ninth Circuit has

7    been "forgiving" when a District Court rules "on the merits of a late-filed Rule 12(b)(6) motion."

8    *In re Apple iPhone Antitrust Litig.*, 846 F.3d 313, 318 (9th Cir. 2017), *aff'd sub nom. Apple Inc. v.

9    Pepper*, 139 S. Ct. 1514, 203 L. Ed. 2d 802 (2019).  Defendants could easily reassert the defense

10   as a 12(c) motion after pleadings are closed.  *See id.*  Accordingly, in the interest of judicial

11   efficiency, the Court addresses the merits of the argument.

12            **b.       The Original Complaint Was Filed Within the Statute of Repose.**

13   York County filed its complaint on November 5, 2020, five years to the day after what it

14   contends were misstatements in HP's November 5, 2015 8-K.  Defendants contend that the

15   statements challenged by York County were in fact made in September 2015.  Maryland Electrical

16   responds that York County's original complaint challenged new statements made in the November

17   2015 8-K, and, further, that the September 2015 statements were incorporated by reference into

18   the November 2015 8-K

19   The November 2015 8-K instructed readers to consider the numbers "in conjunction with"

20   the September 2015 10-Q.  Defendants provide two cases from District Courts in New York for

21   the proposition that the phrase "read in conjunction with" is insufficient to incorporate a prior

22   statement by reference.  The first, *In re The Warnaco Grp., Inc. Sec. Litig. (II)*, 388 F. Supp. 2d

23   307, 313 (S.D.N.Y. 2005), *aff'd sub nom. Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147 (2d

24   Cir. 2007), held that a referral to prior documents "'for further information' . . . is insufficient for

25   incorporation by reference."  *Id.* at 313 n.2.  The second, *Markewich v. Adikes*, 422 F. Supp. 1144,

26   1147 (E.D.N.Y 1976), held that "a mere mention of the annual report" was insufficient to

27   incorporate the report to the materials.  *Id.* at 1147; *see id.* (discussing *Dillon v. Berg*'s holding

28   that under Rule 14a-3(c) annual reports were not "soliciting material" when included with proxy

11

soliciting material "except to the extent that the issuer specifically requests that it be treated as part of the proxy soliciting material or incorporates it into the proxy statement by reference." 326 F. Supp. 1214, 1230 (D. Del.), *aff'd,* 453 F.2d 876 (3d Cir. 1971)).

The phrase "read in conjunction with" implies a greater level of integration than referral "for further information" and is more than "a mere mention."  In this situation, where clarity is wanting, the Court examines the instruction to "read in conjunction with" in the specific context in which it was made in order to determine its meaning.  *See, e.g.*, *Knievel v. ESPN*, 393 F.3d 1068, 1078 (9th Cir. 2005) (noting "we assess the meaning of the word in the context in which it was used" in defamation case); *Becerra v. Dr Pepper/Seven Up, Inc.*, 945 F.3d 1225, 1230 (9th Cir. 2019) (assessing meaning of word "diet" in context in which it was used in false advertising case).

The November 5, 2015 8-K stated as follows:

> The unaudited pro forma consolidated condensed financial statements and the accompanying notes should be read in conjunction with. . . the unaudited consolidated condensed financial statements and accompanying notes and 'Management's Discussion and Analysis of Financial Condition and Results of Operations" included in HP Inc.'s Form 10-Q for the nine months ended July 31, 2015.

(Dkt. No. 71-2, Nov. 2015 8-K, at 99.2.)  Unlike the September 2015 10-Q, the November 2015 8-K did not contain analysis from HP's management.  (*See id.*; *see also* Dkt. No. 71-3, Sept. 2015 10-Q, at 66.)  Reading this provision in context, and making all reasonable inferences in favor of Maryland Electrical, the Court finds that the November 2015 8-K specifically directed stockholders to review the Manager's Discussion to provide an explanation for the numbers in the unaudited pro forma financial statements and thereby incorporated those explanations by reference.

Defendants next contend that, even if the September 2015 10-Q was incorporated by reference into the November 2015 8-K, the statute of repose nevertheless bars suit after September 2020 because it "begins to run on the date of the first misrepresentation."  (Mot. at 13 (citing *Betz v. Trainer Wortham & Co.*, 829 F. Supp. 2d 860, 864 (N.D. Cal. 2011).)  Defendants misunderstand the rule stated in *Betz*, where the court denied summary judgment as to repeated representations made within the repose period.  *Betz*, 829 F. Supp. 2d at 865 (finding genuine issue of material fact "with regard to trades that occurred after [critical date] and which were

United States District Court
Northern District of California

connected to a specific misrepresentation[] that likewise fell within the repose period").

Defendants likewise miscite *Malhotra v. Equitable Life Assur. Soc'y of U.S.*, 364 F. Supp. 2d 299, 306 (E.D.N.Y. 2005). That case held that a continuing omission (as opposed to additional affirmative misrepresentations) would not restart the statute of repose unless the omission was "new or materially different." *Id.*

Both *Betz* and *Malhotra* apply the rule that "[e]ach false representation may constitute a separate violation of § 10(b); the five-year period begins to run with respect to each violation when it occurs. [citations] A plaintiff may not recover for reliance on representations made prior to the five-year statute of limitations period under a theory of continuing wrong." *In re Juniper Networks, Inc. Sec. Litig.*, 542 F. Supp. 2d 1037, 1051 (N.D. Cal. 2008). Here, the September 2015 statements were republished by Defendants on November 5, 2015 when they were incorporated by reference into the November 2015 8-K. Defendants pointed to the September 2015 statements and expected York County to rely on them. Thus, the five-year period began anew on November 5, 2015.

### 3. Maryland Electrical's Complaint Relates Back to the Original Complaint as against All Original Defendants.

Defendants contend that the action is nevertheless untimely. Because York County filed its complaint on the very last day of the repose period, any plaintiff seeking to join the action after that date would be time-barred, according to Defendants. Here, Maryland Electrical did not appear in the action until January 4, 2021, when it first moved to be appointed Lead Plaintiff. According to Defendants, Maryland Electrical did not become a party until it filed the Consolidated Complaint. Because Maryland Electrical is now the sole named plaintiff, Defendants reason that the critical date should be measured from April 21, 2021, when the Consolidated Complaint was filed.

Defendants rely on two decisions from the Second Circuit which they claim require a finding that the date of the filing of the Consolidated Complaint should control: *Police & Fire Retirement System of the City of Detroit v. IndyMac MBS, Inc.*, 721 F.3d 95 (2d Cir. 2013) and *Dekalb County Pension Fund v. Transocean Ltd.*, 817 F.3d 393 (2d Cir. 2016). According to

United States District Court
Northern District of California

1    Defendants, these cases provide that in securities class actions the critical date must be measured

2    from the date the lead plaintiff filed an amended complaint.

3            *IndyMac* does not provide the conclusive answer that Defendants contend.  First, as a

4    Second Circuit decision, *IndyMac* does not bind this Court.  Second, *IndyMac's* holding was

5    limited to a finding that, "absent circumstances that would render the newly asserted claims

6    independently timely, neither Federal Rule of Civil Procedure 24 nor the Rule 15(c) 'relation

7    back' doctrine permits members of a putative class, who are not named parties, to intervene in the

8    class action as named parties in order to revive claims that were dismissed from the class

9    complaint for want of jurisdiction."  *Police & Fire Ret. Sys. of City of Detroit v. IndyMac MBS,*

10   *Inc.*, 721 F.3d 95, 101 (2d Cir. 2013).  In that case, the district court had dismissed claims brought

11   by the lead plaintiff for which it lacked constitutional standing.  *Id.* at 111.  The appellants sought

12   to intervene to reinstate the dismissed claims after the statute of repose had passed.  *Id.*  Relying

13   on the rule that "if jurisdiction is lacking at the commencement of a suit, it cannot be aided by the

14   intervention of a plaintiff with a sufficient claim," the Second Circuit found that the intervenors

15   could not "cure" the constitutional defect by joining the action after the statute of repose.  *Id.* at

16   111 (quoting *Disability Advocates, Inc. v. N.Y. Coal. For Quality Assisted Living, Inc.*, 675 F.3d

17   149, 160 (2d Cir. 2012)).

18           *DeKalb* presents a more closely analogous case to the one before this Court.  In that case,

19   Bricklayers and Masons Local Union No. 5, Ohio Pension Fund ("Bricklayers") timely brought a

20   putative class action under Section 14(a) for alleged misrepresentations in a proxy statement.  817

21   F.3d at 399.  DeKalb filed a motion to become lead plaintiff within the 60-day period provided by

22   the PSLRA, but two months after the statute of repose had elapsed.  *Id.*  The District Court then

23   appointed "the DeKalb-Bricklayers Group" to represent the putative class.  *Id.*  The District Court

24   later dismissed the Bricklayers for lack of standing and dismissed DeKalb's Section 14(a) claim as

25   time-barred.  *Id.* at 400.  The Second Circuit affirmed.  *Id.* at 412.  It found that DeKalb's

26   amended consolidated complaint did not "relate back" to the Bricklayer's timely complaint under

27   Federal Rule of Civil Procedure 17(a)(3) because there was no "understandable" or "honest"

28   mistake for DeKalb's "tardy appearance," and because the Bricklayers' complaint "was a nullity"

1    due to its lack of standing.  *Id.*  The court further rejected "out of hand" DeKalb's argument that

2    the 60-day period provided by the PSLRA tolls the statute of repose.  *Id.* at 413.

3            Maryland Electrical attempts to distinguish *IndyMac* and *DeKalb* on the basis that, in each

4    of those actions, the first-filing plaintiff's complaint was dismissed for lack of standing, whereas

5    York County's complaint was never dismissed.  (Dkt. No. 74, Opp. at 9 n.6.)  This argument

6    seems to comport with subsequent decisions from the Second Circuit.  *See, e.g.*, *Klein on behalf of*

7    *Qlik Techs., Inc. v. Qlik Techs., Inc.*, 906 F.3d 215, 226-27 (2d Cir. 2018) (clarifying that there is

8    no "honest mistake" requirement under Rule 17(a)(3) and permitting substitution of plaintiff

9    whose claims would be time-barred if it initiated a separate action).  Although York County's

10   complaint was extinguished by the Consolidated Complaint, this Court did not make a ruling

11   dismissing York County for lack of Article III standing.

12           Further, Maryland Electrical's argument better aligns with the statutory scheme created by

13   the PSLRA.  Under Defendants' reading of the statute of repose, a plaintiff bringing an action

14   subject to the PSLRA would need to file at least 90 days prior to the end of the repose period,

15   unless the filing plaintiff is found to be the most adequate plaintiff.  *See In re LexinFintech*

16   *Holdings Ltd. Sec. Litig.*, No. 3:20-CV-1562-SI, 2021 WL 5530949, at *18 (D. Or. Nov. 24, 2021)

17   (finding statute of repose did not bar claims where parties agreed appointment of filing plaintiff as

18   lead plaintiff would have raised no repose issue); *see also* 15 U.S.C. § 78u-4(a)(3)(B)(i)

19   (providing for maximum of 90 days between publication of notice of pending action and

20   appointment of lead plaintiff).  This would give potential defendants a greater substantive right of

21   repose than that contemplated by the five-year statute.

22           Defendants would have had a right of repose from a new suit five years after making the

23   allegedly fraudulent statements.  That right never vested because York County initiated the action

24   within the repose period.  *See Se. Pennsylvania Transportation Auth. v. Orrstown Fin. Servs. Inc.*,

25   12 F.4th 337, 341 (3d Cir. 2021) (holding "the expiration of a repose period creates a vested right

26   to be free from liability only as against those plaintiffs who do not have a pending action under the

27   statute at that time.  This is because statutes of repose create a deadline for *filing* actions, rather

28   than *resolving* them.") (emphasis in original).  The Consolidated Complaint did not add claims of

United States District Court
Northern District of California

15

fraud for the first time, but rather adopted the allegations already within the original complaint.  It was nothing more than a continuation of the litigation already in progress.

Moreover, Defendants, with the exception of Lores and Bailey, anticipated further proceedings in the action after the original complaint was filed.  *See Hogan v. Pilgrim's Pride Corp.*, 73 F.4th 1150, 1160-61 (10th Cir. 2023) (noting District Court authorized filing of amended complaint and holding, "[s]o long as the case remained open, Defendants had no vested right to repose.").  Rule 15(a) provides for amendments to pleadings as a matter of course, with further leave to amend to be "freely given."  Fed. R. Civ. Proc. 15(a).  The entry of a lead plaintiff from the putative class was contemplated by the original complaint and the process set forth in 15 U.S.C. § 78u-4(a)(3).  Defendants were well aware of the forthcoming entry of a lead plaintiff plaintiff and requested to forego responding to the complaint until a lead plaintiff was appointed.  Defendants' expectations were not disturbed.

Accordingly, the Court holds that amendments to a complaint brought in an action arising under the 1934 Act by a lead plaintiff appointed after the statute of repose relate back to the date of the original complaint under Rule 15(a) if: (1) the action was timely initiated; (2) by a plaintiff with Article III standing; and (3) the fraud claims raised and defendants named in the amended complaint were encompassed by the original complaint.

Here, York County timely filed the original complaint and had Article III standing to do so because it purchased and sold HP stock after the date of the misrepresentations.  (*See* Dkt. No. 1, at 26.)  Maryland Electrical brought identical claims in the Consolidated Complaint as against HP, Weisler, and Lesjak.  (*See id.* at ¶¶ 18-22; Consol. Compl., ¶¶ 73-74.)  Maryland Electrical merely added additional detail to the existing claims.  (*See generally*, *id.*)  Therefore, the Consolidated Complaint relates back to the original complaint as against HP, Weisler, and Lesjak.

### 4.   Certain Claims Against Defendants Lores and Bailey Are Untimely.

Defendants argue that the claims against Lores and Bailey are untimely, even if timely as to the remaining Defendants, because Lores and Bailey were not named as defendants in York County's original complaint.  Plaintiffs point out that Defendants improperly make this argument in a footnote, and that this particular statute of repose argument was waived under Rule 12(g)(2).

1    Rule 12(g)(2) does not bar this defense.  All Defendants, including Lores and Bailey,

2  raised the statute of repose as a defense in their previous motion to dismiss.  (*See* Dkt. No. 45, at

3  9-10.)  All Defendants contended that April 21, 2021 was the relevant date on which the operative

4  complaint was filed.  (*Id.*)  Although Lores and Bailey now assert separately that April 21, 2021 is

5  the relevant date on which they were brought into this action, their argument does not differ from

6  that raised in the prior briefing.  Accordingly, the Court will consider their position on the merits.

7    "Where an amended pleading adds a new defendant to the action, the amended pleading

8  does not relate back to the filing of the original complaint unless the defendant 'should have

9  known that, but for a mistake concerning identity, the action would have been brought against it.'"

10  *In re Metro. Sec. Litig.*, 532 F. Supp. 2d 1260, 1282 (E.D. Wash. 2007) (quoting *Louisiana–*

11  *Pacific Corp. v. ASARCO, Inc.,* 5 F.3d 431, 434 (9th Cir.1993)).  Maryland Electrical does not

12  argue that York County omitted Lores and Bailey due to a mistake of identity, or that Lores and

13  Bailey were on notice of such a mistake.

14    The critical date for the claims against Lores and Bailey is thus April 21, 2016—five years

15  before Lores and Bailey were brought into the action as defendants.  All statements made before

16  that date are outside of the statute of repose, and Lores and Bailey may not be held liable for them.

17  Maryland Electrical is ordered, should it choose to amend the Consolidated Complaint, to specify

18  which statements Lores and Bailey made or actions they took on or after the critical date.

19    **5.    York County Is Not a Party to this Action, But Its Party Status Does Not**
       **Change the Relation-Back Analysis.**

20

21    The Ninth Circuit determined in *Habelt v. iRhythm Technologies, Inc.* that a plaintiff who

22  files the initial complaint in a securities putative class action is extinguished as a party if it takes

23  no action after a different plaintiff is selected as lead under the PSLRA and if the plaintiff's

24  particular claims are not referenced in the operative complaint.  83 F.4th 1162, 1166 (9th Cir.

25  2023).  After first disregarding the caption as determinative of the identity of the parties, the Ninth

26  Circuit examined the body of the complaint to determine whether the initial plaintiff remained a

27  party.  *Id.*  The court found that the allegations in the body "[made] clear" that the lead plaintiff

28  was the "sole plaintiff" because the initial plaintiff and his individual claims were not referenced.

United States District Court
Northern District of California

1    *Id.*; *see id.* at 1169 ("[T]he majority appears to create a new rule that a litigant's name must be

2    specifically listed in the body of the operative complaint to be considered a party, regardless of the

3    history of the litigation.") (Bennett, J., dissenting).   The majority on the panel reached this

4    conclusion over a dissent which pointed out that the consolidated complaint "encompass[ed] all

5    the factual allegations and legal claims raised in the original complaint" by the initial plaintiff.  *Id.*

6    at 1169.

7         Because *Habelt* was decided after the parties completed their briefing, the Court requested

8    additional briefing on the issue of the rule announced by *Habelt* and its impact on this action.

9    (Dkt. No. 77.)  Defendants argue that the extinguishing of York County as a party requires a

10   finding that the Consolidated Complaint cannot relate back to York County's complaint.  (Dkt.

11   No. 78, at 4.)  They reason that, if York County was extinguished, its filing was a nullity, much

12   like the original filings in *IndyMac* and *DeKalb*, which were dismissed for lack of standing.  (*Id.*)

13   Maryland Electrical and York County urge that York County's party status is not relevant to the

14   repose analysis.  (Dkt. No. 78.)  They ask the Court to follow the reasoning of the District Court in

15   *In re NIO, Inc. Sec. Litig.*, No. 19CV1424NGGJRC, 2023 WL 5048615, at *4 n.3 (E.D.N.Y. Aug.

16   8, 2023) in finding that 28 U.S.C. § 1658 "deals with when the action was commenced, rather than

17   who the parties to the action were at its inception." (*Id.*)  Maryland Electrical and York County

18   also attempt to distinguish *Habelt* on the facts to support a finding that York County remains a

19   party: Unlike the plaintiff in *Habelt*, York County continued to participate in this litigation.  (*Id.*)

20        *Habelt* mandates a finding that York County ceased to be a party to this action upon the

21   filing of the operative Consolidated Complaint by Maryland Electrical.  Even though York County

22   continued to indicate its intent to participate in the litigation after the Consolidated Complaint was

23   filed, (*see* Dkt. No. 52), York County is not defined as a party in the Consolidated Complaint.

24   (Consol. Compl., ¶¶ 15-23.)  Nor are its individual claims referenced.  (*See generally*, *id.*)

25   Therefore, this Court is required to find that York County is not a party.

26        However, the Court agrees with Maryland Electrical that York County's party status is

27   irrelevant to the repose analysis.  Defendants do not provide, and the Court is unaware of, any

28   authority which states that extinguishing the original complaint renders it a "nullity" when it is

United States District Court
Northern District of California

mooted by reason of an amended complaint.

The action is not barred by the statute of repose, except in part as to Lores and Bailey as discussed above.

**E.      The Court Grants, In Part, and Denies, In Part, Defendants' Motion On the Merits.**

With standing and timeliness resolved, the Court turns to Defendants' challenges to the sufficiency of the allegations in the Consolidated Complaint.

Section 10(b) of the 1934 Act makes it unlawful for any person "[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange. . . any manipulation or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."  15 U.S.C. § 78j(b).

Rule 10b-5, promulgated pursuant to Section 10(b), proscribes "the use of any means or instrumentality of interstate commerce. . ., (a) [t]o employ any device, scheme, or artifice to defraud, (b) [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b-5(b).  Maryland Electrical contends that Defendants violated all three subsections of Rule 10b-5.

Defendants first argue that Lores and Bailey should be dismissed from the action because Maryland Electrical does not specify any statements made by them and because Maryland Electrical fails to plead a scheme liability theory.  Defendants next claim that Maryland Electrical failed to plead falsity, scienter, or loss causation with the particularity required for claims arising under Section 10(b).  They further contend that Maryland Electrical does not state a Section 20(a) claim because it is derivative of the insufficient Section 10(b) claim.

**1.      The Consolidated Complaint Alleges a Scheme Liability Claim Under Rule 10b-5(a) and (c) as to Bailey and HP, But Not as to the Remaining Defendants.**

In order "to state a claim for securities fraud based on scheme liability, a plaintiff must

allege: (1) the defendant committed a deceptive or manipulative act in furtherance of the alleged scheme; (2) scienter; (3) a connection between the alleged deceptive or manipulative act and the purchase or sale of a security; (4) reliance upon the deceptive or manipulative act; (5) economic loss; and (6) loss causation." *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1193 (D. Or. 2015). To be individually liable, each defendant must have committed a deceptive or manipulative act in furtherance of the scheme. *Id.* Rule 9(b) requires plaintiffs to allege the "nature, purpose, and effect of the fraudulent conduct and the roles of the defendants." *Id.* (quoting *In re Enron*, 235 F. Supp. 2d 549, 580 (S.D. Tex. 2002).

Defendants assert that a scheme liability claim is not pleaded in the Consolidated Complaint. Defendants argue that Maryland Electrical's Section 10(b) and Rule 10b-5 claim does not mention scheme liability, and instead relates only to false statements. Defendants claim without citation that the acceleration scheme "is entirely distinct from a scheme to defraud investors." (Mot. at 19.) Maryland Electrical responds that the acceleration scheme is the "gravamen" of the Consolidated Complaint, and that it constitutes "deceptive or manipulative" conduct under the 1934 Act.

Maryland Electrical's "Count I for violation of §10(b) of the 1934 Act and Rule 10b-5" does not epitomize artful pleading. The claim incorporates by reference all of the preceding allegations in the Consolidated Complaint and recites the bare elements of Rule 10b-5. It does not provide a clear explanation of which, if any, of the preceding 219 paragraphs are relevant to the claim.

Nevertheless, it is apparent from the language of Count I and the conduct alleged in the Consolidated Complaint that Maryland Electrical intended to plead a scheme liability claim against all Defendants. Maryland Electrical describes the acceleration scheme at length and claims repeatedly that the scheme was known to and approved by HP's leadership. Specifically, Bailey allegedly furthered the scheme by approving steep discounts and sales with known gray market sub-distributors in order to artificially inflate sales numbers. (*Id.* ¶¶ 52, 55, 62, 152.)

However, it is unclear from the face of the Consolidated Complaint what conduct Weisler and Lesjak engaged in to further the scheme beyond their alleged misstatements. It is also unclear

20

what Lores may have done to further the scheme beyond monitoring and failing to hold sales personnel accountable for Supplies channel inventory levels.  (*Id.* ¶¶ 64, 170.)  Maryland Electrical does not draw the Court's attention to any additional, particularized allegations in the Consolidated Complaint that would support individual liability for Weisler, Lesjak, or Lores.

Accordingly, the Court dismisses Count I, without prejudice, as to Weisler, Lesjak, and Lores, to the extend Count I relies upon a scheme liability theory.

### 2. The Consolidated Complaint Alleges a Statement Liability Claim Under Rule 10b-5(b), but Not All Alleged Misrepresentations Are Actionable as Pleaded.

The elements of a Section 10(b) and Rule 10b-5(b) claim for misrepresentations are: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809-810 (2011) (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 36 (2011)).

The PSLRA requires plaintiffs to plead "with particularity" the misleading statements or omissions.  15 U.S.C.A. § 78u-4(b)(1).  Plaintiffs must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading."  *Id.*  "In setting forth the reasons why they contend that each challenged statement is misleading, securities plaintiffs may rely on either an affirmative misrepresentation theory or an omission theory." *Wochos v. Tesla*, 985 F.3d 1180, 1188 (9th Cir. 2021).  "Under Rule 10b-5, an affirmative misrepresentation is an 'untrue statement of a material fact,' and a fraudulent omission is a failure to 'state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.'"  *Id.* (quoting 17 C.F.R. § 240.10b-5(b)).  "[A]n omission is material 'when there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information available.' "  *Matrixx*, 563 U.S. at 38.

Defendants contend that Maryland Electrical fails to plead falsity with particularity because (a) the supplies revenue statements are protected forward-looking statements; (b) the

supplies pricing and margins statements were not false or misleading; and (c) the supplies channel inventory statements were not false or misleading.  Maryland Electrical opposes.

### a. The Court Grants Defendants' Motion Regarding Statement Liability as to Lores and Bailey.

The Consolidated Complaint does not provide any misstatements or omissions made by Lores and Bailey.  Therefore, the motion is granted on the statement liability theory as to Lores and Bailey.

### b. The Court Grants Defendants' Motion as to the Supplies Revenue Statements and Omissions.

Maryland Electrical contends that Weisler and Lesjak made misrepresentations that HP was "on track" to stabilize Supplies revenue by the end of 2017 on February 24, 2016, March 1, 2016, May 25, 2016, and June 1, 2016, even though Defendants knew that Supplies revenue was not on track to stabilize absent significant inventory reduction.  (Consol. Compl., ¶¶ 136, 140-43, 147.)

Defendants contend that the alleged misstatements relating to Supplies revenue are forward-looking statements protected by the safe harbor statute, 15 U.S.C. § 78u-5.  They claim Maryland Electrical fails to plead Defendants had actual knowledge of the statements' falsity and that the statements were accompanied by meaningful cautionary language.  Maryland Electrical denies that the statements are forward-looking or accompanied by sufficient cautionary language. Maryland Electrical also argues that Defendants were aware that the statements were false when made.

### i. Most of the Challenged Statements Were Forward-Looking.

The safe harbor provision of the PSLRA insulates defendants from liability for forward-looking statements if:

(A) the forward-looking statement is (i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or (ii) immaterial; or

(B) the plaintiff fails to prove that the forward-looking statement (i) if made by a natural person, was made with actual knowledge by that person that the statement was false or

United States District Court
Northern District of California

misleading; or (ii) if made by a business entity[,] was (I) made by or with the approval of an executive officer of that entity; and (II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading.

15 U.S.C. § 78u-5(c).  A "forward-looking statement" includes "(A) a statement containing a projection of revenues, income. . ., earnings. . ., capital expenditures, . . . or other financial items; (B) a statement of the plans and objectives of management for future operations . . .; (C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission; [and] (D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C). . . ."  *Id.* § 78u-5(i)(1).

A statement may be "mixed"; that is, a statement may contain both forward-looking or non-forward-looking elements.  *Quality Systems*, 865 F.3d at 1141.  In the case of mixed statements, a court separates out protected and unprotected elements of the statements.  *See id.* "[A] defendant may not transform non-forward-looking statements into forward-looking statements that are protected by the safe harbor provisions of the PSLRA by combining non-forward-looking statements about past or current facts with forward-looking statements about projected revenues and earnings."  *Id.*

The safe harbor provision "'is designed to protect companies and their officials' when they merely fall short of their 'optimistic projections.'"  *Tesla*, 985 F.3d at 1189 (quoting *Quality Systems*, 865 F.3d at 1142).  "[I]n order to establish that a challenged statement contains non-forward-looking features. . . a plaintiff must plead sufficient facts to show that the statement goes *beyond* the articulation of 'plans,' 'objectives,' and 'assumptions' and instead contains an express or implied 'concrete' assertion concerning a specific 'current or past fact.'"  *Id.* at 1191-92 (emphasis in original).  All but two of the challenged Supplies revenue statements are forward-looking.

Predictions that Supplies revenue "will stabilize" are statements of the "objectives" of management and of "future economic performance."  *See* 15 U.S.C. § 78u-5(i)(1).  Maryland Electrical contends that Defendants' statements go "beyond the assertion of a future goal" by

stating that HP "hit certain intermediate benchmarks." *See Tesla*, 985 F.3d at 1192 (explaining that "on track" statements are forward-looking unless accompanied by present or past factual statements, such as the goal "is achievable because production of relevant units actually rose 75% over the last quarter or because the company has actually hit certain intermediate benchmarks."). Defendants' statements that revenues were in line with a "model" or that "the model is predicting" that Defendants would meet their end-of-year 2017 goal are not concrete representations that HP had met intermediate benchmarks. Assumptions and future goals are necessarily baked into predictive models.

Only two of the challenged statements regarding the Supplies revenue were mixed with non-forward-looking statements: "Let me also highlight that we made this progress [in printing] while reducing hardware and supplies channel inventory globally. We are now within our targeted ranges," and, "Our supplies trajectory improved, but it was somewhat masked by the channel inventory reductions that we had, supplies inventory is now back within the ranges globally and that's obviously where we wanted to be." (Consol. Compl., ¶ 142.) These portions of the "on-track" statements are not forward-looking, but instead relate to the status of the channel inventory at the time the statements were made. They are thus not protected by the safe harbor. These two statements are discussed in further detail below in Section E(2)(c).

### ii. The Forward-Looking Statements Were Not Accompanied by Meaningful Cautionary Language.

The PSLRA protects forward-looking statements which are accompanied by meaningful cautionary language. *Emps. Teamsters Loc. Nos. 175 & 505 Pension Tr. Fund v. Clorox Co.*, 353 F.3d 1125, 1132 (9th Cir. 2004). A statement is accompanied by meaningful cautionary language if it includes language "identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." *Id.* at 1133 (quoting 15 U.S.C. § 77z-2(c)(1)(A)(i)).

Vague and general disclosures may not be sufficient if the defendants are aware of specific risks, and "[r]isk disclosures that speak entirely of as-yet-unrealized risks and contingencies and do not alert the reader that some of these risks may already have come to fruition can mislead

reasonable investors." *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 703 (9th Cir. 2021) (internal quotations omitted).  Maryland Electrical contends that the statements were not accompanied by meaningful cautionary language, and that any warnings were insufficient and themselves misleading.[4]

The June 1, 2016 statement by Weisler did not include meaningful cautionary language. At the outset of Weisler's statements at the Sanford C Bernstein Strategic Decisions Conference, the interviewer stated: "And – oh, before we start, we do have – I want to direct your attention to the safe harbor statements.  I'm going to go through each word of these.  So please bear with me. No.  I'm just kidding.  Please be aware of the disclaimers in that statement." (Dkt. No. 71-8, Ex. 8, at 1.)  Neither the interviewer nor Weisler identified where the safe harbor statements were to be found, and Weisler did not make any further cautionary comments.

Defendants included insufficient cautionary language with their remaining forward-looking statements.  In the February 24, 2016 earnings call, Diana Sroka, Head of Investor Relations for HP, opened the call with the following warning:

> As always, elements of this presentation are forward-looking and are based on our best view of the world and our businesses as we see them today.  For more detailed information, please see disclaimers in the earnings materials relating to forward-looking statements that involve risks, uncertainties, and assumptions.  For a discussion of some of these risks, uncertainties, and assumptions, please refer to HP's SEC reports, including our most recent Form 10-K.  HP assumes no obligation and does not intend to update any such forward-looking statements.  We also note that the financial information discussed on this call reflects estimates based on information available at this time and could differ materially from the amounts ultimately reported in HP's Form 10-Q for the fiscal quarter ended January 31, 2016.

(Dkt. No. 71-5, Ex. 5, at 1.)  Sroka repeated a nearly identical warning statement at the outset of the May 25, 2016 earnings call, (Dkt. No. 71-6, Ex. 6, at 1), and, before the March 1, 2016 presentation, an IP hardware analyst with Morgan Stanley repeated the warning.  (Dkt. No. 71-7, Ex. 7, at 4.)  The reference to warnings in HP's recent SEC filings sufficiently incorporates the warnings therein.  *See Clorox Co.*, 353 F.3d at 1133 (incorporating content of Form 10-K and noting that "the PSLRA does

---

[4] Maryland Electrical does not allege in the Consolidated Complaint that the risk statements were themselves misleading.  However, whether the risk statements were misleading is relevant for the sufficiency analysis.

United States District Court
Northern District of California

not require that the cautions physically accompany oral statements" if the oral statement "is accompanied by an oral statement that additional information. . . is contained in a readily available written document").

HP argues that the following language in its September 2015 Form 10-K was meaningful cautionary language under the PSLRA:

- "This Annual Report on Form 10-K. . . contains forward-looking statements that involve risks, uncertainties and assumptions.  If the risks or uncertainties ever materialize or the assumptions prove incorrect, the results of HP Inc. . . . may differ materially from those expressed or implied by such forward-looking statements and assumptions."  (Dkt. No. 71-1, Ex. 1, at 3.)
- "Successfully managing the interaction of our direct and indirect channel efforts to reach various potential customer segments for our products and services is a complex process. . . [O]ur failure to implement the most advantageous balance in the delivery model for our products and services could adversely affect our revenue and gross margins." (*Id.* at 22.)
- "Our financial results could be materially adversely affected due to distribution channel conflicts or if the financial conditions of our channel partners were to weaken." (*Id.*)
- "If we have excess or obsolete inventory, we may have to reduce our prices and write down inventory." (*Id.* at 23.)

In support of their argument that the above warnings were "more than sufficient," Defendants cite *Police Retirement System of St. Louis v. Intuitive Surgical, Inc. ("PRS")*, 759 F.3d 1051 (9th Cir. 2014).  In that case, the Ninth Circuit found that the defendant company's statements regarding growth and financial health were non-actionable "forward-looking statements or garden variety corporate optimism." *Id.* at 1055.  The forward-looking statements in that case were accompanied by the following disclaimer:

> Before we begin, I would like to inform you that comments mentioned on today's call may be deemed to contain forward-looking statements.  Actual results may differ materially from those expressed or implied, as a result of certain risks and uncertainties. These risks and uncertainties are described in detail in the company's [SEC] filings. Prospective investors are cautioned not to place undue reliance on such forward-looking statements.

*Id.* at 1059.  HP's boilerplate language at the outset of its 10-K closely tracks that of *PRS*. *Compare* Ex. 1, at 3 ("If the risks or uncertainties ever materialize or the assumptions prove incorrect, the results. . .may differ materially") *with PRS*, 759 F.3d at 1050 ("results may differ materially. . . as a result of certain risks and uncertainties").

United States District Court
Northern District of California

Yet, here, the cautionary language is not enough.  The boilerplate cautionary statements in *PRS* served as an effective warning regarding "classic growth and revenue projections," along with three assertions about the defendants' rosy outlook for the future growth of the field generally.  *Id.* at 1058-59.  Here, in contrast, the alleged misstatements and omissions related to the Supplies revenue stabilizing by the end of 2017, which Maryland Electrical avers Defendants knew was impossible without significant inventory reduction.  Defendants' boilerplate warning and identification of suboptimal channel inventory as a potential future risk did not adequately convey the risks posed by then-existing oversaturated inventory channels.  *See Alphabet*, 1 F.4th at 703 (finding risk disclosures insufficient where Defendants warned security vulnerabilities could pose risk but did not disclose existing security risk).  The warning regarding channel inventory in the abstract thus does not bring Defendants' statements into the PSLRA's safe harbor.

### iii. Maryland Electrical Does Not Adequately Alleges HP, Weisler, and Lesjak Were Aware the Statements Were False When Made.

Defendants claim that Maryland Electrical fails to plead facts showing they knew HP was not "on track" to stabilize Supplies revenue by the end of 2017, particularly given that HP did stabilize Supplies revenue in 2017.  Maryland Electrical responds that Defendants had actual knowledge and that the Supplies revenue stabilization in 2017 came only after "HP had completely overhauled its sales model and took a $700 million Supplies inventory reduction." (Dkt. No. 74, Opp., at 23 n.19.)

Maryland Electrical does not point to any particular allegations to support that Weisler and Lesjak had actual knowledge of the statements' falsity when made.  Accordingly, the forward-looking Supplies revenue statements are protected by the PSLRA's safe harbor.

### c. Plaintiffs Adequately Allege the Supplies Pricing and Margins Statements and Omissions Were Misleading.

Maryland Electrical contends that Defendants misled shareholders by attributing declines in Supplies pricing and margin to "a competitive pricing environment" and "unfavorable currency impacts" caused by the weaker Japanese yen.  (Consol. Compl., ¶¶ 43, 95, 98-100, 102, 105, 106, 109, 112-15.)  Defendants HP, Weisler, and Lesjak repeated that competition in pricing and

United States District Court
Northern District of California

1   currency headwinds were "driving" declines in various SEC filings and earnings calls through

2   June 3, 2016.  (*Id.*)

3         Defendants argue that Maryland Electrical fails to plead particularized facts demonstrating

4   that these statements were misleading.  In particular, Defendants argue that Maryland Electrical

5   "invents" allegations that the undisclosed acceleration scheme was the primary driver of declining

6   margins.  Citing their own exhibits, Defendants argue that the "undisputed facts" are that the

7   "primary factors" causing declining margins were "unfavorable currency impacts" and a

8   "competitive pricing environment," and any excess channel inventory build-up existed only

9   because of HP's transition from a "push" to a "pull" model for sales.  (Mot. at 16.)

10        At this stage, Court must construe all well-pleaded facts in light of Maryland Electrical.

11   Maryland Electrical pleads that Defendants were forced to switch from a "push" to a "pull" model

12   of sales because HP had oversaturated its Supplies channel inventory to the point where some

13   partners would not "place orders at any price."  (Consol. Compl., ¶ 57.)  Although Defendants

14   claim that Maryland Electrical speculates without foundation, Maryland Electrical properly relies

15   on the SEC Order and internal company emails to cross the line into plausibility.  Defendants'

16   fact-based arguments are more appropriately tested with the benefit of discovery at a later stage.

17        Maryland Electrical alleges sufficient facts to support its position that Defendants'

18   repeated references to currency and competitive pricing as the primary causes of decline were

19   materially misleading to a reasonable investor.  Currency rates and pricing decisions by

20   competitors are temporary problems outside of HP's control.  The acceleration scheme, in

21   contrast, was within Defendants' control.  By omitting the scheme, Defendants "hid the ball" and

22   misrepresented HP's true health.  *See In re Atossa Genetics Inc Sec. Litig.*, 868 F.3d 784, 797 (9th

23   Cir. 2017) (holding that "though not literally false, the alleged omissions in [defendant's] Form 8-

24   K filing were misleading.").

25             **d.      Maryland Electrical Pleads Sufficient Facts to Show that Some, but Not
                          All, Channel Inventory Statements and Omissions Were Misleading.**
26

27        Maryland Electrical contends that Defendants misled shareholders when HP, Weisler, and

28   Lesjak represented that Supplies channel inventory was declining and "slightly above" or "within"

United States District Court
Northern District of California

the target range and on the decline.  (Consol. Compl., ¶¶ 120, 122-23, 125-26, 129-30, 142.)

Defendants claim that these "slightly above" range statements were consistent with HP's reduction

of inventory.  Defendants also claim that Maryland Electrical fails to plead facts showing that HP

had $250 million-$700 million in excess inventory at the time the statements were made, and thus

the allegations amount to "fraud by hindsight."  Defendants also contend that they had no

obligation to disclose Tier 2 inventory because HP lacked visibility into Tier 2.

### i.     The "Slightly Above" Range Statements Were Misleading.

Weisler and Lesjak reported that HP was "slightly above [its] target weeks of supply

range" on November 24, 2015, February 24, 2016, and March 1, 2016.  (Consol. Compl., ¶¶ 120,

123, 126.)  Along with those statements, they disclosed the need for "channel inventory

correction" to return to targeted ranges.  (*E.g.*, *id.* at ¶ 123 ("On the Supplies side, we are still

slightly above our targeted range, and so we do need some additional channel inventory correction

in Q2, but we will be through that by the end of the first half [of FY 16]").)  They also stated that

inventory was being "reduced," for an overall impression that channel inventory may have been

too high but was trending in the right direction.  (*See id.* ¶¶ 120, 122-23, 126.)  According to

Maryland Electrical, these statements defied a known trend that Supplies channel inventory was

increasing due to the acceleration scheme.  (*Id.* ¶ 85.)

The "slightly above" statements appear innocuous and consistent in isolation, but they

were misleading when considered in context with assurances that Supplies channel inventory was

trending in the right direction.  Maryland Electrical plausibly alleges that, at the time, Supplies

channel inventory was increasing.  Maryland Electrical further alleges that Defendants had

"robust" real-time knowledge of the increasing supplies channel inventory through weekly reports,

regular monitoring, and "thorough" Tier 2 inventory estimates.  (*See id.* ¶¶ 64, 166, 182.)

Accordingly, the Court finds that Maryland Electrical has plausibly alleged the "slightly

above" range statements were misleading.

### ii.     The "Within" Range Statements Were Not Misleading.

On May 25, 2016, Weisler and Lesjak informed investors on an earnings call that

"[S]upplies inventory is now back within the [target] ranges globally."  (Consol. Compl. ¶ 142;

United States District Court
Northern District of California

*see id.* ¶¶ 129, 130.)  The next month, HP announced it was transitioning to a new sales model and would need to reduce channel inventory by an additional $450 million.  (*Id.* ¶ 69.)

As Defendants point out, Maryland Electrical does not allege that Lesjak's June 21, 2016 statement that inventory was at "the right levels" for the push model was false.  (Dkt. No. 71-9, Ex. 9, at 6.)  In that conference call, Lesjak explained that HP had "spent significant time evaluating what [it] believe[d] those levels need to be to mitigate the market challenges," which resulted in a reduction in goal levels.  (*Id.* at 3.)  Maryland Electrical does not point to specific allegations regarding whether HP's target ranges were in fact not met.  Although the Court does not consider Lesjak's statement for its truth, the statement illuminates a gap in the pleadings: were the target ranges met, or is Maryland Electrical's grievance that the target ranges were unreasonable?  The Court cannot determine this answer from the Consolidated Complaint.

### iii.    The Tier 2 Omissions Were Misleading.

When Defendants discussed Supplies channel inventory with the public, they disclosed information relating only to Tier 1, not Tier 2, channels.  Plaintiffs claim this omission was misleading because Defendants had actual knowledge that Tier 2 was oversaturated and were actively engaged in an improper scheme to push Tier 1 inventory into Tier 2.  Defendants claim that they lacked visibility into Tier 2 and point to the SEC's allegation that HP had "incomplete data."  (SEC Order ¶ 15.)

Defendants reason that investors would not have benefited from incomplete data into which HP lacked visibility, citing *West v. eHealth, Inc.*, No. 3:15-CV-00360-JD, 2016 WL 948116, at *6 (N.D. Cal. Mar. 14, 2016).  In that case, defendants stopped reporting conversion rates (the rate at which "applicants . . . [became] premium-paying members") because of increased unpredictability.  *Id.* at **4, 6.  Plaintiffs alleged that the increased variability of conversion rates necessarily meant prior reports of conversion rates lacked a reasonable basis, while also alleging that defendants should have continued to report the rates.  *Id.* at *6.  The court disagreed, noting, "from the context, it is clear that [defendant] was discussing the need to more fully understand the reasons that the company had been struggling to collect commissions, not [defendant's] lack of ability to estimate the conversion rate altogether."  *Id.*  In that context, where defendants did not

United States District Court
Northern District of California

United States District Court
Northern District of California

understand the factors behind the numbers, it was "implausible that defendants could have avoided misleading their investors by disclosing more information about a metric that defendants could not accurately measure." *Id.*

Context is everything. Maryland Electrical alleges that Defendants had robust insight into Tier 2 channel inventories, whereas the plaintiffs in *eHealth* argued that defendants lacked insight into the conversion rates. *See id.* Maryland Electrical contends that Defendants actively monitored Tier 2 inventory, including through weekly reports, whereas the plaintiffs in *eHealth* believed defendants had no basis for their estimates. (*See* Consol. Compl. ¶¶ 166, 170.) Per the Consolidated Complaint, Defendants knowingly pushed sales managers to artificially depress Tier 1 inventory by pushing inventory into Tier 2, including through simultaneous sales to Tier 2 distributors and unreasonably high discounts. (*See id.* ¶¶ 32, 59, 60.) Although the SEC Order states that HP lacked "meaningful insight into its overall channel health," (SEC Order ¶ 48), other allegations in the SEC Order indicate that HP estimated its Tier 2 inventory quarterly, (*id.* ¶ 15), and that certain personnel within HP were aware of "unhealthy levels of stock" in Tier 2, (*id.* ¶¶ 21, 48). The SEC further found that, because of the channel saturation in Tier 2, HP offered steep discounts to Tier 1 partners in exchange for holding inventory. (*Id.* ¶ 32.) All of these pieces gave Defendants a basis for the estimated Tier 2 inventory.

With this knowledge in hand, Defendants failed to disclose that commentary regarding channel inventory levels included only Tier 1 analysis. (*Id.* ¶ 20.) This omission—and the omission of Defendants' well-supported insights into Tier 2—could have materially misled a reasonable investor.

### e. The APJ Growth Statements and Omissions Were Not Misleading.

Maryland Electrical contends that Defendants made material misrepresentations by touting revenue growth in APJ while revenue declined in every other region because (i) the growth was a result of the acceleration scheme, and (ii) the APJ growth cannibalized revenue in other regions. (Consol. Compl., ¶¶ 137-38, 144-45.) Maryland Electrical specifically challenges the following statements:

- By Weisler, on a February 24, 2016 earnings call: "[W]hile revenue continued to be

challenged by market contraction in PCs and core printing, we delivered constant currency revenue growth in APJ. . ." (*Id.* ¶ 137);

- In the presentation accompanying the February 26, 2016 earnings call, a visual highlighting that APJ revenue had increased 2% on a constant currency basis, compared with year-over-year revenue declines of at least 6% in the other regions, (*id.* ¶ 138);

- By Weisler, on a May 25, 2016 earnings call: "I am pleased with our second quarter results. . . . Amid difficult market conditions, net revenue was in line with our expectations, down 11% year-over-year as reported or down 5% in constant currency. And in APJ for the second quarter in a row we delivered constant currency revenue growth with strength in personal assistance across much of the region." (*Id.* ¶ 144);

- In the presentation accompanying the May 25, 2016 earnings call, a visual highlighting that APJ revenue had increased 1% on a constant currency basis, compared with year-over-year revenue declines of at least 6% in the other regions, (*id.* ¶ 145).

Defendants claim that these statements are not misleading because "general descriptions of historical results. . . do not represent anything about the causes of that performance."  (Mot. at 17 (quoting *In re Apple Inc. Sec. Litig.*, No. 19-CV-02033-YGR, 2020 WL 2857397, at *10 (N.D. Cal. June 2, 2020)).  Defendants argue they were not required to list every reason for the growth.

Descriptions of general historical results are actionable where a speaker goes beyond reporting the results to provide specific factors contributing to the numbers but omits "adverse information that cuts against the positive information."  *Apple*, 2020 WL 2857397, at *11 (quoting *Khoja*, 899 F.3d at 1009).  In *In re Plantronics, Inc. Sec. Litig.*, for example, the court found that defendants' failure to disclose its acceleration scheme was actionable where the defendants attributed growth to an acquisition, new product releases, and organic growth.  No. 19-CV-07481-JST, 2022 WL 3653333, at **9-11 (N.D. Cal. Aug. 17, 2022).

Maryland Electrical fails to identify any misrepresentations attributing the growth in APJ to a particular source.  In the four representations it challenges, Defendants reported the APJ region's increased revenue, but did not provide reasons for the divergent growth.  (*See* Consol. Compl., ¶¶ 137-38, 144-45.)  Accordingly, as pleaded, the statements are not actionable.

### 3. The Allegations in the Consolidated Complaint Support a Strong Inference of Scienter.

"A [securities] complaint will survive a motion to dismiss only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Prodanova*, 993 F.3d at 1106 (quoting *Tellabs, Inc. v.*

*Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007)) (internal marks omitted).  "At least as compelling" does not mean "more compelling than."  *See Tellabs*, 551 U.S. at 324 ("The inference that the defendant acted with scienter need not be irrefutable . . . or even the most plausible of competing inferences.") (internal marks omitted).

The Ninth Circuit has already determined that the Consolidated Complaint adequately alleges scienter.  *York Cnty.*, 65 F.4th at 468.  Under the law of the case doctrine and as binding precedent, the Ninth Circuit's determination controls.  *Grand Canyon Tr. v. Provencio*, 26 F.4th 815, 821 (9th Cir. 2022).  Defendants' protests that the Ninth Circuit left the question for another day contradict the text of the order, which expressly considered the competing inferences from the SEC Order and found a strong inference of scienter.  *York Cnty.*, 65 F.4th at 468 (holding that "the SEC's decision not to charge a defendant with fraud does not hurt a plaintiff's ability to plead a strong inference of scienter" and that HP's disclosures "contradicted its own internal data. . . creat[ing] a strong inference that HP knowingly misled the public as to the state of the company.") (internal quotations omitted).  Accordingly, Defendants' motion is denied as to scienter.

### 4.    The Consolidated Complaint Adequately Alleges Loss Causation.

A securities plaintiff must allege that defendants proximately caused her damages via a "short and plain statement" under Rule 8(a).  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005).  Generally, the plaintiff must claim that the defendant company's "share price fell significantly after the truth became known." *Id.*  Here, Maryland Electrical alleges that, as a result of partial disclosures and the public inventory reduction necessitated by the acceleration scheme, HP stock prices declined.  (Consol. Compl., ¶¶ 199-208.)  Defendants contend these allegations are not sufficient.

First, Defendants claim that Maryland Electrical fails to identify challenged statements that were corrected by subsequent disclosures of the fraud.  According to Defendants, it is "impermissible" to "assume that  every challenged statement was corrected" without specific correcting disclosures.  (Mot. at 25.)  This is not the law.  In *Mineworkers' Pension Scheme v. First Solar Inc.*, the Ninth Circuit held that the proximate cause inquiry is context dependent and fact specific.  881 F.3d 750, 754 (9th Cir. 2018).  The Court noted that "[a] plaintiff may. . . prove

United States District Court
Northern District of California

loss causation by showing that the stock price fell upon the revelation of an earnings miss, even if the market was unaware at the time that fraud had concealed the miss." *Id.* Here, Maryland Electrical claims that Defendants fraudulently misrepresented and omitted the Supplies channel inventory, the largest source of income for HP. When Defendants announced inventory corrections and revenue declines, stock prices dropped—even though the acceleration scheme was not known at the time. This is sufficient.

Defendants next argue that an intervening event, not the alleged fraud, caused the declines. Defendants point to the transition from a "push" to a "pull" model as the source of the inventory reductions, as opposed to the acceleration scheme. They contend that Maryland Electrical "alleges no facts calling into question" this reasoning. (Mot. at 26.) Not so. Maryland Electrical alleges that the change was implemented because of the need to correct oversaturated inventory channels caused by the acceleration scheme. This allegation is plausible.

Finally, Defendants contend that inventory reduction could not have been the cause of stock decline because the stock price did not decline after the May 2016 announcement. This contention has no basis in the Consolidated Complaint. Defendants are free to challenge the stock price changes after discovery, but they may not bring in extraneous and unsupported factual allegations to support a motion to dismiss under Rule 12(b)(6).

**F.      The Court Denies Defendants' Motion to Dismiss the Section 20(a) Claim.**

Defendants' motion to dismiss the Section 20(a) claim is based entirely upon its contention that Maryland Electrical failed to plead a violation of Section 10(b). Because the Court finds that the Section 10(b) claim survives, in part, Defendants' argument fails. The motion to dismiss the Section 20(a) claim is thus denied.

## CONCLUSION

For the seasons set forth above, the Court grants, in part, and denies, in part, Defendants' renewed motion to dismiss, as follows:

- Maryland Electrical has standing;

- York County is no longer a party to this action;

- The action is not barred by the statute of repose as to Defendants HP, Weisler, or

Lesjak;

- The statute of repose shields Defendants Lores and Bailey from liability for actions or statements prior to April 21, 2016;

- Maryland Electrical alleges a scheme liability claim under Section 10(b) and Rule 10b-5(a) and (c) against Bailey and HP, but not against the remaining Defendants;

- Maryland Electrical's statement liability claim under Section 10(b) and Rule 10b-5(b) is dismissed as to the Supplies revenue statements and omissions, the "within range" channel inventory statements and omissions, and the APJ growth statements and omissions.  Maryland Electrical stated a claim as to Defendants HP, Weisler, and Lesjak for the remaining statements and omissions;

- Maryland Electrical's statement liability claim under Section 10(b) and Rule 10b-5(b) is dismissed as to Lores and Bailey;

- Maryland Electrical adequately alleges scienter and loss causation; and

- Defendants' Motion to Dismiss Maryland Electrical's Section 20(a) claim is denied because the Section 10(b) claim survives, in part.

Maryland Electrical may file an amended pleading, if it so chooses, by April 17, 2024.

The Court HEREBY ORDERS the parties to appear for a Case Management Conference on June 7, 2024.  The parties shall submit an updated Joint Case Management Statement no later than May 31, 2024.

**IT IS SO ORDERED.**

Dated: March 27, 2024

_____
JEFFREY S. WHITE
United States District Judge